UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| | Case No. 24-cv-361-RGA |
| The Chemours Company Securities Litigation, | |
| | <u>CLASS ACTION</u> |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

NATURE OF THE ACTION.................................................................................... 1

JURISDICTION AND VENUE............................................................................... 6

PARTIES ................................................................................................................. 7

ALLEGATIONS OF MISCONDUCT .................................................................. 9

   **A.**   Background Of Chemours. ....................................................................... 9

   **B.**   For Financial Information to be Useful, it Must Faithfully Represent What it Purports to Represent.......................................................................... 10

   **C.**   Chemours' Code of Ethics for its CEO, CFO, and Controller Requires Those Officers to "Promote Full, Fair, Accurate, Timely and Understandable Disclosure" in Documents Filed with the SEC and Other Public Statements. .............................. 11

   **D.**   The SEC has Made Clear That it is Misleading to Investors When a Company Does Not Disclose that it Altered its Normal Operations in an Effort to Meet a Previously Communicated Guidance for a Financial Metric. ....................................... 11

   **E.**   Cash Flow Metrics are Important to Investors........................................... 13

   **F.**   Chemours Indicated to Investors that Free Cash Flow was one of the Company's Most Important Financial Metrics. ............................................................ 14

   **G.**   Defendants began the Class Period by Announcing $447 Million in Free Cash Flow for the Year 2022 and $1.5 Billion in Free Cash Flow Over the Last Three Years.. 15

   **H.**   Defendants Announced Negative $210 Million Free Cash Flow and Negative $119 Million in Cash Provided by Operating Activities for the First Quarter of 2023, but Affirmed Free Cash Flow Guidance of Over $350 Million for 2023......................... 16

   **I.**   The 2022 10-K and Class Period 10-Qs Stated that Chemours Had Effective Disclosure Controls and Procedures and Internal Control Over Financial Reporting. ........................................................................................... 17

   **J.**   Chemours Admitted that its Ineffective Internal Controls Allowed the Individual Defendants to Manipulate Free Class Flow During the Class Period, Violating the Company's Code of Ethics for the CEO, CFO, and Controller. ................................ 19

1)   On February 13, 2024, Chemours Announced that it was Delaying its Financial Results for the Fourth Quarter and Full Year of 2023 Because it was Evaluating its Internal Control Over Financial Reporting. .......................................................... 19

2)   On February 29, 2024, Chemours Shocked Investors by Placing Defendants Newman, Lock, and Wisel on Administrative Leave Pending an Internal Review Concerning the Company's Practices for Managing Working Capital and Admitting that it was Evaluating One or More Weaknesses in its Internal Controls. ...................................................................................................................... 20

3)   Chemours' Internal Investigation Found that Defendants had Violated Chemours' Code of Ethics by Manipulating the Timing of Payables and Receivables in an Effort to Meet Publicly Communicated Free Cash Flow Targets and Increase their Incentive Compensation. ........................................................................................... 21

4)   Following the Resignation of Defendant Newman, Chemours Finally Filed its 2023 10-K, which Admitted that Defendants had Manipulated the Timing of $360 million and $215 million in Cash Provided by Operating Activities in 2023 and 2022, Respectively, and that Chemours' Internal Control over Financial Reporting was not Effective. ..................................................................................................... 23

5)   The Extensive Remediation Plan and Risk Factors in Chemours' 2023 10-K Along with Company's Admission that it is Being Investigated by the SEC and U.S. Attorney's Office for the Southern District of New York Further Supports the Materiality of Defendants' Misstatements ..................................................................... 28

6)   Defendant Lock Resigned all his Positions at Chemours and the Company Appointed a New Permanent CFO and Principal Accounting Officer .................. 32

K.   According to Former Employees, Chemours' Manipulation of Payables and Receivables at the End of the Year was Long-Running and Broad-Based .............. 32

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ............................................................................................................ 35

A.   Free Cash Flow Misstatements. ......................................................................... 35

1)   The February 9, 2023 Press Release and 8-K ..................................................... 35

2)   The 2022 10-K .......................................................................................................... 39

3)   The 4Q 2022 Earnings Call and Presentation. ......................................................... 41

4)   The 2023 Proxy Statement ..................................................................................... 50

5)   The April 27, 2023 Press Release and 8-K .......................................................... 51

6)    The 1Q23 10-Q ........................................................................................ 52

7)    The 1Q 2023 Earnings Call and Presentation ...................................... 54

8)    The July 27, 2023 Press Release and July 28, 2023 8-K ..................... 58

9)    The 2Q23 10-Q ........................................................................................ 59

10)   The 2Q 2023 Earnings Call and Presentation ...................................... 61

11)   The October 26, 2023 Press Release and 8-K ...................................... 64

12)   The 3Q23 10-Q ........................................................................................ 65

13)   The 3Q 2023 Earnings Call and Presentation ...................................... 68

B.    Internal Controls Misstatements. ................................................................... 70

C.    Code of Ethics Misstatements. ........................................................................ 78

ADDITIONAL SCIENTER ALLEGATIONS ............................................................ 79

A.    The Individual Defendants Had Motives to Mislead Investors. .................. 79

1)    The Individual Defendants Had a Motive to Make Their Misleading Statements
      Because Free Cash Flow was a Key Metric for Determining Their Incentive
      Compensation. ........................................................................................ 79

2)    The Individual Defendants Were Motivated to Make Their Misleading Statements
      Because They Wanted to Meet Publicly Communicated Free Cash Flow Targets 81

3)    Defendant Ralhan Filed Form 144s During the Class Period Indicating his intent
      to Sell Millions of Dollars of Chemours Common Stock at Inflated Prices. .......... 82

B.    The Defendants Acted Knowingly or Recklessly. ......................................... 82

1)    Defendant Newman Acted Knowingly or Recklessly. ........................... 82

2)    Defendant Lock Acted Knowingly or Recklessly. ................................. 84

3)    Defendant Wisel Acted Knowingly or Recklessly. ................................ 86

4)    Defendant Ralhan Acted Knowingly or Recklessly. ............................. 87

5)     The Magnitude of the Cash Flow Manipulation and Coordination Required Strongly Supports the Scienter of Each Individual Defendant. ............................. 88

C.     The Individual Defendants Acted Intentionally or Recklessly When They Approved and Failed to Correct the Aforementioned Misstatements. ......................................... 89

D.     There is a Strong Inference that Chemours Acted with Scienter. .............................. 89

DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD INVESTORS ....................... 90

LOSS CAUSATION ............................................................................................................... 91

PLAINTIFFS' CLASS ACTION ALLEGATIONS ............................................................. 92

COUNT I ................................................................................................................................. 95

For Violations of Section 10(b) And Rule 10b-5(b) Promulgated Thereunder Against All Defendants ........................................................................................................... 95

COUNT II ................................................................................................................................ 97

Violations of Section 10(b) of the Securities Exchange Act of 1934  and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants ................................... 97

COUNT III .............................................................................................................................. 99

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ........ 99

PRAYER FOR RELIEF ....................................................................................................... 100

JURY TRIAL DEMANDED ................................................................................................. 100

Lead Plaintiff Cindy Nguyen ("Nguyen") and Named Plaintiffs Todd Masel ("Masel") and Jim Hayes ("Hayes") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, public filings, wire and press releases published by and regarding The Chemours Company ("Chemours" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of persons or entities who (a) purchased publicly traded Chemours common stock between February 10, 2023 and February 28, 2024, both dates inclusive (the "Class Period"), and suffered compensable damages thereby; (b) purchased publicly traded Chemours call options during the Class Period and suffered compensable damages thereby; and/or (c) sold publicly traded Chemours put options during the Class Period and suffered compensable damages thereby, (collectively the "Class").[1]

2.      Headquartered in Wilmington, Delaware, Chemours is an industrial and specialty chemical company that serves, among others, the "coatings, plastics, refrigeration and air

---

[1] Excluded from the Class are: Defendants and their immediate families; the officers and directors of Chemours at all relevant times; their subsidiaries, affiliates, legal representatives, heirs, successors, or assigns; and any entity in which Defendants or any excluded persons have or had a controlling interest.

conditioning, transportation, semiconductor and consumer electronics, general industrial, and oil and gas" markets. Chemours' common stock trades in the United States on the New York Stock Exchange ("NYSE") under the ticker symbol "CC."

3.      The Class Period begins on February 10, 2023, to coincide with the announcement of Chemours' fourth quarter and full year 2022 financial results after the market closed on February 9, 2023. Chemours announced Free Cash Flow (defined as Cash Flow Provided by Operations[2], less purchases of property, plant, and equipment) of $447 million for the full year 2022, "demonstrating [Chemours'] continuing ability to generate strong Free Cash Flow."

4.      Chemours reiterated its 2022 Free Cash Flow when it filed its 2022 annual report on Form 10-K (the "2022 10-K") with the Securities and Exchange Commission ("SEC") on February 10, 2023. In connection with the 2022 10-K, the Company's Chief Executive Officer ("CEO"), Defendant Mark Newman, and then-Chief Financial Officer ("CFO"), Defendant Sameer Ralhan, certified that the 2022 10-K "***does not contain any untrue statement of a material fact or omit to state a material fact*** necessary to make the statements made…not misleading" and that "the financial statements, and other financial information included in this report, ***fairly present***…the financial condition, results of operations and ***cash flows*** of the registrant as of, and for, the periods presented in this report." (emphasis added).

5.      Furthermore, Chemours' 2023 Proxy Statement stressed the importance of Free Cash Flow to the Company, explaining that the Company's incentive compensation plan for

---

[2] Chemours uses the terms "Cash Flows Provided by Operating Activities", Cash Flows Provided by (used for) Operating Activities", "Cash Provided By Operating Activities", and  "Operating Cash flow" interchangeably in their public filings and statements and they are used interchangeably in this Amended Complaint.

Named Executive Officers focused "***on the key areas that produce long-term sustained growth specifically***, Adjusted EBITDA and ***Free Cash Flow***." (emphasis added).

6.      Chemours continued to report Free Cash Flow and Cash Flows Provided by Operating Activities results throughout the Class Period. Each of the Company's quarterly financial reports filed on Form 10-Q with the SEC during the Class Period contained substantially identical certifications to those set forth above from Defendants Newman, Ralhan (first quarter of 2023), and Jonathan Lock (second and third quarters of 2023).

7.      For the first quarter of 2023, Chemours reported notably weak Free Cash Flow results — negative $210 million based on negative $119 million in Cash Provided By Operating Activities.

8.      Despite this weak start, the Company provided investors with a Free Cash Flow guidance of greater than $350 million based on greater than $750 million in Cash Flows Provided by Operating Activities for the full-year of 2023. The Cash Flows Provided by Operating Activities guidance was almost identical to the $754 million that Chemours had reported for 2022.

9.      To reassure investors about the weak start, Defendants told them, among other things, that it was caused by the pattern of seasonality of Chemours' business.

10.     Chemours' 2022 10-K and the 10-Qs from the Class Period also all stated that "the CEO and CFO have concluded that…disclosure controls and procedures are effective at the reasonable assurance level" and each attached certifications stating that the certifying officer had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

11.     On February 13, 2024, investors began to learn the truth when Chemours announced that it had postponed the release of its 2023 financial results "because it need[ed]

additional time to complete its year-end reporting process" and was **"*evaluating its internal control over financial reporting . . . with respect to maintaining effective controls related to information and communications*."** (emphasis added). Chemours further revealed that it needed additional time for its Audit Committee to conduct a related internal review.

12.     In response to this, the price of Chemours common stock dropped $3.85 per share or more than 12%, harming investors.

13.     Then, before the market opened on February 29, 2024, Chemours stunned investors when it announced that it was delaying the filing of its annual report for 2023 and that its Board of Directors had "***place[d] President and Chief Executive Officer Mark Newman, Senior Vice President and Chief Financial Officer Jonathan Lock and Vice President, Controller and Principal Accounting Officer Camela Wisel on administrative leave*** . . . pending the completion of an internal review being overseen by the Audit Committee of the ***Board of Directors with the assistance of independent outside counsel[.]*"** (emphasis added).  The scope of the investigation include[d] "the processes for reviewing reports made to the Chemours Ethics Hotline" and Chemours' "***practices for managing working capital, including the related impact on metrics within the Company's incentive plans [and] certain non-GAAP metrics***" in the Company's financial reports. (emphasis added). The Company also acknowledged that it was "***evaluating one or more potential material weaknesses in its internal control over financial reporting***……including the effectiveness of the 'tone at the top' set by certain members of senior management." (emphasis added).

14.     In response to this, Chemours common stock plummeted $9.05 per share, or more than 31%, again harming investors.

4

15.    On March 6, 2024, after the end of the Class Period, the Company disclosed that the Board's Audit Committee concluded "that the members of senior management who were placed on administrative leave last week engaged in efforts in the fourth quarter of 2023 to delay payments to certain vendors that were originally due to be paid in the fourth quarter of 2023 until the first quarter of 2024, and to accelerate the collection of receivables into the fourth quarter of 2023 that were originally not due to be received until the first quarter of 2024." The Audit Committee also determined that "similar actions…were taken in the fourth quarter of 2022, resulting in a significant increase in these cash flow measures for the quarter ended December 31, 2022, and a decrease in these measures in the first quarter of 2023."

16.    Critically, ***"[t]he Audit Committee found that these individuals engaged in these efforts in part to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers***." (emphasis added). Manipulations of the Company's payables and receivables directly impact Chemours' Cash Provided by Operations, which then flows through into the Free Cash Flow metric.

17.    As a result, the Audit Committee found that Defendants Newman, Lock, and Wisel had showed "a ***lack of transparency with the Company's Board of Directors***" and  "***violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure***.'" (emphasis added).

18.    Later in March, when Chemours finally filed its 2023 10-K, the Company admitted that the combined accelerated collections and delayed payable totaled $215 million in 2022 — more than 28% of the $754 million of the Cash Provided by Operating Activities that Chemours

reported for the year and greater than the $161 million the Company reported for the entire fourth quarter of 2022. In 2023, the manipulation was even greater —  the $360 million in combined accelerated collections and delayed payables accounted for almost 65% of the $556 million of Cash Provided by Operating Activities that Chemours reported for 2023.

19.     The 2023 10-K also disclosed four internal control deficiencies, "relating to failure to set an appropriate tone at the top, design and maintenance of effective controls related to information and communication, design and maintenance of effective controls related to evaluation and escalation of reports made to the Chemours Ethics Hotline, and design and maintenance of effective controls related to vendor master data in order to prevent unauthorized cash disbursements."

20.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's common stock when the truth was revealed, Plaintiffs and other members of the Class have suffered significant damages.

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), because Chemours has its principal place of business here and is incorporated in Delaware.

24.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

25.     Lead Plaintiff Nguyen, as set forth in the certification submitted in connection with her lead plaintiff motion, incorporated by reference herein, purchased Chemours common stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

26.     Named Plaintiff Todd Masel, as set forth in his previously submitted certification, purchased Chemours common stock during the Class Period and Named Plaintiff Jim Hayes, as set forth in the attached certification, sold put options and purchased common stock during the Class Period. Named Plaintiffs made these transactions at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

27.     Defendant Chemours is incorporated in Delaware and its headquarters is located at 1007 Market Street Wilmington, Delaware 19801. Its common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "CC."

28.     Defendant Mark E. Newman ("Newman") served as the Company's Chief Executive Officer ("CEO") and President from July 2021 until the Company placed him on administrative leave on February 28, 2024. Prior to that, he served as the Company's Senior Vice President ("VP") and Chief Operating Officer ("COO") from June 2019 to June 2021 and its Senior VP and Chief Financial Officer ("CFO") from July 2015 to July 2019. Defendant Newman resigned his officer and director positions within the Company effective March 22, 2024, and was "not entitled to any severance, equity award vesting or other compensation in connection with his resignation, other than any rights he has to vested benefits under the terms of the Company's employee benefit plans."

7

29.     Defendant Sameer Ralhan ("Ralhan") served as the Company's CFO and Senior VP from June 2019 until June 19, 2023. Ralhan started working for the Company in November 2014 and, prior to becoming CFO, he served as a VP of Finance from May 2016 to June 2019.

30.     Defendant Jonathan Lock ("Lock") served as the Company's CFO and Senior VP from June 6, 2023 until the Company placed him on administrative leave on February 28, 2024. He joined Chemours in 2018 as VP of Corporate Development and Investor Relations and was promoted to an officer in 2021. Defendant Lock resigned from all positions at Chemours effective April 23, 2024, and was "not entitled to any severance, equity award vesting or other compensation in connection with his resignation."

31.     Defendant Camela Wisel ("Wisel") served as the Company's VP, Chief Accounting Officer and Controller and as the principal accounting officer for purposes of Chemours' filings with the SEC from September 29, 2021 until she was placed on administrative leave on February 28, 2024. Wisel started working at the Company in April in 2015, and prior to appointment as Chief Accounting Officer served as Vice President and Treasurer from September 2020 to September 2021.

32.     Defendants Newman, Ralhan, Lock, and Wisel are collectively referred to herein as the "Individual Defendants."

33.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

34.     Chemours and the Individual Defendants are collectively referred to herein as "Defendants."

## ALLEGATIONS OF MISCONDUCT

**A.  Background Of Chemours.**

35.     Chemours began operating as an independent, publicly-traded company in 2015 following its spin-off from E.I. du Pont de Nemours and describes itself as a "leading, global provider of performance chemicals that are key inputs in end-products and processes in a variety of industries."

36.     Chemours is an industrial and specialty chemical company which produces products for, among other things, the "coatings, plastics, refrigeration and air conditioning, transportation, semiconductor and consumer electronics, general industrial, and oil and gas" markets. It consists of three principle reportable segments: Titanium Technologies ("TT"), Thermal & Specialized Solutions ("TSS"), and Advanced Performance Materials ("APM").

37.      In its 2022 10-K, Chemours stated: "Our success depends on the performance of our key employees, including our senior management team....***[I]f we are unable to effectively***

9

*plan for the succession of our senior management team, our results of operations, financial condition, and cash flows could be adversely affected, as we may be unable to realize our business strategy.*" (emphasis added).

**B. For Financial Information to be Useful, it Must Faithfully Represent What it Purports to Represent.**

38.     The Financial Accounting Standards Board (the "FASB") is the independent, private sector, not-for-profit organization that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow Generally Accepted Accounting Principles ("GAAP"). The SEC recognizes the FASB as the designated accounting standard setter for public companies.

39.     According to the FASB's most recent conceptual framework for financial reporting, Statement of Financial Accounting Concepts No. 8, ("CON 8"), Ch. 3, "[i]f financial information is to be useful, it must be relevant *and faithfully represent what it purports to represent*. The usefulness of financial information is enhanced if it is comparable, verifiable, timely, and understandable." (emphasis added). CON 8, Ch. 5, further states that "[f]aithful representation … is a fundamental qualitative characteristic. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. Financial information that is faithfully represented must be complete, neutral, and free from error."

40.     CON 8, Ch. 7, also states: "Information about an entity's assets, liabilities, and equity *and their relationships to each other at a moment in time* helps users to assess the entity's liquidity, financial flexibility,  net resources available, the capability of generating future net cash flows, and exposures to risk. It also provides information about the entity's ability to meet its long-term financial obligations." (footnote omitted, emphasis added).

**C. Chemours' Code of Ethics for its CEO, CFO, and Controller Requires Those Officers to "Promote Full, Fair, Accurate, Timely and Understandable Disclosure" in Documents Filed with the SEC and Other Public Statements.**

41.     According to Chemours' 2022 and 2023 Schedule 14A Proxy Statements (the "2022 Proxy Statement" and the "2023 Proxy Statement"), the Company's "Code of Ethics for the CEO, CFO and Controller applies to those three executive officers. This Code sets forth the standards of conduct that the CEO, CFO and Controller must uphold while performing his or her duties."

42.     In fiscal years 2022 and 2023, "there were no waivers of any provisions of…the Code of Ethics for the CEO, CFO and Controller."

43.     The Standards of Conduct portion of the Chemours' Code of Ethics for the CEO, CFO, and Controller states that "[i]n performing his or her duties, the Chief Executive Officer, the Chief Financial Officer, and the Controller shall…***promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications*** made by the Company." (emphasis added).

**D. The SEC has Made Clear That it is Misleading to Investors When a Company Does Not Disclose that it Altered its Normal Operations in an Effort to Meet a Previously Communicated Guidance for a Financial Metric.**

44.     The SEC has made clear that it is misleading for a company to fail to disclose to investors that it altered its normal operations in an effort to meet a previously communicated guidance for a financial metric.

45.     For example, in 2019, Marvell Technology Group, Ltd. ("Marvell") agreed to settle *In the Matter of Marvell Technology Group, Ltd,* Administrative Proceeding File No. 3-19454, for $5.5 million dollars. In the agreed order resolving the case, dated September 16, 2019, the SEC alleged that "Marvell orchestrated a plan to accelerate, or pull-in, sales that had originally

been scheduled for future quarters to the current quarter in order to close the gap between actual and forecasted revenue, meet publicly-issued guidance, and mask declining sales."

46.    The SEC further stated that Marvell's failure to disclose that "a significant portion of its revenue had resulted from the use of pull-ins intended to meet the company's public revenue guidance" misled investors because, *inter alia*, "investors were left with the misleading impression that Marvell was able to meet its public guidance organically, through normal customer demand for its products" and "investors were unaware of the adverse impact that pull-ins were having on revenue and sales in future quarters."

47.    The SEC explained that Marvell's misleading statements were material because "[a] reasonable investor, in considering whether to purchase or sell Marvell securities, would have found it important that Marvell was using pull-ins to generate sales for the purpose of meeting publicly disclosed revenue targets and mask a significant downturn in sales, and that the pull-ins would adversely impact future revenue."

48.    Additionally, in 2021, Under Armour, Inc. ("Under Armour") agreed to settle *In the Matter of Under Armour, Inc.,* Administrative Proceeding File No. 3-20278 for $9 million dollars. In the agreed order resolving the case, dated May 3, 2021, the SEC alleged that "Under Armour sought to accelerate, or 'pull forward,' existing orders that customers had requested be shipped in future quarters that could be completed in the current quarter to close the gap between its internal forecasts and analysts' revenue estimates."

49.    The SEC further stated that by failing to disclose that "a significant portion of its revenue and revenue growth had resulted from the use of pull forwards", Under Armour mislead investors because, *inter alia*, "investors were left with a misleading impression of how Under Armour was meeting or beating analysts' revenue estimates." This was material because

"[i]nvestors were unaware that Under Armour's use of pull forwards was compromising its future revenue by shifting revenue from future quarters to the current quarter."

50.     Furthermore, it does not matter whether the financial metric in question is non-GAAP. Under 17 CFR § 244.100, "General rules regarding disclosure of non-GAAP financial measures," a registrant under the Exchange Act "shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure and any other accompanying discussion of that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading."

### E.  Cash Flow Metrics are Important to Investors.

51.     The statement of cash flows is a central component of an entity's financial statements, it provides key information about an entity's financial health and its capacity to generate cash.  According to GAAP, "[t]he primary objective of a statement of cash flows is to provide relevant information about the cash receipts and cash payments of an entity during a period." ASC 230-10-10-1. GAAP goes on to say that "[t]he information provided in a statement of cash flows, if used with related disclosures and information in the other financial statements, should help investors, creditors, and others (including donors) to do all of the following:

a.  Assess the entity's ability to generate positive future net cash flows

b.  Assess the entity's ability to meet its obligations, its ability to pay dividends, and its needs for external financing

c.  Assess the reasons for differences between net income and associated cash receipts and payments

d.  Assess the effects on an entity's financial position of both its cash and noncash investing and financing transactions during the period." ASC 230-10-10-2

52.    In a statement issued on December 4, 2023 by its Chief Accountant entitled "The Statement of Cash Flows: Improving the Quality of Cash Flow Information Provided to Investors," the SEC stressed the importance of cash flow reporting to investors. The Statement explained:

> The information presented in the statement of cash flows helps investors assess the issuer's potential to generate positive future net cash flows, meet its financial obligations, and pay dividends or otherwise return cash to investors. Investors also may use cash flow information to evaluate an issuer's need for external financing, to determine the reasons for differences between net income and associated cash receipts and payments, and to understand the effects of both its cash and noncash investing and financing transactions on an issuer's financial position.[4] In addition, cash flow information is often used as a proxy to understand earnings quality.[5] ***For these reasons, the statement of cash flows is a critical component of high quality financial reporting for investors.***

(emphasis added).

53.    The FASB's most recent conceptual framework for financial reporting, CON 8, concurs with the SEC about the importance of cash flow reporting, explaining, among other things, that "[i]nformation about cash flows helps users understand a reporting entity's operations, evaluate its financing and investing activities, assess its liquidity or solvency, and interpret other information about financial performance."

**F.    Chemours Indicated to Investors that Free Cash Flow was one of the Company's Most Important Financial Metrics.**

54.    Chemours' SEC filings define Free Cash Flow as "our cash flows provided by (used for) operating activities, less purchases of property, plant, and equipment as shown in our consolidated statements of cash flows." "Cash flows provided by (used for) operating activities" is a GAAP measurement which includes operating activities such as 'producing and delivering goods and providing services.'" ASC 230-10-20. Manipulations of the Company's accounts receivable and accounts payable directly impacts Chemours' cash flows provided by (used for) operating activities, which then flows through into the Free Cash Flow metric.

14

55.     In its 2022 10-K and 10-Qs from the Class Period, Chemours explained that it used "non-GAAP financial measures", including "Free Cash Flows", "***in order to clarify and provide investors with a better understanding of our performance*** when analyzing changes in our underlying business between reporting periods ***and provide for greater transparency*** with respect to supplemental information used by management in its financial and operational decision-making." (emphasis added). They further stated: "We believe the ***presentation of these non-GAAP financial measures***…***is a useful financial analysis tool that can assist investors in assessing our operating performance and underlying prospects***." (emphasis added).

56.     The 2022 10-K further acknowledged that the "***[f]ailure to meet some or all of our key financial and non-financial targets could negatively impact the value of our business and adversely affect our stock price***" and listed "free cash flows" as one of those targets. (emphasis in original).

57.     Additionally, Chemours' 2023 Proxy Statement states that the Company's incentive compensation plan for Named Executive Officers ("NEO") "focused the NEOs on the key areas that produce long-term sustained growth specifically, Adjusted EBITDA and Free Cash Flow." It further stated that "Management and the [Compensation and Leadership Development Committee] believe these measures reinforced the importance of earnings and cash generation to the achievement of Chemours' objectives, as well as their importance to shareholders."

58.     Finally, as discussed further below, Defendants discussed Free Cash Flow during every earnings call during the Class Period.

**G. Defendants began the Class Period by Announcing $447 Million in Free Cash Flow for the Year 2022 and $1.5 Billion in Free Cash Flow Over the Last Three Years.**

59.     On February 9, 2023, after the market closed, Defendants released Chemours' results for the full year of 2022. A press release attached to an 8-K filed with the SEC, announced

that Free Cash Flow for 2022 "was $447 million, demonstrating our continuing ability to generate strong Free Cash Flow." The press release also touted to investors that "Chemours had delivered over $1.5 billion in Free Cash Flow over the last three years"

60.    The February 9, 2023 8-K press release further stated in its "Full Year 2023 Outlook" that the Company's guidance for 2023 was "Free Cash Flow of greater than $350 million, including CAPEX of approximately $400 million to support TSS and APM growth investments." (footnote excluded.)

61.    The press release further indicated that Free Cash Flow guidance was based on a guidance of more than $750 million in Cash Flows Provided by Operating Activities for 2023, which was almost identical to the $754 million Cash Flows Provided by Operating Activities that Chemours reported for 2022. The predicted drop of Free Cash Flow from $447 million in 2022 to $350 million in 2023 was entirely based on a predicted increase in Purchases of property, plant, and equipment (CAPEX) to $400 million in 2023 from $307 million in 2022.

62.    Defendants also made statements touting Chemours 2022 Free Cash Flow and Cash Flows Provided by Operating Activities in, among other things, the Company's 2022 10-K and February 10, 2023 earning call.

**H.  Defendants Announced Negative $210 Million Free Cash Flow and Negative $119 Million in Cash Provided by Operating Activities for the First Quarter of 2023, but Affirmed Free Cash Flow Guidance of Over $350 Million for 2023.**

63.    On April 27, 2023, after the market closed, Defendants announced that ***Free Cash Flow for the first quarter of 2023 was negative $210 million***. The negative $210 million in Free Cash Flow was driven by ***negative $119 million in Cash Provided by Operating Activities***, which was a decline of $121 million from the $2 million that Chemours generated in Cash Provided by Operating Activities in the first quarter of 2022. Additionally, it was only the second time since

16

it became a publicly traded company that it had a first quarter with negative Cash Provided by Operating Activities.[3]

64.     Despite this, Chemours reaffirmed its 2023 Free Cash Flow guidance of $350 million on $750 million in Cash Flows Provided by Operating Activities.

65.     Defendants continued to report year-to-date Free Cash Flow[4] and Cash Provided by Operating Activities metrics throughout the rest of 2023. Those metrics continued to be weighed down by Chemours' poor first quarter. To explain this and reassure investors that the Company would meet its Free Cash Flow guidance, Defendants told investors that the Company's weak start to the year was because of the Company's "historical pattern of seasonality" and other aspects of Chemours' business.[5]

**I.    The 2022 10-K and Class Period 10-Qs Stated that Chemours Had Effective Disclosure Controls and Procedures and Internal Control Over Financial Reporting.**

66.     Chemours' 2022 10-K explains that Chemours' management assesses the effectiveness of the Company's internal control over financial reporting based on criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control - Integrated Framework* (2013) (the "COSO" Framework).

---

[3] In the first quarter of 2019, Cash Provided by Operating Activities was negative $44 million.

[4] In the third quarter of 2023, Chemours added a "new non-GAAP liquidity measure of Adjusted Free Cash Flows to exclude the impact of cash inflows/outflows that are significant, unusual in nature and/or infrequent in occurrence that neither relate to the ordinary course of our business nor reflect the ongoing operational performance and underlying cash generation of our businesses. The change was driven by certain PFAS litigation settlements and legal fees that we believe were unusual in nature or infrequent in occurrence that neither related to the Company's ordinary course of business or ongoing operational performance and underlying cash generation of our businesses." The Company claimed "that excluding items of this nature provides the Company's investors with better understanding of and enables them to compare our underlying cash generation of our businesses from period to period."

[5] All of Defendants' misstatements concerning Free Cash Flow and Cash Provided by Operating Activities, who made each statement, and the specific reasons each one is false are laid out in Paragraphs 119-209.

67.     The COSO Framework stresses the importance of the "tone at the top" to the effectiveness of internal controls. It explains: "The board of directors and senior management establish the tone at the top regarding the importance of internal control including expected standards of conduct. Management reinforces expectations at the various levels of the organization. *The resulting control environment has a pervasive impact on the overall system of internal control*." (emphasis added).

68.     The COSO Framework further states: "*Tone at the top and throughout the organization is fundamental to the functioning of an internal control system*. Without a strong tone at the top to support a strong culture of internal control, awareness of risk can be undermined, responses to risks may be inappropriate, control activities may be ill defined or not followed, information and communication may falter, and feedback from monitoring activities may not be heard or acted upon." (emphasis added).

69.     Chemours' 2022 10-K and 10-Qs from the Class Period each attached certifications pursuant to  Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Newman and Defendant Ralhan (2022 10-K and first quarter of 2023 10-Q) or Defendant Lock (second and third quarter of 2023 10-Qs). Those certifications each stated, among other things, that the certifying officers disclosed "any change in the registrant's internal control over financial reporting", "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

70.     Chemours' 2022 10-K and 10-Qs from the Class Period further stated that "our CEO and CFO, together with management, conducted an evaluation of the effectiveness of our

disclosure controls and procedures" and "*the CEO and CFO have concluded that these disclosure controls and procedures are effective at the reasonable assurance level*." Those reports also all stated: "*There have been no changes in our internal control over financial reporting*…that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." (emphasis added).[6]

### J. Chemours Admitted that its Ineffective Internal Controls Allowed the Individual Defendants to Manipulate Free Class Flow During the Class Period, Violating the Company's Code of Ethics for the CEO, CFO, and Controller.

*1)  On February 13, 2024, Chemours Announced that it was Delaying its Financial Results for the Fourth Quarter and Full Year of 2023 Because it was Evaluating its Internal Control Over Financial Reporting.*

71.    On February 13, 2024, after market hours, Chemours filed with the SEC a current report on Form 8-K with an attached press release that "announced that it has postponed the release of its financial results and conference call related to the fourth quarter and full year ended December 31, 2023, which had previously been scheduled for February 14, 2024 and February 15, 2024, respectively," and that it now "expect[ed] to issue its fourth quarter and full year 2023 financial results after market close on Wednesday, February 28, 2024." The Company said the delay was necessary "because it need[ed] additional time to complete its year-end reporting process" and was "*evaluating its internal control over financial reporting* ... with respect to maintaining effective controls related to information and communications." Chemours also revealed that it needed additional time for its Audit Committee "to complete a related internal review."

---

[6] All of Defendants' misstatements concerning internal controls over financial reporting, who made each statement, and the specific reasons each one is false is in laid out in Paragraphs 210-222.

72.     On this news, Chemours' common stock fell $3.85 per share from its closing price on February 13, 2024, or more than 12%, to close at $26.64 per share on February 14, 2024.

> *2) On February 29, 2024, Chemours Shocked Investors by Placing Defendants Newman, Lock, and Wisel on Administrative Leave Pending an Internal Review Concerning the Company's Practices for Managing Working Capital and Admitting that it was Evaluating One or More Weaknesses in its Internal Controls.*

73.     Then, before the market opened on February 29, 2024, Chemours stunned investors when it announced in a Form 8-K and a NT 10-K filed with the SEC that the Company's board of directors had placed Defendants Newman, Lock, and Wisel on administrative leave and appointed Denise Dignam as Interim CEO and Matt Abbott as Interim CFO "pending the completion of an internal review being overseen by the Audit Committee of the Board of Directors with the assistance of independent outside counsel." According to the Company, the scope of the investigation "include[d] the **processes for reviewing reports made to the Chemours Ethics Hotline**, **the Company's practices for managing working capital, including the related impact on metrics within the Company's incentive plans, certain non-GAAP metrics included in filings made with the Securities and Exchange Commission or otherwise publicly released, and related disclosures**." (emphasis added).

74.     Given the importance of these issues—not only to executive compensation, but also investors' assessment of Chemours' financial performance—the Company acknowledged that it was "**evaluating one or more potential material weaknesses in its internal control** over financial reporting…with respect to maintaining effective controls related to the control environment, including the effectiveness of the 'tone at the top' set by certain members of senior management communication components of the COSO internal control framework" and again delayed the filing of its annual report for 2023.

75.     On February 29, 2024, Bloomberg Intelligence analysts Sean Gilmartin and Holly Froum issued an analyst report in response to Chemours' disclosures, stating:  "***Chemours' internal control issues appear much worse than we initially thought*** after the company said it's [sic] again delaying its 4Q earnings results and 10-K, while also putting CEO Mark Newman and CFO Jonathan Lock on administrative leave and appointing an interim CEO and CFO. ***We think this development is now a clear overhang*** and distracts from the underlying recovery story in its titanium dioxide business." (emphasis added).

76.     On the same day, BMO Capital Markets analyst, John. P. McNulty, issued a report downgrading Chemours stock from overperform to underperform and lowering his price target from $45 to $19.

77.     The price of Chemours' stock fell $9.05 per share from its closing price on February 28, 2024, or more than 31%, to close at $19.67 on February 29, 2024.

     *3)     Chemours' Internal Investigation Found that Defendants had Violated Chemours' Code of Ethics by Manipulating the Timing of Payables and Receivables in an Effort to Meet Publicly Communicated Free Cash Flow Targets and Increase their Incentive Compensation.*

78.     In a Form 8-K and attached press release dated March 6, 2024, filed with the SEC on March 7, 2024, and signed by Interim CFO Matthew S. Abbott, Chemours announced some findings from the Audit Committee's internal review, which "relate[d] to an anonymous report made to the Chemours Ethics Hotline".

79.     Chemours disclosed that the Audit Committee's review "***determined that there was a lack of transparency with the Company's Board of Directors by the members of senior management who were placed on administrative leave last week due to the payables and receivables timing actions described below, and their effect on free cash flow targets at the end of the relevant periods***." (emphasis added). Therefore, as a result, the Audit Committee concluded that Defendants Newman, Lock, and Wisel  "***violated the Company's Code of Ethics*** applicable

to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the '*promot[ion of] full, fair, accurate, timely and understandable disclosure*.'" (emphasis added).

80.     The Audit Committee further determined with the assistance of independent counsel  that, among other things, Defendants Newman, Lock, and Wisel "engaged in efforts in the fourth quarter of 2023 to delay payments to certain vendors that were originally due to be paid in the fourth quarter of 2023 until the first quarter of 2024, and to accelerate the collection of receivables into the fourth quarter of 2023 that were originally not due to be received until the first quarter of 2024." The Audit Committee further found that Defendants Newman, Lock, and Wisel "*engaged in these efforts in part to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers*." (emphasis added).

81.     The March 6, 2024 8-K further stated that "[t]he Audit Committee and Company management continue to work on assessing the net impact on cash flow measures of the working capital timing actions detailed above, *which had the effect of significantly increasing the cash flow measures, including free cash flow, for the quarter ended December 31, 2023, with a corresponding anticipated decrease in these measures in the first quarter of 2024.* The Audit Committee review also determined that *similar actions*, though to a lesser extent, *were taken in the fourth quarter of 2022, resulting in a significant increase in these cash flow measures for the quarter ended December 31, 2022, and a decrease in these measures in the first quarter of 2023.*" (emphasis added).

82.     The March 6, 2024 8-K also disclosed that the "anonymous report made to the Chemours Ethics Hotline [that the Audit Committee's review related to] was not elevated to the General Counsel or the Audit Committee, until the matter was identified in connection with the

Company's year-end 2023 external audit process" and that "[t]he Audit Committee determined that *the failure resulted from inadequate controls and procedures regarding the evaluation and escalation of hotline reports and poor judgment by certain employees who handle the intake of such reports*." (emphasis added).

83.    The March 6, 2024 8-K concluded that "[a]s a result of the foregoing, the Company is evaluating one or more potential material weaknesses in its internal control over financial reporting as of December 31, 2023 with respect to maintaining effective controls related to the control environment, including the effectiveness of the 'tone at the top' set by certain members of senior management and the information and communication components of the COSO internal control framework, including controls over the Chemours Ethics Hotline program. *Accordingly, the Company expects to report on material weaknesses as of December 31, 2023 and its related remediation plans in its Annual Report on Form 10-K*." (emphasis added).

    4)    *Following the Resignation of Defendant Newman, Chemours Finally Filed its 2023 10-K, which Admitted that Defendants had Manipulated the Timing of $360 million and $215 million in Cash Provided by Operating Activities in 2023 and 2022, Respectively, and that Chemours' Internal Control over Financial Reporting was not Effective.*

84.    In a Form 8-K and attached press release dated March 18, 2024, filed with the SEC on March 19, 2024, and signed by Interim CFO Matthew S. Abbott, Chemours announced that it had received notice from the NYSE "that the Company is not in compliance with Section 802.01E of the NYSE Listed Company Manual due to a delay in filing its Annual Report on Form 10-K for the year ended December 31, 2023."

85.    In a Form 8-K and attached press release dated March 22, 2024, filed with the SEC on March 25, 2024, and signed by Interim CFO Matthew S. Abbott, Chemours named Interim CEO Denise Dignam as President and CEO and announced that Defendant Newman had resigned his officer and director positions within the Company effective March 22, 2024 and was "not

entitled to any severance, equity award vesting or other compensation in connection with his resignation, other than any rights he has to vested benefits under the terms of the Company's employee benefit plans." The Company also announced that Interim CFO Abbott would continue in his role while the Company commenced a comprehensive search for a permanent CFO.

86. On March 28, 2024, Chemours finally filed its Form 10-K for the fiscal year ended December 31, 2023 (the "2023 10-K") with the SEC.

87. The 2023 10-K disclosed that the Defendants manipulation of the Company's cash flows had been substantial. The Audit Committee determined "that former members of senior management engaged in efforts in the fourth quarter of 2023 to delay payments of up to approximately $100 million, primarily to certain vendors that were originally due to be paid in the fourth quarter of 2023 until the first quarter of 2024; and to accelerate the collection of up to approximately $260 million of receivables into the fourth quarter of 2023 that were originally not due to be received until the first quarter of 2024." The $360 million in combined accelerated collections and delayed payables accounted for *almost 65% of the $556 million of the Cash Provided by Operating Activities that Chemours reported for 2023.*

88. The Audit Committee's review also determined that "similar actions…were taken in the fourth quarter of 2022, resulting in a delay of up to approximately $40 million of payments to vendors that were originally due to be paid in the fourth quarter of 2022 until the first quarter of 2023 and the acceleration of the collection of up to approximately $175 million of receivables into the fourth quarter of 2022 that were originally not due to be received until the first quarter of 2023." The $215 million in combined accelerated collections and delayed payables accounted for *more than 28% of the $754 million of the Cash Provided by Operating Activities that Chemours*

*reported for 2022 and was <u>greater than</u> the $161 million of the Cash Provided by Operating Activities that the Company reported for the fourth quarter of 2022.*

89.    The 2023 10-K reiterated that "[t]he Audit Committee Internal Review determined that there was a lack of transparency with the Company's board of directors by these former members of senior management with respect to working capital timing actions described above, their effect on publicly communicated free cash flow targets, and which also would be part of a key metric for determining incentive compensation at the end of the relevant periods."

90.    The 2023 10-K included the following chart showing Defendants' manipulation of operating cash flow at the end of 2022 and 2023 and, to a somewhat lesser extent, in 2021 :

The working capital timing actions detailed above resulted in an increase in operating cash flow for the quarter ended December 31, 2023, with a corresponding anticipated decrease in operating cash flow expected in the first quarter of 2024, and an increase in operating cash flow for the quarter ended December 31, 2022, with a corresponding decrease in operating cash flow in the first quarter of 2023. The following table presents: (i) the approximate increase in operating cash flow for the fourth quarters of 2023 and 2022 as a result of the working capital timing actions; (ii) the approximate decrease in operating cash flow for the first quarters of 2023 and 2022 as a result of the working capital timing actions; and (iii) the net impact of the working capital timing actions that occurred in 2023 and 2022:

| *(Dollars in millions) (Unaudited)* | Approximate Impact of Efforts in 2023 (1) | | Approximate Impact of Efforts in 2022 (2) | |
|---|---|---|---|---|
| Approximate increase in operating cash flow and year-end cash balances from working capital timing actions in quarter ended December 31 | $ | 360 | $ | 215 |
| Approximate decrease in operating cash flow and quarter-end cash balances from working capital timing actions affecting the quarter ended March 31 | | (215 ) | | (90 ) |
| **Approximate net impact in operating cash flow from working capital timing actions** | $ | 145 | $ | 125 |

(1)
These amounts represent the approximate: (i) increase of $360 million in operating cash flow from working capital timing actions in the quarter ended December 31, 2023; (ii) decrease of $215 million in operating cash flow from working capital timing actions affecting the quarter ended March 31, 2023; and (iii) the approximate net impact of $145 million from working capital timing actions that affected operating cash flow in the year ended December 31, 2023.....

(2)
These amounts represent the approximate: (i) increase of $215 million in operating cash flow from working capital timing actions in the quarter ended December 31, 2022; (ii) decrease of $90 million in operating cash flow from working capital timing actions affecting the quarter ended March 31, 2022; (iii) and the approximate net impact of $125 million from working capital timing actions that affected operating cash flow in the year ended December 31, 2022....

91.    The 2023 10-K also admitted that "[m]anagement has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2023 using the criteria set forth in the *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework")" and "concluded that our internal control over financial reporting was not effective as of December 31, 2023 due to the material weaknesses described below."

92.    The 2023 10-K identified "four control deficiencies relating to failure to set an appropriate tone at the top, design and maintenance of effective controls related to information and communication, design and maintenance of effective controls related to evaluation and escalation of reports made to the Chemours Ethics Hotline, and design and maintenance of effective controls related to vendor master data in order to prevent unauthorized cash disbursements."

93.    The Company admitted that "[e]ach of these four control deficiencies constituted material weaknesses in our internal control over financial reporting. These material weaknesses also resulted in us deeming our disclosure controls and procedures not effective. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis."

94.    *First,* the Company "did not design and maintain an effective control environment" since "senior management failed to set an appropriate tone at the top" and that material weakness

26

led to a lack of transparency by former senior management regarding their delay of payments and acceleration of collection of receivables to meet publicly communicated free cash flow targets and receive incentive compensation:

> *We did not design and maintain an effective control environment as senior management failed to set an appropriate tone at the top resulting in a material weakness.* Specifically, among other things, *there was a lack of transparency with the Company's board of directors by former senior management regarding efforts to delay payments to certain vendors and to accelerate the collection of receivables, and that these individuals engaged in these efforts in part to meet free cash flow targets that the Company had communicated publicly, and which also would be a part of a key metric for determining incentive compensation applicable to both executive officers and to employees.* As a result, it was concluded that *former senior management violated the Company's "Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller"*. The ineffective control environment contributed to the following additional material weaknesses.

(emphasis added).

95.    *Second and third*, the Company: "did not design and maintain effective controls related to the information communication component of the COSO Framework and principles of internally communicating information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control.":

> We did not design and maintain effective controls related to the information and communication component of the COSO Framework, and principles of internally communicating information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control. Specifically, the Company did not design and maintain effective controls to ensure appropriate communication between certain functions within the Company, including (i) the identification and communication of certain contractual arrangements and (ii) communication of business developments which impact key assumptions used in the goodwill impairment assessment. *This material weakness related to information and communication contributed to an additional material weakness in that we did not design and maintain effective controls regarding the evaluation and escalation of reports made through the Chemours Ethics Hotline, including controls regarding the escalation of certain reports to the General Counsel and Chair of the Audit Committee*.

(emphasis added).

96.     *Fourth*, the Company admitted: "[W]e did not design and maintain effective controls to prevent or timely detect unauthorized changes to our vendor master files in order to prevent unauthorized cash disbursements."

5) *The Extensive Remediation Plan and Risk Factors in Chemours' 2023 10-K Along with Company's Admission that it is Being Investigated by the SEC and U.S. Attorney's Office for the Southern District of New York Further Supports the Materiality of Defendants' Misstatements.*

97.     The 2023 10-K laid out the following remedial actions that Chemours' had taken to improve its internal controls:

We are committed to taking steps necessary to remediate the control deficiencies that constituted the material weaknesses. We are actively engaged and have devoted substantial resources towards the implementation of enhanced procedures and controls and the remediation of material weaknesses in our internal control over financial reporting. We also engaged external legal, accounting, financial and other consulting and professional services firms to assist senior management in the development and execution of a comprehensive remediation plan. ***To date, we have made the following enhancements to our internal control over financial reporting:***

• ***On February 28, 2024, our board of directors placed President and Chief Executive Officer Mark Newman, Senior Vice President and Chief Financial Officer Jonathan Lock and Vice President, Controller and Principal Accounting Officer Camela Wisel on administrative leave*** pending completion of the Audit Committee Internal Review;

• On February 28, 2024, our board of directors appointed Denise Dignam as Interim Chief Executive Officer and Matthew Abbott as Interim Chief Financial Officer (principal financial and accounting officer), and subsequently appointed Denise Dignam as Chief Executive Officer on March 22, 2024;

• Senior leadership has held multiple "All Hands" meetings in 2024 with employees, as well as disseminated company-wide and team-specific communications to emphasize our commitment to our core values, specifically *Unshakeable Integrity*;

• ***Enhanced our internal management representation letter process which serves as a mechanism for internal information sharing and supports, in part, our CEO's and Interim CFO's certifications and accuracy of our financial***

*statements. The Company has also provided mandatory training to respondents in order to facilitate the receipt of complete and accurate information*;

• Enhanced our Disclosure Committee process;

•*Provided updated training on internal control over financial reporting and requirements under the Sarbanes-Oxley Act of 2002*, including training courses on applicable federal securities laws for senior management, and training courses on ethics for finance professionals; and

• The Company put in place a written procedure specifying that reports to the Chemours Ethics Hotline that involve officers subject to the reporting requirements of Section 16 of the Exchange Act ("Section 16 Officers") will be promptly reported to the General Counsel and that the General Counsel will promptly inform the Chair of the Audit Committee. If there is a report involving the General Counsel, the Company's procedures require those reports will be promptly reported to the Chief Audit Executive and the Chair of the Audit Committee.

(emphasis added).

98.    The 2023 10-K also said that Chemours was "in the process of designing and implementing the following enhancements to [its] internal control over financial reporting":

• In addition to certain of the actions described above, implementing the recommendations of the Audit Committee's independent outside counsel as adopted and approved by the Audit Committee and the Board of Directors.

• Enhancing our controls, policies, procedures, and training related to the Chemours Ethics Hotline, including controls, policies, and procedures related to the evaluation and escalation of certain reports made through the hotline to the Company's General Counsel and Chair of the Audit Committee;

• Senior leadership will continue to hold "All Hands" meetings with employees, as well as disseminate company-wide and team-specific communications to emphasize our commitment to our core values, specifically *Unshakeable Integrity*;

•Enhancing our controls, policies, procedures, and training as it relates to timely and accurate communication and information sharing, including enhancing key controls concerning information communicated and used in determining the accounting for significant transactions, contracting, and business developments which impact key assumptions used in the goodwill impairment assessment;

•*Providing additional and continuing training for employees and members of management to ensure that relevant information is appropriately communicated*

*to personnel involved in the preparation of our consolidated financial statements or related disclosures*;

•*Conducting additional training for employees regarding the importance of the Company establishing and maintaining effective internal control over financial reporting* and disclosure controls and procedures, in order for information to be appropriately communicated to all relevant personnel involved in the preparation of our financial statements and disclosures;

•The Company is in process of making system upgrades (or enhancements) that will automatically notify the General Counsel and the Chair of the Audit Committee of reports involving Section 16 Officers;

•*The Compensation Committee is revising key metrics used in the determination of executive and employees' incentive compensation starting in 2024*; and

•Enhancing our controls, policies, procedures, workflow, and training as it relates to the verification of vendor master file changes with certified vendor contacts in order to prevent unauthorized cash disbursement.

99.    The 2023 10-K included multiple new risk factors caused by Defendants' cash flow manipulation and the Company's internal control deficiencies. The 2023 10-K defines the listed risk factors as "the principal risks that could adversely affect our business, results of operations, financial condition, and cash flows."

100.    *First*, under "*Risks Related to Legal Matters, Environmental Sustainability, and Regulations*", the 2023 10-K stated "*[a]s a result of the Audit Committee Internal Review, we may be exposed to litigation from investors and/or regulatory entities, which may adversely affect our reputation, results of operations, financial condition, and cash flows.* The 2023 10-K further admitted that "*Chemours is cooperating with requests for information from the SEC and the United States Attorney's Office for the Southern District of New York* concerning the results of the Audit Committee Internal Review and the Company's SEC filings in respect of that review" and that "[t]hese matters could result in us incurring additional costs and liabilities, which

may be material to our results of operations, financial condition, and cash flows. (emphasis added).

101.    *Second*, under "**Risks Related to Operations**", the 2023 10-K stated: "***The ineffectiveness of our internal control over financial reporting and disclosure controls and procedures, the existence of material weaknesses…and the potential for additional material weaknesses in our internal control over financial reporting in the future could result in material misstatements in our financial statements that could go undetected.***" (emphasis in original).

102.    *Third*, and also under "**Risks Related to Operations**", the 2023 10-K stated: "***We have incurred and expect to continue to incur significant expenses related to the Audit Committee Internal Review and the remediation of the material weaknesses in our internal control over financial reporting***" and admitted that the risk of "[t]he incurrence of significant additional expenses or the requirement that management devote substantial time to these efforts could reduce the time otherwise available to execute on our business strategies and could have a material adverse effect on our results of operations, financial condition, and cash flows. (emphasis in original).

103.    *Fourth*, under "**General Risk Factors**", the 2023 10-K stated: "***We may experience a disruption of our business activities and our business could be adversely affected due to senior management transitions***." (emphasis in original). The 2023 10-K further admitted: "We have had several unplanned senior management changes recently, including our then-Chief Executive Officer, then-Chief Financial Officer, and then-Controller being placed on administrative leave in February 2024" [and] "[o]ur ability to execute our business strategies may be impacted by the uncertainty associated with these transitions and the time and attention of our board of directors

31

and management may be required to dedicate to management transitions could disrupt our business. ***These factors could have a material adverse effect on our results of operations, financial condition, and cash flows***." (emphasis added).

  6) *Defendant Lock Resigned all his Positions at Chemours and the Company Appointed a New Permanent CFO and Principal Accounting Officer.*

  104. In a Form 8-K and attached press release dated April 23, 2024, filed with the SEC on April 25, 2024, and signed by Interim CFO Matthew S. Abbott, Chemours announced that Defendant Lock had resigned from all positions at Chemours effective April 23, 2024 and was "not entitled to any severance, equity award vesting or other compensation in connection with his resignation."

  105. On June 5, 2024, the Company filed a Form 8-K dated May 31, 2024 that announced it had appointed Shane Hostetter as CFO, effective as of July 1, 2024, and that Hostetter would also serve as the Company's principal accounting officer.

  106. On July 25, 2024, the Company filed a Form 8-K dated July 23, 2024 that announced it had appointed David A. Will as Controller and Chief Accounting Officer, effective as of August 12, 2024, and that Will would take over for Hostetter as the Company's principal accounting officer.

  **K. According to Former Employees, Chemours' Manipulation of Payables and Receivables at the End of the Year was Long-Running and Broad-Based**

  107. Former Employee 1 ("FE-1")[7] started working for Chemours as a consultant in 2015 on a project to move Chemours off of DuPont's SAP application following Chemours separation from Dupont. FE-1 was then hired full time by Chemours in July of 2016 and stayed at the Company until January 2024. FE-1 served as a Senior Finance Manager and reported to

---

[7] To protect their identities, the pronoun "she" is used for all FEs.

Chief Information Officer Dean Meyer. SAP is widely-used enterprise resource planning ("ERP") software that creates a centralized system for businesses that enables every department to access and share common data.

108.    FE-1 helped Defendants Newman and Ralhan delay accounts payables and accelerate receivables at the end of 2018. At the time, Newman was Chemours' CFO and Ralhan was a VP of Finance. FE-1 was involved in the process because she was one of the few people who knew how to pull the "open payables" from the SAP information system. At the end of 2018, FE-1 attended daily calls, including on Christmas Day and New Year's Eve, that were attended by, among others, Ralhan, Newman, Assistant Treasurer Mike Bosacco, Director of Corporate Financial Planning and Analysis Brandon Ontjes. Ralhan directed which accounts would not be paid even though they were due. FE-1 pulled the "open payables" data from the SAP system into an Excel spreadsheet and emailed the spreadsheet to the attendees ahead of the meetings and Ontjes performed a similar task related to the accounts receivables. FE-1 explained that the  goal was to "call people" from the accounts receivables side and see if they would "pay early" and to "meter cash going out to try to hit" the Free Cash Flow target.

109.    FE-1 believes that Chemours continued advancing the collection of receivable and delaying payment of payables in the years that followed, but she was not directly involved. FE-1 thought that she was no longer needed because others had learned to pull the data without her assistance.

110.    FE-1 stated that Chemours' guidance for Free Cash Flow of greater than $350 million for the full year 2023 after Chemours reported Free Cash Flow of negative $210 million for the first quarter of 2023 only made sense if Chemours intended to manipulate payables and

receivables. She explained Chemours' business was not seasonal or cyclical in such a way that would explain generating so much cash flow later in the year.

111.    FE-2 worked at Chemours from March 2022 to January 2024, first as a buyer for Titanium Technologies division and then as a category manager for the APM division. Although she was technically assigned to the APM division, she procured raw materials (specifically chemicals) on behalf of all three of the company's divisions.

112.    FE-2 initially reported to Judith DelTosto, who was a Director of Global Procurement. She later reported to Andrew Kurz, the Global Procurement Director for Titanium Technologies for a few months beginning in June 2023. She last reported to Aru Deshmukh (the Global Procurement Strategy Director, APM) from September 2023 until January 2024.

113.    Deshmukh reported to Vice President, Chief Procurement Officer Sunil Naik. According to Taylor, Naik was terminated in 2024 after Chemours disclosed that senior executives manipulated the company's Free Cash Flow. Another procurement executive – TR Kannon – was also terminated in 2024.

114.    During the fourth quarter of 2023, FE-2's direct supervisor, Deshmukh, instructed Category Managers to reach out to certain suppliers to see if Chemours could delay payments until after the beginning of the 2024 fiscal year. Deshmukh gave the instructions during a virtual team meeting in October 2023 attended by approximately 12 to 15 category managers and buyers, including FE-2. The meetings occurred on either a weekly or bi-weekly basis over Microsoft Teams. Deshmukh also sent the Category Managers an Excel spreadsheet that contained a list of suppliers they were supposed to contact.

115.    According to FE-2, the Category Managers had to start working on the Free Cash Flow manipulation in October in order to push the payments out to January.

116.    In directing her team to try to delay payments, Deshmukh mentioned that it was a "top down" directive, which FE-2 interpreted as meaning that Defendant Newman had given the directive. FE-2 was confident that Deshmukh would not have directed a strategy to delay payments on her own since she had only been the Global Procurement Strategy Director since September 2023.

117.    FE-2 worked in procurement at several other chemical companies before joining Chemours, but she had never been directed to delay payments to vendors before and thought the practice was unethical.

118.    Accordingly, FE-2 was upset to learn through a discussion with some of her colleagues during a team meeting after Deshmukh gave the instructions to delay payments that it was a "routine practice" at Chemours to hold payments at the end of the year.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. Free Cash Flow Misstatements.

*1) The February 9, 2023 Press Release and 8-K*

119.    On February 9, 2023, the Company filed a Form 8-K signed by Defendant Ralhan. In a press release attached to the filing, Chemours announced as part of its "**Full Year 2022 Results**" that its "Free Cash Flow of $447 million, delivered over $1.5 billion in Free Cash Flow over the last three years." (footnote omitted, emphasis in original).

120.    The foregoing statement was false and misleading when made because it failed to disclose that Chemours improperly delayed payables and accelerated receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies to generate $447 million in Free Cash Flow for 2022 and $1.5 billion over the last three years. Chemours later admitted that this manipulation of payables and receivables "violated

the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

121. The February 9, 2023 8-K press release further stated: "Free Cash Flow was $447 million, demonstrating our continuing ability to generate strong Free Cash Flow."

122. The foregoing statement was false and misleading when made because (1) it failed to disclose that Chemours improperly delayed payables and accelerated receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies to generate $447 million in Free Cash Flow for 2022 and (2) instead, misleadingly stated that the improperly generated Free Cash Flow of $447 million "demonstrate[d] [Chemours'] continuing ability to generate strong free cash flow." Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

123. The February 9, 2023 8-K press release further stated in its "**Full Year 2023 Outlook**" that Chemours had "Free Cash Flow of greater than $350 million, including CAPEX of approximately $400 million to support TSS and APM growth investments." (footnote omitted, emphasis in original).

124. The foregoing statement was false and misleading when made because it failed to disclose that meeting its 2023 Free Cash Flow projection required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer,

and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

125.    Chemours' February 9, 2023 8-K press release also contained the following charts stating that Chemours generated $754 million in Cash Provided by Operating Activities and $447 million in Free Cash Flow for 2022 and $161 million in Cash Provided by Operating Activities and $94 million in Free Cash Flow for the fourth quarter of 2022:

**Consolidated Statements of Cash Flows (Unaudited)**
*(Dollars in millions)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| **Cash flows from operating activities** | | | |
| Net income | $      578 | $      608 | $      219 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation and amortization | 291 | 317 | 320 |
| Gain on sales of assets and businesses, net | (21 ) | (115 ) | (8 ) |
| Equity in earnings of affiliates, net | (22 ) | (11 ) | — |
| (Gain) loss on extinguishment of debt | (7 ) | 21 | 22 |
| Amortization of debt issuance costs and issue discounts | 9 | 9 | 9 |
| Deferred tax provision (benefit) | 20 | (77 ) | (120 ) |
| Asset-related charges | 5 | — | 22 |
| Stock-based compensation expense | 27 | 34 | 16 |
| Net periodic pension cost | 9 | 6 | 14 |
| Defined benefit plan contributions | (10 ) | (17 ) | (21 ) |
| Other operating charges and credits, net | (21 ) | 18 | (22 ) |
| Decrease (increase) in operating assets: | | | |
| Accounts and notes receivable | 91 | (225 ) | 175 |
| Inventories and other operating assets | (390 ) | (202 ) | 126 |
| (Decrease) increase in operating liabilities: | | | |
| Accounts payable and other operating liabilities | 195 | 454 | 55 |
| Cash provided by operating activities | 754 | 820 | 807 |

...

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions)*

**GAAP Cash Flow Provided by Operating Activities to Free Cash Flows Reconciliation**

Free Cash Flows is defined as cash flows provided by (used for) operating activities, less purchases of property, plant, and equipment as shown in the consolidated statements of cash flows.

| | Three Months Ended | | | Year Ended | |
| --- | --- | --- | --- | --- | --- |
| | December 31, | | September 30, | December 31, | |
| | 2022 | 2021 | 2022 | 2022 | 2021 |

| Cash provided by operating activities | $ | 161 | $ | 214 | $ | 301 | $ | 754 | $ | 820 |
| Less: Purchases of property, plant, and equipment | | (67 ) | | (83 ) | | (72 ) | | (307 ) | | (277 ) |
| **Free Cash Flows** | $ | 94 | $ | 131 | $ | 229 | $ | 447 | $ | 543 |

126.    The foregoing charts were false and misleading statements when made because they failed to disclose that Chemours improperly delayed payables and accelerated receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies to generate $754 million in Cash Provided by Operating Activities and $447 million in Free Cash Flow for 2022 and $161 million in Cash Provided by Operating Activities and $94 million in Free Cash Flow for the fourth quarter of 2022. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

127.    The February 9, 2023 8-K press release also contained the following chart showing 2023 guidance of over $750 million for Cash Flow Provided by Operating Activities and over $350 million for Free Cash Flow.

**2023 Estimated GAAP Cash Flow Provided by Operating Activities to Estimated Free Cash Flow Reconciliation (*)**

| | (Estimated) Year Ended December 31, 2023 |
| --- | --- |
| Cash flow provided by operating activities | $            >750 |
| Less: Purchases of property, plant, and equipment | ~(400) |
| **Free Cash Flows** | $            >350 |

(*) The Company's estimates reflect its current visibility and expectations based on market factors, such as currency movements, macro-economic factors, and end-market demand. Actual results could differ materially from these current estimates.

128.    The foregoing statement was false and misleading when made because it failed to disclose that meeting its 2023 Free Cash Flow and Cash Flow Provided by Operating Activities projections required Chemours to improperly delay payables and accelerate receivables in

violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

    *2) The 2022 10-K*

129.    On February 10, 2023, the Company filed the 2022 10-K, signed by Defendants Newman, Ralhan, and Wisel. Additionally, attached to the 2022 10-K were certifications pursuant to SOX signed by Defendants Newman and Ralhan stating that they had read the 2022 10-K and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, ***fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this repor***t." (emphasis added).

130.    The 2022 10-K included the following charts stating that Chemours generated $754 million in Cash Provided by Operating Activities and $447 million in Free Cash Flow for 2022:

**Cash Flows**

The following table sets forth a summary of the net cash provided by (used for) our operating, investing, and financing activities for the years ended December 31, 2022 and 2021.

| (Dollars in millions) | Year Ended December 31, | |
|---|---|---|
| | **2022** | **2021** |
| Cash provided by operating activities | $ 754 | $ 820 |
| Cash (used for) provided by investing activities | (284) | 220 |
| Cash used for financing activities | (685) | (560) |

…

**The Chemours Company**
**Consolidated Statements of Cash Flows**
*(Dollars in millions)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **Cash flows from operating activities** | | | |
| Net income | $ 578 | $ 608 | $ 219 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation and amortization | 291 | 317 | 320 |
| Gain on sales of assets and businesses, net | (21 ) | (115 ) | (8 ) |
| Equity in earnings of affiliates, net | (22 ) | (11 ) | — |
| (Gain) loss on extinguishment of debt | (7 ) | 21 | 22 |
| Amortization of debt issuance costs and issue discounts | 9 | 9 | 9 |
| Deferred tax provision (benefit) | 20 | (77 ) | (120 ) |
| Asset-related charges | 5 | — | 22 |
| Stock-based compensation expense | 27 | 34 | 16 |
| Net periodic pension cost | 9 | 6 | 14 |
| Defined benefit plan contributions | (10 ) | (17 ) | (21 ) |
| Other operating charges and credits, net | (21 ) | 18 | (22 ) |
| Decrease (increase) in operating assets: | | | |
| Accounts and notes receivable | 91 | (225 ) | 175 |
| Inventories and other operating assets | (390 ) | (202 ) | 126 |
| (Decrease) increase in operating liabilities: | | | |
| Accounts payable and other operating liabilities | 195 | 454 | 55 |
| Cash provided by operating activities | 754 | 820 | 807 |

....

The following table sets forth a reconciliation of our cash flows provided by (used for) operating activities to FCF for the years ended December 31, 2022 and 2021.

| | Year Ended December 31, | |
|---|---|---|
| *(Dollars in millions)* | 2022 | 2021 |
| Cash provided by operating activities | $ 754 | $ 820 |
| Less: Purchases of property, plant, and equipment (1) | (307 ) | (277 ) |
| **Free Cash Flows** | $ 447 | $ 543 |

(1)
The year ended December 31, 2021 includes $22 million related to construction-in-progress assets acquired in exchange for the termination of a contract with a third-party service provider at our under-construction Mining Solutions facility in Gomez Palacio, Durango, Mexico. In December 2021, the assets at the Mining Solutions facility in Gomez Palacio, Durango, Mexico were sold as part of the divestiture of our Mining Solutions Business.

131.    The foregoing charts were false and misleading when made because they failed to disclose that Chemours improperly delayed payables and accelerated receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies to generate $754 million in Cash Provided by Operating Activities and $447 million in Free Cash Flow for 2022. Chemours later admitted that this manipulation of payables and

receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

132.    The 2022 10-K made the following statement about Chemours' operating cash flow generation:

> Our primary sources of liquidity are cash generated from operations and available cash, along with our receivables securitization and borrowings under our debt financing arrangements, both of which are described in further detail in "Note 20 – Debt" to the *Consolidated Financial Statements*. Our ***operating cash flow generation is driven by, among other things, the general global economic conditions at any point in time and their resulting impacts on demand for our products, raw materials and energy prices, and industry-specific issues, such as production capacity and utilization. We have generated strong operating cash flows through various past industry and economic cycles, evidencing the underlying operating strength of our businesses.*** We anticipate that our cash generated from operations, available cash, receivables securitization, and existing debt financing arrangements will provide us with sufficient liquidity through at least February 2024.

(emphasis added).

133.    The foregoing statement was false and misleading when made because it failed to disclose that the $215 million Chemours manipulated in improperly delayed payables and accelerated receivables  in the fourth quarter of 2022 in violation of Chemours' internal policies and SEC policies was an important driver in the timing of Chemours' operating cash flow generation. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

### 3)  The 4Q 2022 Earnings Call and Presentation.

134.    In connection with the Company's fourth quarter 2022 earnings conference call ("4Q 2022 Earnings Call") held before the market opened on February 10, 2023, Chemours posted

41

its "Q4 and Full Year 2022 Earnings Prepared Comments" and its "Fourth Quarter & Full Year 2022 Earnings Presentation" to its website. Defendant Lock also directed investors to Chemours' Q4 and Full Year 2022 Earnings Prepared Comments and Fourth Quarter & Full Year 2022 Earnings Presentation during the 4Q 2022 Earnings Call:

> During the course of this call, management will refer to certain non-GAAP financial measures that we believe are useful to investors, evaluating the Company's performance. A reconciliation of non-GAAP terms and adjustments are included in our release and at the end of our presentation. As a reminder, our prepared remarks, a full transcript and an audio recording, plus our earnings deck has been posted to our website alongside our earnings release. This morning's call will focus purely on Q&A.

135. In the Q4 and Full Year 2022 Earnings Prepared Comments, Defendant Newman stated: "For the year, we generated Free Cash Flow of $447 million dollars. Our ability to turn earnings into cash consistently has generated more than $1.5 billion dollars of Free Cash Flows over the past three years."

136. Slide 3 of the Fourth Quarter & Full Year 2022 Earnings Presentation also stated that Chemours "Generated $447 million of Free Cash Flow":

## Full Year 2022 Highlights

**Financial Performance**
- Delivered 4% Adj. EBITDA growth and 17% Adj. EPS growth despite challenging 4Q
- Drove record full-year Net Sales and Adjusted EBITDA in TSS and APM segments
- Generated $447 million of Free Cash Flow

**Sustainability Driven Growth**
- Announced Opteon™ expansion at Corpus Christi, Texas facility
- Announced Nafion™ expansion at Villers-St.-Paul, France facility
- Continued to demonstrate sustainability leadership, including commitment to SBTi targets

**Capital Allocation**
- Returned $649 million to shareholders, including $495 million in share repurchases
- Deployed $307 million in capital expenditures
- Funded $100 million escrow payment per MOU, and repaid $68 million in debt



137.    The foregoing statement and slide were false and misleading when made because they failed to disclose that Chemours improperly delayed payables and accelerated receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies to generate $447 million in Free Cash Flow for 2022 and $1.5 billion over the last three years. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

138.    In the Q4 and Full Year 2022 Earnings Prepared Comments, Defendant Ralhan, while referencing Slide 4 of the Fourth Quarter & Full Year 2022 Earnings Presentation,  stated that "***Free Cash Flow continues to be a strength for the company*** . . . despite Net Working Capital build driven by lower sales volume, primarily in [Titanium Technologies], leading to higher inventory levels as we exited the year." (emphasis added).

139.    Slide 4 of the Fourth Quarter & Full Year 2022 Earnings Presentation stated that Chemours generated $447 million in Free Cash Flow in 2022:

## Full Year 2022 Financial Summary

($ in millions unless otherwise noted)

Year-Over-Year

| | FY22 | FY21 | Δ Yr/Yr |
|---|---|---|---|
| Net Sales | $6,794 | $6,345 | $449 |
| Net Income[1] | $578 | $608 | $(30) |
| Adj. Net Income | $738 | $674 | $64 |
| EPS[2] | $3.65 | $3.60 | $0.05 |
| Adj. EPS[3] | $4.66 | $4.00 | $0.66 |
| Adj. EBITDA | $1,361 | $1,313 | $48 |
| Adj. EBITDA Margin (%)[4] | 20% | 21% | (100) Bps |
| Free Cash Flow[5] | $447 | $543 | $(96) |
| Pre-Tax ROIC (%)[6] | 30% | 27% | +300 bps |

See reconciliation of Non-GAAP measures in the Appendix
[1] Net Income attributable to The Chemours Company
[2] Calculation based on diluted share count.
[3] Adjusted EPS excludes restructuring, gain/loss on sale, legal and environmental charges as well as other items – see Appendix for full details
[4] Defined as Adjusted EBITDA divided by Net Sales.
[5] Defined as Cash from Operations minus cash used for PP&E purchases
[6] Defined as Adjusted EBITDA less depreciation & amortization on a trailing twelve-month basis divided by average invested capital over the last five quarters

Chemours

- Net Sales up 7% to $6.8 billion reflecting pricing strength across the portfolio, higher volume in TSS and APM segments, partially offset by lower volumes in TT in the second half of the year

- GAAP EPS of $3.65, up $0.05 year-over-year and Adjusted EPS of $4.66, up $0.66[3] year-over-year

- Adjusted EBITDA of $1.361 billion, up 4% year-over-year, driven by strong topline growth, partially offset by higher raw material and logistics costs and currency headwinds resulting from strong USD

- Adjusted EBITDA Margin declined 100 bps to 20% from prior-year due to higher raw material, energy and logistics costs

- Free Cash Flow of $447 million on higher year-end inventory

140.    The foregoing statement and slide were false and misleading when made because (1) they failed to disclose that Chemours improperly delayed payables and accelerated receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies to generate $447 million in Free Cash Flow for 2022 and (2) instead, misleadingly stated based on the improperly generated Free Cash Flow of $447 million that "Free Cash Flow continues to be a strength for the company". Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

141.    Defendant Ralhan also stated in the Q4 and Full Year 2022 Earnings Prepared Comments, while referencing Slide 5 of the Fourth Quarter & Full Year 2022 Earnings Presentation, that "Free Cash Flow was $94 million dollars[]" for 4Q 2022.

142.    Slide 5 of the Fourth Quarter & Full Year 2022 Earnings Presentation also stated that Chemours' Free Cash Flow for the fourth quarter of 2022 was $94 million:



Fourth Quarter 2022 Financial Summary

($ in millions unless otherwise noted)

Year-Over-Year

| | 4Q22 | 4Q21 | Δ Yr/Yr |
|---|---|---|---|
| Net Sales | $1,338 | $1,575 | $(237) |
| Net Income (Loss)[1] | $(97) | $233 | $(330) |
| Adj. Net Income | $0 | $135 | $(135) |
| EPS[2] | $(0.65) | $1.40 | $(2.05) |
| Adj. EPS[3] | $0.00 | $0.81 | $(0.81) |
| Adj. EBITDA | $120 | $307 | $(187) |
| Adj. EBITDA Margin (%)[4] | 9% | 19% | (10)pp |
| Free Cash Flow[5] | $94 | $131 | $(37) |

See reconciliation of Non-GAAP measures in the Appendix

[1] Net Income (Loss) income attributable to The Chemours Company
[2] Calculation based on diluted share count.
[3] Adjusted EPS excludes restructuring, goodwill on sale, legal and environmental charges as well as other items – see Appendix for full details
[4] Defined as Adjusted EBITDA divided by Net Sales
[5] Defined as Cash from Operations minus cash used for PP&E purchases

- Net Sales down 15% to $1.3 billion primarily reflecting volume decline in TT segment mainly due to softer demand in Europe and Asia Pacific, and currency headwinds, which more than offset the impact of higher pricing

- GAAP EPS of $(0.65), down $(2.05) year-over-year and Adjusted EPS of $0.00, down $(0.81)[3] year-over-year

- Adjusted EBITDA of $120 million, down (61)% year-over-year, driven by decrease in sales volume in TT, higher raw material and logistics costs, and currency headwinds resulting from strong US dollar, partially offset by higher pricing across all the segments

- Adjusted EBITDA Margin declined to 9% from prior-year due to higher raw material, energy and logistics costs, and impact of December winter storm in TSS and TT segments

- Free Cash Flow of $94 million

Chemours                                                                                                                5

143.    Defendant Ralhan also stated in the Q4 and Full Year 2022 Earnings Prepared Comments, while referencing Slide 7 of the Fourth Quarter & Full Year 2022 Earnings Presentation, that: "In the fourth quarter, we generated $161 million dollars of Operating Cash Flow and CAPEX was $67 million dollars."

144.    Slide 7 of the Fourth Quarter & Full Year 2022 Earnings Presentation stated that Chemours' Free Cash Flow was $94 million and its Operating Cash Flow was $161 for the fourth quarter of 2022:



145.    The statements and slides in the foregoing four paragraphs were false and misleading when made because they failed to disclose that Chemours improperly delayed payables and accelerated receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies to generate $94 million in Free Cash Flow and $161 million in Operating Cash Flow for the fourth quarter of 2022. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

146.    Defendant Newman stated in the Q4 and Full Year 2022 Earnings Prepared Comments, while referencing Slide 13 of the Fourth Quarter & Full Year 2022 Earnings Presentation, that: "Despite the decline in earnings and increase in CAPEX, we expect to generate Free Cash Flow in excess of $350 million dollars".

46

147.    Slide 13 of the Fourth Quarter & Full Year 2022 Earnings Presentation also stated an over $350 million guidance for Free Cash Flow:



148.    The foregoing statement and slide were false and misleading when made because they failed to disclose that meeting its 2023 Free Cash Flow and Cash Flow Provided by Operating Activities projections required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

149.    Slide 19 of the Fourth Quarter & Full Year 2022 Earnings Presentation stated that Chemours generated $754 million in Cash Provided by Operating Activities and $447 million in Free Cash Flow for 2022 and $161 million in Cash Provided by Operating Activities and $94 million in Free Cash Flow for the fourth quarter of 2022:

## Free Cash Flow Reconciliations (Unaudited)

| ($ in millions) | Three Months Ended December 31, | | | | September 30, | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2022 | | 2021 | | 2022 | 2022 | | 2021 |
| Cash flows provided by operating activities | $ | 161 | $ | 214 | $ 301 | $ 754 | $ | 820 |
| Less: Purchases of property, plant, and equipment | | (67) | | (83) | (72) | (307) | | (277) |
| **Free Cash Flows** | $ | 94 | $ | 131 | $ 229 | $ 447 | $ | 543 |

150.    The slide in the foregoing paragraph was false and misleading when made because it failed to disclose that Chemours improperly delayed payables and accelerated receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies to generate $754 million in Cash Provided by Operating Activities and $447 million in Free Cash Flow for 2022 and $161 million in Cash Provided by Operating Activities and $94 million in Free Cash Flow for the fourth quarter of 2022. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

151.    Slide 23 of the Fourth Quarter & Full Year 2022 Earnings Presentation showed a 2023 guidance of over $750 million for Cash Flow Provided by Operating Activities and over $350 million for Free Cash Flow:

## Estimated GAAP Cash Flows Provided by Operating Activities to Free Cash Flow Reconciliations (*) (Unaudited)

| ($ in millions) | (Estimated) Year Ended December 31, 2023 |
|---|---|
| Cash provided by operating activities | $            >750 |
| Less: Purchases of property, plant, and equipment | ~(400) |
| **Free Cash Flows** | $            >350 |

\* The Company's estimates reflect its current visibility and expectations based on market factors, such as currency movements, macro-economic factors, and end-market demand. Actual results could differ materially from these current estimates.

152.    The foregoing slide was false and misleading when made because it failed to disclose that meeting its 2023 Free Cash Flow and Cash Flow Provided by Operating Activities projections required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

153.    During the question and answer portion of the Q4 2022 Earnings Call, Defendant Ralhan stated the following:

**Matthew DeYoe, Analyst**
Good morning. Can you talk through just the working capital headwinds to cash flow thinking primarily inventories? How that balance out? Is that going to drive, lower operating leverage in 1Q? And I guess, what should we think for working capital headwinds/tailwinds for the year?

**Sameer Ralhan, Senior Vice President, Chief Financial Officer**
Yeah, Matt. Why don't I take this one and Mark can comment afterwards. Essentially as we kind of look at the working capital, really it's predominantly in the TT business that you have seen in Q4 as we kind of move into 2023 in Q1 and beyond. *Q1 as you know seasonally we typically consume working capital, right, because of the seasonality both for the TT business and the TSS business. So we will consume working capital in Q1. But as we kind of move through the year, we should be able to release that working capital. And that's reflected in the guide that we've given for the free cash flow greater than $350 million*.

(emphasis in titles in original; other emphasis added).

154.    The foregoing statement was false and misleading when made because (1) it failed to disclose that meeting its 2023 Free Cash Flow projection required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies and (2) it gave the impression the only reason the Free Cash Flow metric would be higher in later quarters in the year was the "seasonality" of Chemours' business. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

*4)  The 2023 Proxy Statement*

155.    On March 10, 2023,  the Company filed a Proxy Statement, signed by Defendant Newman (the "2023 Proxy Statement").

156.    The 2023 Proxy Statement stated: "Free Cash Flow (FCF) of  $447 million — delivering over $1.5 billion in FCF in the past three years."

157.    The foregoing statement was false and misleading when made because it failed to disclose that Chemours improperly delayed payables and accelerated receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies to generate $447 million in Free Cash Flow for 2022 and $1.5 billion over the last three years. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

*5)  The April 27, 2023 Press Release and 8-K*

158.    On April 27, 2023, after the market closed, the Company filed a Form 8-K signed by Defendant Ralhan with an attached press release.

159.    The April 27, 2023 8-K press release stated that despite negative $210 million in Free Cash Flow and negative $119 million in cash provided by operating activities for the first quarter of 2023: "The Company is reaffirming its full year 2023 Adjusted EBITDA and Free Cash Flow guidance. The Company expects full year 2023 Adjusted EBITDA to be within the range of $1.20 - $1.30 billion **and expects Free Cash Flow of greater than $350 million, inclusive of approximately $400 million of capital expenditures.**" (emphasis added).

160.    The April 27, 2023 8-K included the following chart showing a 2023 guidance of over $750 million for Cash Flow Provided by Operating Activities and over $350 million for Free Cash Flow:

**2023 Estimated GAAP Cash Flow Provided by Operating Activities to Estimated Free Cash Flow Reconciliation (*)**

|  | (Estimated) Year Ended December 31, 2023 |
|---|---|
| Cash flow provided by operating activities | $ >750 |
| Less: Purchases of property, plant, and equipment | ~(400) |
| **Free Cash Flows** | $ >350 |

(*) The Company's estimates reflect its current visibility and expectations based on market factors, such as currency movements, macro-economic factors, and end-market demand. Actual results could differ materially from these current estimates.

161.    The foregoing statement and chart were false and misleading when made because they failed to disclose that meeting its 2023 Free Cash Flow and Cash Flow Provided by Operating Activities projections required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to

the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

*6) The 1Q23 10-Q*

162.    On April 28, 2023, the Company filed with the SEC its quarterly report on form 10-Q for the period ended March 31, 2023 (the "1Q23 10-Q"), signed by Defendant Ralhan. Additionally, attached to the 1Q23 10-Q were certifications pursuant to SOX signed by Defendants Newman and Ralhan stating they had read the 1Q23 10-Q and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

163.    The 1Q23 10-Q gave the following reasons for the decrease in Chemours' operating cash flow from $2 million in the first quarter of 2022 to negative $119 million in the first quarter of 2023:

*Operating Activities*

We used $119 million in cash flows for, and generated $2 million in cash flows from our operating activities during the three months ended March 31, 2023 and 2022, respectively. ***The decrease in our operating cash inflows was primarily attributable to a decrease in our net income, changes in net working capital, and higher spend at our Fayetteville site***, partially offset by lower incentive compensation payment in the first quarter of 2023 compared to the first quarter of 2022 and the one-time payment of the $25 million settlement with the State of Delaware in the first quarter of 2022 that did not recur in 2023.

(emphasis added).

52

164.    The foregoing statement was false and misleading when made because by failing to disclose the $215 million Chemours manipulated in improperly delayed payables and accelerated receivables in the fourth quarter of 2022 in violation of Chemours' internal policies and SEC policies, it gave the misleading impression that the negative $119 million in cash from operating activities for the first quarter of 2023 was attributable to other factors when it was instead driven, in significant part, by that manipulation. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

165.    The 1Q23 10-Q further stated concerning Chemours' operating cash flow generation:

> Our primary sources of liquidity are cash generated from operations and available cash, along with our receivables securitization and borrowings under our debt financing arrangements, both of which are described in further detail in "Note 14 – Debt" to the *Interim Consolidated Financial Statements* in this Quarterly Report on Form 10-Q and "Note 20 – Debt" to the *Consolidated Financial Statements* in our Annual Report on Form 10-K for the year ended December 31, 2022. ***Our operating cash flow generation is driven by, among other things, the general global economic conditions at any point in time and their resulting impacts on demand for our products, raw materials and energy prices, and industry-specific issues, such as production capacity and utilization. We have generated strong operating cash flows through various past industry and economic cycles, evidencing the underlying operating strength of our businesses.***

(emphasis added).

166.    The foregoing statement was false and misleading when made because it failed to disclose that the $215 million Chemours manipulated in improperly delayed payables and accelerated receivables in the fourth quarter of 2022 in violation of Chemours' internal policies and SEC policies was an important driver in the timing of Chemours' operating cash flow generation. Chemours later admitted that this manipulation of payables and receivables "violated

the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

     *7)  The 1Q 2023 Earnings Call and Presentation*

167.    On April 28, 2023, Chemours conducted its first quarter 2023 earnings call ("1Q 2023 Earnings Call"). During that call, in which Defendants Lock, Newman, and Ralhan participated, they referred to the "Q1 2023 Earnings Prepared Remarks" and "Chemours 1Q 2023 Earnings Presentation", dated April 27, 2023. Both of those documents are posted on the portion of Chemours' website directed at investors. Defendant Lock stated on the 1Q 2023 Earnings Call that:

> During the course of this call management will refer to certain non-GAAP financial measures that we believe are useful to investors evaluating the company's performance. A reconciliation of non-GAAP terms and adjustments are included in our release and at the end of our presentation. As a reminder, our prepared remarks, a full transcript, plus our earnings deck have been posted to our website alongside our earnings release.

168.    In the Q1 2023 Earning Prepared Remarks, Defendant Newman, while referencing Slide 3 of the Chemours 1Q 2023 Earnings Presentation, stated that "we are reaffirming our full-year 2023 Adjusted EBITDA and Free Cash Flow guidance." Later Defendant Newman, while referencing Slide 11, again stated: "We are pleased to reaffirm our 2023 guidance we provided earlier this year."

169.    Slide 3 of the Chemours 1Q 2023 Earnings Presentation also reaffirmed the above $350 million Free Cash Flow Guidance for 2023:



170.    Slide 11 also reaffirmed that guidance:



171.    The foregoing two statements and two slides were false and misleading when made because they failed to disclose that meeting its 2023 Free Cash Flow and Cash Flow Provided by

Operating Activities projections required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

172.    In the Q1 2023 Earnings Prepared Remarks, Defendant Ralhan, while referencing Slide 4 of the Chemours 1Q 2023 Earnings Presentation, stated that "Free Cash Flow in the quarter was a use of ($210) million dollars. Our cash performance in the quarter reflects increased Net Working Capital due to higher inventory primarily driven primarily by seasonal inventory builds across the business and lower sales volume in TT."

173.    Slide 4 of the Chemours 1Q 2023 Earnings Presentation similarly stated "Free Cash Flow use of $(210) million was driven by NWC consumption due to higher inventory driven by seasonal inventory builds and lower y-o-y sales volume in TT":

## First Quarter 2023 Financial Summary

($ in millions unless otherwise noted)

| | 1Q23 | 1Q22 | Δ Yr/Yr |
|---|---|---|---|
| Net Sales | $1,536 | $1,764 | $(228) |
| Net Income [1] | $145 | $234 | $(89) |
| Adj. Net Income | $148 | $239 | $(91) |
| EPS [2] | $0.96 | $1.43 | $(0.47) |
| Adj. EPS [2][3] | $0.98 | $1.46 | $(0.48) |
| Adj. EBITDA | $304 | $403 | $(99) |
| Adj. EBITDA Margin (%) [4] | 20% | 23% | (3)Pp |
| Free Cash Flow [5] | $(210) | $(104) | $(106) |
| Pre-Tax ROIC (%) [6] | 26% | 31% | (5)Pp |

See reconciliation of Non-GAAP measures in the Appendix.
[1] Net Income (Loss) Income attributable to The Chemours Company
[2] Calculation based on diluted share count
[3] Adjusted EPS excludes restructuring, goodwill, asset, legal and environmental charges as well as other items – see Appendix for full details
[4] Defined as Adjusted EBITDA divided by Net Sales
[5] Defined as Cash from Operations minus cash used for PP&E purchases
[6] Defined as Adjusted EBITDA less depreciation & amortization on a trailing twelve-month basis divided by average invested capital over the last five quarters

**Year-Over-Year**

- Net Sales down 13% to $1.5 billion, primarily driven by volume decline in TT

- GAAP EPS of $0.96, down $(0.47) year-over-year and Adjusted EPS of $0.98, down $(0.48)[3] year-over-year

- Adjusted EBITDA of $304 million, down (25)% year-over-year, driven by lower TT volumes — pricing actions in 1Q more than offset the impact of higher costs and currency headwinds

- Adjusted EBITDA Margin declined to 20% from prior-year due to lower volume and higher raw material costs

- Free Cash Flow use of $(210) million was driven by NWC consumption due to higher inventory driven by seasonal inventory builds, and lower y-o-y sales volume in TT

4



174.    The foregoing statement and slide were false and misleading when made because by failing to disclose the $215 million Chemours manipulated in improperly delayed payables and accelerated receivables in the fourth quarter of 2022 in violation of Chemours' internal policies and SEC policies, they gave the misleading impression that the negative $119 million in cash from operating activities for the first quarter of 2023 was attributable to "increased Net Working Capital due to higher inventory primarily driven primarily by seasonal inventory builds across the business and lower sales volume in TT" when it was driven, in significant part, by that manipulation. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

175.    In the Q1 2023 Earnings Prepared Remarks, Defendant Ralhan stated: "In the first quarter, we consumed $(119) million dollars of Operating Cash Flow and CAPEX was $91 million dollars. Operating Cash Flow reflects both reduced TT sales volume and typical inventory build-up preceding the spring sales period in TT and TSS."

176.    The foregoing statement was false and misleading when made because by failing to disclose the $215 million Chemours manipulated in improperly delayed payables and accelerated receivables in the fourth quarter of 2022 in violation of Chemours' internal policies and SEC policies, it gave the misleading impression that the negative $119 million in cash from operating activities for the first quarter of 2023 was attributable to "reduced TT sales volume and typical inventory build-up preceding the spring sales period in TT and TSS" when it was driven, in significant part, by that manipulation. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief

57

Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

177. Slide 20 of the Chemours 1Q 2023 Earnings Presentation stated a 2023 guidance of over $750 million for Cash Flow Provided by Operating Activities and over $350 million for Free Cash Flow:



178. The foregoing slide was false and misleading when made because it failed to disclose that meeting its 2023 Free Cash Flow and Cash Flow Provided by Operating Activities projections required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

*8) The July 27, 2023 Press Release and July 28, 2023 8-K*

179. On July 28, 2023, the Company filed a Form 8-K signed by Defendant Lock. In a press release, dated July 27, 2023, attached to the filing, Chemours announced that it was cutting its "Free Cash Flow guidance [to] greater than $325 million."

180.    The July 27, 2023 press release also included a chart with the following cash flow guidance

**2023 Estimated GAAP Cash Flow Provided by Operating Activities to Estimated Free Cash Flow Reconciliation (*)**

| | | (Estimated) Year Ending December 31, 2023 |
|---|---|---|
| Cash flow provided by operating activities | $ | >725 |
| Less: Purchases of property, plant, and equipment | | ~(400) |
| **Free Cash Flows** | $ | >325 |

(*) Assumes future cash payments of approximately $592 million related to the recent PFAS settlement with U.S. public water systems, which is currently pending preliminary court approval, will occur after December 31, 2023.

(The Company's estimates reflect its current visibility and expectations based on market factors, such as currency movements, macro-economic factors, and end-market demand. Actual results could differ materially from these current estimates.

181.    The foregoing statement and chart were false and misleading when made because they failed to disclose that meeting its 2023 Free Cash Flow and Cash Flow Provided by Operating Activities projections required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

*9)  The 2Q23 10-Q*

182.    On July 28, 2023, the Company filed with the SEC its quarterly report on form 10-Q for the period ended June 20, 2023 (the "2Q23 10-Q"), signed by Defendant Lock. Additionally, attached to the 2Q23 10-Q were certifications pursuant to SOX signed by Defendants Newman and Lock stating they had read the 2Q23 10-Q and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information

included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report".

183.    The 2Q23 10-Q gave the following reasons for the decrease in Chemours' operating cash flow from $293 million in the first six months of 2022 to negative $58 million in the first six months of 2023:

> *Operating Activities*
>
> We used $58 million in cash flows for, and generated $293 million in cash flows from our operating activities during the six months ended June 30, 2023 and 2022, respectively. ***The decrease in our operating cash inflows was primarily attributable to lower earnings, changes in net working capital, primarily due to higher payment of payables due to timing of inventory build and higher cost of raw materials, and higher spend at our Fayetteville site***. These decreases were partially offset by lower incentive compensation payment in the first half of 2023 compared to the first half of 2022 and the one-time payment of the $25 million settlement with the State of Delaware in the first half of 2022 that did not recur in 2023.

(emphasis added).

184.    The foregoing statement was false and misleading when made because by failing to disclose the $215 million Chemours manipulated in improperly delayed payables and accelerated receivables in the fourth quarter of 2022 in violation of Chemours' internal policies and SEC policies, it gave the misleading impression that the negative $58 million in cash from operating activities for the first for the first six months of 2023 was attributable to other factors when it was instead driven, in significant part, by that manipulation. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

185.    The 2Q23 10-Q further stated concerning Chemours' operating cash flow generation:

Our primary sources of liquidity are cash generated from operations and available cash, along with our receivables securitization and borrowings under our debt financing arrangements, which includes borrowing capacity under our revolving credit facility. ***Our operating cash flow generation is driven by, among other things, the general global economic conditions at any point in time and their resulting impacts on demand for our products, raw materials and energy prices, and industry-specific issues, such as production capacity and utilization.*** Despite the current challenging market conditions across the industry, we anticipate that through our cost efforts and growth initiatives, our operations will provide sufficient liquidity, together with the availability under our Revolving Credit Facility, to support the cash needs for the businesses. ***We have a historical pattern of seasonality, with working capital use of cash in the first half of the year, and a working capital source of cash in the second half of the year.*** We have generated strong operating cash flows through various past industry and economic cycles, evidencing the underlying operating strength of our businesses.

(emphasis added).

186.    The foregoing statement was false and misleading when made because it failed to disclose that the $215 million Chemours manipulated in improperly delayed payables and accelerated receivables  in the fourth quarter of 2022 in violation of Chemours' internal policies and SEC policies was an important driver in the timing of Chemours' operating cash flow generation and instead attributed it to other factors, including a "pattern of seasonality" in Chemours' business. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

*10) The 2Q 2023 Earnings Call and Presentation*

187.    On July 28, 2023, Chemours conducted its second quarter 2023 earnings call (the "2Q 2023 Earnings Call"). During that call, in which Defendants Newman and Lock participated, they referred to "Q2 2023 Earning Prepared Remarks" and  "Chemours 2Q 2023 Earnings Presentation", dated July 27, 2023. Both of those documents are posted on the portion of

Chemours' website directed at investors. Brandon Ontjes, Vice President of FP&A and Investor Relations, stated on the 2Q 2023 Earnings Call that:

> During the course of this call, management will refer to certain non-GAAP financial measures that we believe are useful to investors evaluating the company's performance. A reconciliation of non-GAAP terms and adjustments are included in our release and at the end of our presentation.
>
> As a reminder, our prepared remarks, a full transcript, plus our earnings deck have been posted to the Investor Relations section of our website along our earnings release. This morning's call will focus purely on Q&A.

188.    In the Q2 2023 Earnings Prepared Remarks, Defendant Newman, while referencing Slide 3 of the Chemours 2Q 2023 Earnings Presentation, stated: "We are also making a slight revision to our Free Cash Flow guidance to now greater than $325 million, reflecting the business's resilience and ability to generate substantial cash flow throughout the business cycle."

189.    Later Defendant Newman, while referencing Slide 12, again stated: "Despite the emerging headwinds, we remain steadfast in our commitment to previous strategic capital investments, adhering to our capital expenditure guidance, and driving free cash flow of greater than $325 million."

190.    Slides 3, 12, and 21 of the Chemours 2Q 2023 Earnings Presentation also stated the Free Cash Flow guidance of greater than $325 million:



## Second Quarter 2023 Highlights

**Delivered solid 2Q results, with record Net Sales and Adjusted EBITDA in the TSS segment**

**Announced shutdown of TT Kuan Yin, Taiwan facility to optimize manufacturing circuit**

**Reached comprehensive settlement of PFAS-related drinking water claims of a defined class of U.S. public water systems**

**Agreed to sell Glycolic Acid Business for $137M; launched THE Mobility F.C. Membranes Co.**

**Revised Adjusted EBITDA guidance range to $1.100B to $1.175B¹, Free Cash Flow to be >$325M²**

¹ Adjusted EBITDA referred to throughout, principally exclude the impact of recent legal settlements for legacy environmental matters and associated fees in addition to other items of a non-recurring nature.
² Assumes future cash payments of approximately $592 million related to the recent PFAS settlement with U.S. public water systems, which is currently pending preliminary court approval, will occur after December 31, 2023.
See reconciliation of Non-GAAP measures in the Appendix
³ Updated Adjusted EPS guidance range to $3.27-$3.60

 Chemours™

3

191.    Slide 12 stated:

## 2023 Guidance – Update of Earnings and Cash Metrics

**Adjusted EBITDA** — **$1.100-$1.175 Billion²**

**Adjusted EPS** — **$3.27-$3.60²**

**Free Cash Flow** — **>$325 Million³**

**Updated Key Business Factors and Assumptions¹:**

- Delayed recovery in TT, with 2H demand flat to slightly improved compared to 1H, given uneven and uncertain macroeconomic conditions globally
- Weaker 2H demand for products in the Advanced Materials portfolio with continued elevated input costs, partially offset by solid customer demand in Performance Solutions portfolio
- Continued Opteon™ adoption ahead of HFC step-down in 2024. Uncertainty in the rate of automotive and construction end-market demand recovery with typical seasonal demand in 2H
- Raw material cost inflation to moderate from 1H with sequential easing as we progress throughout the year
- No strengthening in USD from 2Q level

**Capital Expenditure Guidance** *(Unchanged)*:

- Free Cash Flow guidance reflects ~$400 million in capital expenditures
- Capital expenditures to support long-term demand growth in TSS and APM, run and maintain and sustainability
  - ○ ~$200 million of growth capex (Opteon™ expansion, Nafion™ expansion, semicon PFA expansion)
  - ○ ~$200 million of run and maintain and sustainability capex

See reconciliation of Non-GAAP measures in the Appendix
¹ Subject to risks, uncertainties and assumptions, all of which are described in our public filings and safe harbor statement.
² Adjusted EBITDA and Adjusted EPS, referred to throughout, principally exclude the impact of recent legal settlements for legacy environmental matters and associated fees in addition to other items of a non-recurring nature.
³ Assumes future cash payments of approximately $592 million related to the recent PFAS settlement with U.S. public water systems, which is currently pending preliminary court approval, will occur after December 31, 2023.

12

 Chemours™

192.    Slide 21 stated:

**Estimated GAAP Cash Flows Provided by Operating Activities to Free Cash Flow Reconciliations (*) (Unaudited)**

($ in millions)

| | (Estimated) Year Ending December 31, 2023 |
|---|---|
| Cash provided by operating activities | $ >725 |
| Less: Purchases of property, plant and equipment | ~(400) |
| **Free Cash Flows** | $ >325 |

* Assumes future cash payments of approximately $592 million related to the recent PFAS settlement with U.S. public water systems, which is currently pending preliminary court approval, will occur after December 31, 2023.

The Company's estimates reflect its current visibility and expectations based on market factors, such as currency movements, macro-economic factors, and end-market demand. Actual results could differ materially from these current estimates.

193.    The foregoing two statements and three slides were false and misleading when made because they failed to disclose that meeting its 2023 Free Cash Flow and Cash Flow Provided by Operating Activities projections required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

*11) The October 26, 2023 Press Release and 8-K*

194.    On October 26, 2023, the Company filed a Form 8-K signed by Defendant Lock. A press release attached to the filing stated: "Given weaker demand outlook, we now anticipate full year Adjusted EBITDA to be between $1.025 billion and $1.075 billion; with Adjusted Free Cash Flow guidance greater than $225 million."

195.    The October 26, 2023 8-K further stated: "The Company is updating its full year 2023 Adjusted EBITDA and Adjusted Free Cash Flow guidance. The Company now expects full year 2023 Adjusted EBITDA to be within the range of $1.025 to $1.075 billion and ***Adjusted Free Cash Flow of greater than $225 million, inclusive of approximately $400 million of capital expenditures which remains unchanged***." (emphasis added).

196.    The October 26, 2023 8-K also included a chart with the following cash flow guidance:

**2023 Estimated GAAP Cash Flow Provided by Operating Activities to Estimated Free Cash Flows and Adjusted Free Cash Flows Reconciliation (\*)**

|  | (Estimated) Year Ending December 31, 2023 |
|---|---|
| Cash flow provided by operating activities | $                      >588 |
| Less: Purchases of property, plant, and equipment | ~(400) |
| **Free Cash Flows (1)** | >188 |
| PFAS Litigation Settlements (2) | 37 |
| **Adjusted Free Cash Flows (1)** | $                      >225 |

(1) Assumes the release of restricted cash related to the recent PFAS settlement with U.S. public water systems, which is subject to court approval, will occur after December 31, 2023.

(2) Represents litigation settlements and fees related to PFAS and PFOA matters.

(\*) The Company's estimates reflect its current visibility and expectations based on market factors, such as currency movements, macro-economic factors, and end-market demand. Actual results could differ materially from these current estimates.

197.    The foregoing statement and chart were false and misleading when made because they failed to disclose that meeting its 2023 Free Cash Flow, Adjusted Free Cash Flow, and Cash Flow Provided by Operating Activities projections required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

*12) The 3Q23 10-Q*

198.    On October 27, 2023, the Company filed with the SEC its quarterly report on form 10-Q for the period ended September 30, 2023 (the "3Q23 10-Q"), signed by Defendant Lock. Additionally, attached to the 3Q23 10-Q were certifications pursuant to SOX signed by Defendants Newman and Lock stating that they had read the 3Q23 10-Q and that it "does not

contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

199.    The 3Q23 10-Q gave the following reasons for the decrease in Chemours' operating cash flow from $594 million in the first nine months of 2022 to $72 million in the first nine months of 2023:

*Operating Activities*

We generated $72 million and $594 million in cash flows from our operating activities during the nine months ended September 30, 2023 and 2022, respectively. ***The decrease in our operating cash inflows was primarily attributable to lower earnings, changes in net working capital, primarily due to higher payment of payables due to timing, inventory build and higher cost of raw materials, and higher spend at our Fayetteville site.*** These decreases were partially offset by lower incentive compensation payment in 2023 compared to 2022 and the one-time payment of the $25 million settlement with the State of Delaware in 2022 that did not recur in 2023.

(emphasis added)

200.    The foregoing statement was false and misleading when made because by failing to disclose the $215 million Chemours manipulated in improperly delayed payables and accelerated receivables in the fourth quarter of 2022 in violation of Chemours' internal policies and SEC policies, it gave the misleading impression that the $72 million generated in operating cash flow for the first for the first nine months of 2023 was attributable to other factors when it was instead driven, in significant part, by that manipulation. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to

the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

201.    The 3Q23 10-Q further stated:

Our primary sources of liquidity are cash generated from operations and available cash, along with our receivables securitization and borrowings under our debt financing arrangements, which includes borrowing capacity under our revolving credit facility. ***Our operating cash flow generation is driven by, among other things, the general global economic conditions at any point in time and their resulting impacts on demand for our products, raw materials and energy prices, and industry-specific issues, such as production capacity and utilization.*** During the third quarter of 2023, we announced our Titanium Technologies Transformation Plan, that includes incremental efforts to streamline our workforce and improve other operational costs designed to yield cost savings and drive improved margins. We expect these transformation initiatives to deliver an earnings benefit of approximately $100 million in 2024. Despite the current challenging market conditions across the industry, we anticipate that through our cost efforts and growth initiatives, our operations will provide sufficient liquidity, together with the availability under our Revolving Credit Facility, to support the cash needs for the businesses. ***We have a historical pattern of seasonality, with working capital use of cash in the first half of the year, and a working capital source of cash in the second half of the year.*** We have generated strong operating cash flows through various past industry and economic cycles, evidencing the underlying operating strength of our businesses.

202.    The foregoing statement was false and misleading when made because it failed to disclose that the $215 million Chemours manipulated in improperly delayed payables and accelerated receivables  in the fourth quarter of 2022 in violation of Chemours' internal policies and SEC policies was an important driver in the timing of Chemours' operating cash flow generation and instead attributed it entirely to other factors, including a "pattern of seasonality" in Chemours' business. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

*13) The 3Q 2023 Earnings Call and Presentation*

203.    On October 27, 2023, Chemours conducted its third quarter 2023 earnings call (the

"3Q 2023 Earnings Call"). During that call, in which Defendants Newman and Lock participated,

they referred to "Q3 2023 Earning Prepared Remarks" and the "Chemours 3Q 2023 Earnings

Presentation", dated October 26, 2023. Both of those documents are posted on the portion of

Chemours' website directed at investors. Brandon Ontjes, Vice President of FP&A and Investor

Relations stated on the 2Q 2023 Earnings Call that:

> During the course of this call, management will refer to certain non-GAAP financial
> measures that we believe are useful to investors evaluating the company's
> performance. A reconciliation of non-GAAP terms and adjustments are included in
> our release and at the end of our presentation. As a reminder, our prepared remarks,
> a full transcript, plus our earnings deck have been posted to the Investor Relations
> section of our website along with our earnings release. This morning's call will
> focus purely on Q&A.

204.    In the Q2 2023 Earning Prepared Remarks, Defendant Newman, while referencing

Slide 4 of the Chemours 3Q 2023 Earnings Presentation, stated: "Finally, given our third quarter

results and a weaker demand outlook through year-end, we are revising our full-year 2023

Adjusted EBITDA guidance range to between $1.025 billion and $1.075 billion, which is down

(8%) at the midpoint, and ***we now expect our Adjusted Free Cash Flow to be greater than $225***

***million***." (emphasis added).

205.    Later Defendant Newman, while referencing Slide 13, again stated: "***We also***

***expect Adjusted Free Cash Flow will be greater than $225 million***. As you just heard from

Jonathan, this change reflects the ongoing global demand challenges impacting products in both

our TT segment and APM's Advanced Materials portfolio." (emphasis added).

206.    Slides 4, 13, 22 of the Chemours 3Q 2023 Earnings Presentation stated a 2023

Adjusted Free Cash Flow guidance of greater than $225 million for 2023:



207.    Slide 13 stated:



208.    Slide 22 stated the Adjusted Free Cash Flow Guidance along with guidance of greater than $188 million for Free Cash Flow and $588 million for Cash Provided by Operating Activities:



209.    The foregoing two statements and three slides were false and misleading when made because they failed to disclose that meeting its 2023 Adjusted Free Cash Flow, Free Cash Flow, and Cash Flow Provided by Operating Activities projections required Chemours to improperly delay payables and accelerate receivables in violation of Chemours' internal policies and SEC policies. Chemours later admitted that this manipulation of payables and receivables "violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"

**B.  Internal Controls Misstatements.**

210.    The 2022 10-K SOX certifications, signed by Defendants Newman and Ralhan, stated that:

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)     ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements*** for external purposes in accordance with generally accepted accounting principles;

c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and,

d)     ***Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting***; and,

5.     The registrant's other certifying officer and ***I have disclosed, based on our most recent evaluation of internal control over financial reporting***, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)     ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and,

b)     ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

(emphasis added).

211.    The 2022 10-K stated that Defendants Newman and Ralhan "have concluded that [Chemours'] disclosure controls and procedures are effective at the reasonable assurance level" and "there have been no changes in [Chemours'] internal control over financial reporting":

### Disclosure Controls and Procedures

We maintain disclosure controls and procedures designed to provide reasonable assurance that the information required to be disclosed in our reports filed or submitted under the Securities Exchange Act of 1934 (the "Exchange Act") is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the U.S. Securities and Exchange Commission ("SEC"). These controls and procedures also provide reasonable assurance that information required to be disclosed in such reports is accumulated and communicated to management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), to allow timely decisions regarding required disclosures.

As of December 31, 2022, our CEO and CFO, together with management, conducted an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) under the Exchange Act. Based on that evaluation, *the CEO and CFO have concluded that these disclosure controls and procedures are effective at the reasonable assurance level*.

### Changes in Internal Control over Financial Reporting

*There have been no changes in our internal control over financial reporting* that occurred during the year ended December 31, 2022 *that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

### Management's Report on Internal Control over Financial Reporting

*We have completed an evaluation of our internal control over financial reporting and have concluded that our internal control over financial reporting was effective* as of December 31, 2022 (refer to "Management's Report on Internal Control over Financial Reporting" on page F-2 to the *Consolidated Financial Statements*). The effectiveness of our internal control over financial reporting as of December 31, 2022 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein (refer to the "Report of Independent Registered Public Accounting Firm" on page F-3 to the *Consolidated Financial Statements*).

(emphasis in titles in original; other emphasis added).

212.    The 2022 10-K also stated, with additional signatures from Defendants Newman and Ralhan below it that:

72

**Management's Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:

(i)      pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

(ii)      provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that receipts and expenditures of the Company are being made only in accordance with authorization of management and directors of the Company; and,

(iii)      provide reasonable assurance regarding prevention or timely detection of unauthorized acquisitions, uses, or dispositions of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2022, based on criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control - Integrated Framework* (2013). ***Based on its assessment and those criteria, management concluded that the Company maintained effective internal control over financial reporting as of December 31, 2022***.

(emphasis in titles in original; other emphasis added).

213.    The foregoing three statements were false and misleading when made because Defendants exploited weaknesses in Chemours' internal controls in financial reporting, including four control deficiencies relating to failure to set an appropriate tone at the top, design and maintenance of effective controls related to information and communication, design and maintenance of effective controls related to evaluation and escalation of reports made to the Chemours Ethics Hotline, and design and maintenance of effective controls related to vendor

master data in order to prevent unauthorized cash disbursements, to improperly delay payables and accelerate receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies. The statements are also false because Defendants engaged in an intentional scheme to override internal controls and misrepresent Operating Cash Flow and Free Cash Flow in an effort to mislead investors and obtain larger incentive compensation.

214.    Attached to the 1Q23 10-Q were certifications pursuant to SOX signed by Defendants Newman and Ralhan substantially similar to the ones described in Paragraph 210.

215.    The 1Q23 10-Q further stated that Defendants Newman and Ralhan "conducted an evaluation of the effectiveness of our disclosure controls and procedures" and "have concluded that these disclosure controls and procedures are effective at the reasonable assurance level":

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that the information required to be disclosed in our reports filed or submitted under the Securities Exchange Act of 1934 ("Exchange Act") is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the U.S. Securities and Exchange Commission ("SEC"). These controls and procedures also provide reasonable assurance that information required to be disclosed in such reports is accumulated and communicated to management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), to allow timely decisions regarding required disclosures.

As of March 31, 2023, our CEO and CFO, together with management, conducted an evaluation of the effectiveness of our disclosure controls and procedure*s* as defined in Rule 13a-15(e) under the Exchange Act. ***Based on that evaluation, the CEO and CFO have concluded that these disclosure controls and procedures are effective at the reasonable assurance level.***

**Changes in Internal Control over Financial Reporting**

There ***have been no changes in our internal control over financial reporting that occurred*** during the quarter ended March 31, 2023 that have ***materially affected, or are reasonably likely to materially affect, our internal control over financial reporting***.

74

(emphasis in titles in original; other emphasis added).

216. The foregoing two statements were false and misleading when made because Defendants exploited weaknesses in Chemours' internal controls in financial reporting, including four control deficiencies relating to failure to set an appropriate tone at the top, design and maintenance of effective controls related to information and communication, design and maintenance of effective controls related to evaluation and escalation of reports made to the Chemours Ethics Hotline, and design and maintenance of effective controls related to vendor master data in order to prevent unauthorized cash disbursements, to improperly delay payables and accelerate receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies. The statements are also false because Defendants engaged in an intentional scheme to override internal controls and misrepresent Operating Cash Flow and Free Cash Flow in an effort to mislead investors and obtain larger incentive compensation.

217. Attached to the 2Q23 10-Q were certifications pursuant to SOX signed by Defendants Newman and Lock substantially similar to the ones described in Paragraph 210.

218. The 2Q23 10-Q stated that Defendants Newman and Lock "conducted an evaluation of the effectiveness of our disclosure controls and procedures" and "have concluded that these disclosure controls and procedures are effective at the reasonable assurance level":

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that the information required to be disclosed in our reports filed or submitted under the Securities Exchange Act of 1934 ("Exchange Act") is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the U.S. Securities and Exchange Commission ("SEC"). These controls and procedures also provide reasonable assurance that information required to be disclosed in such reports is accumulated and communicated to management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), to allow timely decisions regarding required disclosures.

As of June 30, 2023, our CEO and CFO, together with management, conducted an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) under the Exchange Act. Based on that evaluation, ***the CEO and CFO have concluded that these disclosure controls and procedures are effective at the reasonable assurance level.***

### **Changes in Internal Control over Financial Reporting**

***There have been no changes in our internal control over financial reporting*** that occurred during the quarter ended June 30, 2023 ***that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(emphasis in titles in original; other emphasis added).

219.    The foregoing two statements were false and misleading when made because Defendants exploited weaknesses in Chemours' internal controls in financial reporting, including four control deficiencies relating to failure to set an appropriate tone at the top, design and maintenance of effective controls related to information and communication, design and maintenance of effective controls related to evaluation and escalation of reports made to the Chemours Ethics Hotline, and design and maintenance of effective controls related to vendor master data in order to prevent unauthorized cash disbursements, to improperly delay payables and accelerate receivables, manipulating a total of $215 million in the fourth quarter of 2022, in violation of Chemours' internal policies and SEC policies. The statements are also false because Defendants engaged in an intentional scheme to override internal controls and misrepresent Operating Cash Flow and Free Cash Flow in an effort to mislead investors and obtain larger incentive compensation.

220.    Attached to the 3Q23 10-Q were certifications pursuant to SOX signed by Defendants Newman and Lock substantially similar to the ones described in Paragraph 210.

221. The 3Q23 10-Q stated that Defendants Newman and Lock "conducted an evaluation of the effectiveness of our disclosure controls and procedures" and "have concluded that these disclosure controls and procedures are effective at the reasonable assurance level":

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that the information required to be disclosed in our reports filed or submitted under the Securities Exchange Act of 1934 ("Exchange Act") is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the U.S. Securities and Exchange Commission ("SEC"). These controls and procedures also provide reasonable assurance that information required to be disclosed in such reports is accumulated and communicated to management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), to allow timely decisions regarding required disclosures.

As of September 30, 2023, our CEO and CFO, together with management, conducted an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) under the Exchange Act. Based on that evaluation, *the CEO and CFO have concluded that these disclosure controls and procedures are effective at the reasonable assurance level*.

**Changes in Internal Control over Financial Reporting**

*There have been no changes in our internal control over financial reporting* that occurred during the quarter ended September 30, 2023 *that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

(emphasis in titles in original; other emphasis added).

222. The foregoing two statements were false and misleading when made because Defendants exploited weaknesses in Chemours' internal controls in financial reporting, including four control deficiencies relating to failure to set an appropriate tone at the top, design and maintenance of effective controls related to information and communication, design and maintenance of effective controls related to evaluation and escalation of reports made to the Chemours Ethics Hotline, and design and maintenance of effective controls related to vendor master data in order to prevent unauthorized cash disbursements, to improperly delay payables

and accelerate receivables, manipulating a total of $215 million in the fourth quarter of 2022 and again exploiting those deficiencies to manipulate payables and receivables at the end of 2023, in violation of Chemours' internal policies and SEC policies. The statements are also false because Defendants engaged in an intentional scheme to override internal controls and misrepresent Operating Cash Flow and Free Cash Flow in an effort to mislead investors and obtain larger incentive compensation.

### C. Code of Ethics Misstatements.

223.    During the entire Class Period, Chemours' Code of Ethics For the Chief Executive Officer, Chief Financial Officer, and Controller was posted on the portion of Chemours' website directed at investors. Further the 2023 Proxy Statement (signed by Defendant Newman) stated that the Company's "Code of Ethics for the CEO, CFO and Controller applies to those three executive officers" and '[t]his Code sets forth the standards of conduct that the CEO, CFO and Controller must uphold while performing his or her duties"

224.    The Code of Ethics stated: "In performing his or her duties, the Chief Executive Officer, the Chief Financial Officer, and the Controller shall…*promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications* made by the Company." (emphasis added).

225.    The foregoing statement was false and misleading when made because, as admitted by Chemours (*see* Paragraph 79), Defendants Newman, Lock, and Wisel violated this provision of the Code of Ethics when they made their statements concerning Free Cash Flow without disclosing that they improperly delayed payables and accelerated receivables in violation of Chemours' internal policies and SEC policies.

## ADDITIONAL SCIENTER ALLEGATIONS

**A. The Individual Defendants Had Motives to Mislead Investors.**

*1) The Individual Defendants Had a Motive to Make Their Misleading Statements Because Free Cash Flow was a Key Metric for Determining Their Incentive Compensation.*

226.    As discussed above, Chemours admitted that the Individual Defendants engaged in efforts to delay payments to certain vendors that were originally due to be paid in the fourth quarters of 2022 and 2023 until the first quarters of the following year, and to accelerate the collection of receivables into the fourth quarters of 2022 and 2023 that were originally not due to be received until the first quarter of the following year "in part to meet free cash flow targets…which…would be part of a key metric for determining incentive compensation applicable to executive officers."

227.    According to Chemours 2023 Proxy Statement, incentive pay was a large percentage of the target compensation for both the CEO and other NEOs. Since Defendant Newman was CEO, his target pay was 14% base salary, 18% annual incentive pay ("AIP"), and 68% long-term incentive pay ("LTIP"). As CFO, the target pay of Defendants Ralhan and Lock was 29% base salary, 22% AIP, and 49% LTIP. Based on this, the 2023 Proxy Statement described the CEO and NEOs as having 86% and 71% of their "pay at risk" because it was based on incentive compensation.

228.    Defendant Wisel's compensation was also heavily influenced by incentive compensation. When she was appointed to her position as VP, Chief Accounting Officer and Controller on September 29, 2021, Chemours filed an 8-K that stated she would receive an annual base salary of $312,500 and be eligible for an AIP award of 50% of base salary and a target LTIP award of $300,000

229.    Free Cash Flow was a huge factor in both AIP and LTIP compensation.

230.    AIP incentive compensation was determined by the following formula from the 2023 Proxy Statement:



231.    Free Cash Flow was one of two "CC Financial Metrics" that were weighted equally (the other was Adjusted EBITDA). Therefore *Free Cash Flow accounted for 42.5% of each Individual Defendant's AIP incentive compensation*.

232.    Additionally, Chemours set a threshold for Free Cash Flow each year that the Company had to exceed for the Individual Defendants to receive any AIP compensation based on Free Cash Flow. For 2022 the threshold was $372 million. Accordingly, without the $215 million manipulation in 2022 boosting Free Cash Flow to $447 million, the Individual Defendants would not have received any AIP compensation based on Free Cash Flow. Instead, because they undertook the manipulation, Defendant Newman received an additional $320,637 in AIP compensation which was almost of third of his $1,000,000 base salary. Defendant Ralhan received an additional $123,322 in AIP compensation in 2022 because of the manipulation, which was almost 20% of his $625,000 base salary.

233.    Additionally, Chemours' 2024 Proxy Statement shows that the threshold for an AIP award based on Free Cash Flow for 2023 was $244 million. The manipulation that Defendant Newman, Lock, and Wisel undertook at the end of 2023 would have put them over that threshold with Free Cash Flow of $273 million, but because Chemours discounted the manipulation after the board of directors discovered them, they did not make the threshold.

234.    LTIP compensation was also heavily based on Free Cash Flow during the Class Period. The 2020-2022 LTIP compensation was 60% Performance Stock Units ("PSUs) and

2021-2023 and 2022-2024 LTIP compensation was 50% PSUs. PSU awards for each of those periods was based on pre-established three-year cumulative targets for two metrics — Free Cash Flow Conversion and Adjusted Net Income, which were given equal weight. The formula was also modified by the change in Chemours' stock price over the LTIP period (called the rTSR modifier), which gave the Individual Defendants a motive to keep the stock price high. The Free Cash Flow Conversion metric is defined as Free Cash Flow divided by Adjusted EBITDA.

235.    PSU equity awards for the 2020-2022 LTIP "earned 214% of target value" because "Free Cash Flow Conversion exceeded expectations which resulted in a payment of 200% of target." Accordingly as a result of the 2020-2022 LTIP, Defendant Newman earned 147,540 PSUs (the target was 62,370) and Defendant Ralhan earned 98,360 PSUs (the target was 41,580)

236.    As discussed above, LTIP played an outsized role in each of the Individual Defendants' target compensation: 68% for Newman, 49% for Ralhan and Lock, and close to 40% for Wisel.

2)    *The Individual Defendants Were Motivated to Make Their Misleading Statements Because They Wanted to Meet Publicly Communicated Free Cash Flow Targets*

237.    Chemours admitted that the Individual Defendants engaged in efforts to delay payments to certain vendors that were originally due to be paid in the fourth quarters of 2022 and 2023 until the first quarters of the following year, and to accelerate the collection of receivables into the fourth quarters of 2022 and 2023 that were originally not due to be received until the first quarter of the following year "in part to meet free cash flow targets that the Company had communicated publicly."

238.    As discussed above in Paragraph 56, the 2022 10-K acknowledged that the failure to meet "key financial and non-financial targets", including Free Cash Flow, "could ***negatively***

*impact the value of our business and adversely affect our stock price*." Accordingly, Defendants were highly motivated to mislead investors.

   3) *Defendant Ralhan Filed Form 144s During the Class Period Indicating his intent to Sell Millions of Dollars of Chemours Common Stock at Inflated Prices.*

239.    Between June 8, 2023 and September 14, 2023, starting only a few months after Defendant Ralhan announced the full-year Free Cash Flow for 2022, Defendant Ralhan filed Form 144s with the SEC indicating his intent *to sell 259,408 shares of Chemours common stock for $8,544,292.83*, or $32.93 a share, within three months of the filing of the form.

240.    These sales were unusual for Defendant Ralhan. Since Ralhan was appointed CFO of Chemours in 2019, he had only sold 89,820 shares of Chemours common stock total (34,457 shares in 2021 and 55,363 in 2022).

241.    Accordingly, Defendant Ralhan was motivated to make misleading statements concerning Chemours' cash flow metrics and internal controls so that he could sell shares of the Company's common stock at inflated prices.

## B. The Defendants Acted Knowingly or Recklessly.

   1) *Defendant Newman Acted Knowingly or Recklessly.*

242.    The Audit Committee of Chemours' board of directors found that Newman acted knowingly or recklessly. As described in Paragraphs 73-74, on February 29, 2024, the Company's board of directors put Defendant Newman on administrative leave and appointed an interim CEO. Then on March 6, 2024 (*see* Paragraphs 78-83), Chemours announced that the Audit Committee's review had "*determined that there was a lack of transparency with the Company's Board of Directors by the members of senior management who were placed on administrative leave last week due to the payables and receivables timing actions..and their effect on free cash flow targets at the end of the relevant periods*" and they had "*violated the Company's Code of Ethics*

applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the '***promot[ion of] full, fair, accurate, timely and understandable disclosure***.'" (emphasis added). The Audit Committee further found that Defendant Newman and the others engaged in those timing actions "***in part to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers***." (emphasis added). Defendant Newman resigned his officer and director positions within the Company effective March 22, 2024 and was "not entitled to any severance, equity award vesting or other compensation in connection with his resignation, other than any rights he has to vested benefits under the terms of the Company's employee benefit plans."

243.    As described in Paragraphs 108-109, FE-1 stated that Newman had long running direct involvement in the improper end of the year Free Cash Flow manipulation at Chemours starting, at the latest, when he was serving as CFO in 2018, when he attended daily meetings about delaying payables and accelerating receivables. Additionally, FE-2 (Paragraph 116) understood that when her supervisor told her that delaying payables at the end of 2023 was a "top down" directive she meant that it had come directly from Defendant Newman.

244.    Defendant Newman's fraudulent intent and recklessness is further supported by the fact he spoke about Free Cash Flow on every earnings call during the Class Period and signed and signed SOX certifications for the Class Period 10-Qs which gave investors misleading explanations for Chemours' weak Free Cash Flow and Operating Cash Flow numbers during 2023.

245.    Defendant Newman's fraudulent intent and recklessness is also supported because the SOX certifications he signed for the 2022 10-K and for all the Class Period 10-Qs which

specifically stated that they did "not contain any untrue statement" and that "the financial statements, and other financial information included in this report, *fairly present* in all material respects the financial condition, *results of operations and cash flows* of the registrant."

246.    Finally, Defendant Newman knowingly misrepresented that Chemours' internal controls over financial reporting were effective because he exploited them before and during the Class Period to manipulate Free Cash Flow in an effort to increase his incentive pay and to meet publicly communicated targets. He exploited them while representing that he had conducted an evaluation that concluded "controls and procedures [were] effective at the reasonable assurance level and certified" and certified in his SOX certifications that he had disclosed "[a]ll significant deficiencies and material weaknesses in…internal control over financial reporting" in the 2022 10-K and Class Period 10-Qs.

### 2)    *Defendant Lock Acted Knowingly or Recklessly.*

247.    The Audit Committee of Chemours' board of directors found that Lock acted knowingly or recklessly. As described in Paragraphs 73-74, on February 29, 2024, the Company's board of directors put Defendant Lock on administrative leave and appointed an interim CFO. Then on March 6, 2024 (*see* Paragraphs 78-83), Chemours announced that the Audit Committee's review had "*determined that there was a lack of transparency with the Company's Board of Directors by the members of senior management who were placed on administrative leave last week due to the payables and receivables timing actions…and their effect on free cash flow targets at the end of the relevant periods*" and they had "*violated the Company's Code of Ethics* applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the '*promot[ion of] full, fair, accurate, timely and understandable disclosure*.'" (emphasis added). The Audit Committee further found that Defendant Lock and the others engaged in those timing actions "*in part to meet free cash flow targets that the Company had communicated*

*publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers*." (emphasis added). Defendant Lock resigned all his positions at the Company effective April 25, 2024 and was "not entitled to any severance, equity award vesting or other compensation in connection with his resignation."

248.    Furthermore, as CFO it was Defendant Lock's job to review and assess the accuracy of the Company's financial statements. Additionally, Lock participated in every earnings call during the Class Period, where Free Cash Flow was prominently discussed, and discussed Free Cash Flow himself during the earnings calls for the second and third quarters of 2023 after he became CFO. Lock also signed and executed SOX certification for the 10-Qs for the second and third quarters of 2023 which gave investors misleading explanations for Chemours' weak Free Cash Flow and Operating Cash Flow numbers for the beginning of 2023.

249.    Defendant Lock's fraudulent intent and recklessness is also supported by the SOX certifications he signed for the 10-Qs for the second and third quarter of 2023, which specifically stated that they did "not contain any untrue statement" and that "the financial statements, and other financial information included in this report, *fairly present* in all material respects the financial condition, *results of operations and cash flows* of the registrant."

250.    Finally, Defendant Lock knowingly misrepresented that Chemours' internal controls over financial reporting were effective because he exploited them before and during the Class Period to manipulate Free Cash Flow in an effort to increase his incentive pay and to meet publicly communicated targets.  He exploited them while representing that he had conducted an evaluation that concluded "controls and procedures [were] effective at the reasonable assurance level and certified" and certified in his SOX certifications that he had disclosed "[a]ll significant

deficiencies and material weaknesses in…internal control over financial reporting" in the 10-Qs for the second and third quarters of 2023.

*3) Defendant Wisel Acted Knowingly or Recklessly.*

251.    The Audit Committee of Chemours' board of directors found that Wisel acted knowingly or recklessly. As described in Paragraphs 73-74, on February 29, 2024, the Company's board of directors put Defendant Wisel on administrative leave. Then on March 6, 2024 (*see* Paragraphs 78-83), Chemours announced that the Audit Committee's review had "***determined that there was a lack of transparency with the Company's Board of Directors by the members of senior management who were placed on administrative leave last week due to the payables and receivables timing actions…and their effect on free cash flow targets at the end of the relevant periods***" and they had "***violated the Company's Code of Ethics*** applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the '***promot[ion of] full, fair, accurate, timely and understandable disclosure***.'" (emphasis added). The Audit Committee further found that Defendant Wisel and the others engaged in those timing actions "***in part to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers***." (emphasis added). On July 25, 2024, Chemours hired David A. Will as the Company's new permanent Controller and Chief Accounting Officer.

252.    Additionally, as VP, Chief Accounting Officer and Controller it was Defendant Wisel's job to review and assess the accuracy of the Company's financial statements.

253.    Defendant Wisel also knowingly misrepresented that Chemours internal controls over financial reporting were effective because she exploited them before and during the Class Period to manipulate Free Cash Flow in an effort to increase her incentive pay and to meet publicly communicated targets.

    *4) Defendant Ralhan Acted Knowingly or Recklessly.*

254.    It is inconceivable that Defendant Ralhan, who as CFO until June 19, 2023 was responsible for reviewing Chemours' financial statements, was not involved in and not aware of the Free Cash Flow manipulation that the Company undertook at the end of 2022 given that the Audit Committee determined that Newman, the CEO, Lock, who was the Senior Vice President & Chief Development Officer and succeeded Ralhan as CFO, and Wisel, who was Chief Accounting Officer and Controller, were aware of the manipulation.

255.    As described in Paragraphs 108-109, FE-1 stated that Ralhan had long running direct involvement in Free Cash Flow manipulation at Chemours starting, at the latest, when he was serving as a VP of Finance in 2018, when he attended daily meetings about delaying payables and accelerating receivables. According to FE-1, Ralhan decided which accounts would not be paid even though they were due.

256.    Defendant Ralhan's fraudulent intent and recklessness is further supported by the fact he spoke about Free Cash Flow on the earnings calls for the 2022 fourth quarter and full-year results and for the first quarter results.  He also made statements during the earnings call for the 2022 fourth quarter and full-year results and in signing the first quarter 2023 10-Q that gave investors misleading explanations for Chemours' weak Free Cash Flow and Operating Cash Flow numbers for the beginning of 2023.

257.    Defendant Ralhan's fraudulent intent and recklessness is also supported by the SOX certifications he signed for the 2022 10-K and for the 10-Q for the first quarter of 2023, which specifically stated that they did "not contain any untrue statement" and that "the financial statements, and other financial information included in this report, ***fairly present*** in all material respects the financial condition, ***results of operations and cash flows*** of the registrant." (emphasis added).

258.    Finally, Defendant Ralhan knowingly misrepresented that Chemours' internal controls of financial reporting were effective because he exploited them before and during the Class Period to manipulate Free Cash Flow in an effort to increase his incentive pay and to meet publicly communicated targets. He exploited them while representing that he had conducted an evaluation that concluded "controls and procedures [were] effective at the reasonable assurance level and certified" and certified in his SOX certifications that he had disclosed "[a]ll significant deficiencies and material weaknesses in…internal control over financial reporting" in the 2022 10-K and 10-Q for the first quarter of 2023.

5)    *The Magnitude of the Cash Flow Manipulation and Coordination Required Strongly Supports the Scienter of Each Individual Defendant.*

259.    As alleged above, the Defendants' manipulation of Chemours' Cash Provided by Operating Activities was significant. In 2022, the $215 million in combined accelerated collections and delayed payable accounted for more 28% of the $754 million of the Cash Provided by Operating Activities that Chemours reported for the year and was greater than the $161 million the Company reported for the entire fourth quarter of 2022.  And in 2023, it was even greater — the $360 million in combined accelerated collections and delayed payables accounted for almost 65% of the $556 million of the Cash Provided by Operating Activities that Chemours reported for 2023.

260.    Furthermore, Chemours' anomalous Free Cash Flow of negative $210 million and negative $119 million in Cash Provided by Operating Activities in the first quarter of 2023 along with its robust projection of $350 million in Free Cash Flow on $750 million in Cash Flows Provided by Operating Activities strongly supports that Defendants planned from the beginning of 2023 to manipulate those metrics at the end of the year. FE-1 confirmed this, stating that the only way Chemours' Free Cash Flow guidance was plausible at the time it was communicated is

if Defendants intended to manipulate it at the end of the year to achieve it.

261.    The statements of FE-1 and FE-2 further indicate that end of the year Free Cash Flow manipulations required extensive planning, including many team meetings involving a large number of people. According to FE-2, to execute the manipulation at the end of 2023, work needed to start in October.

262.    Finally, the statements of FE-1 and FE-2, along with Chemours' own admissions, indicate that there was a pattern of end of year Free Cash Flow manipulations at Chemours.

263.    All of these facts strongly support the inference that Defendants acted intentionally or recklessly, as opposed to negligently.

### C. The Individual Defendants Acted Intentionally or Recklessly When They Approved and Failed to Correct the Aforementioned Misstatements.

264.    Each of the Individual Defendants was provided with copies of the aforementioned SEC filings and other documents that contained the misleading statements alleged herein before their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. They were at minimum reckless when they signed and/or authorized the issuance of those public filing and other public statements and signed SOX Certifications.

### D. There is a Strong Inference that Chemours Acted with Scienter.

265.    Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Chemours, including each high-ranking officer or director, is imputable to the Company. The knowledge of each of these individuals should therefore be imputed to Chemours for the purposes of assessing corporate scienter.

266.    Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Chemours as an entity. Corporate scienter may

be alleged independent of individual defendants where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading. Given the importance of Chemours' Free Cash Flow and internal controls statements, they necessarily would have required the approval of a corporate officer with knowledge that they were false and misleading.

**DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD INVESTORS**

267.    Defendants engaged in a scheme to mislead the public about Chemours' Free Cash Flow and Cash Provided by Operating Activities and the effectiveness of the Company's internal controls.

268.    As alleged above, Chemours admitted that Defendants exploited the Company's undisclosed ineffective internal controls to engaged in a scheme to delay payments to certain vendors that were originally due to be paid in the fourth quarters of 2022 and 2023 until the first quarters of the following year, and to accelerate the collection of receivables into the fourth quarters of 2022 and 2023 that were originally not due to be received until the first quarter of the following year.

269.    The purpose of Defendants' scheme was to mislead investors since Chemours admitted it was "to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers."

270.    This had the effect of misleading investors because Defendants undertook their scheme knowing that the Company would disseminate statements concerning Chemours' Free Cash Flow and Cash Flow Provided by Operating Activities numbers to investors that did not disclose the manipulations described above and stating that the Company's internal controls for financial reporting were effective.

## LOSS CAUSATION

271.    On February 13, 2024, after market hours, Chemours filed an 8-K with an attached press release announcing that it "has postponed the release of its financial results and conference call related to the fourth quarter and full year ended December 31, 2023" because it needed additional time to evaluate its to complete its year-end reporting process since it was "***evaluating its internal control over financial reporting as of December 31, 2023 with respect to maintaining effective controls related to information and communications***" and "***[t]he Company's Audit Committee also need[ed] additional time to complete a related internal review***." (emphasis added).

272.    On this news, Chemours' common stock fell $3.85 per share from its closing price on February 13, 2024, or more than 12%, to close at $26.64 per share on February 14, 2024.

273.    On February 29, 2024, before the market opened, the Company filed with the SEC a late filing notice on form NT 10-K and Form 8-K with an attached press release. In those filings the Company disclosed that the board of directors had put Defendants Newman, Lock, and Wisel on administrative leave "pending the completion of an internal review being overseen by the Audit Committee of the Board of Directors with the assistance of independent outside counsel." They further disclosed that the scope of the internal review "includes the processes for reviewing reports made to the Chemours Ethics Hotline, the Company's practices for managing working capital, including the related impact on metrics within the Company's incentive plans, certain non-GAAP metrics included in filings made with the Securities and Exchange Commission or otherwise publicly released, and related disclosures." The Company further acknowledged that it was "evaluating one or more potential material weaknesses in its internal control over financial reporting as of December 31, 2023 with respect to maintaining effective controls related to the control environment, including the effectiveness of the 'tone at the top' set by certain members

of senior management and information and communication components of the COSO internal control framework."

274.    On this news, the price of Chemours' stock fell $9.05 per share from its closing price on February 28, 2024, or more than 31%, to close at $19.67 on February 29, 2024.

275.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

276.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased Chemours common stock, purchased Chemours call options, and sold Chemours put options publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

277.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

278.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

279.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

280.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

281.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

282.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

283.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

284.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

**For Violations of Section 10(b) And Rule 10b-5(b) Promulgated Thereunder**
**Against All Defendants**

285.    Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

286.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

287.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

288.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

95

289.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

290.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

291.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

292.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

293.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

294.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants

295.    Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

296.    This Count is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) promulgated thereunder by the SEC. Accordingly, Plaintiffs need not allege in this Court nor prove in this case that any of the Exchange Act Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

297.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the price of Chemours' common stock;

and (iii) cause Plaintiffs and other members of the Class to purchase Chemours' common stock at artificially inflated prices.

298.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of Chemours' common stock, in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder.

299.    The Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included their scheme to defraud investors by manipulating payables and receivables, knowing that it would be reflected in Chemours' public statements to investors, including in Free Cash Flow, and the Defendants made and/or controlled the making of those statements, while concealing the manipulation of payables and receivables.

300.    Despite the numerous representations that were made to the market—and ample opportunity to supplement, alter, or correct such misrepresentations—the Defendants failed to do so, thereby concealing the Company's scheme to defraud from investors.

301.    Lead Plaintiffs and the Exchange Act Class reasonably relied upon the integrity of the market in which Chemours' common stock traded.

302.    During the Class Period, Plaintiffs were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Plaintiffs known the true extent of the Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Chemours common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

303.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Chemours common stock during the Class Period.

304.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of Chemours common stock during the Class Period.

## COUNT III

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

305.    Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

306.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

307.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

308.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace

during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

309.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  September 11, 2024

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Brian B. Alexander, Esq.
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: balexander@rosenlegal.com

*Counsel for Plaintiffs and the Class*