**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| THE CHEMOURS COMPANY SECURITIES LITIGATION | Case No. 24-cv-361 RGA |
| This document relates to all actions. | <u>CLASS ACTION</u> |

**OPENING BRIEF IN SUPPORT OF
THE CHEMOURS COMPANY'S MOTION TO DISMISS
<u>THE AMENDED CLASS ACTION COMPLAINT</u>**

OF COUNSEL:

WACHTELL, LIPTON, ROSEN
   & KATZ

Jonathan M. Moses (*pro hac vice*)
Noah B. Yavitz (*pro hac vice*)
Canem Ozyildirim (*pro hac vice*)
51 West 52nd Street
New York, NY  10019
(212) 403-1000

POTTER ANDERSON
   & CORROON LLP

Peter J. Walsh, Jr. (#2437)
Tyler E. Cragg (#6398)
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
(302) 984-6000

*Counsel for The Chemours Company*

October 11, 2024

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...........................................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS ....................................................................2

SUMMARY OF ARGUMENT .......................................................................................................2

STATEMENT OF FACTS ..............................................................................................................3

       A.      The Defendants. ...........................................................................................................3

       B.      Chemours discloses its cash flows to the public, while explaining that cash flows are impacted by management's timing of receivables and payables and cautioning that they should be reviewed in conjunction with Chemours' financial statements.....................................................................................................3

       C.      Chemours issues financial statements in 2023, together with guidance on anticipated Free Cash Flow........................................................................................5

       D.      The Audit Committee conducts an internal review, then places Newman, Lock, and Wisel on administrative leave while Chemours warns the market of deterioration in its operating performance.........................................................6

       E.      Chemours issues its annual report for 2023, confirming a steep decline in its business, and Newman, Lock, and Wisel resign.......................................................8

ARGUMENT...................................................................................................................................10

I.      Plaintiffs fail to plead any false or misleading statements or omissions. ...........................10

       A.      Plaintiffs do not plead any "Free Cash Flow Misstatements." ...............................10

       B.      Plaintiffs do not plead any actionable misstatement of Chemours' cash flow guidance. ..................................................................................................................14

       C.      Plaintiffs do not plead any actionable misstatement concerning Chemours' internal controls. .......................................................................................................15

       D.      Plaintiffs do not plead any actionable misstatement concerning Chemours' Code of Ethics...........................................................................................................17

       E.      The other statements challenged by Plaintiffs are otherwise inactionable. ...........18

II.     Plaintiffs fail to plead scienter. ..........................................................................................20

A.      Plaintiffs do not plead that the Individual Defendants were aware of any purported accounting improprieties. ..................................................................21

B.      The Individual Defendants' generic motivations do not support an inference of scienter. ...............................................................................................23

C.      Plaintiffs cannot plead scienter by mischaracterizing Chemours' disclosures. .....24

        1.      Chemours has not admitted that the Individual Defendants "exploited" internal control deficiencies. ..................................................24

        2.      Chemours has not admitted that the Individual Defendants "manipulated" the Company's books. ........................................................25

        3.      Chemours' personnel changes do not support an inference of scienter. ................................................................................................25

D.      The allegations of the purported "Former Employees" do not help Plaintiffs. .....26

E.      Plaintiffs' grab-bag of other allegations does not move the needle.......................27

III.    Plaintiffs do not plead that all the alleged misrepresentations caused Chemours stockholders to suffer any loss......................................................................................29

IV.     Plaintiffs fail to adequately plead "Scheme Liability" under Rule 10b-5(a) and (c).........30

CONCLUSION.............................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bartesch* v. *Cook*,
  941 F. Supp. 2d 501 (D. Del. 2013)...........................................................................13, 18, 22

*Behrmann* v. *Brandt*,
  2020 WL 4432536 (D. Del. July 31, 2020) ..................................................................... 11-12

*Cheng* v. *Activision Blizzard, Inc.*,
  2022 WL 2101919 (C.D. Cal. Apr. 18, 2022) ........................................................................13

*City of Edinburgh Council* v. *Pfizer, Inc.*,
  754 F.3d 136 (3d Cir. 2014)..............................................................................................3 n.2, 10

*City of Pontiac Policemen's and Firemen's Ret. Sys.* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014)...................................................................................................13

*City of Roseville Emps. Ret. Sys.* v. *Horizon Lines, Inc.*,
  686 F. Supp. 2d 404 (D. Del. 2009),
  *aff'd*, 442 F. App'x 672 (3d Cir. 2011)...........................................................................17, 23

*City of Roseville Emps.' Ret. Sys.* v. *Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010) .......................................................................................23

*City of Warren Police & Fire Ret. Sys.* v. *Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) ....................................................................................................16

*Connor* v. *Unisys Corp.*,
  2024 WL 387633 (E.D. Pa. Feb. 1, 2024) ....................................................................... 15-16

*Das* v. *Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018)....................................................................................25

*Glover* v. *DeLuca*,
  2006 WL 2850448 (W.D. Pa. Sept. 29, 2006)..................................................................13, 21

*Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.*,
  141 S. Ct. 1951 (2021)............................................................................................................29

*Harris* v. *AmTrust Fin. Servs., Inc.*,
  135 F. Supp. 3d 155 (S.D.N.Y. 2015),
  *aff'd*, 649 F. App'x 7 (2d Cir. 2016)................................................................................11 n.8

*Hayes* v. *Gross*,
  982 F.2d 104 (3d Cir. 1992)...................................................................................................25

*Hull* v. *Glob. Digital Sols., Inc.*,
  2017 WL 6493148 (D.N.J. Dec. 19, 2017) ..................................................................30

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)........................................................................18, 20, 28

*In re Audible Inc. Sec. Litig.*,
  2007 WL 1062986 (D.N.J. Apr. 3, 2007) .............................................................26

*In re Aurora Cannabis Inc. Sec. Litig.*,
  2023 WL 5508831 (D.N.J. Aug. 24, 2023) ..........................................................30

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)...............................................................................28

*In re Cognizant Techs. Sols. Sec. Litig.*,
  2018 WL 3772675 (D.N.J. Aug. 8, 2018) ......................................................16, 17

*In re Craftmatic Sec. Litig.*,
  890 F.2d 628 (3d Cir. 1990)..................................................................................13

*In re Great Atl. & Pac. Tea Co.*,
  103 F. App'x 465 (3d Cir. 2004) .....................................................................22, 23

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017),
  *aff'd*, 905 F.3d 106 (3d Cir. 2018)...................................................................18, 25

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018)......................................................................... *passim*

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) .................................................................20, 21, 23

*In re Mylan N.V. Sec. Litig.*,
  2023 WL 3539371 (W.D. Pa. May 18, 2023).......................................................12

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d Cir. 2002)............................................................................3 n.2

*In re Ocugen, Inc. Sec. Litig.*,
  2024 WL 1209513 (3d Cir. Mar. 21, 2024)..........................................................14

*In re Ravisent Techs., Inc.*,
  2004 WL 1563024 (E.D. Pa. July 13, 2004)........................................................22

*In re Resolute Energy Corp. Sec. Litig.*,
    2021 WL 327385 (D. Del. Feb. 1, 2021),
    *aff'd*, 2022 WL 260059 (3d Cir. Jan. 27, 2022)........................................................................29

*In re Royal Dutch/Shell Transp.*,
    2006 WL 2355402 (D.N.J. Aug. 14, 2006) ............................................................................30

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)..............................................................................12, 16

*In re Synchronoss Techs., Inc. Sec. Litig.*,
    2019 WL 2849933 (D.N.J. July 2, 2019).............................................................................22

*Institutional Invs. Grp.* v. *Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...............................................................................15, 20, 21, 23

*Kumar* v. *Kulicke and Soffa Indus., Inc.*,
    2019 WL 5081896 (E.D. Pa. Oct. 9, 2019)..........................................................................26

*Matrix Capital Management Fund, LP* v. *BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ...............................................................................................24

*McCabe* v. *Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007).................................................................................................29

*Nat'l Junior Baseball League* v. *Pharmanet Dev. Grp. Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ................................................................................20, 27

*Pension Ben. Guar. Corp.* v. *White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993)..........................................................................................3 n.2

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund* v. *Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) .............................................................................................17

*Schmidt* v. *Skolas*,
    770 F.3d 241 (3d Cir. 2014..............................................................................................3 n.2

*Se. Pa. Transp. Auth.* v. *Orrstown Fin. Servs., Inc.*,
    2022 WL 3572474 (M.D. Pa. Aug. 18, 2022) ......................................................................15

*SEC* v. *Fierro*,
    2023 WL 4249011 (D.N.J. June 29, 2023).....................................................................21 n.13

*SEC* v. *Mintz*,
    2024 WL 1173096 (D.N.J. Mar. 18, 2024)...........................................................................30

*Takata* v. *Riot Blockchain, Inc.*,
    2020 WL 2079375 (D.N.J. Apr. 30, 2020) ...........................................................................30

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
     551 U.S. 308 (2007)........................................................................................................20

*Webb* v. *Solarcity Corp.*,
     884 F.3d 844 (9th Cir. 2018) .........................................................................................28

*Zhengyu He* v. *China Zenix Auto Int'l Ltd.*,
     2020 WL 3169506 (D.N.J. June 12, 2020) ...............................................................17 n.12

**Statutes and Rules**

15 U.S.C. § 78u-4(b)(1) .........................................................................................................10

15 U.S.C. § 78u-4(b)(2)(A).....................................................................................................20

15 U.S.C. § 78u-5(i)(1)(A) .....................................................................................................15

15 U.S.C. § 78u-5(i)(1)(D) .....................................................................................................15

15 U.S.C. § 78u-5(c)(1)(A)(i).................................................................................................15

Fed. R. Civ. P. 9(b) ................................................................................................................10

Sarbanes-Oxley Act of 2002.....................................................................................6, 15, 17 n.12

**Other Authorities**

FASB, Non-Authoritative Concepts Statement No. 8 ..........................................................11 n.8

## PRELIMINARY STATEMENT

This is a securities fraud action claiming that The Chemours Company ("Chemours") and several of its former executives misled investors about cash flows and related internal controls between February 2023 and February 2024.  But Plaintiffs do not allege any violation of accounting rules.  Nor do they dispute that Chemours received every dollar disclosed, through legitimate sales that were properly recognized.  And Chemours has not restated any of its financial disclosures.  To the contrary, its outside accountants confirmed in March 2024 that Chemours had "present[ed] fairly, in all material respects," its cash flows.

Plaintiffs allege that Defendants nevertheless deceived investors because they did not disclose that, in late 2022 and late 2023, Chemours executives undertook an effort to have customers pay invoices sooner and vendors receive payments later, based in part on a desire to achieve published guidance and potentially earn larger bonuses.  For support, Plaintiffs point to a series of disclosures that Chemours made in early 2024, which reported on an internal review that identified a "lack of transparency" with Chemours' board regarding those efforts, giving rise to a material deficiency in internal controls and a violation of Chemours' internal ethical guidelines.  None of that is a finding of market deception — let alone knowing, reckless, or fraudulent conduct.  Indeed, Chemours had previously cautioned investors, repeatedly, that such "timing" of receivables and payables was a significant factor in its reported cash flows and statements.

Not surprisingly, therefore, the Complaint fails on several independent grounds.  *First*, Plaintiffs allege no false or misleading disclosures.  Chemours provided an accurate account of its cash flows and the principal factors influencing them, and there is no basis in Plaintiffs' allegations to infer that any Individual Defendant contemporaneously believed the timing activity, which improved Chemours' year-end liquidity, was improper or even unusual.  The challenged statements — consisting of cash flow disclosures, forward-looking guidance, certifications about internal controls, and stray characterizations of Chemours' business — thus supply no basis for securities fraud.

*Second*, Plaintiffs do not plead sufficient facts to support a strong inference of scienter. The determination by Chemours' Audit Committee that several of its former officers were less than fully transparent with the board in regard to a metric that could have affected their compensation does not support an inference that any Defendant acted with the requisite knowledge of wrongdoing or extreme recklessness required for securities fraud.

*Third*, while the Complaint challenges statements about cash flow timing activities, Plaintiffs plead nothing to show that Chemours' supposedly deficient disclosures on that topic harmed stockholders. Indeed, when Chemours disclosed the conduct in March 2024 — after the end of the Class Period — Chemours' share price went <u>up</u> 15 percent.

Plaintiffs seek to piggyback on the actions of Chemours' board in its oversight of the company's officers. Chemours respectfully submits that the Court should reject Plaintiffs' effort to spin these internal corporate matters into securities fraud. The Amended Complaint (the "Complaint")[1] should be dismissed, with prejudice, for failure to state a claim.

## NATURE AND STAGE OF THE PROCEEDINGS

In March 2024, two individual Chemours stockholders sued Defendants separately, both on behalf of a putative class of Chemours stockholders. Dkt. 1; *Masel* v. *The Chemours Company.*, No. 1:24-cv-00377 (D. Del.), ECF No. 1. On July 10, 2024, the Court consolidated the cases and appointed Nguyen as Lead Plaintiff. Dkt. 10. On September 11, 2024, Nguyen filed the Complaint, Dkt. 17, joined by two Named Plaintiffs (collectively, "Plaintiffs"). Defendants now move to dismiss.

## SUMMARY OF ARGUMENT

1. Plaintiffs fail to plead any false or misleading statement or omission. Point I.

2. Plaintiffs fail to plead scienter. Point II.

3. Plaintiffs fail to plead loss causation for each alleged misstatement. Point III.

4. Plaintiffs fail to plead "scheme" liability. Point IV.

---

[1] References to "¶ __" are to the specified paragraph of the Complaint.

## STATEMENT OF FACTS

**A.    The Defendants.**

Defendant Chemours is a Delaware corporation that produces industrial and specialty chemical products.  ¶ 2.  Defendants Mark Newman, Sameer Ralhan, Jonathan Lock, and Camela Wisel (collectively, the "Individual Defendants") are former Chemours officers.  As relevant here, Newman served as Chemours' Chief Executive Officer from July 2021 until February 2024, ¶ 28, Lock served as the company's Senior Vice President and Chief Financial Officer ("CFO") from June 2023 until February 2024, ¶ 30, Ralhan preceded Lock as CFO from June 2019 until June 2023, ¶ 29, and Wisel served as the company's Vice President, Controller, and Principal Accounting Officer from September 2021 until February 2024, ¶ 31.

**B.    Chemours discloses its cash flows to the public, while explaining that cash flows are impacted by management's timing of receivables and payables and cautioning that they should be reviewed in conjunction with Chemours' financial statements.**

Chemours' business is comprised of three reporting segments:  Titanium Technologies ("TT"), Thermal & Specialized Solutions ("TSS"), and Advanced Performance Materials ("APM").  ¶ 36.  Prior to 2023, TT generated roughly half of the company's earnings, while TSS and APM each generated roughly a quarter.  Ex. 10 (2022 10-K) at F-76.[2]  As required under generally accepted accounting principles ("GAAP"), Chemours periodically reports the cash provided by these operating activities ("Operating Cash Flow") — a figure that captures the net operating flow of funds into and out of the company.  ¶ 54.  Since it began issuing SEC filings,

---

[2] On a motion to dismiss, the Court must evaluate "documents incorporated into the complaint by reference and matters of which [it] may take judicial notice," *City of Edinburgh Council* v. *Pfizer, Inc.*, 754 F.3d 159, 163 n.3, 166 (3d Cir. 2014), including SEC filings, newspaper articles, and any "undisputedly authentic document that a defendant attaches as an exhibit to [its motion] if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp.* v. *White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Schmidt* v. *Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("SEC filings attached by a number of the defendants[] are matters of public record of which the court can take judicial notice."); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (taking judicial notice of documents pertaining to stock price data).  The Cragg Declaration filed alongside this brief includes various Chemours SEC filings and other documents that are subject to judicial notice, which are referenced as "Ex. __."

Chemours has reported that its operating results is driven by, among other things, "global economic conditions," but that it has "generated strong operating cash flow through various industry and economic cycles evidencing the operating strength of [its] business[]." Ex. 1 (2014 Form 10) at 19, 74.[3]  Chemours has also cautioned that due to a "historical pattern of seasonality" in its business, ¶ 65, it experiences seasonal variation in cash flows, "with working capital use of cash in the first half of the year, and a working capital source of cash in the second half of the year," ¶¶ 185, 201; Ex. 2 (2015 Form 10-K) at 45.

Over the years, Chemours' disclosures consistently identified a close link between its Operating Cash Flow and its "working capital," *id.* — a measure of liquidity that reflects the difference between a company's current assets and its current liabilities.  *See, e.g.*, Ex. 10 (2022 10-K) at 48, F-8.  As detailed in Chemours' financial statements, the calculation of its working capital is dominated by its customer receivables and inventories (which comprise the majority of its current assets) and its accounts payable (which comprise the majority of its current liabilities). *Id.* at 48-51, F-8.  When Chemours collects on customer invoices, its receivables convert into cash that boosts Operating Cash Flow.  When Chemours pays its vendors, its accounts payable convert into payments that reduce Operating Cash Flow.  In this way, working capital represents a temporary buffer between financial results and cash.  By reviewing Chemours' financial statements, investors can track revenue originating as sales, which are then recorded as receivables, and finally feed into cash flow as the company's customers make payments for invoiced amounts.

When Chemours collects on receivables earlier, its sales impact its cash flows earlier; when Chemours pays vendors later, its vendor payments impact its cash flows later.  Given this relationship, Chemours has long highlighted the effects that management's timing of collections

---

[3] *See* Ex. 3 (2016 10-K) at 44 (same); Ex. 4 (2017 10-K) at 51 (same); Ex. 5 (2018 10-K) at 43 (same); Ex. 6 (2019 10-K) at 42 (same); Ex. 7 (2020 10-K) at 52 (substantially similar); Ex. 8 (2021 10-K) at 47 (substantially similar); Ex. 10 (2022 10-K) at 45 (substantially similar); Ex. 20 (2023 10-K) at 55 ("we have historically generated operating cash flows through various past industry and economic cycles").

and payments have on its cash flows, flagging the "timing of [its] collection[s]" on receivables and the "timing of [its] payment[s] on accounts payable" as one of the principal factors influencing its calculation of Operating Cash Flow. *See, e.g.*, Ex. 10 (2022 10-K) at 48-49.

Beginning in 2015, Chemours also disclosed a non-GAAP metric called "Free Cash Flow," which is calculated as Operating Cash Flow minus cash used for purchases of property, plant, and equipment (another GAAP figure, representing certain capital outlays). Ex. 2 (2015 10-K) at 56. Free Cash Flow is one of many non-GAAP figures that Chemours has reported, the most significant of which is "Adjusted EBITDA," which Chemours has flagged as its "primary measure of segment profitability." *See, e.g.*, Ex. 7 (2020 10-K) at 71 (disclosing the non-GAAP figures of adjusted EBITDA, adjusted net income, adjusted earnings per share, free cash flow, return on invested capital, and net leverage ratio). While Chemours presents these non-GAAP measures as "useful financial analysis tool[s] that c[ould] assist investors in assessing the company's operating performance and underlying prospects," ¶ 55, it warns that they should "not be considered in isolation or as a substitute for analysis of [its] results as reported under GAAP," and "should be read in conjunction with [its] financial statements and notes thereto." Ex. 2 (2015 10-K) at 57, 60; Ex. 10 (2022 10-K) at 64.

### C.    Chemours issues financial statements in 2023, together with guidance on anticipated Free Cash Flow.

In February 2023, Chemours filed its 2022 annual report and disclosed that it had generated $754 million in Operating Cash Flow and $447 million in Free Cash Flow. ¶ 125. Chemours also announced that it expected Free Cash Flow exceeding $350 million in 2023. ¶ 60; Ex. 9 (Feb. 09, 2023 8-K). In explaining its results, Chemours noted that the year-over-year variation in operating cash flows was:

> primarily attributable to changes in working capital, primarily related to changes in inventory due to higher unit costs, impact of timing of payment on accounts payable and collection of our accounts receivable, higher payments related to environmental remediation at Fayetteville, and payment of the $25 million settlement with the State of Delaware.

Ex. 10 (2022 10-K) at 48 (emphasis added).  Accordingly, Chemours reported that it ended the

year with $94 million less in receivables and $89 million more in accounts payable than it had in

2021 — shifts that were "primarily attributable" to "the timing of collections from [its]

customers" and "the timing of payments to [its] vendors," respectively.  *Id.* at 49-50.

As required by the Sarbanes-Oxley Act of 2002 ("SOX"), Chemours' annual report also

included customary certifications by Newman and Ralhan, confirming that "based on [their]

assessment," they had "concluded that [Chemours] maintained effective internal control over

financial reporting as of December 31, 2022."  Ex. 10 (2022 10-K) at F-2; ¶ 212.  This

assessment was seconded by Chemours' independent auditors, who opined based on their review

that Chemours had maintained effective internal controls and that its "consolidated financial

statements . . . present[ed] fairly, in all material respects, [its] financial position . . . and . . . cash

flows" for 2022.  *Id.* at F-3.

Chemours issued equivalent disclosures concerning its Operating Cash Flow, Free Cash

Flow, and internal controls in each of its quarterly reports for 2023.  ¶¶ 162, 182, 198.  Due to

deterioration in the performance of its business, Chemours also reduced its Free Cash Flow

guidance as the year progressed.  *See* Ex. 12 (July 27, 2023 8-K) (reducing guidance to $325

million, citing "weaker 2H demand visibility"); Ex. 14 (Oct. 26, 2023 8-K) (reducing guidance to

$225 million, citing "weaker demand outlook").

**D.**     **The Audit Committee conducts an internal review, then places**
           **Newman, Lock, and Wisel on administrative leave while Chemours**
           **warns the market of deterioration in its operating performance.**

On February 13, 2024, Chemours announced that it was postponing the release of its full

year 2023 financial results because it "need[ed] additional time to complete its year-end

reporting process."  ¶¶ 11, 71; Ex. 16 (Feb. 13, 2024 8-K) at 1.  The company also disclosed that

its board's Audit Committee was conducting an "internal review" to "evaluat[e] its internal

control over financial reporting . . . with respect to maintaining effective controls related to

information and communication." ¶¶ 11, 71.  The announcement provided no specifics on the nature of the review.  Chemours' share price fell 12% over the next trading day.  ¶ 12.

Two weeks later, on February 29, 2024, Chemours announced that it had placed Newman, Lock, and Wisel on administrative leave, "pending the completion of [the Audit Committee's] internal review."  Ex. 17 (Feb. 29, 2024 8-K); ¶ 13.  The company provided limited information about the review, disclosing only that it was focused on "the processes for reviewing reports made to the Chemours Ethics Hotline" and "practices for managing working capital, including the related impact on metrics within the Company's incentive plans, certain non-GAAP" metrics included in filings.  ¶ 13.  Based on its work to date, Chemours reported that it was evaluating potential material weaknesses in its internal control over financial reporting as of December 31, 2023, including with respect to "tone at the top."  ¶ 13.

In the same press release, Chemours also announced "unaudited preliminary estimates of operating results" for 2023.  Ex. 17 (Feb. 29, 2024 8-K).  The company reported a significant year-over-year decline in net sales, which fell 11.8% from $6.8 billion to $6 billion.  *Id.*  The company described this decline as "primarily attributable to lower volumes" in TT and APM, partially offset by TSS performance.  *Id.*  Chemours indicated that it would suffer over $200 million in net losses, an $800 million decline from the half-billion dollars of net income reported for 2022.  *Id.*  Chemours' share price fell 31% the next day.  ¶ 14.

On March 6, 2024, Chemours issued another press release, announcing the Audit Committee's determination that there was a "lack of transparency with [Chemours'] Board of Directors by [Newman, Lock, and Wisel] due to [certain] payables and receivables timing actions" and that "[a]s a result, . . . in connection with [those] actions . . . [each had] violated the Company's Code of Ethics."  Ex. 18 (March 7, 2024 8-K); ¶¶ 78-79.  The press release summarized the Committee's conclusion that Newman, Lock, and Wisel had "engaged in efforts in the fourth quarter of 2023 to delay payments to certain vendors that were originally due to be paid in the fourth quarter of 2023" and also to "accelerate the collection of receivables into the fourth quarter of 2023," "in part to meet free cash flow targets . . . which also would be part of a

key metric for determining incentive compensation applicable to" them. ¶¶ 17, 79. The Audit Committee also noted that "similar," but "lesser" actions had taken place at the end of 2022. *Id.* The disclosure did not quantify the impact of any of the activity.

Based on these findings, Chemours disclosed that it "expect[ed] to report on material weaknesses" in its internal controls as of December 31, 2023 in its upcoming annual report "with respect to maintaining effective controls related to the control environment, including the effectiveness of the 'tone at the top' set by certain members of senior management." Ex. 18 (March 7, 2024 8-K). Chemours' share price rose 15% over the next trading day.[4]

### E.    Chemours issues its annual report for 2023, confirming a steep decline in its business, and Newman, Lock, and Wisel resign.

Chemours released its 2023 annual report on March 27, 2024, providing additional information concerning the Audit Committee's internal review. Ex. 20 (2023 10-K). Specifically, Chemours disclosed that Newman, Lock, and Wisel had delayed "up to approximately $100 million" in vendor payments and accelerated "approximately $260 million" of customer receivables in the fourth quarter of 2023, and that "similar actions" were taken by unnamed persons in the fourth quarter of 2022 with respect to $40 million in vendor payments and $175 million in receivables. *Id.* at 54. The net effect of these timing actions was to increase the net cash flowing into Chemours' accounts — and thus its Operating Cash Flow — by $145 million in 2023 and by $125 million in 2022. *Id.* at 55. The report also concluded that, as of December 31, 2023, management had "not design[ed] and maintain[ed] an effective control environment as senior management failed to set an appropriate tone at the top resulting in a material weakness." *Id.* at 77. This ineffective control environment was found to have contributed to other material weaknesses in internal controls related to: (1) "the information and communication component of the COSO Framework . . . to ensure appropriate communication between certain functions within the Company;" and (2) "the evaluation and escalation of reports

---

[4] Ex. 22 (chart of Chemours' share price).

made through the Chemours Ethics Hotline." *Id.* at 78.[5]  Notwithstanding these findings, the

2023 annual report identified no material misstatements in any of Chemours' reported financials.

*Id.* at 77-78.  In addition, Chemours' independent auditors reaffirmed that the financial

statements complied with GAAP and presented "fairly, in all material respects, the financial

position of the Company as of December 31, 2023 and 2022" and "the results of its operations

and its cash flows for each of the three years in the period ended December 31, 2023." *Id.* at F-2.

Newman had resigned from his roles at Chemours on March 22, 2024.  Ex. 19 (March 25, 2024

8-K).  Lock resigned a month later, on April 23, 2024.  Ex. 21 (April 25, 2024 8-K).  By that

point, Chemours' share price had largely recovered from its declines over the prior month,

despite the company's $800 million drop in sales.



Sources: *CRSP*; Amended Complaint; Chemours SEC Filings

Note: Prices are not adjusted for dividends.

---

[5] The annual report also identified a weakness in controls designed to prevent "unauthorized changes to [] vendor master files in order to prevent unauthorized cash disbursements." ¶ 96. However, the filing did not link this finding to the cash flow actions of its former management.

## ARGUMENT

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must plead facts sufficient to show: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council* v. *Pfizer, Inc.*, 754 F.3d 136, 167 (3d Cir. 2014). Ordinary notice-pleading standards do not apply. Under Fed. R. Civ. P. 9(b), a complaint must plead fraud "with particularity." And under the Private Securities Litigation Reform Act of 1995 ("PSLRA), it must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading. . . ." 15 U.S.C. § 78u-4(b)(1) (emphasis added). The PSLRA further requires a plaintiff to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2).

The Complaint falls well short of these exacting requirements on two independent grounds. Plaintiffs do not adequately allege any misrepresentations or omissions actionable as securities fraud, *see infra* Point I, nor do they allege particularized facts giving rise to a strong inference of scienter, *see infra* Point II. Moreover, even if the Complaint pleaded falsity or scienter, Plaintiffs do not allege any loss suffered by stockholders with respect to the core challenged statements — namely, those relating to timing actions of payables and receivables. *See infra* Point III. And these same arguments dispatch Plaintiffs' claims of "scheme" liability. *See infra* Point IV. For those reasons, the Complaint should be dismissed.[6]

### I.      Plaintiffs fail to plead any false or misleading statements or omissions.

#### A.      Plaintiffs do not plead any "Free Cash Flow Misstatements."

Plaintiffs' lead theory is that Defendants made "[m]isstatements" concerning Chemours' cash flows during the Class Period, after "indicat[ing] . . . that Free Cash Flow was one of the

---

[6] Chemours also incorporates by reference the arguments presented by the Individual Defendants in support of their motions to dismiss, as relevant to Plaintiffs' claims against Chemours.

Company's [m]ost [i]mportant [f]inancial [m]etrics." ¶¶ 54-58.[7]  The Complaint does not, however, claim any violation of GAAP.[8]  Nor does it claim that Chemours ever overstated the cash generated by its business.  Nor that Chemours booked phony sales, prematurely recognized earnings, engaged in "channel stuffing," or anything like that.[9]  The Complaint lacks such allegations because, as Plaintiffs must concede, Chemours actually received every dollar that it reported during the Class Period, in the quarter for which it was reported, based on legitimate sales that were properly recorded under recognized accounting principles.  Indeed, if Chemours had recorded its cash flows otherwise — if it had reported any of those funds in an earlier or later quarter — that would have violated GAAP.

For this reason, Chemours has not restated any of its financial statements, even after a thorough review conducted by an army of lawyers and accountants.  Quite the contrary:  After the internal review concluded, the company's independent, outside accountants reaffirmed that Chemours' "consolidated financial statements . . . present[ed] fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2023." Ex. 20 (2023 10-K) at F-2 (emphasis added).  The Complaint thus does not — and cannot — dispute that Chemours fairly presented its cash flows during the Class Period.  This, alone, is dispositive as to those statements. *Behrmann* v. *Brandt*, 2020 WL 4432536, at \*10 (D. Del. July

---

[7] These statements are alleged at ¶¶ 119, 121, 125, 130, 132, 134, 135, 136, 138, 139, 141, 142, 143, 144, 149, 156, 163, 165, 167, 172, 173, 175, 183, and 199.

[8] Plaintiffs point to a "Statement of Financial Accounting Concepts," ¶¶ 39-40, but this "does not establish generally accepted accounting standards." *See* FASB Concepts Statements, available at https://www.fasb.org/jsp/FASB/Page/PreCodSectionPage&cid=1176156317989.  Issuers have no duty to supplement their GAAP disclosures to comply with this "conceptual" guidance. *Harris* v. *AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 172 n.28 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

[9] The alleged activity is thus entirely unlike the misconduct described by the SEC in the non-binding consent orders cited by Plaintiffs. *See* ¶¶ 45-46 (citing *In the Matter of Marvell Tech. Grp., Ltd.*, Admin. Proc. No. 3-19454, where the respondent manufactured sales by pushing customers "to accept product earlier than they had requested"); ¶¶ 48-49 (citing *In the Matter of Under Armour, Inc.*, Admin. Proc. No. 3-20278, involving the same conduct).

-11-

31, 2020), *report and recommendation adopted*, 2020 WL 5752389 (D. Del. Sept. 25, 2020) ("Absent inaccuracies in a company's reported financial results, statements or omissions regarding those financial statements are generally not actionable.") (citing *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403-04 (S.D.N.Y. 2016) ("[T]he allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability")).

Unable to dispute the accuracy of Chemours' accounting, Plaintiffs instead claim that Defendants' presentation of the company's cash flows was "misleading" because Defendants "failed to disclose that Chemours improperly delayed payables and accelerated receivables . . . in violation of Chemours' internal policies and SEC policies." *See, e.g.*, ¶ 120.  But Plaintiffs offer no well-pleaded allegations in support of this accusation.

To begin, Chemours did disclose to investors that its cash flows were significantly impacted by discretionary "timing" of payables and receivables, which were separately disclosed in any event.  For example, the Complaint alleges that when Chemours issued its 2022 annual report, it committed securities fraud by announcing $754 million in Operating Cash Flow without disclosing "improperly delayed payables and accelerated receivables."  ¶ 131.  But that same filing specifically called out the major impact of the "timing of payment on accounts payable and collection of [Chemours'] accounts receivable," Ex. 10 (2022 10-K) at 48, and also itemized the significant year-over-year change in receivables and payables — shifts that were "primarily attributable" to, among other factors, "the timing of collections from our customers" and "the timing of payments to our vendors," respectively. *Id.* at 49-50.  Equivalent disclosures are found in all of the financial statements cited by the Complaint.[10]  Plaintiffs cannot plead fraud by omission in the face of these express disclosures. *See In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *11 (W.D. Pa. May 18, 2023) (dismissing where the issuer "disclosed the very

---

[10] Ex. 11 (1Q23 10-Q) at 53 (attributing shifts in receivables and payables to the "timing of collections from customers" and the "timing of vendor payments"); Ex. 13 (2Q23 10-Q) at 58-59 (same); Ex. 15 (3Q23 10-Q) at 62-63 (substantially similar).

thing that Plaintiff claim[ed] was left out").

Nor can Plaintiffs plead fraud based on a "failure" to characterize this disclosed capital management as "improper" or contrary to "internal" and "SEC" policies. "[D]isclosure is not a rite of confession," *City of Pontiac Policemen's and Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014), and management had no obligation to "frame their disclosures in such a pejorative manner." *Bartesch* v. *Cook*, 941 F. Supp. 2d 501, 508-09 (D. Del. 2013) (citing *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 639-40 (3d Cir. 1990) ("Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts.")). "[A]bsent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or violations of a company's internal codes of conduct and legal policies." *Cheng* v. *Activision Blizzard, Inc.*, 2022 WL 2101919, at *9 (C.D. Cal. Apr. 18, 2022).

*Glover* v. *DeLuca*, 2006 WL 2850448 (W.D. Pa. Sept. 29, 2006), is on point. Like Plaintiffs here, Glover alleged that executives had "manipulated" a company's accounting by "postponing payments, particularly to vendors and subcontractors, until the next quarter." *Id.* at *21. Judge Hardiman held that this theory fell short, even if the allegations were credited, because the stockholder had "failed to establish why this practice constitut[ed] fraud, violated the terms of [third-party agreements], GAAP, or any SEC regulation, or why it should have been disclosed to the market." *Id.* at *22. As here, there was "no allegation that the [defendant company] was keeping two sets of books to hide [its] actions" — to the contrary, the impact of the delayed payments was disclosed within the company's "accounts payable total." *Id.*

And even if the Exchange Act did impose a duty of self-flagellation, it would not apply in this case, because the Complaint does not plead that any Defendant contemporaneously believed management's conduct was improper. To the contrary, Plaintiffs cite purported witnesses who claim that management's year-end timing of cash flows was long-standing, routine and widely known among executives. ¶ 108 (alleging "daily calls" in December 2018 on which timing was

discussed); ¶ 118 (characterizing the timing as "'routine practice' at Chemours"). Nor do the disclosures in 2024 that underlay the Complaint change the assessment. Chemours' Audit Committee criticized management for a failure to identify and escalate the timing actions to the board, but nowhere stated that management believed their actions to be improper. Ex. 18 (March 7, 2024 8-K). At worst, Plaintiffs could take this as a "suggestion that the Individual Defendants were just bad leaders" who failed to update their board. *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 (3d Cir. 2018). But allegations of poor leadership or judgment cannot "substitute for contemporaneous knowledge in a securities fraud case." *In re Ocugen, Inc. Sec. Litig.*, 2024 WL 1209513, at *5 (3d Cir. Mar. 21, 2024).

For the same reason, Plaintiffs are not helped by their unsupported assertion that Chemours "indicated to the market that Free Cash Flow was one of the Company's most important financial metrics." ¶¶ 54-58. Contrary to Plaintiffs' assertion, Chemours discussed not one, but six different non-GAAP metrics, as "useful financial analysis tool[s] that can assist investors in assessing [its] operating performance and underlying prospects," Ex. 10 (2022 10-K) at 64. Far from emphasizing the importance of Free Cash Flow, Chemours said it "utilize[s] Adjusted EBITDA as the primary measure of segment profitability." *Id.* And Chemours also warned its investors that those non-GAAP figures should be reviewed "in conjunction with" other financial reporting — such as the specific disclosure that Chemours' cash flows were significantly impacted by the timing of payables and receivables. *Id.*

## B.    Plaintiffs do not plead any actionable misstatement of Chemours' cash flow guidance.

The Complaint claims that when Defendants provided cash flow guidance through the Class Period, they misled the market by failing to disclose that achieving those cash flows would "requir[e] [Chemours] to improperly delay payables and accelerate receivables." ¶ 148.[11] This

---

[11] The alleged misstatements concerning Chemours' free cash flow guidance are at ¶¶ 123, 127, 138, 146, 147, 151, 153, 159, 160, 165, 168, 169, 170, 177, 179, 180, 188, 189, 190, 191, 192, 194, 195, 196, 204, 205, 206, 207, and 208.

theory fails for all the reasons discussed above, but also on an independent ground:  The guidance falls within the statutory safe harbor for forward-looking statements.  Under the PSLRA, a forward-looking statement is inactionable if it is either identified as such and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially" or if the plaintiff fails to show that the statement was made with "actual knowledge" of its falsity.  15 U.S.C. § 78u-5(c)(1); *see Institutional Invs. Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009) (discussing statutory standard).  The statute defines "forward-looking statement" broadly to include, among other things, statements "containing . . . financial items," 15 U.S.C. § 78u-5(i)(1)(A), together with "any statement of the assumptions underlying or relating to any [such] statement."  15 U.S.C. § 78u-5(i)(1)(D).

Here, Chemours properly identified its guidance as forward-looking statements.  Specifically, each of the SEC filings referenced by Plaintiffs included a section noting the inclusion of "[f]orward-looking statements provid[ing] current expectations of future events based on certain assumptions," which were generally identified by the use of words like "believe" and "estimate."  *See, e.g.*, Ex. 10 (2022 10-K) at 2.  Chemours also included express disclosure of the potential impact that timing activity could have on Chemours' cash flows, *see supra*, at 3-5, putting the market on notice that such timing could materially impact results.

Plaintiffs have also failed to plead that any Defendants had "actual knowledge" of falsity when the challenged guidance was issued.  *See infra* Point I(C); Point II.  As such, the forward-looking guidance are inactionable under both prongs of the statutory safe harbor.

### C.    Plaintiffs do not plead any actionable misstatement concerning Chemours' internal controls.

Plaintiffs point to SOX certifications made by certain Individual Defendants concerning Chemours' internal controls.  ¶¶ 129, 162, 182, 198, 210, 211, 212, 214, 215, 217, 218, 220, 221.  Such certifications are "statements of opinion or belief," reflecting only "defendants' perception of . . . internal controls."  *Se. Pa. Transp. Auth.* v. *Orrstown Fin. Servs., Inc.*, 2022 WL 3572474, at *48 (M.D. Pa. Aug. 18, 2022) (collecting cases); *see also Connor* v. *Unisys Corp.*, 2024 WL

387633, at *5-6 (E.D. Pa. Feb. 1, 2024) (quotation omitted) ("[s]tatements in SOX [c]ertifications . . . regarding the effectiveness of a company's procedures signal that they are opinions by stating that they are based on the knowledge of the officer").  To plead the falsity of these opinion statements, Plaintiffs must present particularized facts showing that they "(i) w[ere] not sincerely believed when made; (ii) contain[ed] an expressly embedded, untrue factual assertion; or (iii) reasonably implie[d] untrue facts and omit[ted] appropriate qualifying language." *City of Warren Police & Fire Ret. Sys.* v. *Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023).  For SOX certifications, the "falsity of the statement is entirely dependent on what [the certifier] knew, not on what was objectively true at the time of the statement." *Sanofi*, 155 F. Supp. 3d at 402.

Plaintiffs do not satisfy this standard.  Nowhere does the Complaint allege that any Individual Defendant contemporaneously doubted the effectiveness of Chemours' internal controls, nor that any of the controls-related statements embedded or implied a false assertion of fact.  Instead, Plaintiffs offer the conclusory allegation that certain of the Individual Defendants "exploited weaknesses in Chemours' internal controls in financial reporting."  ¶¶ 213, 216, 219, 222.  But this allegation does not address the relevant question:  whether Individual Defendants were aware that their conduct was improper or inconsistent with effective internal controls, such that the conduct itself belied sincere belief.  *Sanofi*, 155 F. Supp. at 402.

Precedent within this Circuit shows why this pleading defect is fatal to Plaintiffs' claim.  For example, in *In re Cognizant Technologies Solutions Corp.*, 2018 WL 3772675 (D.N.J. Aug. 8, 2018), plaintiffs attacked the SOX certifications of defendant managers after their employer "admitted material weaknesses existed in its internal controls, including 'tone at the top,' as senior management participated in making corrupt payments by overriding" internal controls.  *Id.* at *25.  Even that was not enough to plead a material misstatement, absent specific allegations that the defendants had "reason to believe that [their certifications] were misleading when made."  *Id*.  The same logic applies with greater force here, where the Individual Defendants' activities do not involve manifestly illegal conduct like that at issue in *Cognizant*, but instead

-16-

cash management practices that have been recognized by other courts as not "inherently improper."  *Greebel* v. *FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999).[12]

### D.      Plaintiffs do not plead any actionable misstatement concerning Chemours' Code of Ethics.

The Complaint attacks a statement that Chemours' Code of Ethics applied to certain of the Individual Defendants and "set[] forth the standards of conduct that [they] must uphold while performing his or her duties."  ¶¶ 223-25.  According to Plaintiffs, this was false because Chemours subsequently concluded that Newman, Lock, and Wisel violated the Code.  But such ethical guidelines are "aspirational," *Cognizant*, 2018 WL 3772675, at *17, and the adoption of an ethical code "simply does not imply that all of its directors and officers are following [it]." *City of Roseville Emps.' Ret. Sys.* v. *Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) (quotation omitted); *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (because codes of ethics are "aspirational" and do not "create an impression of full compliance," undisclosed noncompliance with the code was not misleading).  Plaintiffs' attempt to weaponize this aspirational guidance is "untenable," because if that strategy were credited, then "any company with a code of ethics . . . would be required to disclose all violations of that code or face liability under federal securities law."  *Horizon Lines*, 686 F. Supp. 2d at 415.

Furthermore, because evaluating compliance with ethical standards "inherently involve[s] business judgment," even an outright assurance of compliance with a code of ethics — which

---

[12] Plaintiffs also challenge SOX certifications that:  (1) Chemours' filings were materially accurate; and (2) there had been no "changes in [Chemours'] internal controls over financial reporting that ha[d] materially affected, or [we]re reasonably likely to materially affect, [Chemours'] internal control over financial reporting." *See, e.g.*, ¶¶ 210-11.  Again, these are statements of opinion that have not been pleaded false.  Even if they were statements of fact, however, it would make no difference.  The first set of certifications adds nothing, because Plaintiffs plead only that they were false due to other allegedly false statements. *Zhengyu He* v. *China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at *7 (D.N.J. June 12, 2020).  And the second set has not been pleaded false, because the Complaint lacks even a conclusory allegation that Chemours' internal controls "changed" during the Class Period.

Plaintiffs do not allege here — is nothing more than a statement of the speaker's opinion. *Bartesch*, 941 F. Supp. 2d at 511-12.  And, once again, Plaintiffs have alleged nothing to support the inference that any of the Individual Defendants contemporaneously believed that his or her conduct was at all improper, let alone in violation of Chemours' Code of Ethics.

### E.    The other statements challenged by Plaintiffs are otherwise inactionable.

The balance of the Complaint also suffers from myriad pleading defects:

"Strong" Operating Cash Flow.  Plaintiffs claim that Defendants deceived the market when they characterized Operating Cash Flow as "strong."  ¶¶ 121, 132, 138, 140, 165, 185, 201.  Of course, Chemours' Operating Cash Flow was strong in 2022 — with hundreds of millions of dollars pouring into corporate coffers, driven by robust sales.  Ex. 10 (2022 10-K) at 45.  But even if reasonable minds could differ, it would not transform a qualitative assessment into securities fraud.  As the Third Circuit has held, such "vague and general statements of optimism constitute no more than puffery and are understood by reasonable investors as such."  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 529, 538 (3d Cir. 1999) (dismissing statements that stressed defendants' "confidence in . . . earnings momentum" and "consistent earnings"); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) ("The Court agrees that statements about 'strong' and 'record' financial results, as well as the generally optimistic statements, constitute puffery.  They are not determinate, verifiable statements.  They are the types of vague statements upon which reasonable investors do not rely."), *aff'd*, 905 F.3d 106 (3d Cir. 2018).

Seasonality.  The Complaint claims that it was fraudulent for Defendants to disclose that Chemours had experienced a "historical pattern of seasonality, with working capital use of cash in the first half of the year, and a working capital source of cash in the second half of the year."  ¶¶ 153, 172, 173, 185, 186, 201; *see* also ¶ 153 ("seasonally we typically consume working capital, because of the seasonality both for the TT business and the TSS business").  Plaintiffs do not plead facts to contradict this disclosure, though, because they cannot.  Chemours'

uncontested financial results reveal that the bulk of its business — the TT and TSS segments — did indeed experience the seasonality described by Plaintiffs. Chemours consistently disclosed this phenomenon long before the Class Period, *see, e.g.*, Ex. 3 (2016 10-K) at 7 ("The demand for $TiO_2$ is subject to seasonality," with "volume . . . typically lowest in the first quarter"); it continues to disclose it to this day, *see* Ex. 20 (2023 10-K) at 6 (same). The Complaint does not explain, as it must, how these consistent disclosures were transformed into fraud by the Individual Defendants' disclosed practice of timing the collection of receivables and disbursement of payables.

Factors "driv[ing]" Chemours' "cash flow generation." The Complaint attacks Chemours' periodic disclosure that its "operating cash flow generation" was "driven by, among other things," various "global economic conditions" and "industry-specific issues." ¶¶ 132, 165, 185, 201. Plaintiffs assert that this non-exhaustive list should have included "manipulation of payables and receivables" — but they cannot explain why that should be so. While Defendants elsewhere disclosed that management timed the collection of receivables, that practice did not "generat[e]" operating cash flow; it just hastened the date when the money hit Chemours' accounts. For that reason, the market could not have been misled by its omission as a factor "driv[ing]" cash flow "generation." This is just a repackaged demand for self-flagellation.

Disclosures of annual trends in operating cash inflows. Lastly, Plaintiffs claim that Defendants misrepresented the factors influencing year-over-year shifts in its Operating Cash Flow, once again by failing to disclose the "manipulation of payables and receivables." *See* ¶¶ 163, 183, 199. Each of the criticized disclosures, however, identified "changes in working capital" as a primary influence in those shifts. And as discussed above, Chemours clearly explained that these shifts in working capital stemmed in large part from the discretionary timing with respect to receivables and vendor payments. *See supra*, at 3-5. Again, this is nothing more than a demand for self-flagellation.

## II.    Plaintiffs fail to plead scienter.

To state a claim, Plaintiffs must also plead "with particularity facts giving rise to a strong inference" of scienter "with respect to each act or omission alleged," 15 U.S.C. § 78u-4(b)(2)(A), by showing Defendants acted either knowingly or recklessly, *Avaya*, 564 F.3d at 252-53.  To establish recklessness under this standard, a complaint must demonstrate not "merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta*, 180 F.3d at 535.  The requisite "strong inference" is shown only where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The Complaint does not meet this demanding standard.

For each alleged misrepresentation, Plaintiffs claim scienter with the same conclusory litany:  Defendants purportedly "admitted that" they engaged in a "manipulation of payables and receivables" in violation of Chemours' "internal policies and SEC policies," as well as its Code of Ethics, *see, e.g.*, ¶¶ 120, 122, 137, 225, as part of "an intentional scheme to override internal controls . . . to mislead investors and obtain larger incentive compensation," *see, e.g.*, ¶ 213.  But Plaintiffs allege no GAAP violation and zero particularized facts to suggest that the Individual Defendants engaged in "conscious misbehavior," *Nat'l Junior Baseball League* v. *Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 553 (D.N.J. 2010), or "kept turning a blind eye to all such factual 'red flags.'"  *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 286-87 (D.N.J. 2007).

Against this conclusory assertion, the "opposing inference of non-fraudulent intent" is far more "compelling," *Tellabs*, 551 U.S. at 314, 317 — the Individual Defendants believed in good faith that they were participating in permissible management of Chemours' year-end cash flows.  While Chemours' Audit Committee has since concluded that Newman, Lock, and Wisel exhibited "a lack of transparency" with Chemours' board in managing the timing of certain receivables and payables, in violation of the Chemours Code of Ethics, these findings are clearly insufficient when neither hindsight nor claims of corporate mismanagement, poor judgment, or

poor leadership can support a "strong inference" that management acted with scienter at the time of the challenged disclosures. *Hertz*, 905 F.3d at 117. To put it another way, the Audit Committee's conclusions at the end of the Class Period in no way demonstrate that management, in particular the Individual Defendants, believed that their actions were wrong during the Class Period. And it is the Individual Defendants' state of mind that matters in assessing scienter. *Avaya*, 564 F.3d at 252; *see also Hertz*, 905 F.3d at 121 n.6.

### A.    Plaintiffs do not plead that the Individual Defendants were aware of any purported accounting improprieties.

Plaintiffs' principal theory of scienter is familiar — the Individual Defendants participated in "improper" cash management that violated "internal and SEC policies." *See, e.g.*, ¶¶ 120, 184, 186, 216, 225. To plead scienter under that theory, Plaintiffs must advance particularized "allegations to compellingly imply that the Individual Defendants knew or recklessly disregarded that their actions were resulting in improper accounting practices." *Hertz*, 905 F.3d at 118. Even where a defendant has admitted an outright violation of accounting rules — unlike here — a complaint still must plead that the challenged disclosures reflected a "self-evident business nonsensicality which cannot be made by a defendant with a non-culpable state of mind." *Intelligroup*, 527 F. Supp. 2d at 352.[13]

Under this standard, it is not enough to allege that a defendant was intimately familiar with purportedly "improper accounting" practices. *Glover*, 2006 WL 2850448, at *10 (no scienter absent "allegations showing an intent to defraud the public regarding the content of the company's financial reports"). And for good reason. As courts within this Circuit have routinely observed, financial disclosures "inherently involve[] business judgment," *Bartesch*, 941 F. Supp. 2d at 511-12, and running afoul of such accounting policies involves "the type of complex accounting judgments that are insufficient to support an inference of scienter." *In re*

---

[13] Nor could Plaintiffs allege valid claims by relying on purported violations of SEC policies. *See, e.g.*, ¶ 120; *SEC* v. *Fierro*, 2023 WL 4249011, at *6, *6 n.9 (D.N.J. June 29, 2023) (explaining that courts must look at the plain language of the Exchange Act and that the SEC guidance is "not binding").

*Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at \*9, 13  (D.N.J. July 2, 2019).  This is particularly so here, when Chemours disclosed that payables and receivables were subject to timing considerations, and Plaintiffs can offer no rule or "crystalline policy" that speaks to why such timing actions were plainly improper.  *See In re Ravisent Techs., Inc. Sec. Litig.*, 2004 WL 1563024, at \*9 (E.D. Pa. July 13, 2004) (company's premature revenue recognition practice that "grossly overstate[d] [its] financial statement" raised an inference of scienter only because it violated GAAP <u>and</u> the company's own "crystalline [revenue recognition] policy" that "could not have been any more simple."); *Synchronoss*, 2019 WL 2849933 at \*13 (distinguishing cases where "courts inferred scienter based on straightforward violations of GAAP revenue recognition rules *and* clear company policy regarding revenue recognition").

      *Hertz* is instructive.  In that case, plaintiffs challenged misstatements concerning accounting violations that overstated a company's net income by over 20%, resulting in full restatements for three fiscal years, four categories of admitted material internal control weaknesses, including relating to "tone at the top," and executive departures.  *Hertz*, 905 F.3d at 112-13, 116.  Even under those facts — which went far beyond what is alleged here — the Third Circuit affirmed dismissal, because plaintiffs failed to give rise to an inference of scienter that "the Individual Defendants were aware that their actions were improper . . . [or] [the] accounting errors were so obvious that only an attitude of reckless disregard" could explain them.  *Id.* at 121. *See also In re Great Atl. & Pac. Tea Co. Sec. Litig.*, 103 F. App'x 465, 467, 470 (3d Cir. 2004) (affirming dismissal where defendants were accused of "irregularities relating to the appropriate timing for the recognition of vendor allowances and the accounting for inventory," admitted to GAAP violations, and the defendant company restated years of income statements, reasoning that awareness of the underlying accounting actions was not sufficient to plead scienter).

      The same result should follow here, where the Complaint is empty of any allegation, not only of a GAAP violation, but also that any of the Individual Defendants understood that management's working capital actions were "improper," contrary to Chemours' Code of Ethics, or violative of SEC guidance.  *See, e.g.*, ¶ 120 (concluding, without more, that Defendants

-22-

"improperly delayed payables and accelerated receivables").  Nor have Plaintiffs pleaded facts to support an inference that any Individual Defendant knew or recklessly disregarded that Chemours' financial disclosures misled the public concerning the company's cash flows. Regardless, any such inference would be negated by the fact that an independent auditor confirmed — after Chemours completed its internal review of the Individual Defendants' conduct — that Chemours' financial statements from the Class Period "present fairly, in all material respects, [its] financial position as of December 31, 2023 and 2022, and . . . its cash flows . . . ."  Ex. 20 (2023 10-K) at F-2.

> **B.      The Individual Defendants' generic motivations do not support an inference of scienter.**

Plaintiffs also suggest that the Court should infer knowing or reckless conduct from the Individual Defendants' generic motivation to achieve cash flow targets and increase their incentive compensation.  ¶¶ 237-38.  Such allegations of "'motive and opportunity' may no longer serve as an independent route to scienter."  *Avaya*, 564 F.3d at 277.  Less still where, as here, the pleadings muster only "general corporate motive[s]."  *See In re Great Atl. & Pac. Tea Co.*, 103 F. App'x at 469 (company's desire to manage earnings to meet analyst and market expectations insufficient to plead scienter); *Avaya*, 564 F.3d at 279 ("Corporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud.").  For that reason, Plaintiffs' allegation that the Individual Defendants had "an interest in maximizing their own compensation, which is common to every company . . . add[s] little to an inference of fraud."  *City of Roseville Emps.' Ret. Sys.* v. *Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 396 (D. Del. 2010) (allegations that defendants committed fraud in part to receive "hundreds of thousands of dollars pursuant to [the company's] Cash Incentive Plan, which was based in part on [the company's] financial performance," insufficient to plead scienter); *see also Intelligroup*, 527 F. Supp. 2d at 341 ("[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers.").  At any rate, even if

Plaintiffs could raise a strong inference of scienter through allegations that the Individual Defendants were motivated, in part, by the generic desire to achieve cash flow targets and thus incentive compensation, that does not mean they believed accelerating the collection of receivables and delaying the payment of payables at year end was improper.

### C.    Plaintiffs cannot plead scienter by mischaracterizing Chemours' disclosures.

Unable to identify any actual evidence that anyone at Chemours acted with a culpable state of mind, Plaintiffs try to pad their pleadings by mischaracterizing Chemours' recent disclosures concerning the Individual Defendants' conduct.  This effort fails.

#### 1.    Chemours has not admitted that the Individual Defendants "exploited" internal control deficiencies.

Plaintiffs assert in conclusory fashion that the Individual Defendants "exploited weaknesses in Chemours' internal controls in financial reporting . . . to improperly delay payables and accelerate receivables."  ¶¶ 213-22.  But that is neither well pleaded nor sufficient to allege scienter.

*First*, as set out above, Plaintiffs fail to plead that the Individual Defendants had any awareness of the control weakness at the time of the alleged misstatements, less still that they "exploited" it.  *See supra* Point I(A), (C).  Indeed, while Chemours disclosed four material weaknesses of internal control over financial disclosure, they "did not result in any material misstatements of the Company's financial statements or disclosures."  Ex. 20 (2023 10-K) at 77-78; *Matrix Cap. Mgmt. Fund, LP* v. *BearingPoint, Inc.*, 576 F.3d 172, 188 (4th Cir. 2009) (dismissing Section 10(b) claims based on restated financials; no scienter absent awareness of weaknesses "sufficiently severe so as to threaten the reliability of financial reporting").

*Second*, internal control weaknesses, including those concerning "an inappropriate tone at the top," do not raise a strong inference of scienter.  The Third Circuit held in *Hertz* that admissions of mismanagement or bad leadership do not amount to "affirmative misconduct," even where that conduct required a restatement.  905 F.3d at 117 ("[T]he more plausible inference from the Restatement's use of the word 'tone' is that the Restatement is referring to

-24-

management style and not to misconduct."). Again, absent a showing "that the defendants were aware, or recklessly disregarded, that that the[y] … created an environment in which fraud was occurring," there is no fraud. *Id.* (citing *Hayes* v. *Gross*, 982 F.2d 104, 106 (3d Cir. 1992)).

Plaintiffs make no such allegations here. Instead, they claim Chemours "admitted" that "ineffective internal controls allowed the individual defendants to manipulate free cash flow during the class period." ¶¶ 71-106. But Chemours said only that certain senior managers' failure to set an inappropriate tone at the top led to a "lack of transparency with the Company's board of directors," not that the defendants had knowingly allowed or participated in accounting violations or "manipulat[ions]." ¶¶ 94, 120.

### 2. Chemours has not admitted that the Individual Defendants "manipulated" the Company's books.

Plaintiffs' reliance on Code of Ethics violations suffers from the same fatal flaw: Plaintiffs fail to plead sufficient facts to support a strong inference that any Individual Defendant was aware that his or her actions violated the Code. *See, e.g.*, *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 814 (S.D.N.Y. 2018) ("Since Plaintiff does not allege that Individual Defendants knew, or were reckless in not knowing, that [their conduct] was unlawful, he cannot state a claim that Defendants acted recklessly by failing to disclose it.")

Moreover, Plaintiffs mischaracterize the disclosed conclusions of the Audit Committee's internal review. There was no finding that the "manipulation of payables and receivables" violated Chemours' ethical guidelines. Instead, the Audit Committee concluded that Newman, Lock, and Wisel violated an internal ethics policy due to their "lack of transparency with [Chemours'] Board of Directors." 2023 Form 10-K at 77. Again, this finding does not support any inference of "manipulat[ion]," much less knowing or reckless disclosure to the market. *Hertz*, 2017 WL 1536223, at \*16.

### 3. Chemours' personnel changes do not support an inference of scienter.

Plaintiffs cannot rely on executive departures and Chemours' related disclosures to raise an inference of scienter absent allegations that "resignations were a result of . . . involvement in a

-25-

systemic fraud." *Hertz*, 905 F.3d at 118.  To show scienter, a pleading must specifically allege "that the resignation was the result of something other than the reasonable assumption that the resignation occurred as a result of the release of bad news." *Id.*  After a finding of internal control deficiencies, leadership changes "support[] [a] non-culpable inference" that a company-defendant was "attempting to improve its processes to prevent future mistakes." *Kumar* v. *Kulicke and Soffa Indus., Inc.*, 2019 WL 5081896, at *9 (E.D. Pa. Oct. 9, 2019).

Citing Chemours' SEC filings, Plaintiffs imply that the company put Newman, Lock, and Wisel on administrative leave because "[t]he Audit Committee of Chemours' board of directors found that [Individual Defendants] acted knowingly or recklessly."  ¶¶ 242, 247, 251, 254.  Chemours' disclosures reflect no such finding.  As Plaintiffs elsewhere acknowledge, Chemours made leadership changes as part of its effort to remediate internal control deficiencies, based on the determination that Newman, Lock, and Wisel were not "transparen[t]" with the full board.  *Id.*; *see also* Ex. 20 (2023 10-K) at 77-78.  "Changes in leadership are only to be expected when leadership fails," as Plaintiffs allege here.  *Hertz*, 905 F.3d at 117, 119.  As in *Hertz*, no inference of scienter is available because Plaintiffs have alleged zero facts to show "that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud." *Id.*

**D.**     **The allegations of the purported "Former Employees" do not help Plaintiffs.**

Neither of Plaintiffs' purported confidential witnesses supports an inference of scienter either, because they cannot tie any Individual Defendant to any alleged misrepresentation. *In re Audible Inc. Sec. Litig.*, 2007 WL 1062986, at *11 (D.N.J. Apr. 3, 2007) (confidential witnesses do not support an inference of scienter where their knowledge could not be imputed to any defendant and "nothing in their statements implies that [defendants] shared their knowledge.").

FE-1 claims to have been a Senior Finance Manager who did not report to any of the Individual Defendants, but once "helped Defendants Newman and Ralhan delay accounts payables at the end of 2018."  ¶¶ 107-08.  In support, FE-1 claims that Newman, Ralhan, and many others attended meetings in 2018 where cash flow management was discussed.  ¶¶ 108,

243, 261.  Vague descriptions of meetings that predated the Class Period by nearly five years shed no light on whether the Individual Defendants believed their conduct was improper years later.  *Pharmanet*, 720 F. Supp. 2d at 540 (allegations of witness that "worked with high-level executives and participated in company-wide meetings" where the conduct was discussed because plaintiff failed to state "whether the information came from the Individual Defendants at these meetings, or any other executives, that had first hand knowledge").  Indeed, FE-1 admits that she can offer no insight about the relevant time period beyond her personal "belie[fs]."  ¶ 109.  That adds nothing.  *Pharmanet*, 720 F. Supp. 2d at 555 (witness's "belie[f] that the Finance Department would not [engage in conduct] without [defendant's] knowledge or authorization" insufficient to show scienter).

FE-2 likewise has no first-hand knowledge, and admits to having neither reported to nor interacted with any of the Individual Defendants.  ¶¶ 111-14.  She <u>assumes</u> that Newman instructed her team to "reach out to certain suppliers to see if Chemours could delay payments," ¶ 114, because her manager stated that "it was a top down directive."  ¶ 116.  But allegations far removed from the chain of command that fail to "specif[y] details regarding the basis for the source's personal knowledge," including the dates on which the relevant information was acquired, are insufficient to plead scienter and amount to "only second-hand information, rumor, or speculation," *Pharmanet*, 720 F. Supp. 2d at 543, 547; *see also Chubb*, 394 F.3d at 155 ("[g]eneric and conclusory allegations based upon rumor or conjecture . . . [fail] to satisfy" PSLRA).  And like FE-1, FE-2 does not suggest that the Individual Defendants thought the conduct was improper.  *Pharmanet*, 720 F. Supp. 2d at 557-58.

**E.     Plaintiffs' grab-bag of other allegations does not move the needle.**

Plaintiffs' "additional" scienter allegations likewise miss the mark.

*First*, Plaintiffs' allegations about the Individual Defendants' roles at the company, their responsibilities, and general involvement in the company's financial reporting contribute nothing to the analysis.  *See, e.g.*, ¶¶ 243-44, 248, 252, 254-56.  As the Third Circuit has observed, such

allegations concerning defendants' "position[s] within the company . . . are precisely the types" which are "inadequate" to plead scienter. *Advanta*, 180 F.3d at 539 (quotation omitted).

*Second*, Plaintiffs' attempts to infer scienter from the "magnitude" of the identified cash management activities are unavailing.  ¶¶ 259-63.  As the Third Circuit held in *Hertz*, even in circumstances where a company has issued a restatement due to accounting improprieties, the amount of the restatement is insufficient to support an inference of scienter.  905 F.3d at 116 ("A company's admission even to significant accounting errors . . . is insufficient by itself to give rise to a strong inference of scienter."); *see also Webb* v. *Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018) (restatement disclosing net income overstatement by 15% to 67% per quarter insufficient to plead scienter absent other compelling allegations) .  Here, the company indisputably reported accurate cash flow figures.  Plaintiffs' effort to obscure that fact fails.

*Third*, the Individual Defendants' certifications as to the accuracy of Chemours' financials do not support scienter.  ¶¶ 244-46, 248-50, 257-58.  Plaintiffs suggest that because Chemours identified weaknesses in its internal controls, the certifications were false and misleading.  ¶¶ 244-46, 248-50, 257-58.  But none of Chemours' SEC filings were materially false, and even that would be insufficient without allegations "that the defendant knew he was signing a false SEC filing or recklessly disregarded inaccuracies contained in an SEC filing." *Hertz*, 905 F.3d at 118.  Plaintiffs plead no such facts here.

*Finally*, an allegation that only <u>one</u> of the Individual Defendants sold his Chemours shares — which Plaintiffs cannot even claim here, *see* Ralhan Brief at Point I(B) — undermines any scienter inference.  ¶¶ 239-41; *see Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018) ("stock sales were not indicative of scienter" where "[o]nly two of the six defendants sold stock during the relevant time period"); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423 (3d Cir. 1997) (no strong inference of scienter where two of the "more powerful" officer-defendants did not trade shares); *Advanta*, 180 F.3d at 540 ("[T]hree of the individual defendants sold no stock at all during the Class Period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices.").

**III.    Plaintiffs do not plead that all the alleged misrepresentations caused Chemours stockholders to suffer any loss.**

To plead loss causation, a plaintiff must specify the "causal connection between the material misrepresentation" and the loss.  *In re Resolute Energy Corp. Sec. Litig.*, 2021 WL 327385, at *3 (D. Del. Feb. 1, 2021), *aff'd*, 2022 WL 260059 (3d Cir. Jan. 27, 2022) (internal quotation omitted).  Thus, Plaintiffs must show that Defendants "misrepresented or omitted the very facts that," when revealed as misrepresentations, "were a substantial factor in causing . . . economic loss."  *McCabe* v. *Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007).

Plaintiffs point to two "corrective disclosures" to show loss causation:  (1) Chemours' February 13, 2024 press release announcing the postponement of its annual report, which generally disclosed that a review of "internal control over financial reporting with respect to maintaining effective controls related to information and communications," ¶ 271; and (2) Chemours' February 29, 2024 press release announcing Chemours' preliminary estimates of operating results for 2023 and the administrative leave of Newman, Lock, and Wisel, pending the completion of a review of "the processes for reviewing reports made to the Chemours Ethics Hotline, the Company's practices for managing working capital, including the related impact on metrics within the Company's incentive plans, [and] certain non-GAAP metrics."  ¶ 273.

While these disclosures put investors on notice of potential deficiencies in Chemours' internal controls—neither contains any reference to cash flows, guidance concerning those cash flows, or management's practices concerning the timing of receivables and its payables.  Those disclosures did not come until Chemours' March 6, 2024 press release, which the Complaint pointedly does not allege as a corrective disclosure.  And there's a reason why Plaintiffs buried that disclosure:  Chemours' share price went up 15% in reaction to that news.

As the Supreme Court has explained, the Exchange Act does not countenance such an obvious "mismatch between the contents of the misrepresentation and the [alleged] corrective disclosure."  *Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021).  Where the alleged corrective disclosure "did not reveal the subject or false nature of the alleged

-29-

fraud," courts "routinely conclude[] that loss causation is lacking." *In re Aurora Cannabis Inc. Sec. Litig.*, 2023 WL 5508831, at \*5 (D.N.J. Aug. 24, 2023); *see also Hull* v. *Glob. Digital Sols., Inc.*, 2017 WL 6493148, at \*3, 13 (D.N.J. Dec. 19, 2017).  So too here.

## IV.     Plaintiffs fail to adequately plead "Scheme Liability" under Rule 10b-5(a) and (c).

Plaintiffs' "scheme liability" claim fails because Plaintiffs do not allege any deceptive conduct.  *SEC* v. *Mintz*, 2024 WL 1173096, at \*15 (D.N.J. Mar. 18, 2024); *see also In re Royal Dutch/Shell Transp.*, 2006 WL 2355402, at \*8 (D.N.J. Aug. 14, 2006).  The only allegedly deceptive conduct concerns Defendants' purported misstatements and the same conclusory claim that Defendants "admitted" to misconduct.  ¶¶ 267-70.  But "a plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made."  2006 WL 2355402, at \*8.  At any rate, Plaintiffs' scheme liability claim fails for the independent reason that the Complaint does not raise a strong inference that Defendants had an "intent to deceive."  *Takata* v. *Riot Blockchain, Inc.*, 2020 WL 2079375, at \*16 (D.N.J. Apr. 30, 2020); *see supra* Point II.

## CONCLUSION

For the reasons stated above, the Court should dismiss the Complaint with prejudice.

DATED:  October 11, 2024

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

WACHTELL, LIPTON, ROSEN
   & KATZ

Jonathan M. Moses (*pro hac vice*)
Noah B. Yavitz (*pro hac vice*)
Canem Ozyildirim (*pro hac vice*)
51 West 52nd Street
New York, NY  10019
(212) 403-1000

By: */s/ Tyler E. Cragg*
     Peter J. Walsh, Jr. (#2437)
     Tyler E. Cragg (#6398)
     Hercules Plaza, 6th Floor
     1313 North Market Street
     Wilmington, DE  19801
     (302) 984-6000

*Counsel for Defendant The Chemours Company*