# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE CHEMOURS COMPANY SECURITIES LITIGATION | Case No. 24-cv-361 RGA |
| | Hon. Richard G. Andrews |
| This document relates to all actions. | CLASS ACTION |

**VOLUME I OF V**
**(EXHIBITS 1-2)**
**TRANSMITTAL AFFIDAVIT OF TYLER E. CRAGG, ESQ.**
**IN SUPPORT OF THE CHEMOURS COMPANY'S MOTION TO DISMISS**
**THE AMENDED CLASS ACTION COMPLAINT**

POTTER ANDERSON & CORROON LLP
Peter J. Walsh, Jr. (#2437)
Tyler E. Cragg (#6398)
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
(302) 984-6000
pwalsh@potteranderson.com
tcragg@potteranderson.com

Dated:  October 10, 2024       *Attorneys for Defendant The Chemours Company*

12685.00105

# EXHIBIT 1

**As filed with the U.S. Securities and Exchange Commission on December 18, 2014**

**File No.**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10

---

### GENERAL FORM FOR REGISTRATION OF SECURITIES
### PURSUANT TO SECTION 12(b) OR 12(g) OF
### THE SECURITIES EXCHANGE ACT OF 1934

---

# The Chemours Company, LLC
#### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Delaware** | **46-4845564** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **1007 Market Street, Wilmington, Delaware** | **19898** |
| **(Address of principal executive offices)** | **(Zip Code)** |

#### Registrant's telephone number, including area code: (302) 774-1000

#### Securities to be registered pursuant to Section 12(b) of the Act:

| **Title of each class to be so registered** | **Name of each exchange on which each class is to be registered** |
|---|---|
| **Common Stock, par value $0.01 per share** | **New York Stock Exchange** |

#### Securities to be registered pursuant to Section 12(g) of the Act: None

---

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒  (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

**THE CHEMOURS COMPANY, LLC**

**INFORMATION REQUIRED IN REGISTRATION STATEMENT**

**CROSS-REFERENCE SHEET BETWEEN INFORMATION STATEMENT AND ITEMS OF FORM 10**

Certain information required to be included in this Form 10 is incorporated by reference to specifically-identified portions of the body of the information statement filed herewith as Exhibit 99.1. None of the information contained in the information statement shall be incorporated by reference herein or deemed to be a part hereof unless such information is specifically incorporated by reference.

**Item 1.    *Business.***

The information required by this item is contained under the sections of the information statement entitled "Information Statement Summary," "Cautionary Statement Concerning Forward-Looking Statements," "Risk Factors," "Management Discussion and Analysis of Financial Condition and Results of Operations," "Business," "The Distribution," "Certain Relationships and Related Person Transactions," "Our Relationship with DuPont Following the Distribution" and "Where You Can Find More Information." Those sections are incorporated herein by reference.

**Item 1A.    *Risk Factors.***

The information required by this item is contained under the sections of the information statement entitled "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements." Those sections are incorporated herein by reference.

**Item 2.    *Financial Information.***

The information required by this item is contained under the sections of the information statement entitled "Selected Historical Condensed Combined Financial Data," "Capitalization," "Unaudited Pro Forma Condensed Combined Financial Statements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." Those sections are incorporated herein by reference.

**Item 3.    *Properties.***

The information required by this item is contained under the section of the information statement entitled "Business—Chemours Production Facilities and Technical Centers." That section is incorporated herein by reference.

**Item 4.    *Security Ownership of Certain Beneficial Owners and Management.***

The information required by this item is contained under the section of the information statement entitled "Security Ownership of Certain Beneficial Owners and Management." That section is incorporated herein by reference.

**Item 5.    *Directors and Executive Officers.***

The information required by this item is contained under the section of the information statement entitled "Management." That section is incorporated herein by reference.

**Item 6.    *Executive Compensation.***

The information required by this item is contained under the sections of the information statement entitled "Compensation Discussion and Analysis" and "Executive Compensation." Those sections are incorporated herein by reference.

**Item 7.**    *Certain Relationships and Related Transactions, and Director Independence.*

The information required by this item is contained under the sections of the information statement entitled "Management," "Executive Compensation," "Certain Relationships and Related Person Transactions," and "Our Relationship with DuPont Following the Distribution." Those sections are incorporated herein by reference.

**Item 8.**    *Legal Proceedings.*

The information required by this item is contained under the section of the information statement entitled "Business—Legal Proceedings." That section is incorporated herein by reference.

**Item 9.**    *Market Price of, and Dividends on, the Registrant's Common Equity and Related Stockholder Matters.*

The information required by this item is contained under the sections of the information statement entitled "Risk Factors," "Dividend Policy," "Capitalization," "The Distribution" and "Description of Our Capital Stock." Those sections are incorporated herein by reference.

**Item 10.**    *Recent Sales of Unregistered Securities.*

The information required by this item is contained under the section of the information statement entitled "Description of Our Capital Stock—Sale of Unregistered Securities." That section is incorporated herein by reference.

**Item 11.**    *Description of Registrant's Securities to be Registered.*

The information required by this item is contained under the sections of the information statement entitled "Risk Factors," "Dividend Policy," "Capitalization," "The Distribution" and "Description of Our Capital Stock." Those sections are incorporated herein by reference.

**Item 12.**    *Indemnification of Directors and Officers.*

The information required by this item is contained under the section of the information statement entitled "Description of Our Capital Stock—Limitations on Liability, Indemnification of Officers and Directors and Insurance." That section is incorporated herein by reference.

**Item 13.**    *Financial Statements and Supplementary Data.*

The information required by this item is contained under the sections of the information statement entitled "Index to Financial Statements" (and the financial statements referenced therein). That section is incorporated herein by reference.

**Item 14.**    *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.*

None.

**Item 15.**    *Financial Statements and Exhibits.*

*(a)    Financial Statements*

The information required by this item is contained under the section of the information statement entitled "Index to Financial Statements" (and the financial statements referenced therein). That section is incorporated herein by reference.

*(b)    Exhibits*

See below.

The following documents are filed as exhibits hereto:

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1 | Form of Separation Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company. * |
| 3.1 | Form of Certificate of Incorporation of The Chemours Company. * |
| 3.2 | Form of By-Laws of The Chemours Company. * |
| 10.1 | Form of Transition Services Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company. * |
| 10.2 | Form of Tax Matters Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company. * |
| 10.3 | Form of Employee Matters Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company. * |
| 10.4 | Form of Intellectual Property Cross-License Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company. * |
| 21.1 | Subsidiaries of The Chemours Company. * |
| 99.1 | Information Statement of The Chemours Company, preliminary and subject to completion, dated December 18, 2014. |

* To be filed by amendment.

**SIGNATURES**

Pursuant to the requirements of Section 12 of the Securities Exchange Act of 1934, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized.

The Chemours Company, LLC

By:    /s/ Nigel Pond

Name: Nigel Pond
Title:   Vice President

Date: December 18, 2014

**EXHIBIT INDEX**

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1 | Form of Separation Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company. * |
| 3.1 | Form of Certificate of Incorporation of The Chemours Company. * |
| 3.2 | Form of By-Laws of The Chemours Company. * |
| 10.1 | Form of Transition Services Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company. * |
| 10.2 | Form of Tax Matters Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company. * |
| 10.3 | Form of Employee Matters Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company. * |
| 10.4 | Form of Intellectual Property Cross-License Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company. * |
| 21.1 | Subsidiaries of The Chemours Company. * |
| 99.1 | Information Statement of The Chemours Company, preliminary and subject to completion, dated December 18, 2014. |

_____

* To be filed by amendment.

**Exhibit 99.1**

<span style="color:red">**Preliminary and Subject to Completion, dated December 18, 2014**</span>

**INFORMATION STATEMENT**

# The Chemours Company

## Common Stock, Par Value $0.01 Per Share

––––––––––

This information statement is being furnished to the holders of common stock of E. I. du Pont de Nemours and Company (DuPont) in connection with the distribution of shares of common stock of The Chemours Company (Chemours). Chemours is a wholly owned subsidiary of DuPont that operates DuPont's Performance Chemicals segment, which includes its titanium technologies, fluoroproducts and chemical solutions businesses. DuPont will distribute all of the outstanding shares of Chemours common stock on a pro rata basis to DuPont's common stockholders.

Chemours was organized as a limited liability company under the laws of the State of Delaware, and, prior to the distribution, will be converted to a Delaware corporation.

For every share of DuPont common stock held of record by you as of the close of business on [ • ], 2015, the record date for the distribution, you will receive [ • ] share[s] of Chemours common stock. No fractional shares of Chemours common stock will be issued. Instead, you will receive cash in lieu of any fractional shares. As discussed under "The Distribution — Trading Between the Record Date and Distribution Date," if you sell your DuPont common stock in the "regular-way" market after the record date and before the separation and distribution, you also will be selling your right to receive shares of Chemours common stock in connection with the separation and distribution. We expect the shares of Chemours common stock to be distributed by DuPont to you on [ • ], 2015. We refer to the date of the distribution of Chemours common stock as the "distribution date." After the distribution, we will be an independent, publicly traded company.

**No vote of DuPont's stockholders is required to effect the distribution. Therefore, you are not being asked for a proxy to vote on the separation or the distribution, and you are requested not to send us a proxy.** You do not need to pay any consideration, exchange or surrender your existing shares of DuPont common stock or take any other action to receive your shares of Chemours common stock.

The distribution is intended to be tax-free to DuPont shareholders for United States federal income tax purposes, except for cash received in lieu of fractional shares. The distribution is subject to the satisfaction or waiver by DuPont of certain conditions, including the continued effectiveness of a private letter ruling that DuPont has received from the U.S. Internal Revenue Service and opinions of tax counsel confirming that the distribution and certain transactions entered into in connection with the distribution generally will be tax-free to DuPont and its shareholders for U.S. federal income tax purposes, except for cash received in lieu of fractional shares. Cash received in lieu of any fractional shares of Chemours common stock will generally be taxable to you.

DuPont currently owns all of the outstanding shares of Chemours. Accordingly, there is no current trading market for Chemours common stock, although we expect that a limited market, commonly known as a "when-issued" trading market, will develop on or shortly before the record date for the distribution, and we expect "regular-way" trading of Chemours common stock to begin on the first trading day following the completion of the separation and distribution. Chemours intends to apply to have its common stock authorized for listing on the New York Stock Exchange, Inc. under the symbol [ • ].

––––––––––

**In reviewing this information statement, you should carefully consider the matters described under the caption "Risk Factors" beginning on page 19.**

**Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved these securities or determined if this information statement is truthful or complete. Any representation to the contrary is a criminal offense.**

**This information statement does not constitute an offer to sell or the solicitation of an offer to buy any securities.**

**References in this information statement to specific codes, legislation or other statutory enactments are to be deemed as references to those codes, legislation or other statutory enactments, as amended from time to time.**

**The date of this information statement is [ • ], 2014.**

**Table of Contents**

# TABLE OF CONTENTS

|  | Page |
|---|---|
| INFORMATION STATEMENT SUMMARY | 1 |
| QUESTIONS AND ANSWERS ABOUT THE SEPARATION AND DISTRIBUTION | 10 |
| RISK FACTORS | 19 |
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS | 35 |
| THE DISTRIBUTION | 36 |
| DIVIDEND POLICY | 42 |
| CAPITALIZATION | 43 |
| UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS | 44 |
| SELECTED HISTORICAL COMBINED FINANCIAL DATA | 50 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 51 |
| BUSINESS | 71 |
| MANAGEMENT | 102 |
| COMPENSATION DISCUSSION AND ANALYSIS | 109 |
| EXECUTIVE COMPENSATION | 115 |
| CERTAIN RELATIONSHIPS AND RELATED PERSON TRANSACTIONS | 119 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 120 |
| OUR RELATIONSHIP WITH DUPONT FOLLOWING THE DISTRIBUTION | 122 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE DISTRIBUTION | 129 |
| FINANCING ARRANGEMENTS | 132 |
| DESCRIPTION OF OUR CAPITAL STOCK | 133 |
| WHERE YOU CAN FIND MORE INFORMATION | 139 |

**Table of Contents**

*The following is a summary of material information discussed in this information statement. This summary may not contain all the details concerning the separation and distribution or other information that may be important to you. To better understand the separation, distribution and Chemours' business and financial position, you should carefully review this entire information statement. Except as otherwise indicated or unless the context otherwise requires, the information included in this information statement, including the combined financial statements of Chemours, which are comprised of the assets and liabilities of DuPont's Performance Chemicals segment, which includes its titanium technologies, fluoroproducts and chemical solutions businesses, and certain additional assets and liabilities associated with the DuPont business, assumes the completion of all the transactions referred to in this information statement in connection with the separation and distribution. Unless the context otherwise requires, references in this information statement to "The Chemours Company," "The Chemours Company, LLC," "Chemours," "we," "us," "our" and "our company" refer to The Chemours Company and its combined subsidiaries. References in this information statement to "DuPont" refer to E. I. du Pont de Nemours and Company, a Delaware corporation, and its consolidated subsidiaries (other than Chemours and its combined subsidiaries), unless the context otherwise requires. References to "DuPont stockholders" refer to stockholders of DuPont in their capacity as holders of common stock only, unless context otherwise requires.*

*Chemours was organized as a limited liability company under the laws of the State of Delaware. In accordance with the separation and distribution, actions will have been taken so as at the time immediately prior to the distribution, Chemours will have been converted from a limited liability company to a Delaware corporation.*

*This information statement describes the business to be transferred to Chemours by DuPont in the separation as if the transferred business were our business for all historical periods described. References in this information statement to our historical assets, liabilities, products, businesses or activities of our business are generally intended to refer to the historical assets, liabilities, products, businesses or activities of the transferred business as the business was conducted as part of DuPont and its subsidiaries prior to the separation and distribution.*

*You should not assume that the information contained in this information statement is accurate as of any date other than the date set forth on the cover. Changes to the information contained in this information statement may occur after that date, and we undertake no obligation to update the information, except in the normal course of our public disclosure obligations.*

**INFORMATION STATEMENT SUMMARY**

**Distributing Company**

DuPont was founded in 1802 and was incorporated in Delaware in 1915. Today, DuPont is creating higher growth and higher value by extending the company's leadership in agriculture and nutrition, strengthening and growing capabilities in advanced materials and leveraging cross-company skills to develop a world-leading bio-based industrial business. Through these strategic priorities, DuPont is helping customers find solutions to capitalize on areas of growing global demand — enabling more, safer, nutritious food; creating high-performance, cost-effective energy efficient materials for a wide range of industries; and increasingly delivering renewably sourced bio-based materials and fuels. Total worldwide employment at December 31, 2013, was about 64,000 people. DuPont has operations in more than 90 countries worldwide and about 60 percent of consolidated net sales are made to customers outside the United States of America (U.S.).

**Our Company**

Chemours is a leading global provider of performance chemicals through three reporting segments: Titanium Technologies, Fluoroproducts and Chemical Solutions. Our performance chemicals are key inputs into products and processes in a variety of industries. Our Titanium Technologies segment is the leading global producer of

1

Table of Contents

titanium dioxide ($TiO_2$), a premium white pigment used to deliver opacity. Our Fluoroproducts segment is a leading global provider of fluoroproducts, such as refrigerants and industrial fluoropolymer resins. Our Chemical Solutions segment is a leading North American provider of industrial and specialty performance chemicals used in gold production, oil refining, agriculture, industrial polymers and other industries. Our position with each of these businesses reflects the strong value proposition we provide to our customers based on our long history of innovation and our reputation within the chemical industry for safety, quality and reliability. We operate 37 production facilities located in 12 countries and serve several thousand customers located in more than 130 countries.

## Our Strengths

Our competitive strengths include the following:

### Leading Global Market Positions

We are the largest global producer of $TiO_2$, with annual $TiO_2$ capacity of approximately 1.2 million metric tons. We are in the process of expanding capacity at our Altamira, Mexico production facility by 200,000 metric tons. Production at the expansion is scheduled to start up in 2016. Each of our $TiO_2$ production facilities ranks among those with the largest capacity globally, and our production facilities at New Johnsonville, Tennessee and DeLisle, Mississippi are the two largest capacity $TiO_2$ production facilities in the world. We believe that our world-scale assets, consistent quality and delivery reliability differentiate us from our competitors in the $TiO_2$ market.

We are the market leader in fluoroproducts, with leading positions in fluorinated refrigerants, and industrial fluoropolymer resins and downstream products. We have a leading position in hydrofluorocarbon (HFC) refrigerants and are at the forefront of developing high-performance sustainable technologies such as our low global warming potential (GWP) hydrofluoro-olefin (HFO) refrigerants and foam expansion agents. We are also the market leader in industrial fluoropolymer resins and downstream products and coatings, marketed under the well-known Teflon ® brand name. Teflon ® industrial resins are used in high-performance wire and cable and multiple components in high-tech processing equipment.

We maintain leading market positions in key businesses in our Chemical Solutions segment. We are the largest producer of sodium cyanide, which is used primarily in gold production, in the Americas. In North America, we maintain market leading positions in sulfuric acid, which is used primarily in oil refining; aniline, which is primarily used to make polyurethane, and glycolic acid, which is primarily used in personal care products. We also have a strong market position in disinfectants used for water sanitization, animal health and bio-security.

Our market-leading positions are due to the scale and scope of our operations, our outstanding process technology, our differentiated products, our competitive pricing and efficient manufacturing base and long-standing partnerships with our customers.

### Industry-leading Cost Structure

We produce our products in cost-efficient manufacturing facilities that utilize proprietary process technologies to help drive our industry-leading cost structure. We continue to focus on increasing manufacturing efficiencies and mitigating cost inflation through process improvements, selected capital investments and adoption of best practices.

Our Titanium Technologies segment, in particular, has high asset productivity. Our proprietary $TiO_2$ process technology allows us to optimize the use of a variety of titanium-bearing ore types, providing us with a cost advantage. Our world-scale $TiO_2$ production facilities provide significant economies of scale. We operate large individual production lines at high utilization rates. The scale of our production facilities combined with our process technology capabilities, has allowed us to achieve the lowest manufacturing costs per unit in the industry over a sustained period of time. Our new Altamira, Mexico $TiO_2$ production line is expected to be one of the

2

Table of Contents

lowest cost production lines in the world. In addition, we continually strive to improve our productivity and optimize our capacity by applying our engineering and manufacturing technology expertise to our production facilities.

Our leading fluoroproducts capacity, innovative production processes, effective supply chain and sourcing strategies make us highly cost competitive also in the fluoroproducts market. Our use of local contract manufacturing and joint venture partners in selected countries as a source of regional access and asset-light manufacturing (where possible) further enhances the overall cost position of our Fluoroproducts segment.

We believe that we have competitive cost positions within our Chemical Solutions segment as a result of proprietary process technologies, manufacturing scale and efficient supply chain processes. Our Chemical Solutions segment is also expected to benefit from its exploitation of low cost energy and hydrocarbon raw material inputs in North America, where nearly all of our Chemical Solutions production facilities are located.

### *Leading Technology and Intellectual Property*

As part of our DuPont heritage, our businesses have a long history of delivering innovative and high-quality products. We expect sustained technology leadership to be a key differentiator for Chemours, as the majority of our products are critical inputs that significantly impact the functionality, performance and quality of our customers' products. Our product offerings are enhanced by application technology scientists and laboratories across the globe, whose goal it is to deliver formulation improvements to help our customers achieve lower costs, better performance and higher overall value-in-use from our products compared to those of our competitors.

In our Titanium Technologies segment, we commercialized the chloride process for $TiO_2$ production in 1953, providing products with better opacity and superior whiteness due to lower impurities, and generating lower waste and byproducts than the traditional sulfate production technology. Currently, we are one of the limited number of $TiO_2$ producers with rights to chloride process for production of $TiO_2$. We believe that our proprietary chloride technology enables us to operate plants at a much higher capacity than other chloride technology based $TiO_2$ producers, uniquely utilizing a broad spectrum of titanium bearing ore feedstocks and achieving the highest unit margins in our industry. Our research and development (R&D) and technology efforts focus on improving production processes, developing and yielding $TiO_2$ grades that help customers achieve optimal performance. In our Fluoroproducts segment, we pioneered fluorine chemistry and invented polytetrafluoroethylene (PTFE), as well as developed the first generation of refrigeration agents in the first half of the 20th century. Our continuing innovation focus places us at the forefront of industry and regulatory changes with a focus on sustainable solutions. In fluoroproducts, we led the industry in the Montreal-Protocol (1987) driven transition from chlorofluorocarbons (CFCs) to the lesser ozone depleting hydrochlorofluorocarbons (HCFCs), and non-ozone depleting HFCs. In 1988 we committed to cease production of CFCs and started manufacturing non-ozone depleting HFCs in the early 1990's. Driven by new and emerging environmental legislations and standards currently being implemented across the U.S., Europe and Japan, we are currently driving the development and commercialization of our next generation Opteon ® product line, innovative low global warming potential (GWP) fluorochemicals for refrigeration and other applications. This new patented technology has zero ozone depletion potential and very low GWP and offers similar functionality to current HFC products. Like Titanium Technologies and Fluoroproducts, our Chemical Solutions segment has strong technical capabilities and a reputation for its ability to manage hazardous materials. This ability is a key competitive advantage for Chemical Solutions, as several of its products' end-users demand the highest level of excellence in the safe manufacturing, handling and shipping of the materials.

Our technological advantage is supported by our intellectual property portfolio of trade secrets, patents and protected innovations, covering process technologies, product formulations and various end-use applications. We maintain a world-renowned trademark portfolio, including the widely recognized brands Ti-Pure ® and Vantage ® for titanium dioxide products, Suva ®, ISCEON ®, Freon ®, Opteon ®, Teflon ®, Tefzel ®, Viton ®, Krytox ®, Formacel ®, Dymel ®, FM 200 ®, Nafion ®, Capstone ® for fluoroproducts, and Virkon ® and Oxone ® for Chemical Solutions.

3

**Table of Contents**

*Positioned to Capitalize on Economic Growth*

Demand for TiO$_2$ comes from the coatings, paper and plastics industries and is highly correlated to growth in the global residential housing, commercial construction and packaging markets. Over the long-term, global TiO$_2$ demand has grown in line with gross domestic product (GDP). Growth in emerging markets, including China, however, may be greater than GDP-level growth due in part to the rising middle class in such markets, which has become a key driver of demand for end products that use our TiO$_2$.

Our Fluoroproducts segment, particularly through its low GWP and non-ozone depleting products, is expected to benefit from regulatory changes requiring phase-out and phase-downs of less sustainable incumbent products. In addition, our customers continually require innovative next generation advanced materials, particularly industrial fluoropolymer resins, driving new product development and growth. We believe the fluoroproducts demand growth in developed markets is in line with global GDP, whereas demand growth in emerging markets is higher than GDP. Growth is also expected to be driven by country-specific legislation phasing-down the current HFC refrigerants for which our new HFO-based products and blends are functional substitutes with a low environmental footprint.

Our Chemical Solutions segment serves customers in a diverse range of end markets that we believe generally grow in line with global GDP.

*Long Standing Customer Relationships*

We serve more than 5,000 customers across a wide range of end markets in more than 130 countries. Many of our commercial and industrial relationships have been in place for decades and are based on our proven value proposition of safely and reliably supplying our customers with the materials needed for their operations. Our customers are comprised of a diverse group of companies, including many industry leaders. Knowledge of our customers' business needs is at the core of our innovative processes and forms the basis of our product development initiatives. We work closely with our customers to optimize their formulations and products. We also provide ongoing technical support services to these customers, which helps them to maximize the effectiveness of our advanced performance products.

*Strong Management Team with Deep Industry Experience*

Chemours has a strong executive management team that combines in-depth industry experience and demonstrated leadership. Mark Vergnano, our Chief Executive Officer, previously served as Executive Vice President of DuPont since 2009. His prior experience includes 35 years in a variety of general management, manufacturing and technical leadership positions, including vice president and general manager for DuPont Nonwovens, DuPont Building Innovations and group vice president of DuPont Safety & Protection. Mark Newman, our Senior Vice President and Chief Financial Officer, previously served as senior vice president and chief financial officer of SunCoke Energy Inc. Prior to his time at SunCoke, Mr. Newman served in a number of senior operating and finance leadership roles in the U.S. and China, primarily with the General Motors Corporation where he began his career in 1986. Chemours' segment presidents are BC Chong, Thierry Vanlancker and Chris Siemer, each of whom has been in chemical industry leadership positions for more than twenty years. Mr. Chong has served as president of DuPont's Titanium Technologies business since 2011. Previously, he held leadership positions in manufacturing operations, new business development, strategic planning and sales and marketing. Mr. Vanlancker was named president of DuPont's Fluoroproducts and Chemical Solutions business in 2012. He brings over a decade of experience in managing fluoro-based businesses and has held leadership positions in general management and sales and marketing. Mr. Siemer joined DuPont in 2010 and has managed global industrial and specialty chemical business portfolios for more than twenty years.

In addition to our strong executive management team, we have an experienced group of employees who work to maintain our leading market positions with their commitment to safe and efficient production, technology leadership, expansion of product offerings and customer relationships.

4

Table of Contents

*Strong Cash Flow Generation*

Chemours has generated strong operating cash flow through various industry and economic cycles evidencing the operating strength of our businesses. For each of the past five fiscal years, we have generated cash flows from operating activities in excess of $[ • ] million, with such cash flows averaging $[ • ] billion per year.

Our cash flow has been more than sufficient to satisfy our capital expenditure requirements, which on average equaled $[ • ] million per year during the past five years, including a significant increase in each of the past three fiscal years due to expenditures relating to the expansion of our TiO$_2$ production facility at Altamira, Mexico. Consequently, for each of the past five fiscal years, we have generated free cash flow (defined as cash flows from operating activities less capital expenditures) of at least $[ • ] million, which averaged $[ • ] billion per year. We expect our capital expenditures to be reduced in 2016 and in the near term thereafter due to the completion of the Altamira expansion, which should further bolster our free cash flow as the new capacity is expected to be accessible in mid-2016.

## Our Strategy

*Enhance Operational Excellence and Asset Efficiency*

Operational excellence, which includes a commitment to safety, environmental stewardship and improved reliability, is key to our future success. We continually evaluate our business to identify opportunities to increase operational efficiency throughout our production facilities with a focus on maintaining operational excellence and maximizing asset efficiency. We continue to set new, stricter operational excellence targets for each of our facilities based on industry-leading benchmarks. We intend to continue focusing on increasing manufacturing efficiencies through selected capital projects, process improvements and best practices in order to lower unit costs. We will also carefully manage our portfolio, especially in our Chemical Solutions segment, and take appropriate actions to address product lines that face challenging market conditions and do not generate returns on invested capital that we believe are sufficient to create long-term shareholder value.

*Focus on Cash Flow Generation*

Our goal is to focus on cash flow generation and return on invested capital through the continuing optimization of our cost structure, improvement in working capital and supply chain efficiencies, and a disciplined approach to capital expenditures.

We have a proven track record of mitigating fixed cost inflation with cost saving actions and productivity improvements. We intend to continue to identify incremental cost saving opportunities based in large part on benchmarks of industry-leading performance and productivity improvements by utilizing our engineering and manufacturing technology expertise and partnerships with low cost producers. Our goal is to have a cost structure that positions us favorably to compete and grow. Our goal is to continue upgrading our customer and product mix to increase our sales of value-added, differentiated products to achieve premium pricing to improve margins and enhance cash flow.

We intend to actively manage our working capital by increasing inventory turnover and reducing finished goods and raw materials inventory without affecting our ability to deliver products to our customers. We strive to improve our supply chain efficiency by focusing on reducing both operating costs and working capital needs. Our supply chain efforts to lower operating costs have consisted of reducing procurement spending, lowering transportation and warehouse costs and optimizing production scheduling.

We remain focused on disciplined capital allocation among our segments. We plan to allocate our capital expenditures to projects required to enhance the reliability of our manufacturing operations and maintain the overall asset portfolio. This includes key maintenance and repair activities in each segment, and necessary regulatory and maintenance spending to ensure safe operations. We intend to optimize capital spending on growth projects across our various businesses based on a thorough comparison of risk-adjusted returns for each project.

Table of Contents

*Maintain Strong Customer Focus*

A key component of our strategy is to produce innovative, high-performance products that offer enhanced value propositions to our customers at competitive prices. Our goal is to continually work closely with our customers to provide solutions and products that optimize their formulations and products. This market-driven product development enables us to offer a high-quality product portfolio to our customers and provides our businesses with the ability to respond quickly and efficiently to changes in market demands.

*Leverage our Leadership to Drive Organic Growth*

We plan to continue to capitalize on our global operations network, distribution infrastructure and technology to pursue global growth. We will focus our efforts on those geographic areas and end products that we believe offer the most attractive growth and long-term profitability prospects.

Our strategy in our Titanium Technologies segment is to continue to strengthen our leading position from both product offering and cost perspective in order to increase the segment's sales and profitability. We intend to continue to position Chemours as the preferred supplier of $TiO_2$ worldwide by delivering the highest quality product offering to our customers coupled with superior technical expertise. We are currently expanding capacity at our Altamira, Mexico production facility, which will increase our global capacity by approximately 17 percent and will be one of the lowest cost $TiO_2$ production lines in the world. Production at the expansion is scheduled to start up in 2016.

Our Fluoroproducts segment plans to make ongoing, selective investments to capitalize on market opportunities based on our innovation capabilities and industry dynamics. We intend to continue to leverage our fluoroproducts and process expertise to develop new high-performance, differentiated offerings and to promote industry transition towards more sustainable technologies. Specifically, our strategy is to focus on development of proprietary, high-value, sustainable specialties (for example, Opteon ® YF and HFO-1336, which are designed to meet tighter regulatory standards and replace commodity HFC refrigerants or foaming agents).

Our Chemical Solutions segment intends to capitalize on potential growth opportunities in businesses in which we have strong regional positions, e.g. sulfuric acid and sodium cyanide. We plan to make selective capital investments to grow our sulfur products and sodium cyanide businesses, in which we have leading market positions in the Americas, and to take initiatives to improve profitability in the remainder of the businesses in our Chemical Solutions segment.

*Deepen Our Presence in Emerging Markets*

Emerging markets are a strategic priority for a number of our businesses. We are well positioned not only to leverage our strong market positions in mature but highly sophisticated markets in North America and Europe, but also to participate in the expected growth of emerging markets in Asia, Eastern Europe and Latin America. We believe that improving living standards and growth in GDP across emerging markets are combining to create increased demand for our products. We expect to capitalize on this growth opportunity by expanding our customer base and local capabilities in order to increase our market share across emerging markets, especially China. To accelerate our penetration of these markets and maintain our competitive cost position, we may develop relationships with leading local partners, especially in businesses where participation in the fast-growing Chinese market is particularly important for long-term sustainable growth. For example, we are well positioned to leverage our strong production technology in our industrial fluoropolymers resins business, where the Chinese market is expected to continue to evolve from low-end fluoropolymer applications to higher value PTFE, copolymer and fluoroelastomer products, as a result of an increasing percentage of aerospace, automotive, semiconductor, electronics and telecommunications manufacturing transitions to China.

6

**Table of Contents**

*Drive Organizational Alignment*

We believe that maintaining alignment of the efforts of our employees with our overall business strategy and operational excellence goals is critical to our success. We have outstanding people and assets and, with the commitment to values of safety, customer appreciation, simplicity, collective entrepreneurship and integrity, we believe that we can maintain our competitiveness and help achieve our operational excellence and asset efficiency strategic objectives.

**Risks Associated with Our Business**

An investment in Chemours common stock is subject to a number of risks. The following list of risk factors is not exhaustive. Please read the information in the section captioned "Risk Factors" for a more thorough description of these and other risks.

- Conditions in the global economy and global capital markets may adversely affect our results of operations, financial condition, and cash flows.

- Market conditions, as well as global and regional economic downturns that adversely affect the demand for the end-use products that contain $TiO_2$, fluoroproducts or our other products, could adversely affect the profitability of our operations and the prices at which we can sell our products, negatively impacting our financial results.

- The markets for many of our products have seasonally affected sales patterns.

- Changes in government policies and laws and certain geopolitical conditions and activities could adversely affect our financial results.

- Our reported results could be adversely affected by currency exchange rates and currency devaluation could impair our competitiveness.

- Price fluctuations in energy and raw materials could have a significant impact on our ability to sustain and grow earnings.

- We are subject to extensive environmental, health and safety laws and regulations that may result in unanticipated loss or liability, which could reduce our profitability.

- Hazards associated with chemical manufacturing, storage and transportation could adversely affect our results of operations.

- The businesses in which we compete are highly competitive. This competition may adversely affect our results of operations and operating cash flows.

- Our significant indebtedness could adversely affect our financial condition, and we could have difficulty fulfilling our obligations under our indebtedness, either of which could have a material adverse effect on the value of our common stock.

- We may need additional capital in the future and may not be able to obtain it on favorable terms.

- The agreements governing our indebtedness will restrict our current and future operations, particularly our ability to respond to changes or to take certain actions.

- If we are unable to innovate and successfully introduce new products, or new technologies or processes reduce the demand for our products or the price at which we can sell products, our profitability could be adversely affected.

- Our results of operations and financial condition could be seriously impacted by business disruptions and security breaches, including cybersecurity incidents.

- If our intellectual property were compromised or copied by competitors, or if our competitors were to develop similar or superior intellectual property or technology, our results of operations could be negatively affected.

7

Table of Contents

- As a result of our current and past operations, including operations related to divested businesses and our discontinued operations, we could incur significant environmental liabilities.

- Our results of operations could be adversely affected by litigation and other commitments and contingencies.

## The Separation and Distribution

On October 24, 2013, DuPont announced its intention to separate its Performance Chemicals segment, which includes its titanium technologies, fluoroproducts and chemical solutions businesses, from the other businesses of DuPont that comprise its Agriculture, Electronics & Communications, Industrial Biosciences, Nutrition & Health, Performance Materials and Safety & Protection segments (the DuPont Business). The distribution is intended to be generally tax free for U.S. federal income tax purposes.

In furtherance of this plan, on [ • ], 2015, DuPont's board of directors approved the distribution of all of the issued and outstanding shares of Chemours common stock on the basis of [ • ] share[s] of Chemours common stock for each share of DuPont common stock issued and outstanding on [ • ], 2015, the record date for the distribution. As a result of the distribution, Chemours will become an independent, publicly traded company.

### *Internal Reorganization*

DuPont will transfer the entities and related assets and liabilities that are necessary in advance of the distribution so that Chemours is transferred the entities, assets and liabilities associated with DuPont's Performance Chemicals segment, which includes its titanium technologies, fluoroproducts and chemical solutions businesses, and certain additional assets and liabilities associated with the DuPont Business. We are currently a wholly owned subsidiary of DuPont. In connection with the distribution, DuPont will undertake a series of internal reorganization transactions to facilitate the transfers of entities and the related assets and liabilities described above. See "Our Relationship with DuPont Following the Distribution — Separation Agreement" for further discussion.

### *Chemours' Post-Separation Relationship with DuPont*

Chemours will enter into a Separation Agreement with DuPont, which is referred to in this information statement as the "Separation Agreement," and which will contain the principles governing the internal reorganization discussed above and will specify the terms of the distribution. In connection with the separation and distribution, Chemours will enter into various other agreements to effect the separation and distribution and provide a framework for its relationship with DuPont after the separation and distribution. These other agreements will include a Transition Services Agreement, a Tax Matters Agreement, an Employee Matters Agreement, IP Cross-License Agreements and certain manufacturing and supply arrangements. These agreements will provide for the allocation between Chemours and DuPont of DuPont's and Chemours' assets, employees, liabilities and obligations (including investments, property and employee benefits and tax-related assets and liabilities) attributable to periods prior to, at and after Chemours' separation from DuPont, and will govern certain relationships between Chemours and DuPont after the separation. For additional information regarding the Separation Agreement and other transaction agreements, see the sections entitled "Risk Factors — Risks Related to the Separation" and "Our Relationship with DuPont Following the Distribution."

## Regulatory Approvals

Chemours must complete the necessary registration under U.S. federal securities laws of Chemours common stock, as well as the applicable New York Stock Exchange (NYSE) listing requirements for such shares.

Other than the requirements discussed above, we do not believe that any other material governmental or regulatory filings or approvals will be necessary to consummate the distribution.

8

Table of Contents

DuPont's stockholders will not have any appraisal rights in connection with the distribution.

**Corporate Information**

Chemours was organized in the state of Delaware on February 18, 2014 as Performance Operations, LLC, and changed its name to the Chemours Company, LLC on April 15, 2014. In accordance with the separation and distribution, actions will have been taken so as at the time immediately prior to the distribution, Chemours will have been converted from a limited liability company to a Delaware corporation. The address of Chemours' principal executive offices is [ ● ]. Chemours' telephone number is [ ● ].

9

Table of Contents

**QUESTIONS AND ANSWERS ABOUT THE SEPARATION AND DISTRIBUTION**

| | |
|---|---|
| ***What is Chemours and why is DuPont separating the Chemours business and distributing Chemours' stock?*** | Chemours currently is a wholly owned subsidiary of DuPont that was formed to operate DuPont's Performance Chemicals segment, which includes its titanium technologies, fluoroproducts and chemical solutions businesses. The separation will be effected by a distribution of Chemours common stock on a pro rata basis to DuPont's stockholders. Following the separation and distribution, Chemours will be a separate company from DuPont, and DuPont will not retain any ownership interest in Chemours.

The separation of Chemours from DuPont and the distribution of Chemours common stock are intended to provide you with equity investments in two separate companies that will be able to focus on each of their respective businesses. DuPont and Chemours expect that the separation will result in enhanced long-term performance of each business for the reasons discussed in the sections entitled "The Distribution — Background of the Distribution" and "The Distribution — Reasons for the Separation and Distribution." |
| ***Why am I receiving this document?*** | DuPont is delivering this document to you because you are a holder of DuPont common stock. If you are a holder of DuPont common stock as of the close of business on [ • ], 2015, the record date for the distribution, you are entitled to receive [ • ] share[s] of our common stock for each share of DuPont common stock that you hold at the close of business on such date. This document will help you understand how the separation and distribution will affect your investment in DuPont and your investment in Chemours after the separation. |
| ***What are the reasons for the separation?*** | DuPont's Board of Directors determined that the separation and distribution of the Chemours business from the DuPont Business would be in the best interests of DuPont and its stockholders and approved the plan of separation. A wide variety of factors were considered by DuPont's board of directors in evaluating the separation and distribution. Among other things, DuPont's board of directors considered the following potential benefits of the separation and distribution:

• *Closer alignment of DuPont's businesses with its evolving strategic direction —* DuPont's overall mission is to bring world-class science and engineering to the global marketplace in the form of innovative products, materials and services. Increasingly, DuPont's strategic direction and business model is focused on advancing the company's integrated capabilities in biology, chemistry and materials science to further strengthen its leading positions across three strategic priorities: agriculture and nutrition, advanced materials and biobased industrials. DuPont is focused on high potential commercial opportunities in secular growth markets in food, energy, and protection where the company's innovation, global scale and efficient execution have the potential to create valuable new outcomes. In addition, the Performance Chemicals Segment is highly cyclical and its performance is volatile as |

10

Table of Contents

compared to DuPont's other businesses. Its leading businesses in Titanium Technologies and Fluoroproducts, and Chemical Solutions, well-established positions in attractive markets, and strong cash flow generation will be better positioned as an independent company. The separation and distribution will allow DuPont to continue its transformation into a higher growth, less cyclical company, resulting in greater value creation for its shareholders.

- *Elimination of capital and other constraints on the Performance Chemicals segment* — The separation and distribution will allow Chemours to attract capital to fund opportunities that the Performance Chemicals segment otherwise would not be able to pursue as a component of a company with a different strategic direction. As a stand-alone company, Chemours will have separate access to the debt and equity capital markets.

DuPont's board of directors considered a number of potentially negative factors in evaluating the separation and distribution, including risks relating to the creation of a new public company, possible increased administrative costs and one-time separation costs, but concluded that the potential benefits of the separation and distribution outweighed these factors. For more information, see the sections entitled "The Distribution — Reasons for the Separation and Distribution" and "Risk Factors" included elsewhere in this information statement.

*Why is the separation of Chemours structured as a distribution?*

The board of directors of DuPont has approved a plan to separate DuPont's performance chemicals business into a new publicly traded company. DuPont currently believes the separation by way of distribution is the most efficient way to separate its performance chemicals business from DuPont for various reasons. In particular, we believe a separation will (i) provide a high degree of assurance that decisions regarding our capital structure will support future financial stability; (ii) offer a high degree of certainty of completion in a timely manner, lessening disruption to current business operations; and (iii) would generally be a tax-free distribution of Chemours shares to DuPont's stockholders for U.S. federal income tax purposes. After consideration of strategic opportunities, DuPont believes that a tax-free separation will enhance the long-term value of both DuPont and us. See "The Distribution — Reasons for the Separation and Distribution."

*What do I have to do to participate in the distribution?*

Nothing. **You are not required to take any action to receive your Chemours shares, although you are urged to read this entire document carefully.** No stockholder approval of the distribution is required or sought. **Therefore, you are not being asked for a proxy to vote on the separation or the distribution, and you are requested not to send us a proxy.** You will neither be required to pay anything for the shares of Chemours common stock nor be required to surrender any shares of DuPont common stock to participate in the distribution. **Please do not send in your DuPont stock certificates.**

11

Table of Contents

| | |
|---|---|
| ***What is the record date for the distribution?*** | DuPont will determine record ownership as of the close of business on [ •   ], 2015, which we refer to as the "record date." |
| ***What will I receive in distribution?*** | If you hold DuPont common stock as of the record date, on the distribution date you will receive [ •   ] share[s] of our common stock for every [ •   ] share[s] of DuPont common stock. You will receive only whole shares of our common stock in the distribution. For a more detailed description, see "The Distribution." |
| ***How will fractional shares be treated in the distribution?*** | You will not receive any fractional shares of our common stock in connection with the distribution. Instead, the distribution agent will aggregate all fractional shares into whole shares and sell the whole shares in the open market at prevailing market prices on behalf of DuPont stockholders entitled to receive a fractional share. The distribution agent will then distribute the aggregate cash proceeds of the sales, net of brokerage fees and other costs, pro rata to these holders (net of any required withholding for taxes applicable to each holder). We anticipate that the distribution agent will make these sales in the "when-issued" market, and when-issued trades will generally settle within two weeks following the distribution date. See "— How will Chemours common stock trade?" for additional information regarding when-issued trading and "The Distribution — The Number of Shares of Chemours Common Stock You Will Receive" for a more detailed explanation of the treatment of fractional shares. |
| ***Will the number of DuPont shares I own change as a result of the distribution?*** | No, the number of shares of DuPont common stock you own will not change as a result of the distribution. Your proportionate interest in DuPont will not change as a result of the separation and distribution. |
| ***How many shares of Chemours common stock will be distributed?*** | The actual number of shares of our common stock that DuPont will distribute will depend on the number of shares of DuPont common stock outstanding on the record date. The shares of our common stock that DuPont distributes will constitute all of the issued and outstanding shares of our common stock immediately prior to the distribution. For more information on the shares being distributed, see "Description of Our Capital Stock." |
| ***When will the distribution occur?*** | It is expected that the distribution will be effected after the closing of trading on the NYSE on [ •   ], 2015, which we refer to as the "distribution date." On or shortly after the distribution date, the whole shares of our common stock will be credited in book-entry accounts for stockholders entitled to receive the shares in the distribution. We expect the distribution agent, acting on behalf of DuPont, to take about two weeks after the distribution date to fully distribute to DuPont stockholders any cash in lieu of the fractional shares they are entitled to receive. See "— How will DuPont distribute shares of our common stock?" for more information on how to access your book-entry account or your bank, brokerage or other account holding the Chemours common stock you receive in the distribution. |

Table of Contents

*If I sell my shares of DuPont common stock on or before the distribution date, will I still be entitled to receive shares of Chemours common stock in the distribution?*

If you hold shares of DuPont common stock on the record date and decide to sell them on or before the distribution date, you may choose to sell your DuPont common stock with or without your entitlement to our common stock. Beginning on or shortly before the record date and continuing up to and through the distribution, it is expected that there will be two markets in DuPont common stock: a "regular-way" market and an "ex-distribution" market. Shares of DuPont common stock that trade in the "regular-way" market will trade with an entitlement to shares of Chemours common stock distributed pursuant to the distribution. Shares that trade in the "ex-distribution" market will trade without an entitlement to shares of Chemours common stock distributed pursuant to the distribution.

You should discuss these alternatives with your bank, broker or other nominee. See "The Distribution — Trading Between the Record Date and Distribution Date" for more information.

*How will DuPont distribute shares of our common stock?*

Registered stockholders: If you are a registered stockholder (meaning you hold physical DuPont stock certificates or you own your shares of DuPont common stock directly through an account with DuPont's transfer agent, Computershare Trust Company, N.A. (Computershare), the distribution agent will credit the whole shares of our common stock you receive in the distribution to your book-entry account on or shortly after the distribution date. About two weeks after the distribution date, the distribution agent will mail you a book-entry account statement that reflects the number of whole shares of our common stock you own, along with a check for any cash in lieu of fractional shares you are entitled to receive. You will be able to access information regarding your book-entry account holding the Chemours shares at [ • ] using the same credentials that you use to access your DuPont account or via our transfer agent's interactive voice response system at [ • ].

"Street name" or beneficial stockholders: If you own your shares of DuPont common stock beneficially through a bank, broker or other nominee, your bank, broker or other nominee will credit your account with the whole shares of our common stock you receive in the distribution on or shortly after the distribution date, and the distribution agent will mail you a check for any cash in lieu of fractional shares you are entitled to receive. Please contact your bank, broker or other nominee for further information about your account.

We will not issue any physical stock certificates to any stockholders, even if requested. See "The Distribution — When and How You Will Receive the Distribution" for a more detailed explanation.

*What are the conditions to the separation and distribution?*

The distribution is subject to a number of conditions, including, among others:

- the making of a $[ • ] cash distribution from Chemours to DuPont prior to the distribution, and the determination by DuPont in its sole discretion that following the separation it shall have no further

13

Table of Contents

liability or obligation whatsoever under any financing arrangements that Chemours will be entering into in connection with the separation;

- the Securities and Exchange Commission (SEC) having declared effective the registration statement, of which this information statement forms a part, no stop order relating to the registration statement being in effect, nor any proceeding seeking such stop order being pending, and the information statement having been distributed to DuPont's stockholders;

- Chemours common stock having been approved and accepted for listing by the NYSE, subject to official notice of issuance;

- DuPont has received a ruling (IRS Ruling) from the U.S. Internal Revenue Service (IRS) substantially to the effect that, among other things, the distribution of our ordinary shares, together with certain related transactions, will qualify under Sections 355 and 368(a) of the Internal Revenue Code of 1986, as amended (Code), with the result that DuPont and DuPont's shareholders will not recognize any taxable income, gain or loss for U.S. federal income tax purposes as a result of the distribution, except to the extent of cash received in lieu of fractional shares. As a condition to the distribution, the IRS Ruling must remain in effect as of the distribution date. In addition, the distribution is conditioned on the receipt of an opinion of tax counsel (Tax Opinion), in form and substance acceptable to DuPont, substantially to the effect that certain requirements, including certain requirements that the IRS will not rule on, necessary to obtain tax-free treatment, have been satisfied. See "Material U.S. Federal Income Tax Consequences of the Distribution";

- the receipt of an opinion from an independent appraisal firm to the board of directors of DuPont confirming the solvency of each of DuPont and Chemours after the distribution that is in form and substance acceptable to DuPont in its sole discretion;

- all permits, registrations and consents required under the securities or blue sky laws of states or other political subdivisions of the United States or of other foreign jurisdictions in connection with the distribution having been received;

- no order, injunction, or decree issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the separation, distribution or any of the related transactions being in effect;

- the reorganization of DuPont and Chemours businesses prior to the separation and distribution having been effectuated;

- the approval by the board of directors of DuPont of the distribution and all related transactions (and such approval not having been withdrawn);

- DuPont's election of the individuals to be listed as members of our board of directors post-distribution, as described in this information statement, immediately prior to the distribution date;

14

Table of Contents

- Chemours having entered into certain agreements in connection with the separation and distribution and certain financing arrangements prior to or concurrent with the separation; and

- no events or developments shall have occurred or exist that, in the sole and absolute judgment of DuPont's board of directors, make it inadvisable to effect the distribution or would result in the distribution and related transactions not being in the best interest of DuPont or its stockholders.

| | |
|---|---|
| *Can DuPont decide to cancel the separation even if all the conditions have been met?* | Yes. The separation is subject to the satisfaction or waiver by DuPont of certain conditions. See "The Distribution — Conditions to the Distribution." Even if all such conditions are met, DuPont has the right not to complete the separation if, at any time prior to the distribution, the board of directors of DuPont determines, in its sole discretion, that the separation is not in the best interests of DuPont or its stockholders, that a sale or other alternative is in the best interests of DuPont or its stockholders, or that market conditions or other circumstances are such that it is not advisable at that time to separate the performance chemicals business from DuPont. |
| *What are the U.S. federal income tax consequences of the distribution to me?* | The distribution is conditioned on the continued validity of the IRS Ruling, which DuPont has received from the IRS, and the receipt and continued validity of the Tax Opinion, in form and substance acceptable to DuPont, substantially to the effect that, among other things, the distribution will qualify as a tax-free transaction under Section 355 and Section 368(a)(1)(D) of the Code, and certain transactions related to the transfer of assets and liabilities to Chemours in connection with the separation will not result in the recognition of any gain or loss to DuPont, Chemours or their stockholders. Such conditions are waivable by DuPont's board of directors in its sole and absolute discretion. DuPont received the IRS Ruling from the IRS on September 30, 2014. Accordingly, and so long as the distribution so qualifies, for U.S. federal income tax purposes, no gain or loss will be recognized by you, and no amount will be included in your income, upon the receipt of shares of our common stock pursuant to the distribution. However, any cash payments made instead of fractional shares will generally be taxable to you. For a more detailed description, see "The Distribution — Material U.S. Federal Income Tax Consequences of the Distribution." |
| *How will the distribution affect my tax basis in my shares of DuPont common stock?* | Assuming that the distribution is tax-free to DuPont stockholders, your tax basis in your DuPont common stock held by you immediately prior to the distribution will be allocated between your DuPont common stock and Chemours common stock that you receive in the distribution in proportion to the relative fair market values of each immediately following the distribution. DuPont will provide its stockholders with information to enable them to compute their tax basis in both DuPont and Chemours shares. This information will be posted on DuPont's website, www.dupont.com, promptly following the distribution date. You should consult your tax advisor about how this allocation will work in your situation, including a situation where |

15

Table of Contents

you have purchased DuPont shares at different times or for different amounts, and regarding any particular consequences of the distribution to you. For a more detailed description, see "The Distribution — Material U.S. Federal Income Tax Consequences of the Distribution."

| | |
|---|---|
| ***Will my shares of DuPont common stock continue to trade following the distribution?*** | DuPont common stock will continue to trade on the NYSE under the symbol "DD" after the distribution. |
| ***How will Chemours common stock trade?*** | Currently, there is no public market for our common stock. We intend to list our common stock on the NYSE under the symbol "[ ● ]."<br><br>We anticipate that trading in our common stock will begin on a "when-issued" basis as early as [ ● ] trading days prior to the record date for the distribution and will continue up to and including the distribution date. When-issued trading in the context of a separation refers to a sale or purchase made conditionally on or before the distribution date because the securities of the separated entity have not yet been distributed. When-issued trades generally settle within two weeks after the distribution date. On the first trading day following the distribution date, any when-issued trading of our common stock will end and "regular-way" trading will begin. Regular-way trading refers to trading after the security has been distributed and typically involves a trade that settles on the third full trading day following the date of the trade. See "The Distribution — Trading Between the Record Date and Distribution Date" for more information. We cannot predict the trading prices for our common stock before, on or after the distribution date. |
| ***What indebtedness will Chemours have following the separation?*** | We expect that, at the time of distribution, we will have significant third-party indebtedness, which we expect to incur through a bond offering, term loans or a combination of these and other financing arrangements. Subsequent information regarding our indebtedness following the distribution will be provided in subsequent amendments to this information statement. |
| ***Will the separation affect the trading price of my DuPont common stock?*** | We expect the trading price of shares of DuPont common stock immediately following the distribution to be lower than immediately prior to the distribution because the trading price will no longer reflect the value of the performance chemicals business. Furthermore, until the market has fully analyzed the value of DuPont without Chemours, the trading price of shares of DuPont common stock may fluctuate. There can be no assurance that, following the distribution, the combined trading prices of DuPont common stock and the Chemours common stock will equal or exceed what the trading price of DuPont common stock would have been in the absence of the separation, and it is possible the post-distribution combined equity value of DuPont and Chemours will be less than DuPont's equity value prior to the distribution. |
| ***Are there risks associated with owning shares of Chemours common stock?*** | Yes. Our business faces both general and specific risks and uncertainties. Our business also faces risks relating to the separation. |

16

Table of Contents

Following the separation, we will also face risks associated with being an independent, publicly traded company. Accordingly, you should read carefully the information set forth in the section entitled "Risk Factors" in this information statement.

**Does Chemours intend to pay cash dividends?**

Following the distribution, we expect to pay regular dividends. Prior to the distribution, while we are a wholly-owned subsidiary of DuPont, our board of directors, consisting of DuPont employees, intends to declare a dividend of [ • ] for the third quarter of 2015, to be paid to our stockholders as of a record date following the distribution. The payment and amount of any subsequent dividend will be subject to the sole discretion of our post-distribution, independent board of directors and will depend upon many factors. See "Dividend Policy" for more information.

**What will Chemours' relationship be with DuPont following the separation and distribution?**

Chemours will enter into a Separation Agreement with DuPont to effect the separation and provide a framework for Chemours' relationship with DuPont after the separation and distribution and will also enter into certain other agreements, such as a Transition Services Agreement, a Tax Matters Agreement, an Employee Matters Agreement and IP Cross-License Agreements and certain manufacturing and supply arrangements. These agreements will provide for the terms of the separation between Chemours and DuPont of the assets, employees, liabilities and obligations (including its investments, property and employee benefits and tax-related assets and liabilities) of DuPont and its subsidiaries attributable to periods prior to, at and after Chemours' separation from DuPont and will govern the relationship between Chemours and DuPont subsequent to the completion of the separation and distribution. For additional information regarding the Separation Agreement and other transaction agreements, see the sections entitled "Risk Factors — Risks Related to the Separation" and "Our Relationship with DuPont Following the Distribution."

**Do I have appraisal rights in connection with the separation and distribution?**

No. Holders of DuPont stock are not entitled to appraisal rights in connection with the separation and distribution.

**Who is the transfer agent and registrar for Chemours common stock?**

Following the separation and distribution, [ • ] will serve as transfer agent and registrar for our common stock.

[ • ] has two additional roles in the distribution.

• Computershare currently serves and will continue to serve as DuPont's transfer agent and registrar.

• In addition, [ • ] will serve as the distribution agent in the distribution and will assist DuPont in the distribution of our common stock to DuPont's stockholders.

17

Table of Contents

*Where can I get more information?*

If you have any questions relating to the mechanics of the distribution, you should contact the distribution agent at:

[  •   ]

Before the separation and distribution, if you have any questions relating to the separation and distribution, you should contact DuPont at:

Investor Relations

[  •   ]

Individual Holders: After the separation and distribution, if you have any questions relating to Chemours, you should contact us at:

Investor Relations

[  •   ]

Individual Holders: After the separation and distribution, if you have any questions relating to DuPont, you should contact them at:

Investor Relations

[  •   ]

Institutional Holders: After the separation and distribution, if you have any questions relating to Chemours, you should contact us at:

Investor Relations

[  •   ]

Institutional Holders: After the separation and distribution, if you have any questions relating to DuPont, you should contact them at:

Investor Relations

[  •   ]

18

Table of Contents

## RISK FACTORS

*You should carefully consider the following risks and other information in this information statement in evaluating us and our common stock. The risk factors generally have been separated into three groups: risks related to our business, risks related to the separation and risks related to our common stock.*

*Any of the following risks, as well as additional risks and uncertainties not currently known to us or that we currently deem immaterial, could materially and adversely affect our business, results of operations or financial condition. Our operations could be affected by various risks, many of which are beyond our control. Based on current information, we believe that the following identifies the most significant risk factors that could affect our business, results of operations or financial condition. Past financial performance may not be a reliable indicator of future performance and historical trends should not be used to anticipate results or trends in future periods. See "Cautionary Statement Concerning Forward-Looking Statements" for more details.*

### Risks Related to Our Business

***Conditions in the global economy and global capital markets may adversely affect our results of operations, financial condition, and cash flows.***

Our business and operating results may in the future be adversely affected by global economic conditions, including instability in credit markets, declining consumer and business confidence, fluctuating commodity prices and interest rates, volatile exchange rates, and other challenges such as the changing financial regulatory environment that could affect the global economy. Our customers may experience deterioration of their businesses, cash flow shortages, and difficulty obtaining financing. As a result, existing or potential customers may delay or cancel plans to purchase products and may not be able to fulfill their obligations to us in a timely fashion. Further, suppliers could experience similar conditions, which could impact their ability to supply materials or otherwise fulfill their obligations to us. Because we will have significant international operations, there will be a large number of currency transactions that result from international sales, purchases, investments and borrowings. Also, our effective tax rate may fluctuate because of variability in geographic mix of earnings, changes in statutory rates, and taxes associated with repatriation of non-U.S. earnings. Future weakness in the global economy and failure to manage these risks could adversely affect our results of operations, financial condition and cash flows in future periods.

***Market conditions, as well as global and regional economic downturns that adversely affect the demand for the end-use products that contain $TiO_2$, fluoroproducts or our other products, could adversely affect the profitability of our operations and the prices at which we can sell our products, negatively impacting our financial results .***

Our revenue and profitability is largely dependent on the $TiO_2$ industry and the industries that are end users of our fluoroproducts. $TiO_2$ and our fluoroproducts, such as refrigerants and resins, are used in many "quality of life" products for which demand historically has been linked to global, regional and local GDP and discretionary spending, which can be negatively impacted by regional and world events or economic conditions. Such events are likely to cause a decrease in demand for our products and, as a result, may have an adverse effect on our results of operations and financial condition. The future profitability of our operations, and cash flows generated by those operations, also will be affected by the available supply of our products in the market, such as $TiO_2$ and our fluoroproducts.

Additionally, our profitability may be affected by the market for, and use of, by-products generated as part of our manufacturing processes. A significant decrease in the demand for such products could adversely impact our operations by limiting our ability to manufacture our products.

***The markets for many of our products have seasonally affected sales patterns.***

The demand for $TiO_2$, certain of our fluoroproducts and certain of our other products during a given year is subject to seasonal fluctuations. As a result of seasonal fluctuations, our operating cash flow may be negatively

19

Table of Contents

impacted due to demand fluctuations. In particular, because TiO $_2$ is widely used in coatings, demand is higher in the painting seasons of spring and summer. Because certain fluoroproducts are used in refrigerants, such products are in higher demand in the spring and summer in the Northern Hemisphere. We may be adversely affected by anticipated or unanticipated changes in regional weather conditions. For example, poor weather conditions in a region can lead to an abbreviated painting season, which can depress consumer sales of paint products that use TiO $_2$, which could have a negative effect on our cash position.

### *Changes in government policies and laws and certain geopolitical conditions and activities could adversely affect our financial results.*

Sales to customers outside the U.S. constitute about [ • ] percent of our 2014 revenue. We anticipate that international sales will continue to represent a substantial portion of our total sales and that continued growth and profitability will require further international expansion, particularly in developing markets. Sales from developing markets represent [ • ] percent of our revenue in 2014 and our growth plans include focusing on expanding our presence in developing markets. Our financial results could be affected by changes in trade, monetary and fiscal policies, laws and regulations, or other activities of U.S. and non-U.S. governments, agencies and similar organizations. These factors include, but are not limited to, changes in a country's or region's economic or political conditions, trade or other economic-based regulations, environmental regulations, including climate change-based regulations or legislation and regulations relating to the transport or shipment of hazardous materials, and policies affecting production, pricing and marketing of products, local labor conditions and regulations, reduced protection of intellectual property rights in some countries, changes in the regulatory or legal environment, restrictions on currency exchange activities, burdensome taxes and tariffs and other trade barriers or policies. International risks and uncertainties, including changing social and economic conditions as well as terrorism, political hostilities and war, could lead to reduced sales and profitability.

### *Our reported results could be adversely affected by currency exchange rates and currency devaluation could impair our competitiveness.*

Due to our international operations, we transact in many foreign currencies and are subject to the effects of changes in foreign currency exchange rates. During times of a strengthening U.S. dollar, our reported net revenues and operating income will be reduced because the local currency will be translated into fewer U.S. dollars. During periods of local economic crisis, local currencies may be devalued significantly against the U.S. dollar, potentially reducing our margin. Chemours may enter forward exchange contracts and other financial contracts in an attempt to mitigate the impact of currency rate fluctuations however cannot be assured such actions will eliminate any adverse impact from variation in currency rates. Also, actions to recover margins may result in lower volume and a weaker competitive position, which may have an adverse effect on our profitability.

### *Price fluctuations in energy and raw materials could have a significant impact on our ability to sustain and grow earnings.*

Our manufacturing processes consume significant amounts of energy and raw materials, the costs of which are subject to worldwide supply and demand as well as other factors beyond our control. Variations in the cost of energy, which primarily reflect market prices for oil and natural gas, and for raw materials, may significantly affect our operating results from period to period. Additionally, consolidation in the industries providing our raw materials may have an impact on the cost and availability of such materials. To the extent we do not have fixed price contracts with respect to specific raw materials, we have no control over the costs of raw materials and such costs may fluctuate widely for a variety of reasons, including changes in availability, major capacity additions or reductions, or significant facility operating problems. These fluctuations could negatively affect our operating margins and our profitability.

We endeavor to offset the effects of higher energy and raw material costs through selling price increases, productivity improvements and cost reduction programs. However, the outcome of these efforts is largely determined by existing competitive and economic conditions, and may be subject to a time delay between the

20

Table of Contents

increase in our raw materials costs and our ability to increase prices, which could vary significantly depending on the market served. If we are not able to fully offset the effects of higher energy or raw material costs, it could have a material adverse effect on our financial results.

***Effects of our raw materials contracts, including our inability to renew such contracts, could have a significant impact on our earnings.***

When possible we have purchased, and we plan to continue to purchase, raw materials, including titanium bearing ores and fluorospar, through negotiated medium- or long-term contracts to minimize the impact of price fluctuations. To the extent that we have been able to achieve favorable pricing in our existing negotiated long-term contracts, we may not be able to renew such contracts at the current prices, or at all, and this may adversely impact our cash flow from operations. However, to the extent that the prices of raw materials that we utilize significantly decline, we may be bound by the terms of our existing long-term contracts and obligated to purchase such raw materials at higher prices as compared to other market participants.

***We are subject to extensive environmental, health and safety laws and regulations that may result in unanticipated loss or liability, which could reduce our profitability.***

Our operations and production facilities are subject to extensive environmental and health and safety laws and regulations at national, international and local levels in numerous jurisdictions relating to pollution, protection of the environment, climate change, transporting and storing raw materials and finished products and storing and disposing of hazardous wastes. If we are found to be in violation of these laws or regulations, we may incur substantial costs, including fines, damages, criminal or civil sanctions and remediation costs, or experience interruptions in our operations. We also may be subject to changes in our operations and production based on increased regulation or other changes to, or restrictions imposed by, any such additional regulations. In addition, the manner in which adopted regulations (including environmental regulations) are ultimately implemented may affect our products and results of operations. In the event of a catastrophic incident involving any of the raw materials we use or chemicals we produce, we could incur material costs as a result of addressing the consequences of such event and future reputational costs associated with any such event.

There is also a risk that one or more of our key raw materials or one or more of our products may be found to have, or be characterized as having, a toxicological or health-related impact on the environment or on our customers or employees, which could potentially result in us incurring liability in connection with such characterization and the associated effects of any toxicological or health-related impact. If such a discovery or characterization occurs, we may incur increased costs in order to comply with new regulatory requirements or the relevant materials or products, including products of our customers incorporating our materials or products, may be recalled or banned. Changes in laws and regulations, or their interpretation, and our customers' perception of such changes or interpretations may also affect the marketability of certain of our products.

***Hazards associated with chemical manufacturing, storage and transportation could adversely affect our results of operations.***

There are hazards associated with chemical manufacturing and the related storage and transportation of raw materials, products and wastes. These hazards could lead to an interruption or suspension of operations and have an adverse effect on the productivity and profitability of a particular manufacturing facility or on us as a whole. While we endeavor to provide adequate protection for the safe handling of these materials, issues could be created by various events, including natural disasters, severe weather events, acts of sabotage and performance by third parties, and as a result we could face the following potential hazards:

- piping and storage tank leaks and ruptures;

- mechanical failure;

- employee exposure to hazardous substances; and

- chemical spills and other discharges or releases of toxic or hazardous substances or gases.

21

**Table of Contents**

These hazards may cause personal injury and loss of life, damage to property and contamination of the environment, which could lead to government fines, work stoppage injunctions, lawsuits by injured persons, damage to our public reputation and brand, and diminished product acceptance. If such actions are determined adversely to us or there is an associated economic impact to our business, we may have inadequate insurance or cash flow to offset any associated costs. Such outcomes could adversely affect our financial condition and results of operations.

***The businesses in which we compete are highly competitive. This competition may adversely affect our results of operations and operating cash flows.***

Each of the businesses in which we operate is highly competitive. Competition in the performance chemicals industry is based on a number of factors such as price, product quality and service. We face significant competition from major international and regional competitors. Additionally, our Titanium Technologies business competes with numerous regional producers, including producers in China, which have expanded their readily available production capacity during the previous five years. Additionally, there have also been reports of potential development of chloride production of $TiO_2$ by certain of such producers.

In addition, historically, information about our business and operations was presented as part of the broader DuPont corporate organization. As an independent, publicly traded company, we will be required to publicly provide more detailed information about our business and operations, including financial information, as a stand-alone company. This information will be accessible to our customers, suppliers and competitors, each of which may factor the new information into their commercial dealings with us or the markets in which we operate. The use of such information by third parties in the marketplace could have an adverse effect on us and our results of operations, including our relative level of profitability.

***Our significant indebtedness could adversely affect our financial condition, and we could have difficulty fulfilling our obligations under our indebtedness, either of which could have a material adverse effect on the value of our common stock.***

Upon the consummation of our separation from DuPont, we expect to have $[ ● ] million of indebtedness. Our significant level of indebtedness increases the risk that we may be unable to generate cash sufficient to pay amounts due in respect of our indebtedness. The level of our indebtedness could have other important consequences on our business, including;

- making it more difficult for us to satisfy our obligations with respect to indebtedness;

- increasing our vulnerability to adverse changes in general economic, industry and competitive conditions;

- requiring us to dedicate a significant portion of our cash flow from operations to make payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital and other general corporate purposes;

- limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- restricting us from capitalizing on business opportunities;

- placing us at a competitive disadvantage compared to our competitors that have less debt; and

- limiting our ability to borrow additional funds for working capital, acquisitions, debt service requirements, execution of our business strategy or other general corporate purposes.

The occurrence of any one or more of these circumstances could have a material adverse effect on us.

***We may need additional capital in the future and may not be able to obtain it on favorable terms.***

Our industry is capital intensive, and we may require additional capital in the future to finance our growth and development, implement further marketing and sales activities, fund ongoing research and development activities

22

Table of Contents

and meet general working capital needs. Our capital requirements will depend on many factors, including acceptance of and demand for our products, the extent to which we invest in new technology and research and development projects, and the status and timing of these developments, as well as general availability of capital from debt and/or equity markets.

However, debt or equity financing may not be available to us on terms we find acceptable, if at all. If we incur additional debt or raise equity through the issuance of our preferred stock, the terms of the debt or our preferred stock issued may give the holders rights, preferences and privileges senior to those of holders of our common stock, particularly in the event of liquidation. If we raise funds through the issuance of additional equity, your ownership in us would be diluted. Also, regardless of the terms of our debt or equity financing, our agreements and obligations under the Tax Matters Agreement may limit our ability to issue stock. For a more detailed discussion, see "— *We intend to agree to numerous restrictions to preserve the tax-free treatment of the transactions in the United States, which may reduce our strategic and operating flexibility.* " If we are unable to raise additional capital when needed, our financial condition, and thus your investment in us, could be materially and adversely affected.

Additionally, our failure to maintain the credit ratings on our debt securities could negatively affect our ability to access capital and could increase our interest expense on certain existing and future indebtedness. We expect the credit rating agencies to periodically review our capital structure and the quality and stability of our earnings. Deterioration in our capital structure or the quality and stability of our earnings could result in a downgrade of the credit ratings on our debt securities. Any negative ratings actions could constrain the capital available to us and could limit our access to funding for our operations and/or increase the cost of such capital. If, as a result, our ability to access capital when needed becomes constrained, our interest costs could increase, which could have material adverse effect on our results of operations, financial condition and cash flows.

*The agreements governing our indebtedness will restrict our current and future operations, particularly our ability to respond to changes or to take certain actions.*

The agreements governing our indebtedness contain, and the agreements governing future indebtedness and future debt securities may contain, significant operating and financial maintenance covenants that limit our operations, including the ability to engage in activities that may be in our long-term best interests. These restrictive covenants may limit us, and our restricted subsidiaries, from taking, or give rights to the holders of our indebtedness in the event of, the following actions:

- incurring additional indebtedness and guaranteeing indebtedness;

- paying dividends or making other distributions in respect of, or repurchasing or redeeming, our capital stock;

- making acquisitions or other investments;

- prepaying, redeeming or repurchasing certain indebtedness;

- selling or otherwise disposing of assets;

- selling stock of our subsidiaries;

- incurring liens;

- entering into transactions with affiliates;

- entering into agreements restricting our subsidiaries' ability to pay dividends;

- entering into transactions that result in a change of control of us; and

- consolidating, merging or selling all or substantially all of our assets.

Our failure to comply with those covenants could result in an event of default that, if not cured or waived, could result in the acceleration of some or all of our indebtedness, which could lead us to bankruptcy, reorganization or insolvency.

23

Table of Contents

*If we are unable to innovate and successfully introduce new products, or new technologies or processes reduce the demand for our products or the price at which we can sell products, our profitability could be adversely affected.*

Our industries and the end-use markets into which we sell our products experience periodic technological change and product improvement. Our future growth will depend on our ability to gauge the direction of commercial and technological progress in key end-use markets and on our ability to fund and successfully develop, manufacture and market products in such changing end-use markets. We must continue to identify, develop and market innovative products or enhance existing products on a timely basis to maintain our profit margins and our competitive position. We may be unable to develop new products or technology, either alone or with third parties, or license intellectual property rights from third parties on a commercially competitive basis. If we fail to keep pace with the evolving technological innovations in our end-use markets on a competitive basis, including with respect to innovation with regard to the development of alternative uses for, or application of, products developed that utilize such end-use products, our financial condition and results of operations could be adversely affected. We cannot predict whether technological innovations will, in the future, result in a lower demand for our products or affect the competitiveness of our business. We may be required to invest significant resources to adapt to changing technologies, markets, competitive environments and laws and regulations. We cannot anticipate market acceptance of new products or future products. In addition, we may not achieve our expected benefits associated with new products developed to meet new laws or regulations if the implementation of such laws or regulations is delayed.

*Our results of operations and financial condition could be seriously impacted by business disruptions and security breaches, including cybersecurity incidents.*

Business and/or supply chain disruptions, plant and/or power outages and information technology system and/or network disruptions, regardless of cause including acts of sabotage, employee error or other actions, geo-political activity, weather events and natural disasters could seriously harm our operations as well as the operations of our customers and suppliers. Failure to effectively prevent, detect and recover from security breaches, including attacks on information technology and infrastructure by hackers; viruses; breaches due to employee error or actions; or other disruptions could result in misuse of our assets, business disruptions, loss of property including trade secrets and confidential business information, legal claims or proceedings, reporting errors, processing inefficiencies, negative media attention, loss of sales and interference with regulatory compliance. Like most major corporations, we have been and expect to be the target of industrial espionage, including cyber-attacks, from time to time. We have determined that these attacks have resulted, and could result in the future, in unauthorized parties gaining access to certain confidential business information, and have included the obtaining of trade secrets and proprietary information related to the chloride manufacturing process for TiO$_2$ by third parties. Although we do not believe that we have experienced any material losses to date related to these breaches, there can be no assurance that we will not suffer any such losses in the future. We plan to actively manage the risks within our control that could lead to business disruptions and security breaches. As these threats continue to evolve, particularly around cybersecurity, we may be required to expend significant resources to enhance our control environment, processes, practices and other protective measures. Despite these efforts, such events could materially adversely affect our business, financial condition or results of operations.

*If our intellectual property were compromised or copied by competitors, or if our competitors were to develop similar or superior intellectual property or technology, our results of operations could be negatively affected.*

Intellectual property rights, including patents, trade secrets, confidential information, trademarks, tradenames and trade dress, are important to our business. We will endeavor to protect our intellectual property rights in key jurisdictions in which our products are produced or used and in jurisdictions into which our products are imported. Our success will depend to a significant degree upon our ability to protect and preserve our intellectual property rights. However, we may be unable to obtain protection for our intellectual property in key jurisdictions. Although we own and have applied for numerous patents and trademarks throughout the world, we may have to rely on judicial enforcement of our patents and other proprietary rights. Our patents and other intellectual

24

Table of Contents

property rights may be challenged, invalidated, circumvented, and rendered unenforceable or otherwise compromised. A failure to protect, defend or enforce our intellectual property could have an adverse effect on our financial condition and results of operations. Similarly, third parties may assert claims against us and our customers and distributors alleging our products infringe upon third party intellectual property rights.

We also rely materially upon unpatented proprietary technology, know-how and other trade secrets to maintain our competitive position. While we maintain policies to enter into confidentiality agreements with our employees and third parties to protect our proprietary expertise and other trade secrets, these agreements may not be enforceable or, even if legally enforceable, we may not have adequate remedies for breaches of such agreements. We also may not be able to readily detect breaches of such agreements. The failure of our patents or confidentiality agreements to protect our proprietary technology, know-how or trade secrets could result in significantly lower revenues, reduced profit margins or loss of market share.

If we must take legal action to protect, defend or enforce our intellectual property rights, any suits or proceedings could result in significant costs and diversion of our resources and our management's attention, and we may not prevail in any such suits or proceedings. A failure to protect, defend or enforce our intellectual property rights could have an adverse effect on our financial condition and results of operations.

*As a result of our current and past operations, including operations related to divested businesses and our discontinued operations, we could incur significant environmental liabilities.*

We are subject to various laws and regulations around the world governing the environment, including the discharge of pollutants and the management and disposal of hazardous substances. As a result of our operations, including the operations of divested businesses and certain discontinued operations, we could incur substantial costs, including remediation and restoration costs. The costs of complying with complex environmental laws and regulations, as well as internal voluntary programs, are significant and will continue to be so for the foreseeable future. The ultimate costs under environmental laws and the timing of these costs are difficult to predict. While we establish accruals in accordance with generally accepted accounting principles, the ultimate actual costs and liabilities may vary from the accruals because the estimates on which the accruals are based depend on a number of factors (many of which are outside of our control) including the nature of the matter, the complexity of the site, site geology, the nature and extent of contamination, the type of remedy, the outcome of discussions with regulatory agencies and other Potentially Responsible Parties (PRPs) at multi-party sites and the number and financial viability of other PRPs. See Note 17 to the Annual Combined Financial Statements.

*Our results of operations could be adversely affected by litigation and other commitments and contingencies.*

We face risks arising from various unasserted and asserted litigation matters, including, but not limited to, product liability, patent infringement, antitrust claims, and claims for third party property damage or personal injury stemming from alleged environmental or other torts. We have noted a nationwide trend in purported class actions against chemical manufacturers generally seeking relief such as medical monitoring, property damages, off-site remediation and punitive damages arising from alleged environmental or other torts without claiming present personal injuries. We also have noted a trend in public and private nuisance suits being filed on behalf of states, counties, cities and utilities alleging harm to the general public. Various factors or developments can lead to changes in current estimates of liabilities such as a final adverse judgment, significant settlement or changes in applicable law. A future adverse ruling or unfavorable development could result in future charges that could have a material adverse effect on us. An adverse outcome in any one or more of these matters could be material to our financial results and could adversely impact the value of any of our brands that are associated with any such matters.

In the ordinary course of business, we may make certain commitments, including representations, warranties and indemnities relating to current and past operations, including those related to divested businesses and issue guarantees of third party obligations. Additionally, we will be required to indemnify DuPont for uncapped

25

**Table of Contents**

amounts with regard to specified liabilities under certain of the agreements entered into in connection with the separation and distribution, including, among others, the Separation Agreement, the Employee Matters Agreement and the Tax Matters Agreement. If we were required to make payments, such payments could be significant and would exceed the amounts we have accrued with respect thereto, adversely affecting our results of operations.

**Risks Related to the Separation**

*We may be unable to achieve some or all of the benefits that we expect to achieve from our separation from DuPont.*

We believe that, as an independent, publicly traded company, we will continue to, among other things, focus our financial and operational resources on our specific business, growth profile and strategic priorities, design and implement corporate strategies and policies targeted to our operational focus and strategic priorities, guide our processes and infrastructure to focus on our core strengths, implement and maintain a capital structure designed to meet our specific needs and more effectively respond to industry dynamics. However, we may be unable to achieve some or all of these benefits. For example, in order to position ourselves for the separation, we are undertaking a series of strategic, structural and process realignment and restructuring actions within our operations. These actions may not provide the benefits we currently expect, and could lead to disruption of our operations, loss of, or inability to recruit, key personnel needed to operate and grow our businesses following the separation, weakening of our internal standards, controls or procedures and impairment of our key customer and supplier relationships. In addition, completion of the proposed separation will require significant amounts of management's time and effort, which may divert management's attention from operating and growing our businesses. If we fail to achieve some or all of the benefits that we expect to achieve as an independent company, or do not achieve them in the time we expect, our business, financial condition and results of operations could be materially and adversely affected.

*If the distribution, together with certain related transactions, were to fail to qualify for non-recognition treatment for U.S. federal income tax purposes, then we could be subject to significant tax and indemnification liability and stockholders receiving our common stock in the distribution could be subject to significant tax liability.*

DuPont has received the IRS Ruling from the IRS substantially to the effect that, among other things, the distribution will qualify as a tax-free transaction under Section 355 and Section 368(a)(1)(D) of the Code. The distribution is conditioned on the continued validity of the IRS Ruling, as well as on receipt of the Tax Opinion, in form and substance acceptable to DuPont, substantially to the effect that, among other things, the distribution will qualify as a tax-free transaction under Section 355 and Section 368(a)(1)(D) of the Code, and certain transactions related to the transfer of assets and liabilities to us in connection with the separation will not result in the recognition of any gain or loss to DuPont, us or our stockholders. The IRS Ruling relies, and the Tax Opinion will rely, on certain facts, assumptions, and undertakings, and certain representations from DuPont and us, regarding the past and future conduct of both respective businesses and other matters, and the Tax Opinion will rely on the IRS Ruling. Notwithstanding the IRS Ruling and the Tax Opinion, the IRS could determine that the distribution or such related transactions should be treated as a taxable transaction if it determines that any of these facts, assumptions, representations, or undertakings is not correct, or that the distribution should be taxable for other reasons, including if the IRS were to disagree with the conclusions in the Tax Opinion that are not covered by the IRS Ruling.

If the distribution ultimately is determined to be taxable, then a stockholder of DuPont that received shares of our common stock in the distribution would be treated as having received a distribution of property in an amount equal to the fair market value of such shares on the distribution date and could incur significant income tax liabilities. Such distribution would be taxable to such stockholder as a dividend to the extent of DuPont's current and accumulated earnings and profits. Any amount that exceeded DuPont's earnings and profits would be treated first as a non-taxable return of capital to the extent of such stockholder's tax basis in its shares of DuPont stock

26

Table of Contents

with any remaining amount being taxed as a capital gain. DuPont would recognize a taxable gain in an amount equal to the excess, if any, of the fair market value of the shares of our common stock held by DuPont on the distribution date over DuPont's tax basis in such shares. In addition, if certain related transactions fail to qualify for tax-free treatment under U.S. federal, state and/or local tax law and/or foreign tax law, we and DuPont could incur significant tax liabilities under U.S. federal, state, local and/or foreign tax law.

Generally, taxes resulting from the failure of the separation and distribution to qualify for non-recognition treatment for U.S. federal income tax purposes would be imposed on DuPont or DuPont's stockholders and, under the Tax Matters Agreement that we will enter into with DuPont, DuPont is generally obligated to indemnify us against such taxes. However, under the terms of the Tax Matters Agreement, we also generally will be responsible for any taxes imposed on DuPont that arise from the failure of the distribution to qualify as tax-free for U.S. federal income tax purposes within the meaning of Section 355 of the Code or the failure of such related transactions to qualify for tax-free treatment, to the extent such failure to qualify is attributable to actions, events or transactions relating to our, or our affiliates', stock, assets or business, or any breach of our or our affiliates' representations, covenants or obligations under the Tax Matters Agreement (or any other agreement we enter into in connection with the separation), the materials submitted to the IRS in connection with the request for the IRS Ruling or the representation letter provided to counsel in connection with the Tax Opinion. Events triggering an indemnification obligation under the agreement include events occurring after the distribution that cause DuPont to recognize a gain under Section 355(e) of the Code. Such tax amounts could be significant. To the extent we are responsible for any liability under the Tax Matters Agreement, there could be a material adverse impact on our business, financial condition, results of operations and cash flows in future reporting periods. For a more detailed discussion, see "Material U.S. Federal Income Tax Consequences of the Distribution."

*We will be subject to continuing contingent tax-related liabilities of DuPont following the distribution.*

After the distribution, there will be several significant areas where the liabilities of DuPont may become our obligations. For example, under the Code and the related rules and regulations, each corporation that was a member of DuPont's consolidated tax reporting group during any taxable period or portion of any taxable period ending on or before the effective time of the distribution is jointly and severally liable for the U.S. federal income tax liability of the entire consolidated tax reporting group for such taxable period. In connection with the separation, we will enter into a Tax Matters Agreement with DuPont that will allocate the responsibility for prior period taxes of DuPont's consolidated tax reporting group between us and DuPont. For a more detailed description, see "Our Relationship with DuPont Following the Distribution — Tax Matters Agreement." If DuPont were unable to pay any prior period taxes for which it is responsible, however, we could be required to pay the entire amount of such taxes, and such amounts could be significant. Other provisions of federal, state, local, or foreign law may establish similar liability for other matters, including laws governing tax-qualified pension plans, as well as other contingent liabilities.

*We intend to agree to numerous restrictions to preserve the tax-free treatment of the transactions in the United States, which may reduce our strategic and operating flexibility.*

Our ability to engage in significant equity transactions could be limited or restricted after the distribution in order to preserve, for U.S. federal income tax purposes, the tax-free nature of the distribution by DuPont. Even if the distribution otherwise qualifies for tax-free treatment under Section 355 of the Code, the distribution may result in corporate-level taxable gain to DuPont under Section 355(e) of the Code if 50 percent or more, by vote or value, of shares of our stock or DuPont's stock are acquired or issued as part of a plan or series of related transactions that includes the distribution. The process for determining whether an acquisition or issuance triggering these provisions has occurred is complex, inherently factual and subject to interpretation of the facts and circumstances of a particular case. Any acquisitions or issuances of our stock or DuPont's stock within a two-year period after the distribution generally are presumed to be part of such a plan, although we or DuPont, as

27

**Table of Contents**

applicable, may be able to rebut that presumption. Accordingly, under the Tax Matters Agreement that we will enter into with DuPont, for the two-year period following the distribution, we will be prohibited, except in certain circumstances, from:

- entering into any transaction resulting in the acquisition of [ • ] percent or more of our stock or substantially all of our assets, whether by merger or otherwise;

- merging, consolidating or liquidating;

- issuing equity securities beyond certain thresholds;

- repurchasing our capital stock; or

- ceasing to actively conduct our business.

These restrictions may limit our ability to pursue certain strategic transactions or other transactions that we may believe to otherwise be in the best interests of our stockholders or that might increase the value of our business. In addition, under the Tax Matters Agreement, we will be required to indemnify DuPont against any such tax liabilities as a result of the acquisition of our stock or assets, even if we do not participate in or otherwise facilitate the acquisition. For a more detailed description, See "Our Relationship with DuPont Following the Distribution — Tax Matters Agreement."

*We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent company.*

We have historically operated as part of DuPont's corporate organization, and DuPont has assisted us by providing various corporate functions. Following the separation and distribution, DuPont will have no obligation to provide us with assistance other than the transition services described under "Our Relationship with DuPont Following the Distribution." These services do not include every service we have received from DuPont in the past, and DuPont is only obligated to provide these services for limited periods from the distribution date. Accordingly, following the separation and distribution, we will need to provide internally or obtain from unaffiliated third parties the services we currently receive from DuPont. These services include information technology, research and development, finance, legal, insurance, compliance and human resources activities, the effective and appropriate performance of which is critical to our operations. We may be unable to replace these services in a timely manner or on terms and conditions as favorable as those we receive from DuPont. In particular, DuPont's information technology networks and systems are complex, and duplicating these networks and systems will be challenging. Because our business previously operated as part of the wider DuPont organization, we may be unable to successfully establish the infrastructure or implement the changes necessary to operate independently, or we may incur additional costs that could adversely affect our business. If we fail to obtain the quality of administrative services necessary to operate effectively or incur greater costs in obtaining these services, our profitability, financial condition and results of operations may be materially and adversely affected.

*Our historical combined and pro forma condensed combined financial data are not necessarily representative of the results we would have achieved as an independent, publicly traded company and may not be a reliable indicator of our future results.*

The historical and pro forma financial data we have included in this information statement may not reflect what our business, financial condition, results of operations and cash flows would have been had we been an independent, publicly traded company during the periods presented or what our business, financial condition, results of operations and cash flows will be in the future when we are an independent company. This is primarily because:

- Prior to our separation, our business was operated by DuPont as part of its broader corporate organization, rather than as an independent, publicly traded company. In addition, prior to our separation, DuPont, or one of its affiliates, performed significant corporate functions for us, including

28

Table of Contents

tax and treasury administration and certain governance functions, including internal audit and external reporting. Our historical financial statements reflect allocations of corporate expenses from DuPont for these and similar functions, which are not necessarily representative of the costs we will incur for similar services in the future as an independent company. In addition, while our pro forma financial statements reflect estimates of the costs that we would have incurred as an independent company during the periods presented, the estimates may not accurately reflect the costs we would have incurred as an independent company during such periods, or will incur in the future. Furthermore, following the separation and distribution, we will also be responsible for the additional costs associated with being an independent, publicly traded company, including costs related to corporate governance and external reporting.

- Our working capital requirements and capital for our general corporate purposes, including acquisitions and capital expenditures, historically have been satisfied as part of the company-wide cash management practices of DuPont. While our businesses have historically generated sufficient cash to finance our working capital and other cash requirements, following the separation and distribution, we will no longer have access to DuPont's cash pool. Without the opportunity to obtain financing from DuPont, we may need to obtain additional financing from banks, through public offerings or private placements of debt or equity securities or other arrangements.

- We will enter into transactions with DuPont that did not exist prior to the separation. See "Our Relationship with DuPont Following the Distribution" for information regarding these transactions.

- Other significant changes may occur in our cost structure, management, financing and business operations as a result of our operating as a company separate from DuPont.

We will incur interest expense as part of our incurring debt in connection with the separation and distribution, whereas our historical financial data does not include an allocation of interest expense. After giving pro-forma effect to the separation, our interest expense would have been $[ ● ] for the year ended [ ● ]. In addition, the pro forma financial data included in this information statement is based on the best information available, which in part includes a number of estimates and assumptions. These estimates and assumptions may prove not to be accurate, and accordingly, our pro forma financial data should not be assumed to be indicative of what our financial condition or results of operations actually would have been as a stand-alone company nor to be a reliable indicator of what our financial condition or results of operations actually may be in the future.

For additional information about our past financial performance and the basis of presentation of our financial statements, see "Selected Historical Combined Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the notes thereto included in this information statement.

***As an independent, publicly traded company, we may not enjoy the same benefits that we did as a part of DuPont.***

There is a risk that, by separating from DuPont, we may become more susceptible to market fluctuations and other adverse events than we would have been if we were still a part of the current DuPont organizational structure. As part of DuPont, we have been able to enjoy certain benefits from DuPont's operating diversity, purchasing power and opportunities to pursue integrated strategies with DuPont's other businesses. As an independent, publicly traded company, we will not have similar diversity or integration opportunities and may not have similar purchasing power or access to capital markets. Additionally, as part of DuPont, we have been able to leverage the DuPont historical market reputation and performance and brand identity to recruit and retain key personnel to run our business. As an independent, publicly traded company, we will not have the same historical market reputation and performance or brand identity as DuPont and it may be more difficult for us to recruit or retain such key personnel.

29

Table of Contents

***We will incur significant indebtedness in connection with the separation and distribution, and the degree to which we will be leveraged following completion of the distribution may materially and adversely affect our business, financial condition and results of operations.***

We are incurring significant indebtedness in connection with the separation. We have historically relied upon DuPont for working capital requirements on a short-term basis and for other financial support functions. After the distribution, we will not be able to rely on DuPont's earnings, assets or cash flow, and we will be responsible for servicing our own debt, obtaining and maintaining sufficient working capital and paying dividends.

Our ability to make payments on and to refinance our indebtedness, including the debt incurred pursuant to the separation as well as any future debt that we may incur, will depend exclusively on our ability to generate cash in the future from our own operations, financings or asset sales. Our ability to generate cash is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. We may not generate sufficient funds to service our debt and meet our business needs, such as funding working capital or the expansion of our operations. If we are not able to repay or refinance our debt as it becomes due, we may be forced to take disadvantageous actions, including reducing spending on marketing, retail trade incentives, advertising and new product innovation, reducing financing in the future for working capital, capital expenditures and general corporate purposes, selling assets or dedicating an unsustainable level of our cash flow from operations to the payment of principal and interest on our indebtedness. In addition, our ability to withstand competitive pressures and to react to changes in our industry could be impaired. The lenders who hold our debt could also accelerate amounts due in the event that we default, which could potentially trigger a default or acceleration of the maturity of our other debt.

***Restrictions under the Intellectual Property Cross-License Agreement could limit our ability to develop and commercialize certain products and/or prosecute, maintain and enforce certain intellectual property.***

We are dependent to a certain extent on DuPont to prosecute, maintain and enforce certain of the intellectual property licensed under the Intellectual Property Cross-License Agreement. Specifically, DuPont will be responsible for filing, prosecuting and maintaining patents that DuPont licenses to us. DuPont also has the first right to enforce such patents trade secrets and the know-how licensed to us by DuPont. If DuPont fails to fulfill its obligations or chooses to not enforce the licensed patents, trade secrets or know-how under the Intellectual Property Cross-License Agreement, we may not be able to prevent competitors from making, using and selling competitive products (unless we are able to effectively exercise our secondary rights to enforce such patents, trade secrets and know-how).

In addition, our restrictions under the Intellectual Property Cross-License Agreement could limit its ability to develop and commercialize certain products. For example, the licenses granted to us under the agreement may not extend to all new products, services and businesses that we may in the future decide to enter into. These limitations and restrictions may make it more difficult, time consuming or expensive for us to develop and commercialize certain new products and services, or may result in certain of our products or services being later to market than those of our competitors.

***Certain of the contracts to be transferred or assigned to us contain provisions requiring the consent of a third party in connection with the transactions contemplated by the distribution. If such consent is not given, we may not be entitled to the benefit of such contracts in the future.***

Certain of the contracts to be transferred or assigned to us in connection with the distribution and the internal transactions described below in this information statement contain provisions which require the consent of a third party to the internal transactions, the distribution or both. If we are unable to obtain such consents on commercially reasonable and satisfactory terms, our ability to obtain the benefit of such contracts in the future may be impaired.

30

Table of Contents

***Our customers, prospective customers, suppliers or other companies with whom we conduct business may need assurances that our financial stability on a stand-alone basis is sufficient to satisfy their requirements for doing or continuing to do business with them.***

Some of our customers, prospective customers, suppliers or other companies with whom we conduct business may need assurances that our financial stability on a stand-alone basis is sufficient to satisfy their requirements for doing or continuing to do business with them, and may require us to provide additional credit support, such as letters of credit or other financial guarantees. Any failure of parties to be satisfied with our financial stability could have a material adverse effect on our business, financial condition, results of operations and cash flows.

***In connection with our separation we will assume, and indemnify DuPont for, certain liabilities. If we are required to make payments pursuant to these indemnities to DuPont, we may need to divert cash to meet those obligations and our financial results could be negatively impacted. In addition, DuPont may indemnify us for certain liabilities. The DuPont indemnity may not be sufficient to insure us against the full amount of liabilities for which it will be allocated responsibility, and DuPont may not be able to satisfy its indemnification obligations in the future.***

Pursuant to the Separation Agreement, the Employee Matters Agreement and the Tax Matters Agreement with DuPont, we will agree to assume, and indemnify DuPont for, certain liabilities for uncapped amounts, which may include, among other items, associated defense costs, settlement amounts and judgments, as discussed further in "Our Relationship With DuPont Following the Distribution," "Notes to Unaudited Pro Forma Combined Financial Statements" and "Financial Statements — Notes to the Combined Financial Statements." Payments pursuant to these indemnities may be significant and could negatively impact our business, particularly indemnities relating to our actions that could impact the tax-free nature of the distribution. Third parties could also seek to hold us responsible for any of the liabilities of the DuPont Business. DuPont will agree to indemnify us for such liabilities, but such indemnity from DuPont may not be sufficient to protect us against the full amount of such liabilities, and DuPont may not be able to fully satisfy its indemnification obligations. Moreover, even if we ultimately succeed in recovering from DuPont any amounts for which we are held liable, we may be temporarily required to bear these losses ourselves. Each of these risks could negatively affect our business, financial condition, results of operations and cash flows.

### Risks Related to Our Common Stock

***We cannot be certain that an active trading market for our common stock will develop or be sustained after the distribution, and following the distribution, our stock price may fluctuate significantly.***

A public market for our common stock does not currently exist. We anticipate that on or prior to the record date for the distribution, trading of shares of our common stock will begin on a "when-issued" basis and will continue through the distribution date. However, we cannot guarantee that an active trading market will develop or be sustained for our common stock after the distribution. If an active trading market does not develop, you may have difficulty selling your shares of common stock at an attractive price, or at all. In addition, we cannot predict the prices at which shares of our common stock may trade after the distribution.

Similarly, DuPont cannot predict the effect of the distribution on the trading prices of its common stock. After the distribution, DuPont common stock will continue to be listed and traded on the NYSE under the symbol "DD." Subject to the consummation of the distribution, we expect our common stock to be listed and traded on the NYSE under the symbol " • ." The combined trading prices of DuPont common stock and our common stock after the distribution, as adjusted for any changes in the combined capitalization of these companies, may not be equal to or greater than the trading price of DuPont common stock prior to the distribution. Until the market has fully evaluated the business of DuPont without our businesses, or fully evaluated us, the price at which DuPont's or our common stock trades may fluctuate significantly.

31

Table of Contents

The market price of our common stock may fluctuate significantly due to a number of factors, some of which may be beyond our control, including:

- our business profile and market capitalization may not fit the investment objectives of DuPont's current stockholders, causing a shift in our initial investor base, and our common stock may not be included in some indices in which DuPont common stock is included, causing certain holders to be mandated to sell their shares of our common stock;

- our quarterly or annual earnings, or those of other companies in our industry;

- the failure of securities analysts to cover our common stock after the distribution;

- actual or anticipated fluctuations in our operating results;

- changes in earnings estimates by securities analysts or our ability to meet those estimates or our earnings guidance;

- the operating and stock price performance of other comparable companies;

- overall market fluctuations and domestic and worldwide economic conditions; and

- other factors described in these "Risk Factors" and elsewhere in this information statement.

Stock markets in general have experienced volatility that has often been unrelated to the operating performance of a particular company. These broad market fluctuations may adversely affect the trading price of our common stock.

*A number of shares of our common stock are or will be eligible for future sale, which may cause our stock price to decline.*

Any sales of substantial amounts of shares of our common stock in the public market or the perception that such sales might occur, in connection with the distribution or otherwise, may cause the market price of our common stock to decline. Upon completion of the distribution, we expect that we will have an aggregate of approximately [ ● ] shares of our common stock issued and outstanding. These shares will be freely tradable without restriction or further registration under the U.S. Securities Act of 1933, as amended (the Securities Act), unless the shares are owned by one of our "affiliates," as that term is defined in Rule 405 under the Securities Act.

We are unable to predict whether large amounts of our common stock will be sold in the open market following the distribution. We are also unable to predict whether a sufficient number of buyers would be in the market at that time. In this regard, a portion of DuPont common stock is held by index funds tied to stock indices. If we are not included in these indices at the time of distribution, these index funds may be required to sell our common stock.

*We cannot guarantee the timing, amount, or payment of dividends on our common stock in the future.*

Following the distribution, we expect to pay regular dividends. Prior to the distribution, while we are a wholly-owned subsidiary of DuPont, our board of directors, consisting of DuPont employees, intends to declare a dividend of [ ● ] for the third quarter of 2015, to be paid to our stockholders as of a record date following the distribution. The payment and amount of any subsequent dividend will be subject to the sole discretion of our post-distribution, independent board of directors and will depend upon many factors, including our financial condition and prospects, our capital requirements and access to capital markets, covenants associated with certain of our debt obligations, legal requirements and other factors that our board of directors may deem relevant, and there can be no assurances that we will continue to pay a dividend in the future. For more information, see the section entitled "Dividend Policy."

*Your percentage of ownership in us may be diluted in the future.*

Your percentage ownership in us may be diluted because of equity issuances for acquisitions, capital market transactions or otherwise, including, without limitation, equity awards that we may be granting to our directors, officers and employees. Our employees may have options to purchase shares of our common stock after the distribution as a result of conversion of their DuPont stock options (in whole or in part) to our stock options.

32

Table of Contents

In addition, our amended and restated certificate of incorporation will authorize us to issue, without the approval of our stockholders, one or more classes or series of preferred stock having such designation, powers, preferences and relative, participating, optional and other special rights, including preferences over our common stock with respect to dividends and distributions, as our board of directors generally may determine. The terms of one or more classes or series of preferred stock could dilute the voting power or reduce the value of our common stock. For example, we could grant the holders of preferred stock the right to elect some number of our directors in all events or on the happening of specified events or to veto specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we could assign to holders of preferred stock could affect the residual value of our common stock. See the section entitled "Description of Our Capital Stock."

***Certain provisions in our amended and restated certificate of incorporation and amended and restated by-laws, and of Delaware law, may prevent or delay an acquisition of us, which could decrease the trading price of the common stock.***

Our amended and restated certificate of incorporation and amended and restated by-laws will contain, and Delaware law contains, provisions that are intended to deter coercive takeover practices and inadequate takeover bids by making such practices or bids unacceptably expensive to the bidder and to encourage prospective acquirers to negotiate with our board of directors rather than to attempt a hostile takeover. These provisions include, among others:

- the inability of our stockholders to act by written consent;

- the limited ability of our stockholders to call a special meeting;

- rules regarding how stockholders may present proposals or nominate directors for election at stockholder meetings;

- the right of our board of directors to issue preferred stock without stockholder approval;

- the division of our board of directors into three approximately equal classes of directors, with each class serving a staggered three-year term, which will result in, under Delaware law, stockholders only being permitted to remove directors for cause;

- the ability of our directors, and not stockholders, to fill vacancies (including those resulting from an enlargement of the board of directors) on our board of directors; and

- the requirement that stockholders holding at least 80 percent of our voting stock are required to amend certain provisions in our amended and restated certificate of incorporation and our amended and restated by-laws.

In addition, following the distribution, we will be subject to Section 203 of the Delaware General Corporations Law (the DGCL). Section 203 provides that, subject to limited exceptions, persons that (without prior board approval) acquire, or are affiliated with a person that acquires, more than 15 percent of the outstanding voting stock of a Delaware corporation shall not engage in any business combination with that corporation, including by merger, consolidation or acquisitions of additional shares, for a three-year period following the date on which that person or its affiliate becomes the holder of more than 15 percent of the corporation's outstanding voting stock.

We believe these provisions will protect our stockholders from coercive or otherwise unfair takeover tactics by requiring potential acquirers to negotiate with our board of directors and by providing our board of directors with more time to assess any acquisition proposal. These provisions are not intended to make us immune from takeovers. However, these provisions will apply even if an acquisition proposal or offer may be considered beneficial by some stockholders and could delay or prevent an acquisition that our board of directors determines is not in our best interests and our stockholders'. These provisions may also prevent or discourage attempts to remove and replace incumbent directors.

33

**Table of Contents**

Several of the agreements that we have entered into with DuPont require DuPont's consent to any assignment by us of our rights and obligations, or a change of control of us, under the agreements. The consent rights set forth in these agreements might discourage, delay or prevent a change of control that you may consider favorable. See the sections entitled "Our Relationship with DuPont Following the Distribution" and "Description of Our Capital Stock" for a more detailed description of these agreements and provisions.

In addition, an acquisition or further issuance of our stock could trigger the application of Section 355(e) of the Code. For a discussion of Section 355(e), see the section entitled "Material U.S. Federal Income Tax Consequences of the Distribution." Under the Tax Matters Agreement, we would be required to indemnify DuPont for the tax imposed under Section 355(e) of the Code resulting from an acquisition or issuance of its stock, even if it did not participate in or otherwise facilitate the acquisition, and this indemnity obligation might discourage, delay or prevent a change of control that you may consider favorable.

**Table of Contents**

**CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS**

This information statement and other materials DuPont and Chemours have filed or will file with the SEC contain, or will contain, certain statements regarding business strategies, market potential, future financial performance, future action, results and other matters which are "forward-looking" statements within the meaning of the Securities Exchange Act of 1934, as amended (the Exchange Act), and the Private Securities Litigation Reform Act of 1995. The words "believe," "expect," "anticipate," "project," "estimate," "budget," "continue," "could," "intend," "may," "plan," "potential," "predict," "seek," "should," "will," "would," "objective," "forecast," "goal," "guidance," "outlook," "effort," "target" and similar expressions, among others, generally identify forward-looking statements, which speak only as of the date the statements were made. Additionally, forward-looking statements include, but are not limited to:

- Chemours' expectations as to future sales of products;

- Chemours' ability to protect its intellectual property in the United States and abroad;

- Chemours' estimates regarding its capital requirements and its needs for additional financing;

- Chemours' estimates of its expenses, future revenues and profitability;

- Chemours' estimates of the size of the markets for its products and services;

- Chemours' expectations related to the rate and degree of market acceptance of its products;

- The outcome of certain Chemours contingencies, such as litigation and environmental matters; and

- Chemours' estimates of the success of other competing technologies that may become available.

In particular, information included under the sections entitled "Information Statement Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Business," and "The Distribution" contains forward-looking statements. The matters discussed in these forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results to differ materially from those projected, anticipated or implied in the forward-looking statements. These factors include, but are not limited to, fluctuations in energy and raw material prices; failure to develop and market new products and optimally manage product life cycles; significant litigation and environmental matters; failure to appropriately manage process safety and product stewardship issues; changes in laws and regulations or political conditions; global economic and capital markets conditions, such as inflation, interest and currency exchange rates; business or supply disruptions; security threats, such as acts of sabotage, terrorism or war, weather events and natural disasters; ability to protect, defend and enforce Chemours' intellectual property rights; increased competition; increasing consolidation of our core customers; changes in relationships with our significant customers and suppliers; unanticipated expenses such as litigation or legal settlement expenses; unanticipated business disruptions; our ability to predict, identify and interpret changes in consumer preferences and demand; our ability to realize the expected benefits of the separation; our ability to complete proposed divestitures or acquisitions; our ability to realize the expected benefits of acquisitions if they are completed; uncertainty regarding the availability of financing to us in the future and the terms of such financing; and disruptions in our information technology networks and systems. Additionally, there may be other risks and uncertainties that we are unable to identify at this time or that we do not currently expect to have a material impact on our business.

Where, in any forward-looking statement, an expectation or belief as to future results or events is expressed, such expectation or belief is based on the current plans and expectations of management and expressed in good faith and believed to have a reasonable basis, but there can be no assurance that the expectation or belief will result or be achieved or accomplished. Factors that could cause actual results or events to differ materially from those anticipated include the matters described under the sections entitled "Risk Factors," "Business" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." DuPont and Chemours disclaim and do not undertake any obligation to update or revise any forward-looking statement, except as required by applicable law.

**Table of Contents**

## THE DISTRIBUTION

### Background of the Distribution

On October 24, 2013, DuPont announced its intention to separate its Performance Chemicals segment through a pro rata distribution of Chemours common stock to stockholders of DuPont. The distribution is intended to be generally tax free for U.S. federal income tax purposes.

In furtherance of this plan, on [ • ], 2015, DuPont's board of directors approved the distribution of all of the issued and outstanding shares of Chemours common stock on the basis of [ • ] share[s] of Chemours common stock for each share of DuPont common stock issued and outstanding on [ • ], 2015, the record date for the distribution. As a result of the distribution, Chemours and DuPont will become two independent, publicly traded companies.

On [ • ], the distribution date, each DuPont stockholder will receive [ • ] share[s] of Chemours common stock for each share of DuPont common stock held at the close of business on the record date, as described below. You will receive cash in lieu of any fractional shares of Chemours common stock that you would have received as a result of the application of the distribution ratio. You will not be required to make any payment, surrender or exchange your DuPont common stock or take any other action to receive your shares of Chemours common stock in the distribution.

The distribution of Chemours common stock as described in this information statement is subject to the satisfaction or waiver of certain conditions. For a more detailed description of these conditions, see this section under " — Conditions to the Distribution."

### Reasons for the Separation and Distribution

DuPont's board of directors determined that the separation and distribution of the Chemours business from the DuPont Business would be in the best interests of DuPont and its stockholders and approved the plan of separation. A wide variety of factors were considered by DuPont's board of directors in evaluating the separation and distribution. Among other things, DuPont's board of directors considered the following potential benefits of the separation and distribution:

- *Closer alignment of DuPont's businesses with its evolving strategic direction* — DuPont's overall mission is to bring world-class science and engineering to the global marketplace in the form of innovative products, materials and services. Increasingly, DuPont's strategic direction and business model is focused on advancing the company's integrated capabilities in biology, chemistry and materials science to further strengthen its industry-leading positions across three strategic priorities: agriculture and nutrition, advanced materials and biobased industrials. DuPont is focused on high potential commercial opportunities in secular growth markets in food, energy, and protection where the company's innovation, global scale and efficient execution have the potential to create valuable new outcomes. In addition, the Performance Chemicals Segment is highly cyclical and its performance is volatile as compared to DuPont's other businesses. Its leading businesses in Titanium Technologies and Fluoroproducts, and Chemical Solutions, well-established positions in attractive markets, and strong cash flow generation will be better positioned as an independent company. The separation and distribution will allow DuPont to continue its transformation into a higher growth, less cyclical company, resulting in greater value creation for its shareholders.

- *Elimination of capital and other constraints on the Performance Chemicals segment* — The separation and distribution will allow Chemours to attract capital to fund opportunities that the Performance Chemicals segment otherwise would not be able to pursue as a component of a company with a different strategic direction. As a stand-alone company, Chemours will have separate access to the debt and equity capital markets.

Neither DuPont nor Chemours can assure you that, following the separation and distribution, any of the benefits described above or otherwise will be realized to the extent anticipated or at all.

36

Table of Contents

DuPont's board of directors also considered a number of potentially negative factors in evaluating the separation and distribution, including the following factors impacting Chemours:

- *Loss of synergies and joint purchasing power and increased costs* — As a current part of DuPont, Chemours takes advantage of DuPont's size and purchasing power in procuring certain goods and services. After the separation and distribution, as a separate, independent entity, Chemours may be unable to obtain these goods, services, and technologies at prices or on terms as favorable as those DuPont obtained prior to the separation and distribution. Chemours will also incur costs for certain functions previously performed by DuPont, such as accounting, tax, legal, human resources, and other general and administrative functions, that may be higher than the amounts reflected in Chemours' historical financial statements, which could cause Chemours' profitability to decrease.

- *Disruptions to the business as a result of the separation* — The actions required to separate DuPont's and Chemours' respective businesses could disrupt Chemours' operations.

- *Increased significance of certain costs and liabilities* — Certain costs and liabilities that were otherwise less significant to DuPont as a whole will be more significant for Chemours as a stand-alone company.

- *One-time costs of the separation and distribution* — Chemours will incur costs in connection with the transition to being a stand-alone public company that will include establishment of accounting, tax, legal, and other professional services costs, recruiting and relocation costs associated with hiring key senior management personnel new to Chemours, and costs to separate information systems.

- *Inability to realize anticipated benefits of the separation and distribution* — Chemours may not achieve the anticipated benefits of the separation and distribution for a variety of reasons, including, among others: (a) the separation and distribution will require significant amounts of management's time and effort, which may divert management's attention from operating and growing the Chemours business; (b) following the separation and distribution, Chemours may be more susceptible to market fluctuations and other events particular to one or more of Chemours' products than if it were still a part of DuPont; and (c) following the separation and distribution, the Chemours business will be less diversified than DuPont's business prior to the separation and distribution.

DuPont's board of directors concluded that the potential benefits of the separation and distribution outweighed these factors. However, neither DuPont nor Chemours can assure you that, following the separation and distribution, any of the benefits described above or otherwise will be realized to the extent anticipated or at all.

## Formation of a Holding Company Prior to the Distribution

In connection with and prior to the distribution, Chemours was organized by DuPont in the state of Delaware on February 18, 2014 as Performance Operations, LLC, for the purpose of transferring to Chemours assets and liabilities, including any entities holding assets and liabilities, associated with certain of DuPont's Performance Chemicals segment. Chemours changed its name to the Chemours Company, LLC on April 15, 2014. In accordance with the separation and distribution, actions will have been taken so as at the time immediately prior to the distribution, Chemours will have been converted from a limited liability company to a Delaware corporation.

## The Number of Shares of Chemours Common Stock You Will Receive

For each share of DuPont common stock that you own at the close of business on [ ● ], 2015, the record date, you will receive [ ● ] share[s] of Chemours common stock on the distribution date. DuPont will not distribute any fractional shares of Chemours common stock to its stockholders. Instead, if you are a registered holder, the distribution agent will aggregate fractional shares into whole shares, sell the whole shares in the open market at prevailing market prices and distribute the aggregate cash proceeds (net of discounts and commissions) of the

Table of Contents

sales pro rata (based on the fractional share such holder would otherwise have been entitled to receive) to each holder who otherwise would have been entitled to receive a fractional share in the distribution. The distribution agent, in its sole discretion, without any influence by DuPont or Chemours, will determine when, how, through which broker-dealer and at what price to sell the whole shares. Any broker-dealer used by the transfer agent will not be an affiliate of either DuPont or Chemours. Neither Chemours nor DuPont will be able to guarantee any minimum sale price in connection with the sale of these shares. Recipients of cash in lieu of fractional shares will not be entitled to any interest on the amounts of payment made in lieu of fractional shares.

The aggregate net cash proceeds of these sales will be taxable for U.S. federal income tax purposes. See the section entitled "Material U.S. Federal Income Tax Consequences of the Distribution" for an explanation of the material U.S. federal income tax consequences of the distribution. If you hold physical certificates for DuPont common stock and are the registered holder, you will receive a check from the distribution agent in an amount equal to your pro rata share of the aggregate net cash proceeds of the sales. Chemours estimates that it will take approximately two weeks from the distribution date for the distribution agent to complete the distributions of the aggregate net cash proceeds. If you hold your DuPont common stock through a bank or brokerage firm, your bank or brokerage firm will receive, on your behalf, your pro rata share of the aggregate net cash proceeds of the sales and will electronically credit your account for your share of such proceeds.

### When and How You Will Receive the Distribution

With the assistance of the distribution agent, the distribution of Chemours common stock is expected to occur on [ • ], 2015, the distribution date, to all holders of outstanding DuPont common stock on [ • ], 2015, the record date. [ • ] will serve as the distribution agent in connection with the distribution, and [ • ] will serve as the transfer agent and registrar for Chemours common stock. DuPont stockholders will receive cash in lieu of any fractional shares of Chemours common stock which they would have been entitled to receive.

If you own DuPont common stock as of the close of business on the record date, Chemours common stock that you are entitled to receive in the distribution will be issued electronically, as of the distribution date, to you or to your bank or brokerage firm on your behalf in direct registration or book-entry form. If you are a registered holder, the distribution agent or the transfer agent will then mail you a direct registration account statement that reflects your shares of Chemours common stock. If you hold your shares through a bank or brokerage firm, your bank or brokerage firm will credit your account for the shares. "Direct registration form" refers to a method of recording share ownership when no physical share certificates are issued to stockholders, as is the case in this distribution. Commencing on or shortly after the distribution date, if you hold physical share certificates that represent your DuPont common stock and you are the registered holder of the shares represented by those certificates, the distribution agent will mail to you an account statement that indicates the number of shares of Chemours common stock that have been registered in book-entry form in your name. If you sell DuPont common stock in the "regular-way" market up to and including the distribution date, you will be selling your right to receive shares of Chemours common stock in the distribution.

Most DuPont stockholders hold their common stock through a bank or brokerage firm. In such cases, the bank or brokerage firm would be said to hold the shares in "street name" and ownership would be recorded on the bank or brokerage firm's books. If you hold your DuPont common stock through a bank or brokerage firm, your bank or brokerage firm will credit your account for the Chemours common stock that you are entitled to receive in the distribution, and the distribution agent will mail you a check for any cash in lieu of fractional shares you are entitled to receive. If you have any questions concerning the mechanics of having shares held in "street name," please contact your bank or brokerage firm.

### Transferability of Shares You Receive

Shares of Chemours common stock distributed to holders in connection with the distribution will be transferable without registration under the Securities Act, except for shares received by persons who may be deemed to be

38

Chemours affiliates. Persons who may be deemed to be Chemours' affiliates after the distribution generally include individuals or entities that control, are controlled by or are under common control with Chemours, which may include certain of Chemours executive officers, directors or principal stockholders. Securities held by Chemours affiliates will be subject to resale restrictions under the Securities Act. Chemours affiliates will be permitted to sell shares of Chemours common stock only pursuant to an effective registration statement or an exemption from the registration requirements of the Securities Act, such as the exemption afforded by Rule 144 under the Securities Act.

### Results of the Distribution

After its separation from DuPont, Chemours will be an independent, publicly traded company. The actual number of shares to be distributed will be determined on [ • ], 2015, the record date for the distribution, and will reflect any exercise of DuPont options between the date the DuPont board of directors declares the distribution and the record date for the distribution. The distribution will not affect the number of outstanding DuPont common stock or any rights of DuPont's stockholders. DuPont will not distribute any fractional shares of Chemours common stock.

Before the distribution, Chemours will enter into a Separation Agreement and other agreements with DuPont to effect the separation and provide a framework for Chemours relationship with DuPont after the separation and distribution. These agreements will provide for the allocation between DuPont and Chemours of DuPont's assets, liabilities and obligations (including employee benefits, intellectual property, and tax-related assets and liabilities) attributable to periods prior to, at and after Chemours' separation from DuPont and will govern certain relationships between DuPont and Chemours after the separation and distribution. For a more detailed description of these agreements, see the section entitled "Our Relationship with DuPont Following the Distribution."

### Market for Chemours common stock

There is currently no public trading market for Chemours common stock. Chemours intends to apply to list its common stock on the NYSE under the symbol " • ." Chemours has not and will not set the initial price of its common stock. The initial price will be established by the public markets.

Chemours cannot predict the price at which its common stock will trade after the distribution. In fact, the combined trading prices, after the distribution, of the shares of Chemours common stock that each DuPont stockholder will receive in the distribution and DuPont common stock held at the record date may not equal the "regular-way" trading price of a share of DuPont common stock immediately prior to the distribution. The price at which Chemours common stock trades may fluctuate significantly, particularly until an orderly public market develops. Trading prices for Chemours common stock will be determined in the public markets and may be influenced by many factors. See the section entitled "Risk Factors — Risks Related to Our Common Stock."

### Trading Between the Record Date and Distribution Date

Beginning on or shortly before the record date and continuing up to and including through the distribution date, DuPont expects that there will be two markets in DuPont common stock: a "regular-way" market and an "ex- distribution" market. Shares of DuPont common stock that trade on the "regular-way" market will trade with an entitlement to Chemours common stock distributed pursuant to the separation. Shares of DuPont common stock that trade on the "ex-distribution" market will trade without an entitlement to Chemours common stock distributed pursuant to the distribution. Therefore, if you sell DuPont common stock in the "regular-way" market up to and including through the distribution date, you will be selling your right to receive Chemours common stock in the distribution. If you own DuPont common stock at the close of business on the record date and sell those shares on the "ex-distribution" market up to and including through the distribution date, you will receive the shares of Chemours common stock that you are entitled to receive pursuant to your ownership as of the record date of DuPont common stock.

39

**Table of Contents**

Furthermore, we anticipate that trading in our common stock will begin on a "when-issued" basis as early as [ • ] trading days prior to the record date for the distribution and will continue up to and including the distribution date. "When-issued" trading in the context of a separation refers to a sale or purchase made conditionally on or before the distribution date because the securities of the separated entity have not yet been distributed. The "when-issued" trading market will be a market for Chemours common stock that will be distributed to holders of DuPont common stock on the distribution date. If you owned DuPont common stock at the close of business on the record date, you would be entitled to Chemours common stock distributed pursuant to the distribution. You may trade this entitlement to shares of Chemours common stock, without DuPont common stock you own, on the "when-issued" market. On the first trading day following the distribution date, "when-issued" trading with respect to Chemours common stock will end, and "regular-way" trading will begin.

**Conditions to the Distribution**

Chemours expects that the distribution will be effective on [ • ], 2015, the distribution date, provided that, among other conditions described in this information statement, the following conditions shall have been satisfied or, if permissible under the Separation Agreement, waived by DuPont:

- the making of a $[ • ] cash distribution from Chemours to DuPont prior to the distribution, and the determination by DuPont in its sole discretion that following the separation and distribution it shall have no further liability or obligation whatsoever under any financing arrangements that Chemours will be entering into in connection with the separation;

- the SEC having declared effective the registration statement, of which this information statement forms a part, no stop order relating to the registration statement being in effect, nor any proceeding seeking such stop order being pending, and the information statement having been distributed to DuPont's stockholders;

- Chemours common stock having been approved and accepted for listing by the NYSE, subject to official notice of issuance;

- DuPont has received the IRS Ruling from the IRS substantially to the effect that, among other things, the distribution of our ordinary shares, together with certain related transactions, will qualify under Sections 355 and 368(a) of the Code, with the result that DuPont and DuPont's shareholders will not recognize any taxable income, gain or loss for U.S. federal income tax purposes as a result of the distribution, except to the extent of cash received in lieu of fractional shares. As a condition to the distribution, the IRS Ruling must remain in effect as of the distribution date. In addition, the distribution is conditioned on the receipt of the Tax Opinion, in form and substance acceptable to DuPont, substantially to the effect that certain requirements, including certain requirements that the IRS will not rule on, necessary to obtain tax-free treatment, have been satisfied. See "Material U.S. Federal Income Tax Consequences of the Distribution";

- the receipt of an opinion from an independent appraisal firm to the board of directors of DuPont confirming the solvency of each of DuPont and Chemours after the distribution that is in form and substance acceptable to DuPont in its sole discretion;

- all permits, registrations and consents required under the securities or blue sky laws of states or other political subdivisions of the United States or of other foreign jurisdictions in connection with the distribution having been received;

- no order, injunction, or decree issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the separation, distribution or any of the related transactions being in effect;

- the reorganization of DuPont and Chemours businesses prior to the separation and distribution having been effectuated;

- the approval by the board of directors of DuPont of the distribution and all related transactions (and such approval not having been withdrawn);

40

Table of Contents

- DuPont's election of the individuals to be listed as members of our board of directors post-distribution, as described in this information statement, immediately prior to the distribution date;

- Chemours having entered into certain agreements in connection with the separation and distribution and certain financing arrangements prior to or concurrent with the separation; and

- no events or developments shall have occurred or exist that, in the sole and absolute judgment of DuPont's board of directors, make it inadvisable to effect the distribution or would result in the distribution and related transactions not being in the best interest of DuPont or its stockholders.

The fulfillment of the foregoing conditions does not create any obligations on DuPont's part to effect the distribution, and DuPont's board of directors has reserved the right, in its sole discretion, to amend, modify or abandon the distribution and related transactions at any time prior to the distribution date.

## DuPont Preferred Stock

If you are a holder of shares of DuPont preferred stock, without par value-cumulative, Series $4.50 or DuPont preferred stock, without par value-cumulative, Series $3.50 (collectively, the DuPont Preferred Stock), you will retain your DuPont Preferred Stock and will not have the right to receive any of our common stock as a dividend with respect to such holdings as a result of the distribution.

## Regulatory Approvals

Chemours must complete the necessary registration under U.S. federal securities laws of Chemours common stock, as well as the applicable NYSE listing requirements for such shares.

Other than the requirements discussed above, we do not believe that any other material governmental or regulatory filings or approvals will be necessary to consummate the distribution.

## No Appraisal Rights

DuPont's stockholders will not have any appraisal rights in connection with the distribution.

## Reasons for Furnishing this Information Statement

We are furnishing this information statement solely to provide information to DuPont's stockholders who will receive shares of our common stock in the distribution. You should not construe this information statement as an inducement or encouragement to buy, hold or sell any of our securities or any securities of DuPont. We believe that the information contained in this information statement is accurate as of the date set forth on the cover. Changes to the information contained in this information statement may occur after that date, and neither DuPont nor we undertake any obligation to update the information except in the normal course of DuPont's and our public disclosure obligations and practices.

41

**Table of Contents**

## DIVIDEND POLICY

Following the distribution, we expect to pay regular dividends. Prior to the distribution, while we are a wholly-owned subsidiary of DuPont, our board of directors, consisting of DuPont employees, intends to declare a dividend of [ • ] for the third quarter of 2015, to be paid to our stockholders as of a record date following the distribution.

The payment and amount of any subsequent dividend will be subject to the sole discretion of our post-distribution, independent board of directors and will depend upon many factors, including our financial condition and prospects, our capital requirements and access to capital markets, covenants associated with certain of our debt obligations, legal requirements and other factors that our board of directors may deem relevant, and there can be no assurances that we will continue to pay a dividend in the future. There can also be no assurance that the combined annual dividends on DuPont common stock and our common stock after the distribution, if any, will be equal to the annual dividends on DuPont common stock prior to the distribution.

42

**Table of Contents**

## CAPITALIZATION

The following table sets forth our cash and cash equivalents and capitalization as of [ • ], 2014, on a historical and on a pro forma basis to give effect to the separation and distribution and the transactions related to the separation and distribution as if they occurred on [ • ], 2014. Explanation of the pro forma adjustments made to our historical combined financial statements can be found under "Unaudited Pro Forma Combined Financial Statements." The following table should be reviewed in conjunction with "Unaudited Pro Forma Combined Financial Statements," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical combined financial statements and accompanying notes included elsewhere in this information statement.

|  | As of [ • ], 2014 (dollars in millions) | |
| --- | --- | --- |
|  | Historical | Pro Forma |
| Cash and cash equivalents: | $ — | |
| Debt, including current and long-term: | | |
| Current debt | $ — | |
| Long-term debt | — | |
| Total debt | $ — | |
| Equity: | | |
| Common stock, par value $0.01 | $ — | |
| Additional paid-in capital | — | |
| DuPont equity and noncontrolling interests | — | |
| Total Equity | $ — | |
| Total Capitalization | $ — | |

We have not yet finalized our post-distribution capitalization. We will have cash on hand in an amount to be determined at or prior to the time of the distribution. We expect that, at the time of distribution, we will have significant third-party indebtedness, which we expect to incur through a bond offering, term loans or a combination of these and other financing arrangements. We intend to update our financial information to reflect our post-distribution capitalization in an amendment to this information statement.

43

Table of Contents

## UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

The following Unaudited Pro Forma Combined Financial Statements are derived from the historical combined financial statements of Chemours, prepared in accordance with U.S. generally accepted accounting principles, which are included elsewhere in this information statement.

The Unaudited Pro Forma Combined Income Statements for the fiscal year ended December 31, 2013 and the nine months ended September 30, 2014 give effect to the distribution as if it had occurred on January 1, the first day of fiscal year 2013. The Unaudited Pro Forma Combined Balance Sheet as of September 30, 2014 gives effect to the distribution as if it had occurred on September 30, 2014. These Unaudited Pro Forma Combined Financial Statements include adjustments to reflect the following:

(1)    Adjustments required by SEC Staff Accounting Bulletin Topic 1:B-3 including:

a.    the inclusion of $[ • ] of debt at an interest rate of [ • ]%;

b.    the pro-rata distribution of approximately [ • ] shares Chemours common stock to DuPont stockholders;

c.    cash injection of $[ • ] from DuPont;

d.    the cash dividend of approximately $[ • ] to DuPont.

(2)    Other Adjustments required by Article 11 of SEC Regulation S-X including:

a.    the contribution by DuPont to Chemours, pursuant to the Separation Agreement, of all the assets and liabilities that comprise the Chemours business;

b.    the expected transfer to Chemours, upon completion of the separation of certain assets and liabilities that were not included in Chemours' Audited Combined Financial Statements;

c.    the assets and liabilities related to defined benefit pension and other post-retirement plans that were not included in Chemours' Audited Combined Financial Statements;

d.    the impact of the Separation Agreement, Tax Matters Agreement, Employee Matters Agreement and other commercial agreements between Chemours and DuPont.

Chemours' Audited Combined Financial Statements include allocations for certain expenses and support functions historically provided by DuPont, such as business shared services, and other selling, general and administrative costs that benefit Chemours. Effective with the Separation, we will assume responsibility for all of these functions and related costs. Chemours will incur incremental costs as an independent public company, including costs to replace services previously provided by DuPont as well as other stand-alone costs. In total, we estimate that these costs will range from $[ • ] million to $[ • ] million, over and above amounts currently included in the Unaudited Combined Financial Statements. Due to the scope and complexity of these activities, the amount and timing of these incremental costs could vary and, therefore, are not included within the Unaudited Pro Forma Combined Financial Statements.

Chemours is expected to incur one-time transaction costs of approximately $[ • ] million related to the Separation after it is completed. No pro forma adjustments have been made to our income statements to reflect the cost and expenses described in this paragraph.

44

Table of Contents

**Chemours**
**Unaudited Pro Forma Combined Income Statement**
**Year Ended December 31, 2013**

| (Dollars in millions, except for share data) | Chemours | Pro Forma Historical Adjustments | Pro Forma Other Adjustments | | Pro Forma |
|---|---|---|---|---|---|
| Net sales | $ | $ | $ | | $ |
| Cost of goods sold | | | | | |
| Gross profit | | | | | |
| Selling, general and administrative expense | | | | (A),(C),(D),(E),(F),(G),(R) | |
| Research and development expense | | | | | |
| Employee separation/asset related charges, net | | | — | | — |
| Total expenses | | | | | |
| Equity in earnings of affiliates | | | | | |
| Other income, net | | | | | |
| Income before income taxes | | | | | |
| Provision for income taxes | | | | (I) | |
| Net income | | | — | | — |
| Less: Net income attributable to noncontrolling interests | | | | | |
| Net income attributable to Chemours | $ | $ | $ | | $ |
| Unaudited pro forma earnings per common share | | | | | |
| Basic (J) | | | | | $ |
| Diluted (K) | | | | | $ |
| Average number of shares used in calculating unaudited pro forma earnings per share | | | | | |
| Basic (J) | | | | | |
| Diluted (K) | | | | | |

See Notes to Unaudited Pro Forma Combined Financial Statements.

45

Table of Contents

**Chemours**
**Unaudited Pro Forma Combined Income Statement**
**Nine months ended September 30, 2014**

| (Dollars in millions, except for share data) | Chemours | Pro Forma Historical Adjustments | Pro Forma Other Adjustments | | Pro Forma |
|---|---|---|---|---|---|
| Net sales | $ | $ | $ | | $ |
| Cost of goods sold | | | | | |
|     Gross profit | | | | | |
| Selling, general and administrative expense | | | | (A),(C),(D), (E),(F),(G), (R) | |
| Research and development expense | | | | | |
| Employee separation/asset related charges, net | | | — | | — |
|     Total expenses | | | | | |
| Equity in earnings of affiliates | | | | | |
| Other income, net | | | | | |
| Income before income taxes | | | | | |
| Provision for income taxes | | | | (I) | |
|     Net income | | | — | | — |
|     Less: Net income attributable to noncontrolling interests | | | | | |
|     Net income attributable to Chemours | $ | $ | $ | | $ |
| Unaudited pro forma earnings per common share | | | | | |
| Basic (J) | | | | | $ |
| Diluted (K) | | | | | $ |
| Average Number of shares used in calculating unaudited pro forma earnings per share | | | | | |
| Basic (J) | | | | | |
| Diluted (K) | | | | | |

See Notes to Unaudited Pro Forma Combined Financial Statements.

46

Table of Contents

**Chemours**
**Unaudited Pro Forma Combined Balance Sheet**
**As of September 30, 2014**

| (Dollars in millions, except for share data) | Chemours | Pro Forma Historical Adjustments | Pro Forma Other Adjustments | | Pro Forma |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Current assets: | $ | $ | $ | | $ |
|    Cash and cash equivalents | | | (L) | | |
|    Accounts and notes receivable — trade, net | | | | (M) | |
|    Inventories | | | | | |
|    Prepaid expenses and other | | | | | |
|    Deferred income taxes | | | | (A) | |
|      Total current assets | | | — | | — |
| Property, plant and equipment | | | | (A) | |
|   Less accumulated depreciation | | | | | |
|     Net property, plant and equipment | | | — | | — |
| Goodwill | | | — | | — |
| Other intangibles, net | | | | | |
| Investments in affiliates | | | | | |
| Other assets | | | — | (A) | — |
|     Total assets | $ | $ | $ | | $ |
| **Liabilities and DuPont Company Net Investment** | | | | | |
| Current liabilities: | | | | | |
|    Accounts payable | $ | $ | $ | | $ |
|    Short-term capital lease obligations | | | | | |
|    Short-term borrowings and current maturities of long-term debt | | (N) | | | |
|    Deferred income taxes | | | | (A) | |
|    Other accrued liabilities | | | | (H),(S) | |
|      Total current liabilities | | | — | | — |
| Long-term capital lease obligations | | | | | |
| Long-term debt | | (N) | | | |
| Other liabilities | | | | (O),(H) | |
| Deferred income taxes | | | | (A) | |
|    Total liabilities | | | | | |
| **Equity** | | | | | |
| DuPont Company Net Investment | | (P) | | (B) | |
| Common stock, $0.01 par value; [ • ] shares authorized; [ • ] issued and outstanding on a pro forma basis | | (Q) | | | |
| Capital in excess of par value | | (Q) | | | |
| Noncontrolling interests | | | | | |
| Accumulated other comprehensive income | | | | (A) | |
|    Total equity | | | | | |
| **Total liabilities and equity** | $ | $ | $ | | $ |

See Notes to Unaudited Pro Forma Combined Financial Statements.

47

**Table of Contents**

**CHEMOURS**

**NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS**

(A) Reflects the impact of assets, liabilities and related expenses that we expect to assume from DuPont that were not included in our Unaudited Combined Financial Statements. There may be additional assets, liabilities or related expenses transferred to us in the separation for which the transfer has not been finalized. This adjustment includes the estimate of net property, plant and equipment retained by DuPont or transferred to Chemours, pursuant to the Separation Agreement, that comprise the Chemours business. The estimate is not expected to be materially different from the amounts currently presented in the Unaudited Combined Financial Statements.

(B) [currently un-used; placeholder]

(C) Reflects higher costs associated with a new insurance structure.

(D) Represents removal of corporate allocations from DuPont to Chemours for the usage of DuPont's facilities, functions and services; costs for administrative functions and services performed on behalf of Chemours by centralized staff groups within DuPont; a portion of DuPont's general corporate expenses; and certain pension and other retirement benefit costs. These costs were replaced with the revised cost structure for each service or function.

(E) Represents changes to employee related accruals and costs based upon liabilities assumed under the Employee Matters Agreement and identification of employees to support the Chemours business.

(F) Represents costs that we anticipate incurring, upon completion of separation from DuPont, for incremental selling, general and administrative expense as a result of being a public company. Additionally, we currently depend on DuPont for a number of administrative functions. Prior to the completion of our separation from DuPont, we will enter into a transition services agreement under which DuPont will provide to us, on an interim basis, various corporate support services, for which the costs are reflected above.

(G) Reflects the impact of supply agreements for products and ingredients previously obtained through DuPont. See note (X) to the unaudited pro forma combined balance sheet.

(H) [currently un-used; placeholder]

(I) Reflects the tax effects of the pro forma adjustments at the applicable statutory income tax rate of [ • ]. The effective tax rate of Chemours could be different (either higher or lower) depending on activities subsequent to the distribution. The impacts of pro forma adjustments on long-term deferred tax assets and liabilities were offset against existing long-term deferred tax assets and liabilities reflected in our historical Combined Balance Sheet based on jurisdiction.

(J) The number of shares of Chemours common stock used to compute basic earnings per share is based on: (a) the number of shares of Chemours common stock assumed to be outstanding on the distribution date; (b) the number of shares of DuPont common stock outstanding on December 31, 2013 and (c) the number of shares of DuPont common stock outstanding on September 30, 2014, as applicable, assuming a distribution ratio of shares of Chemours common stock for every [ • ] shares of DuPont common stock.

(K) The number of shares used to compute diluted earnings per share is based on the number of shares of Chemours common stock as described in Note (J) above, plus incremental shares assuming exercise of dilutive outstanding options and restricted stock awards. This calculation may not be indicative of the dilutive effect that will actually result from Chemours' stock-based awards issued in connection with the adjustment of outstanding DuPont stock-based awards or the grant of new stock-based awards. The number of dilutive shares of common stock underlying Chemours' stock-based awards issued in connection with the adjustment of outstanding DuPont stock-based awards will not be determined until the distribution date or shortly thereafter.

48

**Table of Contents**

(L) Reflects a $[ •   ] distribution to DuPont prior to the distribution based on the assumed net proceeds of the debt described in Note (N).

(M) Related party accounts receivable and accounts payable will be adjusted to reflect the commercial agreement between the parties.

(N) Reflects the anticipated incurrence of $[ •   ] of debt, net of estimated debt issuance costs of $[ •   ]. We expect the debt to be comprised of long-term debt and other financing arrangements.

(O) Reflects the addition of net benefit plan liabilities that will be transferred to Chemours by DuPont as part of the separation. These net benefit plan liabilities are excluded from the historical combined balance sheet. The benefit plan expenses associated with these liabilities are included in the Chemours' historical Combined Income Statements.

(P) Reflects the pro forma recapitalization of our equity. As of the distribution date, DuPont Company Net Investment in our business will be exchanged to reflect the distribution of our shares of common stock to DuPont stockholders. DuPont stockholders will receive shares of our common stock based on an expected distribution ratio of [ •   ] shares of Chemours common stock for every [ •   ] shares of DuPont common stock.

(Q) Represents the elimination of DuPont Company Net Investment and adjustments to capital in excess of par to reflect the following:

1. Elimination of DuPont Company Net Investment and adjustment to capital in excess of par value:

|  | $ |
|---|---|
| Reclassification of DuPont Company Net Investment |  |
| Assumption of net assets and liabilities described in Note (A) |  |
| Accrual for interest expense as described in Note (R) |  |
| Distribution of cash to DuPont as described in Note (L) |  |
| Settlement of accounts receivable due from related party described in Note (M) |  |
| Addition of net benefit plan assets and liabilities described in Note (O) |  |
| **Total DuPont Company Net Investment/Shareholders' Equity** |  |
| Chemours common stock described in Note (J) |  |
| **Total capital in excess of par value** |  |

(R) Represents adjustments to interest expense and amortization of debt issuance costs related to approximately $[ •   ] million of debt that we expect to incur as described in Note (N). We expect the weighted-average interest rate on the debt to be approximately [ •   ]%. Interest expense may be higher or lower if our actual interest rate or credit ratings change.

(S) Reflects the carrying value for indemnification of DuPont pursuant to the Separation Agreement, against certain liabilities. Also, pursuant to the Separation Agreement, Chemours will indemnify DuPont against liabilities that may arise in the future in connection with the Chemours business, including tax and product liabilities. The term of this indemnification is indefinite and includes defense costs and expenses, as well as monetary and non-monetary settlements and judgments. Although it is reasonably possible that future payments may exceed amounts accrued, due to the nature of the indemnified items, it is not possible to reasonably estimate the maximum potential loss or a range of loss. No assets are held as collateral and no specific recourse provisions exist.

49

Table of Contents

## SELECTED HISTORICAL COMBINED FINANCIAL DATA

The following table presents Chemours' selected historical combined financial data. The selected historical combined financial data as of December 31, 2013 and 2012, and for the years ended December 31, 2013 and 2012 are derived from audited information and for the year ended December 31, 2011 is derived from unaudited information contained in Chemours' annual Combined Financial Statements included elsewhere in this information statement. The selected historical combined financial data as of September 30, 2014 and for the nine months ended September 30, 2014 and 2013 are derived from Chemours' unaudited interim Combined Financial Statements included elsewhere in this information statement. The selected historical combined financial data as of December 31, 2011, and as of and for the year ended December 31, 2010 are derived from Chemours' unaudited Combined Financial Statements that are not included in this information statement. In management's opinion, the unaudited interim Combined Financial Statements as of September 30, 2014 and for the nine months ended September 30, 2014 and 2013 have been prepared on the same basis as the audited information in the annual Combined Financial Statements and include all adjustments and allocations, consisting only of ordinary recurring adjustments, necessary for a fair presentation of the information for the periods presented.

The selected historical combined financial data include certain expenses of DuPont that were allocated to Chemours for certain corporate functions including information technology, research and development, finance, legal, insurance, compliance and human resources activities. These costs may not be representative of the future costs Chemours will incur as an independent, publicly traded company. In addition, Chemours' historical financial information does not reflect changes that Chemours expects to experience in the future as a result of Chemours' separation and distribution from DuPont, including changes in Chemours' cost structure, personnel needs, tax structure, capital structure, financing and business operations. Chemours' Combined Financial Statements also do not reflect the assignment of certain assets and liabilities between DuPont and Chemours as reflected under "Unaudited Pro Forma Combined Financial Statements" included elsewhere in this information statement. Consequently, the financial information included here may not necessarily reflect what Chemours' financial position, results of operations and cash flows would have been had it been an independent, publicly traded company during the periods presented. Accordingly, these historical results should not be relied upon as an indicator of Chemours' future performance.

For a better understanding, this section should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the "Unaudited Pro Forma Combined Financial Statements" and corresponding notes and the Annual Combined Financial Statements and accompanying notes and the unaudited Interim Combined Financial Statements and accompanying notes included elsewhere in this information statement.

| (Dollars in millions) | Nine months ended September 30, (Unaudited) | | Year ended December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2013 | 2012 | 2011 (Unaudited) | 2010 (Unaudited) |
| **Summary of operations:** | | | | | | |
| Net sales | $4,883 | $5,203 | $6,859 | $7,365 | $ 7,972 | $ 6,489 |
| Income before income taxes | $ 430 | $ 429 | $ 576 | $1,485 | $ 1,907 | $ 969 |
| Provision for income taxes on continuing operations | $ 108 | $ 116 | $ 152 | $ 427 | $ 474 | $ 247 |
| Net income attributable to Chemours | $ 321 | $ 313 | $ 423 | $1,057 | $ 1,431 | $ 720 |
| **Financial position at year end:** | | | | | | |
| Working capital | $1,038 | $ 881 | $ 509 | $ 600 | $ 593 | $ 373 |
| Total assets | $6,044 | $5,704 | $5,621 | $5,317 | $ 5,257 | $ 4,948 |
| Long-term capital lease obligations | $ — | $ 1 | $ 1 | $ 1 | $ 2 | $ 2 |
| **General:** | | | | | | |
| Purchases of property, plant and equipment and investments in affiliates | $ 404 | $ 278 | $ 438 | $ 432 | $ 355 | $ 220 |
| Depreciation and amortization | $ 185 | $ 200 | $ 261 | $ 266 | $ 272 | $ 279 |
| Employees (thousands) | 9 | 9 | 9 | 9 | 9 | 9 |

**Table of Contents**

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The discussion and analysis presented below refer to and should be read in conjunction with the audited and unaudited combined financial statements (the Annual Combined Financial Statements) and related notes, the unaudited interim combined financial statements (the Interim Combined Financial Statements) and related notes and the unaudited pro forma combined financial statements (the Pro Forma Combined Financial Statements), each included elsewhere in this information statement. The following discussion may contain forward-looking statements that reflect our plans, estimates and beliefs. The words "believe," "expect," "anticipate," "project," and similar expressions, among others, generally identify "forward-looking statements," which speak only as of the date the statements were made. The matters discussed in these forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results to differ materially from those made, projected or implied in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this information statement, particularly in "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements." We believe the assumptions underlying the combined financial statements are reasonable. However, the combined financial statements included herein may not necessarily reflect our results of operations, financial position and cash flows in the future or what they would have been had we been a separate, stand-alone company during the periods presented.

As explained above, except as otherwise indicated or unless the context otherwise requires, the information included in this discussion and analysis assumes the completion of all the transactions referred to in this information statement in connection with the separation and distribution. Unless the context otherwise requires, references in this information statement to "The Chemours Company," "The Chemours Company, LLC," "Chemours," "we," "us," "our" and "our company" refer to The Chemours Company and its combined subsidiaries. References in this information statement to "DuPont" refers to E. I. du Pont de Nemours and Company, a Delaware corporation, and its consolidated subsidiaries (other than Chemours and its combined subsidiaries), unless the context otherwise requires. References to "DuPont stockholders" refer to stockholders of DuPont in their capacity as holders of common stock only, unless context otherwise requires.

#### Introduction

Management's discussion and analysis, which we refer to in this information statement as "MD&A," of our results of operations and financial condition is provided as a supplement to the Annual and Interim Combined Financial Statements and footnotes included elsewhere herein to help provide an understanding of our financial condition, changes in financial condition and results of our operations.

Forward-looking statements are based on certain assumptions and expectations of future events which may not be accurate or realized. Forward-looking statements also involve risks and uncertainties, many of which are beyond Chemours' control. Some of the important factors that could cause Chemours' actual results to differ materially from those projected in any such forward-looking statements are:

- Fluctuations in energy and raw material prices;

- Failure to develop and market new products and optimally manage product life cycles;

- Significant litigation and environmental matters;

- Failure to appropriately manage process safety and product stewardship issues;

- Changes in laws and regulations or political conditions;

- Global economic and capital markets conditions, such as inflation, interest and currency exchange rates, interest rates and commodity prices, as well as regulatory requirements;

- Business or supply disruptions;

51

**Table of Contents**

- Security threats, such as acts of sabotage, terrorism or war, weather events and natural disasters;

- Ability to protect, defend and enforce Chemours' intellectual property rights;

- Increased competition;

- Increasing consolidation of our core customers;

- Changes in relationships with our significant customers and suppliers;

- Unanticipated expenses such as litigation or legal settlement expenses;

- Unanticipated business disruptions;

- Our ability to predict, identify and interpret changes in consumer preference and demand;

- Our ability to realize the expected benefits of the separation;

- Our ability to complete proposed divestitures or acquisitions, and our ability to realize the expected benefits of acquisitions if they are completed;

- Uncertainty regarding the availability of financing to us in the future and the terms of such financing; and,

- Disruptions in our information technology networks and systems

Additionally, there may be other risks and uncertainties that we are unable to identify at this time or that we do not currently expect to have a material impact on our business. For further discussion of some of the important factors that could cause Chemours' actual results to differ materially from those projected in any such forward-looking statements, see the Risk Factors discussion beginning on page 19.

### Separation and Distribution

On October 24, 2013, DuPont announced its intention to separate its Performance Chemicals segment through a pro rata distribution of Chemours common stock to stockholders of DuPont. The distribution is intended to be generally tax free for U.S. federal income tax purposes.

Chemours is currently a subsidiary of DuPont. Chemours was organized in the state of Delaware on February 18, 2014 as Performance Operations, LLC, and changed its name to The Chemours Company, LLC on April 15, 2014. In accordance with the separation and distribution, actions will have been taken so as at the time immediately prior to the distribution, Chemours will have been converted from a limited liability company to a Delaware corporation. DuPont will generally transfer to us all the assets and all the liabilities relating to the Chemours business, which DuPont intends to separate from other businesses of DuPont that comprise its Agriculture, Electronics & Communications, Industrial Biosciences, Nutrition & Health, Performance Materials and Safety & Protection segments. DuPont stockholders will not be required to pay for shares of our common stock received in the distribution or to surrender or exchange shares of DuPont common stock in order to receive shares of our common stock or to take any other action in connection with the distribution.

Additionally, we will incur costs as a result of becoming an independent, publicly traded company for transition services and from establishing or expanding the corporate support for our business, including information technology, human resources, treasury, tax, risk management, accounting and financial reporting, investor relations, governance, legal, procurement and other services. We believe our cash flows from operations will be sufficient to fund these corporation expenses.

### Overview

Chemours delivers customized solutions with a wide range of industrial and specialty chemical products for markets including plastics and coatings, refrigeration and air conditioning, general industrial, mining and oil refining. Principal products include titanium dioxide, refrigerants, industrial fluoropolymer resins, sodium

**Table of Contents**

cyanide, sulfuric acid and aniline. Chemours consists of three reportable segments including Titanium Technologies, Fluoroproducts and Chemical Solutions. See the section titled, "Business," included in this information statement for a detailed description of Chemours' business and segments.

Chemours is globally operated with manufacturing facilities, sales centers, administrative offices, and warehouses located throughout the world. Chemours' operations are primarily located in the United States, Canada, Mexico, Brazil, the Netherlands, Belgium, China, Taiwan, Japan, Switzerland, Singapore, Hong Kong, India, the United Kingdom, France and Sweden. As of September 30, 2014, Chemours consisted of 40 production facilities globally: six dedicated to Titanium Technologies, 20 dedicated to Fluoroproducts, 12 dedicated to Chemical Solutions and two that supported multiple Chemours segments. At three of these sites, currently shared with other DuPont businesses, DuPont will continue its own manufacturing operations after separation, as well as contract manufacture for Chemours for the products currently produced by the Fluoroproducts segment at these sites.

*Results*

**Nine Months Ended September 30, 2014**

Income before income taxes increased to $430 million. Net sales of $4.9 billion decreased six percent due primarily to a portfolio change experienced by the Chemical Solutions segment and lower prices principally for titanium dioxide and refrigerants. The portfolio change involved a customer's election to exercise a buy-out option of a supply contract and related aniline facility at the end of 2013. Decreased price of titanium dioxide was partially offset by increased volumes for Opteon ® YF refrigerant.

**Analysis of Operations**

**Nine Months Ended September 30, 2014 compared to Nine Months Ended September 30, 2013**

| | Nine Months Ended September 30, | |
|---|---|---|
| *(Dollars in millions)* | **2014** | **2013** |
| **NET SALES** | $  4,883 | $  5,203 |

**Nine month period ended September 30, 2014 versus nine month period ended September 30, 2013:**  The table below shows a regional breakdown of combined net sales based on location of customers and related variance percentages for the nine months ended September 30, 2014 and 2013, respectively:

| *(Dollars in millions)* | Nine Months Ended September 30, 2014 | Percent Change vs. Nine Months Ended September 30, 2013 | Percent Change Due to: | | | |
|---|---|---|---|---|---|---|
| | | | **Local Price** | **Currency** | **Volume** | **Portfolio** |
| Worldwide | $      4,883 | (6)% | (4)% | — % | 2% | (4)% |
| North America | 2,110 | (12) | (5) | — | 1 | (8) |
| Asia Pacific | 1,138 | 1 | (3) | (1) | 5 | — |
| EMEA [1] | 940 | (1) | (5) | 3 | 1 | — |
| Latin America [2] | 695 | (6) | (2) | (2) | (2) | — |

1.    Europe, Middle East and Africa (EMEA).
2.    Latin America includes Mexico.

Sales decreased six percent, reflecting a global reduction of selling prices experienced across all three segments, Titanium Technologies, Fluoroproducts and Chemical Solutions. In addition, Chemical Solutions' sales decreased due to a customer's election to exercise a buy-out option of a supply contract and related aniline facility at the end of 2013. These volume and portfolio reductions were partially offset by increased volume in both the Titanium Technologies and Fluoroproducts segments.

53

**Table of Contents**

| | Nine months ended September 30, | |
|---|---|---|
| *(Dollars in millions)* | **2014** | **2013** |
| **COST OF GOODS SOLD** | $  3,824 | $  4,095 |
| As a percent of net sales | 78% | 79% |

Cost of goods sold (COGS) decreased seven percent to $3.8 billion primarily due to decreased sales. COGS as a percentage of net sales was 78 percent, consistent with the nine months ended September 30, 2013.

| | Nine months ended September 30, | |
|---|---|---|
| *(Dollars in millions)* | **2014** | **2013** |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPENSE** | $  532 | $  585 |
| As a percent of net sales | 11% | 11% |

Selling, general and administrative expense decreased nine percent to $532 million, primarily due to lower pension costs. Chemours management expects that the allocated corporate and leveraged costs in Chemours' Combined Financial Statements will approximate operating costs upon separation; however, these expenses may not be indicative of expenses that will be incurred by Chemours in future years (see Note 3 to the Interim Combined Financial Statements for additional information).

Additionally, selling, general and administrative expense for the nine months ended September 30, 2013 includes higher legal fees associated with titanium dioxide antitrust litigation (see Note 13 to the Interim Combined Financial Statements for additional information).

| | Nine months ended September 30, | |
|---|---|---|
| *(Dollars in millions)* | **2014** | **2013** |
| **RESEARCH AND DEVELOPMENT EXPENSE** | $  110 | $  123 |
| As a percent of net sales | 2% | 2% |

The $13 million decrease in research and development expense was mainly attributable to lower pension costs.

| | Nine months ended September 30, | |
|---|---|---|
| *(Dollars in millions)* | **2014** | **2013** |
| **EMPLOYEE SEPARATION/ASSET RELATED CHARGES, NET** | $  21 | $  — |
| As a percent of net sales | — % | — % |

The employee separation/asset related charges incurred during the nine months ended September 30, 2014 consisted primarily of charges related to the 2014 restructuring program, including $16 million for employee separation costs and $3 million for asset shut-down costs. The actions associated with this charge and all related payments are expected to be substantially complete by December 31, 2015.

Additional details related to the 2014 restructuring program discussed above can be found in Note 5 to the Interim Combined Financial Statements.

| | Nine months ended September 30, | |
|---|---|---|
| *(Dollars in millions)* | **2014** | **2013** |
| **EQUITY IN EARNINGS OF AFFILIATES** | $  18 | $  17 |

54

**Table of Contents**

Equity in earnings of affiliates increased $1 million due to an increase in net income recognized by Chemours' joint ventures in China and Japan.

|  | Nine months ended September 30, | |
| --- | --- | --- |
| *(Dollars in millions)* | **2014** | **2013** |
| **OTHER INCOME, NET** | $ 16 | $ 12 |

The $4 million increase in other income, net was largely attributable to an $11 million and $6 million increase from the gain on sales of assets and royalty income, respectively. These increases were partially offset by a $3 million increase in exchange losses, driven by the strengthening of the U.S. Dollar versus the Euro in 2014, and a reduction of $3 million for leasing, contract services and miscellaneous income. Furthermore, for the nine months ended September 30, 2013, Chemours recognized a $7 million gain on purchase of equity investment that did not occur in 2014.

|  | Nine months ended September 30, | |
| --- | --- | --- |
| *(Dollars in millions)* | **2014** | **2013** |
| **PROVISION FOR INCOME TAXES** | $ 108 | $ 116 |
| Effective income tax rate | 25% | 27% |

For the nine months ended September 30, 2014, Chemours recorded a tax provision on continuing operations of $108 million, reflecting a decrease from the nine months ended September 30, 2013 due primarily to a decrease in earnings. The decrease in the effective tax rate in 2014 compared to 2013 was primarily due to a one-time tax benefit recognized in 2014 relating to a tax accounting method change.

|  | Nine months ended September 30, | |
| --- | --- | --- |
| *(Dollars in millions)* | **2014** | **2013** |
| **NET INCOME** | $ 322 | $ 313 |

Net income for the nine months ended September 30, 2014 was $322 million compared to $313 million for the nine months ended September 30, 2013. See the above discussion of individual line items for further detail.

## Year Ended December 31, 2013

Income before income taxes decreased 61 percent to $576 million due to decreased sales and increased cost of goods sold. Net sales of $6.9 billion decreased seven percent driven by a 12 percent decrease related to lower selling prices, partially offset by a five percent increase in sales volume.

| *(Dollars in millions)* | 2013 | 2012 | 2011 |
| --- | --- | --- | --- |
| **NET SALES** | $6,859 | $7,365 | $7,972 |

*2013 versus 2012* The table below shows a regional breakdown of 2013 combined net sales based on location of customers and percentage variances from 2012:

|  |  |  | Percent Change Due to: | | |
| --- | --- | --- | --- | --- | --- |
|  |  | Percentage | | | |
|  | 2013 Net | Change vs. | Local | Currency | |
| *(Dollars in millions)* | Sales | 2012 | Price | Effect | Volume |
| Worldwide | $ 6,859 | (7)% | (12)% | — % | 5% |
| North America | 3,138 | (4) | (7) | — | 3 |
| Asia Pacific | 1,519 | (8) | (13) | (2) | 7 |
| EMEA | 1,237 | (6) | (16) | 1 | 9 |
| Latin America | 965 | (13) | (15) | — | 2 |

55

**Table of Contents**

Sales decreased seven percent, reflecting a global reduction of selling prices experienced in the Titanium Technologies and Fluoroproducts segments. Price reductions were partially offset by volume increases in both segments.

*2012 versus 2011* The table below shows a regional breakdown of 2012 combined net sales based on location of customers and percentage variances from 2011:

| (Dollars in millions) | 2012 Net Sales | Percentage Change vs. 2011 | Local Price | Currency Effect | Volume |
|---|---|---|---|---|---|
| | | | | Percent Change Due to: | |
| Worldwide | $ 7,365 | (8)% | 5% | (1)% | (12)% |
| North America | 3,284 | — | 9 | — | (9) |
| Asia Pacific | 1,654 | (16) | (2) | — | (14) |
| EMEA | 1,318 | (18) | 5 | (5) | (18) |
| Latin America | 1,109 | (1) | 7 | (1) | (7) |

Sales decreased eight percent due to lower sales volume primarily reflective of the decrease in customer demand experienced by the Titanium Technologies and Fluoroproducts segments in all regions. This decrease was partially offset by favorable pricing for titanium dioxide in the first half of 2012.

| (Dollars in millions) | 2013 | 2012 | 2011 |
|---|---|---|---|
| **COST OF GOODS SOLD** | $5,395 | $5,014 | $5,375 |
| As a percent of net sales | 79% | 68% | 67% |

*2013 versus 2012* COGS increased eight percent to $5.4 billion, related to an increase in sales volumes in the Titanium Technologies and Fluoroproducts segments. COGS as a percentage of net sales was 79 percent, an 11 percent increase from 2012, principally reflecting the impact of increased raw materials costs, primarily ore. Additionally, Chemours incurred a $72 million charge for titanium dioxide antitrust litigation in 2013 (see Note 17 to the Annual Combined Financial Statements for additional information).

*2012 versus 2011* COGS decreased seven percent to $5 billion, driven mainly by a decrease in sales volume in the Titanium Technologies and Fluoroproducts segments. COGS as a percentage of net sales was 68 percent, consistent with 2011.

| (Dollars in millions) | 2013 | 2012 | 2011 |
|---|---|---|---|
| **SELLING, GENERAL AND ADMINISTRATIVE EXPENSE** | $768 | $747 | $731 |
| As a percent of net sales | 11% | 10% | 9% |

*2013 versus 2012* The 2013 increase of $21 million was largely due to increased direct use of functional support by Chemours.

*2012 versus 2011* The 2012 increase of $16 million was primarily due to an increase in pension expense and functional costs, partially offset by a decrease in bonuses related to the short-term incentive plan.

| (Dollars in millions) | 2013 | 2012 | 2011 |
|---|---|---|---|
| **RESEARCH AND DEVELOPMENT EXPENSE** | $164 | $145 | $135 |
| As a percent of net sales | 2% | 2% | 2% |

*2013 versus 2012* Research and development expense increased $19 million in 2013 due to increased direct research and development spending by the Fluoroproducts and Chemical Solutions segments.

**Table of Contents**

*2012 versus 2011* The $10 million increase was primarily attributable to increased direct research and development expenses across all segments.

| (Dollars in millions) | 2013 | 2012 | 2011 |
|---|---|---|---|
| **EMPLOYEE SEPARATION/ASSET RELATED CHARGES, NET** | $ 2 | $ 36 | $— |

The $36 million in charges recorded during 2012 in employee separation / asset related charges, net consisted of $3 million in charges related to the 2012 restructuring program, and $33 million in asset impairment charges to writedown the carrying value of an asset group to fair value within the Chemical Solutions segment.

Additional details related to the asset impairment discussed above can be found in Note 6 to the Annual Combined Financial Statements.

| (Dollars in millions) | 2013 | 2012 | 2011 |
|---|---|---|---|
| **EQUITY IN EARNINGS OF AFFILIATES** | $22 | $25 | $44 |

*2013 versus 2012* Equity in earnings of affiliates decreased $3 million due to reductions in net income recognized by Chemours' joint ventures in China and Japan.

*2012 versus 2011* Equity in earnings of affiliates decreased $19 million due to reductions in net income recognized by Chemours' joint ventures in China and Japan.

| (Dollars in millions) | 2013 | 2012 | 2011 |
|---|---|---|---|
| **OTHER INCOME, NET** | $24 | $37 | $132 |

*2013 versus 2012* The $13 million decrease was largely attributable to $26 million higher pre-tax foreign exchange losses which was primarily driven by a strengthening of the U.S. Dollar versus the Venezuelan Bolivar and the Brazilian Real in 2013. This decrease was partially offset by a $7 million gain recognized related to the 2013 purchase of remaining interest on an equity investment and a $6 million increase in leasing, contract services and miscellaneous income.

*2012 versus 2011* The $95 million decrease was largely attributable to a $5 million pre-tax exchange loss in 2012 which was primarily driven by a strengthening of the U.S. Dollar versus the Brazilian Real in 2012 and a weakening of the U.S. Dollar versus the Euro in 2011, as compared to a $68 million gain in 2011. Also contributing to the decrease was a $13 million decrease in royalty income as well as a $9 million gain on the sale of assets in 2011 that did not occur in 2012.

Additional information related to Chemours' other income, net is included in Note 7 to the Annual Combined Financial Statements.

| (Dollars in millions) | 2013 | 2012 | 2011 |
|---|---|---|---|
| **PROVISION FOR INCOME TAXES** | $152 | $427 | $474 |
| Effective income tax rate | 26% | 29% | 25% |

In 2013, Chemours recorded a tax provision on continuing operations of $152 million, reflecting a decrease from 2012 due to a significant decrease in earnings. The decrease in the 2013 effective tax rate compared to 2012 was primarily due to geographic mix of earnings.

In 2012, Chemours recorded a tax provision on continuing operations of $427 million, reflecting a decrease from 2011 due to a significant decrease in earnings. The increase in the 2012 effective tax rate compared to 2011 was primarily due to geographic mix of earnings, in addition to exchange (gains) losses.

57

**Table of Contents**

See Note 8 to the Annual Combined Financial Statements for additional details related to the provision for income taxes, as well as items that significantly impact Chemours' effective income tax rate.

| *(Dollars in millions)* | 2013 | 2012 | 2011 |
|---|---|---|---|
| **NET INCOME** | $424 | $1,058 | $1,433 |

Net income for 2013 was $424 million compared to $1.1 billion in 2012 and $1.4 billion in 2011. See the above discussion of individual line items for further detail.

**Segment Reviews**

In general, the accounting policies of the segments are the same as those described in Note 3 of the Annual Combined Financial Statements. Exceptions are noted as follows: (1) Segment sales include transfers to another business segment, (2) Segment adjusted earnings before interest and taxes (adjusted EBIT) is defined as income (loss) before income taxes excluding non-operating pension and other postretirement employee benefit costs, exchange gains (losses) and corporate expenses, and (3) All references to prices are on a U.S. dollar (USD) basis, including the impact of currency.

A reconciliation of segment sales to combined net sales and segment adjusted EBIT to income before income taxes for 2013, 2012 and 2011 is included in Note 20 to the Annual Combined Financial Statements. Segment adjusted EBIT and segment adjusted EBIT margins include certain items that management believes are significant to understanding the segment results discussed below. See Note 20 to the Annual Combined Financial Statements and Note 15 to the Interim Combined Financial Statements for details related to these items.

**Titanium Technologies**

| *(Dollars in millions)* | Nine months ended September 30, | | Year ended December 31, | | |
|---|---|---|---|---|---|
| | 2014 | 2013 | 2013 | 2012 | 2011 |
| Segment sales | $ 2,254 | $ 2,293 | $3,026 | $3,295 | $3,680 |
| Adjusted EBIT | $ 494 | $ 438 | $ 605 | $1,339 | $1,509 |
| Adjusted EBIT margin | 22% | 19% | 20% | 41% | 41% |

| Change in segment sales from prior period | September 30, | December 31, | |
|---|---|---|---|
| | 2014 | 2013 | 2012 |
| Price | (4)% | (21)% | 8% |
| Volume | 2% | 13% | (18)% |
| Portfolio / Other | — % | — % | — % |
| **Total change** | **(2)%** | **(8)%** | **(10)%** |

*Nine months ended 2014 versus 2013* Sales declined by two percent from the nine months ended September 30, 2013 to the nine months ended September 30, 2014 due to a reduction in price, which was partially offset by an increase in volume. Despite the stabilization of titanium dioxide market demand and improved sales volume, prices decreased in 2014 due to low global titanium dioxide industry capacity utilization and lower ore costs.

Adjusted EBIT and adjusted EBIT margin increased primarily due to lower legal expenses. 2013 adjusted EBIT includes a $72 million charge related to titanium dioxide antitrust litigation (see Note 13 to the Interim Combined Financial Statements for additional information).

*2013 versus 2012* Sales declined in 2013 versus 2012 by eight percent, primarily due to a reduction in price which was partially offset by an increase in volume. Destocking and weak economic growth in the second half of

Table of Contents

2012 and reduced market demand resulted in lower producer utilization levels and downward pricing pressures in 2013. As the titanium dioxide market destocking moderated and stabilized in 2013, sales volumes improved in 2013. However, the slower than expected global economic growth in 2013 continued to minimize growth in demand and depress prices during the year.

2013 adjusted EBIT and adjusted EBIT margin decreased principally on lower selling prices. Volume gains were offset by higher raw material inventory costs, mainly ore costs. 2013 adjusted EBIT includes a $72 million charge related to titanium dioxide antitrust litigation (see Note 17 to the Annual Combined Financial Statements for additional information).

*2012 versus 2011* Sales for 2012 experienced a 10 percent decrease as weak economic activity and customer destocking led to reduced demand, partially offset by an increase in selling prices as compared to 2011. Lower industry utilization from lower demand resulted in downward pricing pressures in the second half of 2012. The price decrease was more than offset by higher selling prices in the first half of 2012 resulting from demand exceeding supply, as new capacity was not introduced in the industry during the global economic recovery in the previous years.

2012 adjusted EBIT margin was consistent with 2011. However, adjusted EBIT decreased, primarily as a result of lower demand. Additionally, there was an increase in the cost of raw materials, mainly ore costs that led to decreased adjusted EBIT.

## Fluoroproducts

| (Dollars in millions) | Nine months ended September 30, | | Year ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2013 | 2012 | 2011 |
| Segment sales | $ 1,752 | $ 1,817 | $ 2,379 | $ 2,559 | $ 2,834 |
| Adjusted EBIT | $ 167 | $ 225 | $ 287 | $ 444 | $ 590 |
| Adjusted EBIT margin | 10% | 12% | 12% | 17% | 21% |

| Change in segment sales from prior period | September 30, | Year ended December 31, | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| Price | (7)% | (7)% | (1)% |
| Volume | 3% | — % | (9)% |
| Portfolio / Other | — % | — % | — % |
| **Total change** | **(4)%** | **(7)%** | **(10)%** |

*Nine months ended 2014 versus 2013* Sales for the nine months ended September 30, 2014 decreased by four percent, compared to the same period in the prior year, primarily due to lower selling prices for refrigerants and industrial resins. Pricing decreases were partially offset by higher volumes.

Adjusted EBIT and adjusted EBIT margin decreased, primarily due to lower selling prices. 2014 adjusted EBIT included charges of $16 million relating to the 2014 restructuring plan. Margin impact from lower prices and restructuring charges was partially offset by lower business and overhead costs from productivity improvements.

*2013 versus 2012* Sales for 2013 decreased seven percent from 2012, as a result of lower sales prices. Lower prices were experienced in all product markets in all regions, except for in the U.S., where prices increased slightly due to higher refrigerant selling prices in 2013. 2013 adjusted EBIT and adjusted EBIT margin decreased, primarily due to lower selling prices.

*2012 versus 2011* Sales for 2012 decreased by 10 percent as compared to 2011, due to declines in both selling prices and volume experienced in all regions and markets. Prices declined in 2012 due to increased supply

**Table of Contents**

capacity in the industry as compared to 2011. Volume decreased most significantly in the Asia Pacific region in the finishes, melts processing resins and industrial resins product markets as the operations of various competitors recovered from significant operating issues in 2011. Additionally, volume was down significantly in the EMEA region, in the refrigerants and fire extinguishment product markets.

Adjusted EBIT and adjusted EBIT margin both decreased in 2012 as a result of the previously mentioned economic challenges driving down volumes and selling prices for most products.

### Chemical Solutions

| (Dollars in millions) | Nine months ended September 30, | | Year ended December 31, | | |
| | 2014 | 2013 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| Segment sales | $ 882 | $ 1,098 | $1,462 | $1,515 | $1,465 |
| Adjusted EBIT | $ (6) | $ 47 | $ 43 | $ 61 | $ 52 |
| Adjusted EBIT margin | (1)% | 4% | 3% | 4% | 4% |

| Change in segment sales from prior period | September 30, | Year ended December 31, | |
| | 2014 | 2013 | 2012 |
|---|---|---|---|
| Price | (3)% | 1% | 4% |
| Volume | — % | (4)% | (1)% |
| Portfolio / Other | (17)% | — % | — % |
| **Total change** | (20)% | (3)% | 3% |

***Nine months ended 2014 versus 2013*** September 30, 2014 revenue decreased 20 percent, primarily due to the portfolio impact due to a customer's election to exercise a buy-out option of a supply contract and related aniline facility at the end of 2013 (see further information in Note 9 to the Annual Combined Financial Statements). Sales decreased further from lower prices across all products.

Adjusted EBIT and adjusted EBIT margin decreased, primarily due to the portfolio impact and lower selling prices.

***2013 versus 2012*** Sales in 2013 reflected a three percent decrease from 2012, primarily resulting from lower sales volumes of aniline, cyanide and methylamines products. The lower volume was caused by extensive scheduled maintenance shut-downs at MDI (diphenylmethane diisocyanate) producers, lower production output of sodium cyanide and the lower demand of methylamines products in the Asia Pacific region. The overall reduction in sales volume was partially offset by the higher selling prices in aniline and cyanide products.

2013 adjusted EBIT and adjusted EBIT margin decreased primarily as a result of lower sales combined with lower plant utilization while 2012 adjusted EBIT included a $33 million asset impairment charge (see Note 6 to the Annual Combined Financial Statements for additional information).

***2012 versus 2011*** Sales increased by three percent in 2012, largely due to an increase in selling prices for aniline and cyanide products globally and higher sales volume for aniline products. This increase was partially offset by lower sales volume for methylamines, reactive metals and sulfur products in 2012. Increases in selling prices reflect the increased cost of raw materials, mainly benzene and ammonia. Lower volumes were influenced by lower demand for methylamines and reactive metal products as well as lower sales of sulfur products caused by the permanent closure of certain oil refineries in the northeastern U.S.

2012 adjusted EBIT increased as lower volumes were more than offset by higher selling prices, as well as higher plant utilization.

Table of Contents

## Liquidity & Capital Resources

The primary source of liquidity for Chemours' business is cash flow provided by operations, which has historically been transferred to DuPont to support its overall cash management strategy. Transfers of cash to and from DuPont's cash management system have been reflected in DuPont Company Net Investment in the historical Combined Balance Sheets, Statements of Cash Flows and Statements of Changes in DuPont Company Net Investment. Chemours has not reported cash or cash equivalents for the periods presented in the Combined Balance Sheets. Management believes that future cash from operations will provide adequate resources to fund Chemours' operating and financing needs for at least the next twelve months.

The following tables contain several key measures to gauge our financial condition and liquidity at September 30, 2014 and December 31, 2013 and 2012:

## Cash Flows:

| | Nine months ended September 30, | | Year ended December 31, | | |
|---|---|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2013 | 2012 | 2011 |
| **Cash provided by operating activities** | $ 13 | $ 268 | $798 | $1,390 | $1,496 |

Cash provided by operating activities decreased $255 million for the nine months ended September 30, 2014 compared to the same period in 2013 primarily due to increased payments of trade accounts payable for raw materials. In addition, Chemours paid $72 million related to titanium dioxide antitrust litigation in 2014 (see Note 17 to the Annual Combined Financial Statements and Note 13 to the Interim Combined Financial Statements for additional information).

Cash provided by operating activities decreased $592 million in 2013 compared to 2012 due to lower cash from earnings.

Cash provided by operating activities decreased $106 million in 2012 compared to 2011 due to lower cash from earnings which was partially offset by a decreased use of cash related to changes in working capital.

| | Nine months ended September 30, | | Year ended December 31, | | |
|---|---|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2013 | 2012 | 2011 |
| **Cash used for investing activities** | $ (377) | $ (277) | $(424) | $(429) | $(345) |

Cash used for investing activities increased $100 million for the nine months ended September 30, 2014 compared to the same period in 2013 primarily due to the expansion of Titanium Technologies' Altamira plant in Mexico.

Cash used for investing activities in 2013 decreased $5 million compared to 2012. In 2013, there was an $11 million increase in proceeds from sales of assets largely attributable to a customer's election to exercise a buy-out option of a supply contract and related aniline facility (see further information in Note 9 to the Annual Combined Financial Statements). This increase in proceeds from sales of assets was partially offset by an increase in purchases of property, plant and equipment. The Titanium Technologies segment increased capital expenditures on the expansion of the Altamira plant in Mexico while the Fluoroproducts and Chemical Solutions segments decreased their capital expenditures in 2013.

Cash used for investing activities increased $84 million in 2012 compared to 2011. The increase was due mainly to the expansion of Titanium Technologies' Altamira plant in Mexico.

**Table of Contents**

Purchases of property, plant and equipment totaled $438 million, $432 million, and $355 million in 2013, 2012 and 2011, respectively, and $404 million for the nine months ended September 30, 2014. Chemours management expects 2014 purchases of property, plant and equipment to be approximately $570 million.

| (Dollars in millions) | Nine months ended September 30, | | Year ended December 31, | | |
| | 2014 | 2013 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **Cash provided by (used for) financing activities** | $  364 | $  9 | $(374) | $(961) | $(1,151) |

As DuPont manages Chemours' cash and financing arrangements, all excess cash generated through earnings is remitted to DuPont and all sources of cash are funded by DuPont.

Cash provided by financing activities increased $355 million for the nine months ended September 30, 2014. Earnings decreased for the reasons discussed above, resulting in DuPont transferring cash to Chemours to fund operations.

Cash used for financing activities decreased $587 million in 2013 compared to 2012. Earnings decreased for the reasons discussed above, resulting in less cash transferred to DuPont.

Cash used for financing activities decreased $190 million in 2012 compared to 2011. Earnings decreased for the reasons discussed above, resulting in less cash transferred to DuPont.

| Current Assets | September 30, 2014 | December 31, 2013 | December 31, 2012 |
|---|---|---|---|
| Accounts and note receivable — trade, net | $  1,030 | $  841 | $  806 |
| Inventories | 1,072 | 1,055 | 977 |
| Prepaid expenses and other | 44 | 40 | 40 |
| Deferred income taxes | 73 | 44 | 10 |
| **Total Current Assets** | $  2,219 | $1,980 | $1,833 |

Accounts receivable, net as of September 30, 2014 increased $189 million compared to December 31, 2013 due to timing of collections and higher sales in September 2014 than December 2013 in the Titanium Technologies segment. Chemours' inventories increased by $17 million, driven by increased inventory of $75 million in the Fluoroproducts segment and $11 million in the Chemical Solutions segment, which was partially offset by a $69 million reduction in inventory in the Titanium Technologies segment.

Accounts receivable, net increased $35 million as of December 31, 2013 compared to December 31, 2012. The change was primarily a result of higher net sales in Titanium Technologies in the fourth quarter of 2013 as compared to the same quarter of 2012. Inventories were $1.1 billion as of December 31, 2013 compared to $977 million as of December 31, 2012. This increase was primarily due to expected higher customer demand for titanium dioxide in the first quarter of 2014.

| Property, Plant and Equipment | September 30, 2014 | December 31, 2013 | December 31, 2012 |
|---|---|---|---|
| Property, plant and equipment, net | $  3,163 | $2,972 | $2,793 |

62

**Table of Contents**

Property, plant and equipment, net increased $191 million as of September 30, 2014 compared to December 31, 2013, and increased $179 million as of December 31, 2013 compared to December 31, 2012. The increases in property, plant and equipment, net in both periods were primarily due to expansion of Titanium Technologies Altamira plant in Mexico.

| Current Liabilities | September 30, 2014 | December 31, 2013 | 2012 |
|---|---|---|---|
| Accounts payable | $   852 | $1,057 | $   923 |
| Deferred income taxes | 8 | 9 | 11 |
| Other accrued liabilities | 321 | 405 | 299 |
| **Total Current Liabilities** | $   1,181 | $1,471 | $1,233 |

Current liabilities decreased to $1.2 billion as of September 30, 2014, compared to $1.5 billion as of December 31, 2013, primarily as a result of decreased accounts payable due to the timing of Chemours' payments to vendors in the third quarter of 2014 as compared to the fourth quarter of 2013.

Current liabilities as of December 31, 2013 increased to $1.5 billion compared to $1.2 billion as of December 31, 2012. The increase reflects higher accounts payable primarily due to higher purchases of raw material. Additionally, other accrued liabilities increased as a result of the $72 million titanium dioxide litigation accrual (see Note 17 to the Annual Combined Financial Statements for additional information).

**Accounting Estimates**

Chemours' significant accounting policies are more fully described in Note 3 to the Annual Combined Financial Statements. Management believes that the application of these policies on a consistent basis enables Chemours to provide the users of the financial statements with useful and reliable information about Chemours' operating results and financial condition.

The preparation of the Combined Financial Statements in conformity with generally accepted accounting principles in the United States of America (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the Combined Financial Statements and the reported amounts of revenues and expenses, including allocations of costs as discussed above, during the reporting period. Management's estimates are based on historical experience, facts and circumstances available at the time and various other assumptions that are believed to be reasonable. Chemours reviews these matters and reflects changes in estimates as appropriate. Management believes that the following represents some of the more critical judgment areas in the application of Chemours' accounting policies which could have a material effect on Chemours' financial position, liquidity or results of operations.

*New Accounting Guidance*

See Note 3 to the Annual Combined Financial Statements and Note 2 to the Interim Combined Financial Statements for a discussion of recent accounting pronouncements.

*Goodwill*

The excess of the purchase price over the estimated fair value of the net assets acquired, including identified intangibles, in a business combination is recorded as goodwill. Goodwill is tested for impairment at least annually on October 1; however, impairment tests are performed more frequently when events or changes in circumstances indicate that the asset may be impaired. Impairment exists when carrying value exceeds fair value.

Evaluating goodwill for impairment is a two-step process. In the first step, Chemours compares the carrying value of net assets to the fair value of the related operations. Chemours' methodology for estimating the fair

63

**Table of Contents**

value of its reporting units is using the income approach based on the present value of future cash flows. The factors considered in determining the cash flows include: 1) macroeconomic conditions; 2) industry and market considerations; 3) costs in raw materials, labor or other costs having a negative effect on earnings and cash flows; 4) overall financial performance; and 5) other relevant entity-specific events. If the fair value is determined to be less than the carrying value, a second step is performed to compute the amount of the impairment. There were no impairments of goodwill in 2013, 2012 or 2011, and the results of the most recent impairment test indicated that the fair value of each reporting unit substantially exceeded its carrying value.

*Valuation of Assets*

The assets and liabilities of acquired businesses are measured at their estimated fair values at the dates of acquisitions. The determination and allocation of fair value to the assets acquired and liabilities assumed is based on various assumptions and valuation methodologies requiring considerable management judgment, including estimates based on historical information, current market data and future expectations. The principal assumptions utilized in Chemours' valuation methodologies include revenue growth rates, operating margin estimates, royalty rates and discount rates. Although the estimates were deemed reasonable by management based on information available at the dates of acquisition, those estimates are inherently uncertain.

Assessment of the potential impairment of property, plant and equipment, other intangible assets and investments in affiliates is an integral part of Chemours' normal ongoing review of operations. Chemours evaluates the carrying value of long-lived assets to be held and used when events or changes in circumstances indicate the carrying value may not be recoverable. The carrying value of a long-lived asset is considered impaired when the total projected undiscounted cash flows from the asset are separately identifiable and are less than its carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. The fair value methodology used is an estimate of fair market value which is made based on prices of similar assets or other valuation methodologies including present value techniques. Long-lived assets to be disposed of other than by sale are classified as held for use until their disposal. Long-lived assets to be disposed of by sale are classified as held for sale and are reported at the lower of carrying amount or fair market value less cost to sell. Depreciation is discontinued for long-lived assets classified as held for sale.

Testing for potential impairment of these assets is significantly dependent on numerous assumptions and reflects management's best estimates at a particular point in time. The dynamic economic environments in which Chemours' segments operate, and key economic and business assumptions with respect to projected selling prices, market growth and inflation rates, can significantly affect the outcome of impairment tests. Estimates based on these assumptions may differ significantly from actual results. Changes in factors and assumptions used in assessing potential impairments can have a significant impact on the existence and magnitude of impairments, as well as the time in which such impairments are recognized. In addition, Chemours continually reviews its diverse portfolio of assets to ensure they are achieving their greatest potential and are aligned with Chemours' growth strategy. Strategic decisions involving a particular group of assets may trigger an assessment of the recoverability of the related assets. Such an assessment could result in impairment losses. During 2012, Chemours recorded an asset impairment charge of $33 million to write-down the carrying value of an asset group to fair value. See Note 6 to the Annual Combined Financial Statements for additional details related to this charge. There was no asset impairment recognized in 2013.

*Environmental Liabilities and Expenditures*

Environmental liabilities and expenditures included in the Combined Financial Statements represent claims for matters for which Chemours will indemnify DuPont. Accruals for environmental matters are recorded in cost of goods sold when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Accrued liabilities do not include claims against third parties and are not discounted.

Costs related to environmental remediation are charged to expense in the period incurred. Other environmental costs are also charged to expense in the period incurred, unless they increase the value of the property or reduce or prevent contamination from future operations, in which case, they are capitalized and amortized.

64

Table of Contents

*Litigation*

Litigation liabilities and expenditures included in the Combined Financial Statements represent litigation matters for which Chemours will indemnify DuPont. Accruals for litigation matters are made when the information available indicates that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Legal costs such as outside counsel fees and expenses are charged to expense in the period services are received.

*Income Taxes*

Income taxes as presented herein attribute current and deferred income taxes of DuPont to Chemours' stand-alone financial statements in a manner that is systematic, rational, and consistent with the asset and liability method prescribed by Accounting Standards Codification 740, *Income Taxes* (ASC 740), issued by the Financial Accounting Standards Board (FASB). Accordingly, Chemours' income tax provision was prepared following the separate return method. The separate return method applies ASC 740 to the stand-alone financial statements of each member of the consolidated group as if the group member were a separate taxpayer and a stand-alone enterprise. As a result, actual tax transactions included in the consolidated financial statements of DuPont may not be included in the separate Combined Financial Statements of Chemours. Similarly, the tax treatment of certain items reflected in the separate Combined Financial Statements of Chemours may not be reflected in the consolidated financial statements and tax returns of DuPont; therefore, such items as net operating losses, credit carryforwards, and valuation allowances may exist in the stand-alone financial statements that may or may not exist in DuPont's consolidated financial statements.

The breadth of Chemours' operations and the global complexity of tax regulations require assessments of uncertainties and judgments in estimating taxes Chemours will ultimately pay. The final taxes paid are dependent upon many factors, including negotiations with taxing authorities in various jurisdictions, outcomes of tax litigation and resolution of disputes arising from federal, state and international tax audits in the normal course of business.

The provision for income taxes is determined using the asset and liability approach of accounting for income taxes. Under this approach, deferred taxes represent the future tax consequences expected to occur when the reported amounts of assets and liabilities are recovered or paid. The provision for income taxes represents income taxes paid or payable for the current year plus the change in deferred taxes during the year. Deferred taxes result from differences between the financial and tax basis of Chemours' assets and liabilities and are adjusted for changes in tax rates and tax laws when changes are enacted. Valuation allowances are recorded to reduce deferred tax assets when it is more likely than not that a tax benefit will not be realized. It is Chemours' policy to include accrued interest related to unrecognized tax benefits in miscellaneous income and expenses, net, under other income, net. It is Chemours' policy for income tax related penalties to be included in the provision for income taxes.

In general, the taxable income (loss) of various Chemours entities was included in DuPont's consolidated tax returns, where applicable in jurisdictions around the world. As such, separate income tax returns were not prepared for many Chemours' entities. Consequently, income taxes currently payable are deemed to have been remitted to DuPont, in cash, in the period the liability arose and income taxes currently receivable are deemed to have been received from DuPont in the period that a refund could have been recognized by Chemours had Chemours been a separate taxpayer.

As stated in Note 2 to the Annual Combined Financial Statements, aside from a Japanese entity (that is a dual-resident for U.S. income tax purposes), there is no direct ownership relationship among all the other various legal entities comprising Chemours; consequently, no provision has been made for income taxes on unremitted earnings of subsidiaries and affiliates.

## Off-Balance Sheet Arrangements

*Certain Guarantee Contracts*

Information with respect to Chemours' guarantees is included in Note 17 to the Annual Combined Financial Statements and Note 13 to the Interim Combined Financial Statements. Historically, Chemours has not made significant payments to satisfy guarantee obligations; however, Chemours believes it has the financial resources to satisfy these guarantees.

*Contractual Obligations*

Information related to Chemours' significant contractual obligations is summarized in the following table:

| (Dollars in millions) | Total at December 31, 2013 | 2014 | Payments Due In 2015 — 2016 | 2017 — 2018 | 2019 and Beyond |
|---|---|---|---|---|---|
| Operating leases | $ 247 | $ 55 | $ 84 | $ 51 | $ 57 |
| Purchase obligations [1] | | | | | |
|     Raw material obligations | 397 | 348 | 49 | — | — |
|     Utility obligations | 149 | 18 | 29 | 28 | 74 |
|     Other | 22 | 8 | 10 | 4 | — |
| Purchase obligations | 568 | 374 | 88 | 32 | 74 |
| Other liabilities | | | | | |
|     Workers' compensation | 46 | 7 | 20 | 9 | 10 |
|     Asset retirement obligations | 42 | 2 | 8 | 2 | 30 |
|     Environmental remediation | 274 | 47 | 111 | 43 | 73 |
|     Legal settlements | 89 | 76 | 5 | 4 | 4 |
|     Other [2] | 18 | 6 | 3 | 1 | 8 |
| Other liabilities | 469 | 138 | 147 | 59 | 125 |
| Total contractual obligations [3] | $ 1,284 | $567 | $ 319 | $ 142 | $ 256 |

[1]   Represents enforceable and legally binding agreements to purchase goods or services that specify fixed or minimum quantities; fixed, minimum or variable price provisions; and the approximate timing of the agreement.

[2]   Primarily represents employee-related benefits other than pensions and other long-term employee benefits included in the Combined Balance Sheets.

[3]   Due to uncertainty regarding the completion of tax audits and possible outcomes, the estimate of obligations related to unrecognized tax benefits cannot be made. See Note 8 to the Annual Combined Financial Statements for additional information.

Raw material purchase obligations at September 30, 2014 increased $0.9 billion versus December 31, 2013 primarily attributable to the commencement of a 20 year supply agreement.

Chemours expects to meet its contractual obligations through its normal sources of liquidity and believes it has the financial resources to satisfy these contractual obligations.

## Long-term Employee Benefits

DuPont offers various benefits to Chemours' employees and retirees. DuPont maintains retirement-related programs in many countries that have a long-term impact on Chemours' earnings and cash flows. DuPont offers plans that are shared amongst its businesses, including Chemours. In these cases, the participation of employees in these plans is reflected in these financial statements as though Chemours participates in a multiemployer plan with DuPont. A proportionate share of the cost is reflected in these Combined Financial Statements. Assets and

**Table of Contents**

liabilities are retained by DuPont. Further information on DuPont's plans are included in DuPont's annual report. As of the separation date, Chemours expects to record the net periodic benefit obligations for any plans that are transferred from DuPont. See "Unaudited Pro Forma Combined Financial Statements" for additional information.

These plans are typically defined benefit pension plans, as well as medical, dental and life insurance benefits for pensioners and survivors and disability benefits for employees (other long-term employee benefits). Approximately 79 percent of Chemours' worldwide allocation of benefit costs for pensions and essentially all of Chemours' worldwide allocated costs for other long-term employee benefit obligations are attributable to the U.S. benefit plans. Pension coverage for employees of Chemours' non-U.S. combined subsidiaries is provided, to the extent deemed appropriate, through separate plans. DuPont regularly explores alternative solutions to meet its global pension obligations in the most cost-effective manner possible as demographics, life expectancy and country-specific pension funding rules change. Where permitted by applicable law, DuPont reserves the right to change, modify or discontinue its plans that provide pension, medical, dental, life insurance and disability benefits.

The majority of employees hired in the U.S. on or after January 1, 2007 are not eligible to participate in DuPont's pension and post-retirement medical, dental and life insurance plans, but receive benefits in its defined contribution plans.

In January 2012, DuPont contributed approximately $110 million to the principal U.S. pension plan representing an allocation of the contribution in respect of Chemours' employees and retirees and no such contributions were made in 2011 or 2013. No such contributions are expected to be made to the principal U.S. pension plan in 2014. DuPont expects to make contributions to its principal U.S. pension plan beyond 2014; however, the amount of any contributions is heavily dependent on the future economic environment and investment returns on pension trust assets.

Funding for each pension plan is governed by the rules of the sovereign country in which it operates. Thus, there is not necessarily a direct correlation between pension funding and pension expense. In general, however, improvements in a plan's funded status tends to moderate subsequent funding needs. DuPont contributed, in respect of Chemours' employees and retirees, $34 million, $34 million and $28 million to its pension plans other than the principal U.S. pension plan in 2013, 2012 and 2011, respectively, and anticipates that it will make approximately $37 million in contributions in 2014 to pension plans other than the principal U.S. pension plan.

DuPont's other long-term employee benefits are unfunded. DuPont contributed, in respect of Chemours' employees and retirees, pre-tax cash requirements to cover actual net claims costs and related administrative expenses for $58 million, $66 million and $80 million in 2013, 2012 and 2011, respectively. This amount is expected to be about $63 million in 2014. Changes in cash requirements reflect the net impact of higher per capita health care costs, demographic changes, plan amendments and changes in participant premiums, co-pays and deductibles.

Chemours' income can be significantly affected by allocated costs for pension and defined contribution benefits as well as other long-term employee benefits provided by DuPont. The following table summarizes the extent to which Chemours' income over each of the last three years was affected by allocated pre-tax charges related to long-term employee benefits:

| *(Dollars in millions)* | **2013** | **2012** | **2011** |
|---|---|---|---|
| Long-term employee benefit plan charges [1] | $164 | $169 | $151 |

[1]    The figures in this table represent the allocation of costs to Chemours, which were allocated based on active employee headcount. These figures do not represent cash payments to DuPont or DuPont's plans.

See DuPont's 2013 10-K for additional information on the financial status of DuPont's significant plans.

67

**Table of Contents**

Chemours will not continue the U.S. defined benefit plans post separation.

**Environmental Matters**

*Environmental Expenses*

Environmental expenses charged to current operations include environmental operating costs and the increase in the remediation accrual, if any, during the period reported. As a result of its operations, Chemours incurs costs for pollution abatement activities including waste collection and disposal, installation and maintenance of air pollution controls and wastewater treatment, emissions testing and monitoring, and obtaining permits. Chemours also incurs costs for environmental related research and development activities including environmental field and treatment studies as well as toxicity and degradation testing to evaluate the environmental impact of products and raw materials. Management expects that such expenses in 2014 and 2015 will be comparable to 2013 and, therefore, does not believe that year over year changes, if any, in environmental expenses charged to current operations will have a material impact on Chemours' financial position, liquidity or results of operations.

*Remediation Accrual*

Changes in the remediation accrual balance are summarized below.

Annual expenditures in the near future are not expected to vary significantly from the range of such expenditures experienced in the past few years. Longer term, expenditures are subject to considerable uncertainty and may fluctuate significantly.

| *(Dollars in millions)* | |
| --- | --- |
| Balance at December 31, 2011 | $269 |
| Remediation payments | (58) |
| Increase in remediation accrual | 59 |
| Balance at December 31, 2012 | $270 |
| Remediation payments | (36) |
| Increase in remediation accrual | 40 |
| Balance at December 31, 2013 | $274 |
| Remediation payments | (27) |
| Increase in remediation accrual | 51 |
| Balance at September 30, 2014 | $298 |

Chemours is also subject to contingencies pursuant to environmental laws and regulations that in the future may require further action to correct the effects on the environment of prior disposal practices or releases of chemical or petroleum substances by Chemours or other parties. Chemours accrues for environmental remediation activities consistent with the policy as described in Note 3 of the Annual Combined Financial Statements. Much of this liability results from the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, often referred to as Superfund), the Resource Conservation and Recovery Act (RCRA) and similar state and global laws. These laws require certain investigative, remediation and restoration activities at sites where Chemours conducts or once conducted operations or at sites where Chemours-generated waste was disposed. The accrual also includes estimated costs related to a number of sites identified for which it is probable that environmental remediation will be required, but which are not currently the subject of enforcement activities.

As of September 30, 2014 and December 31, 2013, Chemours, through DuPont, has been notified of potential liability under the CERCLA or similar state laws at about 190 sites around the U.S., including approximately 20 sites for which Chemours does not believe it has liability based on current information. Active remediation is under way at approximately 65 of these sites. In addition, at September 30, 2014 and December 31, 2013,

68

Table of Contents

liability at approximately 60 sites, has been resolved either by completing remedial actions with other Potentially Responsible Parties (PRPs) or participating in "de minimis buyouts" with other PRPs whose waste, like Chemours', represented only a small fraction of the total waste present at a site.

At September 30, 2014 and December 31, 2013, the Combined Balance Sheet included a liability of $298 million and $274 million, respectively, relating to these matters which, in management's opinion, is appropriate based on existing facts and circumstances. The average time-frame over which the accrued or presently unrecognized amounts may be paid, based on past history, is estimated to be 15 to 20 years. Remediation activities vary substantially in duration and cost from site to site. These activities, and their associated costs, depend on the mix of unique site characteristics, evolving remediation technologies, diverse regulatory agencies and enforcement policies, as well as the presence or absence of other potentially responsible parties. In addition, Chemours, through DuPont, has limited, readily available information for certain sites or is in the early stages of discussions with regulators. For these sites in particular there may be considerable variability between the remediation activities that are currently being undertaken or planned, as reflected in the liability recorded at September 30, 2014, and the ultimate actions that could be required.

Hence, considerable uncertainty exists with respect to these costs and, under adverse changes in circumstances, management estimates that potential liability may range up to 3.5 times the amount accrued at September 30, 2014 and December 31, 2013.

*Pompton Lakes*

The environmental remediation accrual at September 30, 2014 and December 31, 2013 includes $87 million and $78 million, respectively, related to activities at Chemours' site in Pompton Lakes, New Jersey. Management estimates that potential liability for remediation activities at this site could range up to $116 million. During the twentieth century, DuPont manufactured blasting caps, fuses and related materials at Pompton Lakes. Operating activities at the site were ceased in the mid 1990's. Primary contaminants in the soil and sediments are lead and mercury. Ground water contaminants include volatile organic compounds. Under the authority of the EPA and the New Jersey Department of Environmental Protection, remedial actions at the site are focused on investigating and cleaning up the area. Ground water monitoring at the site is ongoing and Chemours, through DuPont, has installed and continues to install vapor mitigation systems at residences within the ground water plume. In addition, Chemours, through DuPont, is further assessing ground water plume/vapor intrusion delineation. In November 2014, the EPA announced a proposed remediation plan that would require Chemours to dredge mercury contamination from a 36 acre area of the lake and remove sediment from two other areas of the lake near the shoreline. The plan is subject to notice and comment. Chemours expects to spend about $60 million over the next two to three years, which is included in the remediation accrual at September 30, 2014, in connection with remediation activities at Pompton Lakes, including activities related to the EPA's proposed plan. Based on existing facts and circumstances, management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site, other than disclosed, will have a material impact on the financial position, liquidity or results of operations of Chemours.

*Environmental Capital Expenditures*

As of September 30, 2014, Chemours spent approximately $38 million on environmental capital projects either required by law or necessary to meet Chemours' internal environmental goals. Chemours currently estimates expenditures for environmental-related capital projects to be approximately $43 million in 2015. In the U.S., additional capital expenditures are expected to be required over the next decade for treatment, storage and disposal facilities for solid and hazardous waste and for compliance with the Clean Air Act (CAA). Until all CAA regulatory requirements are established and known, considerable uncertainty will remain regarding estimates for future capital expenditures. However, management does not believe that the costs to comply with these requirements will have a material impact on the financial position or liquidity of Chemours.

Table of Contents

## ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**Derivatives and Other Hedging Instruments**

Fluctuations in the value of the U.S. dollar compared to foreign currencies may impact Chemours' earnings. Chemours participates in DuPont's foreign currency hedging program to reduce earnings volatility associated with remeasurement of foreign currency denominated net monetary assets.

DuPont formally documents the hedge relationships, including identification of the hedging instruments and the hedged items, the risk management objectives and strategies for undertaking the hedge transactions, and the methodologies used to assess effectiveness and measure ineffectiveness. Realized gains and losses on derivative instruments of DuPont are allocated by DuPont to Chemours based on projected exposure. Chemours recognizes its allocable share of the gains and losses on DuPont's derivative financial instruments in earnings when the forecasted purchases occur for natural gas hedges and when the forecasted sales occur for foreign currency hedges.

Chemours does not hold or issue financial instruments for speculative or trading purposes. Chemours will however evaluate and possibly enter into forward exchange contracts and other financial instruments to help mitigate the adverse impact of currency rate fluctuations on its earnings.

**Concentration of Credit Risk**

Chemours' sales are not materially dependent on any single customer. As of December 31, 2013, no one individual customer balance represented more than five percent of Chemours' total outstanding receivables balance. Credit risk associated with Chemours' receivables balance is representative of the geographic, industry and customer diversity associated with Chemours' global businesses.

Chemours also maintains strong credit controls in evaluating and granting customer credit. As a result, it may require that customers provide some type of financial guarantee in certain circumstances. Length of terms for customer credit varies by industry and region.

**Commodities Risk**

A portion of our products and raw materials are commodities whose prices fluctuate as market supply and demand fundamentals change. Accordingly, product margins and the level of our profitability tend to fluctuate with changes in the business cycle. The Company tries to protect against such instability through various business strategies. These include provisions in sales contracts allowing us to pass on higher raw material costs through timely price increases and formula price contracts to transfer or share commodity price risk.

70

**Table of Contents**

**BUSINESS**

Chemours is a leading global provider of performance chemicals through three reporting segments: Titanium Technologies, Fluoroproducts and Chemical Solutions. Our performance chemicals are key inputs into products and processes in a variety of industries. Our Titanium Technologies segment is the leading global producer of $TiO_2$, a premium white pigment used to deliver opacity. Our Fluoroproducts segment is a leading global provider of fluoroproducts, such as refrigerants and industrial fluoropolymer resins. Our Chemical Solutions segment is a leading North American provider of industrial and specialty chemicals used in gold production, oil refining, agriculture, industrial polymers and other industries . Our position with each of these businesses reflects the strong value proposition we provide to our customers based on our long history of innovation and our reputation within the chemical industry for safety, quality and reliability.

We operate 37 production facilities located in 12 countries and serve several thousand customers located in more than 130 countries. The following chart illustrates the global reach of our business:



Chemours was formed in 2014 as part of a reorganization of the businesses that comprised the Performance Chemicals business of DuPont. In October 2013, DuPont announced its intention to separate the Performance Chemicals segment through a separation by way of a dividend to DuPont shareholders of 100 percent of the shares of common stock of Chemours, which will become an independent, publicly traded company. The distribution is intended to be U.S. tax-free to Chemours, DuPont and their U.S. stockholders. Completion of the transaction is subject to certain conditions, which are set forth in the section entitled "The Distribution — Conditions to the Distribution."

Chemours is committed to creating value for our customers through the reliable delivery of high quality products and services which enable lifestyle improvements around the globe. In short, we help create a colorful, capable and cleaner world through the power of chemistry. We intend to grow our value to customers and shareholders through (i) operational excellence and asset efficiency, which includes our commitment to safety and environmental stewardship, (ii) strong customer focus to produce innovative, high-performance products, (iii) focus on cash flow generation and return on invested capital through optimization of our cost structure, improvement in working capital and supply chain efficiencies, (iv) organic growth based on leveraging our leadership, (v) expansion in emerging markets and (iv) creation of an organization that is committed to our corporate values of safety, customer appreciation, simplicity, collective entrepreneurship and integrity.

71

Table of Contents

**Competitive Strengths**

Our competitive strengths include the following:

*Leading Global Market Positions*

We are the largest global producer of $TiO_2$, with annual $TiO_2$ capacity of approximately 1.2 million metric tons. We are in the process of expanding capacity at our Altamira, Mexico production facility by 200,000 metric tons. Production at the expansion is scheduled to start up in 2016. Each of our $TiO_2$ production facilities ranks among those with the largest capacity globally, and our production facilities at New Johnsonville, Tennessee and DeLisle, Mississippi are the two largest capacity $TiO_2$ production facilities in the world. We believe that our world-scale assets, consistent quality and delivery reliability differentiate us from our competitors in the $TiO_2$ market.

We are the market leader in fluoroproducts, with leading positions in fluorinated refrigerants, and industrial fluoropolymer resins and downstream products. We have a leading position in HFC refrigerants and are at the forefront of developing high-performance sustainable technologies such as our low GWP HFO refrigerants and foam expansion agents. We are also the market leader in industrial fluoropolymer resins and downstream products and coatings, marketed under the well-known Teflon ® brand name. Teflon ® industrial resins are used in high-performance wire and cable and multiple components in high-tech processing equipment.

We maintain leading market positions in key businesses in our Chemical Solutions segment. We are the largest producer of sodium cyanide, which is used primarily in gold production, in the Americas. In North America, we maintain market leading positions in sulfuric acid, which is used primarily in oil refining; aniline, which is primarily used to make polyurethane, and glycolic acid, which is primarily used in personal care products. We also have a strong market position in disinfectants used for water sanitization, animal health and bio-security.

Our market-leading positions are due to the scale and scope of our operations, our outstanding process technology, our differentiated products, our competitive pricing and efficient manufacturing base and long-standing partnerships with our customers.

*Industry-leading Cost Structure*

We produce our products in cost-efficient manufacturing facilities that utilize proprietary process technologies to help drive our industry-leading cost structure. We continue to focus on increasing manufacturing efficiencies and mitigating cost inflation through process improvements, selected capital investments and adoption of best practices.

Our Titanium Technologies segment, in particular, has high asset productivity. Our proprietary $TiO_2$ process technology allows us to optimize the use of a variety of titanium-bearing ore types, providing us with a cost advantage. Our world-scale $TiO_2$ production facilities provide significant economies of scale. We operate large individual production lines at high utilization rates. The scale of our production facilities combined with our process technology capabilities, has allowed us to achieve the lowest manufacturing costs per unit in the industry over a sustained period of time. Our new Altamira, Mexico $TiO_2$ production line is expected to be one of the lowest cost production lines in the world. In addition, we continually strive to improve our productivity and optimize our capacity by applying our engineering and manufacturing technology expertise to our production facilities.

Our leading fluoroproducts capacity, innovative production processes, effective supply chain and sourcing strategies make us highly cost competitive also in the fluoroproducts market. Our use of local contract manufacturing and joint venture partners in selected countries as a source of regional access and asset-light manufacturing (where possible) further enhances the overall cost position of our Fluoroproducts segment.

**Table of Contents**

We believe that we have competitive cost positions within our Chemical Solutions segment as a result of proprietary process technologies, manufacturing scale and efficient supply chain processes. Our Chemical Solutions segment is also expected to benefit from its exploitation of low cost energy and hydrocarbon raw material inputs in North America, where nearly all of our Chemical Solutions production facilities are located.

### *Leading Technology and Intellectual Property*

As part of our DuPont heritage, our businesses have a long history of delivering innovative and high-quality products. We expect sustained technology leadership to be a key differentiator for Chemours, as the majority of our products are critical inputs that significantly impact the functionality, performance and quality of our customers' products. Our product offerings are enhanced by application technology scientists and laboratories across the globe, whose goal it is to deliver formulation improvements to help our customers achieve lower costs, better performance and higher overall value-in-use from our products compared to those of our competitors.

In our Titanium Technologies segment, we commercialized the chloride process for $TiO_2$ production in 1953, providing products with better opacity and superior whiteness due to lower impurities, and generating lower waste and byproducts than the traditional sulfate production technology. Currently, we are one of the limited number of $TiO_2$ producers with rights to chloride process for production of $TiO_2$. We believe that our proprietary chloride technology enables us to operate plants at a much higher capacity than other chloride technology based $TiO_2$ producers, uniquely utilizing a broad spectrum of titanium bearing ore feedstocks and achieving the highest unit margins in our industry. Our R&D and technology efforts focus on improving production processes, developing and yielding $TiO_2$ grades that help customers achieve optimal performance. In our Fluoroproducts segment, we pioneered fluorine chemistry and invented PTFE, as well as developed the first generation of refrigeration agents in the first half of the 20th century. Our continuing innovation focus places us at the forefront of industry and regulatory changes with a focus on sustainable solutions. In fluoroproducts, we led the industry in the Montreal-Protocol (1987) driven transition from CFCs to the lesser ozone depleting HCFCs, and non-ozone depleting HFCs. In 1988 we committed to cease production of CFCs and started manufacturing non-ozone depleting HFCs in the early 1990's. Driven by new and emerging environmental legislations and standards currently being implemented across the U.S., Europe and Japan, we are currently driving the development and commercialization of our next generation Opteon ® product line, innovative low GWP fluorochemicals for refrigeration and other applications. This new patented technology has zero ozone depletion potential and very low GWP and offers similar functionality to current HFC products. Like Titanium Technologies and Fluoroproducts, our Chemical Solutions segment has strong technical capabilities and a reputation for its ability to manage hazardous materials. This ability is a key competitive advantage for Chemical Solutions, as several of its products' end-users demand the highest level of excellence in the safe manufacturing, handling and shipping of the materials.

Our technological advantage is supported by our intellectual property portfolio of trade secrets, patents and protected innovations, covering process technologies, product formulations and various end-use applications. We maintain a world-renowned trademark portfolio, including the widely recognized brands Ti-Pure ® and Vantage ® for titanium dioxide products, Suva ®, ISCEON ®, Freon ®, Opteon ®, Teflon ®, Tefzel ®, Viton ®, Krytox ®, Formacel ®, Dymel ®, FM 200 ®, Nafion ®, Capstone ® for fluoroproducts, and Virkon ® and Oxone ® for Chemical Solutions.

### *Positioned to Capitalize on Economic Growth*

Demand for $TiO_2$ comes from the coatings, paper and plastics industries and is highly correlated to growth in the global residential housing, commercial construction and packaging markets. Over the long-term, global $TiO_2$ demand has grown in line with GDP. Growth in emerging markets, including China, however, may be greater than GDP-level growth due in part to the rising middle class in such markets, which has become a key driver of demand for end products that use our $TiO_2$.

73

**Table of Contents**

Our Fluoroproducts segment, particularly through its low GWP and non-ozone depleting products, is expected to benefit from regulatory changes requiring phase-out and phase-downs of less sustainable incumbent products. In addition, our customers continually require innovative next generation advanced materials, particularly industrial fluoropolymer resins, driving new product development and growth. We believe the fluoroproducts demand growth in developed markets is in line with global GDP, whereas demand growth in emerging markets is higher than GDP. Growth is also expected to be driven by country-specific legislation phasing-down the current HFC refrigerants for which our new HFO-based products and blends are functional substitutes with a low environmental footprint.

Our Chemical Solutions segment serves customers in a diverse range of end markets that we believe generally grow in line with global GDP.

### *Long Standing Customer Relationships*

We serve more than 5,000 customers across a wide range of end markets in more than 130 countries. Many of our commercial and industrial relationships have been in place for decades and are based on our proven value proposition of safely and reliably supplying our customers with the materials needed for their operations. Our customers are comprised of a diverse group of companies, including many industry leaders. Knowledge of our customers' business needs is at the core of our innovative processes and forms the basis of our product development initiatives. We work closely with our customers to optimize their formulations and products. We also provide ongoing technical support services to these customers, which helps them to maximize the effectiveness of our advanced performance products.

### *Strong Management Team with Deep Industry Experience*

Chemours has a strong executive management team that combines in-depth industry experience and demonstrated leadership. Mark Vergnano, our Chief Executive Officer, previously served as Executive Vice President of DuPont since 2009. His prior experience includes 35 years in a variety of general management, manufacturing and technical leadership positions, including vice president and general manager for DuPont Nonwovens, DuPont Building Innovations and group vice president of DuPont Safety & Protection. Mark Newman, our Senior Vice President and Chief Financial Officer, previously served as senior vice president and chief financial officer of SunCoke Energy Inc. Prior to his time at SunCoke, Mr. Newman served in a number of senior operating and finance leadership roles in the U.S. and China, primarily with the General Motors Corporation where he began his career in 1986. Chemours' segment presidents are BC Chong, Thierry Vanlancker and Chris Siemer, each of whom has been in chemical industry leadership positions for more than twenty years. Mr. Chong has served as president of DuPont's Titanium Technologies business since 2011. Previously, he held leadership positions in manufacturing operations, new business development, strategic planning and sales and marketing. Mr. Vanlancker was named president of DuPont's Fluoroproducts and Chemical Solutions business in 2012. He brings over a decade of experience in managing fluoro-based businesses and has held leadership positions in general management and sales and marketing. Mr. Siemer joined DuPont in 2010 and has managed global industrial and specialty chemical business portfolios for more than twenty years.

In addition to our strong executive management team, we have an experienced group of employees who work to maintain our leading market positions with their commitment to safe and efficient production, technology leadership, expansion of product offerings and customer relationships.

### *Strong Cash Flow Generation*

Chemours has generated strong operating cash flow through various industry and economic cycles evidencing the operating strength of our businesses. For each of the past five fiscal years, we have generated cash flows from operating activities in excess of $[ • ] million, with such cash flows averaging $[ • ] billion per year.

**Table of Contents**

Our cash flow has been more than sufficient to satisfy our capital expenditure requirements, which on average equaled $[ • ] million per year during the past five years, including a significant increase in each of the past three fiscal years due to expenditures relating to the expansion of our TiO$_2$ production facility at Altamira, Mexico. Consequently, for each of the past five fiscal years, we have generated free cash flow (defined as cash flows from operating activities less capital expenditures) of at least $[ • ] million, which averaged $[ • ] billion per year. We expect our capital expenditures to be reduced in 2016 and in the near term thereafter due to the completion of the Altamira expansion, which should further bolster our free cash flow as the new capacity is expected to be accessible in mid-2016.

**Business Strategies**

*Enhance Operational Excellence and Asset Efficiency*

Operational excellence, which includes a commitment to safety, environmental stewardship and improved reliability, is key to our future success. We continually evaluate our business to identify opportunities to increase operational efficiency throughout our production facilities with a focus on maintaining operational excellence and maximizing asset efficiency. We continue to set new, stricter operational excellence targets for each of our facilities based on industry-leading benchmarks. We intend to continue focusing on increasing manufacturing efficiencies through selected capital projects, process improvements and best practices in order to lower unit costs. We will also carefully manage our portfolio, especially in our Chemical Solutions segment, and take appropriate actions to address product lines that face challenging market conditions and do not generate returns on invested capital that we believe are sufficient to create long-term shareholder value.

*Focus on Cash Flow Generation*

Our goal is to focus on cash flow generation and return on invested capital through the continuing optimization of our cost structure, improvement in working capital and supply chain efficiencies, and a disciplined approach to capital expenditures.

We have a proven track record of mitigating fixed cost inflation with cost saving actions and productivity improvements. We intend to continue to identify incremental cost saving opportunities based in large part on benchmarks of industry-leading performance and productivity improvements by utilizing our engineering and manufacturing technology expertise and partnerships with low cost producers. Our goal is to have a cost structure that positions us favorably to compete and grow. Our goal is to continue upgrading our customer and product mix to increase our sales of value-added, differentiated products to achieve premium pricing to improve margins and enhance cash flow.

We intend to actively manage our working capital by increasing inventory turnover and reducing finished goods and raw materials inventory without affecting our ability to deliver products to our customers. We strive to improve our supply chain efficiency by focusing on reducing both operating costs and working capital needs. Our supply chain efforts to lower operating costs have consisted of reducing procurement spending, lowering transportation and warehouse costs and optimizing production scheduling.

We remain focused on disciplined capital allocation among our segments. We plan to allocate our capital expenditures to projects required to enhance the reliability of our manufacturing operations and maintain the overall asset portfolio. This includes key maintenance and repair activities in each segment, and necessary regulatory and maintenance spending to ensure safe operations. We intend to optimize capital spending on growth projects across our various businesses based on a thorough comparison of risk-adjusted returns for each project.

*Maintain Strong Customer Focus*

A key component of our strategy is to produce innovative, high-performance products that offer enhanced value propositions to our customers at competitive prices. Our goal is to continually work closely with our customers to

75

**Table of Contents**

provide solutions and products that optimize their formulations and products. This market-driven product development enables us to offer a high-quality product portfolio to our customers and provides our businesses with the ability to respond quickly and efficiently to changes in market demands.

### Leverage our Leadership to Drive Organic Growth

We plan to continue to capitalize on our global operations network, distribution infrastructure and technology to pursue global growth. We will focus our efforts on those geographic areas and end products that we believe offer the most attractive growth and long-term profitability prospects.

Our strategy in our Titanium Technologies segment is to continue to strengthen our leading position from both product offering and cost perspective in order to increase the segment's sales and profitability. We intend to continue to position Chemours as the preferred supplier of $TiO_2$ worldwide by delivering the highest quality product offering to our customers coupled with superior technical expertise. We are currently expanding capacity at our Altamira, Mexico production facility, which will increase our global capacity by approximately 17 percent and will be one of the lowest cost $TiO_2$ production lines in the world. Production at the expansion is scheduled to start up in 2016.

Our Fluoroproducts segment plans to make ongoing, selective investments to capitalize on market opportunities based on our innovation capabilities and industry dynamics. We intend to continue to leverage our fluoroproducts and process expertise to develop new high-performance, differentiated offerings and to promote industry transition towards more sustainable technologies. Specifically, our strategy is to focus on development of proprietary, high-value, sustainable specialties (for example, Opteon ® YF and HFO-1336, which are designed to meet tighter regulatory standards and replace commodity HFC refrigerants or foaming agents).

Our Chemical Solutions segment intends to capitalize on potential growth opportunities in businesses in which we have strong regional positions, e.g. sulfuric acid and sodium cyanide. We plan to make selective capital investments to grow our sulfur products and sodium cyanide businesses, in which we have leading market positions in the Americas, and to take initiatives to improve profitability in the remainder of the businesses in our Chemical Solutions segment.

### Deepen Our Presence in Emerging Markets

Emerging markets are a strategic priority for a number of our businesses. We are well positioned not only to leverage our strong market positions in mature but highly sophisticated markets in North America and Europe, but also to participate in the expected growth of emerging markets in Asia, Eastern Europe and Latin America. We believe that improving living standards and growth in GDP across emerging markets are combining to create increased demand for our products. We expect to capitalize on this growth opportunity by expanding our customer base and local capabilities in order to increase our market share across emerging markets, especially China. To accelerate our penetration of these markets and maintain our competitive cost position, we may develop relationships with leading local partners, especially in businesses where participation in the fast-growing Chinese market is particularly important for long-term sustainable growth. For example, we are well positioned to leverage our strong production technology in our industrial fluoropolymers resins business, where the Chinese market is expected to continue to evolve from low-end fluoropolymer applications to higher value PTFE, copolymer and fluoroelastomer products, as a result of an increasing percentage of aerospace, automotive, semiconductor, electronics and telecommunications manufacturing transitions to China.

### Drive Organizational Alignment

We believe that maintaining alignment of the efforts of our employees with our overall business strategy and operational excellence goals is critical to our success. We have outstanding people and assets and, with the

76

Table of Contents

commitment to values of safety, customer appreciation, simplicity, collective entrepreneurship and integrity, we believe that we can maintain our competitiveness and help achieve our operational excellence and asset efficiency strategic objectives.

**Titanium Technologies Segment**

Our Titanium Technologies segment is the leading global manufacturer of $TiO_2$. $TiO_2$ is a pigment used to deliver whiteness, opacity, brightness and protection from sunlight in applications such as architectural and industrial coatings, flexible and rigid plastic packaging, PVC window profiles, laminate papers, coated paper and coated paperboard used for packaging. We sell our $TiO_2$ products under the Ti-Pure ® brand name to approximately 850 customers globally. We believe our leading competitive position is the result of our industry-leading manufacturing cost position as well as our ability to offer superior product quality, delivery reliability and high quality technical services. We produce $TiO_2$ at six production facilities: four in the United States, including a mineral sands mining operation, one in Mexico and another in Taiwan. In addition we have a large-scale repackaging and distribution facility in Belgium. In total, we have a $TiO_2$ production capacity of 1.2 million metric tons per year. We are currently expanding our $TiO_2$ production facility in Altamira, Mexico which will increase our total $TiO_2$ production capacity to 1.4 million metric tons per year.

Highly efficient large scale assets based on our proprietary chloride technology and superior feedstock flexibility have historically provided us with a cost advantage in producing $TiO_2$. All of our production facilities use our proprietary chloride process technology, providing us with the industry's lowest manufacturing cost position. We have the ability to deliver superior product quality and consistency to our customers.

A breakdown of our $TiO_2$ sales by region and by category is shown in the charts below:



Industry demand for $TiO_2$ is generally expected to be in line with global GDP, but can be cyclical due to economic and industry specific demand and inventory fluctuations. In developing economies, industry demand is projected to be approximately twice that of developed economies.

*History of TiO $_2$ Production*

Titanium dioxide was first commercially introduced in the 1930s and was produced by mixing sulfuric acid with titanium-bearing ores in order to dissolve and separate titanium from the underlying ore, which is known as the sulfate process.

DuPont entered the $TiO_2$ market in 1931 with the acquisition of Krebs Pigment, based in Wilmington, Delaware. The site is known today as the Edge Moor plant. In the 1940s, DuPont began developing a new $TiO_2$ manufacturing process, which is known as the chloride process that delivers a higher quality product with superior opacity and fewer impurities than the sulfate process. Moreover, the waste and by-products generated by

77

**Table of Contents**

the chloride process were only 20-30 percent of the waste and by-products generated from the sulfate process at that time. DuPont began commercializing $TiO_2$ product using the chloride process at the Edge Moor plant in 1953. Today, the chloride process is the only $TiO_2$ production technology used by Chemours. The chloride process currently accounts for substantially all of North American $TiO_2$ production and approximately 45 percent of global capacity.

We operate two other production facilities in the United States, located in New Johnsonville, TN and DeLisle, MS. These production facilities began operations in 1959 and 1979, respectively, and are the two largest $TiO_2$ production facilities in the world. In 1994, we began operating our Taiwan production facility, which primarily serves the Asia Pacific region. In addition, in 1976 we began chloride production at our Altamira, Mexico production facility, which is currently being expanded to include a new production line for $TiO_2$. Customers in Europe are supplied through a large-scale repackaging and distribution facility in Kallo-Antwerpen, Belgium, that receives bulk $TiO_2$ shipments from our U.S. production lines.

### *$TiO_2$ Chloride Manufacturing Process*

The chloride process uses high temperature chlorination of titanium-bearing ores to separate titanium from iron and other metals. The resulting titanium tetrachloride is then oxidized to produce $TiO_2$ particles in a high temperature reactor. This method of manufacture produces the rutile crystal of $TiO_2$ while the early sulfate process produced the anatase crystal form of $TiO_2$. The rutile form delivers better opacity than the anatase form and was a step-change in product quality at the time of introduction. Rutile $TiO_2$ is preferred over anatase $TiO_2$ for many of the largest end-use applications, such as coatings and plastics, because its superior opacity imparts better hiding power at lower quantities than the anatase form and it is more suitable for outdoor use because it is more durable. As process technologies evolved over time, sulfate technology has improved and today is also able to produce the rutile crystal form of $TiO_2$ and products which perform comparably to chloride products in several applications. However, the $TiO_2$ produced by chloride process remains the preferred pigment for many higher end applications of $TiO_2$.

78

Table of Contents

All of our TiO$_2$ is produced using the chloride process. Our chloride process technology is the industry leader on the basis of cost efficiency of our manufacturing operations, feedstock ore flexibility and product quality and consistency. Moreover, our process is unique in its ability to chlorinate ilmenite ore, which has significantly less titanium content than rutile ore and is a cheaper feedstock source as a result. The creation of TiO$_2$ is the result of numerous complex and hazardous chemical processes. We emphasize employee and process safety, which is evidenced by our strong safety track record.



*Business*

We are the world's largest producer of TiO$_2$. We market our products under the Ti-Pure ® brand for a diverse range of industrial applications primarily in coatings, plastics, laminates and paper products end markets. Our leading competitive position is the result of our low manufacturing cost and ability to offer superior quality, delivery reliability and technical services for our customers. Our ability to deliver high quality on a consistent basis leads to greater customer satisfaction and consequently increased customer loyalty.

Our proprietary chloride process is unique in the industry as it reflects the long-standing technology advantage that we have relative to our competitors. Our process technology delivers best-in-class productivity, operating rates, manufacturing scale, product consistency and feedstock flexibility and allows us to achieve an advantaged cost position that we believe is sustainable, relative to our major competitors that produce similar quality product offerings. Additionally, our ability to use lower grade ilmenite ore feedstock to produce high quality product is an advantage that we believe is currently unmatched by any of our major competitors.

We are constructing a new 200,000 metric ton line at our Altamira facility in Mexico. Production at the expansion is scheduled to start up in 2016 and is expected to either increase our worldwide TiO$_2$ production capacity to approximately 1.4 million metric tons per year or improve the profitability of our existing capacity. This new line incorporates our latest TiO$_2$ production technology with the ability to use various grades of ore to produce high quality TiO$_2$ products. This line is expected to be one of the lowest cost TiO$_2$ production lines in the world and will benefit from Altamira's existing integration into our global supply chain.

Table of Contents

We have operated a titanium mine in Starke, Florida since 1952. The mine provides us with access to a low cost source of domestic, high quality ilmenite feedstock. Co-products of our mining operations are zircon (zirconium silicate) and staurolite minerals. We are a major supplier of high quality zircon in North America, primarily focused on the precision investment casting (PIC) industry, foundry and specialty applications, and ceramics. Our staurolite blasting abrasives, sold as Starblast™, are widely used in steel preparation and maintenance, and paint removal.

Our plants and equipment are maintained and in good operating condition. We believe we have sufficient production capacity to meet demand in 2015. Properties are primarily owned by the company; however, certain properties are leased. No title examination of the properties has been made for the purpose of this report and certain properties are shared with other tenants under long-term leases.

We recognize that the security and safety of our operations are critical to our employees, community and to the future of Chemours. Physical security measures will be combined with process safety measures (including the use of inherently safer technology), administrative procedures and emergency response preparedness into an integrated security plan. Prior to the separation, DuPont conducted vulnerability assessments at our operating facilities in the U.S. and high priority sites worldwide and identified and implemented appropriate measures to protect these facilities from physical and cyber-attacks. We intend to conduct similar vulnerability assessments periodically post-separation. We are partnering with carriers, including railroad, shipping and trucking companies, to secure chemicals in transit.

We sell approximately 25 different grades or forms of $TiO_2$, each tailored for different applications. Key Ti-Pure ® titanium dioxide products are shown in the table below along with their respective key applications:

| | Titanium Technologies | |
| --- | --- | --- |
| **Product Group** | **Key Products** | **Key Applications** |
| Coating Applications | • Ti-Pure ® R902+ | • Easily dispersed universal grade |
| | • Ti-Pure ® R706 | • Blue undertone universal grade |
| | • Ti-Pure ® R931 | • Flat/matte finish coatings |
| | • Ti-Pure ® R960 | • High durability coatings |
| | • Ti-Pure ® Select 6200 | • High dispersion, high durability |
| | • Ti-Pure ® R746 | • Slurry form universal grade |
| | • Ti-Pure ® R741 | • Slurry form of flat/matte finish grade |
| | • Ti-Pure ® Select 6300 | • New, high efficiency flat/matte grade |
| Plastics Applications | • Ti-Pure ® R101 | • Polyolefin and chalking PVC |
| | • Ti-Pure ® R103 | • Urethane, rubber, ABS applications |
| | • Ti-Pure ® R104 | • High dispersion for polyolefin masterbatches |
| | • Ti-Pure ® R105 | • PVC and highly durable polyolefin |
| | • Ti-Pure ® R350 | • Semi-durable polyolefin and ABS |
| Paper and Laminates Applications | • Ti-Pure ® T796+ | • Coated paperboard, coated paper, filled sheet |
| | | • Light stable laminate papers |

As shown above, the product groups for which $TiO_2$ is a critical input are coatings, plastics, and paper and laminates. In coatings, $TiO_2$ is used to provide opacity, brightness and durability in industrial coatings. $TiO_2$ is also used in coatings for home interiors and exteriors, automobiles, aircraft, machines, appliances, traffic paint

80

Table of Contents

and other special purpose coatings. In plastics, $TiO_2$ is used to improve the optical and physical properties, including whiteness and opacity, in plastic items such as containers and packaging materials, and in vinyl products such as windows, doors and siding. $TiO_2$ is also used to provide hiding power, neutral undertone, brightness and surface durability for plastic housewares, appliances, toys, computer cases and food packages. In paper, $TiO_2$ is used to provide whiteness, brightness, opacity and color stability. $TiO_2$ is also used in paper laminates, to help to prevent the material from fading or changing color, *including* after prolonged exposure to sunlight.

### $TiO_2$ Industry Overview and Competitors

Worldwide capacity in January 2012 was estimated to be approximately 7.0 million metric tons. This capacity base was sufficient to serve worldwide demand for $TiO_2$ in 2011 of approximately 5.4 million metric tons.

The global $TiO_2$ market in which we operate is highly competitive. Competition is based primarily on product price, quality and technical service. We face competition from producers using the chloride process as well as those using the sulfate process. Furthermore, due to the low cost of transporting $TiO_2$, there is also competition between producers with production facilities located in different geographies, with the cost advantage belonging to the production facility that is closest to the customer.

In most regions of the world, we compete primarily against large multinational producers such as The National Titanium Dioxide Company, Ltd. (Cristal), Huntsman International LLC, Kronos Worldwide, Inc. and Tronox Limited. In recent years, manufacturing capacity of those multinational producers has only modestly increased, primarily due to de-bottlenecking of the industry's existing production facilities.

In addition to these multinational producers, we also compete against numerous smaller producers, including Chinese producers, who have significantly expanded their $TiO_2$ production capacity over the last decade. However, most Chinese producers primarily utilize the sulfate process to produce a product line that, while cost competitive in China, is suitable principally for lower-end applications. We believe that some local producers in China may be required over time to incur additional capital expenditures to meet increasing environmental standards. In fact, due to increasing concerns about pollution in China, the government has enacted the $TiO_2$ Industry Access Conditions and the Environmental Protection Law which is scheduled to go into effect in 2015. These laws are expected to exert pressure on the heavily polluting small and medium-sized enterprises.

$TiO_2$ is an approximately \$15 billion annual market globally, as of 2011. Global growth in $TiO_2$ demand tracks GDP growth in developed markets, but regional and application specific growth rates may vary depending on application technology, and the relative rate of growth in the housing, construction, automobile manufacturing, white goods and packaging industries.

### Research and Development

Our research and development team has responsibility for improving chloride production processes, improving product quality and strengthening our competitive position by developing new applications. Our research and development efforts in titanium technologies are focused on the following areas:

- Process technology innovations, which deliver cost efficiencies by lowering raw material and energy consumption and enhancing ore source flexibility, while effectively managing the impurities contained in those ores;

- Process technology innovations that enable us to significantly increase the throughput capacity of current production lines at investment levels far below those of brownfield or greenfield lines;

- Innovations based on the unique $TiO_2$ particle formation capability of our chloride process which enable greater product differentiation relative to competitors; and

- Improved product offerings to enable more efficient usage of $TiO_2$ in our customers' products, thereby resulting in lower cost or better product performance for our customers.

81

Table of Contents

*Raw Materials*

The primary raw materials used in the manufacture of $TiO_2$ are titanium-bearing ores, chlorine, calcined petroleum coke and energy. We source titanium-bearing ores from a number of suppliers around the globe, who are primarily located in Australia, South Africa, Canada and Madagascar. To ensure proper supply volume and to minimize pricing volatility, we generally enter into contracts in which volume is requirement-based and pricing is determined by a range of mechanisms structured to help us achieve competitive pricing relative to the market. To ensure availability of supply, we typically enter into long-term supply contracts and source our raw material from multiple suppliers across different regions and from multiple sites per supplier. Furthermore, we typically purchase multiple grades of ore from each supplier to limit our exposure to any single supplier for any single grade of ore. Historically, we have not experienced any problems renewing such contracts for raw materials or securing our supply of titanium-bearing ores. Nevertheless, when such contracts expire we may be subject to current market pricing for the underlying raw materials.

We encourage the development of ore sources by offering off-take agreements to suppliers. We also play an active role in ore source development around the globe, especially for those ores which can only be used by us, given the capability of our unique process technology. Supply chain flexibility allows for ore purchase and use optimization to manage short-term demand fluctuations and for long-term competitive advantage. Our process technology and ability to use lower grade ilmenite ore gives us the flexibility to alter our ore mix to the lowest cost configuration based on sales, demand and projected ore pricing. Lastly, we have taken steps to optimize routes for distribution and increase storage capacity at our production facilities.

We are the largest buyer of chlorine in the United States. Transporting chlorine is becoming increasingly costly due to its hazardous nature and we have taken steps to reduce our exposure to this expense. In 2011, we entered into an agreement with Occidental Chemical Corporation, a subsidiary of Occidental Petroleum Corporation , to construct an onsite chlor-alkali production facility at our Johnsonville location. The chlor-alkali production facility began operation in May 2014. Calcined petroleum coke is an important raw material input to our process. We source calcined petroleum coke from well-established suppliers in North America and China, typically under contracts that run multiple years to facilitate material and logistics planning through the supply chain. Pricing depends on various market factors including refinery crude quality trends and coal price. Distribution efficiency is enhanced through use of bulk ocean, barge and rail transportation modes.

Lastly, energy is another key input cost into $TiO_2$ manufacturing process, representing approximately 15 percent of the production cost. Chemours has access to natural gas based energy at our four U.S. and Mexico $TiO_2$ production facilities and Florida minerals plant, supporting advantaged energy costs given the low cost shale gas in the United States. We continually evaluate investments to replace aging coal- and oil-based steam supply assets with natural gas at our sites. Natural gas-based cogeneration of steam and electricity is being extended as part of the major expansion at one of our $TiO_2$ production facilities.

*Sales, Marketing and Distribution*

We sell the majority of our products through our direct sales force across 32 countries. We also utilize third-party sales agents and distributors who are authorized to sell our products in specific areas.

$TiO_2$ represents a significant raw material cost for our customers and as a result, purchasing decisions are often made by our customers' senior management team. Our sales organization works to develop and maintain close relationships with key decision makers.

In addition, our sales team and technical service team work together to develop relationships with all layers of our customers' organizations to ensure that we meet our customers' commercial and technical requirements. When appropriate, we collaborate closely with customers to solve formulation or application problems by modifying product characteristics or developing new product grades.

82

Table of Contents

To ensure an efficient distribution, we own or lease approximately 650 railcars, which are predominantly used for outbound distribution of products in the United States and Canada. Lease terms are typically staggered, which provides us with a competitive cost position as well as flexibility to on-hire and off-hire containers in response to changes in market conditions. A dedicated logistics team, along with external partners, continually optimizes the assignment of our transportation equipment to product lines and geographic regions in order to maximize utilization and maintain an efficient supply chain.

### *Customers*

Globally, we serve approximately 850 customers through our Titanium Technologies segment. In 2013, our ten largest Titanium Technologies customers accounted for approximately 30 percent of the segment's sales. No single Titanium Technologies customer represented more than 10 percent of our sales in 2013. Our larger customers in the United States and Europe are typically served through direct sales and tend to have medium to long-term contracts. We serve our small- and mid-size customers through a combination of our direct sales and distribution network.

Our direct customers in Titanium Technologies are producers of decorative coatings, automotive and industrial coatings, polyolefin masterbatches, polyvinylchloride window profiles, engineering polymers, laminate paper, coatings paper and coated paperboard. We focus on developing long-term partnerships with key market participants in each of these sectors. We also deliver a high level of technical service to satisfy our customers' specific needs, which helps us maintain strong customer relationships.

### *Seasonality*

The demand for $TiO_2$ is subject to moderate seasonality because certain applications, such as decorative coatings, are influenced by weather conditions or holiday seasons. As a result, our $TiO_2$ sales volume is typically lowest in the first quarter, highest in the second and third quarters and moderate in the fourth quarter. This pattern applies to the entire $TiO_2$ market, but may vary by region, country or application. It can also be altered by economic or other demand cycles.

### Fluoroproducts Segment

Our Fluoroproducts segment creates products for high-performance applications across a broad array of industries and is the global leader in providing sustainable fluoroproducts, such as refrigerants and industrial fluoropolymer resins and derivatives. We own the well-known brands Freon ® and Teflon ® , which are used across multiple products and end markets, including consumer cookware, chemical processing industry and electronics/semiconductors.

Our Fluoroproducts segment is a global leader in providing most sustainable fluorine-based advanced materials solutions. Our Fluoroproducts segment was the pioneer of fluorine chemistry in the first half of the 20 th century and has continued to develop leading and innovative fluoroproduct technologies. Consequently, we have strong market positions in fluorochemical gases, fluoropolymer resins, fluoromonomers, fluorotelomers, fluoroelastomers, coatings, films and membranes. The unique chemical properties of fluorine, including chemical and electrical resistance, thermal stability and low surface energy, make fluoroproducts suitable as critical inputs in many applications across a broad variety of industries, including refrigeration, automotive, aerospace, personal care, wire & cable and electronics. Our Teflon ® brand is globally well recognized and used in a diverse array of product applications and licensing agreements with partners. The success of the Fluoroproducts segment is based on our core competencies of leadership in fluorine chemistry and materials science, market-driven application development and commercialization, customer and channel knowledge, proactive development of sustainable solutions, strong intellectual property rights, process development and process safety management. Our Fluoroproducts segment supplies customers from 19 production facilities around the world with approximately half of our sales in North America.

83

Table of Contents

A breakdown of Fluoroproducts' 2013 sales by region and product group is shown in the charts below:





### History

Our Fluoroproducts segment was established in the first half of the 20th century, when DuPont pioneered the development of fluorine chemistry. Since then, DuPont has remained a leader in fluoroproduct innovation and continues to re-invent the category. We developed much of the science that makes air conditioning and refrigeration possible. Key milestones in the history of the Fluoroproducts segment are listed below:

1930: Freon ® CFCs are first manufactured by DuPont in a JV with General Motors

1930s: DuPont commercializes Freon ® CFCs and HCFCs

1938: DuPont scientists invent PTFE, the first fluoropolymer

1945: DuPont trademarks the fluoropolymer as Teflon ®

1960s: Development of new technologies for fluoroplastics ion exchange membranes and fluorolubricants

1961: Cookware with DuPont Teflon ® Nonstick Coatings was first introduced to retailers in the U.S.

1970s: DuPont identifies HFCs as a potential lower ozone depletion replacement for CFCs

1987: The Montreal Protocol details the phase out of CFCs/HCFCs over a 35-year period

1990s: DuPont commercializes HFCs to replace CFCs and HCFCs

2000s: DuPont introduces ISCEON ® HFC blends as a drop-in replacement for HCFC

2006: The EU bans HFC-134a in car air conditioning starting 2012 and fully phased out in new cars by 2017

2007: DuPont and Honeywell jointly develop HFO-1234yf (Chemours brand Opteon ® YF), as a low GWP HFC-134a replacement for car air conditioning

2011: First commercial shipment of Opteon ® YF

2011: HFO-1336 foaming agent and liquid refrigerant development

- 2013: Low global warming HFO refrigerants are commercialized

### Business

The Fluoroproducts segment's specialty chemicals are critical for numerous industrial applications. We have established a global leadership position in fluoroproducts because of our leadership in fluorine chemistry and materials science, continuous innovation and market driven application development based on deep knowledge of our customers' product needs.

84

**Table of Contents**

We are cost competitive in our key markets due to our manufacturing expertise, scale and integrated global supply chain. We also benefit from the geographic proximity of our technical resources to key customers and our high quality product offering. Our strategy is to maximize productivity for our most mature product lines while investing differentially in higher growth, higher performance and more sustainable new fluoroproduct offerings.

Our integrated manufacturing process is shown in the chart below:



Fluorine chemistry is highly complex; however, as one of the pioneers of fluorine chemistry, we have decades of experience. To liberate elemental fluorine, we transform calcium fluorite (fluorspar ore) into hydrofluoric acid. Multiple chemical processes are then utilized to transform hydrofluoric acid into fluorochemicals, fluoroplastics, fluoropolymers, fluoromonomers, fluorotelomers, fluoroelastomers, films, membranes and coatings.

The manufacturing of fluoroproducts involves intermediates that are highly corrosive and hazardous in complex processes. We have an industry-leading safety culture and apply world-class technical expertise to ensure that our operations are run safely and reliably. These capabilities also enable us to continuously improve production yields, reduce unplanned downtime and increase our throughput, which in turn improves our overall manufacturing efficiency.

The high value, advanced materials created by Chemours enable global markets and industries to address challenging science and technology requirements where traditional chemicals and engineered materials break down or do not perform as effectively. Fluorine-based advanced materials have numerous beneficial properties including high chemical inertness, high temperature resistance, UV resistance, low friction properties, dielectric strength and non-flammability. Consequently, they are uniquely suited for markets such as cooling, refrigeration, lubrication, electrical insulation, non-stick coatings and fire suppression. For many applications, fluoroproducts provide significant performance and cost advantages over potential substitute products.

85

Table of Contents

Our Fluoroproducts segment sells products through two principal groups: fluorochemicals and fluoropolymers, the key products and key applications for which are shown in the table below:

| | **Fluoroproducts** | |
|---|---|---|
| **Product Group** | **Key Products** | **Key Applications** |
| Fluorochemicals | • ISCEON ® , Freon ® , Opteon ® Refrigerants | • Commercial Refrigeration |
| | • Formacel ® Foam Expansion Agents | • Refrigerated Transport |
| | • Dymel ® Aerosol Propellants | • Residential, Commercial and Automotive Air Conditioning |
| | • FM 200 ® Clean Agent Fire Extinguishants | • Foam Expansion Agent for Construction |
| | | • Propellants for Personal Care |
| | | • Clean Agent Fire Suppression Systems for data rooms |
| Fluoropolymers | • Teflon ® PTFE Resins | • Aerospace Materials |
| | • Teflon ® and Tefzel ® Melt Processable Fluoropolymer Resins | • Chemical Processing |
| | • Viton ® Fluoroelastomers | • Semiconductor Manufacturing |
| | • Krytox ® Performance Lubricants | • Telecom Wire and Cabling |
| | • Nafion ® Ion Exchange Membranes | • Automotive Hoses, Gaskets |
| | • Teflon ® Consumer and Industrial finishes | • Sintered bearings lubrication |
| | • Capstone ® and Teflon ® Surface Active Agents | • Chloralkali production |
| | | • Non-stick Cookware |
| | | • Upholstery |
| | | • Industrial Bakeware |
| | | • Surfactants in Paint |
| | | • Fire Fighting Foams in Oil & Gas |

*Fluorochemicals*

Our fluorochemicals products include refrigerants, foam expansion agents, propellants and fire extinguishants.

Refrigerants include more than twenty fluorinated gases and liquids and blends; applications include automotive air conditioning, commercial refrigeration and refrigerated transport. We are the leading global refrigerants producer due to our ability to produce innovative products and we have been able to effectively transition from one product generation to the next over three significant waves in refrigerant technology.

Change in the refrigerants industry is primarily driven by environmental regulatory change. As new regulations are implemented, customers are required to transition to new products and technologies to meet tighter regulatory standards. Chemours was the first manufacturer of CFCs based refrigerants and has continued up until today to stay at the forefront of industry and regulatory changes, proactively driving development and leading industry transitions to more sustainable technologies over time. We took a leadership role in the transition from ozone-depleting CFCs to less ozone-depleting HCFCs and were once again at the forefront in leading the industry transition from HCFCs to non-ozone depleting HFCs as stipulated by the Montreal Protocol. Chemours currently produces both second generation HCFC products (such as HCFC-22) and third generation HFC products (such as ISCEON ® ). As a result of additional regulatory changes, the typically higher GWP HFCs are also gradually being phased down over time. In response, we are currently developing a fourth generation HFO platform, including HFO-1234yf (which

86

**Table of Contents**

Chemours markets and sells under the brand name Opteon ® YF), an innovative, low-GWP refrigerant jointly developed by Chemours, through DuPont, and Honeywell International, Inc. in response to the European Union's (EU) Mobile Air Conditioning (MAC) Directive. This patented technology is both zero ozone depleting and has very low GWP while keeping the functionality of HFCs. Even though the joint development activities resulted in a commercially available refrigerant satisfying the MAC Directive, the European Commission launched an investigation in 2011 and in October 2014, announced its preliminary view that the agreements between the companies regarding production may have hindered competition in violation of the EU's antitrust laws. The Commission seeks fines and equitable relief to increase competition, including cessation of cooperation between the companies. Chemours and Honeywell have always marketed and sold the refrigerant separately and independently. Chemours, through DuPont, has complied at all times with applicable laws in the development and production of HFO-1234yf and plans to vigorously defend against the Commission's allegations and preliminary conclusions. Chemours does not expect this matter to have a material impact on its results of operations.

Chemours' proprietary Opteon ® YF is a next generation of car refrigerants and has a lower cost per vehicle versus alternative products, as it is designed as a substitute for refrigerants in the current car air conditioning systems. As a result of regulatory trends in the European Union, the United States and Japan, and its combination of safety, performance, sustainability and cost benefits, Opteon ® YF is a strong candidate to replace HFC-134a, the HFC car refrigerant currently used in car air conditioning applications in those regions. Opteon ® YF represents a significant scientific breakthrough as it has 99.9 perecnt lower GWP than HFC-134a- and well below the 150 GWP threshold required by the MAC Directive. It offers car manufacturers an optimal balance of performance, cost, energy efficiency and improved sustainability. ISCEON ® is part of our third-generation HFC product family and serves as a drop-in replacement for HCFCs which are being phased out under the Montreal Protocol. ISCEON ® enables the continued use of existing equipment with minimal downtime for retrofitting and the avoidance of costly equipment replacement. ISCEON ® is patent protected and continues to be an important product for the Fluoroproducts segment.

Our future performance in refrigerants will be driven in part by our ability to successfully manage product line transitions by continuing to meet demand for products that are being phased down, while remaining a leader in the introduction of new, more sustainable, cost-effective and easy to implement solutions that allow customers to adopt products to meet new regulatory requirements. We have consistently demonstrated expertise in these core capabilities by developing sustainable technology trade secrets and patents.

Our Formacel ® foam expansion agents (FEA) are used in a variety of construction, appliance, transportation, packaging and other applications in the thermoset and thermoplastic industries. We are developing a novel fourth generation foam expansion agent for polyurethane foams, HFO-1336mzz, which will be marketed as Formacel ® 1100 foam expansion agent. The product not only has zero ozone depletion potential (ODP) and less than one percent of the GWP of the HFCs currently used in rigid polyurethane insulating foam, but is non-flammable and offers superior insulation performance compared to alternative technologies.

Chemours' Dymel ® propellants are used in a broad variety of applications including household products, such as hair sprays and air fresheners and industrial products, such as adhesives, spray paints and insulating foams. Our Dymel ® propellants are used as safe alternatives to smog forming and volatile organic compounds (VOC) or flammable propellants. Due to their low VOC formulation potential, Dymel ® 152a propellants enable manufacturers to comply with local, state and federal air quality standards.

Our clean agent fire extinguishants offer increased safety, non-conductivity, non-corrosiveness and the absence of residue upon usage. Because of these properties, they are preferred solutions for applications such as computer rooms, museums, hospitals, laboratories and airplanes where suppressing fire quickly while protecting people and assets is paramount. Our clean agent product lines are branded and include the leading FM-200 ® and FE-25™ trademarks.

We maintain strong positions in the markets for clean agents fire extinguishants and propellants due to our competitive cost position and leading regulatory and product stewardship.

87

Table of Contents

*Fluoropolymers*

Our fluoropolymers products include a broad range of industrial fluoropolymer resins and diversified products such as Krytox ® performance lubricants, Nafion ® ion exchange membranes, Teflon ® consumer and industrial finishes and Capstone ® and Teflon ® surface active agents.

Industrial fluoropolymer resins products fall into three principal product lines: Teflon ® branded PTFE resins, melt processable fluoropolymers such as Teflon ® branded fluorinated ethylene propylene and perfluoroalkoxy and Tefzel ® branded ethylene-tetrafluoroethelyne fluoroplastics, and Viton ® branded fluoroelastomers. Industrial fluoropolymer resins are used across a broad range of applications in various industries such as automotive, wire and cable, aerospace, semiconductors and chemical processing.

Our industrial fluoroplastic resins business includes a broad range of PTFE applications and a portion of the branded Teflon ® franchise, principally Teflon ® films and numerous other industrial applications, such as automotive, cabling materials, aerospace and renewable energy. PTFE is a versatile industrial fluoropolymer resin and its various grades are used in both specialized and lower-end product applications. For lower-end applications such as stock shapes for chemical processing equipment, PTFE is commoditized and subject to potential pricing pressure. For higher-end applications such as in aerospace, PTFE is available as a differentiated product, including dispersions with distinct capabilities and therefore better shielded from being commoditized

In general, Chemours has strong leadership positions in high-end fluoroplastic product lines used in high-value applications, many of which require specification with industrial customers. We continue to introduce differentiated offerings to meet customers' critical needs. Our ECCtreme™ ECA 3000 fluoroplastic resin is an industry-changing class of high-temperature perfluoroplastic (HTP) that combines the beneficial properties of typical perfluoroplastics with the potential capability to maintain operational performance under extreme temperatures and extreme conditions. The first of its kind, ECCtreme™ ECA 3000 fluoroplastic resin, the first thermoplastic with a UL ® certification for continued use above 300°C addresses the demand for HTPs in sustainable energy production, particularly in wire and cable applications.

Industrial products developed with Teflon ® fluoroplastic resins have exceptional resistance to high temperatures, chemical reaction, corrosion and stress cracking. The properties of Teflon ® make it the preferred solution for many industrial applications and different processing techniques. Teflon ® continues to have strong brand recognition and customer preference due to its unique properties, which will drive growth in branded fluoropolymer offerings.

Viton ® , our leading fluoroelastomer, is used to improve systems durability, minimize systems downtime and repair seal failures because of its high chemical and temperature resistance. It is the most specified fluoroelastomer for fuel system seals and hoses, O-rings and gaskets in automotive applications.

In the industrial fluoropolymer resins market, product differentiation, productivity and cost management are becoming increasingly important to our success. Going forward, the industrial fluoropolymer resins business will continue to focus on commercializing higher-end products and branded offerings at a premium price while also prioritizing manufacturing cost reductions through process innovation as well as asset productivity and capacity release programs.

With Krytox ® Performance Lubricants, Chemours is one of the global leaders in the perfluoropolyether (PFPE) oils and greases markets. Krytox ® offers a combination of outstanding lubrication and highly desirable chemical properties that increase the service life and productivity of industrial machinery and components in the automotive and aerospace industries. Krytox ® oils and greases are nontoxic, can be regenerated and last longer than conventional lubricants. They are also non-flammable, chemically inert and maintain their lubricity and viscosity in extreme low or high temperatures, humidity and 100 percent liquid or gaseous oxygen service, and when combined with reactive chemicals.

Table of Contents

We are one of the global leaders in the ion exchange perfluorinated membranes market through our ion-exchange product, Nafion ® . Our membranes offer high conductivity to cations, chemical resistance and high operating temperature. The primary application for Nafion ® is production of chlorine and caustic soda by electrolysis. This technology is environmentally sound and has become the preferred method for chlorine and caustic soda production because of its significant operating cost advantages over the older mercury and diaphragm technologies. Other uses for Nafion ® membranes are fuel cell applications.

Fluoropolymers business also includes our globally recognized Teflon ® branded line of finishes, which are, for example, used as coatings in the manufacturing of easy-to-clean, non-stick cookware. The brand is also used in conjunction with our industrial finishes, as well as fluoroadditives, which are used in textiles to provide oil and water repellency and in paints to provide easy-to-clean functionality. Our broad family of surface active agents includes fluoroadditives, repellants and surfactants commercialized under the Capstone ® and Teflon ® trademarks. They are used in a wide variety of industries and applications around the world such as fluorosurfactants in architectural paint.

### *Industry Overview and Competitors*

Our Fluoroproducts segment is the global leader in providing sustainable, fluorine-based, advanced material solutions. Our Fluoroproducts segment competes against a broad variety of global manufacturers, including Honeywell, Arkema, Mexichem, Daikin, Solvay and Dyneon, as well as local Chinese and Indian manufacturers. We have a leadership position in fluorine chemistry and materials science, a broad scope and scale of operations, market driven application development and deep customer knowledge.

Chemours has global leadership positions in a number of fluoroproduct categories as set forth in the table below:

| Product Group | Fluoroproducts Leadership Positions | | |
| | Position | Key Applications | Key Competitors |
|---|---|---|---|
| **Fluorochemicals** | #1 Globally | Refrigeration and Air conditioning | Honeywell, Arkema, Mexichem, Solvay, Dongyue, Juhua |
| **Fluoropolymers** | #1 Globally | Diversified industrial applications | Daikin, 3M, Solvay, Asahi Glass Company, Dongyue, Chenguang, Whitford |

We believe the size of the global fluoroproducts end markets that we serve was approximately $10 to 12 billion in 2013. We believe the fluoroproducts demand growth in developed markets is in line with global GDP, whereas demand growth in emerging markets is higher than GDP. Developed markets represent the largest fluoroproducts markets today. Emerging markets and especially China present the largest potential growth markets driven primarily by the emergence of a very large middle class and the increasing demand for consumer electronics, telecommunications, automobiles, refrigerators, air conditioners and an expanding infrastructure, all of which require fluoroproducts to operate effectively.

### *Research and Development*

Our Fluoroproducts segment conducts R&D at dedicated research facilities, technical service labs and production facilities. We have 11 research and technical service locations in the U.S., Europe and Asia Pacific, with the highest concentration of researchers in Wilmington, Delaware.

Table of Contents

Our current R&D focus is on the implementation of asset productivity programs and the development of new products for sustainable growth such as new zero ODP and low GWP refrigerants and foam expansion agents and high value fluoropolymers with superior chemical, temperature resistance and strong electrical properties. A deep understanding of our customers is at the core of our innovation process.

### Raw Materials

The primary raw materials required to support the Fluoroproducts segment are fluorspar, chlorinated organics, hydrofluoric acid and vinylidene fluoride. Fluorspar is available in many countries and not concentrated in any particular region.

Our supply chains are designed for maximum competitiveness through advantaged sourcing of key raw materials. Starting with our sourcing agreements, we use a mixture of fixed and market-based pricing and we engage in long-term supply contracts to ensure a reliable supply of raw materials. Our global commodity sourcing teams work closely with supply chain and production leadership to develop strategies that assure adequate supplies of raw materials. Although the fluoroproduct industry has historically relied primarily on fluorspar exports from China, we have diversified our sourcing through multiple geographic regions and suppliers to ensure a stable and cost competitive supply.

### Sales, Marketing and Distribution

With more than 85 years of innovation and development in fluorine science, our technical, marketing and sales teams around the world have deep expertise in our products and their end-uses and work with customers to select the appropriate fluoroproducts to meet their performance needs. We sell our products through direct channels and through resellers. Selling agreements vary by product line and markets served and include both spot pricing arrangements and longer term contracts with a typical duration of one-year.

We maintain one of the largest fleets of rail cars, tank trucks and containers in the fluoroproducts industry. For the portion of the fleet that is leased, related lease terms are usually staggered, which provides us with a competitive cost position as well as the ability to adjust the size of our fleet in response to changes in market conditions. A dedicated logistics team, along with external partners, continually optimizes the assignment of our transportation equipment to product lines and geographic regions in order to maximize utilization and flexibility of the supply chain.

### Customers

We serve thousands of customers and distributors globally and in many instances these commercial relationships have been in place for decades. No single Fluoroproducts customer represented more than 10 percent of our sales in 2013.

### Seasonality

Fluoroproducts sales fluctuate by season; sales in the first half of the year are on average approximately 10 percent higher than sales in the second half of the year. This trend is primarily a result of inventory build in the first half of the year by refrigerant customers in the Northern hemisphere as they prepare for the summer season.

## Chemical Solutions Segment

Our Chemical Solutions segment comprises a diverse portfolio of industrial and specialty chemical businesses primarily operating in the Americas. Chemical Solutions' products are used by a diverse group of industries in which they serve as important raw materials and effect chemicals for industries including, among others, gold production, oil refining agriculture and industrial polymers. We are the leading provider of several Chemical

90

**Table of Contents**

Solutions products, including cyanide and sulfuric acid. Chemical Solutions generates value through the use of market leading manufacturing technology, safety performance and product stewardship, and differentiated logistics capabilities.

Chemical Solutions operates at 14 production facilities, which are concentrated in North America. Chemical Solutions sells our products and solutions through three primary product groups: Cyanides, Sulfur Products, and Performance Chemicals & Intermediates. Performance Chemicals & Intermediates business includes a number of product lines including Clean & Disinfect chemicals, Aniline, Methylamines and Reactive Metals. A breakdown of Chemical Solutions' 2013 sales by region and primary product groups is shown in the charts below.



*Note: Excludes sales from the Baytown facility divested on December 31, 2013.*

*Business*

The industrial and specialty chemicals produced by our Chemical Solutions segment are important raw materials for a wide range of industries and end markets. We hold a long standing reputation for high quality and the safe handling of hazardous products such as sodium cyanide and sulfuric acid. We believe that we have leading cost positions in cyanides, sulfur products and our clean & disinfect products. We believe that our costs positions in these products are the result of our process technology, manufacturing scale, efficient supply chain and proximity to large customers. Our Chemical Solutions segment also holds, and occasionally licenses, what we believe to be the leading process technologies for the production of aniline, a key building block for polyurethanes, and for hydrogen and sodium cyanide, which are used in industrial polymers and in gold production.

91

Table of Contents

Our Chemical Solutions segment consists of three primary product groups, the key products and key applications for which are summarized as follows:

**Chemical Solutions**

| Product Group | Key Products | Key Applications |
|---|---|---|
| Cyanides | • Sodium Cyanide | • Gold and Silver Mining |
| | • Hydrogen Cyanide | • Acrylics |
| | • Potassium Cyanide | • Plating/Pharmaceuticals |
| Sulfur Products | • Non-Fuming Sulfuric Acid | • Refining |
| | • Spent Acid Regeneration | • Chemicals, Paper, Metal Water Treatment |
| | • Sulfur Derivatives – Oleums, $SO_3$, Chlorosulfonic Acid (CSA) | • Surfactants, Personal Care |
| Performance Chemicals & Intermediates | | |
| | • Chlorine Dioxide | • Water Sanitation and Treatment, Oil and Gas |
| | • Virkon ® Disinfectants | • Animal and Human Health, Bio-security |
| | • Glycolic Acid | • Industrial Cleaning |
| | • Oxone ® Chlorine free oxidizer – | • High Purity Anti-aging Ingredient |
| | | • Pool and Spa care |
| | • Aniline | • MDI (methylene diphenyl disocyanate) for Rigid Polyurethane Foam for Construction and Refrigerators Insulation |
| | • Nitrobenzene | |
| | • Nitric Acid | |
| | | • Rubber Chemicals, Dyes and Pigments |
| | • Amines – MMA, DMA, TMA | • Agricultural Chemicals |
| | • Amides – MMF, DMF | • Water Treatment Chemicals |
| | • DMAc | • Oil and Gas Drilling |
| | • DMS | • Electronics |
| | • Vazo ® Azo Free Radical Initiator – | • Industrial Solvents |
| | | • Surfactants, Fabric Softeners |
| | • Sodium Metal | • Pulp and Paper, Titanium, Silicon |
| | • Lithium Metal | • Life Sciences, Batteries |
| | | • Bio-Diesel |

92

Table of Contents

## Cyanides

The principal product of our Cyanides product group is solid sodium cyanide, of which we are a leading producer in the Americas. Solid sodium cyanide is primarily sold for gold and silver production because it is the most efficient and lowest cost method to leach ore. Among the on-purpose producers of solid sodium cyanide, we hold a superior delivered-cost position in the Americas primarily due to higher hydrogen cyanide yields, attractive raw material cost (ammonia and natural gas), economies of scale and close proximity to our customer base. Though sodium cyanide only represents two to three percent of ore extraction cost, it is essential to the ore extraction process. Demand for solid sodium cyanide in the Americas has increased substantially over the last decade because of increased gold mining activity due to the region's structurally lower ore and refining costs, and resulting increases in production.

Our leading position in cyanides is attributable to our proprietary advanced technological capabilities in next-generation hydrogen cyanide and sodium cyanide manufacturing, best-in-class product stewardship and global distribution capabilities. Our ability to source and produce locally coupled with our strong distribution capabilities through strategically located warehouses, re-packing terminals and differentiated packaging are key differentiators. In addition, our reputation for supply safety is highly valued by our customers. Since operations began approximately 60 years ago, the cyanides business has had a leading safety record, lending confidence to customers that our products will be delivered safely.

## Sulfur Products

The U.S.-based Sulfuric Acid Products product group is a leading producer of both non-fuming sulfuric acid products and higher value sulfur derivative products (HVSDs) such as oleum, sulfur trioxide and chlorosulfonic acid. We also provide spent acid regeneration and sulfur gas recovery services to the oil refining industry, where our merchant regeneration capacity is ranked #1 and #2 in the U.S. Northeast and Gulf Coast, respectively. Non-fuming sulfuric acid is one of the most produced chemicals in the world by volume and it is an input in a broad range of industrial applications including inorganic and organic chemicals, catalysts, paper, water treatment and chemical process water removal. HVSDs are primarily used in surfactants, flame retardants and shampoos. As part of our suite of services, our Sulfur Products business offers customers the option to transport spent sulfuric acid back to us to be recovered and regenerated.

Our Sulfur Products operations rely on an advantaged supply chain that leverages multiple cost-competitive U.S. plant sites, best-in-class process technology via our *Acid Technology Center* and deep and long-held customer relationships. We are the industry leader in acid plant reliability and provide our customers with a secure supply of sulfuric acid and HVSDs.

## Performance Chemicals & Intermediates

Performance Chemicals & Intermediates business manufactures a wide range of products including Clean & Disinfect chemicals, Aniline, Methylamines and Reactive Metals. Clean & Disinfect chemicals consist of chlorine dioxide ($ClO_2$), disinfectants, glycolic acid and Oxone®. These chemicals have leading positions in a number of segments including animal production bio-security through our Virkon® products, household and industrial cleaning solutions through our glycolic acid and Oxone® products and water disinfection through our $ClO_2$ offerings. Clean & Disinfect chemicals are well positioned to take advantage of potential growth in each of these end markets due to our technological expertise, product pipeline and broad global market access through our network of channel partners. Aniline is a critical raw material in methylene diphenyl diisocyanate (MDI) production, an essential component of polyurethane. Besides use in MDI production, aniline is used in rubber processing chemicals, specialty aramid fibers such as aromatic polyamide, agricultural chemicals such as amide herbicides, dyes and pigments. In Methylamines we provide key industries, including water treatment, agricultural chemicals and specialty fibers, a reliable domestic source of primary amines and the only domestic source for amides, dimethyleacetamide, dimethylformamide and dimethylsulfate in the U.S. In the Asia-Pacific region, Methylamines business primarily serves the specialty fibers and electronics segments. Methylamines

Table of Contents

business also manages the manufacture and sales of Vazo ® , azo free radical initiators, which are used in a range of chemical processes. We are the leading North American sodium metal producer serving the silicon, titanium, pulp and paper industries. We also produce lithium metal, which is sold for the production of butyl lithium.

### Chemical Solutions Leadership Positions

| Product (Product Group) | Position | Key Applications | Key Competitors |
|---|---|---|---|
| Cyanides | #1 in Solid Sodium Cyanide in Americas | Gold Production | Orica, Cyanco, Samsung |
| Sulfur Products | #1 in Spent Acid Regeneration in U.S. Northeast Region | Refining | Solvay, Chemtrade |
| | #2 in Spent Acid Regeneration in U.S. Gulf Coast Region | | |
| Performance Chemicals & Intermediates | Leading positions in U.S. in number of products e.g. | | |
| | Chlorine Dioxide | Water treatment | Evoqua, OxyChem |
| | Glycolic Acid | Household, institutional and industrial cleaning, Personal care | CABB, Taicang Xinmao |
| | Oxone ® | Recreational Water treatment, dentures cleaning | United Initiators |

### Research and Development

The Chemical Solutions research and development team is primarily focused on developing and improving chemical production processes to improve asset safety, sustainability, capacity, productivity and product quality. The team also supports, from time to time, the licensing of proprietary technologies to generate incremental profitability and improving asset productivity across all businesses. The segment's new product research and development is limited and highly focused.

### Raw Materials

Key raw materials for Chemical Solutions include ammonia, methanol, sulfur, natural gas, formaldehyde, hydrogen and caustic soda. We source raw materials from global and regional suppliers where possible and maintain multiple supplier relationships to protect against supply disruptions and potential price increases. To further mitigate the risk of raw material availability and cost fluctuation, Chemical Solutions has also taken steps to optimize routes for distribution, increase the storage capacity at our production facilities, lock-in long-term contracts with key suppliers and increase the number of customer contracts with raw material price pass-through terms. We do not believe that the loss of any particular supplier would be material to our business.

### Sales, Marketing and Distribution

Our technical, marketing and sales teams around the world have deep expertise with our products and their end markets. We predominantly sell directly to customers, although we do also use a network of distributors for specific product lines and geographies. Sales may take place through either spot transactions or via long-term contracts.

94

Table of Contents

Most of Chemical Solutions' raw materials and products can be delivered by efficient bulk transportation. As such, we maintain one of the largest fleets of rail cars, tank trucks and containers in the chemicals industry. For the portion of the fleet that is leased, related lease terms are usually staggered, which provides us with a competitive cost position as well as the ability to adjust the size of our container fleet in response to changes in market conditions. A dedicated logistics team, along with external partners, continually optimizes the assignment of our transportation equipment to product lines and geographic regions in order to maximize utilization and flexibility of the supply chain.

The strategic placement of our production facilities in locations designed to serve our key customer base gives us robust distribution capabilities.

### Customers

Our Chemical Solutions segment focuses on developing long-term partnerships with key market participants. Many of our commercial and industrial relationships have been in place for decades and are based on our proven value proposition of safely and reliably supplying our customers with the materials needed for their operations. Our reputation and long-term track record is a key competitive advantage as several of the products' end users demand the highest level of excellence in safe manufacturing, distribution, handling and storage. Chemical Solutions has Department of Transportation Special Permits and Approvals in place for distribution of various materials associated with each of our business lines as required. Our Chemical Solutions segment serves several hundred customers globally. No single Chemical Solutions customer represented more than 10 percent of our sales in 2013.

### Seasonality

Our sales are subject to minimal seasonality. Our Sulfur Products business is influenced by seasonal fluctuations as in the warmer summer months we typically sell a higher volume of acid due to oil refinery customers operating at higher capacities.

### Chemours Intellectual Property

Intellectual property, including trade secrets, certain patents, trademarks, copyrights, know-how and other proprietary rights, is a critical part of maintaining the technology leadership and competitive edge. Our business strategy is to file patent and trademark applications globally for proprietary new product and application development technologies. We work actively on a global basis to create, protect and enforce our intellectual property rights. The protection afforded by these patents and trademarks varies based on country, scope of individual patent and trademark coverage, as well as the availability of legal remedies in each country. Although certain proprietary intellectual property rights are important to the success of our company, we do not believe that we are materially dependent on any particular patent or trademark. We believe that securing our intellectual property is critical to maintaining our technology leadership and our competitive position, especially with respect to new technologies or the extensions of existing technologies. Our proprietary process technology is also a source of incremental income through licensing arrangements.

Our Titanium Technologies segment in particular relies upon unpatented proprietary knowledge and continuing technological innovation and other trade secrets to develop and maintain our competitive position in this space. Our proprietary chloride production process is an important part of our technology and our business could be harmed if our trade secrets are not maintained in confidence. In our Titanium Technologies intellectual property portfolio, we consider our trademark Ti-Pure ® to be a valuable asset and have registered this trademark in a number of countries.

Our Fluoroproducts segment is the technology leader in the markets in which it participates. We have one of the largest patent portfolios in the fluorine derivatives industry. In our Fluoroproducts intellectual property portfolio, we consider our Suva ® , ISCEON ® , Freon ® , Opteon ® , Teflon ® , Tefzel ® , Viton ® , Krytox ® , Formacel ® , Dymel ® , FM 200 ® , Nafion ® and Capstone ® , trademarks to be valuable assets.

95

Table of Contents

Our Chemical Solutions segment is a manufacturing and application development technology leader in a majority of the markets in which it participates. In our Chemical Solutions intellectual property portfolio, we consider our Virkon ® and Oxone ® trademarks to be valuable assets. Trade secrets are one of the key elements of our intellectual property security in Chemical Solutions as most of the segment's manufacturing and application development technologies are no longer under patent coverage.

Please also see the section entitled "Our Relationship with DuPont Following the Distribution" for a description of the material terms of the intellectual property license arrangements that we intend to enter into with DuPont prior to the consummation of the separation and distribution.

**Chemours Production Facilities and Technical Centers**

Our corporate headquarters are in [ • ], [ • ], and we will maintain a global network of production facilities and technical centers located in cost-effective and strategic locations. We will also use contract manufacturing and joint venture partners in order to provide regional access or to lower manufacturing costs as appropriate. The following chart lists our production facilities:

| | **Titanium Technologies** | **Production Facilities Fluoroproducts** | **Chemical Solutions** | **Shared Locations** |
|---|---|---|---|---|
| North America | • Edge Moor, DE | • El Dorado, AR | • Red Lion, DE | • Pascagoula, MS (Chemical Solutions and Fluoroproducts) |
| | • DeLisle, MS | • Elkton, MD | • Wurtland, KY | • Belle, WV (Chemical Solutions and Fluoroproducts) |
| | • New Johnsonville, TN | • Louisville, KY | • Burnside, LA | |
| | • Starke, FL (Mine) | • Fayetteville, NC | • Morses Mill, NJ | |
| | | • Deepwater, NJ | • Niagara, NY | |
| | | • Corpus Christi, TX | • Fort Hill, OH | |
| | | • LaPorte, TX | • N. Kingstown, RI | |
| | | • Washington, WV | • Memphis, TN | |
| | | • Maitland, Canada | • Beaumont, TX | |
| | | | • Borderland, TX | |
| | | | • James River, VA | |
| EMEA | | • Mechelen, Belgium | • Sudbury, UK | |
| | | • Villers St. Paul, France | | |
| | | • Dordrecht, Netherlands | | |
| | | • Malmo, Sweden | | |
| Latin America | • Altamira, Mexico | • Barra Mansa, Brazil | | |
| Asia Pacific | • Kuan Yin, Taiwan | • Changshu, China | | |
| | | • Chiba, Japan (Joint Venture) | | |
| | | • Shimizu, Japan (Joint Venture) | | |

96

Table of Contents

We have technical centers and R&D facilities located at number of our production facilities. We also maintain standalone technical centers to serve our customers and provide technical support. The following chart lists our standalone technical centers:

| | | Technical Centers | | |
|---|---|---|---|---|
| Region | Titanium Technologies | Fluoroproducts | Chemical Solutions | Shared Locations |
| North America | | • Akron, OH | | • Wilmington, DE (Chemical Solutions, Fluoroproducts and Titanium Technologies) [1] |
| EMEA | • Moscow, Russia | • Mantes, France<br>• Meyrin, Switzerland | | |
| Latin America | • Paulinia, Brazil<br>• Mexico City-Zurich, Mexico | | | |
| Asia Pacific | | • Utsonomyia, Japan | | • Shanghai, China (Titanium Technologies and Fluoroproducts) |

_____

[1]    There are two facilities in this location.

The company's plants and equipment are maintained and in good operating condition. The company believes it has sufficient production capacity for its primary products to meet demand in 2015. Properties are primarily owned by the company; however, certain properties are leased. No title examination of the properties has been made for the purpose of this report and certain properties are shared with other tenants under long-term leases.

Chemours recognizes that the security and safety of its operations are critical to its employees, community, and to the future of the company. Physical security measures have been combined with process safety measures (including the use of inherently safer technology), administrative procedures and emergency response preparedness into an integrated security plan. Prior to the separation, DuPont conducted vulnerability assessments at operating facilities in the U.S. and high priority sites worldwide and identified and implemented appropriate measures to protect these facilities from physical and cyber-attacks. Chemours intends to conduct similar vulnerability assessments periodically post-separation. Chemours is partnering with carriers, including railroad, shipping and trucking companies, to secure chemicals in transit.

**Chemours Employees**

We have approximately 9,100 employees, approximately 29 percent of whom are represented by unions. Management believes its relations with its employees to be good.

**Regulatory**

Chemours operates in a constantly evolving regulatory environment and we are subject to numerous and varying regulatory requirements for our operations and end products. It is our practice to identify potential regulatory risks early in the research and development process and manage them proactively throughout the product lifecycle through use of routine assessments, protocols, standards, performance measures and audits. Governing bodies regularly issue new regulations and changes to existing regulations and we have implemented global systems and procedures designed to ensure compliance with existing laws and regulations.

Table of Contents

We continuously analyze and improve our practices, processes and products to reduce their risk and impact through the product life cycle. For example, in 2013, we met our commitment to no longer make, use or buy perfluorooctanoic acid (PFOA) by 2015, two years ahead of the U.S. EPA PFOA Stewardship Program.

We work collaboratively with a number of stakeholder groups including government agencies, trade associations and non-governmental organizations to proactively engage in federal, state, and international public policy processes ranging from climate change to chemical management. We also have ongoing interactions with our suppliers, carriers, distributors, and customers to achieve similar product stewardship.

**Environmental Matters**

Chemours' global manufacturing, product handling and distribution facilities are subject to a broad array of environmental laws and regulations. Such rules are subject to change by the implementing governmental agency, and Chemours monitors these changes closely. Company policy requires that all operations fully meet or exceed legal and regulatory requirements. In addition, Chemours implements voluntary programs to reduce air emissions, minimize the generation of hazardous waste, decrease the volume of water use and discharges, increase the efficiency of energy use and reduce the generation of persistent, bioaccumulative and toxic materials. Management has noted a global upward trend in the amount and complexity of proposed chemicals regulation. The costs to comply with complex environmental laws and regulations, as well as internal voluntary programs and goals, are significant and will continue to be significant for the foreseeable future. Annual expenditures are expected to continue to increase in the near future; however, they are not expected to vary significantly from the range of such expenditures experienced in the past few years. Longer term, expenditures are subject to considerable uncertainty and may fluctuate significantly.

*Climate Change*

Chemours believes that climate change is an important global issue that presents risks and opportunities. Expanding upon significant global greenhouse gas (GHG) emissions and other environmental footprint reductions made in the period 1990-2004, Chemours reduced its environmental footprint achieving in 2013 reductions of 19 percent in GHG emissions and six percent in water consumption versus our 2004 baselines. Chemours continuously evaluates opportunities for existing and new product and service offerings in light of the anticipated demands of a low-carbon economy. About $177 million of Chemours' 2013 revenue was generated from sales of products that help direct and downstream customers reduce GHG emissions.

Legislative efforts to control or limit GHG emissions could affect Chemours' energy source and supply choices as well as increase the cost of energy and raw materials derived from fossil fuels. Such efforts are also anticipated to provide the business community with greater certainty for the regulatory future, help guide investment decisions, and drive growth in demand for low-carbon and energy-efficient products, technologies, and services. Similarly, demand is expected to grow for products that facilitate adaptation to a changing climate.

At the national and regional level, there are existing efforts to address GHG emissions. Several of Chemours' facilities in the EU are regulated under the EU Emissions Trading Scheme. China has begun pilot programs for trading of GHG emissions in selected areas and South Korea will begin to implement its emission trading scheme in 2015. In the EU, U.S. and Japan, policy efforts to reduce the GHG emissions associated with gases used in refrigeration and air conditioning create market opportunities for lower GHG solutions. The current unsettled policy environment in the U.S. adds an element of uncertainty to business decisions particularly those relating to long-term capital investments. If in the absence of federal legislation, states were to implement programs mandating GHG emissions reductions, Chemours, its suppliers and customers could be competitively disadvantaged by the added costs of complying with a variety of state-specific requirements.

In 2010, EPA launched a phased-in scheme to regulate GHG emissions first from large stationary sources under the existing Clean Air Act permitting requirements administered by state and local authorities. As a result, large

98

Table of Contents

capital investments may be required to install Best Available Control Technology on major new or modified sources of GHG emissions. This type of GHG emissions regulation by EPA, in the absence of or in addition to federal legislation, could result in more costly, less efficient facility-by-facility controls versus a federal program that incorporates policies that provide an economic balance that does not severely distort markets. Differences in regional or national legislation could present challenges in a global marketplace highlighting the need for coordinated global policy action. In 2013 EPA proposed more stringent regulations for new Electric Generating Units (EGU's) that may affect the long-term price and supply of electricity. The precise impact is uncertain.

## Legal Proceedings

Chemours is subject to various litigation matters, including, but not limited to, product liability, antitrust claims, and claims for third party property damage or personal injury stemming from alleged environmental or other torts.

Pursuant to the Separation Agreement, Chemours indemnifies DuPont against certain liabilities, including the litigation and environmental liabilities discussed below that arose prior to the distribution. The term of this indemnification is indefinite and includes defense costs and expenses, as well as monetary and non-monetary settlements and judgments. Also, pursuant to the Separation Agreement, Chemours indemnifies DuPont against liabilities that may arise in the future in connection with the Chemours business, including environmental, tax and product liabilities. For additional information see Note 17 to the Annual Combined Financial Statements.

## Litigation

### Asbestos

At September 30, 2014, there were about 2,455 lawsuits pending against DuPont alleging personal injury from exposure to asbestos. These cases are pending in state and federal court in numerous jurisdictions in the United States and are individually set for trial. Most of the actions were brought by contractors who worked at sites at some point between 1950 and the 1990s. A small number of cases involve similar allegations by DuPont employees. A limited number of the cases were brought by household members of contractors and DuPont employees. Finally, certain lawsuits allege personal injury as a result of exposure to DuPont products. At September 30, 2014, Chemours had accruals of $40 million related to this matter.

### PFOA: Environmental and Litigation Proceedings

Chemours used PFOA (collectively, perfluorooctanoic acids and its salts, including the ammonium salt), as a processing aid to manufacture some fluoropolymer resins at various sites around the world including its Washington Works plant in West Virginia. At September 30, 2014, Chemours had accruals of $14 million related to this matter.

The accrual includes charges related to DuPont's obligations under agreements with the U. S. Environmental Protection Agency and voluntary commitments to the New Jersey Department of Environmental Protection. These obligations and voluntary commitments include surveying, sampling and testing drinking water in and around certain company sites and offering treatment or an alternative supply of drinking water if tests indicate the presence of PFOA in drinking water at or greater than the national Provisional Health Advisory.

### Drinking Water Actions

In August 2001, a class action, captioned Leach v DuPont, was filed in West Virginia state court alleging that residents living near the Washington Works facility had suffered, or may suffer, deleterious health effects from exposure to PFOA in drinking water.

99

Table of Contents

DuPont and attorneys for the class reached a settlement in 2004 that binds about 80,000 residents. In 2005, DuPont paid the plaintiffs' attorneys' fees and expenses of $23 million and made a payment of $70 million, which class counsel designated to fund a community health project. Chemours, through DuPont, funded a series of health studies which were completed in October 2012 by an independent science panel of experts (the C8 Science Panel). The studies were conducted in communities exposed to PFOA to evaluate available scientific evidence on whether any probable link exists, as defined in the settlement agreement, between exposure to PFOA and human disease.

The C8 Science Panel found probable links, as defined in the settlement agreement, between exposure to PFOA and pregnancy-induced hypertension, including preeclampsia; kidney cancer; testicular cancer; thyroid disease; ulcerative colitis; and diagnosed high cholesterol.

In May 2013, a panel of three independent medical doctors released its initial recommendations for screening and diagnostic testing of eligible class members. In September 2014, the medical panel recommended follow-up screening and diagnostic testing three years after initial testing, based on individual results. The medical panel has not communicated its anticipated schedule for completion of its protocol. Through DuPont, Chemours is obligated to fund up to $235 million for a medical monitoring program for eligible class members and, in addition, administrative cost associated with the program, including class counsel fees. In January 2012, Chemours, through DuPont, put $1 million in an escrow account to fund medical monitoring as required by the settlement agreement. The court appointed Director of Medical Monitoring has established the program to implement the medical panel's recommendations. Under the program, notice has been given and the registration process, as well as eligibility screening, to participate in diagnostic testing has begun. At each of September 30, 2014 and December 31, 2013, no money has been disbursed from the fund.

In addition, under the settlement agreement, DuPont must continue to provide water treatment designed to reduce the level of PFOA in water to six area water districts, including the Little Hocking Water Association (LHWA), and private well users.

Class members may pursue personal injury claims against DuPont only for those human diseases for which the C8 Science Panel determined a probable link exists. Class members began filings lawsuits alleging such claims in 2012. At September 30, 2014, there were approximately 2,545 lawsuits filed in various federal and state courts in Ohio and West Virginia, an increase of about 2,460 and 2520, respectively over December 31, 2013 and 2012. In accordance with a stipulation reached in the third quarter 2014 and other court procedures, these lawsuits have been or will be served and consolidated in multi-district litigation in Ohio federal court (MDL). The majority of the lawsuits allege personal injury claims associated with high cholesterol and thyroid disease from exposure to PFOA in drinking water. There are 18 lawsuits alleging wrongful death. In the third quarter 2014, six plaintiffs from the MDL were selected for individual trial. The first trial is scheduled to begin in September 2015, and the second in November 2015. Chemours, through DuPont, denies the allegations in these lawsuits and is defending itself vigorously.

*Additional Actions*

An Ohio action brought by the LHWA is ongoing. In addition to general claims of PFOA contamination of drinking water, the action claims "imminent and substantial endangerment to health and or the environment" under the Resource Conservation and Recovery Act (RCRA). In the second quarter 2014, DuPont filed a motion for summary judgment which if granted, will be dispositive of this matter. The LHWA has moved for partial summary judgment. Chemours, through DuPont, denies these claims and is defending itself vigorously.

While it is probable that the company will incur costs related to the medical monitoring program, such costs cannot be reasonably estimated due to uncertainties surrounding the level of participation by eligible class members and the scope of testing. Chemours believes that it is reasonably possible that it could incur losses related to the other PFOA matters discussed above; however, a range of such losses, if any, cannot be reasonably estimated at this time.

100

Table of Contents

**Environmental Proceedings**

*Chambers Works Plant, Deepwater, New Jersey*

In 2010, the government initiated an enforcement action alleging that the facility violated recordkeeping requirements of certain provisions of the CAA and the Federal Clean Air Act Regulations (FCAR) governing Leak Detection and Reporting (LDAR) and that it failed to report emissions of a compound from Chambers Works' waste water treatment facility under EPCRA. The alleged non-compliance was identified by EPA in 2007 and 2009 following separate environmental audits. DuPont is in settlement negotiations with EPA and DOJ.

Table of Contents

## MANAGEMENT

**Executive Officers Following the Distribution**

The following sets forth information regarding individuals who are expected to serve as our executive officers, including their positions after the distribution. Additional executive officers will be selected prior to the distribution to serve as executive officers after the distribution, and information concerning those executive officers will be included in an amendment to this information statement. While some of these individuals currently serve as officers and employees of DuPont, after the distribution, none of our executive officers will be executive officers or employees of DuPont.

*Mark P. Vergnano* , age 56, will serve as our President and Chief Executive Officer. In October 2009, Mr. Vergnano was appointed Executive Vice President and was responsible for businesses in the Chemours segment: DuPont Chemicals & Fluoroproducts and Titanium Technologies. Prior to that, he had several assignments in manufacturing, technology, marketing, sales and business strategy. In June 2006, he was named Group Vice President of DuPont Safety & Protection. In February 2003, he was named Vice President and General Manager — Nonwovens and Vice President and General Manager — Surfaces and Building Innovations in October 2005. Mr. Vergnano joined DuPont in 1980 as a process engineer.

*Mark E. Newman* , age 51, will serve as our Senior Vice President and Chief Financial Officer. Mr. Newman joined Chemours in November 2014 from SunCoke Energy where he was SunCoke Energy's Senior Vice President and Chief Financial Officer and led its financial, strategy, business development and information technology functions. Mr. Newman joined SunCoke's leadership team in March 2011 to help drive SunCoke's separation from its parent company, Sunoco, Inc. He led SunCoke through an initial public offering and championed a major restructuring of SunCoke, which resulted in the initial public offering of SunCoke Energy Partners in January 2013, creating the first coke-manufacturing master limited partnership. Prior to joining SunCoke, Mr. Newman served as Vice President Remarketing & Managing Director of SmartAuction, Ally Financial Inc (previously General Motors Acceptance Corporation). Mr. Newman began his career at General Motors in 1986 as an Industrial Engineer and progressed through several financial and operational leadership roles within the global automaker, including Vice President and Chief Financial Officer of Shanghai General Motors Limited; Assistant Treasurer of General Motors Corporation; and North America Vice President and CFO.

*Boo Ching (B.C.)* Chong, age 53, will serve as our President — Titanium Technologies. Mr. Chong was named president — DuPont Titanium Technologies in January 2011. In October 2009, he was named vice president — DuPont Performance Coatings, Asia Pacific. In July 2008, he was named vice president and general manager of DuPont Automotive OEM Coatings. From 2004 to 2007, he was global business director — DuPont Packaging & Industrial Polymers, Ethylene Copolymers. Mr. Chong was named vice president and general manager — DuPont Packaging & Industrial Polymers in June 2007. From 2001 to 2003, he was global business director for Delrin ® polyacetal and Asia Pacific regional director for Engineering Polymers before assuming the additional role of managing director for DuPont in Singapore. Mr. Chong joined DuPont in 1989 in Singapore as operations manager for DuPont Engineering Polymers.

*Thierry F.J. Vanlancker* , age 50, will serve as our President — Fluoroproducts. Mr. Vanlancker was named president — DuPont Chemicals & Fluoroproducts in May 2012. He was named vice president for DuPont Performance Coatings — EMEA in November 2010. In 2006, he moved to Wilmington, Delaware to serve as global business and market director — Fluorochemicals. In 2004, after two years as sales manager for all Refinish Brands EMEA, he was appointed as regional director — Fluoroproducts EMEA based in Geneva, Switzerland. He moved to Belgium in 1999 to be part of the Herberts Acquisition/Integration Team within the newly formed DuPont Performance Coatings business and in 2000 was appointed business manager for the Spies Hecker Refinish paint brand based in Cologne, Germany. In 1996, he transferred to Wilmington, Delaware as global technical service manager for P&IP and was appointed global product manager Vamac ® ethylene acrylic

102

Table of Contents

elastomers in 1998. In 1993 he transferred to Bad Homburg, Germany, and was appointed market development consultant for P&IP Europe, Middle East & Africa (EMEA). Mr. Vanlancker joined DuPont in 1988 in Belgium as a sales representative.

*Christian W. Siemer* , age 56, will serve as our President — Chemical Solutions. Mr. Siemer joined DuPont in 2010 as the Managing Director of Clean Technologies, a business unit of DuPont Sustainable Solutions focused on process technology development and licensing. He led the successful acquisition of MECS Inc., the global leader in technology for the production of sulfuric acid. Mr. Siemer began his career in 1980 with Stauffer Chemicals as a process engineer. Following Stauffer's acquisition by ICI plc, Mr. Siemer moved through a range of commercial roles and overseas assignments managing portfolios of international industrial and specialty chemical businesses.

*David C. Shelton* , age 51, will serve as our General Counsel and Corporate Secretary. In 2011, Mr. Shelton was appointed Associate General Counsel, DuPont, and was responsible for the US Commercial team — the business lawyers and paralegals counseling all the DuPont business units with the exception of Agriculture and Pioneer. Since 2002, Mr. Shelton was the Commercial attorney to a variety of DuPont businesses including the Performance Materials platform, which he advised on international assignment in Geneva, and the businesses now comprising the DuPont Chemicals and Fluoroproducts business unit. Prior to that, Mr. Shelton advised the company on environmental and remediation matters as part of the environmental legal team. Mr. Shelton joined DuPont in 1996, after seven years in private practice as a litigator in Pennsylvania and New Jersey.

*E. Bryan Snell* , age 58, will serve as Senior Vice President — Corporate Strategy and Productivity. Mr. Snell was appointed Planning Director — DuPont Performance Chemicals in May, 2014. Prior to that, he held leadership positions in DuPont Titanium Technologies, including Planning Director (2011-12 in Wilmington, DE and 2012-13 in Singapore) and Global Sales and Marketing Director (2008-2010). Mr. Snell served as Regional Operations Director — DuPont Coatings and Color Technologies Platform in 2007 and 2008. He was posted in Taiwan from 2002 to 2006, in the roles of Plant Manager — Kuan Yin Plant and Asia/Pacific Regional Director, DuPont Titanium Technologies. Mr. Snell joined DuPont in 1978 as a process engineer and has experience in nuclear and petrochemical operations, as well as sales, business strategy and M&A.

*Beth Albright* , age 47, will serve as our Senior Vice President Human Resources. Mrs. Albright joined DuPont in Oct 2014. She became Senior Vice-President Human Resources for Day & Zimmermann in May 2011. In July 2009 she took her first top Human Resources role as the Global Vice President Human Resources for Tekni-Plex. She joined Rohm and Haas in 2000 and held various Human Resources supporting global businesses, technology, manufacturing and staff functions. In 1995 she joined FMC as site Human Resources manager at a manufacturing site and progressed into the corporate office. Mrs. Albright began her career with Fluor Daniel Construction in their Industrial Relations department in 1989.

**Board of Directors Following the Distribution**

The following sets forth information with respect to those persons who are expected to serve on our Board of Directors following the distribution. We may name and present additional nominees for election prior to the distribution. After the distribution, none of these individuals will be directors or employees of DuPont.

Upon completion of the distribution, Chemours' board of directors will be divided into three classes, each comprised of three directors. The directors designated as Class I directors will have terms expiring at the first annual meeting of stockholders following the distribution, which Chemours expects to hold in 2016. The directors designated as Class II directors will have terms expiring at the following year's annual meeting of stockholders, which Chemours expects to hold in 2017, and the directors designated as Class III directors will have terms expiring at the following year's annual meeting of stockholders, which Chemours expects to hold in 2018. Chemours expects that Class I will directors will be comprised of [ • ]; Class II directors will be comprised

103

Table of Contents

of [ • ]; and Class III directors will be comprised of [ • ]. Commencing with the first annual meeting of stockholders following the separation, directors for each class will be elected at the annual meeting of stockholders held in the year in which the term for that class expires and thereafter will serve for a term of three years. At any meeting of stockholders for the election of directors at which a quorum is present, the election will be determined by a majority of the votes cast by the stockholders entitled to vote in the election, with directors not receiving a majority of the votes cast required to tender their resignations for consideration by the board, expect that in the case of a contested election, the election will be determined by a plurality of the votes cast by the stockholders entitled to vote in the election.

We are in the process of identifying individuals who will serve on our board of directors following the distribution, and we expect to provide information regarding these individuals in an amendment to this information statement.

## Director Independence

It is anticipated that all of our Board of Directors, except our Chief Executive Officer, who will be an employee of Chemours, will meet the criteria for independence as defined by the rules of the NYSE and the corporate governance guidelines to be adopted by the Board of Directors. The corporate governance guidelines, including our independence standards, will be posted to our website prior to the completion of the distribution.

## Committees of the Board of Directors

Effective upon the completion of the distribution, our Board of Directors will have the following standing committees: an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee. Our Board of Directors will adopt a written charter for each of these committees, which will be posted on our website.

### *Audit Committee*

The responsibilities of the Audit Committee will be more fully described in our Audit Committee Charter and will include, among other duties:

- Reviewing annual audited and quarterly financial statements, as well as our disclosures under "Management's Discussion and Analysis of Financial Conditions and Results of Operations," with management and the independent auditors.

- Obtaining and reviewing periodic reports, at least annually, from management assessing the effectiveness of our internal controls and procedures for financial reporting.

- Reviewing our processes to assure compliance with all applicable laws, regulations and corporate policy.

- Recommending the public accounting firm to be proposed for appointment by the stockholders as our independent auditors and review the performance of the independent auditors.

- Reviewing the scope of the audit and the findings and approve the fees of the independent auditors.

- Satisfying itself as to the independence of the independent auditors and ensuring receipt of their annual independence statement.

- Reviewing proposed borrowings and issuances of securities.

- Recommending to the Board of Directors the dividends to be paid on our common stock.

- Reviewing cash management policies.

The Audit Committee will consist entirely of independent directors, and we intend that each will meet the independence requirements set forth in the listing standards of NYSE and Rule 10A under the Exchange Act. Each member of the Audit Committee will be financially literate and have accounting or related financial

104

management expertise, as such terms are interpreted by our Board of Directors in its business judgment. Additionally, at least one member of the Audit Committee will be an "audit committee financial expert" under SEC rules and the NYSE listing standards applicable to audit committees. The initial members of the Audit Committee will be determined prior to the completion of the distribution.

### *Compensation Committee*

The responsibilities of the Compensation Committee will be more fully described in our Compensation Committee Charter and will include, among other duties:

- Assessing current and future senior leadership talent, including assisting our Board of Directors in Chief Executive Officer succession planning.

- Reviewing and approving our programs for executive development, performance and skill evaluations.

- Overseeing the performance evaluation of the Chief Executive Officer based on input from other independent directors.

- Recommending, for approval by the independent directors, Chief Executive Officer compensation.

- Recommending and approving the principles guiding our executive compensation and benefits plans.

- Reviewing our incentive compensation arrangements to determine whether they encourage excessive risk-taking, and evaluating compensation policies and practices that could mitigate any such risk.

- Working with management to develop the Compensation Discussion and Analysis in regard to executive compensation disclosure.

- Considering the voting results of any say-on-pay or related stockholder proposals.

The Compensation Committee will consist entirely of independent directors, and we intend that each will meet the independence requirements set forth in the listing standards of NYSE. We also intend the members of the Compensation Committee to be "non-employee directors" (within the meaning of Rule 16b-3 of the Exchange Act) and "outside directors" (within the meaning of Section 162(m) of the Code). The initial members of the Compensation Committee will be determined prior to the completion of the distribution.

### *Nominating and Corporate Governance Committee*

The responsibilities of the Nominating and Corporate Governance Committee will be more fully described in our Nominating and Corporate Governance Committee Charter and will include, among other duties:

- Identifying individuals qualified to become directors and recommend the candidates for all directorships.

- Recommending individuals for election as officers.

- Reviewing our Corporate Governance Guidelines and making recommendations for changes.

- Considering questions of independence and possible conflicts of interest of directors and executive officers.

- Taking an oversight role in shaping our policies and procedures.

The Nominating and Corporate Governance Committee will consist entirely of independent directors, and we intend that each will meet the independence requirements set forth in the listing standards of NYSE. The initial members of the Nominating and Corporate Governance Committee will be determined prior to the completion of the distribution.

Table of Contents

**Stockholder Recommendations for Director Nominees and Director Qualification Standards**

The Chemours Nominating and Corporate Governance Committee considers potential candidates suggested by Board members, as well as management, stockholders and others.

The Board's Corporate Governance Guidelines describe qualifications for directors. Directors are selected for their integrity and character; sound, independent judgment; breadth of experience, insight and knowledge; and business acumen. Leadership skills, scientific or technology expertise, familiarity with issues affecting global businesses, prior government service, and diversity are among the relevant criteria, which will vary over time depending on the needs of the Board. Additionally, directors are expected to be willing and able to devote the necessary time, energy and attention to assure diligent performance of their responsibilities.

When considering candidates for nomination, the Committee takes into account these factors to assure that new directors have the highest personal and professional integrity, have demonstrated exceptional ability and judgment and will be most effective, in conjunction with other directors, in serving the long-term interest of all stockholders. The Committee will not nominate for election as a director a partner, member, managing director, executive officer or principal of any entity that provides accounting, consulting, legal, investment banking or financial advisory services to Chemours.

The Committee will consider candidates for director suggested by stockholders, applying the factors for potential candidates described above and taking into account the additional information described below. Stockholders wishing to suggest a candidate for director should write to the Corporate Secretary and include: (i) a statement that the writer is a stockholder of record (or providing appropriate support of ownership of Chemours stock); (ii) the name of and contact information for the candidate; (iii) a statement of the candidate's business and educational experience; (iv) information regarding each of the factors described above in sufficient detail to enable the Committee to evaluate the candidate; (v) a statement detailing any relationship between the candidate and any customer, supplier or competitor of Chemours or any other information that bears on potential conflicts of interest, legal considerations or a determination of the candidate's independence; (vi) information concerning service as an employee, officer or member of a board of any charitable, educational, commercial or professional entity; (vii) detailed information about any relationship or understanding between the proposing stockholder and the potential candidate; and (viii) a statement by the potential candidate that s/he is willing to be considered and to serve as a director if nominated and elected.

Once the Committee has identified a prospective candidate, the Committee makes an initial determination as to whether to conduct a full evaluation of the candidate. This initial determination is based on whatever information is provided to the Committee with the recommendation of the prospective candidate, as well as the Committee's own knowledge of the prospective candidate. This may be supplemented by inquiries to the person making the recommendation or others. The preliminary determination is based primarily on the likelihood that the prospective nominee can satisfy the factors described above. If the Committee determines, in consultation with the Chair of the Board and other Board members as appropriate, that further consideration is warranted, it may gather additional information about the prospective nominee's background and experience.

The Committee also considers other relevant factors as it deems appropriate, including the current composition of the Board and specific needs of the Board to assure its effectiveness. In connection with this evaluation, the Committee determines whether to interview the prospective nominee. One or more members of the Committee and other directors, as appropriate, may interview the prospective nominee in person or by telephone. After completing this evaluation, the Committee concludes whether to make a recommendation to the full Board for its consideration.

**Compensation Committee Interlocks and Insider Participation**

During fiscal 2014, Chemours did not exist and did not have a compensation committee or any other committee serving a similar function. Decisions as to the compensation of those who currently serve as our executive officers were made by DuPont, as described in "Compensation Discussion and Analysis."

106

Table of Contents

**Corporate Governance Guidelines**

Our Board of Directors will adopt governance guidelines designed to assist Chemours and our Board of Directors in implementing effective corporate governance practices. The governance guidelines will be reviewed regularly by the Nominating and Corporate Governance Committee in light of changing circumstances in order to continue serving our best interests and the best interests of our stockholders.

**Communications with the Board of Directors and Procedures for Treatment of Complaints Regarding Accounting, Internal Accounting Controls and Auditing Matters**

Stockholders and other parties interested in communicating directly with the Board, Chair, Lead Director or other outside director may do so by writing in care of the Corporate Secretary, [ • ]. The Board's independent directors have approved procedures for handling correspondence received by Chemours and addressed to the Board, Chair, Lead Director or other outside director. Concerns relating to accounting, internal controls, auditing or ethical matters are immediately brought to the attention of the internal audit function and handled in accordance with procedures established by the Audit Committee with respect to such matters, which include an anonymous toll-free hotline ([ • ]) and a website through which to report issues [ *(https:[ • ] )*.]

**Board Leadership Structure**

Our governing documents allow the roles of Chairman and CEO to be filled by the same or different individuals. This approach allows the Board flexibility to determine whether the two roles should be separated or combined based upon our needs and the Board's assessment of our leadership from time to time. It is expected that the Board will regularly consider the advantages of having an independent chairman and a combined chairman and CEO and is open to different structures as circumstances may warrant.

At this time, the Board believes that separating the roles of chairman and CEO serves the best interests of Chemours and its stockholders. By having an independent chairman, the CEO can focus primarily on our business strategy and operations at a time when Chemours becomes an independent, publicly traded company. While our CEO and senior management, working with the Board, set the strategic direction for Chemours and our CEO provides day-to-day leadership, the independent Chairman leads the Board in the performance of its duties and serves as the principal liaison between the independent directors and the CEO.

**Code of Ethics**

The Board has adopted a Code of Business Conduct and Ethics for Directors. In addition, Chemours has a Code of Conduct applicable to all Chemours employees, including executive officers, and a Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Controller.

**Director Compensation**

Following the distribution, director compensation will be determined by our Board of Directors with the assistance of its Nominating and Corporate Governance Committee. It is anticipated that such compensation will consist of the following:

- a cash retainer in the amount of $[ • ] per year and

- an initial equity award of restricted stock units with a grant date fair value of approximately $[ • ].

In addition, we anticipate that the Chairman of our Board of Directors will receive an additional cash retainer in the amount of $[ • ] per year and that the chairs of the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee will receive an additional cash retainer in the amount of $[ • ], $[ • ] and $[ • ] per year, respectively. We will not provide directors who are also our employees any additional compensation for serving as a director.

107

Table of Contents

*Stock Ownership Guidelines*

We expect to adopt stock ownership guidelines for directors that will require them to hold all annual equity awards until retirement or, at their election, until a later time as described below under "Management — Director Compensation — Deferred Compensation."

*Deferred Compensation*

Under the Chemours Stock Accumulation and Deferred Compensation Plan for Directors we expect to adopt, a director will be eligible to defer all or part of his or her Board retainer and committee chair fees in cash or stock units until retirement as a director or until a specified year after retirement. Interest will accrue on deferred cash payments, and dividend equivalents will accrue on deferred stock units. This deferred compensation will be an unsecured obligation of the company.

108

Table of Contents

**COMPENSATION DISCUSSION AND ANALYSIS**

While Chemours has discussed its anticipated executive compensation programs and policies with the Human Resources & Compensation Committee of DuPont's Board of Directors (the DuPont Compensation Committee), those programs and policies remain subject to review and approval by Chemours' own Compensation Committee. Chemours is currently a part of DuPont, and its Compensation Committee has not yet been formed. Accordingly, this Compensation Discussion and Analysis (CD&A) discusses DuPont's historical compensation programs as applied to certain individuals who are expected to be our "named executive officers" and outlines certain aspects of Chemours' anticipated post-distribution compensation structure for those individuals.

For purposes of this CD&A, we refer to the following individuals as our "named executive officers" (or NEOs):

- Mark P. Vergnano, who is expected to serve as our President and Chief Executive Officer (CEO).

- Mark E. Newman, who is expected to serve as our Senior Vice President and Chief Financial Officer.

- Our three most highly paid other executive officers based on compensation earned during 2014 from DuPont.

Because 2014 is not yet over, and thus total compensation for 2014 has not yet been determined, it is not yet possible to identify our NEOs other than Mr. Vergnano and Mr. Newman, and it is not yet possible to describe all of the 2014 compensation our NEOs will have received from DuPont. Accordingly, additional information regarding the 2014 compensation of our NEOs will be provided by amendment to the registration statement on Form 10 of which this information statement is a part.

*I. Compensation Philosophy and Design Principles*

We expect our executive compensation program upon the distribution will generally include the same elements as DuPont's executive compensation programs. Following the distribution, our Compensation Committee will review all aspects of compensation and may make adjustments that it believes are appropriate in structuring our executive compensation arrangements.

DuPont's compensation programs are designed and administered around the following core principles:

1. Establish a strong link between pay and performance

2. Align executives' interests with stockholders' interests

3. Reinforce business strategies and drive long-term sustained stockholder value

109

**Table of Contents**

Consistent with these principles, the DuPont Compensation Committee has adopted executive compensation programs with a strong link between pay and achievement of short and long-term goals. The primary elements of the DuPont executive compensation programs are:

| | | Total Direct Compensation |
| --- | --- | --- |
| *Pay Element* | *Description of Element* | |
| **Base salary** | Fixed cash compensation. | |
| **Short-term incentive (STIP) awards** | Annual cash incentive compensation where any award is based on performance, which for 2013 was measured against pre-defined annual operating earnings per share, after-tax operating income, revenue, cash flow from operations, dynamic planning factor, as well as individual performance goals. | |
| **Long-term incentive (LTI) awards** | Performance-based long-term incentive compensation that is aligned with DuPont's stock price and is awarded in the form of stock options, restricted stock units (RSUs) and performance stock units (PSUs). The vesting of PSUs granted in 2013 was based upon DuPont's revenue growth (intermediate-term) and total stockholder return relative to companies in its peer group. | |

Consistent with a pay-for-performance philosophy, more than two-thirds of targeted total direct compensation for DuPont executive officers is contingent upon performance and, therefore, fluctuates with financial results and share price.

## II. Compensation Decision Making Process

Following the distribution, we expect our Board of Directors will adopt a Compensation Committee Charter that initially will grant our Compensation Committee similar responsibilities to those of the DuPont Compensation Committee. Our Compensation Committee Charter will include the authority to retain an independent advisor for the purpose of reviewing and providing guidance related to executive compensation programs.

110

Table of Contents

Summarized in the table below are oversight responsibilities for DuPont's executive compensation programs. We expect our allocation of responsibilities will initially be similar.

| | |
|---|---|
| **DuPont Compensation Committee** | • Establishes executive compensation philosophy |
| | • Approves incentive compensation programs and target performance expectations for STIP and PSU awards |
| | • Approves all compensation actions for the executive officers, other than the CEO, including base salary, target and actual STIP, LTI grants, and target and actual PSU awards |
| | • Recommends to the full Board compensation actions for the CEO, including base salary, target and actual STIP, LTI grant, and target and actual PSU awards |
| **All Independent Board Members** | • Assess performance of the CEO |
| | • Approve all compensation actions for the CEO, including base salary, target and actual STIP, LTI grant, and target and actual PSU awards |
| **Independent Advisor** | • Provides independent advice, research, and analytical services on a variety of subjects, including compensation of executive officers, nonemployee director compensation and executive compensation trends |
| | • Participates in DuPont Compensation Committee meetings as requested and communicates with the Chair of such committee between meetings |
| **CEO** | • Provides a performance assessment of the other executive officers |
| | • Recommends compensation targets and actual awards for the other executive officers |

We expect our Compensation Committee with the assistance of its compensation advisor will make reference to published compensation surveys and peer group practices in determining appropriate NEO compensation practices. We expect the Chemours peer group will initially include the following companies (though the list of companies is subject to the approval of, and change by, our Compensation Committee after the distribution): PPG Industries Inc., Ecolab Inc., Praxair, Inc., Huntsman Corporation, The Sherwin-Williams Company, Air Products & Chemicals, Inc., Eastman Chemcial Company, The Mosaic Company, Ashland Inc., Celanese Corporation, Axiall Corporation, RPM International Inc., Valspar Corporation, Polyone Corporation and W. R. Grace & Co.

111

Table of Contents

## III. Compensation Program Description

The following table summarizes the elements, objectives, risk mitigation factors and other key features of DuPont's total direct compensation program for officers. We expect similar features will initially apply to our NEO compensation program. Following the distribution, our Compensation Committee will review the compensation programs and may make certain changes to align them with our compensation philosophy and their view of our business needs and strategic priorities.

| Pay Element | Objective of Element Including Risk Mitigation Factors | How Amounts Are Determined |
|---|---|---|
| **Base salary** | • Provides regular source of income for NEOs.<br>• Provides foundation for other pay components.<br>• To avoid encouraging excessive risk-taking, it is important that an appropriate level of cash compensation is not variable. | Based on wide range of factors, including market pay surveys, business results, and individual performance.<br><br>Targeted to market median on average (based on survey information). |
| **STIP awards** | • Align executives with annual goals and objectives.<br>• Create a direct link between executive pay and annual financial and operational performance.<br>• Amount of compensation earned cannot exceed a maximum payout of 200% of individual target levels and is also subject to a claw-back in the event of a financial restatement or misconduct. | Actual payout is based on performance of company, business unit and individual.<br><br>Target award is approximately market median. |
| **LTI awards** | • Link pay and performance — accelerate growth, profitability and stockholder return.<br>• Align the interests of executives with stockholders.<br>• Balance plan costs, such as accounting and dilution, with employee-perceived value, potential wealth creation opportunity and employee share ownership expectations. | Actual value realized is based on company performance over a 3-year time frame or linked to stock price.<br><br>Targeted to market median on average. |
| | Performance Share Units :<br>• To serve as a long-term incentive based on the achievement of pre-established performance objectives in relation to the peer group in revenue growth and total stockholder return.<br>• Amount earned cannot exceed a maximum payout of 200% of individual target levels and is also subject to a claw-back in the event of a financial restatement or misconduct.<br>• Overlapping performance cycles to assure sustainability of performance. | Based on financial performance in relation to the peer group in revenue growth and total stockholder return. |
| | Stock Options / Restricted Stock Units :<br>• Aligns the interests of the officers and stockholders.<br>• Awards provide a balanced approach between risk and retention.<br>• Awards are subject to a claw-back in the event of a financial restatement or misconduct. | Actual value realized is linked to stock price. |

112

Table of Contents

In addition to the annual and long-term direct compensation programs designed to align pay with performance, DuPont provides its executives with the benefits, retirement plans, and limited perquisites summarized below. We expect these additional compensation features generally will be made available to our NEOs upon the distribution, though again all such features are subject to change by our Compensation Committee once it is established.

| Pay Element | Role in Program/Objectives | How Amounts Are Determined |
|---|---|---|
| **Standard benefits and retirement plans** | • Same tax-qualified retirement, medical, dental, vacation benefit, life insurance, and disability plans provided to other employees <br><br> • Nonqualified retirement plans that restore benefits above the Code limits for tax-qualified retirement plans as provided to other employees <br><br> • Nonqualified deferred compensation plan that allows for deferral of base salary, STIP and LTI awards | Tax-qualified plans are targeted to peer group median <br><br> Nonqualified retirement plans are provided to restore benefits due to Code limits |
| **Severance benefits (change in control)** | • Severance benefits upon a change in control and termination (double-trigger) to ensure continuity of management in a potential change in control environment <br><br> • A change in control does not automatically entitle an executive to this severance benefit. An executive must lose his/her job within two years of the change in control | Cash payment of two times base salary and target annual incentive (three times for the CEO) <br><br> Pro-rated payment of the target annual incentive for the year of termination. Financial counseling and outplacement services for two years (three for the CEO) |
| **Limited perquisites** | • Very limited perquisites or personal benefits <br><br> • Personal financial counseling (excluding tax preparation) at a cost of generally less than $10,000 per executive | |

### IV. Other Compensation and Tax Matters

*Change in Control Benefits* . To ensure DuPont executives remain focused on company business during a period of potential uncertainty, DuPont has adopted certain change in control benefits. For any benefits to be earned, a change in control must occur and the executive's employment must be terminated within two years following the change in control, either by the employer without cause or by the executive for good reason. No tax gross ups are payable under the change in control arrangements. We have not yet established any change in control benefits for our NEOs. If any such benefits are adopted, however, we expect it will be on a "double trigger" basis only and that no tax gross-ups will be payable.

*Stock Ownership Guidelines* . DuPont requires its executive officers to accumulate and hold shares of DuPont Common Stock with a value equal to a specified multiple of base pay. Our Compensation Committee will adopt stock ownership guidelines based on our compensation philosophy, business needs and corporate governance guidelines.

*Compensation Recovery Policy (Clawbacks)* . DuPont has in place a compensation recovery policy that covers each current and former employee of DuPont or an affiliated company who is, or was, a grantee of incentive-based compensation. If a grantee engages in misconduct, then: (i) he/she forfeits any right to receive any future awards or other equity-based incentive compensation; (ii) DuPont may demand repayment of any awards or cash

113

Table of Contents

payments already received by the grantee; and (iii) the grantee is required to provide repayment within ten days following demand. We expect our Compensation Committee will adopt similar recoupment policies to ensure incentive compensation paid as the result of any fraud or intentional misconduct leading to a restatement of our financial statements, would be recoverable.

*Tax Considerations* . Section 162(m) of the Code generally precludes a public corporation from taking a deduction for compensation in excess of $1,000,000 for its CEO or any of its three next-highest-paid executive officers (other than the Chief Financial Officer), unless certain specific and detailed criteria are satisfied. This limitation does not apply to qualified performance-based compensation. To qualify as performance-based, compensation must, among other things, be paid pursuant to a stockholder approved plan upon the attainment of objective performance criteria. We expect our Compensation Committee will develop compensation programs and designs that allow certain variable compensation paid to our NEOs to qualify as performance-based within the meaning of Section 162(m) so as to be tax deductible. However, our Compensation Committee may choose to adopt elements of our compensation programs that would not qualify as performance-based within the meaning of Section 162(m) as it determines appropriate. In any event, the requirement for stockholder approval of our compensation programs to qualify under Section 162(m) will not apply until our first annual meeting of stockholders that occurs at least one year after the distribution (i.e. our 2017 annual meeting).

**New Equity Incentive Plan**

Information regarding our contemplated new equity incentive plan will be provided by amendment to the registration statement on Form 10 of which this information statement is a part.

114

Table of Contents

## EXECUTIVE COMPENSATION

The following tables will be populated with information in regard to our NEOs for the fiscal year ending December 31, 2014 by amendment to the registration statement on Form 10 of which this information statement is a part. All of the compensation shown will relate to the compensation, if any, paid by DuPont to the NEO for 2014. We will not have paid our NEOs any compensation for 2014.

**Summary Compensation Table**

| Name and Principal Position | Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total ($) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |

**2014 Grants of Plan-Based Awards**

The following table will provide information on STIP awards, stock options, RSUs and PSUs granted in 2014 to each NEO.

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: Number of Shares of Stock or Units (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Share) | Grant Date Fair Value of Stock and Option Awards |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Threshold | Target | Maximum | Threshold (#) | Target (#) | Maximum (#) | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

115

Table of Contents

## Outstanding Equity Awards at December 31, 2014

The following table will show the number of shares underlying exercisable and unexercisable options and unvested and, as applicable, unearned RSUs and PSUs (in each case denominated in shares of DuPont Common Stock) held by our NEOs at December 31, 2014. Market or payout values in the table below will be based on the closing price of DuPont Common Stock as of December 31, 2014.

| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock Held That Have Not Vested (#) | Market Value of Shares or Units of Stock Held That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

## 2014 Option Exercises and Stock Vested

The table below will show the number of shares of DuPont Common Stock acquired upon the exercise of stock options and the vesting of RSUs and PSUs during 2014.

| Name | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| | Number of Shares Acquired on Exercise (#) | Value Realized Upon Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized Upon Vesting ($) |
| | | | | |

116

Table of Contents

**Pension Benefits as of December 31, 2014**

The table below will show the present value of accumulated benefits for the NEOs under the tax qualified and nonqualified pension plans of DuPont (the Pension Plan and Pension Restoration Plan, respectively), as of December 31, 2014.

| Name | Plan Name | Number of Years of Credited Service | Present Value of Accumulated Benefit [1] |
|---|---|---|---|
|  |  |  |  |

The Pension Plan is a tax-qualified defined benefit pension plan that covers a majority of the U.S. DuPont employees, except those hired or rehired after December 31, 2006. The Pension Plan provides employees with a lifetime retirement income based on years of service and the employees' final average pay near retirement. The normal form of benefit for married individuals is a 50 percent qualified joint and survivor annuity. The normal form of benefit for unmarried individuals is a single life annuity, which is actuarially equivalent to the normal form for married individuals. Normal retirement age under the Pension Plan is generally age 65, and benefits are vested after five years of service. Under the provisions of the Pension Plan, employees are eligible for unreduced pensions when they meet one of the following conditions:

• Age 65 or older with at least five years of service

• Age 58 with age plus service equal to or greater than 85

• Permanent incapacity to perform duties, with at least 15 years of service

An employee who is not eligible for retirement with an unreduced pension is eligible for retirement with a reduced pension if he/she is age 50 with at least 15 years of service. His/her pension is reduced by the greater of five percent for every year that his/her age plus service is less than 85 or five percent for every year that his/her age is less than 58. In no event will the reduction exceed 50 percent.

The primary pension formula that applies to the DuPont executive officers provides a monthly retirement benefit equal to:

$$\left( \begin{array}{l} 1.5\% \text{ of Average} \\ \text{Monthly} \\ \text{Compensation} \end{array} \times \begin{array}{l} \text{Years of} \\ \text{Service through} \\ 12/31/07 \end{array} \right) - \left[ \begin{array}{l} 50\% \text{ of Monthly} \\ \text{Primary Social} \\ \text{Security Benefit} \end{array} \times \left( \begin{array}{l} \text{Years of} \\ \text{Service through} \\ 12/31/07 \end{array} \Big/ \begin{array}{l} \text{Total} \\ \text{Years of} \\ \text{Service} \end{array} \right) \right]$$

PLUS

$$\left( \begin{array}{l} 0.5\% \text{ of Average} \\ \text{Monthly} \\ \text{Compensation} \end{array} \times \begin{array}{l} \text{Years of} \\ \text{Service after} \\ 12/31/07 \end{array} \right) - \left[ \begin{array}{l} 16.67\% \text{ of Monthly} \\ \text{Primary Social} \\ \text{Security Benefit} \end{array} \times \left( \begin{array}{l} \text{Years of} \\ \text{Service after} \\ 12/31/07 \end{array} \Big/ \begin{array}{l} \text{Total} \\ \text{Years of} \\ \text{Service} \end{array} \right) \right]$$

Average monthly compensation is based on the employee's three highest-paid years or, if greater, the 36 consecutive highest-paid months. Compensation for a given month includes regular compensation plus one-twelfth of an individual's STIP award for the relevant year. Other bonuses are not included in the calculation of average monthly compensation.

If benefits provided under the Pension Plan exceed the applicable Code compensation or benefit limits, the excess benefit is paid under the Pension Restoration Plan, an unfunded nonqualified plan. Effective January 1, 2007, the form of benefit under the Pension Restoration Plan for participants not already in pay status is a lump sum. The mortality tables and interest rates used to determine lump sum payments are the Applicable Mortality Table and the Applicable Interest Rate prescribed by the Secretary of the Treasury in Section 417(e)(3) of the Code.

117

**Table of Contents**

DuPont has not granted the NEOs any extra years of credited service.

**Nonqualified Deferred Compensation As of December 31, 2014**

The following table will provide information on DuPont's defined contribution or other plans that during 2014 provided for deferrals of compensation on a basis that is not tax-qualified.

| Name | Executive Contributions in 2014 | Registrant Contributions in 2014 | Aggregate Earnings in 2014 | Aggregate Balance as of 12/31/2014 |
|---|---|---|---|---|
| | | | | |

**Potential Payments upon Termination or Change In Control**

This section will provide information on the compensation and benefits that would have been provided to the NEOs had a change in control of DuPont occurred on December 31, 2014 or had their employment terminated on that date under certain specified circumstances. All of the compensation will be compensation, if any, that would have been paid under DuPont arrangements applicable to the NEOs at that time (exclusive of plans that are generally available to all salaried employees and that do not discriminate in scope, terms, or operation in favor of executive officers). The amounts to be shown will not necessarily be indicative of what we will pay under similar circumstances because we have not yet determined what change in control or termination plans we will adopt and because in any event a wide variety of factors can affect payment amounts, which as a result can be determined with certainty only when an actual change in control or termination event occurs.

118

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PERSON TRANSACTIONS

*Review and Approval of Transactions with Related Persons*

Our board of directors is expected to adopt written policies and procedures relating to the approval or ratification of "Related Person Transactions." Under the policies and procedures, the Governance Committee (or its Chair, under some circumstances) will review the relevant facts of all proposed Related Person Transactions and either approve or disapprove of the entry into the Related Person Transaction, by taking into account, among other factors it deems appropriate: (i) the commercial reasonableness of the transaction; (ii) the materiality of the Related Person's direct or indirect interest in the transaction; (iii) whether the transaction may involve a conflict of interest, or the appearance of one; (iv) whether the transaction was in the ordinary course of business; and (v) the impact of the transaction on the Related Person's independence under the Corporate Governance Guidelines and applicable regulatory and listing standards.

No director will participate in any discussion or approval of a Related Person Transaction for which he/she or any of his/her immediate family members is the Related Person. Related Person Transactions will be approved or ratified only if they are determined to be in the best interests of us and our stockholders.

If a Related Person Transaction that has not been previously approved or previously ratified is discovered, the Related Person Transaction will be presented to the Governance Committee for ratification. If the Governance Committee does not ratify the Related Person Transaction, then we either ensures all appropriate disclosures regarding the transaction are made or, if appropriate, takes all reasonable actions to attempt to terminate its participation in the transaction.

It is expected that under our policies and procedures to be adopted, a "Related Person Transaction" will generally be include any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships in which: (i) we were, are or will be a participant;(ii) the aggregate amount involved exceeds $[ • ] in any fiscal year; and (iii) any Related Person had, has or will have a direct or indirect material interest.

It is expected that under our policies and procedures to be adopted, a "Related Person" will generally be any person who is, or at any time since the beginning of our last fiscal year was: (i) a director or an executive officer of us or a nominee to become a director of us; (ii) any person who is known to be the beneficial owner of more than five percent of any class of our outstanding common stock; or (iii) any immediate family member of any of the persons mentioned above.

Our Governance Committee will be charged with reviewing issues involving independence and all Related Person Transactions. It is expected that we and our subsidiaries may purchase products and services from and/or sell products and services to companies of which certain of our directors or executive officers, or their immediate family members, are employees. The Governance Committee and our board of directors will have reviewed such transactions and relationships and make a determination as to the materiality of such transactions.

*Restrictions on Certain Types of Transactions*

We expect to adopt a policy that prohibits directors and officers from engaging in the following types of transactions with respect to our stock: short-term trading; short sales; hedging transactions; margin accounts and pledging securities. This policy will also strongly recommend that all other employees refrain from entering into these types of transactions.

119

Table of Contents

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

Before the distribution, all of the outstanding shares of our common stock will be owned beneficially and of record by DuPont. The following table sets forth information with respect to the expected beneficial ownership of our common stock by: (1) each person who is known by us who will beneficially own more than five percent of our common stock, (2) each expected director, director nominee and named executive officers and (3) all of our expected directors, director nominees and executive officers as a group. Except as noted below, we based the share amounts on each person's beneficial ownership of DuPont common stock on [ • ], 2015, giving effect to a distribution ratio of [ • ] shares of our common stock for each common stock of DuPont. Immediately following the distribution, we estimate that [ • ] million of our shares of common stock will be issued and outstanding based on DuPont common stock expected to be outstanding as of the record date. The actual number of our outstanding shares of our common stock following the distribution will be determined on [ • ], 2015, the record date.

### Security Ownership of Certain Beneficial Owners

Based solely on the information filed on Schedule 13G for the year ended December 31, 2013, reporting beneficial ownership of DuPont common stock, we anticipate the following stockholders will beneficially own more than five percent of our common stock following the distribution.

| Name and Address of Beneficial Owner | Number of Shares of DuPont Common Stock | Number of Share of Our Common Stock | Percent of Shares Outstanding |
|---|---|---|---|
| Blackrock, Inc.<br>40 East 52nd Street<br>New York, NY 10022 | 57,492,034[1] | | 6.20[1] |
| The Vanguard Group<br>100 Vanguard Blvd.<br>Malvern, PA 19355 | 47,220,623[2] | | 5.09[2] |

(1)   Based solely on Schedule 13G/A filed with the Securities and Exchange Commission on February 10, 2014, Blackrock, Inc., reported that it has sole voting power with respect to 46,909,081 shares and sole dispositive power with respect to 57,492,034 shares as of December 31, 2013.

(2)   Based solely on a Schedule 13G filed with the Securities and Exchange Commission on February 12, 2014, The Vanguard Group reported it has sole voting power with the respect to 1,511,866 shares, sole dispositive power with respect to 45,804,463 shares, and shared dispositive power with respect to 1,416,160 shares as of December 31, 2013.

### Security Ownership of Directors and Executive Officers

The following table provides information regarding beneficial ownership of our named executive officers, our expected directors, direct nominees and all of our expected directors, director nominees and executive officers as a group.

| Name | Amount and Nature of Beneficial Ownership (Number of Shares) | | | | Percent of Class |
|---|---|---|---|---|---|
| | Direct [1] | Indirect [2] | Right to Acquire [3] | Total | |
| Mark P. Vergnano [4] | | | | | * |
| Mark E. Newman [5] | | | | | * |
| Directors and Officers as a Group | | | | | * |

*   Less than one percent

(1)   These shares are held individually or jointly with others, or in the name of a bank, broker or nominee for the individual's account.

120

Table of Contents

(2)    This column includes other shares over which directors and executive officers have or share voting or investment power, including shares directly owned by certain relatives with whom they are presumed to share voting and/or investment power, and shares held under the RSP.

(3)    This column includes shares which directors and executive officers had a right to acquire beneficial ownership of within 60 days from December 31, 2013, through the exercise of stock options or through the conversion of RSUs or deferred stock units granted or held under DuPont's equity-based compensation plans.

(4)    Mr. Vergnano's share ownership includes: [ •   ].

(5)    Mr. Newman's share ownership includes: [ •   ].

121

**Table of Contents**

**OUR RELATIONSHIP WITH DUPONT FOLLOWING THE DISTRIBUTION**

Following the separation, we and DuPont will operate separately, each as an independent public company. Prior to the separation, we and DuPont will enter into certain agreements that will effect the separation, provide a framework for our relationship with DuPont after the separation and provide for the allocation between us and DuPont of DuPont's assets, employees, liabilities and obligations (including its investments, property and employee benefits and tax-related assets and liabilities) attributable to periods prior to, at and after our separation from DuPont. The following is a summary of the terms of the material agreements that we intend to enter into with DuPont prior to the separation. When used in this section, "distribution date" refers to the date on which DuPont distributes our common stock to the holders of DuPont common stock.

The material agreements described below will be filed as exhibits to the registration statement on Form 10 of which this information statement is a part, and the summaries of each of these agreements set forth the terms of the agreements that we believe are material. These summaries are qualified in their entireties by reference to the full text of the applicable agreements, which are incorporated by reference into this information statement. The terms of the agreements described below that will be in effect following the separation have not yet been finalized; changes to these agreements, some of which may be material, may be made prior to our separation from DuPont.

**Separation Agreement**

We intend to enter into a Separation Agreement with DuPont prior to the distribution of our common stock to DuPont stockholders. The Separation Agreement will set forth our agreements with DuPont regarding the principal actions to be taken in connection with the separation. It will also set forth other agreements that govern certain aspects of our relationship with DuPont following the separation and distribution. This summary of the Separation Agreement is qualified in its entirety by reference to the full text of the agreement, which is incorporated by reference into this information statement.

*Transfer of Assets and Assumption of Liabilities* . The Separation Agreement will identify assets to be transferred, liabilities to be assumed and contracts to be assigned to each of DuPont and us as part of the internal reorganization transaction described herein, and will describe when and how these transfers, assumptions and assignments will occur, though many of the transfers, assumptions and assignments will have already occurred prior to the parties' entering into the Separation Agreement. The Separation Agreement will provide for those transfers of assets and assumptions of liabilities that are necessary in connection with the separation so that we and DuPont retain the assets necessary to operate our respective businesses and retain or assume the liabilities allocated in accordance with the separation. The Separation Agreement will also provide for the settlement or extinguishment of certain liabilities and other obligations between us and DuPont. In particular, the Separation Agreement will provide that, subject to the terms and conditions contained in the Separation Agreement:

- All of the assets, including the equity interests of our subsidiaries, assets reflected on our pro forma balance sheet and assets exclusively relating to our business will be retained by or transferred to us or one of our subsidiaries, except as set forth in one of the other agreements described below.

- All of the liabilities (including whether accrued, contingent or otherwise, and subject to certain exceptions) primarily related to, arising out of or resulting from our business will be retained by or transferred to us or one of our subsidiaries, except as set forth in one of the other agreements described below.

- Liabilities (including whether accrued, contingent or otherwise) related to, arising out of or resulting from certain businesses of DuPont that were previously terminated or divested will be generally allocated among the parties to the extent formerly owned or primarily managed or otherwise operated by such parties or their respective businesses.

- Liabilities (including whether accrued, contingent or otherwise) relating to environmental matters, including liabilities relating to remediation, hazardous substances and off-site liability arising from or

122

Table of Contents

related to our business, property or assets and certain other specified environmental liabilities, will be retained by or transferred to us or one of our subsidiaries.

- Liabilities (including whether accrued, contingent or otherwise) relating to legal proceedings, including actions primarily relating to or arising out our business and certain other specified actions, including with respect to PFOA, will be retained by or transferred to us or one of our subsidiaries.

- Liabilities (including whether accrued, contingent or otherwise) relating to, arising out of or resulting from infringement, misappropriation or other violations of any intellectual property relating to the conduct of our business will be retained by or transferred to us or one of our subsidiaries.

- Liabilities (including whether accrued, contingent or otherwise) relating to, arising out of or resulting from any form, registration statement, schedule or similar disclosure document filed or furnished with the U.S. Securities and Exchange Commission, to the extent the liability arising therefrom related to matters related to our business will be retained by or transferred to us or one of our subsidiaries.

- We will generally assume all other liability (including whether accrued, contingent or otherwise) relating to, arising out of or resulting from disclosure documents filed or furnished with the U.S. Securities and Exchange Commission that are related to the separation (including the Form 10 and this information statement).

- Except as expressly set forth in the Separation Agreement or any other agreements, each party shall be responsible for its own internal fees, costs and expenses incurred following the distribution date, including any costs and expenses relating to such party's disclosure documents filed following the distribution date.

- All assets and liabilities (including whether accrued, contingent or otherwise) of DuPont will be retained by or transferred to DuPont or one of its subsidiaries (other than us or one of our subsidiaries), except as set forth in one of the other agreements described below and except for other limited exceptions that will result in us retaining or assuming certain other specified liabilities.

The allocation of liabilities with respect to taxes, except for payroll taxes and reporting and other tax matters expressly covered by the employee matters agreement, are solely covered by the tax matters agreement.

Except as may expressly be set forth in the Separation Agreement or any ancillary agreement, all assets will be transferred on an "as is," "where is" basis and the respective transferees will bear the economic and legal risks that any conveyance will prove to be insufficient to vest in the transferee good title, free and clear of any security interest, that any necessary consents or governmental approvals are not obtained and that any requirements of laws or judgments are not complied with. In general, neither we nor DuPont will make any representations or warranties regarding any assets or liabilities transferred or assumed, any consents or approvals that may be required in connection with such transfers or assumptions, or any other matters.

Information in this information statement with respect to the assets and liabilities of the parties following the separation is presented based on the allocation of such assets and liabilities pursuant to the Separation Agreement, unless the context otherwise requires. Certain of the liabilities and obligations to be assumed by one party or for which one party will have an indemnification obligation under the Separation Agreement and the other agreements relating to the separation are, and following the separation may continue to be, the legal or contractual liabilities or obligations of another party. Each such party that continues to be subject to such legal or contractual liability or obligation will rely on the applicable party that assumed the liability or obligation or the applicable party that undertook an indemnification obligation with respect to the liability or obligation, as applicable, under the Separation Agreement, to satisfy the performance and payment obligations or indemnification obligations with respect to such legal or contractual liability or obligation.

*Further Assurances; Separation of Guarantees* . To the extent that any transfers of assets or assumptions of liabilities contemplated by the Separation Agreement have not been consummated on or prior to the date of the distribution, the parties will agree to cooperate with each other to effect such transfers or assumptions while

123

Table of Contents

holding such assets or liabilities for the benefit of the appropriate party so that all the benefits and burdens relating to such asset or liability inure to the party entitled to receive or assume such asset or liability. Each party will agree to use commercially reasonable efforts to take or to cause to be taken all actions, and to do, or to cause to be done, all things reasonably necessary under applicable law or contractual obligations to consummate and make effective the transactions contemplated by the Separation Agreement and other transaction agreements. Additionally, we and DuPont will use commercially reasonable efforts to remove us as a guarantor of liabilities (including surety bonds) retained by DuPont and its subsidiaries and to remove DuPont and its subsidiaries as a guarantor of liabilities (including surety bonds) to be assumed by us.

*The Distribution* . The Separation Agreement will govern the rights and obligations of the parties regarding the proposed distribution and certain actions that must occur prior to the proposed distribution. DuPont will cause its agent to distribute to its stockholders that hold shares of DuPont's common stock as of the applicable record date all the issued and outstanding shares of our common stock. DuPont will have the sole and absolute discretion to determine (and change) the terms of, and whether to proceed with, the distribution and, to the extent it determines to so proceed, to determine the date of the distribution.

*Conditions.* The Separation Agreement will provide that the distribution is subject to several conditions that must be satisfied or waived by DuPont in its sole discretion. For further information regarding these conditions, see "The Distribution—Conditions to the Distribution." DuPont may, in its sole discretion, determine the record date, the distribution date and the terms of the distribution and may at any time prior to the completion of the distribution decide to abandon or modify the distribution.

*Shared Contracts* . Certain shared contracts are to be assigned or amended to facilitate the separation of our business from DuPont. If such contracts may not be assigned or amended, the parties are required to take reasonable actions to cause the appropriate party to receive the benefit of the contract after the separation is complete.

*Release of Claims and Indemnification.* Except as otherwise provided in the Separation Agreement or any ancillary agreement, each party will release and forever discharge the other party and its subsidiaries and affiliates from all liabilities existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed on or before the separation. The releases will not extend to obligations or liabilities under any agreements between the parties that remain in effect following the separation pursuant to the Separation Agreement or any ancillary agreement. These releases will be subject to certain exceptions set forth in the Separation Agreement.

The Separation Agreement will provide for cross-indemnities that, except as otherwise provided in the Separation Agreement, are principally designed to place financial responsibility for the obligations and liabilities allocated to us under the Separation Agreement with us and financial responsibility for the obligations and liabilities allocated to DuPont under the Separation Agreement with DuPont. Specifically, each party will indemnify, defend and hold harmless the other party, its affiliates and subsidiaries and each of its officers, directors, employees and agents for any losses arising out of or due to:

- the liabilities or alleged liabilities each party assumed or retained pursuant to the Separation Agreement;

- the operation of each such party's business, whether prior to, at, or after the distribution; and

- any breach by us or DuPont of any provision of the Separation Agreement or any other agreement unless such other agreement expressly provides for separate indemnification therein.

The amount of each party's indemnification obligations will be subject to reduction by any insurance proceeds received by the party being indemnified. The Separation Agreement will also specify procedures with respect to claims subject to indemnification and related matters. Indemnification with respect to taxes will be governed by the Tax Matters Agreement.

Table of Contents

*Legal Matters* . Except as otherwise set forth in the Separation Agreement or any ancillary agreement (or as otherwise described above), each party to the Separation Agreement will assume the liability for, and control of, all pending, threatened and future legal matters related to its own business or its assumed or retained liabilities and will indemnify the other party for any liability arising out of or resulting from such legal matters. Each party to a claim will agree to cooperate in defending any claims against the other party for events that took place prior to, on or after the date of distribution.

*Cash Distribution* . The Separation Agreement will provide that, prior to the distribution, we will make a cash distribution to DuPont, funded partially by third-party indebtedness that we will incur prior to the date of the distribution. The completion of the cash distribution will be a condition to the consummation of the separation under the Separation Agreement.

*Cash True-up* . The Separation Agreement will contain a cash adjustment provision, to be determined within [ ● ] days of the distribution, that will assure that our aggregate cash balance at the time of the distribution is equal to a target level of cash. This adjustment could result in a payment to us from DuPont or a payment by us to DuPont.

*Insurance* . Following the separation, we will be responsible for obtaining and maintaining at our own cost our own insurance coverage.

*Dispute Resolution* . If a dispute arises between us and DuPont under the Separation Agreement, the general counsels of the parties and such other representatives as the parties may designate will negotiate to resolve any disputes for a reasonable period of time. If the parties are unable to resolve the dispute in this manner then, unless otherwise agreed by the parties and except as otherwise set forth in the Separation Agreement, the dispute will be resolved through binding arbitration.

*Term/Termination* . Prior to the distribution, DuPont has the unilateral right to terminate or modify the terms of the Separation Agreement. After the effective time of the distribution, the term of the Separation Agreement is indefinite and it may only be terminated with the prior written consent of both DuPont and us.

*No Solicit; No Hire* . We and DuPont will agree that for a period of two years following the effective date, subject to certain customary exceptions, neither us nor DuPont will (1) recruit, solicit, hire, or retain an employee of the other party or its subsidiaries or (2) induce or attempt to induce any such employee to cease his relationship with the other party.

*Other Matters Governed by the Separation Agreement* . Other matters governed by the Separation Agreement include access to financial and other information, confidentiality, access to and provision of records and treatment of outstanding guarantees and similar credit support.

**Site Services Agreements**

We intend to enter into Site Services Agreements with DuPont for the provision of site services at shared sites either (a) by Chemours to DuPont at sites owned by Chemours and on which DuPont will maintain operations, or (b) by DuPont to Chemours at sites owned by DuPont on which Chemours will maintain operations. These services agreements will generally address provision of services relating to access to steam, waste water treatment, potable water supply, access to electricity, to the extent permitted by local law, site security to the extent permitted by, and in accordance with, Federal law.

All such services will be provided for an indefinite period of time and for specified fees, which are generally at cost.

125

Table of Contents

**Transition Services Agreement / IT Transition Services Agreement**

We intend to enter into a Transition Services Agreement and an IT Transition Services Agreement pursuant to which DuPont will provide functional and information technology services respectively Chemours. DuPont will provide such services for a limited time, generally for no longer than 24 months following the date of the distribution, for specified fees, which are at cost for services provided by third parties and at cost plus five percent for services provided by either Chemours or DuPont, as applicable.

**Tax Matters Agreement**

*Allocation of Taxes.* We intend to enter into a Tax Matters Agreement with DuPont immediately prior to the distribution that will govern the parties' respective rights, responsibilities and obligations with respect to tax liabilities and benefits, tax attributes, the preparation and filing of tax returns, the control of audits and other tax proceedings and other matters regarding taxes. In general, under the agreement:

- DuPont will be responsible for any U.S. federal, state and local taxes (and any related interest, penalties or audit adjustments) reportable on a consolidated, combined or unitary return that includes DuPont or any of its subsidiaries (and us and/or any of our subsidiaries) for any periods or portions thereof ending on or prior to the date of the distribution.

- Otherwise, we will be responsible for any U.S. federal, state, local and foreign taxes (and any related interest, penalties or audit adjustments) that are imposed on us and/or any of our subsidiaries for all tax periods, whether before or after the date of the distribution.

Neither party's obligations under the agreement will be limited in amount or subject to any cap. The agreement will also assign responsibilities for administrative matters, such as the filing of returns, payment of taxes due, retention of records and conduct of audits, examinations or similar proceedings. In addition, the agreement provides for cooperation and information sharing with respect to tax matters.

DuPont will generally be responsible for preparing and filing any tax return that includes DuPont or any of its subsidiaries (as determined immediately after the distribution), including those that also include us and/or any of our subsidiaries. We will generally be responsible for preparing and filing any tax returns that include only us and/or any of our subsidiaries.

The party responsible for preparing and filing a given tax return will generally have primary authority to control tax contests related to any such tax return. We will generally have exclusive authority to control tax contests with respect to tax returns that include only us and/or any of our subsidiaries.

*Preservation of the Tax-free Status of Certain Aspects of the Separation* . We and DuPont intend for the distribution and certain related transactions to qualify as a reorganization pursuant to which no gain or loss is recognized by DuPont or its shareholders for U.S. federal income tax purposes under Sections 355, 368(a)(1)(D) and related provisions of the Code. In addition, we and DuPont intend for certain other aspects of the separation to qualify for tax-free treatment under U.S. federal, state and local tax law and/or foreign tax law.

DuPont has received a private letter ruling from the IRS to the effect that, among other things, the distribution and certain related transactions qualify as a reorganization pursuant to which no gain or loss is recognized by DuPont or its shareholders for U.S. federal income tax purposes under Sections 355, 368(a)(1)(D) and related provisions of the Code. In addition, DuPont will receive opinions from its outside tax advisors regarding the tax-free status of these transactions and certain related transactions. In connection with the ruling and the opinions, we and DuPont have made and will make certain representations regarding the past and future conduct of our respective businesses and certain other matters.

We will also agree to certain covenants that contain restrictions intended to preserve the tax-free status of the distribution and certain related transactions. We may take certain actions prohibited by these covenants only if DuPont receives a private letter ruling from the IRS or we obtain and provide to DuPont an opinion from a U.S.

126

tax counsel or accountant of recognized national standing, acceptable to DuPont in its sole and absolute discretion, to the effect that such action would not jeopardize the tax-free status of these transactions. We will be barred from taking any action, or failing to take any action, where such action or failure to act adversely affects the tax-free status of these transactions, for all time periods. In addition, during the time period ending two years after the date of the potential Distribution these covenants will include specific restrictions on our:

- issuance or sale of stock or other securities (including securities convertible into our stock but excluding certain compensatory arrangements);

- sales of assets outside the ordinary course of business; and

- entering into any other corporate transaction (apart from the Merger or LLC Merger) which would cause us to undergo a 50 percent or greater change in our stock ownership.

We will generally agree to indemnify DuPont and its affiliates against any and all tax-related liabilities incurred by them relating to the distribution and certain other aspects of the separation to the extent caused by an acquisition of our stock or assets or by any other action undertaken by us. This indemnification provision will apply even if DuPont has permitted us to take an action that would otherwise have been prohibited under the tax-related covenants described above.

**Employee Matters Agreement**

We will enter into an Employee Matters Agreement with DuPont prior to the distribution that will govern the compensation and employee benefit obligations with respect to our current and former employees and those of DuPont. The Employee Matters Agreement will allocate liabilities and responsibilities relating to employee compensation and benefits plans and programs and other related matters in connection with the distribution including, without limitation, the treatment of outstanding DuPont equity awards, other outstanding incentive compensation awards, deferred compensation obligations and retirement and welfare benefit obligations.

With certain exceptions, the Employee Matters Agreement will provide that as of the consummation of the distribution, our employees will cease to be active participants in, and we will cease to be a participating employer in, the benefit plans and programs maintained by DuPont. As of such time, our employees will generally become eligible to participate in all of our applicable plans. In general, we will credit each of our employees with his or her pre-distribution service for all purposes under the plans maintained by us to the extent the corresponding DuPont plans gave credit for such service and such crediting does not result in a duplication of benefits.

We will generally retain or assume responsibility for, and will pay and be liable for, all wages, salaries, welfare, incentive compensation and employment-related obligations and liabilities with respect to our current employees, whether arising before or after the distribution, and DuPont will generally retain or assume responsibility for, and will pay and be liable for, all such obligations and liabilities with respect to its own employees and our former employees. There will be no transfer of pension assets or liabilities in the United States, and DuPont will retain the obligation to provide any post-retirement welfare benefits that may have be made available to our employees in the United States. The treatment of benefit plans maintained outside of the United States is generally subject to the provisions of the applicable local transfer agreements.

**IP Cross-License**

We intend that certain of our subsidiaries will enter into two Intellectual Property Cross-License Agreements with DuPont, pursuant to which (i) DuPont will license to Chemours certain patents, know-how and technical information owned by DuPont or its affiliates and necessary or useful in Chemours' business, and (ii) Chemours will license to DuPont certain patents owned by Chemours or its affiliates and necessary or useful in DuPont's business. All patents and technical information licensed pursuant to this agreement will be identified in schedules to the agreement.

127

**Table of Contents**

In most circumstances, the licenses will be perpetual, irrevocable, sublicenseable (in connection with the party's business), assignable (in connection with a sale of the applicable portion of a party's business or assets, subject to certain exceptions), worldwide licenses in connection with the current operation of the businesses and, with respect to specified products and fields of use, future operation of such businesses, subject to certain limitations.

**Tolling, Supply and other Commercial Agreements**

We intend to enter into certain tolling, supply and other commercial agreements with DuPont, the terms and conditions and costs of which will be specified in each such agreement.

*Other Agreements*

**Real Estate Matters**

We intend to enter into one or more License to Use Agreements with DuPont, involving our and DuPont's subsidiaries, under which we and DuPont will allow each other to use certain shared manufacturing sites for an indefinite period of time for specified fees, and to certain lab space, office space, warehouse space, outside storage yard space, restrooms and conference rooms on a temporary basis for specified fees.

**Other Ancillary Agreements**

We intend enter into additional ancillary agreements related to the separation, including a reciprocal sales arrangement, on arm's-length terms, that would continue the compatibility of certain of our products into certain DuPont technology platforms or otherwise provide for the sale of goods or services, and an agreement regarding the manufacture and sale by DuPont to us of a limited number of products or intermediates currently manufactured at a facility housing Chemours equipment, as well as the ownership and transfer of the equipment and other property and the employment of the personnel related to the manufacturing of those products or intermediates.

128

Table of Contents

### MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE DISTRIBUTION

The following is a summary of the material U.S. federal income tax consequences to DuPont and to the holders of shares of DuPont common stock in connection with the distribution. This summary is based on the Code, the Treasury Regulations promulgated thereunder, and judicial and administrative interpretations thereof, all as in effect as of the date of this information statement and all of which are subject to differing interpretations and may change at any time, possibly with retroactive effect. Any such change could affect the tax consequences described below. This summary assumes that the separation will be consummated in accordance with the Separation Agreement and as described in this information statement.

Except as specifically described below, this summary is limited to holders of shares of DuPont common stock that are U.S. Holders, as defined immediately below. For purposes of this summary, a U.S. Holder is a beneficial owner of DuPont common stock that is, for U.S. federal income tax purposes:

- an individual who is a citizen or a resident of the U.S.;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized under the laws of the U.S. or any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if (1) a court within the U.S. is able to exercise primary jurisdiction over its administration and one or more U.S. persons have the authority to control all of its substantial decisions, or (2) in the case of a trust that was treated as a domestic trust under the law in effect before 1997, a valid election is in place under applicable Treasury Regulations.

This summary also does not discuss all tax considerations that may be relevant to stockholders in light of their particular circumstances, nor does it address the consequences to stockholders subject to special treatment under the U.S. federal income tax laws, such as:

- dealers or traders in securities or currencies;

- tax-exempt entities;

- cooperatives;

- banks, trusts, financial institutions, or insurance companies;

- persons who acquired shares of DuPont common stock pursuant to the exercise of employee stock options or otherwise as compensation;

- stockholders who own, or are deemed to own, at least 10 percent or more, by voting power or value, of DuPont's equity;

- holders owning DuPont common stock as part of a position in a straddle or as part of a hedging, conversion, constructive sale, synthetic security, integrated investment, or other risk reduction transaction for U.S. federal income tax purposes;

- certain former citizens or former long-term residents of the U.S.;

- holders who are subject to the alternative minimum tax; or

- persons that own DuPont common stock through partnerships or other pass-through entities.

This summary does not address the U.S. federal income tax consequences to stockholders who do not hold shares of DuPont common stock as a capital asset. Moreover, this summary does not address any state, local, or foreign tax consequences or any estate, gift or other non-income tax consequences.

129

Table of Contents

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds shares of DuPont common stock, the tax treatment of a partner in that partnership generally will depend on the status of the partner and the activities of the partnership. Such a partner or partnership should consult its own tax advisor as to the tax consequences of the distribution.

**YOU SHOULD CONSULT YOUR OWN TAX ADVISOR WITH RESPECT TO THE SPECIFIC U.S. FEDERAL, STATE AND LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE DISTRIBUTION IN LIGHT OF YOUR PARTICULAR CIRCUMSTANCES AND THE EFFECT OF POSSIBLE CHANGES IN LAW THAT MIGHT AFFECT THE TAX CONSEQUENCES DESCRIBED IN THIS INFORMATION STATEMENT.**

*Treatment of the Distribution*

DuPont has received the IRS Ruling from the IRS substantially to the effect that, among other things, the distribution will qualify as a tax-free transaction under Section 355 and Section 368(a)(1)(D) of the Code. The distribution is conditioned on the continued validity of the IRS Ruling, as well as on receipt of the Tax Opinion, in form and substance acceptable to DuPont, substantially to the effect that, among other things, the distribution will qualify as a tax-free transaction under Section 355 and Section 368(a)(1)(D) of the Code, and certain transactions related to the transfer of assets and liabilities to us in connection with the separation will not result in the recognition of any gain or loss to DuPont, us or our stockholders.

Assuming the distribution qualifies as tax-free under Section 368(a)(1)(D) and Section 355 of the Code, for U.S. federal income tax purposes:

- no gain or loss will be recognized by DuPont as a result of the distribution;

- no gain or loss will be recognized by, or be includible in the income of, a holder of DuPont common stock solely as a result of the receipt of our common stock in the distribution;

- the aggregate tax basis of the shares of DuPont common stock and shares of our common stock in the hands of each DuPont stockholder immediately after the distribution will be the same as the aggregate tax basis of the shares of DuPont common stock held by such holder immediately before the distribution, allocated between the shares of DuPont common stock and shares of our common stock in proportion to their relative fair market values immediately following the distribution;

- the holding period with respect to shares of our common stock received by DuPont stockholders will include the holding period of their shares of DuPont common stock, provided that such shares of DuPont common stock are held as a capital asset immediately following the distribution; and

- DuPont stockholders that have acquired different blocks of DuPont common stock at different times or at different prices should consult their tax advisors regarding the allocation of their aggregate adjusted basis among, and their holding period of, our shares distributed with respect to blocks of DuPont common stock.

Although the IRS Ruling is generally binding on the IRS, the IRS Ruling is based on certain facts and assumptions, and certain representations and undertakings, from DuPont and us that certain necessary conditions to obtain tax-free treatment under the Code have been satisfied. Furthermore, as a result of the IRS's general ruling policy with respect to distributions under Section 355 of the Code as in effect at the time the IRS Ruling was requested, the IRS did not rule on whether a distribution satisfies certain critical requirements necessary to obtain tax-free treatment under the Code. Specifically, the IRS did not rule that the distribution was effected for a valid business purpose, that the distribution does not constitute a device for the distribution of earnings and profits, or that the distribution is not part of a plan described in Section 355(e) of the Code (as discussed below). Instead, the IRS Ruling is based on representations made to the IRS by DuPont that these requirements have been established. DuPont expects to obtain the Tax Opinion, which is expected to include a conclusion that the distribution is being effected for a valid business purpose, that the distribution does not constitute a device for the

130

Table of Contents

distribution of earnings and profits, and that the distribution is not part of a plan described in Section 355(e) of the Code (as discussed below). The Tax Opinion will be expressed as of the date of the distribution and will not cover subsequent periods, and the Tax Opinion will rely on the IRS Ruling. As a result, the Tax Opinion is not expected to be issued until after the date of this information statement. An opinion of counsel represents counsel's best legal judgment based on current law and is not binding on the IRS or any court. We cannot assure you that the IRS will agree with the conclusions expected to be set forth in the Tax Opinion, and it is possible that the IRS or another tax authority could adopt a position contrary to one or all of those conclusions and that a court could sustain that contrary position. If any of the facts, representations, assumptions, or undertakings described or made in connection with the IRS Ruling or the Tax Opinion are not correct, are incomplete or have been violated, the IRS Ruling could be revoked retroactively or modified by the IRS, and our ability to rely on the Tax Opinion could be jeopardized. We are not aware of any facts or circumstances, however, that would cause these facts, representations, or assumptions to be untrue or incomplete, or that would cause any of these undertakings to fail to be complied with, in any material respect.

If, notwithstanding the conclusions in the IRS Ruling and those that we expect to be included in the Tax Opinion, it is ultimately determined that the distribution does not qualify as tax-free under Section 355 of the Code for U.S. federal income tax purposes, then DuPont would recognize gain in an amount equal to the excess, if any, of the fair market value of our common stock distributed to DuPont's stockholders on the distribution date over DuPont's tax basis in such shares. In addition, each DuPont stockholder that receives shares of our common stock in the distribution could be treated as receiving a distribution in an amount equal to the fair market value of our common stock that was distributed to the stockholder, which generally would be taxed as a dividend to the extent of the stockholder's pro rata share of DuPont's current and accumulated earnings and profits, including DuPont's taxable gain, if any, on the distribution, then treated as a non-taxable return of capital to the extent of the stockholder's basis in DuPont stock and thereafter treated as capital gain from the sale or exchange of DuPont stock.

Even if the distribution otherwise qualifies for tax-free treatment under Section 355 of the Code, the distribution may result in corporate level taxable gain to DuPont under Section 355(e) of the Code if 50 percent or more, by vote or value, of our stock or DuPont's stock is treated as acquired or issued as part of a plan or series of related transactions that includes the distribution. If an acquisition or issuance of our stock or DuPont's stock triggers the application of Section 355(e) of the Code, DuPont would recognize taxable gain as described above, but the distribution would be tax-free to each DuPont stockholder.

A U.S. Holder that receives cash instead of fractional shares of our common stock should be treated as though the U.S. Holder first received a distribution of a fractional share of our common stock, and then sold it for the amount of cash. Such U.S. Holder should recognize capital gain or loss, provided that the fractional share is considered to be held as a capital asset, measured by the difference between the cash received for such fractional share and the U.S. Holder's basis in the fractional share, as determined above. Such capital gain or loss should generally be a long-term capital gain or loss if the U.S. Holder's holding period for such U.S. Holder's DuPont common stock exceeds one year on the date of the distribution.

U.S. Treasury regulations require certain stockholders that receive stock in a distribution to attach a detailed statement setting forth certain information relating to the distribution to their respective U.S. federal income tax returns for the year in which the distribution occurs. Within a reasonable period after the distribution, DuPont will provide stockholders who receive our common stock in the distribution with the information necessary to comply with such requirement. In addition, all stockholders are required to retain permanent records relating to the amount, basis, and fair market value of our common stock received in the distribution and to make those records available to the IRS upon request of the IRS.

**Table of Contents**

**FINANCING ARRANGEMENTS**

We expect that, at the time of distribution, we will have significant third-party indebtedness, which we expect to incur through a bond offering, term loans or a combination of these and other financing arrangements. Subsequent information regarding our indebtedness following the distribution will be provided in subsequent amendments to this information statement.

132

Table of Contents

## DESCRIPTION OF OUR CAPITAL STOCK

Our amended and restated certificate of incorporation and by-laws will be amended and restated prior to the separation. The following is a summary of the material terms of our capital stock that will be contained in the amended and restated certificate of incorporation and amended and restated by-laws, and is qualified in its entirety by reference to these documents. You should refer to our amended and restated certificate of incorporation and amended and restated by-laws, which are included as exhibits to the registration statement of which this information statement is a part, along with the applicable provisions of Delaware law. Prior to the distribution date, DuPont, as our sole stockholder, will approve and adopt our amended and restated certificate of incorporation, and our board of directors will approve and adopt our by-laws. For more information on how you can obtain our amended and restated certificate of incorporation and our by-laws, see "Where You Can Find More Information" on page 139 of this information statement. We urge you to read our amended and restated certificate of incorporation and our by-laws in their entirety.

### Authorized Capital Stock

Immediately following the distribution, our authorized capital stock will consist of [ •    ] shares of common stock, par value $0.01 per share, and [ •    ] shares of preferred stock, par value $[ •    ] per share.

### Common Stock

Immediately following the distribution, Chemours expects that approximately [ •    ] shares of its common stock will be issued and outstanding based upon approximately [ •    ] shares of DuPont common stock outstanding as of [ •    ], 2015.

*Voting Rights* . The holders of common stock are entitled to one vote for each share held of record on all matters to the exclusion of all other stockholders except as specifically stated in our certificate of incorporation. All corporate actions, other than the election of directors, are decided by a plurality vote by holders of our common stock.

*Quorum* . The holders of our common stock entitled to cast a majority of votes at a stockholders' meeting constitute a quorum at such meeting.

*Election of Directors* . Directors are generally elected by a majority of the votes cast by holders of our common stock. However, directors are elected by a plurality of the votes cast by holders of our common stock in the case of elections held at a stockholders' meeting for which our corporate secretary has received a notice or otherwise has become aware, prior to such meeting, that a holder of our common stock has nominated a person for election to our board of directors. A majority of the votes cast means that the number of votes cast "for" a director's election exceeds the number of votes cast "against" that director's election. Abstentions and broker non-votes are not counted as votes cast either "for" or "against" a director's election.

*Dividends and Liquidation Rights* . Holders of common stock are entitled to dividends as may be declared by our board of directors whenever full accumulated dividends for all past dividend periods and for the current dividend period have been paid, or declared and set apart for payment, on then outstanding preferred stock. Upon liquidation, dissolution or winding-up of our company, whether voluntary or involuntary, our remaining assets and funds will be divided and paid to holders of our common stock according to their respective shares after payments have been made to holders of our preferred stock.

*Miscellaneous* . The shares of our common stock will be fully paid and non-assessable upon issuance and payment therefor. Holders of Common Stock do not have any preemptive rights to subscribe for any additional shares of capital stock or other obligations convertible into or exercisable for shares of capital stock that we may issue in the future. There are no redemption or sinking fund provisions applicable to our Common Stock.

133

Table of Contents

**Preferred Stock**

Our amended and restated certificate of incorporation will authorize the Chemours board of directors, without further action by our stockholders, to issue shares of preferred stock and to fix by resolution the designations, preferences and relative, participating, optional or other special rights, and such qualifications, limitations or restrictions thereof, including, without limitation, redemption rights, dividend rights, liquidation preferences and conversion or exchange rights of any class or series of preferred stock, and to fix the number of classes or series of preferred stock, the number of shares constituting any such class or series and the voting powers for each class or series.

The authority possessed by our board of directors to issue preferred stock could potentially be used to discourage attempts by third parties to obtain control of Chemours through a merger, tender offer, proxy contest or otherwise by making such attempts more difficult or more costly. Our board of directors may issue preferred stock with voting rights or conversion rights that, if exercised, could adversely affect the voting power of the holders of the common stock. There are no current agreements or understandings with respect to the issuance of preferred stock and our board of directors has no present intention to issue any shares of preferred stock.

*Miscellaneous* . The shares of our preferred stock will be fully paid and non-assessable upon issuance and payment therefor. Unless otherwise stated in the certificate of designations, holders of preferred stock do not have any preemptive rights to subscribe for any additional shares of preferred stock or other obligations convertible into or exercisable for shares of preferred stock that we may issue in the future. Unless otherwise stated in the certificate of designations, there are no redemption or sinking fund provisions applicable to our preferred stock.

**Anti-Takeover Considerations**

The provisions of the DGCL, our amended and restated certificate of incorporation and our by-laws contain provisions that could serve to discourage or to make more difficult a change in control of us without the support of our board of directors or without meeting various other conditions. These provisions, summarized below, are expected to discourage certain types of coercive takeover practices and takeover bids that our board of directors may consider inadequate and to encourage persons seeking to acquire control of us to first negotiate with our board of directors. We believe that the benefits of increased protection of its ability to negotiate with the proponent of an unfriendly or unsolicited proposal to acquire or restructure it outweigh the disadvantages of discouraging takeover or acquisition proposals because, among other things, negotiation of these proposals could result in an improvement of their terms.

*State Takeover Legislation*

Upon the distribution, we will be subject to Section 203 of the DGCL, an anti-takeover statute. In general, Section 203 of the DGCL, subject to certain exceptions set forth therein, prohibits a business combination between a corporation and an interested stockholder within three years of the time such stockholder became an interested stockholder, unless (a) prior to such time, the board of directors of the corporation approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder, (b) upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85 percent of the voting stock of the corporation outstanding at the time the transaction commenced, exclusive of shares owned by directors who are also officers and by certain employee stock plans, or (c) at or subsequent to such time, the business combination is approved by the board of directors and authorized by the affirmative vote at a stockholders' meeting of at least 66 2/3 percent of the outstanding voting stock which is not owned by the interested stockholder.

Except as otherwise set forth in Section 203, an interested stockholder is defined to include (i) any person that is the owner of 15 percent or more of the outstanding voting stock of the corporation, or is an affiliate or associate

134

Table of Contents

of the corporation and was the owner of 15 percent or more of the outstanding voting stock of the corporation at any time within three years immediately prior to the date of determination; and (ii) the affiliates and associates of any such person.

The provisions of Section 203 may encourage persons interested in acquiring us to negotiate in advance with our board of directors, because the stockholder approval requirement would be avoided if a majority of the directors then in office approve either the business combination or the transaction which results in any such person becoming an interested stockholder. These provisions also may have the effect of preventing changes in our management. It is possible that these provisions could make it more difficult to accomplish transactions which our stockholders may otherwise deem to be in their best interests.

*Classified Board of Directors*

Our amended and restated certificate of incorporation and by-laws will provide that its board of directors will be divided into three classes. At the time of the separation, our board of directors will be divided into three approximately equal classes. The directors designated as Class I directors will have terms expiring at the first annual meeting of stockholders following the distribution. The directors designated as Class II directors will have terms expiring at the second annual meeting of stockholders, and the directors designated as Class III directors will have terms expiring at the third annual meeting of stockholders. Commencing with the first annual meeting of stockholders following the separation, directors for each class will be elected at the annual meeting of stockholders held in the year in which the term for that class expires and thereafter will serve for a term of three years. Because of the classified board provisions, it would take at least two elections of directors for any individual or group to gain control of our board of directors. Accordingly, these provisions could discourage a third party from initiating a proxy contest, making a tender offer or otherwise attempting to gain control of Chemours.

*Stockholder Action by Written Consent*

Delaware law provides that, unless otherwise stated in the certificate of incorporation, any action which may be taken at an annual meeting or special meeting of stockholders may be taken without a meeting, if a consent in writing is signed by the holders of the outstanding stock having the minimum number of votes necessary to authorize the action at a meeting of stockholders. Our amended and restated certificate of incorporation will expressly eliminate the right of its stockholders to act by written consent and, as such, stockholder action must take place at the annual or a special meeting of Chemours stockholders.

*Meetings of Stockholders*

Our amended and restated certificate of incorporation will provide the ability for stockholders to call a special meeting on the terms and conditions, if any, as set forth from time to time in our by-laws and will further provide that the by-laws cannot be amended to extend such a right to holders of record owning less than 35 percent of the outstanding stock entitled to vote. At the time of the distribution, our by-laws will provide that special meetings of the stockholders may be called by a majority of our board of directors and will be called by our corporate secretary at the request in writing of the holders of record of at least 35 percent of the outstanding stock entitled to vote.

*No Cumulative Voting*

Delaware law permits stockholders to cumulate their votes and either cast them for one candidate or distribute them among two or more candidates in the election of directors only if expressly authorized in a corporation's certificate of incorporation. Our amended and restated certificate of incorporation does not authorize cumulative voting.

135

Table of Contents

*Requirements for Advance Notification of Stockholder Nominations and Proposals*

Our by-laws will establish advance notice procedures with respect to stockholder proposals and nomination of candidates for election as directors other than nominations made by or at the direction of its board of directors or a committee of its board of directors. Generally, such proposal shall be made not later than the close of business on the 90 th day, nor earlier than the close of business on the 120 th day in advance of the anniversary of the previous year's annual meeting. For purposes of the first annual meeting, proposals shall be made not later than the close of business on [ • ], nor earlier than the close of business on [ • ].

These advance-notice provisions may have the effect of precluding a contest for the election of our directors or the consideration of stockholder proposals if the proper procedures are not followed, and of discouraging or deterring a third party from conducting a solicitation of proxies to elect its own slate of directors or to approve its own proposal, without regard to whether consideration of those nominees or proposals might be harmful or beneficial to us and our stockholders.

*Removal of Directors*

Delaware law provides that, except in the case of a classified board of directors or where cumulative voting applies, a director, or the entire board of directors, of a corporation may be removed, with or without cause, by the affirmative vote of a majority of the shares of the corporation entitled to vote at an election of directors. Because of the classified board provisions in our amended and restated certificate of incorporation, stockholders may only remove a director for cause by the affirmative vote of holders of a majority of the shares of voting common stock.

*Size of Our Board of Directors*

Our amended and restated certificate of incorporation and by-laws will provide that the number of directors on its board of directors will be not less than [ • ], nor more than [ • ], with the exact number of directors to be fixed exclusively by the board of directors.

*Vacancies*

Delaware law provides that vacancies and newly created directorships resulting from a resignation or any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, unless the governing documents of a corporation provide otherwise. Our amended and restated certificate of incorporation and our by-laws provide that vacancies occurring in our board of directors for any cause may be filled by vote of a majority of our whole board of directors. The remaining directors may elect a successor to hold office for the unexpired term of the director whose place is vacant and until the election of his successor.

*Amendments to Certificate of Incorporation*

Our amended and restated certificate of incorporation will provide that the provisions of the amended and restated certificate of incorporation may only be amended by the vote of a majority of the voting power of the outstanding voting stock, except that our amended and restated certificate of incorporation will provide that the affirmative vote of the holders of at least 80 percent of its voting stock then outstanding is required to amend certain provisions relating to:

- no cumulative voting;
- amendment of the by-laws;
- the size, classification, election, removal, nomination and filling of vacancies with respect to the Chemours board of directors;

136

Table of Contents

- stockholder action by written consent and ability to call special meetings of stockholders;

- director and officer indemnification; and

- any provision relating to the amendment of any of these provisions.

*Amendments to By-laws*

Our amended and restated certificate of incorporation and by-laws will provide that the by-laws may be amended by our board of directors or by the affirmative vote of at least 80 percent of our voting stock then outstanding.

*Undesignated Preferred Stock*

The authority that our board of directors will possess to issue preferred stock could potentially be used to discourage attempts by third parties to obtain control of Chemours through a merger, tender offer, proxy contest or otherwise by making such attempts more difficult or more costly. Our board of directors may be able to issue preferred stock with voting rights or conversion rights that, if exercised, could adversely affect the voting power of the holders of common stock.

**Limitations on Liability, Indemnification of Officers and Directors, and Insurance**

The DGCL authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breaches of directors' fiduciary duties as directors, and our amended and restated certificate of incorporation will include such an exculpation provision. Under the provisions of our amended and restated certificate of incorporation and by-laws, each person who is or was one of our directors or officers shall be indemnified by us as of right to the full extent permitted by the DGCL.

Under the DGCL, to the extent that a person is successful on the merits in defense of a suit or proceeding brought against him because he is or was one of our directors or officers, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred in connection with such action. If unsuccessful in defense of a third-party civil suit or a criminal suit, or if such a suit is settled, that person shall be indemnified against both (i) expenses, including attorneys' fees, and (ii) judgments, fines and amounts paid in settlement if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, our best interests and, with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. If unsuccessful in defense of a suit brought by or in our right, or if such suit is settled, that person shall be indemnified only against expenses, including attorneys' fees, incurred in the defense or settlement of the suit if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, our best interests, except that if he is adjudged to be liable for negligence or misconduct in the performance of his duty to us, he cannot be made whole even for expenses unless the court determines that he is fairly and reasonably entitled to indemnity for such expenses.

Under our amended and restated certificate of incorporation and by-laws, the right to indemnification includes the right to be paid by us the expenses incurred in defending any action, suit or proceeding in advance of its final disposition, subject to the receipt by us of undertakings as may be legally defined. In any action by an indemnitee to enforce a right to indemnification or by us to recover advances made, the burden of proving that the indemnitee is not entitled to be indemnified is placed on us.

We maintain liability insurance for our directors and officers to provide protection where we cannot legally indemnify a director or officer and where a claim arises under the Employee Retirement Income Security Act of 1974 against a director or officer based on an alleged breach of fiduciary duty or other wrongful act and directors' and officers' liability insurance for our directors and officers.

The limitation of liability and indemnification provisions that will be in our amended and restated certificate of incorporation and by-laws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duty. These provisions may also have the effect of reducing the likelihood of derivative litigation

137

Table of Contents

against our directors and officers, even though such an action, if successful, might otherwise benefit Chemours and our stockholders. However, these provisions will not limit or eliminate our rights, or those of any stockholder, to seek non-monetary relief such as injunction or rescission in the event of a breach of a director's duty of care. The provisions will not alter the liability of directors under the federal securities laws. In addition, your investment may be adversely affected to the extent that, in a class action or direct suit, we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions. There is currently no pending material litigation or proceeding against any of our directors, officers or employees for which indemnification is sought.

## Exclusive Forum

Our amended and restated certificate of incorporation will provide that unless the board of directors otherwise determines, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for any derivative action or proceeding brought on behalf of us, any action asserting a claim of breach of a fiduciary duty owed by any of our directors or officers to us or our stockholders, creditors or other constituents, any action asserting a claim against us or any of our directors or officers arising pursuant to any provision of the DGCL or our amended and restated certificate of incorporation or by-laws, or any action asserting a claim against us or any of our directors or officers governed by the "internal affairs doctrine" under Delaware state corporate law. However, if (and only if) the Court of Chancery of the State of Delaware dismisses any such action for lack of subject matter jurisdiction, the action may be brought in another court sitting in the State of Delaware.

## Sale of Unregistered Securities

On [ • ], 2015, we issued [ • ] shares of common stock, par value $0.01 per share, to DuPont pursuant to Section 4(a)(2) of the Securities Act. We did not register the issuance of the issued shares under the Securities Act because such issuance did not constitute a public offering.

## Transfer Agent and Registrar

After the distribution, the transfer agent and registrar for our common stock will be [ • ].

## Listing

Our common stock has been approved for listing on the NYSE under the symbol "[ • ]."

138

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We have filed a registration statement on Form 10 with the SEC with respect to the shares of our common stock being distributed as contemplated by this information statement. This information statement is a part of, and does not contain all of the information set forth in, the registration statement and the exhibits and schedules to the registration statement. For further information with respect to us and our common stock, please refer to the registration statement, including its exhibits and schedules. Statements made in this information statement relating to any contract or other document are not necessarily complete, and you should refer to the exhibits attached to the registration statement for copies of the actual contract or document. You may review a copy of the registration statement, including its exhibits and schedules, at the SEC's public reference room, located at 100 F Street, N.E., Washington, D.C. 20549, by calling the SEC at 1-800-SEC-0330 as well as on the Internet website maintained by the SEC at www.sec.gov. Information contained on any website referenced in this information statement is not incorporated by reference in this information statement.

As a result of the distribution, we will become subject to the information and reporting requirements of the Exchange Act and, in accordance with the Exchange Act, we will file periodic reports, proxy statements and other information with the SEC, which will be available on the Internet website maintained by the SEC at www.sec.gov.

We intend to furnish holders of our common stock with annual reports containing consolidated financial statements prepared in accordance with U.S. generally accepted accounting principles and audited and reported on, with an opinion expressed, by an independent registered public accounting firm.

You should rely only on the information contained in this information statement or to which we have referred you. We have not authorized any person to provide you with different information or to make any representation not contained in this information statement.

139

Table of Contents

**FINANCIAL STATEMENTS**

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E. I. du Pont de Nemours and Company)**

**Table of Contents**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Combined Income Statements | F-3 |
| Combined Statements of Comprehensive Income | F-4 |
| Combined Balance Sheets | F-5 |
| Combined Statements of Changes in DuPont Company Net Investment | F-6 |
| Combined Statements of Cash Flows | F-7 |
| Notes to the Combined Financial Statements | F-8 |
| Interim Combined Statements of Comprehensive Income for the nine month periods ended September 30, 2014 and 2013 (Unaudited) | F-37 |
| Interim Combined Balance Sheets as of September 30, 2014 (Unaudited) and December 31, 2013 | F-38 |
| Interim Combined Statements of Cash Flows for the nine month periods ended September 30, 2014 and 2013 (Unaudited) | F-39 |
| Condensed Notes to the Interim Combined Financial Statements (Unaudited) | F-40 |

As noted in the audit opinion on page F-2 these financial statements on pages F-1 — F-36 are audited for the periods ended December 31, 2013 and December 31, 2012. All references throughout the document to amounts for 2011 refer to amounts that are unaudited.

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholders and the Board of Directors of E. I. du Pont de Nemours and Company:

In our opinion, the accompanying combined balance sheets and the related combined statements of income, comprehensive income, changes in DuPont company net investment and cash flows present fairly, in all material respects, the financial position of The Chemours Company at December 31, 2013 and 2012, and the results of their operations and their cash flows for the years then ended, in conformity with the accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP

Philadelphia, Pennsylvania
December 18, 2014

F-2

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E. I. du Pont de Nemours and Company)**
Combined Income Statements
(Dollars in millions)

| | Year ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 (Unaudited) |
| Net sales | $6,859 | $7,365 | $ 7,972 |
| Cost of goods sold | 5,395 | 5,014 | 5,375 |
| Gross profit | 1,464 | 2,351 | 2,597 |
| Selling, general and administrative expense | 768 | 747 | 731 |
| Research and development expense | 164 | 145 | 135 |
| Employee separation/asset related charges, net | 2 | 36 | — |
| Total expenses | 934 | 928 | 866 |
| Equity in earnings of affiliates | 22 | 25 | 44 |
| Other income, net | 24 | 37 | 132 |
| Income before income taxes | 576 | 1,485 | 1,907 |
| Provision for income taxes | 152 | 427 | 474 |
| Net income | 424 | 1,058 | 1,433 |
| Less: Net income attributable to noncontrolling interests | 1 | 1 | 2 |
| Net income attributable to Chemours | $ 423 | $1,057 | $ 1,431 |

*See accompanying Notes to the Combined Financial Statements.*

F-3

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E. I. du Pont de Nemours and Company)**
Combined Statements of Comprehensive Income
(Dollars in millions)

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 | 2012 | 2011 (Unaudited) |
| Net income | $424 | $1,058 | $ 1,433 |
| Other comprehensive loss, before tax: | | | |
|     Reclassification adjustment for gains reclassified to earnings for the sale of available-for-sale marketable securities | — | — | (1) |
| Other comprehensive loss, net of tax of $0 | — | — | (1) |
| Comprehensive income | 424 | 1,058 | 1,432 |
|     Less: Comprehensive income attributable to noncontrolling interests | 1 | 1 | 2 |
| Comprehensive income attributable to Chemours | $423 | $1,057 | $ 1,430 |

*See accompanying Notes to the Combined Financial Statements.*

F-4

**Table of Contents**

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E. I. du Pont de Nemours and Company)**
Combined Balance Sheets
*(Dollars in millions)*

|  | December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| **Assets** | | |
| Current assets: | | |
| Accounts and notes receivable — trade, net | $ 841 | $ 806 |
| Inventories | 1,055 | 977 |
| Prepaid expenses and other | 40 | 40 |
| Deferred income taxes | 44 | 10 |
| Total current assets | 1,980 | 1,833 |
| Property, plant and equipment | 8,821 | 8,489 |
| Less accumulated depreciation | (5,849) | (5,696) |
| Net property, plant and equipment | 2,972 | 2,793 |
| Goodwill | 198 | 198 |
| Other intangibles, net | 17 | 29 |
| Investments in affiliates | 123 | 130 |
| Other assets | 331 | 334 |
| Total assets | $ 5,621 | $ 5,317 |
| **Liabilities and DuPont Company Net Investment** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,057 | $ 923 |
| Deferred income taxes | 9 | 11 |
| Other accrued liabilities | 405 | 299 |
| Total current liabilities | 1,471 | 1,233 |
| Other liabilities | 456 | 464 |
| Deferred income taxes | 415 | 391 |
| Total liabilities | 2,342 | 2,088 |
| Commitments and contingent liabilities (Note 17) | | |
| DuPont Company Net Investment: | | |
| DuPont Company Net Investment | 3,257 | 3,208 |
| Accumulated other comprehensive income | 19 | 19 |
| Total DuPont Company Net Investment | 3,276 | 3,227 |
| Noncontrolling interests | 3 | 2 |
| Total DuPont Company Net Investment and noncontrolling interests | 3,279 | 3,229 |
| Total liabilities, DuPont Company Net Investment and noncontrolling interests | $ 5,621 | $ 5,317 |

*See accompanying Notes to the Combined Financial Statements.*

F-5

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E. I. du Pont de Nemours and Company)**
Combined Statements of Changes in DuPont Company Net Investment
Years ended December 31, 2013, 2012 and 2011
*(Dollars in millions)*

| | DuPont Company Net Investment | Accumulated other comprehensive income (loss) | Non-controlling interests | Total |
|---|---|---|---|---|
| Balance at January 1, 2011 (unaudited) | $ 2,829 | $ 20 | $ 1 | $ 2,850 |
| Net income | 1,431 | — | 2 | 1,433 |
| Reclassification adjustment for gains reclassified to earnings for the sale of available-for-sale marketable securities, net of tax benefit of $0 | — | (1) | — | (1) |
| Net transfers to DuPont | (1,150) | — | (1) | (1,151) |
| Balance at December 31, 2011 (unaudited) | $ 3,110 | $ 19 | $ 2 | $ 3,131 |
| Net income | 1,057 | — | 1 | 1,058 |
| Net transfers to DuPont | (959) | — | (1) | (960) |
| Balance at December 31, 2012 | $ 3,208 | $ 19 | $ 2 | $ 3,229 |
| Net income | 423 | — | 1 | 424 |
| Net transfers to DuPont | (374) | — | — | (374) |
| Balance at December 31, 2013 | $ 3,257 | $ 19 | $ 3 | $ 3,279 |

*See accompanying Notes to the Combined Financial Statements.*

F-6

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E. I. du Pont de Nemours and Company)**
Combined Statements of Cash Flows
*(Dollars in millions)*

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2013** | **2012** | **2011 (Unaudited)** |
| Operating activities: | | | |
| Net income | $ 424 | $1,058 | $ 1,433 |
| Adjustments to reconcile net income to cash provided by operations | | | |
| Depreciation and amortization | 261 | 266 | 272 |
| Other operating charges and credits — net | 6 | 47 | (1) |
| Equity in (earnings) losses of affiliates, net of dividends received of $19, $31 and $24 | (1) | 6 | (15) |
| Deferred tax (benefit) expense | (14) | 15 | 49 |
| (Decrease) increase in operating assets: | | | |
| Accounts and notes receivable — trade, net | (37) | 137 | 6 |
| Inventories and other operating assets | (75) | (94) | (245) |
| Increase (decrease) in operating liabilities: | | | |
| Accounts payable and other operating liabilities | 234 | (45) | (3) |
| Cash provided by operating activities | 798 | 1,390 | 1,496 |
| Investing activities: | | | |
| Purchases of property, plant and equipment | (438) | (432) | (355) |
| Proceeds from sales of assets — net | 14 | 3 | 10 |
| Cash used for investing activities | (424) | (429) | (345) |
| Financing activities: | | | |
| Payments on long-term capital lease obligations | — | (1) | — |
| Net transfers to DuPont | (374) | (960) | (1,151) |
| Cash used for financing activities | (374) | (961) | (1,151) |
| Increase (decrease) in cash and cash equivalents | — | — | — |
| Cash and cash equivalents at beginning of period | — | — | — |
| Cash and cash equivalents at end of period | $ — | $ — | $ — |

*See accompanying Notes to the Combined Financial Statements.*

F-7

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements
*(Dollars in millions)*

## Note 1: Description of the Business

The accompanying Combined Financial Statements present, on a historical cost basis, the combined assets, liabilities, revenues and expenses related to The Chemours Company (Chemours) of E. I. du Pont de Nemours and Company (DuPont). Chemours does not operate as a separate, stand-alone entity and is comprised of certain DuPont wholly owned legal entities for which Chemours is the sole business, components of legal entities in which Chemours operates in conjunction with other DuPont businesses, and a majority owned joint venture. Historically, Chemours operated as a part of DuPont, and Chemours' results of operations have been reported in DuPont's consolidated financial statements.

Chemours delivers customized solutions with a wide range of industrial and specialty chemical products for markets including plastics and coatings, refrigeration and air conditioning, general industrial, mining and oil refining. Principal products include titanium dioxide, refrigerants, industrial fluoropolymer resins, sodium cyanide, sulfuric acid and aniline. Chemours consists of three reportable segments including Titanium Technologies, Fluoroproducts and Chemical Solutions.

Chemours is globally operated with manufacturing facilities, sales centers, administrative offices, and warehouses located throughout the world. Chemours operations are primarily located in the United States, Canada, Mexico, Brazil, the Netherlands, Belgium, China, Taiwan, Japan, Switzerland, Singapore, Hong Kong, India, the United Kingdom, France and Sweden. As of December 31, 2013, Chemours consisted of 40 production facilities globally, six dedicated to Titanium Technologies, 20 dedicated to Fluoroproducts, 12 dedicated to Chemical Solutions and two that supported multiple Chemours segments. At three of these sites, currently shared with other DuPont businesses, DuPont will continue its own manufacturing operations after separation, as well as contract manufacture for Chemours for the products currently produced by the Fluoroproducts segment at these sites.

## Note 2: Basis of Presentation

Throughout the period covered by the Combined Financial Statements, Chemours operated as a part of DuPont. Consequently, stand-alone financial statements have not been historically prepared for Chemours. The accompanying Combined Financial Statements have been prepared from DuPont's historical accounting records and are presented on a stand-alone basis as if the operations had been conducted independently from DuPont. Aside from a Japanese entity (that is a dual-resident for U.S. income tax purposes), there is no direct ownership relationship among all the other various legal entities comprising Chemours. Accordingly, DuPont and its subsidiaries' net investment in these operations is shown in lieu of Stockholder's Equity in the Combined Financial Statements. The Combined Financial Statements include the historical operations, assets, and liabilities of the legal entities that are considered to comprise the Chemours business, including certain environmental remediation and litigation obligations for which Chemours will indemnify DuPont.

Discrete financial information was not available for Chemours within certain legal entities that include the operations of Chemours and other DuPont businesses (shared entities), as DuPont does not record every transaction at the Chemours level, but rather at the legal entity level. Chemours is also comprised of certain stand-alone legal entities for which discrete financial information is available. For the shared entities for which discrete financial information was not available, allocation methodologies were applied to certain accounts to allocate amounts to Chemours as discussed further in Note 4.

The Combined Income Statements include all revenues and costs directly attributable to Chemours, including costs for facilities, functions, and services used by Chemours. Costs for certain functions and services performed

F-8

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

by centralized DuPont organizations are directly charged to Chemours based on usage or other allocation methods. The results of operations also include allocations of (i) costs for administrative functions and services performed on behalf of Chemours by centralized staff groups within DuPont; (ii) DuPont's general corporate expenses; and (iii) certain pension and other retirement benefit costs (see Note 4 for a description of the allocation methodologies employed). As more fully described in Note 3 and Note 8, current and deferred income taxes and related tax expense have been determined based on the stand-alone results of Chemours by applying Accounting Standards Codification 740, *Income Taxes* (ASC 740), issued by the Financial Accounting Standards Board (FASB), to Chemours operations in each country as if it were a separate taxpayer (i.e. following the separate return methodology).

All charges and allocations of cost for facilities, functions, and services performed by DuPont organizations have been deemed paid by Chemours to DuPont in the period in which the cost was recorded in the Combined Income Statements. Chemours' portion of current income taxes payable is deemed to have been remitted to DuPont in the period the related tax expense was recorded. Chemours' portion of current income taxes receivable is deemed to have been remitted to Chemours by DuPont in the period to which the receivable applies only to the extent that a refund of such taxes could have been recognized by Chemours on a stand-alone basis under the law of the relevant taxing jurisdiction.

DuPont uses a centralized approach to cash management and financing its operations. Accordingly none of the cash, cash equivalents, debt, or related interest expense has been allocated to Chemours in the Combined Financial Statements. Transactions between DuPont and Chemours are accounted for through DuPont Company Net Investment (see Note 4 for additional information). Chemours purchased materials and services from, and sold materials and services to other businesses of DuPont not included in the defined scope of Chemours. Transactions between DuPont and Chemours are deemed to have been settled immediately through DuPont Company Net Investment. DuPont's short and long-term debt has not been pushed down to the Chemours' Combined Financial Statements because it is not specifically identifiable to Chemours.

All of the allocations and estimates in the Combined Financial Statements are based on assumptions that management of DuPont and Chemours believes are reasonable. However, the Combined Financial Statements included herein may not be indicative of the financial position, results of operations, and cash flows of Chemours in the future or if Chemours had been a separate, stand-alone entity during the periods presented.

**Note 3: Summary of Significant Accounting Policies**

These Combined Financial Statements have been prepared in accordance with generally accepted accounting principles in the United States of America (GAAP). The significant accounting policies described below, together with the other notes that follow, are an integral part of the Combined Financial Statements.

*Preparation of Financial Statements*

The preparation of the Combined Financial Statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the Combined Financial Statements and the reported amounts of revenues and expenses, including allocations of costs as discussed above, during the reporting period. Management's estimates are based on historical experience, facts and circumstances available at the time and various other assumptions that are believed to be reasonable. Actual results could differ from those estimates.

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

### Basis of Combination

All significant intercompany accounts and transactions within Chemours have been eliminated in the preparation of the accompanying Combined Financial Statements. All significant intercompany transactions with DuPont are deemed to have been paid in the period the cost was incurred.

### Revenue Recognition

Revenue is recognized when the earnings process is complete. Revenue for product sales is recognized when products are shipped to the customer in accordance with the terms of the agreement, when title and risk of loss have been transferred, collectability is reasonably assured and pricing is fixed or determinable. Accruals are made for sales returns and other allowances based on historical experience. Cash sales incentives are accounted for as a reduction in sales and noncash sales incentives are recorded as a charge to cost of goods sold at the time the revenue or selling expense, depending on the nature of the incentive, is recorded. Amounts billed to customers for shipping and handling fees are included in net sales and costs incurred by Chemours for the delivery of goods are classified as cost of goods sold in the Combined Income Statements. Taxes on revenue-producing transactions are excluded from net sales. Licensing and royalty income is recognized in accordance with agreed upon terms, when performance obligations are satisfied, the amount is fixed or determinable and collectability is reasonably assured.

### Cash and Cash Equivalents

Chemours participates in DuPont's centralized cash management and financing programs (see Note 4 for additional information).

### Fair Value Measurements

Under the accounting for fair value measurements and disclosures, a fair value hierarchy was established that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements). A financial instrument's level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement.

Chemours uses the following valuation techniques to measure fair value for its assets and liabilities:

(a) Level 1 — Quoted market prices in active markets for identical assets or liabilities;

(b) Level 2 — Significant other observable inputs (e.g. quoted prices for similar items in active markets, quoted prices for identical or similar items in markets that are not active, inputs other than quoted prices that are observable such as interest rate and yield curves, and market-corroborated inputs); and

(c) Level 3 — Unobservable inputs for the asset or liability, which are valued based on management's estimates of assumptions that market participants would use in pricing the asset or liability.

### Receivables and Allowance for Doubtful Accounts

Receivables are recognized net of an allowance for doubtful accounts. The allowance for doubtful accounts receivable reflects the best estimate of losses inherent in Chemours' accounts receivable portfolio determined on the basis of historical experience, specific allowances for known troubled accounts and other available evidence. Accounts receivable are written off when management determines that they are uncollectible.

F-10

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

*Inventories*

Chemours' inventories are valued at the lower of cost or market. Inventories held at substantially all U.S. locations are valued using the last-in, first-out (LIFO) method. Inventories held outside the U.S. are determined by the average cost method. Elements of cost in inventories include raw materials, direct labor, and manufacturing overhead. Stores and supplies are valued at cost or market, whichever is lower; cost is generally determined by the average cost method. Approximately 53 percent and 52 percent of inventory is on a LIFO basis as of December 31, 2013 and 2012, respectively. The remainder is accounted for using the average cost method.

*Property, Plant and Equipment*

Property, plant and equipment is carried at cost and is depreciated using the straight-line method. Property, plant and equipment placed in service prior to 1995 is depreciated under the sum-of-the-years' digits method or other substantially similar methods. Substantially all equipment and buildings are depreciated over useful lives ranging from 15 to 25 years. Capitalizable costs associated with computer software for internal use are amortized on a straight-line basis over five to seven years. When assets are surrendered, retired, sold or otherwise disposed of, their gross carrying values and related accumulated depreciation are removed from the accounts and included in determining gain or loss on such disposals.

Repair and maintenance costs that materially add to the value of the asset or prolong its useful life are capitalized and depreciated based on the extension to the useful life. Capitalized repair and maintenance costs are recorded on the Combined Balance Sheets within other assets.

*Direct Financing Type Leases*

Certain of Chemours' facilities are located on land owned by third parties. The plant and equipment built on this land is constructed by, owned, and operated by Chemours for the exclusive benefit of the third party landlord. The useful lives of the equipment are generally shorter than the lease term, or there exists a purchase option for the third party to acquire the equipment at the end of the lease term. Based on an analysis of the underlying agreements, management has determined that these agreements and property represent a direct financing type lease, whereby Chemours is the lessor of its equipment to the third party landlords. As such, the related plant and equipment are reported as leases receivable. The current portion is included in accounts and notes receivable — trade, net (see Note 9) and the non-current portion is included in other assets (see Note 13). The equipment balances have zero net book value within property, plant and equipment.

*Goodwill and Other Intangible Assets*

The excess of the purchase price over the estimated fair value of the net assets acquired, including identified intangibles, is recorded as goodwill. Goodwill is tested for impairment annually on October 1; however, these tests are performed more frequently when events or changes in circumstances indicate that the asset may be impaired. Impairment exists when carrying value exceeds fair value.

Evaluating goodwill for impairment is a two-step process. In the first step, Chemours compares the carrying value of net assets to the fair value of the related operations. Chemours' methodology for estimating the fair value of its reporting units is using the income approach based on the present value of future cash flows. The factors considered in determining the cash flows include: 1) macroeconomic conditions; 2) industry and market considerations; 3) costs of raw materials, labor or other costs having a negative effect on earnings and cash

F-11

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

flows; 4) overall financial performance; and 5) other relevant entity-specific events. If the fair value is determined to be less than the carrying value, a second step is performed to compute the amount of the impairment.

Definite-lived intangible assets, such as purchased and licensed technology, patents, trademarks, and customer lists are amortized over their estimated useful lives, generally for periods ranging from five to 20 years. The reasonableness of the useful lives of these assets is continually evaluated.

### Impairment of Long-Lived Assets

Chemours evaluates the carrying value of long-lived assets to be held and used when events or changes in circumstances indicate the carrying value may not be recoverable. The carrying value of a long-lived asset is considered impaired when the total projected undiscounted cash flows from the asset are separately identifiable and are less than its carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. The fair value methodology used is an estimate of fair market value which is made based on prices of similar assets or other valuation methodologies including present value techniques. Long-lived assets to be disposed of other than by sale are classified as held for use until their disposal. Long-lived assets to be disposed of by sale are classified as held for sale and are reported at the lower of carrying amount or fair market value less cost to sell. Depreciation is discontinued for long-lived assets classified as held for sale.

### Research and Development

Research and development costs are expensed as incurred. Research and development expenses include costs (primarily consisting of employee costs, materials, contract services, research agreements, and other external spend) relating to the discovery and development of new products, enhancement of existing products and regulatory approval of new and existing products.

### Environmental Liabilities and Expenditures

Environmental liabilities and expenditures included in the Combined Financial Statements represent claims for matters that were identified as attributable to Chemours or will be indemnified by Chemours after the separation. Accruals for environmental matters are recorded in cost of goods sold when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Accrued liabilities do not include claims against third parties and are not discounted.

Costs related to environmental remediation are charged to expense in the period incurred. Other environmental costs are also charged to expense in the period incurred, unless they increase the value of the property or reduce or prevent contamination from future operations, in which case they are capitalized and amortized.

### Asset Retirement Obligations

Chemours records asset retirement obligations at fair value at the time the liability is incurred. Fair value is measured using expected future cash outflows discounted at Chemours' credit-adjusted risk-free interest rate, which are considered level 3 inputs. Accretion expense is recognized as an operating expense classified within cost of goods sold on the Combined Income Statements using the credit-adjusted risk-free interest rate in effect when the liability was recognized. The associated asset retirement obligations are capitalized as part of the carrying amount of the long-lived asset and depreciated over the estimated remaining useful life of the asset, generally for periods ranging from one to 25 years.

F-12

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

### *Litigation*

Litigation liabilities and expenditures included in the Combined Financial Statements represent litigation matters for which Chemours will indemnify DuPont. Accruals for litigation are made when the information available indicates that it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Legal costs such as outside counsel fees and expenses are charged to expense in the period services are received.

### *Insurance/Self-Insurance*

Chemours incurred $8, $7 and $7 of cost related to DuPont's general insured risks for the years ended December 31, 2013, 2012 and 2011, respectively. Chemours is a participant in DuPont's self-insurance program where permitted by law or regulation, including workers' compensation, vehicle liability and employee related benefits. Liabilities associated with these risks are estimated in part by considering historical claims experience, demographic factors, and other actuarial assumptions. For other risks, a combination of insurance and self-insurance is used, reflecting comprehensive reviews of relevant risks. The annual cost is allocated to all of the participating businesses using methodologies deemed reasonable by management. All obligations pursuant to these plans have historically been obligations of DuPont. As such, these obligations are not included in the Combined Balance Sheets, with the exception of self-insurance liabilities related to workers compensation, vehicle liability and employee related benefits.

### *Income Taxes*

Income taxes as presented herein attribute current and deferred income taxes of DuPont to Chemours' stand-alone financial statements in a manner that is systematic, rational, and consistent with the asset and liability method prescribed by ASC 740. Accordingly, Chemours' income tax provision was prepared following the separate return method. The separate return method applies ASC 740 to the stand-alone financial statements of each member of the consolidated group as if the group member were a separate taxpayer and a stand-alone enterprise. As a result, actual tax transactions included in the consolidated financial statements of DuPont may not be included in the separate Combined Financial Statements of Chemours. Similarly, the tax treatment of certain items reflected in the separate Combined Financial Statements of Chemours may not be reflected in the consolidated financial statements and tax returns of DuPont; therefore, such items as net operating losses, credit carryforwards, and valuation allowances may exist in the stand-alone financial statements that may or may not exist in DuPont's consolidated financial statements.

The breadth of Chemours' operations and the global complexity of tax regulations require assessments of uncertainties and judgments in estimating the taxes that Chemours will ultimately pay. The final taxes paid are dependent upon many factors, including negotiations with taxing authorities in various jurisdictions, outcomes of tax litigation and resolution of disputes arising from federal, state and international tax audits in the normal course of business.

The provision for income taxes is determined using the asset and liability approach of accounting for income taxes. Under this approach, deferred taxes represent the future tax consequences expected to occur when the reported amounts of assets and liabilities are recovered or paid. The provision for income taxes represents income taxes paid or payable for the current year plus the change in deferred taxes during the year. Deferred taxes result from differences between the financial and tax basis of Chemours' assets and liabilities and are adjusted for changes in tax rates and tax laws when changes are enacted. Valuation allowances are recorded to

F-13

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

reduce deferred tax assets when it is more likely than not that a tax benefit will not be realized. It is Chemours' policy to include accrued interest related to unrecognized tax benefits in miscellaneous income and expenses, net, under other income, net. It is Chemours' policy to include income tax related penalties in the provision for income taxes.

In general, the taxable income (loss) of various Chemours entities was included in DuPont's consolidated tax returns, where applicable in jurisdictions around the world. As such, separate income tax returns were not prepared for many Chemours entities. Consequently, income taxes currently payable are deemed to have been remitted to DuPont, in cash, in the period the liability arose and income taxes currently receivable are deemed to have been received from DuPont in the period that a refund could have been recognized by Chemours had Chemours been a separate taxpayer.

As stated above in Note 2, aside from a Japanese entity (that is a dual-resident for U.S. income tax purposes), there is no direct ownership relationship among all the other various legal entities comprising Chemours; consequently, no provision has been made for income taxes on unremitted earnings of subsidiaries and affiliates.

*Foreign Currency Translation*

During the periods covered by these financial statements, the Chemours Business operated within subsidiaries of DuPont. For subsidiaries where the U.S. dollar (USD) is the functional currency, all foreign currency-denominated asset and liability amounts are remeasured into USD at end-of-period exchange rates, except for inventories, prepaid expenses, property, plant and equipment, goodwill and other intangible assets, which are remeasured at historical rates. Foreign currency-denominated income and expenses are remeasured at average exchange rates in effect during the year, except for expenses related to balance sheet amounts remeasured at historical exchange rates. Exchange gains and losses arising from remeasurement of foreign currency-denominated monetary assets and liabilities are included in income in the period in which they occur.

For subsidiaries where the local currency is the functional currency, assets and liabilities denominated in local currencies are translated into USD at end-of-period exchange rates and the resulting translation adjustments are reported, net of their related tax effects, as a component of accumulated other comprehensive income (loss) in equity. Assets and liabilities denominated in other than the local currency are remeasured into the local currency prior to translation into USD and the resultant exchange gains or losses are included in income in the period in which they occur. Income and expenses are translated into USD at average exchange rates in effect during the period.

*DuPont Company Net Investment*

Chemours' equity on the Combined Balance Sheets represents DuPont's net investment in the Chemours business and is presented as "DuPont Company Net Investment" in lieu of stockholders' equity. The Statements of Changes in DuPont Company Net Investment include net cash transfers and other property transfers between DuPont and Chemours as well as intercompany receivables and payables between Chemours and other DuPont affiliates that were settled on a current basis. DuPont performs cash management and other treasury-related functions on a centralized basis for nearly all of its legal entities, which includes Chemours. DuPont Company Net Investment account includes assets and liabilities incurred by DuPont on behalf of Chemours such as accrued liabilities related to corporate allocations including administrative expenses for legal, accounting, treasury, information technology, human resources and other services. Other assets and liabilities recorded by DuPont, whose related income and expenses have been pushed down to Chemours, are also included in DuPont Company Net Investment.

F-14

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

All transactions reflected in DuPont Company Net Investment in the accompanying Combined Balance Sheets have been considered cash receipts and payments for purposes of the Combined Statements of Cash Flows and are reflected in financing activities in the accompanying Combined Statements of Cash Flows.

Earnings per share data has not been presented in the accompanying Combined Financial Statements because Chemours does not operate as a separate legal entity with its own capital structure.

### *Employee Benefits*

Certain of Chemours' employees participate in defined benefit pension and other post-employment benefit plans (the Plans) sponsored by DuPont and accounted for by DuPont in accordance with accounting guidance for defined benefit pension and other post-employment benefit plans. Significantly all expense was allocated in shared entities and reported within costs of goods sold and selling, general and administrative expenses in the Combined Income Statements. Chemours has considered the Plans to be part of a multiemployer plan with DuPont. The expense related to the current employees of Chemours as well as the expense related to retirees of Chemours are included in these Combined Financial Statements (see Note 18 for further information).

### *Derivatives*

Chemours participates in DuPont's foreign currency hedging program to reduce earnings and cash flow volatility associated with foreign currency exchange rate changes.

DuPont formally documents the hedge relationships, including identification of the hedging instruments and the hedged items, the risk management objectives and strategies for undertaking the hedge transactions, and the methodologies used to assess effectiveness and measure ineffectiveness. Realized gains and losses on derivative instruments of DuPont are allocated by DuPont to Chemours based on projected exposure. Chemours recognizes its allocable share of the gains and losses on DuPont's derivative financial instruments in earnings when the forecasted purchases occur for natural gas hedges and when the forecasted sales occur for foreign currency hedges.

Chemours does not hold or issue financial instruments for speculative or trading purposes.

### *New Accounting Guidance*

### Recent Accounting Pronouncements

Accounting Standards Update No. (ASU) 2013-02, *Reporting of Amounts Reclassified out of Accumulated Other Comprehensive Income* , issued in February 2013, requires additional disclosure surrounding the reporting of amounts reclassified out of accumulated other comprehensive income. For items reclassified out of accumulated other comprehensive income (AOCI) and into net income in their entirety, entities are required to disclose the effect of the reclassification on each affected net income line item. Additionally, entities are required to provide a cross reference to other required U.S. GAAP disclosures for AOCI reclassification items that are not reclassified in their entirety into net income. Effective for annual reporting periods beginning after December 15, 2012 and interim periods within those years, the adoption of this standard had no effect on Chemours' financial condition, results of operations or cash flows.

### Note 4: Relationship with DuPont and Related Entities

Historically, Chemours has been managed and operated in the normal course of business with other affiliates of DuPont. Accordingly, certain shared costs have been allocated to Chemours and reflected as expenses in the stand-alone Combined Financial Statements. Management of DuPont and Chemours consider the allocation

F-15

**Table of Contents**

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

methodologies used to be reasonable and appropriate reflections of the historical DuPont expenses attributable to Chemours for purposes of the stand-alone financial statements. The expenses reflected in the Combined Financial Statements may not be indicative of expenses that will be incurred by Chemours in the future. All related party transactions approximate market prices.

(a)  *Related Party Purchases and Sales*

Throughout the period covered by the Combined Financial Statements, Chemours sold finished goods to DuPont and its non-Chemours businesses.

Related party sales to other DuPont businesses include the following amounts:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| **Selling Segment** | **2013** | **2012** | **2011 (Unaudited)** |
| Titanium Technologies | $  6 | $ 68 | $      66 |
| Fluoroproducts | 37 | 31 | 42 |
| Chemical Solutions | 78 | 67 | 67 |
| Total | $121 | $166 | $      175 |

Sales to DuPont's Performance Coatings business decreased significantly in 2013, as DuPont sold the business in February of 2013. Upon the date of the sale, transactions with DuPont Performance Coatings were no longer accounted for as related party transactions.

Chemours purchased byproducts from other DuPont businesses in the following amounts:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| **Purchasing Segment** | **2013** | **2012** | **2011 (Unaudited)** |
| Titanium Technologies | $ 1 | $ 1 | $      1 |
| Chemical Solutions | 14 | 21 | 32 |
| Total | $15 | $22 | $      33 |

(b)  *Leveraged Services and Corporate Costs*

DuPont incurs significant corporate costs for services provided to Chemours as well as other DuPont businesses. These costs include expenses for information systems, accounting, other financial services such as treasury and audit, purchasing, human resources, legal, facilities, engineering, corporate research and development, corporate stewardship, marketing and business analysis support.

A portion of these costs benefit multiple or all DuPont businesses, including Chemours, and are allocated to Chemours and its reportable segments using methods based on proportionate formulas involving total costs or other various allocation methods that management believes are consistent and reasonable. Other Chemours corporate costs are not allocated to the reportable segments and are reported in Corporate and Other.

The allocated leveraged functional service expenses and general corporate expenses included in the Combined Income Statements were $519, $500 and $470 for the years ended December 31, 2013, 2012 and 2011,

F-16

**Table of Contents**

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

respectively. Allocated leveraged functional service expenses and general corporate expenses were recorded in the Combined Income Statements within the following captions:

| | Year ended December 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011 (Unaudited)** |
| Selling, general and administrative expense | $436 | $412 | $ 388 |
| Research and development expense | 50 | 50 | 43 |
| Cost of goods sold | 33 | 38 | 39 |
| Total | $519 | $500 | $ 470 |

### (c)  *Shared Sites*

Chemours has manufacturing operations at 40 production facilities globally. Chemours shares 14 of these production facilities with DuPont's other non-Chemours manufacturing operations. Additionally, Chemours shares warehouse, sales centers, office space, and research and development facilities with other DuPont businesses. The property, plant and equipment primarily or exclusively used by Chemours for these shared locations are included in the Combined Balance Sheets.

The full historical cost, accumulated depreciation and depreciation expense for assets at shared manufacturing plant sites and other facilities where Chemours is the primary or exclusive user of the assets have been included in the Combined Balance Sheets and Combined Income Statements. Accordingly, when the use of a Chemours primary asset has been shared with another DuPont business (manufacturing or otherwise), the cost for the non-Chemours usage has been deemed to have been charged to DuPont's non-Chemours business. The amounts are credited primarily to cost of goods sold in the Combined Income Statements and were $12, $13 and $11 for the years ended December 31, 2013, 2012 and 2011, respectively.

At shared manufacturing plant sites and other facilities where Chemours is not the primary or exclusive user of the assets; the shared assets have been excluded from the Combined Balance Sheets. Accordingly, where Chemours has used these shared assets, a charge to cost of goods sold has been recorded for its usage of these shared assets. The amounts are charged primarily to cost of goods sold in the Combined Income Statements and were $3 for each of the years ended December 31, 2013, 2012 and 2011.

### (d)  *Cash Management and Financing*

Chemours participates in DuPont's centralized cash management and financing programs. Disbursements are made through centralized accounts payable systems which are operated by DuPont. Cash receipts are transferred to centralized accounts, also maintained by DuPont. As cash is disbursed and received by DuPont, it is accounted for by Chemours through DuPont Company Net Investment. All short and long-term debt is financed by DuPont and financing decisions for wholly and majority owned subsidiaries is determined by central DuPont treasury operations.

### (e)  *Accounts Receivable and Payable*

Receivables and payables between Chemours and DuPont and its non-Chemours businesses are settled on a current basis and have been accounted for through the DuPont Company Net Investment account in the Combined Financial Statements.

**Table of Contents**

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

### Note 5: Research and Development Expense

Research and development expense directly incurred by Chemours resources was $114, $95 and $92 for the years ended December 31, 2013, 2012 and 2011, respectively. Research and development expense also includes $50, $50 and $43 for the years ended December 31, 2013, 2012 and 2011, respectively, representing an assignment of costs associated primarily with DuPont's Corporate Central Research and Development long-term research activities. This assignment was based on the cost of research projects for which Chemours was determined to be the sponsor or co-sponsor. All research services provided by DuPont's central research and development to Chemours are specifically requested by Chemours, covered by service-level agreements and billed based on usage.

### Note 6: Employee Separation/Asset Related Charges, Net

At December 31, 2013 and 2012, total liabilities relating to restructuring activities were $2 and $3, respectively, primarily relating to the 2012 restructuring program.

#### *Asset Impairment*

Asset impairment constitutes the majority of the expense in the employee separation/asset related charges, net. During 2012, as a result of strategic decisions related to deteriorating conditions within a specific industrial chemicals market, Chemours determined that an impairment triggering event had occurred and that an assessment of the asset group related to this industrial chemical was warranted. This assessment determined that the carrying value of the asset group exceeded its fair value. As a result of the impairment test, a $33 pre-tax impairment charge was recorded within employee separation/asset net by the Chemical Solutions segment. In calculating the impairment charge, fair value was determined by utilizing a discounted cash flow approach which included assumptions concerning future operating performance and economic conditions that may differ from actual cash flows. In connection with this matter, as of December 31, 2012, Chemours had long-lived assets with a remaining net book value of approximately $6, accounted for at fair value on a nonrecurring basis after initial recognition. No additional impairment was recorded in 2013. These nonrecurring fair value measurements were determined using level 3 inputs within the fair value hierarchy, as described in Note 3 to the Combined Financial Statements.

### Note 7: Other Income, Net

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2013** | **2012** | **2011 (Unaudited)** |
| Leasing, contract services and miscellaneous income [1] | $ 24 | $ 18 | $ 18 |
| Royalty income [2] | 24 | 24 | 37 |
| Gain on purchase of equity investment [3] | 7 | — | — |
| Gain on sales of assets | — | — | 9 |
| Exchange (losses) gains [4] | (31) | (5) | 68 |
| | $ 24 | $ 37 | $ 132 |

---

[1]    Leasing, contract services and miscellaneous income includes accrued interest related to unrecognized tax benefits. Refer to Note 8 for further discussion of unrecognized tax benefits.

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

2    Royalty income is primarily for technology and trademark licensing.

3    Gain on purchase of equity investment consists of a gain on the remeasurement of Chemours' equity investment and a gain on the bargain purchase of the remainder of the DESCO C.V. joint venture for $4 and $3, respectively, recognized in the third quarter of 2013. Prior to purchasing the remaining interest in DESCO C.V. in the third quarter of 2013, Chemours accounted for the joint venture as an equity method investment.

4    Exchange (losses) gains primarily driven by a strengthening of the U.S. Dollar versus the Venezuelan Bolivar and the Brazilian Real in 2013, a strengthening of the U.S. Dollar versus the Brazilian Real in 2012 and a weakening of the U.S. Dollar versus the Euro in 2011. See Note 3 for further discussion over foreign currency translation, including the allocation of exchange gains (losses) for shared operations.

**Note 8: Income Taxes**

As previously discussed in Note 3, although Chemours was historically included in consolidated income tax returns of DuPont, Chemours' income taxes are computed and reported herein under the "separate return method." Use of the separate return method may result in differences when the sum of the amounts allocated to stand-alone tax provisions are compared with amounts presented in consolidated financial statements. In that event, the related deferred tax assets and liabilities could be significantly different from those presented herein. Certain tax attributes, e.g. net operating loss carryforwards, which were actually reflected in DuPont's consolidated financial statements may or may not exist at the stand-alone Chemours level.

Chemours' Combined Financial Statements do not reflect any amounts due to DuPont for income tax related matters as it is assumed that all such amounts due DuPont were settled on December 31st of each year.

Combined income before income taxes for U.S. and international operations was:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | **2013** | **2012** | **2011 (Unaudited)** |
| U.S. (including exports) | $224 | $ 898 | $ 977 |
| International | 352 | 587 | 930 |
|    Total pre-tax income | $576 | $1,485 | $ 1,907 |

Income before taxes, as shown above, is based on the location of the entity to which such earnings are attributable.

F-19

**Table of Contents**

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

The components of the provision for income taxes were:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 (Unaudited) |
| Current tax expense: | | | |
| U.S. federal | $ 67 | $256 | $ 250 |
| U.S. state and local | 11 | 44 | 47 |
| International | 88 | 112 | 128 |
| Total current tax expense | 166 | 412 | 425 |
| Deferred tax (benefit) expense: | | | |
| U.S. federal | (4) | 15 | 44 |
| U.S. state and local | (2) | 2 | 8 |
| International | (8) | (2) | (3) |
| Total deferred tax (benefit) expense | (14) | 15 | 49 |
| Total provision for income taxes | $152 | $427 | $ 474 |

An analysis of Chemours' effective income tax rate follows:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 (Unaudited) |
| Statutory U.S. federal income tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal benefit | 1.0 | 2.0 | 1.8 |
| Lower effective tax rate on international operations — net | (10.2) | (6.6) | (9.0) |
| Valuation allowance | 1.2 | 0.4 | 0.2 |
| Exchange losses (gains) | 2.3 | 0.2 | (1.1) |
| Section 199 deduction | (0.8) | (1.6) | (1.2) |
| Other, net | (2.1) | (0.6) | (0.8) |
| Total effective tax rate | 26.4% | 28.8% | 24.9% |

Exchange (gain) / loss principally reflects the impact of non-taxable gains and losses resulting from remeasurement of foreign currency — denominated monetary assets and liabilities. The primary driver of the lower effective tax rate on international operations — net is the spread of income and loss amongst the various foreign jurisdictions. The valuation allowance was increased by $7, $7 and $3 in 2013, 2012 and 2011, respectively, relating to assets for which Chemours determined it was more likely than not the assets would not be realized. In addition, Chemours is entitled to a domestic manufacturing deduction relating to income from certain qualifying domestic production activities pursuant to section 199 of the Internal Revenue Code.

F-20

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

The significant components of deferred tax assets and liabilities are as follows:

| | December 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| Deferred tax assets — current: | | |
| Accounts receivable and other assets | $ 5 | $ 3 |
| Other accrued liabilities | 64 | 25 |
| Total deferred tax assets — current | $ 69 | $ 28 |
| Deferred tax assets — noncurrent: | | |
| Other accrued liabilities | 134 | 139 |
| Tax loss carryforwards | 26 | 19 |
| Total deferred tax assets — noncurrent | $ 160 | $ 158 |
| Valuation allowance | (26) | (19) |
| Total deferred tax assets, net | $ 203 | $ 167 |
| Deferred tax liabilities — current: | | |
| Accrued expenses and other liabilities | (4) | (5) |
| Inventories | (29) | (25) |
| Total deferred tax liabilities — current | $ (33) | $ (30) |
| Deferred tax liabilities — noncurrent: | | |
| Goodwill and other intangibles | (2) | (1) |
| Accrued expenses and other liabilities | (53) | (51) |
| Property, plant and equipment | (485) | (469) |
| Total deferred tax liabilities — noncurrent | $(540) | $(521) |
| Total deferred tax liabilities | $(573) | $(551) |
| Net deferred tax liability | $(370) | $(384) |

Under the tax laws of various jurisdictions in which Chemours operates, deductions or credits that cannot be fully utilized for tax purposes during the current year may be carried forward or back, subject to statutory limitations, to reduce taxable income or taxes payable in future or prior years. At December 31, 2013, the tax effect of carryforwards was $1, after taking into consideration the valuation allowance, which expire at various times over the next seven years. If certain substantial changes in the entity's ownership occur, there may be a limitation on the amount of the carryforwards that can be utilized.

As described above in Note 2, aside from a Japanese entity (that is a dual-resident for U.S. income tax purposes), there is no direct ownership relationship among all the other various legal entities comprising Chemours, consequently, no provision has been made for income taxes on unremitted earnings of subsidiaries and affiliates.

Upon audit, taxing authorities may challenge all or part of an uncertain income tax position. While Chemours has no history of tax audits on a stand-alone basis, DuPont is routinely audited by U.S. federal, state and local, and non-U.S. taxing authorities. Accordingly, DuPont (and Chemours) regularly assesses the outcome of potential examinations in each of the taxing jurisdictions when determining the adequacy of the amount of unrecognized tax benefit recorded. The reserves are adjusted, from time to time, based upon changing facts and circumstances, such as the progress of a tax audit. It is reasonably possible that changes to Chemours' global unrecognized tax

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

benefits could be significant, however, due to the uncertainty regarding the timing of completion of audits and possible outcomes, a current estimate of the range of increases or decreases that may occur within the next 12 months cannot be made. If recognized, $26 of liabilities for unrecognized tax benefits would affect the effective tax rate.

DuPont, and / or its subsidiaries, files income tax returns in the U.S. federal jurisdiction, and various states and non-U.S. jurisdictions. With few exceptions, Chemours is no longer subject to U.S. federal, state and local, or non-U.S. income tax examinations by tax authorities for years before 2004. Chemours' most significant tax jurisdiction is the U.S. federal tax jurisdiction. The Internal Revenue Service is currently examining DuPont's consolidated U.S. tax returns for 2004 through 2011. In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on the combined financial position, liquidity or results of operations of the business. See the reconciliation of the total amounts of unrecognized tax benefits below excluding interest and penalties:

|  | Year ended December 31, | | |
|  | 2013 | 2012 | 2011 (Unaudited) |
| --- | --- | --- | --- |
| Total unrecognized tax benefits as of January 1 | $24 | $23 | $ 21 |
| Gross amounts of decreases in unrecognized tax benefits as a result of adjustments to tax provisions taken during the prior period | (1) | (1) | (2) |
| Gross amounts of increases in unrecognized tax benefits as a result of tax positions taken during the current period | 5 | 4 | 5 |
| Reduction to unrecognized tax benefits as a result of a lapse of the applicable statute of limitations | (2) | (2) | (1) |
| Total unrecognized tax benefits as of December 31 | $26 | $24 | $ 23 |

Interest and penalties have been accrued related to unrecognized tax benefits. The liabilities for interest and penalties related to unrecognized tax benefits were $6, $4 and $3 as of December 31, 2013, 2012 and 2011, respectively. Expense for interest and penalties was $2, $1 and $0 for the years ended December 31, 2013, 2012 and 2011, respectively.

The following reflects a rollforward of the deferred tax asset valuation allowance for the years ended December 31, 2013, 2012 and 2011:

|  | Year ended December 31, | | |
|  | 2013 | 2012 | 2011 (Unaudited) |
| --- | --- | --- | --- |
| Balance at beginning of period | $19 | $12 | $ 9 |
| Net charges to income tax expense | 7 | 7 | 3 |
| Balance at end of period | $26 | $19 | $ 12 |

F-22

**Table of Contents**

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

## Note 9: Accounts and Notes Receivable–Trade, Net

| | December 31, | |
| --- | --- | --- |
| | **2013** | **2012** |
| Accounts receivable — trade, net [1] | $762 | $723 |
| VAT, GST, and other taxes [2] | 53 | 47 |
| Advances and deposits | 12 | 17 |
| Leases receivable — current | 12 | 15 |
| Notes receivable — trade, net [3] | 2 | 4 |
| | $841 | $806 |

[1] Accounts receivable — trade, are net of allowances of $7 and $6 as of December 31, 2013 and 2012, respectively. Allowances are equal to the estimated uncollectible amounts.
[2] VAT receivables are generally recorded at the legal entity level and allocated to Chemours within shared legal entities.
[3] Notes receivable — trade, net primarily consists of loan receivables with terms of one year or less and are primarily concentrated in China. As of December 31, 2013, there were no past due notes receivable, nor were there any impairments related to current loan agreements.

Accounts and notes receivable are carried at amounts that approximate fair value. Chemours performs credit evaluations of its customers' financial condition and limits the amount of credit extended when deemed necessary. Generally, no collateral from customers is required. Bad debt expense was $2, $0 and $1 for the years ended December 31, 2013, 2012 and 2011, respectively. Chemours primarily estimates reserves for losses on receivables by specific identification based on an assessment of the customers' ability to make required payments.

### (a) Direct Financing Leases

At three of its facilities in the U.S. (Baytown, Borderland and Morses Mill), Chemours has constructed fixed assets on land that it leases from third parties. Management has analyzed these arrangements and determined these assets represent a direct financing lease, whereby Chemours is the lessor of this equipment. Chemours has recorded leases receivable of $160 and $188 in 2013 and 2012 which represent the balance of the minimum future lease payments receivable. The current portion of leases receivable is included in accounts and notes receivable, as shown above. The long-term portion of leases receivable are included in other assets, as shown in Note 13. Management has evaluated the realizable value of these leased assets and determined no impairment existed at December 31, 2013 or 2012. There is no estimated future residual value of these leased assets. Future minimum lease receipts for each of the years ended December 31, 2014, 2015, 2016, 2017 and 2018 are $12 and for the years thereafter are $88.

### (b) Baytown Put/Call

At the Baytown facility (one of the three facilities noted above), the third party landlord executed a put/call option effective December 31, 2013 to acquire the entire property and equipment of the Baytown facility for 1.625 times the net book value (defined as cost less accumulated depreciation based on straight-line depreciation using a useful life of 11 years). At the time of the transfer, the net book value of the Baytown lease receivable was $13.

F-23

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

## Note 10: Inventories

|  | December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| Finished products | $ 583 | $ 541 |
| Semi-finished products | 194 | 181 |
| Raw materials and supplies | 568 | 525 |
|  | 1,345 | 1,247 |
| Adjustment of inventories to a LIFO basis | (290) | (270) |
|  | $1,055 | $ 977 |

Inventory values, before LIFO adjustment, are generally determined by the average cost method, which approximates current cost. Inventories are valued under the LIFO method at substantially all of the U.S. locations which comprised $717 and $648 or 53 percent and 52 percent of inventories before the LIFO adjustments at December 31, 2013 and 2012, respectively. The remainder of inventory held in international locations and certain U.S. locations is valued under the average cost method.

## Note 11: Property, Plant and Equipment

Chemours' property, plant and equipment consisted of:

|  | December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| Equipment | $ 7,365 | $ 7,219 |
| Buildings | 765 | 743 |
| Construction in progress | 532 | 372 |
| Land | 128 | 124 |
| Mineral rights | 31 | 31 |
| Total | 8,821 | 8,489 |
| Accumulated depreciation | (5,849) | (5,696) |
| Net property, plant and equipment | $ 2,972 | $ 2,793 |

Depreciation expense amounted to $255, $260 and $265 for the years ended December 31, 2013, 2012, and 2011, respectively. Property, plant and equipment include gross assets acquired under capital leases of $4 and $5 at December 31, 2013 and 2012, respectively.

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

## Note 12: Goodwill and Other Intangible Assets

*(a)   Goodwill*

The following table summarizes changes in the carrying amount of goodwill by reportable segment for the years ended December 31, 2013 and 2012.

|  | Balance as of December 31, 2013 | Goodwill adjustments | Balance as of December 31, 2012 |
|---|---|---|---|
| Titanium Technologies | $ 13 | $ — | $ 13 |
| Fluoroproducts | 85 | — | 85 |
| Chemical Solutions | 100 | — | 100 |
| Goodwill, net | $ 198 | $ — | $ 198 |

Chemours has three reportable segments, Titanium Technologies, Fluoroproducts and Chemical Solutions (see further discussion of reportable segments in Note 20). These reportable segments are comprised of four operating segments, Titanium Technologies, Fluorochemicals, Fluoropolymer Solutions and Chemical Solutions. Fluorochemicals and Fluoropolymer Solutions are aggregated into the Fluoroproducts reportable segment. Chemours defines its reporting units as its four operating segments, and has assigned its goodwill balance to these reporting units based primarily on specific identification of goodwill acquired by the reporting unit. In 2013 and 2012, Chemours performed impairment tests for goodwill and determined that no goodwill impairment existed and the fair value of each reporting unit substantially exceeded its carrying value.

*(b)   Other Intangible Assets*

The following table summarizes the gross carrying amounts and accumulated amortization of other intangible assets by major class:

| | December 31, 2013 | | |
|---|---|---|---|
| | Gross | Accumulated Amortization | Net |
| Customer agreements | $ 23 | $ (17) | $ 6 |
| Patents | 22 | (17) | 5 |
| Purchased trademarks | 20 | (15) | 5 |
| Purchased and licensed technology | 17 | (16) | 1 |
| Total other intangible assets | $ 82 | $ (65) | $17 |

| | December 31, 2012 | | |
|---|---|---|---|
| | Gross | Accumulated Amortization | Net |
| Customer agreements | $ 50 | $ (37) | $13 |
| Patents | 22 | (15) | 7 |
| Purchased trademarks | 20 | (14) | 6 |
| Purchased and licensed technology | 19 | (16) | 3 |
| Total other intangible assets | $111 | $ (82) | $29 |

F-25

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

The aggregate pre-tax amortization expense for definite-lived intangible assets was $6, $6 and $7 during the years ended December 31, 2013, 2012 and 2011, respectively. Customer agreements decreased in 2013 by $7, primarily as a result of the transfer of Baytown. The estimated aggregate pre-tax amortization expense for 2014, 2015, 2016, 2017 and 2018 is $3, $3, $3, $2 and $1, respectively. There are no indefinite-lived intangible assets.

## Note 13: Other Assets

|  | December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| Leases receivable — non-current [1] | $148 | $173 |
| Capitalized repair and maintenance costs | 134 | 117 |
| Advances and deposits | 11 | 11 |
| Deferred income taxes — non-current | 9 | 9 |
| Miscellaneous [2] | 29 | 24 |
|  | $331 | $334 |

[1] Leases receivable includes direct financing type leases of property at three locations (see Note 9).
[2] Miscellaneous includes prepaid expenses for royalty fees, vendor supply agreements, and taxes other than income taxes. Also included in miscellaneous other assets are capitalized expenses for the preparation of the future landfill cells at Titanium Technologies' New Johnsonville plant site.

## Note 14: Accounts Payable

|  | December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| Trade payables | $1,026 | $887 |
| VAT and other taxes [1] | 31 | 36 |
|  | $1,057 | $923 |

[1] VAT payables are generally recorded at the legal entity level and allocated to Chemours within shared legal entities.

## Note 15: Other Accrued Liabilities

|  | December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| Compensation and other employee-related costs | $132 | $127 |
| Accrued litigation | 86 | 3 |
| Customer rebates | 62 | 64 |
| Environmental remediation | 47 | 46 |
| Property taxes | 27 | 26 |
| Contract services | 18 | 7 |
| Deferred revenue | 14 | 6 |
| Miscellaneous [1] | 19 | 20 |
|  | $405 | $299 |

[1] Miscellaneous primarily includes cylinder deposits, accrued utilities, and restructuring accruals.

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

## Note 16: Other Liabilities

|  | December 31, | |
|---|---|---|
|  | **2013** | **2012** |
| Environmental remediation | $227 | $224 |
| Employee-related benefits | 104 | 97 |
| Accrued litigation | 49 | 65 |
| Asset retirement obligations | 40 | 42 |
| Deferred revenue | 11 | 13 |
| Contract termination fee | 9 | 8 |
| Miscellaneous | 16 | 15 |
|  | $456 | $464 |

See Note 17 for discussion of environmental remediation, asset retirement obligations and accrued litigation.

## Note 17: Commitments and Contingent Liabilities

*(a)    Guarantees*

### Obligations for Equity Affiliates & Others

Chemours, through DuPont, has directly guaranteed various debt obligations under agreements with third parties related to equity affiliates, customers, suppliers and other affiliated companies. At December 31, 2013 and 2012, Chemours had directly guaranteed $46 and $49 of such obligations, respectively. This amount represents the maximum potential amount of future (undiscounted) payments that Chemours could be required to make under the guarantees. Chemours would be required to perform on these guarantees in the event of default by the guaranteed party. No amounts were accrued at December 31, 2013 and 2012.

Chemours assesses the payment/performance risk by assigning default rates based on the duration of the guarantees. These default rates are assigned based on the external credit rating of the counterparty or through internal credit analysis and historical default history for counterparties that do not have published credit ratings. For counterparties without an external rating or available credit history, a cumulative average default rate is used.

### Operating Leases

Chemours uses various leased facilities and equipment in its operations. The terms for these leased assets vary depending on the lease agreement. Future minimum lease payments (including residual value guarantee amounts) under noncancelable operating leases are, $55, $47, $37, $28 and $23 for the years ended December 31, 2014, 2015, 2016, 2017 and 2018, respectively, and $57 for the years thereafter. Net rental expense under operating leases was $62, $53 and $43 during the years ended December 31, 2013, 2012 and 2011, respectively.

F-27

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

### (b)    Asset Retirement Obligations

Chemours has recorded asset retirement obligations primarily associated with closure, reclamation and removal costs for mining operations related to the production of titanium dioxide in the Titanium Technologies segment. Chemours' asset retirement obligation liabilities were $42 and $43 at December 31, 2013 and 2012, respectively. A summary of the changes in asset retirement obligations during 2013 and 2012 is as follows:

|  | Year ended December 31, | |
| --- | --- | --- |
|  | 2013 | 2012 |
| Beginning balance | $43 | $    39 |
| Accretion expense | 3 | 2 |
| Additional liabilities incurred | — | 2 |
| Changes in estimated cash flows | — | 2 |
| Settlements/payments | (4) | (2) |
| Ending balance | $42 | $    43 |
| Current portion | $ 2 | $     1 |
| Noncurrent portion | $40 | $    42 |

### (c)    Litigation

DuPont, of which Chemours, prior to the distribution, is a subsidiary, is subject to various pending legal proceedings arising out of the normal course of its business including product liability, intellectual property, commercial, environmental and antitrust lawsuits. It is not possible to predict the outcome of these various proceedings although management does not anticipate their resolution will have a materially adverse effect on Chemours' combined financial position or liquidity. However, the ultimate liabilities could be significant to results of operations in the period recognized.

**Asbestos**

At December 31, 2013, there were about 2,400 lawsuits pending against DuPont alleging personal injury from exposure to asbestos. These cases are pending in state and federal court in numerous jurisdictions in the United States and are individually set for trial. Most of the actions were brought by contractors who worked at sites at some point between 1950 and the 1990s. A small number of cases involve similar allegations by DuPont employees. A limited number of the cases were brought by household members of contractors and DuPont employees. Finally, certain lawsuits allege personal injury as a result of exposure to DuPont products. At December 31, 2013 and 2012, Chemours had an accrual of $40 and $38, respectively, related to this matter.

**Cogeneration Lawsuit**

Chemours' Chambers Works facility in New Jersey has an agreement to purchase electricity from the Chambers Cogeneration Limited Partnership, (CCLP). The contract requires periodic price adjustment by a formula that uses the value from a specific line item on a Federal Energy Regulatory Commission reporting form as a proxy for market price. CCLP filed a lawsuit against DuPont in 2008 claiming about $30 for recalculated past charges, adjustment to future billing and attorneys' fees. In 2011, the court granted CCLP's motion for summary judgment on the issue of liability. In the second quarter 2012, the court assessed total damages of $26. At June 30, 2012, Chemours had recorded net charges of $17, reflecting total charges of $26 and a payment of $9 to CCLP within the second quarter 2012.

F-28

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

In the fourth quarter of 2012, the parties agreed to settle the matter for $15 exclusive of the $9 paid in 2012 thereby recognizing a gain of $2. At December 31, 2012, Chemours had accruals of $10 related to this matter reflecting a payment of $5 to CCLP. In the first quarter 2013, DuPont paid on behalf of Chemours $10 to CCLP completing the settlement payment.

**Lucite**

In 2009, Lucite sued DuPont in federal court in Tennessee for contractual indemnity to install improved environmental technology at the Memphis, Tennessee acrylics plant which DuPont sold in 1993. As part of the sale, DuPont, of which, Chemours, prior to the distribution, is a subsidiary, issued a fifteen-year indemnity with respect to all environmental liabilities that existed at the time of the sale. In 2004, the United States Environmental Protection Agency (EPA) issued a comprehensive audit report finding violations of the Clean Air Act that dated back to 1978. EPA alleged that "best available" technology should have been installed in 1978 when DuPont increased the capacity of the plant's spent acid recovery unit. In the course of settling the EPA enforcement action, Lucite reportedly spent $25 in penalties, costs and expenses.

In 2011, Lucite and DuPont settled the matter for $19. Accordingly, Chemours recorded additional charges of $9 during the year ending December 31, 2011. The settlement was paid in the second quarter of 2011.

**PFOA**

Chemours used PFOA (collectively, perfluorooctanoic acids and its salts, including the ammonium salt), as a processing aid to manufacture some fluoropolymer resins at various sites around the world including its Washington Works plant in West Virginia. Chemours had accruals of $15 related to the PFOA matters discussed below at December 31, 2013 and 2012.

The accrual includes charges related to DuPont's obligations under agreements with the U. S. Environmental Protection Agency and voluntary commitments to the New Jersey Department of Environmental Protection. These obligations and voluntary commitments include surveying, sampling and testing drinking water in and around certain company sites and offering treatment or an alternative supply of drinking water if tests indicate the presence of PFOA in drinking water at or greater than the national Provisional Health Advisory.

Drinking Water Actions

In August 2001, a class action, captioned Leach v DuPont, was filed in West Virginia state court alleging that residents living near the Washington Works facility had suffered, or may suffer, deleterious health effects from exposure to PFOA in drinking water.

DuPont and attorneys for the class reached a settlement in 2004 that binds about 80,000 residents. In 2005, DuPont paid the plaintiffs' attorneys' fees and expenses of $23 and made a payment of $70, which class counsel designated to fund a community health project. Chemours, through DuPont, funded a series of health studies which were completed in October 2012 by an independent science panel of experts (the C8 Science Panel). The studies were conducted in communities exposed to PFOA to evaluate available scientific evidence on whether any probable link exists, as defined in the settlement agreement, between exposure to PFOA and human disease.

The C8 Science Panel found probable links, as defined in the settlement agreement, between exposure to PFOA and pregnancy-induced hypertension, including preeclampsia; kidney cancer; testicular cancer; thyroid disease; ulcerative colitis; and diagnosed high cholesterol.

F-29

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

In May 2013, a panel of three independent medical doctors released its initial recommendations for screening and diagnostic testing of eligible class members. In September 2014, the medical panel recommended follow-up screening and diagnostic testing three years after initial testing, based on individual results. The medical panel has not communicated its anticipated schedule for completion of its protocol. Through DuPont, Chemours is obligated to fund up to $235 for a medical monitoring program for eligible class members and, in addition, administrative cost associated with the program, including class counsel fees. In January 2012, Chemours, through DuPont, put $1 in an escrow account to fund medical monitoring as required by the settlement agreement. The court appointed Director of Medical Monitoring has established the program to implement the medical panel's recommendations. Under the program, notice has been given and the registration process, as well as eligibility screening, to participate in diagnostic testing has begun. At each of September 30, 2014 and December 31, 2013, no money has been disbursed from the fund.

In addition, under the settlement agreement, DuPont must continue to provide water treatment designed to reduce the level of PFOA in water to six area water districts, including the Little Hocking Water Association (LHWA), and private well users.

Class members may pursue personal injury claims against DuPont only for those human diseases for which the C8 Science Panel determined a probable link exists. At September 30, 2014, there were approximately 2,545 lawsuits filed in various federal and state courts in Ohio and West Virginia, an increase of about 2,460 and 2,520, respectively over December 31, 2013 and 2012. In accordance with a stipulation reached in the third quarter 2014 and other court procedures, these lawsuits have been or will be served and consolidated in multi-district litigation in Ohio federal court (MDL). The majority of the lawsuits allege personal injury claims associated with high cholesterol and thyroid disease from exposure to PFOA in drinking water. There are 18 lawsuits alleging wrongful death. In the third quarter 2014, six plaintiffs from the MDL were selected for individual trial. The first trial is scheduled to begin in September 2015, and the second in November 2015. Chemours, through DuPont, denies the allegations in these lawsuits and is defending itself vigorously.

<u>Additional Actions</u>

An Ohio action brought by the LHWA is ongoing. In addition to general claims of PFOA contamination of drinking water, the action claims "imminent and substantial endangerment to health and or the environment" under the Resource Conservation and Recovery Act (RCRA). In the second quarter 2014, DuPont filed a motion for summary judgment which if granted, will be dispositive of this matter. The LHWA has moved for partial summary judgment. Chemours, through DuPont, denies these claims and is defending itself vigorously.

While it is probable that the company will incur costs related to the medical monitoring program, such costs cannot be reasonably estimated due to uncertainties surrounding the level of participation by eligible class members and the scope of testing. Chemours believes that it is reasonably possible that it could incur losses related to the other PFOA matters discussed above; however, a range of such losses, if any, cannot be reasonably estimated at this time.

***Titanium Dioxide Antitrust Litigation***

In February 2010, two suits were filed in Maryland federal district court alleging conspiracy among DuPont, of which Chemours, prior to the distribution, is a subsidiary, Huntsman International LLC (Huntsman), Kronos Worldwide Inc. (Kronos), Millennium Inorganics Chemicals Inc. (Millennium) and others to fix prices of

F-30

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

titanium dioxide sold in the U.S. between March 2002 and the present. The cases were subsequently consolidated and in August 2012, the court certified a class consisting of U.S. customers that have directly purchased titanium dioxide since February 1, 2003.

During the third quarter 2013, DuPont and plaintiffs agreed to settle this matter, subject to court approval. In connection therewith, Chemours has recorded charges of $72, within cost of goods sold, at December 31, 2013. The settlement explicitly acknowledges that DuPont denies all allegations and does not admit liability. The court entered the order granting final approval to the settlement on December 13, 2013. The settlement was paid in January 2014.

In November 2013, Valspar, which opted out of the class action settlement described above, filed suit in federal court in Minnesota against DuPont, Huntsman, Kronos and Millennium making substantially similar claims to those made in the class action. The lawsuit was moved to Delaware federal court on DuPont's motion.

In March 2013, a purported class action was filed against DuPont, Huntsman, Kronos and Millennium in the U.S. District Court for the Northern District of California on behalf of "indirect purchasers" from more than 30 states that purchased products containing titanium dioxide. The settlement discussed above cannot be used to establish liability in the indirect purchaser case. In September 2014, the Court dismissed most of the claims in the original complaint. The plaintiffs have filed an Amended Complaint, limiting the purported class to indirect purchasers of architectural coating products containing titanium dioxide from 21 states. DuPont denies all allegations and will again seek dismissal of the Amended Complaint.

Chemours, through DuPont, denies these allegations and is defending itself vigorously against the Valspar and indirect purchaser claims. While management believes a loss related to either matter is reasonably possible, a range of such losses, if any, cannot be reasonably estimated at this time.

*(d)    Environmental*

DuPont, of which Chemours, prior to the distribution, is a subsidiary, is also subject to contingencies pursuant to environmental laws and regulations that in the future may require further action to correct the effects on the environment of prior disposal practices or releases of chemical substances by Chemours or other parties. Chemours accrues for environmental remediation activities consistent with the policy set forth in Note 3. Much of this liability results from the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, often referred to as Superfund), RCRA and similar state and global laws. These laws require DuPont, of which Chemours, prior to the distribution, is a subsidiary, to undertake certain investigative, remediation and restoration activities at sites where Chemours conducts or once conducted operations or at sites where Chemours-generated waste was disposed. The accrual also includes estimated costs related to a number of sites identified for which it is probable that environmental remediation will be required, but which are not currently the subject of enforcement activities.

Remediation activities vary substantially in duration and cost from site to site. These activities, and their associated costs, depend on the mix of unique site characteristics, evolving remediation technologies, diverse regulatory agencies and enforcement policies, as well as the presence or absence of potentially responsible parties. At December 31, 2013, the Combined Balance Sheets included a liability of $274, relating to these matters and, in management's opinion, is appropriate based on existing facts and circumstances. The average time frame, over which the accrued or presently unrecognized amounts may be paid, based on past history, is estimated to be 15 to 20 years. As of December 31, 2013, considerable uncertainty exists with respect to these costs and, under adverse changes in circumstances, potential liability may range up to 3.5 times the amount accrued.

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

**Pompton Lakes**

The environmental remediation accrual at December 31, 2013 includes $78 related to activities at Chemours' site in Pompton Lakes, New Jersey. Management estimates that potential liability for remediation activities at this site could range up to $116. During the twentieth century, DuPont manufactured blasting caps, fuses and related materials at Pompton Lakes. Operating activities at the site were ceased in the mid 1990's. Primary contaminants in the soil and sediments are lead and mercury. Ground water contaminants include volatile organic compounds. Under the authority of the EPA and the New Jersey Department of Environmental Protection, remedial actions at the site are focused on investigating and cleaning up the area. Ground water monitoring at the site is ongoing and Chemours, through DuPont, has installed and continues to install vapor mitigation systems at residences within the ground water plume. In addition, Chemours, through DuPont, is further assessing ground water plume/vapor intrusion delineation. In November 2014, the EPA announced a proposed remediation plan that would require Chemours to dredge mercury contamination from a 36 acre area of the lake and remove sediment from two other areas of the lake near the shoreline. The plan is subject to notice and comment. Chemours expects to spend about $60 over the next three years, which is included in the remediation accrual at September 30, 2014, in connection with remediation activities at Pompton Lakes, including activities related to the EPA's proposed plan. Based on existing facts and circumstances, management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site, other than disclosed, will have a material impact on the financial position, liquidity or results of operations of Chemours.

**Note 18: Long-Term Employee Benefits**

DuPont offers various long-term benefits to its employees. Where permitted by applicable law, DuPont reserves the right to change, modify or discontinue the Plans.

DuPont offers plans that are shared amongst its businesses, including Chemours. In these cases, the participation of employees in these plans is reflected in these financial statements as though Chemours participates in a multiemployer plan with DuPont. A proportionate share of the cost is reflected in these Combined Financial Statements. Assets and liabilities of such plans are retained by DuPont. Further information on the DuPont plan is discussed in DuPont's Annual Report on Form 10-K for the year ended December 31, 2013 (DuPont's Annual Report).

*(a) Defined Benefit Pensions*

**DuPont Pension and Retirement Plan**

DuPont has both funded and unfunded noncontributory defined benefit pension plans covering a majority of the U.S. employees, hired before January 1, 2007. The benefits under these plans are based primarily on years of service and employees' pay near retirement. DuPont's funding policy is consistent with the funding requirements of federal laws and regulations.

**Non-U.S. Pension Plans**

Pension coverage for employees of DuPont's non-U.S. subsidiaries, is provided, to the extent deemed appropriate, through separate plans. Obligations under such plans are funded by depositing funds with trustees, covered by insurance contracts, or remain unfunded.

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

### (b) Other Long-Term Employee Benefits

DuPont provides medical, dental and life insurance benefits to pensioners and survivors, and disability and life insurance protection to employees. The associated plans for retiree benefits are unfunded and the cost of approved claims are paid from DuPont funds. Essentially all of the cost for these retiree benefit plans is attributable to DuPont's U.S. plans. The retiree medical plan is contributory with pensioners and survivors' contributions adjusted annually to achieve a 50/50 target sharing of cost increases between DuPont and pensioners and survivors. In addition, limits are applied to DuPont's portion of the retiree medical cost coverage. U.S. employees hired on or after January 1, 2007 are not eligible to participate in the post-retirement medical, dental and life insurance plans. DuPont also provides disability benefits to employees. Employee disability benefit plans are insured in many countries. However, in the U.S., such plans are generally self-insured. Expenses for self-insured plans are reflected in the Combined Financial Statements.

### (c) Defined Contribution Plan

DuPont sponsors several defined contribution plans, which cover substantially all U.S. employees. The most significant is DuPont's U.S. Retirement Savings Plan (the Plan), which reflects the 2009 merger of DuPont's Retirement Savings Plan and DuPont's Savings and Investment Plan. This Plan includes a non-leveraged Employee Stock Ownership Plan (ESOP). Employees are not required to participate in the ESOP and those who do are free to diversify out of the ESOP. The purpose of the Plan is to provide retirement savings benefits for employees and to provide employees an opportunity to become stockholders of DuPont. The Plan is a tax qualified contributory profit sharing plan, with cash or deferred arrangement, and any eligible employee of DuPont may participate. DuPont contributes 100 percent of the first six percent of the employee's contribution election and also contributes three percent of each eligible employee's eligible compensation regardless of the employee's contribution.

### Participation in the Plans

Chemours participates in DuPont's U.S. and non-U.S. plans as though they are participants in a multiemployer plan with the other businesses of DuPont. More information on the financial status of DuPont's significant plans can be found in DuPont's Annual Report. The following table presents information for DuPont's significant plans in which Chemours participates.

| Plan name | EIN / Pension number | 2013 | 2012 | 2011 (Unaudited) |
|---|---|---|---|---|
| DuPont Pension and Retirement Plan (U.S.) | 51-0014090 / 001 | $126 | $118 | $ 87 |
| All Other U.S. and non-U.S. Plans | | 38 | 51 | 64 |

For purposes of these financial statements, the figures in this table represent the allocation of cost to Chemours, which was allocated based on active employee headcount. These figures do not represent cash payments to DuPont, or DuPont's plans.

### Cash Flow

**Defined Benefit Plan**

No contributions were made to the principal U.S. pension plan trust fund in 2011 or 2013. In 2012, DuPont made a contribution to the principal U.S. pension plan of which Chemours' portion was approximately $110. DuPont does not expect to make any contributions to the principal U.S. pension plan in 2014. DuPont contributed on

F-33

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

behalf of Chemours $34, $34 and $28 to its pension plans other than the principal U.S. pension plan in 2013, 2012 and 2011, respectively. DuPont contributed on behalf of Chemours $58, $66 and $80 to its other long-term employee benefit plans, respectively, in 2013, 2012 and 2011. DuPont expects to contribute on behalf of Chemours approximately $37 and $63 to its pension plans other than the principal U.S. pension plan and its other long-term employee benefit plans, respectively, in 2014.

**Defined Contribution Plan**

DuPont's contributions to the Plan on behalf of Chemours were allocated in the amounts of $50, $49 and $49 for the years ended December 31, 2013, 2012 and 2011, respectively. The Plan's matching contributions vest immediately upon contribution. The three percent non-matching contribution vests for employees with at least three years of service. In addition, DuPont expects to contribute on behalf of Chemours about $55 to its defined contribution plans for the year ended December 31, 2014.

The contribution made by DuPont on behalf of Chemours is an allocation of the total contribution based on the headcount of the participants in the plan which are part of the Chemours business.

**Note 19: Geographic Information**

| | December 31, 2013 | | December 31, 2012 | | December 31, 2011 (Unaudited) | |
| --- | --- | --- | --- | --- | --- | --- |
| | Net Sales [1] | Net Property [2] | Net Sales [1] | Net Property [2] | Net Sales [1] | Net Property [2] |
| North America | $ 3,138 | $ 2,183 | $ 3,284 | $ 2,193 | $ 3,276 | $ 2,156 |
| Asia Pacific | 1,519 | 138 | 1,654 | 139 | 1,969 | 145 |
| EMEA [3] | 1,237 | 321 | 1,318 | 251 | 1,607 | 225 |
| Latin America [4] | 965 | 330 | 1,109 | 210 | 1,120 | 140 |
| Total | $ 6,859 | $ 2,972 | $ 7,365 | $ 2,793 | $ 7,972 | $ 2,666 |

[1]    Net sales are attributed to countries based on the location of customer.
[2]    Includes property, plant and equipment less accumulated depreciation.
[3]    Europe, Middle East and Africa.
[4]    Latin America includes Mexico.

**Note 20: Segment Information**

Chemours' operations are classified into three reportable segments based on similar economic characteristics, the nature of products and production processes, end-use markets, channels of distribution and regulatory environment. Chemours' reportable segments are Titanium Technologies, Fluoroproducts and Chemical Solutions. Corporate costs and certain legal and environmental expenses that are not aligned with the reportable segments are reflected in Corporate and Other.

Major products by segment include: Titanium Technologies (titanium dioxide); Fluoroproducts (fluorochemicals and fluoropolymers); and Chemical Solutions (cyanides, sulfur products and performance chemicals and intermediates). Chemours operates globally in substantially all of its product lines. Segment sales include transfers to another reportable segment. Segment adjusted earnings before interest and taxes (adjusted EBIT) is defined as income (loss) before income taxes excluding non-operating pension and other postretirement

F-34

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

employee benefit costs and exchange gains (losses). Segment net assets include net working capital, net property, plant and equipment and other non-current operating assets and liabilities of the segment.

| | Titanium Technologies | Fluoro products | Chemical Solutions | Corporate and Other | Total |
|---|---|---|---|---|---|
| **December 31, 2013** | | | | | |
| Sales | $ 3,026 | $ 2,379 | $ 1,462 | $ — | $6,867 |
| Less: transfers | 7 | — | 1 | — | 8 |
| Net sales | 3,019 | 2,379 | 1,461 | — | 6,859 |
| Adjusted EBIT | 605 | 287 | 43 | (214) | 721 |
| Depreciation and amortization | 117 | 90 | 53 | 1 | 261 |
| Equity in earnings from affiliates | — | 22 | — | — | 22 |
| Segment net assets | 1,417 | 1,412 | 744 | (294) | 3,279 |
| Affiliate net assets | — | 123 | — | — | 123 |
| Purchases of plant, property and equipment | 290 | 96 | 52 | — | 438 |
| **December 31, 2012** | | | | | |
| Sales | $ 3,295 | $ 2,559 | $ 1,515 | $ — | $7,369 |
| Less: transfers | 4 | — | — | — | 4 |
| Net sales | 3,291 | 2,559 | 1,515 | — | 7,365 |
| Adjusted EBIT | 1,339 | 444 | 61 | (227) | 1,617 |
| Depreciation and amortization | 115 | 95 | 55 | 1 | 266 |
| Equity in earnings from affiliates | — | 25 | — | | 25 |
| Segment net assets | 1,361 | 1,380 | 764 | (276) | 3,229 |
| Affiliate net assets | — | 130 | — | — | 130 |
| Purchases of plant, property and equipment | 270 | 105 | 57 | — | 432 |
| **December 31, 2011** | | | | | |
| Sales | $ 3,680 | $ 2,834 | $ 1,465 | $ — | $7,979 |
| Less: transfers | 6 | — | 1 | — | 7 |
| Net sales | 3,674 | 2,834 | 1,464 | — | 7,972 |
| Adjusted EBIT | 1,509 | 590 | 52 | (200) | 1,951 |
| Depreciation and amortization | 113 | 98 | 60 | 1 | 272 |
| Equity in earnings from affiliates | — | 44 | — | — | 44 |
| Segment net assets | 1,199 | 1,356 | 826 | (250) | 3,131 |
| Affiliate net assets | — | 136 | — | — | 136 |
| Purchases of plant, property and equipment | 129 | 108 | 118 | — | 355 |

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Combined Financial Statements (continued)
*(Dollars in millions)*

Total segment adjusted EBIT reconciles to total combined income before income taxes on the Combined Statements of Income as follows:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 | 2012 | 2011 (Unaudited) |
| Total segment adjusted EBIT | $ 721 | $1,617 | $ 1,951 |
| Non-operating pension and other postretirement employee benefit costs | (114) | (127) | (112) |
| Exchange (losses) gains | (31) | (5) | 68 |
| Income before income taxes | $ 576 | $1,485 | $ 1,907 |

Net sales by product group were as follows:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 | 2012 | 2011 (Unaudited) |
| Titanium dioxide | $3,019 | $3,291 | $ 3,674 |
| Fluoropolymers | 1,324 | 1,428 | 1,637 |
| Fluorochemicals | 1,055 | 1,131 | 1,197 |
| Performance chemicals and intermediates | 913 | 939 | 905 |
| Cyanides | 320 | 336 | 303 |
| Sulfur products | 228 | 240 | 256 |
| Net Sales | $6,859 | $7,365 | $ 7,972 |

**Note 21: Subsequent Events**

These Combined Financial Statements reflect management's evaluation of subsequent events through December 18, 2014.

F-36

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E. I. du Pont de Nemours and Company)**
Interim Combined Statements of Comprehensive Income (Unaudited)
*(Dollars in millions)*

| | Nine months ended September 30, | |
|---|---|---|
| | 2014 | 2013 |
| Net sales | $ 4,883 | $ 5,203 |
| Cost of goods sold | 3,824 | 4,095 |
| Gross profit | 1,059 | 1,108 |
| Selling, general and administrative expense | 532 | 585 |
| Research and development expense | 110 | 123 |
| Employee separation/asset related charges, net | 21 | — |
| Total expenses | 663 | 708 |
| Equity in earnings of affiliates | 18 | 17 |
| Other income, net | 16 | 12 |
| Income before income taxes | 430 | 429 |
| Provision for income taxes | 108 | 116 |
| Net income | 322 | 313 |
| Less: Net income attributable to noncontrolling interests | 1 | — |
| Net income attributable to Chemours | $ 321 | $ 313 |
| Comprehensive income | 322 | 313 |
| Less: Comprehensive income attributable to noncontrolling interests | 1 | — |
| Comprehensive income attributable to Chemours | $ 321 | $ 313 |

*See accompanying Notes to the Interim Combined Financial Statements.*

F-37

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E. I. du Pont de Nemours and Company)**
Interim Combined Balance Sheets
*(Dollars in millions)*

| | September 30, 2014 (Unaudited) | December 31, 2013 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Accounts and notes receivable — trade, net | $ 1,030 | $ 841 |
| Inventories | 1,072 | 1,055 |
| Prepaid expenses and other | 44 | 40 |
| Deferred income taxes | 73 | 44 |
| Total current assets | 2,219 | 1,980 |
| Property, plant and equipment | 9,095 | 8,821 |
| Less accumulated depreciation | (5,932) | (5,849) |
| Net property, plant and equipment | 3,163 | 2,972 |
| Goodwill | 198 | 198 |
| Other intangibles, net | 12 | 17 |
| Investments in affiliates | 136 | 123 |
| Other assets | 316 | 331 |
| Total assets | $ 6,044 | $ 5,621 |
| **Liabilities and DuPont Company Net Investment** | | |
| Current liabilities: | | |
| Accounts payable | $ 852 | $ 1,057 |
| Deferred income taxes | 8 | 9 |
| Other accrued liabilities | 321 | 405 |
| Total current liabilities | 1,181 | 1,471 |
| Other liabilities | 481 | 456 |
| Deferred income taxes | 416 | 415 |
| Total liabilities | 2,078 | 2,342 |
| Commitments and contingent liabilities (Note 13) | | |
| DuPont Company Net Investment: | | |
| DuPont Company Net Investment | 3,944 | 3,257 |
| Accumulated other comprehensive income | 19 | 19 |
| Total DuPont Company Net Investment | 3,963 | 3,276 |
| Noncontrolling interests | 3 | 3 |
| Total DuPont Company Net Investment and noncontrolling interests | 3,966 | 3,279 |
| Total liabilities, DuPont Company Net Investment and noncontrolling interests | $ 6,044 | $ 5,621 |

*See accompanying Notes to the Interim Combined Financial Statements.*

F-38

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E. I. du Pont de Nemours and Company)**
Interim Combined Statements of Cash Flows (Unaudited)
*(Dollars in millions)*

| | Nine months ended September 30, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Operating activities: | | |
| Net income | $ 322 | $ 313 |
| Adjustments to reconcile net income to cash provided by operations | | |
| Depreciation and amortization | 185 | 200 |
| Other operating charges and credits — net | 6 | 2 |
| Equity in earnings of affiliates, net of dividends received of $3 and $1 | (13) | (12) |
| Deferred tax benefit | (26) | (13) |
| Increase in operating assets: | | |
| Accounts and notes receivable — trade, net | (189) | (210) |
| Inventories and other operating assets | (6) | (63) |
| (Decrease) increase in operating liabilities: | | |
| Accounts payable and other operating liabilities | (266) | 51 |
| Cash provided by operating activities | 13 | 268 |
| Investing activities: | | |
| Purchases of property, plant and equipment | (404) | (278) |
| Proceeds from sales of assets — net | 27 | 1 |
| Cash used for investing activities | (377) | (277) |
| Financing activities: | | |
| Payments on long-term capital lease obligations | (1) | — |
| Net transfers from DuPont | 365 | 9 |
| Cash provided by financing activities | 364 | 9 |
| Increase (decrease) in cash and cash equivalents | — | — |
| Cash and cash equivalents at beginning of period | — | — |
| Cash and cash equivalents at end of period | $ — | $ — |

*See accompanying Notes to the Interim Combined Financial Statements.*

F-39

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

## Note 1: Description of the Business

The accompanying Interim Combined Financial Statements present, on a historical cost basis, the combined assets, liabilities, revenues and expenses related to The Chemours Company (Chemours) of E. I. du Pont de Nemours and Company (DuPont). Chemours does not operate as a separate, stand-alone entity and is comprised of certain DuPont wholly owned legal entities for which Chemours is the sole business, components of legal entities in which Chemours operates in conjunction with other DuPont businesses, and a majority owned joint venture. Historically, Chemours operated as a part of DuPont, and Chemours' results of operations have been reported in DuPont's consolidated financial statements.

Chemours delivers customized solutions with a wide range of industrial and specialty chemical products for markets including plastics and coatings, refrigeration and air conditioning, general industrial, mining and oil refining. Principal products include titanium dioxide, refrigerants, industrial fluoropolymer resins, sodium cyanide, sulfuric acid and aniline. Chemours consists of three reportable segments including Titanium Technologies, Fluoroproducts and Chemical Solutions.

Chemours is globally operated with manufacturing facilities, sales centers, administrative offices, and warehouses located throughout the world. Chemours operations are primarily located in the United States, Canada, Mexico, Brazil, the Netherlands, Belgium, China, Taiwan, Japan, Switzerland, Singapore, Hong Kong, India, the United Kingdom, France and Sweden. As of September 30, 2014, Chemours consisted of 40 production facilities globally, six dedicated to Titanium Technologies, 20 dedicated to Fluoroproducts, 12 dedicated to Chemical Solutions and two that supported multiple Chemours segments. At three of these sites, currently shared with other DuPont businesses, DuPont will continue its own manufacturing operations after separation, as well as contract manufacture for Chemours for the products currently produced by the Fluoroproducts segment at these sites.

## Note 2: Basis of Presentation

Throughout the period covered by the Interim Combined Financial Statements, Chemours operated as a part of DuPont. Consequently, stand-alone financial statements have not been historically prepared for Chemours. The accompanying Interim Combined Financial Statements have been prepared from DuPont's historical accounting records and are presented on a stand-alone basis as if the operations had been conducted independently from DuPont. Aside from a Japanese entity (that is a dual-resident for U.S. income tax purposes), there is no direct ownership relationship among all the other various legal entities comprising Chemours. Accordingly, DuPont and its subsidiaries' net investment in these operations is shown in lieu of Stockholder's Equity in the Interim Combined Financial Statements. The Interim Combined Financial Statements include the historical operations, assets, and liabilities of the legal entities that are considered to comprise the Chemours business, including certain environmental remediation and litigation obligations for which Chemours will indemnify DuPont.

All of the allocations and estimates in the Interim Combined Financial Statements are based on assumptions that management of DuPont and Chemours believes are reasonable. However, the Interim Combined Financial Statements included herein may not be indicative of the financial position, results of operations, and cash flows of Chemours in the future or if Chemours had been a separate, stand-alone entity during the periods presented.

The accompanying Interim Combined Financial Statements have been prepared for the nine months ended September 30, 2014 and 2013 in accordance with generally accepted accounting principles in the United States of America (GAAP) for interim financial information. In the opinion of management, all adjustments (consisting of

F-40

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

normal recurring adjustments) considered necessary for a fair statement of the results for interim periods have been included. Results for interim periods should not be considered indicative of results for a full year. These Interim Combined Financial Statements do not represent complete financial statements and should be read in conjunction with the Combined Financial Statements for the years ended December 31, 2013, 2012 and 2011, collectively referred to as the "Annual Combined Financial Statements". Unless otherwise stated, references to years and nine month periods relate to Chemours fiscal years and nine month periods. The condensed notes that follow are an integral part of the Interim Combined Financial Statements.

### *Recent Accounting Pronouncements*

In May 2014, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2014-09, " *Revenue from Contracts with Customers,* " which requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. The ASU will replace most existing revenue recognition guidance in U.S. GAAP when it becomes effective. The new standard is effective beginning on January 1, 2017. Early application is not permitted. The standard permits the use of either the retrospective or cumulative effect transition method. Chemours is evaluating the effect that ASU 2014-09 will have on the Combined Financial Statements. Chemours has not yet selected a transition method nor has it determined the effect of the standard on its ongoing financial reporting.

In April 2014, the FASB issued authoritative guidance, ASU No. 2014-08, " *Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity",* amending existing requirements for reporting discontinued operations. Under the new guidance, discontinued operations reporting will be limited to disposal transactions that represent strategic shifts having a major effect on operations and financial results. The amended guidance also enhances disclosures and requires assets and liabilities of a discontinued operation to be classified as such for all periods presented in the financial statements. Public entities will apply the amended guidance prospectively to all disposals occurring within annual periods beginning on or after December 15, 2014 and interim periods within those years. Chemours will adopt this standard on January 1, 2015. Due to the change in requirements for reporting discontinued operations described above, presentation and disclosures of future disposal transactions after adoption may be different than under current standards.

### Note 3: Relationship with DuPont and Related Entities

Historically, Chemours has been managed and operated in the normal course of business with other affiliates of DuPont. Accordingly, certain shared costs have been allocated to Chemours and reflected as expenses in the stand-alone Interim Combined Financial Statements. Management of DuPont and Chemours consider the allocation methodologies used to be reasonable and appropriate reflections of the historical DuPont expenses attributable to Chemours for purposes of the stand-alone financial statements. The expenses reflected in the Combined Financial Statements may not be indicative of expenses that will be incurred by Chemours in the future. All related party transactions approximate market prices.

### *(a)    Related Party Purchases and Sales*

Throughout the period covered by the Interim Combined Financial Statements, Chemours sold finished goods to DuPont and its non-Chemours businesses.

F-41

**Table of Contents**

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

Related party sales to other DuPont businesses include the following amounts:

| | Nine months ended September 30, | |
| --- | --- | --- |
| Selling Segment | 2014 | 2013 |
| Titanium Technologies | $ 1 | $ 6 |
| Fluoroproducts | 34 | 29 |
| Chemical Solutions | 55 | 58 |
| Total | $ 90 | $ 93 |

Chemours purchased byproducts from other DuPont businesses in the following amounts:

| | Nine months ended September 30, | |
| --- | --- | --- |
| Purchasing Segment | 2014 | 2013 |
| Titanium Technologies | $ 1 | $ 1 |
| Chemical Solutions | 5 | 11 |
| Total | $ 6 | $ 12 |

(b)    *Leveraged Services and Corporate Costs*

DuPont incurs significant corporate costs for services provided to Chemours as well as other DuPont businesses. These costs include expenses for information systems, accounting, other financial services such as treasury and audit, purchasing, human resources, legal, facilities, engineering, corporate research and development, corporate stewardship marketing and business analysis support.

A portion of these costs benefit multiple or all DuPont businesses, including Chemours, and are allocated to Chemours and its reportable segments using methods based on proportionate formulas involving total costs or other various allocation methods that management believes are consistent and reasonable. Other Chemours corporate costs are not allocated to the reportable segments and are reported in Corporate and Other.

The allocated leveraged functional service expenses and general corporate expenses included in the Combined Income Statements were $378 and $397 for the nine months ended September 30, 2014 and 2013, respectively. Allocated leveraged functional service expenses and general corporate expenses were recorded in the Interim Combined Statements of Comprehensive Income within the following captions:

| | Nine months ended September 30, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Selling, general and administrative expense | $ 318 | $ 333 |
| Research and development expense | 35 | 38 |
| Cost of goods sold | 25 | 26 |
| Total | $ 378 | $ 397 |

(c)    *Shared Sites*

Chemours has manufacturing operations at 40 production facilities globally. Chemours shares 14 of these production facilities with DuPont's other non-Chemours manufacturing operations. Additionally, Chemours

F-42

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

shares warehouse, sales centers, office space, and research and development facilities with other DuPont businesses. The property, plant and equipment primarily or exclusively used by Chemours for these shared locations are included in the Interim Combined Balance Sheets.

The full historical cost, accumulated depreciation and depreciation expense for assets at shared manufacturing plant sites and other facilities where Chemours is the primary or exclusive user of the assets have been included in the Interim Combined Balance Sheets and Income Statements. Accordingly, when the use of a Chemours primary asset has been shared with another DuPont business (manufacturing or otherwise), the cost for the non-Chemours usage has been deemed to have been charged to DuPont's non-Chemours business. The amounts are credited primarily to cost of goods sold in the Interim Combined Statements of Comprehensive Income and were $12 and $10 for the nine months ended September 30, 2014 and 2013, respectively.

At shared manufacturing plant sites and other facilities where Chemours is not the primary or exclusive user of the assets, the shared assets have been excluded from the Interim Combined Balance Sheets. Accordingly, where Chemours has used these shared assets a charge to cost of goods sold has been recorded for its usage of these shared assets. The amounts are charged primarily to the cost of goods sold in the Interim Combined Statements of Comprehensive Income and were $3 and $2 for the nine months ended September 30, 2014 and 2013, respectively.

(d)    *Cash Management and Financing*

Chemours participates in DuPont's centralized cash management and financing programs. Disbursements are made through centralized accounts payable systems which are operated by DuPont. Cash receipts are transferred to centralized accounts, also maintained by DuPont. As cash is disbursed and received by DuPont, it is accounted for by Chemours through DuPont Company Net Investment. All short and long-term debt is financed by DuPont and financing decisions for wholly and majority owned subsidiaries is determined by central DuPont treasury operations.

**Note 4: Research and Development Expense**

Research and development expense directly incurred by Chemours resources was $75 and $85 for the nine months ended September 30, 2014 and 2013, respectively. Research and development expense also includes $35 and $38 for the nine months ended September 30, 2014 and 2013, respectively, representing an assignment of costs associated primarily with DuPont's Corporate Central Research and Development long-term research activities. This assignment was based on the cost of research projects for which Chemours was determined to be the sponsor or co-sponsor. All research services provided by DuPont's central research and development to Chemours are specifically requested by Chemours, covered by service-level agreements and billed based on usage.

**Note 5: Employee Separation/Asset Related Charges, Net**

*2014 Restructuring Program*

In the nine month period ended September 30, 2014, Chemours implemented a restructuring plan to increase productivity and recorded a pre-tax charge of $19 in employee separation / asset related charges, net in the Interim Combined Statements of Comprehensive Income related to this initiative. The charge consisted of $16 related to employee separation costs and $3 for asset shut-down costs. The actions associated with this charge and all related payments are expected to be substantially complete by December 31, 2015.

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

The year-to-date 2014 charge impacted segment earnings as follows:

| | |
|---|---|
| Titanium Technologies | $ 3 |
| Fluoroproducts | 16 |
| | $19 |

Account balances and activity for the 2014 restructuring program are summarized below:

| | Employee Separation Costs | Asset Shut Down Costs | Total |
|---|---|---|---|
| Charges to income for nine months ending September 30, 2014 | $ 16 | $ 3 | $ 19 |
| Charges to accounts: | | | |
| Payments | (1) | — | (1) |
| Net Translation Adjustment | (2) | — | (2) |
| Asset write-offs and adjustments | — | (3) | (3) |
| Balance as of September 30, 2014 | $ 13 | $ — | $ 13 |

**Note 6: Other Income, Net**

| | Nine months ended September 30, | |
|---|---|---|
| | 2014 | 2013 |
| Leasing, contract services and miscellaneous income [1] | $ 11 | $ 14 |
| Royalty income [2] | 22 | 16 |
| Gain on purchase of equity investment [3] | — | 7 |
| Gain on sales of assets [4] | 12 | 1 |
| Exchange losses [5] | (29) | (26) |
| | $ 16 | $ 12 |

[1] Leasing, contract services and miscellaneous income includes accrued interest related to unrecognized tax benefits. Refer to Note 7 for further discussion of unrecognized tax benefits.

[2] Royalty income is primarily for technology and trademark licensing.

[3] Gain on purchase of equity investment consists of a gain on the remeasurement of Chemours' equity investment and a gain on the bargain purchase of the remainder of the DESCO C.V. joint venture for $4 and $3, respectively, recognized in the third quarter of 2013. Prior to purchasing the remaining interest in DESCO C.V. in the third quarter of 2013, Chemours accounted for the joint venture as an equity method investment.

[4] Gain on sale of assets includes a $7 gain from the sale of a business in June 2014.

[5] Exchange losses primarily driven by the strengthening of the U.S. Dollar versus the Euro in 2014 and a strengthening of the U.S. Dollar versus the Venezuelan Bolivar and the Brazilian Real in 2013. See Note 3 to the Annual Combined Financial Statements for further discussion over foreign currency translation, including the allocation of exchange gains (losses) for shared operations.

F-44

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

**Note 7: Income Taxes**

Chemours recorded a tax provision of $108 and $116 for the nine months ended September 30, 2014 and 2013, respectively. Each year DuPont, and / or its subsidiaries, file income tax returns in the U.S. federal jurisdiction and various states and non-U.S. jurisdictions. These tax returns are subject to examination and possible challenge by the taxing authorities. Positions challenged by the taxing authorities may be settled or appealed by DuPont. As a result, income tax uncertainties are recognized in Chemours' Combined Financial Statements in accordance with accounting for income taxes, when applicable. It is reasonably possible that changes to Chemours global unrecognized tax benefits could be significant, however, due to the uncertainty regarding the timing of completion of audits and possible outcomes, a current estimate of the range of such changes that may occur within the next twelve months cannot be made.

**Note 8: Accounts and Notes Receivable – Trade, Net**

|  | September 30, 2014 (Unaudited) | December 31, 2013 |
|---|---|---|
| Accounts receivable—trade, net [1] | $ 924 | $ 762 |
| VAT, GST, and other taxes [2] | 79 | 53 |
| Leases receivable—current | 9 | 12 |
| Advances and deposits | 13 | 12 |
| Notes receivable—trade, net [3] | 5 | 2 |
|  | $ 1,030 | $ 841 |

[1]    Accounts receivable – trade, are net of allowances of $5 and $7 as of September 30, 2014 and December 31, 2013, respectively. Allowances are equal to the estimated uncollectible amounts.
[2]    VAT receivables are generally recorded at the legal entity level and allocated to Chemours within shared legal entities.
[3]    Notes receivable – trade, net primarily consists of loan receivables with terms of one year or less and are primarily concentrated in China. As of September 30, 2014, there were no past due notes receivable, nor were there any impairments related to current loan agreements.

Accounts and notes receivable are carried at amounts that approximate fair value. Bad debt expense was $0 and $2 for the nine months ended September 30, 2014 and 2013, respectively.

*(a)    Direct Financing Leases*

At two of its facilities in the U.S. (Borderland and Morses Mill), Chemours has constructed fixed assets on land that it leases from third parties. Management has analyzed these arrangements and determined these assets represent a direct financing lease, whereby Chemours is the lessor of this equipment. Chemours has recorded leases receivable of $149 and $160 at September 30, 2014 and December 31, 2013, respectively, which represent the balance of the minimum future lease payments receivable. The current portion of leases receivable is included in accounts and notes receivable, as shown above. The long-term portion of leases receivable are included in other assets, as shown in Note 12. Management has evaluated the realizable value of these leased assets and determined no impairment existed at September 30, 2014 or December 31, 2013. There is no estimated future residual value of these leased assets.

F-45

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

## Note 9: Inventories

|  | September 30, 2014 (Unaudited) | | December 31, 2013 | |
|---|---|---|---|---|
| Finished products | $ | 673 | $ | 583 |
| Semi-finished products | | 181 | | 194 |
| Raw materials and supplies | | 481 | | 568 |
| | | 1,335 | | 1,345 |
| Adjustment of inventories to a LIFO basis | | (263) | | (290) |
| | $ | 1,072 | $ | 1,055 |

Inventory values, before LIFO adjustment, are generally determined by the average cost method, which approximates current cost. Inventories are valued under the LIFO method at substantially all of the U.S. locations which comprised $699 and $717 or 52 percent and 53 percent of inventories before the LIFO adjustments at September 30, 2014 and December 31, 2013, respectively. The remainder of inventory held in international locations and certain U.S. locations is valued under the average cost method.

## Note 10: Property, Plant, and Equipment

Depreciation expense amounted to $183 and $195 for the nine months ended September 30, 2014 and 2013 respectively. Property, plant and equipment include gross assets under capital leases of $4 at September 30, 2014 and December 31, 2013.

## Note 11: Goodwill and Other Intangible Assets

(a)  *Goodwill*

There were no significant changes in the carrying amount of goodwill for the nine months ended September 30, 2014.

(b)  *Other Intangible Assets*

The following table summarizes the gross carrying amounts and accumulated amortization of other intangible assets by major class:

|  | September 30, 2014 | | |
|---|---|---|---|
|  | Gross | Accumulated Amortization | Net |
| Customer agreements | $ 20 | $ (16) | $ 4 |
| Patents | 20 | (16) | 4 |
| Purchased trademarks | 18 | (14) | 4 |
| Purchased and licensed technology | 17 | (17) | — |
| Total other intangible assets | $ 75 | $ (63) | $ 12 |

F-46

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

| | December 31, 2013 | | |
| --- | --- | --- | --- |
| | | Accumulated | |
| | Gross | Amortization | Net |
| Customer agreements | $ 23 | $ (17) | $ 6 |
| Patents | 22 | (17) | 5 |
| Purchased trademarks | 20 | (15) | 5 |
| Purchased and licensed technology | 17 | (16) | 1 |
| Total other intangible assets | $ 82 | $ (65) | $17 |

The aggregate pre-tax amortization expense for definite-lived intangible assets was $2 and $5 for the nine months ended September 30, 2014 and 2013, respectively. There are no indefinite-lived intangible assets.

Definite-lived intangible assets are amortized over their estimated useful lives, generally for periods ranging from five to 20 years. The reasonableness of the useful lives of these assets is continually evaluated.

**Note 12: Other Assets**

| | September 30, 2014 | | |
| --- | --- | --- | --- |
| | (Unaudited) | | December 31, 2013 |
| Leases receivable—non-current [1] | $ 140 | $ | 148 |
| Capitalized repair and maintenance costs | 135 | | 134 |
| Advances and deposits | 10 | | 11 |
| Deferred income taxes—non-current | 10 | | 9 |
| Miscellaneous [2] | 21 | | 29 |
| | $ 316 | $ | 331 |

[1]   Leases receivable includes direct financing type leases of property at two locations (see Note 8).
[2]   Miscellaneous includes prepaid expenses for royalty fees, vendor supply agreements, and taxes other than income taxes. Also included in miscellaneous other assets are capitalized expenses for the preparation of the future landfill cells at Titanium Technologies' New Johnsonville plant site

**Note 13: Commitments and Contingent Liabilities**

*(a)   Guarantees*

**Obligations for Equity Affiliates & Others**

Chemours, through DuPont, has directly guaranteed various debt obligations under agreements with third parties related to equity affiliates, customers, suppliers and other affiliated companies. At September 30, 2014 and December 31, 2013 Chemours had directly guaranteed $46 and $46 of such obligations, respectively. This represents the maximum potential amount of future (undiscounted) payments that Chemours could be required to make under the guarantees. Chemours would be required to perform on these guarantees in the event of default by the guaranteed party. No amounts were accrued at September 30, 2014 and December 31, 2013.

Chemours assesses the payment/performance risk by assigning default rates based on the duration of the guarantees. These default rates are assigned based on the external credit rating of the counterparty or through

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

internal credit analysis and historical default history for counterparties that do not have published credit ratings. For counterparties without an external rating or available credit history, a cumulative average default rate is used.

*(b)    Litigation*

DuPont, of which Chemours, prior to the distribution, is a subsidiary, is subject to various pending legal proceedings arising out of the normal course of its business including product liability, intellectual property, commercial, environmental and antitrust lawsuits. It is not possible to predict the outcome of these various proceedings although management does not anticipate their resolution will have a materially adverse effect on Chemours' combined financial position or liquidity. However, the ultimate liabilities could be significant to results of operations in the period recognized.

**Asbestos**

At September 30, 2014, there were about 2,455 lawsuits pending against DuPont alleging personal injury from exposure to asbestos. These cases are pending in state and federal court in numerous jurisdictions in the United States and are individually set for trial. Most of the actions were brought by contractors who worked at sites at some point between 1950 and the 1990s. A small number of cases involve similar allegations by DuPont employees. A limited number of the cases were brought by household members of contractors and DuPont employees. Finally, certain lawsuits allege personal injury as a result of exposure to DuPont products. At September 30, 2014 and December 31, 2013, Chemours had an accrual of $40 related to this matter.

**Titanium Dioxide Antitrust Litigation**

In February 2010, two suits were filed in Maryland federal district court alleging conspiracy among DuPont, of which, Chemours, prior to the distribution, is a subsidiary, Huntsman International LLC (Huntsman), Kronos Worldwide Inc. (Kronos), Millennium Inorganics Chemicals Inc. (Millennium) and others to fix prices of titanium dioxide sold in the United States between March 2002 and the present. The cases were subsequently consolidated and in August 2012, the court certified a class consisting of U.S. customers that have directly purchased titanium dioxide since February 1, 2003.

During 2013, DuPont and plaintiffs agreed to settle this matter, subject to court approval. In connection therewith, Chemours has recorded charges of $72, within cost of goods sold, for the year ended December 31, 2013. The settlement explicitly acknowledges that DuPont denies all allegations and does not admit liability. The court entered the order granting final approval to the settlement on December 13, 2013. The settlement was paid in January 2014.

In November 2013, Valspar, which opted out of the class action settlement described above, filed suit in federal court in Minnesota against DuPont, Huntsman, Kronos and Millennium making substantially similar claims to those made in the class action. The lawsuit was moved to Delaware federal court on DuPont's motion.

In March 2013, a purported class action was filed against DuPont, Huntsman, Kronos and Millennium in the U.S. District Court for the Northern District of California on behalf of "indirect purchasers" from more than 30 states that purchased products containing titanium dioxide. The settlement discussed above cannot be used to establish liability in the indirect purchaser case. In September 2014, the Court dismissed most of the claims in the original complaint. The plaintiffs have filed an Amended Complaint, limiting the purported class to indirect purchasers of architectural coating products containing titanium dioxide from 21 states. DuPont denies all allegations and will again seek dismissal of the Amended Complaint.

F-48

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

Chemours, through DuPont, denies these allegations and is defending itself vigorously against the Valspar and indirect purchaser claims. While management believes a loss related to either matter is reasonably possible, a range of such losses, if any, cannot be reasonably estimated at this time.

**PFOA**

Chemours used PFOA (collectively, perfluorooctanoic acids and its salts, including the ammonium salt), as a processing aid to manufacture some fluoropolymer resins at various sites around the world including its Washington Works plant in West Virginia. Chemours had accruals of $14 and $15 related to the PFOA matters discussed below at September 30, 2014 and December 31, 2013, respectively.

The accrual includes charges related to DuPont's obligations under agreements with the U.S. Environmental Protection Agency and voluntary commitments to the New Jersey Department of Environmental Protection. These obligations and voluntary commitments include surveying, sampling and testing drinking water in and around certain company sites and offering treatment or an alternative supply of drinking water if tests indicate the presence of PFOA in drinking water at or greater than the national Provisional Health Advisory.

Drinking Water Actions

In August 2001, a class action, captioned Leach v DuPont, was filed in West Virginia state court alleging that residents living near the Washington Works facility had suffered, or may suffer, deleterious health effects from exposure to PFOA in drinking water.

DuPont and attorneys for the class reached a settlement in 2004 that binds about 80,000 residents. In 2005, DuPont paid the plaintiffs' attorneys' fees and expenses of $23 and made a payment of $70, which class counsel designated to fund a community health project. Chemours, through DuPont, funded a series of health studies which were completed in October 2012 by an independent science panel of experts (the C8 Science Panel). The studies were conducted in communities exposed to PFOA to evaluate available scientific evidence on whether any probable link exists, as defined in the settlement agreement, between exposure to PFOA and human disease.

The C8 Science Panel found probable links, as defined in the settlement agreement, between exposure to PFOA and pregnancy-induced hypertension, including preeclampsia; kidney cancer; testicular cancer; thyroid disease; ulcerative colitis; and diagnosed high cholesterol.

In May 2013, a panel of three independent medical doctors released its initial recommendations for screening and diagnostic testing of eligible class members. In September 2014, the medical panel recommended follow-up screening and diagnostic testing three years after initial testing, based on individual results. The medical panel has not communicated its anticipated schedule for completion of its protocol. Through DuPont, Chemours is obligated to fund up to $235 for a medical monitoring program for eligible class members and, in addition, administrative cost associated with the program, including class counsel fees. In January 2012, Chemours, through DuPont, put $1 in an escrow account to fund medical monitoring as required by the settlement agreement. The court-appointed Director of Medical Monitoring has established the program to implement the medical panel's recommendations. Under the program, notice has been given and the registration process, as well as eligibility screening, to participate in diagnostic testing has begun. At each of September 30, 2014 and December 31, 2013, no money has been disbursed from the fund.

In addition, under the settlement agreement, DuPont must continue to provide water treatment designed to reduce the level of PFOA in water to six area water districts, including the Little Hocking Water Association (LHWA), and private well users.

F-49

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

Class members may pursue personal injury claims against DuPont only for those human diseases for which the C8 Science Panel determined a probable link exists. Class members began filing lawsuits alleging such claims in 2012. At September 30, 2014, there were approximately 2,545 lawsuits filed in various federal and state courts in Ohio and West Virginia, an increase of about 2,460 and 2,520, respectively over December 31, 2013 and 2012. In accordance with a stipulation reached in the third quarter of 2014 and other court procedures, these lawsuits have been or will be served and consolidated in multi-district litigation in Ohio federal court (MDL). The majority of the lawsuits allege personal injury claims associated with high cholesterol and thyroid disease from exposure to PFOA in drinking water. There are 18 lawsuits alleging wrongful death. In the third quarter 2014, six plaintiffs from the MDL were selected for individual trial. The first trial is scheduled to begin in September 2015, and the second in November 2015. Chemours, through DuPont, denies the allegations in these lawsuits and is defending itself vigorously.

Additional Actions

An Ohio action brought by the LHWA is ongoing. In addition to general claims of PFOA contamination of drinking water, the action claims "imminent and substantial endangerment to health and or the environment" under the Resource Conservation and Recovery Act (RCRA). In the second quarter 2014, DuPont filed a motion for summary judgment which if granted, will be dispositive of this matter. The LHWA has moved for partial summary judgment. Chemours, through DuPont, denies these claims and is defending itself vigorously.

While it is probable that the company will incur costs related to the medical monitoring program, such costs cannot be reasonably estimated due to uncertainties surrounding the level of participation by eligible class members and the scope of testing. Chemours believes that it is reasonably possible that it could incur losses related to the other PFOA matters discussed above; however, a range of such losses, if any, cannot be reasonably estimated at this time.

*(c)    Environmental*

DuPont, of which Chemours, prior to the distribution, is a subsidiary, is also subject to contingencies pursuant to environmental laws and regulations that in the future may require further action to correct the effects on the environment of prior disposal practices or releases of chemical substances by Chemours or other parties. Chemours accrues for environmental remediation activities consistent with the policy set forth in Note 3 to the Annual Combined Financial Statements. Much of this liability results from the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, often referred to as Superfund), RCRA and similar state and global laws. These laws require DuPont, of which Chemours, prior to the distribution, is a subsidiary, to undertake certain investigative, remediation and restoration activities at sites where Chemours conducts or once conducted operations or at sites where Chemours generated waste was disposed. The accrual also includes estimated costs related to a number of sites identified for which it is probable that environmental remediation will be required, but which are not currently the subject of enforcement activities.

Remediation activities vary substantially in duration and cost from site to site. These activities, and their associated costs, depend on the mix of unique site characteristics, evolving remediation technologies, diverse regulatory agencies and enforcement policies, as well as the presence or absence of potentially responsible parties. At September 30, 2014, the Combined Balance Sheets included a liability of $298, relating to these matters and, in management's opinion, is appropriate based on existing facts and circumstances. The average time frame, over which the accrued or presently unrecognized amounts may be paid, based on past history, is estimated to be 15 to 20 years. As of September 30, 2014, considerable uncertainty exists with respect to these costs and, under adverse changes in circumstances, potential liability may range up to 3.5 times the amount accrued.

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

**Pompton Lakes**

The environmental remediation accrual at September 30, 2014 and December 31, 2013 includes $87 and $78, respectively, related to activities at Chemours' site in Pompton Lakes, New Jersey. Management estimates that potential liability for remediation activities at this site could range up to $116. During the twentieth century, DuPont manufactured blasting caps, fuses and related materials at Pompton Lakes. Operating activities at the site were ceased in the mid 1990's. Primary contaminants in the soil and sediments are lead and mercury. Ground water contaminants include volatile organic compounds. Under the authority of the EPA and the New Jersey Department of Environmental Protection, remedial actions at the site are focused on investigating and cleaning up the area. Ground water monitoring at the site is ongoing and Chemours, through DuPont, has installed and continues to install vapor mitigation systems at residences within the ground water plume. In addition, Chemours, through DuPont, is further assessing ground water plume/vapor intrusion delineation. In November 2014, the EPA announced a proposed remediation plan that would require Chemours to dredge mercury contamination from a 36 acre area of the lake and remove sediment from two other areas of the lake near the shoreline. The plan is subject to notice and comment. Chemours expects to spend about $60 over the next two to three years, which is included in the remediation accrual at September 30, 2014, in connection with remediation activities at Pompton Lakes, including activities related to the EPA's proposed plan. Based on existing facts and circumstances, management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site, other than disclosed will have a material impact on the financial position, liquidity or results of operations of Chemours.

**Note 14: Long-Term Employee Benefits**

DuPont offers various long-term benefits to its employees. Where permitted by applicable law, DuPont reserves the right to change, modify or discontinue the Plans.

DuPont offers plans that are shared amongst its businesses, including Chemours. In these cases, the participation of employees in these plans is reflected in these financial statements as though Chemours participates in a multiemployer plan with DuPont. A proportionate share of the cost is reflected in these Combined Financial Statements. Assets and liabilities of such plans are retained by DuPont. Further information on the DuPont plan is discussed in DuPont's Annual Report on Form 10-K for the year ended December 31, 2013 (DuPont's Annual Report).

(a)  *Defined Benefit Pensions*

**DuPont Pension and Retirement Plan**

DuPont has both funded and unfunded noncontributory defined benefit pension plans covering a majority of the U.S. employees, hired before January 1, 2007. The benefits under these plans are based primarily on years of service and employees' pay near retirement. DuPont's funding policy is consistent with the funding requirements of federal laws and regulations.

**Non-U.S. Pension Plans**

Pension coverage for employees of DuPont's non-U.S. subsidiaries, is provided, to the extent deemed appropriate, through separate plans. Obligations under such plans are funded by depositing funds with trustees, covered by insurance contracts, or remain unfunded.

F-51

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

(b)   *Other Long-Term Employee Benefits*

DuPont provides medical, dental and life insurance benefits to pensioners and survivors, and disability and life insurance protection to employees. The associated plans for retiree benefits are unfunded and the cost of approved claims are paid from DuPont funds. Essentially all of the cost for these retiree benefit plans is attributable to DuPont's U.S. plans. The retiree medical plan is contributory with pensioners and survivors' contributions adjusted annually to achieve a 50/50 target sharing of cost increases between DuPont and pensioners and survivors. In addition, limits are applied to DuPont's portion of the retiree medical cost coverage. U.S. employees hired on or after January 1, 2007 are not eligible to participate in the post-retirement medical, dental and life insurance plans. DuPont also provides disability benefits to employees. Employee disability benefit plans are insured in many countries. However, in the U.S., such plans are generally self-insured. Expenses for self-insured plans are reflected in the Combined Financial Statements.

*Participation in the U.S. Plans*

Chemours participates in DuPont's U.S. and non-U.S. plans as though they are participants in a multiemployer plan with the other businesses of DuPont. More information on the financial status of DuPont's significant plans can be found in DuPont's Annual Report. The following table presents information for DuPont's significant plans in which Chemours participates.

| | | Nine months ended September 30, | |
| --- | --- | --- | --- |
| Plan name | EIN / Pension number | 2014 | 2013 |
| DuPont Pension and Retirement Plan (U.S.) | 51-0014090 / 001 | $        38 | $        95 |
| All Other U.S. and non-U.S. Plans | | 14 | 29 |

For purposes of these financial statements, the figures in this table represent the allocation of cost to Chemours, which was allocated based on active employee headcount. These figures do not represent cash payments to DuPont, or DuPont's plans.

**Note 15: Segment Information**

Chemours' operations are classified into three reportable segments based on similar economic characteristics, the nature of products and production processes, end-use markets, channels of distribution and regulatory environment. Chemours' reportable segments are Titanium Technologies, Fluoroproducts and Chemical Solutions. Corporate costs and certain legal and environmental expenses that are not aligned with the reportable segments are reflected in Corporate and Other.

F-52

Table of Contents

**THE CHEMOURS COMPANY**
**(A Consolidated Subsidiary of E.I. du Pont de Nemours and Company)**
Notes to the Interim Combined Financial Statements (Unaudited)
*(Dollars in millions)*

Segment sales include transfers to another reportable segment. Segment adjusted earnings before interest and taxes (adjusted EBIT) is defined as income (loss) before income taxes excluding non-operating pension and other postretirement employee benefit costs and exchange gains (losses).

| | Titanium Technologies | Fluoroproducts | Chemical Solutions | Corporate and Other | Total |
|---|---|---|---|---|---|
| **September 30, 2014** | | | | | |
| Sales | $ 2,254 | $ 1,752 | $ 882 | $ — | $4,888 |
| Less: transfers | 5 | — | — | — | 5 |
| Net sales | 2,249 | 1,752 | 882 | — | 4,883 |
| Adjusted EBIT | 494 | 167 | (6) | (178) | 477 |
| **September 30, 2013** | | | | | |
| Sales | $ 2,293 | $ 1,817 | $ 1,098 | $ — | $5,208 |
| Less: transfers | 5 | — | — | — | 5 |
| Net sales | 2,288 | 1,817 | 1,098 | — | 5,203 |
| Adjusted EBIT | 438 | 225 | 47 | (169) | 541 |

Total segment adjusted EBIT reconciles to total combined income before income taxes on the Combined Statements of Income as follows:

| | Nine months ended September 30, | |
|---|---|---|
| | 2014 | 2013 |
| Total segment adjusted EBIT | $ 477 | $ 541 |
| Non-operating pension and other postretirement employee benefit costs | (18) | (86) |
| Exchange gains (losses) | (29) | (26) |
| Income before income taxes | $ 430 | $ 429 |

**Note 16: Subsequent Events**

These Interim Combined Financial Statements reflect management's evaluation of subsequent events through December 18, 2014.

F-53

# EXHIBIT 2

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2015**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 001-36794**

# The Chemours Company
(Exact Name of Registrant as Specified in Its Charter)

| **Delaware** | **46-4845564** |
|---|---|
| (State or other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**1007 Market Street, Wilmington, Delaware 19899**
(Address of Principal Executive Offices)
Registrant's Telephone Number: **(302) 773-1000**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of Each Class** | **Name of Exchange on Which Registered** |
|---|---|
| Common Stock ($.01 par value) | New York Stock Exchange |

Securities are registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark whether the registrant is a well-known seasoned issuer (as defined in Rule 405 of the Securities Act). Yes ☐ No ☒

Indicate by check mark whether the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐     Accelerated filer ☐     Non-accelerated filer ☒     Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The registrant's separation from E. I. du Pont de Nemours and Company became effective on July 1, 2015. As a result, there was no aggregate market value of common stock held by non-affiliates of the registrant as of June 30, 2015, the last business day of the registrant's most recently completed second fiscal quarter. As of February 19, 2016, 181,376,949 shares of the company's common stock, $0.01 par value, were outstanding.

**Documents Incorporated by Reference**

Portions of the registrant's definitive proxy statement relating to its 2016 annual meeting of shareholders (2016 Proxy Statement) are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. The 2016 Proxy Statement will be filed with the U. S. Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

Table of Contents

**The Chemours Company**

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| **Part I** |  |  |  |
| Item 1. | Business | | 3 |
| Item 1A. | Risk Factors | | 15 |
| Item 1B. | Unresolved Staff Comments | | 30 |
| Item 2. | Properties | | 30 |
| Item 3. | Legal Proceedings | | 31 |
| Item 4. | Mine Safety Disclosures | | 32 |
|  | Executive Officers of the Registrant | | 32 |
| **Part II** |  |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 35 |
| Item 6. | Selected Financial Data | | 36 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 37 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | | 58 |
| Item 8. | Financial Statements and Supplementary Data | | 59 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | | 59 |
| Item 9A. | Controls and Procedures | | 59 |
| Item 9B. | Other Information | | 60 |
| **Part III** |  |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | | 60 |
| Item 11. | Executive Compensation | | 60 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 60 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | | 60 |
| Item 14. | Principal Accounting Fees and Services | | 61 |
| **Part IV** |  |  |  |
| Item 15. | Exhibits, Financial Statement Schedules | | 62 |
| **Signatures** |  |  | 63 |

1

Table of Contents

**Forward-Looking Statements**

This section and other parts of this Annual Report on Form 10-K contain forward-looking statements, within the meaning of the federal securities law, that involve risks and uncertainties. Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to any historical or current fact. The words "believe," "expect," "anticipate," "plan," "estimate," "target," "project" and similar expressions, among others, generally identify "forward-looking statements," which speak only as of the date the statements were made. The matters discussed in these forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results to differ materially from those set forth in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and in the Item 1A, "Risk Factors."

Forward-looking statements are based on certain assumptions and expectations of future events which may not be accurate or realized. Forward-looking statements also involve risks and uncertainties, many of which are beyond Chemours' control. Important factors that may materially affect such forward-looking statements and projections include:

• Fluctuations in energy and raw material prices;

• Failure to develop and market new products and optimally manage product life cycles;

• Our substantial indebtedness and availability of borrowing facilities, including access to our revolving credit facilities;

• Uncertainty regarding the availability of additional financing in the future, and the terms of such financing;

• Negative rating agency actions;

• Significant litigation and environmental matters, including indemnifications we were required to assume;

• Failure to appropriately manage process safety and product stewardship issues;

• Changes in laws and regulations or political conditions;

• Global economic and capital markets conditions, such as inflation, interest and currency exchange rates, and commodity prices, as well as regulatory requirements;

• Currency related risks;

• Business or supply disruptions and security threats, such as acts of sabotage, terrorism or war, weather events and natural disasters;

• Ability to protect, defend and enforce Chemours' intellectual property rights;

• Increased competition and increasing consolidation of our core customers;

• Changes in relationships with our significant customers and suppliers;

• Significant or unanticipated expenses, including but not limited to litigation or legal settlement expenses;

• Our ability to predict, identify and interpret changes in consumer preference and demand;

• Our ability to realize the expected benefits of the separation;

• Our ability to complete proposed divestitures or acquisitions and our ability to realize the expected benefits of acquisitions if they are completed;

• Our ability to deliver cost savings as anticipated, whether or not on the timelines proposed;

• Our ability to pay or the amount of any dividend; and,

• Disruptions in our information technology networks and systems.

Additionally, there may be other risks and uncertainties that we are unable to identify at this time or that we do not currently expect to have a material impact on our business. The Company assumes no obligation to revise or update any forward-looking statement for any reason, except as required by law.

Unless the context otherwise requires, references herein to "The Chemours Company," "The Chemours Company, LLC," "Chemours," "the Company", "our company", "we," "us," and "our" refer to The Chemours Company and its consolidated subsidiaries. References herein to "DuPont" refers to E.I. du Pont de Nemours and Company, a Delaware corporation, and its consolidated subsidiaries (other than Chemours and its consolidated subsidiaries), unless the context otherwise requires.

2

Table of Contents

**PART I**

**Item 1. BUSINESS**

**Overview**

Chemours, a leading global provider of performance chemicals, began operating as an independent public company on July 1, 2015 (the Distribution Date) after separating from E. I. du Pont de Nemours (DuPont). We have three reporting segments: Titanium Technologies, Fluoroproducts and Chemical Solutions. Our products are key inputs into end-products and processes in a variety of industries. Our Titanium Technologies segment is the leading global producer of titanium dioxide ($TiO_2$), a premium white pigment used to deliver whiteness, brightness, opacity and protection in a variety of applications. Our Fluoroproducts segment is a leading global provider of fluoroproducts, such as refrigerants and industrial fluoropolymer resins. Our Chemical Solutions segment is the leading North American provider of industrial and specialty chemicals used in gold production, oil refining, agriculture, industrial polymers and other industries.

Effective prior to the opening of trading on the New York Stock Exchange (NYSE) on July 1, 2015, DuPont completed the separation of the businesses comprising DuPont's Performance Chemicals reporting segment, and certain other assets and liabilities, into Chemours, a separate and distinct public company. The separation was completed by way of a distribution of all of the then-outstanding shares of common stock of Chemours through a dividend in kind of Chemours' common stock (par value $0.01) to holders of DuPont common stock (par value $0.30) as of the close of business on June 23, 2015 (the Record Date) (the transaction is referred to herein as the Distribution).

On the Distribution Date, each holder of DuPont's common stock received one share of Chemours' common stock for every five shares of DuPont's common stock held on the Record Date. The spin-off was completed pursuant to a separation agreement and other agreements with DuPont related to the spin-off, including an employee matters agreement, a tax matters agreement, a transition services agreement and an intellectual property cross-license agreement. These agreements govern the relationship between Chemours and DuPont following the spin-off and provided for the allocation of various assets, liabilities, rights and obligations. These agreements also include arrangements for transition services to be provided by DuPont to Chemours.

We operate 35 production facilities located in 11 countries and serve more than 5,000 customers across a wide range of end markets in more than 130 countries. The following chart illustrates the global scope of our businesses:



**2015 Sales by Region**

Latin America: 14%
EMEA: 17%
North America: 45%
Asia Pacific: 24%

3

Table of Contents



Chemours is committed to creating value for our customers through the reliable delivery of high quality products and services around the globe. We create value for customers and stockholders through (i) operational excellence and asset efficiency, which includes our commitment to safety and environmental stewardship, (ii) strong customer focus to produce innovative, high-performance products, (iii) focus on cash flow generation through optimization of our cost structure, and improvement in working capital and supply chain efficiencies through our transformation plan (described in Chemours Strategy section below), (iv) organic growth and (v) creation of an organization that is committed to our corporate values of safety, customer appreciation, simplicity, collective entrepreneurship and integrity.

Many of Chemours' commercial and industrial relationships have been in place for decades. Our customers are comprised of a diverse group of companies, many of which are leaders in their respective industries. Our sales are not materially dependent on any single customer. As of December 31, 2015, no one individual customer balance represented more than five percent of Chemours' total outstanding receivables balance and no single customer represented more than ten percent of our sales.

**Chemours Five-Point Transformation Plan**

Immediately after Chemours was launched as an independent public company, we began to make changes to our organization, cost structure and portfolio of businesses to transform our company into a higher growth chemistry company. The objectives of our multi-year five-point transformation plan are to improve our financial performance, streamline and strengthen our portfolio and reduce our leverage by:

1.      Reducing our costs through a simpler business model;

2.      Optimizing our portfolio to focus on our businesses where we have leading positions;

3.      Growing our market positions where we have competitive advantages;

4.      Refocusing our investments by concentrating our capital expenditures on our core businesses; and

5.      Enhancing our organization to deliver our values and support our transformation to a higher-value chemistry company.

Through cost reduction and growth, Chemours expects the transformation plan to deliver $500 million of incremental Adjusted EBITDA improvement over 2015 through 2017. Based on our anticipated cost reduction and growth initiatives, we would expect an approximately similar improvement in pre-tax income. Adjusted EBITDA is a non-GAAP financial measure. For a discussion of our use of non-GAAP financial measures and reconciliations to the closest GAAP financial measures, see our Management's Discussion and Analysis of Financial Condition and Results of Operations - Non-GAAP Financial Measures in Item 7. Through a combination of higher free cash flow from operations, lower capital spending, and potential proceeds from asset sales, the Company anticipates reducing its leverage ratio (net debt to Adjusted EBITDA) to approximately three times by 2017. This plan will allow us to narrow our focus to businesses with the highest return and earnings growth potential.

Table of Contents

In our Titanium Technologies segment, we have a long-standing history of delivering high-quality $TiO_2$ pigment using our proprietary chloride technology. We are the largest global producer of $TiO_2$, and our low-cost network of manufacturing facilities allows us to efficiently and cost-effectively serve our global customer base. We expect to further enhance our operating cost advantage with the start up of our second production line at our Altamira, Mexico facility in 2016. Chemours is well positioned to remain the lowest cost $TiO_2$ producer and continue to meet our customers' growing needs around the world.

In Fluoroproducts, we are one of two globally integrated producers making both fluorochemicals and fluoropolymers. In Fluorochemicals, we expect to market Opteon™, the world's lowest global warming potential refrigerant, around the world as governments pass legislation that makes the use of low global warming potential refrigerants a requirement. We will also apply our application expertise across our fluoropolymers offerings, providing our customers with tailored products that have unique properties, including very high temperature resistance and high chemical resistance. We will continue to invest in research and development to remain a leader in these areas, and ensure that we are able to meet our customers needs as regulations change.

In Chemical Solutions, we are investing in our cyanides business to increase capacity by 50 percent. This additional capacity will allow us to serve the growing demand for sodium cyanide in the gold mining industry in the Americas. We also made significant progress on our strategic review of our portfolio, including the announced sale of the Beaumont Aniline facility, planned exit of the Reactive Metals business, and decision to retain the Methylamines business. We plan to complete our strategic review of this segment in 2016, which is ultimately expected to result in a streamlined set of businesses with reduced capital requirements.

We will maintain our commitment to responsible stewardship and safety for our employees, customers and the communities where we operate. Meeting and exceeding our customers' expectations while conducting business in accordance with our high ethical standards will continue to be a primary focus for our company as we continue to transform Chemours into a higher-value chemistry company.

**Segments**

Additional information on our segments can be found in Management's Discussion and Analysis of Financial Condition and Results of Operations and Note 23 to the Consolidated Financial Statements.

**Titanium Technologies Segment**

*Segment Overview*

Chemours' Titanium Technologies segment is the leading global manufacturer of $TiO_2$. $TiO_2$ is a pigment used to deliver whiteness, opacity, brightness and protection from sunlight in applications such as architectural and industrial coatings, flexible and rigid plastic packaging, PVC window profiles, laminate papers, coated paper and coated paperboard used for packaging. We sell our $TiO_2$ products under the Ti-Pure™ brand name to over 800 customers globally. We operate four $TiO_2$ production facilities: two in the United States (U.S.), one in Mexico and another in Taiwan. In addition, we have a large-scale repackaging and distribution facility in Belgium and operate a mineral sands mining operation in Starke, Florida. In total, we have a $TiO_2$ production capacity of 1.05 million metric tons per year. We are expanding our $TiO_2$ production facility in Altamira, Mexico which will increase our total $TiO_2$ production capacity to 1.25 million metric tons per year.

Chemours is one of a limited number of producers operating a chloride process for the production of $TiO_2$. We believe that our proprietary chloride technology enables us to operate plants at a much higher capacity than other chloride technology- based $TiO_2$ producers, uniquely utilizing a broad spectrum of titanium-bearing ore feedstocks and achieving the highest unit margins in our industry. This technology, which operates at all of our production facilities, provides us with one of the industry's lowest manufacturing cost positions. Our research and development efforts focus on improving production processes and developing $TiO_2$ grades that help our customers achieve optimal performance in both their cost and product performance.

Demand for $TiO_2$ comes from the coatings, paper and plastics industries and is highly correlated to growth in the global residential housing, commercial construction and packaging markets. Industry demand for $TiO_2$ is generally expected to be in line with global GDP, and can be cyclical due to economic and industry-specific market dynamics.

5

Table of Contents

A breakdown of our TiO$_2$ sales by region and end-market is shown in the charts below:





\* include specialty applications

We sell approximately 20 different grades or forms of TiO$_2$, each tailored for different applications to address undertone, dispersion and other application criteria for different end uses.

We have operated a titanium mine in Starke, Florida since 1949. The mine provides us with access to a low cost source of domestic, high quality ilmenite feedstock and supplies less than ten percent of our feedstock consumption needs. Co-products of our mining operations are zircon (zirconium silicate) and staurolite minerals. We are a major supplier of high quality zircon in North America, primarily focused on the precision investment casting (PIC) industry, foundry and specialty applications, and ceramics. Our staurolite blasting abrasives, sold as Starblast™, are widely used in steel preparation and maintenance, and paint removal.

***Industry Overview and Competitors***

Worldwide effective capacity in 2015 was estimated to be approximately 6.5 million metric tons. This capacity base was more than sufficient to serve worldwide demand for TiO$_2$ in 2015 of approximately 5.5 million metric tons.

6

Table of Contents

The global TiO$_2$ market in which we operate is highly competitive. Competition is based primarily on product price, quality and technical service. We face competition from producers using the chloride process as well as those using the alternative sulfate process. Furthermore, due to the low cost of transporting TiO$_2$, there is also competition between producers with production facilities located in different geographies, with some cost advantage belonging to the production facility that is closest to the customer.

In most regions of the world, we compete primarily against large multinational producers such as The National Titanium Dioxide Company, Ltd. (Cristal), Huntsman International LLC, Kronos Worldwide, Inc. and Tronox Limited. In recent years, manufacturing capacity of those multinational producers has only modestly increased, primarily due to de-bottlenecking of the industry's existing production facilities.  Overall, in 2015, approximately 250,000 metric tons of capacity was taken offline and another approximately 170,000 metric tons were temporarily shut down due to worldwide oversupply of TiO$_2$.

In addition to these multinational producers, we also compete against numerous other producers, including producers in China,  who, although generally having smaller facilities, have significantly expanded their TiO$_2$ production capacity over the last decade. Most Chinese producers utilize the sulfate process to produce a product line that, while cost competitive in China, is suitable principally for lower-end and limited mid-range applications.  The quality differential and logistic considerations has limited the global export of TiO$_2$ produced in China to approximately 600 thousand metric tons in 2015, a decline of 3% from 2014. TZMI, an independent industry consultant, indicated that environmental factors and weak prices and margins contributed to the idling of capacity in China, some of which is likely to be permanent. The net permanent capacity reduction in China is estimated to be approximately 30,000 metric tons in 2015.  In 2015, two of the largest Chinese domestic producers, Henan Billions and Lomon, announced their intention to merge. This transaction, currently under regulatory review, is believed to be a potential trend in China toward additional consolidation and more efficient production facilities.

*Raw Materials*

The primary raw materials used in the manufacture of TiO$_2$ are titanium-bearing ores, chlorine, calcined petroleum coke and energy.  We source titanium-bearing ores from a number of suppliers around the globe, who are primarily located in Australia, South Africa, Canada and Mozambique. To ensure proper supply volume and to minimize pricing volatility, we generally enter into contracts in which volume is requirement-based and pricing is determined by a range of mechanisms structured to help us achieve competitive pricing relative to the market. We typically enter into a combination of long- and mid-term supply contracts and source our raw material from multiple suppliers across different regions and from multiple sites per supplier. Furthermore, we typically purchase multiple grades of ore from each supplier to limit our exposure to any single supplier for any single grade of ore in any given time period.  Historically, we have not experienced any problems renewing such contracts for raw materials or securing our supply of titanium-bearing ores.

We play an active role in ore source development around the globe, especially for those ores which can only be used by us, given the capability of our unique process technology. Supply chain flexibility allows for ore purchase and use optimization to manage short-term demand fluctuations and for long-term competitive advantage. Our process technology and ability to use lower grade ilmenite ore gives us the flexibility to alter our ore mix to the lowest cost configuration based on sales, demand and projected ore pricing. Lastly, we have taken steps to optimize routes for distribution and increase storage capacity at our production facilities.

Transporting chlorine, one of our primary raw materials, can be costly.  To reduce our exposure to this expense, we have a chlor-alkali production facility run by a third party that is co-located at our Johnsonville,Tennessee site, reducing our need to transport chlorine. Calcined petroleum coke is an important raw material input to our process. We source calcined petroleum coke from well-established suppliers in North America and China, typically under contracts that run multiple years to facilitate material and logistics planning through the supply chain. Distribution efficiency is enhanced through use of bulk ocean, barge and rail transportation modes.

Energy is another key input cost into the TiO$_2$ manufacturing process, representing approximately 10 percent of the production cost. Chemours has access to natural gas based energy at our U.S. and Mexico TiO$_2$ production facilities and our Florida minerals plant, supporting advantaged energy costs given the low cost shale gas in the U.S. We continually evaluate investments to replace aging coal- and oil-based steam supply assets with natural gas at our sites. Natural gas-based cogeneration of steam and electricity is being extended as part of the major expansion at one of our TiO$_2$ production facilities.

7

Table of Contents

### Sales, Marketing and Distribution

We sell the majority of our products through a direct sales force. We also utilize third-party sales agents and distributors to expand our reach. $TiO_2$ represents a significant raw material cost for our customers and as a result, purchasing decisions are often made by our customers' senior management team. Our sales organization works to develop and maintain close relationships with key decision makers in our value chain.

In addition, our sales team and technical service team work together to develop relationships with all layers of our customers' organizations to ensure that we meet our customers' commercial and technical requirements. When appropriate, we collaborate closely with customers to solve formulation or application problems by modifying product characteristics or developing new product grades.

To ensure an efficient distribution, we have a large fleet of railcars, which are predominantly used for outbound distribution of products in the U.S. and Canada. A dedicated logistics team, along with external partners, continually optimizes the assignment of our transportation equipment to product lines and geographic regions in order to maximize utilization and maintain an efficient supply chain.

### Customers

Globally, we serve approximately 800 customers through our Titanium Technologies segment. In 2015, our ten largest Titanium Technologies customers accounted for approximately 30 percent of the segment's sales. No single Titanium Technologies customer represented more than eight percent of our segment sales in 2015. Our larger customers in the U.S. and Europe are typically served through direct sales and tend to have medium- to long-term contracts with annual volume requirements and periodic price adjustment mechanisms. We serve our small- and mid-size customers through a combination of our direct sales and distribution network.

Our direct customers in Titanium Technologies are producers of decorative coatings, automotive and industrial coatings, polyolefin masterbatches, polyvinylchloride window profiles, engineering polymers, laminate paper, coatings paper and coated paperboard. We focus on developing long-term partnerships with key market participants in each of these sectors. We also deliver a high level of technical service to satisfy our customers' specific needs, which helps us maintain strong customer relationships.

### Seasonality

The demand for $TiO_2$ is subject to seasonality because certain applications, such as decorative coatings, are influenced by weather conditions or holiday seasons. As a result, our $TiO_2$ sales volume is typically lowest in the first quarter, highest in the second and third quarters and moderate in the fourth quarter. This pattern applies to the entire $TiO_2$ market, but may vary by region, country or application. It can also be altered by economic or other demand cycles.

### Fluoroproducts Segment

### Segment Overview

Our Fluoroproducts segment is the global leader in providing fluorine-based, advanced material solutions. The segment creates products that have unique properties such as high temperature resistance, high chemical resistance and unique di-electric properties for applications across a broad array of industries. We are the global leader in providing fluoroproducts, such as refrigerants and industrial fluoropolymer resins and derivatives. We have a leading position in hydrofluorocarbon (HFC) refrigerants and are a leader in the development of sustainable technologies like Opteon™, a line of low Global Warming Potential (GWP) hydrofluoroolefin (HFO) refrigerants and foam expansion agents, which also have a zero ozone depletion footprint. Opteon™ was jointly developed with Honeywell International, Inc., in response to the European Union's (EU) Mobile Air Conditioning (MAC) Directive. This new patented technology offers similar functionality to current HFC products but meets or exceeds currently mandated environmental standards. We are the market leader in fluoropolymer resins and downstream products and coatings, marketed under the well-known Teflon™ brand name. Teflon™ industrial resins are used in high-performance wire and cable and multiple components in high-tech processing equipment.

We led the industry in the Montreal-Protocol (1987) driven transition from chlorofluorocarbons (CFCs) to the lesser ozone depleting hydrochlorofluorocarbons (HCFCs), and non-ozone depleting HFCs. In 1988, we committed to cease production of CFCs and started manufacturing non-ozone depleting HFCs in the early 1990s. Driven by new and emerging environmental legislations and standards currently being implemented across the U.S., Europe, Latin America and Japan, we are now commercializing Opteon™ and we expect increased adoption through 2017. Over the years, regulation has pushed the industry to evolve and respond to environmental concerns. We have and will continue to invest in research and development to ensure that we remain a leader and

8

Table of Contents

are able to meet our customers needs as regulations change. We are the market leader in fluoropolymer resins and downstream products and coatings, marketed under the Teflon™ brand.

The manufacturing of fluoroproducts is complex and involves intermediates that are highly corrosive and hazardous in complex processes. We have an industry-leading safety culture and apply world-class technical expertise to ensure that our operations are run safely and reliably. These capabilities also enable us to continuously improve production yields, reduce unplanned downtime and increase our throughput, which in turn improves our overall manufacturing efficiency and customer responsiveness.

Our capacity, innovative production processes, effective supply chain and sourcing strategies make us highly cost competitive in the fluoroproducts market. We use local contract manufacturing and joint venture partners in selected countries as a source of regional access and asset-light manufacturing to further enhance the overall cost position of our Fluoroproducts segment.

A breakdown of the Fluoroproducts segment's 2015 sales by region and product group is shown in the charts below:





We sell fluoroproducts through two product groups: Fluorochemicals and Fluoropolymers. Fluorochemicals products include refrigerants, foam expansion agents, propellants and fire extinguishants. Fluoropolymers products include various industrial fluoropolymer resins, and serve a wide range of industrial and end-user applications spanning from wearable electronics to automotive, network cables, pipe lining and gaskets, corrosion resistance, surface protections, non-stick adhesion and thermal stability, among others. Fluorochemicals' refrigerant sales fluctuate by season as sales in the first half of the year generally are

9

Table of Contents

slightly higher than sales in the second half of the year; however, shifts in the product portfolio in recent quarters have partially offset this impact.

*Industry Overview and Competitors*

Our Fluoroproducts segment competes against a broad variety of global manufacturers, including Honeywell, Arkema, Mexichem, Daikin, Solvay and Dyneon, as well as local Chinese and Indian manufacturers. We have a leadership position in fluorine chemistry and materials science, a broad scope and scale of operations, market driven application development and deep customer knowledge.

Chemours has global leadership positions in the following fluoroproduct categories as set forth in the table below:

<strong>Fluoroproducts Leadership Positions</strong>

| Product Group | Position | Key Applications | Key Competitors |
|---|---|---|---|
| Fluorochemicals | #1 Globally | Refrigeration and Air conditioning | Honeywell, Arkema, Mexichem, Dongyue, Juhua |
| Fluoropolymers | #1 Globally | Diversified industrial applications | Daikin, 3M, Solvay, Asahi Glass Company, Dongyue, Chenguang, Whitford |

Fluoroproducts demand growth is expected to be in line with growth in global GDP. Growth may expected to be higher than GDP in situations where, for environmental reasons, regulatory drivers constrain the market or drive the market toward lower global warming alternatives. Developed markets represent the largest fluoroproducts markets today. Middle class growth and the increasing demand for consumer electronics, telecommunications, automobiles, refrigerators, air conditioners and expanding infrastructure are all key drivers of increased demand for various fluoroproducts.

*Raw Materials*

The primary raw materials required to support the Fluoroproducts segment are fluorspar, chlorinated organics, chlorinated inorganics, hydrofluoric acid and vinylidene fluoride. These are available in many countries and not concentrated in any particular region.

Our supply chains are designed for maximum competitiveness through advantaged sourcing of key raw materials.  Starting with our sourcing agreements, we use a mixture of fixed and market-based pricing and are covered by contracts with terms that span from two to ten years, except for purchases for resale from China that are negotiated on a monthly basis. Most qualified Fluorspar sources have market-based pricing. Although the fluoroproduct industry has historically relied primarily on fluorspar exports from China, Chemours has diversified its sourcing through multiple geographic regions and suppliers to ensure a stable and cost competitive supply. Our current supply agreements are generally in effect through 2020.

*Sales, Marketing and Distribution*

With more than 85 years of innovation and development in fluorine science, our technical, marketing and sales teams around the world have deep expertise in our products and their end-uses. We work with customers to select the appropriate fluoroproducts to meet their technical performance needs. We sell our products through direct channels and through resellers. Selling agreements vary by product line and markets served and include both spot pricing arrangements and longer term contracts with a typical duration of one year.

We maintain a large fleet of railcars, tank trucks and containers to deliver our products and support our supply chain needs. For the portion of the fleet that is leased, related lease terms are usually staggered, which provides us with a competitive cost position as well as the ability to adjust the size of our fleet in response to changes in market conditions. A dedicated logistics team, along with external partners, continually optimizes the assignment of our transportation equipment to product lines and geographic regions in order to maximize utilization and flexibility of the supply chain.

*Customers*

We serve approximately 4,000 customers and distributors globally and in many instances these commercial relationships have been in place for decades. No single Fluoroproducts customer represented more than 10 percent of the segment's sales in 2015.

Table of Contents

*Seasonality*

Seasonality in Fluorochemicals sales is driven by increased demand for residential, commercial and automotive air conditioning in the spring. This demand peaks in the summer months and declines in the fall and winter. Commercial refrigeration demand is fairly steady throughout the year, but demand is slightly higher during the summer months. There is no significant seasonality for Fluoropolymers, as demand is relatively consistent throughout the year.

**Chemical Solutions Segment**

*Segment Overview*

Our Chemical Solutions segment comprises a diverse portfolio of industrial and specialty chemical businesses primarily operating in the Americas. The Chemical Solutions segment's products are used as important raw materials and catalysts for a diverse group of industries including, among others, gold production, oil refining, agriculture and industrial polymers. We are a leading North American provider of several Chemical Solutions products, including sodium cyanide and sulfuric acid. Chemical Solutions generates value through the use of market leading manufacturing technology, safety performance and product stewardship, and differentiated logistics capabilities.

As part of our transformation plan, we announced a strategic review of our Chemical Solutions segment, excluding Cyanides. In November 2015, we announced the sale of our Aniline facility in Beaumont, Texas to The Dow Chemical Company, subject to customary approvals and closing conditions, which is expected to be completed in the first quarter of 2016. We also made significant progress on our strategic review of our portfolio, including the announced planned exit of the Reactive Metals business and decision to retain and improve the cost position of our Methylamines business. The remainder of our Chemical Solutions assets are still under strategic review, and we expect to conclude the process in 2016.

Chemical Solutions operates at 13 dedicated production facilities, which are primarily concentrated in North America. Chemical Solutions sells products and solutions through three primary product groups: Cyanides, Sulfur Products, and Performance Chemicals & Intermediates. Performance Chemicals & Intermediates business includes a number of product lines including Clean & Disinfect chemicals, Aniline, Methylamines, Glycolic Acid, Vazo™ free radical initiators and Reactive Metals. Our Chemical Solutions segment serves customers in a diverse range of end markets that we expect to generally grow in line with growth in global GDP.

A breakdown of Chemical Solutions' 2015 sales by region and primary product groups is shown in the charts below.



Table of Contents



We sell products through three primary product groups. The Cyanides product group includes sodium cyanide, hydrogen cyanide and potassium cyanide. We are the market leader in solid sodium cyanide production in the Americas, which is used primarily by the mining industry for gold and silver production. The U.S.-based Sulfur Products group is a leading producer of both non-fuming sulfuric acid products and higher value sulfur derivative products (HVSDs) such as oleum, sulfur trioxide and chlorosulfonic acid. This product group also provides spent acid regeneration and sulfur gas recovery services to the oil refining industry, where our merchant regeneration capacity is ranked #1 and #2 in the U.S. Northeast and Gulf Coast regions, respectively. In the Performance Chemicals and Intermediates product group, we manufacture a wide variety of chemicals used in many different applications such as water treatment, cleaning (household, institutional and industrial), agricultural chemicals, textiles and electronics.

***Industry Overview and Competitors***

The industrial and specialty chemicals produced by our Chemical Solutions segment are important raw materials for a wide range of industries and end markets. We hold a long standing reputation for high quality and the safe handling of hazardous products such as sodium cyanide and sulfuric acid. We believe that we have leading cost positions in cyanides, sulfur products and our clean and disinfect products. Our competitive cost positions in these products are the result of our process technology, manufacturing scale, efficient supply chain and proximity to large customers. Our Chemical Solutions segment also holds, and occasionally licenses, what we believe to be the leading process technologies for the production of hydrogen and sodium cyanide, which are used in industrial polymers and in gold production.

Chemours has global leadership positions in the following product categories:

**Chemical Solutions Leadership Positions**

| Product (Product Group) | Position | Key Applications | Key Competitors |
|---|---|---|---|
| Cyanides | #1 in Solid Sodium Cyanide in the Americas | Gold Production | Orica, Cyanco, Samsung |
| Sulfur Products | #1 in Spent Acid Regeneration in U.S. Northeast Region | Refining | Ecoservices, Chemtrade |
| | #2 in Spent Acid Regeneration in U.S. Gulf Coast Region | | |
| Performance Chemicals & Intermediates | Leading positions in U.S. in number of products, e.g.: | | |
| | Chlorine Dioxide | Water treatment | Evoqua, OxyChem |
| | Glycolic Acid | Household, institutional and industrial cleaning, personal care | CABB, Taicang Xinmao |
| | Oxone™ | Recreational water treatment, dentures cleaning | United Initiators |

12

Table of Contents

*Raw Materials*

Key raw materials for Chemical Solutions include ammonia, methanol, sulfur, natural gas, formaldehyde, hydrogen and caustic soda. We source raw materials from global and regional suppliers where possible and maintain multiple supplier relationships to protect against supply disruptions and potential price increases. To further mitigate the risk of raw material availability and cost fluctuation, Chemical Solutions has also taken steps to optimize routes for distribution, increase the storage capacity at our production facilities, lock in long-term contracts with key suppliers and increase the number of customer contracts with raw material price pass-through terms. We do not believe that the loss of any particular supplier would be material to our business.

*Sales, Marketing and Distribution*

Our technical, marketing and sales teams around the world have deep expertise with our products and their end markets. We predominantly sell directly to customers, although we also use a network of distributors for specific product lines and geographies. Sales may take place through either spot transactions or via long-term contracts.

Most of Chemical Solutions' raw materials and products can be delivered by efficient bulk transportation. As such, we maintain a large fleet of railcars, tank trucks and containers to support our supply chain needs. For the portion of the fleet that is leased, related lease terms are usually staggered, which provides us with a competitive cost position as well as the ability to adjust the size of our container fleet in response to changes in market conditions. A dedicated logistics team, along with external partners, continually optimizes the assignment of our transportation equipment to product lines and geographic regions in order to maximize utilization and flexibility of the supply chain.

The strategic placement of our production facilities in locations designed to serve our key customer base gives us robust distribution capabilities.

*Customers*

Our Chemical Solutions segment focuses on developing long-term partnerships with key market participants. Many of our commercial and industrial relationships have been in place for decades and are based on our proven value proposition of safely and reliably supplying our customers with the materials needed for their operations. Our reputation and long-term track record is a key competitive advantage as several of the products' end users demand the highest level of excellence in safe manufacturing, distribution, handling and storage. Chemical Solutions has a Department of Transportation Special Permits and Approvals in place for distribution of various materials associated with each of our business lines as required. Our Chemical Solutions segment serves over a thousand customers globally. The largest Chemical Solutions customer represented approximately 10 percent of segment sales in 2015.

*Seasonality*

Our sales are subject to minimal seasonality. Our Sulfur Products business is influenced by seasonal fluctuations because in the summer months we typically sell a higher volume of acid due to oil refinery customers operating at higher capacities.

**Intellectual Property**

Intellectual property, including trade secrets, certain patents, trademarks, copyrights, know-how and other proprietary rights, is a critical part of maintaining our technology leadership and competitive edge. Our business strategy is to file patent and trademark applications globally for proprietary new product and application development technologies. We hold many patents, particularly in our Fluoroproducts segment, as described herein. These patents, including various patents that expire during the period of 2016 to 2034, in the aggregate, are believed to be of material importance to our business. However, we believe that no single patent (or related group of patents) is material in relation to our business as a whole. In addition, particularly in our Titanium Technologies segment, we hold significant intellectual property in the form of trade secrets and, while we believe that no single trade secret is material in relation to our combined business as a whole, we believe they are material in the aggregate. Unlike patents, trade secrets do not have a predetermined validity period, but are valid indefinitely, so long as their secrecy is maintained. We work actively on a global basis to create, protect and enforce our intellectual property rights. The protection afforded by these patents and trademarks varies based on country, scope of individual patent and trademark coverage, as well as the availability of legal remedies in each country. Although certain proprietary intellectual property rights are important to the success of our company, we do not believe that we are materially dependent on any particular patent or trademark. We believe that securing our intellectual property is critical to maintaining our technology leadership and our competitive position, especially with respect to new technologies or the extensions of existing technologies. Our proprietary process technology is also a source of incremental income through licensing arrangements.

13

Table of Contents

Our Titanium Technologies segment in particular relies upon unpatented proprietary knowledge and continuing technological innovation and other trade secrets to develop and maintain our competitive position in this space. Our proprietary chloride production process is an important part of our technology and our business could be harmed if our trade secrets are not maintained in confidence. In our Titanium Technologies intellectual property portfolio, we consider our trademark Ti-Pure™ to be a valuable asset and have registered this trademark in a number of countries.

Our Fluoroproducts segment is the technology leader in the markets in which it participates. We have one of the largest patent portfolios in the fluorine derivatives industry. In our Fluoroproducts intellectual property portfolio, we consider our Freon™, Opteon™, Teflon™, Viton™ and Krytox™ trademarks to be valuable assets.

Our Chemical Solutions segment is a manufacturing and application development technology leader in a majority of the markets in which it participates. In our Chemical Solutions intellectual property portfolio, we consider our Virkon™ and Oxone™ trademarks to be valuable assets. Trade secrets are one of the key elements of our intellectual property security in Chemical Solutions as most of the segment's manufacturing and application development technologies are no longer under patent coverage.

At separation, certain of our subsidiaries entered into an intellectual property cross-license agreement with DuPont, pursuant to which (i) DuPont has agreed to license to Chemours certain patents, know-how and technical information owned by DuPont or its affiliates and necessary or useful in Chemours' business, and (ii) Chemours has agreed to license to DuPont certain patents owned by Chemours or its affiliates and necessary or useful in DuPont's business. In most circumstances, the licenses are perpetual, irrevocable, sublicenseable (in connection with the party's business), assignable (in connection with a sale of the applicable portion of a party's business or assets, subject to certain exceptions) worldwide licenses in connection with the current operation of the businesses and, with respect to specified products and fields of use, future operation of such businesses, subject to certain limitations with respect to specified products and fields of use.

**Research and Development**

We perform research and development activities in all of our segments with the majority of our efforts focused in the Fluoroproducts segment. The Fluoroproducts segment efforts center on developing new sustainable fluorochemicals and new applications and formulations for fluoropolymers that meet customers' technical requirements. In Titanium Technologies and Chemical Solutions, our efforts are focused on process technology to reduce cost and maintain safety and stewardship standards. The table below sets forth the last three years of research and development expense by segment:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| *(Dollars in millions)* | **2015** | | **2014** | | **2013** | |
| Titanium Technologies | $ | 33 | $ | 47 | $ | 48 |
| Fluoroproducts | | 50 | | 79 | | 93 |
| Chemical Solutions | | 14 | | 17 | | 23 |
| Total | $ | 97 | $ | 143 | $ | 164 |

**Backlog**

In general, the Company does not manufacture its products against a backlog of orders and does not consider backlog to be a significant indicator of the level of future sales activity. Production and inventory levels are based on the level of incoming orders as well as projections of future demand. Therefore, the Company believes that backlog information is not material to understanding its overall business and should not be considered a reliable indicator of the Company's ability to achieve any particular level of revenue or financial performance.

**Environmental Matters**

Information related to environmental matters is included in several areas of this report: (1) Environmental Proceedings, (2) Risk Factors, (3) Management's Discussion and Analysis of Financial Condition and Results of Operations and (4) Notes 3 and 19 to the Consolidated Financial Statements.

14

Table of Contents

**Available Information**

Chemours is subject to the reporting requirements under the Securities Exchange Act of 1934. Consequently, the Company is required to file reports and information with the Securities and Exchange Commission (SEC), including reports on the following forms: annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934.

The public may read and copy any materials the Company files with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet site at http://www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC.

The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports are also accessible on the Company's website at http://www.chemours.com by clicking on the section labeled "Investor Relations", then on "Filings & Reports" and then on "SEC Filings." These reports are made available, without charge, as soon as is reasonably practicable after the Company files or furnishes them electronically with the SEC.

**Employees**

We have approximately 8,100 employees, approximately 24% of whom are represented by unions or works councils. Management believes that its relations with its employees and labor organizations are good. There have been no strikes or work stoppages in any of our locations in recent history.

**Item 1A. RISK FACTORS**

*The company's operations could be affected by various risks, many of which are beyond our control. Based on current information, we believe that the following identifies the most significant risk factors that could affect our business, results of operations or financial condition. Past financial performance may not be a reliable indicator of future performance and historical trends should not be used to anticipate results or trends in future periods. See "Cautionary Statement Concerning Forward-Looking Statements" for more details.*

**Risks Related to Our Business**

***Conditions in the global economy and global capital markets may adversely affect our results of operations, financial condition, and cash flows.***

Our business and operating results may in the future be adversely affected by global economic conditions, including instability in credit markets, declining consumer and business confidence, fluctuating commodity prices and interest rates, volatile exchange rates, and other challenges such as the changing financial regulatory environment that could affect the global economy. Our customers may experience deterioration of their businesses, cash flow shortages, and difficulty obtaining financing. As a result, existing or potential customers may delay or cancel plans to purchase products and may not be able to fulfill their obligations to us in a timely fashion. Further, suppliers could experience similar conditions, which could impact their ability to supply materials or otherwise fulfill their obligations to us. Because we have significant international operations, there are a large number of currency transactions that result from international sales, purchases, investments and borrowings. Also, our effective tax rate may fluctuate because of variability in geographic mix of earnings, changes in statutory rates, and taxes associated with repatriation of non-U.S. earnings. Future weakness in the global economy and failure to manage these risks could adversely affect our results of operations, financial condition and cash flows in future periods.

***Market conditions, as well as global and regional economic downturns that adversely affect the demand for the end-use products that contain $TiO_2$, fluoroproducts or our other products, could adversely affect the profitability of our operations and the prices at which we can sell our products, negatively impacting our financial results.***

Our revenue and profitability is largely dependent on the $TiO_2$ industry and the industries that are end users of our fluoroproducts. $TiO_2$ and our fluoroproducts, such as refrigerants and resins, are used in many "quality of life" products for which demand historically has been linked to global, regional and local GDP and discretionary spending, which can be negatively impacted by regional and world events or economic conditions. Such events are likely to cause a decrease in demand for our products and, as a result, may

15

Table of Contents

have an adverse effect on our results of operations and financial condition. The future profitability of our operations, and cash flows generated by those operations, will also be affected by the available supply of our products in the market.

Additionally, our profitability may be affected by the market for, and use of, by-products generated as part of our manufacturing processes. A significant decrease in the demand for such products could adversely impact our operations by increasing the cost of our products and reducing our profit margins.

***If we are unable to execute our cost reduction plans successfully, our total operating costs may be greater than expected, which may adversely affect our profitability.***

We have announced a transformation plan that includes a number of cost saving measures. We have implemented a number of these measures and have realized a portion of the anticipated benefits. While we continue to search for opportunities to reduce our costs and expenses to improve operating profitability without jeopardizing the quality of our products or the effectiveness of our operations, our success in achieving targeted cost and expense reductions depends upon a number of factors such as timing of execution, market condition, and regulatory and local requirements and approvals. If we do not successfully execute on our cost reduction initiatives or if we experience delays in completing the implementation of these initiatives, our results of operations or financial condition could be adversely affected.

***Our reported results could be adversely affected by currency exchange rates and currency devaluation could impair our competitiveness.***

Due to our international operations, we transact in many foreign currencies, including but not limited to the Euro, Brazilian real, Mexican peso and Japanese yen. As a result, we are subject to the effects of changes in foreign currency exchange rates. During times of a strengthening U.S. dollar, our reported net revenues and operating income will be reduced because the local currency will be translated into fewer U.S. dollars. During periods of local economic crisis, local currencies may be devalued significantly against the U.S. dollar, potentially reducing our margin. For example, unfavorable movement in the Euro has negatively impacted our results of operations since the second half of 2014, and the further decline of the Euro could affect future periods. From time to time, Chemours enters into forward exchange contracts and other financial contracts in an attempt to mitigate the impact of currency rate fluctuations. Currently, Chemours does not hedge on a transactional basis. There can be no assurance that any hedging action will lessen the adverse impact of a variation in currency rates. Also, actions to recover margins may result in lower volume and a weaker competitive position, which may have an adverse effect on our profitability. For example, in Titanium Technologies, a substantial portion of our manufacturing is located in the U.S. and Mexico, while our $TiO_2$ is delivered to customers around the world. Furthermore, our ore cost is principally denominated in U.S. dollars. Accordingly, in periods when the U.S. dollar or Mexican Peso strengthen against other local currencies such as the Euro, our costs are higher relative to our competitors who operate largely outside of the United States, and the benefits we realize from having lower costs associated with our manufacturing process are reduced, impacting our profitability.

***The markets for many of our products have seasonally affected sales patterns.***

The demand for $TiO_2$, certain of our fluoroproducts and certain of our other products during a given year is subject to seasonal fluctuations. As a result of seasonal fluctuations, our operating cash flow may be negatively impacted due to demand fluctuations. In particular, because $TiO_2$ is widely used in coatings, demand is higher in the painting seasons of spring and summer. Because certain fluoroproducts are used in refrigerants, such products are in higher demand in the spring and summer in the Northern Hemisphere. We may be adversely affected by anticipated or unanticipated changes in regional weather conditions. For example, poor weather conditions in a region can lead to an abbreviated painting season, which can depress consumer sales of paint products that use $TiO_2$, which could have a negative effect on our cash position.

***Our results of operations could be adversely affected by litigation and other commitments and contingencies.***

We face risks arising from various unasserted and asserted litigation matters, including, but not limited to, product liability, patent infringement, antitrust claims, and claims for third party property damage or personal injury stemming from alleged environmental or other torts. We have noted a nationwide trend in purported class actions against chemical manufacturers generally seeking relief such as medical monitoring, property damages, off-site remediation and punitive damages arising from alleged environmental or other torts without claiming present personal injuries. We also have noted a trend in public and private nuisance suits being filed on behalf of states, counties, cities and utilities alleging harm to the general public. Various factors or developments can lead to changes in current estimates of liabilities such as a final adverse judgment, significant settlement or changes in applicable law. A future adverse ruling or unfavorable development could result in future charges that could have a material adverse effect on us. An adverse outcome in any one or more of these matters could be material to our financial results and could adversely impact the value of any of our brands that are associated with any such matters.

16

Table of Contents

In the ordinary course of business, we may make certain commitments, including representations, warranties and indemnities relating to current and past operations, including those related to divested businesses, and issue guarantees of third party obligations. Additionally, we are required to indemnify DuPont for uncapped amounts with regard to liabilities allocated to, or assumed by us under each of the separation agreement, the employee matters agreement, the tax matters agreement and the intellectual property cross-license agreement that were executed prior to the spin-off. These indemnification obligations to date have included defense costs associated with certain litigation matters as well as certain damages awards, settlements, and penalties. As we are required to make payments, such payments could be significant and could exceed the amounts we have accrued with respect thereto, adversely affecting our results of operations. In addition, in the event that DuPont seeks indemnification for adverse trial rulings or outcomes, these indemnification claims could materially adversely affect our financial condition.  Disputes between Chemours and DuPont many also arise with respect to indemnification matters including disputes based on matters of law or contract interpretation. If and to the extent these disputes arise, they could materially adversely affect us.

***As a result of our current and past operations, including operations related to divested businesses and our discontinued operations, we could incur significant environmental liabilities.***

We are subject to various laws and regulations around the world governing the environment, including the discharge of pollutants and the management and disposal of hazardous substances. As a result of our operations, including the operations of divested businesses and certain discontinued operations, we could incur substantial costs, including remediation and restoration costs.  The costs of complying with complex environmental laws and regulations, as well as internal voluntary programs, are significant and will continue to be significant for the foreseeable future. This includes costs we expect to continue to incur for environmental investigation and remediation activities at a number of our current or former sites and third-party disposal locations. However, the ultimate costs under environmental laws and the timing of these costs are difficult to accurately predict. While we establish accruals in accordance with generally accepted accounting principles, the ultimate actual costs and liabilities may vary from the accruals because the estimates on which the accruals are based depend on a number of factors (many of which are outside of our control), including the nature of the matter and any associated third-party claims, the complexity of the site, site geology, the nature and extent of contamination, the type of remedy, the outcome of discussions with regulatory agencies and other Potentially Responsible Parties (PRPs) at multi-party sites and the number and financial viability of other PRPs. See "Environmental Matters" within Item 7 - Management's Discussion and Analysis (MD&A) of Financial Condition and Results of Operations for further information and Note 19 to the Consolidated Financial Statements included elsewhere in this Annual Report.

***As we conduct a substantial percentage of our operations internationally, and may increase our presence in developing and other international markets, unforeseen or adverse changes in government policies, laws or certain geopolitical conditions and activities could adversely affect our financial results.***

We have 35 production facilities, with operations primarily located in the U.S., Canada, Mexico, Brazil, the Netherlands, Belgium, China, Japan, Taiwan, Switzerland, the United Kingdom, and France.  Sales to customers outside the U.S. constituted about 57% of our 2015 revenue.  We anticipate that international production and sales, including those activities in developing markets, will be a continued and increasingly important part of our business.  For example, we use local contract manufacturing and joint venture partners in Asia and Latin America, more specifically China, Vietnam and Mexico, as sources of regional access, asset-light production (where possible) and sourcing partners that decrease the cost of materials and production for our Fluoroproducts segment. However, our ability to achieve these improved cost positions is dependent on our ongoing relationships in the region, including our ability to source materials in those relevant countries and those relationships may be materially affected by geopolitical factors and government actions, such as the enactment of import/export restrictions or other trade limitations. To the extent our regional production or sourcing arrangements in Asia and Latin America are disrupted, that disruption could have an adverse effect on our costs and materially impact our financial results. Sales from developing markets represented 25% percent of our 2015 revenue and our growth plans include focusing on our presence in developing markets, specifically markets in Asia, Eastern Europe and Latin America. While we believe these developing markets offer prospects for business growth, we also anticipate that such markets could be subject to more volatile economic, political and market conditions than other market areas in which we operate and, should changes in trade, monetary and fiscal policies, laws and regulations, or other activities of U.S. and non-U.S. governments, agencies and similar organizations have a negative effect on our sales to non-U.S. markets, our financial results could be affected adversely. In this regard, factors that could affect our sales, include, but are not limited to, changes in a country's or region's economic or political conditions, trade or other economic-based regulations, environmental regulations, including climate change-based regulations or legislation and regulations relating to the transport or shipment of hazardous materials, and policies affecting production, pricing and marketing of products, local labor conditions and regulations, reduced protection of intellectual property rights in some countries, changes in the regulatory or legal environment, restrictions on currency exchange activities, burdensome taxes and tariffs and other trade barriers or policies. The certainty, timing and enforcement of these regulations is less predictable in developing countries, adding a further element of uncertainty to business decisions including those related to long-term capital investment. For example, demand growth in Chemours HFO based products and blends is expected to be driven by country-

17

Table of Contents

specific legislation phasing down the usage of comparative HFC based products, based on compliance with and implementation of the Montreal Protocol or similar environmental regulations governing the use of HCFCs, HFCs and HFOs. While a number of countries in Asia and Eastern Europe in which we sell or market our products have enacted legislation or otherwise adopted programs to phase-down the usage of HFC refrigerants, the enforcement of such legislation and impact of such programs is uncertain and any delays in such implementation and enforcement could have an adverse effect on our sales and financial results. In Titanium Technologies, we believe that some local producers in China may be required to incur additional capital expenditures to meet recently enacted environmental standards for pollution abatement, which could exert pressure on competing regional producers in China utilizing the sulfate process.

***Failure to maintain effective internal controls could adversely affect our ability to meet our reporting requirements.***

The Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") requires, among other things, that we maintain effective internal control over financial reporting and disclosure controls and procedures. One key aspect of the Sarbanes-Oxley Act is that we must perform system and process evaluation and testing of our internal control over financial reporting to allow management and our independent registered public accounting firm to report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, with auditor attestation of the effectiveness of our internal controls, beginning with our annual report on Form 10-K for the fiscal year ending December 31, 2016. If we are not able to comply with the requirements of Section 404 in a timely manner, or if we or our independent registered public accounting firm identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our common shares could decline and we could be subject to penalties or investigations by the NYSE, the SEC or other regulatory authorities, which would require additional financial and management resources.

Effective internal controls are necessary for us to provide reasonable assurance with respect to our financial reports, and to effectively prevent fraud. Internal controls over financial reporting may not prevent or detect misstatements because of inherent limitations, including the possibility of human error, the circumvention or overriding of controls, or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If we cannot provide reasonable assurance with respect to our financial reports and effectively prevent fraud, our operating results could be harmed. In addition, projections of any evaluation of effectiveness of internal control over financial reporting to future periods are subject to the risk that the control may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. If we fail to maintain the effectiveness of our internal controls, including any failure to implement required new or improved controls, or if we experience difficulties in their implementation, our business and operating results could be harmed, we could fail to meet our reporting obligations, and there could be a material adverse effect on our stock price.

The ongoing process of implementing internal controls in connection with our operation as a stand-alone company requires significant attention from management and we cannot be certain that these measures will ensure that we implement and maintain adequate controls over our financial processes and reporting in the future. Difficulties encountered in their implementation could harm our results of operations or cause us to fail to meet our reporting obligations. If we fail to obtain the quality of administrative services necessary to operate effectively or incur greater costs in obtaining these services, our profitability, financial condition and results of operations may be materially and adversely affected.

***Effects of our raw materials contracts, including our inability to renew such contracts, could have a significant impact on our earnings.***

When possible we have purchased, and we plan to continue to purchase, raw materials, including titanium bearing ores and fluorspar, through negotiated medium- or long-term contracts to minimize the impact of price fluctuations. To the extent that we have been able to achieve favorable pricing in our existing negotiated long-term contracts, we may not be able to renew such contracts at the current prices, or at all, and this may adversely impact our cash flow from operations. However, to the extent that the prices of raw materials that we utilize significantly decline, we may be bound by the terms of our existing long-term contracts and obligated to purchase such raw materials at higher prices as compared to other market participants.

***Price fluctuations in energy and raw materials could have a significant impact on our ability to sustain and grow earnings.***

Our manufacturing processes consume significant amounts of energy and raw materials, the costs of which are subject to worldwide supply and demand as well as other factors beyond our control. Variations in the cost of energy, which primarily reflect market prices for oil and natural gas, and for raw materials may significantly affect our operating results from period to period. Additionally, consolidation in the industries providing our raw materials may have an impact on the cost and availability of such materials. To the extent we do not have fixed price contracts with respect to specific raw materials, we have no control over the costs of raw materials and such costs may fluctuate widely for a variety of reasons, including changes in availability, major capacity additions

18

Table of Contents

or reductions, or significant facility operating problems. These fluctuations could negatively affect our operating margins and our profitability.

We attempt to offset the effects of higher energy and raw material costs through selling price increases, productivity improvements and cost reduction programs. However, the outcome of these efforts is largely determined by existing competitive and economic conditions, and may be subject to a time delay between the increase in our raw materials costs and our ability to increase prices, which could vary significantly depending on the market served. If we are not able to fully offset the effects of higher energy or raw material costs, it could have a material adverse effect on our financial results.

***Hazards associated with chemical manufacturing, storage and transportation could adversely affect our results of operations.***

There are hazards associated with chemical manufacturing and the related storage and transportation of raw materials, products and wastes. These hazards could lead to an interruption or suspension of operations and have an adverse effect on the productivity and profitability of a particular manufacturing facility or on us as a whole. While we endeavor to provide adequate protection for the safe handling of these materials, issues could be created by various events, including natural disasters, severe weather events, acts of sabotage and performance by third parties, and as a result we could face the following potential hazards:

• piping and storage tank leaks and ruptures;

• mechanical failure;

• employee exposure to hazardous substances; and

• chemical spills and other discharges or releases of toxic or hazardous substances or gases.

These hazards may cause personal injury and loss of life, damage to property and contamination of the environment, which could lead to government fines, work stoppage injunctions, lawsuits by injured persons, damage to our public reputation and brand, and diminished product acceptance. If such actions are determined adversely to us or there is an associated economic impact to our business, we may have inadequate insurance or cash flow to offset any associated costs. Such outcomes could adversely affect our financial condition and results of operations.

***We are subject to extensive environmental, health and safety laws and regulations that may result in unanticipated loss or liability, which could reduce our profitability.***

Our operations and production facilities are subject to extensive environmental and health and safety laws and regulations at national, international and local levels in numerous jurisdictions relating to pollution, protection of the environment, climate change, transporting and storing raw materials and finished products and storing and disposing of hazardous wastes. Such laws include, in the U.S., the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, often referred to as Superfund), the Resource Conservation and Recovery Act (RCRA) and similar state and global laws for management and remediation of hazardous materials, the Clean Air Act (CAA) and the Clean Water Act, for protection of air and water resources, the Toxic Substances Control Act (TSCA), and in the EU, the Registration, Evaluation, Authorization and Restriction of Chemicals (REACH), for regulation of chemicals in commerce and reporting of potential known adverse effects and numerous local, state and federal laws and regulations governing materials transport and packaging. If we are found to be in violation of these laws or regulations, we may incur substantial costs, including fines, damages, criminal or civil sanctions and remediation costs, or experience interruptions in our operations. We also may be subject to changes in our operations and production based on increased regulation or other changes to, or restrictions imposed by, any such additional regulations. In addition, the manner in which adopted regulations (including environmental regulations) are ultimately implemented may affect our products and results of operations. In the event of a catastrophic incident involving any of the raw materials we use or chemicals we produce, we could incur material costs as a result of addressing the consequences of such event and future reputational costs associated with any such event.

There is also a risk that one or more of our key raw materials or one or more of our products may be found to have, or be characterized as having, a toxicological or health-related impact on the environment or on our customers or employees or unregulated emissions, which could potentially result in us incurring liability in connection with such characterization and the associated effects of any toxicological or health-related impact. If such a discovery or characterization occurs, we may incur increased costs in order to comply with new regulatory requirements or the relevant materials or products, including products of our customers incorporating our materials or products, may be recalled or banned. Changes in laws and regulations, or their interpretation, and our customers' perception of such changes or interpretations may also affect the marketability of certain of our products.

19

Table of Contents

***The businesses in which we compete are highly competitive. This competition may adversely affect our results of operations and operating cash flows.***

Each of the businesses in which we operate is highly competitive. Competition in the performance chemicals industry is based on a number of factors such as price, product quality and service. We face significant competition from major international and regional competitors. Additionally, our Titanium Technologies business competes with numerous regional producers, including producers in China, which have expanded their readily available production capacity during the previous five years. Additionally, the risk of substitution of Chinese producers by our customers could increase as they expand their use of chloride production technology.

***Our results of operations and financial condition could be seriously impacted by business disruptions and security breaches, including cybersecurity incidents.***

Business and/or supply chain disruptions, plant downtime and/or power outages and information technology system and/or network disruptions, regardless of cause including acts of sabotage, employee error or other actions, geo-political activity, weather events and natural disasters could seriously harm our operations as well as the operations of our customers and suppliers. Failure to effectively prevent, detect and recover from security breaches, including attacks on information technology and infrastructure by hackers, viruses, breaches due to employee error or actions or other disruptions could result in misuse of our assets, business disruptions, loss of property including trade secrets and confidential business information, legal claims or proceedings, reporting errors, processing inefficiencies, negative media attention, loss of sales and interference with regulatory compliance. Like most major corporations, we have been and expect to be the target of industrial espionage, including cyber-attacks, from time to time. We have determined that these attacks have resulted, and could result in the future, in unauthorized parties gaining access to certain confidential business information, and have included the obtaining of trade secrets and proprietary information related to the chloride manufacturing process for $TiO_2$ by third parties. Although we do not believe that we have experienced any material losses to date related to these breaches, there can be no assurance that we will not suffer any such losses in the future. We plan to actively manage the risks within our control that could lead to business disruptions and security breaches. As these threats continue to evolve, particularly around cybersecurity, we may be required to expend significant resources to enhance our control environment, processes, practices and other protective measures. Despite these efforts, such events could materially adversely affect our business, financial condition or results of operations.

***If our intellectual property were compromised or copied by competitors, or if our competitors were to develop similar or superior intellectual property or technology, our results of operations could be negatively affected.***

Intellectual property rights, including patents, trade secrets, confidential information, trademarks, tradenames and trade dress are important to our business. We endeavor to protect our intellectual property rights in key jurisdictions in which our products are produced or used and in jurisdictions into which our products are imported. Our success depends to a significant degree upon our ability to protect and preserve our intellectual property rights. However, we may be unable to obtain protection for our intellectual property in key jurisdictions. Although we own and have applied for numerous patents and trademarks throughout the world, we may have to rely on judicial enforcement of our patents and other proprietary rights. Our patents and other intellectual property rights may be challenged, invalidated, circumvented, and rendered unenforceable or otherwise compromised. A failure to protect, defend or enforce our intellectual property could have an adverse effect on our financial condition and results of operations. Similarly, third parties may assert claims against us and our customers and distributors alleging our products infringe upon third party intellectual property rights.

We also rely materially upon unpatented proprietary technology, know-how and other trade secrets to maintain our competitive position. While we maintain policies to enter into confidentiality agreements with our employees and third parties to protect our proprietary expertise and other trade secrets, these agreements may not be enforceable or, even if legally enforceable, we may not have adequate remedies for breaches of such agreements. We also may not be able to readily detect breaches of such agreements. The failure of our patents or confidentiality agreements to protect our proprietary technology, know-how or trade secrets could result in significantly lower revenues, reduced profit margins or loss of market share.

If we must take legal action to protect, defend or enforce our intellectual property rights, any suits or proceedings could result in significant costs and diversion of resources and management's attention, and we may not prevail in any such suits or proceedings. A failure to protect, defend or enforce our intellectual property rights could have an adverse effect on our financial condition and results of operations.

20

Table of Contents

***Restrictions under the intellectual property cross-license agreement could limit our ability to develop and commercialize certain products and/or prosecute, maintain and enforce certain intellectual property.***

We depend to a certain extent on DuPont to prosecute, maintain and enforce certain of the intellectual property licensed under the intellectual property cross-license agreement. Specifically, DuPont is responsible for filing, prosecuting and maintaining patents that DuPont licenses to us. DuPont also has the first right to enforce such patents, trade secrets and the know-how licensed to us by DuPont. If DuPont fails to fulfill its obligations or chooses to not enforce the licensed patents, trade secrets or know-how under the intellectual property cross-license agreement, we may not be able to prevent competitors from making, using and selling competitive products (unless we are able to effectively exercise our secondary rights to enforce such patents, trade secrets and know-how).

In addition, our restrictions under the intellectual property cross-license agreement could limit our ability to develop and commercialize certain products. For example, the licenses granted to us under the agreement may not extend to all new products, services and businesses that we may enter in the future. These limitations and restrictions may make it more difficult, time consuming or expensive for us to develop and commercialize certain new products and services, or may result in certain of our products or services being later to market than those of our competitors.

***If we are unable to innovate and successfully introduce new products, or new technologies or processes reduce the demand for our products or the price at which we can sell products, our profitability could be adversely affected.***

Our industries and the end-use markets into which we sell our products experience periodic technological change and product improvement. Our future growth will depend on our ability to gauge the direction of commercial and technological progress in key end-use markets and on our ability to fund and successfully develop, manufacture and market products in such changing end-use markets. We must continue to identify, develop and market innovative products or enhance existing products on a timely basis to maintain our profit margins and our competitive position. We may be unable to develop new products or technology, either alone or with third parties, or license intellectual property rights from third parties on a commercially competitive basis. If we fail to keep pace with the evolving technological innovations in our end-use markets on a competitive basis, including with respect to innovation with regard to the development of alternative uses for, or application of, products developed that utilize such end-use products, our financial condition and results of operations could be adversely affected. We cannot predict whether technological innovations will, in the future, result in a lower demand for our products or affect the competitiveness of our business. We may be required to invest significant resources to adapt to changing technologies, markets, competitive environments and laws and regulations. We cannot anticipate market acceptance of new products or future products. In addition, we may not achieve our expected benefits associated with new products developed to meet new laws or regulations if the implementation of such laws or regulations is delayed.

***Our customers, prospective customers, suppliers or other companies with whom we conduct business may need assurances that our financial stability is sufficient to satisfy their requirements for doing or continuing to do business with them.***

Some of our customers, prospective customers, suppliers or other companies with whom we conduct business may need assurances that our financial stability is sufficient to satisfy their requirements for doing or continuing to do business with them, and may require us to provide additional credit support, such as letters of credit or other financial guarantees. Any failure of parties to be satisfied with our financial stability could have a material adverse effect on our business, financial condition, results of operations and cash flows.

***In connection with our separation, we were required to assume, and indemnify DuPont for, certain liabilities. As we are required to make payments pursuant to these indemnities to DuPont, we may need to divert cash to meet those obligations and our financial results could be negatively affected. In addition, DuPont's obligation to indemnify us for certain liabilities may not be sufficient to insure us against the full amount of liabilities for which it will be allocated responsibility, and DuPont may not be able to satisfy its indemnification obligations in the future.***

Pursuant to the separation agreement, the employee matters agreement, the tax matters agreement and the intellectual property cross-license agreement we entered into with DuPont prior to the spin-off, we were required to assume, and indemnify DuPont for, certain liabilities for uncapped amounts. These indemnification obligations to date have included, among other items, defense costs associated with certain litigation matters as well as certain damages awards, settlement amounts and penalties. Payments pursuant to these indemnities may be significant and could negatively impact our business, particularly indemnities relating to our actions that could impact the tax-free nature of the distribution. In addition, in the event that DuPont seeks indemnification for adverse trial rulings or outcomes, these indemnification claims could materially adversely affect our financial condition. Disputes between Chemours and Dupont may also arise with respect to indemnification matters, including disputes based on matter of law or contract interpretation. If and to the extent these disputes arise, they could materially adversely affect us.

21

Table of Contents

Third parties could also seek to hold us responsible for any of the liabilities of the DuPont businesses. DuPont has agreed to indemnify us for such liabilities, but such indemnity from DuPont may not be sufficient to protect us against the full amount of such liabilities, and DuPont may not be able to fully satisfy its indemnification obligations. Moreover, even if we ultimately succeed in recovering from DuPont any amounts for which we are held liable, we may be temporarily required to bear these losses ourselves. Each of these risks could negatively affect our business, financial condition, results of operations and cash flows. See Note 19 to the Consolidated Financial Statements for further information.

***In connection with our separation, we were required to enter into numerous separation-related and commercial agreements with our former parent company, DuPont, which may not reflect optimal or commercially beneficial terms to Chemours.***

Commercial agreements we entered into with DuPont in connection with the separation were negotiated in the context of the separation while we were still a wholly-owned subsidiary of DuPont. Accordingly, during the period in which the terms of those agreements were negotiated, we did not have an independent board of directors or management independent of DuPont. Certain commercial agreements, having long terms and commercially advantageous cancellation and assignment rights to DuPont, may not include adjustments for changes in industry and market conditions. There is a risk that the pricing and other terms under these agreements may not be commercially beneficial and may not be able to be renegotiated in the future. The terms relate to, among other things, the allocation of assets, liabilities, rights and obligations, including the provision of products and services and the sharing and operation of property, manufacturing, office and laboratory sites, and other commercial rights and obligations between DuPont and us.

***Our ability to close or divest businesses and assets under our announced transformation plan and make future strategic decisions regarding our manufacturing operations may be adversely affected to the extent we are dependent upon consents or cooperation from DuPont under the agreements entered into between us and DuPont as part of the separation.***

Pursuant to the separation agreement, the employee matters agreement, the tax matters agreement and the intellectual property cross-license agreement, and related agreements entered into prior to separation, we may need to obtain DuPont's consent, cooperation, services, records or information in order to effect the strategic divestitures contemplated under our announced transformation plan. Our inability to receive, or delays in receiving, such consents, cooperation, services, records or information may adversely affect our ability to execute upon our transformation plan or reduce our strategic or operational flexibility.

In addition, we periodically assess our manufacturing operations in order to manufacture and distribute our products in the most efficient manner. Based on our assessments, we may make strategic decisions regarding our manufacturing operations such as capital improvements to modernize certain units, move manufacturing or distribution capabilities from one plant or facility to another plant or facility, discontinue manufacturing or distributing certain products or close or divest all or part of a manufacturing plant or facility, some of which have significant shared services and lease agreements with DuPont. These agreements may adversely impact our ability to take these strategic decisions regarding out manufacturing operations. Further, if such agreements are terminated or revised, we would have to assess and potentially adjust our manufacturing operations, the closure or divestiture of all or part of a manufacturing plant or facility that could result in future charges that could be significant.

***Expansion or improvement of our existing facilities may not result in revenue and profitability increases and will be subject to regulatory, environmental, political, legal and economic risks, which could adversely affect our results of operations and financial condition.***

One of the ways we may improve our business is through the expansion or improvement of our existing facilities, such as the current work being done to expand our Altamira $TiO_2$ facility and the planned expansion of our Cyanides facility. Construction of additions or modifications to facilities involves numerous regulatory, environmental, political, legal and economic uncertainties that are beyond our control.  Such expansion or improvement projects may also require the expenditure of significant amounts of capital, and financing may not be available on economically acceptable terms or at all. As a result, these projects may not be completed on schedule, at the budgeted cost, or at all. Moreover, our revenue may not increase immediately upon the expenditure of funds on a particular project. As a result, we may not be able to realize our expected investment return, which could adversely affect our results of operations and financial condition.

***We are a holding company that is dependent on cash flows from our operating subsidiaries to fund our debt obligations, capital expenditures and ongoing operations.***

All of our operations are conducted and all of our assets are owned by our operating companies, which are our subsidiaries. We intend to continue to conduct our operations at the operating companies and any future subsidiaries.  Consequently, our cash flow and our ability to meet our obligations or make cash distributions depends upon the cash flow of our operating companies and any future subsidiaries, and the payment of funds by our operating companies and any future subsidiaries in the form of dividends or

22

Table of Contents

otherwise. The ability of our operating companies and any future subsidiaries to make any payments to us depends on their earnings, the terms of their indebtedness, including the terms of any credit facilities, and legal restrictions regarding the transfer of funds.

Our debt is generally the exclusive obligation of The Chemours Company and our guarantor subsidiaries. Because a significant portion of our operations are conducted by nonguarantor subsidiaries, our cash flow and our ability to service indebtedness, including our ability to pay the interest on our debt when due and principal of such debt at maturity, are dependent to a large extent upon cash dividends and distributions or other transfers from such nonguarantor subsidiaries. Any payment of dividends, distributions, loans or advances by our nonguarantor subsidiaries to us could be subject to restrictions on dividends or repatriation of earnings under applicable local law, monetary transfer restrictions and foreign currency exchange regulations in the jurisdictions in which our subsidiaries operate, and any restrictions imposed by the current and future debt instruments of our nonguarantor subsidiaries. In addition, payments to us by our subsidiaries are contingent upon our subsidiaries' earnings.

Our subsidiaries are separate legal entities and, except for our guarantor subsidiaries, have no obligation, contingent or otherwise, to pay any amounts due on our debt or to make any funds available for those amounts, whether by dividends, loans, distributions or other payments, and do not guarantee the payment of interest on, or principal of, our debt. Any right that we have to receive any assets of any of our subsidiaries that are not guarantors upon the liquidation or reorganization of any such subsidiary, and the consequent right of holders of notes to realize proceeds from the sale of their assets, will be structurally subordinated to the claims of that subsidiary's creditors, including trade creditors and holders of debt issued by that subsidiary.

***If our intangible assets or other long-lived assets become impaired, we may be required to record a significant charge to earnings.***

We have a significant amount of intangible assets and other long-lived assets on our consolidated balance sheet. Under U.S. GAAP, we review our intangible assets and other long-lived assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Factors that may be considered a change in circumstances, indicating that the carrying value of our intangible assets and other long-lived assets may not be recoverable, include, but are not limited to, a significant decline in share price and market capitalization, changes in the industries in which we operate, particularly the impact of a downturn in the global economy, as well as competition or other factors leading to reduction in expected long-term sales or profitability. We may be required to record a significant noncash charge in our financial statements during the period in which any impairment of our intangible assets and other long-lived assets is determined, negatively impacting our results of operations.

***Differences in views with our joint venture participants may cause our joint ventures not to operate according to their business plans, which may adversely affect our results of operations.***

We currently participate in a number of joint ventures and may enter into additional joint ventures in the future. The nature of a joint venture requires us to share control with unaffiliated third parties. Differences in views among joint venture participants may result in delayed decisions or failure to agree on major decisions. If these differences cause the joint ventures to deviate from their business plans or to fail to achieve their desired operating performance, our results of operations could be adversely affected.

***Our failure to comply with the anti-corruption laws of the United States and various international jurisdictions could negatively impact our reputation and results of operations.***

Doing business on a global basis requires us to comply with the laws and regulations of the U.S. government and those of various international and sub-national jurisdictions, and our failure to successfully comply with these rules and regulations may expose us to liabilities. These laws and regulations apply to companies, individual directors, officers, employees and agents, and may restrict our operations, trade practices, investment decisions and partnering activities. In particular, our international operations are subject to U.S. and foreign anti-corruption laws and regulations, such as the U.S. Foreign Corrupt Practices Act (the "FCPA"), the United Kingdom Bribery Act 2010 (the "Bribery Act") as well as anti-corruption laws of the various jurisdictions in which we operate. The FCPA, the Bribery Act and other laws prohibit us and our officers, directors, employees and agents acting on our behalf from corruptly offering, promising, authorizing or providing anything of value to foreign officials for the purposes of influencing official decisions or obtaining or retaining business or otherwise obtaining favorable treatment. Our global operations may expose us to the risk of violating, or being accused of violating, the foregoing or other anti-corruption laws. Such violations could be punishable by criminal fines, imprisonment, civil penalties, disgorgement of profits, injunctions and exclusion from government contracts, as well as other remedial measures. Investigations of alleged violations can be very expensive, disruptive, and damaging to our reputation. Although we have implemented anti-corruption policies and procedures since the separation, there can be no guarantee that these policies, procedures, and training will effectively prevent violations by our employees or representatives in the future. Additionally, we face a risk that our distributors and other business partners may violate the FCPA, the Bribery Act or similar laws or regulations. Such violations could expose us to FCPA and Bribery Act liability and/or our reputation may potentially be harmed by their violations and resulting sanctions and fines.

23

Table of Contents

**Risks Related to Our Indebtedness**

***Our significant indebtedness could adversely affect our financial condition, and we could have difficulty fulfilling our obligations under our indebtedness, which may have a material adverse effect on us.***

As of December 31, 2015, we had approximately $4.0 billion of indebtedness.  At December 31, 2015, together with the guarantors, we had approximately $1.5 billion of senior secured indebtedness outstanding, and had an additional $1.0 billion of capacity under the Revolving Credit Facility, all of which was senior secured indebtedness. In February 2016, we entered into an amendment to our Revolving Credit Facility which reduced its capacity to $750 million. Our significant level of indebtedness increases the risk that we may be unable to generate cash sufficient to pay amounts due in respect of our indebtedness. The level of our indebtedness could have other important consequences on our business, including:

- making it more difficult for us to satisfy our obligations with respect to indebtedness;

- increasing our vulnerability to adverse changes in general economic, industry and competitive conditions;

- requiring us to dedicate a significant portion of our cash flow from operations to make payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital and other general corporate purposes;

- limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- restricting us from capitalizing on business opportunities;

- placing us at a competitive disadvantage compared to our competitors that have less debt;

- limiting our ability to borrow additional funds for working capital, acquisitions, debt service requirements, execution of our business strategy or other general corporate purposes;

- limiting our ability to enter into certain commercial arrangements because of concerns of counterparty risks; and

- limiting our ability to adjust to changing market conditions and placing us at a competitive disadvantage compared to our competitors that have less debt.

The occurrence of any one or more of these circumstances could have a material adverse effect on us.

***Despite our significant level of indebtedness, we may be able to incur substantially more debt and enter into other transactions which could further exacerbate the risks to our financial condition described above.***

Notwithstanding our significant level of indebtedness, we may be able to incur significant additional indebtedness in the future, including additional secured indebtedness that would be effectively senior to the notes (including up to $750 million of available capacity under the Revolving Credit Facility pursuant to the February 2016 amendment). Although the indenture that governs the notes and the credit agreement that governs the Senior Secured Credit Facilities contain restrictions on our ability to incur additional indebtedness and to enter into certain types of other transactions, these restrictions are subject to a number of significant qualifications and exceptions. Additional indebtedness incurred in compliance with these restrictions, including secured indebtedness, could be substantial. These restrictions also do not prevent us from incurring obligations, such as trade payables, that do not constitute indebtedness as defined under our debt instruments. To the extent such new debt is added to our current debt levels, the substantial leverage risks described in the immediately preceding risk factor would increase.

***We may need additional capital in the future and may not be able to obtain it on favorable terms.***

Our industry is capital intensive, and we may require additional capital in the future to finance our growth and development, implement further marketing and sales activities, fund ongoing research and development activities and meet general working capital needs. Our capital requirements will depend on many factors, including acceptance of and demand for our products, the extent to which we invest in new technology and research and development projects, and the status and timing of these developments, as well as general availability of capital from debt and/or equity markets.

However, debt or equity financing may not be available to us on terms we find acceptable, if at all. Also, regardless of the terms of our debt or equity financing, our agreements and obligations under the tax matters agreement may limit our ability to issue stock. For a more detailed discussion, see risk factor "*We agreed to numerous restrictions to preserve the tax-free treatment of the transactions in the United States, which may reduce our strategic and operating flexibility.*" If we are unable to raise additional capital when needed, our financial condition could be materially and adversely affected.

24

Table of Contents

Additionally, our failure to maintain the credit ratings on our debt securities, including the notes, could negatively affect our ability to access capital and could increase our interest expense on future indebtedness. We expect the credit rating agencies to periodically review our capital structure and the quality and stability of our earnings. Deterioration in our capital structure or the quality and stability of our earnings could result in a downgrade of the credit ratings on our debt securities. Any negative rating agency actions could constrain the capital available to us, reduce or eliminate available borrowing to us and could limit our access to and/or increase the cost of funding our operations. If, as a result, our ability to access capital when needed becomes constrained, our interest costs could increase, which could have material adverse effect on our results of operations, financial condition and cash flows.

***Our variable rate indebtedness subjects us to interest rate risk, which could cause our indebtedness service obligations to increase significantly.***

Our borrowings under the Senior Secured Credit Facilities are at variable rates and expose us to interest rate risk. As a result, if interest rates increase, our debt service obligations under the Senior Secured Credit Facilities or other variable rate debt would increase even though the amount borrowed remained the same, and our net income and cash flows, including cash available for servicing our indebtedness, would correspondingly decrease. As of December 31, 2015, we had approximately $1.5 billion of our outstanding debt at variable interest rates.

***We may be unable to service our indebtedness, including the notes.***

Our ability to make scheduled payments on and to refinance our indebtedness, including the notes, depends on and is subject to our financial and operating performance, which in turn is affected by general and regional economic, financial, competitive, business and other factors (many of which are beyond our control), including the availability of financing in the international banking and capital markets. We cannot be certain that our business will generate sufficient cash flow from operations or that future borrowings will be available to us in an amount sufficient to enable us to service our debt, including the notes, to refinance our debt or to fund our other liquidity needs.

If we are unable to meet our debt service obligations or to fund our other liquidity needs, we will need to restructure or refinance all or a portion of our debt, including the notes. Failure to successfully restructure or refinance our debt could cause us to default on our debt obligations and would impair our liquidity. Our ability to restructure or refinance our debt will depend on the condition of the capital markets and our financial condition at such time. Any refinancing of our indebtedness could be at higher interest rates and may require us to comply with more onerous covenants that could further restrict our business operations.

Moreover, in the event of a default of our debt service obligations, the holders of the applicable indebtedness, including the notes and the Senior Secured Credit Facilities, could elect to declare all the funds borrowed to be due and payable, together with accrued and unpaid interest. We cannot be certain that our assets or cash flows would be sufficient to fully repay borrowings under our outstanding debt instruments if accelerated upon an event of default. First, a default in our debt service obligations in respect of the notes would result in a cross default under the Senior Secured Credit Facilities. The foregoing would permit the lenders under the Revolving Credit Facility to terminate their commitments thereunder and cease making further loans, and would allow the lenders under the Senior Secured Credit Facilities to declare all loans immediately due and payable and to institute foreclosure proceedings against their collateral, which could force us into bankruptcy or liquidation. Second, any event of default or declaration of acceleration under the Senior Secured Credit Facilities or any other agreements relating to our outstanding indebtedness under which the total amount of outstanding indebtedness exceeds $100 million could also result in an event of default under the indenture governing the notes, and any event of default or declaration of acceleration under any other of our outstanding indebtedness may also contain a cross-default provision. Any such default, event of default or declaration of acceleration could materially and adversely affect our results of operation and financial condition.

***The agreements governing our indebtedness restrict our current and future operations, particularly our ability to respond to changes or to take certain actions.***

The agreements governing our indebtedness, including the notes, contain, and the agreements governing future indebtedness and future debt securities may contain, significant restrictive covenants and, in the case of the Revolving Credit Facility, financial maintenance covenants that will limit our operations, including our ability to engage in activities that may be in our long-term best interests. These restrictive covenants may limit us, and our restricted subsidiaries, from taking, or give rights to the holders of our indebtedness in the event of the following actions:

- incurring additional indebtedness and guaranteeing indebtedness;

- paying dividends or making other distributions in respect of, or repurchasing or redeeming, our capital stock;

25

Table of Contents

- making acquisitions or other investments;

- prepaying, redeeming or repurchasing certain indebtedness;

- selling or otherwise disposing of assets;

- selling stock of our subsidiaries;

- incurring liens;

- entering into transactions with affiliates;

- entering into agreements restricting our subsidiaries' ability to pay dividends;

- entering into transactions that result in a change of control of us; and

- consolidating, merging or selling all or substantially all of our assets.

Our failure to comply with those covenants could result in an event of default that, if not cured or waived, could result in the acceleration of some or all of our indebtedness, which could lead us to bankruptcy, reorganization or insolvency.

**Risks Related to the Separation**

***We may be unable to achieve some or all of the benefits that we expected to achieve from our separation from DuPont.***

As an independent, publicly-traded company, we continue to, among other things, focus our financial and operational resources on our specific business, growth profile and strategic priorities, design and implement corporate strategies and policies targeted to our operational focus and strategic priorities, guide our processes and infrastructure to focus on our core strengths, implement and maintain a capital structure designed to meet our specific needs and more effectively respond to industry dynamics, all of which are benefits we expected to achieve from our separation. However, we may be unable to fully achieve some or all of these benefits. For example, in order to position ourselves for the separation and distribution, we undertook a series of strategic, structural and process realignment and restructuring actions within our operations. These actions may not provide the benefits we expected, and could lead to disruption of our operations, loss of, or inability to recruit, key personnel needed to operate and grow our businesses following the separation and distribution, weakening of our internal standards, controls or procedures and impairment of our key customer and supplier relationships. If we fail to achieve some or all of the benefits that we expected to achieve as an independent company, or do not achieve them in the time we expected, our business, financial condition and results of operations could be materially and adversely affected.

***If the distribution, together with certain related transactions, were to fail to qualify for non-recognition treatment for U.S. federal income tax purposes, then we could be subject to significant tax and indemnification liability and stockholders receiving our common stock in the distribution could be subject to significant tax liability.***

DuPont received an IRS Ruling from the IRS substantially to the effect that, among other things, the distribution qualified as a tax-free transaction under Section 355 and Section 368(a)(1)(D) of the Internal Revenue Code (the Code). The tax-free nature of the distribution was conditioned on the continued validity of the IRS Ruling, as well as on receipt of a tax opinion, in form and substance acceptable to DuPont, substantially to the effect that, among other things, the distribution would qualify as a tax-free transaction under Section 355 and Section 368(a)(1)(D) of the Code, and certain transactions related to the transfer of assets and liabilities to us in connection with the separation and distribution would not result in the recognition of any gain or loss to DuPont, us or our stockholders. The IRS Ruling and the tax opinion relied on certain facts, assumptions, and undertakings, and certain representations from DuPont and us, regarding the past and future conduct of both respective businesses and other matters, and the tax opinion relies on the IRS Ruling. Notwithstanding the IRS Ruling and the tax opinion, the IRS could determine that the distribution or such related transactions should be treated as a taxable transaction if it determines that any of these facts, assumptions, representations, or undertakings were not correct, or that the distribution should be taxable for other reasons, including if the IRS were to disagree with the conclusions in the tax opinion that are not covered by the IRS Ruling.

If the distribution ultimately was determined to be taxable, then a stockholder of DuPont that received shares of our common stock in the distribution would be treated as having received a distribution of property in an amount equal to the fair market value of such shares on the distribution date and could incur significant income tax liabilities. Such distribution would be taxable to such stockholder as a dividend to the extent of DuPont's current and accumulated earnings and profits. Any amount that exceeded DuPont's earnings and profits would be treated first as a non-taxable return of capital to the extent of such stockholder's tax basis in its shares of DuPont stock with any remaining amount being taxed as a capital gain. DuPont would recognize a taxable gain in

26

Table of Contents

an amount equal to the excess, if any, of the fair market value of the shares of our common stock held by DuPont on the distribution date over DuPont's tax basis in such shares. In addition, if certain related transactions fail to qualify for tax-free treatment under U.S. federal, state and/or local tax law and/or foreign tax law, we and DuPont could incur significant tax liabilities under U.S. federal, state, local and/or foreign tax law.

Generally, taxes resulting from the failure of the separation and distribution or certain related transactions to qualify for non-recognition treatment under U.S. federal, state and/or local tax law and/or foreign tax law would be imposed on DuPont or DuPont's stockholders and, under the tax matters agreement that we entered into with DuPont prior to the spin-off, DuPont is generally obligated to indemnify us against such taxes to the extent that we may be jointly, severally or secondarily liable for such taxes. However, under the terms of the tax matters agreement, we are also generally responsible for any taxes imposed on DuPont that arise from the failure of the distribution to qualify as tax-free for U.S. federal income tax purposes within the meaning of Section 355 of the Code or the failure of such related transactions to qualify for tax-free treatment, to the extent such failure to qualify is attributable to actions, events or transactions relating to our, or our affiliates', stock, assets or business, or any breach of our or our affiliates' representations, covenants or obligations under the tax matters agreement (or any other agreement we enter into in connection with the separation and distribution), the materials submitted to the IRS or other governmental authorities in connection with the request for the IRS Ruling or other tax rulings or the representation letter provided to counsel in connection with the tax opinion. Events triggering an indemnification obligation under the agreement include events occurring after the distribution that cause DuPont to recognize a gain under Section 355(e) of the Code. Such tax amounts could be significant. To the extent we are responsible for any liability under the tax matters agreement, there could be a material adverse impact on our business, financial condition, results of operations and cash flows in future reporting periods.

***We are subject to continuing contingent tax-related liabilities of DuPont.***

There are several significant areas where the liabilities of DuPont may become our obligations. For example, under the Code and the related rules and regulations, each corporation that was a member of DuPont's consolidated tax reporting group during any taxable period or portion of any taxable period ending on or before the effective time of the distribution is jointly and severally liable for the U.S. federal income tax liability of the entire consolidated tax reporting group for such taxable period. In connection with the separation and distribution, we entered into a tax matters agreement with DuPont that allocates the responsibility for prior period taxes of DuPont's consolidated tax reporting group between us and DuPont. If DuPont were unable to pay any prior period taxes for which it is responsible, however, we could be required to pay the entire amount of such taxes, and such amounts could be significant. Other provisions of federal, state, local, or foreign law may establish similar liability for other matters, including laws governing tax-qualified pension plans, as well as other contingent liabilities.

***We agreed to numerous restrictions to preserve the tax-free treatment of the transactions in the U.S., which may reduce our strategic and operating flexibility.***

Our ability to engage in significant equity transactions could be limited or restricted in order to preserve, for U.S. federal income tax purposes, the tax-free nature of the distribution by DuPont. Even if the distribution otherwise qualifies for tax-free treatment under Section 355 of the Code, the distribution may result in corporate-level taxable gain to DuPont under Sections 355(e) and 368(a)(1)(D) of the Code if 50 percent or more, by vote or value, of shares of our stock or DuPont's stock are acquired or issued as part of a plan or series of related transactions that includes the distribution. The process for determining whether an acquisition or issuance triggering these provisions has occurred is complex, inherently factual and subject to interpretation of the facts and circumstances of a particular case. Any acquisitions or issuances of our stock or DuPont's stock within a two-year period after the distribution generally are presumed to be part of such a plan, although we or DuPont, as applicable, may be able to rebut that presumption. Accordingly, under the tax matters agreement entered into prior to the spin-off, for the two-year period following the distribution, we are prohibited, except in certain circumstances, from:

- entering into any transaction resulting in the acquisition of 40 percent or more of our stock or substantially all of our assets, whether by merger or otherwise;

- merging, consolidating or liquidating;

- issuing equity securities beyond certain thresholds;

- repurchasing our capital stock; or

- ceasing to actively conduct our business.

27

Table of Contents

These restrictions may limit our ability to pursue certain strategic transactions or other transactions, including our transformation plans, that we may believe to otherwise be in our best interests or that might increase the value of our business. In addition, under the tax matters agreement, we are required to indemnify DuPont against any such tax liabilities as a result of the acquisition of our stock or assets, even if we do not participate in or otherwise facilitate the acquisition.

***We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate efficiently as an independent company.***

We historically operated as part of DuPont's corporate organization, and DuPont assisted us by providing various corporate functions. Following the separation and distribution, DuPont has no obligation to provide us with assistance other than certain transition services. These services do not include every service we received from DuPont in the past, and DuPont is only obligated to provide these services for limited periods from the distribution date. Accordingly, following the separation and distribution, we need to provide internally or obtain from unaffiliated third parties the services we received from DuPont. These services include information technology, research and development, finance, legal, insurance, compliance and human resources activities, the effective and appropriate performance of which is critical to our operations. We may be unable to replace these services in a timely manner or on terms and conditions as favorable as those we received from DuPont.  In particular, DuPont's information technology networks and systems are complex, and duplicating these networks and systems will be challenging. Because our business previously operated as part of the wider DuPont organization, we may be unable to successfully establish the infrastructure or implement the changes necessary to operate independently, or we may incur additional costs that could adversely affect our business.

There is a risk that, since separating from DuPont, we are more susceptible to market fluctuations and other adverse events than we would have been if we were still a part of DuPont's organizational structure. As part of DuPont, we were able to enjoy certain benefits from DuPont's operating diversity, purchasing power and opportunities to pursue integrated strategies with DuPont's other businesses. As an independent, publicly traded company, we do not have similar diversity or integration opportunities and do not have similar purchasing power or access to capital markets. Additionally, as part of DuPont, we were able to leverage the DuPont historical market reputation and performance and brand identity to recruit and retain key personnel to run our business. As an independent, publicly traded company, we do not have the same historical market reputation and performance or brand identity as DuPont and it may be more difficult for us to recruit or retain such key personnel.

**Risks Related to Our Common Stock**

***Our stock price could become more volatile and investments could lose value.***

The market price of our common stock and the number of shares traded each day has experienced significant fluctuations since our separation from DuPont and may continue to fluctuate significantly. The market price for our common stock may be affected by a number of factors, including, but not limited to:

•    our quarterly or annual earnings, or those of other companies in our industry;

•    actual or anticipated fluctuations in our operating results;

•    changes in earnings estimates by securities analysts or our ability to meet those estimates or our earnings guidance;

•    anticipated outcomes or resolutions of legal or other contingencies;

•    the operating and stock price performance of other comparable companies;

•    credit rating agency actions;

•    a change in our dividend or stock repurchase activities;

•    changes in rules or regulations applicable to our business;

•    the announcement of new products by us or our competitors;

•    overall market fluctuations and domestic and worldwide economic conditions; and

•    other factors described in these "Risk Factors" and elsewhere in this Form 10-K.

28

Table of Contents

A significant drop in our stock price, such as that experienced in the period from July 1, 2015 to the date of this filing, could expose us to costly and time-consuming litigation, which could result in substantial costs and divert management's attention and resources, resulting in an adverse effect on our business.

***We cannot guarantee the timing, amount, or payment of dividends on our common stock in the future.***

The declaration, payment and amount of any dividend are subject to the sole discretion of our Board of Directors and, in the context of our financial policy, will depend upon many factors, including our financial condition and prospects, our capital requirements and access to capital markets, covenants associated with certain of our debt obligations, legal requirements and other factors that our Board of Directors may deem relevant, and there can be no assurances that we will continue to pay a dividend in the future.

***A stockholder's percentage of ownership in us may be diluted in the future.***

A stockholder's percentage ownership in us may be diluted because of equity issuances for acquisitions, capital market transactions or otherwise, including, without limitation, equity awards that we may be granting to our directors, officers and employees. Such issuances may have a dilutive effect on our earnings per share, which could adversely affect the market price of our common stock.

In addition, our amended and restated certificate of incorporation authorizes us to issue, without the approval of our stockholders, one or more classes or series of preferred stock having such designation, powers, preferences and relative, participating, optional and other special rights, including preferences over our common stock with respect to dividends and distributions, as our board of directors generally may determine. The terms of one or more classes or series of preferred stock could dilute the voting power or reduce the value of our common stock. For example, we could grant the holders of preferred stock the right to elect some number of our directors in all events or on the happening of specified events or to veto specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we could assign to holders of preferred stock could affect the residual value of our common stock.

***Certain provisions in our amended and restated certificate of incorporation and amended and restated by-laws, and of Delaware law, may prevent or delay an acquisition of us, which could decrease the trading price of the common stock.***

Our amended and restated certificate of incorporation and amended and restated by-laws contain, and Delaware law contains, provisions that are intended to deter coercive takeover practices and inadequate takeover bids by making such practices or bids unacceptably expensive to the bidder and to encourage prospective acquirers to negotiate with our Board of Directors rather than to attempt a hostile takeover. These provisions include, among others:

- the inability of our stockholders to act by written consent;

- the limited ability of our stockholders to call a special meeting;

- rules regarding how stockholders may present proposals or nominate directors for election at stockholder meetings;

- the right of our board of directors to issue preferred stock without stockholder approval;

- the division of our board of directors into three approximately equal classes of directors, with each class serving a staggered three-year term, which will result in, under Delaware law, stockholders only being permitted to remove directors for cause;

- the ability of our directors, and not stockholders, to fill vacancies (including those resulting from an enlargement of the board of directors) on our board of directors; and

- the requirement that stockholders holding at least 80 percent of our voting stock are required to amend certain provisions in our amended and restated certificate of incorporation and our amended and restated by-laws.

In addition, we are subject to Section 203 of the Delaware General Corporations Law (the DGCL). Section 203 provides that, subject to limited exceptions, persons that (without prior board approval) acquire, or are affiliated with a person that acquires, more than 15 percent of the outstanding voting stock of a Delaware corporation shall not engage in any business combination with that corporation, including by merger, consolidation or acquisitions of additional shares, for a three-year period following the date on which that person or its affiliate becomes the holder of more than 15 percent of the corporation's outstanding voting stock.

We believe these provisions will protect our stockholders from coercive or otherwise unfair takeover tactics by requiring potential acquirers to negotiate with our board of directors and by providing our board of directors with more time to assess any

Table of Contents

acquisition proposal. These provisions are not intended to make us immune from takeovers. However, these provisions will apply even if an acquisition proposal or offer may be considered beneficial by some stockholders and could delay or prevent an acquisition that our board of directors determines is not in our best interests and our stockholders'. These provisions may also prevent or discourage attempts to remove and replace incumbent directors.

Several of the agreements that we have entered into with DuPont require DuPont's consent to any assignment by us of our rights and obligations, or a change of control of us, under the agreements. The consent rights set forth in these agreements might discourage, delay or prevent a change of control that a stockholder may consider favorable.

In addition, an acquisition or further issuance of our stock could trigger the application of Section 355(e) of the Code. Under the tax matters agreement executed prior to the spin-off, we would be required to indemnify DuPont for the tax imposed under Section 355(e) of the Code resulting from an acquisition or issuance of its stock, even if it did not participate in or otherwise facilitate the acquisition, and this indemnity obligation might discourage, delay or prevent a change of control that a stockholder may consider favorable. Please see the risk factor "*If the distribution, together with certain related transactions, were to fail to qualify for non-recognition treatment for U.S. federal income tax purposes, then we could be subject to significant tax and indemnification liability and stockholders receiving our common stock in the distribution could be subject to significant tax liability.*" for further information.

## Item 1B. UNRESOLVED STAFF COMMENTS

None.

## Item 2. PROPERTIES

### Chemours Production Facilities and Technical Centers

Our corporate headquarters is in Wilmington, Delaware, and we maintain a global network of production facilities and technical centers located in cost-effective and strategic locations. We also use contract manufacturing and joint venture partners in order to provide regional access or to lower manufacturing costs as appropriate. The following chart lists our production facilities as of December 31, 2015:

**Production Facilities**

| | Titanium Technologies | Fluoroproducts | Chemical Solutions | Shared Locations |
|---|---|---|---|---|
| North America | DeLisle, MS<br>New Johnsonville, TN<br>Starke, FL (Mine) | El Dorado, AR [1]<br>Elkton, MD [1]<br>Louisville, KY<br>Fayetteville, NC<br>Deepwater, NJ<br>Corpus Christi, TX<br>LaPorte, TX [2]<br>Washington, WV<br>Maitland, Canada | Red Lion, DE [1]<br>Wurtland, KY<br>Burnside, LA<br>Pascagoula, MS<br>Morses Mill, NJ [1]<br>Niagara, NY [4]<br>Fort Hill, OH<br>N. Kingstown, RI [1]<br>Memphis, TN<br>Beaumont, TX [5]<br>Borderland, TX [1]<br>James River, VA | Belle, WV [3] |
| Europe, Middle East & Africa (EMEA) | | Mechelen, Belgium<br>Villers St. Paul, France [1]<br>Dordrecht, Netherlands | Sudbury, UK | |
| Latin America | Altamira, Mexico | Barra Mansa, Brazil [2] | | |
| Asia Pacific | Kuan Yin, Taiwan | Changshu, China<br>Chiba, Japan<br>(Joint Venture)<br>Shimizu, Japan<br>(Joint Venture) | | |

Table of Contents

[1] Leased from third party.

[2] Leased from DuPont.

[3] Shared facility between the Chemical Solutions and Fluoroproducts segments.

[4] During the fourth quarter of 2015, the Company announced its plan to stop production at this facility by the end of 2016. See the Recent Developments section in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, and Note 6 to the Consolidated Financial Statements for further information regarding our plans for this facility.

[5] At December 31, 2015, this location was classified as held-for-sale.

We have technical centers and R&D facilities located at a number of our production facilities. We also maintain standalone technical centers to serve our customers and provide technical support. The following chart lists our standalone technical centers as of December 31, 2015:

| | | Technical Centers | | |
|---|---|---|---|---|
| Region | Titanium Technologies | Fluoroproducts | Chemical Solutions | Shared Locations |
| North America | | Akron, OH [2] | | Wilmington, DE (All Segments) [2, 3] |
| EMEA | Moscow, Russia [1] | Mechelen, Belgium [1] Mantes, France [1] Meyrin, Switzerland [2] | | |
| Latin America | Paulinia, Brazil [2] Mexico City, Mexico [1] | | | |
| Asia Pacific | | Utsonomyia, Japan [2] | | Shanghai, China [2] (All Segments) |

[1] Leased from third party.

[2] Leased from DuPont.

[3] There are two facilities at this location.

Chemours' plants and equipment are maintained and in good operating condition. Chemours believes it has sufficient production capacity for its primary products to meet demand in 2016. Properties are primarily owned by Chemours; however, certain properties are leased, as noted in the preceding tables.

Chemours recognizes that the security and safety of its operations are critical to its employees, community, and to the future of Chemours. Physical security measures have been combined with process safety measures (including the use of inherently safer technology), administrative procedures and emergency response preparedness into an integrated security plan. Prior to the separation, DuPont conducted vulnerability assessments at operating facilities in the U.S. and high priority sites worldwide and identified and implemented appropriate measures to protect these facilities from physical and cyber-attacks. Chemours intends to conduct similar vulnerability assessments periodically in the future. Chemours is partnering with carriers, including railroad, shipping and trucking companies, to secure chemicals in transit.

**Item 3. LEGAL PROCEEDINGS**

**Legal Proceedings**

The Company is subject to various litigation matters, including, but not limited to, product liability, patent infringement, antitrust claims and claims for third party property damage or personal injury stemming from alleged environmental torts. Information regarding certain of these matters is set forth below and in Note 19 to the Consolidated Financial Statements.

Table of Contents

**Litigation**

*PFOA: Environmental and Litigation Proceedings*

For purposes of this report, the term PFOA means collectively perfluorooctanoic acid and its salts, including the ammonium salt and does not distinguish between the two forms. Information related to this matter is included in Note 19 to the Consolidated Financial Statements under the heading PFOA.

**Environmental Proceedings**

*LaPorte Plant, LaPorte, Texas*

The U.S. Environmental Protection Agency (EPA) conducted a multimedia inspection at the DuPont LaPorte facility in January 2008. DuPont, the EPA and the Department of Justice (DOJ) began discussions in the fall of 2011 relating to the management of certain materials in the facility's waste water treatment system, hazardous waste management, flare and air emissions. These negotiations continue.

*Beaumont Plant, Nederland, Texas*

On September 10, 2015, the Company agreed to a proposed order from the Texas Commission on Environmental Quality to resolve an alleged violation of its air quality permits at the Beaumont facility. The TCEQ commissioners approved the agreed order on enforcement that included an administrative penalty in the amount of approximately $128,000.

*Wurtland Plant, Wurtland, Kentucky*

DuPont signed a Consent Decree in 2007 in which it agreed to retrofit its four sulfuric acid plants, including the Wurtland Plant. After the retrofitting was complete, the Wurtland plant conducted a test burn in 2012 as required by the Decree. The EPA concluded the test burn did not demonstrate compliance and required a second trial burn in 2013, which the EPA found satisfactory. The DOJ is seeking stipulated penalties on the grounds that compliance was not demonstrated in 2012, and the plant failed to provide timely notice of the 2012 test, as required by the Decree. Negotiations with the DOJ are ongoing.

**Item 4. MINE SAFETY DISCLOSURES**

Information regarding mine safety and other regulatory actions at the Company's surface mine in Starke, Florida is included in Exhibit 95 to this report.

**EXECUTIVE OFFICERS OF THE REGISTRANT**

The following is a list of the executive officers and a summary of their professional experience:

*Mark P. Vergnano*, age 58, serves as our President and Chief Executive Officer. In October 2009, Mr. Vergnano was appointed Executive Vice President of DuPont and was responsible for multiple businesses and functions, including the businesses in the Chemours segment: DuPont Chemicals & Fluoroproducts and Titanium Technologies. In June 2006, he was named Group Vice President of DuPont Safety & Protection. In October 2005, he was named Vice President and General Manager - Surfaces and Building Innovations. In February 2003, he was named Vice President and General Manager -Nonwovens. Prior to that, he had several assignments in manufacturing, technology, marketing, sales and business strategy. Mr. Vergnano joined DuPont in 1980 as a process engineer. Mr. Vergnano serves on the board of directors of Johnson Controls, Inc., since 2011; the National Safety Council, since 2007; and the American Chemistry Council, since 2015.

Table of Contents

*Mark E. Newman*, age 52, serves as our Senior Vice President and Chief Financial Officer. Mr. Newman joined Chemours in November 2014 from SunCoke Energy where he was SunCoke Energy's Senior Vice President and Chief Financial Officer and led its financial, strategy, business development and information technology functions. Mr. Newman joined SunCoke's leadership team in March 2011 to help drive SunCoke's separation from its parent company, Sunoco, Inc. He led SunCoke through an initial public offering and championed a major restructuring of SunCoke, which resulted in the initial public offering of SunCoke Energy Partners in January 2013, creating the first coke-manufacturing master limited partnership. Prior to joining SunCoke, Mr. Newman served as Vice President Remarketing & Managing Director of SmartAuction, Ally Financial Inc (previously General Motors Acceptance Corporation). Mr. Newman began his career at General Motors in 1986 as an Industrial Engineer and progressed through several financial and operational leadership roles within the global automaker, including Vice President and Chief Financial Officer of Shanghai General Motors Limited; Assistant Treasurer of General Motors Corporation; and North America Vice President and CFO.

*E. Bryan Snell*, age 59, serves as our President - Titanium Technologies. Mr. Snell was appointed President - Titanium Technologies in May 2015. Previously, he served as Planning Director - DuPont Performance Chemicals (2014-2015). Prior to that, he held leadership positions in DuPont Titanium Technologies, including Planning Director (2011-12 in Wilmington, DE and 2012-13 in Singapore) and Global Sales and Marketing Director (2008-2010). Mr. Snell served as Regional Operations Director - DuPont Coatings and Color Technologies Platform in 2007 and 2008. He was posted in Taiwan from 2002 to 2006, in the roles of Plant Manager -Kuan Yin Plant and Asia/Pacific Regional Director, DuPont Titanium Technologies. Mr. Snell joined DuPont in 1978 as a process engineer and has experience in nuclear and petrochemical operations, as well as sales, business strategy and M&A.

*Thierry F.J. Vanlancker*, age 51, serves as our President - Fluoroproducts. Mr. Vanlancker was named president - DuPont Chemicals & Fluoroproducts in May 2012. He was named vice president for DuPont Performance Coatings - EMEA in November 2010. In 2006, he moved to Wilmington, Delaware to serve as global business and market director - Fluorochemicals. In 2004, after two years as sales manager for all Refinish Brands EMEA, he was appointed as regional director - Fluoroproducts EMEA based in Geneva, Switzerland. He moved to Belgium in 1999 to be part of the Herberts Acquisition/Integration Team within the newly formed DuPont Performance Coatings business and in 2000 was appointed business manager for the Spies Hecker Refinish paint brand based in Cologne, Germany. In 1996, he transferred to Wilmington, Delaware as global technical service manager for P&IP and was appointed global product manager Vamac® ethylene acrylic elastomers in 1998. In 1993 he transferred to Bad Homburg, Germany, and was appointed market development consultant for P&IP Europe, Middle East & Africa (EMEA). Mr. Vanlancker joined DuPont in 1988 in Belgium as a sales representative.

*Christian W. Siemer*, age 57, serves as our President - Chemical Solutions. He moved to this role in July 2014. Mr. Siemer joined DuPont in 2010 as the Managing Director of Clean Technologies, a business unit of DuPont Sustainable Solutions focused on process technology development and licensing. He led the successful acquisition of MECS Inc., the global leader in technology for the production of sulfuric acid. Mr. Siemer began his career in 1980 with Stauffer Chemicals as a process engineer. Following Stauffer's acquisition by ICI plc, Mr. Siemer moved through a range of commercial roles and overseas assignments managing portfolios of international industrial and specialty chemical businesses.

*David C. Shelton*, age 52, serves as our Senior Vice President, General Counsel and Corporate Secretary. In 2011, Mr. Shelton was appointed Associate General Counsel, DuPont, and was responsible for the US Commercial team - the business lawyers and paralegals counseling all the DuPont business units with the exception of Agriculture and Pioneer. Mr. Shelton was the Commercial attorney to a variety of DuPont businesses including the Performance Materials platform, which he advised on international assignment in Geneva, and the businesses now comprising the DuPont Chemicals and Fluoroproducts business unit. Prior to that, Mr. Shelton advised the company on environmental and remediation matters as part of the environmental legal team. Mr. Shelton joined DuPont in 1996, after seven years in private practice as a litigator in Pennsylvania and New Jersey.

*Beth Albright*, age 49, serves as our Senior Vice President Human Resources. Mrs. Albright joined DuPont in October 2014 from Day & Zimmermann, where she held the position of Senior Vice-President Human Resources since May 2011. Prior to her experience at Day & Zimmermann, Mrs. Albright was the Global Vice President Human Resources for Tekni-Plex, which she joined in July 2009. She joined Rohm and Haas in 2000 and held various Human Resources supporting global businesses, technology, manufacturing and staff functions. In 1995 she joined FMC as site Human Resources manager at a manufacturing site and progressed into the corporate office. Mrs. Albright began her career with Fluor Daniel Construction in their Industrial Relations department in 1989.

*Erich Parker*, age 65, serves as our Vice President of Corporate Communications and Chief Brand Officer. Mr. Parker was appointed Creative Director and Global Director of Corporate Communications of DuPont in 2010. He led the initiative to develop corporate positioning and its creative expression through branded content and program sponsorship with large international media outlets. In 2008, Mr. Parker was appointed Communications Leader for DuPont's Safety and Protection Platform. Prior to joining DuPont,

33

Table of Contents

Mr. Parker was principal of his own public relations and marketing communications firm based in Washington, D.C., and New York. Mr. Parker has also served as Executive Vice President of Association & Issues Management; Director of Communications for the American Academy of Actuaries; founding publisher and Executive Editor of the magazine Contingencies; and Public Affairs Aide for Renewable Energy to the Secretary of Energy, U.S. Department of Energy.

34

Table of Contents

**PART II**

**Item 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market for Registrant's Common Equity and Related Stockholder Matters**

The company's common stock is listed on the New York Stock Exchange, Inc. (symbol CC). The number of record holders of common stock was approximately 56,880 at February 19, 2016.

Holders of the Company's common stock are entitled to receive dividends when they are declared by the Board of Directors. Dividends on common stock are generally declared and paid on a quarterly basis. The Stock Transfer Agent and Registrar is Computershare Trust Company, N.A.

The company's stock began trading on July 1, 2015. The quarterly high and low trading stock prices and dividends per common share for 2015 are shown below.

| 2015 | Market Prices | | Per Share Dividend Declared |
|---|---|---|---|
| | **High** | **Low** | |
| Fourth Quarter | 8.80 | 4.58 | $0.03 |
| Third Quarter | 16.68 | 5.94 | $0.55 [1] |

[1]  Dividend was declared prior to our separation from DuPont and paid on September 11, 2015 to our stockholders of record as of August 3, 2015.

**Unregistered Sales of Equity Securities**

Not Applicable.

**Issuer Purchases of Equity Securities**

Not Applicable.

35

Table of Contents

**Stock Performance Graph**

The following graph presents the cumulative total shareholder return for the Company's common stock compared with the Standard & Poor's (S&P) MidCap 400 index and the S&P MidCap 400 Chemical index since our separation from DuPont.



The graph assumes that the values of Chemours' common stock, the S&P MidCap 400 index, and S&P MidCap 400 Chemical index were each $100 on July 1, 2015, the date that Chemours' common stock began "regular-way" trading on the New York Stock Exchange, and that all dividends were reinvested.

On January 29, 2016, Chemours was moved from the S&P MidCap 400 index to the S&P SmallCap 600 index.

**Item 6. SELECTED FINANCIAL DATA**

The following table presents Chemours' selected financial data. For periods ended December 31, 2011 through 2014, and for the first six months of the year ended December 31, 2015, certain expenses of DuPont were allocated to Chemours for corporate functions including information technology, research and development, finance, legal, insurance, compliance and human resources activities prior to our spin-off on July 1, 2015. Consequently, the financial information included here may not necessarily reflect what Chemours' financial position, results of operations and cash flows would have been had it been an independent, publicly traded company during the periods presented. Certain reclassifications of prior years' data have been made to conform to the current year's presentation, primarily relating to the early adoption of balance sheet classification of deferred taxes discussed in Note 3 to the Consolidated Financial Statements.

For a better understanding, this section should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the Consolidated Financial Statements and accompanying notes included elsewhere in this Annual Report on Form 10-K.

Table of Contents

| *(Dollars in millions, except per share data)* | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2014** | **2013** | **2012** | **2011** |
| **Summary of operations:** | | | | | |
| Net sales | $ 5,717 | $ 6,432 | $ 6,859 | $ 7,365 | $ 7,972 |
| Employee separation and asset related charges, net | 333 | 21 | 2 | 36 | - |
| (Loss) income before income taxes | (188) | 550 | 576 | 1,485 | 1,907 |
| (Benefit from) provision for income taxes | (98) | 149 | 152 | 427 | 474 |
| Net (loss) income attributable to Chemours | (90) | 400 | 423 | 1,057 | 1,431 |
| Basic (loss) earnings per share of common stock [1] | (0.50) | 2.21 | 2.34 | 5.84 | 7.91 |
| Diluted (loss) earnings per share of common stock [1] | (0.50) | 2.21 | 2.34 | 5.84 | 7.91 |
| **Financial position at year end:** | | | | | |
| Working capital [2] | 835 | 543 | 474 | 601 | 585 |
| Total assets | 6,298 | 5,959 | 5,580 | 5,309 | 5,242 |
| Borrowings and capital lease obligations, net [3] | 3,954 | 1 | 1 | 1 | 2 |
| **General:** | | | | | |
| Purchases of property, plant and equipment | 519 | 604 | 438 | 432 | 355 |
| Depreciation and amortization | 267 | 257 | 261 | 266 | 272 |
| Dividends per common share [4] | 0.58 | - | - | - | - |

[1]   For 2011-2014, pro forma earnings per share (EPS) was calculated based on 180,996,833 shares of Chemours common stock that were distributed to DuPont shareholders on July 1, 2015. The same number of shares was used to calculate basic and diluted earnings per share since no Chemours equity awards were outstanding prior to the separation.

[2]   Current assets minus current liabilities.

[3]   Amount as of December 31, 2015 includes unamortized debt issuance costs of $60 million.

[4]   Includes the following:

- dividend of an aggregate amount of $100 million declared prior to separation by our then-Board of Directors (consisting of DuPont employees), which was paid on September 11, 2015 to our stockholders of record as of August 3, 2015, and

- dividend of $0.03 per share declared after separation by our independent Board of Directors which was paid on December 14, 2015 to our stockholders of record as of November 13, 2015.


**Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Introduction**

Management's discussion and analysis, which we refer to as "MD&A", of our results of operations and financial condition supplements the Consolidated Financial Statements and related notes included elsewhere herein to help provide an understanding of our financial condition, changes in financial condition and results of our operations.  The discussion and analysis presented below refer to and should be read in conjunction with the Consolidated Financial Statements and the related notes included elsewhere in this Annual Report on Form 10-K .

**Overview**

Chemours is a leading global provider of products that are key inputs in end-products and processes in a variety of industries.  We deliver customized solutions with a wide range of industrial and specialty chemical products for markets including plastics and coatings, refrigeration and air conditioning, general industrial, mining and oil refining. Principal products include titanium dioxide, refrigerants, industrial fluoropolymer resins and a portfolio of industrial chemicals including sodium cyanide.

Chemours manages and reports operating results through three reportable segments: Titanium Technologies, Fluoroproducts and Chemical Solutions. Our position with each of these businesses reflects the strong value proposition we provide to our customers based on our long history and reputation in the chemical industry for safety, quality and reliability.

37

Table of Contents

On July 1, 2015 (the Distribution Date), DuPont completed the previously announced spin-off of Chemours by distributing Chemours' common stock, on a pro rata basis, to DuPont's stockholders of record as of the close of business on June 23, 2015 (the Record Date) (the transaction referred to herein as the Distribution). On the Distribution Date, each holder of DuPont common stock received one share of Chemours' common stock for every five shares of DuPont's common stock held on the Record Date. The spin-off was completed pursuant to a separation agreement and several other agreements with DuPont related to the spin-off, including an employee matters agreement, a tax matters agreement, a transition services agreement and an intellectual property cross-license agreement, each of which was filed with the SEC as an exhibit to our Current Report on Form 8-K on July 1, 2015. These agreements govern the relationship among Chemours and DuPont following the spin-off and provide for the allocation of various assets, liabilities, rights and obligations. These agreements also include arrangements for transition services to be provided by DuPont to Chemours.

*Basis of Presentation*

Prior to July 1, 2015, Chemours operations were included in DuPont's financial results in different legal forms, including but not limited to wholly-owned subsidiaries for which Chemours was the sole business, components of legal entities in which Chemours operated in conjunction with other DuPont businesses and a majority owned joint venture. For periods prior to July 1, 2015, the Consolidated Financial Statements, included elsewhere in this Annual Report on Form 10-K, have been prepared from DuPont's historical accounting records and are presented on a stand-alone basis as if the business operations had been conducted independently from DuPont. The Consolidated Financial Statements include the historical operations, assets and liabilities of the legal entities that are considered to comprise the Chemours business, including certain environmental remediation and litigation obligations of DuPont and its subsidiaries that Chemours may be required to indemnify pursuant to the separation-related agreements executed prior to the Distribution. All of the allocations and estimates in the Consolidated Financial Statements prior to July 1, 2015 are based on assumptions that management believes are reasonable.

**Recent Developments**

***Transformation Plan***

During the third quarter of 2015, Chemours announced a plan to transform the company by reducing structural costs, growing market positions, optimizing its portfolio, refocusing investments, and enhancing its organization. Chemours expects the transformation plan to deliver $500 million of incremental Adjusted EBITDA improvement over 2015 through 2017. Based on our anticipated cost reduction and growth initiatives, we would expect an approximately similar improvement in pre-tax income. Through a combination of higher free cash flow from operations, lower capital spending, and potential proceeds from asset sales, the Company anticipates reducing its leverage ratio (net debt to Adjusted EBITDA) to approximately three times by year-end 2017. See Non-GAAP Financial Measures included herein for a definition of Adjusted EBITDA and other information regarding our use of non-GAAP measures.

Key actions initiated under the transformation plan during 2015 included Titanium Technologies plant and production line closures, Fluoroproduct line closures, announcement of the Reactive Metals Solutions (RMS) plant closure, global workforce reductions, and lower service, real estate and procurement costs.

*Global Workforce Reductions*

In June 2015, in light of continued weakness in the global titanium dioxide market cycle and continued foreign currency impacts due to the strengthening of the U.S. dollar, Chemours implemented a restructuring plan to reduce and simplify its cost structure. This plan resulted in a global workforce reductions of more than 430 positions. As a result of this action, we recorded a pre-tax charge of $64 million for employee separation costs in the year ended December 31, 2015. The actions associated with this charge and all related payments are expected to be substantially complete by the end of 2016.

In November 2015, Chemours announced an additional global workforce reduction of approximately 430 positions. This action is part of ongoing efforts to streamline and simplify the structure of the organization worldwide and to reduce costs. As a result of this action, the Company recorded approximately $48 million of employee separation costs during the fourth quarter of 2015. The Company expects to complete this headcount reduction during 2016 and related payments are expected to be substantially complete in 2017.

*Titanium Technologies Plant Closures*

In August 2015, the Company announced the closure of its Edge Moor, Delaware manufacturing site. The Edge Moor plant produced $TiO_2$ product for use in the paper industry and other applications where demand has declined steadily and has resulted

38

Table of Contents

in underused capacity at the plant. In addition, as part of the plan, the Company permanently shut down one underused TiO$_2$ production line at its New Johnsonville, Tennessee plant. The Company stopped production at Edge Moor in September 2015 and immediately began decommissioning the plant. The Company expects to complete decommissioning activities in the first quarter of 2016 and will begin dismantling thereafter. Dismantling and removal activities are expected to be completed in early 2017.

As a result, during the year ended December 31, 2015, the Company recorded charges of approximately $140 million, which consist of property, plant and equipment and other asset impairment charges of $115 million, employee separation costs of $11 million and decommissioning costs of $14 million. These charges were allocated entirely to the Titanium Technology segment. The Company also expects to incur additional charges of approximately $50 million for decommissioning, dismantling and removal costs in 2016 to early 2017, which will be expensed as incurred. Because the Company is still in the early stages of implementing this plan, the amount and timing of the above estimates may differ materially from the amounts provided.

*Fluoroproducts Restructuring*

During the third quarter of 2015, in connection with the Company's transformation plan announced in August 2015 and efforts to improve the profitability of the Fluoroproducts segment, management approved the shutdown of certain production lines of the segment's manufacturing facilities in the United States. As a result, the Company recorded restructuring charges of approximately $21 million, which consist of property, plant and equipment accelerated depreciation of $18 million, employee separation costs of $2 million and decommissioning costs of $1 million. The Company also expects to incur approximately $5 million of additional decommissioning, dismantling and removal costs in 2016 through 2017.

*Chemical Solutions Portfolio Optimization Actions*

In November 2015, the Company signed a definitive agreement to sell its aniline facility in Beaumont, Texas to The Dow Chemical Company (Dow) for approximately $140 million in cash. The Company expects the transaction to close and record gain on sale in the first quarter of 2016. At December 31, 2015, the assets at Beaumont were classified as held for sale on the Company's Consolidated Balance Sheet. As part of this transaction, Chemours has entered into an agreement to meet Dow's additional aniline supply requirements with production from its Pascagoula, Mississippi facility. Chemours will also continue to serve other aniline customers from its Pascagoula plant.

Also during the fourth quarter of 2015, the Company announced the completion of the strategic review of its Reactive Metals Solutions (RMS) business and the decision to stop production at the Niagara Falls, NY site by the end of December 2016. The Niagara Falls plant has approximately 200 employees and contractors that will be impacted by this action. As a result, in the fourth quarter of 2015, the Company recorded approximately $12 million of employee separation costs. Additional restructuring charges of approximately $15 million for contract termination, decommissioning and site redevelopment are expected to be incurred in 2016 through 2018. Because the Company is still in the early stages of implementing this plan, the amount and timing of the above estimates may differ materially from the amounts provided.

Prior to the plant closure decision, the RMS plant assets were evaluated for impairment during the third quarter of 2015. We determined that the manufacturing facility should be assessed for impairment driven primarily by continued losses experienced by the business. The assessment indicated that the carrying amount of the long-lived assets were not recoverable when compared to the expected undiscounted cash flows of business. Based on our assessment of the fair value of the related asset groups, we determined that the carrying value of RMS' asset groups exceeded its fair value. As a result of the impairment test, a $45 million pre-tax impairment charge was recorded in the Chemical Solutions segment. See Note 12 to the Consolidated Financial Statements for further information.

In addition, also during the third quarter of 2015, the Company determined that indicators were present in the Sulfur reporting unit which suggested that the fair value of the reporting unit had declined below the carrying value, primarily driven by lower than forecasted revenue and profitability levels for 2015 and future periods. The interim goodwill impairment analysis performed in the third quarter of 2015 resulted in a goodwill impairment of $25 million in 2015. See Note 13 to the Consolidated Financial Statements for further information.

Table of Contents

**Our Results and Business Highlights**

**Revenue and Growth:** Net sales for the year ended December 31, 2015 were $5.7 billion, a decrease of 11.1% from $6.4 billion for the year ended December 31, 2014, which was primarily due to continued pressure on $TiO_2$ prices, the negative impact of foreign currency and soft demand conditions for certain fluoropolymers products.

**Profitability:** We recognized a net loss of $90 million for the year ended December 31, 2015, compared with net income of $401 million and $424 million for the same periods in 2014 and 2013, respectively. The decrease in our profitability during the year was primarily the result of a decline in our net sales as well as the impact of various restructuring activities discussed in the Recent Developments section of this MD&A and our indebtedness, which resulted to pre-tax charges of $333 million of employee separation and asset related charges, net and $132 million of interest expense, partially offset by the related income tax benefits of approximately $150 million. Adjusted EBITDA was $573 million, $876 million and $984 million for the years ended December 31, 2015, 2014, and 2013, respectively.

**Results of Operations**

| (Dollars in millions) | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | | 2014 | | 2013 | |
| Net sales | $ | 5,717 | $ | 6,432 | $ | 6,859 |
| Cost of goods sold | | 4,762 | | 5,072 | | 5,395 |
| Gross profit | | 955 | | 1,360 | | 1,464 |
| Selling, general and administrative expense | | 632 | | 685 | | 768 |
| Research and development expense | | 97 | | 143 | | 164 |
| Employee separation and asset related charges, net | | 333 | | 21 | | 2 |
| Goodwill impairment | | 25 | | - | | - |
| Total expenses | | 1,087 | | 849 | | 934 |
| Equity in earnings of affiliates | | 22 | | 20 | | 22 |
| Interest expense, net | | (132) | | - | | - |
| Other income, net | | 54 | | 19 | | 24 |
| **(Loss) income before income taxes** | | (188) | | 550 | | 576 |
| (Benefit from) provision for income taxes | | (98) | | 149 | | 152 |
| **Net (loss) income** | | (90) | | 401 | | 424 |
| Less: Net income attributable to noncontrolling interests | | - | | 1 | | 1 |
| **Net (loss) income attributable to Chemours** | $ | (90) | $ | 400 | $ | 423 |

*Net sales*

**For the years ended December 31, 2015 and 2014:** The table below shows the impact of price, currency, volume and portfolio on net sales for the year ended December 31, 2015 compared with 2014:

| (Dollars in millions) | 2015 Net Sales | Percentage Change vs 2014 | Percentage change due to: | | | |
|---|---|---|---|---|---|---|
| | | | Local Price | Currency Effect | Volume | Portfolio/Other |
| Worldwide | $ 5,717 | (11)% | (5)% | (4)% | (1)% | (1)% |

Net sales for the year ended December 31, 2015 were $5.7 billion, a decrease of approximately 11% compared to $6.4 billion for the year ended December 31, 2014, which was primarily due to continued pressure on $TiO_2$ prices and the negative impact of foreign currency, offset by price increases in Fluoroproducts and volume growth in Chemical Solutions portfolio.

40

Table of Contents

**For the years ended December 31, 2014 and 2013:** The table below shows the impact of price, currency, volume and portfolio on net sales for the year ended December 31, 2014 compared with 2013:

| (Dollars in millions) | 2014 Net Sales | Percentage Change vs 2013 | Percentage change due to: | | | |
| | | | Local Price | Currency Effect | Volume | Portfolio/Other |
|---|---|---|---|---|---|---|
| Worldwide | $ 6,432 | (6)% | (5)% | -% | 3% | (4)% |

Net sales of $6.4 billion for the year ended December 31, 2014 decreased 6% primarily in comparison with the year ended December 31, 2013, primarily due to a portfolio change in the Chemical Solutions segment and lower prices principally for $TiO_2$ and refrigerants. The portfolio change involved a customer's election to exercise a put/call option to acquire the entire property and equipment of the Baytown facility on December 31, 2013. Decreased selling prices for $TiO_2$ were partially offset by increased volumes for Opteon™ YF refrigerant.

### *Cost of goods sold*

**For the years ended December 31, 2015 and 2014:** Cost of goods sold (COGS) decreased 6% during the year ended December 31, 2015 in comparison with the year ended December 31, 2014. Approximately 4% of the decrease was driven by lower production costs from lower costs of raw materials, lower employee benefits and the impact of global headcount reduction as a result of our transformation plan. The decrease was due to lower sales volume and mix, as well slightly favorable currency impact. COGS as a percentage of net sales increased by 4% to 83% for the year ended December 31, 2015 primarily driven by lower average prices primarily in $TiO_2$ and the unfavorable foreign currency impact on our net sales over our fixed U.S. dollar costs.

**For the years ended December 31, 2014 and 2013:** COGS decreased 6% during the year ended December 31, 2014 in comparison with the year ended December 31, 2013. This decrease is primarily driven by a portfolio change in the Chemical Solutions segment involving a customer's election to exercise a put/call option to acquire the entire property and equipment of the Baytown facility, coupled with a decrease in pension costs. The portfolio change accounted for $248 million of the decrease in COGS. The decrease in pension costs was primarily related to improved returns on pension plan assets and an increase in the discount rate. COGS as a percentage of net sales was 79%, consistent with the year ended December 31, 2013.

The following table shows COGS as a percent of net sales.

| (Dollars in millions) | Year Ended December 31, | | |
| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Net sales | $ 5,717 | $ 6,432 | 6,859 |
| COGS | 4,762 | 5,072 | 5,395 |
| COGS as a percent of net sales | 83% | 79% | 79% |

### *Selling, general and administrative expense*

**For the years ended December 31, 2015 and 2014:** Selling, general and administrative expense (SG&A) decreased 8% to $632 million for the year ended December 31, 2015 in comparison with the year ended December 31, 2014. This decrease is primarily driven by the cost reduction initiatives implemented during the year, such as the global workforce reduction and other initiatives in connection with the transformation plan, as well as lower employee benefits (including pension), slightly offset by $17 million of transactions, legal and other related charges and approximately $4 million higher stock-based compensation charges primarily related to the converted awards. SG&A as a percentage of net sales was 11% for both periods.

**For the years ended December 31, 2014 and 2013:** SG&A decreased 11% to $685 million for the year ended December 31, 2014 in comparison with the year ended December 31, 2013. This decrease was primarily driven by lower pension costs in 2014 and higher legal fees in 2013 related to the $TiO_2$ antitrust litigation, which was resolved in 2013. SG&A as a percentage of net sales was 11% for both periods.

### *Research and development expense*

**For the years ended December 31, 2015 and 2014:** Research and development (R&D) expense decreased by $46 million or 32% for the year ended December 31, 2015 in comparison with the year ended December 31, 2014. Reductions in R&D spend

Table of Contents

were primarily driven by decisions to either delay or terminate projects following our separation from DuPont. The global workforce reduction initiative also impacted the R&D function and contributed to the decrease in R&D expense. R&D expense as a percentage of net sales was 2% for both periods.

**For the years ended December 31, 2014 and 2013:** R&D decreased by $21 million for the year ended December 31, 2014 in comparison with the year ended December 31, 2013, primarily due to lower pension costs. R&D expense as a percentage of net sales was 2% for both periods.

### *Interest expense, net*

We incurred interest expense of $132 million for the year ended December 31, 2015 related to our financing transactions completed in May 2015 in connection with the separation. There was no comparable expense in 2014 or 2013. Refer to Note 18 to the Consolidated Financial Statements and the Liquidity and Capital Resources section of this MD&A for additional information related to our indebtedness.

### *Employee separation and asset related charges, net*

For the year ended December 31, 2015, we recorded pre-tax charges of approximately $333 million for employee separation and other asset related charges in connection with various restructuring activities during the year. This cost includes $112 million severance charges from our global workforce reduction, $140 million related to our capacity optimization in our Titanium Technologies segment, including the closure of our Edge Moor production facility, $21 million of Fluoroproducts restructuring activities, $57 million of restructuring relating to our Chemical Solutions segment, and impairment charges. See the Recent Developments section of this MD&A for further information.

### *Other income, net*

**For the years ended December 31, 2015 and 2014:** For the year ended December 31, 2015 compared to the year ended December 31, 2014, other income, net increased by $35 million. This change is comprised of a $42 million gain on foreign exchange forward contracts, lower foreign currency exchange losses of approximately $23 million driven by the continued strengthening of the U.S. dollar versus the Mexican peso, the Euro and other currencies, and additional technology and licensing income of approximately $11 million. These increases were offset by a loss on sale of assets and businesses of $9 million in 2015 compared to the gain of $40 million recognized in 2014 discussed below. See Note 7 to the Consolidated Financial Statements for details of Other income, net.

**For the years ended December 31, 2014 and 2013:** For the year ended December 31, 2014 compared to the year ended December 31, 2013, other income, net decreased by $5 million. This change is comprised of a $40 million gain on sales of assets and businesses in 2014, offset by a $35 million increase in foreign currency exchange losses, driven by the strengthening of the U.S. dollar versus the Euro and Swiss franc in 2014, and a reduction of $7 million for leasing, contract services and miscellaneous income. In addition, for the year ended December 31, 2013, Chemours recognized a $7 million gain on purchase of an equity investment that did not occur in 2014.

### *(Benefit from) provision for income taxes*

**For the years ended December 31, 2015 and 2014:** For the year ended December 31, 2015, Chemours recorded a tax benefit of $98 million with an effective income tax rate of approximately 52%. For the year ended December 31, 2014, Chemours recorded a tax provision of $149 million with an effective tax rate of approximately 27%. The $247 million decrease in the tax provision and the corresponding increase in effective tax rate were due primarily to tax benefits recognized from the restructuring and asset impairment charges in the U.S. recorded in the second half of 2015, partially offset by earnings in foreign jurisdictions.

**For the years ended December 31, 2014 and 2013:** For the year ended December 31, 2014, Chemours recorded a tax provision of $149 million with an effective income tax rate of approximately 27%. For the year ended December 31, 2013, Chemours recorded a tax provision of $152 million with an effective income tax rate of approximately 26%. The decrease in the tax provision was primarily due to a decrease in earnings. The increase in the effective tax rate in 2014 compared to 2013 was primarily due to the geographic mix of earnings and valuation allowance partly offset by a one-time tax benefit recognized in 2014 relating to a tax accounting method change. This tax accounting method change allowed an increase in tax basis in certain depreciable fixed assets which resulted in a net tax benefit for Chemours of $10 million in 2014.

42

Table of Contents

**Segment Reviews**

Adjusted EBITDA represents our primary measure of segment performance and is defined as income (loss) before income taxes excluding the following:

• interest expense, depreciation and amortization,

• non-operating pension and other postretirement employee benefit costs,

• exchange gains (losses),

• employee separation, asset-related charges and other charges, net,

• asset impairments,

• gains (losses) on sale of business or assets, and

• other items not considered indicative of our ongoing operational performance and expected to occur infrequently.

A reconciliation of Adjusted EBITDA to net (loss) income for the years ended December 31, 2015, 2014 and 2013 is included in Non-GAAP Financial Measures in Item 7 and in Note 23 to the Consolidated Financial Statements.

**Titanium Technologies**

| | Year Ended December 31, | | |
|---|---|---|---|
| *(Dollars in millions)* | **2015** | **2014** | **2013** |
| Segment Net Sales | $ 2,392 | $ 2,937 | 3,019 |
| Adjusted EBITDA | 326 | 723 | 726 |
| Adjusted EBITDA Margin | 14% | 25% | 24% |

| | Year Ended December 31, | |
|---|---|---|
| **Change in segment net sales from prior period** | **2015** | **2014** |
| Price | (12)% | (4)% |
| Volume | (2)% | 1% |
| Currency | (5)% | -% |
| Portfolio / Other | -% | -% |
| Total Change | (19)% | (3)% |

**2015 versus 2014:** Net sales decreased by $545 million or 19% for the year ended December 31, 2015, compared with the same period in 2014, due primarily to lower selling prices and the continued unfavorable effect of foreign currency primarily against the Euro. Oversupply in the global titanium dioxide industry and weak demand continue to put downward pressure on pricing in all regions.

Adjusted EBITDA decreased during the year ended December 31, 2015 in comparison with same period in 2014. Adjusted EBITDA margin also decreased during the year ended December 31, 2015 in comparison with same period in 2014. Both decreases were primarily driven by lower sales and margin due to pricing pressures and unfavorable effects of foreign currency. Offsetting these decreases were productivity improvement initiatives, which resulted in lower raw materials, energy and plant operating costs, as well as the impact of our cost reduction programs, which included certain Titanium Technology plant shut-downs and global headcount reductions.

**2014 versus 2013:** Net sales decreased by $82 million or 3% for the year ended December 31, 2014 compared with the same period in 2013. This decrease was due to lower prices which was partially offset by an increase in volume.

Adjusted EBITDA decreased marginally in 2014 while adjusted EBITDA margin remained relatively consistent in 2014 when compared to 2013.

43

Table of Contents

**Fluoroproducts**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (Dollars in millions) | | **2015** | | **2014** | | **2013** |
| Segment Net Sales | $ | 2,230 | $ | 2,327 | $ | 2,379 |
| Adjusted EBITDA | | 300 | | 282 | | 395 |
| Adjusted EBITDA Margin | | 13% | | 12% | | 17% |

| | Year Ended December 31, | |
|---|---|---|
| **Change in segment net sales from prior period** | **2015** | **2014** |
| Price | 2% | (8)% |
| Volume | -% | 6% |
| Currency | (4)% | -% |
| Portfolio / Other | (2)% | -% |
| Total Change | (4)% | (2)% |

*2015 versus 2014:* Net sales decreased $97 million or 4% for the year ended December 31, 2015 compared with the same period in 2014. Net sales were unfavorably impacted by foreign currency exchange rates, primarily related to the Euro, Brazilian real, and Japanese yen, and continued weaker demand for industrial resins. Favorable product mix with strong Opteon™ refrigerant adoption delivered increased prices and steady overall volumes over the prior year.

Adjusted EBITDA and adjusted EBITDA margin increased during the year ended December 31, 2015 in comparison with same periods in 2014. Both increases were primarily due to product mix and cost reduction efforts including global headcount reductions during the second half of 2015.

*2014 versus 2013*: Net sales decreased by $52 million or 2% for the year ended December 31, 2014 compared with the same period in 2013, primarily due to lower selling prices for refrigerants and industrial resins. Refrigerant prices decreased in North America as a result of actions by the EPA related to allowances on HCFC's (R-22) and the impact of lower cost Chinese imports on the overall pricing of HFC (R-134a) refrigerants and refrigerant blends globally. Industrial resins prices declined primarily as a result of pricing pressure from the addition of new production capacity by competitors. Pricing decreases were partially offset by higher volumes.

Adjusted EBITDA and adjusted EBITDA margin decreased, primarily due to lower prices and production shutdowns. Margin impact from lower prices was partially offset by lower business and overhead costs from productivity improvements. Additionally in 2014, expense relating to the short-term incentive plan was lower by approximately $8 million.

**Chemical Solutions**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (Dollars in millions) | | **2015** | | **2014** | | **2013** |
| Segment Net Sales | $ | 1,095 | $ | 1,168 | $ | 1,461 |
| Adjusted EBITDA | | 29 | | 17 | | 101 |
| Adjusted EBITDA Margin | | 3% | | 1% | | 7% |

44

Table of Contents

| Change in segment net sales from prior period | Year Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Price | (5)% | (2)% |
| Volume | 2% | 1% |
| Currency | (3)% | -% |
| Portfolio / Other | -% | (19)% |
| Total Change | (6)% | (20)% |

*2015 versus 2014:* Net sales decreased by $73 million or 6% for the year ended December 31, 2015 compared with the same period in 2014, primarily due to lower prices based on contractual pass-through terms, changes in the mix of products sold as well as the unfavorable impact of foreign currency exchange rates including the Mexican peso, Canadian dollar and the Euro. These decreases were partially offset by volume increases in Cyanide and Sulfur due to strong demand**.**

Adjusted EBITDA and Adjusted EBITDA margin increased during the year ended December 31, 2015 in comparison with same period in 2014. The slight increase in Adjusted EBITDA was driven primarily by lower R&D expense and cost reduction efforts, including the global headcount reductions, during the second half of 2015.

*2014 versus 2013:* Net sales decreased $293 million or 20%, for the year ended December 31, 2014 compared with the same period in 2013, primarily due to the portfolio impact of a customer's election to exercise a put/call option to acquire the entire property and equipment of the Baytown facility on December 31, 2013. Sales decreased further from lower prices across all products.

Adjusted EBITDA and adjusted EBITDA margin decreased, primarily due to the portfolio impact noted above and lower prices.

**2016 Outlook**

With our transformation plan on track, we expect to reduce structural costs by an additional $200 million in 2016. These cost savings are primarily from actions taken during 2015 including facilities closures, headcount reductions, and procurement and productivity enhancements. In 2016, we suspended annual salary increases globally, subject to contractual and legal limitations, and we halted a discretionary contribution component in our U.S. 401(k) plan that will contribute toward our $200 million target. We anticipate that we will need to establish additional cost reduction initiatives during 2016 to realize our target of reducing structural costs by $350 million through 2017.

For 2016, we believe that those cost reductions in our transformation plan along with growth from Opteon™ and the benefits of our Altamira startup, will help us deliver full year Adjusted EBITDA above our 2015 performance. Along with a reduction in capital spending, we expect to generate modestly positive free cash flow during the year. Our outlook reflects our current visibility and expectations on market factors, such as currency movements, $TiO_2$ pricing, and end-market demand.

**Liquidity and Capital Resources**

Prior to our spin-off on July 1, 2015, transfers of cash to and from DuPont's cash management system were reflected in DuPont Company Net Investment in the historical Consolidated Balance Sheets, Statements of Cash Flows and Statements of Changes in DuPont Company Net Investment. DuPont funded our cash needs through the date of the separation. Chemours has a historical pattern of seasonality, with working capital use of cash in the first half of the year, and a working capital source of cash in the second half of the year.

Chemours' primary source of liquidity is cash generated from operations, available cash and borrowings under the debt financing arrangements as described below. We believe these sources are sufficient to fund our planned operations and to meet our interest, dividend and contractual obligations. Our financial policy seeks to deleverage by using free cash flow to repay outstanding borrowings, selectively invest for growth to enhance our portfolio including certain strategic capital investments, and return cash to shareholders through dividend payments.

While we were a wholly-owned subsidiary of DuPont, our then-Board of Directors, consisting of DuPont employees, declared a dividend of an aggregate amount of $100 million for the third quarter of 2015, which was paid on September 11, 2015 to our

Table of Contents

stockholders of record as of August 3, 2015. On September 1, 2015, our independent Board of Directors declared a dividend of $0.03 per share, which was paid on December 14, 2015 to our stockholders of record on November 13, 2015.

The separation agreements set forth a process to true-up cash and working capital transferred to us from DuPont at separation. In January 2016, Chemours and DuPont entered into an agreement, contingent upon the credit agreement amendment described herein, which provided for the extinguishment of payment obligations of cash and working capital true-ups previously contemplated in the separation agreements. As a result, Chemours was not required to make any payments to DuPont, nor did DuPont make any payments to Chemours. In addition, the agreement set forth an advance payment of approximately $190 million, which was paid to Chemours in February 2016, for certain specified goods and services that Chemours expects to provide to DuPont over the next twelve to fifteen months under existing agreements with Chemours.

Over the next 12 months, Chemours expects to have significant interest, capital expenditure and restructuring payments. We expect to fund these payments through cash generated from operations, asset dispositions, available cash and borrowings under the revolving credit facility. We anticipate that our operations and debt financing arrangements will provide sufficient liquidity over the next 12 months. The availability under our Revolving Credit Facility is subject to the last 12 months of our consolidated EBITDA as defined under the credit agreement.

***Cash Flow***

The following table sets forth a summary of the net cash provided by (used for) operating, investing and financing activities.

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| *(Dollars in millions)* | **2015** | **2014** | **2013** |
| Cash provided by operating activities | $ 182 | $ 505 | $ 798 |
| Cash used for investing activities | (497) | (560) | (424) |
| Cash provided by (used for) financing activities | 687 | 55 | (374) |

<u>*Cash Provided by Operating Activities*</u>

Cash provided by operating activities decreased by $323 million for the year ended December 31, 2015 compared to the same period in 2014, due to lower earnings than the prior year, payments on restructuring activities and interest payments on our 2015 financing transactions.

Cash provided by operating activities decreased by $293 million for the year ended December 31, 2014 compared with the same period in 2013, primarily due to increased payments of trade accounts payable for raw materials and lower earnings in 2014. The primary cause of the decrease was the timing of ore purchases with longer payment terms in the second half of 2013, which resulted in payments in early 2014. In addition, Chemours paid $72 million related to titanium dioxide antitrust litigation in 2014.

<u>*Cash Used for Investing Activities*</u>

Cash used for investing activities decreased $63 million for the year ended December 31, 2015 compared to the same period in 2014, primarily as a result of a $85 million decrease in capital expenditures of which $80 million relates to the expansion of Titanium Technologies' Altamira plant in Mexico and approximately $50 million from other on-going and expansion activities, partially offset by increase in separation-related capital expenditures of $45 million. In addition, we realized approximately $42 million of net gain from foreign exchange contract settlements entered into in 2015 after the separation and no similar realized gains or losses were incurred prior to the separation. The decreases in cash used for investing activities are partially offset by incremental investments made to our unconsolidated affiliate in China and lower sales proceeds due to lesser business and asset sale activities during 2015.

Cash used for investing activities increased $136 million for 2014 compared to the same period in 2013 primarily due to the expansion of Titanium Technologies' Altamira plant in Mexico.

Capital expenditures relating to our Altamira expansion were $146 million, $227 million and $159 million for the years ended December 31, 2015, 2014 and 2013, respectively.

<u>*Cash Provided by (Used for) Financing Activities*</u>

Cash provided by financing activities increased by $632 million for the year ended December 31, 2015 compared to the same period in 2014, due primarily from the proceeds from our financing transactions offset by the net transfers to DuPont in connection

Table of Contents

with the separation. Through June 30, 2015, DuPont managed Chemours' cash and financing arrangements and all excess cash generated through earnings was deemed remitted to DuPont and all sources of cash were deemed funded by DuPont. Prior to the spin-off on July 1, 2015, Chemours remitted approximately $3.4 billion to DuPont in the form of a dividend, using cash received from issuance of debt. See Note 4 to the Consolidated Financial Statements for additional information.

Cash provided by financing activities was $55 million in 2014 as compared to cash used for financing activities of $374 million in 2013. Lower cash provided by operations as discussed above and higher purchases of property, plant and equipment of $166 million, primarily due to the Altamira expansion, resulted in cash transfer from DuPont to fund the Company's operations.

***Current Assets***

| (Dollars in millions) | | December 31, 2015 | | December 31, 2014 |
|---|---|---|---|---|
| Cash | $ | 366 | $ | - |
| Accounts and notes receivable - trade, net | | 859 | | 846 |
| Inventories | | 972 | | 1,052 |
| Prepaid expenses and other | | 104 | | 43 |
| Total current assets | $ | 2,301 | $ | 1,941 |

In 2014, Chemours participated in DuPont's centralized cash management and financing programs. Disbursements were made through centralized accounts payable systems which are operated by DuPont. Cash receipts were transferred to centralized accounts, also maintained by DuPont. As such, we did not reflect a cash balance in our financial statements prior to separation. Cash as of December 31, 2015 includes the cash provided by DuPont at separation and our net increase in cash since the separation.

Accounts and notes receivable - trade, net at December 31, 2015 increased $13 million compared to December 31, 2014 primarily due to timing of collections of trade accounts receivable offset by unfavorable currency translation.

Inventories at December 31, 2015 decreased $80 million compared to December 31, 2014 primarily due to an effort to decrease inventory on hand as well lower cost of raw materials and lower production costs resulting from our transformation plan.

Prepaid expenses and other increased $61 million primarily due to our aniline facility in Beaumont, Texas which is classified as held-for-sale as of December 31, 2015 and included as other current assets. Also included is a prepaid premium on insurance programs we entered into in the normal course of business after the separation. Prior to the spin, Chemours participated in DuPont insurance programs.

***Current Liabilities***

| (Dollars in millions) | | December 31, 2015 | | December 31, 2014 |
|---|---|---|---|---|
| Accounts payable | $ | 973 | $ | 1,046 |
| Short-term borrowings and current portion of long-term debt | | 39 | | - |
| Other accrued liabilities | | 454 | | 352 |
| Total current liabilities | $ | 1,466 | $ | 1,398 |

Accounts payable decreased compared to December 31, 2014 due to timing of payments to vendors, and lower purchases and capital expenditures. Short-term borrowings and current portion of long-term debt primarily reflects our financing transactions with our unconsolidated affiliate and the required quarterly installment payments on our senior secured term loan. We had no comparable financing transactions in 2014. Other accrued liabilities increased due to employee separation accruals related to 2015 actions and accrued interest on debt issued in 2015.

***Financing Transactions***

On May 12, 2015, Chemours entered into certain financing transactions in connection with the Distribution and in recognition of the assets contributed to us by DuPont in anticipation of the separation. The proceeds from the financing transactions were used to fund a cash distribution to DuPont of $3.4 billion and a distribution in kind of Notes with an aggregate principal amount of $507 million. See Note 18 to the Consolidated Financial Statements for further discussion of these transactions.

Table of Contents

The credit agreement provided for a seven-year senior secured term loan (the Term Loan Facility) in a principal amount of $1.5 billion repayable in equal quarterly installments at a rate of one percent of the original principal amount per year, with the balance payable on the final maturity date. The Term Loan Facility was issued with a $7 million original issue discount and bears variable interest rate subject to a floor of 3.75%. The proceeds from the Term Loan Facility were used to fund a portion of the distribution to DuPont, along with related fees and expenses.

Prior to an amendment in February 2016, the credit agreement also provided for a five-year $1.0 billion senior secured revolving credit facility (the Revolving Credit Facility). In February 2016, an amendment to the Revolving Credit Facility reduced the capacity to $750 million beginning in the first quarter of 2016 and amended certain covenants (see Debt Covenant discussion included herein). The proceeds of any loans made under the Revolving Credit Facility can be used to finance capital expenditures, acquisitions, working capital needs and for other general corporate purposes. Availability under the Revolving Credit Facility is subject to certain covenant limitations. At December 31, 2015, the facility was undrawn with a borrowing availability of approximately $625 million. We had $129 million letters of credit issued and outstanding under this facility at December 31, 2015.

Chemours' obligations under the Term Loan Facility and Revolving Credit Facility (collectively, the Senior Secured Credit Facilities) are guaranteed on a senior secured basis by all of its material domestic subsidiaries, subject to certain agreed upon exceptions. The obligations under the Senior Secured Credit Facilities are also, subject to certain agreed upon exceptions, secured by a first priority lien on substantially all of Chemours and its material wholly-owned domestic subsidiaries' assets, including 100 percent of the stock of domestic subsidiaries and 65 percent of the stock of certain foreign subsidiaries.

Additionally, on May 12, 2015, Chemours issued approximately $2,503 million aggregate principal of senior unsecured notes (the Notes) in a private placement. The 2023 notes (the 2023 Notes) with an aggregate principal amount of $1,350 million bear interest at a rate of 6.625% per annum and will mature on May 15, 2023 with all principal paid at maturity. The 2025 notes (the 2025 Notes) with an aggregate principal amount of $750 million bear interest at a rate of 7.000% per annum and will mature on May 15, 2025 with all principal paid at maturity. The 2023 euro notes (the Euro Notes) with an aggregate principal amount of €360 million bear interest at a rate of 6.125% per annum and will mature on May 15, 2023 with all principal paid at maturity. Interest on the Notes is payable semi-annually in cash in arrears on May 15 and November 15 of each year, which commenced on November 15, 2015. The Notes were offered in the U.S. to persons reasonably believed to be qualified institutional buyers in reliance on Rule 144A under the Securities Act, and outside the U.S. to non-U.S. persons in reliance on Regulation S under the Securities Act. Chemours is required to register the Notes with the SEC within 465 days. If Chemours fails to do so, it would be required to pay additional interest at a rate of 0.25% for the first 90 days following a registration default and additional 0.25% per annum with respect to each subsequent 90-day period, up to a maximum rate of 0.50%, until the registration requirements are met. Application is also expected to be made to the Irish Stock Exchange for the approval of listing particulars in relation to the Euro Notes prior to the first anniversary of the issue date of the Euro Notes.

Each series of Notes is or will be fully and unconditionally guaranteed, jointly and severally, by Chemours' existing and future domestic subsidiaries that guarantee (the Guarantors) the Senior Secured Credit Facilities or that guarantee other indebtedness of Chemours or any guarantor in an aggregate principal amount in excess of $75 million (the Guarantees). The Notes are unsecured and unsubordinated obligations of Chemours. The Guarantees are unsecured and unsubordinated obligations of the Guarantors. The Notes rank equally in right of payment to all of Chemours' existing and future unsecured unsubordinated debt and senior in right of payment to all of Chemours' existing and future debt that is by its terms expressly subordinated in right of payment to the Notes. The Notes are subordinated to indebtedness under the Senior Secured Credit Facilities as well as any future secured debt to the extent of the value of the assets securing such debt. Chemours' is obligated to offer to purchase the Notes at a price of (a) 101 percent of their principal amount, together with accrued and unpaid interest, if any, to the date of purchase, upon the occurrence of certain change of control events and (b) 100 percent of their principal amount, together with accrued and unpaid interest, if any, to the date of purchase, with the proceeds from certain asset dispositions. These restrictions and prohibitions are subject to certain qualifications and exceptions set forth in the Indenture, including without limitation, reinvestment rights with respect to the proceeds of asset dispositions. Chemours is permitted to redeem some or all of the 2023 Notes and Euro Notes by paying a "make-whole" premium prior to May 15, 2018. Chemours also may redeem some or all of the 2023 Notes and Euro Notes on or after May 15, 2018 and thereafter at specified redemption prices. Chemours also may redeem some or all of the 2025 Notes on or after May 15, 2020 at specified redemption prices.

*Debt Covenants*

Chemours is subject to certain debt covenants that, among other things, limit Chemours and certain of Chemours' subsidiaries to incur indebtedness, pay dividends or make other distributions, prepay, redeem or repurchase certain debt, make loans and investments, sell assets, incur liens, enter into transactions with affiliates and consolidate or merge. These covenants are subject to a number of exceptions and qualifications set forth in the respective agreements.

48

Table of Contents

In the third quarter of 2015, Chemours and its Revolving Credit Facility lenders entered into an amendment to the Revolving Credit Facility that strengthens Chemours' financial position by providing enhanced liquidity to implement the Transformation Plan.  The amendment modified the consolidated EBITDA definition in the covenant calculation to include pro forma benefits of announced cost reduction initiatives. Further, in the first quarter of 2016, Chemours and its Revolving Credit Facility lenders entered into a second amendment to the Revolving Credit Facility that (a) replaced the total net leverage ratio financial covenant with a senior secured net leverage ratio; (b) reduced the minimum required levels of interest expense coverage ratio covenant; (c) increased the limits and time horizon for inclusion of pro forma benefits of announced cost reduction initiatives into consolidated EBITDA definition for the purposes of calculating financial covenants; and (d) reduced the revolver availability from $1.0 billion to $750 million. These changes provide further flexibility to Chemours to sustain a potentially prolonged downturn in the business and enhance its liquidity to implement the transformation plan.

The credit agreement contains financial covenants which, solely with respect to the Revolving Credit Facility as amended, require Chemours not to exceed a maximum senior secured net leverage ratio of 3.50 to 1.00 and to maintain a minimum interest coverage ratio of 1.75 to 1.00 until December 31, 2016. In addition, the credit agreement contains customary affirmative and negative covenants that, among other things, limit or restrict Chemours and its subsidiaries' ability, subject to certain exceptions, to incur liens, merge, consolidate or sell, transfer or lease assets, make investments, pay dividends, transact with subsidiaries and incur indebtedness. The credit agreement also contains customary representations and warranties and events of default.

The Senior Secured Credit Facilities and the Notes contain events of default customary for these types of financings, including cross default and cross acceleration provisions to material indebtedness of Chemours. Chemours was in compliance with its debt covenants as of December 31, 2015.

*Maturities*

There are no debt maturities in any of the next seven years, except, in accordance with the credit agreement, Chemours has required principal payments related to the Term Loan Facility of $15 million in each year from 2016 to 2020. Debt maturities related to the Term Loan Facility and the Notes in 2021 and beyond will be $3,913 million.

*Supplier Financing*

Chemours has entered into a global paying services agreement with a financial institution. Under this agreement, the financial institution acts as the paying agent for Chemours with respect to accounts payable due to our suppliers who elect to participate in the program. The agreement allows our suppliers to sell their receivables to the financial institution at the discretion of both parties on terms that are negotiated between them.  Our obligations to our suppliers, including the amounts due and scheduled payment dates, are not impacted by our suppliers' decisions to sell their receivables under this program. At December 31, 2015, the payment instructions from Chemours were $171 million, of which certain suppliers have elected to be paid early in an aggregate amount of $161 million. The available capacity under this program can vary based on the number of investors participating in this program at any point of time.

*Capital Expenditures*

Our operations are capital intensive, requiring ongoing investment to upgrade or enhance existing operations and to meet environmental and operational regulations. Our capital requirements have consisted, and are expected to continue to consist, primarily of:

• ongoing capital expenditures, such as those required to maintain equipment reliability, the integrity and safety of our manufacturing sites and to comply with environmental regulations;

• investments in our existing facilities to help support introduction of new products and de-bottleneck to expand capacity and grow our business; and

• investment in projects to reduce future operating costs and enhance productivity.

49

Table of Contents

The following table summarizes ongoing and expansion capital expenditures (which includes environmental capital expenditures), as well as expenditures related to our separation from DuPont, for the years ended December 31, 2015, 2014 and 2013:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (Dollars in millions) | | 2015 | | 2014 | | 2013 |
| Titanium Technologies | $ | 255 | $ | 365 | $ | 290 |
| Fluoroproducts | | 142 | | 133 | | 96 |
| Chemical Solutions | | 117 | | 106 | | 52 |
| Corporate & Other | | 5 | | - | | - |
| Total Capital Expenditures [1] | $ | 519 | $ | 604 | $ | 438 |

[1] Includes separation-related capital expenditures of $66 million and $21 million for the years ended December 31, 2015 and 2014, respectively.

The decrease in our ongoing capital expenditures in 2015 compared with 2014 is due to lower spending in 2015 as we finish the expansion of our Altamira production facility. Capital expenditures as a percentage of our net sales were 9%, 9% and 6% for the years ended December 31, 2015, 2014 and 2013, respectively.

We expect our capital expenditures, excluding separation-related spending, to decline in 2016 and 2017 as we finish the expansion of our Altamira production facility, reaching a more normalized level of approximately $350 million per year beginning in 2017. For further detail related to our environmental capital expenditures, please see the Environmental Matters section of this MD&A.

### Contractual Obligations

Information related to the Company's significant contractual obligations is summarized in the table below.

| | | | | | Payments Due In | | | | |
|---|---|---|---|---|---|---|---|---|---|
| (Dollars in millions) | | Total at December 31, 2015 | | 2016 | | 2017 - 2018 | | 2019 - 2020 | 2021 and Beyond |
| Long-term debt obligations [1] | $ | 3,988 | $ | 15 | $ | 30 | $ | 30 | $ 3,913 |
| Interest payments on long-term debt obligations [1] | | 1,702 | | 223 | | 444 | | 442 | 593 |
| Operating leases | | 346 | | 84 | | 135 | | 89 | 38 |
| Purchase obligations [2] | | | | | | | | | |
| Raw material obligations | | 1,358 | | 111 | | 168 | | 156 | 923 |
| Utility obligations | | 119 | | 26 | | 35 | | 18 | 40 |
| Other | | 169 | | 60 | | 73 | | 26 | 10 |
| Total purchase obligations | | 1,646 | | 197 | | 276 | | 200 | 973 |
| Other liabilities | | | | | | | | | |
| Workers' compensation | | 38 | | 6 | | 17 | | 7 | 8 |
| Asset retirement obligations | | 42 | | 1 | | 4 | | - | 37 |
| Environmental remediation | | 290 | | 67 | | 89 | | 62 | 72 |
| Legal settlements | | 20 | | 7 | | 4 | | 4 | 5 |
| Employee separation costs | | 99 | | 76 | | 23 | | - | - |
| Other [3] | | 61 | | 20 | | 4 | | 5 | 32 |
| Total other liabilities | | 550 | | 177 | | 141 | | 78 | 154 |
| Total contractual obligations [4] | $ | 8,232 | $ | 696 | $ | 1,026 | $ | 839 | $ 5,671 |

[1] To calculate payments due for principal and interest, we assumed that interest rates, foreign currency exchange rates, and outstanding borrowings under credit facilities were unchanged from December 31, 2015 through maturity.

Table of Contents

[2] Represents enforceable and legally binding agreements to purchase goods or services that specify fixed or minimum quantities; fixed minimum or variable price provisions; and the approximate timing of the agreement.

[3] Includes expected contributions and benefits payments in excess of plan assets to be made to fund our pension and other long-term employee benefit plans. Actual payments will depend on several factors, including investment performance and discount rates, and may also be affected by changes in applicable local requirements. See Note 21 to the Consolidated Financial Statements for additional information.

[4] Due to uncertainty regarding the completion of tax audits and possible outcomes, we are unable to determine the timing of payments related to unrecognized tax benefits. See Note 8 to the Consolidated Financial Statements for additional information.

### *Off Balance Sheet Arrangements*

Information with respect to Chemours' guarantees is included in Note 19 to the Consolidated Financial Statements. Historically, Chemours has not made significant payments to satisfy guarantee obligations; however, Chemours believes it has the financial resources to satisfy these guarantees in the event required.

### *Recent Accounting Pronouncements*

See Note 3 to the Consolidated Financial Statements included elsewhere in this Annual Report for a summary of recent accounting pronouncements.

### **Critical Accounting Policies and Estimates**

Chemours' significant accounting policies are more fully described in Note 3 to the Consolidated Financial Statements. Management believes that the application of these policies on a consistent basis enables the Company to provide the users of the financial statements with useful and reliable information about the Company's operating results and financial condition.

The preparation of the Consolidated Financial Statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts, including, but not limited to, receivable and inventory valuations, impairment of tangible and intangible assets, long-term employee benefit obligations, income taxes, restructuring liabilities, environmental matters, and litigation. Management's estimates are based on historical experience, facts and circumstances available at the time and various other assumptions that are believed to be reasonable. The Company reviews these matters and reflects changes in estimates as appropriate. Management believes that the following represents some of the more critical judgment areas in the applications of the Company's accounting policies which could have a material effect on the Company's financial position, liquidity or results of operations.

### *Goodwill*

The excess of the purchase price over the estimated fair value of the net assets acquired, including identified intangibles, in a business combination is recorded as goodwill. Goodwill is tested for impairment at least annually on October 1; however, impairment tests are performed more frequently when events or changes in circumstances indicate that the asset may be impaired. Impairment exists when carrying value exceeds fair value. Goodwill is evaluated for impairment at the reporting unit level.

Evaluating goodwill for impairment is a two-step process. In the first step, Chemours compares the carrying value of net assets to the fair value of the related operations. Chemours estimates the fair value of its reporting units using the income approach based on the present value of future cash flows. The factors considered in determining the cash flows include: 1) macroeconomic conditions; 2) industry and market considerations; 3) costs of raw materials, labor or other costs having a negative effect on earnings and cash flows; 4) overall financial performance; and 5) other relevant entity-specific events. If the fair value is determined to be less than the carrying value, a second step is performed to compute the amount of the impairment.

As a result of the tests performed in 2015, there was no impairment of the Company's goodwill as the fair value substantially exceeded the carrying values for each reporting units tested, except for our Sulfur reporting unit in the Chemicals Solutions segment.

Goodwill of $25 million was allocated to our Sulfur reporting unit. We performed the two-step impairment test for the Sulfur reporting unit and determined that the implied fair value of its goodwill was lower than its carrying value, resulting in a full impairment of the reporting unit's goodwill. As a result, Chemours recorded a $25 million pre-tax impairment charge for goodwill during the year ended December 31, 2015 in the Chemicals Solutions segment. See Note 13 to the Consolidated Financial Statements for further discussions.

The determination of whether or not goodwill is impaired involves a significant level of judgment in the assumptions underlying the approach used to determine the estimated fair value of our reporting units. Chemours believes that assumptions and rates used

Table of Contents

in the impairment assessment are reasonable.  However, these assumptions are judgmental and variations in any assumptions could result in materially different calculations of fair value. The Company will continue to evaluate goodwill on an annual basis as of October 1, and whenever events or changes in circumstances, such as significant adverse changes in operating results, market conditions or changes in management's business strategy, indicate that there may be a probable indicator of impairment. It is possible that the assumptions used by management related to the evaluation may change or that actual results may vary significantly from management's estimates.

*Valuation of Assets*

The assets and liabilities of acquired businesses are measured at their estimated fair values at the dates of acquisition.  The determination and allocation of fair value to the assets acquired and liabilities assumed is based on various assumptions and valuation methodologies requiring considerable management judgment, including estimates based on historical information, current market data and future expectations. The principal assumptions utilized in Chemours' valuation methodologies include revenue growth rates, operating margin estimates, royalty rates and discount rates. Although the estimates are deemed reasonable by management based on information available at the dates of acquisition, those estimates are inherently uncertain.

Assessment of potential impairment of property, plant and equipment, other intangible assets and investments in affiliates is an integral part of Chemours' normal ongoing review of operations. Chemours evaluates the carrying value of long-lived assets to be held and used when events or changes in circumstances indicate that the carrying value may not be recoverable. For purposes of recognition or measurement of an impairment loss, the assessment is performed on the asset or asset group at the lowest level for which identifiable cash flows are largely independent of the cash flows of other groups of assets and liabilities. To determine the level at which the assessment is performed, Chemours considers factors such as revenue dependency, shared costs and the extent of vertical integration. The carrying value of a long-lived asset is considered impaired when the total projected undiscounted cash flows from the use and eventual disposition of asset or asset group are less than its carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. The fair value methodology used is an estimate of fair market value which is made based on prices of similar assets or other valuation methodologies including present value techniques. Long-lived assets to be disposed of other than by sale are classified as held for use until their disposal. Long-lived assets to be disposed of by sale are classified as held for sale and are reported at the lower of carrying amount or fair market value less cost to sell. Depreciation is discontinued for long-lived assets classified as held for sale.

Testing for potential impairment of these assets is significantly dependent on numerous assumptions and reflects management's best estimates at a particular point in time. The dynamic economic environments in which Chemours' segments operate, and key economic and business assumptions with respect to projected selling prices, market growth and inflation rates, can significantly affect the outcome of impairment tests. Estimates based on these assumptions may differ significantly from actual results. Changes in factors and assumptions used in assessing potential impairments can have a significant impact on the existence and magnitude of impairments, as well as the time in which such impairments are recognized. In addition, Chemours continually reviews its diverse portfolio of assets to ensure they are achieving their greatest potential and are aligned with Chemours' growth strategy. Strategic decisions involving a particular group of assets may trigger an assessment of the recoverability of the related assets. Such an assessment could result in impairment losses. During 2015, Chemours recorded a pre-tax asset impairment charge in the Chemical Solutions segment of $45 million to adjust the carrying value of its asset group to fair value. See Notes 6 and 12 to the Consolidated Financial Statements for additional details related to this charge.

*Environmental Liabilities and Expenditures*

Chemours accrues for remediation activities when it is probable that a liability has been incurred and a reasonable estimate of the liability can be made. Environmental liabilities and expenditures included in the Consolidated Financial Statements include claims for matters that are liabilities of DuPont and its subsidiaries, that Chemours may be required to indemnify pursuant to the separation-related agreements executed prior to the Distribution. Accruals for environmental matters are recorded in cost of goods sold when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Accrued liabilities do not include claims against third parties and are not discounted.

Costs related to environmental remediation are charged to expense in the period incurred. Other environmental costs are also charged to expense in the period incurred, unless they increase the value of the property or reduce or prevent contamination from future operations, in which case, they are capitalized and amortized.

*Litigation*

Chemours accrues for litigation matters when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Litigation liabilities and expenditures included in the Consolidated Financial Statements represent

Table of Contents

litigation matters that are liabilities of DuPont and its subsidiaries, that Chemours may be required to indemnify pursuant to the separation-related agreements executed prior to the Distribution. Disputes between Chemours and DuPont may arise with respect to indemnification of these matters, including disputes based on matters of law or contract interpretation. If and to the extent these disputes arise, they could materially adversely affect Chemours' results of operations. Legal costs such as outside counsel fees and expenses are charged to expense in the period services are received.

*Income Taxes*

Prior to July 1, 2015, income taxes as presented herein attribute current and deferred income taxes of DuPont to Chemours' stand-alone financial statements in a manner that is systematic, rational, and consistent with the asset and liability method prescribed by Accounting Standards Codification 740, *Income Taxes* (ASC 740), issued by the Financial Accounting Standards Board (FASB). Accordingly, Chemours' income tax provision was prepared following the separate return method. The separate return method applies ASC 740 to the stand-alone financial statements of each member of the consolidated group as if the group member were a separate taxpayer and a stand-alone enterprise. As a result, actual tax transactions included in the Consolidated Financial Statements of DuPont may not be included in the separate combined financial statements of Chemours. Similarly, the tax treatment of certain items reflected in the separate combined financial statements of Chemours may not be reflected in the Consolidated Financial Statements and tax returns of DuPont; therefore, such items as net operating losses, credit carryforwards, and valuation allowances may exist in the stand-alone financial statements that may or may not exist in DuPont's Consolidated Financial Statements.

The taxable income (loss) of various Chemours entities, prior to July 1, 2015, was included in DuPont's consolidated tax returns, where applicable, in jurisdictions around the world. As such, separate income tax returns were not prepared for many Chemours' entities. Consequently, income taxes currently payable are deemed to have been remitted to DuPont, in cash, in the period the liability arose and income taxes currently receivable are deemed to have been received from DuPont in the period that a refund could have been recognized by Chemours had Chemours been a separate taxpayer. As described in Note 2 to the Consolidated Financial Statements, the operations comprising Chemours are in various legal entities which have no direct ownership relationship. Consequently, no provision has been made for income taxes on unremitted earnings of subsidiaries and affiliates. Unremitted earnings of subsidiaries outside the U.S. are considered to be reinvested indefinitely.

The provision for income taxes is determined using the asset and liability approach of accounting for income taxes. Under this approach, deferred taxes represent the future tax consequences expected to occur when the reported amounts of assets and liabilities are recovered or paid. The provision for income taxes represents income taxes paid or payable for the current year plus the change in deferred taxes during the year. Deferred taxes result from differences between the financial and tax basis of Chemours' assets and liabilities and are adjusted for changes in tax rates and tax laws when changes are enacted. Valuation allowances are recorded to reduce deferred tax assets when it is more likely than not that a tax benefit will not be realized. In evaluating the ability to realize deferred tax assets, the Company relies on, in order of increasing subjectivity, taxable income in prior carryback years, the future reversals of existing taxable temporary differences, tax planning strategies and forecasted taxable income using historical and projected future operating results.

The breadth of Chemours' operations and the global complexity of tax regulations require assessments of uncertainties and judgments in estimating the taxes that Chemours will ultimately pay. The final taxes paid are dependent upon many factors, including negotiations with taxing authorities in various jurisdictions, outcomes of tax litigation and resolution of disputes arising from federal, state and international tax audits in the normal course of business. A liability for unrecognized tax benefits is recorded when management concludes that the likelihood of sustaining such positions upon examination by taxing authorities is less than "more likely than not." It is Chemours' policy to include accrued interest related to unrecognized tax benefits in other income, net and income tax related penalties to be included in the provision for income taxes.

*Employee Benefits*

Prior to separation, certain of Chemours' employees participated in defined benefit pension and other post-employment benefit plans (the Plans) sponsored by DuPont and accounted for by DuPont in accordance with accounting guidance for defined benefit pension and other post-employment benefit plans. Substantially all expenses related to these plans were allocated in shared entities and reported within costs of goods sold, selling, general and administrative expenses and research and development expense in the Consolidated Statements of Operations. Chemours considered all plans to be part of a multi-employer plan with DuPont prior to January 1, 2015.

In connection with the spin-off, Chemours retained the existing Netherlands pension plan and an agreement was executed in 2015 to ensure continuance of the plan for both DuPont and Chemours employees and retirees. As a result of that agreement, Chemours now accounts for the Netherlands plan as a multiple employer plan. Additionally, in 2015, Chemours formed new pension plans

53

Table of Contents

in Taiwan, Germany, Belgium, Switzerland, Japan, Korea and Mexico that mirror the plans historically operated by DuPont in these countries. The new plans are accounted for under the single employer method.

The amounts recognized in the Consolidated Financial Statements related to pension and other long-term employee benefits plans are determined from actuarial valuations. Inherent in these valuations are assumptions including expected return on plan assets, discount rates at which liabilities could have been settled, rate of increase in future compensation levels, and mortality rates. These assumptions are updated annually and are disclosed in Note 21 to the Consolidated Financial Statements. In accordance with U.S. GAAP, actual results that differed from the assumptions are accumulated and amortized over future periods and therefore, affect expense recognized and obligations recorded in future periods.

Chemours generally utilizes discount rates that are developed by matching the expected cash flows of each benefit plan to various yield curves constructed from a portfolio of high quality, fixed income instruments provided by the plan's actuary as of the measurement date. As of December 31, 2015, the weighted average discount rate was 2.39%.

Expected long-term rate of return on assets is determined by performing a detailed analysis of historical and expected returns based on the strategic asset allocation of the underlying asset class applicable to each country. We also consider our historical experience with the pension fund asset performance. The expected long-term rate of return is an assumption and not what is expected to be earned in any one particular year. The weighted-average long-term rate of return assumption used for determining net periodic pension expense for 2015 was 7.21%.

The estimated impact of a 50 basis point increase of the discount rate to the net periodic benefit cost for 2015 would result in an increase of $5 million, while the impact of a 50 basis point decrease of the discount rate would result in an increase of approximately $7 million. The estimated impact of a 50 basis point increase of the expected return on asset assumption on the net periodic benefit cost for 2015 would result in a decrease of approximately $6 million, while the impact of a 50 basis point decrease would result in an increase of $6 million.

**Environmental Matters**

*Environmental Expenses*

Environmental expenses charged to current operations include environmental operating costs and the increase in the remediation accrual, if any, during the period reported. As a result of its operations, Chemours incurs costs for pollution abatement activities including waste collection and disposal, installation and maintenance of air pollution controls and wastewater treatment, emissions testing and monitoring and obtaining permits. Chemours also incurs costs for environmental-related research and development activities including environmental field and treatment studies as well as toxicity and degradation testing to evaluate the environmental impact of products and raw materials. Management expects that such expenses in 2016 will be comparable to 2015 and, therefore, does not believe that year over year changes, if any, in environmental expenses charged to current operations will have a material impact on Chemours' financial position, liquidity or results of operations.

*Remediation Accrual*

Annual expenditures in the near future are not expected to vary significantly from the range of such expenditures incurred during the past few years. Longer term, expenditures are subject to considerable uncertainty and may fluctuate significantly. Changes in the remediation accrual are summarized below.

| *(Dollars in millions)* | | |
|---|---|---|
| Balance at December 31, 2013 | $ | 274 |
| Remediation Payments | | (38) |
| Increase in Remediation Accrual | | 59 |
| Balance at December 31, 2014 | | 295 |
| Remediation Payments | | (43) |
| Increase in Remediation accrual | | 38 |
| Balance at December 31, 2015 | $ | 290 |

Chemours is also subject to contingencies pursuant to environmental laws and regulations that in the future may require further action to correct the effects on the environment of prior disposal practices or releases of chemical or petroleum substances by

54

Table of Contents

Chemours or other parties. Chemours accrues for environmental remediation activities consistent with the policy as described in Note 3 to the Consolidated Financial Statements. Much of this liability results from the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, often referred to as Superfund), the Resource Conservation and Recovery Act (RCRA) and similar state and global laws. These laws require certain investigative, remediation and restoration activities at sites where Chemours conducts or once conducted operations or at sites where Chemours-generated waste was disposed. The accrual also includes estimated costs related to a number of sites identified for which it is probable that environmental remediation will be required, but which are not currently the subject of enforcement activities.

As of December 31, 2015, Chemours, through DuPont, has been notified of potential liability under the CERCLA or similar state laws at about 174 sites around the U.S., including approximately 22 sites for which Chemours does not believe it has liability based on current information. Active remediation is under way at approximately 53 of these sites. In addition, at December 31, 2015, liability at approximately 66 sites, has been resolved either by completing remedial actions with other Potentially Responsible Parties (PRPs) or participating in "de minimis buyouts" with other PRPs whose waste, like Chemours', represented only a small fraction of the total waste present at a site. The Company received notice of potential liability at two new sites through December 31, 2015. During 2014, Chemours received notice of three new sites.

At December 31, 2015, the Consolidated Balance Sheet included a liability of $290 million relating to these matters which, in management's opinion, is appropriate based on existing facts and circumstances. The average time-frame over which the accrued or presently unrecognized amounts may be paid, based on past history, is estimated to be 15 to 20 years. Remediation activities vary substantially in duration and cost from site to site. These activities, and their associated costs, depend on the mix of unique site characteristics, evolving remediation technologies, diverse regulatory agencies and enforcement policies, as well as the presence or absence of other potentially responsible parties. In addition, Chemours, through DuPont, has limited available information for certain sites or is in the early stages of discussions with regulators. For these sites in particular there may be considerable variability between the remediation activities that are currently being undertaken or planned, as reflected in the liability recorded at December 31, 2015, and the ultimate actions that could be required.

Therefore, considerable uncertainty exists with respect to environmental remediation costs and, under adverse changes in circumstances, the potential liability may range up to approximately $611 million above the amount accrued at December 31, 2015. Except for Pompton Lakes, which is discussed further below, based on existing facts and circumstances, management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the financial position, liquidity or results of operations of Chemours.

*Pompton Lakes*

The environmental remediation accrual is $87 million at December 31, 2015 related to activities at Chemours' site in Pompton Lakes, New Jersey. Management believes that it is reasonably possible that remediation activities at this site could range up to $119 million, including previously accrued amounts. This could have a material impact on the liquidity of Chemours in the period recognized. However, management does not believe this would have a material adverse effect on Chemours' combined financial position, liquidity or results of operations. During the twentieth century, blasting caps, fuses and related materials were manufactured at Pompton Lakes. Operating activities at the site ceased in the mid 1990's. Primary contaminants in the soil and sediments are lead and mercury. Ground water contaminants include volatile organic compounds.

Under the authority of the EPA and the New Jersey Department of Environmental Protection, remedial actions at the site are focused on investigating and cleaning up the area. Ground water monitoring at the site is ongoing and Chemours, through DuPont, has installed and continues to install vapor mitigation systems at residences within the ground water plume. In addition, Chemours is further assessing ground water conditions. In June 2015, the EPA issued a modification to the site's RCRA permit that requires Chemours to dredge mercury contamination from a 36 acre area of the lake and remove sediment from 2 other areas of the lake near the shoreline. Chemours expects to spend about $50 million over the next two to three years, which is included in the remediation accrual at December 31, 2015, in connection with remediation activities at Pompton Lakes, including activities related to the EPA's proposed plan. The Company expects these activities to begin sometime on or after mid-2016; however initiation of this work in the field is dependent upon timing of agency approval of permits and implementation plans.

*Environmental Capital Expenditures*

As of December 31, 2015, Chemours spent approximately $27 million on environmental capital projects either required by law or necessary to meet Chemours' internal environmental goals. Chemours currently estimates expenditures for environmental-related capital projects to be approximately $17 million in 2016, which is included in our estimate of overall capital expenditures discussed in the Liquidity and Capital Resources section of this MD&A. In the U.S., additional capital expenditures are expected to be required over the next decade for treatment, storage and disposal facilities for solid and hazardous waste and for compliance

55

Table of Contents

with the Clean Air Act (CAA). Until all CAA regulatory requirements are established and known, considerable uncertainty will remain regarding estimates for future capital expenditures.  However, management does not believe that the costs to comply with these requirements will have a material impact on the financial position or liquidity of Chemours.

*Climate Change*

Chemours believes that climate change is an important global issue that presents risks and opportunities. Chemours continuously evaluates opportunities for existing and new product and service offerings in light of the anticipated demands of a low-carbon economy. Our new, low GWP products are anticipated to reduce greenhouse gas content of refrigerants by 90 million metric tons carbon dioxide equivalent in the U.S. and greater than 300 million metric tons worldwide by 2025.

We continue to monitor legislative and regulatory developments to control or limit greenhouse gas (GHG) emissions. Depending on the scope and content, changes could affect Chemours' energy source and supply choices, as well as increase the cost of energy and raw materials derived from fossil fuels. Such efforts are also expected to provide the business community with greater certainty for the regulatory future, help guide investment decisions, and drive growth in demand for low-carbon and energy-efficient products, technologies, and services. Similarly, demand is expected to grow for products that facilitate adaptation to a changing climate.

Several of Chemours facilities in the EU are regulated under the EU Emissions Trading Scheme. In 2015, China announced a national cap and trade program to be implemented in 2017. Similarly, South Korea implemented its emission trading scheme on January 1, 2015. In the EU, U.S. and Japan, policy efforts to reduce the GHG emissions associated with gases used in refrigeration and air conditioning are creating market opportunities for new solutions to lower GHG emissions.

In May 2010, the EPA launched a phased-in scheme to regulate GHG emissions first from large stationary sources under the existing Clean Air Act permitting requirements administered by state and local authorities. As a result, large capital investments may be required to install Best Available Control Technology on major new or modified sources of GHG emissions. This type of GHG emissions regulation by the EPA, in the absence of or in addition to federal legislation, could result in more costly, less efficient facility-by-facility controls versus a federal program that incorporates policies that provide an economic balance that does not severely distort markets.  In 2015, the EPA promulgated regulations for carbon dioxide emissions from new and reconstructed/modified Electric Generating Units (EGUs) and for carbon dioxide emissions from existing EGUs that would be based on individual state emission reduction programs. If these or similar regulations are enacted, they may affect the long term price and supply of electricity and natural gas and demand for products that contribute to energy efficiency and renewable energy. Chemours, as well as our suppliers and customers, could be in a competitive disadvantage by the added costs of complying with a variety of state-specific requirements. However, the precise impact of these regulations is uncertain due to the anticipated legal challenges to this regulatory approach.

**PFOA**

See discussion under "PFOA" in Note 19 to the Consolidated Financial Statements.

**Non-GAAP Financial Measures**

We prepare our financial statements in accordance with U.S. GAAP. To supplement our financial information presented in accordance with U.S. GAAP, we provide the following non-GAAP financial measures, "Adjusted EBITDA", "Adjusted Net Income" and "Free Cash Flow", in order to clarify and provide investors with a better understanding of the company's performance when analyzing changes in our underlying business between reporting periods and provide for greater transparency with respect to supplemental information used by management in its financial and operational decision making. We utilize Adjusted EBITDA as the primary measure of segment profitability used by our Chief Operating Decision Maker (CODM).

Adjusted EBITDA is defined as income (loss) before taxes excluding the following:

•     interest expense, depreciation and amortization,

•     non-operating pension and other postretirement employee benefit costs,

•     exchange gains (losses),

•     employee separation, asset-related charges and other charges, net,

•     asset impairments,

56

Table of Contents

- gains (losses) on sale of business or assets, and

- other items not considered indicative of our ongoing operational performance and expected to occur infrequently.

Adjusted net income (loss) is defined as net (loss) income attributable to Chemours adjusted for items excluded from Adjusted EBITDA except interest expense, depreciation and amortization, and certain (benefit from) provision for income taxes. Free Cash Flow is defined as cash provided by (used in) operating activities less cash used for purchases of property, plant and equipment as disclosed in the Consolidated Statements of Cash Flows.

We believe the presentation of these non-GAAP financial measures, when used in conjunction with GAAP financial measures, is a useful financial analysis tool that can assist investors in assessing the company's operating performance and underlying prospects. This analysis should not be considered in isolation or as a substitute for analysis of our results as reported under GAAP. In the future, we may incur expenses similar to those eliminated in this presentation. Our presentation of Adjusted EBITDA, Adjusted Net Income and Free Cash Flow should not be construed as an inference that our future results will be unaffected by unusual or infrequently occurring items. The non-GAAP financial measures we use may be defined differently from measures with the same or similar names used by other companies. This analysis, as well as the other information provide in this annual report on Form 10-K, should be read in conjunction with the company's financial statements and notes thereto included in this report.

The following table reconciles Adjusted EBITDA and Adjusted Net Income discussed above to net income (loss) attributable to Chemours for the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| (Dollars in millions) | 2015 | 2014 | 2013 |
| **Net (loss) income attributable to Chemours** | $ (90) | $ 400 | $ 423 |
| Non-operating pension and other postretirement employee benefit costs | (3) | 22 | 114 |
| Exchange losses (gains) | (19) | 66 | 31 |
| Restructuring charges | 285 | 21 | 2 |
| Asset impairments | 73 | - | - |
| Losses (gains) on sale of business or assets | 9 | (40) | - |
| Transaction, legal and other charges | 17 | - | - |
| Benefit from income taxes relating to reconciling items [1] | (129) | (16) | (53) |
| **Adjusted Net Income** | 143 | 453 | 517 |
| Net income attributable to noncontrolling interests | - | 1 | 1 |
| Interest expense | 132 | - | - |
| Depreciation and amortization | 267 | 257 | 261 |
| All remaining provision for income taxes [1] | 31 | 165 | 205 |
| **Adjusted EBITDA** | $ 573 | $ 876 | $ 984 |
| | | | |
| Weighted average number of common shares outstanding - Basic [2] | 180,993,623 | 180,966,833 | 180,966,833 |
| Weighted average number of common shares outstanding - Diluted [2] | 181,737,587 | 180,966,833 | 180,966,833 |
| **Adjusted earnings per common share, basic** | $ 0.79 | $ 2.50 | $ 2.86 |
| **Adjusted earnings per common share, diluted** | $ 0.79 | $ 2.50 | $ 2.86 |
| **(Loss) earnings per common share, basic** | $ (0.50) | $ 2.21 | $ 2.34 |
| **(Loss) earnings per common share, diluted [3]** | $ (0.50) | $ 2.21 | $ 2.34 |

[1]   Total of (benefit from) provision for income taxes reconciles to the amount reported in the consolidated statement of operations for the years ended December 31, 2015, 2014 and 2013.

[2]   On July 1, 2015, DuPont distributed 180,966,833 shares of Chemours' common stock to holders of its common stock. All earnings per common share amounts for the years ended December 31, 2014 and 2013 were calculated using the shares distributed on July 1, 2015.

[3]   Diluted earnings per share considers the impact of potentially dilutive shares except in periods in which there is a loss because the inclusion of the potential common shares would have an antidilutive effect.

Table of Contents

**Item 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to changes in foreign currency exchange rates because of our global operations. As a result, we have assets, liabilities and cash flows denominated in a variety of foreign currencies. We are also exposed to changes in the prices of certain commodities that we use in production. Changes in these rates and commodity prices may have an impact on future cash flow and earnings. We manage these risks through normal operating and financing activities and, when deemed appropriate, through the use of derivative financial instruments. We do not enter into derivative financial instruments for trading or speculative purposes.

By using derivative instruments, we are subject to credit and market risk. The fair market value of the derivative instruments is determined by using valuation models whose inputs are derived using market observable inputs, and reflects the asset or liability position as of the end of each reporting period. When the fair value of a derivative contract is positive, the counterparty owes us, thus creating a receivable risk for us. We are exposed to counterparty credit risk in the event of non-performance by counterparties to our derivative agreements. We minimize counterparty credit (or repayment) risk by entering into transactions with major financial institutions of investment grade credit rating.

**Foreign Currency Risks**

Fluctuations in the value of the U.S. dollar compared to foreign currencies may impact Chemours' earnings. In 2015, Chemours entered into foreign currency forward contracts to minimize volatility in earnings related to the foreign exchange gains and losses resulting from remeasuring monetary assets and liabilities that Chemours holds which are denominated in non-functional currencies. These derivatives are stand-alone and have not been designated as a hedge. For the year ended December 31, 2015, we had open foreign exchange forward contracts with an aggregate notional U.S. dollar equivalent of $288 million, the fair value of which amounted to less than $1 million of net unrealized gain.

Prior to 2015, Chemours participated in DuPont's foreign currency hedging program to reduce earnings volatility associated with remeasurement of foreign currency denominated net monetary assets. DuPont formally documented the hedge relationships, including identification of the hedging instruments and hedged items, the risk management objectives and strategies for undertaking the hedge transactions, and the methodologies used to assess effectiveness and measure ineffectiveness. Realized gains and losses on derivative instruments of DuPont were allocated by DuPont to Chemours based on projected exposure. Chemours recognized its allocable share of the gains and losses on DuPont's derivative financial instruments in earnings when the forecasted purchases occurred for natural gas hedges and when the forecasted sales occurred for foreign currency hedges. The impact of Chemours' participation in the foreign currency hedging program was a gain of $4 million in 2014.

In July 2015, Chemours designated its €360 million Euro notes as a hedge of its net investments in certain of its international subsidiaries that use the Euro as functional currency in order to reduce the volatility in stockholders' equity caused by the changes in foreign currency exchange rates of the Euro with respect to the U.S. dollar. Chemours uses the spot method to measure the effectiveness of the net investment hedge. Under this method, for each reporting period, the change in the carrying value of the Euro notes due to remeasurement of the effective portion is reported in accumulated other comprehensive loss in the Consolidated Balance Sheet and the remaining change in the carrying value of the ineffective portion, if any, is recognized in other income, net in the Consolidated Statements of Operations. Chemours evaluates the effectiveness of its net investment hedge at the beginning of every quarter.

See Note 20 to the Consolidated Financial Statements for further information on derivative financial instruments.

*Sensitivity Analysis*

In a hypothetical adverse change in the market prices or rates that existed at December 31, 2015, a 10% increase in the U.S. dollar against our outstanding hedged contracts on foreign currencies, such as Chinese yuan, British pound, and Brazilian real, at the currency exchange rates as of December 31, 2015 would increase our net gain by approximately $3 million, while a 10% depreciation of the U.S. Dollar against the same hedged currencies would decrease our net gain by approximately $4 million.

Chemours' risk management programs and the underlying exposure are closely correlated, such that the potential loss in value for the risk management portfolio described above would be largely offset by change in the value of the underlying exposure. See Note 20 to the Consolidated Financial Statements for further information.

**Concentration of Credit Risk**

Chemours' sales are not dependent on any single customer. As of December 31, 2015 and December 31, 2014, no one individual customer balance represented more than five percent of Chemours' total outstanding receivables balance. Credit risk associated with Chemours' receivables balance is representative of the geographic, industry and customer diversity associated with Chemours'

Table of Contents

global businesses. As a result of our customer base being widely dispersed, we do not believe our exposure to credit-related losses related to our business as of December 31, 2015 and December 31, 2014 was material.

Chemours also maintains strong credit controls in evaluating and granting customer credit. As a result, it may require that customers provide some type of financial guarantee in certain circumstances. Length of terms for customer credit varies by industry and region.

### Commodities Risk

A portion of our products and raw materials are commodities whose prices fluctuate as market supply and demand fundamentals change. Accordingly, product margins and the level of our profitability tend to fluctuate with the changes in the business cycle. Chemours tries to protect against such instability through various business strategies. These include provisions in sales contracts allowing us to pass on higher raw material costs through timely price increases and formula price contracts to transfer or share commodity price risk. Chemours did not have any commodity derivative instruments in place as of December 31, 2015 or December 31, 2014.

### Item 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The financial statements and supplementary data required by this Item are included herein, commencing on page F-1 of this Annual Report.

### Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

### Item 9A. CONTROLS AND PROCEDURES

#### Evaluation of Disclosure Controls and Procedures

The company maintains a system of disclosure controls and procedures to give reasonable assurance that information required to be disclosed in the Company's reports filed or submitted under the Securities Exchange Act of 1934 (Exchange Act) is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission. These controls and procedures also give reasonable assurance that information required to be disclosed in such reports is accumulated and communicated to management to allow timely decisions regarding required disclosures.

As of December 31, 2015, the Company's Chief Executive Officer (CEO) and Chief Financial Officer (CFO), together with management, conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures pursuant to Rules 13a-15(e) and 15d-15(e) of the Exchange Act. Based on that evaluation, the CEO and CFO concluded that these disclosure controls and procedures are effective at the reasonable assurance level referenced above.

#### Changes in Internal Control over Financial Reporting

There have been no changes in the Company's internal control over financial reporting that occurred during the quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

#### Management Reporting on Internal Control over Financial Reporting

This annual report does not include a report of management's assessment regarding internal control over financial reporting or an attestation report of the Company's registered public accounting firm due to a transition period established by rules of the SEC for newly public companies.

Table of Contents

**Item 9B. OTHER INFORMATION**

None.

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

Except for information concerning executive officers, which is included in Part I of this annual report under the caption "Executive Officers of the Registrant", the information about the Company's directors required by this Item 10 is contained under the caption "Proposal 1 - Election of Directors" in the Company's definitive proxy statement for its 2016 annual meeting of stockholders (2016 Proxy Statement) which the Company anticipates filing with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates, and is incorporated herein by reference.

Information regarding the Company's Audit Committee, code of ethics, and compliance with Section 16(a) of the Exchange Act is contained in the 2016 Proxy Statement under the captions "Corporate Governance," "Board Structure and Committee Composition" and "Section 16(a) Beneficial Ownership Reporting Compliance" and is incorporated herein by reference.

**ITEM 11. EXECUTIVE COMPENSATION**

The information required by this Item 11 is contained in the 2016 Proxy Statement under the captions "Executive Compensation", "Director Compensation", "Compensation Committee Report" and "Compensation Committee Interlocks and Insider Participation" and is incorporated herein by reference.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by Item 12 and not otherwise set forth below is contained in the 2016 Proxy Statement under the caption "Security Ownership of Certain Beneficial Owners and Management" and is incorporated herein by reference.

**Securities authorized for issuance under equity compensation plans as of December 31, 2015**

*(shares in thousands, except per share)*

| Plan Category | Number of securities to be issued upon Exercise of Outstanding Options, Warrants and Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights [2] | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans [3] |
|---|---|---|---|
| Equity compensation plans approved by security holders | 10,633 [1] | $ 14.66 | 11,773 |

[1] Includes stock-settled time-vested and performance-based restricted stock units granted and stock units deferred under the company's Equity and Incentive Plan.

[2] Represents the weighted-average exercise price of the outstanding stock options only; the outstanding stock-settled time-vested and performance-based restricted stock units and deferred stock units are not included in this calculation.

[3] Reflects shares available pursuant to the issuance of stock options, restricted stock, restricted stock units or other stock-based awards under the Equity and Incentive Plan approved by our former parent prior to separation while the Company was a wholly-owned subsidiary of DuPont (see Note 22 to Consolidated Financial Statements for further information). The maximum number of shares of stock reserved for the grant or settlement of awards under the plan shall be 13,500,000 plus the number of shares of stock of the converted DuPont awards. The aggregate number of shares of stock granted during any fiscal year to any single individual (other than with regard to converted DuPont awards) shall not exceed 3,000,000.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE**

The information required by Item 13 is contained in the 2016 Proxy Statement under the captions "Director Independence" and "Certain Relationships and Transactions" and is incorporated herein by reference.

Table of Contents

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

The information required by Item 14 is contained in the 2016 Proxy Statement under the captions "Proposal 4 - Ratification of Selection of Independent Registered Public Accounting Firm", "Fees Paid to Independent Registered Public Accounting Firm" and "Audit Committee's Pre-Approval Policies and Procedures" and is incorporated herein by reference.

61

Table of Contents

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

**(a)(1) Financial Statements**

See the Index to the Consolidated Financial Statements on page F-1 of this report.

**(a)(2) Financial Statement Schedules**

See Schedule II listed below.

**Schedule II - Valuation and Qualifying Accounts**

| | Year Ended December 31, | | |
|---|---|---|---|
| (Dollars in millions) | 2015 | 2014 | 2013 |
| *Accounts Receivable - Allowance for Doubtful Accounts* | | | |
| Balance at beginning of period | $ 4 | $ 7 | $ 6 |
| Additions charged to expenses | 1 | 1 | 2 |
| Deductions from reserves [1] | - | (4) | (1) |
| Currency translation | (1) | - | - |
| Balance at end of period | $ 4 | $ 4 | $ 7 |
| *Deferred Tax Assets - Valuation Allowance* | | | |
| Balance at beginning of period | $ 36 | $ 26 | $ 19 |
| Net charges to income tax expense | - | 10 | 7 |
| Release of valuation allowance [2] | (36) | - | - |
| Balance at end of period | $ - | $ 36 | $ 26 |

[1] Bad debt write-offs were less than $1 for the year ended December 31, 2015.

[2] Release of valuation allowance during 2015 was primarily related to the tax attributes retained by DuPont pursuant to the tax matters agreement.

**(a)(3) Exhibits**

See the Exhibit List beginning on page 61 of this report.

62

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

The CHEMOURS COMPANY

(Registrant)

| | | |
|---|---|---|
| Date: | February 25, 2016 | |
| By: | /s/ Mark E. Newman | |
| | Mark E. Newman | |
| | Senior Vice President and Chief Financial Officer | |
| | (As Duly Authorized Officer and Principal Financial Officer) | |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant in the capacities and on the dates indicated:

| Signature | Title(s) | Date |
|---|---|---|
| /s/ Mark P. Vergnano<br>Mark P. Vergnano | President, Chief Executive Officer, and Director<br>(Principal Executive Officer) | February 25, 2016 |
| /s/ Mark E. Newman<br>Mark E. Newman | Senior Vice President and Chief Financial Officer<br>(Principal Financial Officer) | February 25, 2016 |
| /s/ Amy P. Trojanowski<br>Amy P. Trojanowski | Vice President and Controller<br>(Principal Accounting Officer) | February 25, 2016 |
| /s/ Richard H. Brown<br>Richard H. Brown | Chairman of the Board | February 25, 2016 |
| /s/ Curtis V. Anastasio<br>Curtis V. Anastasio | Director | February 25, 2016 |
| /s/ Bradley J. Bell<br>Bradley J. Bell | Director | February 25, 2016 |
| /s/ Mary B. Cranston<br>Mary B. Cranston | Director | February 25, 2016 |
| /s/ Curtis J. Crawford<br>Curtis J. Crawford | Director | February 25, 2016 |
| /s/ Dawn L. Farrell<br>Dawn L. Farrell | Director | February 25, 2016 |
| /s/ Stephen D. Newlin<br>Stephen D. Newlin | Director | February 25, 2016 |

Table of Contents

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Separation Agreement by and between E. I. du Pont de Nemours and Company and the Chemours Company (incorporated by reference to Exhibit 2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 3.1 | Company's Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 3.2 | Company's Amended and Restated Bylaws (incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.1 | Second Amended and Restated Transition Services Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.2 | Tax Matters Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.3 | Employee Matters Agreement by and between E. I. du Pont de Nemours and Company and The Chemours Company (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.4 | Third Amended and Restated Intellectual Property Cross-License Agreement by and among E. I. du Pont de Nemours and Company, The Chemours Company FC and The Chemours Company TT, LLC (incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.5* | Offer of Employment Letter between Mark E. Newman and E. I. du Pont de Nemours and Company, dated October 14, 2014 (incorporated by reference to Exhibit 10.5 to the Company's Amendment No. 2 to Form 10, as filed with the U.S. Securities and Exchange Commission on April 21, 2015). |
| 10.6* | Offer of Employment Letter between Elizabeth Albright and E. I. du Pont de Nemours and Company, dated September 25, 2014 (incorporated by reference to Exhibit 10.6 to the Company's Amendment No. 2 to Form 10, as filed with the U.S. Securities and Exchange Commission on April 21, 2015). |
| 10.7 | Indenture, dated May 12, 2015 by and among The Chemours Company, The Guarantors party thereto and U.S. Bank National Association, as Trustee, Elavon Financial Services Limited, as Registrar and Transfer Agent for the Euro Notes (incorporated by reference to Exhibit 10.7 to the Company's Amendment No. 3 to Form 10, as filed with the U.S. Securities and Exchange Commission on May 13, 2015). |
| 10.8 | First Supplemental Indenture, dated May 12, 2015, by and among The Chemours Company, the Guarantors party thereto and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 10.8 to the Company's Amendment No. 3 to Form 10, as filed with the U.S. Securities and Exchange Commission on May 13, 2015). |
| 10.9 | Second Supplemental Indenture, dated May 12, 2015, by and among The Chemours Company, the Guarantors party thereto and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 10.9 to the Company's Amendment No. 3 to Form 10, as filed with the U.S. Securities and Exchange Commission on May 13, 2015). |
| 10.10 | Third Supplemental Indenture, dated May 12, 2015, by and among The Chemours Company, the Guarantors party thereto and U.S. Bank National Association, as Trustee, Elavon Financial Services Limited, UK Branch, as Paying Agent for the Euro Notes and Elavon Financial Services Limited, as Registrar and Transfer Agent for the Euro Notes (incorporated by reference to Exhibit 10.10 to the Company's Amendment No. 3 to Form 10, as filed with the U.S. Securities and Exchange Commission on May 13, 2015). |

64

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.11 | 6.625% Notes due 2023 (included in Exhibit 10.8). |
| 10.12 | 7.000% Notes due 2025 (included in Exhibit 10.9). |
| 10.13 | 6.125% Notes due 2023 (included in Exhibit 10.10). |
| 10.14(1) | Credit Agreement, dated May 12, 2015 by and among The Chemours Company, certain Guarantors party thereto and JPMorgan Chase Bank, N.A., as administrative agent (incorporated by reference to Exhibit 10.14 to the Company's Amendment No. 3 to Form 10, as filed with the U.S. Securities and Exchange Commission on May 13, 2015). |
| 10.14(2) | Amendment No. 1 to the Credit Agreement among The Chemours Company, the lenders and issuing banks thereto and JPMorgan Chase Bank, N.A., as administrative agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on September 28, 2015). |
| 10.14(3) | Amendment No. 2 to the Credit Agreement dated February 19, 2016 by and among The Chemours Company, the lenders and issuing banks thereto and JPMorgan Chase Bank, N.A., as administrative agent (incorporated by reference to Item 10.1 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on February 23, 2016). |
| 10.15 | Registration Rights Agreement, dated May 12, 2015, by and among The Chemours Company, certain Guarantors party thereto and Credit Suisse Securities (USA) LLC and J.P. Morgan Securities LLC, as representatives of the Dollar purchases and Credit Suisse Securities (USA) LLC and J.P Morgan Securities plc, as representatives of the Euro Purchasers (incorporated by reference to Exhibit 10.15 to the company's Amendment No. 3 to Form 10, as filed with the U.S. Securities and Exchange Commission on May 13, 2015). |
| 10.16* | The Chemours Company Equity and Incentive Plan (incorporated by reference to Exhibit 4.1 to the Company's Form S-8 (File No. 333-205391, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.17* | The Chemours Company Retirement Savings Restoration Plan (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.18* | The Chemours Company Management Deferred Compensation Plan (incorporated by reference to Exhibit 4.1 to the Company's Form S-8 (File No. 333-205393), as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.19* | The Chemours Company Stock Accumulation and Deferred Compensation Plan for Directors (incorporated by reference to Exhibit 4.1 to the Company's Form S-8 (File No. 333-205392), as filed with the U.S. Securities and Exchange Commission on July 1, 2015). |
| 10.20* | The Chemours Company Senior Executive Severance Plan (incorporated by reference to Exhibit 10.20 to the company's Amendment No. 3 to Form 10, as filed with the U.S. Securities and Exchange Commission on May 13, 2015). |
| 10.21* | Form of Option Award Terms under the Company's Equity Incentive Plan (incorporated by reference to Exhibit 10.21 to the company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015). |
| 10.22* | Form of Restricted Stock Unit Terms under the Company's Equity Incentive Plan (incorporated by reference to Exhibit 10.22 to the company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015). |
| 10.23* | Form of Stock Appreciation Right Terms under the Company's Equity Incentive Plan (incorporated by reference to Exhibit 10.23 to the company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015). |
| 10.24* | Form of Restricted Stock Unit Terms for Non-Employee Directors under the Company's Equity Incentive Plan (incorporated by reference to Exhibit 10.24 to the company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015). |

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.25* | Form of Performance-Based Restricted Stock Unit Terms for August 2015 (incorporated by reference to Exhibit 10.25 to the company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015). |
| 10.26* | Form of Performance Share Unit Award Terms under the Company's Equity Incentive Plan. |
| 10.27* | Form of Cash Performance Award Terms under the Company's Equity Incentive Plan. |
| 10.28* | Form of Indemnification Agreement for officers and directors. |
| 10.30 | Letter Agreement dated January 28, 2016 by and between The Chemours Company and E. I. du Pont de Nemours and Company (incorporated by reference to Item 10.2 to the Company's Current Report on Form 8-K, as filed with the U.S. Securities and Exchange Commission on February 23, 2016). |
| 21 | Subsidiaries of the Registrant |
| 23 | Consent of Independent Registered Public Accounting Firm |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification of the Company's Principal Executive Officer. |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification of the Company's Principal Financial Officer. |
| 32.1 | Section 1350 Certification of the company's Principal Executive Officer. The information contained in this Exhibit shall not be deemed filed with the Securities and Exchange Commission nor incorporated by reference in any registration statement filed by the registrant under the Securities Act of 1933, as amended. |
| 32.2 | Section 1350 Certification of the company's Principal Financial Officer. The information contained in this Exhibit shall not be deemed filed with the Securities and Exchange Commission nor incorporated by reference in any registration statement filed by the registrant under the Securities Act of 1933, as amended. |
| 95 | Mine Safety Disclosures |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

_____
*Management contract or compensatory plan or arrangement.

66

Table of Contents

**The Chemours Company**
**Index to the Consolidated Financial Statements**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2015, 2014 and 2013 | F-3 |
| Consolidated Statements of Comprehensive (Loss) Income for the years ended December 31, 2015, 2014 and 2013 | F-4 |
| Consolidated Balance Sheets as of December 31, 2015 and 2014 | F-5 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2015, 2014 and 2013 | F-6 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2015, 2014 and 2013 | F-7 |
| Notes to the Consolidated Financial Statements | F-8 |

F- 1

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Shareholders of The Chemours Company:

In our opinion, the consolidated financial statements listed in the index appearing under Item 15(a)(1) present fairly, in all material respects, the financial position of The Chemours Company and its subsidiaries at December 31, 2015 and 2014, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2015 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion the financial statement schedule listed in the index appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and the financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and the financial statement schedule based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP

Philadelphia, Pennsylvania
February 25, 2016

F- 2

Table of Contents

**The Chemours Company**
**Consolidated Statements of Operations**
*(Dollars in millions, except per share)*

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2015 | | 2014 | | 2013 |
| Net sales | $ | 5,717 | $ | 6,432 | $ | 6,859 |
| Cost of goods sold | | 4,762 | | 5,072 | | 5,395 |
| Gross profit | | 955 | | 1,360 | | 1,464 |
| Selling, general and administrative expense | | 632 | | 685 | | 768 |
| Research and development expense | | 97 | | 143 | | 164 |
| Employee separation and asset related charges, net | | 333 | | 21 | | 2 |
| Goodwill impairment | | 25 | | - | | - |
| Total expenses | | 1,087 | | 849 | | 934 |
| Equity in earnings of affiliates | | 22 | | 20 | | 22 |
| Interest expense, net | | (132) | | - | | - |
| Other income, net | | 54 | | 19 | | 24 |
| **(Loss) income before income taxes** | | (188) | | 550 | | 576 |
| (Benefit from) provision for income taxes | | (98) | | 149 | | 152 |
| **Net (loss) income** | | (90) | | 401 | | 424 |
| Less: Net income attributable to noncontrolling interests | | - | | 1 | | 1 |
| **Net (loss) income attributable to Chemours** | $ | (90) | $ | 400 | $ | 423 |
| | | | | | | |
| **Per share data** | | | | | | |
| **Basic (loss) earnings per share of common stock** | $ | (0.50) | $ | 2.21 [1] | $ | 2.34 [1] |
| **Diluted (loss) earnings per share of common stock** | $ | (0.50) | $ | 2.21 [1] | $ | 2.34 [1] |
| **Dividends per share of common stock** | $ | 0.58 | | N/A | | N/A |

[1] On July 1, 2015, E. I. du Pont de Nemours and Company distributed 180,966,833 shares of Chemours' common stock to holders of its common stock. Basic and diluted (loss) earnings per common share for the years ended December 31, 2014 and 2013 were calculated using the shares distributed on July 1, 2015. Refer to Note 9 for information regarding the calculation of basic and diluted earnings per share.

*See accompanying notes to the consolidated financial statements.*

F- 3

Table of Contents

**The Chemours Company**
**Consolidated Statements of Comprehensive (Loss) Income**
*(Dollars in millions)*

| | Year Ended December 31, | | | | | | | | |
| | 2015 | | | 2014 | | | 2013 | | |
| | Pre-Tax | Tax | After-Tax | Pre-Tax | Tax | After-Tax | Pre-Tax | Tax | After-Tax |
|---|---|---|---|---|---|---|---|---|---|
| **Net (loss) income** | $ (188) | $ 98 | $ (90) | $ 550 | $ (149) | $ 401 | $ 576 | $ (152) | $ 424 |
| **Other comprehensive (loss) income:** | | | | | | | | | |
| **Unrealized gain on net investment hedge** | 8 | - | 8 | - | - | - | - | - | - |
| **Cumulative translation adjustments** | (304) | - | (304) | - | - | - | - | - | - |
| **Defined benefit plans, net:** | | | | | | | | | |
| Net loss | (11) | 1 | (10) | - | - | - | - | - | - |
| Prior service credit | 24 | (4) | 20 | - | - | - | - | - | - |
| Effect of foreign exchange rates | 33 | (8) | 25 | - | - | - | - | - | - |
| Reclassifications to net income [1]: | | | | | | | - | - | - |
| Amortization of prior service cost | 4 | - | 4 | - | - | - | - | - | - |
| Amortization of loss | 16 | (3) | 13 | - | - | - | - | - | - |
| **Defined benefit plans, net** | 66 | (14) | 52 | - | - | - | - | - | - |
| **Other comprehensive loss** | (230) | (14) | (244) | - | - | - | - | - | - |
| **Comprehensive (loss) income** | (418) | 84 | (334) | 550 | (149) | 401 | 576 | (152) | 424 |
| Less: Comprehensive income attributable to noncontrolling interests | - | - | - | 1 | - | 1 | 1 | - | 1 |
| **Comprehensive (loss) income attributable to Chemours** | $ (418) | $ 84 | $ (334) | $ 549 | $ (149) | $ 400 | $ 575 | $ (152) | $ 423 |

[1] These other comprehensive income (loss) components are included in the computation of net periodic benefit costs. Refer to Note 21 for further information.

*See accompanying notes to the consolidated financial statements.*

F- 4

Table of Contents

**The Chemours Company**
**Consolidated Balance Sheets**
*(Dollars in millions, except per share amount)*

|  | December 31, 2015 | December 31, 2014 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash | $ 366 | $ - |
| Accounts and notes receivable - trade, net | 859 | 846 |
| Inventories | 972 | 1,052 |
| Prepaid expenses and other | 104 | 43 |
| Total current assets | 2,301 | 1,941 |
| Property, plant and equipment | 9,015 | 9,282 |
| Less: Accumulated depreciation | (5,838) | (5,974) |
| Net property, plant and equipment | 3,177 | 3,308 |
| Goodwill | 166 | 198 |
| Other intangible assets, net | 10 | 11 |
| Investments in affiliates | 136 | 124 |
| Other assets | 508 | 377 |
| **Total assets** | $ 6,298 | $ 5,959 |
| **Liabilities and equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 973 | $ 1,046 |
| Short-term borrowings and current maturities of long-term debt | 39 | - |
| Other accrued liabilities | 454 | 352 |
| Total current liabilities | 1,466 | 1,398 |
| Long-term debt | 3,915 | - |
| Other liabilities | 553 | 464 |
| Deferred income taxes | 234 | 424 |
| **Total liabilities** | 6,168 | 2,286 |
| **Commitments and contingent liabilities** | | |
| **Equity** | | |
| Common stock (par value $0.01 per share; 810,000,000 shares authorized; 181,069,751 shares issued and outstanding as of December 31, 2015) | 2 | - |
| Additional paid-in capital | 775 | - |
| DuPont Company Net Investment, prior to separation | - | 3,650 |
| Accumulated deficit | (115) | - |
| Accumulated other comprehensive (loss) income | (536) | 19 |
| **Total Chemours stockholders' equity** | 126 | 3,669 |
| Noncontrolling interests | 4 | 4 |
| **Total equity** | 130 | 3,673 |
| **Total liabilities and equity** | $ 6,298 | $ 5,959 |

*See accompanying notes to the consolidated financial statements.*

F- 5

Table of Contents

**The Chemours Company**
**Consolidated Statements of Stockholders' Equity**
**Years ended December 31, 2015, 2014 and 2013**
*(Dollars in millions)*

| | Common Stock | | DuPont Company Net Investment | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Noncontrolling Interests | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| **Balance at December 31, 2012** | - | $  - | $  3,146 | $  - | $  19 | $  2 | $  - | $  3,167 |
| Net income | - | - | 423 | - | - | 1 | - | 424 |
| Net transfers from DuPont | - | - | (374) | - | - | - | - | (374) |
| **Balance at December 31, 2013** | - | - | 3,195 | - | 19 | 3 | - | 3,217 |
| Net income | - | - | 400 | - | - | 1 | - | 401 |
| Net transfers from DuPont | - | - | 55 | - | - | - | - | 55 |
| **Balance at December 31, 2014** | - | - | 3,650 | - | 19 | 4 | - | 3,673 |
| Net income | - | - | 25 | - | - | - | (115) | (90) |
| Other comprehensive loss | - | - | - | - | (244) | - | - | (244) |
| Issuance of Common Stock at separation | 180,966,833 | 2 | - | (2) | - | - | - | - |
| Common Stock issued - compensation plans | 102,918 | - | - | - | - | - | - | - |
| Establishment of pension plans, net and related accumulated other comprehensive income (loss) | - | - | 268 | - | (311) | - | - | (43) |
| Dividends declared | - | - | (100) | (5) | - | - | - | (105) |
| Non-cash debt exchange | - | - | (507) | - | - | - | - | (507) |
| Cash provided at separation by DuPont | - | - | 247 | - | - | - | - | 247 |
| Net transfers from DuPont, net of elimination of predecessor balances | - | - | (3,583) | 769 | - | - | | (2,814) |
| Stock-based compensation expense | - | - | - | 13 | - | - | - | 13 |
| **Balance at December 31, 2015** | 181,069,751 | $  2 | $  - | $  775 | $  (536) | $  4 | $  (115) | $  130 |

*See accompanying notes to the consolidated financial statements.*

F- 6

Table of Contents

**The Chemours Company**
**Consolidated Statements of Cash Flows**
*(Dollars in millions)*

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2015** | | **2014** | | **2013** |
| **Operating activities** | | | | | | |
| Net (loss) income | $ | (90) | $ | 401 | $ | 424 |
| Adjustments to reconcile net (loss) income to cash provided by operating activities: | | | | | | |
| Depreciation and amortization | | 267 | | 257 | | 261 |
| Amortization of deferred financing costs and issuance discount | | 8 | | - | | - |
| Other operating charges and credits, net | | 7 | | 18 | | 13 |
| Loss (gain) on sale of assets and businesses | | 9 | | (40) | | (7) |
| Equity in earnings of affiliates, net of dividends received of $23, $19 and $19 | | - | | 1 | | (1) |
| Deferred tax benefit | | (198) | | (22) | | (14) |
| Asset related charges | | 206 | | - | | - |
| (Increase) decrease in operating assets: | | | | | | |
| Accounts and notes receivable - trade, net | | (64) | | 4 | | (37) |
| Inventories and other operating assets | | 19 | | (29) | | (75) |
| Increase (decrease) in operating liabilities: | | | | | | |
| Accounts payable and other operating liabilities | | 18 | | (85) | | 234 |
| Cash provided by operating activities | | 182 | | 505 | | 798 |
| **Investing activities** | | | | | | |
| Purchases of property, plant and equipment | | (519) | | (604) | | (438) |
| Proceeds from sales of assets, net | | 12 | | 32 | | 14 |
| Foreign exchange contract settlements | | 42 | | - | | - |
| Investment in affiliates | | (32) | | (8) | | - |
| Other investing activities | | - | | 20 | | - |
| Cash used for investing activities | | (497) | | (560) | | (424) |
| **Financing activities** | | | | | | |
| Proceeds from issuance of debt, net | | 3,491 | | - | | - |
| Debt repayments | | (10) | | - | | - |
| Dividends paid | | (105) | | - | | - |
| Debt issuance costs | | (79) | | - | | - |
| Cash provided at separation by DuPont | | 247 | | - | | - |
| Net transfers (to) from DuPont | | (2,857) | | 55 | | (374) |
| Cash provided by (used for) financing activities | | 687 | | 55 | | (374) |
| Effect of exchange rate changes on cash | | (6) | | - | | - |
| **Increase in cash** | | 366 | | - | | - |
| **Cash at beginning of year** | | - | | - | | |
| **Cash at end of year** | $ | 366 | $ | - | $ | - |
| | | | | | | |
| **SUPPLEMENTAL CASH FLOW INFORMATION:** | | | | | | |
| Cash paid during the year for: | | | | | | |
| Interest, net of amounts capitalized | $ | 103 | $ | - | $ | - |
| Income taxes, net of refunds | $ | 53 | $ | - | $ | - |
| Non-cash change in property, plant and equipment included in accounts payable | $ | 45 | $ | (11) | $ | - |

*See accompanying notes to the consolidated financial statements.*

F- 7

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

**Note 1. Background and Description of the Business**

The Chemours Company (Chemours or the Company) delivers customized solutions with a wide range of industrial and specialty chemical products for markets including plastics and coatings, refrigeration and air conditioning, general industrial, mining and oil refining. Principal products include titanium dioxide ($TiO_2$), refrigerants, industrial fluoropolymer resins, sodium cyanide, sulfuric acid and aniline. Chemours consists of three reportable segments: Titanium Technologies, Fluoroproducts and Chemical Solutions.

Chemours is globally operated with manufacturing facilities, sales centers, administrative offices and warehouses located throughout the world. Chemours' operations are primarily located in the United States (U.S.), Canada, Mexico, Brazil, the Netherlands, Belgium, China, Taiwan, Japan, Switzerland, Singapore, Hong Kong, India, the United Kingdom, and France. As of December 31, 2015, Chemours consists of 35 production facilities globally, five dedicated to Titanium Technologies, 16 dedicated to Fluoroproducts, 13 dedicated to Chemical Solutions and one that supports multiple Chemours segments.

Effective prior to the opening of trading on the New York Stock Exchange (NYSE) on July 1, 2015 (the Distribution Date), E. I. du Pont de Nemours and Company (DuPont) completed the previously announced separation of the businesses comprising DuPont's Performance Chemicals reporting segment, and certain other assets and liabilities, into Chemours, a separate and distinct public company. The separation was completed by way of a distribution of all of the then-outstanding shares of common stock of Chemours through a dividend in kind of Chemours' common stock (par value $0.01) to holders of DuPont common stock (par value $0.30) as of the close of business on June 23, 2015 (the Record Date) (the transaction referred to herein as the Distribution).

On the Distribution Date, each holder of DuPont's common stock received one share of Chemours' common stock for every five shares of DuPont's common stock held on the Record Date. The spin-off was completed pursuant to a separation agreement and other agreements with DuPont related to the spin-off, including an employee matters agreement, a tax matters agreement, a transition services agreement and an intellectual property cross-license agreement. These agreements govern the relationship between Chemours and DuPont following the spin-off and provided for the allocation of various assets, liabilities, rights and obligations. These agreements also include arrangements for transition services to be provided by DuPont to Chemours.

Unless the context otherwise requires, references in these Notes to the Consolidated Financial Statements to "we," "us," "our," "Chemours" and the "Company" refer to The Chemours Company and its consolidated subsidiaries after giving effect to the Distribution.

**Note 2. Basis of Presentation**

The accompanying Consolidated Financial Statements have been prepared in accordance with generally accepted accounting principles in the U.S. (GAAP). In the opinion of management, all adjustments considered necessary for a fair statement of the results have been included. Certain reclassifications of prior year's data have been made to conform to the current presentation, primarily relating to the adoption of Accounting Standards Update (ASU) No. 2015-17, "Income Taxes (Topic 740) - Balance Sheet Classification of Deferred Taxes" (see recent accounting pronouncements in Note 3 for further information). Unless otherwise stated, references to years relate to Chemours' fiscal years. The notes that follow are an integral part of the Consolidated Financial Statements.

Chemours did not operate as a separate, stand-alone entity for the full period covered by Consolidated Financial Statements. Prior to our spin-off on July 1, 2015, Chemours operations were included in DuPont's financial results in different legal forms, including but not limited to wholly-owned subsidiaries for which Chemours was the sole business, components of legal entities in which Chemours operated in conjunction with other DuPont businesses and a majority owned joint venture. For periods prior to July 1, 2015, the accompanying Consolidated Financial Statements have been prepared from DuPont's historical accounting records and are presented on a stand-alone basis as if the business operations had been conducted independently from DuPont. Prior to January 1, 2015, aside from a Japanese entity that is a dual-resident for U.S. federal income tax purposes, there was no direct ownership relationship among all the other various legal entities comprising Chemours. Prior to July 1, 2015, DuPont and its subsidiaries' net investments in these operations is shown in lieu of Stockholder's Equity in the Consolidated Financial Statements. The Consolidated Financial Statements include the historical operations, assets and liabilities of the legal entities that are considered to comprise the Chemours business, including certain environmental remediation and litigation obligations of DuPont and its subsidiaries that Chemours may be required to indemnify pursuant to the separation-related agreements executed prior to the spin-off.

F-8

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

All of the allocations and estimates in the Consolidated Financial Statements prior to July 1, 2015 are based on assumptions that management believes are reasonable. However, the Consolidated Financial Statements included herein may not be indicative of the financial position, results of operations and cash flows of Chemours in the future or if Chemours had been a separate, stand-alone entity during the periods presented.

The net transfers from DuPont on the Consolidated Statements of Stockholder's Equity include a non-cash contribution from DuPont of $109 for the year ended December 31, 2015. This non-cash contribution occurred during physical separation activities at shared production facilities in the U.S. prior to the spin-off and certain assets identified at separation. It was determined that assets previously managed by other DuPont businesses would be transferred to and managed by Chemours.

**Note 3. Summary of Significant Accounting Policies**

These Consolidated Financial Statements have been prepared in accordance with GAAP. The significant accounting policies described below, together with the other notes that follow, are an integral part of the Consolidated Financial Statements.

*Preparation of Financial Statements*

The preparation of the Consolidated Financial Statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the Consolidated Financial Statements and the reported amounts of revenues and expenses, including allocations of costs as discussed above, during the reporting period. Management's estimates are based on historical experience, facts and circumstances available at the time and various other assumptions that we believe are reasonable. Actual results could differ from those estimates.

*Principles of Consolidation and Combination*

The Consolidated Financial Statements include the accounts Chemours and its subsidiaries, and entities in which a controlling interest is maintained. For those consolidated subsidiaries in which the Company's ownership is less than 100%, the outside shareholders' interests are shown as noncontrolling interests. Investments in companies in which Chemours, directly or indirectly, owns 20% to 50% of the voting stock and has the ability to exercise significant influence over operating and financial policies of the investee are accounting for using the equity method of accounting. As a result, Chemours' share of the earnings or losses of such equity affiliates is included in the accompanying Consolidated Statements of Operations and our share of these companies' stockholders' equity is included in the accompanying Consolidated Balance Sheets.

The financial statements for the periods prior to our spin-off on July 1, 2015 include the combined assets, liabilities, revenues, and expenses of Chemours. We eliminated all intercompany accounts and transactions in the preparation of the accompanying Consolidated and Combined Financial Statements.

*Revenue Recognition*

Revenue is recognized when the earnings process is complete. Revenue for product sales is recognized when products are shipped to the customer in accordance with the terms of the agreement, when title and risk of loss have been transferred, collectability is reasonably assured and pricing is fixed or determinable. Revenue associated with advance payments are recorded as deferred revenue and are recognized as shipments are made and title, ownership and risk of loss pass to the customer. Accruals are made for sales returns and other allowances based on historical experience. Cash sales incentives are accounted for as a reduction in sales and noncash sales incentives are recorded as a charge to cost of goods sold at the time the revenue or selling expense, depending on the nature of the incentive, is recorded. Amounts billed to customers for shipping and handling fees are included in net sales and costs incurred by Chemours for the delivery of goods are classified as cost of goods sold in the Consolidated Statements of Operations. Taxes on revenue-producing transactions are excluded from net sales. Licensing and royalty income is recognized in accordance with agreed upon terms, when performance obligations are satisfied, the amount is fixed or determinable and collectability is reasonably assured.

*Cash and Cash Equivalents*

Cash and cash equivalents generally include cash, time deposits or highly liquid investments with original maturities of three months or less.

Prior to the spin-off, Chemours participated in DuPont's centralized cash management and financing programs (see Note 4 for additional information).

F- 9

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

*Receivables and Allowance for Doubtful Accounts*

Receivables are recognized net of an allowance for doubtful accounts. The allowance for doubtful accounts reflects the best estimate of losses inherent in Chemours' accounts receivable portfolio determined on the basis of historical experience, specific allowances for known troubled accounts and other available evidence. Accounts receivable are written off when management determines that they are uncollectible.

*Inventories*

Chemours' inventories are valued at the lower of cost or market. Inventories held at substantially all U.S. locations are valued using the last-in, first-out (LIFO) method. Inventories held outside the U.S. are determined by the average cost method. Elements of cost in inventories include raw materials, direct labor, and manufacturing overhead. Stores and supplies are valued at cost or market, whichever is lower; cost is generally determined by the average cost method. Approximately 61% and 52% of inventory is on a LIFO basis as of December 31, 2015 and 2014, respectively. The remainder is accounted for using the average cost method.

*Property, Plant and Equipment*

Property, plant and equipment is carried at cost and is depreciated using the straight-line method. Property, plant and equipment placed in service prior to 1995 is depreciated under the sum-of-the-years' digits method or other substantially similar methods. Substantially all equipment and buildings are depreciated over useful lives ranging from 15 to 25 years. Capitalizable costs associated with computer software for internal use are amortized on a straight-line basis over five to seven years. When assets are surrendered, retired, sold or otherwise disposed of, their gross carrying values and related accumulated depreciation are removed from the balance sheet and included in determining gain or loss on such disposals.

Repair and maintenance costs that materially add to the value of the asset or prolong its useful life are capitalized and depreciated based on the extension to the useful life. Capitalized repair and maintenance costs are recorded on the Consolidated Balance Sheets in other assets.

*Direct Financing Type Leases*

Certain of Chemours' facilities are located on land owned by third parties. The plant and equipment built on this land is constructed by, owned, and operated by Chemours for the exclusive benefit of the third party landlord. The useful lives of the equipment are generally shorter than the lease term, or there exists a purchase option for the third party to acquire the equipment at the end of the lease term. Based on an analysis of the underlying agreements, management has determined that these agreements and property represent a direct financing type lease, whereby Chemours is the lessor of its equipment to the third party landlords. As such, the related plant and equipment are reported as leases receivable. The current portion is included in accounts and notes receivable - trade, net (see Note 10) and the non-current portion is included in other assets (see Note 14) in the Consolidated Balance Sheets. The equipment has zero net book value within property, plant and equipment.

*Goodwill and Other Intangible Assets*

The excess of the purchase price over the estimated fair value of the net assets acquired, including identified intangibles, is recorded as goodwill. Goodwill is tested for impairment annually on October 1; however, these tests are performed more frequently when events or changes in circumstances indicate that the asset may be impaired. Impairment exists when carrying value exceeds fair value. Goodwill is evaluated for impairment at the reporting unit level.

Evaluating goodwill for impairment is a two-step process. In the first step, Chemours compares the carrying value of net assets to the fair value of the related operations. Chemours' methodology for estimating the fair value of its reporting units is using the income approach based on the present value of future cash flows. The factors considered in determining the cash flows include: 1) macroeconomic conditions; 2) industry and market considerations; 3) costs of raw materials, labor or other costs having a negative effect on earnings and cash flows; 4) overall financial performance; and 5) other relevant entity-specific events. If the fair value is determined to be less than the carrying value, a second step is performed to compute the amount of the impairment.

Definite-lived intangible assets, such as purchased and licensed technology, patents, trademarks, and customer lists are amortized over their estimated useful lives, generally for periods ranging from five to 20 years. The reasonableness of the useful lives of these assets is continually evaluated.

F-10

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

### Impairment of Long-Lived Assets

Chemours evaluates the carrying value of long-lived assets to be held and used when events or changes in circumstances indicate the carrying value may not be recoverable. For purposes of recognition or measurement of an impairment loss, the assessment is performed on the asset or asset group at the lowest level for which identifiable cash flows are largely independent of the cash flows of other groups of assets and liabilities. To determine the level at which the assessment is performed, Chemours considers factors such as revenue dependency, shared costs and the extent of vertical integration.

The carrying value of a long-lived asset is considered impaired when the total projected undiscounted cash flows from the use and eventual disposition of an asset or asset group are separately identifiable and are less than its carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. The fair value methodology used is an estimate of fair market value which is made based on prices of similar assets or other valuation methodologies including present value techniques. Long-lived assets to be disposed of other than by sale are classified as held for use until their disposal. Long-lived assets to be disposed of by sale are classified as held for sale and are reported at the lower of carrying amount or fair market value less cost to sell. Depreciation is discontinued for long-lived assets classified as held for sale.

### Research and Development

Research and development costs are expensed as incurred. Research and development expenses include costs (primarily consisting of employee costs, materials, contract services, research agreements, and other external spend) relating to the discovery and development of new products, enhancement of existing products and regulatory approval of new and existing products.

### Environmental Liabilities and Expenditures

Chemours accrues for remediation activities when it is probable that a liability has been incurred and a reasonable estimate of the liability can be made. Environmental liabilities and expenditures included in the Consolidated Financial Statements include claims for matters that are liabilities of DuPont and its subsidiaries, that Chemours may be required to indemnify pursuant to the separation-related agreements executed prior to the spin-off. Accruals for environmental matters are recorded in cost of goods sold when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Accrued liabilities do not include claims against third parties and are not discounted.

Costs related to environmental remediation are charged to expense in the period incurred. Other environmental costs are also charged to expense in the period incurred, unless they increase the value of the property or reduce or prevent contamination from future operations, in which case they are capitalized and amortized.

### Asset Retirement Obligations

Chemours records asset retirement obligations at fair value at the time the liability is incurred. Fair value is measured using expected future cash outflows discounted at Chemours' credit-adjusted risk-free interest rate, which are considered level 3 inputs. Accretion expense is recognized as an operating expense classified within cost of goods sold on the Consolidated Income Statements using the credit-adjusted risk-free interest rate in effect when the liability was recognized. The associated asset retirement obligations are capitalized as part of the carrying amount of the long-lived asset and depreciated over the estimated remaining useful life of the asset, generally for periods ranging from two to 25 years.

### Litigation

Chemours accrues for litigation matters when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Litigation liabilities and expenditures included in the Consolidated Financial Statements represent litigation matters that are liabilities of DuPont and its subsidiaries, that Chemours may be required to indemnify pursuant to the separation-related agreements executed prior to the spin-off. Legal costs such as outside counsel fees and expenses are charged to expense in the period services are received.

### Insurance

Chemours insures certain risks where permitted by law or regulation, including workers' compensation, vehicle liability and employee related benefits. Liabilities associated with these risks are estimated in part by considering historical claims experience, demographic factors and other actuarial assumptions. For other risks, the Company uses a combination of insurance and self-insurance, reflecting comprehensive reviews of relevant risks. A receivable for an insurance recovery is generally recognized when the loss has occurred and collection is considered probable.

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

Prior to the spin-off, Chemours was a participant in DuPont's self-insurance program where permitted by law or regulation, including workers' compensation, vehicle liability and employee related benefits. Liabilities associated with these risks are estimated in part by considering historical claims experience, demographic factors, and other actuarial assumptions. For other risks, a combination of insurance and self-insurance is used, reflecting comprehensive reviews of relevant risks. The annual cost was allocated to all of the participating businesses using methodologies deemed reasonable by management. All obligations pursuant to these plans have historically been obligations of DuPont. As such, these obligations were not included in the Consolidated Balance Sheets, with the exception of self-insurance liabilities related to workers compensation, vehicle liability and employee related benefits.

### Defined Benefit Plans

We have defined benefit plans covering certain of our employees outside the U.S., which are generally required by local regulations. The benefits, which primarily relate to pension, are accrued over the employees' service periods. We use actuarial methods and assumptions in the valuation of defined benefit obligations and the determination of net periodic pension income or expense. Differences between actual and expected results or changes in the value of defined benefit obligations and plan assets, if any, are not recognized in earnings as they occur but rather systematically over subsequent periods.

### Stock-based Compensation

Chemours' stock-based compensation consists of stock options and restricted stock units (RSUs) to employees and non-employee directors. Stock options are measured at fair value on the grant date or date of modification, as applicable. We recognize compensation expense on a straight-line basis over the requisite service period. The number of awards ultimately expected to vest is determined by use of an estimated forfeiture rate. The estimated forfeiture rate is based on historical data for the employee group awarded options and expected employee turnover rates, which management reevaluates each period.

### Income Taxes

The provision for income taxes is determined using the asset and liability approach of accounting for income taxes. Under this approach, deferred taxes represent the future tax consequences expected to occur when the reported amounts of assets and liabilities are recovered or paid. The provision for income taxes represents income taxes paid or payable for the current year plus the change in deferred taxes during the year. Deferred taxes result from differences between the financial and tax basis of Chemours' assets and liabilities and are adjusted for changes in tax rates and tax laws when changes are enacted. Valuation allowances are recorded to reduce deferred tax assets when it is more likely than not that a tax benefit will not be realized.

Chemours recognizes income tax positions that meet the more likely than not threshold and accrues interest related to unrecognized income tax positions, which is included in other income, net in our Consolidated Statements of Operations. Income tax related penalties are included in the provision for income taxes.

Chemours does not provide for income taxes on undistributed earnings of all foreign subsidiaries that are intended to be indefinitely reinvested.

Prior to separation on July 1, 2015, income taxes presented attributed current and deferred income taxes of DuPont to Chemours' stand-alone financial statements in a manner that is systematic, rational, and consistent with the asset and liability method prescribed by ASC 740, Income Taxes (ASC 740). Accordingly, Chemours' income tax provision was prepared following the separate return method. The separate return method applies ASC 740 to the stand-alone financial statements of each member of the consolidated group as if the group member were a separate taxpayer and a stand-alone enterprise.

### Foreign Currency Translation

Chemours identifies its separate and distinct foreign entities and groups them into two categories: (1) extensions of the parent (U.S. dollar functional currency) and (2) self-contained (local functional currency). If a foreign entity does not align with either category, factors are evaluated and a judgment is made to determine the functional currency. Chemours changes the functional currency of its separate and distinct foreign entities only when significant changes in economic facts and circumstances indicate clearly that the functional currency has changed.

During the periods covered by the Consolidated Financial Statements, part of the Chemours business operated within foreign entities. For foreign entities where the U.S. dollar is the functional currency, all foreign currency-denominated asset and liability amounts are remeasured into U.S. dollars at end-of-period exchange rates, except for inventories; prepaid expenses; property, plant

F- 12

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

and equipment; goodwill and other intangible assets, which are remeasured at historical rates. Foreign currency-denominated income and expenses are remeasured at average exchange rates in effect during the period, except for expenses related to balance sheet amounts remeasured at historical exchange rates. Exchange gains and losses arising from remeasurement of foreign currency-denominated monetary assets and liabilities are included in other income, net in the period in which they occur.

For foreign entities where the local currency is the functional currency, assets and liabilities denominated in local currencies are translated into U.S. dollars at end-of-period exchange rates and the resulting translation adjustments are reported as a component of accumulated other comprehensive (loss) income in equity. Assets and liabilities denominated in other than the functional currency are remeasured into the functional currency prior to translation into U.S. dollars and the resulting exchange gains or losses are included in income in the period in which they occur. Income and expenses are translated into U.S. dollars at average exchange rates in effect during the period.

Beginning in 2015, when the Chemours operations were legally and operationally separated within DuPont in anticipation of the spin-off, certain of Chemours foreign entities set their local currency as the functional currency.

***Derivatives***

Chemours enters into forward currency exchange contracts to minimize volatility in earnings related to the foreign exchange gains and losses resulting from remeasuring net monetary assets that Chemours holds which are denominated in non-functional currencies. Chemours does not hold or issue financial instruments for speculative or trading purposes. The derivative assets and liabilities are reported on a gross basis in the Consolidated Balance Sheets. All gains and losses resulting from the revaluation of the derivative assets and liabilities are recognized in other income, net in the Consolidated Statements of Operations during the period in which they occurred. Please refer to Note 20 for additional information.

***Fair Value Measurement***

Under the accounting for fair value measurements and disclosures, a fair value hierarchy was established that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets and liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements). A financial instrument's level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement.

Chemours uses the following valuation techniques to measure fair value for its assets and liabilities:

(a) Level 1-Quoted market prices in active markets for identical assets and liabilities;

(b) Level 2-Significant other observable inputs (e.g. quoted prices for similar items in active markets, quoted prices for identical or similar items in markets that are not active, inputs other than quoted prices that are observable, such as interest rate and yield curves, and market-corroborated inputs); and

(c) Level 3-Unobservable inputs for the asset or liability, which are valued based on management's estimates of assumptions that market participants would use in pricing the asset or liability.

***Recent Accounting Pronouncements***

In November 2015, the Financial Accounting Standards Board (FASB) issued ASU No. 2015-17, "Income Taxes (Topic 740) - Balance Sheet Classification of Deferred Taxes", to simplify the presentation of deferred income taxes and require that deferred income tax liabilities and assets be classified as noncurrent in a classified statement of financial position. The amendments are effective for financial statements issued for annual periods beginning after December 15, 2016, and interim periods within those annual periods, and earlier application is permitted for all entities as of the beginning of an interim or annual reporting period. The Company retroactively adopted this change effective in 2015 and as such the 2014 Consolidated Balance Sheet reflects the reclassifications affecting total current assets, total assets, total current liabilities and total liabilities . The reclassifications did not have a significant impact on Chemours' financial position and had no impact on its results of operations or cash flows. See Note 8 for additional information.

In June 2015, the FASB issued ASU No. 2015-11, "Inventory (Topic 330), Simplifying the Measurement of Inventory," which requires an entity to measure inventory at the lower of cost and net realizable value. Net realizable value is the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. Currently, the inventory standard requires an entity to measure inventory at the lower of cost or market. Market could be replacement cost,

F- 13

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

net realizable value, or net realizable value less an approximately normal profit margin. The amendment does not apply to inventory that is measured using LIFO or the retail inventory method but applies to all other inventory, which includes inventory that is measured using first-in, first-out (FIFO) or average cost. The amendment is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years, and should be applied prospectively with earlier application permitted as of the beginning of an interim or annual reporting period. Chemours is currently evaluating the impact of adopting this guidance.

In May 2015, the FASB issued ASU No. 2015-07, "Fair Value Measurement (Topic 820) - Disclosures for Investment in Certain Entities that Calculate Net Asset Value per Share or its Equivalent." This guidance removes the requirement to categorize within the fair value hierarchy all investments for which fair value is measured using the net asset value per share practical expedient. The guidance also removes the requirement to make certain disclosures for all investments that are eligible to be measured at fair value using the net asset value per share practical expedient. Rather, those disclosures are limited to investments for which the entity has elected to measure the fair value using that practical expedient. The amendment is effective for fiscal years beginning after December 15, 2015 and interim periods within those fiscal years. A reporting entity should apply the amendments retrospectively to all periods presented and earlier application is permitted. Chemours adopted this guidance effective January 1, 2016. The adoption is not expected to have a significant impact on our financial position and results of operations.

In April 2015, the FASB issued ASU No. 2015-05, "Customer's Accounting for Fees Paid in a Cloud Computing Arrangement," which provides guidance about whether a cloud computing arrangement includes a software license. The customer should account for the software license element of the arrangement consistent with the acquisition of other software licenses. If the cloud computing arrangement does not include a software license, the customer should account for the arrangement as a service contract. This guidance is effective for annual periods, including interim periods within those annual periods, beginning after December 15, 2015, and early adoption is permitted. Chemours adopted this guidance effective January 1, 2016. The adoption is not expected to have a significant impact on our financial position and results of operations.

In April 2015, the FASB issued ASU No. 2015-03, "Interest - Imputation of Interest (Subtopic 835-30)," which requires debt issuance costs related to a recognized debt liability to be presented in the balance sheet as a direct deduction from the carrying amount of that debt liability, consistent with debt discounts. The guidance is effective for public entities for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2015 with early adoption permitted, including adoption in an interim period. Chemours adopted this guidance for the quarter ending June 30, 2015. The adoption of this standard had no impact on Chemours' results of operations or cash flows. Due to the accounting change described above, Chemours recorded debt issuance costs incurred for the issuance of its senior secured term loans and senior unsecured notes as a reduction of the liability on the Consolidated Balance Sheets. See Note 18 for additional information.

In February 2015, the FASB issued ASU No. 2015-02, "Consolidation (Topic 810): Amendments to the Consolidation Analysis." The amendments modify the evaluation of whether limited partnerships and similar legal entities are variable interest entities (VIEs) or voting interest entities and eliminate the presumption that a general partner should consolidate a limited partnership. The amendment is effective for public entities for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2015. Chemours adopted this guidance effective January 1, 2016. The adoption is not expected to have a significant impact on our financial position and results of operations.

In May 2014, the FASB and the International Accounting Standards Board (IASB) jointly issued ASU No. 2014-09, "Revenue from Contracts with Customers (Topic 606)," which clarifies the principles for recognizing revenue and develops a common revenue standard for GAAP and International Financial Reporting Standards (IFRS). The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods and services. The guidance is effective for public entities for annual and interim periods beginning after December 15, 2016 (original effective date). In July 2015, the FASB approved a deferral of the effective date of this guidance to provide entities with adequate time to effectively implement the new revenue standard and adoption as of the original effective date is permitted. The Company is currently evaluating the impact of adopting this guidance on its financial position and results of operations.

In April 2014, the FASB issued ASU No. 2014-08, "Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity," amending existing requirements for reporting discontinued operations and disposals of components of an entity. The amended guidance limits the discontinued operations reporting to disposal transactions that represent strategic shifts having a major effect on operations and financial results. The amendment also enhances disclosures and requires assets and liabilities of a discontinued operation to be classified as such for all periods presented in the financial statements. Chemours adopted this guidance effective on January 1, 2015. Due to the change in requirements for reporting discontinued operations

F- 14

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

described above, presentation and disclosures of future disposal transactions after adoption may be different than under current standards.

**Note 4. Relationship with DuPont and Related Entities**

Prior to the spin-off, Chemours was managed and operated in the normal course of business with other affiliates of DuPont. Accordingly, certain shared costs were allocated to Chemours and reflected as expenses in the stand-alone Consolidated Financial Statements. Management of DuPont and Chemours considered the allocation methodologies used to be reasonable and appropriate reflections of the historical DuPont expenses attributable to Chemours for purposes of the stand-alone financial statements. The expenses reflected in the Consolidated Financial Statements may not be indicative of expenses that will be incurred by Chemours in the future.

Subsequent to July 1, 2015, DuPont was no longer a related party of Chemours. Chemours' ongoing relationship with DuPont is governed by a separation agreement and other agreements with DuPont related to the spin-off, including an employee matters agreement, a tax matters agreement, a transition services agreement and an intellectual property cross-license agreement. These agreements provided for the allocation of various assets, liabilities, rights and obligations, and include arrangements for transition services to be provided by DuPont to Chemours.

*(a) Related Party Sales*

Prior to the spin-off, including certain periods covered by the Consolidated Financial Statements, Chemours sold finished goods to DuPont and its non-Chemours businesses.

Related party sales to DuPont include the following amounts:

| Selling Segment | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2015** | | **2014** | | **2013** | |
| Titanium Technologies | $ | 2 [1] | $ | - | $ | 6 |
| Fluoroproducts | | 34 [1] | | 45 | | 37 |
| Chemical Solutions | | 21 [1] | | 65 | | 78 |
| Total | $ | 57 | $ | 110 | $ | 121 |

[1] Subsequent to the spin-off on July 1, 2015, transactions with DuPont businesses were not considered related party transactions.

*(b) Leveraged Services and Corporate Costs*

Prior to the spin-off on July 1, 2015, DuPont incurred significant corporate costs for services provided to Chemours as well as other DuPont businesses. These costs included expenses for information systems, accounting, other financial services such as treasury and audit, purchasing, human resources, legal, facilities, engineering, corporate research and development, corporate stewardship, marketing and business analysis support.

A portion of these costs benefited multiple or all DuPont businesses, including Chemours, and were allocated to Chemours and its reportable segments using methods based on proportionate formulas involving total costs or other various allocation methods that management considered consistent and reasonable. Other Chemours corporate costs are not allocated to the reportable segments and are reported in Corporate and Other.

The allocated leveraged functional service expenses and general corporate expenses included in the Consolidated Statements of Operations were $238 (through June 30, 2015), $492 and $519 for the years ended December 31, 2015, 2014 and 2013, respectively. Allocated leveraged functional service expenses and general corporate expenses were recorded in the Consolidated Statements of Operations within the following captions:

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | | **2014** | | **2013** | |
| Selling, general and administrative expense | $ | 205 [1] | $ | 411 | $ | 436 |
| Research and development expense | | 10 [1] | | 49 | | 50 |
| Cost of goods sold | | 23 [1] | | 32 | | 33 |
| Total | $ | 238 | $ | 492 | $ | 519 |

[1] Subsequent to the spin-off on July 1, 2015, transactions with DuPont businesses were not considered related party transactions. Accordingly, no costs were allocated after the July 1, 2015 spin-off date.

*(c) Cash Management and Financing*

For a portion of the periods presented, Chemours participated in DuPont's centralized cash management and financing programs. Disbursements were made through centralized accounts payable systems which were operated by DuPont. Cash receipts were transferred to centralized accounts, also maintained by DuPont. As cash was disbursed and received by DuPont, it was accounted for by Chemours through DuPont Company Net Investment.

The separation agreements set forth a process to true-up cash and working capital transferred to us from DuPont at separation. In January 2016, Chemours and DuPont entered into an agreement, contingent upon the credit agreement amendment (described in Note 18), which provided for the extinguishment of payment obligations of cash and working capital true-ups previously contemplated in the separation agreements. As a result, Chemours was not required to make any payments to DuPont, nor did DuPont make any payments to Chemours. In addition, the agreement set forth an advance payment of approximately $190, which was paid to Chemours in February 2016, for certain specified goods and services that Chemours expects to provide to DuPont over the next twelve to fifteen months under existing agreements with Chemours.

*(d) Tax Matters Agreement*

Chemours and DuPont entered into a tax matters agreement that governs the parties' respective rights, responsibilities and obligations with respect to tax liabilities and benefits, tax attributes, the preparation and filing of tax returns, the control of audits and other tax proceedings and other matters regarding taxes. In general, under the agreement, DuPont is responsible for any U.S. federal, state and local taxes (and any related interest, penalties or audit adjustments) reportable on a consolidated, combined or unitary return that includes DuPont or any of its subsidiaries and Chemours and/or any of its subsidiaries for any periods or portions thereof ending on or prior to the date of the Separation and Chemours is responsible for any U.S. federal, state, local and foreign taxes (and any related interest, penalties or audit adjustments) that are imposed on Chemours and/or any of its subsidiaries for all tax periods, whether before or after the date of the distribution.

**Note 5. Research and Development Expense**

Research and development expense directly incurred by Chemours was $87, $94 and $114 for the years ended December 31, 2015, 2014 and 2013, respectively. Research and development expense also includes $10, $49 and $50 for the years ended December 31, 2015, 2014 and 2013, respectively, which represents an assignment of costs associated primarily with DuPont's Corporate Central Research and Development long-term research activities. This assignment was based on the cost of research projects for which Chemours was determined to be the sponsor or co-sponsor. All research services provided by DuPont's Central Research and Development to Chemours were specifically requested by Chemours, covered by service-level agreements and billed based on usage. DuPont research and development services were no longer used after the separation on July 1, 2015.

F-16

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

**Note 6. Employee Separation and Asset Related Charges, Net**

For the years ended December 31, 2015, 2014 and 2013, Chemours recorded charges for employee separation and asset related charges as follows:

|  | Year Ended December 31, | | |
|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Employee Separation Charges | $ 137 | $ 18 | $ 2 |
| Asset Related Charges - Restructuring | 133 | 3 | - |
| Asset Related Charges - Impairment [1] | 48 | - | - |
| Decommissioning and other charges - Restructuring | 15 | - | - |
| Total | $ 333 | $ 21 | $ 2 |

[1] See Note 12 for further information.

*Transformation Plan*

During the third quarter of 2015, Chemours announced a plan to transform the Company by reducing structural costs, growing market positions, optimizing its portfolio, refocusing investments, and enhancing its organization (the "Transformation Plan"). Through a combination of higher free cash flow from operations, lower capital spending, and potential proceeds from asset sales, the Company anticipates reducing its leverage ratio (net debt to Adjusted EBITDA (see Note 23 for definition)). Key actions initiated under the Transformation Plan since the separation included Titanium Technologies plant and production line closures, Fluoroproduct line closures, Reactive Metals Solutions (RMS) plant closure and other cost reduction initiatives including global workforce reduction.

**Titanium Technologies Plant Closures:** In August 2015, the Company announced the closure of its Edge Moor, Delaware manufacturing site located in the U.S. The Edge Moor plant produced $TiO_2$ product for use in the paper industry and other applications where demand has steadily declined, resulting in underused capacity at the plant. In addition, the Company permanently shut down one underused $TiO_2$ production line at its New Johnsonville, Tennessee plant. The Company stopped production at Edge Moor in September 2015 and immediately began decommissioning the plant. The Company expects to complete decommissioning activities in first quarter of 2016 and will begin dismantling thereafter. Dismantling and removal activities are expected to be completed in early 2017.

As a result, the Company recorded charges of approximately $140, which consisted of employee separation costs of $11, property, plant and equipment and other asset impairment charges of $115, and decommission costs and other charges of $14. The Company also expects to incur additional charges of approximately $50 for decommissioning, dismantling and removal costs through early 2017, which will be expensed as incurred.

**Fluoroproducts Restructuring:** Also, in August 2015, in an effort to improve the profitability of the Fluoroproducts segment, management approved the shutdown of certain production lines of the segment's manufacturing facilities in the U.S. As a result, the Company recorded restructuring charges of approximately $21, which consist of property, plant and equipment accelerated depreciation of $18, employee separation costs of $2, and decommissioning and other costs of $1. The Company expects to incur additional charges of approximately $5 for decommissioning, dismantling and removal costs during 2016, which will be expensed as incurred.

**RMS Closure:** Also during the fourth quarter of 2015, the Company announced the completion of the strategic review of its RMS business and the decision to stop production at the Niagara Falls, New York site by the end of December 2016. The Niagara Falls plant has approximately 200 employees and contractors that will be impacted by this action. In the fourth quarter of 2015, the Company recorded approximately $12 of employee separation costs. Additional restructuring charges of approximately $15 for contract termination, decommissioning and site redevelopment are expected to be incurred in 2016 through 2018. Impairment of RMS related assets were recorded in the third quarter of 2015 (see Note 12 for further information).

F-17

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

*Global Restructuring Programs*

In November 2015, Chemours announced an additional global workforce reduction of approximately 430 positions. This action is part of ongoing efforts to streamline and simplify the structure of the organization worldwide and to reduce costs. As a result of these actions, the Company recorded approximately $48 of employee separation costs during the fourth quarter of 2015. The headcount reduction is expected to be completed in 2016 and related payments are expected to be substantially complete in 2017.

In June 2015, in light of continued weakness in the global titanium dioxide market cycle and continued foreign currency impacts due to the strengthening of the U.S. dollar, Chemours implemented a restructuring plan to reduce and simplify its cost structure. This plan resulted in a global workforce reduction of more than 430 positions. As a result, we recorded a pre-tax charge of $64 for employee separation costs in the year ended December 31, 2015. The actions associated with this charge and all related payments are expected to be substantially complete by the end of 2016.

In 2014, Chemours implemented a restructuring plan to increase productivity and recorded a pre-tax charge of $19 related to this initiative. The charge consisted of $16 related to employee separation costs and $3 for asset shut-down costs. The actions associated with this charge and all related payments are substantially complete as of December 31, 2015.

The charges related to our programs and impairments impacted segment earnings for the years ended December 31, 2015 and 2014 as follows:

| | Titanium Technologies | Fluoroproducts | Chemical Solutions | Total |
|---|---|---|---|---|
| **Year ended December 31, 2015** | | | | |
| Titanium Technologies plant closures | $ 140 | $ - | $ - | $ 140 |
| Fluoroproducts restructuring and other asset impairment | - | 24 | - | 24 |
| RMS plant closure | - | - | 57 | 57 |
| 2015 Restructuring | 33 | 54 | 25 | 112 [1] |
| | $ 173 | $ 78 | $ 82 | $ 333 |
| **Year ended December 31, 2014** | | | | |
| 2014 Restructuring | $ 3 | $ 16 | $ - | $ 19 |

[1] Includes approximately $24 related to corporate overhead functions that was allocated to our segments.

F- 18

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

The following table shows the change in our significant liability account balances.

| | Titanium Technologies Site Closures | Chemical Solutions Site Closures | 2015 Restructuring | 2014 Restructuring | Total |
|---|---|---|---|---|---|
| Balance as of December 31, 2013 | $ - | $ - | $ - | $ - | $ - |
| Charges to income for the year ended December 31, 2014 | - | - | - | 16 | 16 |
| Charges to liability accounts: | | | | | |
| Payments | - | - | - | (2) | (2) |
| Net currency translation adjustment | - | - | - | (2) | (2) |
| Balance as of December 31, 2014 | - | - | - | 12 | 12 |
| Charges to income for the year ended December 31, 2015 | 11 | 12 | 112 | - | 135 |
| Charges to liability accounts: | | | | | |
| Payments | - | - | (39) | (11) | (50) |
| Net currency translation adjustment [1] | - | - | - | - | - |
| Balance as of December 31, 2015 | $ 11 | $ 12 | $ 73 | $ 1 | $ 97 |

[1] Net currency translation adjustment for the year ended December 31, 2015 was less than $1.

**Note 7. Other Income, Net**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Leasing, contract services and miscellaneous income | $ 25 | $ 17 | $ 24 |
| Royalty income [1] | 19 | 28 | 24 |
| Gain on purchase of equity method investment | - | - | 7 |
| (Loss) gain on sale of assets and businesses [2] | (9) | 40 | - |
| Exchange gains (losses), net [3] | 19 | (66) | (31) |
| Total other income, net | $ 54 | $ 19 | $ 24 |

[1] Royalty income is primarily for technology and trademark licensing.

[2] In 2015, the Company sold its subsidiary in Sweden for proceeds of $4 that resulted in a loss on sale of $9 in the Fluoroproducts segment. In 2014, the gain of $40 includes gains on sales of businesses of $30 and $4 in the Fluoroproducts and Titanium Technologies segments, respectively. The remaining $6 related to gain on other sale of assets in the Fluoroproducts segment.

[3] Chemours uses foreign currency forward contracts to offset its net exposure, by currency, related to its non-functional currency-denominated monetary assets and liabilities. See Note 20 for further information. The pre-tax exchange gains are recorded in other income, net and the related tax impact is recorded in provision for income taxes in the Consolidated Statements of Operations. The $19 net exchange gain for the year ended December 31, 2015 includes a gain on derivatives of $42, partially offset by a $23 pre-tax exchange loss on non-functional monetary assets and liabilities as a result of the strengthening of the U.S. dollar against the Mexican peso, Euro, Thai baht, Chinese yuan and other currencies. Exchange losses in 2014 and 2013, respectively, were primarily driven by the strengthening of the U.S. Dollar versus the Swiss franc and the Euro in 2014, and a strengthening of the U.S. dollar versus the Venezuelan bolivar and the Brazilian real in 2013.

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

**Note 8. Income Taxes**

| (Dollars in millions) | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2015** | | **2014** | | **2013** | |
| Current tax expense: | | | | | | |
| U.S. federal | $ | 37 [1] | $ | 85 | $ | 67 |
| U.S. state and local | | 1 [1] | | 13 | | 11 |
| International | | 62 | | 73 | | 88 |
| Total current tax expense | | 100 | | 171 | | 166 |
| Deferred tax (benefit) expense: | | | | | | |
| U.S. federal | | (187) | | (20) | | (4) |
| U.S. state and local | | (14) | | (3) | | (2) |
| International | | 3 | | 1 | | (8) |
| Total deferred tax benefit | | (198) | | (22) | | (14) |
| Total (benefit from) provision for income taxes | $ | (98) | $ | 149 | $ | 152 |

[1] Recorded pursuant to the tax matters agreement.

The significant components of deferred tax assets and liabilities are as follows:

| (Dollars in millions) | December 31, 2015 | | December 31, 2014 | |
| --- | --- | --- | --- | --- |
| Deferred tax assets-noncurrent: | | | | |
| Other assets and other accrued liabilities | $ | 257 | $ | 188 |
| Tax loss carryforwards | | 124 | | 36 |
| Total deferred tax assets-noncurrent | | 381 | | 224 |
| Valuation allowance | | - | | (36) |
| Total deferred tax assets, net | | 381 | | 188 |
| Deferred tax liabilities-noncurrent: | | | | |
| Goodwill and other intangibles | | - | | (2) |
| Accrued expenses and other liabilities | | (7) | | (34) |
| Property, plant and equipment | | (530) | | (533) |
| Inventories and other assets | | (31) | | (33) |
| Total deferred tax liabilities-noncurrent | | (568) | | (602) |
| Net deferred tax liability | $ | (187) | $ | (414) |

F-20

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

An analysis of the Company's effective tax rate is as follows:

| (Dollars in millions) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2014** | **2013** |
| Statutory U.S. federal income tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal benefit | 5.1% | 1.0% | 1.0% |
| Benefit from (lower effective tax rate) on international operations-net | 12.0% | (9.6)% | (10.2)% |
| Valuation allowance | -% | 2.0% | 1.2% |
| Exchange (gains) losses | 0.5% | 2.7% | 2.3% |
| Depletion | 3.4% | (3.9)% | (4.1)% |
| Goodwill | (3.2)% | -% | -% |
| Section 199 deduction | -% | (0.7)% | (0.8)% |
| Other, net | (0.5)% | 0.6% | 2.0% |
| Total effective tax rate | 52.3% | 27.1% | 26.4% |

(Loss) income before income taxes for U.S. and international operations was:

| (Dollars in millions) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2014** | **2013** |
| U.S. (including exports) | $ (492) | $ 244 | $ 224 |
| International | 304 | 306 | 352 |
| Total pre-tax (loss) income | $ (188) | $ 550 | $ 576 |

Chemours recorded a tax benefit of $98 for the year ended December 31, 2015 and provisions of $149 and $152 for the years ended December 31, 2014 and 2013, respectively. The $247 decrease in the tax provision was primarily due to tax benefits recognized from the restructuring and asset impairment charges in the U.S. recorded in the second half of 2015, partially offset by earnings in foreign jurisdictions.

The decrease in state income tax provision and the corresponding increase in the state effective tax rate, net of federal benefit, for the year ended December 31, 2015 as compared to 2014 and 2013 is due to the tax benefit recognized from the restructuring and asset impairment charges in the U.S. The tax benefit from international operations is primarily driven by Chemours' overall geographic mix of earnings. The Company did not have valuation allowance as of December 31, 2015 as compared to 2014 and 2013, as the valuation allowance relates to pre-spin assets that are the responsibilities of DuPont pursuant to the tax matters agreement. Exchange (gains) losses principally reflect the impact of non-taxable gains and losses resulting from remeasurement of foreign currency-denominated monetary assets and liabilities. Depletion represents the tax benefit from the percentage depletion deductions taken pursuant to Section 613 of the Code. Goodwill represents the tax effect of the goodwill reallocation based on Chemours' new business reporting units and impairment charges, as described in Note 13. In addition, Chemours is entitled to a domestic manufacturing deduction relating to income from certain qualifying domestic production activities pursuant to Section 199 of the Code in tax years 2014 and 2013, as well as a one-time tax benefit recognized in 2014 relating to a tax accounting method change. Consistent with the discussion in Note 2, the pre-spin effective tax rate stated herein may not be indicative of the future effective tax rate of Chemours as a result of the separation from DuPont.

Under the tax laws of various jurisdictions in which the Company operates, deductions or credits that cannot be fully utilized for tax purposes during the current year may be carried forward or back, subject to statutory limitations, to reduce taxable income or taxes payable in the future or prior years. At December 31, 2015, the tax effect of such carryforwards is $124. Of this amount, $25 expires in 2026, $90 expires in 2036, and $9 expires from 2021 to 2036, the majority of which expires in 2036. Based on analysis of the cumulative earnings from the prior three years, the Company determined it is more likely than not that these assets will be fully utilized.

F-21

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

At December 31, 2015, in connection with the spin-off, the Company deemed approximately $1.5 billion of unremitted earnings of subsidiaries outside the U.S. as indefinitely reinvested. No deferred tax liability has been recognized with regard to the remittance of such earnings. It is not practical to estimate the income tax liability that might be incurred if such earnings were remitted to the U.S.

Each year, Chemours and/or its subsidiaries, files income tax returns in the U.S. federal jurisdiction and various states and non-U.S. jurisdictions. These tax returns are subject to examination and possible challenge by the taxing authorities. Positions challenged by the taxing authorities may be settled or appealed by Chemours and/or DuPont in accordance with the tax matters agreement. As a result, income tax uncertainties are recognized in Chemours' Consolidated Financial Statements in accordance with accounting for income taxes, when applicable. It is reasonably possible that changes to Chemours' global unrecognized tax benefits could be significant; however, due to the uncertainty regarding the timing of completion of audits and possible outcomes, a current estimate of the range of such changes that may occur within the next twelve months cannot be made.

As previously discussed in Note 3, prior to our spin-off, Chemours was included in DuPont's consolidated income tax returns, and Chemours' income taxes for those periods are computed and reported herein under the "separate return method." Use of the separate return method may result in differences when the sum of the amounts allocated to stand-alone tax provisions are compared with amounts presented in Consolidated Financial Statements. In that event, the related deferred tax assets and liabilities could be significantly different from those presented herein for these periods. Certain tax attributes, e.g. net operating loss carryforwards, which were actually reflected in DuPont's consolidated financial statements may or may not exist at the stand-alone Chemours level. Chemours' Consolidated Financial Statements do not reflect any amounts due to DuPont for income tax related matters prior to separation as it is assumed that all such amounts due to DuPont were settled on December 31 of each year.

The following table shows the change in our unrecognized tax benefit.

| (Dollars in millions) | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2015** | | **2014** | | **2013** | |
| Total unrecognized tax benefits as of January 1 | $ | 39 | $ | 26 | $ | 24 |
| Gross amounts of decreases in unrecognized tax benefits as a result of adjustments to tax provisions taken during the prior period | | - | | (1) | | (1) |
| Gross amounts of increases in unrecognized tax benefits as a result of tax positions taken during the current period | | - | | 15 | | 5 |
| Reduction to unrecognized tax benefits as a result of a lapse of the applicable statute of limitations | | (32) [1] | | (1) | | (2) |
| Total unrecognized tax benefits as of December 31 | $ | 7 | $ | 39 | $ | 26 |
| | | | | | | |
| Total unrecognized tax benefits, if recognized, that would impact the effective tax rate | $ | - | $ | 39 | $ | 26 |
| Total amount of interest and penalties recognized in the Consolidated Statements of Operations | | 1 [1] | | 2 | | 2 |
| Total amount of interest and penalties recognized in the Consolidated Balance Sheets | | - | | 8 | | 6 |

[1] Recorded pursuant to the tax matters agreement.

F-22

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

The following is a rollforward of the deferred tax asset valuation allowance for the years ended December 31, 2015, 2014 and 2013.

| (Dollars in millions) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Balance at beginning of period | $ 36 | $ 26 | $ 19 |
| Net charges to income tax expense | - | 10 | 7 |
| Release of valuation allowance [1] | (36) | - | - |
| Balance at end of period | $ - | $ 36 | $ 26 |

[1] Release of valuation allowance during 2015 was primarily related to the tax attributes retained by DuPont pursuant to the tax matters agreement.

**Note 9. Earnings Per Share of Common Stock**

The table below shows a reconciliation of the numerator and denominator for basic and diluted earnings per share calculations for the periods indicated.

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Numerator: | | | |
| Net (loss) income attributable to Chemours | $ (90) | $ 400 | $ 423 |
| Denominator: | | | |
| Weighted-average number of common shares outstanding- Basic | 180,993,623 | 180,966,833 [1] | 180,966,833 [1] |
| Dilutive effect of the Company's employee compensation plans [2] | - | - | - |
| Weighted average number of common shares outstanding - Diluted [2] | 180,993,623 | 180,966,833 | 180,966,833 |

[1] For 2013 and 2014, pro forma earnings per share (EPS) was calculated based on 180,966,833 shares of Chemours common stock that were distributed to DuPont shareholders on July 1, 2015.

[2] Diluted (loss) earnings per share is calculated using net (loss) income available to common shareholders divided by diluted weighted-average shares of common shares outstanding during each period, which includes unvested restricted shares. Diluted earnings per share considers the impact of potentially dilutive securities except in periods in which there is a loss because the inclusion of the potential common shares would have an antidilutive effect. Chemours had no equity awards outstanding prior to the spin-off.

The following average number of stock options were antidilutive and, therefore, were not included in the diluted earnings per share calculation:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Average number of stock options | 8,358,894 | - | - |

F- 23

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

**Note 10. Accounts and Notes Receivable - Trade, Net**

|  | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Accounts receivable-trade, net [1] | $ 757 | $ 746 |
| VAT, GST and other taxes [2] | 68 | 62 |
| Leases receivable-current | 13 | 12 |
| Other receivables [3] | 21 | 26 |
| Total | $ 859 | $ 846 |

[1] Accounts receivable - trade is net of allowances of $4 and $4 as of December 31, 2015 and 2014, respectively. Allowances are equal to the estimated uncollectible amounts.

[2] Value Added Tax (VAT) and Goods and Services Tax (GST).

[3] Other receivables consist of notes receivable, advances and other deposits.

Accounts and notes receivable are carried at amounts that approximate fair value. Bad debt expense was less than $1 for the year ended December 31, 2015, and $1 and $2 for the years ended December 31, 2014 and 2013, respectively.

*Direct Financing Leases*

At two of its facilities in the U.S. (Borderland and Morses Mill), Chemours has constructed fixed assets on land that it leases from third parties. Management has analyzed these arrangements and determined these assets represent a direct financing lease, whereby Chemours is the lessor of this equipment. Chemours has recorded leases receivable of $138 and $149 at December 31, 2015 and 2014, respectively, which represent the balance of the minimum future lease payments receivable. The current portion of leases receivable is included in accounts and notes receivable - trade, net, as shown above. The long-term portion of leases receivable is included in other assets, as shown in Note 14. Management has evaluated the realizable value of these leased assets and determined no impairment existed at December 31, 2015 or December 31, 2014. There is no estimated future residual value of these leased assets.

**Note 11. Inventories**

|  | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Finished products | $ 613 | $ 611 |
| Semi-finished products | 172 | 173 |
| Raw materials, stores and supplies | 433 | 521 |
| Subtotal | 1,218 | 1,305 |
| Adjustment of inventories to LIFO basis | (246) | (253) |
| Total | $ 972 | $ 1,052 |

Inventory values, before LIFO adjustment, are generally determined by the average cost method, which approximates current cost. Inventories are valued using the LIFO method at substantially all of the U.S. locations, which comprised $744 and $684 or 61% and 52% of inventories before the LIFO adjustments at December 31, 2015 and December 31, 2014, respectively. The remainder of inventory held in international locations and certain U.S. locations is valued using the average cost method.

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

**Note 12. Property, Plant and Equipment**

Chemours' property, plant and equipment consisted of:

|  | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Equipment | $ 7,327 | $ 7,500 |
| Buildings | 737 | 778 |
| Construction in progress | 804 | 852 |
| Land | 111 | 116 |
| Mineral rights | 36 | 36 |
| Total | 9,015 | 9,282 |
| Accumulated depreciation | (5,838) | (5,974) |
| Net property, plant and equipment | $ 3,177 | $ 3,308 |

Depreciation expense amounted to $264, $254 and $255 for the years ended December 31, 2015, 2014 and 2013, respectively. Property, plant and equipment includes gross assets under capital leases of $7 and $6 at December 31, 2015 and 2014, respectively. Interest expense capitalized as part of property, plant and equipment was $21 for the year ended December 31, 2015. Chemours did not incur interest in the years ended December 31, 2014 or 2013.

During the third quarter of 2015, in connection with the strategic evaluation of the Chemical Solutions portfolio, excluding cyanides, the Company determined that the carrying value of the RMS manufacturing facility of the Chemical Solutions segment may not be recoverable given the strategic decision to discontinue investment in the business. An impairment evaluation was performed which indicated that the carrying amount of this asset group in the U.S. was not recoverable when compared to the expected undiscounted cash flows. Based on management's assessment of the fair value of the asset group, the Company determined that the carrying value of that asset group exceeded the fair value and as a result, a $45 pre-tax impairment charge was recorded in the Chemical Solutions segment. The fair value of the asset group was determined using an income approach based on the present value of the estimated future cash flows. The key assumptions used included growth rates and cash flow projections, discount rate, tax rate and an estimated terminal value. The amount was recorded in employee separation and asset related charges, net in the Consolidated Statements of Operations. Refer to Note 6 for additional information.

*Asset Held for Sale*

In November 2015, the Company signed a definitive agreement to sell its aniline facility in Beaumont, Texas to The Dow Chemical Company (Dow) for approximately $140 in cash, subject to customary approvals and closing conditions. The Company expects the transaction to close and record a gain in the Chemical Solutions segment in the quarter ending March 31, 2016. As of December 31, 2015, the asset disposal group of approximately $46 was classified as held-for-sale within the caption prepaid expenses and other in the Consolidated Balance Sheets.

**Note 13. Goodwill and Other Intangible Assets, Net**

*Goodwill:* The following table summarizes changes in the carrying amount of goodwill by reportable segment:

|  | Titanium Technologies | Fluoroproducts | Chemical Solutions | Total |
|---|---|---|---|---|
| Balance as of December 31, 2013 | $ 13 | $ 85 | $ 100 | $ 198 |
| Impairment charge | - | - | - | - |
| Other adjustments | - | - | - | - |
| Balance as of December 31, 2014 | 13 | 85 | 100 | 198 |
| Impairment charge | - | - | (25) | (25) |
| Other adjustments | - | - | (7) | (7) |
| Balance as of December 31, 2015 | $ 13 | $ 85 | $ 68 | $ 166 |

F- 25

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

Accumulated impairment losses as of December 31, 2015, 2014 and 2013 included in goodwill are $25, $0, and $0, respectively.

The Company has three segments: Titanium Technologies, Fluoroproducts and Chemical Solutions (see further discussion of reportable segments in Note 23). The Company defines its reporting units as its operating segments for Titanium Technologies; however, the Fluoroproducts and Chemical Solutions segments represent three and seven reporting units, respectively.

In the third quarter of 2015, in connection with the strategic evaluation of the Chemical Solutions portfolio, the Company realigned the reporting structure of the portfolio, specifically the level at which segment management regularly reviews operating results. The Company now identifies seven reporting units for purposes of goodwill allocation and impairment assessment. These seven reporting units are Aniline, Clean & Disinfect, Cyanides, Methylamines, Reactive Metal Solutions, Sulfur, and Vazo. Chemical Solutions remains a single operating segment.

In addition, in connection with the spin-off on July 1, 2015, the Fluoroproducts segment changed its organizational structure, which changed its reporting units from Fluorochemicals and Fluoropolymers to Fluorochemicals, Industrial Resins and Diversified Technologies.

In connection with the goodwill allocation to the new reporting units in Fluoroproducts and Chemical Solutions segments during the third quarter of 2015, we evaluated the reporting units for impairment and determined that the estimated fair values of those reporting units, except for the Sulfur reporting unit, were substantially in excess of the carrying value, indicating that goodwill was not impaired. We performed the second step of the impairment test for Sulfur and determined that the implied fair value of goodwill was lower than its carrying value, resulting in a full impairment of the Sulfur reporting unit's goodwill. As a result, Chemours recorded a $25 million pre-tax impairment charge for goodwill during the year ended December 31, 2015 in the Chemicals Solutions reportable segment.

The Company also performed its annual impairment tests for Titanium Technologies and Fluorochemicals goodwill and determined that no goodwill impairment existed as of December 31, 2015, and the fair value of each reporting unit substantially exceeded its carrying value.

Chemours estimates the fair value of its reporting units using the income approach based on the present value of estimated future cash flows, discounted at a risk-adjusted market rate, including a growth rate to calculate the terminal value. The Company's forecasted future cash flows, which incorporate anticipated future revenue growth and related expenses to support the growth, were used to calculate fair value. The factors considered in determining the cash flows include: 1) macroeconomic conditions; 2) industry and market considerations; 3) costs of raw materials, labor or other costs having a negative effect on earnings and cash flows; 4) overall financial performance; and 5) other relevant entity-specific events. The discount rate used represents the weighted average cost of capital for the reporting units considering the risks and uncertainty inherent in the cash flows of the reporting units and in the internally developed forecasts. The implied fair value of the goodwill in step two was determined by allocating the fair value of the reporting units to all of the assets and liabilities as if the reporting units had been acquired in a business combination and its fair value was the purchase price paid to be acquired. The use of these unobservable inputs resulted in the fair value estimate being classified as a Level 3 asset measured at fair value on a nonrecurring basis subsequent to its original recognition.

The determination of whether or not goodwill is impaired involves a significant level of judgment in the assumptions underlying the approaches used to determine the estimated fair value of our reporting units. Chemours believes that assumptions and rates used in the impairment assessment are reasonable. However, these assumptions are judgmental and variations in any assumptions could result in materially different calculations of fair value. The Company will continue to evaluate goodwill on an annual basis as of October 1, and whenever events or changes in circumstances, such as significant adverse changes in operating results, market conditions or changes in management's business strategy, indicate that there may be a probable indicator of impairment. It is possible that the assumptions used by management related to the evaluation may change or that actual results may vary significantly from management's estimates.

F- 26

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

***Other Intangible Assets, Net:*** The following table summarizes the gross carrying amounts and accumulated amortization of other intangible assets by major class:

| | December 31, 2015 | | | December 31, 2014 | | |
|---|---|---|---|---|---|---|
| | Gross | Accumulated Amortization | Net | Gross | Accumulated Amortization | Net |
| Customer lists | $ 13 | $ (10) | $ 3 | $ 13 | $ (10) | $ 3 |
| Patents | 19 | (17) | 2 | 19 | (15) | 4 |
| Purchased trademarks | 5 | (2) | 3 | 5 | (1) | 4 |
| Purchased and licensed technology | 8 | (6) | 2 | 5 | (5) | - |
| Total | $ 45 | $ (35) | $ 10 | $ 42 | $ (31) | $ 11 |

The aggregate pre-tax amortization expense for definite-lived intangible assets was $3, $3 and $6 for the years ended December 31, 2015, 2014 and 2013, respectively. The estimated aggregate pretax amortization expense for 2016, 2017, 2018, 2019 and 2020 is $3, $2, $1, $1 and $1, respectively. Definite-lived intangible assets are amortized over their estimated useful lives, generally for periods ranging from 5 to 20 years. The reasonableness of the useful lives of these assets is continually evaluated. There are no indefinite-lived intangible assets.

### Note 14. Other Assets

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Leases receivable - non-current [1] | $ 125 | $ 137 |
| Capitalized repair and maintenance costs | 149 | 185 |
| Pension assets [2] | 138 | - |
| Advances and deposits | 11 | 17 |
| Deferred income taxes | 47 | 10 |
| Miscellaneous [3] | 38 | 28 |
| Total | $ 508 | $ 377 |

[1] Leases receivable includes direct financing leases of property at two locations. See Note 10 for further information.

[2] Pension assets represent pension plans commencing in 2015. See Note 21 for further information.

[3] Miscellaneous includes prepaid expenses for royalty fees, vendor supply agreements and taxes other than income taxes, deferred financing fees related to the Revolving Credit Facility of $19 at December 31, 2015, as well as capitalized expenses for the preparation of future landfill cells at Titanium Technologies' New Johnsonville plant site.

### Note 15. Accounts Payable

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Trade payables | $ 945 | $ 1,004 |
| VAT and other payables | 28 | 42 |
| Total | $ 973 | $ 1,046 |

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

**Note 16. Other Accrued Liabilities**

|  | December 31, 2015 |  | December 31, 2014 |
|---|---|---|---|
| Compensation and other employee-related costs | $ | 109 | $ | 109 |
| Employee separation costs [1] | | 76 | | 12 |
| Accrued litigation [2] | | 11 | | 7 |
| Environmental remediation [2] | | 68 | | 69 |
| Income taxes | | 32 | | - |
| Customer rebates | | 53 | | 59 |
| Deferred revenue | | 20 | | 28 |
| Accrued interest | | 21 | | - |
| Miscellaneous [3] | | 64 | | 68 |
| Total | $ | 454 | $ | 352 |

[1] See Note 6 for further information.

[2] See Note 19 for further discussion of environmental remediation and accrued litigation.

[3] Miscellaneous primarily includes accrued utility expenses, property taxes, an accrued indemnification liability and other miscellaneous expenses.

**Note 17. Other Liabilities**

|  | December 31, 2015 |  | December 31, 2014 |
|---|---|---|---|
| Environmental remediation [1] | $ | 223 | $ | 226 |
| Employee-related costs [2] | | 108 | | 32 |
| Employee separation costs [3] | | 23 | | - |
| Accrued litigation [1] | | 58 | | 52 |
| Asset retirement obligations [1] | | 41 | | 43 |
| Deferred revenue | | 11 | | 13 |
| Miscellaneous [4] | | 89 | | 98 |
| Total | $ | 553 | $ | 464 |

[1] See Note 19 for further details on environmental remediation, asset retirement obligations and accrued litigation.

[2] See Note 21 for further details on long-term employee benefits.

[3] See Note 6 for further information.

[4] Miscellaneous primarily includes an accrued indemnification liability.

F- 28

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

**Note 18. Debt**

In conjunction with Chemours' separation from DuPont, Chemours entered into approximately $3,995 of financing transactions on May 12, 2015. Long-term debt, net of an unamortized discount on the Term Loan Facility of $7, was comprised of the following at December 31, 2015:

|  | December 31, 2015 |
|---|---|
| Long-term debt: | |
| Senior secured term loan, net of issue discount | $ 1,493 |
| Senior unsecured notes: | |
| 6.625%, due May 2023 | 1,350 |
| 7.00%, due May 2025 | 750 |
| 6.125%, due May 2023 (€360) | 395 |
| Other | 26 |
| Total | 4,014 |
| Less: Unamortized debt issuance costs | 60 |
| Less: Short-term borrowings and current maturities | 39 |
| Total long-term debt | $ 3,915 |

*Senior Secured Credit Facilities*

On May 12, 2015, Chemours entered into a credit agreement that provides for a seven-year senior secured term loan (the Term Loan Facility) in a principal amount of $1,500 repayable in equal quarterly installments at a rate of one percent of the original principal amount per year, with the balance payable on the final maturity date. The Term Loan Facility was issued with a $7 original issue discount and bears variable interest rate subject to a floor of 3.75%. The proceeds from the Term Loan Facility were used to fund a portion of the distribution to DuPont, along with related fees and expenses.

The credit agreement also provided for a five-year senior secured revolving credit facility (the Revolving Credit Facility), which has been reduced to $750 as part of the amendment completed on February 19, 2016. The proceeds of any loans made under the Revolving Credit Facility can be used for capital expenditures, acquisitions, working capital needs and other general corporate purposes. We had no borrowings outstanding under our Revolving Credit Facility at December 31, 2015, and we had $129 in letters of credit issued and outstanding under this facility. The Revolving Credit Facility bears variable interest of a range based on our total net leverage ratio between (a) 0.50% and 1.25% for base rate loans and (b) 1.50% and 2.25% for LIBOR loans. The applicable margin was 1.25% for base rate loans and 2.25% for LIBOR loans as of December 31, 2015. In addition, we are required to pay a commitment fee on the average daily unused amount of the Revolving Credit Facility at a rate based on our total net leverage ratio, between 0.20% and 0.35%. Commitment fees are currently assessed at a rate of 0.35%.

During the third quarter of 2015, Chemours and its Revolving Credit Facility lenders entered into an amendment to the Revolving Credit Facility that strengthened Chemours' financial position by providing enhanced liquidity to implement the Transformation Plan. The amendment modified the consolidated EBITDA definition in the covenant calculation to include pro forma benefits of announced cost reduction initiatives.

During the first quarter of 2016, Chemours and its Revolving Credit Facility lenders entered into a second amendment to the Revolving Credit Facility that (a) replaced the total net leverage ratio financial covenant with senior secured net leverage ratio; (b) reduced the minimum required levels of interest expense coverage ratio covenant; (c) increased the limits and extended the time horizon for inclusion of pro forma benefits of announced cost reduction initiatives into Consolidated EBITDA definition for the purposes of calculating financial maintenance covenants; and (d) reduced the revolver availability from $1,000 to $750. These changes provide further flexibility to Chemours to sustain the prolonged downturn in the business and enhance its liquidity to implement the Transformation Plan.

The credit agreement contains financial covenants which, solely with respect to the Revolving Credit Facility as amended, require Chemours not to exceed a maximum senior secured net leverage ratio of 3.50 to 1.00 and to maintain a minimum interest coverage ratio of 1.75 to 1.00 until December 31, 2016. In addition, the credit agreement contains customary affirmative and negative

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

covenants that, among other things, limit or restrict Chemours and its subsidiaries' ability, subject to certain exceptions, to incur liens, merge, consolidate or sell, transfer or lease assets, make investments, pay dividends, transact with subsidiaries and incur indebtedness. The credit agreement also contains customary representations and warranties and events of default. Chemours was in compliance with its debt covenants as of December 31, 2015.

Chemours' obligations under the senior secured credit facilities are guaranteed on a senior secured basis by all of its material domestic subsidiaries, subject to certain agreed upon exceptions. The obligations under the senior secured credit facilities are also, subject to certain agreed upon exceptions, secured by a first priority lien on substantially all of Chemours and its material wholly-owned domestic subsidiaries' assets, including 100% of the stock of domestic subsidiaries and 65% of the stock of certain foreign subsidiaries.

*Senior Unsecured Notes*

On May 12, 2015, Chemours issued senior unsecured notes (the Notes) with an aggregate principal of approximately $2,503 in a private placement subject to a registration rights arrangement.

All of the notes, including the 2023 notes with an aggregate principal amount of $1,350, the 2025 notes with an aggregate principal amount of $750 and the 2023 Euro notes with an aggregate principal amount of €360 (or $395 as of December 31, 2015), require payment of principal at maturity and interest semi-annually in cash in arrears on May 15 and November 15 of each year.

The proceeds from the Notes were used to fund the cash and in-kind distributions to DuPont and to pay related fees and expenses. The in-kind distribution to DuPont of $507 aggregate principal amount of Chemours 2025 Notes were exchanged by DuPont with third parties for certain DuPont notes.

Chemours is required to register the Notes with the Securities and Exchange Commission within 465 days after the original issue date. If Chemours fails to do so, it would be required to pay additional interest at a rate of 0.25% for the first 90 days following a registration default and additional 0.25% per annum with respect to each subsequent 90-day period, up to a maximum rate of 0.50%, until the registration requirements are met. Application is also expected to be made to the Irish Stock Exchange for the approval of listing particulars in relation to the Euro notes prior to the first anniversary of the issue date of the Euro notes.

Each series of Notes is or will be fully and unconditionally guaranteed, jointly and severally, by Chemours' existing and future domestic subsidiaries that guarantee (the Guarantors) the Senior Secured Credit Facilities or that guarantee other indebtedness of Chemours or any guarantor in an aggregate principal amount in excess of $75 million (the Guarantees). The Notes are unsecured and unsubordinated obligations of Chemours. The Guarantees are unsecured and unsubordinated obligations of the Guarantors. The Notes rank equally in right of payment to all of Chemours' existing and future unsecured unsubordinated debt and senior in right of payment to all of Chemours' existing and future debt that is by its terms expressly subordinated in right of payment to the Notes. The Notes are subordinated to indebtedness under the Senior Secured Credit Facilities as well as any future secured debt to the extent of the value of the assets securing such debt. Chemours' is obligated to offer to purchase the Notes at a price of (a) 101 percent of their principal amount, together with accrued and unpaid interest, if any, to the date of purchase, upon the occurrence of certain change of control events and (b) 100 percent of their principal amount, together with accrued and unpaid interest, if any, to the date of purchase, with the proceeds from certain asset dispositions. These restrictions and prohibitions are subject to certain qualifications and exceptions set forth in the Indenture, including without limitation, reinvestment rights with respect to the proceeds of asset dispositions. Chemours is permitted to redeem some or all of the 2023 Notes and Euro Notes by paying a "make-whole" premium prior to May 15, 2018. Chemours also may redeem some or all of the 2023 Notes and Euro Notes on or after May 15, 2018 and thereafter at specified redemption prices. Chemours also may redeem some or all of the 2025 Notes on or after May 15, 2020 at specified redemption prices.

*Maturities*

There are no debt maturities in each of the next seven years, except, in accordance with the credit agreement, Chemours has required quarterly principal payments related to the Term Loan Facility equivalent to 1.00% per annum beginning September 2015 through March 2022, with the balance due at maturity. Term Loan principal maturities over the next five years are $15 in each year from 2016 to 2020. Debt maturities related to the Term Loan Facility and the Notes in 2021 and beyond will be $3,913.

F- 30

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

*Debt Fair Value*

The fair values of the Term Loan Facility, the 2023 notes, the 2025 notes and the 2023 Euro notes at December 31, 2015 were approximately $1,348, $946, $513 and $277, respectively. The estimated fair values of the Term Loan Facility and the Notes are based on quotes received from third party brokers, and are classified as Level 2 in the fair value hierarchy.

**Note 19. Commitments and Contingent Liabilities**

**(a) Guarantees**

**Obligations for Equity Affiliates and Others**

Chemours has directly guaranteed various obligations of customers, suppliers and other third parties. At December 31, 2015 and December 31, 2014, Chemours had directly guaranteed $8 and $41 of such obligations, respectively. These represent the maximum potential amount of future (undiscounted) payments that Chemours could be required to make under the guarantees in the event of default by the guaranteed parties. No amounts were accrued at December 31, 2015 and 2014.

Chemours assesses the payment and performance risk by assigning default rates based on the duration of the guarantees. These default rates are assigned based on the external credit rating of the counterparty or through internal credit analysis and historical default history for counterparties that do not have published credit ratings. For counterparties without an external rating or available credit history, a cumulative average default rate is used.

**Operating Leases**

Chemours uses various leased facilities and equipment in its operations. The terms for these leased assets vary depending on the lease agreement. Future minimum lease payments (including residual value guarantee amounts) under non-cancelable operating leases are $84, $73, $62, $53 and $36 for the years ended December 31, 2016, 2017, 2018, 2019 and 2020, respectively, and $38 for the years thereafter. Net rental expense under operating leases was $83, $75 and $62 during the years ended December 31, 2015, 2014 and 2013, respectively.

**(b) Asset Retirement Obligations**

Chemours has recorded asset retirement obligations primarily associated with closure, reclamation and removal costs for mining operations related to the production of $TiO_2$ in the Titanium Technologies segment. Chemours' asset retirement obligation liabilities were $42 and $43 at December 31, 2015 and 2014, respectively. A summary of the changes in asset retirement obligations is as follows:

| (Dollars in millions) | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2015 | | 2014 | |
| Beginning balance | $ | 43 | $ | 42 |
| Accretion expense | | 1 | | 2 |
| Additional liabilities incurred | | - | | 1 |
| Changes in estimated cash flows | | - | | - |
| Settlements/payments | | (2) | | (2) |
| Ending balance | $ | 42 | $ | 43 |
| Current portion | $ | 1 | $ | - |
| Non-current portion | $ | 41 | $ | 43 |

**(c) Litigation**

In addition to the matters discussed below, Chemours, by virtue of its status as a subsidiary of DuPont prior to the Distribution, is subject to or required under the separation-related agreements executed prior to the Distribution to indemnify DuPont against various pending legal proceedings arising out of the normal course of the Chemours business including product liability, intellectual property, commercial, environmental and antitrust lawsuits. It is not possible to predict the outcome of these various proceedings.

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

Except for the PFOA litigation for which a separate assessment is provided in this Note, while management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the aforementioned proceedings, it does not believe any such loss would have a material impact on Chemours' consolidated financial position, results of operations or liquidity. With respect to the litigation matters discussed below, management's estimate of the probability of loss in excess of the amounts accrued, if any, is addressed individually for each matter. In the event that DuPont seeks indemnification for adverse trial rulings or outcomes for any such matter, these indemnification claims could materially adversely affect Chemours' financial condition. Disputes between Chemours and DuPont may also arise with respect to indemnification matters, including disputes based on matters of law or contract interpretation. If and to the extent these disputes arise, they could materially adversely affect Chemours.

**Asbestos**

At December 31, 2015, there were approximately 2,212 lawsuits pending against DuPont alleging personal injury from exposure to asbestos. These cases are pending in state and federal court in numerous jurisdictions in the U.S. and are individually set for trial. Most of the actions were brought by contractors who worked at sites between 1950 and the 1990s. A small number of cases involve similar allegations by DuPont employees. A limited number of the cases were brought by household members of contractors or DuPont employees. Finally, certain lawsuits allege personal injury as a result of exposure to DuPont products. Chemours had an accrual of $42 and $38 related to this matter at December 31, 2015 and 2014, respectively. Additionally, Chemours had an accrual for $3 for asbestos cases outside the U.S. at December 31, 2015. Chemours reviews this estimate and related assumptions quarterly and annually updates the results of an approximate 20-year projection. Management believes that the likelihood is remote that Chemours would incur losses in excess of the amounts accrued in connection with this matter.

**Benzene**

In the separation, DuPont assigned its Benzene docket to Chemours. There are 29 pending cases against DuPont alleging benzene-related illnesses. These cases consist of premises matters involving contractors and deceased former employees who claim exposure to benzene while working at DuPont sites primarily in the 1960s through the 1980s, and product liability claims based on alleged exposure to benzene found in trace amounts in aromatic hydrocarbon solvents used to manufacture DuPont products, such as paints, thinners and reducers.

A benzene case (Hood v. DuPont) was tried to a verdict in Texas state court on October 20, 2015. Plaintiffs alleged that Mr. Hood's Acute Myelogenous Leukemia (AML) was the result of 24 years of occupational exposure to trace benzene found in DuPont automotive paint products and that DuPont negligently failed to warn him that its paints, reducers and thinners contained benzene that could cause cancer or leukemia. The jury found in the Plaintiffs favor awarding $6.9 in compensatory damages and $1.5 in punitive damages. Through DuPont, Chemours will appeal the verdict based upon substantial errors made at the trial court. Management believes that a loss is reasonably possible related to these matters; however, given the evaluation of each Benzene matter is highly fact driven and impacted by disease, exposure and other factors, a range of such losses cannot be reasonably estimated at this time.

**PFOA**

Prior to the fourth quarter of 2014, Chemours used PFOA (collectively, perfluorooctanoic acids and its salts, including the ammonium salt) as a processing aid to manufacture some fluoropolymer resins at various sites around the world including its Washington Works plant in West Virginia. Chemours had accruals of $20 and $14 related to the PFOA matters discussed below at December 31, 2015 and 2014, respectively.

The accruals include charges related to DuPont's obligations under agreements with the U.S. Environmental Protection Agency (EPA) and voluntary commitments to the New Jersey Department of Environmental Protection. These obligations and voluntary commitments include surveying, sampling and testing drinking water in and around certain company sites and offering treatment or an alternative supply of drinking water if tests indicate the presence of PFOA in drinking water at or greater than the national Provisional Health Advisory.

<u>Drinking Water Actions</u>

In August 2001, a class action, captioned Leach v. DuPont, was filed in West Virginia state court alleging that residents living near the Washington Works facility had suffered, or may suffer, deleterious health effects from exposure to PFOA in drinking water.

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

DuPont and attorneys for the class reached a settlement in 2004 that binds about 80,000 residents. In 2005, DuPont paid the plaintiffs' attorneys' fees and expenses of $23 and made a payment of $70, which class counsel designated to fund a community health project. Chemours, through DuPont, funded a series of health studies which were completed in October 2012 by an independent science panel of experts (the C8 Science Panel). The studies were conducted in communities exposed to PFOA to evaluate available scientific evidence on whether any probable link exists, as defined in the settlement agreement, between exposure to PFOA and human disease. The C8 Science Panel found probable links, as defined in the settlement agreement, between exposure to PFOA and pregnancy-induced hypertension, including preeclampsia, kidney cancer, testicular cancer, thyroid disease, ulcerative colitis and diagnosed high cholesterol.

In May 2013, a panel of three independent medical doctors released its initial recommendations for screening and diagnostic testing of eligible class members. In September 2014, the medical panel recommended follow-up screening and diagnostic testing three years after initial testing, based on individual results. The medical panel has not communicated its anticipated schedule for completion of its protocol. Through DuPont, Chemours is obligated to fund up to $235 for a medical monitoring program for eligible class members and, in addition, administrative cost associated with the program, including class counsel fees. In January 2012, Chemours, through DuPont, put $1 in an escrow account to fund medical monitoring as required by the settlement agreement. The court-appointed Director of Medical Monitoring has established the program to implement the medical panel's recommendations and the registration process, as well as eligibility screening, is ongoing. Diagnostic screening and testing has begun and associated payments to service providers are being disbursed from the escrow account. As of December 31, 2015, less than $1 has been disbursed from the escrow account related to medical monitoring.

In addition, under the settlement agreement, DuPont must continue to provide water treatment designed to reduce the level of PFOA in water to six area water districts, including the Little Hocking Water Association (LHWA) and private well users.

Class members may pursue personal injury claims against DuPont only for those human diseases for which the C8 Science Panel determined a probable link exists. At December 31, 2015, there were approximately 3,500 lawsuits filed in various federal and state courts in Ohio and West Virginia. These lawsuits are consolidated in multi-district litigation in Ohio federal court (MDL). Based on the information currently available to the Company, the majority of the lawsuits allege personal injury claims associated with high cholesterol and thyroid disease from exposure to PFOA in drinking water. There are 37 lawsuits alleging wrongful death. In the third quarter of 2014, six plaintiffs from the MDL were selected for individual trial. The first case (Bartlett v. DuPont) was tried to a verdict on October 7, 2015. The Plaintiff alleged that PFOA in drinking water caused her kidney cancer with causes of action for negligence and negligent infliction of emotional distress. The jury found in favor of the Plaintiff awarding $1.1 in damages for negligence and $0.5 for emotional distress. The jury found that DuPont's conduct did not warrant punitive damages. DuPont Management believes that rulings made before and during the trial resulted in several significant and meritorious grounds for appeal, and an appeal to the Sixth Circuit will be filed. The second case (Wolf v. DuPont) set for trial in March 2016, has been settled for an amount well below the incremental cost of preparing for trial. There are three more trials scheduled in 2016, with the next trial starting in May 2016.

In January 2016, the court announced that starting in April 2017, 40 individual plaintiff trials will be scheduled per year. This multi-year plan pertains only to the cases claiming cancer, which represents approximately 7% of the total number of cases in the MDL. The remaining cases, comprising approximately 93% of the docket, will remain inactive.

Chemours, through DuPont, denies the allegations in these lawsuits and is defending itself vigorously. Except for the Wolf v. DuPont case, no claims have been settled or resolved during the periods presented.

Additional Actions

In addition to general claims of PFOA contamination of drinking water, LHWA brought an action claiming "imminent and substantial endangerment to health and or the environment" under the Resource Conservation and Recovery Act (RCRA). The parties reached a confidential settlement in late November 2015. Final papers were completed in February 2016.

PFOA Summary

While it is probable that the Company will incur costs related to the medical monitoring program discussed above, such costs cannot be reasonably estimated due to uncertainties surrounding the level of participation by eligible class members and the scope of testing. Chemours believes that it is reasonably possible that it could incur losses related to the MDL in Ohio federal court discussed above but such losses cannot be estimated at this time due to the uniqueness of the individual MDL plaintiff's claims and Chemours' defenses to those claims, both as to potential liability and damages on an individual claim basis, and numerous unsettled legal issues, among other factors. The trials and appeals of these matters will occur over the course of many years.

F-33

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

Significant unfavorable outcomes in a number of cases in the MDL could have a material adverse effect on Chemours' consolidated financial position, results of operations or liquidity.

### (d) Environmental

Chemours, by virtue of its status as a subsidiary of DuPont prior to the Distribution, is subject to contingencies pursuant to environmental laws and regulations that in the future may require further action to correct the effects on the environment of prior disposal practices or releases of chemical substances by Chemours or other parties. Chemours accrues for environmental remediation activities consistent with the policy set forth in Note 3. Much of this liability results from the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, often referred to as Superfund), RCRA and similar state and global laws. These laws require Chemours to undertake certain investigative, remediation and restoration activities at sites where Chemours conducts or once conducted operations or at sites where Chemours-generated waste was disposed. The accrual also includes estimated costs related to a number of sites identified for which it is probable that environmental remediation will be required, but which are not currently the subject of enforcement activities.

Remediation activities vary substantially in duration and cost from site to site. These activities, and their associated costs, depend on the mix of unique site characteristics, evolving remediation technologies, diverse regulatory agencies and enforcement policies, as well as the presence or absence of other potentially responsible parties. At December 31, 2015, the Consolidated Balance Sheets included a liability of $290, relating to these matters which, in management's opinion, is appropriate based on existing facts and circumstances. The average time frame, over which the accrued or presently unrecognized amounts may be paid, based on past history, is estimated to be 15 to 20 years. Therefore, considerable uncertainty exists with respect to environmental remediation costs and, under adverse changes in circumstances, the potential liability may range up to approximately $611 above the amount accrued at December 31, 2015. Except for Pompton Lakes, which is discussed further below, based on existing facts and circumstances, management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the financial position, liquidity or results of operations of Chemours.

#### Pompton Lakes

The environmental remediation accrual at December 31, 2015 includes $87 related to activities at Chemours' site in Pompton Lakes, New Jersey. Management believes that it is reasonably possible that potential liability for remediation activities at this site could range up to $119 including previously accrued amounts. This could have a material impact on the liquidity of Chemours in the period recognized. During the twentieth century, blasting caps, fuses and related materials were manufactured at Pompton Lakes. Operating activities at the site were ceased in the mid 1990s. Primary contaminants in the soil and sediments are lead and mercury. Ground water contaminants include volatile organic compounds.

Under the authority of the EPA and the New Jersey Department of Environmental Protection, remedial actions at the site are focused on investigating and cleaning up the area. Ground water monitoring at the site is ongoing and Chemours has installed and continues to install vapor mitigation systems at residences within the ground water plume. In addition, Chemours is further assessing ground water conditions. In June 2015, the EPA issued a modification to the site's RCRA permit that requires Chemours to dredge mercury contamination from a 36 acre area of the lake and remove sediment from two other areas of the lake near the shoreline. Chemours expects to spend about $50 over the next two to three years in connection with remediation activities commencing in mid-2016 at Pompton Lakes, including activities related to the EPA's proposed plan. These amounts are included in the remediation accrual at December 31, 2015.

#### Note 20. Financial Instruments

#### Derivative Instruments

#### Objectives and Strategies for Holding Derivative Instruments

In the ordinary course of business, Chemours enters into contractual arrangements (derivatives) to reduce its exposure to foreign currency risks. The Company has established a derivative program to be utilized for financial risk management. This program reflects varying levels of exposure coverage and time horizons based on an assessment of risk. The derivative program has procedures consistent with Chemours' financial risk management policies and guidelines.

F- 34

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

*Foreign Currency Forward Contracts*

Chemours uses foreign currency forward contracts to reduce its net exposure, by currency, related to non-functional currency-denominated monetary assets and liabilities of its operations so that exchange gains and losses resulting from exchange rate changes are minimized. These derivative instruments are not part of a cash flow hedge program or a fair value hedge program, and have not been designated as a hedge. Although all of the forward contracts are subject to an enforceable master netting agreement, Chemours has elected to present the derivative assets and liabilities on a gross basis in the Consolidated Balance Sheets. No collateral has been required for these contracts. All gains and losses resulting from the revaluation of the derivative assets and liabilities are recognized in other income, net in the Consolidated Statements of Operations during the period in which they occurred.

At December 31, 2015, there were 41 forward exchange currency contracts outstanding with an aggregate gross notional value of $288. Chemours recognized a net gain of $42 for the year ended December 31, 2015, which is recorded in other income, net in the Consolidated Statements of Operations. There were no forward contracts outstanding in 2014 or 2013.

*Net Investment Hedge - Foreign Currency Borrowings*

Beginning on July 1, 2015, Chemours designated its €360 million Euro notes (see Note 18) as a hedge of its net investments in certain of its international subsidiaries that use the Euro as functional currency in order to reduce the volatility in stockholders' equity caused by the changes in foreign currency exchange rates of the Euro with respect to the U.S. Dollar. Chemours used the spot method to measure the effectiveness of the net investment hedge. Under this method, for each reporting period, the change in the carrying value of the Euro notes due to remeasurement of the effective portion is reported in accumulated other comprehensive loss in the Consolidated Balance Sheet and the remaining change in the carrying value of the ineffective portion, if any, is recognized in other income, net in the Consolidated Statements of Operations. Chemours evaluates the effectiveness of its net investment hedge quarterly at the beginning of each quarter. For the year ended December 31, 2015, Chemours did not record any ineffectiveness and recognized gain of $8 on its net investment hedges within accumulated other comprehensive income. There were no net investment hedges in 2014 or 2013.

*Fair Value of Derivative Instruments*

The table below presents the fair value of Chemours' derivative assets and liabilities within the fair value hierarchy, as described in Note 3 to the Consolidated Financial Statements.

| | | Fair Value Using Level 2 Inputs | |
|---|---|---|---|
| | **Balance Sheet Location** | **December 31, 2015** | **December 31, 2014** |
| **Asset derivatives:** | | | |
| Foreign currency forward contracts | Accounts and notes receivable - trade, net | $    2 | $    - |
| Total asset derivatives | | $    2 | $    - |
| | | | |
| **Liability derivatives:** | | | |
| Foreign currency forward contracts | Other accrued liabilities | $    2 | $    - |
| Total liability derivatives | | $    2 | $    - |

We classify our foreign currency forward contracts in Level 2 as the valuation inputs are based on quoted prices and market observable data of similar instruments. For derivative assets and liabilities, standard industry models are used to calculate the fair value of the various financial instruments based on significant observable market inputs, such as foreign exchange rates and implied volatilities obtained from various market sources. Market inputs are obtained from well-established and recognized vendors of market data and subjected to tolerance and quality checks.

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

**Note 21. Long-Term Employee Benefits**

*Plans Covering Employees in the U.S.*

Chemours sponsors a variety of employee benefit plans which cover substantially all U.S. employees. Prior to July 1, 2015, U.S. employees generally participated in DuPont's primary pension plan, the Retirement Savings Plan and certain other long-term employee benefit plans. In conjunction with the separation on July 1, 2015, Chemours employees stopped participating in DuPont plans and became participants in newly established Chemours plans. DuPont retained all liabilities related to its U.S. plans post-separation.

On July 1, 2015, Chemours established a defined contribution plan, similar in design to the DuPont Retirement Savings plan, which covered all eligible U.S. employees. The purpose of the Plan is to encourage employees to save for their future retirement needs. The plan is a tax qualified contributory profit sharing plan, with cash or deferred arrangement, and any eligible employee of Chemours employees may participate. Chemours matches 100% of the first 6% of the employee's contribution election. Chemours may also provide an additional discretionary retirement savings contribution to eligible employees' eligible compensation. The amount of this contribution, if any, is at the sole discretion of the Company. The plan's matching contributions vest immediately upon contribution. The discretionary contribution vests for employees with at least three years of service.

In lieu of a defined benefit plan like DuPont's primary pension plan, Chemours provides an enhanced 401(k) contribution for employees who previously participated in DuPont's pension plan. The enhanced benefits consist of an additional contribution of 1% to 7% of the employee's eligible compensation depending on the employee's length of service with DuPont at the time of separation. The plan will continue for a period up to 2019, subject to early termination.

*Plans Covering Employees Outside the U.S.*

Pension coverage for employees of Chemours non-U.S. subsidiaries is provided, to the extent deemed appropriate, through separate plans established after separation and comparable to the DuPont plans in those countries. Obligations under such plans are funded by depositing funds with trustees, covered by insurance contracts or are unfunded.

*Participation in the Plans*

Prior to July 1, 2015, Chemours participated in DuPont's U.S. and non-U.S. plans, except for the plans in the Netherlands and Taiwan, as though they were participants in a multi-employer plan with the other businesses of DuPont. The following table presents the multi-employer pension expense allocated by DuPont to Chemours for the plans in which Chemours participated prior to separation. The allocation of cost was based on active employee headcount and is included in the Consolidated Statement of Operations. These amounts do not represent cash payments to DuPont or DuPont's plans.

| Plan Name | EIN / Pension Number | Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2015 | 2014 | 2013 |
| DuPont Pension and Retirement Plan (U.S.) | 51-0014090/001 | $ 48 | $ 51 | $ 126 |
| All other U.S. and non-U.S. Plans | | 5 | (1) | 38 |

*Single and Multiple Employer Plans*

Beginning in the first quarter of 2015, Chemours has accounted for the plans covering its employees in the Netherlands and Taiwan as a multiple employer plan and a single employer plan, respectively. In the third quarter of 2015, in connection with the separation, additional plans in Germany, Belgium, Japan, Korea, Mexico and Switzerland were established. As of December 31, 2015, these plans were all accounted for as single employer plans.

F- 36

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

The net periodic benefit costs for the pension and amounts recognized in other comprehensive income for the year ended December 31, 2015 were as follows:

| | Year Ended December 31, 2015 | |
|---|---|---|
| Net periodic pension cost (income): | | |
| Service cost | $ | 16 |
| Interest cost | | 19 |
| Expected return on plan assets | | (83) |
| Amortization of loss | | 16 |
| Amortization of prior service cost | | 4 |
| Net periodic pension income | $ | (28) |
| Changes in plan assets and benefit obligations recognized in other comprehensive income: | | |
| Net loss | $ | 11 |
| Amortization of loss | | (16) |
| Prior service credit | | (24) |
| Amortization of prior service cost | | (4) |
| Effect of foreign exchange rates | | (33) |
| Total benefit recognized in other comprehensive income | $ | (66) |
| Total recognized in net periodic pension income and other comprehensive income | $ | (94) |

The pre-tax amounts recognized in accumulated other comprehensive loss are summarized below:

| | December 31, 2015 |
|---|---|
| Net loss | $ 363 |
| Prior service credit | (16) |
| Total amount recognized in accumulated other comprehensive loss | $ 347 |

The estimated pre-tax net loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated other comprehensive (loss) income into net periodic benefit cost during 2016 are $20 and $2, respectively.

F- 37

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

Summarized information on the Company's pension benefit plans is as follows:

| | Year Ended December 31, 2015 |
|---|---:|
| **Change in benefit obligation** | |
| Benefit obligation at beginning of year | $          - |
| Assumption and establishment of pension plans | 1,332 |
| Service cost | 16 |
| Interest cost | 19 |
| Plan participants' contributions | 2 |
| Actuarial loss (gain) | (76) |
| Benefits paid | (39) |
| Plan Amendments | (24) |
| Settlements & Transfers | (6) |
| Currency translation | (118) |
| Benefit obligation at end of year | 1,106 |
| **Change in plan assets** | |
| Fair value of plan assets at beginning of year | - |
| Assumption and establishment of pension plans | 1,297 |
| Actual loss on plan assets | (7) |
| Employer contributions | 16 |
| Plan participants' contributions | 2 |
| Benefits paid | (39) |
| Settlements & Transfers | (6) |
| Currency translation | (123) |
| Fair value of plan assets at end of year | 1,140 |
| **Funded status at end of year** | $          34 |

The net amounts recognized in the Consolidated Balance Sheet as of December 31, 2015 consist of:

| | |
|---|---:|
| Noncurrent assets | $          138 |
| Current liabilities | (2) |
| Noncurrent liabilities | (102) |
| Net amount recognized | $          34 |

The accumulated benefit obligation for all pension plans was $1,030 as of December 31, 2015.

F- 38

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

The following information relates to pension plans with projected and accumulated benefit obligations in excess of the fair value of plan assets at December 31, 2015:

| Information for pension plans with projected benefit obligation in excess of plan assets | December 31, 2015 |
|---|---|
| Projected benefit obligation | $ 194 |
| Accumulated benefit obligation | 158 |
| Fair value of plan assets | 93 |

| Information for pension plans with accumulated benefit obligations in excess of plan assets | December 31, 2015 |
|---|---|
| Projected benefit obligation | $ 190 |
| Accumulated benefit obligation | 157 |
| Fair value of plan assets | 90 |

*Assumptions*

The Company generally utilizes discount rates that are developed by matching the expected cash flows of each benefit plan to various yield curves constructed from a portfolio of high quality, fixed income instruments provided by the plan's actuary as of the measurement date. The expected rate of return on assets reflects economic assumptions applicable to each country.

The following assumptions have been used to determine the benefit obligations and net benefit cost:

| Weighted average assumptions used to determine benefit obligations and benefit cost | Pension Benefit Obligation at December 31, 2015 | Pension Income for the year ended December 31, 2015 |
|---|---|---|
| Discount rate | 2.4% | 1.7% |
| Rate of compensation increase [1] | 2.6% | 3.9% |
| Expected return on plan assets | N/A | 7.2% |

[1] The rate of compensation increase represents the single annual effective salary increase that an average plan participant would receive during the participant's entire career at Chemours.

*Plan Assets*

Each pension plan's assets are invested through a master trust fund. The strategic asset allocation for the trust fund is selected by management, reflecting the results of comprehensive asset and liability modeling. Chemours establishes strategic asset allocation percentage targets and appropriate benchmarks for significant asset classes with the aim of achieving a prudent balance between return and risk. Strategic asset allocations in countries are selected in accordance with the laws and practices of those countries.

The weighted average target allocation for Chemours' pension plan assets is summarized as follows:

| | December 31, 2015 |
|---|---|
| Cash and cash equivalents | 2.7% |
| U.S. and non-U.S. equity securities | 42.3% |
| Fixed income securities | 55.0% |
| Total | 100.0% |

Fixed income securities include corporate issued, government issued and asset backed securities. Corporate debt investments encompass a range of credit risk and industry diversification.

F- 39

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

Fair value calculations may not be indicative of net realizable value or reflective of future fair values. Furthermore, although Chemours believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

The table below presents the fair values of Chemours' pension assets by level within the fair value hierarchy, as described in Note 3, as of December 31, 2015.

| | | Total | | Level 1 | | Level 2 |
|---|---|---|---|---|---|---|
| Asset Category: | | | | | | |
| Debt - government issued | $ | 465 | $ | 7 | $ | 458 |
| Debt - corporate issued | | 148 | | 60 | | 88 |
| Debt - asset backed | | 33 | | - | | 33 |
| U.S. and non U.S. equities | | 460 | | 37 | | 423 |
| Derivatives - asset position | | 4 | | - | | 4 |
| Derivatives - liability position | | (16) | | - | | (16) |
| Cash and cash equivalents | | 40 | | 40 | | - |
| Other | | 6 | | 4 | | 2 |
| | | 1,140 | $ | 148 | $ | 992 |
| Pension trust payables [1] | | (3) | | | | |
| Total | $ | 1,137 | | | | |

[1] Payables are primarily for investment securities purchased.

For pension plan assets classified as Level 1, total fair value is either the price of the most recent trade at the time of the market close or the official close price, as defined by the exchange on which the asset is most actively traded on the last trading day of the period, multiplied by the number of units held without consideration of transaction costs.

For pension benefit plan assets classified as Level 2, where the security is frequently traded in less active markets, fair value is based on the closing price at the end of the period; where the security is less frequently traded, fair value is based on the price a dealer would pay for the security or similar securities, adjusted for any terms specific to that asset or liability. Market inputs are obtained from well-established and recognized vendors of market data and subjected to tolerance and quality checks. For derivative assets and liabilities, standard industry models are used to calculate the fair value of the various financial instruments based on significant observable market inputs, such as foreign exchange rates, commodity prices, swap rates, interest rates and implied volatilities obtained from various market sources.

***Cash Flow***

Defined Benefit Plan

DuPont contributed, on behalf of Chemours, $35 and $34 to its pension plans other than the principal U.S. pension plan in 2014 and 2013, respectively. DuPont contributed, on behalf of Chemours, $66 and $58 to its other long-term employee benefit plans in 2014 and 2013, respectively. DuPont contributed, on behalf of Chemours, $38 in the first half of 2015 to its pension and other long-term benefit plans and Chemours contributed $8 during 2015 to its pension plans. Chemours expects to contribute $18 to its pension plans in 2016.

F- 40

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

Estimated future benefit payments

The following benefit payments are expected to be paid over the next five years and the five years thereafter as of December 31, 2015:

| | | |
|---|---|---:|
| 2016 | $ | 42 |
| 2017 | | 45 |
| 2018 | | 44 |
| 2019 | | 47 |
| 2020 | | 47 |
| 2021 - 2025 | | 250 |

Defined Contribution Plan

DuPont's contributions to the plan on behalf of Chemours were allocated in the amounts of $52 and $50 for the years ended December 31, 2014 and 2013, respectively. In addition, DuPont contributed on behalf of Chemours about $26 to its defined contribution plans for the first half of 2015. From July 1 to December 31, 2015, Chemours contributed $28 to its defined contribution plan.

**Note 22. Stock-based Compensation**

Total stock-based compensation cost included in the Consolidated Statements of Operations was $17, $7 and $6 for the years ended December 31, 2015, 2014 and 2013, respectively. The income tax benefits related to stock-based compensation arrangements were $7, $3 and $2 for the years ended December 31, 2015, 2014 and 2013, respectively.

Stock-based compensation expense in prior years and until separation on July 1, 2015 was allocated to Chemours based on the portion of DuPont's incentive stock program in which Chemours employees participated. Adopted at separation, the Chemours Company Equity and Incentive Plan grants certain employees, independent contractors, or non-employee directors of the Company different forms of awards, including stock options and RSUs. The equity and incentive plan has maximum shares reserve for the grant of 13,500,000 plus the number of shares of converted awards (described below). Chemours Compensation Committee determines the long-term incentive mix, including stock options and RSU, and may authorize new grants annually.

In accordance with the employee matters agreement between DuPont and Chemours, certain executives and employees were entitled to receive equity compensation awards of Chemours in replacement of previously outstanding awards granted under various DuPont stock incentive plans prior to the separation. In connection with the spin-off, these awards were converted into new Chemours equity awards using a formula designed to preserve the intrinsic value of the awards immediately prior to the July 1, 2015 spin-off. At the date of conversion, total intrinsic value of the converted options was $18. As a result of the conversion of these awards, we recorded an approximate $3 incremental charge in the third quarter of 2015. The terms and conditions of the DuPont awards were replicated and as necessary, adjusted to ensure that the vesting schedule and economic value of the awards was unchanged by the conversion.

***Stock Options***

Chemours granted non-qualified options to employees in July 2015 representing replacement of previously granted performance stock unit awards at DuPont. The July 2015 grant will cliff vest March 1, 2018 and expire 10 years from date of grant. Other than those options, Chemours' expense related to stock options was entirely related to options granted to replace outstanding option awards from DuPont that were converted to Chemours options on July 1, 2015.

The fair value related to stock options granted was determined using Black-Scholes option pricing model and the assumptions shown in the table below:

F-41

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

| | Year Ended December 31, 2015 |
|---|---|
| Risk-free interest rate | 1.5% |
| Expected term (years) | 5.4 |
| Volatility | 42.0% |
| Dividend yield | 6.9% |
| Fair value per stock option | $ 3.17 |

The Company determined the dividend yield by dividing the expected annual dividend on the Company's stock by the option exercise price. A historical daily measurement of volatility is determined based on Chemours peer companies' average volatility adjusted for the Company's debt leverage. The risk-free interest rate is determined by reference to the yield on an outstanding U.S. Treasury note with a term equal to the expected life of the option granted. Expected life is determined by reference to Chemours peer companies expected life and the historical experience of Chemours under the DuPont stock incentive plan prior to separation.

The following table summarizes Chemours stock option activity for the year ended December 31, 2015.

| | Number of Shares (in thousands) | Weighted Average Exercise Price(per share) | Weighted Average Remaining Contractual Term (years) | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|
| Outstanding, December 31, 2014 | - | N/A | | |
| Converted on July 1, 2015 | 7,794 | $ 14.56 | | |
| Granted | 662 | 16.04 | | |
| Exercised | (22) | 5.82 | | |
| Forfeited | (150) | 17.20 | | |
| Expired | - | N/A | | |
| Outstanding, December 31, 2015 | 8,284 | $ 14.66 | 4.82 | $ - |
| Exercisable, December 31, 2015 | 5,595 | $ 13.79 | 4.21 | $ - |

The aggregate intrinsic values in the table above represent the total pre-tax intrinsic value (the difference between the Company's closing stock price on the last trading day of December 31, 2015 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders had all option holders exercised their in-the-money options at quarter end. The amount changes based on the fair market value of the Company's stock. Total intrinsic value of options exercised for year ended December 31, 2015 was insignificant.

As of December 31, 2015, there was $5 of unrecognized stock-based compensation expense related to stock options that is expected to be recognized over a weighted-average period of 1.95 years.

*RSUs*

At the time of separation, in accordance with the employee matters agreement, the Company issued RSUs that serially vest over a three-year period and, upon vesting, convert one-for-one to Chemours common stock to replace similar DuPont awards. Under the existing awards, a retirement eligible employee retains any granted awards upon retirement provided the employee has rendered at least six months of service following the grant date. Additional RSUs were also granted to key senior management employees with a performance condition. These RSUs vest on the third anniversary of the date of grant subject to the satisfaction of the performance condition. The fair value of all stock-settled RSUs is based upon the market price of the underlying common stock as of the grant date.

Non-vested awards of RSUs, both with and without performance feature, as of December 31, 2015 are shown below. The weighted-average grant-date fair value of RSUs granted and converted during 2015 was $14.94.

F- 42

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

| | Number of Shares (in thousands) | Weighted Average Grant Date Fair Value (per share) |
|---|---|---|
| Nonvested, December 31, 2014 | - $ | - |
| Converted on July 1, 2015 | 1,431 | 16.00 |
| Granted | 1,065 | 13.50 |
| Vested | (133) | 16.00 |
| Forfeited | (14) | 16.00 |
| Nonvested, December 31, 2015 | 2,349 | 14.87 |

As of December 31, 2015, there was $23 of unrecognized stock-based compensation expense related to RSUs that is expected to be recognized over a weighted-average period of 2.12 years.

**Note 23. Geographic and Segment Information**

**Geographic Information**

| | For and As of the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | | 2014 | | 2013 | |
| | Net Sales [1] | Net Property, Plant and Equipment | Net Sales [1] | Net Property, Plant and Equipment | Net Sales [1] | Net Property, Plant and Equipment |
| North America [2] | $ 2,570 | $ 2,184 | $ 2,759 | $ 2,273 | $ 3,138 | $ 2,183 |
| Asia Pacific | 1,393 | 136 | 1,548 | 140 | 1,519 | 138 |
| EMEA [3] | 977 | 308 | 1,190 | 372 | 1,237 | 321 |
| Latin America [4] | 777 | 549 | 935 | 523 | 965 | 330 |
| Total | $ 5,717 | $ 3,177 | $ 6,432 | $ 3,308 | $ 6,859 | $ 2,972 |

[1] Net sales are attributed to countries based on customer location.

[2] Includes net sales in Canada of $140, $147 and $145 in 2015, 2014 and 2013, respectively. Includes net property, plant and equipment in Canada of $13, $14 and $13 in 2015, 2014 and 2013, respectively.

[3] EMEA includes Europe, Middle East and Africa.

[4] Latin America includes Mexico.

**Segment Information**

Chemours' operations are classified into three segments namely: Titanium Technologies, Fluoroproducts and Chemical Solutions. Corporate costs and certain legal and environmental expenses that are not aligned with the segments and foreign exchange gains and losses are reflected in Corporate and Other.

The Titanium Technologies segment is the leading global producer of TiO2, a premium white pigment used to deliver opacity. The Fluoroproducts segment is a leading global provider of fluoroproducts, such as refrigerants and industrial fluoropolymer resins. The Chemical Solutions segment is a leading North American provider of industrial and specialty chemicals, which includes cyanides, sulfur products and performance chemicals and intermediates, used in gold production, oil refining, agriculture, industrial polymers and other industries. Chemours operates globally in substantially all of its product lines.

In general, the accounting policies of the segments are the same as those described in Note 3. Products are transferred between segments on a basis intended to reflect, as nearly as practicable, the market value of the products. Segment net assets includes net working capital, net property, plant and equipment, and other noncurrent operating assets and liabilities of the segment. Depreciation and amortization includes depreciation on research and development facilities and amortization of other intangible assets, excluding write-down of assets.

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

Adjusted EBITDA is the primary measure of segment profitability used by the Chief Operating Decision Maker (CODM) and is defined as income (loss) before income taxes excluding the following:

•        interest expense, depreciation and amortization,

•        non-operating pension and other postretirement employee benefit costs,

•        exchange gains (losses),

•        employee separation, asset-related charges and other charges, net,

•        asset impairments,

•        gains (losses) on sale of business or assets, and

•        other items not considered indicative of our ongoing operational performance and expected to occur infrequently.

The tables presented below reflect the reclassification of certain corporate costs, certain legal and environmental expenses that are not aligned with our reportable segments, and foreign exchange gains and losses from our reportable segments into Corporate and Other.  All periods presented reflect the current definition of Adjusted EBITDA.

| Year Ended December 31, | Titanium Technologies | | Fluoroproducts | | Chemical Solutions | | Corporate and Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| **2015** | | | | | | | | | | |
| Net sales | $ | 2,392 | $ | 2,230 | $ | 1,095 | $ | - | $ | 5,717 |
| Adjusted EBITDA | | 326 | | 300 | | 29 | | (82) | | 573 |
| Depreciation and amortization | | 125 | | 88 | | 52 | | 2 | | 267 |
| Equity in earnings of affiliates | | - | | 21 | | - | | 1 | | 22 |
| Net assets | | 1,659 | | 1,567 | | 839 | | (3,935) | | 130 |
| Investments in affiliates | | - | | 127 | | - | | 9 | | 136 |
| Purchases of plant, property and equipment | | 255 | | 142 | | 117 | | 5 | | 519 |
| **2014** | | | | | | | | | | |
| Net sales | $ | 2,937 | $ | 2,327 | $ | 1,168 | $ | - | $ | 6,432 |
| Adjusted EBITDA | | 723 | | 282 | | 17 | | (146) | | 876 |
| Depreciation and amortization | | 125 | | 83 | | 48 | | 1 | | 257 |
| Equity in earnings of affiliates | | - | | 20 | | - | | - | | 20 |
| Net assets | | 1,748 | | 1,480 | | 782 | | (337) | | 3,673 |
| Investments in affiliates | | - | | 124 | | - | | - | | 124 |
| Purchases of plant, property and equipment | | 365 | | 133 | | 106 | | - | | 604 |
| **2013** | | | | | | | | | | |
| Net sales | $ | 3,019 | $ | 2,379 | $ | 1,461 | $ | - | $ | 6,859 |
| Adjusted EBITDA | | 726 | | 395 | | 101 | | (238) | | 984 |
| Depreciation and amortization | | 117 | | 90 | | 53 | | 1 | | 261 |
| Equity in earnings of affiliates | | - | | 22 | | - | | - | | 22 |
| Net assets | | 1,390 | | 1,387 | | 734 | | (294) | | 3,217 |
| Investments in affiliates | | - | | 123 | | - | | - | | 123 |
| Purchases of plant, property and equipment | | 290 | | 96 | | 52 | | - | | 438 |

F- 44

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

Total Adjusted EBITDA reconciles to total consolidated net (loss) income in the Consolidated Statements of Operations as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Total Adjusted EBITDA | $ 573 | $ 876 | $ 984 |
| Interest | (132) | - | - |
| Depreciation and amortization | (267) | (257) | (261) |
| Non-operating pension and other postretirement employee benefit costs | 3 | (22) | (114) |
| Exchange gains (losses) | 19 | (66) | (31) |
| Asset impairments | (73) | - | - |
| Restructuring charges | (285) | (21) | (2) |
| Transaction, legal and other charges | (17) | - | - |
| (Loss) gain on sale of assets and businesses | (9) | 40 | - |
| (Loss) income before income taxes | (188) | 550 | 576 |
| (Benefit from) provision for income taxes | (98) | 149 | 152 |
| Net (loss) income | $ (90) | $ 401 | $ 424 |

**Note 24. Accumulated Other Comprehensive Income (Loss)**

The components of accumulated other comprehensive income (loss), net of income taxes, consisted of:

| | Currency Translation Adjustment | Net Investment Hedge | Employee Benefits | Total |
| --- | --- | --- | --- | --- |
| Balance at December 31, 2012 | $ 19 | $ - | $ - | $ 19 |
| Other comprehensive income (loss) | - | - | - | - |
| Balance at December 31, 2013 | 19 | - | - | 19 |
| Other comprehensive income (loss) | - | - | - | - |
| Balance at December 31, 2014 | 19 | - | - | 19 |
| Assumption and establishment of pension plans, net | - | - | (311) | (311) |
| Other comprehensive income (loss) | (304) | 8 | 52 | (244) |
| Balance at December 31, 2015 | $ (285) | $ 8 | $ (259) | $ (536) |

F- 45

Table of Contents

**The Chemours Company**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
*(Dollars in millions, except per share)*

**Note 25. Quarterly Financial Data (Unaudited)**

The following is a summary of the quarterly results of operations for the years ended December 31, 2015 and 2014.

| | | For the three months ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| **2015** | | **March 31** | **June 30** | **September 30** | **December 31** | **Full Year** |
| Net Sales | $ | 1,363 | $ 1,508 | $ 1,486 | $ 1,360 | $ 5,717 |
| Cost of goods sold | | 1,111 | 1,282 | 1,222 | 1,147 | 4,762 |
| Income (loss) before income taxes | | 58 | (18) | (107) | (121) | (188) |
| Net income (loss) | | 43 | (18) | (29) | (86) | (90) |
| Net income (loss) attributable to Chemours | | 43 | (18) | (29) | (86) | (90) |
| Basic earnings (loss) per share [1] | | 0.24 | (0.10) | (0.16) | (0.48) | (0.50) |
| Diluted earnings (loss) per share [1] | | 0.24 | (0.10) | (0.16) | (0.48) | (0.50) |

| | | For the three months ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| **2014** | | **March 31** | **June 30** | **September 30** | **December 31** | **Full Year** |
| Net Sales | $ | 1,569 | $ 1,682 | $ 1,632 | $ 1,549 | $ 6,432 |
| Cost of goods sold | | 1,240 | 1,311 | 1,273 | 1,248 | 5,072 |
| Income before income taxes | | 132 | 155 | 143 | 120 | 550 |
| Net income | | 98 | 116 | 108 | 79 | 401 |
| Net income attributable to Chemours | | 98 | 116 | 107 | 79 | 400 |
| Basic earnings per share [1] | | 0.54 | 0.64 | 0.59 | 0.44 | 2.21 |
| Diluted earnings per share [1] | | 0.54 | 0.64 | 0.59 | 0.44 | 2.21 |

[1] On July 1, 2015, E. I. du Pont de Nemours and Company distributed 180,966,833 shares of Chemours' common stock to holders of its common stock. Basic and diluted earnings (loss) per common share for all periods prior to July 1, 2015 were calculated using the shares distributed on July 1, 2015. Refer to Note 9 for information regarding the calculation of basic and diluted earnings per share.

F-46

**Exhibit 10.26**

**AWARD TERMS OF**
**PERFORMANCE SHARE UNITS GRANTED UNDER THE**
**CHEMOURS COMPANY EQUITY AND INCENTIVE PLAN**

_____

| | |
|---|---|
| **Introduction** | You have been granted Performance Share Units under The Chemours Company Equity and Incentive Plan ("Plan"), subject to the following Award Terms. This grant is also subject to the terms of the Plan, which are hereby incorporated by reference. However, to the extent that an Award Term conflicts with the Plan, the Plan shall govern. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in these Award Terms, including any appendices to these Award Terms (hereinafter, collectively referred to as the "Agreement"). A copy of the Plan, and other Plan-related materials, such as the Plan prospectus, are available at: www.benefits.ml.com. |
| **Grant Award Acceptance** | You must expressly accept the terms and conditions of your Award as set forth in this Agreement. To accept, log on to Merrill Lynch Benefits OnLine at www.benefits.ml.com, select **Equity Plan > Grant Information > Pending Acceptance**.<br><br>**IF YOU DO NOT ACCEPT YOUR PERFORMANCE SHARE UNITS IN THE MANNER INSTRUCTED BY THE COMPANY, YOUR PERFORMANCE SHARE UNITS WILL BE SUBJECT TO CANCELLATION.** |
| **Date of Grant** | [ ] ("Date of Grant") |
| **Type of Awards** | Performance Share Units ("PSUs") |
| **Dividend Equivalents** | Dividends payable on the total number of shares represented by your Performance Share Units (including whole and fractional Performance Share Units) will be allocated to your account in the form of Performance Share Units (whole and fractional) based upon the closing stock price on the date of the dividend payment. Dividend equivalent units will be determined after the end of the Performance Period and credited to your account at that time based on the performance-adjusted number of Performance Share Units in your account. Dividend equivalent units will be calculated by taking the final performance-adjusted Performance Share Units and calculating the dividend equivalent units for the first dividend payment date for the Performance Period. The resulting number of dividend equivalent units from the first dividend payment date will be added to the final performance-adjusted number of Performance Share Units before calculating the dividend equivalent units for the second dividend payment date during the Performance Period. This process will be repeated for each subsequent dividend payment date during the Performance Period. |
| **Restricted Period** | You may not sell, gift, or otherwise transfer or dispose of any of the Performance Share Units during the "Restricted Period." The Restricted Period commences on the Date of Grant and lapses as set forth herein. |

| | |
|---|---|
| **Vesting Schedule** | The Performance Share Units shall only vest if the performance goals set forth on Exhibit A hereto (the "Performance Goals") are satisfied as of the end of the performance period running from [ - ] (the "Performance Period"). If Performance Share Units are determined to be earned as of the Determination Date (as defined on Exhibit A), the Restricted Period shall lapse with respect to such Performance Share Units on the Determination Date. To the extent the Performance Goals are not satisfied, the Performance Share Units that are subject to a Restricted Period will be forfeited. |
| **Termination of Employment Under 55/10 Rule** | For purposes of these Award Terms, "Retirement" shall mean the termination of your employment (other than for Cause) after having attained age 55 and having provided at least ten (10) years of service to the Company.<br><br>If you terminate employment after attainment of age 55 with at least 10 years of service and either (i) you are an active employee for six months following the Date of Grant or (ii) you have been notified by the Company or, if different, your employer (the "Employer"), that your employment with the Company or Employer will terminate because of either lack of work or divestiture to an entity less than 50% owned by Chemours, the Units will remain subject to the Vesting Terms and will be paid in accordance with the Payment provisions set forth herein. However, the number of Units will be prorated based on the number of days you were employed from the Date of Grant through the end of the Performance Period. |
| **Due to Lack of Work, Divestiture to Entity Less Than 50% Owned by Chemours, Disability, or Death** | If the termination occurs after the end of the Performance Period but prior to the Determination Date and the Performance Goals are satisfied, the Restricted Period will lapse as indicated on Exhibit A on the Determination Date.<br><br>If the termination occurs prior to the end of the Performance Period and the Performance Goals are satisfied, the Restricted Period will lapse as to a pro rata portion of the Performance Share Units on the Determination Date. The prorated amount will be determined by multiplying the number of Performance Share Units determined as indicated on Exhibit A by a fraction, the numerator of which is the number of days from the beginning of the Performance Period to the termination date, and the denominator of which is the total number of days in the Performance Period.<br><br>If the Performance Goals are not satisfied, the Performance Share Units that are subject to a Restricted Period will be forfeited. |
| **Due to Any Other Reason (such as voluntary termination)** | Performance Share Units that are subject to a Restricted Period will be forfeited. |

2

| | |
|---|---|
| **Payment** | Performance Share Units, if earned, shall be paid to you when the Restricted Period lapses in accordance with the schedule set forth under "Restricted Period." Performance Share Units are payable in one share of Stock for each whole unit and a cash payment for any fraction of a unit. The value of each fractional unit will be based on the closing price of Stock as reported on the Composite Tape of the New York Stock Exchange as of the effective date of payment. |
| **Code Section 409A** | To the extent that an amount that is considered "nonqualified deferred compensation" subject to Code Section 409A ("deferred compensation") is payable on account of your termination of employment, no amounts shall be paid hereunder on account thereof unless such termination of employment constitutes a "separation from service," within the meaning of Code Section 409A. If you are a "specified employee," within the meaning of Code Section 409A, no amount that is deferred compensation shall be paid or delivered, on account of your separation from service, earlier than the date that is six months after such separation from service. Amounts otherwise payable during that six month period shall be paid on the date that is six months and one day after your separation from service. |
| | The Performance Share Units are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject you to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement, the Plan or both, without your consent, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This section does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the Performance Share Units or the delivery of shares of Stock upon vesting/settlement of the Performance Share Units will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. In no event whatsoever shall the Company be liable to any party for any additional tax, interest or penalties that may be imposed on you by Code Section 409A or any damages for failing to comply with Code Section 409A. |
| **Restricted Conduct** | If you engage in any of the restricted conduct described in subparagraphs (i) through (iv) below for any reason, in addition to all remedies in law and/or equity available to the Company, you shall forfeit all Performance Share Units (whether or not vested) and shall immediately pay to the Company, with respect to previously vested Performance Share Units, a cash amount equal to the Fair Market Value of the Stock plus the cash payment for any fraction of a unit received, without regard to any Tax-Related Items (as defined below) that may have been deducted from such amount. For purposes of subparagraphs (i) through (v) below, "Company" shall mean The Chemours Company and/or any of its Subsidiaries or Affiliates that have employed you or retained your services. |

3

(i) **Non-Disclosure of Confidential Information**. During the course of your employment with the Company and thereafter, you shall not use or disclose, except on behalf of the Company and pursuant to the Company's directions, any Company "Confidential Information" (i.e., information concerning the Company and / or its business that is not generally known outside the Company, which includes, but is not limited to, (a) trade secrets; (b) intellectual property, including but not limited to inventions, invention disclosures and patent applications; (c) information regarding the Company's present and/or future products, developments, processes and systems, budgets, proposals, marketing plans, financial data and projections, suppliers, vendors, inventions, formulas, data bases, know how, ideas, developments, experiments, improvements, computer programs, software, technology, blue prints, specifications and compilations of information; (d) information about employees and employee relations, including but not limited to training manuals and procedures, recruitment method and procedures, recruitment and distribution techniques, business plans and projections, employment contracts and employee handbooks; (e) information on customers or potential customers, including but not limited to customers' names, sales records, prices, particularities, preferences and manner of doing business, and other terms of sales and Company cost information; and (f) information received in confidence by the Company from third parties. Information regarding products, services or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company is considering for broader use, shall be deemed not generally known until such broader use is actually commercially implemented.); and/or

(ii) **Solicitation of Employees**. During your employment and for a period of one year following the termination of your employment for any reason, you shall not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, any employee, agent or consultant of the Company to terminate his/her employment or association with the Company; and/or

(iii) **Solicitation of Customers**. During your employment and for a period of one year following the termination of your employment for any reason, you shall not directly or indirectly, on behalf of yourself or any other person, company or entity, call on, contact, service or solicit competing business from customers or prospective customers of Company if, within the two years prior to the termination of your employment, you had or made contact with the customer, or received or had access to Confidential Information about the customer; and/or

(iv) **Non-Competition**. During your employment and for a period of one year following the termination of your employment for any reason, you shall not, directly or indirectly, in any capacity, (a) compete or engage in a business similar to that of Company, (b) compete or engage in a business similar to that which the Company has plans to engage, or has engaged in during the two years prior to your termination, if, within this two-year period, you received or had access to Confidential Information regarding the proposed plans or the business in which Company engaged; or (c) take any action to invest in (other than a non- controlling ownership of securities issued by publicly held corporations), own, manage, operate, control, participate in, be employed or engaged by or be connected in any manner with any partnership, corporation or other business or entity engaging in a business similar to Company.

4

(v) **Geographic Scope.** You acknowledge that due to the broad scope of Company's customer base, the following geographic scope for subsections (iii) - (iv) of this Restricted Conduct section is necessary. Your non-competition and non-solicitation obligations under this Agreement shall include: (a) any territory in which you performed your duties for the Company; (b) any territory in which Company has customers about which you received or had access to Confidential Information during your employment; (c) any territory in which you solicited customers; or (d) any territory in which Company plans to expand its market share about which you received or had access to Confidential Information during your employment with Company.

| | |
|---|---|
| **Recoupment Policy** | This Award shall be subject to the Company's Incentive Compensation Clawback Policy (as it may be amended from time to time), the terms of which are incorporated herein by reference. |
| **Repayment/Forfeiture** | Any benefits you may receive hereunder shall be subject to repayment or forfeiture as may be required to comply with the requirements of the U.S. Securities and Exchange Commission or any applicable law, including the requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act, or any securities exchange on which the Stock is traded, as may be in effect from time to time. |
| **Deferral** | If you are an officer of the Company, you may defer the settlement of this Award in accordance with any procedures established by the Company for that purpose. |
| **Withholding** | You acknowledge that the Company and/or your employer (the "Employer") (1) make no representations or undertakings regarding the treatment of any income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Plan and legally applicable to you ("Tax-Related Items") in connection with any aspect of the Performance Share Units, including, but not limited to, the grant, vesting or settlement of the Performance Share Units, the subsequent sale of shares of Stock acquired pursuant to such settlement and the receipt of any dividends and/or any dividend equivalents; and (2) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Performance Share Units to reduce or eliminate your liability for Tax- Related Items or achieve any particular tax result. Further, if you are subject to Tax-Related Items in more than one jurisdiction, the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction. |
| | Prior to any relevant taxable or tax withholding event, as applicable, you agree to make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all Tax-Related Items. In this regard, you authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following: (i) withholding from your wages or other cash compensation paid to you by the Company and/or the Employer; or (ii) withholding from proceeds of the sale of shares of Stock acquired upon settlement of the Performance Share Units either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf pursuant to this authorization without further consent); or (iii) withholding in shares of Stock to be issued upon settlement of the Performance Share Units. |

5

If the obligation for Tax-Related Items is satisfied by withholding in shares of Stock, for tax purposes, you are deemed to have been issued the full number of shares of Stock subject to the vested Performance Share Units, notwithstanding that a number of the shares of Stock are held back solely for the purpose of paying the Tax-Related Items.

Finally, you agree to pay to the Company or the Employer, any amount of Tax- Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to issue or deliver the shares or the proceeds of the sale of shares of Stock, if you fail to comply with your obligations in connection with the Tax-Related Items.

Notwithstanding anything in this section to the contrary, to avoid a prohibited acceleration under Code Section 409A, if shares of Stock subject to the Performance Share Units will be withheld (or sold on your behalf) to satisfy any Tax Related Items arising prior to the date of settlement of the Performance Share Units for any portion of the Performance Share Units that is considered nonqualified deferred compensation subject to Code Section 409A, then the number of shares withheld (or sold on your behalf) shall not exceed the number of shares that equals the liability for Tax-Related Items.

| | |
|---|---|
| **Severability** | The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable. |
| **Waiver** | You acknowledge that a waiver by the Company of breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement, or of any subsequent breach by you or any other participant. |
| **[INTERNATIONAL AWARDS: Appendix** | Notwithstanding any provisions in these Award Terms, the Performance Share Units shall be subject to the additional terms and conditions set forth in Appendix A to this Agreement and to any special terms and provisions as set forth in Appendix B for your country, if any. Moreover, if you relocate to one of the countries included in Appendix B, the special terms and conditions for such country will apply to you, to the extent the Company determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. Appendix A and B constitute part of these Award Terms.] |
| **Imposition of Other Requirements** | The Company reserves the right to impose other requirements on your participation in this Agreement, on the Performance Share Units and on any shares of Stock acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. |

6

**Exhibit A**

**Performance Goals**

[Provided to award holders following Committee approval.]

**[INTERNATIONAL AWARDS: APPENDIX A]**

**ADDITIONAL TERMS AND CONDITIONS**

This Appendix includes additional terms and conditions that govern the Performance Share Units. These terms and conditions are in addition to, or, if so indicated, in place of, the terms and conditions set forth in the Award Terms. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Award Terms or the Plan.

| | |
|---|---|
| **Data Privacy** | *You hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this Agreement and any other Performance Share Unit grant materials by and among, as applicable, the Employer, the Company and its Subsidiaries or Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan.* |
| | *You understand that the Company and the Employer may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number or other identification number (e.g., resident registration number), salary, nationality, job title, any stock or directorships held in the Company, details of all Performance Share Units or any other entitlement to stock awarded, canceled, exercised, vested, unvested or outstanding in your favor, for the exclusive purpose of implementing, administering and managing the Plan ("Data").* |
| | *You understand that Data will be transferred to any third parties assisting the Company with the implementation, administration and management of the Plan. You understand that the recipients of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the Company, its Subsidiaries and Affiliates, the Employer and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing your participation in the Plan. You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consent herein, in any case without cost, by contacting in writing your local human resources representative. Further, you understand that you are providing the consent herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service and career with the Employer will not be adversely affected; the only consequence of refusing or withdrawing your consent is that the Company would not be able to grant you Performance Share Units or other awards or administer or maintain such awards (i.e., the award would be null and void). Therefore, you understand that refusing or withdrawing your consent may affect your ability to participate in the Plan. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.* |

**Nature of Grant**   By participating in the Plan, you acknowledge, understand and agree that:

(a) the Plan is established voluntarily by the Company, it is discretionary in nature and may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan; (b) the grant of the Performance Share Units is voluntary and occasional and does not create any contractual or other right to receive future grants, or benefits in lieu of Performance Share Units, even if Performance Share Units have been granted in the past; (c) all decisions with respect to future grants of Performance Share Units, if any, will be at the sole discretion of the Company; (d) you are voluntarily participating in the Plan; (e) the Performance Share Units are not intended to replace any pension rights or compensation; (f) unless otherwise agreed with the Company, the Performance Share Units and the shares of Stock subject to the Performance Share Units, and the income and value of same, are not granted as consideration for, or in connection with, any service you may provide as a director of a Subsidiary or Affiliate; (g) the Performance Share Units and the income and value of same are not part of normal or expected compensation for any purpose including, without limitation, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments; (h) the future value of the underlying shares of Stock is unknown, indeterminable and cannot be predicted with certainty; (i) no claim or entitlement to compensation or damages shall arise from forfeiture of the Performance Share Units resulting from the termination of your employment or other service relationship (for any reason whatsoever, whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or the terms

of your employment agreement, if any), and in consideration of the grant of the Performance Share Units to which you are otherwise not entitled, you irrevocably agree never to institute any such claim against the Company, any of its Subsidiaries or Affiliates or the Employer, waive your ability, if any, to bring any such claim, and release the Company, its Subsidiaries and Affiliates and the Employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, you shall be deemed irrevocably to have agreed not to pursue such claim and agree to execute any and all documents necessary to request dismissal or withdrawal of such claim; (j) for purposes of the Performance Share Units, your employment or other service relationship will be considered terminated as of the date you are no longer actively providing services to the Company or one of its Subsidiaries or Affiliates (regardless of the reason for such termination and whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any), and unless otherwise expressly provided in this Agreement or determined by the Company, your right to vest in the Performance Share Units under this Agreement, if any, will terminate as of such date and will not be extended by any notice period (e.g., your period of service would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any); the Committee shall have the exclusive discretion to determine when you are no longer actively providing services for purposes of the Performance Share Unit grant (including whether you may still be considered to be providing services while on an approved leave of absence); (k) unless otherwise provided in the Plan or by the Company in its discretion, the Performance Share Units and the benefits evidenced by this Agreement do not create any entitlement to have the Performance Share Units or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any

corporate transaction affecting the shares of the Company; and (l) neither the Company, the Employer nor any Subsidiary or Affiliate shall be liable for any foreign exchange rate fluctuation between your local currency and the U.S. dollar that may affect the value of the Performance Share Units or of any amount due to you pursuant to the settlement of the Performance Share Units or the subsequent sale of any shares of Stock acquired upon settlement.

| | |
|---|---|
| **No Advice Regarding Grant** | The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding your participation in the Plan, or your acquisition or sale of the underlying shares of Stock. You are hereby advised to consult with your own personal tax, legal and financial advisors regarding your participation in the Plan before taking any action related to the Plan. |
| **Venue** | Any and all disputes relating to, concerning or arising from this Agreement, or relating to, concerning or arising from the relationship between the parties evidenced by the Performance Share Units or this Agreement, shall be brought and heard exclusively in the United States District Court for the District of Delaware or the Delaware Superior Court, New Castle County. Each of the parties hereby represents and agrees that such party is subject to the personal jurisdiction of said courts; hereby irrevocably consents to the jurisdiction of such courts in any legal or equitable proceedings related to, concerning or arising from such dispute, and waives, to the fullest extent permitted by law, any objection which such party may now or hereafter have that the laying of the venue of any legal or equitable proceedings related to, concerning or arising from such dispute which is brought in such courts is improper or that such proceedings have been brought in an inconvenient forum**.** |
| **Language** | If you have received this Agreement or any other document related to this Agreement translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control. |
| **Electronic Delivery and Acceptance** | The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company. |
| **Insider Trading/Market Abuse Laws** | You acknowledge that, depending on your country of residence, you may be subject to insider trading restrictions and/or market abuse laws, which may affect your ability to acquire or sell shares of Stock or rights to shares of Stock (e.g., Performance Share Units) under the Plan during such times as you are considered to have "inside information" regarding the Company (as defined by the laws in your country). Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under the Company's insider trading policy. You acknowledge that it is your responsibility to comply with any applicable restrictions, and you are advised to speak to your personal advisor on this matter. |
| **Foreign Asset/ Account Reporting Requirements** | Your country may have certain foreign asset and/or account reporting requirements which may affect your ability to acquire or hold shares of Stock under the Plan or cash received from participating in the Plan (including from any dividends received or sale proceeds arising from the sale of shares of Stock) in a brokerage or bank account outside your country. You may be required to report such accounts, assets or transactions to the tax or other |

authorities in your country. You also may be required to repatriate sale proceeds or other funds received as a result of your participation in the Plan to your country through a designated bank or broker and/or within a certain time after receipt. You acknowledge that it is your responsibility to comply with such regulations, and you should consult your personal legal advisor for any details.

**[INTERNATIONAL AWARDS: APPENDIX B]**

**COUNTRY-SPECIFIC TERMS AND CONDITIONS**

This Appendix includes additional terms and conditions that govern the Performance Share Units granted to you under the Plan if you reside in one of the countries listed herein. These terms and conditions are in addition to, or if so indicated, in place of the terms and conditions set forth in the Award Terms or Appendix A.

You should be aware that local exchange control laws may apply to you as a result of your participation in the Plan. By accepting the Performance Share Units, you agree to comply with applicable exchange control laws associated with your participation in the Plan. If you have any questions regarding your responsibilities in this regard, you agree to seek advice from your personal legal advisor, at your own cost, and further agree that neither the Company nor any Subsidiary or Affiliate will be liable for any fines or penalties resulting from your failure to comply with applicable laws.

If you are a citizen or resident of a country other than the one in which you are currently working, transfer employment after the Performance Share Units are granted or are considered a resident of another country for local law purposes, the terms and conditions contained herein may not be applicable to you, and the Company shall, in its discretion, determine to what extent the terms and conditions contained herein shall apply to you.

**BELGIUM**

There are no country specific provisions.

**BRAZIL**

**Compliance with Law**. By accepting the Performance Share Units, you acknowledge that you agree to comply with applicable Brazilian laws and pay any and all applicable taxes associated with the vesting of the Performance Share Units, the receipt of any dividends, and the sale of shares of Stock acquired under the Plan.

**Labor Law Acknowledgement.** This provision supplements the acknowledgments contained in the *Nature of Grant* section of Appendix A:

By accepting the Performance Share Units, you agree that (i) you are making an investment decision, (ii) the shares of Stock will be issued to you only if the vesting conditions are met and any necessary services are rendered by you over the vesting period, and (iii) the value of the underlying shares of Stock is not fixed and may increase or decrease in value over the vesting period without compensation to you.

**CHINA**

The following applies only to Grantees who are exclusively citizens of the People's Republic of China ("China") and who reside in mainland China, as determined by the Company in its sole discretion.

**Settlement of Performance Share Units and Sale of Shares.** To facilitate compliance with exchange control requirements, you agree to the sale of any shares of Stock to be issued to you upon vesting and settlement of the Award. The sale will occur (i) immediately upon the vesting/settlement of the Performance Share Units, (ii) following your termination of employment from the Company or one of its Subsidiaries or Affiliates, or (iii) within any other time frame as the Company determines to be necessary

to comply with local regulatory requirements. You further agree that the Company is authorized to instruct its designated broker to assist with the mandatory sale of such shares (on your behalf pursuant to this authorization) and you expressly authorizes the Company's designated broker to complete the sale of such shares. You acknowledge that the Company's designated broker is under no obligation to arrange for the sale of the shares at any particular price. Upon the sale of the shares of Stock, the Company agrees to pay you the cash proceeds from the sale, less any brokerage fees or commissions and subject to any obligation to satisfy Tax-Related Items. You agree that the payment of the cash proceeds will be subject to the repatriation requirements described below.

You further agree that any shares to be issued to you shall be deposited directly into an account with the Company's designated broker. The deposited shares shall not be transferable (either electronically or in certificate form) from the brokerage account. This limitation shall apply both to transfers to different accounts with the same broker and to transfers to other brokerage firms. The limitation shall apply to all shares of Stock issued to you under the Plan, whether or not you continue to be employed by the Company or one of its Subsidiaries or Affiliates. If you sell shares of Stock issued upon vesting/settlement of the Performance Share Units, the repatriation requirements described below shall apply.

**Exchange Control Requirements**. You understand and agree that, pursuant to local exchange control requirements, you will be required to immediately repatriate to China the cash proceeds from the sale of shares of Stock acquired from the Performance Share Units and any dividends. You further understand that, under local law, such repatriation of the cash proceeds may need to be effected through a special exchange control account established by the Company or a Subsidiary or Affiliate of the Company and you hereby consent and agree that the proceeds from the sale of shares of Stock acquired from the Performance Share Units, any dividends or dividend equivalents may be transferred to such special account prior to being delivered to you. The proceeds may be paid in U.S. dollars or local currency at the Company's discretion. If the proceeds are paid in U.S. dollars, you acknowledge that you may be required to set up a U.S. dollar bank account in China so that the proceeds may be delivered to this account. If the proceeds are converted to local currency, you acknowledge that the Company (including its Subsidiaries and Affiliates) is under no obligation to secure any currency conversion rate and may face delays in converting the proceeds to local currency due to exchange control restrictions in China. You agree to bear any currency fluctuation risk between the date the shares of Stock acquired from the Performance Share Units are sold and any dividends or dividend equivalents are paid and the time that (i) the Tax-Related Items are converted to local currency and remitted to the tax authorities and (ii) net proceeds are converted to local currency and distributed to you. You acknowledge that neither the Company nor any Subsidiary or Affiliate will be held liable for any delay in delivering the proceeds to you. You agree to sign any agreements, forms and/or consents that may be requested by the Company or the Company's designated broker to effect any of the remittances, transfers, conversions or other processes affecting the proceeds.

Finally, you agree to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

**FRANCE**

**Consent to Receive Information in English**. By accepting the Award, you confirm having read and understood the documents relating to this grant (the Plan and the Agreement) which were provided in the English language. You accept the terms of those documents accordingly.

*En acceptant l'attribution, vous confirmez ainsi avoir lu et compris les documents relatifs à cette attribution (le Plan et ce Contrat) qui ont été communiqués en langue anglaise. Vous acceptez les termes en connaissance de cause.*

**GERMANY**

There are no country specific provisions.

**INDIA**

There are no country specific provisions.

**ITALY**

**Data Privacy**. This provision replaces the *Data Privacy* section of Appendix A:

*You understand that the Employer, the Company and any Subsidiary or Affiliate may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance (to the extent permitted under Italian law) or other identification number, salary, nationality, job title, any shares of stock or directorships held in the Company or any Subsidiary or Affiliate, details of all Performance Share Units or other entitlement to shares of stock or equivalent benefits granted, awarded, canceled, exercised, vested, unvested or outstanding in your favor, for the exclusive purpose of implementing, managing and administering the Plan ("Data").*

*You also understand that providing the Company with Data is necessary for the performance of the Plan and that your refusal to provide such Data would make it impossible for the Company to perform its contractual obligations and may affect your ability to participate in the Plan. The Controller of personal data processing is The Chemours Company, with registered offices at 1007 Market Street, Wilmington, DE 19801, United States of America, and, pursuant to Legislative Decree no. 196/2003, its representative in Italy is Diego Negri, via Pontaccio 10 Milan. Italy.*

*You understand that Data will not be publicized, but it may be transferred to banks, other financial institutions, or brokers involved in the management and administration of the Plan. You understand that Data may also be transferred to the Company's stock plan service provider, Bank of America Merrill Lynch, or such other administrator that may be engaged by the Company in the future. You further understand that the Company and/or any Subsidiary or Affiliate will transfer Data among themselves as necessary for the purpose of implementing, administering and managing your participation in the Plan, and that the Company and/or any Subsidiary or Affiliate may each further transfer Data to third parties assisting the Company in the implementation, administration, and management of the Plan, including any requisite transfer of Data to a broker or other third party with whom you may elect to deposit any shares of Stock acquired at vesting of the Performance Share Units. Such recipients may receive, possess, use, retain, and transfer Data in electronic or other form, for the purposes of implementing, administering, and managing your participation in the Plan. You understand that these recipients may be located in or outside the European Economic Area, such as in the United States or elsewhere. Should the Company exercise its discretion in suspending all necessary legal obligations connected with the management and administration of the Plan, it will delete Data as soon as it has completed all the necessary legal obligations connected with the management and administration of the Plan.*

*You understand that Data-processing related to the purposes specified above shall take place under automated or non-automated conditions, anonymously when possible, that comply with the purposes for which Data is collected and with confidentiality and security provisions, as set forth by applicable Italian data privacy laws and regulations, with specific reference to Legislative Decree no. 196/2003.*

*The processing activity, including communication, the transfer of Data abroad, including outside of the European Economic Area, as herein specified and pursuant to applicable Italian data privacy laws and regulations, does not require your consent thereto as the processing is necessary to performance of contractual obligations related to implementation, administration, and management of the Plan. You understand that, pursuant to Section 7 of the Legislative Decree no. 196/2003, you have the right to, including but not limited to, access, delete, update, correct, or terminate, for legitimate reason, the Data processing. Furthermore, you are aware that Data will not be used for direct marketing purposes. In addition, Data provided can be reviewed and questions or complaints can be addressed by contacting your local human resources representative.*

**Plan Document Acknowledgment.** In accepting the grant of the Performance Share Units, you acknowledge that you have received a copy of the Plan and this Agreement and have reviewed the Plan and this Agreement in their entirety and fully understand and accept all provisions of the Plan and this Agreement.

You acknowledge that you have read and specifically and expressly approved the following sections of this Agreement: *Termination of Employment*; *Withholding*; *Imposition of Other Requirements; Nature of Grant*; *Venue*; *Language*; and the *Data Privacy* section included in this Appendix.

## JAPAN

There are no country specific provisions.

## MEXICO

**No Entitlement or Claims for Compensation.** These provisions supplement the *Nature of Grant* section of Appendix A:

**Modification.** By accepting the Performance Share Units, you understand and agree that any modification of the Plan or the Agreement or its termination shall not constitute a change or impairment of the terms and conditions of your employment.

**Policy Statement.** The Award of Performance Share Units the Company is making under the Plan is unilateral and discretionary and, therefore, the Company reserves the absolute right to amend it and discontinue it at any time without any liability.

The Company, with registered offices at 1007 Market Street, Wilmington, Delaware 19801, U.S.A., is solely responsible for the administration of the Plan and participation in the Plan and the acquisition of shares does not, in any way, establish an employment relationship between you and the Company since you are participating in the Plan on a wholly commercial basis, and the sole employer is Chemours Company nor does it establish any rights between you and the Employer.

**Plan Document Acknowledgment.** By accepting the Award of Performance Share Units, you acknowledge that you have received copies of the Plan, have reviewed the Plan and the Agreement in their entirety and fully understand and accept all provisions of the Plan and the Agreement.

In addition, by accepting the Agreement, you further acknowledge that you have read and specifically and expressly approve the terms and conditions in the Agreement, in which the following is clearly described and established: (i) participation in the Plan does not constitute an acquired right; (ii) the Plan and participation in the Plan is offered by the Company on a wholly discretionary basis; (iii) participation in the Plan is voluntary; and (iv) the Company and any Subsidiary or Affiliates are not responsible for any decrease in the value of the shares of Stock underlying the Performance Share Units.

Finally, you hereby declare that you do not reserve any action or right to bring any claim against the Company for any compensation or damages as a result of your participation in the Plan and therefore grant a full and broad release to the Employer, the Company and any Subsidiary or Affiliate with respect to any claim that may arise under the Plan.

**Spanish Translation**

***Sin derecho a Compensación o a su reclamación.*** *Las presentes disposiciones complementan el apartado denoninado* Naturaleza del Otorgamiento *de los Términos del Otorgamiento:*

***Modificación.*** *Al aceptar las Acciones Restringidas, usted entiende y acepta que, cualquier modificación del Plan o del Contrato o su terminación, no deberá considerarse como un cambio o menoscabo a las condiciones de su relación de trabajo.*

***Declaración de Políticas.*** *El Otorgamiento de Acciones Restringidas que la Empresa está llevando a cabo en términos del Plan, es unilateral y discrecional y, por lo tanto, la Empresa se reserva el derecho de modificar e interrumpir el mismo en cualquier tiempo, sin responsabilidad alguna.*

*La Empresa, con domicilio en Market Street 1007, C.P. 19898, Wilmington, Delaware, E.U.A., es la única responsable de la administración del Plan y la participación en el Plan, y la adquisición de acciones no establece, de ninguna manera, una relación de trabajo entre usted y la Empresa, en virtud de que su participación en el Plan es únicamente de carácter comercial y su único patrón es Chemours Company y tampoco crea ningún derecho entre usted y su Patrón..*

***Reconocimiento del Documento del Plan.*** *Al aceptar el Otorgamiento de las Acciones Restringidas, usted reconoce heber recibido una copia del Plan, haber revisado el mismo , asi como los Términos del Otorgamiento en su totalidad, y comprender y aceptar en su totalidad todas las disposiciones contenidas en el Plan y en los Términos del Otorgamiento.*

*Adicionalmente, al acceptar los Términos del Otorgamiento, reconoce que ha leído y, específica y expresamente, acepta los términos y condiciones contenidos en los Términos del Otorgamiento, en los que claramente se describe y establece lo siguiente: (i) la participación en el Plan no constituye un derecho adquirido; (ii) el Plan y la participación en el Plan es ofrecida por la Empresa completamente de forma discrecional; (iii) la participación en el Plan es voluntaria; y (iv) la Empresa, así como sus Subsidiarias o Filiales no serán responsables por cualquier disminución en el valor de las acciones subyacentes a las Acciones Restringidas.*

*Finalmente, por el presente, usted declara que no se reserva acción legal alguna o derecho a ejercitar en contra de la Empresa por cualquier compensación o daños que se generen como resultado de su participación en el Plan en virtud de ello, usted otorga el finiquito más amplio que en Derecho proceda al Patrón, la Empresa y sus Subsidiarias y Filiales respecto a cualquier reclamación o demanda que pudiera generarse en relación con el Plan.*

**NETHERLANDS**

There are no country specific provisions.

**RUSSIA**

**U.S. Transaction.** You understand that acceptance of the grant of the Performance Share Units results in a contract between you and the Company completed in the United States and that the Agreement is governed by the laws of the State of Delaware, without regard to choice of law principles thereof. Any Stock to be issued upon vesting of the Performance Share Units shall be delivered to you through a brokerage account in the U.S. You may hold the Stock in your brokerage account in the U.S.; however, in no event will Stock issued to you under the Plan be delivered to you in Russia. You are not permitted to sell the Stock directly to other Russian legal entities or individuals.

**Securities Law Information.** You acknowledge that the Agreement, the grant of the Performance Share Units, the Plan and all other materials you may receive regarding participation in the Plan do not constitute advertising or an offering of securities in Russia. Absent any requirement under local law, the issuance of securities pursuant to the Plan has not and will not be registered in Russia and therefore, the securities described in any Plan-related documents may not be used for offering or public circulation in Russia.

**SINGAPORE**

**Securities Law Information.** The grant of the Performance Share Units is being made pursuant to the "Qualifying Person" exemption under section 273(1)(f) of the Securities and Futures Act (Chapter 289, 2006 Ed.) ("SFA"). The Plan has not been lodged or registered as a prospectus with the Monetary Authority of Singapore. You should note that the Performance Share Units are subject to section 257 of the SFA and you will not be able to make (i) any subsequent sale of Stock in Singapore or (ii) any offer of such subsequent sale of Stock subject to the awards in Singapore, unless such sale or offer is made (a) after six months from the Date of Grant or (b) pursuant to the exemptions under Part XIII Division (1) Subdivision (4) (other than section 280) of the SFA.

**SOUTH KOREA**

There are no country specific provisions.

**SPAIN**

**Nature of Grant.** This provision supplements the *Nature of Grant* section of Appendix A:

By accepting the Performance Share Units, you consent to participation in the Plan and acknowledge that you have received a copy of the Plan.

You understand and agree that, as a condition of the grant of the Performance Share Units, except as provided for in under the *Termination of Employment* section of the Award Terms, the termination of your employment for any reason (including for the reasons listed below) will automatically result in the loss of the Performance Share Units that may have been granted to you and that have not vested on the date of termination.

In particular, you understand and agree that any unvested Performance Share Units as of your termination date will be forfeited without entitlement to the underlying shares of Stock or to any amount as indemnification in the event of a termination by reason of, including, but not limited to: resignation, disciplinary dismissal adjudged to be with cause, disciplinary dismissal adjudged or recognized to be

without cause, individual or collective layoff on objective grounds, whether adjudged to be with cause or adjudged or recognized to be without cause, "despido improcedente," material modification of the terms of employment under Article 41 of the Workers' Statute, relocation under Article 40 of the Workers' Statute, Article 50 of the Workers' Statute, unilateral withdrawal by the Employer, and under Article 10.3 of Royal Decree 1382/1985.

Furthermore, you understand that the Company has unilaterally, gratuitously and in its sole discretion decided to grant the Performance Share Units under the Plan to individuals who may be employees of the Company or any Subsidiary or Affiliate. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not economically or otherwise bind the Company or its Subsidiaries or Affiliates over and above the specific terms set forth in this Agreement. Consequently, you understand that the Performance Share Units are granted on the assumption and condition that the Performance Share Units and the shares of Stock issued at vesting shall not become a part of any employment or service contract (either with the Company, the Employer or any Subsidiary or Affiliate) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever. In addition, you understand that the grant of the Performance Share Units would not be made to you but for the assumptions and conditions referred to above; thus, you acknowledge and freely accept that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, then any grant to you of the Performance Share Units shall be null and void.

**Securities Law Information.** The Performance Share Units and the shares of Stock described in this Agreement do not qualify under Spanish regulations as securities. No "offer of securities to the public," as defined under Spanish law, has taken place or will take place in the Spanish territory. The Agreement has not been nor will it be registered with the *Comisión Nacional del Mercado de Valores*, and does not constitute a public offering prospectus.

## SWITZERLAND

**Securities Law Information.** The Performance Share Units are not intended to be publicly offered in or from Switzerland. Because the offer of the Performance Share Units is considered a private offering, it is not subject to registration in Switzerland. Neither this document nor any other materials relating to the Performance Share Units constitutes a prospectus as such term is understood pursuant to article 652a of the Swiss Code of Obligations, and neither this document nor any other materials relating to the Performance Share Units may be publicly distributed or otherwise made publicly available in Switzerland.

## TAIWAN

There are no country specific provisions.

## UNITED KINGDOM

**Responsibility for Taxes.** This provision supplements the *Withholding* section of the Award Terms:

If payment or withholding of income tax is not made within 90 days of the end of the U.K. tax year in which the event giving rise to the liability for income tax occurs (the "Due Date") or such other period specified in Section 222(1)(c) of the U.K. Income Tax (Earnings and Pensions) Act 2003, the amount of any uncollected income tax will constitute a loan owed by you to the Employer, effective on the Due Date. You agree that the loan will bear interest at the then-current Official Rate of Her Majesty's Revenue and Customs ("HMRC"), it will be immediately due and repayable, and the Company or the Employer may

recover it at any time thereafter by any of the means referred to in the *Withholding* section. Notwithstanding the foregoing, if you are a director or executive officer of the Company (within the meaning of Section 13(k) of the Exchange Act), you will not be eligible for such a loan to cover the income tax liability. In the event that you are a director or executive officer and income tax is not collected from or paid by you by the Due Date, the amount of any uncollected income tax may constitute a benefit to you on which additional income tax and national insurance contributions may be payable. You will be responsible for reporting and paying any income tax and national insurance contributions due on this additional benefit directly to HMRC under the self-assessment regime and for reimbursing the Company or the Employer for any employee national insurance contributions due on this additional benefit, which the Company or the Employer may recover at any time thereafter by any of the means referred to in the *Withholding* section.

**Exhibit 10.27**

**AWARD TERMS OF
CASH PERFORMANCE AWARD GRANTED UNDER
THE CHEMOURS COMPANY EQUITY AND INCENTIVE PLAN**

---

| | |
|---|---|
| **Introduction** | You have been granted a cash performance award ("Cash Performance Award") under The Chemours Company Equity and Incentive Plan ("Plan"), subject to the following Award Terms. This Cash Performance Award is intended to constitute a "Cash-Based Award" under the Plan. This grant is also subject to the terms of the Plan, which is hereby incorporated by reference. However, to the extent that an Award Term conflicts with the Plan, the Plan shall govern. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in these Award Terms, including any appendices to these Award Terms (hereinafter, collectively referred to as the "Agreement"). A copy of the Plan, and other Plan-related materials, such as the Plan prospectus, are available at: www.benefits.ml.com. |
| **Grant Award Acceptance** | You must expressly accept the terms and conditions of your Award as set forth in this Agreement. To accept, log on to Merrill Lynch Benefits OnLine at www.benefits.ml.com, select **Equity Plan > Grant Information > Pending Acceptance**. |
| | **IF YOU DO NOT ACCEPT YOUR CASH PERFORMANCE AWARD IN THE MANNER INSTRUCTED BY THE COMPANY, YOUR CASH PERFORMANCE AWARD WILL BE SUBJECT TO CANCELLATION.** |
| **Date of Grant** | [ ] ("Date of Grant") |
| **Type of Award** | Cash Performance Award |
| **Non-Transferable** | You may not sell, gift, or otherwise transfer or dispose of the Cash Performance Award prior to payment. The Cash Performance Award becomes payable as set forth herein. |
| **Vesting Schedule** | The Cash Performance Award shall only vest and become payable if the performance goals set forth on Exhibit A hereto (the "Performance Goals") are satisfied as of the end of the performance period running from [ - ] (the "Performance Period"). If an amount is determined to be earned as of the Determination Date (as defined on Exhibit A), that amount shall become payable on the Determination Date. To the extent the Performance Goals are not satisfied, no amount will be payable, and the Cash Performance Award will lapse without value. |
| **Termination of Employment** | |

| | |
|---|---|
| **Under 55/10 Rule** | For purposes of these Award Terms, "Retirement" shall mean the termination of your employment other than for Cause after having attained age 55 and having provided at least ten (10) years of service to the Company. |
| | If you terminate employment after attainment of age 55 with at least 10 years of service and either (i) you are an active employee for six months following the Date of Grant or (ii) you have been notified by the Company or, if different, your employer (the "Employer"), that your employment with the Company or Employer will terminate because of either lack of work or divestiture to an entity less than 50% owned by Chemours, the Award will remain subject to the Vesting Terms and will be paid in accordance with the Payment provisions set forth herein. However, the amount will be prorated based on the number of days you were employed from the Date of Grant through the end of the Performance Period. |
| **Due to Lack of Work, Divestiture to Entity Less Than 50% Owned by Chemours, Disability, or Death** | If the termination occurs after the end of the Performance Period but prior to the Determination Date and the Performance Goals are satisfied, an amount will become payable as indicated on <u>Exhibit A</u> on the Determination Date. |
| | If the termination occurs prior to the end of the Performance Period and the Performance Goals are satisfied, an amount will become payable as to a pro rata portion of the amount determined to be earned on the Determination Date. The prorated amount will be determined by multiplying the amount determined as indicated on <u>Exhibit A</u> by a fraction, the numerator of which is the number of days from the beginning of the Performance Period to the termination date, and the denominator of which is the total number of days in the Performance Period. |
| | If the Performance Goals are not satisfied, no amount will be payable, and the Cash Performance Award will lapse without value. |
| **Due to Any Other Reason (such as voluntary termination)** | The Cash Performance Award will be forfeited. |
| **Code Section 409A** | To the extent that an amount that is considered "nonqualified deferred compensation" subject to Code Section 409A ("deferred compensation") is payable on account of your termination of employment, no amounts shall be paid hereunder on account thereof unless such termination of employment constitutes a "separation from service," within the meaning of Code Section 409A. If you are a "specified employee," within the meaning of Code Section 409A, no amount that is deferred compensation shall be paid or delivered, on account of your separation from service, earlier than the date that is six months after such separation from service. Amounts otherwise payable during that six month period shall be paid on the date that is six months and one day after your separation from service. |

2

The Cash Performance Award is intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject you to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement, the Plan or both, without your consent, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This section does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that any amounts earned will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. In no event whatsoever shall the Company be liable to any party for any additional tax, interest or penalties that may be imposed on you by Code Section 409A or any damages for failing to comply with Code Section 409A.

**Restricted Conduct**

If you engage in any of the restricted conduct described in subparagraphs (i) through (iv) below for any reason, in addition to all remedies in law and/or equity available to the Company, you shall forfeit all Cash Performance Awards and shall immediately pay to the Company, with respect to previously paid Cash Performance Awards, a cash amount equal to the amount deemed paid, without regard to any Tax-Related Items (as defined below) that may have been deducted from such amount. For purposes of subparagraphs (i) through (v) below, "Company" shall mean The Chemours Company and/or any of its Subsidiaries or Affiliates that have employed you or retained your services.

(i) **Non-Disclosure of Confidential Information**. During the course of your employment with the Company and thereafter, you shall not use or disclose, except on behalf of the Company and pursuant to the Company's directions, any Company "Confidential Information" (i.e., information concerning the Company and / or its business that is not generally known outside the Company, which includes, but is not limited to, (a) trade secrets; (b) intellectual property, including but not limited to inventions, invention disclosures and patent applications; (c) information regarding the Company's present and/or future products, developments, processes and systems, budgets, proposals, marketing plans, financial data and projections, suppliers, vendors, inventions, formulas, data bases, know how, ideas, developments, experiments, improvements, computer programs, software, technology, blue prints, specifications and compilations of information; (d) information about employees and employee relations, including but not limited to training manuals and procedures, recruitment method and procedures, recruitment and distribution techniques, business plans and projections, employment contracts and employee handbooks; (e) information on customers or potential customers, including but not limited to customers' names, sales records, prices, particularities, preferences and manner of doing business, and other terms of sales and Company cost information; and (f) information received in confidence by the

3

Company from third parties. Information regarding products, services or technological innovations in development, in test marketing or being marketed or promoted in a discrete geographic region, which information the Company is considering for broader use, shall be deemed not generally known until such broader use is actually commercially implemented.); and/or

(ii) **Solicitation of Employees**. During your employment and for a period of one year following the termination of your employment for any reason, you shall not recruit, solicit or induce, or cause, allow, permit or aid others to recruit, solicit or induce, any employee, agent or consultant of the Company to terminate his/her employment or association with the Company; and/or

(iii) **Solicitation of Customers**. During your employment and for a period of one year following the termination of your employment for any reason, you shall not directly or indirectly, on behalf of yourself or any other person, company or entity, call on, contact, service or solicit competing business from customers or prospective customers of Company if, within the two years prior to the termination of your employment, you had or made contact with the customer, or received or had access to Confidential Information about the customer; and/or

(iv) **Non-Competition**. During your employment and for a period of one year following the termination of your employment for any reason, you shall not, directly or indirectly, in any capacity, (a) compete or engage in a business similar to that of Company, (b) compete or engage in a business similar to that which the Company has plans to engage, or has engaged in during the two years prior to your termination, if, within this two-year period, you received or had access to Confidential Information regarding the proposed plans or the business in which Company engaged; or (c) take any action to invest in (other than a non- controlling ownership of securities issued by publicly held corporations), own, manage, operate, control, participate in, be employed or engaged by or be connected in any manner with any partnership, corporation or other business or entity engaging in a business similar to Company.

(v) **Geographic Scope.** You acknowledge that due to the broad scope of Company's customer base, the following geographic scope for subsections (iii) - (iv) of this Restricted Conduct section is necessary. Your non-competition and non-solicitation obligations under this Agreement shall include: (a) any territory in which you performed your duties for the Company; (b) any territory in which Company has customers about which you received or had access to Confidential Information during your employment; (c) any territory in which you solicited customers; or (d) any territory in which Company plans to expand its market share about which you received or had access to Confidential Information during your employment with Company.

| | |
|---|---|
| **Recoupment Policy** | This Award shall be subject to the Company's Incentive Compensation Clawback Policy (as it may be amended from time to time), the terms of which are incorporated herein by reference. |

4

| | |
|---|---|
| **Repayment/Forfeiture** | Any benefits you may receive hereunder shall be subject to repayment or forfeiture as may be required to comply with the requirements of the U.S. Securities and Exchange Commission or any applicable law, including the requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act, or any securities exchange on which the Stock is traded, as may be in effect from time to time. |
| **Deferral** | If you are an officer of the Company, you may defer the settlement of this Award in accordance with any procedures established by the Company for that purpose. |
| **Withholding** | You acknowledge that the Company and/or your employer (the "Employer") (1) make no representations or undertakings regarding the treatment of any income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Plan and legally applicable to you ("Tax-Related Items") in connection with any aspect of the Cash Performance Award, including, but not limited to, the grant or payment of a Cash Performance Award; and (2) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Cash Performance Award to reduce or eliminate your liability for Tax- Related Items or achieve any particular tax result. Further, if you are subject to Tax-Related Items in more than one jurisdiction, the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction. |
| | Prior to any relevant taxable or tax withholding event, as applicable, you agree to make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all Tax-Related Items. In this regard, you authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy the obligations with regard to all Tax-Related Items by withholding from your wages or other cash compensation paid to you by the Company and/or the Employer. |
| | Finally, you agree to pay to the Company or the Employer, any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to issue or deliver the shares or the proceeds of the sale of shares of Stock, if you fail to comply with your obligations in connection with the Tax-Related Items. |
| **Severability** | The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable. |
| **Waiver** | You acknowledge that a waiver by the Company of breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement, or of any subsequent breach by you or any other participant. |

5

| | |
|---|---|
| **[INTERNATIONAL AWARDS: Appendix** | Notwithstanding any provisions in these Award Terms, the Cash Performance Award shall be subject to the additional terms and conditions set forth in Appendix A to this Agreement and to any special terms and provisions as set forth in Appendix B for your country, if any. Moreover, if you relocate to one of the countries included in Appendix B, the special terms and conditions for such country will apply to you, to the extent the Company determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. Appendix A and B constitute part of these Award Terms.] |
| **Imposition of Other Requirements** | The Company reserves the right to impose other requirements on your participation in this Agreement and on the Cash Performance Award, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. |

6

**Exhibit A**

**Performance Goals**

[Provided to award holders following Committee approval.]

A-1

**[INTERNATIONAL AWARDS: APPENDIX A]**

**ADDITIONAL TERMS AND CONDITIONS**

This Appendix includes additional terms and conditions that govern the Cash Performance Award. These terms and conditions are in addition to, or, if so indicated, in place of, the terms and conditions set forth in the Award Terms. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Award Terms or the Plan.

| | |
|---|---|
| **Data Privacy** | *You hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this Agreement and any other Cash Performance Award grant materials by and among, as applicable, the Employer, the Company and its Subsidiaries or Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan.* |
| | *You understand that the Company and the Employer may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number or other identification number (e.g., resident registration number), salary, nationality, job title, any stock or directorships held in the Company, details of all Cash Performance Awards or any other entitlement to stock awarded, canceled, exercised, vested, unvested or outstanding in your favor, for the exclusive purpose of implementing, administering and managing the Plan ("Data").* |
| | *You understand that Data will be transferred to any third parties assisting the Company with the implementation, administration and management of the Plan. You understand that the recipients of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the Company, its Subsidiaries and Affiliates, the Employer and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing your participation in the Plan. You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consent herein, in any case without cost, by contacting in writing your local human resources representative. Further, you understand that you are providing the consent herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service and career with the Employer will not be adversely affected; the only consequence of refusing or withdrawing your consent is that the Company would not be able to grant you a Cash Performance Award or other awards or administer or maintain such* |

A-2

*awards (i.e., the award would be null and void). Therefore, you understand that refusing or withdrawing your consent may affect your ability to participate in the Plan. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

| | |
|---|---|
| **Nature of Grant** | By participating in the Plan, you acknowledge, understand and agree that: |

(a) the Plan is established voluntarily by the Company, it is discretionary in nature and may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan; (b) the grant of the Cash Performance Award is voluntary and occasional and does not create any contractual or other right to receive future grants, or benefits in lieu of the Cash Performance Award, even if Cash Performance Awards have been granted in the past; (c) all decisions with respect to future grants of Cash Performance Awards, if any, will be at the sole discretion of the Company; (d) you are voluntarily participating in the Plan; (e) the Cash Performance Award is not intended to replace any pension rights or compensation; (f) unless otherwise agreed with the Company, the Cash Performance Award, subject to the Cash Performance Award and the income and value of same, are not granted as consideration for, or in connection with, any service you may provide as a director of a Subsidiary or Affiliate; (g) the Cash Performance Award and the income and value of same are not part of normal or expected compensation for any purpose including, without limitation, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments; (h) no claim or entitlement to compensation or damages shall arise from forfeiture of the Cash Performance Award resulting from the termination of your employment or other service relationship (for any reason whatsoever, whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any), and in consideration of the grant of the Cash Performance Award to which you are otherwise not entitled, you irrevocably agree never to institute any such claim against the Company, any of its Subsidiaries or Affiliates or the Employer, waive your ability, if any, to bring any such claim, and release the Company, its Subsidiaries and Affiliates and the Employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, you shall be deemed irrevocably to have agreed not to pursue such claim and agree to execute any and all documents necessary to request dismissal or withdrawal of such claim; (i) for purposes of the Cash Performance Award, your employment or other service relationship will be considered terminated as of the date you are no longer actively providing services to the Company or one of its Subsidiaries or Affiliates (regardless of the reason for such termination and whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any), and unless otherwise expressly provided in this Agreement or determined by the Company, your right to earn any amount under the Cash Performance Award under this Agreement, if any, will terminate as of such date and will not be extended by any notice period (e.g., your period of service would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the

A-3

jurisdiction where you are employed or the terms of your employment agreement, if any); the Committee shall have the exclusive discretion to determine when you are no longer actively providing services for purposes of the Cash Performance Award grant (including whether you may still be considered to be providing services while on an approved leave of absence); (j) unless otherwise provided in the Plan or by the Company in its discretion, the Cash Performance Award and the benefits evidenced by this Agreement do not create any entitlement to have the Cash Performance Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting the shares of the Company; and (k) neither the Company, the Employer nor any Subsidiary or Affiliate shall be liable for any foreign exchange rate fluctuation between your local currency and the U.S. dollar that may affect the value of the Cash Performance Award or of any amount due to you pursuant to the payment of the Cash Performance Award.

| | |
|---|---|
| **No Advice Regarding Grant** | The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding your participation in the Plan. You are hereby advised to consult with your own personal tax, legal and financial advisors regarding your participation in the Plan before taking any action related to the Plan. |
| **Venue** | Any and all disputes relating to, concerning or arising from this Agreement, or relating to, concerning or arising from the relationship between the parties evidenced by the Cash Performance Award or this Agreement, shall be brought and heard exclusively in the United States District Court for the District of Delaware or the Delaware Superior Court, New Castle County. Each of the parties hereby represents and agrees that such party is subject to the personal jurisdiction of said courts; hereby irrevocably consents to the jurisdiction of such courts in any legal or equitable proceedings related to, concerning or arising from such dispute, and waives, to the fullest extent permitted by law, any objection which such party may now or hereafter have that the laying of the venue of any legal or equitable proceedings related to, concerning or arising from such dispute which is brought in such courts is improper or that such proceedings have been brought in an inconvenient forum. |
| **Language** | If you have received this Agreement or any other document related to this Agreement translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control. |
| **Electronic Delivery and Acceptance** | The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company. |

A-4

| **Foreign Asset/ Account Reporting Requirements** | Your country may have certain foreign asset and/or account reporting requirements which may affect your ability to acquire or hold cash received from participating in the Plan in a brokerage or bank account outside your country. You may be required to report such accounts, assets or transactions to the tax or other authorities in your country. You also may be required to repatriate sale proceeds or other funds received as a result of your participation in the Plan to your country through a designated bank or broker and/or within a certain time after receipt. You acknowledge that it is your responsibility to comply with such regulations, and you should consult your personal legal advisor for any details. |
|---|---|

A-5

**[INTERNATIONAL AWARDS: APPENDIX B]**

**COUNTRY-SPECIFIC TERMS AND CONDITIONS**

[Provided to award holders as appropriate]

B-1

**Exhibit 10.28**

**INDEMNIFICATION AGREEMENT**

This Indemnification Agreement ("Agreement") is made as of _____ __, 201__ by and between The Chemours Company, a Delaware corporation (the "Company"), and _____ ("Indemnitee"). Except as provided herein, this Agreement supersedes and replaces any and all previous Agreements between the Company and Indemnitee covering the subject matter of this Agreement.

**RECITALS**

WHEREAS, the Board of Directors of the Company (the "Board") believes that highly competent persons have become more reluctant to serve publicly-held corporations as directors or officers or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation;

WHEREAS, the Board has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities. The Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation") and the Amended and Restated Bylaws (the "Bylaws") of the Company require indemnification of the officers and directors of the Company. Indemnitee may also be entitled to indemnification pursuant to the General Corporation Law of the State of Delaware (the "DGCL"). The Certificate of Incorporation, the Bylaws and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the board of directors, officers and other persons with respect to indemnification;

WHEREAS, the uncertainties relating to such insurance and to indemnification may increase the difficulty of attracting and retaining such persons;

WHEREAS, the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company and its stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

WHEREAS, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

WHEREAS, this Agreement is a supplement to and in furtherance of the Certificate of Incorporation and the Bylaws and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder; and

WHEREAS, Indemnitee does not regard the protection available under the Certificate of Incorporation and the Bylaws and insurance as adequate in the present circumstances, and may not be willing to serve or continue to serve as an officer or director without adequate protection, and the Company desires Indemnitee to serve or continue to serve in such capacity.

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the Company and Indemnitee do hereby covenant and agree as follows:

Section 1.                    Services to the Company. Indemnitee agrees to serve as a director or officer of the Company or as an agent of the Company. Indemnitee may at any time and for any reason resign from such position (subject to any other contractual obligation or any obligation imposed by operation of law), in which event the Company shall have no obligation under this Agreement to continue Indemnitee in such position. This Agreement shall not be deemed an employment contract between the Company (or any of its subsidiaries or any Enterprise) and Indemnitee. Indemnitee specifically acknowledges that if Indemnitee is employed with the Company (or any of its subsidiaries or any Enterprise), such employment relationship is at will, and the Indemnitee may be discharged at any time for any reason, with or without cause, except as may be otherwise provided in any written employment contract between Indemnitee and the Company (or any of its subsidiaries or any Enterprise), other applicable formal severance policies duly adopted by the Board, or, with respect to service as a director or officer of the Company, by the

1

Certificate of Incorporation, the Company's Bylaws, and the DGCL. The foregoing notwithstanding, this Agreement shall continue in force after Indemnitee has ceased to serve as a director, officer or agent of the Company as provided in Section 16 hereof.

Section 2.        Definitions. As used in this Agreement:

(a)        References to "agent" shall mean any person who is or was a director, officer, or employee of the Company or a subsidiary of the Company or other person authorized by the Company to act for the Company, to include such person serving in such capacity as a director, officer, employee, fiduciary or other official of another corporation, partnership, limited liability company, joint venture, trust or other enterprise at the request of, for the convenience of, or to represent the interests of the Company or a subsidiary of the Company.

(b)        A "Change in Control" shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

i.        Acquisition of Stock by Third Party. Any Person (as defined below) is or becomes the Beneficial Owner (as defined below), directly or indirectly, of securities of the Company representing twenty percent (20%) or more of the combined voting power of the Company's then outstanding securities unless the change in relative Beneficial Ownership of the Company's securities by any Person results solely from a reduction in the aggregate number of outstanding shares of securities entitled to vote generally in the election of directors;

ii.        Change in Board of Directors. During any period of two (2) consecutive years (not including any period prior to the execution of this Agreement), individuals who at the beginning of such period constitute the Board, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in Sections 2(b)(i), 2(b)(iii) or 2(b)(iv)) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority of the members of the Board;

iii.        Corporate Transactions.  The effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the Surviving Entity) more than 50% of the combined voting power of the voting securities of the Surviving Entity outstanding immediately after such merger or consolidation and with the power to elect at least a majority of the board of directors or other governing body of such Surviving Entity;

iv.        Liquidation. The approval by the stockholders of the Company of a complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets.
For purposes of this Section 2(b), the following terms shall have the following meanings:

(A) "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

(B) "Person" shall have the meaning as set forth in Sections 13(d) and 14(d) of the Exchange Act; provided, however, that Person shall exclude (i) the Company, (ii) any trustee or other fiduciary holding securities under an employee benefit plan of the Company, and (iii) any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(C) "Beneficial Owner" shall have the meaning given to such term in Rule 13d-3 under the Exchange Act; provided, however, that Beneficial Owner shall exclude any Person otherwise becoming a Beneficial Owner by reason of the stockholders of the Company approving a merger of the Company with another entity.

(D) "Surviving Entity" shall mean the surviving entity in a merger or consolidation or any entity that controls, directly or indirectly, such surviving entity.

2

(c)        "Corporate Status" describes the status of a person who is or was a director, officer, employee or agent of the Company or of any other corporation, limited liability company, partnership or joint venture, trust or other enterprise which such person is or was serving at the request of the Company.

(d)        "Disinterested Director" shall mean a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(e)        "Enterprise" shall mean the Company and any other corporation, limited liability company, partnership, joint venture, trust or other enterprise of which Indemnitee is or was serving at the request of the Company as a director, officer, trustee, partner, managing member, employee, agent or fiduciary.

(f)        "Expenses" shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts and other professionals, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, any federal, state, local or foreign taxes imposed on Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, ERISA excise taxes and penalties, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding. Expenses also shall include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 14(d) only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(g)        "Independent Counsel" shall mean a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past three years has been, retained to represent: (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning the Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder.  Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(h)        The term "Proceeding" shall include any threatened, pending or completed action, suit, claim, counterclaim, cross claim, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought in the right of the Company or otherwise and whether of a civil, criminal, administrative, legislative, or investigative (formal or informal) nature, including any appeal therefrom, in which Indemnitee was, is or will be involved as a party, potential party, non-party witness or otherwise by reason of the fact that Indemnitee is or was a director or officer of the Company, by reason of any action taken by Indemnitee (or a failure to take action by Indemnitee) or of any action (or failure to act) on Indemnitee's part while acting pursuant to Indemnitee's Corporate Status, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification, reimbursement, or advancement of Expenses can be provided under this Agreement.

(i)        Reference to "other enterprise" shall include employee benefit plans; references to "fines" shall include any excise tax assessed with respect to any employee benefit plan; references to "serving at the request of the Company" shall include any service as a director, officer, employee or agent of the Company which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner Indemnitee reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Agreement.

Section 3.                    Indemnity in Third-Party Proceedings.  The Company shall indemnify Indemnitee in accordance with the provisions of this Section 3 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor, by reason of Indemnitee's Corporate Status. Pursuant to this Section 3, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses, judgments, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines and amounts paid in settlement) actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company and, in the case of a criminal Proceeding had no reasonable cause to believe that Indemnitee's conduct was unlawful. The parties hereto intend

3

that this Agreement shall provide to the fullest extent permitted by law for indemnification in excess of that expressly permitted by statute, including, without limitation, any indemnification provided by the Certificate of Incorporation, the Bylaws, vote of its stockholders or disinterested directors or applicable law.

Section 4.                    Indemnity in Proceedings by or in the Right of the Company. The Company shall indemnify Indemnitee in accordance with the provisions of this Section 4 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding by or in the right of the Company to procure a judgment in its favor by reason of Indemnitee's Corporate Status. Pursuant to this Section 4, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company. No indemnification for Expenses shall be made under this Section 4 in respect of any claim, issue or matter as to which Indemnitee shall have been finally adjudged by a court to be liable to the Company, unless and only to the extent that the Delaware Court (as hereinafter defined) or any court in which the Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification.

Section 5.                    Indemnification for Expenses of a Party Who is Wholly or Partly Successful. Notwithstanding any other provisions of this Agreement, to the fullest extent permitted by applicable law and to the extent that Indemnitee is a party to (or a participant in) and is successful, on the merits or otherwise, in any Proceeding or in defense of any claim, issue or matter therein, in whole or in part, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee in connection therewith. If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with or related to each successfully resolved claim, issue or matter to the fullest extent permitted by law. For purposes of this Section and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

Section 6.                    Indemnification For Expenses of a Witness. Notwithstanding any other provision of this Agreement, to the fullest extent permitted by applicable law and to the extent that Indemnitee is, by reason of Indemnitee's Corporate Status, a witness or otherwise asked to participate in any Proceeding to which Indemnitee is not a party, Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith.

Section 7.                    Partial Indemnification. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of Expenses, but not, however, for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

Section 8.                    Additional Indemnification.

(a)        Notwithstanding any limitation in Sections 3, 4, or 5, the Company shall indemnify Indemnitee to the fullest extent permitted by applicable law if Indemnitee is a party to or threatened to be made a party to any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) by reason of Indemnitee's Corporate Status.

(b)        For purposes of Section 8(a), the meaning of the phrase "to the fullest extent permitted by applicable law" shall include, but not be limited to:

i.        to the fullest extent permitted by the provision of the DGCL that authorizes or contemplates additional indemnification by agreement, or the corresponding provision of any amendment to or replacement of the DGCL, and

ii.        to the fullest extent authorized or permitted by any amendments to or replacements of the DGCL adopted after the date of this Agreement that increase the extent to which a corporation may indemnify its officers and directors.

Section 9.                    Exclusions. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnification payment in connection with any claim involving Indemnitee:

(a)        for which payment has actually been made to or on behalf of Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; or

4

(b)        for (i) an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of Section 16(b) of the Exchange Act (as defined in Section 2(b) hereof) or similar provisions of state statutory law or common law, (ii) any reimbursement of the Company by the Indemnitee of any bonus or other incentive-based or equity-based compensation or of any profits realized by the Indemnitee from the sale of securities of the Company, as required in each case under the Exchange Act (including any such reimbursements that arise from an accounting restatement of the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), or Section 904 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, or the payment to the Company of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 306 of the Sarbanes-Oxley Act) or (iii) any reimbursement of the Company by Indemnitee of any compensation pursuant to any compensation recoupment or clawback policy adopted by the Board or the compensation committee of the Board, including but not limited to any such policy adopted to comply with stock exchange listing requirements implementing Section 10D of the Exchange Act; or

(c)        except as provided in Section 14(d) of this Agreement, in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation or (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law.

Section 10.                          Advances of Expenses. Notwithstanding any provision of this Agreement to the contrary (other than Section 14(d)), the Company shall advance, to the extent not prohibited by law, the Expenses incurred and paid by Indemnitee in connection with any Proceeding (or any part of any Proceeding) not initiated by Indemnitee or any Proceeding initiated by Indemnitee with the prior approval of the Board as provided in Section 9(c), and such advancement shall be made within thirty (30) days after the receipt by the Company of a statement or statements requesting such advances from time to time, whether prior to or after final disposition of any Proceeding. Advances shall be unsecured and interest free. Advances shall be made without regard to Indemnitee's ability to repay the Expenses and without regard to Indemnitee's ultimate entitlement to indemnification under the other provisions of this Agreement. In accordance with Section 14(d), advances shall include any and all reasonable Expenses incurred pursuing an action to enforce this right of advancement, including Expenses incurred preparing and forwarding statements to the Company to support the advances claimed. The Indemnitee shall qualify for advances upon the execution and delivery to the Company of this Agreement, which shall constitute an undertaking providing that the Indemnitee undertakes to repay the amounts advanced (without interest) to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company. No other form of undertaking shall be required other than the execution of this Agreement. This Section 10 shall not apply to any claim made by Indemnitee for which indemnity is excluded pursuant to Section 9.

Section 11.                          Procedure for Notification and Defense of Claim.

(a)        Indemnitee shall notify the Company in writing of any matter with respect to which Indemnitee intends to seek indemnification or advancement of Expenses hereunder as soon as reasonably practicable following the receipt by Indemnitee of written notice thereof.  The written notification to the Company shall include a description of the nature of the Proceeding and the facts underlying the Proceeding. To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of such Proceeding. The omission by Indemnitee to notify the Company hereunder will not relieve the Company from any liability which it may have to Indemnitee hereunder or otherwise than under this Agreement except to the extent that such delay materially and adversely affects the Company's ability to participate in the defense of such Proceeding, and any delay in so notifying the Company shall not constitute a waiver by Indemnitee of any rights under this Agreement.  The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board in writing that Indemnitee has requested indemnification.

(b)        The Company will be entitled to participate in the Proceeding at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact

5

have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

Section 12.    <u>Procedure Upon Application for Indemnification.</u>

(a)    Upon written request by Indemnitee for indemnification pursuant to Section 11(a), a determination, if required by applicable law, with respect to Indemnitee's entitlement thereto shall be made in the specific case: (i) if a Change in Control shall have occurred, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee; or (ii) if a Change in Control shall not have occurred, (A) by a majority vote of the Disinterested Directors, even though less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum of the Board, (C) if there are no such Disinterested Directors or, if such Disinterested Directors so direct, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee or (D) if so directed by the Board, by the stockholders of the Company; and, if it is so determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within ten (10) days after such determination. Indemnitee shall cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or Expenses (including attorneys' fees and disbursements) incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom. The Company promptly will advise Indemnitee in writing with respect to any determination that Indemnitee is or is not entitled to indemnification, including a description of any reason or basis for which indemnification has been denied.

(b)    In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 12(a) hereof, the Independent Counsel shall be selected as provided in this Section 12(b). If a Change in Control shall not have occurred, the Independent Counsel shall be selected by the Board, and the Company shall give written notice to Indemnitee advising Indemnitee of the identity of the Independent Counsel so selected. If a Change in Control shall have occurred, the Independent Counsel shall be selected by Indemnitee (unless Indemnitee shall request that such selection be made by the Board, in which event the preceding sentence shall apply), and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either event, Indemnitee or the Company, as the case may be, may, within ten (10) days after such written notice of selection shall have been given, deliver to the Company or to Indemnitee, as the case may be, a written objection to such selection; <u>provided</u>, <u>however</u>, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 2 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or the Delaware Court has determined that such objection is without merit. If, within twenty (20) days after the later of submission by Indemnitee of a written request for indemnification pursuant to Section 11(a) hereof and the final disposition of the Proceeding, no Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may petition the Delaware Court for resolution of any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by such court or by such other person as such court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 12(a) hereof. Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 14(a) of this Agreement, Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

Section 13.    <u>Presumptions and Effect of Certain Proceedings</u>

(a)    In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall, to the fullest extent not prohibited by law, presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 11(a) of this Agreement, and the Company shall, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption in connection with the making by any person, persons or entity of any determination contrary to that presumption. Neither the failure of the Company (including by its directors or Independent Counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or Independent

6

Counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(b)    The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which Indemnitee reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful.

(c)    For purposes of any determination of good faith, Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise, including financial statements, or on information supplied to Indemnitee by the directors or officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser, financial advisor or other expert selected with reasonable care by or on behalf of the Enterprise as to matters Indemnitee reasonably believes are within such Person's professional or expert competence. The provisions of this Section 13(d) shall not be deemed to be exclusive or to limit in any way the other circumstances in which the Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement.

(d)    The knowledge and/or actions, or failure to act, of any director, officer, trustee, partner, managing member, fiduciary, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement

Section 14.            Remedies of Indemnitee.

(a)    Subject to Section 14(e), in the event that (i) a determination is made pursuant to Section 12 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 10 of this Agreement, (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 12(a) of this Agreement within ninety (90) days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to Section 5, 6 or 7 or the second to last sentence of Section 12(a) of this Agreement within ten (10) days after receipt by the Company of a written request therefor, (v) payment of indemnification pursuant to Section 3, 4 or 8 of this Agreement is not made within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification, or (vi) in the event that the Company or any other person takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or Proceeding designed to deny, or to recover from, the Indemnitee the benefits provided or intended to be provided to the Indemnitee hereunder, Indemnitee shall be entitled to an adjudication by the Delaware Court of Indemnitee's entitlement to such indemnification or advancement of Expenses. Alternatively, Indemnitee, at Indemnitee's option, may seek an award in arbitration to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Indemnitee shall commence such proceeding seeking an adjudication or an award in arbitration within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 14(a). The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration.

(b)    In the event that a determination shall have been made pursuant to Section 12(a) of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 14 shall be conducted in all respects as a de novo trial, or arbitration, on the merits and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 14 the Company shall have the burden of proving Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be.

(c)    If a determination shall have been made pursuant to Section 12(a) of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 14, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)    The Company shall, to the fullest extent not prohibited by law, be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 14 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement. It is the intent of the Company that, to the fullest extent permitted by law, the Indemnitee not be required to incur legal fees or other Expenses associated with the interpretation, enforcement or defense of Indemnitee's

7

rights under this Agreement by litigation or otherwise because the cost and expense thereof would substantially detract from the benefits intended to be extended to the Indemnitee hereunder. The Company shall, to the fullest extent permitted by law, indemnify Indemnitee against any and all Expenses and, if requested by Indemnitee, shall (within ten (10) days after receipt by the Company of a written request therefor) advance, to the extent not prohibited by law, such Expenses to Indemnitee, which are incurred by Indemnitee in connection with any action brought by Indemnitee for indemnification or advancement of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company if, in the case of indemnification, Indemnitee is wholly successful on the underlying claims; if Indemnitee is not wholly successful on the underlying claims, then such indemnification shall be only to the extent Indemnitee is successful on such underlying claims or otherwise as permitted by law, whichever is greater.

(e)    Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

Section 15.    <u>Non-exclusivity; Survival of Rights; Insurance; Subrogation.</u>

(a)    The rights of indemnification and to receive advancement of Expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Certificate of Incorporation, the Bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by Indemnitee in Indemnitee's Corporate Status prior to such amendment, alteration or repeal. To the extent that a change in Delaware law, whether by statute or judicial decision, permits greater indemnification or advancement of Expenses than would be afforded currently under the Certificate of Incorporation, the Bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)    To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees, or agents of the Enterprise, Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any such director, officer, employee or agent under such policy or policies. If, at the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company has director and officer liability insurance in effect, the Company shall give prompt notice of such claim or of the commencement of a Proceeding, as the case may be, to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

(c)    In the event of any payment made by the Company under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights

(d)    The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable (or for which advancement is provided hereunder) hereunder if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(e)    The Company's obligation to indemnify or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, trustee, partner, managing member, fiduciary, employee or agent of any other corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount Indemnitee has actually received as indemnification or advancement of Expenses from such other corporation, limited liability company, partnership, joint venture, trust or other enterprise.

Section 16.    <u>Duration of Agreement; Successors and Assigns.</u> Due to the uncertain application of any statutes of limitations that may govern any claim, this Agreement shall be of indefinite duration. The indemnification and advancement of expenses rights provided by or granted pursuant to this Agreement shall be binding upon and be enforceable by the parties hereto and their respective successors and assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), shall continue as to an Indemnitee who has ceased

8

to be a director, officer, employee or agent of the Company or of any other Enterprise, and shall inure to the benefit of Indemnitee and Indemnitee's spouse, assigns, heirs, devisees, executors and administrators and other legal representatives.

Section 17.        Severability.  If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (b) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

Section 18.        Enforcement.

(a)        The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director or officer of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving or continuing to serve as a director or officer of the Company.

(b)        This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof; provided, however, that this Agreement is a supplement to and in furtherance of the Certificate of Incorporation, the Bylaws and applicable law, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder.

Section 19.        Modification and Waiver.  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions of this Agreement nor shall any waiver constitute a continuing waiver.

Section 20.        Notice by Indemnitee. Indemnitee agrees promptly to notify the Company in writing upon being served with any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification or advancement of Expenses covered hereunder.  The failure of Indemnitee to so notify the Company shall not relieve the Company of any obligation which it may have to the Indemnitee under this Agreement or otherwise, except to the extent that the Company is materially and adversely prejudiced by such failure.

Section 21.        Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if (a) delivered by hand and receipted for by the party to whom said notice or other communication shall have been directed, (b) mailed by certified or registered mail with postage prepaid, on the third business day after the date on which it is so mailed, (c) mailed by reputable overnight courier and receipted for by the party to whom said notice or other communication shall have been directed or (d) sent by facsimile transmission, with receipt of oral confirmation that such transmission has been received:

(a)        If to Indemnitee, at the address indicated on the signature page of this Agreement, or such other address as Indemnitee shall provide to the Company.

(b)        If to the Company to
The Chemours Company
1007 Market Street
Wilmington, Delaware 19899
Attn: Corporate Secretary

or to any other address as may have been furnished to Indemnitee by the Company.

Section 22.        Contribution. To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement,

9

in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding; and/or (ii) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

Section 23.            Applicable Law and Consent to Jurisdiction. This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 14(a) of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Court of Chancery of the State of Delaware (the "Delaware Court"), and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) appoint, to the extent such party is not otherwise subject to service of process in the State of Delaware, irrevocably The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801 as its agent in the State of Delaware as such party's agent for acceptance of legal process in connection with any such action or proceeding against such party with the same legal force and validity as if served upon such party personally within the State of Delaware, (iv) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court, and (v) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court has been brought in an improper or inconvenient forum.

Section 24.            Identical Counterparts. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

Section 25.            Miscellaneous. Use of the masculine pronoun shall be deemed to include usage of the feminine pronoun where appropriate. The headings of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

10

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed as of the day and year first above written.

THE CHEMOURS COMPANY                                INDEMNITEE

By: _____

Name: _____                       Name: _____

Office: _____                       Address: _____

                                                   _____

                                                   _____

**Exhibit 21**

**SUBSIDIARIES OF THE REGISTRANT**

| Name | Organized Under Laws Of |
|---|---|
| 2463297 Ontario Limited | Canada |
| Antec International Ltd. | United Kingdom |
| Baanhoekweg Energie Project BV | Netherlands |
| ChemFirst Inc. | Mississippi |
| Chemours Belgium BVBA | Belgium |
| Chemours Chemicals Rus | Russia |
| Chemours Deutschland GmbH | Germany |
| Chemours EMEA 2, LLC | Delaware |
| Chemours France SAS | France |
| Chemours Hong Kong Holding Limited | Hong Kong |
| Chemours International 2, LLC | Delaware |
| Chemours International Operations Sàrl | Switzerland |
| Chemours Italy S.r.l. | Italy |
| Chemours Jersey Ltd. | Channel Islands |
| Chemours Kabushiki Kaisha | Japan |
| Chemours Korea Inc. | Korea |
| Chemours Netherlands 2, LLC | Delaware |
| Chemours Netherlands BV | Netherlands |
| Chemours NL Holding 1 B.V. | Netherlands |
| Chemours NL Holding 2 B.V. | Netherlands |
| Chemours NL Holding 3 B.V. | Netherlands |
| Chemours NL Holding 4 B.V. | Netherlands |
| Chemours NL Holding 5 B.V. | Netherlands |
| Chemours Services Sàrl | Switzerland |
| Chemours Spain S.L. | Spain |
| Chemours Titanium Technologies (Taiwan) Ltd. | Taiwan |
| Chemours TR Kimyasal Ürünler Limited Şirketi | Turkey |
| Dordrecht Energy Supply Company B.V. | Netherlands |
| Dordrecht Energy Supply Company C.V. | Netherlands |
| First Chemical Corporation | Mississippi |
| First Chemical Texas, L.P | Delaware |
| Initiatives Inc. S.A. de C.V. | Mexico |
| International Dioxcide, Inc. | Delaware |
| Shenzhen Chemours Investment Co., Ltd. | China |
| TCC Holding 1 C.V. | Netherlands |
| TCC Holding 2 C.V. | Netherlands |
| TCC Holding 3 C.V. | Netherlands |
| The Chemours (Changshu) Fluoro Technology Company Limited | China |
| The Chemours (Taiwan) Company Limited | Taiwan |
| The Chemours (Thailand) Company Limited | Thailand |
| The Chemours Canada Company | Canada |
| The Chemours Chemical (Shanghai) Company Limited | China |

| Name | Organized Under Laws Of |
| --- | --- |
| The Chemours Company | Delaware |
| The Chemours Company (Australia) Pty Limited | Australia |
| The Chemours Company Asia Pacific Operations, Inc. | Delaware |
| The Chemours Company Chile Limitada | Chile |
| The Chemours Company Colombia S.A.S. | Colombia |
| The Chemours Company Delaware Operations, Inc. | Delaware |
| The Chemours Company EMEA, LLC | Delaware |
| The Chemours Company FC, LLC | Delaware |
| The Chemours Company Industria E Comercio de Produtos Quimicos Ltda. | Brazil |
| The Chemours Company International, LLC | Delaware |
| The Chemours Company Malaysia Sdn. Bhd. | Malaysia |
| The Chemours Company Mexicana S. de R.L. de C.V. | Mexico |
| The Chemours Company Mexico, S. de R.L. de C.V. | Mexico |
| The Chemours Company Netherlands, LLC | Delaware |
| The Chemours Company North America, Inc. | Delaware |
| The Chemours Company S.R.L. | Argentina |
| The Chemours Company Servicios, S. de R.L. de C.V. | Mexico |
| The Chemours Company Singapore Pte. Ltd. | Singapore |
| The Chemours Company TT, LLC | Pennsylvania |
| The Chemours Company Worldwide Operations, Inc. | Delaware |
| The Chemours Holding Company, S. de R.L. de C.V. | Mexico |
| The Chemours India Private Limited | India |

Subsidiaries not listed would not, if considered in the aggregate as a single subsidiary, constitute a significant subsidiary.

**Exhibit 23**

<u>CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM</u>

We hereby consent to the incorporation by reference in the Registration Statement on Forms S-8 (Nos. 333-205391, 333-205393, 333-205392) of The Chemours Company of our report dated February 25, 2016 relating to the financial statements and financial statement schedule, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP

Philadelphia, Pennsylvania
February 25, 2016

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**

I, Mark P. Vergnano, certify that:

1.  I have reviewed this Annual Report on Form 10-K of The Chemours Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 25, 2016

By:    /s/ Mark P. Vergnano

Mark P. Vergnano
President and Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**

I, Mark E. Newman, certify that:

1. I have reviewed this Annual Report on Form 10-K of The Chemours Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 25, 2016

By:    /s/ Mark E. Newman

Mark E. Newman
Senior Vice President and
Chief Financial Officer

**Exhibit 32.1**

**Certification of CEO Pursuant to**
**18 U.S.C. Section 1350,**
**As Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of The Chemours Company (the "Company") on Form 10-K for the year ended December 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Mark P. Vergnano, as Chief Executive Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Mark P. Vergnano

Mark P. Vergnano
Chief Executive Officer
February 25, 2016

**Exhibit 32.2**

**Certification of CFO Pursuant to
18 U.S.C. Section 1350,
As Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of The Chemours Company (the "Company") on Form 10-K for the period ended December 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Mark E. Newman, as Chief Financial Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Mark E. Newman

Mark E. Newman
Chief Financial Officer
February 25, 2016

**Exhibit 95**

**MINE SAFETY DISCLOSURES**

The company owns and operates a surface mine near Starke, Florida. The following table provides information about citations, orders and notices issued from the Mine Safety and Health Administration (MSHA) under the Federal Mine Safety and Health Act of 1977 (Mine Act) for the year ended December 31, 2015.

| Mine (MSHA Identification Number) | Section 104 S&S[1] Citations (#) | Section 104(b) Orders (#) | Section 104(d) Citations and Orders (#) | Section 110(b)(2) Violations (#) | Section 107(a) Orders (#) | Total Dollar Value of MSHA Assessments Proposed ($) | Total Number of Mining Related Fatalities (#) | Received Notice of Pattern of Violations Under Section 104(e) (yes/no) | Received Notice of Potential to Have Pattern Under Section 104(e) (yes/no) | Legal Actions Pending as of Last Day of Period (#) | Legal Actions Initiated During Period (#) | Legal Actions Resolved During Period (#) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Starke, FL (0800225) | 3 | - | - | - | - | $ 3,490 | - | No | No | - | - | 6 [2] |

[1]    S&S refers to significant and substantial violations of mandatory health or safety standards under section 104 of the Mine Act.

[2]    During 2015, six legal actions were resolved, which resulted in 1 S&S designation from citations issued in 2014 being deleted.