# Exhibit 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

**May 31, 2023**
Date of Report (Date of Earliest Event Reported)



# The Chemours Company
(Exact Name of Registrant as Specified in Its Charter)

| Delaware | 001-36794 | 46-4845564 |
|---|---|---|
| (State or Other Jurisdiction | (Commission | (I.R.S. Employer |
| Of Incorporation) | File Number) | Identification No.) |

**1007 Market Street**
**Wilmington, Delaware 19801**
(Address of principal executive offices)

Registrant's telephone number, including area code: (302) 773-1000

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐      Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐      Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐      Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐      Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Exchange on Which Registered |
|---|---|---|
| Common Stock ($0.01 par value) | CC | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company    ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

**Item 5.02**    **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On May 31, 2023, Sameer Ralhan, Senior Vice President of The Chemours Company (the "Company"), notified the Company of his intention to resign, effective June 19, 2023. Jonathan Lock, Senior Vice President, Chief Development Officer is appointed Senior Vice President, Chief Financial Officer, effective June 6, 2023. Additionally, Matthew Abbott, Vice President, Digital and Data Analytics Leader, is appointed Senior Vice President, Chief Enterprise Transformation Officer, effective June 6, 2023.

Mr. Lock, age 42, as Senior Vice President and Chief Development Officer, led our Corporate Strategy, M&A, Investor Relations, Sustainability and Regulatory Affairs functions. Mr. Lock was appointed to that role in November 2021. Mr. Lock joined Chemours in April 2018 as Vice President, Corporate Development and Investor Relations with oversight for Corporate Strategy, M&A, and Investor Relations. Prior to Chemours, Mr. Lock led corporate strategy and investor relations for SunCoke Energy and its Master Limited Partnership, SunCoke Energy Partners, from 2013 to 2018, where he helped the company expand and grow following its spin-out from Sunoco. Prior to SunCoke, Mr. Lock was a leader in the industrials practice at Marakon Associates where he advised Global 500 companies on growth and portfolio issues first from 2004 to 2008 and again from 2011 to 2013. From 2001 to 2004, Mr. Lock was a member of the Technology Labs group at Accenture.

In connection with his appointment to Senior Vice President, Chief Financial Officer, Mr. Lock will receive an annual base salary of $600,000 and be eligible for a target Annual Incentive Plan (AIP) award of 75% of base salary and a target Long Term Incentive Plan (LTIP) award of $1,000,000.

There are no arrangements or understandings between Mr. Lock and any other persons in connection with his appointment. Mr. Lock does not have any family relationships with any executive officer or director of Chemours and he is not a party to any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K.

**Item 9.01**    **Financial Statements and Exhibits.**

(d) Exhibits

99.1 Press Release of the Company, dated as of June 6, 2023.

104  Cover Page Interactive Data File (formatted as Inline XBRL).

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

THE CHEMOURS COMPANY

By:   /s/ Kristine M. Wellman

Kristine M. Wellman

Senior Vice President, General Counsel & Corporate Secretary

Date:   June 6, 2023

EX-99.1 2 cc-ex99_1.htm EX-99.1



**EXHIBIT 99.1**

### Sameer Ralhan Resigns as Chemours Chief Financial Officer (CFO); Company Appoints Jonathan Lock as new CFO and Promotes Matt Abbott to Executive Team as SVP, Chief Enterprise Transformation Officer

**Wilmington, Del.**, June 6, 2023 – The Chemours Company ("Chemours") (NYSE: CC), a global chemistry company with leading market positions in Titanium Technologies, Thermal & Specialized Solutions, and Advanced Performance Materials, today announced the resignation of Sameer Ralhan, Chief Financial Officer (CFO), effective June 19. Leveraging a strong bench of top talent and thoughtful succession planning, Jonathan Lock, Senior Vice President (SVP) and Chief Development Officer, is appointed to the role of CFO, effective June 6. As CFO, Jonathan will lead Finance, Investor Relations, Corporate Development, Strategy, and Enterprise Risk Management. Jonathan will work closely with Sameer to ensure a seamless leadership transition. In addition, Matt Abbott, Vice President, Digital and Data Analytics, is promoted to SVP, Chief Enterprise Transformation Officer, a corporate officer, and senior executive position with responsibility for Information Technology, Cyber Security, Digital and Data Analytics and Procurement.

Chemours President and CEO Mark Newman acknowledged Sameer's impact on the company saying, "Sameer has been a valued member of the Chemours executive team and has made significant contributions to the company's success through his transformation of the Finance function into a source of strategic insight and analysis. We wish him all the best in his future endeavors."

Continued Newman, "I'm thrilled to have the opportunity to place someone as talented as Jonathan into the role of CFO.  Jonathan is well-known by investors and has led numerous high-value transactions for Chemours.  He has a deep understanding of Chemours and capital markets, and his appointment ensures that we do not miss a beat in executing our strategy to deliver long term value to shareholders."

Lock joined Chemours in 2018 as Vice President (VP) of Corporate Development and Investor Relations and went on to have responsibility for M&A, Corporate Strategy, Enterprise Risk Management, and more recently, Sustainability. Promoted to an officer in 2021, Lock brings more than two decades of experience across a range of management consulting, corporate strategy, investor relations, and corporate development roles. Lock is a proven leader and has led several strategic transactions for Chemours including the recent Fuel Cell joint venture with BWT/FumaTech and the divestiture of our Glycolic Acid business. With a talent for identifying growth opportunities, enterprise risk management, and strategic planning, Lock's appointment brings an exciting new dimension to the CFO role. Lock holds a BS in Biomedical Engineering from Northwestern University, an MBA from the Kellogg School of Management, and a JD from the Northwestern University School of Law.

As a part of the CFO change, the Sustainability organization moves from Lock to Kristine Wellman, SVP, General Counsel and Corporate Secretary; a change that more effectively aligns and integrates Chemours' commitment to sustainability with the company's overall corporate governance, regulatory and government affairs strategies.

Joining the executive team to accelerate growth, unlock significant productivity, and improve operational performance across the enterprise, is Matt Abbott, the company's first SVP & Chief Enterprise Transformation Officer. Abbott joined Chemours in 2017 and has held various roles across audit and controllership. Most recently as digital and data analytics leader, Abbott has been central to designing digital strategies to accelerate Chemours' journey to becoming a data-driven organization. Prior to that, he served as Chief Audit Executive, and Chief Accounting Officer and Controller leading the global accounting and reporting operations of the Finance function, where he fostered a culture of excellence and continuous improvement.  Prior to Chemours, Abbott was an Audit Partner with PricewaterhouseCoopers LLP. Matt brings over 25 years of experience and a deep understanding of the chemical sector that will enable him to accelerate Chemours' journey towards operational excellence enabled by next generation digital solutions and technologies. Abbott holds a BSc in Management Sciences from Warwick Business School and is a licensed Certified Public Accountant.

1



**EXHIBIT 99.1**

In this next evolution of the Chemours executive team, Newman concluded, "The changes announced today are a testament to the deep bench of top talent and strong succession plans that we have in place. Both Jonathan and Matt are incredibly talented leaders and will allow us to build on the significant momentum we have at Chemours as we continue our journey to grow and position this company for the future. I am proud of the agility and resilience of our teams to stay focused and continue serving our customers and delivering strong results in the face of changes and challenges. I have every confidence in our ability to continue executing our growth strategy."

**About The Chemours Company**

The Chemours Company (NYSE: CC) is a global leader in Titanium Technologies, Thermal & Specialized Solutions, and Advanced Performance Materials providing its customers with solutions in a wide range of industries with market-defining products, application expertise and chemistry-based innovations. We deliver customized solutions with a wide range of industrial and specialty chemicals products for markets, including coatings, plastics, refrigeration and air conditioning, transportation, semiconductor and consumer electronics, general industrial, and oil and gas. Our flagship products are sold under prominent brands such as Ti-Pure™, Opteon™, Freon™, Teflon™, Viton™, Nafion™, and Krytox™. The company has approximately 6,600 employees and 29 manufacturing sites serving approximately 2,900 customers in approximately 120 countries. Chemours is headquartered in Wilmington, Delaware and is listed on the NYSE under the symbol CC.

For more information, we invite you to visit chemours.com or follow us on Twitter @Chemours or LinkedIn.

**Forward-Looking Statements**

This press release contains forward-looking statements, within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, which involve risks and uncertainties. Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to a historical or current fact. The words "believe," "expect," "will," "anticipate," "plan," "estimate," "target," "project" and similar expressions, among others, generally identify "forward-looking statements," which speak only as of the date such statements were made. These forward-looking statements may address, among other things, the outcome or resolution of any pending or future environmental liabilities, the commencement, outcome or resolution of any regulatory inquiry, investigation or proceeding, the initiation, outcome or settlement of any litigation, changes in environmental regulations in the U.S. or other jurisdictions that affect demand for or adoption of our products, anticipated future operating and financial performance for our segments individually and our company as a whole, business plans, prospects, targets, goals and commitments, capital investments and projects and target capital expenditures, plans for dividends or share repurchases, sufficiency or longevity of intellectual property protection, cost reductions or savings targets, plans to increase profitability and growth, our ability to make acquisitions, integrate acquired businesses or assets into our operations, and achieve anticipated synergies or cost savings, all of which are subject to substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Forward-looking statements are based on certain assumptions and expectations of future events that may not be accurate or realized, such as full year guidance relying on models based upon management assumptions regarding future events that are inherently uncertain.  These statements are not guarantees of future performance. Forward-looking statements also involve risks and uncertainties that are beyond Chemours' control. Matters outside our control, including general economic conditions and the COVID-19 pandemic, have affected or may affect our business and operations and may or may continue to hinder our ability to provide goods and services to customers, cause disruptions in our supply chains such as through strikes, labor disruptions or other events, adversely affect our business partners, significantly reduce the demand for our products, adversely affect the health and welfare of our personnel or cause other unpredictable events. Additionally, there may be other risks and uncertainties that Chemours is unable to identify at this time or that Chemours does not currently expect to have a material impact on its business. Factors that could cause or contribute to these differences include the risks, uncertainties and other factors discussed in our filings with the U.S. Securities and Exchange Commission, including in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2023 and in our Annual Report on Form 10-K for the year ended December 31, 2022. Chemours assumes no obligation to revise or update any forward-looking statement for any reason, except as required by law.



**EXHIBIT 99.1**

**CONTACTS:**

**INVESTORS**
*Kurt Bonner*
*Manager, Investor Relations*
*+1.302.773.0026*
investor@chemours.com

**NEWS MEDIA**
*Thomas Sueta*
*Corporate Communications Director*
*+1.302.773.3903*
media@chemours.com

3

# Exhibit 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

## FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**March 6, 2024**
**Date of Report (Date of Earliest Event Reported)**



# The Chemours Company

**(Exact Name of Registrant as Specified in Its Charter)**

| Delaware | 001-36794 | 46-4845564 |
|---|---|---|
| (State or Other Jurisdiction Of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1007 Market Street**
**Wilmington, Delaware 19801**
(Address of principal executive offices)

**Registrant's telephone number, including area code: (302) 773-1000**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Exchange on Which Registered |
|---|---|---|
| Common Stock ($0.01 par value) | CC | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 7.01        Regulation FD Disclosure.**

On March 6, 2024, The Chemours Company issued a press release announcing additional information regarding the previously disclosed Audit Committee review. A copy of the news release is furnished as Exhibit 99.1 and is incorporated herein by reference.

The information furnished with this report on Form 8-K, including Exhibit 99.1, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, and it will not be deemed incorporated by reference into any registration statement or other document filed under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such a filing.

**Item 9.01**        **Financial Statements and Exhibits.**

(d) Exhibits

99.1      Press release dated March 6, 2024.

104       The cover page from this Current Report on Form 8-K, formatted in Inline XBRL.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

THE CHEMOURS COMPANY

By:   /s/ Matthew S. Abbott
       Matthew S. Abbott
       Interim Chief Financial Officer
Date:  March 7, 2024

EX-99.1 2 d806416dex991.htm EX-99.1

**Exhibit 99.1**



**Chemours Provides update on Internal Review**

**Wilmington, Del.**, March 6, 2024 (Business Wire) – As previously disclosed, the Audit Committee of the Board of Directors of The Chemours Company ("Chemours" or "the Company") (NYSE: CC), with the assistance of independent outside counsel, has been overseeing an internal review. The review relates to an anonymous report made to the Chemours Ethics Hotline regarding the matters described below. A substantially complete report of the findings of the internal review was delivered to the full Board on March 5, 2024.

Chair Dawn Farrell said "The Chemours Board of Directors takes these issues very seriously and appreciates the diligent efforts by the Audit Committee, with support from its counsel and Company management, to review these matters. We are also grateful for the leadership and dedication of our interim CEO and CFO, their senior management team and all our employees at our business units for their work every day to serve our valued customers."

The Audit Committee review determined that there was a lack of transparency with the Company's Board of Directors by the members of senior management who were placed on administrative leave last week due to the payables and receivables timing actions described below, and their effect on free cash flow targets at the end of the relevant periods. As a result, the Audit Committee concluded that, in connection with the actions described below, the members of senior management who were placed on administrative leave last week violated the Company's Code of Ethics applicable to the Chief Executive Officer, the Chief Financial Officer, and the Controller relating to the "promot[ion of] full, fair, accurate, timely and understandable disclosure."

The findings of the internal review do not affect the preliminary, unaudited estimates of operating results and other financial measures as of and for the year ended December 31, 2023 as disclosed in the Company's press release dated February 29, 2024.

The Audit Committee's determinations, based on the review conducted with the assistance of independent outside counsel, included, among other things, that the members of senior management who were placed on administrative leave last week engaged in efforts in the fourth quarter of 2023 to delay payments to certain vendors that were originally due to be paid in the fourth quarter of 2023 until the first quarter of 2024, and to accelerate the collection of receivables into the fourth quarter of 2023 that were originally not due to be received until the first quarter of 2024. The Audit Committee found that these individuals engaged in these efforts in part to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers. As noted above, there was a lack of transparency with the Company's Board of Directors by the members of senior management who were placed on administrative leave with respect to these actions.

As previously disclosed, as of December 31, 2023, the Company's cash and cash equivalents and restricted cash and restricted cash equivalents totaled approximately $1.8 billion, of which $1.2 billion was unrestricted. The Audit Committee and Company management continue to work on assessing the net impact on cash flow measures of the working capital timing actions detailed above, which had the effect of significantly increasing the cash flow measures, including free cash flow, for the quarter ended December 31, 2023, with a corresponding anticipated decrease in these measures in the first quarter of 2024. The Audit Committee review also determined that similar actions, though to a lesser extent, were taken in the fourth quarter of 2022, resulting in a significant increase in these cash flow measures for the quarter ended December 31, 2022, and a decrease in these measures in the first quarter of 2023. The Company is working diligently to complete its year-end reporting process, including its review of internal control over financial reporting as of December 31, 2023, and to file its Annual Report on Form 10-K with the SEC as promptly as practicable.

As noted above, the Audit Committee review relates to an anonymous report made to the Chemours Ethics Hotline that was not elevated to the General Counsel or the Audit Committee, until the matter was identified in connection with the Company's year-end 2023 external audit process. The Audit Committee determined that the failure resulted from inadequate controls and procedures regarding the evaluation and escalation of hotline reports and poor judgment by certain employees who handle the intake of such reports.

As a result of the foregoing, the Company is evaluating one or more potential material weaknesses in its internal control over financial reporting as of December 31, 2023 with respect to maintaining effective controls related to the control environment, including the effectiveness of the "tone at the top" set by certain members of senior management and the information and communication components of the COSO internal control framework, including controls over the Chemours Ethics Hotline program. Accordingly, the Company expects to report on material weaknesses as of December 31, 2023 and its related remediation plans in its Annual Report on Form 10-K.

**About The Chemours Company**

The Chemours Company (NYSE: CC) is a global leader in Titanium Technologies, Thermal & Specialized Solutions, and Advanced Performance Materials providing its customers with solutions in a wide range of industries with market-defining products, application expertise and chemistry-based innovations. We deliver customized solutions with a wide range of industrial and specialty chemicals products for markets, including coatings, plastics, refrigeration and air conditioning, transportation, semiconductor and consumer electronics, general industrial, and oil and gas. Our flagship products are sold under prominent brands such as Ti-Pure™, Opteon™, Freon™, Teflon™, Viton™, Nafion™, and Krytox™. The company has approximately 6,200 employees and 28 manufacturing sites serving approximately 2,700 customers in approximately 110 countries. Chemours is headquartered in Wilmington, Delaware and is listed on the NYSE under the symbol CC.

For more information, we invite you to visit chemours.com or follow us on X (formerly Twitter) @Chemours or on LinkedIn.

**Forward-Looking Statements**

This press release contains forward-looking statements, within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, which involve risks and uncertainties. Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to a historical or current fact. The words "believe," "expect," "will," "anticipate," "plan," "estimate," "target," "project" and similar expressions, among others, generally identify "forward-looking statements," which speak only as of the date such statements were made. All forward-looking statements are subject to risks and uncertainties. These risks include the results of the Audit Committee review; the timing and completion of the Company's reporting of its 2023 results; completing the assessment of internal control over financial reporting and filing required reports with the Securities and Exchange Commission; remediating any material weaknesses in internal control over financial reporting; regulatory inquiries, litigation, or liabilities that may result from the matters included in the Audit Committee review, including related disclosure in the Company's filings with the Securities and Exchange Commission; the impact of this announcement on the price of our common stock and our relationships with investors, employees, suppliers, lenders and other parties. Other risks and uncertainties include, among other things, the outcome or resolution of any pending or future environmental liabilities, the commencement, outcome or resolution of any regulatory inquiry, investigation or proceeding, the initiation, outcome or settlement of any litigation, changes in environmental regulations in the U.S. or other jurisdictions that affect demand for or adoption of our products, anticipated future operating and financial performance for our segments individually and our company as a whole, business plans, prospects, targets, goals and commitments, capital investments and projects and target capital expenditures, plans for dividends or share repurchases, sufficiency or longevity of intellectual property protection, cost reductions or savings targets, plans to increase profitability and growth, our ability to make acquisitions, integrate acquired businesses or assets into our operations, and achieve anticipated synergies or cost savings, all of which are subject to substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Forward-looking statements are based on certain assumptions and expectations of future events that may not be accurate or realized, such as full year guidance relying on models based upon management assumptions regarding future events that are inherently uncertain. These statements are not guarantees of future performance. Forward-looking statements also involve risks and uncertainties that are beyond Chemours' control. Matters outside our control, including general economic conditions, geopolitical conditions and global health events, have affected or may affect our business and operations and may or may continue to hinder our ability to provide goods and services to customers, cause disruptions in our supply chains such as through strikes, labor disruptions or other events, adversely affect our business partners, significantly reduce the demand for our products, adversely affect the health and welfare of our personnel or cause other unpredictable events. Additionally, there may be other risks and uncertainties that

Chemours is unable to identify at this time or that Chemours does not currently expect to have a material impact on its business. Factors that could cause or contribute to these differences include the risks, uncertainties and other factors discussed in our filings with the U.S. Securities and Exchange Commission, including in our Annual Report on Form 10-K for the year ended December 31, 2022 and our Quarterly Report on Form 10-Q for the quarter ended September 30, 2023. Chemours assumes no obligation to revise or update any forward-looking statement for any reason, except as required by law.

**CONTACTS:**

**INVESTORS**

*Brandon Ontjes*
*VP, Financial Planning & Analysis and Investor Relations*
*+1.302.773.3300*
*investor@chemours.com*

*Kurt Bonner,*
*Manager, Investor Relations*
*+1.302.773.0026*
*investor@chemours.com*

**NEWS MEDIA**

*Thom Sueta*
*Director, Corporate Communications*
*+1.302.773.3903*
*media@chemours.com*

*Cassie Olszewski*
*Sr. Manager, Media Relations & Corporate Reputation*
*+1.302.219.7140*
*media@chemours.com*

# Exhibit 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

**April 23, 2024**
**Date of Report (Date of Earliest Event Reported)**

---

# The Chemours Company
**(Exact Name of Registrant as Specified in Its Charter)**

---

| Delaware | 001-36794 | 46-4845564 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1007 Market Street**
**Wilmington, Delaware 19801**
**(Address of principal executive offices)**

**Registrant's telephone number, including area code: (302) 773-1000**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Exchange on Which Registered |
|---|---|---|
| Common Stock ($0.01 par value) | CC | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02.**        **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On April 23, 2024, Jonathan S. Lock resigned from all positions with The Chemours Company (the "Company"). In connection with his resignation, Mr. Lock and the Company entered into a separation and release agreement (the "Separation Agreement"), dated as of April 23, 2024, that provides that, subject to Mr. Lock providing an effective release of claims against the Company and his compliance with the restrictive covenants applicable to him and the obligations under the Separation Agreement, Mr. Lock's stock options to acquire Company common stock that were vested prior to his resignation would be exercisable for a longer period following his resignation than would otherwise apply (consistent with the treatment provided to employees who are retirement eligible) and, if he elects continued healthcare coverage under COBRA, he will also receive three months of COBRA premium payments ($7,245.00). Except as described in the prior sentence, and other than any rights Mr. Lock has to vested benefits under the terms of the Company's employee benefit plans, Mr. Lock is not entitled to any severance, equity award vesting or other compensation in connection with his resignation.

The foregoing description of the terms and conditions of the Separation Agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which is filed as Exhibit 10.1 hereto and is incorporated herein by reference.

**Item 9.01.**        **Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit No. | Description |
|---|---|
| 10.1 | Separation and Release Agreement, dated as of April 23, 2024, by and between The Chemours Company and Jonathan S. Lock |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**THE CHEMOURS COMPANY**

Date: April 25, 2024

By:     /s/ Matthew S. Abbott
Name:   Matthew S. Abbott
Title:    Interim Chief Financial Officer

EX-10.1 2 d713795dex101.htm EX-10.1

**Exhibit 10.1**

EXECUTION COPY

**SEPARATION AND RELEASE AGREEMENT**

THIS SEPARATION AND RELEASE AGREEMENT (this "Agreement"), dated as of April 23, 2024, is by and between The Chemours Company (the "Company"), and Jonathan S. Lock ("Executive"). The Company and Executive are hereinafter referred to as the "Parties".

WHEREAS, Executive has been employed by the Company as its Senior Vice President and Chief Financial Officer;

WHEREAS, the Company and Executive have mutually agreed that Executive will voluntarily resign from his roles as Senior Vice President and Chief Financial Officer of the Company;

WHEREAS, the Company and Executive desire to set forth their respective rights and obligations in respect of Executive's separation from the Company.

NOW, THEREFORE, in consideration of the covenants and conditions set forth herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. Resignations on Termination Date. Executive and the Company agree that, effective April 23, 2024 (the "Termination Date"), Executive shall resign from his positions as Senior Vice President and Chief Financial Officer of the Company and from any other positions held by Executive with the Company and its subsidiaries and affiliates, and Executive's employment with the Company and all of its affiliates will permanently terminate on the Termination Date. Executive hereby agrees that no further action is required by Executive or any of the preceding to make the terminations provided for in this Section 1 effective, but Executive nonetheless agrees to execute (or to allow the Company's officers to execute on Executive's behalf) any additional documentation as may be requested by the Company in connection therewith and solely for the purpose of effectuating such resignations, and to not reassume any such service or position.

2. Separation Benefits. Subject to the terms of this Agreement and Executive's execution of the release of claims in the form attached as Exhibit A to this Agreement (the "Release") within twenty-one (21) calendar days following the Termination Date, and the non-revocation of the Release during the seven (7)-day period following execution of the Release, Executive shall be entitled to the following payments and benefits (collectively, the "Separation Benefits"): (a) subject to Executive's timely election of benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Executive shall receive an amount equal to $7,245.00 (equal to three (3) months of COBRA premiums for medical and dental coverage), paid in a lump sum as soon as practicable after the Release becomes effective, but no later than sixty (60) calendar days following the Termination Date; and (b) Executive's vested stock options as of the Termination Date (as set forth on Schedule I to this Agreement) shall remain exercisable for three (3) years following the Termination Date (but no later than the remaining full term of any such option) in accordance with their terms and using the exercise methodologies available under the applicable award agreement and the Company's standard practices (including via "net" exercise methods) as in effect from time to time, subject to

Executive's refraining from engaging in the restricted conduct activities described under the section entitled "Restricted Conduct" in the applicable award agreement and complying with this Agreement; *provided, however*, that solely with respect to the non-competition covenant set forth in the equity award agreements, the restricted period shall be one (1) month from the Termination Date (as opposed to one (1) year). All of the unvested stock options and unvested restricted stock units granted to Executive and the performance stock units granted to Executive in 2021, 2022 and 2023, are forfeited in full immediately on the Termination Date for no consideration. In addition, the Executive will be paid or provided (i) all salary and wages due to Executive with respect to Executive's services to the Company through the Termination Date, paid in accordance with the Company's normal payroll practices, (ii) vested benefits under Company's employee benefit plans in which Executive participated as of the Termination Date (including, without limitation, COBRA continuation coverage) in accordance with the terms thereof and any payment elections thereunder, and (iii) payment for his accrued and unused vacation days, to be paid in a lump sum as soon as practicable following the Termination Date.

3. <u>Acknowledgements</u>. Executive further agrees and acknowledges that (a) the Company has paid Executive all salary and wages due to Executive with respect to Executive's services to the Company through the Termination Date (except as set forth in the last sentence of Section 2) and there are no other accrued but unpaid amounts to which Executive is entitled, (b) Executive is not otherwise eligible for or entitled to the Separation Benefits provided under Section 2, and such benefits are adequate and sufficient consideration in exchange for the Release, (c) Executive will not be entitled to a 2023 or 2024 annual cash incentive award, a 2024 equity or equity-based award or, other than the Separation Benefits, any compensation or benefits in connection with Executive's termination, including severance, separation or termination pay or benefits under the Company's Senior Executive Severance Plan or any other plan, program, policy or practice, (d) except as specifically provided above in clause (b) of Section 2 with respect to the vested stock options, all of Executive's outstanding unvested equity and unvested equity-based awards will be irrevocably forfeited and cancelled for no consideration as of the Termination Date, and (e) Executive and any amounts or benefits previously paid or provided to Executive and the Separation Benefits remain subject to the terms of the applicable plans and award agreements (except as expressly modified by clause (b) of Section 2), all of the Company's policies and procedures, including the Incentive Compensation Clawback Policy and the Company's Incentive-Based Compensation Clawback Policy for Executive Officers.

4. <u>Full Settlement; Cooperation; Indemnification; Return of Property</u>.

a. *Full Settlement*. Except as expressly provided herein, Executive agrees that the Separation Benefits shall be in full satisfaction of any rights and benefits due to Executive upon a termination of Executive's employment with the Company.

b. *Cooperation*. Executive agrees to continue to cooperate with the Company and its respective directors, officers, employees, attorneys and experts in connection with the Board's continued review with respect to the Company's accounting and, to the extent applicable, Executive's conduct with respect to the same. Such cooperation and assistance shall include, but not be limited to, promptly providing information and documents and providing general cooperation to assist the Company. The Company will, to the extent feasible, use

-2-

reasonable business efforts to provide Executive with reasonable notice in the event Executive's assistance is required and to schedule any meetings and the timing of any document production in such manner as would not materially interfere with Executive's other business and personal commitments. The Company will pay or reimburse Executive for all reasonable out-of-pocket travel, duplicating or telephonic expenses incurred by Executive in complying with the cooperation obligations hereunder, and such entitlement will in no way affect other rights that Executive has to be indemnified or advanced expenses under the "Indemnification Agreement" (as defined below) or the Company's organizational documents.

c. *Indemnification; D&O Coverage*. The Company acknowledges that the Indemnification Agreement between Executive and the Company, dated as of February 23, 2023 (the "Indemnification Agreement") and any similar rights under the Company's organizational documents shall survive the Termination Date in accordance with the terms thereof. In addition, the Company shall continue to cover Executive under directors' and officers' liability insurance following the Termination Date in the same amount and to the same extent as the Company covers its other active officers and directors.

d. *Return of Property*. By signing this Agreement, Executive certifies that (i) he has returned to the Company all documents, materials, equipment, and devices in his possession, custody or control that are the property of the Company; (ii) after returning such property to the Company, Executive has not retained any copies of any confidential information and/or any other materials, documents and/or property belonging to the Company; and (iii) Executive has delivered to the Company all confidential information on his home and/or personal computer drives and from any other personal electronic, digital or magnetic storage devices; *provided* that, the foregoing shall not prohibit Executive and Executive's counsel from retaining copies of paper or electronic documents that Executive provided to such counsel in his or her capacity as such, subject to (A) the Company separately having in its possession copies of such documents or having been provided with such documents (or, for any documents that Executive's counsel reasonably determines in good faith constitute attorney work product or subject to attorney-client privilege protection, redacted copies thereof) prior to the Termination Date, and (B) Executive agreeing that, if requested by the Company or its counsel, Executive will instruct his counsel to destroy such documents in a manner that remains compliant with applicable legal obligations, if any. For the avoidance of doubt, the Company will cooperate with Executive to provide him with any personal files contained on Executive's laptop computer, and the Company will not access folders (if any) on such laptop if labeled "attorney work product" (based on Executive's representation that any such classification has been or will be reasonably determined in good faith by Executive's counsel prior to the Termination Date). In addition, Executive will be permitted to retain copies of relevant benefit plan documents for benefit plans in which Executive participated as of the Termination Date.

e. Remedies. Material violations of this Agreement may result in the immediate forfeiture of any then-outstanding equity awards and entitle the Company to repayment by Executive of any benefits previously received in respect of the Separation Benefits, including any amounts received from the exercise of vested stock options addressed in Section 2 of this Agreement. Executive agrees that the foregoing will not invalidate this Agreement or the Release, and acknowledges that Executive will continue to be bound by the terms of this Agreement and the Release. Executive acknowledges that the Company may be

-3-

irreparably injured by his violation of this Agreement and that in the event of any breach or threatened breach, the Company shall, in addition to any other remedies available to it, be entitled to seek: (i) a temporary restraining order and/or preliminary and/or permanent injunction, or other equivalent relief, restraining Executive from any actual or threatened breach of this Agreement; (ii) damages, to partially offset the irreparable damage such a violation would cause; and (iii) attorneys' fees and other costs incurred by the Company in obtaining such relief. Nothing in this Agreement shall limit or prevent the Company from also pursuing any other or additional remedies it may have for breach of this Agreement and/or any other agreement Executive may have signed.

5. <u>Tax Withholding</u>. All payments and benefits provided to Executive under this Agreement will be less applicable withholdings for federal, state and local taxes.

6. <u>Entire Agreement</u>. This Agreement and the Release constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersede any and all prior agreements or understandings between the Parties arising out of or relating to Executive's employment and the cessation thereof.

7. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by the laws of the State of Delaware, without giving effect to the conflicts of law principles thereof. Any disputes regarding this Agreement shall be brought only in the Delaware Chancery Court in Wilmington, Delaware or the U.S. District Court for the District of Delaware.

8. <u>Severability of Provisions</u>. Each of the sections contained in this Agreement shall be enforceable independently of every other section in this Agreement, and the invalidity or nonenforceability of any section shall not invalidate or render unenforceable any other section contained in this Agreement.

9. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Company, including as a result of a merger or sale of all or substantially all of the Company's assets or similar corporate transaction. This Agreement shall not be assignable by Executive.

10. <u>Waivers</u>. No failure on the part of either Party to exercise, and no delay in exercising, any right or remedy under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or by any related document or by law.

11. <u>Modification</u>. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by both Executive and the Company.

12. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be one and the same instrument.

[*Remainder of page intentionally left blank.*]

-4-

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

**THE CHEMOURS COMPANY**

By:  /s/ Sean Keohane
     Name: Sean Keohane
     Title: Chair of Compensation and
     Leadership Development Committee

     /s/ Jonathan S. Lock
     Jonathan S. Lock

[*Signature Page to Separation and Release Agreement*]

**EXHIBIT A**

THIS RELEASE (this "Release") is entered into between Jonathan S. Lock ("Executive") and The Chemours Company (the "Company"), for the benefit of the Company. Reference is made to the Separation and Release Agreement (the "Separation Agreement"), dated April 23, 2024, by and between the Company and Executive. Capitalized terms used and not defined herein shall have the meanings provided in the Separation Agreement. The entering into and non-revocation of this Release is a condition to Executive's right to receive the separation benefits described in Section 2 of the Separation Agreement (the "Separation Benefits").

Accordingly, Executive and the Company agree as follows:

1. In consideration for the Separation Benefits, to which Executive is not otherwise entitled, and the sufficiency of which Executive acknowledges, Executive represents and agrees, as follows:

(a) Executive, for himself, his heirs, administrators, attorneys, representatives, executors, successors and assigns (collectively "Releasers"), hereby irrevocably and unconditionally releases, acquits and forever discharges and agrees not to sue the Company or any of its parents, subsidiaries, divisions, affiliates and related entities and their current and former directors, officers, and, in their official capacities as such, shareholders, trustees, employees, consultants, independent contractors, representatives, agents, servants, successors and assigns and all persons acting by, through or under or in concert with any of them (collectively "Releasees"), from all claims, rights, causes of action, contracts, liabilities, agreements, promises, torts, rights, up to and including the date of this Release, arising from or relating to Executive's employment with (including service as a director), or termination of employment from (including termination of service as a director), the Company and its subsidiaries and affiliates, and from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of actions, suits, rights, demands, costs, losses, debts and expenses in connection with Executive's service as a director of the Company and Executive's employment and termination of employment with the Company and its subsidiaries, known or unknown, suspected or unsuspected and any claims of wrongful discharge, breach of contract, implied contract, promissory estoppel, defamation, slander, libel, tortious conduct, employment discrimination or claims under any federal, state or local employment statute, law, order or ordinance, including any rights or claims arising under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"), the Americans with Disabilities Act of 1990, as amended, the Family and Medical Leave Act of 1993, as amended, the Employee Retirement Income Security Act of 1974, as amended, the Equal Pay Act of 1963, the Fair Labor Standards Act, Section 1981 of U.S.C. Title 42, the Fair Credit Reporting Act, the National Labor Relations Act, the Uniformed Services Employment and Reemployment Rights Act, the Genetic Information Nondiscrimination Act, the Immigration Reform and Control Act, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, and the Worker Adjustment and Retraining Notification Act of 1988, as amended. Nothing contained herein shall restrict the Parties' rights to enforce the terms of this Release.

A-1

(b) To the maximum extent permitted by law, Executive agrees that he has not filed, nor will he ever file, a lawsuit asserting any claims which are released by this Release, or to accept any benefit from any lawsuit which might be filed by another person or government entity based in whole or in part on any event, act, or omission which is the subject of this Release.

(c) This Release does not waive rights or claims with respect to (i) Executive's rights to the Separation Benefits, (ii) Executive's rights as a stockholder of the Company, (iii) claims which may not be released under applicable law, (iv) Executive's rights to accrued but unpaid salary or paid time off accrued through the Termination Date and any vested benefits under the Company's Retirement Savings Restoration Plan (401(k)) and Management Deferred Compensation Plan (v) continuation coverage benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985, (vi) any unreimbursed reimbursable business expenses, (vii) any rights under this Separation Agreement or the Indemnification Agreement and any similar rights under the Company's organizational documents, and (viii) any claims that may arise after the date this Release is executed. Nothing contained in this Release shall release Executive from his obligations under the Separation Agreement or any other agreement between Executive and the Company (including the obligations under the heading entitled "Restricted Conduct" in each applicable equity award agreement (as modified by Section 2 of the Separation Agreement) that continue or are to be performed following Executive's termination of employment with the Company, and Executive acknowledges that the Company will have available to it all remedies under the Separation Agreement and at law and at equity, including injunctive relief, in the event that Executive breaches any of his obligations under the Separation Agreement, any other agreement between Executive and the Company or this Release. The covenants, representations and acknowledgments made by Executive in this Release shall continue to have full force and effect after the execution and effectiveness of this Release and the delivery of the Separation Benefits, and this Release shall inure to the benefit of each Releasee, and the successors and assigns of each of them, to the extent necessary to preserve the intended benefits of such provisions.

(d) The Parties agree that the Separation Agreement and this Release shall not affect the rights and responsibilities of the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC") to enforce ADEA and other laws. In addition, the Parties agree that the Separation Agreement and this Release shall not be interpreted to prohibit or restrict Executive from filing a charge or initiating communications directly with or responding to any inquiry from or participating in (including providing testimony for) an investigation or proceeding conducted by the EEOC, the Securities and Exchange Commission ("SEC") or other government agency or making other disclosures that are protected under whistleblower provisions of federal law or regulation (including Section 21F of the Securities Exchange Act of 1934 and the regulations promulgated thereunder) or limit Executive's right to receive an award for information provided to the SEC or any other securities regulatory agency, in each case without the necessity of prior authorization from the Company or the need to notify the Company that he has done so. The Parties further agree that Executive knowingly and voluntarily waives all rights or claims (that arose prior to Executive's execution of this Release) the Releasers may have against the Releasees, or any of them, to receive any benefit or remedial relief (including, but not limited to, reinstatement, back pay, front pay, damages, attorneys' fees, experts' fees) as a consequence of any investigation or proceeding conducted by the EEOC.

A-2

Executive acknowledges that the Company has specifically advised him of the right to seek the advice of an attorney concerning the terms and conditions of this Release. Executive further acknowledges that he has been furnished with a copy of this Release, and he has been afforded twenty-one (21) calendar days in which to consider the terms and conditions set forth above prior to this Release. By executing this Release, Executive affirmatively states that he has had sufficient and reasonable time to review this Release and to consult with an attorney concerning his legal rights prior to the final execution of this Release. Executive further agrees that he has carefully read this Release and fully understands its terms. Executive acknowledges that he has entered into this Release, knowingly, freely and voluntarily. Executive understands that he may revoke this Release within seven (7) calendar days after signing this Release. Revocation of this Release must be made in writing and must be received by Kristine M. Wellman at the Company, 1007 Market Street, C-51, Wilmington, DE 19801, within the time period set forth above.

2. This Release covers both claims that Executive knows about and those Executive may not know about. Executive expressly waives all rights afforded by any statute which limits the effect of a release with respect to unknown claims. Executive understands the significance of Executive's release of unknown claims and Executive's waiver of statutory protection against a release of unknown claims.

3. This Release will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflicting provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the laws of any jurisdiction other than the State of Delaware to be applied. In furtherance of the foregoing, the internal law of the State of Delaware will control the interpretation and construction of this agreement, even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply. The provisions of this Release are severable, and if any part or portion of it is found to be unenforceable, the other paragraphs shall remain fully valid and enforceable.

A-3

4. This Release shall become effective and enforceable on the eighth day following its execution by Executive, <u>provided</u> he does not exercise his right of revocation as described above. If Executive fails to sign and deliver this Release or revokes his signature, this Release will be without force or effect, and Executive shall not be entitled to the Separation Benefits.

Date: April 23, 2024                          /s/ Jonathan S. Lock
                                             _____
                                             Jonathan S. Lock

                                             **THE CHEMOURS COMPANY**

Date: April 23, 2024                          By:    /s/ Sean Keohane
                                                    _____
                                             Name:   Sean Keohane
                                             Title:  Chair of Compensation and Leadership Development Committee

[*Signature Page to Release*]

**Schedule I**

| Grant Date | # of Shares Subject to Vested Stock Options | Exercise Price | | Treatment |
|---|---|---|---|---|
| *Vested Stock Options* | | | | |
| 5/1/2018 | 9,713 | $ | 48.25 | |
| 3/1/2019 | 5,574 | $ | 38.02 | |
| 6/3/2019 | 14,858 | $ | 21.96 | |
| 3/2/2020 | 22,459 | $ | 14.43 | Vested options exercisable for three years after termination date (but not |
| 3/1/2021 | 20,449 | $ | 24.01 | later than the expiration date) |
| 3/1/2022 | 11,459 | $ | 25.98 | |
| 3/1/2023 | 2,306 | $ | 34.84 | |
| 3/1/2023 | 2,366 | $ | 38.32 | |

# Exhibit 4

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Lock Jonathan | Chemours Co [ CC ] | Director | 10% Owner |
| (Last)  (First)  (Middle) | | X Officer (give title below) | Other (specify below) |
| C/O THE CHEMOURS COMPANY | 3. Date of Earliest Transaction (Month/Day/Year) | SVP, Chief Development Officer |
| 1007 MARKET STREET | 03/01/2023 | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| WILMINTON  DE  19801 | 03/03/2023 | X Form filed by One Reporting Person |
| (City)  (State)  (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Performance Stock Option (Right to Buy) | $38.32[(1)] | 03/01/2023 | | A | | 7,097[(2)] | | (3) | 03/01/2023 | Common Stock | 7,097 | $0.00 | 7,097 | D | |

**Explanation of Responses:**

1. Represents a 10 percent premium above the closing price of the Company common stock on the date of grant

2. The original Form 4, filed on March 3, 2023, is amended by this Form 4 amendment solely to revise the number of performance stock options received by the reporting person.

3. These options are scheduled to vest in three equal annual installments beginning on March 1, 2024.

**Remarks:**

/s/ Pauletta Brown, Attorney-in-Fact    03/10/2023

** Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# Exhibit 5

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

1. Name and Address of Reporting Person*

Lock Jonathan

| (Last) | (First) | (Middle) |

C/O THE CHEMOURS COMPANY

1007 MARKET STREET

(Street)

WILMINTON      DE      19801

| (City) | (State) | (Zip) |

2. Issuer Name **and** Ticker or Trading Symbol

Chemours Co [ CC ]

3. Date of Earliest Transaction (Month/Day/Year)
03/01/2023

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)

|  | Director |  | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) |  | Other (specify below) |

SVP, Chief Development Officer

6. Individual or Joint/Group Filing (Check Applicable Line)

| X | Form filed by One Reporting Person |
|---|---|
|  | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/01/2023 | | F | | 418[(1)] | D | $34.84 | 26,610.4423[(2)] | D | |
| Common Stock | 03/01/2023 | | A | | 3,049[(3)] | A | $0.00 | 29,659.4423[(2)] | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option (Right to Buy) | $34.84 | 03/01/2023 | | A | | 6,917 | | (4) | 03/01/2033 | Common Stock | 6,917 | $0.00 | 6,917 | D | |
| Performance Stock Option (Right to Buy) | $38.32[(5)] | 03/01/2023 | | A | | 6,819 | | (4) | 03/01/2033 | Common Stock | 6,819 | $0.00 | 6,819 | D | |

**Explanation of Responses:**

1. Shares automatically withheld to satisfy tax obligations on vesting restricted stock units. Transaction is exempt from Section 16(b) pursuant to Rule 16b-3. No shares were sold.

2. Includes directly owned shares, restricted stock units and dividend equivalent units.

3. Restricted Stock Unit (RSU) award scheduled to vest in three equal annual installments beginning on March 1, 2024.

4. These options are scheduled to vest in three equal annual installments beginning on March 1, 2024.

5. Represents a 10 percent premium above the closing price of the Company common stock on the date of grant

**Remarks:**

/s/ Pauletta Brown, Attorney-in-Fact          03/03/2023

** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# Exhibit 6

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Lock Jonathan | Chemours Co [ CC ] | Director    10% Owner |
| (Last)  (First)  (Middle) | | X   Officer (give title below)    Other (specify below) |
| C/O THE CHEMOURS COMPANY | 3. Date of Earliest Transaction (Month/Day/Year) | SVP, Chief Development Officer |
| 1007 MARKET STREET | 03/01/2022 | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| WILMINGTON   DE   19801 | | X   Form filed by One Reporting Person |
| (City)  (State)  (Zip) | |    Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/01/2022 | | F | | 230[1] | D | $25.98 | 11,485[2] | D | |
| Common Stock | 03/01/2022 | | A | | 1,635[3] | A | $0 | 13,120[2] | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option (Right to Buy) | $25.98 | 03/01/2022 | | A | | 17,189 | | [4] | 03/01/2032 | Common Stock | 17,189 | $0 | 17,189 | D | |

**Explanation of Responses:**

1. Shares automatically withheld to satisfy tax obligations on vesting restricted stock units. Transaction is exempt from Section 16(b) pursuant to Rule 16b-3. No shares were sold.

2. Includes directly owned shares, restricted stock units and dividend equivalent units.

3. Restricted Stock Unit (RSU) award scheduled to vest in three equal annual installments beginning on March 1, 2023.

4. These options are scheduled to vest in three equal annual installments beginning on March 1, 2023.

| | |
|---|---|
| /s/ Pauletta Brown, Attorney-in-Fact | 03/03/2022 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# Exhibit 7

SEC Form 3

**FORM 3**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIES**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0104 |
| Estimated average burden | |
| hours per response: | 0.5 |

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person[*] <br><br> Lock Jonathan <br><br> (Last)　　(First)　　(Middle) <br><br> C/O THE CHEMOURS COMPANY <br> 1007 MARKET STREET <br><br> (Street) <br> WILMINGTON DE　　19801 <br><br> (City)　　(State)　　(Zip) | 2. Date of Event Requiring Statement (Month/Day/Year) <br><br> 11/08/2021 | 3. Issuer Name **and** Ticker or Trading Symbol <br><br> Chemours Co [ CC ] | | |
|---|---|---|---|---|
| | | 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br><br> ___ Director　　　___ 10% Owner <br> X Officer (give title below)　　___ Other (specify below) <br><br> SVP, Chief Development Officer | 5. If Amendment, Date of Original Filed (Month/Day/Year) | |
| | | | 6. Individual or Joint/Group Filing (Check Applicable Line) <br><br> X Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person | |

**Table I - Non-Derivative Securities Beneficially Owned**

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| Common Stock | 8,042.7446[1] | D | |

**Table II - Derivative Securities Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |
| Stock Option (Right to Buy) | [2] | 03/01/2031 | Common Stock | 20,449 | $24.01 | D | |
| Stock Option (Right to Buy) | [3] | 03/02/2030 | Common Stock | 22,459 | $14.43 | D | |
| Stock Option (Right to Buy) | [4] | 06/03/2029 | Common Stock | 14,858 | $21.96 | D | |
| Stock Option (Right to Buy) | [5] | 03/01/2029 | Common Stock | 5,574 | $38.02 | D | |
| Stock Option (Right to Buy) | [6] | 05/01/2028 | Common Stock | 9,713 | $48.25 | D | |

**Explanation of Responses:**

1. Includes directly owned shares, restricted stock units and dividend equivalent units.
2. Options vest in three equal installments beginning on March 1, 2022.
3. Options vest in three equal installments beginning on March 2, 2021.
4. Options vest on June 3, 2022.
5. Options vest in three equal installments beginning on March 1, 2020.
6. Options are fully vested.

| /s/ Pauletta Brown, Attorney-in-Fact | 11/10/2021 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 5 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# Exhibit 8

TABLE OF CONTENTS

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of**
**the Securities Exchange Act of 1934 (Amendment No.    )**

Filed by the Registrant ☒                    Filed by a Party other than the Registrant ☐

| Check the appropriate box: | |
|---|---|
| ☐ | Preliminary Proxy Statement |
| ☐ | **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))** |
| ☒ | Definitive Proxy Statement |
| ☐ | Definitive Additional Materials |
| ☐ | Soliciting Material under §240.14a-12 |

# THE CHEMOURS COMPANY

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

| Payment of Filing Fee (Check the appropriate box): | |
|---|---|
| ☒ | No fee required. |
| ☐ | **Fee paid previously with preliminary materials.** |
| ☐ | Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a6(i)(1) and 0-11 |



# 2024

## NOTICE OF ANNUAL SHAREHOLDERS MEETING AND PROXY STATEMENT

Chemours™



**1007 Market Street**
**Wilmington, Delaware 19801**

April 11, 2024

## Dear Fellow Shareholders:

Thank you for your continued investment in Chemours. The Board of Directors recognizes the commitment and support of our key stakeholders, including our many long-term shareholders, and does not take this for granted.

Following a period that presented both challenges, and important Board actions and management transitions, the Board is highly focused on engagement and transparency and earning the continued support of our stakeholders. The Board is confident in the future of our business and committed to ensuring our business is run in a manner that will enable Chemours to reach its full potential.

As described in more detail in the summary section of this proxy statement, the Board has taken decisive actions in response to an internal review led by the Audit Committee with the assistance of independent outside counsel. These actions included swiftly announcing leadership changes after placing three members of senior management on administrative leave in late February.

On March 22, 2024, the Board appointed Denise Dignam as President and Chief Executive Officer. As a long-tenured senior executive, Denise has been instrumental to Chemours and has led both our Titanium Technologies and Advanced Performance Materials businesses, which combined were more than 68% of our Net Sales in 2023. The Board has also appointed Matt Abbott to serve as Interim Chief Financial Officer while we continue a comprehensive search for a permanent CFO. At Chemours, Matt has served in senior officer roles across operational, accounting and internal audit functions, and possesses valuable prior experience as an audit partner.

The Board has a longstanding and ongoing commitment to refreshment. As a result, we have added two independent directors to the Board within the last six months. In November 2023, we welcomed Alister Cowan to the Board, a distinguished financial expert with over thirty years of experience in financial operations and corporate development. Additionally, in February 2024, Pamela Fletcher joined the Board, bringing valuable perspectives related to developing and commercializing innovative products.

As we look ahead, commitment to safety in our products and operations will remain a fundamental value at Chemours. As a result of previous years' self-evaluation processes and in furtherance of our commitment to comprehensive, enterprise-wide risk management, the Board created a new standing committee for environmental, health, and safety and operational performance topics. This committee structure will enhance and support the Board in oversight of these topics, and its formation aligns with our dedication to safety and operational excellence at every Chemours facility.

I would like to thank our employees for their hard work and dedication, and our customers for their continued support.

On behalf of your Board of Directors, I invite you to attend our 2024 Annual Meeting of Shareholders on May 21st, 2024. The attached Notice of the 2024 Annual Meeting of Shareholders and Proxy Statement contain information about the business to be conducted at the Meeting.

Sincerely,



**Dawn L. Farrell**
Chair of the Board



**Notice of 2024
Annual Meeting of Shareholders**

**1007 Market Street
Wilmington, Delaware 19801**

|  Time and Date: May 21, 2024, 10:00 a.m. ET |  Place: Virtual Only — No Physical Meeting Location |  Record date: April 3, 2024 |
| --- | --- | --- |

The Annual Meeting of Shareholders for The Chemours Company (the "Company") will be held virtually on May 21, 2024 at 10:00 a.m. Eastern Time (including any adjournments or postponements) for the following purposes:

**1.**
To elect nine director nominees named in the accompanying Proxy Statement to serve one-year terms expiring at the Annual Meeting of Shareholders in 2025;

**2.**
To hold a non-binding advisory vote to approve the compensation of our named executive officers;

**3.**
To ratify the selection of PricewaterhouseCoopers LLP as our independent registered public accounting firm for fiscal year 2024; and

**4.**
To transact such other business that may properly come before the Annual Meeting or any adjournments or postponements.

---

**IMPORTANT NOTICE REGARDING AVAILABILITY OF PROXY MATERIALS FOR THE VIRTUAL ANNUAL MEETING OF SHAREHOLDERS TO BE HELD ON MAY 21, 2024:**

The Notice of Internet Availability of Proxy Materials, Notice of Annual Meeting of Shareholders, Proxy Statement and Annual Report are available at www.allianceproxy.com/chemours/2024

---

Only shareholders of record at the close of business on April 3, 2024 are entitled to notice of, and to vote at, the Annual Meeting, and any adjournments or postponements of the Annual Meeting.

By Order of the Board of Directors

*Kristine M. Wellman*

**Kristine M. Wellman**
Senior Vice President, General Counsel &
Corporate Secretary

April 11, 2024

**Your vote is important.** Even if you plan to attend the Annual Meeting, we still encourage you to submit your proxy via Internet, telephone or mail prior to the meeting. If you later choose to revoke your proxy or change your vote, you may do so by following the procedures described under "Can I revoke a proxy?" and "Can I change my vote after I have delivered my proxy?" in the "General Information About the Meeting" section of the attached Proxy Statement.

Table of Contents

| | |
|---|---|
| **PROXY SUMMARY/ANNUAL MEETING OVERVIEW** | **1** |
| **PROPOSAL 1 — ELECTION OF DIRECTORS** | **7** |
| **Director Qualification Process** | **7** |
| **Director Nominees** | **9** |
| **CORPORATE GOVERNANCE** | **16** |
| **Corporate Governance Highlights** | **16** |
| **Corporate Governance Practices** | **16** |
| **Sustainability Highlights** | **17** |
| **Board Oversight of Sustainability** | **20** |
| **Board Leadership Structure** | **20** |
| **Director Independence** | **21** |
| **Oversight of Risk Management** | **21** |
| **Succession Planning** | **22** |
| **Director Education** | **22** |
| **Code of Conduct** | **22** |
| **Shareholder Engagement** | **23** |
| **Policy on Hedging Transactions** | **23** |
| **BOARD STRUCTURE AND COMMITTEE COMPOSITION** | **24** |
| **Audit Committee** | **24** |
| **Compensation and Leadership Development Committee** | **25** |
| **Nominating and Corporate Governance Committee** | **25** |
| **Environmental, Health, and Safety & Operational Performance Committee** | **26** |
| **DIRECTOR COMPENSATION** | **27** |
| **SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT** | **29** |

| | |
|---|---|
| **EXECUTIVE COMPENSATION** | **31** |
| **Compensation Discussion and Analysis** | **31** |
| **Executive Compensation Tables** | **57** |
| **Compensation and Leadership Development Committee Report** | **72** |
| **PROPOSAL 2 — ADVISORY VOTE TO APPROVE NAMED EXECUTIVE OFFICER COMPENSATION** | **79** |
| **PROPOSAL 3 — RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM** | **80** |
| **Fees Paid to Independent Registered Public Accounting Firm** | **80** |
| **Audit Committee's Pre-Approval Policies and Procedures** | **80** |
| **Report of the Audit Committee** | **81** |
| **CERTAIN RELATIONSHIPS AND TRANSACTIONS** | **82** |
| **OTHER INFORMATION** | **83** |
| **Other Business that May Come Before the Meeting** | **83** |
| **2025 Annual Meeting of Shareholders** | **83** |
| **Annual Report on Form 10-K** | **83** |
| **GENERAL INFORMATION ABOUT THE MEETING** | **84** |

## Proxy Summary

Details of the Annual Meeting of Shareholders (including any adjournments and postponements) for The Chemours Company ("Chemours" or the "Company"), including the location of the meeting and the proposals its shareholders will vote upon at the meeting are listed below.



**Time and Date**
10:00 a.m. (Eastern Time)
on Tuesday, May 21, 2024



**Place:**
Virtual Meeting Only — No Physical Location

| MANAGEMENT PROPOSALS | BOARD VOTE RECOMMENDATION | SEE PAGE |
|---|---|---|
| Proposal 1 — Election of Directors | FOR EACH NOMINEE | 7 |
| Proposal 2 — Advisory Vote on Executive Compensation | FOR | 79 |
| Proposal 3 — Ratification of Independent Registered Public Accounting Firm | FOR | 80 |

**Voting**

As a shareholder, you are invited to participate in the Annual Meeting and are entitled and encouraged to vote on the proposals described in this Proxy Statement. Only holders of record of Chemours common stock at the close of business on April 3, 2024 (the "Record Date") are entitled to vote at the Annual Meeting. Each outstanding share of common stock is entitled to one vote.

If your shares are registered directly in your own name with the Company's transfer agent, Computershare Trust Company, N.A., you are considered a "shareholder of record" with respect to those shares, and the Notice has been sent directly to you. As a shareholder of record, you may submit your proxy in advance of the Annual Meeting using any of the following alternatives:



**INTERNET**

Visit www.AALVote.com/CC. Have your proxy card available when you access the above website. Follow the prompts to vote your shares by Internet until 11:59 p.m., Eastern Time, on May 20, 2024.



**MAIL**

Mark, sign, and date your proxy card, then detach it, and return it in the postage-paid envelope provided.



**TELEPHONE**

Use any touch-tone telephone to vote your proxy. Call 1 866-804-9616. Have your proxy card available when you call. Follow the voting instructions to vote your shares.



**DURING THE MEETING**

If you wish to vote your shares electronically during the virtual Annual Meeting, you will need to click on www.AALvote.com/CC during the Annual Meeting while the polls are open. You will need the control number on your Notice, or the proxy card mailed to you, as applicable.



## Proxy Summary (continued)

If, like most shareholders of the Company, you hold your shares through a broker, bank or other nominee, you are considered a "beneficial owner" of those shares, holding the shares in "street name." If you are a beneficial owner of shares, you will receive instructions from your broker or other nominee describing how to vote your shares. To vote online during the Annual Meeting, beneficial owners will need to contact the broker, trustee or nominee that holds their shares to obtain a "legal proxy" to bring to the meeting.



## Proxy Summary (continued)

**AUDIT COMMITTEE INTERNAL REVIEW AND RECENT BOARD ACTIONS**

### _Overview_

As previously disclosed, the Audit Committee, with the assistance of outside counsel, of the Board of Directors conducted an internal review in the first quarter of 2024 in response to an anonymous report made to the Chemours Ethics Hotline. The scope of the review included the processes for reviewing reports made to the Chemours Ethics Hotline, the Company's practices for managing working capital, including the related impact on metrics within the Company's incentive plans, certain non-GAAP metrics included in filings made with the U.S. Securities and Exchange Commission ("SEC") or otherwise publicly released, and related disclosures. The Audit Committee completed its planned procedures with respect to its review and its findings determined that the Company's then-Chief Executive Officer, then-Chief Financial Officer and then-Controller engaged in efforts in the fourth quarter of 2023 to delay payments to certain vendors and accelerate the collection of receivables, in part to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers, and we refer to such efforts as "working capital timing actions." The Audit Committee's internal review determined that there was a lack of transparency with the Board by members of senior management who were engaging in these working capital timing actions.

### _Recent Board Actions_

The Board has taken a number of steps to address the matters described above, including:

✓ Launching an internal review, led by the Audit Committee with assistance from independent outside counsel.

✓ Placing three senior executives on administrative leave.

✓ Appointing Denise Dignam as Interim Chief Executive Officer, who had previously led both our Titanium Technologies and Advanced Performance Materials businesses, and subsequently appointing Denise Dignam as President and Chief Executive Officer and a member of the Board on March 22, 2024.

✓ Appointing Matthew Abbott as Interim Chief Financial Officer, who has held senior officer roles in operational, accounting and internal audit areas during his time at Chemours and has prior experience as an audit partner, and initiating a search for a permanent Chief Financial Officer.

✓ In conjunction with the Compensation and Leadership Development Committee ("CLDC"), determining the calculation of free cash flow metrics by taking into account the net impact of the working capital timing actions, which reduced the payouts for incentive compensation tied to those metrics for all named executive officers. Further, the Board and CLDC exercised full negative discretion for the former Chief Executive Officer and former Chief Financial Officer. Specifically:

◦ **Negative Discretion for AIP:** The CLDC and the Board applied full negative discretion to reduce the 2023 Annual Incentive Plan ("AIP") awards for the former Chief Executive Officer Mark E. Newman and former Chief Financial Officer Jonathan Lock to $0.

◦ **Negative Discretion for PSUs:** The CLDC and the Board applied full negative discretion to determine that the former Chief Executive Officer Mark E. Newman and former Chief Financial Officer Jonathan Lock would receive no payouts for the 2021-2023 Performance Share Unit ("PSU") awards.

The Audit Committee and the full Board recognize that the steps taken to date were a step in the right direction, but that there is more to be done.

The Company is committed to taking steps necessary to remediate the control deficiencies that constituted the material weaknesses described in the Company's Annual Report on Form 10-K for the year ended December 31, 2023, which we refer to as our Annual Report. We are actively engaged and have devoted substantial resources towards the implementation of enhanced procedures and controls and the remediation of material weaknesses in our internal control over financial reporting. We also engaged external legal, accounting, financial and other consulting and professional services firms to assist



TABLE OF CONTENTS

## Proxy Summary (continued)

senior management in the development and execution of a comprehensive remediation plan. We describe in detail our initial and continuing remediation efforts in our Annual Report under Item 9A. Our Board has taken significant action and will continue to transparently communicate as further progress is made.

### RECENT CORPORATE GOVERNANCE UPDATES

Our Board remains committed to representing the best interests of Chemours' shareholders. As part of this commitment, the Board goes through regular refreshment with an emphasis on adding skilled directors with diverse backgrounds and experiences to the Board. The Board also regularly evaluates its structure and processes and considers ways in which it may enhance its oversight role. Recent actions the Board has taken include:

✓ *Addition of Pamela Fletcher to the Board*

- ◦ Pamela Fletcher joined our Board in February 2024. She is the former Senior Vice President and Chief Sustainability Officer of Delta Airlines, where she accelerated the company's decarbonization effort through a holistic approach that applied innovation to achieve sustainability gains in both the aviation fleet and ground support fleet. Her career with General Motors Company spanned over 17 years, where she held various leadership roles including Vice President Electric Vehicles and Vice President Global Innovation. She brings invaluable experience working with, and commercializing, disruptive technologies in new markets.

✓ *Addition of Alister Cowan to the Board and Two Committees*

- ◦ Alister Cowan joined our Board in November 2023. He was recently appointed to serve on the Audit Committee, as well as our newly formed Environmental, Health, and Safety & Operational Performance Committee. He brings a depth of financial expertise to the Board from his over 30 years of experience in companies across the globe. As a former Chief Financial Officer, most recently at Suncor, he brings to the Board valuable insights and experience in financial operations, corporate development, and capital allocation.

✓ *Creation of New Environmental, Health, and Safety & Operational Performance Committee*

- ◦ The Board and each committee conduct an annual self-evaluation of its performance with a particular focus on overall effectiveness. As a result of previous years' self-evaluation processes, the Board began to explore establishing a new standing committee for environmental, health, and safety and operational performance topics in early 2023. This process led the Board to determine it was prudent to establish a new standing committee for environmental, health, and safety and operational performance topics. The formation of this committee aligns with our commitment to our values, particularly our commitment to safe and responsible operations. Historically, the full Board has provided oversight of these topics and will continue to do so. This committee structure will enhance and support the Board in oversight of these matters.

✓ *Appointment of Denise Dignam as President and Chief Executive Officer*

- ◦ Denise Dignam was appointed President and CEO and a member of the Board on March 22, 2024, consistent with the Board's succession planning process. Denise brings over 35 years of experience in the chemical industry where she has held senior roles in business and operations, sales and marketing, commercialization, and supply chain. She had served as Interim Chief Executive Officer since February 2024, and prior to that held the positions of President, Titanium Technologies (TT) segment, and President, Advanced Performance Materials (APM) segment — two businesses that represent in the aggregate over 68% of Chemours' net sales in 2023. As President of Titanium Technologies, Ms. Dignam stood up the TT Transformation Plan, delivered significant operational savings in 2023, refocused the portfolio to deliver more customer value, and developed process improvements for better resource utilization across the manufacturing circuit. During her tenure on Advanced Performance Materials, she reshaped the portfolio to focus resources on secular growth opportunities in Clean Energy and Advanced Electronics. To further accelerate growth, she drove strategic partnerships and initiatives across the globe, and improved the overall cost structure of the business, laying the foundation for further cost optimization.



## Proxy Summary (continued)

**CORPORATE GOVERNANCE HIGHLIGHTS**

| **4.5 years** | **56%** | **89%** | **NEW** |
|---|---|---|---|
| Average Tenure of Director Nominees | Of Director Nominees are Diverse with Respect to Gender or Ethnic Diversity | Director Nominee Independence & Independent Board Chair | Environmental, Health, and Safety & Operational Performance Committee |

**SUSTAINABILITY HIGHLIGHTS**

**Innovation and Sustainable Solutions**
- Announced the launch of our 50-50 joint venture with BWT FUMATECH Mobility GmbH to help meet demand which is critical for scaling the global hydrogen economy.

**Environmental Leadership**
- In 2022, we signed a commitment with the Science Based Targets Initiative (SBTi) to establish science-based targets for scopes 1, 2, and 3 GHG emissions and continued our engagement in 2023 in line with expected validation timelines.

**Community Impact**
- In 2023, awarded approximately $5.6 million in grants in support of our Vibrant Communities goal to improve lives by increasing access to STEM skills, safety initiatives, and sustainable environment programs within the communities where we operate.

**Greatest Place to Work**
- In 2023, 100% of eligible employees met the annual corporate ethics and compliance training requirement by completing the Living Integrity Code of Conduct Training.
- 92% of our global workforce operates in areas with Great Place to Work® certification.

**COMPENSATION HIGHLIGHTS**

**Pay-For-Performance**
- The 2023 AIP design was tied to our performance against financial and sustainability (previously ESG) metrics.
- 2023 CEO Pay elements are 88% at risk and NEOs are 72% at risk.
- CLDC-led adjustments to incentive compensation metrics for working capital timing actions, and use of full negative discretion for former executive officers.

**Annual Say-On-Pay**
- At Chemours' 2023 Annual Meeting, shareholders approved the Company's "Say-on-Pay" proposal with 96% of the votes cast in support of the executive compensation program.

This Proxy Statement includes estimates, projections, statements relating to our business plans, objectives, and expected operating results that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements may appear throughout this report, including in "Executive Compensation — Compensation Discussion and Analysis." These forward-looking statements generally are identified by the words "believe," "project," "expect," "anticipate," "estimate," "intend," "strategy," "future," "opportunity," "plan," "may," "should," "will," "would," "will be," "will continue," "will likely result," and similar expressions. Forward-looking statements are based on current expectations and assumptions that are subject to risks and uncertainties that may cause actual results to differ materially. We describe risks and uncertainties that could cause actual results and events to differ materially in "Risk Factors," "Quantitative and Qualitative Disclosures about Market Risk," "Forward-Looking Statements," and "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections of our Annual Report. Readers are cautioned not to place undue reliance on forward-looking



## Proxy Summary (continued)

statements, which speak only as of the date they are made. We undertake no obligation to update or revise publicly any forward-looking statements, whether because of new information, future events, or otherwise.

This Proxy Statement includes website addresses and references to additional materials found on those websites. These websites and materials are not incorporated by reference herein.



## Proposal 1 — Election of Directors

Nine current members of the Board are standing for re-election to hold office for a one-year term, or until their successors are duly elected and qualified.

Each nominee has agreed to be named in this Proxy Statement and to serve if elected. Although Chemours knows of no reason why any of the nominees would not be able to serve, if any nominee is unavailable for election, the proxy holders may vote for another nominee proposed by the Board of Directors. In that case, your shares will be voted for that other person.

### DIRECTOR QUALIFICATION PROCESS

The Nominating and Corporate Governance Committee ("NCG Committee") considers potential candidates suggested by Board members, as well as management, shareholders, search firms and others.

Our Corporate Governance Guidelines describe qualifications for directors. Directors are selected for their:

- Integrity and character
- Sound, independent judgment
- Breadth of experience
- Keen insight and knowledge
- Business acumen
- Significant professional accomplishments

The specific skills, experience and criteria the Board may consider, and which may vary over time depending on current needs, includes:

- Leadership
- Experience involving technological innovation
- Relevant industry experience
- Financial expertise
- Corporate governance
- Compensation and succession planning
- Familiarity with issues affecting global businesses
- Experience with worldwide business operations, strategy, and management
- Cybersecurity
- Environment, health, safety and sustainability
- Risk management
- Other board experience
- Government service

Diversity in experience, gender and ethnicity that contribute to the total mix of viewpoints and experience represented on the Board, is also a key selection criterion. The Board's commitment to diversity in its membership is reflected in how its diversity levels have evolved over time. From 2021 to 2023, the gender diversity on our Board and the racial or ethnic



## Proposal 1 — Election of Directors (continued)

diversity of our Board both increased. As of last year's Annual Meeting, our Board was 44% diverse with respect to gender and 33% diverse with respect to race or ethnicity. The graph below depicts the Board's diversity levels over time:



The Board has demonstrated a track record of diversity in its membership. Going forward, we will continue to ensure diversity is a central part of the Nominating and Corporate Governance Committee's deliberations regarding potential director appointments and broader refreshment plans.

Directors are expected to devote the necessary time, energy, and attention to ensure diligent performance of their responsibilities. When selecting candidates for nomination, the NCG Committee considers these factors, among other items, to assure new directors have the highest personal and professional integrity. In addition, selected director nominees are required to have demonstrated exceptional ability and judgment and will be most effective, in conjunction with other directors, in serving the long-term interests of all shareholders. The NCG Committee will not nominate for election as a director, a partner, member, managing director, executive officer or principal of any entity that provides accounting, consulting, legal, investment banking or financial advisory services to the organization.

Once the NCG Committee has identified a prospective candidate, the NCG Committee will make an initial determination as to whether to conduct a full evaluation of the candidate. This initial determination will be based on whatever information is provided to the NCG Committee with the recommendation of the prospective candidate, as well as the NCG Committee's own knowledge of the prospective candidate. This may be supplemented by inquiries to the person making the recommendation or others.

The preliminary determination will be based primarily on the likelihood that the prospective nominee can satisfy the factors described above. If the NCG Committee determines, in consultation with the Chair of the Board and other Board members, that further consideration is warranted, it may gather additional information about the prospective nominee's background and experience.

In connection with this evaluation, the NCG Committee will determine whether to interview the prospective nominee. One or more NCG Committee members and other directors, as appropriate, may interview the prospective nominee in person or by telephone. After completing its evaluation, the NCG Committee will decide whether to make a recommendation to the full Board for its consideration.

The NCG Committee evaluates director candidates suggested by shareholders, applying the factors for potential candidates described above, and considers the additional information provided by the shareholder or gathered by the NCG Committee.



## Proposal 1 — Election of Directors (continued)

Shareholders wishing to suggest a candidate for director should write to the Corporate Secretary.

A shareholder's written communication to the Corporate Secretary should be delivered to The Chemours Company, 1007 Market Street, Wilmington, DE 19801, Attention: Corporate Secretary. Shareholders who wish to nominate candidates for the Board of Directors must follow the procedures described under "2025 Annual Meeting of Shareholders — Procedures for Submitting Shareholder Proposals and Nominations" in this Proxy Statement on Page 83.

### DIRECTOR NOMINEES

The following information describes certain information regarding our director nominees.

### DIRECTOR NOMINEE COMPOSITION



### DIRECTOR SKILLS, EXPERIENCE, AND BACKGROUND

The NCG Committee recommended to the Board the nominees named in this Proxy Statement. Based on this recommendation and each nominee's credentials and experience outlined below, the Board has determined that each nominee will make a significant contribution to our Board, is willing to devote the necessary time, energy, and attention to assure diligent performance of their responsibilities, and should serve as a director of the Company.

Based on the processes described above and the Board's ongoing commitment to refreshment and recruiting leadership with additive experiences, the NCG Committee appointed Pamela Fletcher to the Board in February 2024. Ms. Fletcher brings a depth of expertise in the industrials and sustainability space. She has led key initiatives while serving as the Senior Vice President and Chief of Sustainability of Delta Airlines. She applied innovative approaches to achieve sustainability gains in both the aviation and ground support fleet. Prior to joining Delta, Ms. Fletcher had an impressive career at General Motors where she held various leadership positions during her 17-year tenure. Additionally, in late 2023 we added Alister Cowan to our Board. Mr. Cowan has over 30 years of experience serving as a Chief Financial Officer in companies throughout Europe, New Zealand, and Canada. Our Board benefits from his perspectives and financial acumen developed during his distinguished career, along with his experience in corporate governance and boardroom leadership.

The following skills matrix and biographical information about each of the nominees includes information regarding the nominee's service as a director, business experience, current or recent director positions, and the experiences, qualifications, attributes or skills that factored into the Board's determination for nomination. The Board regularly reviews the skills, experience, and background that it believes are desirable to be represented on the Board.

### DIRECTOR SKILLS MATRIX

We maintain a skills matrix where directors indicate whether they have expertise and professional background in areas we believe are essential to serve on the Chemours Board of Directors. The table below lists these areas of expertise, as well as gender, race and ethnicity for our director nominees.



## Proposal 1 — Election of Directors (continued)

| | CURTIS V. ANASTASIO | ALISTER COWAN | MARY B. CRANSTON | DENISE DIGNAM | DAWN L. FARRELL | PAMELA F. FLETCHER | ERIN N. KANE | SEAN D. KEOHANE | GUILLAUME PEPY |
|---|---|---|---|---|---|---|---|---|---|
| Leadership (Strategy and Execution) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Chemical Industry Experience | ■ | ■ | ■ | ■ | | | ■ | ■ | |
| Financial Expertise | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ |
| Global Business Strategy and Management | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Global Business Operations | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Corporate Governance | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Other Board Experience | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Technological Innovation | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Compensation & Succession | ■ | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Risk Management | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Environmental, Health, Safety and Sustainability | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| **Additional Experience** | | | | | | | | | |
| Marketing | ■ | | | ■ | ■ | | ■ | ■ | |
| Business Development | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | ■ |
| Mergers & Acquisitions | ■ | ■ | ■ | | ■ | ■ | | | ■ |
| Investor Relations | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | |
| Information Technology | ■ | ■ | ■ | | | | | | |
| Logistics & Supply Chain | ■ | ■ | | ■ | | | ■ | ■ | ■ |
| Legal Expertise | ■ | | ■ | | | | | | |
| Regulatory Experience | ■ | ■ | ■ | | ■ | ■ | | | ■ |
| Cybersecurity | ■ | ■ | ■ | | | | | | |
| **Gender** | | | | | | | | | |
| Female | | | ■ | ■ | ■ | ■ | ■ | | |
| Male | ■ | ■ | | | | | | ■ | ■ |
| **Race/Ethnicity** | | | | | | | | | |
| African American or Black | | | | | | | | | |
| Alaskan Native or American Indian | | | | | | | | | |
| Asian | | | | | | | | | |
| Hispanic or Latinx | | | | | | | | | |
| Native Hawaiian or Pacific Islander | | | | | | | | | |
| White or Caucasian | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |



## Proposal 1 — Election of Directors (continued)

### DIRECTOR NOMINEES

| CURTIS V. ANASTASIO |
| --- |



**Director Since:** 2015

**Committee Memberships:** Audit (Chair), Nominating & Corporate Governance

**Term of Office Expires:** 2024

**Age:** 67

**BUSINESS EXPERIENCE:**

- President, Chief Executive Officer and Executive Director of NuStar GP Holdings, LLC (2006 to 2013)
- President, Chief Executive Officer and Executive Director of NuStar Energy, L.P. (2001 to 2013)

**OTHER BOARDS AND POSITIONS**

- Par Pacific Holdings, Inc. (2014 to present)
- Core Laboratories (2023 to present)
- Chairman, GasLog Partners LP (2014 to 2023)

**Reason for Nomination:** Mr. Anastasio has leadership experience as both an executive officer and board member. As a former chief executive officer, he is able to provide the Board with valuable insight on global business management and financial matters which is further enhanced by his role as Audit Committee Chairman of Par Pacific Holdings, Inc. and as a former director and member of the Audit Committee of the Federal Reserve Bank of Dallas. Mr. Anastasio also provides valuable knowledge in the areas of energy, legal matters, logistics, marketing and mergers and acquisitions.

| ALISTER COWAN |
| --- |



**Director Since:** 2023

**Committee Memberships:** Audit, Environmental, Health, and Safety & Operational Performance

**Term of Office Expires:** 2024

**Age:** 59

**BUSINESS EXPERIENCE:**

- Senior Advisor (2023), Chief Financial Officer (2014 to 2023) of Suncor Energy Inc.
- Chief Financial Officer of Husky Energy, Inc. (2008 to 2014)
- Executive Vice President, Finance and Chief Financial Officer of British Columbia Hydro and Power Authority (2004 to 2008)
- Vice President, Finance of Direct Energy Services, Inc. (2003 to 2004)
- Vice President and Comptroller (2000 to 2003) TransAlta Corporation, Chief Financial Officer, TransAlta New Zealand Ltd. (1998 to 2000), Group Treasurer (1997 to 1998), and Director, Finance (1996 to 1997) of TransAlta Corporation

**OTHER BOARDS AND POSITIONS**

- Non-Executive Director of Great Canadian Oil Sands Ltd (2016)

**Reason for Nomination:** Mr. Cowan has over 30 years of financial expertise in various companies across the globe. As a former Chief Financial Officer, he brings to the Board valuable insights and experience in financial operations, corporate development, information technology strategy and capital allocation. He also has significant experience in corporate strategy and previously led the Investment Committee at Husky Energy Inc.



## Proposal 1 — Election of Directors (continued)

---

### MARY B. CRANSTON



**Director Since:** 2015

**Committee Memberships:** Compensation and Leadership Development, Nominating & Corporate Governance (Chair)

**Term of Office Expires:** 2024

**Age:** 76

**BUSINESS EXPERIENCE:**

- Senior Partner and Chair Emeritus, Pillsbury Winthrop Shaw Pittman (2007 to 2011); Chair and Chief Executive Officer (1999 to 2006)

**OTHER BOARDS AND POSITIONS**

- TPG, Inc. (2022 to present)
- Visa, Inc. (2007 to 2022)
- McAfee, Inc. (2018 to 2022)
- MyoKardia, Inc. (2016 to 2020)

**Reason for Nomination:** Ms. Cranston has over 30 years of experience in mergers and acquisitions as a legal advisor and oversaw two large mergers while she was the Chief Executive Officer of Pillsbury. Ms. Cranston has experience in finance, risk management, legal, corporate governance, trade, antitrust, telecommunications, SEC enforcement and environmental law. Through her board positions, she has dealt with cybersecurity issues, stockholder activism and shareholder engagement.

---

### DENISE DIGNAM



**Director Since:** 2024

**Committee Memberships:** President & CEO

**Term of Office Expires:** 2024

**Age:** 58

**BUSINESS EXPERIENCE:**

- President and Chief Executive Officer, The Chemours Company (2024 to present); President, Titanium Technologies (2023 to 2024); President, Advanced Performance Materials (2021 to 2023); Vice President of Global Operations, Fluoroproducts (2019 to 2023); Global Senior Business Director, Fluoropolymers (2016 to 2019); North American Business Director, Fluoropolymers (2015 to 2016)
- Director of Global Supply Chain, Fluoroproducts, DuPont (2013 to 2014); Global Business Manager, Sulfur Products (2009 to 2013); Global Sales Manager, Clean Technologies (2007 to 2009)

**OTHER BOARDS AND POSITIONS**

- National Mining Association (2023 to present)
- Kulicke & Soffa Industries (2023 to present)
- United States Chamber of Commerce (2022 to 2023)

**Reason for Nomination:** Ms. Dignam has been with Chemours since its launch as a publicly-traded company, proving herself as an instrumental leader of the organization. She possesses more than 35 years of experience in the chemicals industry where she has held senior roles in business and operations, sales and marketing, commercialization, and supply chain. Most recently, she led the Titanium Technologies segment, delivering significant operational savings, refocusing the portfolio, and developing process improvement for better resource utilization.

---



## Proposal 1 — Election of Directors (continued)

### DAWN F. FARRELL



**Director Since:** 2015

**Committee Memberships:** Chair of the Board

**Term of Office Expires:** 2024

**Age:** 64

**BUSINESS EXPERIENCE:**

- President and Chief Executive Officer, Trans Mountain Corporation (2022 to present)
- President and Chief Executive Officer, TransAlta Corporation (2012 to 2021)
- Chief Operating Officer, TransAlta Corporation (2009 to 2011); Executive Vice President, Commercial Operations and Development (2007 to 2009)
- Executive Vice President of Generation, BC Hydro (2003 to 2006)

**OTHER BOARDS AND POSITIONS**

- Portland General Electric ("PGE") (2022 to present)
- Mount Royal University, Chancellor (2020 to present)
- Canada Natural Resources, Ltd. (2021 to 2022)

**Reason for Nomination:** Mrs. Farrell is a former chief executive officer and a board member for several publicly traded companies. She provides leadership insight to the Board in global business management and operations, shareholder relations, risk management and financial matters. Mrs. Farrell also has experience in business strategy, generation operations, large acquisitions, major regulatory and financing negotiations, and environmental, health and safety programs.

### PAMELA F. FLETCHER



**Director Since:** 2024

**Committee Memberships:** Compensation and Leadership Development, Nominating and Corporate Governance

**Term of Office Expires:** 2024

**Age:** 57

**BUSINESS EXPERIENCE:**

- Senior Vice President and Chief Sustainability Officer, Delta Airlines (2022 to 2023)
- Vice President Global Innovation (2018 to 2022) General Motors Company; Vice President Electric Vehicles (2017 to 2018); Executive Chief Engineer Autonomous and Electric Vehicles and New Technology (2012 to 2016), Chief Engineer Chevrolet Volt Propulsion System (2008 to 2011)

**OTHER BOARDS AND POSITIONS**

- Lumentum Holdings (2023 to present)
- Coherent, Inc. (2017 to 2022)
- Hughes Research Lab (2018 to 2020)

**Reason for Nomination:** Ms. Fletcher brings a wealth of experience in the industrials space. In her role as Senior Vice President and Chief Sustainability Officer of Delta Airlines, she accelerated the company's decarbonization efforts through a holistic approach that applied innovative sustainability gains in both the aviation fleet and ground support fleet.

Her impressive 17-year career at General Motors which covered multiple leadership roles provides her with unique industry knowledge global business operations, engineering, technology and sustainability. Notably, Ms. Fletcher spearheaded the development and commercialization of electric vehicles and related technologies in her roles as Vice President Electric Vehicles and Executive Chief Engineer Electric and Autonomous Vehicles and New Technology.



## Proposal 1 — Election of Directors (continued)

---

### ERIN N. KANE



**Director Since:** 2019

**Committee Memberships:** Audit, Compensation and Leadership Development, Environmental, Health, and Safety & Operational Performance

**Term of Office Expires:** 2024

**Age:** 47

**BUSINESS EXPERIENCE:**

- President and Chief Executive Officer, AdvanSix Inc.(2016 to present)
- Vice President and General Manager, Resins and Chemicals, Honeywell (2014 to 2016); Business Director, Chemical Intermediates, (2011 to 2014); Global Marketing Manager, Resins and Chemicals (2008 to 2011); Global Marketing Manager, Authentication Technologies (2006 to 2008); Product Marketing Manager, Specialty Additives (2004 to 2006); Six Sigma Blackbelt, Specialty Materials (2002 to 2004)
- Six Sigma and Process Engineering, Elementis Specialties and Kvaerner Process (prior to 2002)

**OTHER BOARDS AND POSITIONS**

- American Chemistry Council (2017 to present)
- American Institute of Chemical Engineers (2019 to 2021)

**Reason for Nomination:** Ms. Kane brings an extensive background in the chemical industry and global manufacturing to the Board. In her role as Chief Executive Officer, she led the spin-off of AdvanSix into an independent, NYSE-listed public company in 2016 and its continued growth as a chemistry company. Her background provides her with unique industry knowledge in business operations and strategy, engineering technology, health safety and environmental matters, operational excellence as well as executive management and corporate governance.

---

### SEAN D. KEOHANE



**Director Since:** 2018

**Committee Memberships:** Compensation and Leadership Development (Chair), Nominating and Corporate Governance

**Term of Office Expires:** 2024

**Age:** 56

**BUSINESS EXPERIENCE:**

- President and Chief Executive Officer, Cabot Corporation (2016 to present)
- Executive Vice President, Reinforcement Materials, Cabot Corporation (2014 to 2016); Senior Vice President, Performance Chemicals (2012 to 2014); Vice President and General Manager, Performance Chemicals (2008 to 2012); Vice President (2005 to 2008); joined Cabot Corporation (2002)
- General Management positions, Pratt & Whitney, a division of United Technologies (prior to 2002)

**OTHER BOARDS AND POSITIONS**

- American Chemistry Council (2016 to present)

**Reason for Nomination:** Mr. Keohane has a deep understanding of the international chemicals industry. As Chief Executive Officer of Cabot Corporation, Mr. Keohane brings an expertise in commercial and operational excellence, a commitment to safety, health and environmental leadership, and a strong track record of business development in international markets, particularly China. Mr. Keohane's profound knowledge and expertise in commercializing technology, risk management and broad financial matters including investor relations are a key benefit to our Board of Directors.

---



## Proposal 1 — Election of Directors (continued)

### GUILLAUME PEPY



**Director Since:** 2022

**Committee Memberships:** Audit, Environmental, Health, and Safety & Operational Performance

**Term of Office Expires:** 2024

**Age:** 65

**BUSINESS EXPERIENCE:**

- Chairman and Chief Executive Officer, Societe Nationale SNCF SA (2008 to 2019), Chief Operating Officer (2003 to 2008), Deputy Chief Executive Officer (1998 to 2003), Head of Mainland Services (TGV) (1997 to 1998)
- Deputy Chief Executive Officer, B2B Markets, Taylor Nelson Sofres SA (1996 to 1997)
- Chief Strategy Officer and Investment Director, SNCF (1993 to 1995)
- Chief of Staff to Minister of Labour, French Government (1991 to 1993), Chief of Staff to Minister of Labour (1990 to 1991)
- Chief of Staff, SNCF (1989 to 1990)
- Advisor to Minister of Budget, French Government (1988 to 1989)
- Deputy General Secretary, Council of State (1984 to 1988)

**OTHER BOARDS AND POSITIONS**

- Chairman to Orpea Group (2022 to present)
- Salesforce, Inc., EMEA Advisory Board (2020 to present)
- LYDEC (Suez Morocco), Chairman (2021 to 2022)

**Reason for Nomination:** Mr. Pepy brings a wealth of public and government sector experience to the Board in addition to expert perspective and insights into the regulatory and environmental landscapes in Europe. With his history of leading successful business transformations, Mr. Pepy's executive and board skills will continue to support and guide our management team in their day-to-day executive decision-making. While serving as Chief Executive Officer, Mr. Pepy had experience supervising principal financial officers and accounting personnel. He also served as Chair or Member of several Audit and Risk Committees.

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" THE ELECTION OF EACH
OF THE NINE DIRECTOR NOMINEES**



# Corporate Governance

## CORPORATE GOVERNANCE HIGHLIGHTS

- All directors elected annually
- All non-employee director nominees are independent
- Independent Board Chair
- Highly qualified directors reflect broad and diverse mix of business backgrounds, skills and experiences
- Board Refreshment — onboarded new directors in 2018, 2019, 2021, 2022, 2023 and 2024
- 56% of our Director nominees are diverse based on gender or ethnicity
- 4 of 5 Audit Committee members are "audit committee financial experts"
- Majority voting for uncontested elections with a director resignation policy
- Executive sessions of independent directors at each regularly scheduled Board meeting
- Elimination of supermajority voting provision recommended and submitted for shareholder vote in 2018 and in 2021
- NCG Committee responsible for sustainability oversight
- Established the Environmental, Health, and Safety & Operational Performance Committee ("EHS & O")
- Clawback (with express linkage to Code of Conduct and other corporate policies) and Anti-Hedging policies and adopted Executive Officer Clawback policy in compliance with SEC Rule 10D-1 and NYSE Listing Standards
- Directors and Officers must meet share ownership guidelines
- Annual Board and Committee self-evaluations
- Commitment to sustainability as described in the highlights on Page 17
- Enhanced Director Code of Conduct in 2023

## CORPORATE GOVERNANCE PRACTICES

The Board is committed to the highest standards of corporate governance, which is essential for sustained success and long-term shareholder value.

The Board adopted Corporate Governance Guidelines which provide the framework for the Board's corporate governance. The NCG Committee annually reviews and assesses the Corporate Governance Guidelines and recommends changes to the Board as appropriate. Among other things, the Corporate Governance Guidelines provide that:

- Independent directors meet regularly in executive session in conjunction with regularly scheduled Board meetings
- Directors have access to the organization's management and advisors, and are encouraged to visit the corporate facilities
- As necessary and appropriate, the Board and its Committees may retain outside legal, financial or other advisors
- The Board will conduct an annual self-evaluation of its performance with a particular focus on overall effectiveness

| Spotlight: Board Evaluation in Action |
| --- |
| The Board and each committee make an annual self-evaluation of its performance with a particular focus on overall effectiveness. The Nominating and Corporate Governance Committee is responsible for overseeing the self-evaluation process.<br><br>As a result of previous years' self-evaluation processes, the Board began to explore establishing a new standing committee for environmental, health, and safety and operational performance topics in early 2023. This process led the Board to determine it was prudent to establish a new standing committee for environmental, health, and safety and operational performance topics. The formation of this committee aligns with our commitment to our values, particularly our commitment to safe and responsible operations. Historically, the full Board has provided oversight of these topics and will continue to do so. This committee structure will enhance and support the Board in oversight of these matters. |



## Corporate Governance (continued)

- Directors will avoid any actual or potential conflicts with the interests of the Company, and if any actual or potential conflicts develop, will report all facts to the Board in a timely manner to resolve the conflict, or the director may resign

- Shareholders and others interested in communicating directly with the Board, Chair or other independent director may do so by writing to the Corporate Secretary. The Board's independent directors have approved procedures for handling such correspondence received by the Company and addressed to the Board

The Corporate Governance Guidelines, along with the Charters of the Board Committees, the Company's Code of Conduct, Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Controller, and Code of Business Conduct and Ethics for the Board of Directors are available on the Company's website at www.chemours.com under the heading "Investor Relations" and then "Corporate Governance."

### SUSTAINABILITY HIGHLIGHTS

The world increasingly expects companies to provide essential products, responsibly. At Chemours, we share those expectations, which is why sustainability, and our commitment to it, are embedded in everything we do. We are committed to making chemistry as responsible as it is essential and have set forth Corporate Responsibility Commitment (CRC) goals in four core areas — Innovation & Sustainable Solutions, Environmental Leadership, Community Impact and Greatest Place to Work For All. The following table shows the alignment between our CRC goals and the United Nations Sustainable Development Goals.

| Our Pillars | Our 2030 CRC Goals | UN SDGs |
|---|---|---|
| INNOVATION AND SUSTAINABLE SOLUTIONS | **Sustainable Offerings**<br>❭ Ensure that 50% or more of our revenue comes from offerings that make a specific contribution to the UN SDGs | 2, 3, 6, 7, 8, 9, 11, 12, 13 |
| | **Sustainable Supply Chain**<br>❭ Establish a baseline for the sustainability performance of 80% of suppliers by spend and demonstrate 15% improvement | 5, 6, 8, 10, 12, 13, 15 |
| ENVIRONMENTAL LEADERSHIP | **Climate**<br>❭ Reduce absolute GHG emissions from operations by 60%<br>❭ Journey to net-zero operations by 2050 | 7, 8, 12, 13 |
| | **Water**<br>❭ Reduce air and water process emissions of FOCs by 99% or more | 6, 8, 12, 14 |
| | **Waste**<br>❭ Reduce our landfill volume intensity by 70% | 8, 12, 15 |
| COMMUNITY IMPACT | **Vibrant Communities**<br>❭ Invest $50 million in our communities to improve lives by increasing access to STEM skills, safety initiatives, and sustainable environment programs | 4, 6, 8, 11, 15 |
| GREATEST PLACE TO WORK FOR ALL | **Empowered Employees**<br>❭ Fill 50% of director level positions and above with women globally<br>❭ Fill 35% of all positions globally with women<br>❭ Fill 30% of all U.S. positions with ethnically diverse employees | 3, 4, 5, 8, 10, 18 |
| | **Safety Excellence**<br>❭ Improve employee, contractor, process, and distribution safety performance by at least 75% | 8 |






## Corporate Governance (continued)

### INNOVATION & SUSTAINABLE SOLUTIONS

- Announced the launch of our 50-50 joint venture with BWT FUMATECH Mobility GmbH that focuses on accelerating the capacity to manufacture fuel cell and humidifier membranes for mobility applications and will expedite the supply of membranes to original equipment manufacturers (OEMs) to help meet demand which is critical for scaling the global hydrogen economy.

- Executed a memorandum of understanding (MOU) with TC Energy for the potential development of two electrolysis-based hydrogen production facilities at or near Chemours' Washington Works and Belle manufacturing sites in West Virginia. The MOU supports the companies' participation in and goals of the Appalachian Regional Clean Hydrogen Hub (ARCH2) in West Virginia.

- Our Thermal & Specialized Solutions business announced their international F-gas lifecycle program which aims to advance safe, global recovery, reclaim and reuse across Chemours' production portfolio.

- Met and surpassed our Sustainable Supply Chain goal by assessing sustainability performance of 81% of suppliers by addressable spend, and obtaining a 24% improvement in supplier sustainability performance; in addition, 85% of our supplier partners are above the average threshold of all companies rated by EcoVadis.

### ENVIRONMENTAL LEADERSHIP

- In 2022, we signed a commitment with the Science Based Targets Initiative (SBTi) to establish science-based targets for scopes 1, 2, and 3 GHG emissions and continued our engagement in 2023 in line with expected validation timelines.

- One operating site renewed its Wildlife Habitat Council program and received Gold level certification. As of year-end 2023, we have six total certified sites.

- As of year-end 2022, we achieved a 30% absolute reduction in Scope 1 and 2 GHG emissions since 2018 and we achieved a 53% reduction in fluorinated organic chemical (FOC) process emissions to air and water since 2018.

- Received two awards from the U.S. Department of Energy (DOE) through the Better Building, Better Plants Initiative. The Better Practice Award recognized Chemours for our corporate roadmap to address Scope 1 emissions by reducing FOC process emissions and the Better Project Award recognized a boiler optimization project at the Louisville Works site in Louisville, Kentucky.

- Since the issuance of our 2022 Sustainability Report, we've made additional progress on initiatives that fall under our Environmental Leadership pillar. For example, at our Dordrecht, Netherlands site we completed emissions abatement projects that will reduce FOC process emissions by 80% from the site permitted baseline, and have committed to an additional 30,000 MWh per year of renewable power executed in 2023 to the regional grid at our Changshu, China and Starke, Florida locations.







## Corporate Governance (continued)

COMMUNITY IMPACT

- Awarded approximately $5.6 million in grants in 2023 in support of our Vibrant Communities goal to improve lives by increasing access to STEM skills, safety initiatives, and sustainable environment programs within the communities where we operate.
- Broke ground at Eastside Charter School on a new 24,000 square foot community STEM facility — the Chemours STEM Hub — which will serve as an access point for STEM education and other development opportunities in Wilmington, Delaware. The Hub is anticipated to be completed by the start of the 2024-2025 school year.
- Expanded ChemFEST, our middle school partnership programs, at 5 sites in Belgium, Kentucky, North Carolina, Texas and West Virginia.



**Progress to $50M Vibrant Communities, Investment by 2030**

■ Vibrant Communities Investments since 2018
■ Yet to be Invested

48% / 52%

GREATEST PLACE TO WORK FOR ALL

- In 2023, our teams in Germany, France, Singapore, Taiwan, and Thailand achieved new Great Place to Work[®] certifications and our teams in Belgium, Brazil, Greater China, India, Japan, Mexico, South Korea, Spain, Switzerland and the US maintained their Great Place to Work[®] status. Altogether, 92% of our global workforce operates in areas with Great Place to Work[®] certification.
- In 2023, 100% of eligible employees met the annual corporate ethics and compliance training requirement by completing the Living Integrity Code of Conduct Training.
- As of December 31, 2023, our global gender diversity was 24%, our women in director level and above was at 36%, and our US ethnicity was 21%, as we continue to progress our 2030 diversity goals.
- Chemours has a comprehensive approach to cybersecurity, which includes a robust cybersecurity education focused on cyber risk and prevention measures, using online situational awareness training and continuous phishing simulations.



**Number of Great Places to Work Certifications**

| 2019 | 2020 | 2021 | 2022 | 2023 |
| --- | --- | --- | --- | --- |
| 2 | 2 | 3 | 10 | 15 |

**Percentage of Employees Working in a Great Places to Work™ Certified Locations**

■ Certified ■ Not Certified

8% / 92%



2024 Proxy Statement    **19**

## Corporate Governance (continued)

**EXTERNAL**

    

### BOARD OVERSIGHT OF SUSTAINABILITY

Because sustainability matters are integral to our growth and long-term success, we believe that a two-tiered level of oversight provides the best avenue to integrate sustainability risks and opportunities into our overall business strategy and help us meet the changing demands of all our stakeholders — customers, partners, investors, employees and communities.

| FULL BOARD OF DIRECTORS | | | |
| --- | --- | --- | --- |
| **Sustainability** **Strategy, Standards, Goals, Performance** | | | |
| **Audit Committee** Enterprise Risk Management, Cybersecurity Risk | **Compensation and Leadership Development Committee** Human Capital Management, Recruitment, Development & Retention | **Environmental, Health, and Safety & Operational Performance** EHS Protection Programs, Policies and Practices, Manufacturing Operational Performance | **Nominating and Corporate Governance Committee** Corporate Governance, Policies, Processes, Sustainability and ESG Performance Metrics |

Sustainability is embedded in our business processes, guides how we manage and operate our manufacturing sites, and inspires the new products and offerings we bring to market. Our growth strategy is directly linked to sustainability. Proposed corporate transactions and overall corporate strategy are reviewed by the full Board with input from management on sustainability risks and opportunities. Our Board and its Committees receive regular updates from senior management on sustainability matters, including environmental, health and safety (EHS), social issues, regulatory actions and product stewardship.

Under the oversight of our Board, senior management continues to execute on our CRC goals. With the Board's guidance, we have developed and are advancing progress on goals for climate change, water stewardship, waste management, diversity and inclusion, safety, product sustainability and sustainable sourcing. See update on Page 17.

> To view our Sustainability Report and learn more about our goals, go to:
> https://www.chemours.com/en/sustainability

### BOARD LEADERSHIP STRUCTURE

Mrs. Dawn L. Farrell serves as the Chair of the Board, a position she has held since January 1, 2022, after serving as the Company's Lead Independent Director from July 1, 2021 to December 31, 2021. The Company's governing documents allow the roles of Chair and Chief Executive Officer (CEO) to be filled by the same or different individuals. This approach allows the Board flexibility to determine whether the two roles should be separated or combined based on our needs and the Board's assessment of the Company's leadership from time to time. If the Board does not have an independent chairperson, the Board will appoint a Lead Independent Director and determine the Lead Independent Director's duties and responsibilities. The Board will periodically consider the advantages of having an independent Chair or a combined Chair and CEO and is open to different structures as circumstances may warrant.



## Corporate Governance (continued)

At this time, the Board has determined that separating the roles of Chair and CEO serves our best interests and that of our shareholders. Our CEO and senior management, working with the Board, set the strategic direction for the organization, and the CEO provides day-to-day leadership. The independent Chair leads the Board in the performance of its duties and serves as the principal liaison between the independent directors and the CEO.

### DIRECTOR INDEPENDENCE

The NCG Committee is responsible for reviewing the qualifications and independence of members of the Board and its various committees on a periodic basis, as well as the composition of the Board as a whole. This assessment includes members' qualifications as independent, as well as consideration of skills and experience specific to the needs of the Board.

Director nominees are recommended to the Board by the Committee in accordance with the policies and principles in its Charter. The ultimate responsibility for selection of director nominees resides with the Board. The qualifications that the Board considers when nominating directors is discussed in more detail under "Director Qualification Process" in this Proxy Statement.

**Independent Directors**

The Board assesses the independence of directors and examines the nature and extent of any relations between the Company and directors, their families and their affiliates. The Corporate Governance Guidelines provide that a director is "independent" if he or she satisfies the New York Stock Exchange (NYSE) Listing Standards on director independence and the Board affirmatively determines that the director has no material relationship with the Company (either directly, or as a partner, shareholder or officer of an organization that has a relationship with the Company). The Board has determined that, with the exception of our CEO, Denise Dignam, each of the director nominees — Curtis V. Anastasio, Alister Cowan, Mary B. Cranston, Dawn L. Farrell, Pamela F. Fletcher, Erin N. Kane, Sean D. Keohane, and Guillaume Pepy — are independent.

**Independent Committees**

All members serving on the Audit Committee, the CLDC and the NCG Committee must be independent as defined by the Corporate Governance Guidelines.

In addition, Audit Committee members must meet heightened independence criteria under NYSE Listing Standards and the rules and regulations of the SEC relating to audit committees. Each CLDC member must meet heightened independence criteria under NYSE Listing Standards and the rules and regulations of the SEC relating to compensation committees and be a "non- employee director" pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act").

The Board has determined that each member of the Audit Committee, the CLDC, and the NCG Committee meets the requisite independence and related requirements.

### OVERSIGHT OF RISK MANAGEMENT

The Board of Directors is responsible for oversight of risk management, and its leadership structure, and the Chemours Executive Team ("CET") is accountable for risk management, which is integrated into our annual strategic planning and business and functional managing processes. Risk management is embedded into our line organizations and part of regular, managing processes. There is an established risk assessment cadence, methodology, and systemic approach to risk management throughout the year within the Company with regular and robust risk reporting to management.

The Audit Committee oversees the risk management process, while the full Board oversees the top risks and mitigation actions of the Company. In fulfilling its risk oversight responsibility, the Board receives various management and Board Committee reports and meets with the full CET twice per year to discuss risk management. It also engages in periodic discussions with the Company's officers, as it may deem appropriate. In addition, each of the Board Committees considers the risks within its areas of responsibility. For example, the Audit Committee focuses on risks inherent in the Company's accounting, financial reporting and internal controls and oversees the Company's cybersecurity and information security programs.



## Corporate Governance (continued)

The CLDC considers the risks that may be implicated by the Company's incentive compensation program. The CLDC's assessment of risk related to compensation practices is discussed in more detail in the "Compensation Discussion and Analysis" section of this Proxy Statement.

The NCG Committee considers risks that may be implicated by the Company's political contributions and lobbying expenses as well as any transactions between the Company and related persons. The NCG Committee also oversees the director education program. The NGC Committee's risk oversight responsibilities are discussed in more detail under "Certain Relationships and Transactions" in this Proxy Statement.

The EHS & O Committee provides oversight of the Company's environmental, health and safety risks, and reviews the Company's programs for identifying, assessing, managing, and mitigating such risks.

### SUCCESSION PLANNING

The CLDC, on behalf of the Board, oversees the succession planning process. To assist the Board, the CEO periodically provides the Board with an assessment of senior executives and their potential to succeed to the position of CEO, as well as perspective on potential candidates from outside the organization. The Board makes available, on a continuing basis, the CEO's succession recommendation(s) should he or she be unexpectedly unable to serve. The CEO also provides the Board with an assessment of potential successors to key positions.

The Board's approach to regular succession planning for both planned and unplanned transitions enabled the appointment of two experienced and capable leaders from within Chemours to fill the roles of CEO and Interim CFO. Denise Dignam, who was appointed Interim CEO and has since been appointed President and Chief Executive Officer, has experience leading two businesses that represented over 68% of Chemours' Net Sales in 2023. Matthew Abbott, who serves as Interim CFO, has an extensive background in operational, accounting and internal audit areas during his time at Chemours and as a former audit partner at PricewaterhouseCoopers LLP.

### DIRECTOR EDUCATION

New directors participate in an orientation process to become familiar with the Company and its strategic plans and businesses, significant financial matters, core values including ethics, compliance programs, corporate governance practices and other key policies and practices through a review of background materials, meetings with senior executives and visits to Company facilities. The NCG Committee is responsible for providing guidance on directors' continuing education, and actively monitors and encourages director education opportunities.

### CODE OF CONDUCT

The Company is committed to high standards of ethical conduct and professionalism, and the Company's Code of Conduct confirms the commitment to ethical behavior in the conduct of all activities.

In furtherance of this commitment, the Company has adopted a Code of Conduct, a Code of Business Conduct and Ethics for the Board of Directors, and a Code of Ethics for the CEO, CFO and Controller.

- The Code of Conduct applies to all directors, officers (including the CEO, CFO and Controller) and employees of Chemours, and it sets forth the Company's policies and expectations on a number of topics including avoiding conflicts of interest, confidentiality, insider trading, protection of Chemours and customer property, and providing a proper and professional work environment. The Code of Conduct sets forth a worldwide toll-free and Internet-based ethics hotline, which employees can use to communicate any ethics-related concerns, and the Company provides training on ethics and compliance topics for employees.

- The Code of Business Conduct and Ethics for the Board of Directors applies to all directors, and is intended to (i) foster the highest ethical standards and integrity; (ii) focus the Board and each director on areas of potential ethical risk and conflicts of interest; (iii) guide directors in recognizing and dealing with ethical issues; establish reporting mechanisms; and promote a culture of honesty and accountability.



2024 Proxy Statement     **22**

## Corporate Governance (continued)

- The Code of Ethics for the CEO, CFO and Controller applies to those three executive officers. This Code sets forth the standards of conduct that the CEO, CFO and Controller must uphold while performing his or her duties.

- Each year, the Company trains 100% of its employees on the Code of Conduct.

- In order to continuously improve and evolve its compliance program, the Company engages in regular risk assessments and conducts root cause analyses of any confirmed instances of ethical misconduct.

In fiscal year 2023, there were no waivers of any provisions of (i) the Code of Conduct; (ii) the Code of Business Conduct and Ethics for the Board of Directors; or (iii) the Code of Ethics for the CEO, CFO and Controller. In the event the Company amends or waives any provision of any Code of Conduct or Code of Ethics that relates to any element of the definition of "code of ethics" enumerated in Item 406(b) of Regulation S-K promulgated under the Exchange Act, the Company intends to disclose these actions on the Company website at www.chemours.com.

### SHAREHOLDER ENGAGEMENT

We maintain a very active and broad-based investor relations outreach program to solicit input and to communicate with shareholders on various aspects related to our business and strategy. We also speak to shareholders about governance matters, including our corporate governance profile and our sustainability ambitions and CRC goal progress. Throughout the year, our investor relations team and some of our executive officers and other key employees speak with shareholders at investor conferences, at in-person meetings and in phone conversations.

Following the recent events discussed in this proxy statement and our Annual Report, the Company has commenced a formal process to reach out to our significant stockholders to meet with them to introduce our new President and CEO and help us better understand the views of our investors on key topics, including our Audit Committee review and the Company's remediation plan for the material weaknesses in the Company's internal control over financial reporting disclosed in our Annual Report. This process, which includes the active involvement of our President and CEO and members of our Board, will continue following the filing of this proxy statement.

In 2018, and again in 2021, we proposed and recommended that shareholders vote in favor of eliminating the provisions in our Certificate of Incorporation that require an 80% supermajority vote of shareholders. Despite the Company's significant efforts and the time and expense associated with the solicitation, each vote to eliminate the supermajority provisions fell significantly short of the 80% threshold (receiving the support of only 73.8% of the outstanding shares in 2018, and only 70.9% of the outstanding shares in 2021).

As described in our proxy statement for our 2020 Annual Meeting of Shareholders, the Company undertook, at the direction of the Nominating and Corporate Governance Committee of our Board, an extensive outreach of our shareholders to assess whether the shareholders generally would encourage us to seek to resubmit the proposal for the approval of shareholders at another annual meeting. A significant majority of our shareholders with whom we spoke at that time, and since, have not raised the supermajority voting provisions as an area of concern. For this reason, due to the time and expense associated with resubmitting another supermajority proposal, combined with the unlikelihood of meeting the high voting standard, our Board, at the recommendation of the Nominating and Corporate Governance Committee, determined not to resubmit the proposal at the 2022 annual meeting or at subsequent annual meetings. If, in the course of our ongoing outreach efforts, shareholders express a significant desire to revisit the supermajority voting provisions, we would consider submitting a proposal to remove them at our 2025 Annual Meeting of Shareholders.

### POLICY ON HEDGING TRANSACTIONS

We have adopted a policy that prohibits all officers and directors and all employees that receive or have access to material nonpublic information about the Company from engaging in transactions in publicly traded options, puts, calls or other derivative securities and from entering into hedges or swaps involving the Company's securities. Officers and directors are also prohibited from pledging Chemours securities as collateral for a loan without special exception.



## Board Structure and Committee Composition

The Board currently has four standing Committees: the Audit Committee, the CLDC, EHS & O, and the NCG Committee.

The table below reflects the composition of each Committee as of April 3, 2024.

| | AUDIT COMMITTEE | CLDC | EHS & O COMMITTEE[1] | NCG COMMITTEE |
|---|---|---|---|---|
| Curtis V. Anastasio | C | | | X |
| Alister Cowan | X | | X | |
| Mary B. Cranston | | X | | C |
| Pamela F. Fletcher | | X | | X |
| Erin N. Kane | X | X | C | |
| Sean D. Keohane | | C | | X |
| Guillaume Pepy | X | | X | |
| Sandra Phillips Rogers[2] | X | | | X |
| **X = Member** | | | **C = CHAIR** | |

(1) The EHS & O Committee was formed on 2/12/2024. There were no meetings held in fiscal year 2023.
(2) Sandra Phillips Rogers has informed the Board of her decision to not seek re-election to the Board at the Company's 2024 Annual Meeting.

The Board met eleven times during fiscal year 2023. The Audit Committee met four times during fiscal year 2023, the CLDC met eight times during fiscal year 2023 and the NCG Committee met four times during fiscal year 2023. Each director attended at least 75% of the aggregate number of meetings of the Board and of its committees on which he or she served. Eight of the nine directors who served on the Board at the time of the 2023 Annual Meeting of the Shareholders attended our meeting. Our Corporate Governance Guidelines provide that directors are expected to attend meetings of the Board, its Committees on which they serve, and the Annual Meeting of Shareholders.

Each Committee operates under a written charter. The Charters are available on our corporate website, www.chemours.com, under the heading "Investor Relations" and subheading "Corporate Governance." The principal functions of each Committee are summarized below.

### AUDIT COMMITTEE

The responsibilities of the Audit Committee are more fully described in the Audit Committee Charter and include, among other duties, the fulfillment of its and the Board's oversight responsibilities relating to:

- The integrity of the financial statements of the Company

- The qualifications and independence of the Company's independent auditor, and in connection with the Committee's oversight in this regard, the Chair of the Audit Committee is engaged in the selection process for the audit engagement partner

- The performance of the Company's internal audit function and independent auditors

- Compliance by the Company with legal and regulatory requirements

- The Company's cybersecurity and information security programs

- Conducting an annual Committee self-assessment and an assessment of the independent audit firm, and reporting the results to the full Board

- Conducting a quarterly review of the Company's cybersecurity and information security programs and processes for assessing, identifying, and managing material risks from cybersecurity threats, as well as whether any such risks have affected or are reasonably likely to affect the Company, and the process for complying with any related disclosure requirements



2024 Proxy Statement    **24**

## Board Structure and Committee Composition (continued)

The Audit Committee consists entirely of independent directors, and each meets the heightened independence requirements under NYSE Listing Standards and the rules and regulations of the SEC relating to audit committees. Each member of the Audit Committee is financially literate and has accounting or related financial management expertise, as such terms are interpreted by the Board in its business judgment. Additionally, the Board of Directors has determined, in its business judgment, that four of the five members of the Audit Committee are "audit committee financial experts" for purposes of the rules of the SEC.

### COMPENSATION AND LEADERSHIP DEVELOPMENT COMMITTEE

The responsibilities of the CLDC are more fully described in the CLDC Charter and include, among other duties:

- Assess current and future senior leadership talent, including their development and the succession plans of key management positions (other than CEO)

- Assist the Board in CEO succession planning, including providing oversight of the CEO's succession planning process

- Conduct an annual review of the Company's diversity talent, as well as diversity representation on the slate for key positions

- Oversee the performance evaluation of the CEO based on input from other independent directors versus Board- approved goals and objectives

- Recommend to the independent members of the Board, compensation, including severance agreements as appropriate, for the CEO

- Review and approve compensation and employment arrangements, including equity compensation plans, bonus plans and severance agreements as appropriate, of the CEO and other senior executive officers

- Review the Company's incentive compensation arrangements to determine whether they encourage excessive risk- taking, review and discuss at least annually the relationship between risk management policies and practices and compensation and evaluate compensation policies and practices that could mitigate any such risk. Review and approve the Compensation Discussion and Analysis and the Committee report, and other executive compensation disclosures, as required to be included in the Company's applicable SEC filings

- Conduct an annual Committee self-assessment and an assessment of the independent compensation consultant and report the results to the full Board

The CLDC consists entirely of independent directors, and each member meets the heightened independence requirements under NYSE Listing Standards and the rules and regulations of the SEC relating to compensation committees; and is a "non- employee director" for purposes of Rule 16b-3 promulgated under the Exchange Act.

**Compensation Committee Interlocks and Insider Participation**

During fiscal year 2023, none of the members of the CLDC was an officer or employee of the Company. No executive officer of the Company served on the compensation committee (or other board committee performing equivalent functions) or on the board of directors of any company having an executive officer who served on the CLDC or the Board.

### NOMINATING AND CORPORATE GOVERNANCE COMMITTEE

The responsibilities of the NCG Committee are more fully described in the NCG Committee Charter and include, among other duties:

- Develop and recommend to the Board of Directors a set of corporate governance guidelines

- Identify individuals qualified to become Board members consistent with criteria approved by the Board and recommend to the Board nominees for election as directors, including nominees whom the Board proposes for election as directors at the Annual Meeting



## Board Structure and Committee Composition (continued)

- Review and approve any transaction between the Company and any related person in accordance with the Company's policies and procedures for transactions with related persons

- Oversee our corporate governance practices, including reviewing and recommending to the Board of Directors for approval any changes to the Company's Code of Conduct, Certificate of Incorporation, Bylaws and Committee Charters

- Oversee the Company's policies, performance, and reporting in the areas of sustainability, including environmental, social, governance, and the Corporate Responsibility Commitment 2030 Goals

- Conduct an annual assessment of the Committee's performance, oversee the self-evaluation process of the entire Board of Directors and its other Committees, establish the evaluation criteria, implement the process and report its findings on the process to the Board of Directors

- The NCG Committee consists entirely of independent directors, and each meets the independence requirements set forth in the NYSE Listing Standards

### ENVIRONMENTAL, HEALTH, AND SAFETY & OPERATIONAL PERFORMANCE COMMITTEE

The responsibilities of the EHS&O Committee are more fully described in the EHS&O Committee Charter and include, among other duties:

- Review with management and make recommendations to the Board regarding the effectiveness of the Company's environmental, health, and safety protection programs

- Review with management developments and trends related to environmental, health, and safety protection that may impact the Company

- Assist the Board in overseeing the assessment and management of environmental, health, and safety risks

- Review and discuss the adequacy of the Company's resources dedicated to environmental, health, and safety programs

- Review with management the Company's manufacturing operational performance programs

- Assist the Board in ensuring operational performance excellence at the Company's manufacturing facilities



## Director Compensation

### OVERVIEW

Non-employee directors receive compensation for Board service, which is designed to fairly compensate them for their Board responsibilities and align their interests with the long-term interests of shareholders. The NCG Committee, which consists solely of independent directors, has the primary responsibility to review and consider any revisions to directors' compensation.

During fiscal year 2023, non-employee directors were entitled to the following annual retainers:

| FISCAL YEAR 2023 DIRECTOR RETAINERS | |
|---|---|
| Annual Retainer[1] | $ 100,000 |
| Annual Equity Award[2] | $ 160,000 |
| Non-Executive Chair Retainer[1] | $ 150,000 |
| Audit Committee Chair Retainer[1] | $ 22,500 |
| Compensation and Leadership Development Committee Chair Retainer[1] | $ 17,500 |
| Nominating and Corporate Governance Committee Chair Retainer[1] | $ 17,500 |

(1) Amounts payable in cash may be deferred pursuant to The Chemours Company Stock Accumulation and Deferred Compensation Plan for Directors (the "Directors Deferred Compensation Plan"), which is described further below.

(2) Equity awards are valued as of the grant date and rounded down to the nearest whole share. Equity awards may be deferred pursuant to Directors Deferred Compensation Plan. For 2023, equity awards were in the form of shares of common stock or for directors who elected to defer their equity awards, deferred stock units (DSUs) that convert into shares of common stock when a director leaves the Board or on a grant date anniversary selected by the director. Before DSUs are converted into shares, directors are not entitled to dividends on the DSUs, but they receive dividend equivalents (credited in the form of additional DSUs) that likewise are converted into shares (with any fractional share paid in cash) upon termination of service or on a grant date anniversary selected by the director.

The fees reflected in the table above assume service for a full year. The Company does not pay meeting fees but does pay for or reimburse directors for reasonable expenses related to Board service, including for attending Board, Committee, educational and Company business meetings.

During 2023, the NCG Committee reviewed and recommended to the Board the annual amount of the non-employee director equity and cash compensation. It recommended, and the Board approved an annual retainer of $105,000, beginning January 1, 2024, and an annual equity award in the amount of $160,000, effective April 26, 2023. The Board believes the compensation program is in the best interest of the Company and designed to fairly compensate directors for their Board responsibilities and align their interests with the long-term interests of shareholders.

The Board has adopted share ownership guidelines applicable to non-employee director equity awards. The share ownership guidelines, contained in the Corporate Governance Guidelines, require non-employee directors to hold at least six (6) times the cash portion of their annual retainer worth of Chemours common stock and/or DSUs while serving as a director. Non- employee directors will have five (5) years to attain this ownership threshold from the time of their election to the Board.

### THE CHEMOURS COMPANY STOCK ACCUMULATION AND DEFERRED COMPENSATION PLAN FOR DIRECTORS

Under the Stock Accumulation and Deferred Compensation Plan for Directors, a director is eligible to defer all or part of his or her Board retainer and Committee Chair fees in an interest-bearing notional cash account or stock units until a future year or years, payable in a lump sum or equal annual installments. Interest will accrue on the notional cash account at a rate corresponding to the average 30-year Treasury securities rate applicable for the quarter (or at such other rate as may be specified by the Compensation Committee from time to time) with quarterly compounding. Dividend equivalents will accrue on deferred stock units. This deferred compensation is an unsecured obligation of the Company.



# Director Compensation (continued)

## 2023 DIRECTOR COMPENSATION TABLE

The following table shows information concerning the compensation earned in fiscal year 2023 to non-employee directors:

| DIRECTOR | FEES EARNED OR PAID IN CASH ($)[1] | STOCK AWARDS ($)[2] | ALL OTHER COMPENSATION ($) | TOTAL ($) |
|---|---|---|---|---|
| Curtis V. Anastasio | 122,500 | 159,982 | | 282,482 |
| Bradley J. Bell[4] | | | | — |
| Alister Cowan[5] | 25,000 | 79,996 | | 104,996 |
| Mary B. Cranston | 117,500 | 159,982 | | 277,482 |
| Curtis J. Crawford[6] | 100,000 | 159,982 | | 259,482 |
| Dawn L. Farrell | 250,000 | 159,982 | | 409,982 |
| Erin N. Kane | 100,000 | 159,982 | | 259,982 |
| Sean D. Keohane | 117,500 | 159,982 | | 277,482 |
| Guillaume Pepy | 100,000 | 159,982 | 8,435[3] | 268,417 |
| Sandra P. Rogers | 100,000 | 159,982 | | 259,982 |

(1) Column reflects all cash compensation earned during fiscal year 2023, whether or not payment was deferred pursuant to the Directors Deferred Compensation Plan.

(2) This column represents the dollar amount recognized for financial statement reporting purposes in accordance with FASB ASC 718 as the grant date fair value of DSUs or shares of common stock awarded to the directors in fiscal year 2023. This value is determined by multiplying the number of shares or common stock or DSUs awarded by the closing share price on their respective grant dates — $27.31 on April 26, 2023 and $30.44 on December 15, 2023.

(3) This amount represents the payment of legal fees incurred by Mr. Pepy for tax counseling relating to the foreign tax treatment of his director compensation. This amount was paid in euros and the U.S.-dollar equivalent is shown based on an exchange rate of $1.0797.

(4) Bradley Bell resigned from the Board effective January 2, 2023.

(5) Alister Cowan was appointed to the Board on November 22, 2023.

(6) Curtis Crawford retired from the Board on November 22, 2023.

The aggregate number of DSUs held by each non-employee director at fiscal year-end is as follows:

| NAME | AGGREGATE AWARDS (DSUs) OUTSTANDING AS OF DECEMBER 31, 2023 |
|---|---|
| Curtis V. Anastasio | 67,079 |
| Bradley J. Bell | — |
| Alister Cowan | 2,628 |
| Mary B. Cranston | 70,434 |
| Curtis J. Crawford | — |
| Dawn L. Farrell | 65,743 |
| Erin N. Kane | 39,564 |
| Sean D. Keohane | 32,827 |
| Guillaume Pepy | 12,160 |
| Sandra P. Rogers | 16,065 |



# Security Ownership of Certain Beneficial Owners and Management

## SECURITY OWNERSHIP OF DIRECTORS AND MANAGEMENT

The following table sets forth information with respect to the beneficial ownership of Chemours' common stock as of April 3, 2024 by each of the Company's directors and nominees, named executive officers, and all directors and executive officers as a group.

Amount and nature of beneficial ownership:

| NAME OF BENEFICIAL OWNER | DIRECT[1] | INDIRECT[2] | RIGHT TO ACQUIRE[3] | TOTAL | PERCENT OF CLASS |
|---|---|---|---|---|---|
| Denise Dignam | 18,434 | — | 61,815 | 80,249 | * |
| Kristine M. Wellman | 19,866 | — | 47,789 | 67,655 | * |
| Alvenia Scarborough | 14,823 | — | 31,754 | 46,577 | * |
| Curtis V. Anastasio | — | 3,500 | 67,697 | 71,197 | * |
| Alister Cowan | — | — | 2,652 | 2,652 | * |
| Mary B. Cranston | 2,834 | — | 71,083 | 73,917 | * |
| Dawn L. Farrell | 4,543 | — | 66,348 | 70,891 | * |
| Pamela F. Fletcher | — | — | — | — | * |
| Erin N. Kane | — | — | 39,928 | 39,928 | * |
| Sean D. Keohane | 5,858 | — | 33,129 | 38,987 | * |
| Guillaume Pepy | — | — | 12,272 | 12,272 | * |
| Sandra P. Rogers | — | 378 | 16,213 | 16,591 | * |
| Mark E. Newman[4] | 73,044 | 168,276 | 746,997 | 988,317 | * |
| Jonathan Lock[5] | 24,759 | — | 89,184 | 113,943 | * |
| Sameer Ralhan[6] | 320,749 | — | — | 320,749 | * |
| Edwin Sparks[7] | — | — | — | — | * |
| Susan Kelliher[8] | 84,073 | — | 165,384 | 249,457 | * |
| Directors, nominees and (17 persons) executive officers As a group | 122,078 | 3,878 | 582,594 | 708,550 | 0.47% |

* Indicates ownership of less than 1% of the outstanding shares of Chemours common stock. Each of the Company's executive officers and directors may be contacted at 1007 Market Street, Wilmington, DE 19801.

(1) Shares held individually or jointly with others, or in the name of a bank, broker or nominee for the individual's account.

(2) Shares over which directors, nominees and executive officers may be deemed to have or share voting or investment power, including shares owned by trusts and certain relatives.

(3) Shares which directors and executive officers had a right to acquire beneficial ownership of within 60 days from April 3, 2024, through the exercise of stock options or through the conversion of stock units held under the Company's equity-based compensation plans.

(4) Mr. Newman resigned from his officer and director positions with the Company, effective as of March 22, 2024.

(5) Mr. Lock is on administrative leave.

(6) Mr. Ralhan resigned from his officer position with the Company, effective as of June 19, 2023.

(7) Mr. Sparks resigned from his officer position with the Company, effective as of March 31, 2023.

(8) Ms. Kelliher resigned from her officer position with the Company, effective as of October 1, 2023.



## Security Ownership of Certain Beneficial Owners and Management (continued)

### SECURITY OWNERSHIP OF 5% BENEFICIAL OWNERS

The following table sets forth, as of December 31, 2023, information regarding ownership of Chemours common stock by any entity or person, to the extent known by us or ascertainable from public filings, that is the beneficial owner of more than five percent of the common stock.

| NAME AND ADDRESS OF BENEFICIAL OWNER | NUMBER OF SHARES BENEFICIALLY OWNED | PERCENT OF CLASS[4] |
|---|---|---|
| BlackRock, Inc[1], 50 Hudson Yards New York, NY 10001 55 East 52nd Street | 16,512,174 | 11.1% |
| FMR LLC[2] New York, NY 10055 245 Summer Street Boston, MA 02210 | 16,443,585 | 11.1% |
| The Vanguard Group[3] 100 Vanguard Blvd. Malvern, PA 19355 | 16,028,054 | 10.8% |

(1) Based solely on a Schedule 13G/A regarding holdings in Chemours common stock filed with the SEC on January 24, 2024, BlackRock, Inc. reported that it had sole voting power with respect to 15,889,853 shares and sole dispositive power with respect to 16,512,174 shares as of December 31, 2023.

(2) Based solely on a Schedule 13G/A regarding holdings in Chemours common stock filed with the SEC on February 9, 2024, FMR LLC reported that it had sole voting power with respect to 16,287,179 shares and sole dispositive power with respect to 16,443,585 shares as of December 31, 2023.

(3) Based solely on a Schedule 13G/A regarding holdings in Chemours common stock filed with the SEC on February 13, 2024, The Vanguard Group reported that it had shared voting power with respect to 50,650 shares, sole dispositive power with respect to 15,836,334 shares, and shared dispositive power with respect to 191,720 shares as of December 31, 2023.

(4) Ownership percentages based on 148,587,397 shares outstanding as of December 31, 2023.



## Executive Compensation

**COMPENSATION DISCUSSION AND ANALYSIS**

**Executive Officers for Fiscal Year 2023**

This CD&A primarily focuses on the compensation of our NEOs for fiscal year 2023. The table below represents our NEOs for fiscal year 2023 and their respective titles at the end of fiscal year 2023:

| | |
|---|---|
| **Denise Dignam**[1] | President, Titanium Technologies |
| **Kristine Wellman** | Senior Vice President, General Counsel and Corporate Secretary |
| **Alvenia Scarborough** | Senior Vice President, Corporate Communications and Chief Brand Officer |
| **Susan Kelliher** | Former Senior Vice President, People |
| **Sameer Ralhan** | Former Senior Vice President, Chief Financial Officer |
| **Edwin Sparks** | Former President, Titanium Technologies and Chemical Solutions |
| **Mark Newman**[2] | President and Chief Executive Officer |
| **Jonathan Lock**[3] | Senior Vice President, Chief Financial Officer |

(1)  Ms. Dignam is the CEO of the Company as of March 22, 2024.

(2)  Mr. Newman resigned from his officer and director positions with the Company, effective as of March 22, 2024.

(3)  Mr. Lock is on administrative leave as of February 28, 2024.

This Compensation Discussion and Analysis is organized into six sections:

| **1.** | **2.** | **3.** | **4.** | **5.** | **6.** |
|---|---|---|---|---|---|
| **Executive Summary** | **Executive Compensation Philosophy and Pay-for-Performance** | **Executive Compensation Decision Making** | **2023 Executive Compensation Highlights** | **Company Sponsored Employee Benefits** | **Other Compensation Matters** |



## Executive Summary

**Introduction**

This Compensation Discussion and Analysis ("CD&A") provides a description of the executive compensation received by our Named Executive Officers ("NEOs") for fiscal year 2023.

*Overview of Board Actions*

The primary focus of this CD&A is to detail the executive compensation program and decisions made by our Compensation and Leadership Development Committee for fiscal year 2023. However, as described in the summary section of this proxy statement, in the first quarter of 2024 the Board conducted an internal review overseen by the Audit Committee with the assistance of independent outside counsel. On February 28, 2024, the Board placed two NEOs, in addition to one other member of senior management, on administrative leave and appointed an interim CEO — Denise Dignam — and an interim CFO — Matthew Abbott. Ms. Dignam was subsequently appointed President and Chief Executive Officer on March 22, 2024.

As the Company has communicated publicly, the scope of the Audit Committee's internal review, which was conducted with the assistance of independent outside counsel, included the processes for reviewing reports made to the Chemours Ethics Hotline, the Company's practices for managing working capital, including the related impact on metrics within the Company's incentive plans, certain non-GAAP metrics included in filings made with the SEC or otherwise publicly released, and related disclosures. Specifically, payable and receivable timing actions engaged in by members of senior management who were placed on administrative leave impacted free cash flow targets at the end of relevant periods. Free cash flow metrics are included in executives' incentive plans — particularly in the AIP and historically as one metric in PSUs granted in 2021 and 2022. However, in the first quarter of 2023, the CLDC revised the performance metrics applicable to PSUs granted under the LTIP. For the 2023-2025 PSUs granted in March of 2023, the CLDC increased the emphasis on stock price performance through a relative total stockholder return metric and removed free cash flow conversion as a metric for the PSUs.

The CLDC, with the assistance of its independent compensation consultant, is engaged in a comprehensive evaluation of metrics for fiscal year 2024 with respect to both cash and equity incentive compensation programs. While this evaluation is not yet completed, cash flow remains an important measure of Company performance, and the CLDC expects updated cash flow metrics to include average monthly outcomes over the performance period rather than being measured at a fiscal year end.

Additional detail on actions taken to date by the Board and its committees, along with further plans and a commitment to continued transparency on these topics, can be found in the proxy summary.

As mentioned, the actions engaged in by the senior management team members placed on administrative leave impacted metrics within the Company's incentive plans. As a result of this, the CLDC worked closely with the Audit Committee throughout its internal review, primarily to understand how any actions engaged in by the members of senior management placed on administrative leave impacted performance against free cash flow metrics.

For the performance periods ended December 31, 2023, the Board and CLDC determined the calculation of free cash flow metrics used for incentive compensation determinations by taking into account the net impact of the working capital actions discussed in this proxy statement, which reduced the payouts for incentive compensation tied to those metrics for all NEOs. Further, the Board and CLDC exercised full negative discretion for the former Chief Executive Officer and former Chief Financial Officer resulting in no annual or long-term incentive compensation payouts for those officers for the performance periods ended December 31, 2023. Specifically:

— **Negative Discretion for AIP:** The CLDC and the Board applied full negative discretion to reduce the 2023 AIP awards for the former Chief Executive Officer Mark E. Newman and former Chief Financial Officer Jonathan Lock to $0.

— **Negative Discretion for PSUs:** The CLDC and the Board applied full negative discretion to determine that the former Chief Executive Officer Mark E. Newman and former Chief Financial Officer Jonathan Lock would receive no payouts for the 2021-2023 PSU awards.



## Executive Summary (continued)

**2023 Business Highlights**

2023 was a challenging year for Chemours as the Company faced a challenging market environment and experienced lower year-over-year volumes in our Titanium Technologies (TT) business and the Advanced Materials portfolio of Advanced Performance Materials (APM). This was partially offset by stronger volumes and pricing in Thermal & Specialized Solutions (TSS). While unfavorable factors impacted financial performance, Chemours continued to execute against its business priorities, and remains focused on delivering superior long-term shareholder returns. The Company has delivered above-median total shareholder returns in the last three-year period compared to its compensation peer group.

**Our 2023 results include:**

- Net Sales of $6.0 billion, down (11%) year-over-year
- Net Loss of $(238) million with EPS[1] of $(1.60), down $(5.25) year-over-year
- Adjusted Net Income of $425 million with Adjusted EPS[1] of $2.82, down $(1.84) year-over-year
- Adjusted EBITDA of $1.01 billion, down 25% year-over-year
- Operating Cash Flow of $556 million and capital expenditures of $370 million
- Solid Net Sales growth and double-digit Adjusted EBITDA growth in TSS
- APM Net Sales declined, partially offset by double-digit Net Sales growth in APM's Performance Solutions portfolio
- Achieved more than $50 million in cost savings in 2023 under Titanium Technologies Transformation Plan
- Returned $218 million to shareholders — $149 million in dividends and $69 million in share repurchases
- Total shareholder return of 26.5% over the last three years
- In addition to our financial performance, Chemours achieved a number of important milestones, including:
  - Announced development of two-phase immersion cooling product: Opteon™ 2P50
  - Completed sale of Glycolic Acid business, net cash proceeds of $138 million at low double -digit multiples
  - ARCH2 hydrogen hub granted U.S. Department of Energy award, with Chemours as a project partner
  - Agreed in principle to comprehensively resolve all drinking water claims related to PFAS of a defined class of U.S. public water systems, together with Corteva and DuPont
  - Announced settlement agreement with State of Ohio to resolve PFAS-related claims
  - Maintained its Great Place to Work® certification in all existing countries and became certified in 5 additional countries in 2023

Of the Company's three business segments, TT faced the most challenging market environment, with an extended market downcycle and higher input costs leading to revenues declining 21% to $2.7 billion and Adjusted EBITDA decreasing 52% to $290 million.

TT launched its transformation plan to deliver cost-savings, drive margin improvement over time, and better position the business in key markets and regions. As part of these actions, we made the difficult decision to close our titanium dioxide ($TiO_2$) manufacturing facility in Kuan Yin, Taiwan and take other efficiency measures to streamline and optimize our operations. We achieved approximately $50 million in cost savings in 2023 from these actions, and are on track to take at least another $125 million of cost out of the business in 2024. While we expect a market recovery to be gradual, our focus on cost-efficiency and productivity will position our TT business well in 2024 and beyond.

---

[1] Earnings per share (EPS) on diluted basis



## Executive Summary (continued)

We delivered a strong year in our TSS business. TSS continued to execute well against the secular growth opportunity in low Global Warming Potential (GWP) product adoption around the world, driven by our Opteon™ portfolio of products. This success is attributable in part to the regulatory frameworks promoting the use of low GWP refrigerants, foaming agents and propellants in our primary North American and European markets. For the full year, Net Sales increased 8% to $1.8 billion, and Adjusted EBITDA improved 14% to $685 million.

The work by TSS with equipment OEMs is also driving energy savings in the cold chain and greater adoption of heat pumps to complement increased electrification of both stationary and electric vehicle heating applications. To meet the growing demand for Opteon™ products, we are planning to complete a 40% expansion in Opteon™ YF capacity at our Corpus Christi, Texas facility as a key step in supporting an expectation of mid-to-high single-digit revenue growth in TSS through the end of this decade.

Beyond this planned expansion, the TSS team demonstrated its continued commitment to delivering market-driven innovation with the announcement of Opteon™ 2P50, a new heat-transfer fluid for two-phase immersion cooling (2-PIC). As the world enters a new era of computing power driven by artificial intelligence, Opteon™ 2P50 can help revolutionize how we reduce the energy consumption required to cool data centers and nearly eliminate cooling water use in these facilities. We continue to advance toward market launch for late 2025 or 2026, pending regulatory approvals and other commercialization activities.

APM Net Sales declined 11% to $1.4 billion and Adjusted EBITDA decreased 26% to $273 million driven by contrasting trends between the Advanced Materials (AM) and Performance Solutions (PS) portfolios. AM sales, which are more exposed to economically sensitive end markets, were down 20%; PS sales, which are being driven by growth in high-value clean energy and advanced electronics end markets, increased 11%. Our PS performance was limited in 2023 due to capacity constraints, which will remain until we receive the necessary permits to expand production.

To address our capacity constraints and meet our customers' needs, we are stepping up our investment in Nafion™ membranes for the hydrogen economy and Teflon™ PFA for semiconductor infrastructure. This includes the planned Nafion™ expansion announced for our Villers-Saint-Paul facility in France and the expansion of our PFA production capabilities, key for semiconductor manufacturing, at our Washington Works facility in Parkersburg, West Virginia. We are taking these steps to meet growing demand while investing in strict emissions control and end-of-life management to uphold our leadership in responsible manufacturing of these essential chemistries.

Sustainability is integral to Chemours' strategy and vision. Our products are essential to modern life and to the new, green economy, with technologies that will enable decarbonization, electrification and a cleaner world depending on our chemistries. We are also committed to responsible manufacturing and this year, with the release of our sixth annual Sustainability Report, we showed significant and steady progress on our goals — including emissions reductions.

As a company, we've achieved a 30% reduction in Scope 1 and 2 greenhouse gas (GHG) emissions since 2018 — reaching the halfway point of our 2030 goal to reduce absolute GHG emissions from operations by 60%. We're also proud to have achieved a 53% reduction in total process fluorinated organic chemical (FOC) emissions to air and water — surpassing the halfway point to our 2030 goal of a 99% reduction. And beyond our sites, we are committed to a more sustainable supply chain where we have assessed the sustainability performance of 81% of our suppliers by spend and they have demonstrated a 24% improvement.

Note: Adjusted EBITDA and Adjusted Net Income are non-GAAP financial measures. Please refer to the appendix for a reconciliation of these non-GAAP measures from the most directly comparable GAAP measure.



# Executive Summary (continued)

## EXECUTIVE COMPENSATION PHILOSOPHY

The objectives of Chemours' executive compensation philosophy are rooted in:

- Promoting a culture that aligns executive interests with those of our shareholders and to the Company's strategic and financial priorities that drive shareholder value.

- Providing a competitive Total Direct Compensation (TDC) opportunity designed to attract, retain, and motivate high-performing executive talent.

These objectives are achieved through fixed and variable compensation elements. The CLDC determines the appropriate balance between these elements in setting the TDC opportunity for executives.

| ELEMENT | PURPOSE AND KEY FEATURES |
|---|---|
| Base Salary | ■ Salary paid in cash<br>■ Provides a stable source of income and is a standard element in executive compensation packages<br>■ Compensates for expected day-to-day contribution<br>■ Supports equitable pay practices |
| Annual Incentive Plan (AIP) | ■ Cash incentive earned and awarded annually<br>■ Creates a variable incentive opportunity as a portion of the executive compensation package<br>■ Reinforces and rewards executives for delivering key business goals that are aligned with driving shareholder value<br>■ Pays only when minimum performance criteria are met, and increases payout levels with higher performance results<br>■ Primarily focuses on quantitative metrics but includes qualitative metrics when appropriate<br>■ Includes a mix of corporate and business segment metrics |
| Long-Term Incentive Plan (LTIP) | ■ Long-term equity-based incentives earned and awarded periodically in various forms of equity: PSUs, PSOs, NQSOs, and/or RSUs<br>■ Creates a compensation opportunity aligned with the interests of our shareholders<br>■ Provides incentive to achieve sustained performance and growth over a long time period<br>■ Rewards executives for delivering total shareholder return |



## Executive Summary (continued)

### EXECUTIVE COMPENSATION GOVERNANCE AND BEST PRACTICES

Chemours' executive compensation policies and practices demonstrate a commitment to strong governance standards and include features designed to align the interests of executives with the long-term interests of our shareholders. Policies and governance provisions help mitigate compensation-related risks and enable the CLDC discretion to adjust compensation packages as appropriate to protect shareholders' interests. The table below highlights the key features of Chemours' executive compensation programs and those features that Chemours does not employ:

| WHAT CHEMOURS DOES | WHAT CHEMOURS DOESN'T DO |
|---|---|
| ☑ Pay-for-performance | ☒ Provide income tax gross-ups, other than for international assignment and / or relocation |
| ☑ Deliver total direct compensation predominantly through performance-based pay | ☒ Re-price underwater stock options |
| ☑ Set challenging short- and long-term incentive award goals | ☒ Allow hedging, pledging, short sales, derivative transactions, margin accounts or short-term trading |
| ☑ Target pay and benefits to market competitive levels | ☒ Have a liberal share recycling provision in our equity plan |
| ☑ Maintain robust stock ownership requirements | ☒ Provide single trigger change in control |
| ☑ Maintain a clawback policies for incentive-based compensation | ☒ Offer excessive perquisites |
| ☑ The Board and CLDC have the right to exercise negative discretion | |
| ☑ Annually review the constituents of Compensation peer group and adjust as appropriate | |
| ☑ Undertake an annual review of compensation risk | |
| ☑ Regularly review compensation, especially performance-based compensation to ensure continued alignment with Chemours' strategy | |

### ALIGNING THE INTERESTS OF EXECUTIVES AND SHAREHOLDERS

We believe the structure of our compensation program motivates executives in a manner that aligns their interest with those of our shareholders. The vast majority of target pay is at risk for our executives. For the portion of compensation that is at risk, we believe the strategic and financial goals that we select in our compensation program are important factors for the success of our business and thus our ability to drive long-term shareholder value. We also include relative TSR in our long-term incentive plan to reward outperformance relative to peers over a sustained time period.

The total direct compensation (TDC) for executives places greater weight on at-risk incentive pay and, therefore, fluctuates with business results and stock price. Annually, the CLDC reviews performance against the plan's targets to determine the compensation awarded to executives. The following chart illustrates the percentage of *target* pay at-risk for the CEO and other NEOs on average in the 2023 compensation plan.



## Executive Summary (continued)



Our incentive plan design reinforces these beliefs. The 2023 AIP was tied to our performance against financial and sustainability (previously ESG) metrics. The plan design focused NEOs on execution, delivering for our customers, operating with efficiency and sustainably. The primary metrics in the plan were Adjusted EBITDA and Free Cash Flow — two factors that are closely linked to the long-term growth of Chemours and thus the value of our shareholders' investment. Additionally, the plans reinforced our focus on growth maintaining revenue in both the TSS and APM AIPs and multinational corporations (MNC) market share in the TT AIP. As disclosed in our Annual Report, the CLDC is revising key metrics used in the determination of executive and employees' incentive compensation starting in 2024.

The 2023-2025 Long-Term Incentive Plan (LTIP) was enhanced by design changes to the equity awards granted in March of 2023. The 2023 LTIP awards included Performance Stock Options (PSOs), which were granted with an exercise price that was 10% higher than the Company's stock price on the date of the grant, and as such, the Company's stock price must increase more than 10% before the PSOs have any realizable value. In addition, the three year performance metrics for the 2023-2025 PSUs were also redesigned by enhancing the weighting of the Adjusted Net Income metric to 60% (from 50%) and using a relative TSR metric for the remaining 40% (versus free cash flow conversion as the 40% with a relative TSR modifier in the plan). The CLDC enhanced the LTIP design to balance the need to drive long-term performance and retain key executives. Including relative TSR in this manner also more directly allows the CLDC to reward performance relative to our peers, which supplements absolute TSR as a holistic reflection of management's long-term performance. The 2023 LTIP awards remained heavily performance-weighted (75%) including PSUs, PSOs, and NQSOs delivering value to our executives only if we deliver long-term shareholder value.

**2023 "Say on Pay" Vote Result**

At Chemours' 2023 Annual Meeting, shareholders approved the Company's "Say on Pay" proposal with 96% of the votes cast in support of the executive compensation program. The CLDC takes pride in consistently receiving high support for the Company's "Say on Pay" and is committed to regularly reviewing the program in the context of Chemours' executive compensation philosophy and will continue to consider shareholder input in evaluating program design and decisions.



## Executive Summary (continued)

5 Years of "Say on Pay"

| 2019 | 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|------|
| 95% | 94% | 94% | 95% | 96% |

## 2023 Executive Compensation Highlights

**Named Executive Officer (NEO) Changes**

When analyzing executive compensation for 2023, shareholders should be aware of the following changes to Named Executive Officers in 2023:

■ Denise Dignam assumed the role of President of the Titanium Technologies business segment in March 2023 after replacing Edwin Sparks in the role.

■ Jonathan Lock became the Chief Financial Officer in June 2023, replacing Sameer Ralhan in the role.

■ Kristine Wellman completed her first full year as the General Counsel and Corporate Secretary. Additionally, during 2023, Ms. Wellman assumed responsibility for Corporate Sustainability.

■ Susan Kelliher retired from leading the People function on October 1, 2023. Ron Charles has since assumed this role.

**2023 Annual Incentive Plan (AIP) Design**

The CLDC maintained its focus on aligning the AIP with shareholders' interests. The AIP focused the organization on Adjusted EBITDA and Free Cash Flow. Management and the CLDC believe these measures reinforced the importance of earnings and cash generation to the achievement of Chemours' objectives, as well as their importance to shareholders.

Additionally, consistent with the Company's Corporate Responsibility Commitment goals (CRC), the CLDC continued to include sustainability metrics in the plan and evaluated the best metrics to drive progress against the Company's CRC goals. In 2023, gender diversity and a success measure for a critical greenhouse gas (GHG) emissions reporting system implementation continued to be focus areas. Additionally, the CLDC added a metric related to energy efficiency. The maximum bonus opportunity for the NEOs remained 200%.

**2023 AIP Results**

As documented in the "2023 Business Highlights", 2023 was a challenging year for Chemours as we experienced ongoing lower demand and higher input costs in the year for multiple of our businesses. Of our three business segments, our Titanium Technologies (TT) segment faced the most challenging market environment, with an extended market downcycle and higher input costs, which led to revenues declining by 21% to $2.7 billion and a corresponding 52% reduction in Adjusted EBITDA to $290 million. Our Thermal & Specialized Solutions (TSS) business segment continued to execute well against its secular growth opportunity of low Global Warming Potential (GWP) product adoption around the world. This success is attributed in part to the regulatory frameworks promoting the use of low GWP refrigerants, foaming agents and propellants in our primary North American and European markets. Our APM business segment experienced a 20% Net Sales decline on the one hand in the Advanced Materials portfolio, which is more exposed to economically sensitive end markets, while seeing 11% Net Sales growth in our Performance Solutions portfolio, driven by increased growth in high-value end markets like clean energy and advanced electronics.

Overall, the challenges our teams faced during the year in our TT and APM segments impacted our ability to achieve some AIP metrics at target. Further, the CLDC adjusted the calculation of Free Cash Flow (as defined below) for purposes of the AIP determination to take into account the working capital timing actions. The business segment results reflect the impact of the respective working capital timing actions for each particular segment. This calculation reduced the payout for incentive compensation tied to Free Cash Flow to $0 for all NEOs.

As a result, the Corporate AIP achievement was 23.1%. The AIP outcome for each of the business segments reflected their business results achieving TT 46.8%, TSS 104.6%, and APM 23.1% of overall targeted AIP metrics. The business segment results reflect the impact of the respective working capital timing actions as applicable to each particular segment.



## Executive Summary (continued)

After measuring outcomes of the AIP as described above, the CLDC and the Board applied full negative discretion to reduce the 2023 AIP outcome to 0% for each of Mr. Newman and Mr. Lock.

**2023 Performance Against AIP Targets with Pay Scale Applied**



**2023-2025 Long-Term Incentive Plan (LTIP) Design**

The 2023-2025 Long-Term Incentive Plan (LTIP) was enhanced by design changes to the equity awards granted in March of 2023. The 2023 LTIP awards included Performance Stock Options (PSOs), which were granted with an exercise price that was 10% higher than the Company's stock price on the date of the grant, and as such, the Company's stock price must increase more than 10% before the PSOs have any realizable value. In addition, the three-year performance metrics for the 2023-2025 PSUs were also redesigned by enhancing the weighting of the Adjusted Net Income metric to 60% (from 50%) and using a relative TSR metric for the remaining 40% (versus free cash flow conversion as the 40% with a relative TSR modifier in the plan). With the inclusion of PSOs, the plan had four equally weighted components, which are PSUs, PSOs, NQSOs, and RSUs. PSUs, PSOs, and NQSOs link the NEOs' reward to achievement of key financial and business objectives and appreciation in share price (75% performance based). RSUs encourage retention and mitigate some risk as an inherently less volatile equity vehicle, with some value based on continued employment, while maintaining alignment with shareholders since each RSU has the same value as a share of our common stock.

The PSOs, NQSOs, and RSUs vest annually in three equal installments from the date of grant. The CLDC believes this balance helps reward and retain the Company's critical executive talent. The PSUs are earned based on performance over a three-year performance period. The performance metrics used in the 2023-2025 PSU awards are Adjusted Net Income (60%) and rTSR (40%). Using rTSR as a plan metric is a change from prior years when rTSR was a modifier on stock performance relative to the compensation peer group. The CLDC felt adjusting rTSR to a metric (which replaced the Free Cash Flow Conversion metric) would maintain focus on this critical performance metric while reducing its potential influence on PSU outcome.

Additionally, the CLDC approved the use of "bridge grants," which are equity grants made to NEOs when an off cycle (outside of annual planning in Q1) increase to an NEO's LTIP target is approved — often as a result of an individual being promoted or taking on significant new responsibilities. The intent of the equity grant is to "bridge" the incremental difference between the executive's previous and new LTIP targets. Bridge grants were made to Mr. Lock and Ms. Dignam associated with their promotions. Additionally, Ms. Wellman received a bridge grant related to her increased responsibility for the Corporate Sustainability function which resulted in an increase to her LTIP target. The bridge grants are prorated based on the month of the change to the NEO's LTIP target and were made in the form of RSUs with a three-year graded vesting.



2024 Proxy Statement    **39**

## Executive Summary (continued)

**2021-2023 PSU Award Results**

The achievement for the 2021-2023 PSU award was based on pre-established three-year cumulative targets for Adjusted Net Income and Free Cash Flow Conversion. Those metrics were equally weighted in the plan. Adjusted Net Income results were above target, with an achievement of 149% of target. The CLDC adjusted the calculation of Free Cash Flow to take into account the working capital timing actions. Accordingly, the CLDC determined that Free Cash Flow Conversion achievement was below threshold performance and as such, for this component of the LTIP, there was a 0% outcome with respect to this metric. Based on the equal weighting of those metrics, the blended outcome was 74% of the target PSU award.

The 2021-2023 PSU awards also contained a relative TSR (rTSR) modifier, under which the final level of achievement could be increased or decreased based on Chemours rTSR compared to the peer group. Over the 2021-2023 three-year period, execution on our long-term strategy resulted in Chemours achieving rTSR at the 67th percentile of the peer group, which placed Chemours in the top third of peer group companies. As a result, pursuant to the terms of the PSU awards the 2021-2023 PSU awards vested at the achievement level of 93% of target. The CLDC and the Board applied full negative discretion to determine that Mr. Newman and Mr. Lock would receive no payouts for the 2021-2023 PSU awards.



## Executive Compensation Decision Making

**Compensation Decision Making Responsibilities**

The CLDC applies the following factors to guide executive compensation decisions:

- Alignment of executives' interests with shareholders
- Strategic needs of the Company
- Market pay levels for equivalent roles
- Industry dynamics

The table below summarizes oversight responsibilities and participation in executive compensation decisions:

| | |
|---|---|
| Compensation and Leadership Development Committee | ■ Establish executive compensation philosophy<br>■ Approve incentive compensation programs and determine performance expectations for AIP and LTIP<br>■ Review, discuss, and approve recommendations for all compensation actions for the NEOs, other than the CEO, including base salary, AIP targets and actual payouts, and LTIP targets, grants and earned awards<br>■ Recommend to the independent directors of the Board compensation actions for the CEO, including base salary, AIP targets and actual payouts, and LTIP targets, grants and earned awards |
| All Independent Board Members | ■ Assess performance of the CEO<br>■ Approve all compensation action for the CEO, including base salary, AIP targets and actual payouts, and LTIP targets, grant and earned awards |
| Chief Executive Officer | ■ Provide compensation recommendations for NEOs (other than the CEO) to the CLDC; review, analysis, and final approval of compensation actions are made solely by the CLDC<br>■ Make recommendations based on the CEO's personal review of each NEO's performance, job responsibilities, and importance to the Company's overall business strategy, as well as the Company's executive compensation philosophy<br>■ In consultation with the CFO, after receiving detailed research and recommendations from an independent compensation consultant, recommend AIP and LTIP metrics and targets to the CLDC |
| Independent Consultant to the Compensation and Leadership Development Committee | ■ Provide independent advice, research, and analytical services on a variety of subjects, including compensation of executive officers and executive compensation trends<br>■ Lead discussions with management and the Board in determining metrics and play a significant role in determining the definition of metrics and targets<br>■ Participate in meetings as requested and communicate with the CLDC Chair between meetings<br>■ Evaluate executive compensation policies and guidelines and provide analysis compared to best practices in the industry<br>■ Is engaged by, and reports directly to, the CLDC |

**Independent Compensation Consultant**

The CLDC has retained Farient Advisors (Farient) as its independent compensation consultant to advise on executive compensation matters. Farient provides a variety of consulting services to the CLDC. These services include but are not limited to, advising on market pay practices and compensation best practices, providing competitive pay reviews, reviewing our executive compensation philosophy, reviewing the disclosure of the executive compensation programs in the proxy statement, sharing market trends, opining on incentive plan design and target setting, recommending compensation peer group(s) and providing legislative and regulatory updates. During fiscal year 2023, Farient did not perform any services for Chemours other than advising on executive compensation and non-employee director compensation under its engagement by the CLDC, and the CLDC determined that Farient was independent and that its engagement did not present any conflicts of interest.



## Executive Compensation Decision Making (continued)

**Compensation Peer Group Selection and Competitive Positioning**

In making compensation decisions, the CLDC considers competitive market data from a compensation peer group of companies as one of several reference points. Compensation peer group data is supplemented with broader chemical and general industry data. The CLDC reviews the composition of the compensation peer group annually to ensure that it remains suitable and appropriate for benchmarking pay and performance.

The compensation peer group is composed of publicly-traded U.S. based companies with similar scale, revenue (generally 0.25x to 4x), commodity, diversified and specialty chemicals industries, and business characteristics reflecting Chemours' current state and strategic direction. Market pay data are adjusted using regression to reflect Chemours' relative scale. Thus, data from organizations that are smaller or larger than Chemours are adjusted to better reflect market conditions given the Company's size.

Based on the above criteria, the CLDC chose not to make a change to the compensation peer group, with the exception of removing Venator as the company experienced bankruptcy during the year. Removing Venator from our peer group had little impact on the executives' market pay positions.

The group consists of the following companies:

| | |
|---|---|
| Albemarle Corporation | Element Solutions Inc. |
| Avient Corporation | H.B. Fuller Company |
| Axalta Coating Systems Ltd. | Huntsman Corporation |
| Cabot Corporation | Olin Corporation |
| Celanese Corporation | Trinseo PLC |
| Dupont de Nemours, Inc. | Tronox Holdings PLC |
| Eastman Chemical Company | Westlake Corporation |



## 2023 Executive Compensation Highlights

### BASE SALARY AND PERFORMANCE TARGET OPPORTUNITIES FOR NEOS

The below information reflects the components of the total direct compensation opportunity for our NEOs for the 2023 performance year as compared to the 2022 performance year. For information on the compensation awarded to our NEOs for the 2023 performance period, please see the "2023 Outcomes" section below.

**Mark Newman — President and CEO — Target Total Direct Compensation**

In early 2023, Mark Newman's compensation was adjusted to reflect his impact as the President and CEO in 2022 and further aligned his compensation to the market median in accordance with the Company's executive compensation philosophy. His compensation was recommended by the CLDC, with the support of the Committee's independent compensation consultant and was approved by the Board of Directors in the first quarter of 2023. Mr. Newman's base salary ($1,000,000) and target bonus opportunity ($1,300,000) remained unchanged from the previous year. His target LTIP award opportunity increased to $6,000,000. The LTIP award was granted in March in accordance with our annual grant practices. Mr. Newman's full year total direct compensation at target, which consists of base salary and AIP target and LTIP target opportunities (TDC) was $8,300,000 in 2023.

|  | 2022 | 2023 |
|---|---|---|
| Base Salary | $1,000,000 | $1,000,000 |
| Target AIP Opportunity | $1,300,000 *(130% of salary)* | $1,300,000 *(130% of salary)* |
| Target LTI Opportunity (Grant Value) | $5,100,000 | $6,000,000 |
| Target Total Direct Compensation | $7,400,000 | $8,300,000 |

**2023 Base Salaries of the Other Named-Executive Officers (NEOs)**

Base salaries for the NEOs are intended to be competitive with the market and attract and retain the executive talent needed to successfully execute on our strategy. The CLDC reviews base salaries for NEOs annually in the first quarter. The NEOs' base salaries reflect the scope of their responsibilities, experience, performance, and external market competitiveness. Base salaries represented approximately 28% of overall compensation in 2023.

Mr. Lock's and Ms. Dignam's base salaries were increased in conjunction with their promotions in 2023. Additionally, after considering external market pay data, internal pay equity, and performance, the CLDC approved a base salary increase for Ms. Wellman to $500,000 (an increase of 11%). Ms. Scarborough, Ms. Kelliher, and Messrs. Ralhan's and Spark's base salaries remained unchanged.

| NEO | BASE SALARY AS OF DECEMBER 31, 2022 | BASE SALARY AS OF DECEMBER 31, 2023 |
|---|---|---|
| Jonathan Lock[1] | $ 425,000 | $ 600,000 |
| Denise Dignam[2] | $ 465,000 | $ 550,000 |
| Kristine Wellman | $ 450,000 | $ 500,000 |
| Alvenia Scarborough | $ 350,000 | $ 350,000 |
| Susan Kelliher | $ 425,000 | $ 425,000 |
| Sameer Ralhan[3] | $ 625,000 | $ 625,000 |
| Edwin Sparks[3] | $ 575,000 | $ 575,000 |

(1) Mr. Lock was promoted to Chief Financial Officer effective June 6, 2023. His base salary was increased at the time.

(2) Ms. Dignam was promoted to Business Unit President for TT effective April 1, 2023. Her base salary was increased at the time.

(3) Messrs. Ralhan and Sparks were no longer employed by Chemours on December 31, 2023. The base salary displayed in the December 31, 2023 column is the base salary as of the day they left the organization.



## 2023 Executive Compensation Highlights (continued)

**Annual Incentive Plan (AIP)**

Chemours' AIP is designed to reward executives for achieving and exceeding annual performance goals. Under the AIP, each NEO has a target annual incentive opportunity, expressed as a percentage of base salary. Incentive targets are determined based on the CLDC's review of compensation peer group practices, chemical industry data from proprietary third-party surveys, and the position and scope of responsibilities of each NEO. Incentive targets are reviewed annually in the first quarter of the year.

Mr. Lock's target bonus opportunity was increased in conjunction with his promotion to 75%. Additionally, after considering external market pay data, internal pay equity, and performance, the CLDC approved target bonus opportunity increases for Mses. Wellman and Kelliher to 70%. All other NEOs' AIP targets remained unchanged for 2023.

The following table summarizes 2023 AIP target percentages:

| NEO | BONUS TARGET AS OF DECEMBER 31, 2022 | BONUS TARGET AS OF DECEMBER 31, 2023 |
|---|---|---|
| Jonathan Lock[1] | 50% | 75% |
| Denise Dignam | 75% | 75% |
| Kristine Wellman | 65% | 70% |
| Alvenia Scarborough | 50% | 50% |
| Susan Kelliher | 65% | 70% |
| Sameer Ralhan[2] | 80% | 80% |
| Edwin Sparks[2] | 75% | 75% |

(1) Mr. Lock was promoted to Chief Financial Officer effective June 6, 2023. His target bonus was increased at the time.

(2) Messrs. Ralhan and Sparks were no longer employed by Chemours on December 31, 2023. The target bonus displayed in the December 31, 2023 column is the target bonus as of the day they left the organization.

**Incentive Formula**

Actual annual incentive awards for NEOs in 2023 were determined using the formulas shown below. The calculation of award payments for each NEO was determined based on Chemours' financial and sustainability performance or a combination of Chemours' financial and sustainability performance and business segment financial performance. There is no individual performance component for NEOs in the AIP. The CLDC may only use its discretion to reduce the amount earned.

The AIP awards for Messrs. Newman and Lock, Ms. Wellman, Ms. Scarborough and Ms. Kelliher were determined as follows:



The AIP award for Ms. Dignam was determined as follows:



(1) Chemours Company-wide metrics. Mr. Ralhan was assigned to this plan prior to his departure from the organization.

(2) Ms. Dignam's results were specific to the APM business segment for the first quarter and TT for the remainder of the year. Mr. Sparks was assigned to this plan (TT) prior to his departure from the organization.



## 2023 Executive Compensation Highlights (continued)

**Performance Measures**

The CLDC maintained its focus on aligning management's incentive to the interests of the shareholders. The CLDC approved the plan design that focused the organization on Adjusted EBITDA and Free Cash Flow. Management and the CLDC believe these measures reinforced the importance of earnings and cash generation to the achievement of Chemours' objectives, as well as their importance to shareholders.

Additionally, consistent with the Company's bold Corporate Responsibility Commitment (CRC) goals, the CLDC continued to include sustainability metrics in the plan and evaluated the best metrics to drive progress against the Company's CRC goals. In 2023, gender diversity and a success measure for a critical greenhouse gas (GHG) emissions reporting system implementation continued to be focus areas. Additionally, the CLDC added a metric related to energy efficiency. The maximum bonus opportunity for the NEOs remained 200% in 2023.

The following reflects the weightings for each metric:

| CHEMOURS — AIP for Messrs. Newman, Lock, Ms. Wellman, Ms. Scarborough and Ms. Kelliher (formerly Mr. Ralhan) | WEIGHT |
|---|---|
| Chemours Sustainability | 15.0% |
| Chemours Free Cash Flow | 42.5% |
| Chemours Adjusted EBITDA | 42.5% |

| TITANIUM TECHNOLOGIES — AIP for Ms. Dignam (Q2-Q4) (formerly Mr. Sparks) | WEIGHT |
|---|---|
| Chemours Sustainability | 15.0% |
| Chemours Free Cash Flow | 20.0% |
| Business Segment Free Cash Flow | 20.0% |
| Business Segment EBITDA | 20.0% |
| Business Segment Market Share | 25.0% |

| THERMAL AND SPECIALIZED SOLUTIONS | WEIGHT |
|---|---|
| Chemours Sustainability | 15.0% |
| Chemours Free Cash Flow | 20.0% |
| Business Segment Revenue | 25.0% |
| Business Segment Free Cash Flow | 20.0% |
| Business Segment Adjusted EBITDA | 20.0% |

| ADVANCED PERFORMANCE MATERIALS — AIP for Ms. Dignam (Q1) | WEIGHT |
|---|---|
| Chemours Sustainability | 15.0% |
| Chemours Free Cash Flow | 20.0% |
| Business Segment Revenue | 25.0% |
| Business Segment Free Cash Flow | 20.0% |
| Business Segment Adjusted EBITDA | 20.0% |



## 2023 Executive Compensation Highlights (continued)

**DEFINITIONS OF METRICS:**

— Adjusted EBITDA was defined as income (loss) before income taxes excluding the following items: interest expense, depreciation and amortization; non-operating pension and other post-retirement employee benefit costs, which represents the components of net periodic pension costs and other post-retirement employee benefit costs, which represents the non-service cost component of net periodic pension (income) costs; exchange gains (losses) included in other income (expense), net; restructuring, asset-related, and other charges; gains (losses) on sale of businesses or assets; and, other items not considered indicative of ongoing operational performance and expected to occur infrequently during the Performance Period, including certain litigation related and environmental charges and Qualified Spend reimbursable by DuPont and/or Corteva as part of the Company's cost-sharing agreement under terms of the MOU that were previously excluded from Adjusted EBITDA, which, for purposes of AIP, also excludes adjustments to income, expenses and losses not budgeted resulting from acquisitions, dispositions, regulatory actions and legal settlements.

— Free Cash Flow for compensation purposes is defined as cash flows provided by (used for) operating activities, less purchases of property, plant and equipment as shown in the consolidated financial statements of cash flows. The definition of business Free Cash Flow changed slightly from the previous year. Business Segment Free Cash Flow is more focused on core business activities and includes changes in working capital, prepayments and deferred planned major maintenance costs minus capital expenditures.

— Business Segment Free Cash Flow is defined as adjusted EBITDA plus changes in working capital, prepayments and deferred planned major maintenance costs minus capital expenditures. Working capital is defined as accounts receivable plus inventory minus accounts payable. Unknown impacts of changes to U.S. GAAP accounting and tax policy changes, or other items not considered indicative of ongoing operations during the performance period, including cash impact of unbudgeted items resulting from acquisitions, dispositions, regulatory actions, and legal settlements, will be excluded from this calculation.

— Business Segment Revenue was defined as sales to external customers as defined by Accounting Standards Codification (ASC) 606, revenue from contracts with customers.

— TT market share or TT MNC market share was determined based on our total pigment revenue market share as a percentage of market share of all multi-national competitors (Kronos, Tronox, Venator and Chemours).

— Sustainability metrics included improving gender diversity in our global workforce, completing steps to implement GHG reporting systems, and lowering the per unit cost of energy. All three elements of the sustainability metrics were equally weighted.



## 2023 Executive Compensation Highlights (continued)

### 2023 OUTCOMES

The chart below shows the 2023 AIP performance targets, ranges and results approved by the CLDC. Performance targets were set and approved in early 2023 and were consistent with the Company's budget, which incorporated considerations of potential opportunities and risks associated with external business and market conditions. Targets for each of the performance measures were set at levels considered challenging, motivational, and competitive. The performance range was determined using external guidance, historical performance, and expectations as guardrails. Threshold was considered the level of performance that warranted the minimum payout, and the maximum defined the level of performance considered exceptional.

Based on 2023 financial and sustainability results, the 2023 Chemours AIP results as a percentage of target were Corporate 23.1%, TT 46.8%, TSS 104.6%, and APM 23.1%. The Corporate AIP results reflect the calculation of Free Cash Flows after taking into account the net impact of the working capital timing actions and the business segment results reflect the impact of the respective working capital timing actions as applicable to each particular segment. This calculation reduced the payout for incentive compensation tied to Free Cash Flow to $0 for all NEOs.

The CLDC and the Board further applied full negative discretion to determine that Mr. Newman and Mr. Lock would receive no 2023 AIP awards.

The following tables show the outcome of the measurement of the performance metrics under the 2023 bonus plan, which reflect the CLDC and Board actions described above.

**Dollars are in millions**

**Corporate AIP — Messrs. Newman, and Lock, Ms. Wellman, Ms. Scarborough, and Ms. Kelliher**

| MEASURE | THRESHOLD[1] | TARGET | MAXIMUM[2] | ACTUAL | WEIGHTED FUNDING RESULT |
|---|---|---|---|---|---|
| Consolidated Adjusted EBITDA | $ 1,044 | $ 1,260 | $ 1,485 | $ 1,025 | 0.0% |
| Consolidated Free Cash Flows | $ 244 | $ 375 | $ 544 | $ 128 | 0.0% |
| Sustainability Metric — Y/Y Gender Diversity Increase | 0.54% | 0.71% | 0.89% | 0.82% | 23.1% |
| Sustainability Metric — GHG Reporting Implementation (xOvertime) | 27 | 33 | 53 | 37 | |
| Sustainability Metric — Energy Efficiency | 1.8% | 2.1% | 2.9% | 2.9% | |
| | | | | | **23.1%** |

**Titanium Technologies AIP — Ms. Dignam (Q2-Q4)**

| MEASURE | THRESHOLD[1] | TARGET | MAXIMUM[2] | ACTUAL | WEIGHTED FUNDING RESULT |
|---|---|---|---|---|---|
| Consolidated Free Cash Flows | $ 244 | $ 375 | $ 544 | $ 128 | 0.0% |
| Sustainability Metric — Y/Y Gender Diversity Increase | 0.54% | 0.71% | 0.89% | 0.82% | 23.1% |
| Sustainability Metric — GHG Reporting Implementation (xOvertime) | 27 | 33 | 53 | 37 | |
| Sustainability Metric — Energy Efficiency | 1.8% | 2.1% | 2.9% | 2.9 | |
| TT MNC Market Share | 32.2% | 34.2% | 36.2% | 34.0% | 23.8% |
| TT Adjusted EBITDA | $ 447 | $ 539 | $ 635 | $ 285 | 0.0% |
| TT Free Cash Flows | $ 300 | $ 362 | $ 427 | $ 203 | 0.0% |
| | | | | | **46.8%** |



## 2023 Executive Compensation Highlights (continued)

**Thermal and Specialized Solutions AIP**

| MEASURE | THRESHOLD[1] | TARGET | MAXIMUM[2] | ACTUAL | WEIGHTED FUNDING RESULT |
|---|---|---|---|---|---|
| Consolidated Free Cash Flows | $ 244 | $ 375 | $ 544 | $ 128 | 0.0% |
| Sustainability Metric — Y/Y Gender Diversity Increase | 0.54% | 0.71% | 0.89% | 0.82% | 23.1% |
| Sustainability Metric — GHG Reporting Implementation (xOvertime) | 27 | 33 | 53 | 37 | |
| Sustainability Metric — Energy Efficiency | 1.8% | 2.1% | 2.9% | 2.9% | |
| TSS Revenue | $ 1,669 | $ 1,840 | $ 2,019 | $ 1,819 | 25.0% |
| TSS Adjusted EBITDA | $ 515 | $ 621 | $ 732 | $ 684 | 29.9% |
| TSS Free Cash Flows | $ 419 | $ 506 | $ 596 | $ 545 | 26.7% |
| | | | | | **104.6%** |

**Advanced Performance Materials AIP — Ms. Dignam (Q1)**

| MEASURE | THRESHOLD[1] | TARGET | MAXIMUM[2] | ACTUAL | WEIGHTED FUNDING RESULT |
|---|---|---|---|---|---|
| Consolidated Free Cash Flows | $ 244 | $ 375 | $ 544 | $ 128 | 0.0% |
| Sustainability Metric — GHG Reporting Implementation (xOvertime) | 0.54% | 0.71% | 0.89% | 0.82% | 23.1% |
| Sustainability Metric — XOT Implementation | 27 | 33 | 53 | 37 | |
| Sustainability Metric — Energy Efficiency | 1.8% | 2.1% | 2.9% | 2.9% | |
| APM Revenue | $ 1,505 | $ 1,660 | $ 1,821 | $ 1,443 | 0.0% |
| APM Adjusted EBITDA | $ 296 | $ 357 | $ 421 | $ 270 | 0.0% |
| APM Free Cash Flows | $ 144 | $ 174 | $ 205 | $ 74 | 0.0% |
| | | | | | **23.1%** |

(1) Represents the minimum level of performance required to earn any incentive for this component of the 2023 AIP. Performance below this level would not result in a payout for the performance measure.

(2) Represents the highest level of performance at which maximum payout under the 2023 AIP is earned. Achievement of performance above this level would not result in a greater payout for the performance measure.

The above outcome reflects certain one-time adjustments as summarized below. Each year, management builds the annual budget used for calculating incentive targets with some allowances for risks (e.g. macro-environment). The leadership team is responsible for managing these risks and the targets are not adjusted for them. Our regulatory filings reflect that we have disclosed probable risks but not inestimable risks.

As in past years, the CLDC may consider adjustments due to extraordinary legal, regulatory and/or business activities that are in line with the long-term interest of the company and support shareholder value. Adjustments may be negative or positive, with the principle being that management's compensation should not be impacted by unanticipated or extraordinary events not contemplated in the business plan used in setting incentive targets or that are not considered true operating results within management's control for incentive purposes. It is our practice to raise potential adjustments for the approval of the CLDC as it relates to the outcome of the AIP and LTIP. Prior to seeking CLDC approval, management will seek and receive the approval of the Audit Committee Chair.

Consistent with the above philosophy the following adjustments were applied to the AIP outcome.



## 2023 Executive Compensation Highlights (continued)

- **Earnings/FCF Impact of Legacy Legal Settlements/Fees** — Positive adjustment of ~$8M in Consolidated Adjusted EBITDA metric and ~$66M in Consolidated FCF metric.
- **Earnings/FCF Impact of Glycolic Acid Business Sale** — Positive adjustment of ~$6M in Other Segment/Consolidated Adjusted EBITDA metric and ~$5M in Other Segment/Consolidated FCF metric.
- **Timing of Severance Payments** — Positive adjustment impact of ~($3M) in TT Segment Adjusted EBITDA and AIP relief of ~$8M in Consolidated FCF metric.
- **Operating Cash Flows Treatment of Term Loan Refinancing** — AIP relief of ~$7M in Consolidated FCF metric.

The following AIP awards for each NEO were approved:

| NEO | BONUS TARGET AS OF DECEMBER 31, 2023 | BASE SALARY AS OF DECEMBER 31, 2023 | ACTUAL ANNUAL INCENTIVE PAYOUT[3] |
|---|---|---|---|
| Mark Newman[4] | 130% | $ 1,000,000 | $ 0 |
| Jonathan Lock[1][4] | 75% | $ 600,000 | $ 0 |
| Denise Dignam[2] | 75% | $ 550,000 | $ 166,808 |
| Kristine Wellman | 70% | $ 500,000 | $ 80,850 |
| Alvenia Scarborough | 50% | $ 350,000 | $ 40,425 |
| Susan Kelliher | 70% | $ 425,000 | $ 68,723 |

(1) Mr. Lock was promoted to Chief Financial Officer effective June 6, 2023. His actual bonus target has been prorated for time in role ($351,747).
(2) Ms. Dignam was promoted to BU President for TT effective April 1, 2023. Her actual bonus target has been prorated for time in role ($403,253). Additionally, Ms. Dignam's AIP results are based on her time as the BU President for APM (first quarter) and TT (second to fourth quarter).
(3) Messrs. Ralhan and Sparks were no longer employed by Chemours on December 31, 2023. They did not earn an AIP payout.
(4) Had the CLDC and the Board not applied negative discretion, Mr. Newman and Mr. Lock would have received AIP awards of $300,300 and $81,253, respectively.

### Long-Term Incentive Plan (LTIP)

Chemours provides long-term incentive compensation to tie the NEOs' interests with the interests of shareholders and the creation of long-term, sustained value. The CLDC views these incentives as a critical element of the executive compensation program.

Mr. Lock's and Ms. Dignam's LTIP targets were increased in conjunction with their promotions. Ms. Wellman's target was increased to better align with market practice and reflect her increased responsibility for the Corporate Sustainability function.

The following table reflects the LTIP target opportunities at the end of fiscal years 2022 and 2023 for the NEOs other than Mr. Newman, whose LTIP target opportunities are discussed above.

| NEO | LONG TERM INCENTIVE TARGET AS OF DECEMBER 31, 2022 | LONG TERM INCENTIVE TARGET AS OF DECEMBER 31, 2023 |
|---|---|---|
| Jonathan Lock[1] | $ 425,000 | $ 1,000,000 |
| Denise Dignam[2] | $ 550,000 | $ 950,000 |
| Kristine Wellman[3] | $ 600,000 | $ 850,000 |
| Alvenia Scarborough | $ 325,000 | $ 325,000 |
| Susan Kelliher | $ 700,000 | $ 700,000 |
| Sameer Ralhan[4] | $ 1,625,000 | $ 1,725,000 |
| Edwin Sparks[4] | $ 1,100,000 | $ 1,100,000 |



## 2023 Executive Compensation Highlights (continued)

(1) Mr. Lock was promoted to Chief Financial Officer effective June 6, 2023. His target LTI was increased at the time.

(2) Ms. Dignam was promoted to BU President for TT effective April 1, 2023. Her target LTI was increased at the time.

(3) Ms. Wellman's target LTI increased in the first quarter from $600,000 to $650,000. The target also increased when she assumed responsibility for Corporate Sustainability on August 1, 2023 to $850,000.

(4) Messrs. Ralhan and Sparks were no longer employed by Chemours on December 31, 2023. All unvested awards were forfeited.



The CLDC strongly believes in focusing management on performance. It demonstrated this belief by once again approving an LTIP award mix that was heavily performance-based, consisting of PSUs, PSOs, NQSOs and via time-based RSUs.

### *Performance Share Units (25% of LTI Target Award)*

Twenty five percent of the NEO's LTIP award was delivered through PSUs. The PSUs are earned based on performance over a three-year performance period. The performance metrics used in the 2023-2025 PSU award were Adjusted Net Income (60%) and rTSR (40%), both measured cumulatively over a three-year period ending December 31, 2025. Using rTSR as a weighted metric is a change from prior years when rTSR was a modifier based on stock performance relative to the compensation peer group. The CLDC felt adjusting rTSR to a metric weighted at 40% would maintain focus on this critical performance metric while limiting its influence on the amount of PSUs that may be earned. This change reduced the maximum opportunity from 250% to 200%.



### *Performance Stock Options (25% of LTIP Target Award)*

The use of PSOs provides direct alignment with shareholder interests as they have value only if the price of Chemours' stock at the time of exercise exceeds the stock price on the date of grant plus a 10% premium, while also encouraging retention through their service-based vesting conditions. As a result, these premium priced stock options encourage executives to focus on behaviors and initiatives that support significant stock price appreciation over time. The stock options vest in equal annual installments over three years from the grant date and have a ten-year term.

### *Non-Qualified Stock Options (25% of LTIP Target Award)*

The use of stock options provides direct alignment with shareholder interests as they have value only if the price of Chemours' stock at the time of exercise exceeds the stock price on the date of grant. As a result, stock option grants encourage executives to focus on behaviors and initiatives that support sustained long-term stock price appreciation. The stock options vest in equal annual installments over three years from the grant date and have a ten-year term.

### *Restricted Stock Units (25% of LTIP Target Award)*

The mix of equity award types also includes RSUs with vesting tied to continued service. The plan supports a strong performance orientation and long-term retention of talent to drive the Company strategy. The RSUs vest in equal annual installments over three years from the grant date.

### Adjusted Net Income

Adjusted Net Income is defined as Net Income (Loss) attributable to Chemours, as reported in the Company's Annual Report on Form 10-K, adjusted in a manner consistent with adjusted EBITDA, except interest expense, depreciation, amortization, and certain provision for (benefit from) income tax amounts.



## 2023 Executive Compensation Highlights (continued)

**Relative TSR (rTSR)**

Relative TSR is a metric used to promote alignment with shareholder interests. rTSR for the 2023-2025 PSU Award will be measured at the end of the three-year period against a peer group established as of January 1, 2023. The metric is defined as the change in the Company's stock price plus dividends paid and assumed to be reinvested on the ex-dividend date during the period, divided by beginning stock price, compared on a percentile basis to the same change with respect to a peer group.

For the purpose of calculating rTSR, the Company's beginning stock price will be the closing stock price averaged over the 20 trading days ending on the trading day before the start of the performance period and the ending stock price will be the closing stock price, inclusive of reinvested dividends, averaged over the 20 trading days ending with the last trading day within the performance period.

For purposes of calculating the appropriate earned percentile, any companies that are in the peer group at the beginning of the performance period that are no longer separate publicly traded companies due to merger, acquisition, or buyout shall be disregarded. Companies that are no longer publicly traded due to insolvency or bankruptcy will be included at the lowest performance ranking. For purposes of calculating the earned percentile, the Company will be considered a member of the compensation peer group.

|  | THRESHOLD | TARGET | MAXIMUM |
|---|---|---|---|
| Achieved rTSR | 15th Percentile | 50th Percentile | 85th Percentile |
| Payout | 50% | 100% | 200% |

**2023 LTIP Awards**

The LTIP awards granted to the NEOs in 2023 were as follows:

| NEO | 2023 TARGET LTI AWARD | SHARE EQUIVALENT VALUE OF TARGET PSUS ON GRANT DATE | TARGET NUMBER OF PSU AWARDS[1] | GRANT DATE FAIR VALUE OF RSUS | NUMBER OF RSUS GRANTED[1] | GRANT DATE FAIR VALUE OF STOCK OPTIONS | NUMBER OF STOCK OPTIONS GRANTED[2] | GRANT DATE FAIR VALUE OF PSOS | NUMBER OF PSOS GRANTED[3] |
|---|---|---|---|---|---|---|---|---|---|
| Mark Newman | $ 6,000,000 | $ 1,499,967 | 43,053 | $ 1,499,967 | 43,053 | $ 1,499,996 | 97,656 | $ 1,499,994 | 100,200 |
| Jonathan Lock | $ 425,000 | $ 106,227 | 3,049 | $ 106,227 | 3,049 | $ 106,245 | 6,917 | $ 106,242 | 7,097 |
| August 1[4] | $ 340,000 |  |  | $ 339,997 | 9,224 |  |  |  |  |
| Denise Dignam[5] | $ 1,325,000 | $ 206,218 | 5,919 | $ 706,207 | 20,270 | $ 206,239 | 13,427 | $ 206,242 | 13,777 |
| August 1[4] | $ 100,000 |  |  | $ 99,964 | 2,712 |  |  |  |  |
| Kristine Wellman | $ 650,000 | $ 162,494 | 4,664 | $ 162,494 | 4,664 | $ 162,493 | 10,579 | $ 162,499 | 10,855 |
| August 1[4] | $ 120,000 |  |  | $ 119,979 | 3,255 |  |  |  |  |
| Alvenia Scarborough | $ 325,000 | $ 81,247 | 2,332 | $ 81,247 | 2,332 | $ 81,239 | 5,289 | $ 81,242 | 5,427 |
| August 1[6] | $ 250,000 |  |  | $ 249,985 | 6,782 |  |  |  |  |
| Susan Kelliher | $ 700,000 | $ 174,966 | 5,022 | $ 174,966 | 5,022 | $ 174,996 | 11,393 | $ 174,999 | 11,690 |
| Sameer Ralhan | $ 1,725,000 | $ 431,250 | 12,378 | $ 431,250 | 12,378 | $ 431,247 | 28,076 | $ 431,241 | 28,807 |
| Edwin Sparks | $ 1,100,000 | $ 274,992 | 7,893 | $ 274,992 | 7,893 | $ 274,990 | 17,903 | $ 274,999 | 18,370 |

Annual LTI awards are generally granted March 1 each year.

(1) The number of PSUs and RSUs awarded was determined by dividing the dollar target value for each NEO by the closing price for Chemours common stock on grant date and rounding down to the nearest whole share. The closing price of Chemours common stock was $34.84 on March 1, 2023. The closing price of Chemours common stock was $36.86 on August 1, 2023.

(2) The number of stock options awarded was determined based on the Black-Scholes value. The Black-Scholes value of an option was $15.36 on March 1,



## 2023 Executive Compensation Highlights (continued)

2023. The exercise price of the options was equal to the closing price of Chemours common stock on the grant date. The closing price of Chemours common stock was $34.84 on March 1, 2023.

(3) The number of performance stock options awarded was determined based on the Monte-Carlo value. Monte-Carlo value of a performance stock option was $14.97 on March 1, 2023. The exercise price of the performance stock options was equal to the closing price of Chemours common stock on the grant date plus a 10% premium. The closing price of Chemours common stock was $34.84 on March 1, 2023. The exercise price of the performance stock options was $38.32.

(4) Bridge grants as approved by the CLDC related to the NEOs increased LTIP target. The bridge grants are prorated based on the month of the change to the NEO's LTIP target and were made in the form of RSUs with a three-year graded vesting.

(5) In addition to her annual grant, Ms. Dignam received a one-time retention grant of $500,000 in RSUs, which will cliff vest in 2026.

(6) In addition to her annual grant, Ms. Scarborough received a one-time retention grant of $250,000 in RSUs, which will cliff vest in 2026.

### 2021-2023 PSU Award Results

The achievement for the 2021-2023 PSU award was based on pre-established three-year cumulative targets for Adjusted Net Income and Free Cash Flow Conversion. Those metrics were equally weighted in the plan. Adjusted Net Income results were above target, with an achievement of 149% of target. The CLDC adjusted the calculation of Free Cash Flow to take into account the working capital timing actions. Accordingly, the CLDC determined that Free Cash Flow Conversion achievement was below threshold performance and as such, for this component of the LTIP, there was a 0% payout with respect to this metric. Based on the equal weighting of the metrics, the blended outcome was 74% of the target PSU award.

The 2021-2023 PSU awards also contained a relative TSR (rTSR) modifier, under which the final level of achievement could be increased or decreased based on Chemours rTSR compared to the peer group. Over the 2021-2023 three-year period, execution on our long-term strategy resulted in Chemours achieving rTSR at the 67th percentile of the peer group, which placed Chemours in the top third of peer group companies. As a result, pursuant to the terms of the PSU awards the 2021-2023 PSU awards vested at the achievement level of 93% of target. The CLDC and the Board applied full negative discretion to determine that Mr. Newman and Mr. Lock would receive no payouts for the 2021-2023 PSU awards.

There was a sharp contrast in the global macroeconomic environment over the course of this three-year performance period, with the beginning of this period seeing the global economy recover from the COVID-19 pandemic, which was then followed by the onset of inflation and high interest rates dampening demand, along with significant geopolitical factors. During this period, the Company took quick actions to drive cost savings and then showed agility to respond to the recovery curve, achieving several record production and revenue milestones. The organization's strong business results in Adjusted Net Income over the three-year period, and the top-quartile rTSR, is reflective of the business performing well relative to peers in the two prior years before facing a difficult 2023.

The tables below detail performance against each measure:

| METRIC | METRIC WEIGHT | 2021 ACTUAL | 2022 ACTUAL | 2023 ACTUAL | CUMULATIVE | % ATTAINMENT | ACHIEVEMENT WITH PAY CURVE APPLIED |
|---|---|---|---|---|---|---|---|
| Adj. Net Income | 50% | 691 | 788 | 490 | 1,969 | 149% | 74% |
| FCF Conversion | 50% | 50.7% | 21.7% | 15.5% | 29.9% | 0% | 0% |
| | | | | | | Weighted Outcome | 74% |

Relative TSR is a modifier that is applied to the outcome of Adjusted Net Income and Free Cash Flow Conversion

| <P25 | >=P25 TO <P40 | >=P40 TO <P60 | >=P60 TO <=P75 | >P75 | ACHIEVEMENT |
|---|---|---|---|---|---|
| 0.5 | 0.75 | 1 | 1.25 | 1.5 | 150% |

Performance = 74%   X   Relative TSR (125%)   =   Final PSU Payout (93%)



2024 Proxy Statement   **52**

## 2023 Executive Compensation Highlights (continued)

The performance peer group for these PSUs was comprised of the following companies:

| | | |
|---|---|---|
| Albemarle Corp. | Eastman Chemical Co. | The Sherwin-Williams Co. |
| Air Product Inc. | Element Solutions Co. | Trinseo S.A. |
| Ashland Global Holdings Inc. | Huntsman Corp. | Tronox Holdings PLC |
| Avient Corp.[1] | Olin Corp. | Venator Materials PLC |
| Axalta Coating Systems Ltd | PPG Industries Inc. | Westlake Corp. |
| Cabot Corp. | RPM International Co. | WR Grace and Co. |
| Celanese Corp. | | |

(1) Formerly known as PolyOne Corporation

The table below shows the target number of PSUs granted in 2021 and the actual number of PSUs earned, including dividends equivalents that were converted into additional PSUs.

| NEO[1][2] | TARGET SHARED IN 2021 | ACHIEVEMENT | EARNED SHARE AWARD |
|---|---|---|---|
| Mark Newman[3] | 50,976 | 93% | 0 |
| Jonathan Lock[3] | 10,412 | 93% | 0 |
| Denise Dignam | 9,371 | 93% | 9,496 |
| Alvenia Scarborough | 5,206 | 93% | 5,276 |
| Susan Kelliher | 14,577 | 93% | 14,772 |

(1) Ms. Wellman was not eligible for this plan in 2021.

(2) Messrs. Ralhan and Sparks were no longer employed by Chemours on December 31, 2023 and their PSUs were forfeited.

(3) Had the CLDC and the Board not applied negative discretion, Mr. Newman and Mr. Lock would have received PSU payouts of 51,523 shares and 10,551 shares, respectively.



## Company Sponsored Employee Benefits

The Company offers its NEOs health, welfare and retirement plan benefits consistent with all other U.S. based employees. Additional elements specific to the executive compensation program include nonqualified retirement benefit plans, reimbursement of financial planning and income tax preparation services, and change-in-control benefits.

### The Non-qualified Retirement Savings Restoration Plan (RSRP)

The RSRP is a nonqualified defined contribution plan that restores benefits above the Internal Revenue Code limits for tax-qualified retirement plans to be consistent with those provided to other eligible employees.

Each year during the enrollment window, eligible employees can elect to defer 1-6% of compensation. The deferral elections are effective when the participant's year-to-date compensation exceeds the IRS annual compensation limit ($330,000 for 2023). Compensation for RSRP purposes consists of base salary and AIP payments. Chemours provides a company-matching contribution equal to 100% of the first 6% of the NEO's deferral amount. In addition, and entirely at its discretion, the Company may make non-elective contributions to the RSRP.

Employee and matching contributions are always 100% vested. Non-elective contributions are vested upon completion of three years of service. The NEOs are 100% vested in their deferrals and related investment experience.

### The Non-Qualified Management Deferred Compensation Plan (MDCP)

Under the MDCP, a nonqualified elective deferred compensation plan, participants may defer base salary, AIP, and certain incentive plan awards until a later date. Each year during the enrollment window eligible employees can elect to defer: 1-60% of "base salary" and/or 1-60% of the annual incentives. Additionally, corporate officers may elect to defer settlement of their equity awards (i.e., RSUs and/or PSUs). NEOs are 100% vested in their deferrals and related investment experience.

### Financial Planning and Income Tax Preparation Benefit

NEOs are eligible to receive reimbursement up to $15,000 per calendar year for financial planning and income tax preparation services provided to them by the financial services professional(s) of their choosing. This benefit is intended to enhance understanding and appreciation of company-sponsored compensation and benefit programs, and also emphasize the link between company financial outcomes and executive financial wellness. Amounts reimbursed will be imputed as income to the eligible executive in accordance with IRS regulations.

### Change-in-Control Severance Benefits

To ensure that executives remain focused on Chemours' business during a period of uncertainty, the Company maintains a change-in-control severance plan for NEOs. For any benefits to be earned, a change in control must occur and the executive's employment must be terminated within two years following the change in control, either by Chemours without cause or the executive for good reason (often called a "double trigger"). The plan does not provide tax gross-ups. For additional information, see "Executive Compensation — Potential Payments upon Termination or Change-in-Control."

Benefits provided under the change-in-control severance plan include:

- A lump sum cash payment of two times (three times for the CEO) the sum of the NEO's base salary and target AIP;

- A lump sum cash payment equal to the pro-rated portion of the NEO's AIP target for the year of termination; and

- Continued health and dental benefits, financial counseling and tax preparation, and outplacement services for up to two years (three years for the CEO) following the date of termination.

The change-in-control severance plan also includes 12-month (18-month for the CEO) non-competition and non-solicitation covenants, non-disparagement, and confidentiality provisions.



## Other Compensation Matters

### COMPENSATION AND RISK

Management reviewed its executive and non-executive compensation programs and, in concurrence with the CLDC's independent compensation consultant, determined that none of its compensation programs encourages or creates excessive risk-taking, and none are reasonably likely to have a material adverse effect on the Company.

In conducting this assessment, the components and design features of executive and non-executive plans and programs were analyzed. A summary of the findings of the assessment was provided to the CLDC. Overall, the CLDC concluded that (1) the Company's executive compensation programs provide a mix of awards with performance criteria and design features that mitigate potential excessive risk taking, and (2) non-executive employee compensation programs are appropriately balanced between fixed and variable compensation and do not encourage excessive risk taking. The CLDC also considered its payout caps or limits, stock ownership guidelines, and clawback policy as risk mitigating features of its executive compensation program.

**Stock Ownership Guidelines**

To further support the goal of achieving a strong link between shareholder and executive interests, the Company maintains stock ownership guidelines to require executive share ownership of a value equal to a specified multiple of base pay. Executives have five (5) years from the date they become subject to the guidelines to reach their respective ownership requirements. Until the ownership requirement is satisfied, 100% of the net shares realized from exercise or vesting of stock- based awards must be retained. Stock ownership guidelines are as follows:

| MULTIPLE OF BASE SALARY | 2023 TARGET |
| --- | --- |
| CEO | 5.0x |
| Other NEOs | 3.0x |

All applicable NEOs have satisfied or are on track to satisfy those guidelines.

**Incentive Compensation Clawback Policies**

In October 2023, the Board adopted the Incentive-Based Compensation Clawback Policy for Executive Officers ("Executive Officer Clawback Policy") in line with SEC Rule 10D-1 and NYSE standards, along with the Incentive Compensation Clawback Policy for all current and former employees. The Executive Officer Clawback Policy requires the company to recover excess incentive-based compensation from executive officers and certain high-level employees ("Executive Officers") in the case of a financial restatement due to material noncompliance with financial reporting requirements. Compensation subject to clawback includes stock price or shareholder return based incentives, with recoveries calculated based on either restated financials or reasonable estimates for stock- related metrics. The policy also specifies that "Recoverable Incentive-Based Compensation" pertains to compensation received after the effective date of the policy, during or after service as an Executive Officer, while listed on exchanges, and within three fiscal years preceding a restatement.

The Executive Officer Clawback Policy stipulates that unless the Compensation Committee deems recovery impracticable, all erroneously awarded compensation must be reclaimed, and indemnification for such amounts is prohibited. Additionally, this policy sits alongside other recovery rights and does not limit the company's ability to enforce obligations or seek legal action against covered persons. The policy also contains provisions for automatic compliance updates to match SEC and NYSE changes and is administered by the Compensation Committee, which has final say on policy interpretations.

Furthermore, the Incentive Compensation Clawback Policy provides for broader remedial actions against all employees for misconduct-related restatements, including forfeiture of future awards and repayment demands covering all incentive vehicles, including annual inventive payments, and time- and performance-based long-term incentives. Triggers for clawback include terminations for cause, breaches of non-compete or confidentiality agreements, fraud, or misconduct leading to restatements, or failure to act upon knowledge of such issues. The company engages independent consultants and external counsel to regularly review and ensure the continued compliance of the policies with the evolving regulatory landscape.



## Other Compensation Matters (continued)

### RESTRICTIONS ON HEDGING AND SIMILAR TRANSACTIONS

The Company has a policy that prohibits executive officers and directors from engaging in the following types of transactions with respect to Chemours' stock: hedging transactions, pledging securities, short sales, derivative transactions, margin accounts, and short-term trading.



## Other Compensation Matters (continued)

### SUMMARY COMPENSATION TABLE

The following table sets forth information concerning the total compensation earned by the NEOs during fiscal years 2023, 2022, and 2021.

| NAME AND PRINCIPAL POSITION | YEAR | SALARY ($) | BONUS ($) | STOCK AWARDS ($)[1][2] | OPTION AWARDS ($)[3] | NON-EQUITY INCENTIVE PLAN COMPENSATION ($)[4] | ALL OTHER COMPENSATION ($)[5] | TOTAL ($) |
|---|---|---|---|---|---|---|---|---|
| **Mark Newman** President and Chief Executive Officer | 2023 | 1,000,000 | | 3,249,640 | 2,999,990 | 0 | 85,800 | 7,335,430 |
| | 2022 | 995,833 | | 3,464,363 | 2,039,991 | 1,024,400 | 145,764 | 7,670,351 |
| | 2021 | 837,500 | | 1,879,997 | 1,159,987 | 1,611,000 | 49,185 | 5,537,669 |
| **Jonathan Lock** Senior Vice President, Chief Financial Officer | 2023 | 527,083 | | 570,135 | 212,487 | 0 | 50,172 | 1,359,878 |
| **Denise Dignam** President, Titanium Technologies | 2023 | 531,667 | | 1,046,719 | 412,480 | 166,808 | 75,059 | 2,232,733 |
| | 2022 | 462,500 | | 373,608 | 219,993 | 442,913 | 71,650 | 1,570,664 |
| **Kristine Wellman** Senior Vice President, General Counsel and Corporate Secretary | 2023 | 491,667 | | 472,018 | 324,993 | 80,850 | 45,367 | 1,414,895 |
| **Alvenia Scarborough** Senior Vice President, Corporate Communications, Chief Brand Officer | 2023 | 350,000 | | 426,004 | 162,481 | 40,425 | 36,425 | 1,015,335 |
| **Susan Kelliher** Senior Vice President, People (January – September) | 2023 | 425,000 | | 379,061 | 349,996 | 68,723 | 58,685 | 1,281,464 |
| | 2022 | 425,000 | | 475,467 | 279,996 | 217,685 | 58,191 | 1,456,339 |
| | 2021 | 425,000 | | 458,904 | 279,992 | 494,488 | 36,233 | 1,694,617 |
| **Sameer Ralhan** Senior Vice President, Chief Financial Officer (January – June) | 2023 | 323,649 | | 934,291 | 862,488 | — | 39,522 | 2,159,950 |
| | 2022 | 625,000 | | 1,103,826 | 649,991 | 394,000 | 67,940 | 2,840,757 |
| | 2021 | 616,667 | | 786,684 | 479,993 | 895,000 | 38,400 | 2,816,744 |
| **Edwin Sparks** President, Chemical Solutions and Titanium Technologies (January – March) | 2023 | 164,210 | | 595,764 | 549,989 | — | 24,675 | 1,334,638 |
| | 2022 | 570,833 | | 747,216 | 439,996 | 257,456 | 77,659 | 2,093,161 |
| | 2021 | 546,058 | | 590,026 | 359,992 | 734,250 | 41,521 | 2,271,847 |

(1) Represents the aggregate grant date fair value of PSUs and RSUs computed in accordance with FASB ASC Topic 718. The grant date fair value of each PSU granted to NEOs in 2023, taking into account the estimated probable outcome of the performance conditions, was determined to be $40.64 on March 1, 2023. The techniques and assumptions used in determining the values can be found in Note 24 ("Stock-based Compensation") to the Consolidated Financial Statements in Chemours' Annual Report on Form 10-K for the year ended December 31, 2023. The grant date fair value of each RSU granted to NEOs in 2023 is equal to the closing share price of Chemours common stock on their respective grant dates — $34.84 on March 1, 2023 and $36.86 on August 1, 2023.

(2) If the maximum level of performance were achieved, each NEO would earn 200% of the target number of PSUs awarded. based on the closing price of Chemours common stock on the March 1 grant date ($34.84), the maximum value of PSUs awarded on March 1, 2023, to each NEO is as follows: Mr. Newman — $2,999,933; Mr. Lock — $212,454; Ms. Dignam — $412,436; Ms. Wellman — $324,988; Ms. Scarborough — $162,494; Ms. Kelliher — $349,932; Mr. Ralhan — $862,499 and Mr. Sparks — $549,984.

(3) Represents the aggregate grant date fair value of stock options and performance stock options computed in accordance with FASB ASC Topic 718. Assumptions used in determining the values can be found in Note 24 ("Stock-based Compensation") to the Consolidated Financial Statements in Chemours' Annual Report on Form 10-K for the year ended December 31, 2023.

(4) Represents payouts under the Annual Incentive Plan. This column includes compensation which may have been deferred at the NEO's election. Any such amounts will be included in the "Executive Contributions" column of the 2023 Nonqualified Deferred Compensation table.

(5) The amounts reflect perquisites and personal benefits (financial planning / income tax preparation) and Company contributions to qualified and nonqualified defined contribution plans. The following table details these amounts.



## Other Compensation Matters (continued)

(6) The CLDC and the Board applied negative discretion to reduce Mr. Newman's and Mr. Lock's AIP awards to $0. Had the CLDC and the Board not applied negative discretion, Mr. Newman and Mr. Lock would have received AIP awards of $300,300 and $81,253, respectively.

| NAME | COMPANY CONTRIBUTIONS TO QUALIFIED DEFINED CONTRIBUTION PLAN ($) | COMPANY CONTRIBUTION TO NONQUALIFIED DEFINED CONTRIBUTION PLAN ($) | FINANCIAL PLANNING/ INCOME TAX PREPARATION ($) |
|---|---|---|---|
| Mark Newman | 20,800 | 50,000 | 15,000 |
| Jonathan Lock | 20,800 | 21,872 | 7,500 |
| Denise Dignam | 22,800 | 37,259 | 15,000 |
| Kristine Wellman | 20,800 | 22,227 | 2,340 |
| Alvenia Scarborough | 20,800 | 11,900 | 3,725 |
| Susan Kelliher | 20,800 | 22,885 | 15,000 |
| Sameer Ralhan | 20,800 | 11,222 | 7,500 |
| Edwin Sparks | 21,800 | 2,875 | — |



## Other Compensation Matters (continued)

### 2023 GRANTS OF PLAN BASED AWARDS

The following table provides information on AIP awards, PSUs, PSOs, NQSOs and RSUs granted in 2023 to each NEO. For a complete understanding of the table, refer to the footnotes that follow.

| NAME | TYPE OF AWARD | GRANT DATE | APPROVAL DATE | ESTIMATED POSSIBLE PAYOUTS UNDER NONEQUITY INCENTIVE PLAN AWARDS[1] THRESHOLD ($) | TARGET ($) | MAXIMUM ($) | ESTIMATED FUTURE PAYOUTS UNDER EQUITY INCENTIVE PLAN AWARDS[2] THRESHOLD (#) | TARGET (#) | MAXIMUM (#) | ALL OTHER STOCK AWARDS NUMBER OF SHARES OR STOCK OR UNITS (#) | ALL OTHER OPTIONS AWARDS NUMBER OF SECURITIES UNDERLYING OPTIONS[3] (#) | EXERCISE OR BASE PRICE OF OPTION AWARDS ($) | GRANT DATE FAIR VALUE OF STOCK AND OPTION AWARDS ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mark Newman | 2023 AIP | | | 650,000 | 1,300,000 | 2,600,000 | | | | | | | |
| | Stock Options | 3/1/23 | 2/6/23 | | | | | | | | 97,656 | 34.84 | 1,499,996 |
| | PSO | 3/1/23 | 2/6/23 | | | | | | | | 100,200 | 38.32 | 1,499,994 |
| | PSU | 3/1/23 | 2/6/23 | | | | 21,527 | 43,053 | 86,106 | | | | 1,749,674 |
| | RSU | 3/1/23 | 2/6/23 | | | | | | | 43,053 | | | 1,499,967 |
| Jonathan Lock | 2023 AIP | | | 175,874 | 351,747 | 703,494 | | | | | | | |
| | Stock Options | 3/1/23 | 2/6/23 | | | | | | | | 6,917 | 34.84 | 106,245 |
| | PSO | 3/1/23 | 2/6/23 | | | | | | | | 7,097 | 38.32 | 106,242 |
| | PSU | 3/1/23 | 2/6/23 | | | | 1,525 | 3,049 | 6,098 | | | | 123,911 |
| | RSU | 3/1/23 | 2/6/23 | | | | | | | 3,049 | | | 106,227 |
| | RSU | 8/1/23 | 7/25/23 | | | | | | | 9,224 | | | 339,997 |
| Denise Dignam | 2023 AIP | | | 201,627 | 403,253 | 806,506 | | | | | | | |
| | Stock Options | 3/1/23 | 2/6/23 | | | | | | | | 13,427 | 34.84 | 206,239 |
| | PSO | 3/1/23 | 2/6/23 | | | | | | | | 13,777 | 38.32 | 206,242 |
| | PSU | 3/1/23 | 2/6/23 | | | | 2,960 | 5,919 | 11,838 | | | | 240,548 |
| | RSU | 3/1/23 | 2/6/23 | | | | | | | 5,919 | | | 206,218 |
| | RSU | 3/1/23 | 2/6/23 | | | | | | | 14,351 | | | 499,989 |
| | RSU | 8/1/23 | 7/25/23 | | | | | | | 2,712 | | | 99,964 |
| Kristine Wellman | 2023 AIP | | | 175,000 | 350,000 | 700,000 | | | | | | | |
| | Stock Options | 3/1/23 | 2/6/23 | | | | | | | | 10,579 | 34.84 | 162,493 |
| | PSO | 3/1/23 | 2/6/23 | | | | | | | | 10,855 | 38.32 | 162,499 |
| | PSU | 3/1/23 | 2/6/23 | | | | 2,332 | 4,664 | 9,328 | | | | 189,545 |
| | RSU | 3/1/23 | 2/6/23 | | | | | | | 4,664 | | | 162,494 |
| | RSU | 8/1/23 | 7/25/23 | | | | | | | 3,255 | | | 119,979 |
| Alvenia Scarborough | 2023 AIP | | | 87,500 | 175,000 | 350,000 | | | | | | | |
| | Stock Options | 3/1/23 | 2/6/23 | | | | | | | | 5,289 | 34.84 | 81,239 |
| | PSO | 3/1/23 | 2/6/23 | | | | | | | | 5,427 | 38.32 | 81,242 |
| | PSU | 3/1/23 | 2/6/23 | | | | 1,166 | 2,332 | 4,664 | | | | 94,772 |
| | RSU | 3/1/23 | 2/6/23 | | | | | | | 2,332 | | | 81,247 |
| | RSU | 8/1/23 | 7/25/23 | | | | | | | 6,782 | | | 249,985 |



## Other Compensation Matters (continued)

| NAME | TYPE OF AWARD | GRANT DATE | APPROVAL DATE | ESTIMATED POSSIBLE PAYOUTS UNDER NONEQUITY INCENTIVE PLAN AWARDS[1] | | | ESTIMATED FUTURE PAYOUTS UNDER EQUITY INCENTIVE PLAN AWARDS[2] | | | ALL OTHER STOCK AWARDS NUMBER OF SHARES OR STOCK OR UNITS (#) | ALL OTHER OPTIONS AWARDS NUMBER OF SECURITIES UNDERLYING OPTIONS[3] (#) | EXERCISE OR BASE PRICE OF OPTION AWARDS ($) | GRANT DATE FAIR VALUE OF STOCK AND OPTION AWARDS ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | THRESHOLD ($) | TARGET ($) | MAXIMUM ($) | THRESHOLD (#) | TARGET (#) | MAXIMUM (#) | | | | |
| Susan Kelliher | 2023 AIP | | | 148,750 | 297,500 | 595,000 | | | | | | | |
| | Stock Options | 3/1/23 | 2/6/23 | | | | | | | | 11,393 | 34.84 | 174,996 |
| | PSO | 3/1/23 | 2/6/23 | | | | | | | | 11,690 | 38.32 | 174,999 |
| | PSU | 3/1/23 | 2/6/23 | | | | 2,511 | 5,022 | 10,044 | | | | 204,094 |
| | RSU | 3/1/23 | 2/6/23 | | | | | | | 5,022 | | | 174,966 |
| Sameer Ralhan | 2023 AIP | | | 250,000 | 500,000 | 1,000,000 | | | | | | | |
| | Stock Options | 3/1/23 | 2/6/23 | | | | | | | | 28,076 | 34.84 | 431,247 |
| | PSO | 3/1/23 | 2/6/23 | | | | | | | | 28,807 | 38.32 | 431,241 |
| | PSU | 3/1/23 | 2/6/23 | | | | 6,189 | 12,378 | 24,756 | | | | 503,042 |
| | RSU | 3/1/23 | 2/6/23 | | | | | | | 12,378 | | | 431,250 |
| Edwin Sparks | 2023 AIP | | | 215,625 | 431,250 | 862,500 | | | | | | | |
| | Stock Options | 3/1/23 | 2/6/23 | | | | | | | | 17,903 | 34.84 | 274,990 |
| | PSO | 3/1/23 | 2/6/23 | | | | | | | | 18,370 | 38.32 | 274,999 |
| | PSU | 3/1/23 | 2/6/23 | | | | 3,947 | 7,893 | 15,786 | | | | 320,772 |
| | RSU | 3/1/23 | 2/6/23 | | | | | | | 7,893 | | | 274,992 |

(1) Nonequity incentive plan awards are short-term incentives that may be earned under the 2023 AIP.

(2) Equity incentive plan awards are PSUs corresponding to a three-year performance period, FY2023 — FY2025. The NEOs may earn 50% of the target award upon attainment of threshold performance and up to 200% of the target award upon attainment of maximum performance. Performance outcomes will be determined following the conclusion of the performance period. Dividend equivalent units will be applied to the actual number of shares earned.

(3) The exercise price for stock options is equal to the fair market value of a share of Chemours common stock on the grant date. The exercise price for PSOs is equal to the fair market value of a share of Chemours common stock on the grant date plus a 10% premium. Stock options and PSOs are not credited with dividend equivalent units. Stock options and PSOs feature three-year equal ratable vesting and a ten-year term.



## Other Compensation Matters (continued)

### OUTSTANDING EQUITY AWARDS AT 2023 FISCAL YEAR-END

The following table shows the number of shares underlying exercisable and unexercisable options and unvested and, as applicable, unearned RSUs and PSUs (in each case denominated in shares of Chemours common stock) held by each of the NEOs as of December 31, 2023. Market or payout values in the table below are based on the closing price of Chemours common stock as of December 31, 2023: $31.54.

| | | OPTION AWARDS | | | | | | STOCK AWARDS | |
| | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS[1] | | | | SHARES OR UNITS OF STOCK THAT HAVE NOT VESTED[2] | | EQUITY INCENTIVE PLAN AWARDS: UNEARNED SHARES, UNITS OR OTHER RIGHTS THAT HAVE NOT VESTED[3] | |
| NAME | GRANT DATE | EXERCISABLE (#) | UNEXERCISABLE ($) | OPTION EXERCISE PRICE ($) | OPTION EXPIRATION DATE | NUMBER (#) | MARKET VALUE ($) | NUMBER (#) | MARKET OR PAYOUT VALUE ($) |
|---|---|---|---|---|---|---|---|---|---|
| Mark Newman[5] | 3/1/2023 | — | 100,200 | 38.32 | 3/1/2033 | | | | |
| | 3/1/2023 | — | 97,656 | 34.84 | 3/1/2033 | 44,066 | 1,389,852 | 44,066 | 1,389,852 |
| | 3/1/2022 | 68,756 | 137,512 | 25.98 | 3/1/2032 | 13,880 | 437,771 | 51,828 | 1,634,658 |
| | 7/1/2021 | 23,131 | 11,565 | 35.46 | 7/1/2031 | 1,443 | 45,526 | | |
| | 3/1/2021 | 40,899 | 20,450 | 24.01 | 3/1/2031 | 2,298 | 72,494 | | |
| | 3/2/2020 | 160,427 | — | 14.43 | 3/2/2030 | | | | |
| | 6/3/2019 | 29,717 | — | 21.96 | 6/3/2029 | | | | |
| | 3/1/2019 | 36,236 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 23,357 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 31,662 | — | 34.72 | 3/1/2027 | | | | |
| | 3/1/2016 | 166,089 | — | 5.40 | 3/1/2026 | | | | |
| Jonathan Lock | 8/1/2023 | | | | | 9,373 | 295,617 | | |
| | 3/1/2023 | — | 7,097 | 38.32 | 3/1/2033 | | | | |
| | 3/1/2023 | — | 6,917 | 34.84 | 3/1/2033 | 3,121 | 98,429 | 3,121 | 98,429 |
| | 3/1/2022 | 5,730 | 11,459 | 25.98 | 3/1/2032 | 1,156 | 36,467 | 4,319 | 136,216 |
| | 3/1/2021 | 13,633 | 6,816 | 24.01 | 3/1/2031 | 766 | 24,175 | | |
| | 3/2/2020 | 22,459 | — | 14.43 | 3/2/2030 | | | | |
| | 6/3/2019 | 14,858 | — | 21.96 | 6/3/2029 | | | | |
| | 3/1/2019 | 5,574 | — | 38.02 | 3/1/2029 | | | | |
| | 5/1/2018 | 9,713 | — | 48.25 | 5/1/2028 | | | | |



## Other Compensation Matters (continued)

| NAME | GRANT DATE | EXERCISABLE (#) | UNEXERCISABLE ($) | OPTION EXERCISE PRICE ($) | OPTION EXPIRATION DATE | NUMBER (#) | MARKET VALUE ($) | NUMBER (#) | MARKET OR PAYOUT VALUE ($) |
|---|---|---|---|---|---|---|---|---|---|
| | | **OPTION AWARDS** | | | | | | **STOCK AWARDS** | |
| | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS[1] | | | | SHARES OR UNITS OF STOCK THAT HAVE NOT VESTED[2] | | EQUITY INCENTIVE PLAN AWARDS: UNEARNED SHARES, UNITS OR OTHER RIGHTS THAT HAVE NOT VESTED[3] | |
| Denise Dignam | 8/1/2023 | | | | | 2,756 | 86,916 | | |
| | 3/1/2023 | — | 13,777 | 38.32 | 3/1/2033 | 14,689 | 463,291 | | |
| | 3/1/2023 | — | 13,427 | 34.84 | 3/1/2033 | 6,058 | 191,069 | 6,058 | 191,079 |
| | 3/1/2022 | 7,415 | 14,829 | 25.98 | 3/1/2032 | 1,496 | 47,195 | 5,589 | 176,286 |
| | 3/1/2021 | 12,269 | 6,135 | 24.01 | 3/1/2031 | 10,186 | 321,260 | | |
| | 3/2/2020 | 11,140 | — | 14.43 | 3/2/2030 | | | | |
| | 3/1/2019 | 3,832 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 2,068 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 2,473 | — | 34.72 | 3/1/2027 | | | | |
| Kristine Wellman | 8/1/2023 | | | | | 3,307 | 104,318 | | |
| | 3/1/2023 | — | 10,855 | 38.32 | 3/1/2033 | | | | |
| | 3/1/2023 | — | 10,579 | 34.84 | 3/1/2033 | 4,774 | 150,565 | 4,774 | 150,565 |
| | 3/1/2022 | 5,309 | 10,616 | 25.98 | 3/1/2032 | 4,286 | 135,175 | | |
| | 3/1/2021 | 4,260 | 2,130 | 24.01 | 3/1/2031 | 958 | 30,219 | | |
| | 3/2/2020 | 11,140 | — | 14.43 | 3/2/2030 | | | | |
| | 3/1/2019 | 4,006 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 2,554 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 5,936 | — | 34.72 | 3/1/2027 | | | | |
| Alvenia Scarborough | 8/1/2023 | | | | | 6,891 | 217,354 | | |
| | 3/1/2023 | — | 5,427 | 38.32 | 3/1/2033 | | | | |
| | 3/1/2023 | — | 5,289 | 34.84 | 3/1/2033 | 2,387 | 75,282 | 2,387 | 75,282 |
| | 3/1/2022 | 4,382 | 8,762 | 25.98 | 3/1/2032 | 884 | 27,866 | 3,302 | 104,156 |
| | 3/1/2021 | 6,816 | 3,408 | 24.01 | 3/1/2031 | 5,659 | 178,481 | | |
| | 3/1/2019 | 3,135 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 2,433 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 3,627 | — | 34.72 | 3/1/2027 | | | | |



## Other Compensation Matters (continued)

| NAME | GRANT DATE | OPTION AWARDS | | | | SHARES OR UNITS OF STOCK THAT HAVE NOT VESTED[2] | | EQUITY INCENTIVE PLAN AWARDS: UNEARNED SHARES, UNITS OR OTHER RIGHTS THAT HAVE NOT VESTED[3] | |
| | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS[1] | | | | | | STOCK AWARDS | |
| | | EXERCISABLE (#) | UNEXERCISABLE ($) | OPTION EXERCISE PRICE ($) | OPTION EXPIRATION DATE | NUMBER (#) | MARKET VALUE ($) | NUMBER (#) | MARKET OR PAYOUT VALUE ($) |
| Susan Kelliher | 3/1/2023 | — | 11,690 | 38.32 | 3/1/2033 | | | | |
| | 3/1/2023 | — | 11,393 | 34.84 | 3/1/2033 | 5,140 | 162,122 | 5,140 | 162,122 |
| | 3/1/2022 | 9,437 | 18,874 | 25.98 | 3/1/2032 | 1,905 | 60,081 | 7,113 | 224,351 |
| | 3/1/2021 | 19,086 | 9,543 | 24.01 | 3/1/2031 | 15,845 | 499,741 | | |
| | 3/2/2020 | 74,866 | — | 14.43 | 3/2/2030 | | | | |
| | 3/1/2019 | 16,724 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 9,732 | — | 48.53 | 3/1/2028 | | | | |
| | 6/1/2017 | 8,864 | — | 41.51 | 6/1/2027 | | | | |
| Sameer Ralhan[4] | | | | | | | | | |
| Edwin Sparks[4] | | | | | | | | | |

(1) The following table provides the vesting schedules of stock options outstanding as of December 31, 2023:

| GRANT DATE | OUTSTANDING VESTING DATES |
| --- | --- |
| 3/1/2023 | Vests in equal installments on March 1, 2024, 2025 and 2026 |
| 3/1/2022 | Vests in equal installments on March 1, 2024 and 2025 |
| 7/1/2021 | Vests in equal installments on March 1, 2024 |
| 3/1/2021 | Vests in equal installments on March 1, 2024 |

(2) The following table consists of RSUs outstanding as of December 31, 2023, and PSUs where the performance period is complete, but the units remain unvested. The following table provides details of the vesting schedules for such RSUs and PSUs, including dividend equivalent units:

| GRANT DATE | OUTSTANDING VESTING DATES |
| --- | --- |
| 8/1/2023 | Vests in equal installments on August 1, 2024, 2025 and 2026 |
| 8/1/2023 | RSUs with vesting date of August 1, 2026 |
| 3/1/2023 | Vests in equal installments on March 1, 2024, 2025 and 2026 |
| 3/1/2023 | RSUs with vesting date of March 1, 2026 |
| 3/1/2022 | Vests in equal installments on March 1, 2024 and 2025 |
| 7/1/2021 | RSUs with vesting date of March 1, 2024 |
| 7/1/2021 | PSUs with performance period ended December 31, 2023, vest in first quarter 2024 |
| 3/1/2021 | RSUs with vesting date of March 1, 2024 |
| 3/1/2021 | PSUs with performance period ended December 31, 2023, vest in first quarter 2024 |



## Other Compensation Matters (continued)

(3) The following table provides the vesting schedules for unearned PSUs with outstanding vesting dates as of December 31, 2023:

| GRANT DATE | OUTSTANDING VESTING DATES |
|---|---|
| 3/1/2023 | Performance period ending December 31, 2025. The number of PSUs reported is based on achievement of target performance |
| 3/1/2022 | Performance period ending December 31, 2024. The number of PSUs reported is based on achievement of threshold performance |

The 2022-2024 PSU plan provides for a payout range of 0% to 250% and dividend equivalent units are applied subsequently to the final performance determination.

The 2023-2025 PSU plan provides for a payout range of 0% to 200% and dividend equivalent units are applied subsequently to the final performance determination.

(4) Messrs. Ralhan and Sparks were no longer employed by Chemours on December 31, 2023. They have no outstanding equity awards at 2023 fiscal year-end. Mr. Ralhan departed the company effective June 19, 2023. Mr. Sparks departed the company effective March 31, 2023.

(5) The Company has entered into a separation and release agreement ("Separation Agreement") dated as of March 22, 2024, with Mr. Newman, the former Chief Executive Officer. Under the Separation Agreement, the former Chief Executive Officer is not entitled to any severance, equity award vesting or other compensation in connection with his resignation. All unvested awards as of the date of the Separation Agreement were forfeited for no consideration.

### OPTION EXERCISES AND STOCK VESTED

The table below identifies the number of shares of Chemours common stock acquired upon the exercise of stock options and the vesting of RSUs and PSUs during 2023:

| NAME | OPTION AWARDS[1] | | STOCK AWARDS[2] | |
|---|---|---|---|---|
| | NUMBER OF SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ON EXERCISE ($) | NUMBER OF SHARES ACQUIRED ON VESTING (#) | VALUE REALIZED ON VESTING ($) |
| Mark Newman | | | 157,826 | 5,426,358 |
| Jonathan Lock | | | 21,946 | 754,494 |
| Denise Dignam | | | 3,002 | 106,677 |
| Kristine Wellman | | | 4,605 | 162,503 |
| Alvenia Scarborough | 5,125 | 91,587 | 2,283 | 81,433 |
| Susan Kelliher | | | 92,351 | 3,072,581 |
| Sameer Ralhan | 259,408 | 4,521,566 | 102,258 | 3,514,469 |
| Edwin Sparks | 55,619 | 595,773 | 119,759 | 4,182,860 |

(1) The value realized upon exercise is the difference between the market value of the stock on the exercise date and the option price, multiplied by the number of shares acquired on exercise.

(2) Represents the number of RSUs, PSUs and related dividend equivalent units vesting in 2023. The value realized upon vesting is computed by multiplying the number of units by the closing price of the underlying shares on the vesting date.



## Other Compensation Matters (continued)

### 2023 NONQUALIFIED DEFERRED COMPENSATION

The following table provides information on the Company's defined contribution or other plans that during 2023 provided for deferrals of compensation on a basis that is not tax qualified. Messrs. Newman, Lock, Ms. Dignam, Ms. Scarborough, Ms. Kelliher and Messrs. Ralhan and Sparks each participated in the plan during 2023.

| NAME | EXECUTIVE CONTRIBUTIONS IN LAST FISCAL YEAR ($)[1] | REGISTRANT CONTRIBUTION IN LAST FISCAL YEAR ($)[2] | AGGREGATE EARNING IN LAST FISCAL YEAR ($)[3] | AGGREGATE WITHDRAWALS / DISTRIBUTIONS IN LAST FISCAL YEAR ($) | AGGREGATE BALANCE AT LAST FISCAL YEAR-END ($) |
|---|---|---|---|---|---|
| Mark Newman | | | | | |
| RSRP | 50,000 | 50,000 | 140,713 | | 1,233,228 |
| MDCP | | | 137,876 | | 961,080 |
| Jonathan Lock | | | | | |
| RSRP | 21,872 | 21,872 | 13,328 | | 123,116 |
| Denise Dignam | | | | | |
| RSRP | 37,259 | 37,259 | 23,322 | | 193,683 |
| Kristine Wellman | | | | | |
| RSRP | 22,227 | 22,227 | 15,955 | | 126,148 |
| Alvenia Scarborough | | | | | |
| RSRP | 11,900 | 11,900 | 8,161 | | 57,842 |
| Susan Kelliher | | | | | |
| RSRP | 22,885 | 22,885 | 39,338 | | 262,885 |
| MDCP | 130,611 | | 101,425 | | 772,635 |
| Sameer Ralhan | | | | | |
| RSRP | 11,222 | 11,222 | 122,291 | | 692,215 |
| Edwin Sparks | | | | | |
| RSRP | 2,875 | 2,875 | 58,679 | -44,904 | 392,827 |

(1) The amount in this column represents deferrals from base salary and Non-Equity Incentive Plan Compensation under the RSRP and/or MDCP. The amounts are also included in the 2022 Summary Compensation Table.

(2) The amount in this column represents employer contributions made under the RSRP; the amounts are also included in the 2022 Summary Compensation Table.

(3) Earnings (loss) represent returns on investments in twenty (20) core investment alternatives and interest accruals on cash balances, Chemours common stock returns, and dividend reinvestments. The core investment alternatives are the same investment alternatives available to all employees under the qualified plan. Interest is accrued on cash balances based on a rate that is traditionally less than 120% of the applicable federal rate, and dividend equivalents are accrued at a non-preferential rate. Accordingly, these amounts are not considered above-market or preferential earnings for purposes of, and are not included in, the 2022 Summary Compensation Table.



## Other Compensation Matters (continued)

This table reflects Salary and Non-Equity Incentive Plan Compensation amounts and Company contributions to qualified and nonqualified defined contribution plans reported in the aggregate balance at last fiscal year-end that were previously reported as compensation to the NEO in Chemours' Summary Compensation Table for previous year(s).

| | RSRP ($) | MDCP ($) | TOTAL ($) |
|---|---|---|---|
| Mark Newman | 848,725 | 856,700 | 1,705,425 |
| Denise Dignam | 99,650 | — | 99,650 |
| Susan Kelliher | 15,174 | 146,623 | 161,797 |
| Sameer Ralhan | 282,812 | — | 282,812 |
| Edwin Sparks | 272,999 | — | 272,999 |

### Narrative Discussion of the Nonqualified Deferred Compensation Table

Chemours sponsors two nonqualified deferred compensation plans for the benefit of eligible employees. The Retirement Savings Restoration Plan (RSRP) supplements our qualified defined contribution plan, the Retirement Savings Plan (RSP), and is designed to provide benefits more than IRS qualified plan limits applicable to the RSP. The Management Deferred Compensation Plan (MDCP) is an elective deferral plan that provides eligible employees with the opportunity to defer receipt of a specified portion of their compensation, thereby postponing income taxation on amounts deferred until the time such deferrals are distributed from the MDCP. Eligible employees may elect to participate in either, neither, or both nonqualified deferred compensation plans annually. The following provides an overview of the various deferral options as of December 31, 2023.

### Retirement Savings Restoration Plan

Each year during the enrollment window, eligible employees can elect to defer 1-6% of compensation. The deferral elections spring into effect when the participant's year-to-date compensation exceeds the IRS annual compensation limit ($330,000 for 2023). Compensation for RSRP purposes consists of base salary and annual incentive payments. Chemours provides. a Company matching contribution equal to 100% of the first 6% of the NEOs deferral amount. In addition, and entirely at its discretion, the Company may make non-elective contributions to the RSRP.

Deferrals and contributions to the RSRP are notionally invested in the available investment alternatives which mirror those made available under the qualified RSP. The term "notional" means account balances are not actually invested in any of the deemed investment alternatives, rather, the rate of return derived from the notional investments is credited to individual account balances consistent with the participant's investment direction elections.

When enrolling in the RSRP, participants are also requested to make distribution elections. Distributions are triggered by termination of employment and will commence either upon separation from service or 1-5 years thereafter if the participant so elects. Distributions may be paid in a lump sum or substantially equal annual installments over 2-15 years, at the election of the participant.

Employee and matching contributions are always 100% vested. Non-elective contributions are vested upon completion of three years of service. The NEOs are 100% vested in their deferrals and related investment experience.

### Management Deferred Compensation Plan

Under the terms of the MDCP, each year during the enrollment window eligible employees can elect to defer: 1-60% of "base salary" and/or 1-60% of the annual incentives. Additionally, corporate officers may elect to defer settlement of their equity awards (i.e., RSUs and/or PSUs).



## Other Compensation Matters (continued)

Base salary and annual incentive award deferrals are notionally invested in the available investment alternatives. The term "notional" means account balances are not actually invested in any of the deemed investment alternatives, rather, the rate of return derived from the notional investments is credited to individual account balances consistent with the participant's investment direction elections. Equity award deferrals are notionally invested in Chemours common stock with dividend equivalents credited as additional stock units. Chemours does not match deferrals under the MDCP.

When enrolling in the MDCP, participants are also requested to make distribution elections. Participants may elect either in-service or termination distribution elections. In-service distributions are payable as of a specified date in the form of a lump sum. Termination distributions commence either upon separation from service or 1-5 years thereafter if the participant so elects and can be paid either in a lump sum or substantially equal annual installments over 2-15 years, at the election of the participant.

NEOs are 100% vested in their deferrals and related investment experience.

### Potential Payments upon Termination or Change in Control

The table below summarizes the potential payouts to the NEOs, upon a termination from the Company, or under specified situations in a change in control as further described below. The amounts shown in the following table are approximate and reflect certain assumptions that the Company has made in accordance with the SEC's rules. These assumptions include that the termination of employment or change in control occurred on December 31, 2023, and that the value of a share of the Company's stock on that day was $31.54, the closing price per share of the Company's common stock on December 29, 2023. The table also includes potential payments under The Chemours Company 2017 Equity and Incentive Plan (the "2017 Plan"). The treatment of benefits under each plan on termination or change in control is detailed in the footnotes to the table.

The following table does not include Messrs. Ralhan and Sparks because they left the company during the year and no payments were made to these NEOs in connection with the termination of employment.

Effective January 1, 2017, Chemours revised the termination provisions associated with PSUs, PSOs, NQSOs, and RSUs awards to be more consistent with market prevalence and simplify administration. A summary of the provisions by award type follows.

The Company has entered into a Separation Agreement dated as of March 22, 2024, with Mr. Newman, the former Chief Executive Officer. Under the Separation Agreement, the former Chief Executive Officer is not entitled to any severance, equity award vesting or other compensation in connection with his resignation. Mr. Newman is not eligible for the payments and benefits described below.



TABLE OF CONTENTS

## Other Compensation Matters (continued)

| NAME[9] | FORM OF COMPENSATION[1] | VOLUNTARY OR FOR CAUSE ($) | INVOLUNTARY TERMINATION WITHOUT CAUSE ($)[2] | RETIREMENT ($)[3] | DEATH ($)[4] | DISABILITY ($)[5] | CHANGE IN CONTROL WITH ASSUMPTION OR SUBSTITUTION[6] | CHANGE IN CONTROL WITHOUT ASSUMPTION OR SUBSTITUTION[7] | TERMINATION WITHOUT CAUSE OR RESIGNATION FOR GOOD REASON IN CONNECTION WITH CHANGE IN CONTROL[8] |
|---|---|---|---|---|---|---|---|---|---|
| Mark Newman | Annual Salary | — | 176,282 | — | — | — | — | — | 3,000,000 |
| | Target Annual Bonus | — | 1,300,000 | — | — | — | — | — | 3,900,000 |
| | Target Annual Bonus (pro-rated) | — | — | — | 1,300,000 | 1,300,000 | — | — | 1,300,000 |
| | Health and Dental Benefits | — | 5,046 | — | — | — | — | — | 60,551 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 12,900 |
| | Stock Options | — | — | — | 918,555 | 918,555 | — | 918,555 | 918,555 |
| | RSUs | — | — | — | 1,877,797 | 1,877,797 | — | 1,877,797 | 1,877,797 |
| | PSUs | — | — | — | 4,120,156 | 4,120,156 | — | 4,120,156 | 6,061,389 |
| | **Total** | **—** | **1,483,478** | **—** | **8,216,508** | **8,216,508** | **—** | **6,916,508** | **17,131,192** |
| Jonathan Lock | Annual Salary | — | 66,346 | — | — | — | — | — | 1,200,000 |
| | Target Annual Bonus | — | 450,000 | — | — | — | — | — | 900,000 |
| | Target Annual Bonus (pro-rated) | — | — | — | 450,000 | 450,000 | — | — | 450,000 |
| | Health and Dental Benefits | — | 7,425 | — | — | — | — | — | 59,398 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 8,600 |
| | Stock Options | — | — | — | 115,037 | 115,037 | — | 115,037 | 115,037 |
| | RSUs | — | — | — | 443,358 | 443,358 | — | 443,358 | 443,358 |
| | PSUs | — | — | — | 532,103 | 532,103 | — | 532,103 | 682,526 |
| | **Total** | **—** | **525,921** | **—** | **1,540,498** | **1,540,498** | **—** | **1,090,498** | **3,858,919** |
| Denise Dignam | Annual Salary | — | 275,000 | — | — | — | — | — | 1,100,000 |
| | Target Annual Bonus | — | 412,500 | — | — | — | — | — | 825,000 |
| | Target Annual Bonus (pro-rated) | — | — | — | 412,500 | 412,500 | — | — | 412,500 |
| | Health and Dental Benefits | — | 4,761 | — | — | — | — | — | 38,091 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 8,600 |
| | Stock Options | — | — | — | 128,646 | 128,646 | — | 128,646 | 128,646 |
| | RSUs | — | — | — | 789,068 | 789,068 | — | 789,068 | 789,068 |
| | PSUs | — | — | — | 579,882 | 579,882 | — | 579,882 | 816,098 |
| | **Total** | **—** | **694,411** | **—** | **1,910,096** | **1,910,096** | **—** | **1,497,596** | **4,118,003** |



## Other Compensation Matters (continued)

| NAME[9] | FORM OF COMPENSATION[1] | VOLUNTARY OR FOR CAUSE ($) | INVOLUNTARY TERMINATION WITHOUT CAUSE ($)[2] | RETIREMENT ($)[3] | DEATH ($)[4] | DISABILITY ($)[5] | CHANGE IN CONTROL WITH ASSUMPTION OR SUBSTITUTION[6] | CHANGE IN CONTROL WITHOUT ASSUMPTION OR SUBSTITUTION[7] | TERMINATION WITHOUT CAUSE OR RESIGNATION FOR GOOD REASON IN CONNECTION WITH CHANGE IN CONTROL[8] |
|---|---|---|---|---|---|---|---|---|---|
| Kristine Wellman | Annual Salary | — | 87,340 | — | — | — | — | — | 1,000,000 |
| | Target Annual Bonus | — | 350,000 | — | — | — | — | — | 700,000 |
| | Target Annual Bonus (pro-rated) | — | — | — | 350,000 | 350,000 | — | — | 350,000 |
| | Health and Dental Benefits | — | — | — | — | — | — | — | — |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 8,600 |
| | Stock Options | — | — | — | 83,584 | 83,584 | — | 83,584 | 83,584 |
| | RSUs | — | — | — | 404,595 | 404,595 | — | 404,595 | 404,595 |
| | PSUs | — | — | — | 48,900 | 48,900 | — | 48,900 | 147,103 |
| | **Total** | **—** | **439,490** | **—** | **887,079** | **887,079** | **—** | **537,079** | **2,693,882** |
| Alvenia Scarborough | Annual Salary | — | 86,939 | — | — | — | — | — | 700,000 |
| | Target Annual Bonus | — | 175,000 | — | — | — | — | — | 350,000 |
| | Target Annual Bonus (pro-rated) | — | — | — | 175,000 | 175,000 | — | — | 175,000 |
| | Health and Dental Benefits | — | 6,839 | — | — | — | — | — | 54,712 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 8,600 |
| | Stock Options | — | — | — | 74,379 | 74,379 | — | 74,379 | 74,379 |
| | RSUs | — | — | — | 324,673 | 324,673 | — | 324,673 | 324,673 |
| | PSUs | — | — | — | 319,968 | 319,968 | — | 319,968 | 435,000 |
| | **Total** | **—** | **270,928** | **—** | **894,020** | **894,020** | **—** | **719,020** | **2,122,363** |
| Susan Kelliher | Annual Salary | — | 53,806 | — | — | — | — | — | 850,000 |
| | Target Annual Bonus | — | 297,500 | — | — | — | — | — | 595,000 |
| | Target Annual Bonus (pro-rated) | — | — | — | 297,500 | 297,500 | — | — | 297,500 |
| | Health and Dental Benefits | — | 3,734 | — | — | — | — | — | 29,875 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 8,600 |
| | Stock Options | — | — | — | 176,798 | 176,798 | — | 176,798 | 176,798 |
| | RSUs | — | — | — | 245,697 | 245,697 | — | 245,697 | 245,697 |
| | PSUs | — | — | — | 795,274 | 795,274 | — | 795,274 | 1,043,028 |
| | **Total** | **—** | **357,190** | **—** | **1,515,269** | **1,515,269** | **—** | **1,217,769** | **3,246,498** |



## Other Compensation Matters (continued)

### PSUs

■ Retirement eligibility results in vesting of a pro-rated portion of the award, with performance based on actual performance over the full performance period and proration based on the number of days the NEO was employed during the performance period

■ Death or Disability results in vesting of a pro-rated portion of the award, with performance based on actual performance over the full performance period and proration based on the number of days the NEO was employed during the performance period

■ Change in Control with qualifying termination remains consistent with the description below

### PSOs and NQSOs

■ Retirement eligibility results in continued vesting, and the time to exercise is three years post-employment or the original expiration date of the award, whichever occurs first

■ Death or disability termination results in immediate vesting of unvested awards and the time to exercise is limited to two years post-employment, or the original expiration date of the award whichever occurs first

■ Change in Control with qualifying termination remains consistent with the description below

■ Any other termination results in the forfeiture of unvested options and 90 days post-employment to exercise any options vested as of the termination date

### RSUs

■ Retirement eligibility results in continued vesting of unvested awards

■ Death or Disability termination results in immediate vesting of unvested awards

■ Change in Control with qualifying termination remains consistent with the description below

■ Any other termination results in forfeiture of unvested awards

(1) The award agreements for stock options, performance stock options, PSUs and RSUs contain restrictive covenants that may result in forfeiture of unvested PSUs, PSOs, NQSOs, and RSUs upon a breach of confidentiality, non-solicitation and non-competition obligations during employment and after termination of employment (for a period of one year for non-solicitation and non-competition).

(2) Upon termination of employment for Lack of Work or Involuntary Termination:

    a. PSOs and NQSOs awards granted on or after January 1, 2017 and vested as of the termination date may be exercised during the 90-day period following termination. Unvested stock option awards granted on or after January 1, 2018, to holders who are not retirement eligible are forfeited.

    b. NQSOs awards granted prior to January 1, 2017, may be exercised during the one-year period following termination.

    c. PSUs granted on or after January 1, 2017, and unvested as of the termination date are forfeited.

    d. To the extent that an NEO is retirement eligible, unvested PSOs and NQSOs, RSUs, and PSUs are treated as if the NEO has retired.

    e. Severance benefits consist of: one week of salary for each complete year of service, with a minimum of four weeks and a maximum of twenty-six weeks; pro-rata annual bonus based on service during the performance period (i.e., calendar year); three months of Company-paid health care continuation coverage; limited outplacement assistance.

(3) Upon Retirement:

    a. PSOs and NQSOs granted on or after January 1, 2017 continue vesting, but the time to exercise is limited to three years post-employment or the original expiration date of the award, whichever occurs first.

    b. For stock options granted prior to January 1, 2017 the award holder retains the full term of the award in which to exercise.

    c. PSUs are pro-rated based on actual performance for service during the performance period. Amount shown represents the pro-rated number of units earned as of December 31, 2023 at the level of performance assumed and disclosed in the Outstanding Equity Awards at 2023 Fiscal Year-End table.

(4) Upon Death:

    a. PSOs and NQSOs awards immediately vest and the time to exercise is limited to two years post-employment or the original expiration date of the award, whichever occurs first. Amount shown represents the in-the-money value of stock options for which vesting is accelerated, as of December 31, 2023.

    b. RSUs are automatically vested and paid out. Amount shown represents the value of all RSUs as of December 31, 2023 that are automatically vested and paid out.

    c. PSUs are pro-rated based on actual performance for service during the performance period. Amount shown represents the pro-rated number of units earned as of December 31, 2023 at the level of performance assumed and disclosed in the Outstanding Equity Awards at 2023 Fiscal Year-End table.

(5) Upon termination of employment due to Disability:

    a. PSOs and NQSOs awards granted on or after January 1, 2017 are immediately vested and the time to exercise is limited to two years post- employment or the original expiration date of the award, whichever occurs first.



## Other Compensation Matters (continued)

b. NQSOs granted prior to January 1, 2017 may be exercised during the one-year period following termination.

c. PSUs are pro-rated based on actual performance for service during the performance period. Amount shown represents the pro-rated number of units earned as of December 31, 2023 at the level of performance assumed and disclosed in the Outstanding Equity Awards at 2023 Fiscal Year-End table.

d. RSUs are automatically vested and paid out. Amount shown represents the value of all RSUs as of December 31, 2023 that are automatically vested and paid out.

e. To the extent that the NEO is retirement eligible, unvested stock options, RSUs and PSUs are treated as if the NEO has retired.

(6) Change in Control with Assumption or Substitution:

Treatment varies depending on whether the Company is the surviving entity and, if not, whether the awards are assumed or substituted by an acquiring entity. If the company is the surviving entity or the awards are assumed or substituted, service-based vesting conditions applicable to options and RSUs are not accelerated, and PSU performance goals are deemed achieved at target levels with the awards remaining subject to service-based vesting conditions. Values shown in this column assume outstanding equity awards are assumed or substituted and therefore do not vest due to the change in control.

(7) Change in Control without Assumption or Substitution:

Values shown in this column assume that the Company is not the surviving entity and the acquiring entity does not assume or substitute outstanding equity awards, resulting in the awards vesting in full and being cashed settled, with PSUs vesting at target levels. Accordingly, the amounts shown in this column reflect the in-the-money value of unvested stock options, the value of all RSUs, and the value of PSUs at target levels, in each case as of December 31, 2023.

(8) Termination without Cause or Resignation for Good Reason in connection with Change in Control:

Under the Senior Executive Severance Plan, if a change in control occurs and the executive's employment is terminated within two years following the change in control, either by the Company without cause or the executive for good reason (often called a "double trigger"), subject to the executive's execution of a release of claims, the executive receives (i) a lump sum cash payment equal to two times (three times for the CEO) the sum of the executive's base salary and target annual bonus; (ii) a lump sum cash payment equal to the prorated portion of the executive's target annual bonus for the year of termination; and (iii) continued health and dental benefits and outplacement services for two years (three years for the CEO) following the date of termination.

Additionally, under the 2017 Plan, equity awards would become fully vested, with PSUs vesting at target levels. Amounts shown in this column reflect severance payable under the Senior Executive Severance Plan and the value of equity awards that would vest assuming a change in control occurs and the executive's employment is terminated without cause or for good reason on December 31, 2023.

(9) Messrs. Ralhan and Sparks were no longer employed by Chemours on December 31, 2023, they are no longer eligible for compensation related to Change of Control.

### Susan Kelliher's Special Employment, Separation, and Release Agreement

On September 13, 2023, the Company announced Susan Kelliher, Senior Vice President, People, formalized her intention to retire from her position at the end of September 2023. As part of her transition plan, Ms. Kelliher began serving as a strategic advisor to the company, effective October 1, 2023. She will terminate service as an employee of the Company on July 1, 2024, and transition into a consulting role through June 30, 2025. The Company entered into a special employment, separation, and release agreement with Ms. Kelliher, effective October 1, 2023, which sets forth the terms of the above-described arrangements.

As Strategic Advisor Organizational Effectiveness to the CEO, Ms. Kelliher has continued to receive the same base salary, AIP and LTIP awards at target as defined in her previous role. As part of Ms. Kelliher's future separation of employment on July 1, 2024 and in exchange for her continued full-time employment through that date, in July 2024, Ms. Kelliher will receive $57,212 in severance pay, a 2024 AIP prorated target payout of $148,750, and other incidental benefits set forth in the separation and release agreement. In consideration of her ongoing non-competition and non-solicitation obligations and subject to entry into a post-separation agreement, Ms. Kelliher also will receive a cash payment of $400,000. In addition, pursuant to the separation and release agreement, Ms. Kelliher will be compensated approximately $33,333 per month for consulting services from July 2, 2024, through June 30, 2025.



## Other Compensation Matters (continued)

**Compensation and Leadership Development Committee Report**

*Notwithstanding anything to the contrary set forth in any of the previous or future filings under the Securities Act of 1933 or the Securities Exchange Act of 1934 that might incorporate this proxy statement or future filings with the Securities and Exchange Commission, in whole or part, the following report shall not be deemed to be incorporated by reference into any such filing.*

The CLDC reviewed and discussed the Compensation Discussion and Analysis contained in this Proxy Statement with management of the Company. Based on the review and discussions noted above, the CLDC recommended to the Board that the Compensation Discussion and Analysis be included in our Annual Report and in this Proxy Statement.

COMPENSATION AND LEADERSHIP DEVELOPMENT COMMITTEE

Sean D. Keohane, Chair
Mary B. Cranston
Erin N. Kane
Pamela F. Fletcher



## Other Compensation Matters (continued)

### CEO PAY RATIO

There were no significant changes to the global employee population nor significant changes to employee compensation arrangements. Per SEC rules, Chemours chose a new individual to represent the Median Employee as last year was the final year of the three-year period that individual's compensation could be used for this analysis. The CEO pay ratio figures below are a reasonable estimate calculated in a manner consistent with SEC rules.

The individual's compensation reflects January 1, 2023 to December 31, 2023. The total number of employees was approximately 6,200. When Chemours selected the employee, the Company determined the median employee's pay.

Chemours chose total earnings including overtime pay as the consistently applied compensation measure. Chemours then calculated an annual gross cash compensation for each employee. Chemours used a valid statistical sampling methodology to identify a population of employees whose base pay was within a 5% range of the median. Using this methodology, Chemours identified the median employee from that group.

The total compensation for the selected median employee in 2023 was $109,473. The ratio of CEO pay to the median worker pay is 67:1. This ratio has decreased from 71:1 in 2022.

| ELEMENT | MEDIAN EMPLOYEE $ | CEO $ |
|---|---|---|
| Salary (includes Overtime)[1] | 100,695 | 1,000,000 |
| Stock Awards | 0 | 3,249,640 |
| Option Awards | 0 | 2,999,990 |
| Non-Equity Incentive Plan Compensation/Bonus[2] | 2,353 | 0 |
| Change in Pension Value | 0 | 0 |
| All Other Compensation[3][4] | 6,426 | 85,800 |
| Summary Compensation Table Totals | 109,473 | 7,335,430 |
| CEO Pay Ratio | | 67:1 |

(1) Consists of 2023 base salary plus overtime pay.
(2) Actual 2023 cash incentive paid during the first quarter of fiscal year 2024 under a performance-based compensation plan.
(3) Consists of 2023 employer contributions to qualified and non-qualified defined contribution plans and perquisites/personal benefits as listed in footnote 5 of the Summary Compensation Table.
(4) The CLDC and the Board applied negative discretion to reduce the AIP payout for the former Chief Executive Officer Mr. Newman to $0.

### PAY VERSUS PERFORMANCE

Chemours and the CLDC are committed to ensuring alignment between Company performance and executive compensation to encourage and reward management for the creation of shareholder value. This Pay vs. Performance disclosure provides an additional perspective on our pay and performance alignment. This perspective is enhanced by the inclusion of Compensation Actually Paid ("CAP") to our PEOs and NEOs, which captures the annual change in management's total, company-derived wealth. This provides a distinct view from total compensation for our CEO and NEO as set forth in the "Summary Compensation Table" ("SCT"), which captures the annual economic cost of compensation to the Company. CAP is a more suitable comparator to performance since it includes the effect of performance on executive compensation over time and the degree to which pay is aligned with performance. For further information concerning the Company's variable pay-for-performance philosophy and how the Company aligns executive compensation with the Company's performance, refer to the "Executive Compensation" section of the CD&A.

**Pay Versus Performance Table**

The following table shows the past four fiscal years' of SCT pay, CAP, our cumulative total shareholder return ("TSR"), the cumulative TSR of our performance peers over the same period, our net income, and our Adjusted EBITDA. As the table below



2024 Proxy Statement     **73**

## Other Compensation Matters (continued)

demonstrates, there is a strong relationship between our financial outcomes and CAP to PEOs and the average of CAP to the remaining NEOs. The CLDC believes strongly that the Company's pay-for-performance approach is working as designed. The design includes the ability to use discretion, which the CLDC did in the case of the second PEO and one of the NEOs.

| YEAR | SUMMARY COMPENSATION TABLE TOTAL FOR FIRST PEO[1] | COMPENSATION ACTUALLY PAID TO FIRST PEO[2] | SUMMARY COMPENSATION TABLE TOTAL FOR SECOND PEO[3] | COMPENSATION ACTUALLY PAID TO SECOND PEO[4] | AVERAGE SUMMARY COMPENSATION TABLE TOTAL FOR NON PEO[5] | AVERAGE COMPENSATION ACTUALLY PAID TO NON-PEO NEOS[6] | VALUE OF INITIAL FIXED $100 INVESTMENT BASED ON: | | NET INCOME (MILLIONS)[9] | ADJUSTED EBITDA (MILLIONS)[10] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | TOTAL SHAREHOLDER RETURN[7] | PEER GROUP TOTAL SHAREHOLDER RETURN[8] | | |
| 2023 | — | — | $ 7,335,430 | $ 934,313 | $ 1,542,699 | $ (296,368)[11] | $ 203.94 | $ 149.93 | $ (238) | $ 1,014 |
| 2022 | — | — | $ 7,670,351 | $ 9,839,552 | $ 2,107,360 | $ 2,450,210 | $ 191.44 | $ 130.45 | $ 578 | $ 1,361 |
| 2021 | $ 9,012,886 | $ 25,427,573 | $ 5,537,669 | $ 10,256,484 | $ 2,359,471 | $ 5,383,970 | $ 203.63 | $ 151.70 | $ 608 | $ 1,313 |
| 2020 | $ 8,606,576 | $ 16,928,335 | — | — | $ 2,915,198 | $ 4,524,555 | $ 145.61 | $ 119.86 | $ 219 | $ 879 |

(1) The dollar amounts reported are the amounts of total compensation reported for Mr. Vergnano for each corresponding year in the "Total" column of the SCT. Refer to "Executive Compensation — Executive Compensation Tables — Summary Compensation Table."

(2) The dollar amounts reported represent the amount of CAP to Mr. Vergnano, as computed in accordance with Item 402(v) of Regulation S-K. The dollar amounts do not reflect the actual amount of compensation earned by or paid to Mr. Vergnano during the applicable year. In accordance with the requirements of Item 402(v) of Regulation S-K, the following "Pay Versus Performance Calculation Detail" table displays the adjustments made to Mr. Vergnano's total compensation for each year to determine the CAP.

(3) The dollar amounts reported are the amounts of total compensation reported for Mr. Newman for each corresponding year in the "Total" column of the SCT. Refer to "Executive Compensation — Executive Compensation Tables — Summary Compensation Table."

(4) The dollar amounts reported represent the amount of CAP to Mr. Newman, as computed in accordance with Item 402(v) of Regulation S-K. The dollar amounts do not reflect the actual amount of compensation earned by or paid to Mr. Newman during the applicable year. In accordance with the requirements of Item 402(v) of Regulation S-K, the following "Pay Versus Performance Calculation Detail" table displays the adjustments made to Mr. Newman's total compensation for each year to determine the CAP.

(5) The dollar amounts reported represent the average of the amounts reported for the Company's NEOs as a group (excluding the applicable PEO) in the "Total" column of the SCT in each applicable year. The names of each of the NEOs (excluding the applicable PEO) included for purposes of calculating the average amounts in each applicable year are as follows: (i) for 2023, Jonathan Lock, Denise Dignam, Kristine Wellman, Alvenia Scarborough, Susan Kelliher, Sameer Ralhan, and Edwin Sparks; (ii) for 2022, Sameer Ralhan, Edwin Sparks, Alisha Bellezza, Denise Dignam, and David Shelton; (iii) for 2021, Sameer Ralhan, Edwin Sparks, Susan Kelliher, Bryan Snell, and David Shelton; and (iv) for 2020, Sameer Ralhan, Edwin Sparks, Mark Newman, and David Shelton.

(6) The dollar amounts reported represent the average amount of CAP to the NEOs as a group (excluding the applicable PEO), as computed in accordance with Item 402(v) of Regulation S-K. The dollar amounts do not reflect the actual average amount of compensation earned by or paid to the NEOs as a group (excluding the applicable PEO) during the applicable year. In accordance with the requirements of Item 402(v) of Regulation S-K, the following "Pay Versus Performance Calculation Detail" table displays the adjustments made to the NEOs' (excluding the applicable PEO) total compensation for each year to determine the CAP.

(7) TSR is calculated by dividing the sum of the cumulative amount of dividends for the measurement period, assuming dividend reinvestment, and the difference between the Company's share price at the end and the beginning of the measurement period by the Company's share price at the beginning of the measurement period.

(8) Represents the weighted peer group TSR, weighted according to the respective companies' stock market capitalization at the beginning of each period for which a return is indicated. The peer group used for this purpose is the following published industry index: S&P 400 Chemicals.

(9) The dollar amounts reported represent the amount of net income reflected in the Company's audited financial statements for the applicable year.

(10) See "Compensation Discussion and Analysis" in this Proxy Statement for the definition of Adjusted EBITDA.

(11) Average Compensation Actually Paid of non-PEO NEOs is a negative amount due to equity forfeited upon the departures of Messrs. Ralhan and Sparks.



## Other Compensation Matters (continued)

**Pay Versus Performance Calculation Detail**

| | PEO 1 | | | | PEO 2 | | | | NEO AVERAGE | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2020 | 2023 | 2022 | 2021 | 2020 | 2023 | 2022 | 2021 | 2020 |
| Summary Compensation Table Total | — | — | $ 9,012,886 | $ 8,606,576 | $ 7,335,430 | $ 7,670,351 | $ 5,537,669 | — | $ 1,542,699 | $ 2,107,360 | $ 2,359,471 | $ 2,915,198 |
| Less: Reported Fair Value of Equity Awards[a] | — | — | $ 7,056,334 | $ 6,231,013 | $ 6,249,631 | $ 5,504,353 | $ 3,039,984 | — | $ 1,042,701 | $ 1,130,702 | $ 1,139,675 | $ 1,807,220 |
| Add: Year-End Fair Value of Equity Awards Granted in the Year[b(I)] | — | — | $ 10,037,056 | $ 14,805,523 | $ 5,542,082 | $ 7,286,350 | $ 3,737,324 | — | $ 549,601 | $ 1,482,246 | $ 1,697,677 | $ 3,537,581 |
| Add: Change in Fair Value of Equity Awards Granted in Prior Years and Remain Unvested[b(II)] | — | — | $ 11,676,849 | $ (501,171) | $ (4,188,551) | $ (231,485) | $ 3,508,735 | — | $ (246,002) | $ (164,478) | $ 2,182,023 | $ (157,388) |
| Add: Fair Value as of Vesting Date of Equity Awards Granted and Vested in the Year[b(III)] | — | — | $ 144,996 | — | — | — | — | — | — | — | — | — |
| Add: Change in Fair Value of Equity Awards Granted in Prior Years that Vested in the Year[b(iv)] | — | — | $ 507,084 | $ (2,653) | $ 516,921 | $ 333,788 | $ 184,986 | — | $ 97,757 | $ 47,967 | $ 77,860 | $ (17,955) |
| Add: Fair Value at the End of Prior Year of Equity Awards that Fail to Meet Vesting Conditions[b(v)] | — | — | — | $ (1,929,442) | — | — | $ (1,178,272) | — | — | — | — | |
| Add: Value of Dividends or other Earnings Paid on Stock or Option Awards not Otherwise Reflected in Fair Value or Total Compensation[b(vii)] | — | — | $ 1,105,035 | $ 251,073 | $ (92,496) | $ 284,902 | $ 327,754 | — | $ (19,450) | $ 107,817 | $ 206,615 | $ 54,340 |
| Less: Reported Change in the Actuarial Present Value of Pension Benefits[c] | — | — | — | — | — | — | — | — | — | — | — | — |
| Add: Actuarially determined service cost for services rendered during the fiscal year | — | — | — | — | — | — | — | — | — | — | — | — |
| Add: Entire cost of benefits granted in a plan amendment (or initiation) during the applicable year that are attributed by the benefit formula to services rendered in periods prior to the plan amendment or initiation | — | — | — | — | — | — | — | — | — | — | — | — |
| **CAP** | — | — | $ 25,427,573 | $ 16,928,335 | $ 934,313 | $ 9,839,552 | $ 10,256,484 | — | $ (296,368) | $ 2,450,210 | $ 5,383,970 | $ 4,524,555 |

(a) The grant date fair value of equity awards represents the total of the amounts reported in the "Stock Awards" and "Option Awards" columns in the SCT for the applicable year.

(b) The equity award adjustments for each applicable year include the addition (or subtraction, as applicable) of the following: (i) the year-end fair value of any equity awards granted in the applicable year that are outstanding and unvested as of the end of the year; (ii) the amount of change as of the end of the applicable year (from the end of the prior fiscal year) in fair value of any awards granted in prior years that are outstanding and unvested as of the end of the applicable year; (iii) for awards that are granted and vest in the same applicable year, the fair value as of the vesting date; (iv) for awards granted in prior years that vest in the applicable year, the amount equal to the change as of the vesting date (from the end of the prior fiscal year) in fair value; (v) for awards granted in any prior fiscal year that fail to meet the applicable vesting conditions during the covered fiscal year, the amount equal to the fair value at the end of the prior fiscal year; and (vi) the dollar value of any dividends or other earnings paid on stock or option awards in the applicable year prior to the vesting date that are not otherwise reflected in the fair value of such award or included in any other component of total compensation for the applicable year. The valuation assumptions used to calculate fair values did not materially differ from those disclosed at the time of grant.

(c) The amounts included in this row are the amounts reported in "Change in Pension and Nonqualified Deferred Compensation" column of the SCT for each applicable year.



## Other Compensation Matters (continued)

**Relationship Between CAP and Performance Measures**

Our equity-based compensation is influenced by stock price performance and by the Company's performance against strategic and financial priorities established by the Board and CLDC. As a result, PEOs and NEOs actual compensation is driven by the Company's success in delivering total shareholder return relative to peers (rTSR) and by delivering strategic and financial excellence. We note the following factors influenced the results of the Pay Versus Performance calculations:

■ Impact of Equity Compensation — A significant portion of the executives' TDC is equity-based. Given the critical role of equity grants in the executives' pay, stock price has a significant impact on actual compensation. The Company's stock price has been volatile over the past four years, ranging from approximately $15 to above $44 per share, and the CAP to the PEOs, and the average of CAP to the remaining NEOs, tracks with that volatility.

■ CEO Transition — In July 2021, the Company completed a transition of the CEO role from Mr. Vergnano to Mr. Newman. The following tables reflect that transition, including the value of Mr. Vergnano's separation agreement. Additionally, they reflect Mr. Newman's compensation prior to and after his promotion to CEO. As noted in the CD&A, Mr. Newman's CAP in 2021, 2022, and 2023 was impacted by the compensation philosophy to ramp TDC for newly promoted executives over a multi-year period.

■ CLDC Discretion — In 2023 the CLDC exercised negative discretion on the second PEO, Mr. Newman and one of the NEOs, Mr. Lock, which had significant impact on actual compensation.

■ Financial Metrics — Net Income and Adjusted EBITDA correlate with TSR over the long-term, but not necessarily in any given year, in part because TSR reflects investors' assessment of the Company's value, taking forward-looking factors into account. Conversely, Adjusted EBITDA and Net Income are backward-looking and measure performance over discrete one-year time periods. Our compensation program reflects our belief that actual compensation should correlate closely with stockholder returns but should also correlate with performance on key strategic priorities or financial metrics like net income or Adjusted EBITDA.

The graph below displays the relationship between the Company's TSR versus the TSR of its peer group. The Company's TSR outperformed its peer group.





## Other Compensation Matters (continued)

**CAP vs Company TSR**[1][2]

The below chart showing the relationship between the average PEOs' and NEOs' CAP and TSR demonstrates the critical role of equity grants and significant impact of our stock price on our executives' pay.



(1) TSR is calculated by dividing the sum of the cumulative amount of dividends for the measurement period, assuming dividend reinvestment, and the difference between the Company's share price at the end and the beginning of the measurement period by the Company's share price at the beginning of the measurement period.



## Other Compensation Matters (continued)

**CAP vs Net Income (NI) and Adjusted EBITDA[1]**

The below chart shows the relationship between the average PEOs' and NEOs' CAP versus NI and Adjusted EBITDA which illustrates the impact of these measures as realized compensation.



(1) PEO CAP in displayed in the above table reflects Mr. Vergnano's CAP in 2020, Mr. Newman's CAP in 2022 and 2023 and an average CAP for both for 2021.

**Most Important Company Performance Measures for Determining Executive Compensation**

For fiscal year 2023, our CLDC identified the performance measures listed below as the most important financial performance measures used by the Company to link CAP for our named executive officers, for the most recently completed fiscal year, to the Company's performance:

■ Adjusted EBITDA

■ Free Cash Flow

■ TSR



## Proposal 2 — Advisory Vote to Approve Named Executive Officer Compensation

Pursuant to Section 14A of the Exchange Act and the related rules of the SEC, the Company seeks your vote to approve, on an advisory basis, the compensation of the Company's named executive officers as disclosed in this Proxy Statement pursuant to the SEC's compensation disclosure rules, including the Compensation Discussion and Analysis, the compensation tables, and the narrative disclosures in the Company's compensation tables (a "say-on-pay" vote).

As described in detail under the heading "Executive Compensation — Compensation Discussion and Analysis" in this Proxy Statement, the Board of Directors seeks to link a significant portion of executive officer compensation with the Company's performance. The Company's compensation programs are designed to reward the Company's executive officers for the achievement of short-term and long-term financial goals, while minimizing excessive risk taking. The Company's executive compensation program is strongly aligned with the long-term interests of shareholders. The Company urges you to read the Compensation Discussion and Analysis section of this Proxy Statement for additional details on executive compensation programs, including compensation philosophy and objectives, and the compensation of named executive officers during fiscal year 2023.

The vote on this proposal is not intended to address any specific element of compensation; rather, the vote relates to all compensation relating to the Company's named executive officers, as described in this Proxy Statement.

The vote is advisory and is not binding on the Company, the Board, or the Compensation and Leadership Development Committee, and will not be construed as overruling a decision by, or creating or implying any additional fiduciary duty for, the Company, the Board, or the Compensation and Leadership Development Committee. However, the Board and the Compensation and Leadership Development Committee value the opinions expressed by shareholders in their votes on this proposal and will consider the outcome of the vote when making future compensation decisions and policies regarding the Company's executive officers.

Accordingly, the Board of Directors and management ask shareholders to approve the following resolution at the Annual Meeting:

"**RESOLVED**, that the Company's shareholders approve, on an advisory basis, the compensation of the named executive officers, as disclosed in the Company's Proxy Statement for the 2024 Annual Meeting of Shareholders pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the Compensation Discussion and Analysis, the compensation tables and any related material disclosed in this Proxy Statement."

---

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" THE APPROVAL, ON AN ADVISORY BASIS, OF THE COMPENSATION OF THE NAMED EXECUTIVE OFFICERS AS DESCRIBED IN THIS PROXY STATEMENT.**

---



## Proposal 3 — Ratification of Selection of Independent Registered Public Accounting Firm

The Audit Committee has selected PricewaterhouseCoopers LLP (PwC) as the Company's independent registered public accounting firm to audit the Company's consolidated financial statements and internal control over financial reporting for the fiscal year ending December 31, 2024. In Proposal 3, the Company is asking shareholders to ratify this selection.

Although ratification is not required by the Company's Bylaws or otherwise, the Board is submitting the selection of PwC to the Company's shareholders for ratification. If the selection is not ratified, the Audit Committee will consider whether it is appropriate to select another independent registered public accounting firm. Even if the selection is ratified, the Audit Committee in its discretion may select a different independent registered public accounting firm at any time during the year, if it determines that such a change would be in the best interests of the Company and its shareholders.

Representatives of PwC are expected to be present at the Annual Meeting and will be available to respond to appropriate questions and will have the opportunity to make a statement if they desire to do so.

---

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" THE PROPOSAL TO RATIFY THE SELECTION OF PRICEWATERHOUSECOOPERS LLP AS INDEPENDENT PUBLIC ACCOUNTING FIRM FOR FISCAL YEAR 2024**

---

### FEES PAID TO INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

PwC has served as the Company's independent registered public accounting firm since 2014. Aggregate fees for professional services rendered by PwC for 2023 and 2022 are set forth in the table below.

| | 2023 (IN THOUSANDS) | 2022 (IN THOUSANDS) |
|---|---|---|
| Audit fees[1] | $ 9,695 | $ 7,145 |
| Audit-related fees[2] | 413 | 320 |
| Tax fees[3] | 448 | 319 |
| All other fees[4] | 3 | 14 |
| Total | $ 10,559 | $ 7,798 |

(1) Audit fees related to audits of financial statements and internal controls over financial reporting, statutory audits, reviews of quarterly financial statements, and certain periodic reports filed with the SEC.

(2) Audit-related fees related primarily to accounting consultations and other assurance related services not required by statute.

(3) Tax fees related primarily to tax compliance and advice.

(4) Other fees in 2023 are related to tax research and technical accounting and reporting software tools.

### AUDIT COMMITTEE'S PRE-APPROVAL POLICIES AND PROCEDURES]

To assure that the audit and non-audit services performed by the independent registered public accounting firm do not impair its independence in appearance and/or fact, the Audit Committee has established the Audit and Non-Audit Services Pre-Approval Policy of the Audit Committee (the "Policy"). The Policy outlines the scope of services that PwC may provide to the Company. The Policy sets forth guidelines and procedures the Company must follow when retaining PwC to perform audit, audit-related, tax and other services. The Policy also specifies certain non-audit services that may not be performed by PwC under any circumstances. Pursuant to the Policy, the Audit Committee has approved services to be provided by PwC and fee thresholds within each of the service categories, and services within these thresholds are deemed pre-approved. Additional services and fees exceeding those thresholds require further pre-approval. Requests for specific pre-approvals may be considered by the full Audit Committee. In addition, the Audit Committee has delegated to the Chair the authority to grant specific pre-approvals. Any such pre-approvals are reported to the full Audit Committee at its next meeting. The Policy is evaluated and updated annually by the Audit Committee. For fiscal year 2023, all services provided by PwC were approved by the Audit Committee.



## Proposal 3 — Ratification of Selection of Independent Registered Public Accounting Firm (continued)

### REPORT OF THE AUDIT COMMITTEE

Notwithstanding anything to the contrary set forth in any of the Company's previous or future filings under the Securities Act of 1933 or the Securities Exchange Act of 1934 that might incorporate this proxy statement or future filings with the Securities and Exchange Commission, in whole or part, the following report shall not be deemed to be incorporated by reference into any such filing.

The Audit Committee is appointed by the Board of Directors to assist the Board in the oversight of (i) the integrity of the financial statements of the Company, (ii) the qualifications and independence of the Company's independent auditor, (iii) the performance of the Company's internal audit function and independent auditors, and (iv) the compliance by the Company with legal and regulatory requirements. All members of the Audit Committee meet the criteria for independence applicable to Audit Committee members under NYSE Listing Standards and the rules and regulations of the SEC relating to audit committees. The Audit Committee Charter complies with NYSE Listing Standards.

Management is responsible for the financial reporting process, including its internal control over financial reporting, and for the preparation of its consolidated financial statements in accordance with accounting principles generally accepted in the United States ("GAAP"). The Company's independent registered public accounting firm is responsible for performing an independent audit of the consolidated financial statements and expressing opinions on the consolidated financial statements and internal control over financial reporting. The Audit Committee's responsibility is to monitor and review these processes and act in an oversight capacity. The Audit Committee does not certify the financial statements or guarantee the independent registered public accounting firm's report. The Audit Committee relies, without independent verification, on the information provided to it, including representations made by management and the independent registered public accounting firm, including its audit report.

The Audit Committee discussed with PwC, the Company's independent registered public accounting firm, the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC. The Audit Committee has received the written disclosures and the letter from PwC required by applicable requirements of the Public Company Accounting Oversight Board regarding PwC's communications with the Audit Committee concerning independence and has discussed with PwC its independence. The Audit Committee reviewed and discussed the audited financial statements of the Company for the fiscal year ended December 31, 2023 with management and PwC. Based on the review and discussions noted above, the Audit Committee recommended to the Board that the audited financial statements of the Company be included in the Company's Annual Report on Form 10-K filed with the SEC for the fiscal year ended December 31, 2023.

AUDIT COMMITTEE
Curtis V. Anastasio, Chair
Alister Cowan
Erin N. Kane
Guillaume Pepy
Sandra Phillips Rogers



## Certain Relationships and Transactions

The Board has adopted "Policies and Procedures for Transactions with Related Persons" to assist it in reviewing, approving and ratifying Related Person Transactions and to assist the Company in preparing the disclosures that the rules and regulations of the SEC require to be included in the Company's applicable SEC filings. Pursuant to the policies and procedures, any reported transaction between the Company and a "Related Person" that may qualify as a "Related Person Transaction" will be referred to the NCG Committee or any other committee comprised of independent directors designated by the Board.

The NCG Committee (or its Chair, under some circumstances) will determine whether to approve, ratify, disapprove or reject any Related Person Transaction following consideration of all relevant factors, including, without limitation, the following: (i) the commercial reasonableness of the transaction; (ii) the materiality of the Related Person's direct or indirect interest in the transaction; (iii) whether the transaction may involve a conflict of interest, or the appearance of one; (iv) whether the transaction was in the ordinary course of business; (v) the benefits to the Company; (vi) the availability of other sources for comparable products or services; and (vii) the impact of the transaction on the Related Person's independence under the Company's Corporate Governance Guidelines and applicable regulatory and listing standards. Related Person Transactions will be approved or ratified only if they are determined to be in the best interests of the Company and its shareholders.

If a Related Person Transaction that has not been previously approved or ratified is discovered, the Related Person Transaction will be presented to the NCG Committee for ratification. If the NCG Committee does not ratify the Related Person Transaction, then the Company will ensure all appropriate disclosures regarding the transaction are made and, if appropriate, take all reasonable actions to attempt to terminate the Company's participation in the transaction.

It is expected that the Company and its subsidiaries may purchase products and services from and/or sell products and services to companies of which certain of the Company's directors or executive officers, or their immediate family members, are directors or employees. Chemours carries out transactions with these entities on customary terms, and, in many instances, the Company's directors and executive officers may not be aware of them. To the Company's knowledge, since the beginning of fiscal year 2023, no related person has had a material interest in any of the Company's business transactions or relationships.



## Other Information

**OTHER BUSINESS THAT MAY COME BEFORE THE MEETING**

The Company does not intend to bring any other business before the Annual Meeting for action and has not been notified of any other business proposed to be brought before the Annual Meeting. However, if any other business should be properly presented for action, it is the intention of the persons named on the proxy card to vote in accordance with their judgment on such business.

**2025 ANNUAL MEETING OF SHAREHOLDERS**

### Procedures for Submitting Shareholder Proposals and Nominations

If you want to include a shareholder proposal in the Proxy Statement for the Company's 2025 Annual Meeting of Shareholders, your shareholder proposal must be delivered to the Company not later than December 12, 2024, and it must satisfy the rules and regulations of the SEC to be eligible for inclusion in the Proxy Statement for that meeting. If the date of the Company's 2025 Annual Meeting of Shareholders changes by more than 30 days from the date that is the first anniversary of the 2024 Annual Meeting, then the deadline is a reasonable time before the Company begins to print and mail proxy materials for the 2025 Annual Meeting.

If you want to submit a shareholder proposal for the Company's 2025 Annual Meeting of Shareholders and you do not require that the proposal be included in the Company's proxy materials or want to submit a director nomination, your shareholder proposal or director nomination must be delivered to the Company not earlier than January 21, 2025 and not later than February 20, 2025. However, if the date of the 2025 Annual Meeting changes by more than 30 days from the date that is the first anniversary of the 2024 Annual Meeting, then any shareholder proposal or nomination must be received no later than the close of business on the tenth day following the date of public disclosure of the date of such meeting. Your notice must also include the information required by the Company's Bylaws.

All shareholder proposals and director nominations must be delivered to the Company at the following address: The Chemours Company, 1007 Market Street, Wilmington, DE 19801, Attention: Corporate Secretary.

The chairman of the Annual Meeting or any other annual meeting or special meeting of shareholders may refuse to acknowledge the nomination or shareholder proposal of any person not made in compliance with the foregoing procedures and the Bylaws. A shareholder's compliance with these procedures will not require the Company to include information regarding a proposed nominee in the Company's proxy solicitation materials.

**ANNUAL REPORT ON FORM 10-K**

A copy of our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, including the financial statements and schedules and a list of all exhibits, will be supplied without charge to any shareholder upon written request sent to The Chemours Company, 1007 Market Street, Wilmington, DE 19801, Attention: Investor Relations. Exhibits to the Form 10-K are available for a reasonable fee. You may also view the Annual Report on Form 10-K and its exhibits online at the SEC website at www.sec.gov or on the Company's website at https://investors.chemours.com.

---

**IMPORTANT**

**We value the input and support of all shareholders. Whether your share holdings are large or small, please promptly submit your proxy by telephone, through the Internet or by mail.**

---



## General Information About the Meeting

**Q. Why am I being asked to review these materials?**

A. In order to solicit your proxy for its Annal Meeting of Shareholders, the Company must furnish you with this Notice and Proxy Statement, which contains information about the proposals to be voted upon at the Annual Meeting. As a shareholder, you are invited to participate in the Annual Meeting and are entitled and encouraged to vote on the proposals described in this Proxy Statement. This Proxy Statement and our Annual Report to Shareholders are first being mailed to shareholders and made available on the Internet on or about April 11, 2024.

**Q. Why am I being asked to review materials online?**

A. In accordance with rules and regulations adopted by the SEC, instead of mailing a printed copy of our proxy materials to each shareholder, proxy materials, including this Proxy Statement and Annual Report to Shareholders, will be available online. By providing access of these materials on the Internet rather than mailing printed copies, most shareholders will not receive printed copies of the proxy materials unless they request them. Instead, a Notice of Internet Availability of Proxy Materials (the "Notice") has been sent to most of our shareholders with instructions on how to access and review the proxy materials on the Internet. The Notice also provides instructions on how you may submit your proxy on the Internet.

**If you would like to receive a paper or email copy of our proxy materials, please follow the instructions for requesting such materials in the Notice. We save thousands of dollars each year in postage and printing costs by providing proxy and annual meeting materials online.**

**Q. How does the Board recommend I vote on the proposals described in this Proxy Statement?**

A.

| VOTING MATTER MANAGEMENT PROPOSALS PROPOSAL | BOARD VOTE RECOMMENDATION |
|---|---|
| Proposal 1 — Election of Directors | FOR EACH NOMINEE |
| Proposal 2 — Advisory Vote on Executive Compensation | FOR |
| Proposal 3 — Ratification of Independent Registered Public Accounting Firm | FOR |

**Q. Who may vote at the meeting?**

A. Only holders of record of Chemours common stock at the close of business on April 3, 2024 (the "Record Date") are entitled to vote at the Annual Meeting. Each outstanding share of common stock is entitled to one vote. On the Record Date, there were 148,880,950 shares of Chemours common stock outstanding and entitled to vote.

**Q. How do I vote?**

A. If your shares are registered directly in your own name with the Company's transfer agent, Computershare Trust Company, N.A., you are considered a "shareholder of record" with respect to those shares, and the Notice has been sent directly to you. As a shareholder of record, you may submit your proxy in advance of the Annual Meeting using any of the following alternatives:



## General Information About the Meeting (continued)



**INTERNET**

Visit www.AALVote.com/CC. Have your proxy card available when you access the above website. Follow the prompts to vote your shares by Internet until 11:59 p.m., Eastern Time, on May 20, 2024.



**MAIL**

Mark, sign, and date your proxy card, then detach it, and return it in the postage-paid envelope provided.



**TELEPHONE**

Use any touch-tone telephone to vote your proxy. Call 1 866-804-9616 Have your proxy card available when you call. Follow the voting instructions to vote your shares.



**DURING THE MEETING**

If you wish to vote your shares electronically during the virtual Annual Meeting, go to www.AALvote.com/CC during the Annual Meeting while the polls are open. You will need the control number on your Notice, or the proxy card mailed to you, as applicable.

If, like most shareholders of the Company, you hold your shares through a broker, bank or other nominee, you are considered a "beneficial owner" of those shares, holding the shares in "street name." If you are a beneficial owner of shares, you will receive instructions from your broker or other nominee describing how to vote your shares. To vote on- line at the Annual Meeting, beneficial owners will need to contact the broker, trustee or nominee that holds their shares to obtain a "legal proxy" to bring to the meeting.

**Q. What is the deadline for voting if I do not plan to participate in the virtual Annual Meeting?**

A. You may submit your proxy via the Internet or by telephone until 11:59 p.m., Eastern Time, on May 20, 2024, or the Company's agent must receive your paper proxy card by mail on or before May 20, 2024. If your shares are held in "street name," please refer to the voting instructions from your broker, trustee or other nominee.

**Q. If I provide voting instructions and/or grant my proxy, who will vote my shares at the virtual Annual Meeting and how will they vote my shares?**

A. Matthew S. Abbott and Kristine M. Wellman are Officers of the Company and were named by the Board as proxy holders. They will vote all proxies, or record an abstention, in accordance with the directions on the proxy. If no contrary direction is given, the shares will be voted as recommended by the Board.

**Q. Who will count the votes?**

A. A representative of Alliance Advisors, LLC, an independent tabulator, will count the vote and act as the inspector of election.

**Q. Can I change my vote after I have delivered my proxy?**

A. Yes. Submission of a later proxy by any means by the deadlines or voting online at the Annual Meeting will change your prior vote. Beneficial owners who wish to change their vote must follow the procedures provided by their broker, bank or other nominee.

**Q. Can I revoke a proxy?**

A. Yes. A shareholder of record may revoke a properly executed proxy at any time before its exercise by submitting a letter addressed to, and received by, the Corporate Secretary, by delivering later dated proxy instructions or by voting at the virtual meeting. Beneficial owners who wish to revoke their proxy should contact their broker, bank or other nominee.



## General Information About the Meeting (continued)

Attendance at the meeting alone will not revoke a proxy. Without a legal proxy from the record owner, beneficial owners cannot revoke their proxies at the Annual Meeting because the actual registered shareholders — the broker, bank or other nominees — will not be present. Beneficial owners who wish to vote at the Annual Meeting must obtain a legal proxy from their broker, bank or other nominee.

**Q. What does it mean if I receive more than one Notice, proxy or voting instruction card?**

A. It means your shares are registered differently or are in more than one account. For all Notices you receive, please submit your proxy by Internet for each control number you have been assigned. If you received paper copies of proxy materials, please provide voting instructions for all proxy and voting instruction cards you receive. The Company encourages you to register all your accounts in the same name and address. Registered shareholders may contact our transfer agent, Computershare Investor Services, P.O. Box 43006, Providence, RI 02940-3006, (866) 478-8569. Beneficial owners holding Chemours common stock through a broker, bank or other nominee should contact their broker, bank or nominee and request consolidation of their accounts.

**Q. What is a quorum? Why is a quorum required?**

A. Return of your proxy is important because a quorum is required for shareholders to conduct business at the meeting. The presence at the meeting, online or by proxy, of the holders of shares having a majority of the voting power represented by all issued and outstanding shares entitled to vote on the record date will constitute a quorum, permitting the Company to conduct the business of the meeting.

Proxies received but marked as abstentions, if any, will be included in the calculation of the number of shares considered to be present at the meeting for quorum purposes. Because this proxy includes a "routine" management proposal, shares represented by "broker non-votes" will be counted in determining whether there is a quorum present. If there is not a quorum present at the virtual Annual Meeting, the chairman of the meeting may adjourn the Annual Meeting to a later time.

**Q. How will votes be counted on shares held through brokers?**

A. If you are a beneficial owner and do not provide your broker with voting instructions, your shares may constitute "broker non-votes." Generally, broker non-votes occur on a matter when a broker is not permitted to vote on that matter without instructions from the beneficial owner and instructions are not given. The shares of a shareholder whose shares are not voted because of a broker non-vote on a particular matter will be counted for purposes of determining whether a quorum is present at the virtual Annual Meeting so long as the shares are represented at the meeting.

In tabulating the voting result for any particular proposal, shares that constitute broker non-votes are not considered present and entitled to vote on that proposal. Thus, broker non-votes will not affect the outcome of any matter being voted on at the Annual Meeting, assuming that a quorum is obtained. Brokers will be permitted to vote without voting instructions on the ratification of the selection of PricewaterhouseCoopers LLP, assuming that a quorum is obtained and therefore no broker non-votes are expected with respect to that proposal.

**Q. How many votes are needed to elect the director nominees and approve each of the proposals?**

A.

| PROPOSAL | VOTE REQUIRED | BROKER DISCRETIONARY VOTING ALLOWED? |
|---|---|---|
| Elections of Directors | Majority of Votes Cast | No |
| Advisory Approval of Executive Compensation | Majority of Votes Represented and Entitled to Vote | No |
| Ratification of PwC LLP | Majority of Votes Represented and Entitled to Vote | Yes |

For the election of directors (Proposal 1), under the Bylaws, the number of votes cast "for" a nominee must exceed the number of votes cast "against" the nominee for the nominee to be elected as a director. For all other matters, except as



## General Information About the Meeting (continued)

set forth in the Certificate of Incorporation, the Bylaws or applicable law, the approval of the holders of a majority of votes represented at the meeting and entitled to vote on the proposal is required for approval of a proposal under the Bylaws.

In accordance with the voting standards set forth above, abstentions from voting on a matter by a shareholder present in person or represented by proxy at the meeting have no effect on the election of directors but have the same effect as votes "against" the other proposals.

**Q. What happens if an incumbent director nominee does not receive a majority of the votes cast for his or her re-election at the Annual Meeting?**

A. Our Corporate Governance Guidelines provide that the Board shall nominate for election or re-election only those candidates who agree to tender, promptly following the annual meeting at which they are elected or re-elected as a director, their irrevocable resignations contingent upon their failure to receive a majority of the votes cast for their election in an election that is not a contested election and the Board's acceptance of such resignations. In the event an incumbent director fails to receive the required vote for re-election, the NCG Committee will make a recommendation to the Board as to whether to accept or reject the resignation of the incumbent director. The Board will act on the resignation, taking into account the recommendation of the NCG, and publicly disclose its decision within ninety (90) days following certification of the election results. The NCG in making its recommendation and the Board in making its decision may consider all facts and circumstances they consider relevant or appropriate in reaching their determinations.

**Q. Where can I find voting results of the Annual Meeting?**

A. We will announce preliminary general voting results at the meeting and publish final detailed voting results on a Current Report on Form 8-K that Chemours will file with the SEC within four business days after the meeting.

**Q. Who will bear the cost for soliciting votes for the Annual Meeting?**

A. We will bear all expenses in conjunction with the solicitation of the enclosed proxy, including the charges of brokerage houses and other custodians, nominees or fiduciaries for forwarding documents to security owners and the fee to Innisfree M&A Incorporated ("Innisfree"), who will help the Company solicit proxies. Chemours anticipates that the fee to Innisfree will be approximately $15,000, plus expenses. In addition, proxies may be solicited by mail, email, in person, or by telephone or fax by certain of the Company's directors, officers and other employees.

**Q. What do I need to do to attend the Annual Meeting virtually?**

A. Both shareholders of record and street name shareholders will need to register to be able to attend the Annual Meeting via live audio webcast, submit their questions during the meeting and vote their shares electronically at the Annual Meeting by following the instructions below.

*If you are a shareholder of record, you must:*

- Follow the instructions provided on your Notice or proxy card to first register at www.viewproxy.com/chemours/ 2024/VM by 11:59 p.m. Eastern Time on May 17, 2024. You will need to enter your name, phone number, virtual control number (included on your Notice or proxy card) and email address as part of the registration, following which, you will receive an email confirming your registration, as well as the password to attend the virtual Annual Meeting.

- On the day of the virtual Annual Meeting, if you have properly registered, you may enter the virtual Annual Meeting by logging in using the password you received via email by clicking on the link in your registration confirmation. (If you wish to vote you will need the virtual control number included on your Notice or proxy card).

- If you wish to vote your shares electronically at the virtual Annual Meeting, you will need to click on http://www.AALvote.com/CC during the Annual Meeting while the polls are open (you will need the virtual control number included on your Notice or proxy card).

*If you are a street name shareholder, you must:*

- Register at www.viewproxy.com/Chemours/2024/VM by 11:59 p.m. Eastern Time on May 17, 2024. You will need to enter your name, phone number and email address, and if you want to vote at the meeting, provide a copy of the legal



## General Information About the Meeting (continued)

proxy (which may be uploaded to the registration website or sent via email to virtualmeeting@viewproxy.com as part of the registration, following which, you will receive an email confirming your registration, your virtual control number, as well as the password to attend the virtual Annual Meeting. Please note, if you do not provide a copy of the legal proxy, you may still attend the virtual Annual Meeting, but you will be unable to vote your shares electronically at the virtual Annual Meeting.

- On the day of the virtual Annual Meeting, if you have properly registered, you may enter the virtual Annual Meeting by logging in using the password you received via email by clicking on the link in your registration confirmation. (If you wish to vote you will need the virtual control number assigned to you in your registration confirmation email).

- If you wish to vote your shares electronically at the virtual Annual Meeting, you will need to click http://www.AALvote.com/CC during the virtual Annual Meeting while the polls are open (you will need the virtual control number assigned to you in your registration confirmation email). Further instructions on how to attend the Annual Meeting via live audio webcast, including how to vote your shares electronically at the virtual Annual Meeting are posted on www.viewproxy.com/chemours/2024/VM under Frequently Asked Questions (FAQ). The Annual Meeting live audio webcast will begin promptly at 10:00 a.m. Eastern Daylight Time on May 21, 2024. We encourage you to access the meeting prior to the start time. Online check-in will begin at 9:30 a.m. Eastern Time, and you should allow ample time for the check-in procedures.

We have created and implemented the virtual format in order to facilitate shareholder attendance and participation by enabling shareholders to participate fully, and equally, from any location around the world, at no cost. However, you will bear any costs associated with your Internet access, such as usage charges from Internet access providers and telephone companies.

A virtual Annual Meeting makes it possible for more shareholders (regardless of size, resources or physical location) to have direct access to information more quickly, while saving the Company and our shareholders time and money, especially as physical attendance at meetings has dwindled. We also believe that the online tools we have selected will increase shareholder communication. For example, the virtual format allows shareholders to communicate during the Annual Meeting so they can ask questions of our Board of Directors or management. During the live Q&A session of the virtual Annual Meeting, we may answer questions as they come in, to the extent they are relevant to the business of the Annual Meeting, as time permits.

**Q. Can I access future annual meeting materials through the Internet rather than receiving them by mail?**

A. Yes. Shareholders of record can sign up for electronic delivery at www.allianceproxy.com/chemours/2024. If you submit your proxy through the Internet, you can also sign up for electronic delivery by following the instructions that appear after you finish voting. You will receive an e-mail next year containing links to our Annual Report to Shareholders and the Proxy Statement for the 2025 Annual Meeting.

Beneficial owners may also have the opportunity to receive copies of these documents electronically. Please check the information provided in the proxy materials mailed to you by your broker or other nominee regarding the availability of this service. This procedure reduces the printing costs and fees the Company incurs in connection with the solicitation of proxies.

**Q. What is "householding"?**

A. As permitted by SEC rules, the Company has adopted a procedure called "householding," under which multiple shareholders who have the same address will receive a single Notice and, if applicable, a single set of annual report and other proxy materials, unless one or more of these shareholders notifies the Company that they wish to continue receiving individual copies.

Shareholders who participate in householding will continue to receive separate proxy cards. This procedure can result in significant savings to the Company by reducing printing and postage costs.



## General Information About the Meeting (continued)

If you are a registered holder and would like to participate in householding, or if you participate in householding and would like to receive a separate set of proxy materials, please contact Alliance Advisors, LLC by calling 1-877-777-2857 or by e-mailing requests@viewproxy.com. Beneficial owners should contact their broker or other nominee for information about householding.

**Q. How can I communicate with the Company's Board?**

A. Shareholders and other interested parties may send communications to the Board in care of the Corporate Secretary, The Chemours Company, 1007 Market Street, Wilmington, Delaware 19801. Please indicate whether your message is for the Board as a whole, a particular group or committee of directors, or an individual director.

**Q. What if I have additional questions?**

A. If you have additional questions about the Annual Meeting or any of the information presented in this Proxy Statement, you may direct your questions to Chemours Investor Relations at annualmeeting@chemours.com, or call (302) 773-3291. Web links throughout this document are provided for convenience only and are not intended to be active hyperlinks to the referenced websites. The content on the referenced websites does not constitute a part of this Proxy Statement.



## Appendix — Supplemental Information

**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions)*

The Company believes the presentation of these non-GAAP financial measures, when used in conjunction with GAAP financial measures, is a useful financial analysis tool that can assist investors in assessing the Company's operating performance and underlying prospects. This analysis should not be considered in isolation or as a substitute for analysis of our results as reported under GAAP. This analysis should be read in conjunction with the Company's financial statements and footnotes contained in the documents that the Company files with the U.S. Securities and Exchange Commission. The non- GAAP financial measures used by the Company may be different from the methods used by other companies.

**GAAP Net Income (Loss) Attributable to Chemours to Adjusted Net Income and Adjusted EBITDA Reconciliation**

Adjusted earnings before interest, taxes, depreciation, and amortization ("Adjusted EBITDA") is defined as income (loss) before income taxes, excluding the following items: interest expense, depreciation, and amortization; non-operating pension and other post-retirement employee benefit costs, which represents the components of net periodic pension costs excluding the service cost component; exchange (gains) losses included in other income (expense), net; restructuring, asset- related, and other charges; (gains) losses on sales of businesses or assets; and, other items not considered indicative of the Company's ongoing operational performance and expected to occur infrequently, including certain litigation related and environmental charges and Qualified Spend reimbursable by DuPont and/or Corteva as part of the Company's cost- sharing agreement under the terms of the MOU that were previously excluded from Adjusted EBITDA. Adjusted Net Income is defined as net income (loss) attributable to Chemours, adjusted for items excluded from Adjusted EBITDA, except interest expense, depreciation, amortization, and certain provision for (benefit from) income tax amounts.

| | YEAR ENDED DECEMBER 31, | |
| --- | --- | --- |
| | **2023** | **2022** |
| **(Loss) income before income taxes** | $ (318) | $ 741 |
| **Net (loss) income attributable to Chemours** | (238) | 578 |
| Non-operating pension and other post-retirement employee benefit cost | — | (5) |
| Exchange losses, net | 38 | 15 |
| Restructuring, asset-related, and other charges[1] | 153 | 15 |
| Loss (gain) on extinguishment of debt | 1 | (7) |
| (Gain) loss on sales of assets and businesses, net[2] | (110) | (21) |
| Transaction costs[3] | 16 | — |
| Qualified spend recovery[4] | (54) | (58) |
| Litigation-related charges[5] | 764 | 23 |
| Environmental charges[6] | 9 | 204 |
| Adjustments made to income taxes[7] | (19) | 30 |
| Benefit from income taxes relating to reconciling items[8] | (135) | (36) |
| **Adjusted Net Income** | 425 | 738 |
| Net income attributable to non-controlling interests | 1 | — |
| Interest expense, net | 208 | 163 |
| Depreciation and amortization | 307 | 291 |
| All remaining provision for income taxes | 73 | 169 |
| **Adjusted EBITDA** | $ 1,014 | $ 1,361 |



## Appendix — Supplemental Information (continued)

(1) Refer to "Note 7 — Restructuring, Asset-related, and Other Charges" to the *Consolidated Financial Statements* in our Annual Report on Form 10-K for the year ended December 31, 2023 for further details. In 2022, includes asset charges and write-offs resulting from the conflict between Russia and Ukraine and our decision to suspend our business with Russian entities.

(2) Refer to "Note 8 — Other Income (Expense), Net" to the *Consolidated Financial Statements* in our Annual Report on Form 10-K for the year ended December 31, 2023 for further details.

(3) Includes $7 million of costs associated with the New Senior Secured Credit Facilities entered into during 2023, which is discussed in further detail in "Note 20 — Debt" to the *Consolidated Financial Statements* in our Annual Report on Form 10-K, and $9 million of third-party costs related to the TT Transformation Plan.

(4) Qualified spend recovery represents costs and expenses that were previously excluded from Adjusted EBITDA, reimbursable by DuPont and/or Corteva as part of our cost-sharing agreement under the terms of the MOU which is discussed in further detail in "Note 22 — Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* in our Annual Report on Form 10-K for the year ended December 31, 2023.

(5) Litigation-related charges pertains to litigation settlements, PFOA drinking water treatment accruals, and other related legal fees. For the year ended December 31, 2023, litigation-related charges includes the $592 million accrual related to the United States Public Water System Class Action Suit Settlement plus $24 million of third-party legal fees directly related to the settlement, $55 million of charges related to the Company's portion of Chemours, DuPont, Corteva, EID and the State of Ohio's agreement entered into in November 2023, $13 million related to the Company's portion of the supplemental payment to the State of Delaware, $76 million for other PFAS litigation matters, and $4 million of other litigation matters. For the year ended December 31, 2022, litigation-related charges primarily include proceeds from a settlement in a patent infringement matter relating to certain copolymer patents associated with the Company's Advanced Performance Materials segment and $20 million associated with the Company's portion of the potential loss in the single matter not included in the Leach settlement. See "Note 22 — Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* in our Annual Report on Form 10-K for the year ended December 31, 2023 for further details.

(6) Environmental charges pertains to management's assessment of estimated liabilities associated with certain environmental remediation expenses at various sites. In 2022, environmental charges include $196 million related to on-site and off-site remediation costs at Fayetteville. See "Note 22 — Commitments and Contingent Liabilities" to the *Consolidated Financial Statements* in our Annual Report on Form 10-K for the year ended December 31, 2023 for further details.

(7) Includes the removal of certain discrete income tax impacts within our provision for income taxes, such as shortfalls and windfalls on our share-based payments, certain return-to-accrual adjustments, valuation allowance adjustments, unrealized gains and losses on foreign exchange rate changes, and other discrete income tax items.

(8) The income tax impacts included in this caption are determined using the applicable rates in the taxing jurisdictions in which income or expense occurred for each of the reconciling items and represent both current and deferred income tax expense or benefit based on the nature of the non-GAAP financial measure.

### GAAP Earnings per Share to Adjusted Earnings per Share Reconciliation

Adjusted earnings per share ("Adjusted EPS") is calculated by dividing Adjusted Net Income by the weighted-average number of common shares outstanding. Diluted Adjusted EPS accounts for the dilutive impact of stock-based compensation awards, which includes unvested restricted shares. Diluted Adjusted EPS considers the impact of potentially-dilutive securities, except in periods in which there is a loss because the inclusion of the potentially-dilutive securities would have an anti-dilutive effect.

| | YEAR ENDED DECEMBER 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Numerator: | | |
| Net Income (loss) attributable to Chemours | $ (238) | $ 578 |
| Adjusted Net Income | 425 | 738 |
| Denominator: | | |
| Weighted-average number of common shares outstanding – basic | 148,912,397 | 155,359,361 |
| Dilutive effect of the Company's employee compensation plans[1] | 1,584,958 | 2,943,646 |
| Weighted-average number of common shares outstanding – diluted[1] | 150,497,355 | 158,303,007 |
| Basic earnings (loss) per share of common stock[2] | $ (1.60) | $ 3.72 |
| Diluted earnings (loss) per share of common stock[1][2] | (1.60) | 3.65 |
| Adjusted basic earnings per share of common stock[2] | 2.85 | 4.75 |
| Adjusted diluted earnings per share of common stock[1][2] | 2.82 | 4.66 |

(1) In periods where the Company incurs a net loss, the impact of potentially dilutive securities is excluded from the calculation of EPS under U.S. GAAP, as their inclusion would have an anti-dilutive effect. As such, with respect to the U.S. GAAP measure of diluted EPS, the impact of potentially dilutive securities



## Appendix — Supplemental Information (continued)

is excluded from our calculation for the year ended December 31, 2023. With respect to the non-GAAP measure of adjusted diluted EPS, the impact of potentially dilutive securities is included in our calculation for year ended December 31, 2023, as Adjusted Net Income was in a net income position.

(2)  Figures may not recalculate exactly due to rounding. Basic and diluted earnings per share are calculated based on unrounded numbers.

### GAAP Cash Flow Provided by Operating Activities to Free Cash Flows Reconciliation

Free Cash Flows is defined as cash flows provided by (used for) operating activities, less purchases of property, plant, and equipment as shown in the consolidated statements of cash flows (Note that Free Cash Flow for compensation purposes is defined differently as discussed in "Compensation Discussion and Analysis.")

|  | YEAR ENDED DECEMBER 31, | |
| --- | --- | --- |
|  | 2023 | 2022 |
| Cash provided by operating activities | $ 556 | $ 755 |
| Less: Purchases of property, plant, and equipment | (370) | (307) |
| **Free Cash Flows** | $ 186 | $ 448 |



**PROXY**

## The Chemours Company

**PROXY FOR VIRTUAL ANNUAL MEETING OF SHAREHOLDERS TO BE HELD MAY 21, 2024**
**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**
**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED**

The undersigned hereby appoints Matthew S. Abbott and Kristine M. Wellman, or either of them, each with power of substitution, as proxies for the undersigned to vote all shares of Common Stock of said Company which the undersigned is entitled to vote at the Virtual Annual Meeting of Shareholders (the "Annual Meeting") of The Chemours Company (the "Company") to be held on May 21, 2024, and any adjournment or postponement thereof, as hereinafter specified and, in their judgment, upon such other matters as may properly come before the meeting. The undersigned hereby revokes all proxies previously given.

**THIS PROXY WILL BE VOTED AS DIRECTED OR, IF NO DIRECTION IS GIVEN, WILL BE VOTED "FOR" EACH OF THE NOMINEES NAMED IN PROPOSAL 1, AND "FOR" PROPOSALS 2 AND 3. THE PROXIES ARE AUTHORIZED TO VOTE IN THEIR JUDGMENT UPON SUCH OTHER BUSINESS NOT KNOWN AS MAY PROPERLY COME BEFORE THE ANNUAL MEETING OR ANY ADJOURNMENTS THEREOF.**

(Continued and to be marked, dated and signed on other side)

▲  PLEASE DETACH ALONG PERFORATED LINE AND MAIL IN THE ENVELOPE PROVIDED.  ▲

If you plan to attend the Virtual Annual Meeting, you must be a holder of Company shares as of the Record Date of April 3, 2024, and you must register at www.viewproxy.com/chemours/2024/VM by 11:59 p.m. Eastern Time on May 17, 2024. For more information on how to attend the Virtual Annual Meeting, see "General Information about the Meeting-What do I need to do to attend the Annual Meeting virtually?" in the proxy statement.

**Important Notice Regarding the Availability of Proxy Materials for the Virtual Annual Meeting of Shareholders to be held May 21, 2024**

**The Proxy Statement and our 2023 Annual Report to Shareholders are available at: http://www.allianceproxy.com/chemours/2024**

Please mark your votes like this in blue or black ink ☒

The Board of Directors recommends you vote **FOR** each of the nominees named in Proposal 1, and **FOR** Proposals 2 and 3.

**Proposal 1** – Election of Directors to Serve One-Year Terms expiring at the Annual Meeting of Shareholders in 2025.

**Nominees:**

| | | FOR | AGAINST | ABSTAIN |
|---|---|---|---|---|
| 1a. | Curtis V. Anastasio | ☐ | ☐ | ☐ |
| 1b. | Alister Cowan | ☐ | ☐ | ☐ |
| 1c. | Mary B. Cranston | ☐ | ☐ | ☐ |
| 1d. | Denise Dignam | ☐ | ☐ | ☐ |
| 1e. | Dawn L. Farrell | ☐ | ☐ | ☐ |
| 1f. | Pamela F. Fletcher | ☐ | ☐ | ☐ |
| 1g. | Erin N. Kane | ☐ | ☐ | ☐ |
| 1h. | Sean D. Keohane | ☐ | ☐ | ☐ |
| 1i. | Guillaume Pepy | ☐ | ☐ | ☐ |

**Proposal 2** – Advisory Vote to Approve Named Executive Officer Compensation

☐ FOR ☐ AGAINST ☐ ABSTAIN

**Proposal 3** – Ratification of Selection of PricewaterhouseCoopers LLP for fiscal year 2024

☐ FOR ☐ AGAINST ☐ ABSTAIN

To transact other business as may properly come before the meeting or any adjournment or postponement thereof.

Date _____

Signature _____

Signature _____
(Joint Owners)

Note: Please sign exactly as your name or names appear on this card. Joint owners should each sign personally. If signing as a fiduciary or attorney, please give your exact title.

**CONTROL NUMBER**

➡ [_____]

Address Change/Comments: (If you noted any Address Changes and/or Comments above, please mark box.) ☐

Please indicate if you plan to attend this meeting ☐

---

▲ PLEASE DETACH ALONG PERFORATED LINE AND MAIL IN THE ENVELOPE PROVIDED. ▲

As a shareholder of The Chemours Company, you have the option of voting your shares electronically through the Internet or by telephone, eliminating the need to return the proxy card. Your electronic vote authorizes the named proxies to vote your shares in the same manner as if you marked, signed, dated and returned the proxy card. Votes submitted electronically over the Internet or by telephone must be received by 11:59 p.m., Eastern Standard Time, on May 20, 2024.

**CONTROL NUMBER**

➡ [_____]

## PROXY VOTING INSTRUCTIONS

Please have your 11-digit control number ready when voting by Internet or Telephone



**INTERNET**
**Vote Your Proxy on the Internet:**
**Go to www.AALVote.com/CC**

Have your proxy card available when you access the above website. Follow the prompts to vote your shares.



**TELEPHONE**
**Vote Your Proxy by Phone:**
**Call 1 866-804-9616**

Use any touch-tone telephone to vote your proxy. Have your proxy card available when you call. Follow the voting instructions to vote your shares.



**MAIL**
**Vote Your Proxy by Mail:**

Mark, sign, and date your proxy card, then detach it, and return it in the postage-paid envelope provided.

# Exhibit 9

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of**
**the Securities Exchange Act of 1934 (Amendment No.    )**

Filed by the Registrant   ☒          Filed by a Party other than the Registrant   ☐

| Check the appropriate box: |
| --- |
| ☐      Preliminary Proxy Statement |
| ☐      **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))** |
| ☒      Definitive Proxy Statement |
| ☐      Definitive Additional Materials |
| ☐      Soliciting Material under §240.14a-12 |

# THE CHEMOURS COMPANY

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

| Payment of Filing Fee (Check the appropriate box): |
| --- |
| ☒      No fee required. |
| ☐      **Fee paid previously with preliminary materials.** |
| ☐      Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a6(i)(1) and 0-11 |

Chemours™

2023

**Notice of Annual
Shareholders Meeting
and Proxy Statement**



**1007 Market Street**
**Wilmington, Delaware 19801**

March 10, 2023

**To our Shareholders:**

**We are pleased to invite you to attend the Annual Meeting of shareholders of The Chemours Company to be held on April 26, 2023. The meeting will begin at 10:00 a.m. (Eastern Time).**

The Annual Meeting will be accessible via live webcast at www.viewproxy.com/chemours/2023/VM. Shareholders will be able to vote and submit questions during the Annual Meeting. To attend the Annual Meeting, shareholders should register on or before April 24, 2023 by visiting www.allianceproxy.com/chemours/2023. Further details can be found in the section below "General Information about the Meeting."

The following pages contain our notice of Annual Meeting and Proxy Statement. Please review this material for information concerning the business to be conducted at the annual meeting, including the nominees for election as directors.

We are furnishing proxy materials to our shareholders primarily over the Internet, which expedites shareholders' receipt of proxy materials and reduces the environmental impact of our Annual Meeting.

Whether or not you plan to attend the Annual Meeting, please submit a proxy promptly to ensure that your shares are represented and voted at the meeting.

Sincerely,

**Dawn L. Farrell**
Chair of the Board

**Mark E. Newman**
President & Chief Executive Officer



## Notice of 2023
## Annual Meeting of Shareholders

**1007 Market Street
Wilmington, Delaware 19801**

|  **Time and Date:** April 26, 2023, 10:00 a.m. ET |  **Place:** Virtual Only — No Physical Meeting Location |  **Record date:** March 1, 2023 |
|---|---|---|

The Annual Meeting of Shareholders for The Chemours Company (the "Company") will be held virtually on April 26, 2023 at 10:00 a.m. Eastern Time (including any adjournments or postponements) for the following purposes:

**1.**

To elect nine director nominees named in the accompanying Proxy Statement to serve one-year terms expiring at the Annual Meeting of Shareholders in 2024;

**2.**

To hold a non-binding advisory vote to approve the compensation of our named executive officers;

**3.**

To ratify the selection of PricewaterhouseCoopers LLP as our independent registered public accounting firm for fiscal year 2023; and

**4.**

To transact such other business that may properly come before the Annual Meeting or any adjournments or postponements.

---

**IMPORTANT NOTICE REGARDING AVAILABILITY OF PROXY MATERIALS FOR THE VIRTUAL ANNUAL MEETING OF SHAREHOLDERS TO BE HELD ON APRIL 26, 2023:**

The Notice of Internet Availability of Proxy Materials, Notice of Annual Meeting of Shareholders, Proxy Statement and Annual Report are available at www.allianceproxy.com/chemours/2023

---

Only shareholders of record at the close of business on March 1, 2023 are entitled to notice of, and to vote at, the Annual Meeting, and any adjournments or postponements of the Annual Meeting.

By Order of the Board of Directors.



**Kristine M. Wellman**
Senior Vice President, General Counsel
& Corporate Secretary

March 10, 2023

**Your vote is important.** Even if you plan to attend the Annual Meeting, we still encourage you to submit your proxy via Internet, telephone or mail prior to the meeting. If you later choose to revoke your proxy or change your vote, you may do so by following the procedures described under "Can I revoke a proxy?" and "Can I change my vote after I have delivered my proxy?" in the "Questions and Answers" section of the attached Proxy Statement.

## Table of Contents

PROXY SUMMARY/ANNUAL MEETING OVERVIEW                    1

PROPOSAL 1 — ELECTION OF DIRECTORS                      3
Director Qualification Process                          3
Director Nominees                                       4

CORPORATE GOVERNANCE                                    12
Corporate Governance Highlights                         12
Corporate Governance Practices                          12
Corporate Responsibility Commitment (CRC) Highlights    13
Board Oversight of Corporate Responsibility             17
Board Leadership Structure                              17
Director Independence                                   17
Oversight of Risk Management                            18
Succession Planning                                     19
Director Education                                      19
Code of Conduct                                         19
Shareholder Engagement                                  20
Policy on Hedging Transactions                          20

BOARD STRUCTURE AND COMMITTEE COMPOSITION               20
Audit Committee                                         21
Compensation and Leadership Development Committee       21
Nominating and Corporate Governance Committee           22

DIRECTOR COMPENSATION                                   23

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT    25

EXECUTIVE COMPENSATION                                  27
Compensation Discussion and Analysis                    27
Executive Compensation Tables                           52
Compensation and Leadership Development Committee Report    64

PROPOSAL 2 — ADVISORY VOTE TO APPROVE NAMED EXECUTIVE OFFICER COMPENSATION    71

PROPOSAL 3 — RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM    72
Fees Paid to Independent Registered Public Accounting Firm    72
Audit Committee's Pre-Approval Policies and Procedures    72
Report of the Audit Committee                           73

CERTAIN RELATIONSHIPS AND TRANSACTIONS                  74

OTHER INFORMATION                                       75
Other Business that May Come Before the Meeting         75
2024 Annual Meeting of Shareholders 2024 Annual Meeting of Shareholders    75
Annual Report on Form 10-K Shareholders                 75

GENERAL INFORMATION ABOUT THE MEETING                   76

## Proxy Summary

Details of the Annual Meeting of Shareholders (including any adjournments and postponements) for The Chemours Company, including the location of the meeting and the proposals its shareholders will vote upon at the meeting are listed below.

<table>
<tr><td><br>**Time and Date**<br>10:00 a.m. (Eastern Time)<br>on Wednesday, April 26, 2023</td><td><br>**Place:**<br>Virtual Meeting Only — No Physical Location</td></tr>
</table>

| MANAGEMENT PROPOSALS | BOARD VOTE RECOMMENDATION | SEE PAGE |
|---|---|---|
| Proposal 1 — Election of Directors | FOR EACH NOMINEE | 3 |
| Proposal 2 — Advisory Vote on Executive Compensation | FOR | 71 |
| Proposal 3 — Ratification of Independent Registered Public Accounting Firm | FOR | 72 |

**Voting**

As a shareholder, you are invited to participate in the Annual Meeting and are entitled and encouraged to vote on the proposals described in this Proxy Statement. Only holders of record of Chemours common stock at the close of business on March 1, 2023 (the "Record Date") are entitled to vote at the Annual Meeting. Each outstanding share of common stock is entitled to one vote.

If your shares are registered directly in your own name with the Company's transfer agent, Computershare Trust Company, N.A., you are considered a "shareholder of record" with respect to those shares, and the Notice has been sent directly to you. As a shareholder of record, you may submit your proxy in advance of the Annual Meeting using any of the following alternatives:

| <br>**INTERNET**<br><br>Visit www.AALVote.com/CC. Have your proxy card available when you access the above website. Follow the prompts to vote your shares by Internet until 11:59 p.m., Eastern Time, on April 25, 2023. | <br>**MAIL**<br><br>Mark, sign, and date your proxy card, then detach it, and return it in the postage-paid envelope provided. | <br>**TELEPHONE**<br><br>Use any touch-tone telephone to vote your proxy. Call 1 866-804-9616. Have your proxy card available when you call. Follow the voting instructions to vote your shares. | <br>**DURING THE MEETING**<br><br>If you wish to vote your shares electronically during the virtual Annual Meeting, you will need to click on www.AALvote.com/CC during the Annual Meeting while the polls are open. You will need the control number on your Notice, or the proxy card mailed to you, as applicable |
|---|---|---|---|



TABLE OF CONTENTS

## Proxy Summary (continued)

If, like most shareholders of the Company, you hold your shares through a broker, bank or other nominee, you are considered a "beneficial owner" of those shares, holding the shares in "street name." If you are a beneficial owner of shares, you will receive instructions from your broker or other nominee describing how to vote your shares. To vote on-line during the Annual Meeting, beneficial owners will need to contact the broker, trustee or nominee that holds their shares to obtain a "legal proxy" to bring to the meeting.



2023 Proxy Statement    **2**

TABLE OF CONTENTS

## Proposal 1 — Election of Directors

Nine current members of the Board are standing for re-election to hold office for a one-year term, or until their successors are duly elected and qualified.

Each nominee has agreed to be named in this Proxy Statement and to serve if elected. Although Chemours knows of no reason why any of the nominees would not be able to serve, if any nominee is unavailable for election, the proxy holders may vote for another nominee proposed by the Board of Directors. In that case, your shares will be voted for that other person.

### DIRECTOR QUALIFICATION PROCESS

The Nominating and Corporate Governance Committee ("NCG Committee") considers potential candidates suggested by Board members, as well as management, shareholders, search firms and others.

Our Corporate Governance Guidelines describe qualifications for directors. Directors are selected for their:

- Integrity and character
- Sound, independent judgment
- Breadth of experience
- Keen insight and knowledge
- Business acumen
- Significant professional accomplishments

The specific skills, experience and criteria the Board may consider, and which may vary over time depending on current needs includes:

- Leadership
- Experience involving technological innovation
- Relevant industry experience
- Financial expertise
- Corporate governance
- Compensation and succession planning
- Familiarity with issues affecting global businesses
- Experience with worldwide business operations, strategy and management
- Environment, health, safety and sustainability
- Risk management
- Other board experience
- Government service

Diversity in experience, gender and ethnicity that contribute to the total mix of viewpoints and experience represented on the Board, is also a key selection criteria.

Directors are expected to devote the necessary time, energy, and attention to assure diligent performance of their responsibilities. When selecting candidates for nomination, the NCG Committee considers these factors, among other items, to assure new directors have the highest personal and professional integrity. In addition, selected director nominees are required to have demonstrated exceptional ability and judgment and will be most effective, in conjunction with other directors, in serving the long-term interests of all shareholders. The NCG Committee will not nominate for election as a



## Proposal 1 — Election of Directors (continued)

director, a partner, member, managing director, executive officer or principal of any entity that provides accounting, consulting, legal, investment banking or financial advisory services to the organization.

Once the NCG Committee has identified a prospective candidate, the NCG Committee will make an initial determination as to whether to conduct a full evaluation of the candidate. This initial determination will be based on whatever information is provided to the NCG Committee with the recommendation of the prospective candidate, as well as the NCG Committee's own knowledge of the prospective candidate. This may be supplemented by inquiries to the person making the recommendation or others.

The preliminary determination will be based primarily on the likelihood that the prospective nominee can satisfy the factors described above. If the NCG Committee determines, in consultation with the Chair of the Board and other Board members, that further consideration is warranted, it may gather additional information about the prospective nominee's background and experience.

In connection with this evaluation, the NCG Committee will determine whether to interview the prospective nominee. One or more NCG Committee members and other directors, as appropriate, may interview the prospective nominee in person or by telephone. After completing its evaluation, the NCG Committee will decide whether to make a recommendation to the full Board for its consideration.

The NCG Committee selects director candidates suggested by shareholders, applying the factors for potential candidates described above and considers the additional information provided by the shareholder or gathered by the NCG Committee.

Shareholders wishing to suggest a candidate for director should write to the Corporate Secretary and include the detailed information required under the Company's Amended and Restated Bylaws.

A shareholder's written notice to the Corporate Secretary must be delivered to The Chemours Company, 1007 Market Street, Wilmington, DE 19801, Attention: Corporate Secretary. Shareholders who wish to nominate candidates for the Board of Directors must follow the procedures described under "2024 Annual Meeting of Shareholders — Procedures for Submitting Shareholder Proposals and Nominations" in this Proxy Statement on Page 75.

### DIRECTOR NOMINEES

The following information describes certain information regarding our director nominees.

### DIRECTOR NOMINEE COMPOSITION









2023 Proxy Statement    4

## Proposal 1 — Election of Directors (continued)

### DIRECTOR SKILLS, EXPERIENCE, AND BACKGROUND

The NCG Committee recommended to the Board the nominees named in this Proxy Statement. Based on this recommendation and each nominee's credentials and experience outlined below, the Board has determined that each nominee will make a significant contribution to our Board, is willing to devote the necessary time, energy, and attention to assure diligent performance of their responsibilities and should serve as a director of the Company.

The following skills matrix and biographical information about each of the nominees includes information regarding the nominee's service as a director, business experience, current or recent director positions, information regarding involvement in certain legal or administrative proceedings, if applicable, and the experiences, qualifications, attributes or skills that factored into the Board's determination for nomination. The Board regularly reviews the skills, experience, and background that it believes are desirable to be represented on the Board.

### DIRECTOR SKILLS MATRIX

We maintain a skills matrix where directors indicate whether they have expertise and professional background in areas we believe are essential to serve on the Chemours board of directors. The table below lists these areas of expertise, as well as gender, race and ethnicity for our director nominees.



## Proposal 1 — Election of Directors (continued)

| | CURTIS V. ANASTASIO | MARY B. CRANSTON | CURTIS J. CRAWFORD | DAWN L. FARRELL | ERIN N. KANE | SEAN D. KEOHANE | MARK E. NEWMAN | GUILLAUME PEPY | SANDRA PHILLIPS ROGERS |
|---|---|---|---|---|---|---|---|---|---|
| **Core Skills and Experience** | | | | | | | | | |
| Leadership (Strategy and Execution) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Chemical Industry Experience | ■ | ■ | ■ | | ■ | ■ | ■ | | ■ |
| Financial Expertise | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Global Business Strategy and Management | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Global Business Operations | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Corporate Governance | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Other Board Experience | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Technological Innovation | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ |
| Compensation & Succession | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Risk Management | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Environmental, Health, Safety and Sustainability | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | ■ |
| **Additional Experience** | | | | | | | | | |
| Marketing | ■ | | ■ | ■ | ■ | ■ | | | |
| Business Development | ■ | | ■ | ■ | ■ | ■ | ■ | ■ | |
| Mergers & Acquisitions | ■ | ■ | ■ | ■ | | | ■ | ■ | ■ |
| Investor Relations | ■ | ■ | | ■ | ■ | ■ | ■ | | |
| Information Technology | | ■ | ■ | | | | ■ | | |
| Logistics & Supply Chain | ■ | | | | ■ | ■ | ■ | ■ | |
| Legal Expertise | ■ | ■ | | | | | | | ■ |
| Regulatory Experience | ■ | | ■ | | | | ■ | ■ | ■ |
| Cybersecurity | | ■ | | | ■ | | ■ | | ■ |
| **Gender** | | | | | | | | | |
| Female | | ■ | | ■ | ■ | | | | ■ |
| Male | ■ | | ■ | | | ■ | ■ | ■ | |
| **Race/Ethnicity** | | | | | | | | | |
| African American or Black | | | ■ | | | | ■ | | ■ |
| Alaskan Native or American Indian | | | | | | | | | |
| Asian | | | | | | | | | |
| Hispanic or Latinx | | | | | | | | | |
| Native Hawaiian or Pacific Islander | | | | | | | | | |
| White or Caucasian | ■ | ■ | | ■ | ■ | ■ | | ■ | |



## Proposal 1 — Election of Directors (continued)

### DIRECTOR NOMINEES

**CURTIS V. ANASTASIO**



**Director Since:** 2015

**Committee Memberships:** Audit (Chair), Nominating & Corporate Governance

**Term of Office Expires:** 2023

**Age:** 66

**BUSINESS EXPERIENCE:**

- President, Chief Executive Officer and Executive Director of NuStar GP Holdings, LLC (2006 to 2013)
- President, Chief Executive Officer and Executive Director of NuStar Energy, L.P. (2001 to 2013)

**OTHER BOARDS AND POSITIONS**

- Chairman, GasLog Partners LP (2014 to present)
- Par Pacific Holdings, Inc. (2014 to present)

**Reason for Nomination:** Mr. Anastasio has leadership experience as both an executive officer and board member. As a former chief executive officer, he is able to provide the Board with valuable insight on global business management and financial matters which is further enhanced by his role as audit committee chairman of Par Pacific Holdings, Inc. and as a former director and member of the Audit Committee of the Federal Reserve Bank of Dallas. Mr. Anastasio also provides valuable knowledge in the areas of energy, legal matters, logistics, marketing and mergers and acquisitions.

**MARY B. CRANSTON**



**Director Since:** 2015

**Committee Memberships:** Compensation and Leadership Development, Nominating & Corporate Governance (Chair)

**Term of Office Expires:** 2023

**Age:** 75

**BUSINESS EXPERIENCE:**

- Senior Partner and Chair Emeritus, Pillsbury Winthrop Shaw Pittman (2007 to 2011); Chair and Chief Executive Officer (1999 to 2006)

**OTHER BOARDS AND POSITIONS**

- TPG, Inc. (2022 to present)
- Visa, Inc. (2007 to 2022)
- McAfee, Inc. (2018 to 2022)
- MyoKardia, Inc. (2016 to 2020)

**Reason for Nomination:** Ms. Cranston has over 30 years of experience in mergers and acquisitions as a legal advisor and oversaw two large mergers while she was the chief executive officer of Pillsbury. Ms. Cranston has experience in finance, risk management, legal, corporate governance, trade, antitrust, telecommunications, SEC enforcement and environmental law. Through her board positions, she has dealt with cybersecurity issues, stockholder activism and shareholder engagement.



## Proposal 1 — Election of Directors (continued)

### CURTIS J. CRAWFORD



**Director Since:** 2015
**Committee Memberships:** Audit
**Term of Office Expires:** 2023
**Age:** 75

**BUSINESS EXPERIENCE:**

- President and Chief Executive Officer, XCEO, Inc. (2003 to present)
- President and Chief Executive Officer, Onix Microsystems (2002 to 2003) and Zilog Inc. (1998 to 2001)

**OTHER BOARDS AND POSITIONS**

- Xylem, Inc. (2011 to 2020)
- ON Semiconductor (1999 to 2020)

**RECOGNITIONS**

- 2019 Outstanding Director Award, Financial Times
- Author of three books on leadership and corporate governance
- B. Kenneth West Lifetime Achievement Award, National Association of Corporate Directors (NACD)

**Reason for Nomination:** With more than 20 years of executive and board experience, Dr. Crawford has developed a keen expertise in corporate governance and boardroom leadership. In addition, he has developed comprehensive risk management programs for major corporations and has substantial experience in financial matters, executive compensation and succession planning. His experience as the president and chief executive officer of a consulting firm provides our Board with a unique perspective on corporate governance matters.

### DAWN L. FARRELL



**Director Since:** 2015
**Committee Memberships:** Chair of the Board
**Term of Office Expires:** 2023
**Age:** 63

**BUSINESS EXPERIENCE:**

- President and Chief Executive Officer, Trans Mountain Corporation (2022 to present)
- President and Chief Executive Officer, TransAlta Corporation (2012 to 2021)
- Chief Operating Officer (2009 to 2011); Executive Vice President, Commercial Operations and Development (2007 to 2009)
- Executive Vice President of Generation, BC Hydro (2003 to 2006)

**OTHER BOARDS AND POSITIONS**

- Portland General Electric ("PGE") (2022 to present)
- Mount Royal University, Chancellor (2020 to present)
- Canada Natural Resources, Ltd. (2021 to 2022)

**Reason for Nomination:** Mrs. Farrell has held chief executive officer and board member roles for several publicly traded companies. She provides leadership insight to the Board in global business management and operations, shareholder relations, risk management and financial matters. Mrs. Farrell also has experience in business strategy, generation operations, large acquisitions, major regulatory and financing negotiations, and environmental, health and safety programs.



## Proposal 1 — Election of Directors (continued)

### ERIN N. KANE



**Director Since:** 2019

**Committee Memberships:** Audit, Compensation and Leadership Development

**Term of Office Expires:** 2023

**Age:** 46

**BUSINESS EXPERIENCE:**

- President and Chief Executive Officer, AdvanSix Inc.(2016 to present)
- Vice President and General Manager, Resins and Chemicals, Honeywell (2014 to 2016); Business Director, Chemical Intermediates, (2011 to 2014); Global Marketing Manager, Resins and Chemicals (2008 to 2011); Global Marketing Manager, Authentication Technologies (2006 to 2008); Product Marketing Manager, Specialty Additives (2004 to 2006); Six Sigma Blackbelt, Specialty Materials (2002 to 2004)
- Six Sigma and Process Engineering, Elementis Specialties and Kvaerner Process (prior to 2002)

**OTHER BOARDS AND POSITIONS**

- American Chemistry Council (2017 to present)
- American Institute of Chemical Engineers (2019 to 2021)

**Reason for Nomination:** Ms. Kane led the spin-off of AdvanSix Inc. into an independent, NYSE-listed public Company including the appointment of an executive team, oversight of global business operations and strategy, and the creation of a best-practices corporate governance regime. She established key Board of Directors functions, structured compensation and succession planning, and developed ERM and HSE programs. Her business strategy and board expertise will play a key role in protecting the long-term interests of shareholders.

### SEAN D. KEOHANE



**Director Since:** 2018

**Committee Memberships:** Compensation and Leadership Development (Chair), Nominating and Corporate Governance

**Term of Office Expires:** 2023

**Age:** 55

**BUSINESS EXPERIENCE:**

- President and Chief Executive Officer, Cabot Corporation (2016 to present)
- EVP, President, Reinforcement Materials, Cabot Corporation (2014 to 2016); SVP, President, Performance Chemicals (2012 to 2014); Vice President and General Manager, Performance Chemicals (2008 to 2012); Vice President (2005 to 2008); joined Cabot Corporation (2002)
- General Management positions, Pratt & Whitney, a division of United Technologies (prior to 2002)

**OTHER BOARDS AND POSITIONS**

- American Chemistry Council (2016 to present)

**Reason for Nomination;** Mr. Keohane has a deep understanding of the international chemicals industry. As CEO of Cabot Corporation, Mr. Keohane brings an expertise in commercial and operational excellence, a commitment to safety, health and environmental leadership, and a strong track record of business development in international markets, particularly China. Mr. Keohane's profound knowledge and expertise in commercializing technology, risk management and broad financial matters including investor relations are a key benefit to our Board of Directors.



## Proposal 1 — Election of Directors (continued)

### MARK E. NEWMAN



**Director Since:** 2021

**Committee Memberships:**
President & CEO

**Term of Office Expires:** 2023

**Age:** 59

**BUSINESS EXPERIENCE:**

- President and Chief Executive Officer, The Chemours Company (2021 to present); SVP and Chief Operating Officer (2019 to 2021); SVP and Chief Financial Officer (2015 to 2019)
- SVP and Chief Financial Officer, Performance Chemicals, DuPont (2014 to 2015)
- SVP and Chief Financial Officer, SunCoke Energy Inc. (2011 to 2014)
- VP and Managing Director, SmartAuction, Ally Financial Inc. (2008 to 2011)
- VP and Chief Financial Officer, North America — Vice Chairman GMAC Bank, General Motors Corporation, GMAC Financial Services LLC (2007 to 2008); VP and Chief Financial Officer, GM North America (2006); Assistant Treasurer and General Director (2002 to 2005)
- VP and Chief Financial Officer, Shanghai General Motors (1999 to 2002)
- Treasurer's Office and Government Relations various positions, General Motors Corporation (prior to 1999)

**OTHER BOARDS AND POSITIONS**

- American Chemistry Council (2021 — present)
- Altria Group, Inc. (2018 to 2021)

**Reason for Nomination:** Mr. Newman was instrumental in the launch of Chemours as a publicly-traded Company. The organization's successful transformation from a portfolio of businesses into a focused and profitable Company is a tribute to Mr. Newman's strategic acumen. He has substantial leadership experience in business development, operations, corporate governance, and financial matters. Through his roles with Chemours and prior positions, he has a deep understanding of the chemical and industrial space.

### GUILLAUME PEPY



**Director Since:** 2022

**Committee Memberships:** Audit, Compensation and Leadership Development

**Term of Office Expires:** 2023

**Age:** 64

**BUSINESS EXPERIENCE:**

- Chairman and Chief Executive Officer, Societe Nationale SNCF SA (2008 to 2019), Chief Operating Officer (2003-2008), Deputy Chief Executive Officer (1998 to 2003), Head of Mainland Services (TGV) (1997 to 1998)
- Deputy Chief Executive Office, B2B Markets, Taylor Nelson Sofres SA (1996 to 1997)
- Chief Strategy Officer and Investment Director, SNCF (1993 to 1995)
- Chief of Staff to Minister of Labour, French Government (1991 to 1993), Chief of Staff to Minister of Labour (1990 to 1991)
- Chief of Staff, SNCF (1989 to 1990)
- Advisor to Minister of Budget, French Government (1988 to 1989)
- Deputy General Secretary, Council of State (1984 to 1988)

**OTHER BOARDS AND POSITIONS**

- Chairman to Orpea Group (2022 to present)
- Salesforce, Inc., EMEA Advisory Board (2020 to present)
- LYDEC (Suez Morocco), Chairman (2021 to 2022)

**Reason for Nomination:** Mr. Pepy brings a wealth of public and government sector experience to our Board in addition to expert perspective and insights into the regulatory and environmental landscapes in Europe. With his history of leading successful business transformations, Mr. Pepy's executive and board skills will continue to support and guide our management team in their day-to-day executive decision-making.



## Proposal 1 — Election of Directors (continued)

| SANDRA PHILLIPS ROGERS |
|---|



**Director Since:** 2021

**Committee Memberships:** Audit, Nominating and Corporate Governance

**Term of Office Expires:** 2023

**Age:** 57

**BUSINESS EXPERIENCE:**

■ Senior Vice President, Chief Legal Officer, General Counsel, Corporate Secretary and Chief Diversity Officer, Toyota Motor North America Inc. (2022 to present); automotive manufacturing, sales, research and development, mobility (autonomous, connected, electrification); oversight responsibility for Social Innovation, Sustainability and Regulatory Affairs, Compliance and Audit and Corporate Shared Services Toyota Motor North America Inc. and Toyota de Mexico (Corporate Resources). Group Vice President, Chief Legal Officer, General Counsel, Corporate Secretary and Chief Diversity Officer, Toyota Motor North America Inc. (2019 to 2022). Group Vice President, Chief Legal Officer, General Counsel and Corporate Secretary, Toyota Motor North America Inc. (2015 to 2019)

■ Partner, Complex Litigation Management and Strategy, Morgan, Lewis & Bockius LLP (2008 to 2012)

■ Vice President, Assistant General Counsel and Chief Litigation Counsel, Pfizer (2008); Senior Vice President and Associate General Counsel (2006 to 2008); Vice President and Assistant General Counsel (2005 to 2006); Assistant General Counsel (2004 to 2005)

**OTHER BOARDS AND POSITIONS**

■ MSA Safety Inc (2017 to present)

**Reason for Nomination:** Ms. Rogers provides the Board strong expertise in the legal, human capital, regulatory, and operational aspects of managing a large manufacturing Company. Her diversity and inclusion experience will guide the Board as it continues its efforts to support a total mix of viewpoints and experiences.

---

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" THE ELECTION OF EACH
OF THE NINE DIRECTOR NOMINEES**

---



# Corporate Governance

**CORPORATE GOVERNANCE HIGHLIGHTS**

- All directors elected annually

- 8 of 9 director nominees are independent

- Independent Board Chair

- Highly qualified directors reflect broad and diverse mix of business backgrounds, skills and experiences

- Board Refreshment — onboarded new directors in 2018, 2019, 2021, and 2022

- 67% of our Board members are diverse based on gender and ethnicity

- 4 of 5 Audit Committee members are "audit committee financial experts"

- Majority voting for uncontested elections with a director resignation policy

- Executive sessions of independent directors at each regularly scheduled Board meeting

- Elimination of supermajority voting provision recommended and submitted for shareholder vote in 2021

- NCG Committee responsible for ESG oversight

- Clawback (with express linkage to Code of Conduct and other corporate policies) and Anti-Hedging policies

- Directors and Officers must meet share ownership guidelines

- Annual Board and Committee self-evaluations

- Commitment to Corporate Responsibility — additional progress and publications. See highlights on page 13

**CORPORATE GOVERNANCE PRACTICES**

The Board is committed to the highest standards of corporate governance, which is essential for sustained success and long-term shareholder value.

The Board adopted Corporate Governance Guidelines which provide the framework for the Board's corporate governance. The NCG Committee annually reviews and assesses the Corporate Governance Guidelines and recommends changes to the Board as appropriate. Among other things, the Corporate Governance Guidelines provide that:

- Independent directors meet regularly in executive session in conjunction with regularly scheduled Board meetings

- Directors have access to the organization's management and advisors, and are encouraged to visit the corporate facilities

- As necessary and appropriate, the Board and its Committees may retain outside legal, financial or other advisors

- The Board will make an annual self-evaluation of its performance with a particular focus on overall effectiveness

- Directors will avoid any actual or potential conflicts with the interests of the Company, and if any actual or potential conflicts develop, will report all facts to the Board in a timely manner to resolve the conflict, or the director may resign

- Shareholders and others interested in communicating directly with the Board, Chair or other independent director may do so by writing to the Corporate Secretary. The Board's independent directors have approved procedures for handling such correspondence received by the Company and addressed to the Board

The Corporate Governance Guidelines, along with the Charters of the Board Committees, the Company's Code of Conduct, Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Controller, and Code of Business Conduct and Ethics for the Board of Directors are available on the Company's website at www.chemours.com under the heading "Investor Relations" and then "Corporate Governance."



## Corporate Governance (continued)

**CORPORATE RESPONSIBILITY COMMITMENT (CRC) HIGHLIGHTS**

The world increasingly expects companies to provide essential products, responsibly. At Chemours, we share those expectations, which is why corporate responsibility, and our commitment to it, are embedded in everything we do. We are committed to making chemistry as responsible as it is essential and have set forth Corporate Responsibility Commitment (CRC) goals in three core areas — Inspired People, Shared Planet and Evolved Portfolio.

| Our Pillars | Our 2030 CRC Goals |
| --- | --- |
| **INSPIRED PEOPLE** | **EMPOWERED EMPLOYEES**<br>• **Fill 50% of director level positions globally and above with women**<br>• **Fill 35% of all positions globally with women**<br>• **Fill 30% of all US positions with ethnically diverse employees**<br><br>**SAFETY EXCELLENCE**<br>• **Improve employee, contractor, process, and distribution safety performance by at least 75%**<br><br>**VIBRANT COMMUNITIES**<br>• **Invest $50M in our communities to improve lives by increasing access to STEM skills, safety initiatives, and sustainable environment programs** |
| **SHARED PLANET** | **CLIMATE**<br>• **Reduce absolute GHG emissions from operations by 60%**<br>• **Journey to net-zero operations by 2050**<br><br>**WATER**<br>• **Reduce air and water process emissions of fluorinated organic chemicals by 99% or more**<br><br>**WASTE**<br>• **Reduce our landfill volume intensity by 70%** |
| **EVOLVED PORTFOLIO** | **SUSTAINABLE OFFERINGS**<br>• **Ensure that 50% or more of our revenue comes from offerings that make a specific contribution to the UN SDGs**<br><br>**SUSTAINABLE SUPPLY CHAIN**<br>• **Establish a baseline for the sustainability performance of 80% of suppliers by spend and demonstrate 15% improvement** |



## Corporate Governance (continued)



PEOPLE

- In 2022, our teams in the United States, Belgium, Brazil, South Korea, Greater China, Japan and India achieved Great Places to Work certification, our teams in Switzerland and Spain were certified for the second time, and our Mexico team certified for the fifth consecutive year.



- Recognized as a "3+" Company by 50/50 Women on Boards™ (50/50WOB), a global education and advocacy campaign driving gender balance and diversity on corporate boards.
- Awarded more than $2.2 million in grants in 2022 in support of our Vibrant Communities goal to improve lives by increasing access to STEM skills, safety initiatives, and sustainable environment programs within the communities where we operate.

- Announced partnership with West Virginia University to increase access and exposure to STEM; which includes internships and co-op opportunities and provides funding for chemistry and chemical engineering education.
- In early 2022, kicked off our safety procedural excellence program which includes first-rate training and AI data tools for safety procedure writers.
- Employees in 15 countries dedicated more than 1,800 participation hours during our fourth Global CRC Day, reinforcing that our individual actions support collective progress.
- In 2022,100% of eligible employees met the annual corporate ethics and compliance training requirement by completing the Living Integrity Code of Conduct Training.
- Chemours has a comprehensive approach to cyber security which includes a robust cyber education program focused on cyber risk and prevention, using online situational awareness training and continuous phishing simulations. Approximately 85% of our global workforce have been successfully trained, strengthening our defenses against cyber risk.



## Corporate Governance (continued)

**PLANET**

- Committed to setting official science-based targets for approval by the Science-based Targets Initiative (SBTi).

- Two operating sites renewed their Wildlife Habitat Council programs with one site receiving Gold level certification.

- As of year-end 2021, we achieved an 18% reduction in total absolute GHG emissions since 2018.

- Since the issuance of our 2021 CRC report, we've made additional progress on initiatives that fall under our Planet pillar, such as the completion of the Louisville HFC-23 emissions reduction project representing approximately 25% of total baseline GHG emissions where a reduction will be reflected in 2022 reported emissions data, as well as our commitment to approximately 100,000 MWh per year of renewable power executed in 2022 at our Louisville, Kentucky, Starke, Florida and New Johnsonville, Tennessee sites with several other renewable initiatives in progress.



- As of year-end 2021, we achieved a 40% reduction in fluorinated organic compounds process emissions to air and water since 2018.



## Corporate Governance (continued)



- Announced our aspiration to be the most sustainable $TiO_2$ enterprise in the world and unveiled the new Ti-Pure™ Sustainability (TS) product series, which includes a new calculator tool to help Titanium Technologies customers better evaluate lifecycle impacts.

- Met and surpassed our Sustainable Supply Chain goal of assessing sustainability performance of 80% of suppliers by addressable spend, with 90% of suppliers evaluated by end of 2022.

- 60% of our assessed suppliers increased their EcoVadis score in 2022.

- Improved Chemours' EcoVadis rating from Silver to Gold in June 2022.

**EXTERNAL RECOGNITIONS**

     



## Corporate Governance (continued)

### BOARD OVERSIGHT OF CORPORATE RESPONSIBILITY

Because environmental, social, and governance (ESG) matters are integral to our growth and long-term success, we believe that a two-tiered level of oversight provides the best avenue to integrate ESG risks and opportunities into our overall business strategy and help us meet the changing demands of all our stakeholders — customers, partners, investors, employees and communities.

| FULL BOARD OF DIRECTORS |
| --- |
| Corporate Responsibility<br>Strategy, Standards, Goals, Performance |

| Audit Committee | Compensation and Leadership Development Committee | Nominating and Governance Committee |
| --- | --- | --- |
| Enterprise Risk Management, Cybersecurity Risk | Human Capital Management, Recruitment, Development & Retention | Corporate Governance, Policies, Processes, Performance Metrics, ESG |

Corporate Responsibility is embedded in our business processes, guides how we manage and operate our manufacturing sites, and inspires the new products and offerings we bring to market. Our growth strategy is directly linked to Corporate Responsibility. Proposed corporate transactions and overall corporate strategy are reviewed by the full Board with input from management on ESG risks and opportunities. Our Board and its Committees receive regular updates from senior management on Corporate Responsibility matters, including environmental, health and safety (EHS), social issues, regulatory actions and product stewardship.

Under the oversight of our Board, senior management continues to execute on our Corporate Responsibility. With the Board's guidance, we have developed and are advancing progress on goals for climate change, water stewardship, waste management, diversity and inclusion, safety, product sustainability and sustainable sourcing. See update on Page 13.

> To view our Corporate Responsibility Commitment Report and learn more about our goals, go to:
> https://www.chemours.com/en/corporate-responsibility

### BOARD LEADERSHIP STRUCTURE

Mrs. Dawn L. Farrell serves as the Chair of the Board, a position she has held since January 1, 2022, after serving as the Company's Lead Independent Director from July 1, 2021 to December 31, 2021. The Company's governing documents allow the roles of Chair and Chief Executive Officer (CEO) to be filled by the same or different individuals. This approach allows the Board flexibility to determine whether the two roles should be separated or combined based on our needs and the Board's assessment of the Company's leadership from time to time. If the Board does not have an independent chairperson, the Board will appoint a Lead Independent Director and determine the Lead Independent Director's duties and responsibilities. The Board will periodically consider the advantages of having an independent Chair or a combined Chair and CEO and is open to different structures as circumstances may warrant.

At this time, the Board has determined that separating the roles of Chair and CEO serves our best interests and that of our shareholders. Our CEO and senior management, working with the Board, set the strategic direction for the organization, and the CEO provides day-to-day leadership. The independent Chair leads the Board in the performance of its duties and serves as the principal liaison between the independent directors and the CEO.

### DIRECTOR INDEPENDENCE

The NCG Committee is responsible for reviewing the qualifications and independence of members of the Board and its various committees on a periodic basis, as well as the composition of the Board as a whole. This assessment includes members' qualifications as independent, as well as consideration of skills and experience specific to the needs of the Board.



TABLE OF CONTENTS

## Corporate Governance (continued)

Director nominees are recommended to the Board by the Committee in accordance with the policies and principles in its Charter. The ultimate responsibility for selection of director nominees resides with the Board. The qualifications that the Board considers when nominating directors is discussed in more detail under "Director Qualification Process" in this Proxy Statement.

**Independent Directors**

The Board assesses the independence of directors and examines the nature and extent of any relations between the Company and directors, their families and their affiliates. The Corporate Governance Guidelines provide that a director is "independent" if he or she satisfies the New York Stock Exchange (NYSE) Listing Standards on director independence and the Board affirmatively determines that the director has no material relationship with the Company (either directly, or as a partner, shareholder or officer of an organization that has a relationship with the Company). The Board has determined that, with the exception of Mark E. Newman, each of the current directors — Curtis V. Anastasio, Mary B. Cranston, Curtis J. Crawford, Dawn L. Farrell, Erin N. Kane, Sean D. Keohane, Guillaume Pepy, and Sandra Phillips Rogers — is independent.

**Independent Committees**

All members serving on the Audit Committee, the Compensation and Leadership Development Committee and the NCG Committee must be independent as defined by the Corporate Governance Guidelines.

In addition, Audit Committee members must meet heightened independence criteria under NYSE Listing Standards and the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") relating to audit committees. Each Compensation and Leadership Development Committee member must meet heightened independence criteria under NYSE Listing Standards and the rules and regulations of the SEC relating to compensation committees and be a "non-employee director" pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act").

The Board has determined that each member of the Audit Committee, the Compensation and Leadership Development Committee, and the NCG Committee meets the requisite independence and related requirements.

### OVERSIGHT OF RISK MANAGEMENT

The Board of Directors is responsible for oversight of risk management, and its leadership structure, and the Chemours Executive Team ("CET") is accountable for risk management, which is integrated into our annual strategic planning and business and functional managing processes. Risk management is embedded into our line organizations and part of regular, managing processes. There is an established risk assessment cadence, methodology, and systemic approach to risk management throughout the year within the Company with regular and robust risk reporting to management.

The Audit Committee oversees the risk management process, while the full Board oversees the top risks and mitigation actions of the Company. In fulfilling its risk oversight responsibility, the Board receives various management and Board Committee reports and meets with the full CET twice per year to discuss risk management. It also engages in periodic discussions with the Company's officers, as it may deem appropriate. In addition, each of the Board Committees considers the risks within its areas of responsibility. For example, the Audit Committee focuses on risks inherent in the Company's accounting, financial reporting and internal controls and reviews the Company's cybersecurity and information security programs.

The Compensation and Leadership Development Committee considers the risks that may be implicated by the Company's incentive compensation program. The Compensation and Leadership Development Committee's assessment of risk related to compensation practices is discussed in more detail in the "Compensation Discussion and Analysis" section of this Proxy Statement.

The NCG Committee provides oversight regarding the Company's policies on political contributions and lobbying expenses. The NCG Committee is also responsible for reviewing transactions between the Company and related persons, which is discussed in more detail under "Certain Relationships and Transactions" in this Proxy Statement.



## Corporate Governance (continued)

### SUCCESSION PLANNING

The Board plans for succession to the position of CEO. The Compensation and Leadership Development Committee, on behalf of the Board, oversees the succession planning process. To assist the Board, the CEO periodically provides the Board with an assessment of senior executives and their potential to succeed to the position of CEO, as well as perspective on potential candidates from outside the organization. The Board makes available, on a continuing basis, the CEO's succession recommendation(s) should he or she be unexpectedly unable to serve. The CEO also provides the Board with an assessment of potential successors to key positions.

### DIRECTOR EDUCATION

New directors participate in an orientation process to become familiar with the Company and its strategic plans and businesses, significant financial matters, core values including ethics, compliance programs, corporate governance practices and other key policies and practices through a review of background materials, meetings with senior executives and visits to Company facilities. The NCG Committee is responsible for providing guidance on directors' continuing education, and actively monitors and encourages director education opportunities.

### CODE OF CONDUCT

The Company is committed to high standards of ethical conduct and professionalism, and the Company's Code of Conduct confirms the commitment to ethical behavior in the conduct of all activities.

In furtherance of this commitment, the Company has adopted a Code of Conduct, a Code of Business Conduct and Ethics for the Board of Directors, and a Code of Ethics for the CEO, CFO and Controller.

- The Code of Conduct applies to all directors, officers (including the CEO, CFO and Controller) and employees of Chemours, and it sets forth the Company's policies and expectations on a number of topics including avoiding conflicts of interest, confidentiality, insider trading, protection of Chemours and customer property, and providing a proper and professional work environment. The Code of Conduct sets forth a worldwide toll-free and Internet-based ethics hotline, which employees can use to communicate any ethics-related concerns, and the Company provides training on ethics and compliance topics for employees.

- The Code of Business Conduct and Ethics for the Board of Directors applies to all directors, and is intended to (i) foster the highest ethical standards and integrity; (ii) focus the Board and each director on areas of potential ethical risk and conflicts of interest; (iii) guide directors in recognizing and dealing with ethical issues; establish reporting mechanisms; and promote a culture of honesty and accountability.

- The Code of Ethics for the CEO, CFO and Controller applies to those three executive officers. This Code sets forth the standards of conduct that the CEO, CFO and Controller must uphold while performing his or her duties.

- Each year, the Company trains 100% of its employees on the Code of Conduct.

- In order to continuously improve and evolve its compliance program, the Company engages in regular risk assessments and conducts root cause analyses of any confirmed instances of ethical misconduct.

In fiscal year 2022, there were no waivers of any provisions of (i) the Code of Conduct; (ii) the Code of Business Conduct and Ethics for the Board of Directors; or (iii) the Code of Ethics for the CEO, CFO and Controller. In the event the Company amends or waives any provision of any Code of Conduct or Code of Ethics that relates to any element of the definition of "code of ethics" enumerated in Item 406(b) of Regulation S-K promulgated under the Exchange Act, the Company intends to disclose these actions on the Company website at www.chemours.com.



## Corporate Governance (continued)

### SHAREHOLDER ENGAGEMENT

We maintain a very active and broad-based investor relations outreach program to solicit input and to communicate with shareholders on a variety of topics related to our business and strategy. We also speak to shareholders about governance matters, including our corporate governance profile and our corporate responsibility commitments. Throughout the year, our investor relations team and some of our executive officers and other key employees speak with shareholders at investor conferences, at in-person meetings and in phone conversations. We will continue to engage with shareholders on business, strategy, governance and other relevant topics.

### POLICY ON HEDGING TRANSACTIONS

We have adopted a policy that prohibits all officers and directors and all employees that receive or have access to material nonpublic information about the Company from engaging in transactions in publicly traded options, puts, calls or other derivative securities and from entering into hedges or swaps involving the Company's securities. Officers and Directors are also prohibited from pledging Chemours securities as collateral for a loan without special exception.

## Board Structure and Committee Composition

The Board has nine Directors now and three standing Committees: The Audit Committee, the Compensation and Leadership Development Committee, and the NCG Committee.

The table below reflects the composition of each Committee as of March 1, 2023, and the number of meetings held by each Committee during fiscal year 2022. Dawn L. Farrell as Chair of the Board, and Mark E Newman, as President and Chief Executive Officer, were not members of any Committee.

| | AUDIT COMMITTEE | COMPENSATION AND LEADERSHIP DEVELOPMENT COMMITTEE | NOMINATING AND CORPORATE GOVERNANCE COMMITTEE |
|---|---|---|---|
| Curtis V. Anastasio | C | | X |
| Mary B. Cranston | | X | C |
| Dr. Curtis J. Crawford | X | | |
| Erin N. Kane | X | X | |
| Sean D. Keohane | | C | X |
| Guillaume Pepy | X | X | |
| Sandra Phillips Rogers | X | | X |
| 2022 Meetings | 4 | 8 | 5 |
| **X = Member** | | **C = CHAIR** | |

The Board met 8 times during fiscal year 2022. Each of the directors attended over 75% of the Board meetings and meetings of the Committees on which they served. Our Corporate Governance Guidelines provide that directors are expected to attend meetings of the Board, its Committees on which they serve, and the Annual Meeting of Shareholders.

Each Committee operates under a written charter. The Charters are available on our corporate website, www.chemours.com, under the heading "Investor Relations" and subheading "Corporate Governance." The principal functions of each Committee are summarized below.



## Board Structure and Committee Composition (continued)

### AUDIT COMMITTEE

The responsibilities of the Audit Committee are more fully described in the Audit Committee Charter and include, among other duties, the fulfillment of its and the Board's oversight responsibilities relating to:

- The integrity of the financial statements of the Company

- The qualifications and independence of the Company's independent auditor, and in connection with the Committee's oversight in this regard, the Chair of the Audit Committee is engaged in the selection process for the audit engagement partner

- The performance of the Company's internal audit function and independent auditors

- Compliance by the Company with legal and regulatory requirements

- Conducting an annual Committee self- assessment and an assessment of the independent audit firm, and reporting the results to the full Board

- Conducting a quarterly review of the Company's cyber security and information security programs

The Audit Committee consists entirely of independent directors, and each meets the heightened independence requirements under NYSE Listing Standards and the rules and regulations of the SEC relating to audit committees. Each member of the Audit Committee is financially literate and has accounting or related financial management expertise, as such terms are interpreted by the Board in its business judgment. Additionally, the Board of Directors has determined, in its business judgment, that four of the five members of the Audit Committee is an "audit committee financial expert" for purposes of the rules of the SEC.

### COMPENSATION AND LEADERSHIP DEVELOPMENT COMMITTEE

The responsibilities of the Compensation and Leadership Development Committee are more fully described in the Compensation and Leadership Development Committee Charter and include, among other duties:

- Assess current and future senior leadership talent, including their development and the succession plans of key management positions (other than CEO)

- Assist the Board in CEO succession planning, including providing oversight of the CEO's succession planning process.

- Conduct an annual review of the Company's diversity talent, as well as diversity representation on the slate for key positions

- Oversee the performance evaluation of the CEO based on input from other independent directors versus Board-approved goals and objectives

- Recommend to the independent members of the Board, compensation, including severance agreements as appropriate, for the CEO

- Review and approve compensation and employment arrangements, including equity compensation plans, bonus plans and severance agreements as appropriate, of the CEO and other senior executive officers

- Review the Company's incentive compensation arrangements to determine whether they encourage excessive risk-taking, review and discuss at least annually the relationship between risk management policies and practices and compensation, and evaluate compensation policies and practices that could mitigate any such risk. Review and approve the Compensation Discussion and Analysis and the Committee report, and other executive compensation disclosures, as required to be included in the Company's applicable SEC filings

- Conduct an annual Committee self-assessment and an assessment of the independent compensation consultant and report the results to the full Board



## Board Structure and Committee Composition

The Compensation and Leadership Development Committee consists entirely of independent directors, and each member meets the heightened independence requirements under NYSE Listing Standards and the rules and regulations of the SEC relating to compensation committees; and is a "non-employee director" for purposes of Rule 16b-3 promulgated under the Exchange Act.

**Compensation Committee Interlocks and Insider Participation**

During fiscal year 2022, none of the members of the Compensation and Leadership Development Committee was an officer or employee of the Company. No executive officer of the Company served on the compensation committee (or other board committee performing equivalent functions) or on the board of directors of any Company having an executive officer who served on the Compensation and Leadership Development Committee or the Board.

### NOMINATING AND CORPORATE GOVERNANCE COMMITTEE

The responsibilities of the NCG Committee are more fully described in the NCG Committee Charter and include, among other duties:

- Develop and recommend to the Board of Directors a set of corporate governance guidelines

- Identify individuals qualified to become Board members consistent with criteria approved by the Board and recommend to the Board nominees for election as directors, including nominees whom the Board proposes for election as directors at the Annual Meeting

- Review and approve any transaction between the Company and any related person in accordance with the Company's policies and procedures for transactions with related persons

- Oversee our corporate governance practices, including reviewing and recommending to the Board of Directors for approval any changes to the Company's Code of Conduct, Certificate of Incorporation, Bylaws and Committee Charters

- Oversee the Company's policies, performance, and reporting in the areas of corporate responsibility, including environmental, social and governance

- Conduct an annual assessment of the Committee's performance, oversee the self-evaluation process of the entire Board of Directors and its other Committees, establish the evaluation criteria, implement the process and report its findings on the process to the Board of Directors

- The NCG Committee consists entirely of independent directors, and each meets the independence requirements set forth in the NYSE Listing Standards.



## Director Compensation

### OVERVIEW

Non-employee directors receive compensation for Board service, which is designed to fairly compensate them for their Board responsibilities and align their interests with the long-term interests of shareholders. The NCG Committee, which consists solely of independent directors, has the primary responsibility to review and consider any revisions to directors' compensation.

During fiscal year 2022, non-employee directors were entitled to the following annual retainers:

| FISCAL YEAR 2022 DIRECTOR RETAINERS | |
| --- | --- |
| Annual Retainer[1] | $ 100,000 |
| Annual Equity Award[2] | $ 145,000 |
| Non-Executive Chairman Retainer[1] | $ 150,000 |
| Audit Committee Chair Retainer[1] | $ 22,500 |
| Compensation and Leadership Development Committee Chair Retainer[1] | $ 17,500 |
| Nominating and Corporate Governance Committee Chair Retainer[1] | $ 17,500 |

(1) Amounts payable in cash may be deferred pursuant to The Chemours Company Stock Accumulation and Deferred Compensation Plan for Directors (the "Directors Deferred Compensation Plan"), which is described further below.

(2) Equity awards are valued as of the grant date and rounded down to the nearest whole share. Equity awards may be deferred pursuant to Directors Deferred Compensation Plan. For 2022, equity awards were in the form of shares of common stock or for directors who elected to defer their equity awards, deferred stock units (DSUs) that convert into shares of common stock when a director leaves the Board or on a grant date anniversary selected by the director. Before DSUs are converted into shares, directors are not entitled to dividends on the DSUs, but they receive dividend equivalents (credited in the form of additional DSUs) that likewise are converted into shares (with any fractional share paid in cash) upon termination of service or on a grant date anniversary selected by the director.

The fees reflected in the table above assume service for a full year. Directors who serve for less than the full year are entitled to receive a pro-rated portion of the applicable payment. Each "year," for purposes of non-employee director compensation, begins on the date of the Company's annual meeting of shareholders. The Company does not pay meeting fees but does pay for or reimburse directors for reasonable expenses related to Board service, including for attending Board, Committee, educational and Company business meetings.

During 2022, the NCG Committee reviewed the annual amount of the non-employee director equity and cash compensation and recommended no changes to director compensation. The Board believes the compensation program is in the best interest of the Company and designed to fairly compensate directors for their Board responsibilities and align their interests with the long-term interests of shareholders.

The Board has adopted share ownership guidelines applicable to non-employee director equity awards. The share ownership guidelines, contained in the Corporate Governance Guidelines, require non-employee directors to hold at least six (6) times the cash portion of their annual retainer worth of Chemours common stock and/or DSUs while serving as a director. Non-employee directors will have five (5) years to attain this ownership threshold from the time of their election to the Board.

### THE CHEMOURS COMPANY STOCK ACCUMULATION AND DEFERRED COMPENSATION PLAN FOR DIRECTORS

Under the Stock Accumulation and Deferred Compensation Plan for Directors, a director is eligible to defer all or part of his or her Board retainer and Committee Chair fees in an interest-bearing notional cash account or stock units until a future year or years, payable in a lump sum or equal annual installments. Interest will accrue on the notional cash account at a rate corresponding to the average 30-year Treasury securities rate applicable for the quarter (or at such other rate as may be specified by the Compensation Committee from time to time) with quarterly compounding. Dividend equivalents will accrue on deferred stock units. This deferred compensation is an unsecured obligation of the Company.



## Director Compensation (continued)

### 2022 DIRECTOR COMPENSATION TABLE

The following table shows information concerning the compensation paid in fiscal year 2022 to non-employee directors:

| DIRECTOR | FEES EARNED OR PAID IN CASH ($)[1] | EQUITY AWARDS ($)[2] | OTHER COMPENSATION ($)[3] | TOTAL ($) |
|---|---|---|---|---|
| Curtis V. Anastasio | 122,500 | 144,987 | | 267,487 |
| Bradley J. Bell[4] | 100,000 | 144,987 | | 244,987 |
| Mary B. Cranston | 117,500 | 144,987 | | 262,487 |
| Curtis J. Crawford | 100,000 | 144,987 | | 244,987 |
| Dawn L. Farrell | 250,000 | 144,987 | | 394,987 |
| Erin N. Kane | 100,000 | 144,987 | | 244,987 |
| Sean D. Keohane | 117,500 | 144,987 | | 262,487 |
| Guillaume Pepy | 100,088[5] | 181,229[6] | 39,874 | 321,191 |
| Mark P. Vergnano | 50,000 | | | 50,000 |
| Sandra P. Rogers | 100,000 | 144,987 | | 244,987 |

(1) Column reflects all cash compensation earned during fiscal year 2022, whether or not payment was deferred pursuant to the Directors Deferred Compensation Plan.

(2) This column represents the dollar amount recognized for financial statement reporting purposes with respect to fiscal year 2022 in accordance with FASB ASC 718 as the grant date fair value of compensation earned by directors in the form of DSUs of Chemours common stock or shares of common stock. This value is determined by dividing the annual equity award amount by the closing share price on the date of grant and rounding down to the next whole share, then multiplying by the closing share price on the grant date.

(3) This amount represents the payment for legal fees that Mr. Pepy incurred for tax counseling relating to the foreign tax treatment of his director compensation. This amount was paid in euros and the U.S.-dollar equivalent is shown based on an exchange rate of $1.0654

(4) Bradley Bell resigned as a Director effective as of January 2, 2023.

(5) This amount reflects the total actually received by Mr. Pepy due to variations in the exchange rate on the dates of payment.

(6) This amount reflects the pro-rated award Mr. Pepy received in March 2022 for his partial year service and his 2022 annual equity award amount.

The aggregate number of DSUs held by each non-employee director at fiscal year-end is as follows:

| NAME | AGGREGATE EQUITY DSUs OUTSTANDING AS OF DECEMBER 31, 2022 |
|---|---|
| Curtis V. Anastasio | 59,161 |
| Bradley J. Bell[1] | 50,597 |
| Mary B. Cranston | 62,410 |
| Curtis J. Crawford | 72,949 |
| Dawn L. Farrell | 57,866 |
| Erin N. Kane | 32,512 |
| Sean D. Keohane | 31,794 |
| Guillaume Pepy | 5,970 |
| Mark P. Vergnano | 45,916 |
| Sandra P. Rogers | 9,752 |

(1) Bradley Bell resigned as a Director effective as of January 2, 2023.



# Security Ownership of Certain Beneficial Owners and Management

## SECURITY OWNERSHIP OF DIRECTORS AND MANAGEMENT

The following table sets forth information with respect to the beneficial ownership of Chemours' common stock as of March 2, 2023 by each of the Company's directors and nominees, named executive officers, and all directors and executive officers as a group.

Amount and nature of beneficial ownership:

| NAME OF BENEFICIAL OWNER | DIRECT[1] | INDIRECT[2] | RIGHT TO ACQUIRE[3] | TOTAL | PERCENT OF CLASS |
|---|---|---|---|---|---|
| Mark E. Newman | 199,024 | 34,635 | 580,274 | 813,933 | * |
| Sameer Ralhan | 320,749 | — | 293,169 | 613,918 | * |
| Edwin Sparks | 83,051 | — | 74,908 | 157,959 | * |
| Alisha Bellezza | 11,348 | — | 46,519 | 57,867 | * |
| Denise Dignam | 9,840 | — | 39,197 | 49,037 | * |
| David C. Shelton | 109,470 | 76,492 | 135,392 | 321,354 | * |
| Curtis V. Anastasio | 2,692 | 3,500 | 59,161 | 65,353 | * |
| Mary B. Cranston | 2,834 | — | 62,410 | 65,244 | * |
| Curtis J. Crawford | 27,703 | 47 | 72,949 | 100,699 | * |
| Dawn L. Farrell | 4,543 | — | 57,866 | 62,409 | * |
| Erin N. Kane | — | — | 32,512 | 32,512 | * |
| Sean D. Keohane | — | — | 31,794 | 31,794 | * |
| Guillaume Pepy | — | — | 5,970 | 5,970 | * |
| Sandra P. Rogers | — | 378 | 9,752 | 10,130 | * |
| Directors, nominees and executive officers as a group (17 persons) | 774,105 | 38,560 | 1,635,879 | 2,448,544 | 1.63% |

* Indicates ownership of less than 1% of the outstanding shares of Chemours common stock. Each of the Company's executive officers and directors may be contacted at 1007 Market Street, Wilmington, DE 19801.

(1) Shares held individually or jointly with others, or in the name of a bank, broker or nominee for the individual's account.

(2) Shares over which directors, nominees and executive officers may be deemed to have or share voting or investment power, including shares owned by trusts and certain relatives.

(3) Shares which directors and executive officers had a right to acquire beneficial ownership of within 60 days from March 2, 2023, through the exercise of stock options or through the conversion of stock units held under the Company's equity-based compensation plans.



**SECURITY OWNERSHIP OF 5% BENEFICIAL OWNERS**

Based solely on the information filed on Schedule 13F[1] for the fiscal year ended December 31, 2022, the following table sets forth those shareholders who beneficially own more than five percent of Chemours common stock.

| NAME AND ADDRESS OF BENEFICIAL OWNER | NUMBER OF SHARES BENEFICIALLY OWNED | PERCENT OF CLASS[5] |
|---|---|---|
| BlackRock, Inc[1], 55 East 52nd Street New York, NY 10055 | 18,516,903 | 12.3% |
| The Vanguard Group[2] 100 Vanguard Blvd. Malvern, PA 19355 | 18,416,153 | 12.2% |
| FMR LLC[3] 245 Summer Street Boston, MA 02210 | 11,829,385 | 7.8% |

(1) Based solely on a Schedule 13G/A regarding holdings in Chemours common stock filed with the SEC on January 26, 2023, BlackRock, Inc. reported that it had sole voting power with respect to 17,755,093 shares and sole dispositive power with respect to 18,516,903 shares as of December 31, 2022.

(2) Based solely on a Schedule 13G/A regarding holdings in Chemours common stock filed with the SEC on February 9, 2023, The Vanguard Group reported that it had shared voting power with respect to 84,123 shares, sole dispositive power with respect to 18,196,342 shares, and shared dispositive power with respect to 219,811 shares as of December 31, 2022.

(3) Based solely on a Schedule 13G/A regarding holdings in Chemours common stock filed with the SEC on February 9, 2023, FMR LLC reported that it had sole voting power with respect to 11,673,146 shares and sole dispositive power with respect to 11,829,385 shares as of December 31, 2022.

(4) Ownership percentages based on 148,504,030 shares outstanding as of December 31, 2022.



# Executive Compensation

**COMPENSATION DISCUSSION AND ANALYSIS**

     

| **Mark Newman** | **Sameer Ralhan** | **Edwin Sparks** | **Alisha Bellezza** | **Denise Dignam** | **David Shelton** |
|---|---|---|---|---|---|
| President and Chief Executive Officer | Senior Vice President, Chief Financial Officer | President, Titanium Technologies and Chemical Solutions | President, Thermal and Specialized Solutions | President, Advanced Performance Materials | Former Senior Vice President, General Counsel and Corporate Secretary |

This Compensation Discussion and Analysis is organized into six sections:

| **1.** | **2.** | **3.** | **4.** | **5.** | **6.** |
|---|---|---|---|---|---|
| Executive Summary | Executive Compensation Philosophy and Pay-for-Performance | Executive Compensation Decision Making | 2022 Executive Compensation Highlights | Company Sponsored Employee Benefits | Other Required Disclosures |

## Compensation Discussion and Analysis

## Executive Summary

**2022 Business Highlights**

Courage and agility — words that best describe the drive our team showed in delivering strong performance in 2022. Despite significant challenges, including geopolitical volatility, supply chain disruptions and rising inflation, we delivered improved financial performance and accelerated changes that positioned us well for 2023. During the year, we increased our focus on sustainable growth through announced investments in the hydrogen economy and lower global warming potential refrigerants, while redoubling our efforts in responsible manufacturing. For the first time since our founding, the combined performance of our Thermal & Specialized Solutions (TSS) and Advanced Performance Materials (APM) segments became the primary driver of Chemours' results. This was largely a result of our continued commitment to innovation and secular growth strategies that will continue to yield results into the future.

**Our 2022 results includes:**

- Net Sales of $6.8 billion, up 7% year over year
- Net Income of $578 million with EPS[1] of $3.65, up $0.05 year over year
- Adjusted EBITDA of $1.36 billion, up 4% year over year

[1] Earnings per share (EPS) on diluted basis



## Executive Summary (continued)

■ Free Cash Flow (FCF) of $447 million — delivering over $1.5 billion in FCF in the past three years

■ Returned $649 million to shareholders — $495 million in share repurchases and $154 million in dividends — while continuing to strengthen our balance sheet

■ Achieved record Net Sales and Adjusted EBITDA in TSS

■ Drove record Net Sales, Adjusted EBITDA and Adjusted EBITDA Margin in APM

■ Our Titanium Technologies (TT) segment reported relatively flat Net Sales and lower Adjusted EBITDA versus prior year in the face of ore shortages during a strong first half and weakening demand in Europe and Asia in the second half of the year

■ Connected to our strong financial performance, we achieved a number of important milestones that helped foster a strong business climate and improve our focus on sustainable growth, including:

  • Announcing an $80 million multi-year investment in our Opteon™ YF capacity at Corpus Christi. As a result of this investment, and ongoing debottlenecking activities, our Corpus Christi Opteon™ YF capacity will increase by approximately 40%, and we will further enhance our position as the partner of choice for sustainable, climate-friendly thermal management solutions.

  • Announcing a $200 million expansion in Nafion™ ion exchange material production at our Villers-Saint-Paul, France site. This will support the rapid growth of the hydrogen economy, which we believe could translate into a multibillion-dollar market for electrolyzer and fuel cell membranes by 2030.

  • Agreeing to establish a joint venture with BWT FUMATECH which will accelerate the development of heavy-duty fuel cell membranes. This joint venture partnership combines Chemours' ion exchange materials and technologies with BWT FUMATECH's membrane production capabilities.

  • Supporting the passage of the U.S. CHIPS and Science Act and the Inflation Reduction Act in support of the semiconductor and clean energy sectors.

  • Announcing our aspiration to be the most sustainable $TiO_2$ producer in the industry and unveiling the new Ti-Pure™ Sustainability Product Series.

  • Announcing the launch of a new pilot program in the European Union and the United Kingdom in partnership with Honeywell to recycle and reclaim Opteon™ XP40 and Honeywell's Solstice® N40, which are patented HFO refrigerant blends.

  • Continuing to make strong progress implementing our Corporate Responsibility Commitment goals and committing to setting science-based targets for scopes 1, 2, and 3 greenhouse gas emissions with the Science Based Targets initiative.

  • Achieving Great Place to Work™ certification in ten countries representing over 90% of employees.

  • Updating our Inclusion, Diversity, and Equity goals to help drive greater gender and ethnic diversity.

Despite the global challenges in 2022, the actions and the efforts of our leadership team delivered solid operating performance across our business segments.

Our TT segment had a challenging year holding year-over-year revenues relatively flat at $3.4 billion and Adjusted EBITDA declining 25% to $601 million. The team continued to meet key contracted customer needs in the face of $TiO_2$ ore constraints and higher raw materials and energy costs, as well as much lower demand in Europe and Asia in the second half of the year. With a strong book of contracted customers — through continued execution of our Ti-Pure™ Value Stabilization (TVS) strategy — we continued to focus on improving the quality of segment earnings through $TiO_2$ cycles, growing with strategic customers and becoming the most sustainable $TiO_2$ enterprise in the world. In 2022, the TT segment launched the TiPure™ Sustainability Series, a new family of pigment offerings designed to advance sustainability, minimize climate impact, and maximize resource efficiency. The first product in the series is supported by a environmental footprint calculator to help customers quantify the environmental impact reduction of the grade. Also, the team was recognized by its customer LyondellBassell as a top supplier because of the progress made on the value creation pipeline, including work on plastic grades Ti-Pure™ R-350-17 and Ti-Pure™ R-111.



## Executive Summary (continued)

TSS delivered the highest revenue and earnings growth of all of our businesses in 2022 with Net Sales up 34% to $1.7 billion and Adjusted EBITDA up 50% to $603 million. These results reflect improved pricing achieved on legacy refrigerants, aided by the implementation of the American Innovation and Manufacturing (AIM) Act in the US and volume growth from the adoption of our lower global warming potential (GWP) Opteon™ refrigerants, and other specialized solutions. With the announced $80 million investment to expand Opteon™ YF capacity at our Corpus Christi manufacturing site, and our enhanced focus on product innovation, TSS is well-positioned to drive top-line growth as it delivers more sustainable thermal management and specialized solutions in a regulatory environment that promotes the use of low GWP products. As announced in 2022, our Opteon™ XL41 was selected as the cooling category winner in the 2023 AHR Expo Innovation Awards. Our TSS segment team was also recognized as a Top 5 Supplier by GA Larson, a leading wholesale distributor of heating, ventilation, air conditioning, and refrigeration (HVACR) equipment, and received the Exceptional Commitment award from Key Wholesaler Group (KWGA), the largest group of stationary aftermarket distributors in North America.

Our APM segment delivered record-setting results in 2022 with an increase in Net Sales of 16% to $1.6 billion and Adjusted EBITDA up 29% to $367 million. APM continues to innovate and accelerate key organic and inorganic growth initiatives in clean energy and advanced electronics. In addition to our recently announced $200 million investment in Nafion™ ionomer capacity and expanding membrane capabilities at our manufacturing site in Villers-Saint-Paul, France, we are expanding Teflon™ PFA capacity at our Washington, West Virginia site to support semiconductor infrastructure needs. We also announced the formation of a joint venture with BWT FUMATECH on heavy-duty fuel cell membranes, were selected as a participating partner of the Appalachian Regional Clean Hydrogen Hub (ARCH2) and recently unveiled the Center for Clean Hydrogen, a public-private partnership with the US Department of Defense, the University of Delaware, Plug, and the U.S. Department of Energy's National Renewable Energy Laboratory. These developments position the Company well to meet the growth and technical challenges in clean energy and advanced electronics, both of which rely on responsibly made fluoropolymers. The APM team was honored to receive the Excellent Supplier Award from Entegris, a leading supplier of advanced materials and process solutions for the semiconductor, life sciences, and other high-tech industries, and the Gold Seal Award from Freudenberg-NOK Sealing Technologies, a leading supplier in providing gaskets, seals and other advanced product solutions to a broad cross-section of industries.

Our Corporate Responsibility Commitment (CRC) is embedded in everything we do. With the publication of our fifth CRC report, we continued to show meaningful progress toward reaching our 2030 goals versus our 2018 baseline. That includes achieving 33% of all director-level positions filled by women against our goal of 50%; an 18% reduction in GHG emissions on our path to 60% reduction by 2030 and to net-zero emissions by 2050; a 40% reduction in Fluoro Organic Compound emissions against our goal of greater than 99% reduction; and 47% of our revenue from product offerings that contribute to UN Sustainable Development goals on our way to over 50%.

Finally, in 2022, Chemours was certified as a Great Place to Work™ in 10 countries which represent over 90% of our workforce. Those countries include Belgium, Brazil, China, India, Japan, Korea, Mexico, Spain, Switzerland, and the United States. We are proud of this progress and will continue working to make Chemours the greatest place to work for all employees.

Note: Adjusted EBITDA, Adjusted Net Income, and Free Cash Flow are non-GAAP financial measures. Please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations — Non-GAAP Financial Measures" starting on page 64 of the Company's Annual Report on Form 10-K for the year ended December 31, 2022 for a reconciliation of Adjusted EBITDA, Adjusted Net Income, and Free Cash Flow to the most directly comparable GAAP measure.

### DELIVERING SHAREHOLDER VALUE VIA PAY FOR PERFORMANCE

From our plant sites to our labs and our offices across the globe, you will hear our people talk about the future often and with genuine excitement. That is because they know the work they are doing — and how they are doing it — is unlocking a brighter and more sustainable future for the next generation and beyond. We unlock shareholder value by delivering on our commitments for this future.

We directly link Named Executive Officers' (NEOs) compensation to shareholder value by promoting a performance-based culture with significant pay at risk. The total direct compensation (TDC) for executives places greater weight on at-risk



## Executive Summary (continued)

incentive pay and, therefore, fluctuates with business results and stock price. The following chart illustrates the percentage of target pay at-risk for the CEO and other NEOs on average.



Our incentive plan design reinforces these beliefs. AIP is earned via our performance against financial and ESG metrics. In 2022, the plan metrics focused the NEOs on the key areas that produce long-term sustained growth specifically, Adjusted EBITDA and Free Cash Flow. As our strategy has evolved, as it did this past year in the pivot to growth, our plans evolved, introducing Revenue to TSS AIP, maintaining Revenue in the APM AIP plan and multinational corporations (MNC) market share in the TT AIP. The LTIP award mix is 90% performance-based via Performance Share Units (PSUs) and Non-Qualified Stock Options (NQSOs). Within the LTIP, the metrics used in the PSU plan include Adjusted Net Income and Free Cash Flow Conversion. Relative TSR is used as a modifier to ensure strong alignment to the creation of shareholder value.

**2022 "Say on Pay" Vote Result**

At Chemours' 2022 Annual Meeting, shareholders approved the Company's "Say-on-Pay" proposal with 95% of the votes cast in support of the executive compensation program. The Compensation and Leadership Development Committee is committed to regularly reviewing the program in the context of Chemours' executive compensation philosophy and will continue to consider shareholder input in evaluating program design and decisions.

5 Years of "Say on Pay"

| 2018 | 2019 | 2020 | 2021 | 2022 |
| --- | --- | --- | --- | --- |
| 96% | 95% | 94% | 94% | 95% |

## 2022 Executive Compensation Highlights

Chemours' executive pay programs are governed by the Compensation and Leadership Development Committee (CLDC). As reflected in the Business Highlights, the Company achieved improved financial results in 2022 but fell short of enterprise targets based on challenges in our TT business segment. The record-setting performances of both the TSS and APM business segments represented the first time these segments were the primary drivers of Chemours' results. This positively impacted the organization's overall success and specifically translated to annual incentive results that exceeded target



## Executive Summary (continued)

for those segments. Our TT business segment was challenged by headwinds that ultimately resulted in the segment falling short on critical financial metrics. Those results negatively impacted the annual incentive payout for that business segment and the Company as a whole.

In the 2020-2022 Long-Term Incentive Plan (LTIP), PSU equity awards earned 214% of target value. During the three-year performance period, the Company faced the challenges presented by COVID-19 and took quick actions to drive cost savings and free cash flow generation and then showed the agility to respond to the recovery curve, achieving several record production and revenue milestones. Over the three-year period, the Company managed the inflationary and geo-political pressures on raw materials and other costs to drive strong earnings and free cash flow generation. During that period, the TSS and APM segments were formed, grew their franchises, and delivered products that advanced the world's demand for sustainable and responsible solutions. At the same time, TT's TVS strategy translated into better business partnerships through the performance period that were in line with the strategy to deliver greater earnings and free cash flow stability. The organization's strong business results in Free Cash Flow Conversion and Adjusted Net Income during the three-year period combined with top-quartile Total Shareholder Return relative to the compensation peer group (rTSR) drove above target compensation for the 2020-2022 LTIP.

### Named Executive Officer (NEO) Compensation

2022 was a year of stability for the Chemours Executive Team. It was Mark Newman's first full year in the role as the President and CEO. Sameer Ralhan and Edwin Sparks remained NEOs. Additionally, Alisha Bellezza and Denise Dignam, the Presidents of our business segments that are experiencing the most growth, joined them as NEOs. Ms. Bellezza serves as the Business President of TSS. Ms. Dignam serves as the Business President of APM. Ms. Dignam became a NEO as the result of a transition in roles for Mr. Shelton, who moved to a special assignment on October 1, 2022.

Mr. Shelton transitioned to Special Counsel to the CEO working exclusively on leading the resolution of the Company's legacy liabilities and related remediation programs. As a result of the transition, while not currently a NEO, Kristine Wellman was promoted to the position of Senior Vice President, General Counsel and Corporate Secretary. We are proud, once again, to have followed our executive succession plan to elevate such a dynamic and capable executive. Ms. Wellman's promotion further diversified our leadership team, which now includes five women in key executive leadership positions.

Each year, the CLDC, and in the case of the CEO, the Board, carefully review compensation for each executive. They do so with the support of their independent compensation consultants. Key considerations when determining an executive's compensation include experience, size and scope of role, pay position relative to the market, internal equity, and talent retention. In 2022, the CLDC clarified its practice related to the promotion of an executive to a new role. When promoting a new executive, the CLDC's intent is to adjust TDC to the market median generally within two years. In doing so, the CLDC ensures the new executive is compensated within the market range upon promotion. As the executive becomes fully proficient in the role, compensation increases to reach market median. The section titled, "Executive Compensation Highlights," provides a detailed review of the actions taken in 2022 that are consistent with the CLDC's executive compensation philosophy and practices.

### 2022 Annual Incentive Plan (AIP)

The CLDC maintained its focus on aligning management's incentive to the interests of the shareholders. Once again, for 2022, for Chemours as a whole, the financial metrics were Adjusted EBITDA and Free Cash Flow. Management and the CLDC believe these measures reinforced the importance of earnings and cash generation to the achievement of Chemours' objectives, as well as their importance to shareholders.

The CLDC approved adjustments to the financial metrics that impacted Ms. Bellezza (TSS). The CLDC approved the inclusion of both business segment Revenue (25%) and Adjusted EBITDA (20%) in the TSS plan. The CLDC made these adjustments to reinforce the importance of these critical metrics as the Company pivots to growth while continuing its focus on a sustainable future. Revenue and Adjusted EBITDA replaced Opteon™ Variable Contribution Increase in the plan. Additionally, the weight attributed to the TSS Free Cash Flow metric was reduced to 20% to accommodate this change.

The AIP metrics and weights remained the same for all other NEOs.



## Executive Summary (continued)

While maintaining the same financial metrics as in 2021, the CLDC tightened the Company's Adjusted EBITDA target range to 85%-115% (from 80%-120%). The adjustment was made to align more closely with the Company's risks and opportunities, analyst estimates, and industry benchmarks.

Finally, consistent with the Company's bold Corporate Responsibility goals (CRC), the CLDC maintained our leading position by including ESG metrics in the plan. The CLDC continued to evaluate the best metrics to drive progress against the Company's 10x2030 CRC. In 2022, gender diversity continued to be a focus, and the CLDC added a success measure for a critical green-house gas (GHG) emissions reporting system implementation (xOvertime (xOT)). Furthermore, the maximum bonus opportunity for the ESG metric was expanded from 150% to 200%. The adjustment was made after careful consideration of the risk and opportunities associated with this metric as well as incentive plan norms. That adjustment raised the maximum bonus opportunity for the NEOs from 192.5% to 200%.

**2022 AIP Results**

As documented in the "2022 Business Highlights", Chemours had a successful year in 2022. We achieved growth, driven by record-setting results in our TSS and APM business segments amidst significant global macroeconomic challenges, while achieving several CRC milestones that will propel us towards a bright future. However, the challenges our teams faced during the year in our TT segment impacted our ability to achieve all AIP metric targets, which translated into a Corporate AIP achievement of 78.8%.

Our TT segment faced a myriad of challenges, including ore constraints, rising input costs and a decline in demand in Europe. At the same time, demand in Asia was impacted by ongoing COVID-19 lockdowns. TT exceeded the MNC market share target by delivering on commitments to our strong base of contracted customers. TT fell short of the thresholds for both segment Adjusted EBITDA and Free Cash Flow which resulted in an AIP achievement of 59.7%.

Our TSS and APM segments posted record performances as secular tailwinds in low GWP refrigerants, clean energy, and advanced electronics continued to take shape. Those results translated into AIP outcomes that exceeded targets. Specifically, both business segments posted outstanding performance against their defined segment Revenue and Adjusted EBITDA targets. Those achievements contributed to AIP outcomes of 152.2% for TSS and 127% for APM.

---

**2022 Performance Against AIP Targets with Pay Scale Applied**



---



## Executive Summary (continued)

**2022-2024 Long-Term Incentive Plan (LTIP)**

In 2022, the Company began a new three-year long-term incentive plan that modeled certain performance outcomes based on execution of the Company's strategic and operational plans. The LTIP award mix is 90% performance-based, consisting of PSUs and NQSOs, which increase in value when the share price increases. The equity mix remained 50% PSUs, 40% NQSOs, and 10% RSUs.

PSUs and NQSOs strongly link the NEOs' reward to shareholder success. Both vehicles carry significant risk to the NEOs. The use of RSUs, mitigates some risk as an inherently less volatile equity vehicle, with some value based on continued employment, while maintaining alignment with shareholders. The NQSOs and RSUs vest annually in three-equal installments from the date of grant. The CLDC believes this balance helps reward and retain the Company's critical executive talent.

The PSUs are earned based on performance over a three-year performance period. The performance metrics used in the 2022-2024 PSU award remained Adjusted Net Income and Free Cash Flow Conversion, both equally weighted. Relative TSR remained a modifier, ranging from 50% to 150% based on stock performance relative to the compensation peer group.

Since Chemours' inception, Adjusted EBITDA and Free Cash Flow Conversion have been important financial metrics that shareholders have expected to gauge the health of the organization. Then the long-term focus on these metrics propelled Chemours from spin to the healthy and vital organization it is today.

**2020-2022 PSU Award Results**

The achievement for the 2020-2022 PSU award was based on pre-established three-year cumulative targets for Adjusted Net Income and Free Cash Flow Conversion. Those metrics were equally weighted in the plan. Adjusted Net Income results were slightly below target, with an achievement of 85%. Free Cash Flow Conversion results reached the maximum of 200% achievement. Based on the equal weighting of those metrics, the blended outcome was 143%.

Only when exceptional rTSR rank is achieved, defined as greater than the 75th percentile, can plan achievement exceed 200%. Over the 2020-2022 three-year period, Chemours delivered rTSR at the 88th percentile of the peer group. As a result, the financial outcome was modified, and the number of PSUs earned increased by 150%. The execution of the Company's long-term strategy resulted in outstanding achievement for the 2020-2022 PSU award of 214%.

**2023 AIP and 2023-2025 LTIP — Preview of Design Changes**

In the shareholder letter from Mrs. Farrell and Mr. Newman, they underscored that our teams are energized and ready to take on any challenge that 2023 may bring as we continue to build the Company to its full potential. Working together we will realize the Company's vision of creating a better world through the power of our chemistry. To achieve our goals, we must pivot to growth while continuing to maintain our focus on disciplined cash management and sustainability.

In early 2023, the CLDC approved minor adjustments to the AIP and more substantive changes to the LTIP in support of our strategy. The CLDC believes the plan modifications will reinforce the focus on our goals while also reducing the duplication of metrics between AIP and LTIP, striking a balance between risk and reward, short- and long-term execution and further tightening the connection between shareholders and the management team.

For 2023, AIP metrics and weights will not change. Adjusted EBITDA and Free Cash Flow remain critical metrics that shareholders expect, and the Company must deliver while making a pivot to more investment on growth and sustainability. Additionally, Business Segment Revenue will remain a key component in the plan for both TSS and APM, our growth business segments. In our TT business segment, we will continue to measure MNC Market Share as a critical indicator of success of the TVS strategy, and our ability to maintain and grow share through the cycle. Continuing to be an innovator and leader in ESG, the CLDC approved the expansion of the components of the ESG metric. That metric will include energy efficiency (consistent with the CRC goal of reducing GHG emissions) in addition to gender diversity and xOvertime. All three elements of the ESG metric will be equally weighted. To ensure the NEOs remain focused on delivering results for all three metrics, threshold must be achieved in all metrics for the executives to earn greater than target, which is 15%.



2023 Proxy Statement     **33**

## Executive Summary (continued)

The LTIP design and PSU metrics will change for the 2023-2025 performance period. The CLDC approved the use of Performance Stock Options (PSOs) whereby the Company's stock price must increase 10% before the options have any realizable value. With the inclusion of PSOs, the plan will have four equally weighted components which will be PSOs, PSUs, NQSOs, and RSUs. Additionally, the metrics of the PSU plan will change. Adjusted Net Income will remain a metric in the plan but with a weight of 60% (versus 50%). Relative TSR will become a metric versus a modifier in the plan and will be weighted at 40%. Free Cash Flow Conversion will be removed as a plan metric reflecting the Company's progress in pivoting to growth and avoiding replication of AIP metrics.

**Executive Compensation Governance and Best Practices**

Chemours' executive compensation policies and practices demonstrate a commitment to strong governance standards and include features designed to mitigate compensation-related risks. The table below highlights the key features of Chemours' executive compensation programs and those features that Chemours does not employ:

| WHAT CHEMOURS DOES | WHAT CHEMOURS DOESN'T DO |
|---|---|
| ☑ Pay-for-performance | ☒ Provide income tax gross-ups, other than for international assignment and / or relocation |
| ☑ Deliver total direct compensation predominantly through performance-based pay | ☒ Re-price underwater stock options |
| ☑ Set challenging short- and long-term incentive award goals | ☒ Allow hedging, pledging, short sales, derivative transactions, margin accounts or short-term trading |
| ☑ Target pay and benefits to market competitive levels | ☒ Have a liberal share recycling provision in our equity plan |
| ☑ Maintain robust stock ownership requirements | ☒ Provide single trigger change in control |
| ☑ Maintain a Clawback policy for incentive-based compensation | ☒ Offer excessive perquisites |
| ☑ Annually review the constituents of Compensation peer group and adjust as appropriate | |
| ☑ Undertake an annual review of compensation risk | |
| ☑ Regularly review compensation, especially performance-based compensation to ensure continued alignment with Chemours' strategy | |



## Executive Compensation Philosophy and Pay-for-Performance

**Executive Compensation Philosophy**

The objectives of Chemours' executive compensation philosophy are rooted in:

- Promoting a performance-based culture that strongly links executive rewards to shareholder interests and to the Company's strategic and financial goals.
- Providing a competitive TDC opportunity designed to attract, retain, and motivate high-performing executive talent.

These objectives are achieved through fixed and variable compensation elements. The CLDC determines the appropriate balance between these elements in setting the TDC opportunity for executives.

| ELEMENT | PURPOSE AND KEY FEATURES |
|---|---|
| Base Salary | ▪ Salary paid in cash<br>▪ Provides a stable source of income and is a standard element in executive compensation packages<br>▪ Compensates for expected day to day contribution<br>▪ Supports equitable pay practices |
| Annual Incentive Plan (AIP) | ▪ Cash incentive earned and awarded annually<br>▪ Creates a variable incentive opportunity as a portion of the executive compensation package<br>▪ Reinforces and rewards executives for delivering key business goals which are short term in nature<br>▪ Pays only when minimum performance criteria are met and pays above market when target performance criteria are exceeded<br>▪ Focuses on quantitative metrics but includes qualitative metrics when appropriate<br>▪ Includes a mix of corporate and business segment metrics |
| Long-Term Incentive Plan (LTIP) | ▪ Long-term equity-based incentives earned and awarded periodically in various forms of equity: PSUs, PSOs, NQSOs, and/or RSUs<br>▪ Creates a compensation opportunity aligned with the interests of our shareholders<br>▪ Provides incentive to achieve sustained performance and growth<br>▪ Rewards executives for delivering total shareholder return |



## Executive Compensation Decision Making

The CLDC applies the following factors to guide executive compensation decisions:

- Company performance and strategic objectives
- Independent external market data
- Economic environment for the chemicals industry

The table below summarizes oversight responsibilities and participation in executive compensation decisions:

| | |
|---|---|
| Compensation and Leadership Development Committee | ■ Establish executive compensation philosophy<br><br>■ Approve incentive compensation programs and determine performance expectations for AIP and LTIP<br><br>■ Approve all compensation actions for the NEOs, other than the CEO, including base salary, AIP targets and actual payouts, and LTIP targets, grants and earned awards<br><br>■ Recommend to the independent directors of the Board compensation actions for the CEO, including base salary, AIP targets and actual payouts, and LTIP targets, grants and earned awards |
| All Independent Board Members | ■ Assess performance of the CEO<br><br>■ Approve all compensation actions for the CEO, including base salary, AIP targets and actual payouts, and LTIP targets, grants and earned awards |
| Chief Executive Officer | ■ Provide compensation recommendations for the NEOs (other than the CEO) to the CLDC; review, analysis, and final approval of compensation actions are made solely by the CLDC<br><br>■ Make recommendations based on the CEO's personal review of each NEO's performance, job responsibilities, and importance to the Company's overall business strategy, as well as the Company's executive compensation philosophy<br><br>■ In consultation with the CFO, recommend AIP and LTIP metrics and targets to the CLDC |
| Independent Consultant to the Compensation and Leadership Development Committee | ■ Provide independent advice, research, and analytical services on a variety of subjects, including compensation of executive officers and executive compensation trends<br><br>■ Participate in meetings as requested and communicate with the CLDC Chair between meetings<br><br>■ Evaluate executive compensation policies and guidelines and provide analysis compared to best practices in the industry<br><br>■ Is engaged by, and reports directly to, the CLDC |

**Independent Compensation Consultant**

The CLDC conducted a review of its independent compensation consultant. Five organizations were invited to submit a proposal to provide support to the CLDC. The five organizations included Willis Towers Watson (WTW) as the incumbent consultant since April 2017.

The rigorous review resulted in Farient Advisors being chosen as the consultant in July. Farient was chosen based on the skills of their proposed team, executive compensation thought leadership, sound governance practices, industry knowledge, and history of successful engagement with proxy advisors.

Farient is engaged by and reports directly to the CLDC, which may replace the consultant or hire additional advisors at any time. The CLDC and the other independent directors of Chemours' Board are the sole decision makers for compensation of executive officers. The CLDC has assessed the independence of both Willis Towers Watson and Farient Advisors and concluded that their work does not raise any conflict of interest.

Farient Advisors provides a variety of consulting services to the CLDC. These services include but are not limited to, benchmarking market pay practices, sharing compensation best practices, providing competitive pay reviews, supporting



## Executive Compensation Decision Making (continued)

the review of the executive compensation philosophy, reviewing the disclosure of the executive compensation programs in the proxy statement, sharing market trends, opining on incentive plan design and target setting, recommending compensation peer group(s) and providing legislative and regulatory updates.

**Compensation Peer Group Selection and Competitive Positioning**

In making compensation decisions, the CLDC considers competitive market data from a compensation peer group of companies as one of several reference points. Compensation peer group data is supplemented with broader chemical industry and general industry data. The CLDC reviews the composition of the compensation peer group annually to ensure that it remains suitable and appropriate.

The selection of the compensation peer group is composed of publicly-traded U.S. based companies with similar scale, revenue (generally 0.5x to 4x), commodity, diversified and specialty chemicals industries, and business characteristics reflecting Chemours' current state and strategic direction.

The above criteria shifted slightly from previous years. At the recommendation of Farient, market capitalization has been removed, the revenue range was expanded, and greater emphasis was placed on the industry and business to business model. The CLDC approved these changes, specifically agreeing to the expansion of revenue in part based on the market data regression approach used by Farient. Market data regression adjusts market points to reflect Chemours's revenue. Thus, data from organizations that are smaller or larger than Chemours is adjusted to better reflect market conditions for the Company's revenue size.

Based on the above criteria, in October the CLDC chose to make changes to the compensation peer group with the assistance of Farient. The change resulted in Dupont de Nemours, Inc., Element Solutions Inc., and H.B. Fuller Company being added to the compensation peer group. Ashland Global Holdings Inc., PPG Industries, Inc., RPM International Inc., and The Sherwin-Williams Company were removed from the compensation peer group. The CLDC confirmed the changes in peers had little impact on the executives' market pay positions.

For decisions made prior to the approval of the adjusted compensation peer group in October 2022, the group consisted of the following companies:

| | |
|---|---|
| Albemarle Corporation | PPG Industries, Inc. |
| Ashland Global Holdings Inc. | RPM International Inc. |
| Avient Corporation | The Sherwin-Williams Company |
| Cabot Corporation | Trinseo S.A. |
| Celanese Corporation | Tronox Limited |
| Eastman Chemical Company | Venator Materials PLC |
| Huntsman Corporation | Westlake Chemical Corporation |
| Olin Corporation | |



## Executive Compensation Decision Making (continued)

For compensation decisions made after the adjusted compensation peer group was approved in October 2022, the group consists of the following companies:

| | |
|---|---|
| Albemarle Corporation | H.B. Fuller Company |
| Avient Corporation | Huntsman Corporation |
| Axalta Coating Systems Ltd. | Olin Corporation |
| Cabot Corporation | Trinseo PLC |
| Celanese Corporation | Tronox Holdings PLC |
| Dupont de Nemours, Inc. | Venator Materials PLC |
| Eastman Chemical Company | Westlake Chemical Corporation |
| Element Solutions Inc. | |



## 2022 Executive Compensation Highlights

**Mark Newman — President and CEO**

Mark Newman's compensation was adjusted to reflect his impact as the President and CEO in 2021 and further aligned his compensation to the marketplace median in accordance with the Company's executive compensation philosophy. His compensation was recommended by the CLDC, with the support of the Committee's independent compensation consultant and was approved by the Board of Directors. Mr. Newman's base salary was increased to $1,000,000, his AIP target increased to $1,300,000 (130% of base salary) and his LTIP target increased to $5,100,000. The LTIP grant was made in March in accordance with the annual grant process: 50% PSUs, 40% NQSOs, and 10% RSUs. Mr. Newman's full year TDC is now $7,400,000.

The Board considered the following factors when determining his compensation:

- Overall experience in the role
- Chemours' financial performance
- Mr. Newman's individual performance
- Compensation provided to CEOs of peer organizations

|  | 2021 | 2022 |
|---|---|---|
| Base Salary | $975,000 | $1,000,000 |
| Target AIP Opportunity | $1,170,000 *(120% of salary)* | $1,300,000 *(130% of salary)* |
| Target LTI Opportunity (Grant Value) | $4,300,000 | $5,100,000 |
| Target Total Direct Compensation | $6,445,000 | $7,400,000 |

Mr. Newman's actual 2022 short-term incentive award earned was $1,024,400 (78.8% of target) based on Chemours' performance against AIP targets reflected earlier. Mr. Newman's total LTIP opportunity was delivered in PSUs, NQSOs, and RSUs, as described above.

**2022 Base Salaries of the Other Named-Executive Officers (NEOs)**

Base salaries for the NEOs are intended to be competitive with the market and attract and retain the executive talent needed to successfully execute the strategy. The CLDC reviews base salaries for NEOs annually. The NEOs' base salaries reflect the scope of their responsibilities, experience, performance, and external market competitiveness. Base salaries represent approximately 30% of overall compensation.

After considering external market pay data, internal equity and performance, the CLDC approved a base salary increase for Mr. Sparks to $575,000 (an increase of 4.5%), Ms. Bellezza to $465,000 (an increase of 3.3%) and Ms. Dignam to $465,000 (an increase of 3.3%). Messrs. Ralhan and Shelton's base salaries remained the same.

| NEO | BASE SALARY AS OF DECEMBER 31, 2021 | BASE SALARY AS OF DECEMBER 31, 2022 |
|---|---|---|
| Sameer Ralhan | $ 625,000 | $ 625,000 |
| Edwin Sparks | $ 550,000 | $ 575,000 |
| Alisha Bellezza | $ 450,000 | $ 465,000 |
| Denise Dignam | $ 450,000 | $ 465,000 |
| David Shelton | $ 500,000 | $ 500,000 |



## 2022 Executive Compensation Highlights (continued)

**Annual Incentive Plan (AIP)**

Chemours' AIP is designed to reward executives for achieving and exceeding annual performance goals. Under the AIP, each NEO has a target annual incentive opportunity, expressed as a percentage of base salary. Incentive targets are determined based on the CLDC's review of compensation peer group practices, chemical industry data from proprietary third-party surveys, and the position and scope of responsibilities of each NEO. Incentive targets are reviewed annually in the first quarter of the year. Ms. Bellezza and Ms. Dignam's AIP targets increased to 75% to further align to market norms. All other NEOs' AIP targets remained unchanged for 2022.

The following table summarizes 2022 AIP target percentages:

| NEO | BONUS TARGET AS OF DECEMBER 31, 2021 | BONUS TARGET AS OF DECEMBER 31, 2022 |
| --- | --- | --- |
| Sameer Ralhan | 80% | 80% |
| Edwin Sparks | 75% | 75% |
| Alisha Bellezza | 65% | 75% |
| Denise Dignam | 65% | 75% |
| David Shelton | 70% | 70% |

**Incentive Formula**

Actual cash annual incentive awards for NEOs in 2022 were determined using the formulas shown below. The calculation of award payments for each NEO was determined based on Chemours' financial and ESG performance or a combination of Chemours' financial and ESG performance and business segment financial performance. There is no individual performance component for NEOs in the AIP. The CLDC may only use its discretion to reduce payout.

The AIP awards for Messrs. Newman, Ralhan, and Shelton were determined as follows:



The AIP awards for Mr. Sparks, Ms. Bellezza, and Ms. Dignam were determined as follows.



(1) Chemours Company-wide metrics

(2) Mr. Sparks' results were specific to the TT business segment. Ms. Bellezza's results were specific to the TSS business segment. Ms. Dignam's results were specific to the APM business segment.

**Performance Measures**

The CLDC maintained its focus on aligning management's incentive to the interests of the shareholders. Once again, for 2022, for Chemours as a whole, the financial metrics were Adjusted EBITDA and Free Cash Flow. Management and the CLDC believe these measures reinforced the importance of earnings and cash generation to the achievement of Chemours' objectives, as well as their importance to shareholders.



## 2022 Executive Compensation Highlights (continued)

The CLDC approved adjustments to the financial metrics that impacted Ms. Bellezza (TSS). The CLDC approved the inclusion of both business segment Revenue (25%) and Adjusted EBITDA (20%) in the TSS plan. The CLDC made these adjustments to reinforce the importance of these critical metrics as the Company pivots to growth while continuing its focus on a sustainable future. Revenue and Adjusted EBITDA replaced Opteon™ Variable Contribution Increase in the plan. Additionally, the weight attributed to the TSS Free Cash Flow metric was reduced to 20% to accommodate this change.

The AIP metrics and weights remained the same for all other NEOs.

While maintaining the same financial metrics as in 2021, the CLDC tightened the Company's Adjusted EBITDA target range to 85%-115% (from 80%-120%). The adjustment was made to align more closely with the Company's risks and opportunities, analyst estimates, and industry benchmarks.

Finally, consistent with the Company's bold Corporate Responsibility goals (CRC), the CLDC maintained our leading position by including ESG metrics in the plan. The CLDC continued to evaluate the best metrics to drive progress against the Company's 10x2030 CRC. In 2022, gender diversity continued to be a focus, and the CLDC added a success measure for a critical green-house gas (GHG) emissions reporting system implementation (xOvertime (xOT)). Furthermore, the maximum bonus opportunity for the ESG metric was expanded from 150% to 200%. The adjustment was made after careful consideration of the risk and opportunities associated with this metric as well as incentive plan norms. That adjustment raised the maximum bonus opportunity for the NEOs from 192.5% to 200%.

The following reflects the weightings for each metric:

| CHEMOURS — AIP for Messrs. Newman, Ralhan, and Shelton | WEIGHT |
|---|---|
| Chemours ESG | 15.0% |
| Chemours Free Cash Flow | 42.5% |
| Chemours Adjusted EBITDA | 42.5% |

| TITANIUM TECHNOLOGIES — AIP for Mr. Sparks | WEIGHT |
|---|---|
| Chemours ESG | 15.0% |
| Chemours Free Cash Flow | 20.0% |
| Business Segment Free Cash Flow | 20.0% |
| Business Segment EBITDA | 20.0% |
| Business Segment Market Share | 25.0% |

| THERMAL AND SPECIALIZED SOLUTIONS — AIP for Ms. Bellezza | WEIGHT |
|---|---|
| Chemours ESG | 15.0% |
| Chemours Free Cash Flow | 20.0% |
| Business Segment Revenue | 25.0% |
| Business Segment Free Cash Flow | 20.0% |
| Business Segment Adjusted EBITDA | 20.0% |



## 2022 Executive Compensation Highlights (continued)

| ADVANCED PERFORMANCE MATERIALS — AIP for Ms. Dignam | WEIGHT |
|---|---|
| Chemours ESG | 15.0% |
| Chemours Free Cash Flow | 20.0% |
| Business Segment Revenue | 25.0% |
| Business Segment Free Cash Flow | 20.0% |
| Business Segment Adjusted EBITDA | 20.0% |

Adjusted EBITDA was defined as income (loss) before interest, income taxes, depreciation and amortization excluding the following items: non-operating pension and other postretirement employee benefit costs, exchange gains (losses) included in other income (expense), net, restructuring, asset-related, and other charges, gains (losses) on sale of assets and business, and other items not considered indicative of ongoing operations and expected to occur infrequently during the Performance Period, which, for purposes of AIP, also excludes adjustments to income, expenses and losses not budgeted resulting from acquisitions, dispositions, regulatory actions and legal settlements.

Free Cash Flow was defined as Cash Flows from Operations less purchases of property, plant and equipment as disclosed in the Company's Cash Flow statement. Business segment Free Cash Flow is defined as Adjusted EBITDA plus the delta of the change in Working Capital minus capital expenditures. Working Capital equals Accounts Receivable plus Inventory minus Accounts Payable. Unknown impacts of changes to U.S. GAAP accounting and tax policy changes, or other items not considered indicative of ongoing operations during the performance period were excluded from this calculation during the Performance Period, including cash impact of unbudgeted items resulting from acquisitions, dispositions, regulatory actions and legal settlements.

Business Revenue was defined as sales to external customers as defined by Accounting Standards Codification (ASC) 606, revenue from contracts with customers.

TT market share or TT MNC market share was determined based on our total pigment revenue market share as a percentage of market share of all multi-national competitors (Kronos, Tronox, Venator and Chemours).

ESG metrics included improving gender diversity in our global workforce and completing steps to implement GHG reporting (xOvertime) with a focus on critical sites that comprise a significant amount of the Company's emissions. Both elements of the ESG metric were equally weighted.

The chart below shows the 2022 AIP performance targets, ranges and results approved by the CLDC. Performance targets were set and approved in early 2022 and were consistent with the Company's budget for 2022, which incorporated considerations of potential opportunities and risks associated with external business and market conditions. Targets for each of the performance measures were set at levels considered challenging, motivational, and competitive. The performance range was determined using external guidance, historical performance, and expectations as guardrails. Threshold was considered the level of performance that warranted the minimum payout, and the maximum defined the level of performance considered exceptional.

Based on 2022 financial and ESG results, the 2022 Chemours AIP payouts were Corporate 78.8%, TT 59.7%, TSS 152.2%, and APM 127% of target.



## 2022 Executive Compensation Highlights (continued)

**Dollars are in millions**

**Corporate AIP — Messrs. Newman, Ralhan, and Shelton**

| MEASURE | THRESHOLD[1] | TARGET | MAXIMUM[2] | ACTUAL | WEIGHTED FUNDING RESULT |
|---|---|---|---|---|---|
| Consolidated Adjusted EBITDA | $ 1,177 | $ 1,421 | $1,674 | $ 1,361 | 40.0% |
| Consolidated Free Cash Flows | $ 372 | $ 539 | $ 745 | $ 441 | 31.3% |
| ESG Metric — Y/Y Gender Diversity Increase | 0.64% | 0.77% | 0.90% | 0.08% | 0.0% |
| ESG Metric — GHG Reporting Implementation (xOvertime) | 18 | 21 | 41 | 21 | 7.5% |
| | | | | | **78.8%** |

**Titanium Technologies AIP — Mr. Sparks**

| MEASURE | THRESHOLD[1] | TARGET | MAXIMUM[2] | ACTUAL | WEIGHTED FUNDING RESULT |
|---|---|---|---|---|---|
| Consolidated Free Cash Flows | $ 372 | $ 539 | $ 745 | $ 441 | 14.7% |
| ESG Metric — Y/Y Gender Diversity Increase | 0.64% | 0.77% | 0.90% | 0.08% | 0.0% |
| ESG Metric — GHG Reporting Implementation (xOvertime) | 18 | 21 | 41 | 21 | 7.5% |
| TT MNC Market Share | 32.8% | 34.2% | 35.6% | 34.9% | 37.5% |
| TT Adjusted EBITDA | $ 750 | $ 906 | $1,067 | $ 601 | 0.0% |
| TT Free Cash Flows | $ 587 | $ 708 | $ 834 | $ 494 | 0.0% |
| | | | | | **59.7%** |

**Thermal and Specialized Solutions AIP — Ms. Bellezza**

| MEASURE | THRESHOLD[1] | TARGET | MAXIMUM[2] | ACTUAL | WEIGHTED FUNDING RESULT |
|---|---|---|---|---|---|
| Consolidated Free Cash Flows | $ 372 | $ 539 | $ 745 | $ 441 | 14.7% |
| ESG Metric — Y/Y Gender Diversity Increase | 0.64% | 0.77% | 0.90% | 0.08% | 0.0% |
| ESG Metric — GHG Reporting Implementation (xOvertime) | 18 | 21 | 41 | 21 | 7.5% |
| TSS Revenue | $ 1,229 | $ 1,356 | $1,487 | $ 1,679 | 50.0% |
| TSS Adjusted EBITDA | $ 339 | $ 409 | $ 482 | $ 603 | 40.0% |
| TSS Free Cash Flows | $ 292 | $ 352 | $ 415 | $ 534 | 40.0% |
| | | | | | **152.2%** |



## 2022 Executive Compensation Highlights (continued)

**Advanced Performance Materials AIP — Ms. Dignam**

| MEASURE | THRESHOLD[1] | TARGET | MAXIMUM[2] | ACTUAL | WEIGHTED FUNDING RESULT |
|---|---|---|---|---|---|
| Consolidated Free Cash Flows | $ 372 | $ 539 | $ 745 | $ 441 | 14.7% |
| ESG Metric — Y/Y Gender Diversity Increase | 0.64% | 0.77% | 0.90% | 0.08% | 0.0% |
| ESG Metric — GHG Reporting Implementation (xOvertime) | 18 | 21 | 41 | 21 | 7.5% |
| APM Revenue | $ 1,322 | $ 1,458 | $ 1,599 | $ 1,618 | 50.0% |
| APM Adjusted EBITDA | $ 259 | $ 313 | $ 369 | $ 367 | 39.0% |
| APM Free Cash Flows | $ 128 | $ 155 | $ 182 | $ 141 | 15.8% |
| | | | | | **127.0%** |

(1) Represents the minimum level of performance required to earn any incentive for this component of the 2022 AIP. Performance below this level would not result in a payout for the performance measure.

(2) Represents the highest level of performance at which maximum payout under the 2022 AIP is earned. Achievement of performance above this level would not result in a greater payout for the performance measure.

**Based on the actual performance achieved, the following AIP awards for each NEO were approved:**

| NEO | BONUS TARGET AS OF DECEMBER 31, 2022 | BASE SALARY AS OF DECEMBER 31, 2022 | ACTUAL ANNUAL INCENTIVE |
|---|---|---|---|
| Mark Newman | 130% | $ 1,000,000 | $ 1,024,400 |
| Sameer Ralhan | 80% | $ 625,000 | $ 394,000 |
| Edwin Sparks | 75% | $ 575,000 | $ 257,456 |
| Alisha Bellezza | 75% | $ 465,000 | $ 530,798 |
| Denise Dignam | 75% | $ 465,000 | $ 442,913 |
| David Shelton | 70% | $ 500,000 | $ 275,800 |

### Long-Term Incentive Plan (LTIP)

Chemours provides long-term incentive compensation to tie the NEOs' interests with the interests of shareholders and the creation of long-term, sustained value. The CLDC views these incentives as a critical element of the executive compensation program.

The CLDC reviewed the long-term incentive target opportunities for all NEOs and adjusted Mr. Ralhan's, Mr. Sparks', Ms. Bellezza's, and Ms. Dignam's targets as reflected in the following table and as discussed above in the "2022 Executive Compensation Highlights".

| NEO | LONG TERM INCENTIVE TARGET AS OF DECEMBER 31, 2021 | LONG TERM INCENTIVE TARGET AS OF DECEMBER 31, 2022 |
|---|---|---|
| Sameer Ralhan | $ 1,200,000 | $ 1,625,000 |
| Edwin Sparks | $ 900,000 | $ 1,100,000 |
| Alisha Bellezza | $ 400,000 | $ 550,000 |
| Denise Dignam | $ 450,000 | $ 550,000 |
| David Shelton | $ 950,000 | $ 950,000 |



## 2022 Executive Compensation Highlights (continued)



The CLDC strongly believes in focusing management on performance. It demonstrated this belief by once again approving an LTIP award mix that was 90% performance-based, consisting of PSUs and NQSOs, which increase in value when the Company's share price increases. The remaining 10% of the plan was awarded via time-based RSUs.

### PSU Awards (50% of LTI Target Award)

Fifty percent of the NEO's LTIP award was delivered through PSUs. The PSUs were earned and vested based on the achievement of Adjusted Net Income and Free Cash Flow Conversion objectives, which are determined at the time of grant. Relative TSR served as a modifier ranging from 50% to 150% based on total shareholder return rank versus Chemours' compensation peer group. The 2022-2024 PSU plan will be measured over a three-year cumulative period. The 2022-2024 LTIP design is consistent with the LTIP design approved and in place since 2020. PSU performance is approved by the CLDC following the three-year performance period, and will vest in first quarter of 2025.

As in prior years, the PSU portion of Chemours' LTIP consisted of overlapping cycles, with a new equity award each year. Each participant receives a grant at the beginning of each three-year cycle.



### Non-Qualified Stock Options (40% of LTIP Target Award)

The use of stock options provides clear and direct alignment with shareholder interests as they have value only if the price of Chemours' stock at the time of exercise exceeds the stock price on the date of grant. As a result, stock option grants encourage executives to focus on behaviors and initiatives that support sustained long-term stock price appreciation. The stock options vest in equal annual installments over three years from the grant date and have a ten-year term.

### Restricted Stock Units (10% of LTIP Target Award)

The mix of equity award types continues to include RSUs with vesting tied to continued service. RSUs represents 10% of the long-term incentive plan mix. The plan supports a strong performance orientation and long-term retention of talent to drive the Company strategy. The RSUs vest in equal annual installments over three years from the grant date.

### PSU Financial Metrics and Modifier

Performance goals are designed to challenge management to deliver higher performance and are aligned with delivering shareholder value. The use of Adjusted Net Income is an important indicator of success in delivering for shareholders. Free Cash Flow Conversion is critical to Chemours' ability to invest and manage assets that deliver the greatest return. In setting these objectives, the CLDC considers how the achievement of goals may be affected by competitive and/or economic conditions over the three-year period.

Relative TSR remained a modifier ranging from 50% to 150% based on stock performance relative to the compensation peer group.

The initial payout range of the PSUs is 0% to 200% depending on Chemours' achievement versus the Adjusted Net Income and Free Cash Flow Conversion metrics. Only when exceptional rTSR rank is achieved, defined as greater than 75th percentile, can plan achievement exceed 200%. The 2022-2024 PSU Award performance period, January 1, 2022, through December 31, 2024, consists of one, cumulative three-year measurement period.



## 2022 Executive Compensation Highlights (continued)

| ADJUSTED NET INCOME | | FREE CASH FLOW CONVERSION | |
|---|---|---|---|
| PERIOD | WEIGHTING | PERIOD | WEIGHTING |
| Cumulative FY2022 – FY2024 | 50% | Average FY2022 – FY2024 | 50% |

### Adjusted Net Income

Adjusted Net Income is defined as Net Income, as reported in the Company's Annual Report on Form 10-K, adjusted in a manner consistent with Adjusted EBITDA, except interest expense, depreciation, amortization, and certain provision for (benefit from) income tax amounts.

### Free Cash Flow Conversion

Free Cash Flow Conversion is defined as Cash Flows from Operations less purchases of property, plant and equipment as disclosed on the Company's Cash Flow statement divided by Adjusted EBITDA. Adjusted EBITDA was defined as income (loss) before interest, income taxes, depreciation and amortization excluding the following items: non-operating pension and other postretirement employee benefit costs, exchange gains (losses) included in other income (expense), net, restructuring, asset-related, and other charges, gains (losses) on sale of assets and business, and other items not considered indicative of ongoing operations and expected to occur infrequently during the Performance Period, which, for this purpose, also excludes adjustments to income, expenses and losses not budgeted resulting from acquisitions, dispositions, regulatory actions and legal settlements. Subject to Board approval, this Free Cash Flow Conversion calculation will be adjusted to reflect the increase in actual amount spent on purchases of property, plant and equipment in excess of 5%, from the amount contemplated in the three-year business plan, used for compensation plan purposes.

Chemours believes disclosing specific targets while the applicable performance period is ongoing could cause competitive harm. However, such targets will be disclosed once the applicable performance periods have ended as part of our discussion and analysis of awards earned by the NEOs.

### Relative TSR (rTSR)

Relative TSR is used as a modifier to promote alignment with shareholder interests. Relative TSR for the 2022- 2024 PSU Award will be measured at the end of the three-year period against the compensation peer group in place as of January 1, 2022. The modifier is defined as the change in the Company's stock price plus dividends paid and assumed to be reinvested on the ex-dividend date during the period, divided by beginning stock price, compared on a percentile basis to the same change with respect to a peer group.

rTSR = (((Current Stock Price — Previous Stock Price) + Dividends) ÷ Previous Stock Price)

For the purpose of calculating rTSR, the Company's beginning stock price will be the closing stock price averaged over the 20 trading days ending on the trading day before the start of the performance period and the ending stock price will be the closing stock price, inclusive of reinvested dividends, averaged over the 20 trading days ending with the last trading day within the performance period.

For purposes of calculating the appropriate earned percentile, any companies that are in the peer group at the beginning of the performance period that are no longer separate publicly traded companies due to merger, acquisition, or buyout shall be disregarded. Companies that are no longer publicly traded due to insolvency or bankruptcy will be included at the lowest performance ranking. For purposes of calculating the earned percentile, the Company will be considered a member of the compensation peer group.

| TSR MODIFIER | <P25 | >=P25 TO <P40 | >=P40 TO <P60 | >=P60 TO <=P75 | >P75 |
|---|---|---|---|---|---|
| Relative TSR to Peer Group | 0.5 | 0.75 | 1 | 1.25 | 1.5 |



## 2022 Executive Compensation Highlights (continued)

**2022 LTI Awards**

Awards to the NEOs under the 2022 long-term incentive program were granted on March 1, 2022 and were as follows:

| NEO | 2022 TARGET LTI AWARD VALUE | SHARE EQUIVALENT VALUE OF TARGET PSUS ON GRANT DATE | TARGET NUMBER OF PSU AWARDS[1] | GRANT DATE FAIR VALUE OF RSUS | NUMBER OF RSUS GRANTED | GRANT DATE FAIR VALUE OF STOCK OPTIONS | NUMBER OF STOCK OPTIONS GRANTED[2] |
|---|---|---|---|---|---|---|---|
| Mark Newman | $ 5,100,000 | $ 2,549,989 | 98,152 | $ 509,987 | 19,630 | $ 2,039,991 | 206,268 |
| Sameer Ralhan | $ 1,625,000 | $ 812,499 | 31,274 | $ 162,479 | 6,254 | $ 649,991 | 65,722 |
| Edwin Sparks | $ 1,100,000 | $ 549,997 | 21,170 | $ 109,999 | 4,234 | $ 439,996 | 44,489 |
| Alisha Bellezza[3] | $ 550,000 | $ 274,998 | 10,585 | $ 554,985 | 21,362 | $ 219,993 | 22,244 |
| Denise Dignam | $ 550,000 | $ 274,998 | 10,585 | $ 55,000 | 2,117 | $ 219,993 | 22,244 |
| David Shelton | $ 950,000 | $ 474,992 | 18,283 | $ 94,983 | 3,656 | $ 379,994 | 38,422 |

(1) The number of PSUs awarded was determined by dividing the dollar target value for each NEO by the closing price for Chemours common stock on grant date and rounding down to the nearest whole share. The closing price of Chemours common stock was $25.98 on March 1, 2022.

(2) The number of stock options awarded was determined based on the Black-Scholes value. The Black-Scholes value of an option was $9.89 on March 1, 2022. The exercise price of the options was equal to the closing price of Chemours common stock on the grant date. The closing price of Chemours common stock was $25.98 on March 1, 2022.

(3) In addition to her annual grant, Ms. Bellezza received a one-time retention grant of $500,000 in RSUs, which will cliff vest in 2025.

**2020-2022 PSU Award Results**

In the 2020-2022 Long-Term Incentive Plan (LTIP), PSU equity awards earned 214% of target value. During the three-year performance period, the Company faced the challenges presented by COVID-19 and took quick actions to drive cost savings and free cash flow generation and then showed the agility to respond to the recovery curve, achieving several record production and revenue milestones. Over the three-year period, the Company managed the inflationary and geo-political pressures on raw materials and other costs to drive strong earnings and free cash flow generation. During that period, the TSS and APM segments were formed, grew their franchises, and delivered products that advanced the world's demand for sustainable and responsible solutions. At the same time, TT's TVS strategy translated into better business partnerships through the performance period that were in line with the strategy to deliver greater earnings and free cash flow stability. The organization's strong business results in Free Cash Flow Conversion and Adjusted Net Income during the three-year period combined with top-quartile Total Shareholder Return relative to the compensation peer group (rTSR) drove above target compensation for the 2020-2022 LTIP.

Adjusted Net Income aligned closely to expectations with a performance and corresponding payment of 85%. Free Cash Flow Conversion exceeded expectations which resulted in a payment of 200% of target. The blended outcome for the financial metrics was 143%.

During the three-year period, Chemours delivered rTSR at the 88th percentile for the peer group resulting in the number of PSUs earned being increased by 150%. Only when exceptional rTSR rank is achieved, defined as greater than the 75th percentile, can plan achievement exceed 200%.

The tables below detail performance against each measure:

| METRIC | METRIC WEIGHT | 2020 ACTUAL | 2021 ACTUAL | 2022 ACTUAL | CUMULATIVE | % ATTAINMENT | ACHIEVEMENT WITH PAY CURVE APPLIED |
|---|---|---|---|---|---|---|---|
| Adj. Net Income | 50% | 329 | 691 | 812 | 1,832 | 85% | 43% |
| FCF Conversion | 50% | 61.4% | 51.2% | 31.8% | 46.0% | 200% | 100% |
| | | | | | | Weighted Outcome | 143% |



## 2022 Executive Compensation Highlights (continued)

Relative TSR is a modifier that is applied to the outcome of Adjusted Net Income and Free Cash Flow Conversion.

| <P25 | >=P25 TO <P40 | >=P40 TO <P60 | >=P60 TO <=P75 | >P75 | ACHIEVEMENT |
|---|---|---|---|---|---|
| 0.5 | 0.75 | 1 | 1.25 | 1.5 | 150% |

The performance peer group is comprised of the following companies:

| | | |
|---|---|---|
| Albemarle Corporation | Eastman Chemical Co. | The Sherwin-Williams Company |
| Ashland Global Holdings Inc. | Huntsman Corporation | Trinseo S.A. |
| Avient Corporation[1] | Olin Corporation | Tronox Holdings Plc |
| Axalta Coating Systems Ltd | PPG Industries Inc. | Venator Materials Plc |
| Cabot Co. | RPM International | Westlake Chemical Corp. |
| Celanese Corporation | | |

(1) Formally known as PolyOne Corporation

The table below shows the target number of PSUs granted in 2020 and the actual number of PSUs earned, including dividends.

| NEO[1] | SHARED GRANTED IN 2020 | ACHIEVEMENT | EARNED SHARE AWARD |
|---|---|---|---|
| Mark Newman | 62,370 | 214% | 147,540 |
| Sameer Ralhan | 41,580 | 214% | 98,360 |
| Edwin Sparks | 33,264 | 214% | 78,688 |
| David Shelton | 39,501 | 214% | 93,442 |

(1) Ms. Bellezza and Ms. Dignam did not participate in the 2020-22 LTIP and did not receive PSUs for that performance period.



## Company Sponsored Employee Benefits

The Company offers its NEOs health, welfare and retirement plan benefits consistent with all other U.S. based employees. Additional elements specific to the executive compensation program include nonqualified retirement benefit plans, reimbursement of financial planning and income tax preparation services, and change-in-control benefits.

**The Non-qualified Retirement Savings Restoration Plan (RSRP)**

The RSRP is a nonqualified defined contribution plan that restores benefits above the Internal Revenue Code limits for tax-qualified retirement plans to be consistent with those provided to other eligible employees.

Each year during the enrollment window, eligible employees can elect to defer 1-6% of compensation. The deferral elections are effective when the participant's year-to-date compensation exceeds the IRS annual compensation limit ($305,000 for 2022). Compensation for RSRP purposes consists of base salary and AIP payments. Chemours provides a company-matching contribution equal to 100% of the first 6% of the NEO's deferral amount. In addition, and entirely at its discretion, the Company may make non-elective contributions to the RSRP.

Employee and matching contributions are always 100% vested. Non-elective contributions are vested upon completion of three years of service. The NEOs are 100% vested in their deferrals and related investment experience.

**The Non-Qualified Management Deferred Compensation Plan (MDCP)**

Under the MDCP, a nonqualified elective deferred compensation plan, participants may defer base salary, AIP, and certain incentive plan awards until a later date. Each year during the enrollment window eligible employees can elect to defer: 1-60% of "base salary" and/or 1-60% of the annual incentives. Additionally, corporate officers may elect to defer settlement of their equity awards (i.e., RSUs and/or PSUs). NEOs are 100% vested in their deferrals and related investment experience.

**Financial Planning and Income Tax Preparation Benefit**

NEOs are eligible to receive reimbursement up to $15,000 per calendar year for financial planning and income tax preparation services provided to them by the financial services professional(s) of their choosing. This benefit is intended to enhance understanding and appreciation of company-sponsored compensation and benefit programs, and also emphasize the link between company financial outcomes and executive financial wellness. Amounts reimbursed will be imputed as income to the eligible executive in accordance with IRS regulations.

**Change-in-Control Severance Benefits**

To ensure that executives remain focused on Chemours' business during a period of uncertainty, the Company maintains a change-in-control severance plan for NEOs. For any benefits to be earned, a change in control must occur and the executive's employment must be terminated within two years following the change in control, either by Chemours without cause or the executive for good reason (often called a "double trigger"). The plan does not provide tax gross-ups. For additional information, see "Executive Compensation — Potential Payments upon Termination or Change-in-Control."

Benefits provided under the change-in-control severance plan include:

- A lump sum cash payment of two times (three times for the CEO) the sum of the NEO's base salary and target AIP;

- A lump sum cash payment equal to the pro-rated portion of the NEO's AIP target for the year of termination; and

- Continued health and dental benefits, financial counseling and tax preparation, and outplacement services for up to two years (three years for the CEO) following the date of termination.

The change-in-control severance plan also includes 12-month (18-month for the CEO) non-competition and non-solicitation covenants, non-disparagement, and confidentiality provisions.



# Other Required Disclosures

## COMPENSATION AND RISK

Management reviewed its executive and non-executive compensation programs and, in concurrence with the CLDC's independent compensation consultant, determined that none of its compensation programs encourages or creates excessive risk-taking, and none are reasonably likely to have a material adverse effect on the Company.

In conducting this assessment, the components and design features of executive and non-executive plans and programs were analyzed. A summary of the findings of the assessment was provided to the CLDC. Overall, the CLDC concluded that (1) the Company's executive compensation programs provide a mix of awards with performance criteria and design features that mitigate potential excessive risk taking and (2) non-executive employee compensation programs are appropriately balanced between fixed and variable compensation and do not encourage excessive risk taking. The CLDC also considered its payout caps or limits, stock ownership guidelines, and clawback policy as risk mitigating features of its executive compensation program.

### Payout Limitations or Caps

In 2022, the bonus opportunity for the ESG metric was expanded from 150% to 200%. The adjustment was made after careful consideration of the risk and opportunities associated with this metric as well as incentive plan norms. This adjustment raised the maximum bonus opportunity for the NEOs from 192.5% to 200%.

PSU awards are capped at 250% of target. 250% can only be earned when rTSR exceeds the 75th percentile. In all other circumstances, the maximum payout is 200% of target.

### Stock Ownership Guidelines

To further support the goal of achieving a strong link between shareholder and executive interests, the Company maintains stock ownership guidelines to require executive share ownership of a value equal to a specified multiple of base pay. Executives have five (5) years from the date they become subject to the guidelines to reach their respective ownership requirements. Until the ownership requirement is satisfied, 100% of the net shares realized from exercise or vesting of stock-based awards must be retained. Stock ownership guidelines are as follows:

| MULTIPLE OF BASE SALARY | 2022 TARGET |
|---|---:|
| CEO | 5.0x |
| Other NEOs | 3.0x |

All applicable NEOs have satisfied or are on track to satisfy those guidelines.

### Incentive Compensation Clawback Policy

Our incentive compensation clawback policy covers current and former employees who have received incentive-based compensation. Under the policy, if a grantee engages in misconduct, the grantee forfeits any right to receive future incentive awards and we may demand repayment of awards or cash payments already received, including repayment, where the award or cash payment was predicated upon the achievement of financial results that were subsequently the subject of a restatement as a result of misconduct by the grantee.

Events that may trigger the clawback policy include the grantee's employment or service being terminated for cause, the breach of a non-compete or confidentiality covenant, and management's determination, after review and consultation with the Audit Committee, that as a result of fraud or misconduct we are required to prepare an accounting restatement due to material noncompliance with financial reporting requirements, if the CLDC has determined that the grantee knew about the material noncompliance or the circumstances that gave rise to such noncompliance and failed to take reasonable steps to bring it to the attention of appropriate individuals within the company or knowingly materially contributed to the circumstances that enabled the material noncompliance to occur.



## Other Required Disclosures (continued)

Additionally, if management determines, after review and consultation with the Audit Committee, that we are required to prepare an accounting restatement due to material noncompliance for reasons not related to fraud or misconduct, with any financial reporting requirements, we may demand repayment of awards or cash payments already received by a grantee, including repayment where the award or cash payment was predicated upon the achievement of certain financial results that were subsequently the subject of a restatement.

The policy is administered and enforced by the CLDC, and it is intended to comply with, and will be deemed automatically amended to comply with, Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, as it may be amended from time to time, and any related rules or regulations promulgated by the Securities and Exchange Commission (SEC) or the New York Stock Exchange. Any such amendment will be effective when necessary to comply with Section 10D of the Exchange Act of 1934, as amended.

With support of the independent compensation consultants and external counsel, we continue to evaluate this policy to ensure compliance with the final SEC rules.

### RESTRICTIONS ON HEDGING AND SIMILAR TRANSACTIONS

The Company has a policy that prohibits executive officers and directors from engaging in the following types of transactions with respect to Chemours' stock: hedging transactions, pledging securities, short sales, derivative transactions, margin accounts, and short-term trading.



## Other Required Disclosures (continued)

### MANDATORY COMPENSATION DISCLOSURES

### SUMMARY COMPENSATION TABLE

The following table sets forth information concerning the total compensation earned by the NEOs during fiscal years 2022, 2021, and 2020.

| NAME AND PRINCIPAL POSITION | YEAR | SALARY ($) | BONUS ($) | STOCK AWARDS ($)[1][2] | OPTION AWARDS ($)[3] | NON-EQUITY INCENTIVE PLAN COMPENSATION ($)[4] | CHANGE IN PENSION VALUE AND NONQUALIFIED AND DEFERRED COMPENSATION EARNINGS ($) | ALL OTHER COMPENSATION ($)[5] | TOTAL ($) |
|---|---|---|---|---|---|---|---|---|---|
| **Mark Newman** President and Chief Executive Officer | 2022 | 995,833 | | 3,464,363 | 2,039,991 | 1,024,400 | — | 145,764 | 7,670,351 |
| | 2021 | 837,500 | | 1,879,997 | 1,159,987 | 1,611,000 | 168,559 | 49,185 | 5,706,228 |
| | 2020 | 678,462 | | 1,069,022 | 599,997 | 557,298 | 93,426 | 90,691 | 3,088,896 |
| **Sameer Ralhan** Senior Vice President, Chief Financial Officer | 2022 | 625,000 | | 1,103,826 | 649,991 | 394,000 | — | 67,940 | 2,840,757 |
| | 2021 | 616,667 | | 786,684 | 479,993 | 895,000 | 96,908 | 38,400 | 2,913,652 |
| | 2020 | 575,000 | | 1,712,679 | 399,997 | 406,916 | 55,937 | 48,740 | 3,199,269 |
| **Edwin Sparks** President, Chemical Solutions and Titanium Technologies | 2022 | 570,833 | | 747,216 | 439,996 | 257,456 | — | 77,659 | 2,093,160 |
| | 2021 | 546,058 | | 590,026 | 359,992 | 734,250 | 30,483 | 41,521 | 2,302,329 |
| | 2020 | 537,500 | | 2,070,143 | 319,998 | 327,938 | 25,984 | 56,980 | 3,338,542 |
| **Alisha Bellezza** President, Thermal & Specialized Solutions | 2022 | 462,500 | | 873,593 | 219,993 | 530,798 | — | 74,398 | 2,161,282 |
| | 2021 | | | | | | | | |
| | 2020 | | | | | | | | |
| **Denise Dignam** President, Advanced Performance Materials | 2022 | 462,500 | | 373,608 | 219,993 | 442,913 | — | 71,650 | 1,570,664 |
| | 2021 | | | | | | | | |
| | 2020 | | | | | | | | |
| **David Shelton** Senior Vice President, General Counsel and Corporate Secretary (January – September) | 2022 | 500,000 | | 645,301 | 379,994 | 275,800 | — | 69,842 | 1,870,937 |
| | 2021 | 500,000 | | 1,122,778 | 379,992 | 626,500 | 142,182 | 44,400 | 2,815,852 |
| | 2020 | 498,077 | | 677,047 | 379,999 | 309,610 | 108,889 | 60,461 | 2,034,083 |

(1) Represents the aggregate grant date fair value of PSUs and RSUs computed in accordance with FASB ASC Topic 718. The grant date fair value of each PSU granted to NEOs in 2022, taking into account the estimated probable outcome of the performance conditions, was determined to be $30.10 on March 1, 2022. The techniques and assumptions used in determining the values can be found in Note 24 ("Stock-based Compensation") to the Consolidated Financial Statements in Chemours' Annual Report on Form 10-K for the year ended December 31, 2022. The grant date fair value of each RSU granted to NEOs in 2022 is equal to the closing share price of Chemours common stock on their respective grant dates — $25.98 on March 1, 2022.

(2) If the maximum level of performance were achieved, each NEO would earn 250% of the target number of PSUs awarded. Based on the closing price of Chemours common stock on the March 1 grant date ($25.98), the maximum value of PSUs awarded on March 1, 2022, to each NEO is as follows: Mr. Newman — $6,374,972; Mr. Ralhan — $2,031,246; Mr. Sparks — $ 1,374,992; Ms. Bellezza — $687,496; Ms. Dignam — $687,496 and Mr. Shelton — $1,187,481

(3) Represents the aggregate grant date fair value of stock options computed in accordance with FASB ASC Topic 718. Assumptions used in determining the values can be found in Note 24 ("Stock-based Compensation") to the Consolidated Financial Statements in Chemours' Annual Report on Form 10-K for the year ended December 31, 2022.

(4) Represents payouts under the Annual Incentive Plan. This column includes compensation which may have been deferred at the NEOs election. Any such amounts will be included in the "Executive Contributions" column of the 2022 Nonqualified Deferred Compensation table.

(5) The amounts reflect perquisites and personal benefits (financial planning / income tax preparation) and Company contributions to qualified and nonqualified defined contribution plans. The following table details these amounts.



## Other Required Disclosures (continued)

| NAME | COMPANY CONTRIBUTIONS TO QUALIFIED DEFINED CONTRIBUTION PLAN ($) | COMPANY CONTRIBUTION TO NONQUALIFIED DEFINED CONTRIBUTION PLAN ($) | FINANCIAL PLANNING/ INCOME TAX PREPARATION ($) |
|---|---|---|---|
| Mark Newman | 19,300 | 111,464 | 15,000 |
| Sameer Ralhan | 19,300 | 39,265 | 9,375 |
| Edwin Sparks | 20,300 | 44,197 | 13,162 |
| Alisha Bellezza | 19,300 | 55,098 | — |
| Denise Dignam | 21,300 | 49,825 | 525 |
| David Shelton | 20,300 | 41,548 | 7,994 |



## Other Required Disclosures (continued)

### 2022 GRANTS OF PLAN BASED AWARDS

The following table provides information on AIP awards, PSUs and NQSOs granted in 2022 to each NEO. For a complete understanding of the table, refer to the footnotes that follow.

| NAME | TYPE OF AWARD | GRANT DATE | APPROVAL DATE | ESTIMATED POSSIBLE PAYOUTS UNDER NONEQUITY INCENTIVE PLAN AWARDS[1] THRESHOLD ($) | TARGET ($) | MAXIMUM ($) | ESTIMATED FUTURE PAYOUTS UNDER EQUITY INCENTIVE PLAN AWARDS[2] THRESHOLD (#) | TARGET (#) | MAXIMUM (#) | ALL OTHER STOCK AWARDS; NUMBER OF SHARES OF STOCK OR UNITS (#) | ALL OTHER OPTION AWARDS; NUMBER OF SECURITIES UNDERLYING OPTIONS[3] (#) | EXERCISE OF BASE PRICE OF OPTION AWARDS ($) | GRANT DATE FAIR VALUE OF STOCK AND OPTION AWARDS ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mark Newman | 2022 AIP | | | 650,000 | 1,300,000 | 2,600,000 | | | | | | | |
| | Stock Options | 3/1/22 | 2/8/22 | | | | | | | | 206,268 | 25.98 | 2,039,991 |
| | PSU | 3/1/22 | 2/8/22 | | | | 49,076 | 98,152 | 245,380 | | | | 2,954,375 |
| | RSU | 3/1/22 | 2/8/22 | | | | | | | 19,630 | | | 509,987 |
| Sameer Ralhan | 2022 AIP | | | 250,000 | 500,000 | 1,000,000 | | | | | | | |
| | Stock Options | 3/1/22 | 2/8/22 | | | | | | | | 65,722 | 25.98 | 649,991 |
| | PSU | 3/1/22 | 2/8/22 | | | | 15,637 | 31,274 | 78,185 | | | | 941,347 |
| | RSU | 3/1/22 | 2/8/22 | | | | | | | 6,254 | | | 162,479 |
| Edwin Sparks | 2022 AIP | | | 215,625 | 431,250 | 862,500 | | | | | | | |
| | Stock Options | 3/1/22 | 2/8/22 | | | | | | | | 44,489 | 25.98 | 439,996 |
| | PSU | 3/1/22 | 2/8/22 | | | | 10,585 | 21,170 | 52,925 | | | | 637,217 |
| | RSU | 3/1/22 | 2/8/22 | | | | | | | 4,234 | | | 109,999 |
| Alisha Bellezza | 2022 AIP | | | 174,375 | 348,750 | 697,500 | | | | | | | |
| | Stock Options | 3/1/22 | 2/8/22 | | | | | | | | 22,244 | 25.98 | 219,993 |
| | PSU | 3/1/22 | 2/8/22 | | | | 5,293 | 10,585 | 26,463 | | | | 318,609 |
| | RSU | 3/1/22 | 2/8/22 | | | | | | | 21,362 | | | 554,985 |
| Denise Dignam | 2022 AIP | | | 174,375 | 348,750 | 697,500 | | | | | | | |
| | Stock Options | 3/1/22 | 2/8/22 | | | | | | | | 22,244 | 25.98 | 219,993 |
| | PSU | 3/1/22 | 2/8/22 | | | | 5,293 | 10,585 | 26,463 | | | | 318,609 |
| | RSU | 3/1/22 | 2/8/22 | | | | | | | 2,117 | | | 55,000 |
| David Shelton | 2022 AIP | | | 175,000 | 350,000 | 700,000 | | | | | | | |
| | Stock Options | 3/1/22 | 2/8/22 | | | | | | | | 38,422 | 25.98 | 379,994 |
| | PSU | 3/1/22 | 2/8/22 | | | | 9,142 | 18,283 | 45,708 | | | | 550,318 |
| | RSU | 3/1/22 | 2/8/22 | | | | | | | 3,656 | | | 94,983 |

(1) Nonequity incentive plan awards are short-term incentives that may be earned under the 2022 AIP.

(2) Equity incentive plan awards are PSUs corresponding to a three-year performance period, FY2022 — FY2024. The NEOs may earn 50% of the target award upon attainment of threshold performance and up to 250% of the target award upon attainment of maximum performance. Performance outcomes will be determined following the conclusion of the performance period. Dividend equivalent units will be applied to the actual number of shares earned.

(3) The exercise price is equal to the fair market value of a share of Chemours common stock on the grant date. Stock options are not credited with dividend equivalent units. Stock options feature three-year equal ratable vesting and a ten-year term.



## Other Required Disclosures (continued)

### OUTSTANDING EQUITY AWARDS AT 2022 FISCAL YEAR-END

The following table shows the number of shares underlying exercisable and unexercisable options and unvested and, as applicable, unearned RSUs and PSUs (in each case denominated in shares of Chemours common stock) held by each of the NEOs as of December 31, 2022. Market or payout values in the table below are based on the closing price of Chemours common stock as of December 31, 2022: $30.62.

Upon completion of the separation from DuPont de Nemours Inc. and in accordance with the Employee Matters Agreement, the NEOs received replacement Chemours stock option awards in respect of their DuPont de Nemours Inc. stock option awards. The stock option awards reflected in the following table with a grant date prior to July 1, 2015, are these replacement stock option awards.

| NAME | GRANT DATE | OPTION AWARDS | | | | | | STOCK AWARDS | |
| | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS[1] | | OPTION EXERCISE PRICE ($) | OPTION EXPIRATION DATE | SHARES OR UNITS OF STOCK THAT HAVE NOT VESTED[2] | | EQUITY INCENTIVE PLAN AWARDS: UNEARNED SHARES, UNITS OR OTHER RIGHTS THAT HAVE NOT VESTED[3] | |
| | | EXERCISABLE (#) | UNEXERCISABLE (#) | OPTION EXERCISE PRICE ($) | OPTION EXPIRATION DATE | NUMBER (#) | MARKET VALUE ($) | NUMBER (#) | MARKET OR PAYOUT VALUE ($) |
| Mark Newman | 3/1/2022 | — | 206,268 | 25.98 | 3/1/2032 | 19,630 | 601,071 | 98,152 | 3,005,414 |
| | 7/1/2021 | 11,566 | 23,130 | 35.46 | 7/1/2031 | 2,632 | 80,592 | 49,350 | 1,511,097 |
| | 3/1/2021 | 20,450 | 40,899 | 24.01 | 3/1/2031 | 4,164 | 127,502 | 78,090 | 2,391,116 |
| | 3/2/2020 | 106,951 | 53,476 | 14.43 | 3/2/2030 | 133,472 | 4,086,907 | | |
| | 6/3/2019 | 29,717 | — | 21.96 | 6/3/2029 | | | | |
| | 3/1/2019 | 36,236 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 23,357 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 31,662 | — | 34.72 | 3/1/2027 | | | | |
| | 3/1/2016 | 166,089 | — | 5.40 | 3/1/2026 | | | | |
| Sameer Ralhan | 3/1/2022 | — | 65,722 | 25.98 | 3/1/2032 | 6,254 | 191,497 | 31,274 | 957,610 |
| | 3/1/2021 | 16,360 | 32,719 | 24.01 | 3/1/2031 | 3,331 | 101,995 | 62,473 | 1,912,908 |
| | 12/1/2020 | | | | | 39,510 | 1,209,796 | | |
| | 3/2/2020 | 71,301 | 35,650 | 14.43 | 3/2/2030 | 88,981 | 2,724,604 | | |
| | 6/3/2019 | 17,830 | — | 21.96 | 6/3/2029 | | | | |
| | 3/1/2019 | 22,299 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 4,866 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 6,596 | — | 34.72 | 3/1/2027 | | | | |
| | 4/26/2016 | 80,000 | — | 9.43 | 4/26/2026 | | | | |
| Edwin Sparks | 3/1/2022 | — | 44,489 | 25.98 | 3/1/2032 | 4,234 | 129,645 | 21,170 | 648,225 |
| | 3/1/2021 | — | 24,539 | 24.01 | 3/1/2031 | 2,498 | 76,489 | 46,855 | 1,434,700 |
| | 12/1/2020 | | | | | 39,510 | 1,209,796 | | |
| | 3/2/2020 | — | 28,520 | 14.43 | 3/2/2030 | 105,835 | 3,240,666 | | |
| | 3/1/2019 | 13,937 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 5,352 | — | 48.53 | 3/1/2028 | | | | |



## Other Required Disclosures (continued)

| NAME | GRANT DATE | OPTION AWARDS | | | | STOCK AWARDS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS[1] | | | | SHARES OR UNITS OF STOCK THAT HAVE NOT VESTED[2] | | EQUITY INCENTIVE PLAN AWARDS: UNEARNED SHARES, UNITS OR OTHER RIGHTS THAT HAVE NOT VESTED[3] | |
| | | EXERCISABLE (#) | UNEXERCISABLE (#) | OPTION EXERCISE PRICE ($) | OPTION EXPIRATION DATE | NUMBER (#) | MARKET VALUE ($) | NUMBER (#) | MARKET OR PAYOUT VALUE ($) |
| Alisha Bellezza | 3/1/2022 | — | 22,244 | 25.98 | 3/1/2032 | 21,362 | 654,104 | 10,585 | 324,113 |
| | 3/1/2021 | — | 10,906 | 24.01 | 3/1/2031 | 1,110 | 33,988 | 20,823 | 637,585 |
| | 9/1/2020 | | | | | 4,601 | 140,883 | | |
| | 3/2/2020 | — | 8,912 | 14.43 | 3/2/2030 | 2,310 | 70,732 | | |
| | 3/1/2019 | 13,937 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 4,866 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 5,936 | — | 34.72 | 3/1/2027 | | | | |
| Denise Dignam | 3/1/2022 | — | 22,244 | 25.98 | 3/1/2032 | 2,117 | 64,823 | 10,585 | 324,113 |
| | 3/1/2021 | 6,135 | 12,269 | 24.01 | 3/1/2031 | 1,249 | 38,244 | 23,428 | 717,350 |
| | 3/2/2020 | 5,570 | 5,570 | 14.43 | 3/2/2030 | 1,444 | 44,215 | | |
| | 3/1/2019 | 3,832 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 2,068 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 2,473 | — | 34.72 | 3/1/2027 | | | | |
| David Shelton | 3/1/2022 | — | 38,422 | 25.98 | 3/1/2032 | 3,656 | 111,947 | 18,283 | 559,825 |
| | 3/1/2021 | 12,952 | 25,902 | 24.01 | 3/1/2031 | 16,519 | 505,812 | 49,458 | 1,514,389 |
| | 3/2/2020 | — | 33,868 | 14.43 | 3/2/2030 | 84,532 | 2,588,374 | | |
| | 3/1/2019 | 26,480 | — | 38.02 | 3/1/2029 | | | | |
| | 3/1/2018 | 16,545 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 19,788 | — | 34.72 | 3/1/2027 | | | | |

(1) The following table provides the vesting schedules of stock options outstanding as of December 31, 2022:

| GRANT DATE | OUTSTANDING VESTING DATES |
|---|---|
| 3/1/2022 | Vests in equal installments on March 1, 2023, 2024 and 2025 |
| 7/1/2021 | Vests in equal installments on March 1, 2023, and 2024 |
| 3/1/2021 | Vests in equal installments on March 1, 2023, and 2024 |
| 3/2/2020 | Vests in equal installments on March 2, 2023 |



## Other Required Disclosures (continued)

(2) The following table consists of RSUs outstanding as of December 31, 2022, and PSUs where the performance period is complete, but the units remain unvested. The following table provides details of the vesting schedules for such RSUs and PSUs, including dividend equivalent units:

| GRANT DATE | OUTSTANDING VESTING DATES |
|---|---|
| 3/1/2022 | Vests in equal installments on March 1, 2023, 2024 and 2025 |
| 7/1/2021 | Vests in equal installments on March 1, 2023, and 2024 |
| 3/1/2021 | Vests in equal installments on March 1, 2023, and 2024 |
| 12/1/2020 | RSUs with vesting date of December 1, 2023 |
| 3/2/2020 | RSUs with vesting date of March 2, 2023 |
| 3/2/2020 | PSUs with performance period ended December 31, 2022, vest in first quarter 2023 |

(3) The following table provides the vesting schedules for unearned PSUs with outstanding vesting dates as of December 31, 2022:

| GRANT DATE | OUTSTANDING VESTING DATES |
|---|---|
| 3/1/2022 | Performance period ending December 31, 2024. The number of PSUs reported is based on achievement of target performance |
| 3/1/2021 and 7/1/2021 | Performance period ending December 31, 2023. The number of PSUs reported is based on achievement of maximum performance |

The 2021-2023 and 2022-2024 PSU plan provides for a payout range of 0% to 250% and dividend equivalent units are applied subsequently to the final performance determination.

### OPTION EXERCISES AND STOCK VESTED

The table below identifies the number of shares of Chemours common stock acquired upon the exercise of stock options and the vesting of RSUs and PSUs during 2022:

| NAME | OPTION AWARDS[1] | | STOCK AWARDS[2] | |
|---|---|---|---|---|
| | NUMBER OF SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ON EXERCISE ($) | NUMBER OF SHARES ACQUIRED ON VESTING (#) | VALUE REALIZED ON VESTING ($) |
| Mark Newman | 197,161 | 4,768,232 | 22,940 | 674,254 |
| Sameer Ralhan | 55,363 | 1,920,912 | 13,568 | 400,182 |
| Edwin Sparks | 62,932 | 1,319,809 | 10,434 | 307,866 |
| Alisha Bellezza | 14,365 | 321,975 | 5,104 | 135,154 |
| Denise Dignam | | | 9,732 | 284,491 |
| David Shelton | 150,780 | 4,604,260 | 17,025 | 476,787 |

(1) The value realized upon exercise is the difference between the market value of the stock on the exercise date and the option price, multiplied by the number of shares acquired on exercise.

(2) Represents the number of RSUs, PSUs and related dividend equivalent units vesting in 2022. The value realized upon vesting is computed by multiplying the number of units by the closing price of the underlying shares on the vesting date.



## Other Required Disclosures (continued)

**2022 NONQUALIFIED DEFERRED COMPENSATION**

The following table provides information on the Company's defined contribution or other plans that during 2022 provided for deferrals of compensation on a basis that is not tax qualified. Mr. Newman, Mr. Ralhan, Mr. Sparks, Ms. Bellezza, Ms. Dignam and Mr. Shelton each participated in the plan during 2022.

| NAME | EXECUTIVE CONTRIBUTIONS IN LAST FISCAL YEAR ($)[1] | REGISTRANT CONTRIBUTION IN LAST FISCAL YEAR ($)[2] | AGGREGATE EARNING IN LAST FISCAL YEAR ($)[3] | AGGREGATE WITHDRAWALS / DISTRIBUTIONS IN LAST FISCAL YEAR ($) | AGGREGATE BALANCE AT LAST FISCAL YEAR-END ($) |
|---|---|---|---|---|---|
| Mark Newman | | | | | |
| RSRP | 111,464 | 111,464 | -111,899 | | 889,187 |
| MDCP | | | -80,322 | -25,047 | 823,204 |
| Sameer Ralhan | | | | | |
| RSRP | 39,265 | 39,265 | -109,449 | | 524,175 |
| Edwin Sparks | | | | | |
| RSRP | 44,197 | 44,197 | -59,284 | | 364,758 |
| Alisha Bellezza | | | | | |
| RSRP | 55,098 | 55,098 | -22,440 | | 141,539 |
| Denise Dignam | | | | | |
| RSRP | 49,825 | 49,825 | -9,759 | | 93,862 |
| David Shelton | | | | | |
| RSRP | 41,548 | 41,548 | -114,406 | | 646,596 |
| MDCP | | | -79,688 | | 606,883 |

(1) The amount in this column represents deferrals from base salary and Non-Equity Incentive Plan Compensation under the RSRP and/or MDCP. The amounts are also included in the 2022 Summary Compensation Table.

(2) The amount in this column represents employer contributions made under the RSRP; the amounts are also included in the 2022 Summary Compensation Table.

(3) Earnings (loss) represent returns on investments in twenty (20) core investment alternatives and interest accruals on cash balances, Chemours common stock returns, and dividend reinvestments. The core investment alternatives are the same investment alternatives available to all employees under the qualified plan. Interest is accrued on cash balances based on a rate that is traditionally less than 120% of the applicable federal rate, and dividend equivalents are accrued at a non-preferential rate. Accordingly, these amounts are not considered above-market or preferential earnings for purposes of, and are not included in, the 2022 Summary Compensation Table.

This table reflects Salary and Non-Equity Incentive Plan Compensation amounts and Company contributions to qualified and nonqualified defined contribution plans reported in the aggregate balance at last fiscal year-end that were previously reported as compensation to the NEO in Chemours' Summary Compensation Table for previous year(s).

| | RSRP | MDCP | TOTAL |
|---|---|---|---|
| Mark Newman | 734,866 | 928,573 | 1,663,439 |
| Sameer Ralhan | 522,199 | — | 552,199 |
| Edwin Sparks | 309,782 | — | 309,782 |
| David Shelton | 667,421 | 549,072 | 1,216,493 |



# Other Required Disclosures (continued)

### Narrative Discussion of the Nonqualified Deferred Compensation Table

Chemours sponsors two nonqualified deferred compensation plans for the benefit of eligible employees. The Retirement Savings Restoration Plan (RSRP) supplements our qualified defined contribution plan, the Retirement Savings Plan (RSP), and is designed to provide benefits more than IRS qualified plan limits applicable to the RSP. The Management Deferred Compensation Plan (MDCP) is an elective deferral plan that provides eligible employees with the opportunity to defer receipt of a specified portion of their compensation, thereby postponing income taxation on amounts deferred until the time such deferrals are distributed from the MDCP. Eligible employees may elect to participate in either, neither, or both nonqualified deferred compensation plans annually. The following provides an overview of the various deferral options as of December 31, 2022.

### Retirement Savings Restoration Plan

Each year during the enrollment window, eligible employees can elect to defer 1-6% of compensation. The deferral elections spring into effect when the participant's year-to-date compensation exceeds the IRS annual compensation limit ($305,000 for 2022). Compensation for RSRP purposes consists of base salary and annual incentive payments. Chemours provides a Company matching contribution equal to 100% of the first 6% of the NEOs deferral amount. In addition, and entirely at its discretion, the Company may make non-elective contributions to the RSRP.

Deferrals and contributions to the RSRP are notionally invested in the available investment alternatives which mirror those made available under the qualified RSP. The term "notional" means account balances are not actually invested in any of the deemed investment alternatives, rather, the rate of return derived from the notional investments is credited to individual account balances consistent with the participant's investment direction elections.

When enrolling in the RSRP, participants are also requested to make distribution elections. Distributions are triggered by termination of employment and will commence either upon separation from service or 1-5 years thereafter if the participant so elects. Distributions may be paid in a lump sum or substantially equal annual installments over 2-15 years, at the election of the participant.

Employee and matching contributions are always 100% vested. Non-elective contributions are vested upon completion of three years of service. The NEOs are 100% vested in their deferrals and related investment experience.

### Management Deferred Compensation Plan

Under the terms of the MDCP, each year during the enrollment window eligible employees can elect to defer: 1-60% of "base salary" and/or 1-60% of the annual incentives. Additionally, corporate officers may elect to defer settlement of their equity awards (i.e., RSUs and/or PSUs).

Base salary and annual incentive award deferrals are notionally invested in the available investment alternatives. The term "notional" means account balances are not actually invested in any of the deemed investment alternatives, rather, the rate of return derived from the notional investments is credited to individual account balances consistent with the participant's investment direction elections. Equity award deferrals are notionally invested in Chemours common stock with dividend equivalents credited as additional stock units. Chemours does not match deferrals under the MDCP.

When enrolling in the MDCP, participants are also requested to make distribution elections. Participants may elect either in-service or termination distribution elections. In-service distributions are payable as of a specified date in the form of a lump sum. Termination distributions commence either upon separation from service or 1-5 years thereafter if the participant so elects and can be paid either in a lump sum or substantially equal annual installments over 2-15 years, at the election of the participant.

NEOs are 100% vested in their deferrals and related investment experience.



## Other Required Disclosures (continued)

### Potential Payments upon Termination or Change in Control

The table below summarizes the potential payouts to the NEOs, upon a termination from the Company, or under specified situations in a change in control as further described below. The amounts shown in the following table are approximate and reflect certain assumptions that the Company has made in accordance with the SEC's rules. These assumptions include that the termination of employment or change in control occurred on December 31, 2022, and that the value of a share of the Company's stock on that day was $30.62, the closing price per share of the Company's common stock on December 31, 2022. The table also includes potential payments under The Chemours Company 2017 Equity and Incentive Plan (the "2017 Plan"). The treatment of benefits under each plan on termination or change in control is detailed in the footnotes to the table.

Effective January 1, 2017, Chemours revised the termination provisions associated with PSUs, NQSOs, and RSUs awards to be more consistent with market prevalence and simplify administration. A summary of the provisions by award type follows.



## Other Required Disclosures (continued)

| NAME | FORM OF COMPENSATION[1] | VOLUNTARY OR FOR CAUSE ($) | INVOLUNTARY TERMINATION WITHOUT CAUSE ($)[2] | RETIREMENT ($)[3] | DEATH ($)[4] | DISABILITY ($)[5] | CHANGE IN CONTROL WITH ASSUMPTION OR SUBSTITUTION[6] | CHANGE IN CONTROL WITHOUT ASSUMPTION OR SUBSTITUTION[7] | TERMINATION WITHOUT CAUSE OR RESIGNATION FOR GOOD REASON IN CONNECTION WITH CHANGE IN CONTROL[8] |
|---|---|---|---|---|---|---|---|---|---|
| Mark Newman | Annual Salary | — | 147,436 | — | — | — | — | — | 3,000,000 |
| | Target Annual Bonus | — | 1,300,000 | — | — | — | — | — | 3,900,000 |
| | Target Annual Bonus (pro-rated) | — | — | — | 1,300,000 | 1,300,000 | — | — | 1,300,000 |
| | Health and Dental Benefits | — | 5,046 | — | — | — | — | — | 60,551 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 12,900 |
| | Stock Options | — | — | — | 2,093,202 | 2,093,202 | — | 2,093,202 | 2,093,202 |
| | RSUs | — | — | — | 809,164 | 809,164 | — | 809,164 | 809,164 |
| | PSUs | — | — | — | 3,947,349 | 3,947,349 | — | 3,947,349 | 6,476,069 |
| | **Total** | **—** | **1,454,632** | **—** | **8,149,715** | **8,149,715** | **—** | **6,849,715** | **17,651,886** |
| Sameer Ralhan | Annual Salary | — | 99,159 | — | — | — | — | — | 1,250,000 |
| | Target Annual Bonus | — | 500,000 | — | — | — | — | — | 1,000,000 |
| | Target Annual Bonus (pro-rated) | — | — | — | 500,000 | 500,000 | — | — | 500,000 |
| | Health and Dental Benefits | — | 7,425 | — | — | — | — | — | 59,398 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 8,600 |
| | Stock Options | — | — | — | 1,098,396 | 1,098,396 | — | 1,098,396 | 1,098,396 |
| | RSUs | — | — | — | 1,503,289 | 1,503,289 | — | 1,503,289 | 1,503,289 |
| | PSUs | — | — | — | 2,101,850 | 2,101,850 | — | 2,101,850 | 2,995,953 |
| | **Total** | **—** | **608,734** | **—** | **5,203,535** | **5,203,535** | **—** | **4,703,535** | **8,415,636** |
| Edwin Sparks | Annual Salary | — | 287,500 | — | — | — | — | — | 1,150,000 |
| | Target Annual Bonus | — | 431,250 | — | — | — | — | — | 862,500 |
| | Target Annual Bonus (pro-rated) | — | — | — | 431,250 | 431,250 | — | — | 431,250 |
| | Health and Dental Benefits | — | 2,022 | — | — | — | — | — | 16,180 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 8,600 |
| | Stock Options | — | — | — | 830,371 | 830,371 | — | 830,371 | 830,371 |
| | RSUs | — | — | — | 2,476,913 | 2,476,913 | — | 2,476,913 | 2,476,913 |
| | PSUs | — | — | — | 1,614,870 | 1,614,870 | — | 1,614,870 | 2,240,649 |
| | **Total** | **—** | **722,922** | **—** | **5,353,404** | **5,353,404** | **—** | **4,922,154** | **8,016,463** |



## Other Required Disclosures (continued)

| NAME | FORM OF COMPENSATION[1] | VOLUNTARY OR FOR CAUSE ($) | INVOLUNTARY TERMINATION WITHOUT CAUSE ($)[2] | RETIREMENT ($)[3] | DEATH ($)[4] | DISABILITY ($)[5] | CHANGE IN CONTROL WITH ASSUMPTION OR SUBSTITUTION[6] | CHANGE IN CONTROL WITHOUT ASSUMPTION OR SUBSTITUTION[7] | TERMINATION WITHOUT CAUSE OR RESIGNATION FOR GOOD REASON IN CONNECTION WITH CHANGE IN CONTROL[8] |
|---|---|---|---|---|---|---|---|---|---|
| Alisha Bellezza | Annual Salary | — | 64,087 | — | — | — | — | — | 930,000 |
| | Target Annual Bonus | — | 348,750 | — | — | — | — | — | 697,500 |
| | Target Annual Bonus (pro-rated) | — | — | — | 348,750 | 348,750 | — | — | 348,750 |
| | Health and Dental Benefits | — | 6,839 | — | — | — | — | — | 54,712 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 8,600 |
| | Stock Options | — | — | — | 319,586 | 319,586 | — | 319,586 | 319,586 |
| | RSUs | — | — | — | 899,707 | 899,707 | — | 899,707 | 899,707 |
| | PSUs | — | — | — | 276,902 | 276,902 | — | 276,902 | 579,147 |
| | **Total** | **—** | **421,826** | **—** | **1,844,945** | **1,844,945** | **—** | **1,496,195** | **3,838,002** |
| Denise Dignam | Annual Salary | — | 232,500 | — | — | — | — | — | 930,000 |
| | Target Annual Bonus | — | 348,750 | — | — | — | — | — | 697,500 |
| | Target Annual Bonus (pro-rated) | — | — | — | 348,750 | 348,750 | — | — | 348,750 |
| | Health and Dental Benefits | — | 4,761 | — | — | — | — | — | 38,091 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 8,600 |
| | Stock Options | — | — | — | 274,489 | 274,489 | — | 274,489 | 274,489 |
| | RSUs | — | — | — | 147,282 | 147,282 | — | 147,282 | 147,282 |
| | PSUs | — | — | — | 298,163 | 298,163 | — | 298,163 | 611,053 |
| | **Total** | **—** | **588,161** | **—** | **1,068,684** | **1,068,684** | **—** | **719,934** | **3,055,765** |
| David Shelton | Annual Salary | — | 250,000 | — | — | — | — | — | 1,000,000 |
| | Target Annual Bonus | — | 350,000 | — | — | — | — | — | 700,000 |
| | Target Annual Bonus (pro-rated) | — | — | — | 350,000 | 350,000 | — | — | 350,000 |
| | Health and Dental Benefits | — | 2,012 | — | — | — | — | — | 16,094 |
| | Outplacement Services | — | 2,150 | — | — | — | — | — | 8,600 |
| | Stock Options | — | — | — | 897,813 | 897,813 | — | 897,813 | 897,813 |
| | RSUs | — | — | — | 617,759 | 617,759 | — | 617,759 | 617,759 |
| | PSUs | — | — | — | 1,797,915 | 1,797,915 | — | 1,797,915 | 2,375,102 |
| | **Total** | **—** | **604,162** | **—** | **3,663,487** | **3,663,487** | **—** | **3,313,487** | **5,965,368** |



## Other Required Disclosures (continued)

### PSUs

- Retirement eligibility results in vesting of a pro-rated portion of the award, with performance based on actualperformance over the full performance period and proration based on the number of days the NEO was employed during the performance period

- Death or Disability results in vesting of a pro-rated portion of the award, with performance based on actual performance over the full performance period and proration based on the number of days the NEO was employed during the performance period

- Change in Control with qualifying termination remains consistent with the description below

### NQSOs

- Retirement eligibility results in continued vesting, and the time to exercise is three years post-employment or the original expiration date of the award, whichever occurs first

- Death or disability termination results in immediate vesting of unvested awards and the time to exercise is limited to two years post-employment, or the original expiration date of the award whichever occurs first

- Change in Control with qualifying termination remains consistent with the description below

- Any other termination results in the forfeiture of unvested options and 90 days post-employment to exercise any options vested as of the termination date

### RSUs

- Retirement eligibility results in continued vesting of unvested awards

- Death or Disability termination results in immediate vesting of unvested awards

- Change in Control with qualifying termination remains consistent with the description below

- Any other termination results in forfeiture of unvested awards

(1) The award agreements for stock options, PSUs and RSUs contain restrictive covenants that may result in forfeiture of unvested stock options, PSUs and RSUs upon a breach of confidentiality, non-solicitation and non-competition obligations during employment and after termination of employment (for a period of one year for non-solicitation and non-competition).

(2) Upon termination of employment for Lack of Work or Involuntary Termination:

    a. Stock option awards granted on or after January 1, 2017 and vested as of the termination date may be exercised during the 90-day period following termination. Unvested stock option awards granted on or after January 1, 2018, to holders who are not retirement eligible are forfeited.

    b. Stock option awards granted prior to January 1, 2017, may be exercised during the one-year period following termination.

    c. PSUs granted on or after January 1, 2017, and unvested as of the termination date are forfeited.

    d. To the extent that an NEO is retirement eligible, unvested stock options, RSUs and PSUs are treated as if the NEO has retired.

    e. Severance benefits consist of: one week of salary for each complete year of service, with a minimum of four weeks and a maximum of twenty-six weeks; pro-rata annual bonus based on service during the performance period (i.e., calendar year); three months of Company-paid health care continuation coverage; limited outplacement assistance.

(3) Upon Retirement:

    a. Stock options granted on or after January 1, 2017 continue vesting, but the time to exercise is limited to three years post-employment or the original expiration date of the award, whichever occurs first.

    b. For stock options granted prior to January 1, 2017 the award holder retains the full term of the award in which to exercise.

    c. PSUs are pro-rated based on actual performance for service during the performance period. Amount shown represents the pro-rated number of units earned as of December 31, 2022 at the level of performance assumed and disclosed in the Outstanding Equity Awards at 2022 Fiscal Year-End table.

(4) Upon Death:

    a. Stock option awards immediately vest and the time to exercise is limited to two years post-employment or the original expiration date of the award, whichever occurs first. Amount shown represents the in-the-money value of stock options for which vesting is accelerated, as of December 31, 2022.

    b. RSUs are automatically vested and paid out. Amount shown represents the value of all RSUs as of December 31, 2022 that are automatically vested and paid out.

    c. PSUs are pro-rated based on actual performance for service during the performance period. Amount shown represents the pro-rated number of units earned as of December 31, 2022 at the level of performance assumed and disclosed in the Outstanding Equity Awards at 2022 Fiscal Year-End table.

(5) Upon termination of employment due to Disability:

    a. Stock option awards granted on or after January 1, 2017 are immediately vested and the time to exercise is limited to two years post-employment or the original expiration date of the award, whichever occurs first.



## Other Required Disclosures (continued)

   b. Stock option awards granted prior to January 1, 2017 may be exercised during the one-year period following termination.

   c. PSUs are pro-rated based on actual performance for service during the performance period. Amount shown represents the pro-rated number of units earned as of December 31, 2022 at the level of performance assumed and disclosed in the Outstanding Equity Awards at 2022 Fiscal Year-End table.

   d. RSUs are automatically vested and paid out. Amount shown represents the value of all RSUs as of December 31, 2022 that are automatically vested and paid out.

   e. To the extent that the NEO is retirement eligible, unvested stock options, RSUs and PSUs are treated as if the NEO has retired.

(6) Change in Control with assumption or substitution:

Treatment varies depending on whether the Company is the surviving entity and, if not, whether the awards are assumed or substituted by an acquiring entity. If the company is the surviving entity or the awards are assumed or substituted, service-based vesting conditions applicable to options and RSUs are not accelerated, and PSU performance goals are deemed achieved at target levels with the awards remaining subject to service-based vesting conditions. Values shown in this column assume outstanding equity awards are assumed or substituted and therefore do not vest due to the change in control.

(7) Change in Control without Assumption or Substitution:

Values shown in this column assume that the Company is not the surviving entity and the acquiring entity does not assume or substitute outstanding equity awards, resulting in the awards vesting in full and being cashed settled, with PSUs vesting at target levels. Accordingly, the amounts shown in this column reflect the in-the-money value of unvested stock options, the value of all RSUs, and the value of PSUs at target levels, in each case as of December 31, 2022.

(8) Termination without Cause or Resignation for Good Reason in connection with Change in Control:

Under the Senior Executive Severance Plan, if a change in control occurs and the executive's employment is terminated within two years following the change in control, either by the Company without cause or the executive for good reason (often called a "double trigger"), subject to the executive's execution of a release of claims, the executive receives (i) a lump sum cash payment equal to two times (three times for the CEO) the sum of the executive's base salary and target annual bonus; (ii) a lump sum cash payment equal to the prorated portion of the executive's target annual bonus for the year of termination; and (iii) continued health and dental benefits and outplacement services for two years (three years for the CEO) following the date of termination. Additionally, under the 2017 Plan, equity awards would become fully vested, with PSUs vesting at target levels. Amounts shown in this column reflect severance payable under the Senior Executive Severance Plan and the value of equity awards that would vest assuming a change in control occurs and the executive's employment is terminated without cause or for good reason on December 31, 2022.

### Compensation and Leadership Development Committee Report

*Notwithstanding anything to the contrary set forth in any of the previous or future filings under the Securities Act of 1933 or the Securities Exchange Act of 1934 that might incorporate this proxy statement or future filings with the Securities and Exchange Commission, in whole or part, the following report shall not be deemed to be incorporated by reference into any such filing.*

The Compensation and Leadership Development Committee reviewed and discussed the Compensation Discussion and Analysis contained in this Proxy Statement with management of the Company. Based on the review and discussions noted above, the Compensation and Leadership Development Committee recommended to the Board that the Compensation Discussion and Analysis be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022, and in this Proxy Statement.

COMPENSATION AND LEADERSHIP DEVELOPMENT COMMITTEE

Sean D. Keohane, Chair
Erin N. Kane
Guillaume Pepy



## Other Required Disclosures (continued)

### CEO PAY RATIO

There were no significant changes to the global employee population nor significant changes to employee compensation arrangements. Per SEC rules, Chemours is using the same individual as last year for the CEO pay ratio exhibit. This is the final year of the three-year period that the individual's compensation can be used for this analysis. The CEO pay ratio figures below are a reasonable estimate calculated in a manner consistent with SEC rules.

The individual's compensation reflects January 1, 2022 to December 31, 2022. The total number of employees was approximately 6,600. When Chemours selected the employee, the Company determined the median of the employee's pay. Chemours chose total earnings including overtime pay as the consistently applied compensation measure. Chemours then calculated an annual gross cash compensation for each employee. Chemours used a valid statistical sampling methodology to identify a population of employees whose base pay was within a 5% range of the median. Using this methodology, Chemours identified the median employee from that group.

The total compensation for the selected median employee in 2022 was $108,156. The ratio of CEO pay to the median worker pay is 71:1.

| ELEMENT | MEDIAN EMPLOYEE $ | CEO $ |
| --- | --- | --- |
| Salary (includes Overtime)[1] | 99,364 | 995,833 |
| Stock Awards | 0 | 3,464,363 |
| Option Awards | 0 | 2,039,991 |
| Non-Equity Incentive Plan Compensation/Bonus[2] | 2,528 | 1,024,400 |
| Change in Pension Value | 0 | 0 |
| All Other Compensation[3] | 6,264 | 145,764 |
| Summary Compensation Table Totals | 108,156 | 7,670,351 |
| CEO Pay Ratio | **71:1** | |

(1) Consists of 2022 base salary plus overtime pay.

(2) Actual 2022 cash incentive paid during the first quarter of fiscal year 2023 under a performance-based compensation plan.

(3) Consists of 2022 employer contributions to qualified and non-qualified defined contribution plans and perquisites/personal benefits as listed in footnote 5 of the Summary Compensation Table.

### PAY VERSUS PERFORMANCE

The following information is shared as required by Section 953(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and Item 402(v) of Regulation S-K. The Company is providing the following information about the relationship between executive compensation actually paid and certain financial performance of the Company. For further information concerning the Company's variable pay-for-performance philosophy and how the Company aligns executive compensation with the Company's performance, refer to the "Executive Compensation" section of the CD&A.

Chemours and the CLDC are committed to ensuring alignment between Company performance and executive compensation to encourage and reward management for the creation of shareholder value. This Pay vs. Performance disclosure provides an additional perspective on our pay and performance alignment. This perspective is enhanced by the inclusion of Compensation Actually Paid ("CAP") to our PEOs and NEOs, which captures the annual change in management's total, company-derived wealth. This provides a distinct view from total compensation for our CEO and NEO as set forth in the "Summary Compensation Table" ("SCT"), which captures the annual economic cost of compensation to the Company. CAP is a more suitable comparator to performance since it includes the effect of performance on executive compensation over time and the degree to which pay is aligned with performance.



## Other Required Disclosures (continued)

**Pay Versus Performance Table**

The following table shows the past three fiscal years' of SCT pay, CAP, our cumulative total shareholder return ("TSR"), the cumulative relative TSR ("rTSR") of our performance peers over the same period, our net income, and our Free Cash Flow. As the table below demonstrates, there is a strong relationship between our financial outcomes and CAP to PEOs and the average of CAP to the remaining NEOs. The CLDC believes strongly that the Company's pay-for-performance approach is working as designed.

| YEAR | SUMMARY COMPENSATION TABLE TOTAL FOR FIRST PEO[1] | COMPENSATION ACTUALLY PAID TO FIRST PEO[2] | SUMMARY COMPENSATION TABLE TOTAL FOR SECOND PEO[3] | COMPENSATION ACTUALLY PAID TO SECOND PEO[4] | AVERAGE SUMMARY COMPENSATION TABLE TOTAL FOR NON-PEO NEOS[5] | AVERAGE COMPENSATION ACTUALLY PAID TO NON-PEO NEOS[6] | VALUE OF INITIAL FIXED $100 INVESTMENT BASED ON: TOTAL SHAREHOLDER RETURN[7] | PEER GROUP TOTAL SHAREHOLDER RETURN[8] | NET INCOME (MILLIONS)[9] | FREE CASH FLOW (MILLIONS)[10] |
|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | — | — | $ 7,670,351 | $ 9,839,552 | $ 2,107,360 | $ 2,450,210 | $ 191.44 | $ 130.45 | $ 578 | $ 447 |
| 2021 | $ 9,012,886 | $ 25,427,573 | $ 5,706,228 | $ 10,425,043 | $ 2,359,471 | $ 5,383,970 | $ 203.63 | $ 151.70 | $ 608 | $ 543 |
| 2020 | $ 8,606,576 | $ 16,928,335 | — | — | $ 2,915,198 | $ 4,524,555 | $ 145.61 | $ 119.86 | $ 219 | $ 540 |

(1) The dollar amounts reported are the amounts of total compensation reported for Mr. Vergnano for each corresponding year in the "Total" column of the SCT. Refer to "Executive Compensation — Executive Compensation Tables — Summary Compensation Table."

(2) The dollar amounts reported represent the amount of CAP to Mr. Vergnano, as computed in accordance with Item 402(v) of Regulation S-K. The dollar amounts do not reflect the actual amount of compensation earned by or paid to Mr. Vergnano during the applicable year. In accordance with the requirements of Item 402(v) of Regulation S-K, the following "Pay Versus Performance Calculation Detail" table displays the adjustments made to Mr. Vergnano's total compensation for each year to determine the CAP.

(3) The dollar amounts reported are the amounts of total compensation reported for Mr. Newman for each corresponding year in the "Total" column of the SCT. Refer to "Executive Compensation — Executive Compensation Tables — Summary Compensation Table."

(4) The dollar amounts reported represent the amount of CAP to Mr. Newman, as computed in accordance with Item 402(v) of Regulation S-K. The dollar amounts do not reflect the actual amount of compensation earned by or paid to Mr. Newman during the applicable year. In accordance with the requirements of Item 402(v) of Regulation S-K, the following "Pay Versus Performance Calculation Detail" table displays the adjustments made to Mr. Newman's total compensation for each year to determine the CAP.

(5) The dollar amounts reported represent the average of the amounts reported for the Company's NEOs as a group (excluding the applicable PEO) in the "Total" column of the SCT in each applicable year. The names of each of the NEOs (excluding the applicable PEO) included for purposes of calculating the average amounts in each applicable year are as follows: (i) for 2022, Sameer Ralhan, Edwin Sparks, Alisha Bellezza, Denise Dignam, and David Shelton; (ii) for 2021, Sameer Ralhan, Edwin Sparks, Susan Kelliher, Bryan Snell, and David Shelton; and (iii) for 2020, Sameer Ralhan, Edwin Sparks, Mark Newman, and David Shelton.

(6) The dollar amounts reported represent the average amount of CAP to the NEOs as a group (excluding the applicable PEO), as computed in accordance with Item 402(v) of Regulation S-K. The dollar amounts do not reflect the actual average amount of compensation earned by or paid to the NEOs as a group (excluding the applicable PEO) during the applicable year. In accordance with the requirements of Item 402(v) of Regulation S-K, the following "Pay Versus Performance Calculation Detail" table displays the adjustments made to the NEOs' (excluding the applicable PEO) total compensation for each year to determine the CAP.

(7) TSR is calculated by dividing the sum of the cumulative amount of dividends for the measurement period, assuming dividend reinvestment, and the difference between the Company's share price at the end and the beginning of the measurement period by the Company's share price at the beginning of the measurement period.

(8) Represents the weighted peer group TSR, weighted according to the respective companies' stock market capitalization at the beginning of each period for which a return is indicated. The peer group used for this purpose is the following published industry index: S&P 400 Chemicals.

(9) The dollar amounts reported represent the amount of net income reflected in the Company's audited financial statements for the applicable year.

(10) Free Cash Flow is defined as Cash Flows from Operations less purchases of property, plant and equipment as disclosed in the Company's Cash Flow statement. While the Company uses numerous financial and non-financial performance measures for the purpose of evaluating performance for the Company's compensation programs, the Company has determined that free cash flow is a financial performance measure that, in the Company's assessment, represents the most important performance measure (that is not otherwise required to be disclosed in the table) used by the company to link CAP to the company's NEOs, for the most recently completed fiscal year, to company performance.



# Other Required Disclosures (continued)

**Pay Versus Performance Calculation Detail**

| | PEO 1 | | | PEO 2 | | | NEO AVERAGE | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 |
| Summary Compensation Table Total | — | $ 9,012,886 | $ 8,606,576 | $ 7,670,351 | $ 5,706,228 | — | $ 2,107,360 | $ 2,359,471 | $ 2,915,198 |
| Less: Reported Fair Value of Equity Awards[a] | — | $ 7,056,334 | $ 6,231,013 | $ 5,504,353 | $ 3,039,984 | — | $ 1,130,702 | $ 1,139,675 | $ 1,807,220 |
| Add: Year-End Fair Value of Equity Awards Granted in the Year[b(i)] | — | $ 10,037,056 | $ 14,805,523 | $ 7,286,350 | $ 3,737,324 | — | $ 1,482,246 | $ 1,697,677 | $ 3,537,581 |
| Add: Change in Fair Value of Equity Awards Granted in Prior Years and Remain Unvested[b(ii)] | — | $ 11,676,849 | $ (501,171) | $ (231,485) | $ 3,508,735 | — | $ (164,478) | $ 2,182,023 | $ (157,388) |
| Add: Fair Value as of Vesting Date of Equity Awards Granted and Vested in the Year[b(iii)] | — | $ 144,996 | — | — | — | — | — | — | — |
| Add: Change in Fair Value of Equity Awards Granted in Prior Years that Vested in the Year[b(iv)] | — | $ 507,084 | $ (2,653) | $ 333,788 | $ 184,986 | — | $ 47,967 | $ 77,860 | $ (17,955) |
| Add: Value of Dividends or other Earnings Paid on Stock or Option Awards not Otherwise Reflected in Fair Value or Total Compensation[b(v)] | — | $ 1,105,035 | $ 251,073 | $ 284,902 | $ 327,754 | — | $ 107,817 | $ 206,615 | $ 54,340 |
| Less: Reported Change in the Actuarial Present Value of Pension Benefits[c] | — | — | — | — | — | — | — | — | — |
| Add: Actuarially determined service cost for services rendered during the fiscal year | — | — | — | — | — | — | — | — | — |
| Add: Entire cost of benefits granted in a plan amendment (or initiation) during the applicable year that are attributed by the benefit formula to services rendered in periods prior to the plan amendment or initiation | — | — | — | — | — | — | — | — | — |
| CAP | — | $ 25,427,573 | $ 16,928,335 | $ 9,839,552 | $ 10,425,043 | — | $ 2,450,210 | $ 5,383,970 | $ 4,524,555 |

(a) The grant date fair value of equity awards represents the total of the amounts reported in the "Stock Awards" and "Option Awards" columns in the SCT for the applicable year.

(b) The equity award adjustments for each applicable year include the addition (or subtraction, as applicable) of the following: (i) the year-end fair value of any equity awards granted in the applicable year that are outstanding and unvested as of the end of the year; (ii) the amount of change as of the end of the applicable year (from the end of the prior fiscal year) in fair value of any awards granted in prior years that are outstanding and unvested as of the end of the applicable year; (iii) for awards that are granted and vest in the same applicable year, the fair value as of the vesting date; (iv) for awards granted in prior years that vest in the applicable year, the amount equal to the change as of the vesting date (from the end of the prior fiscal year) in fair value; and (v) the dollar value of any dividends or other earnings paid on stock or option awards in the applicable year prior to the vesting date that are not otherwise reflected in the fair value of such award or included in any other component of total compensation for the applicable year. The valuation assumptions used to calculate fair values did not materially differ from those disclosed at the time of grant.

(c) The amounts included in this row are the amounts reported in "Change in Pension and Nonqualified Deferred Compensation" column of the SCT for each applicable year.



## Other Required Disclosures (continued)

**Relationship Between CAP and Performance Measures**

Given the impact of stock price on our equity-based compensation, PEOs and NEOs actual compensation is driven by the Company's success in delivering total shareholder return. We note the following factors influenced the results of the Pay Versus Performance calculations:

- Impact of Equity Compensation — A significant portion of the executives' TDC is equity-based. Given the critical role of equity grants in the executives' pay, stock price has a significant impact on actual compensation. The Company's stock price has been volatile over the past three years, ranging from below $10 to above $40 per share, and the CAP to the PEOs, and the average of CAP to the remaining NEOs, tracks with that volatility.

- CEO Transition — In July 2021, the Company completed the successful transition of the CEO role from Mr. Vergnano to Mr. Newman. The following tables reflect that transition, including the value of Mr. Vergnano's separation agreement. Additionally, they reflect Mr. Newman's compensation prior to and after his promotion to CEO. As noted in the CD&A, Mr. Newman's CAP in 2021 and 2022 was impacted by the compensation philosophy to ramp TDC for newly promoted executives over a multi-year period.

- Financial Metrics — Net Income and Free Cash Flow correlate with TSR over the long-term, but not necessarily in any given year, in part because TSR reflects investors' assessment of the Company's value, taking forward-looking factors into account. Conversely, Free Cash Flow and Net Income are backward-looking and measure performance over discrete one-year time periods. Our compensation programs reflect our belief that actual compensation should more closely correlate to TSR than NI or FCF in any given year.

The graph below displays the relationship between the Company's TSR versus the TSR of its peer group. The Company's TSR significantly outperformed its peer group.



**CAP vs Company TSR[1]**

The below chart showing the relationship between the average PEOs' and NEOs' CAP and TSR demonstrates the critical role of equity grants and significant impact of our stock price on our executives' pay.



## Other Required Disclosures (continued)



(1) TSR is calculated by dividing the sum of the cumulative amount of dividends for the measurement period, assuming dividend reinvestment, and the difference between the Company's share price at the end and the beginning of the measurement period by the Company's share price at the beginning of the measurement period.

**CAP vs Net Income (NI) and Free Cash Flow (FCF)[1]**

The below chart shows the relationship between the average PEOs' and NEOs' CAP versus NI and FCF which illustrates the impact of these measures as realized compensation.



(1) PEO CAP in displayed in the above table reflects Mr. Vergnano's CAP in 2020, Mr. Newman's CAP in 2022 and an average CAP for both for 2021.



## Other Required Disclosures (continued)

**Most Important Company Performance Measures for Determining Executive Compensation**

For fiscal year 2022, our CHRC identified the performance measures listed below as the most important financial performance measures used by the Company to link CAP for our named executive officers, for the most recently completed fiscal year, to the Company's performance:

- Adjusted EBITDA
- Free Cash Flow
- TSR

### David Shelton's Settlement Agreement

The Company entered into a settlement agreement and release with Mr. Shelton in connection with his change of role effective October 1, 2022, and future separation of employment on December 31, 2023. As Senior Counsel to the CEO, Mr. Shelton continued to receive the same base salary, AIP and LTIP awards at target as defined in his previous role. In exchange for his continued employment, in January 2024, Mr. Shelton will receive $250,000 in retention pay, 2023 AIP target payout of $350,000, and other incidental benefits set forth in the settlement and release agreement. In connection with ongoing non-competition and non-solicitation obligations and subject to entry into a post-separation agreement, Mr. Shelton will be entitled to cash payments totaling $400,000 payable in January 2024. Mr. Shelton will also have ongoing confidentiality obligations under the settlement and release agreement. In addition, pursuant to the settlement and release agreement, Mr. Shelton will be compensated approximately $22,000 per month for consulting services from January 1, 2024, through June 30, 2025, with the option for the Company to extend such services for up to an additional twelve months.



## Proposal 2 — Advisory Vote to Approve Named Executive Officer Compensation

Pursuant to Section 14A of the Exchange Act and the related rules of the SEC, the Company seeks your vote to approve, on an advisory basis, the compensation of the Company's named executive officers as disclosed in this Proxy Statement pursuant to the SEC's compensation disclosure rules, including the Compensation Discussion and Analysis, the compensation tables, and the narrative disclosures in the Company's compensation tables (a "say-on-pay" vote).

As described in detail under the heading "Executive Compensation — Compensation Discussion and Analysis" in this Proxy Statement, the Board of Directors seeks to link a significant portion of executive officer compensation with the Company's performance. The Company's compensation programs are designed to reward the Company's executive officers for the achievement of short-term and long-term financial goals, while minimizing excessive risk taking. The Company's executive compensation program is strongly aligned with the long-term interests of shareholders. The Company urges you to read the Compensation Discussion and Analysis section of this Proxy Statement for additional details on executive compensation programs, including compensation philosophy and objectives and the compensation of named executive officers during fiscal year 2022.

The vote on this proposal is not intended to address any specific element of compensation; rather, the vote relates to all compensation relating to the Company's named executive officers, as described in this Proxy Statement.

The vote is advisory and is not binding on the Company, the Board, or the Compensation and Leadership Development Committee, and will not be construed as overruling a decision by, or creating or implying any additional fiduciary duty for, the Company, the Board, or the Compensation and Leadership Development Committee. However, the Board and the Compensation and Leadership Development Committee value the opinions expressed by shareholders in their votes on this proposal and will consider the outcome of the vote when making future compensation decisions and policies regarding the Company's executive officers.

Accordingly, the Board of Directors and management ask shareholders to approve the following resolution at the Annual Meeting:

"**RESOLVED**, that the Company's shareholders approve, on an advisory basis, the compensation of the named executive officers, as disclosed in the Company's Proxy Statement for the 2023 Annual Meeting of Shareholders pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the Compensation Discussion and Analysis, the compensation tables and any related material disclosed in this Proxy Statement."

---

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" THE APPROVAL, ON AN ADVISORY BASIS, OF THE COMPENSATION OF THE NAMED EXECUTIVE OFFICERS AS DESCRIBED IN THIS PROXY STATEMENT.**

---



## Proposal 3 — Ratification of Selection of Independent Registered Public Accounting Firm

The Audit Committee has selected PricewaterhouseCoopers LLP (PwC) as the Company's independent registered public accounting firm to audit the Company's consolidated financial statements and internal control over financial reporting for the fiscal year ending December 31, 2023. In Proposal 3, the Company is asking shareholders to ratify this selection.

Although ratification is not required by the Company's Bylaws or otherwise, the Board is submitting the selection of PwC to the Company's shareholders for ratification. If the selection is not ratified, the Audit Committee will consider whether it is appropriate to select another independent registered public accounting firm. Even if the selection is ratified, the Audit Committee in its discretion may select a different independent registered public accounting firm at any time during the year, if it determines that such a change would be in the best interests of the Company and its shareholders.

Representatives of PwC are expected to be present at the Annual Meeting and will be available to respond to appropriate questions and will have the opportunity to make a statement if they desire to do so.

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" THE PROPOSAL TO RATIFY THE SELECTION OF PRICEWATERHOUSECOOPERS LLP AS INDEPENDENT PUBLIC ACCOUNTING FIRM FOR FISCAL YEAR 2023**

### FEES PAID TO INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

PwC has served as the Company's independent registered public accounting firm since 2014. Aggregate fees for professional services rendered by PwC for 2022 and 2021 are set forth in the table below.

|  | 2022 (IN THOUSANDS) | 2021 (IN THOUSANDS) |
|---|---|---|
| Audit fees[1] | $ 7,145 | $ 7,012 |
| Audit-related fees[2] | 320 | 2,207 |
| Tax fees[3] | 319 | 1,549 |
| All other fees[4] | 14 | 37 |
| Total | $ 7,798 | $ 10,805 |

(1)  Audit fees related to audits of financial statements and internal controls over financial reporting, statutory audits, reviews of quarterly financial statements, and certain periodic reports filed with the SEC.

(2)  Audit-related fees related primarily to accounting consultations, employee benefit plans and other assurance related services not required by statute.

(3)  Tax fees related primarily to tax compliance and advice.

(4)  Other fees in 2022 are related technical accounting and reporting software tools.

### AUDIT COMMITTEE'S PRE-APPROVAL POLICIES AND PROCEDURES

To assure that the audit and non-audit services performed by the independent registered public accounting firm do not impair its independence in appearance and/or fact, the Audit Committee has established the Audit and Non-Audit Services Pre-Approval Policy of the Audit Committee (the "Policy"). The Policy outlines the scope of services that PwC may provide to the Company. The Policy sets forth guidelines and procedures the Company must follow when retaining PwC to perform audit, audit-related, tax and other services. The Policy also specifies certain non-audit services that may not be performed by PwC under any circumstances. Pursuant to the Policy, the Audit Committee has approved services to be provided by PwC and fee thresholds within each of the service categories, and services within these thresholds are deemed pre-approved. Additional services and fees exceeding those thresholds require further pre-approval. Requests for specific pre-approvals may be considered by the full Audit Committee. In addition, the Audit Committee has delegated to the Chair the authority to



## Proposal 3 — Ratification of Selection of Independent Registered Public Accounting Firm (continued)

grant specific pre-approvals. Any such pre-approvals are reported to the full Audit Committee at its next meeting. The Policy is evaluated and updated annually by the Audit Committee. For fiscal year 2022, all services provided by PwC were approved by the Audit Committee.

### REPORT OF THE AUDIT COMMITTEE

Notwithstanding anything to the contrary set forth in any of the Company's previous or future filings under the Securities Act of 1933 or the Securities Exchange Act of 1934 that might incorporate this proxy statement or future filings with the Securities and Exchange Commission, in whole or part, the following report shall not be deemed to be incorporated by reference into any such filing.

The Audit Committee is appointed by the Board of Directors to assist the Board in the oversight of (i) the integrity of the financial statements of the Company, (ii) the qualifications and independence of the Company's independent auditor, (iii) the performance of the Company's internal audit function and independent auditors, and (iv) the compliance by the Company with legal and regulatory requirements. All members of the Audit Committee meet the criteria for independence applicable to audit committee members under NYSE Listing Standards and the rules and regulations of the SEC relating to audit committees. The Audit Committee Charter complies with NYSE Listing Standards.

Management is responsible for the financial reporting process, including its internal control over financial reporting, and for the preparation of its consolidated financial statements in accordance with accounting principles generally accepted in the United States ("GAAP"). The Company's independent registered public accounting firm is responsible for performing an independent audit of the consolidated financial statements and expressing opinions on the consolidated financial statements and internal control over financial reporting. The Audit Committee's responsibility is to monitor and review these processes and act in an oversight capacity. The Audit Committee does not certify the financial statements or guarantee the independent registered public accounting firm's report. The Audit Committee relies, without independent verification, on the information provided to it, including representations made by management and the independent registered public accounting firm, including its audit report.

The Audit Committee discussed with PwC, the Company's independent registered public accounting firm, the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC. The Audit Committee has received the written disclosures and the letter from PwC required by applicable requirements of the Public Company Accounting Oversight Board regarding PwC's communications with the Audit Committee concerning independence and has discussed with PwC its independence. The Audit Committee reviewed and discussed the audited financial statements of the Company for the fiscal year ended December 31, 2022 with management and PwC. Based on the review and discussions noted above, the Audit Committee recommended to the Board that the audited financial statements of the Company be included in the Company's Annual Report on Form 10-K filed with the SEC for the fiscal year ended December 31, 2022.

AUDIT COMMITTEE
Curtis V. Anastasio, Chair
Mary B. Cranston
Curtis J. Crawford
Erin N. Kane
Guillaume Pepy
Sandra Phillips Rogers



## Certain Relationships and Transactions

The Board has adopted "Policies and Procedures for Transactions with Related Persons" to assist it in reviewing, approving and ratifying related person transactions and to assist the Company in preparing the disclosures that the rules and regulations of the SEC require to be included in the Company's applicable SEC filings. Pursuant to the policies and procedures, any reported transaction between the Company and a "Related Person" that may qualify as a "Related Person Transaction" will be referred to the NCG Committee or any other committee comprised of independent directors designated by the Board.

The NCG Committee (or its Chair, under some circumstances) will determine whether to approve, ratify, disapprove or reject any Related Person Transaction following consideration of all relevant factors, including, without limitation, the following: (i) the commercial reasonableness of the transaction; (ii) the materiality of the Related Person's direct or indirect interest in the transaction; (iii) whether the transaction may involve a conflict of interest, or the appearance of one; (iv) whether the transaction was in the ordinary course of business; (v) the benefits to the Company; (vi) the availability of other sources for comparable products or services; and (vii) the impact of the transaction on the Related Person's independence under the Company's Corporate Governance Guidelines and applicable regulatory and listing standards. Related Person Transactions will be approved or ratified only if they are determined to be in the best interests of the Company and its shareholders.

If a Related Person Transaction that has not been previously approved or ratified is discovered, the Related Person Transaction will be presented to the NCG Committee for ratification. If the NCG Committee does not ratify the Related Person Transaction, then the Company will ensure all appropriate disclosures regarding the transaction are made and, if appropriate, take all reasonable actions to attempt to terminate the Company's participation in the transaction.

It is expected that the Company and its subsidiaries may purchase products and services from and/or sell products and services to companies of which certain of the Company's directors or executive officers, or their immediate family members, are directors or employees. Chemours carries out transactions with these entities on customary terms, and, in many instances, the Company's directors and executive officers may not be aware of them. To the Company's knowledge, since the beginning of fiscal year 2022, no related person has had a material interest in any of the Company's business transactions or relationships.



## Other Information

**OTHER BUSINESS THAT MAY COME BEFORE THE MEETING**

The Company does not intend to bring any other business before the Annual Meeting for action and has not been notified of any other business proposed to be brought before the Annual Meeting. However, if any other business should be properly presented for action, it is the intention of the persons named on the proxy card to vote in accordance with their judgment on such business.

**2024 ANNUAL MEETING OF SHAREHOLDERS**

### Procedures for Submitting Shareholder Proposals and Nominations

If you want to include a shareholder proposal in the Proxy Statement for the Company's 2024 Annual Meeting of Shareholders, your shareholder proposal must be delivered to the Company not later than November 11, 2023, and it must satisfy the rules and regulations of the SEC to be eligible for inclusion in the Proxy Statement for that meeting. If the date of the Company's 2024 Annual Meeting of Shareholders changes by more than 30 days from the date that is the first anniversary of the 2023 Annual Meeting, then the deadline is a reasonable time before the Company begins to print and mail proxy materials for the 2024 Annual Meeting.

If you want to submit a shareholder proposal for the Company's 2024 Annual Meeting of Shareholders and you do not require that the proposal be included in the Company's proxy materials or want to submit a director nomination, your shareholder proposal or director nomination must be delivered to the Company not earlier than January 1, 2024 and not later than January 31, 2024. However, if the date of the 2024 Annual Meeting changes by more than 30 days from the date that is the first anniversary of the 2023 Annual Meeting, then any shareholder proposal must be received no later than the close of business on the tenth day following the date of public disclosure of the date of such meeting. Your notice must also include the information required by the Company's Bylaws.

All shareholder proposals and director nominations must be delivered to the Company at the following address: The Chemours Company, 1007 Market Street, Wilmington, DE 19801, Attention: Corporate Secretary.

The chairman of the Annual Meeting or any other annual meeting or special meeting of shareholders may refuse to acknowledge the nomination or shareholder proposal of any person not made in compliance with the foregoing procedures and the Bylaws. A shareholder's compliance with these procedures will not require the Company to include information regarding a proposed nominee in the Company's proxy solicitation materials.

**ANNUAL REPORT ON FORM 10-K SHAREHOLDERS**

A copy of our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, including the financial statements and schedules and a list of all exhibits, will be supplied without charge to any shareholder upon written request sent to The Chemours Company, 1007 Market Street, Wilmington, DE 19801, Attention: Investor Relations. Exhibits to the Form 10-K are available for a reasonable fee. You may also view the Annual Report on Form 10-K and its exhibits on-line at the SEC website at www.sec.gov or on the Company's website at https://investors.chemours.com.

---

**IMPORTANT**

**We value the input and support of all shareholders. Whether your share holdings are large or small, please promptly submit your proxy by telephone, through the Internet or by mail.**

---



## General Information About the Meeting

**Q. Why am I being asked to review these materials?**

A. In order to solicit your proxy for its Annal Meeting of Shareholders, the Company must furnish you with this Notice and Proxy Statement, which contains information about the proposals to be voted upon at the Annual Meeting. As a shareholder, you are invited to participate in the Annual Meeting and are entitled and encouraged to vote on the proposals described in this Proxy Statement. This Proxy Statement and our Annual Report to Shareholders are first being mailed to shareholders and made available on the Internet on or about March 10, 2023.

**Q. Why am I being asked to review materials online?**

A. In accordance with rules and regulations adopted by the SEC, instead of mailing a printed copy of our proxy materials to each shareholder, proxy materials, including this Proxy Statement and Annual Report to Shareholders, will be available online. By providing access of these materials on the Internet rather than mailing printed copies, most shareholders will not receive printed copies of the proxy materials unless they request them. Instead, a Notice of Internet Availability of Proxy Materials (the "Notice") has been sent to most of our shareholders with instructions on how to access and review the proxy materials on the Internet. The Notice also provides instructions on how you may submit your proxy on the Internet.

**If you would like to receive a paper or email copy of our proxy materials, please follow the instructions for requesting such materials in the Notice. We save thousands of dollars each year in postage and printing costs by providing proxy and annual meeting materials online.**

**Q. How does the Board recommend I vote on the proposals described in this Proxy Statement?**

A.

| VOTING MATTER MANAGEMENT PROPOSALS PROPOSAL | BOARD VOTE RECOMMENDATION |
|---|---|
| Proposal 1 — Election of Directors | FOR EACH NOMINEE |
| Proposal 2 — Advisory Vote on Executive Compensation | FOR |
| Proposal 3 — Ratification of Independent Registered Public Accounting Firm | FOR |

**Q. Who may vote at the meeting?**

A. Only holders of record of Chemours common stock at the close of business on March 1, 2023 (the "Record Date") are entitled to vote at the Annual Meeting. Each outstanding share of common stock is entitled to one vote. On the Record Date, there were 148,805, 289 shares of Chemours common stock outstanding and entitled to vote.

**Q. How do I vote?**

A. If your shares are registered directly in your own name with the Company's transfer agent, Computershare Trust Company, N.A., you are considered a "shareholder of record" with respect to those shares, and the Notice has been sent directly to you. As a shareholder of record, you may submit your proxy in advance of the Annual Meeting using any of the following alternatives:



## General Information About the Meeting (continued)



**INTERNET**

Visit www.AALVote.com/CC. Have your proxy card available when you access the above website. Follow the prompts to vote your shares by Internet until 11:59 p.m., Eastern Time, on April 25, 2023.



**MAIL**

Mark, sign, and date your proxy card, then detach it, and return it in the postage-paid envelope provided.



**TELEPHONE**

Use any touch-tone telephone to vote your proxy. Call 1 866-804-9616 Have your proxy card available when you call. Follow the voting instructions to vote your shares.



**DURING THE MEETING**

If you wish to vote your shares electronically during the virtual Annual Meeting, go to www.AALvote.com/CC during the Annual Meeting while the polls are open. You will need the control number on your Notice, or the proxy card mailed to you, as applicable

If, like most shareholders of the Company, you hold your shares through a broker, bank or other nominee, you are considered a "beneficial owner" of those shares, holding the shares in "street name." If you are a beneficial owner of shares, you will receive instructions from your broker or other nominee describing how to vote your shares. To vote on-line at the Annual Meeting, beneficial owners will need to contact the broker, trustee or nominee that holds their shares to obtain a "legal proxy" to bring to the meeting.

**Q. What is the deadline for voting if I do not plan to participate in the virtual Annual Meeting?**

A. You may submit your proxy via the Internet or by telephone until 11:59 p.m., Eastern Time, on April 25, 2023, or the Company's agent must receive your paper proxy card by mail on or before April 25, 2023. If your shares are held in "street name," please refer to the voting instructions from your broker, trustee or other nominee.

**Q. If I provide voting instructions and/or grant my proxy, who will vote my shares at the virtual Annual Meeting and how will they vote my shares?**

A. Sameer Ralhan and Kristine M. Wellman are Officers of the Company and were named by the Board as proxy holders. They will vote all proxies, or record an abstention, in accordance with the directions on the proxy. If no contrary direction is given, the shares will be voted as recommended by the Board.

**Q. Who will count the votes?**

A. A representative of Alliance Advisors, LLC, an independent tabulator, will count the vote and act as the inspector of election.

**Q. Can I change my vote after I have delivered my proxy?**

A. Yes. Submission of a later proxy by any means by the deadlines or voting online at the Annual Meeting will change your prior vote. Beneficial owners who wish to change their vote must follow the procedures provided by their broker, bank or other nominee.

**Q. Can I revoke a proxy?**

A. Yes. A shareholder of record may revoke a properly executed proxy at any time before its exercise by submitting a letter addressed to, and received by, the Corporate Secretary, by delivering later dated proxy instructions or by voting at the virtual meeting. Beneficial owners who wish to revoke their proxy should contact their broker, bank or other nominee.



## General Information About the Meeting (continued)

Attendance at the meeting alone will not revoke a proxy. Without a legal proxy from the record owner, beneficial owners cannot revoke their proxies at the Annual Meeting because the actual registered shareholders — the broker, bank or other nominees — will not be present. Beneficial owners who wish to vote at the Annual Meeting must obtain a legal proxy from their broker, bank or other nominee.

**Q. What does it mean if I receive more than one Notice, proxy or voting instruction card?**

A. It means your shares are registered differently or are in more than one account. For all Notices you receive, please submit your proxy by Internet for each control number you have been assigned. If you received paper copies of proxy materials, please provide voting instructions for all proxy and voting instruction cards you receive. The Company encourages you to register all your accounts in the same name and address. Registered shareholders may contact our transfer agent, Computershare Investor Services, P.O. Box 43006, Providence, RI 02940-3006, (866) 478-8569. Beneficial owners holding Chemours common stock through a broker, bank or other nominee should contact their broker, bank or nominee and request consolidation of their accounts.

**Q. What is a quorum? Why is a quorum required?**

A. Return of your proxy is important because a quorum is required for shareholders to conduct business at the meeting. The presence at the meeting, on-line or by proxy, of the holders of shares having a majority of the voting power represented by all issued and outstanding shares entitled to vote on the record date will constitute a quorum, permitting the Company to conduct the business of the meeting.

Proxies received but marked as abstentions, if any, will be included in the calculation of the number of shares considered to be present at the meeting for quorum purposes. Because this proxy includes a "routine" management proposal, shares represented by "broker non-votes" will be counted in determining whether there is a quorum present. If there is not a quorum present at the virtual Annual Meeting, the chairman of the meeting may adjourn the Annual Meeting to a later time.

**Q. How will votes be counted on shares held through brokers?**

A. If you are a beneficial owner and do not provide your broker with voting instructions, your shares may constitute "broker non-votes." Generally, broker non-votes occur on a matter when a broker is not permitted to vote on that matter without instructions from the beneficial owner and instructions are not given. The shares of a shareholder whose shares are not voted because of a broker non-vote on a particular matter will be counted for purposes of determining whether a quorum is present at the virtual Annual Meeting so long as the shares are represented at the meeting.

In tabulating the voting result for any particular proposal, shares that constitute broker non-votes are not considered present and entitled to vote on that proposal. Thus, broker non-votes will not affect the outcome of any matter being voted on at the Annual Meeting, assuming that a quorum is obtained. Brokers will be permitted to vote without voting instructions on the ratification of the selection of PricewaterhouseCoopers LLP, assuming that a quorum is obtained and therefore no broker non-votes are expected with respect to that proposal.

**Q. How many votes are needed to elect the director nominees and approve each of the proposals?**

A.

| PROPOSAL | VOTE REQUIRED | BROKER DISCRETIONARY VOTING ALLOWED? |
| --- | --- | --- |
| Elections of Directors | Majority of Votes Cast | No |
| Advisory Approval of Executive Compensation | Majority of Votes Represented and Entitled to Vote | No |
| Ratification of PwC LLP | Majority of Votes Represented and Entitled to Vote | Yes |

For the election of directors (Proposal 1), under the Bylaws, the number of votes cast "for" a nominee must exceed the number of votes cast "against" the nominee for the nominee to be elected as a director. For all other matters, except as



## General Information About the Meeting (continued)

set forth in the Certificate of Incorporation, the Bylaws or applicable law, the approval of the holders of a majority of votes represented at the meeting and entitled to vote on the proposal is required for approval of a proposal under the Bylaws.

In accordance with the voting standards set forth above, abstentions from voting on a matter by a shareholder present in person or represented by proxy at the meeting have no effect on the election of directors or on the outcome of the votes for the frequency of shareholder votes on the compensation of our named executive officers but have the same effect as votes "against" the other proposals.

**Q. What happens if an incumbent director nominee does not receive a majority of the votes cast for his or her re-election at the Annual Meeting?**

A. Our Corporate Governance Guidelines provide that the Board shall nominate for election or re-election only those candidates who agree to tender, promptly following the annual meeting at which they are elected or re-elected as a director, their irrevocable resignations contingent upon their failure to receive a majority of the votes cast for their election in an election that is not a contested election and the Board's acceptance of such resignations. In the event an incumbent director fails to receive the required vote for re-election, the NCG Committee will make a recommendation to the Board as to whether to accept or reject the resignation of the incumbent director. The Board will act on the resignation, taking into account the recommendation of the NCG, and publicly disclose its decision within ninety (90) days following certification of the election results. The NCG in making its recommendation and the Board in making its decision may consider all facts and circumstances they consider relevant or appropriate in reaching their determinations.

**Q. Where can I find voting results of the Annual Meeting?**

A. We will announce preliminary general voting results at the meeting and publish final detailed voting results on a Current Report on Form 8-K that Chemours will file with the SEC within four business days after the meeting.

**Q. Who will bear the cost for soliciting votes for the Annual Meeting?**

A. We will bear all expenses in conjunction with the solicitation of the enclosed proxy, including the charges of brokerage houses and other custodians, nominees or fiduciaries for forwarding documents to security owners and the fee to Innisfree M&A Incorporated ("Innisfree"), who will help the Company solicit proxies. Chemours anticipates that the fee to Innisfree will be approximately $15,000, plus expenses. In addition, proxies may be solicited by mail, email, in person, or by telephone or fax by certain of the Company's directors, officers and other employees.

**Q. What do I need to do to attend the Annual Meeting virtually?**

A. Both shareholders of record and street name shareholders will need to register to be able to attend the Annual Meeting via live audio webcast, submit their questions during the meeting and vote their shares electronically at the Annual Meeting by following the instructions below.

***If you are a shareholder of record, you must:***

- Follow the instructions provided on your Notice or proxy card to first register at www.viewproxy.com/chemours/2023/VM by 11:59 p.m. Eastern Time on April 24, 2023. You will need to enter your name, phone number, virtual control number (included on your Notice or proxy card) and email address as part of the registration, following which, you will receive an email confirming your registration, as well as the password to attend the virtual Annual Meeting.

- On the day of the virtual Annual Meeting, if you have properly registered, you may enter the virtual Annual Meeting by logging in using the password you received via email by clicking on the link in your registration confirmation. (If you wish to vote you will need the virtual control number included on your Notice or proxy card).

- If you wish to vote your shares electronically at the virtual Annual Meeting, you will need to click on http://www.AALvote.com/CC during the Annual Meeting while the polls are open (you will need the virtual control number included on your Notice or proxy card).



2023 Proxy Statement    **79**

## General Information About the Meeting (continued)

***If you are a street name shareholder, you must:***

Obtain a legal proxy from your broker, bank or other nominee.

- Register at www.viewproxy.com/Chemours/2023/VM by 11:59 p.m. Eastern Time on April 24, 2023. You will need to enter your name, phone number and email address, and provide a copy of the legal proxy (which may be uploaded to the registration website or sent via email to VirtualMeeting@viewproxy.com as part of the registration, following which, you will receive an email confirming your registration, your virtual control number, as well as the password to attend the virtual Annual Meeting. Please note, if you do not provide a copy of the legal proxy, you may still attend the virtual Annual Meeting, but you will be unable to vote your shares electronically at the virtual Annual Meeting.

- On the day of the virtual Annual Meeting, if you have properly registered, you may enter the virtual Annual Meeting by logging in using the password you received via email by clicking on the link in your registration confirmation. (If you wish to vote you will need the virtual control number assigned to you in your registration confirmation email).

- If you wish to vote your shares electronically at the virtual Annual Meeting, you will need to click http://www.AALvote.com/CC during the virtual Annual Meeting while the polls are open (you will need the virtual control number assigned to you in your registration confirmation email). Further instructions on how to attend the Annual Meeting via live audio webcast, including how to vote your shares electronically at the virtual Annual Meeting are posted on www.viewproxy.com/chemours/2023/VM under Frequently Asked Questions (FAQ). The Annual Meeting live audio webcast will begin promptly at 10:00 a.m. Eastern Daylight Time on April 26, 2023. We encourage you to access the meeting prior to the start time. Online check-in will begin at 9:30 a.m. Eastern Time, and you should allow ample time for the check-in procedures.

We have created and implemented the virtual format in order to facilitate shareholder attendance and participation by enabling shareholders to participate fully, and equally, from any location around the world, at no cost. However, you will bear any costs associated with your Internet access, such as usage charges from Internet access providers and telephone companies.

A virtual Annual Meeting makes it possible for more shareholders (regardless of size, resources or physical location) to have direct access to information more quickly, while saving the Company and our shareholders time and money, especially as physical attendance at meetings has dwindled. We also believe that the online tools we have selected will increase shareholder communication. For example, the virtual format allows shareholders to communicate during the Annual Meeting so they can ask questions of our board of directors or management. During the live Q&A session of the virtual Annual Meeting, we may answer questions as they come in, to the extent they are relevant to the business of the Annual Meeting, as time permits.

**Q. Can I access future annual meeting materials through the Internet rather than receiving them by mail?**

A. Yes. Shareholders of record can sign up for electronic delivery at www.allianceproxy.com/chemours/2023. If you submit your proxy through the Internet, you can also sign up for electronic delivery by following the instructions that appear after you finish voting. You will receive an e-mail next year containing links to our Annual Report to Shareholders and the Proxy Statement for the 2024 Annual Meeting.

Beneficial owners may also have the opportunity to receive copies of these documents electronically. Please check the information provided in the proxy materials mailed to you by your broker or other nominee regarding the availability of this service. This procedure reduces the printing costs and fees the Company incurs in connection with the solicitation of proxies.

**Q. What is "householding"?**

A. As permitted by SEC rules, the Company has adopted a procedure called "householding," under which multiple shareholders who have the same address will receive a single Notice and, if applicable, a single set of annual report and other proxy materials, unless one or more of these shareholders notifies the Company that they wish to continue receiving individual copies.



## General Information About the Meeting (continued)

Shareholders who participate in householding will continue to receive separate proxy cards. This procedure can result in significant savings to the Company by reducing printing and postage costs.

If you are a registered holder and would like to participate in householding, or if you participate in householding and would like to receive a separate set of proxy materials, please contact Alliance Advisors, LLC by calling 1-877-777-2857 or by e-mailing requests@viewproxy.com. Beneficial owners should contact their broker or other nominee for information about householding.

**Q. How can I communicate with the Company's Board?**

A. Shareholders and other interested parties may send communications to the Board in care of the Corporate Secretary, The Chemours Company, 1007 Market Street, Wilmington, Delaware 19801. Please indicate whether your message is for the Board as a whole, a particular group or committee of directors, or an individual director.

**Q. What if I have additional questions?**

A. If you have additional questions about the Annual Meeting or any of the information presented in this Proxy Statement, you may direct your questions to Chemours Investor Relations at annualmeeting@chemours.com, or call (302) 773-3291. Web links throughout this document are provided for convenience only and are not intended to be active hyperlinks to the referenced websites. The content on the referenced websites does not constitute a part of this Proxy Statement.



PROXY

## The Chemours Company

**PROXY FOR VIRTUAL ANNUAL MEETING OF SHAREHOLDERS TO BE HELD APRIL 26, 2023**
**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**
**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED**

The undersigned hereby appoints Sameer Ralhan and Kristine M. Wellman, or either of them, each with power of substitution, as proxies for the undersigned to vote all shares of Common Stock of said Company which the undersigned is entitled to vote at the Virtual Annual Meeting of Shareholders (the "Annual Meeting") of The Chemours Company (the "Company") to be held on April 26, 2023, and any adjournment or postponement thereof, as hereinafter specified and, in their judgment, upon such other matters as may properly come before the meeting. The undersigned hereby revokes all proxies previously given.

THIS PROXY WILL BE VOTED AS DIRECTED OR, IF NO DIRECTION IS GIVEN, WILL BE VOTED "FOR" EACH OF THE NOMINEES NAMED IN PROPOSAL 1, AND "FOR" PROPOSALS 2 AND 3. THE PROXIES ARE AUTHORIZED TO VOTE IN THEIR JUDGMENT UPON SUCH OTHER BUSINESS NOT KNOWN AS MAY PROPERLY COME BEFORE THE ANNUAL MEETING OR ANY ADJOURNMENTS THEREOF.

(Continued and to be marked, dated and signed on other side)

▲   PLEASE DETACH ALONG PERFORATED LINE AND MAIL IN THE ENVELOPE PROVIDED.   ▲

If you plan to attend the Virtual Annual Meeting, you must be a holder of Company shares as of the Record Date of March 1, 2023, and you must register at www.viewproxy.com/chemours/2023/VM by 11:59 p.m. Eastern Time on April 24, 2023. For more information on how to attend the Virtual Annual Meeting, see "General Information about the Meeting-What do I need to do to attend the Annual Meeting virtually?" in the proxy statement.

**Important Notice Regarding the Availability of Proxy Materials for the Virtual Annual Meeting of Shareholders to be held April 26, 2023**

**The Proxy Statement and our 2022 Annual Report to Shareholders are available at: http://www.allianceproxy.com/chemours/2023**

Please mark your votes like this in blue or black ink [X]

The Board of Directors recommends you vote **FOR** each of the nominees named in Proposal 1, and **FOR** Proposals 2 and 3.

**Proposal 1** – Election of Directors to Serve One-Year Terms expiring at the Annual Meeting of Shareholders in 2024.

Nominees:

| | | FOR | AGAINST | ABSTAIN |
|---|---|---|---|---|
| 1a. | Curtis V. Anastasio | ☐ | ☐ | ☐ |
| 1b. | Mary B. Cranston | ☐ | ☐ | ☐ |
| 1c. | Curtis J. Crawford | ☐ | ☐ | ☐ |
| 1d. | Dawn L. Farrell | ☐ | ☐ | ☐ |
| 1e. | Erin N. Kane | ☐ | ☐ | ☐ |
| 1f. | Sean D. Keohane | ☐ | ☐ | ☐ |
| 1g. | Mark E. Newman | ☐ | ☐ | ☐ |
| 1h. | Guillaume Pepy | ☐ | ☐ | ☐ |
| 1i. | Sandra Phillips Rogers | ☐ | ☐ | ☐ |

**Proposal 2** – Advisory Vote to Approve Named Executive Officer Compensation

☐ FOR ☐ AGAINST ☐ ABSTAIN

**Proposal 3** – Ratification of Selection of PricewaterhouseCoopers LLP for fiscal year 2023

☐ FOR ☐ AGAINST ☐ ABSTAIN

To transact other business as may properly come before the meeting or any adjournment or postponement thereof.

Date _____

Signature _____

Signature _____

(Joint Owners)

Note: Please sign exactly as your name or names appear on this card. Joint owners should each sign personally. If signing as a fiduciary or attorney, please give your exact title.

**CONTROL NUMBER**

Address Change/Comments: (If you noted any Address Changes and/or Comments above, please mark box.) ☐

Please indicate if you plan to attend this meeting ☐

▲ **PLEASE DETACH ALONG PERFORATED LINE AND MAIL IN THE ENVELOPE PROVIDED.** ▲

As a shareholder of The Chemours Company, you have the option of voting your shares electronically through the Internet or by telephone, eliminating the need to return the proxy card. Your electronic vote authorizes the named proxies to vote your shares in the same manner as if you marked, signed, dated and returned the proxy card. Votes submitted electronically over the Internet or by telephone must be received by 11:59 p.m., Eastern Standard Time, on April 25, 2023.

**CONTROL NUMBER**

## PROXY VOTING INSTRUCTIONS

Please have your 11-digit control number ready when voting by Internet or Telephone



### INTERNET
**Vote Your Proxy on the Internet:**

Go to www.AALVote.com/CC

Have your proxy card available when you access the above website. Follow the prompts to vote your shares.



### TELEPHONE
**Vote Your Proxy by Phone:**

Call 1 866-804-9616

Use any touch-tone telephone to vote your proxy. Have your proxy card available when you call. Follow the voting instructions to vote your shares.



### MAIL
**Vote Your Proxy by Mail:**

Mark, sign, and date your proxy card, then detach it, and return it in the postage-paid envelope provided.

# Exhibit 10

DEF 14A 1 tm223616-1_def14a.htm DEF 14A
TABLE OF CONTENTS

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of**
**the Securities Exchange Act of 1934 (Amendment No.    )**

Filed by the Registrant  ☒                    Filed by a Party other than the Registrant  ☐

| Check the appropriate box: |
| --- |
| ☐ Preliminary Proxy Statement |
| ☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))** |
| ☒ Definitive Proxy Statement |
| ☐ Definitive Additional Materials |
| ☐ Soliciting Material under §240.14a-12 |

# THE CHEMOURS COMPANY

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

| Payment of Filing Fee (Check the appropriate box): |
| --- |
| ☒ No fee required. |
| ☐ **Fee paid previously with preliminary materials.** |
| ☐ Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a6(i)(1) and 0-11 |



**1007 Market Street**
**Wilmington, Delaware 19801**

**March 11, 2022**

To our Shareholders:

We are pleased to invite you to attend the Annual Meeting of shareholders of The Chemours Company to be held on April 27, 2022. The meeting will begin at 10:00 a.m. (Eastern time).

The Annual Meeting will be accessible via live webcast at www.viewproxy.com/chemours/2022/VM. Shareholders will be able to vote and submit questions during the virtual Annual Meeting. To attend the Annual Meeting, shareholders should register on or before April 25, 2022 by visiting www.allianceproxy.com/chemours/2022. Further details can be found in the section below "General Information about the Meeting."

The following pages contain our notice of Annual Meeting and Proxy Statement. Please review this material for information concerning the business to be conducted at the annual meeting, including the nominees for election as directors.

We are furnishing proxy materials to our shareholders primarily over the Internet, which expedites shareholders' receipt of proxy materials and reduces the environmental impact of our Annual Meeting.

Whether or not you plan to attend the virtual Annual Meeting, please submit a proxy promptly to ensure that your shares are represented and voted at the meeting.

Sincerely,

**Dawn L. Farrell**
*Chair of the Board*

**Mark E. Newman**
*President & Chief Executive Officer*

# Notice of 2022 Annual Meeting of Shareholders

## Date: April 27, 2022
Time: 10:00 a.m. Eastern time
Place: Virtual Only — No Physical Meeting Location

Record date: March 1, 2022

Notice is hereby given that a meeting of the shareholders of The Chemours Company (the "Company") will be held virtually, on April 27, 2022 at 10:00 a.m. Eastern time (including any adjournments or postponements thereof, the "Annual Meeting" for the following purposes:

1. To elect the ten director nominees named in the accompanying Proxy Statement to serve one-year terms expiring at the Annual Meeting of Shareholders in 2023;

2. To hold a non-binding advisory vote to approve the compensation of the Company's named executive officers;

3. To hold a non-binding advisory vote to approve the frequency of the advisory vote on named executive officer compensation;

4. To ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for fiscal year 2022; and

5. To transact such other business that may properly come before the Annual Meeting or any adjournments or postponements thereof.

Only shareholders of record at the close of business on March 1, 2022 are entitled to notice of, and to vote at, the Annual Meeting, and any adjournments or postponements of the Annual Meeting.

By Order of the Board of Directors.

**David C. Shelton**
*Senior Vice President, General Counsel &
Corporate Secretary*

March 11, 2022

**Your vote is important.** Even if you plan to attend the virtual Annual Meeting, Chemours still encourages you to submit your proxy via Internet, telephone or mail prior to the meeting. If you later choose to revoke your proxy or change your vote, you may do so by following the procedures described under "Can I revoke a proxy?" and "Can I change my vote after I have delivered my proxy?" in the "Questions and Answers" section of the attached Proxy Statement.

**IMPORTANT NOTICE REGARDING AVAILABILITY OF PROXY MATERIALS
FOR THE VIRTUAL ANNUAL MEETING OF SHAREHOLDERS
TO BE HELD ON APRIL 27, 2022:
The Notice of Internet Availability of Proxy Materials, Notice of Annual Meeting of Shareholders,
Proxy Statement and Annual Report are available at
www.allianceproxy.com/chemours/2022**

# Table of Contents

| | |
|---|---|
| ANNUAL MEETING OVERVIEW | 1 |
| PROPOSAL 1 — ELECTION OF DIRECTORS | 1 |
| Director Qualification Standards | 1 |
| Director Nominees | 3 |
| CORPORATE GOVERNANCE | 10 |
| Corporate Governance Highlights | 10 |
| Corporate Governance Practices | 10 |
| Corporate Responsibility Commitment (CRC) Highlights | 11 |
| Board Oversight of Corporate Responsibility | 13 |
| Board Leadership Structure | 13 |
| Director Independence | 14 |
| Oversight of Risk Management | 14 |
| Succession Planning | 15 |
| Director Education | 15 |
| Code of Conduct | 15 |
| Shareholder Engagement | 16 |
| Policy on Hedging Transactions | 16 |
| BOARD STRUCTURE AND COMMITTEE COMPOSITION | 17 |
| Audit Committee Audit Committee | 17 |
| Compensation and Leadership Development Committee | 18 |
| Nominating and Corporate Governance Committee | 19 |
| DIRECTOR COMPENSATION | 20 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 23 |
| EXECUTIVE COMPENSATIONEXECUTIVE COMPENSATION | 25 |
| Compensation Discussion and Analysis | 25 |
| Executive Compensation Tables | 49 |
| Compensation and Leadership Development Committee Report | 61 |
| PROPOSAL 2 — ADVISORY VOTE TO APPROVE NAMED EXECUTIVE OFFICER COMPENSATION | 62 |
| PROPOSAL 3 — ADVISORY VOTE ON FREQUENCY OF ADVISORY VOTE ON NAMED EXECUTIVE OFFICER COMPENSATION | 62 |
| PROPOSAL 4 — RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 63 |
| Fees Paid to Independent Registered Public Accounting Firm | 63 |
| Audit Committee's Pre-Approval Policies and Procedures | 64 |
| Report of the Audit Committee | 64 |
| CERTAIN RELATIONSHIPS AND TRANSACTIONS | 65 |
| GENERAL INFORMATION ABOUT THE MEETING | 65 |
| OTHER INFORMATION | 71 |
| Other Business that May Come Before the Meeting | 71 |
| 2023 Annual Meeting of Shareholders | 71 |
| Annual Report on Form 10-K Shareholders | 71 |

# PROXY STATEMENT

## ANNUAL MEETING OVERVIEW

Set forth below is summary information regarding the virtual Annual Meeting of shareholders (including any adjournments and postponements thereof, the "Annual Meeting") of The Chemours Company ("Chemours" or the "Company"), including the location of the meeting and the proposals its shareholders will vote upon at the meeting. Please see the more detailed information set forth in this Proxy Statement about the Annual Meeting and the proposals.

| Meeting Information | Summary of Matters to be Voted Upon | | |
|---|---|---|---|
| **Time and Date** | **Voting Matter** | **Board Vote Recommendation** | **See Page** |
| **10:00 a.m. (Eastern time) on Tuesday, April 27, 2022** | ***Management Proposals*** | | |
| | Proposal 1 — Election of Directors | FOR EACH NOMINEE | 1 |
| | Proposal 2 — Advisory Vote on Executive Compensation | FOR | 60 |
| **Place:** | Proposal 3 — Advisory Vote on Frequency of Advisory Vote on Named Executive Officer Compensation | ONE YEAR | 61 |
| **Virtual Meeting Only — No Physical Location** | Proposal 4 — Ratification of Independent Registered Public Accounting Firm | FOR | 62 |

## PROPOSAL 1 — ELECTION OF DIRECTORS

The first proposal to be voted on at the Annual Meeting is the election of members of the Board of Directors (the "Board") of the Company. Ten current members of the Board are standing for re-election to hold office for a one-year term, or until their successors are duly elected and qualified.

Each nominee has agreed to be named in this Proxy Statement and to serve if elected. Although Chemours knows of no reason why any of the nominees would not be able to serve, if any nominee is unavailable for election, the proxy holders may vote for another nominee proposed by the Board of Directors. In that case, your shares will be voted for that other person.

Mr. Mark P. Vergnano, former Chief Executive Officer of the Company and former Chairman of the Board, will not be standing for re-election at the Annual Meeting. Mr. Vergnano has served as a director since this Company's founding and as the Company's first Chief Executive Officer until July 1, 2021 when he was succeeded by Mark E. Newman. Mr. Vergnano served as Chairman of the Board from July 1, 2021 until December 31, 2021. We want to thank Mr. Vergnano for his dedicated service and passion, leading us to be a different kind of chemistry company.

### Director Qualification Standards

The Chemours Nominating and Corporate Governance Committee will consider potential candidates suggested by Board members, as well as management, shareholders, search firms and others.

The Board's Corporate Governance Guidelines describe qualifications for directors. Directors are selected for their integrity and character; sound, independent judgment; breadth of experience, insight and knowledge; business acumen; and significant

professional accomplishment. The specific skills, experience and criteria that the Board may consider, and which may vary over time depending on current needs, include leadership; experience involving technological innovation; relevant industry experience; financial expertise; corporate governance; compensation and succession planning; familiarity with issues affecting global businesses; experience with global business operations, strategy

1

and management; environment, health, safety and sustainability; risk management; other board experience; prior government service; and other individual qualities and attributes, including diversity in experience, gender and ethnicity, that contribute to the total mix of viewpoints and experience represented on the Board. Additionally, directors are expected to be willing and able to devote the necessary time, energy and attention to assure diligent performance of their responsibilities. When considering candidates for nomination, the Nominating and Corporate Governance Committee takes into account these factors, among other items, to assure that new directors have the highest personal and professional integrity, have demonstrated exceptional ability and judgment and will be most effective, in conjunction with other directors, in serving the long-term interests of all shareholders. The Nominating and Corporate Governance Committee will not nominate for election as a director a partner, member, managing director, executive officer or principal of any entity that provides accounting, consulting, legal, investment banking or financial advisory services to Chemours.

Once the Nominating and Corporate Governance Committee has identified a prospective candidate, the Nominating and Corporate Governance Committee will make an initial determination as to whether to conduct a full evaluation of the candidate. This initial determination will be based on whatever information is provided to the Nominating and Corporate Governance Committee with the recommendation of the prospective candidate, as well as the Nominating and Corporate Governance Committee's own knowledge of the prospective candidate. This may be supplemented by inquiries to the person making the recommendation or others. The preliminary determination will be based primarily on the likelihood that the prospective nominee can satisfy the factors described above. If the Nominating and Corporate Governance Committee determines,

in consultation with the Chair of the Board and other Board members as appropriate, that further consideration is warranted, it may gather additional information about the prospective nominee's background and experience. The Nominating and Corporate Governance Committee also may consider other relevant factors as it deems appropriate, including the current composition of the Board and specific needs of the Board to ensure its effectiveness. In connection with this evaluation, the Nominating and Corporate Governance Committee will determine whether to interview the prospective nominee. One or more members of the Nominating and Corporate Governance Committee and other directors, as appropriate, may interview the prospective nominee in person or by telephone. After completing its evaluation, the Committee will conclude whether to make a recommendation to the full Board for its consideration.

The Nominating and Corporate Governance Committee considers candidates for director suggested by shareholders, applying the factors for potential candidates described above and taking into account the additional information provided by the shareholder or gathered by the Committee. Shareholders wishing to suggest a candidate for director should write to the Corporate Secretary and include the detailed information required under the Company's Amended and Restated Bylaws (the "Bylaws").

A shareholder's written notice to the Corporate Secretary described in the preceding paragraph must be delivered to The Chemours Company, 1007 Market Street, Wilmington, DE 19801, Attention: Corporate Secretary. Shareholders who wish to nominate candidates for the Board of Directors must follow the procedures described under "2023 Annual Meeting of Shareholders — Procedures for Submitting Shareholder Proposals and Nominations" in this Proxy Statement.

2

## Director Nominees

The following information describes certain information regarding our director nominees.

## Director Nominee Composition

  

## Skills, Experience, and Background

The Nominating and Corporate Governance Committee recommended to the Board the nominees named in this Proxy Statement. Based on this recommendation and each nominee's credentials and experience outlined below, the Board has determined that each nominee can make a significant contribution to the Board and the Company, is willing and able to devote the necessary time, energy and attention to assure diligent performance of their responsibilities and should serve as a director of the Company.

Set forth on the following pages is a skills matrix and biographical information about each of the nominees, including information regarding the person's service as a director, business experience, current or recent director positions, information regarding involvement in certain legal or administrative proceedings, if applicable, and the experiences, qualifications, attributes or skills that factored into the Board's determination that the person should serve as a director of the Company. The Board regularly reviews the skills, experience, and background that it believes are desirable to be represented on the Board. The following is a description of the Board's adopted Core Skills & Qualifications and additional relevant experience possessed by the nominees.

| Core Skills & Qualifications | | Additional Experience | |
|---|---|---|---|
| Leadership (Strategy & Execution) | Chemical Industry Experience | Marketing | Information Technology |
| Financial Expertise | Risk Management | Business Development Operations | Logistics & Supply Chain |
| Global Business Strategy & Management | Global Business | Mergers & Acquisitions | Legal Expertise |
| Technological Innovation | Compensation & Succession | Capital Markets | Regulatory Experience |
| Corporate Governance | Diversity | Investor Relations & Engagement | Cybersecurity |
| Environment, Health, Safety & Sustainability | Other Board Experience | | |

3

TABLE OF CONTENTS

## Skills Matrix

We maintain a skills matrix that identifies expertise and professional background in areas we think are essential for Chemours. The table below lists the areas of expertise for our director nominees.

| | Curtis V. Anastasio | Bradley J. Bell | Mary B. Cranston | Curtis J. Crawford | Dawn L. Farrell | Erin N. Kane | Sean D. Keohane | Mark E. Newman | Guillaume Pepy | Sandra Phillips Rogers |
|---|---|---|---|---|---|---|---|---|---|---|
| **Core Skills and Experience** | | | | | | | | | | |
| Leadership (Strategy and Execution) | x | x | x | x | x | x | x | x | x | x |
| Chemical Industry Experience | x | x | x | x | | x | x | x | | x |
| Financial Expertise | x | x | x | x | x | x | x | x | x | x |
| Global Business Strategy and Management | x | x | x | x | x | x | x | x | x | x |
| Global Business Operations | x | x | x | x | x | x | x | x | x | x |
| Corporate Governance | x | x | x | x | x | x | x | x | x | x |
| Other Board Experience | x | x | x | x | x | x | x | x | x | x |
| Technological Innovation | x | | x | x | x | x | x | | | x |
| Compensation & Succession | x | x | x | x | x | x | x | x | x | x |
| Risk Management | x | x | x | x | x | x | x | x | x | x |
| Environmental, Health, Safety and Sustainability | x | | x | | x | x | x | x | x | x |
| **Additional Experience** | | | | | | | | | | |
| Marketing | x | | | x | x | x | x | | | |
| Business Development | x | | | x | x | x | x | x | x | |
| Mergers & Acquisitions | x | x | x | x | x | | | x | x | x |
| Capital Markets | | x | | | x | | | x | | |
| Investor Relations & Engagement | x | x | x | | x | x | x | x | | |
| Information Technology | | | x | x | | | | x | | |
| Logistics & Supply Chain | x | | | | | x | x | x | x | |
| Legal Expertise | x | | x | | | | | | | x |
| Regulatory Experience | x | | x | | x | | | x | x | x |
| Cybersecurity | | | x | | x | | | x | | x |
| **Diversity** | | | | | | | | | | |
| Gender | | | x | | x | x | | | | x |
| Ethnicity | | | | x | | | | x | | x |

4

TABLE OF CONTENTS

# Director Nominees



**Curtis V. Anastasio**

**Director Since:** 2015

**Committee Memberships:** Audit (Chair), Nominating and Corporate Governance

**Term of Office Expires:** 2022

**Age:** 65

**Business Experience:**
- President, Chief Executive Officer and Executive Director of NuStar GP Holdings, LLC (2006 to 2013)
- President, Chief Executive Officer and Executive Director of NuStar Energy, L.P. (2001 to 2013)

**Other Boards and Positions**
- Chairman, GasLog Partners LP (2014 to present)
- Par Pacific Holdings, Inc. (2014 to present)

**Mr. Anastasio has significant leadership experience as both an executive officer and board member of public companies. Through his experience as a former chief executive officer, he is able to provide the Board with valuable insight on global business management and financial matters. Mr. Anastasio's knowledge of financial matters is further enhanced by his role as audit committee chairman of Par Pacific Holdings, Inc. and as a former director and member of the Audit Committee of the Federal Reserve Bank of Dallas. With nearly 40 years of experience, Mr. Anastasio also provides valuable knowledge in the areas of energy, legal matters, logistics, marketing and mergers and acquisitions.**



**Bradley J. Bell**

**Director Since:** 2015

**Committee Memberships:** Compensation and Leadership Development, Nominating and Corporate Governance

**Term of Office Expires:** 2022

**Age:** 69

**Business Experience:**
- Executive Vice President and Chief Financial Officer, Nalco Holding Company (2003 to 2010)
- Senior Vice President and Chief Financial Officer of Rohm and Haas Company (1997 to 2003)

**Through his over 35 years of executive experience in the technology, manufacturing and chemicals industries, Mr. Bell has developed financial expertise and experience in mergers and acquisitions, private equity and capital markets transactions. His experience includes over 12 years of experience as a chief financial officer of a publicly traded company, during which he obtained significant financial management and reporting expertise. Mr. Bell has over 30 years of experience as a director of multiple public companies, which allows him to bring the Board substantial knowledge of corporate governance, compensation design, shareholder relations, risk management and succession planning.**

TABLE OF CONTENTS



**Mary B. Cranston**

**Director Since:** 2015

**Committee Memberships:** Audit, Nominating & Corporate Governance (Chair)

**Term of Office Expires:** 2022

**Age:** 74

**Business Experience:**
• Senior Partner and Chair Emeritus, Pillsbury Winthrop Shaw Pittman (2007 to 2011); Chair and Chief Executive Officer (1999 to 2006)

**Other Boards and Positions**
• TPG, Inc. (2022)
• Visa, Inc. (2007 to present)

**Ms. Cranston brings leadership experience and expertise in financial matters, risk management, legal matters and corporate governance. She has over 30 years of experience in mergers and acquisitions as a legal advisor and oversaw two large mergers while she was the chief executive officer of Pillsbury. Ms. Cranston also has experience in the areas of trade, antitrust, telecommunications, SEC enforcement and environmental law. Through her board memberships, she has dealt with cybersecurity issues, stockholder activism and board engagement with shareholders.**



**Curtis J. Crawford**

**Director Since:** 2015

**Committee Memberships:** Audit

**Term of Office Expires:** 2022

**Age:** 74

**Business Experience:**
• President and Chief Executive Officer, XCEO, Inc. (2003 to present)
• President and Chief Executive Officer, Onix Microsystems and Zilog Inc.

**Other Boards and Positions**
• Author of three books on leadership and corporate governance
• B. Kenneth West Lifetime Achievement Award, National Association of Corporate Directors (NACD)

**Dr. Crawford has more than 20 years of board experience and has developed an expertise in corporate governance and boardroom leadership. As an executive of several companies, he gained experience in a range of fields including technological innovation and the chemicals industry. Dr. Crawford has developed comprehensive risk management programs for major corporations and also has substantial experience in financial matters, executive compensation and succession planning. From his experience as the president and chief executive officer of a consulting firm, he provides the Board with a unique perspective on corporate governance matters.**

6



**Dawn L. Farrell**

**Director Since:** 2015

**Committee Memberships:** Chair of the Board

**Term of Office Expires:** 2022

**Age:** 62

**Business Experience:**
- President and Chief Executive Officer, TransAlta Corporation (2012 to 2021);
- Chief Operating Officer (2009 to 2011); Executive Vice President, Commercial Operations and Development (2007 to 2009)
- Executive Vice President of Generation, BC Hydro (2003 to 2006)

**Other Boards and Positions**
- Portland General Electric ("PGE") (2022)
- Canada Natural Resources, Ltd. (2021 to present)
- Mount Royal University, Chancellor (2020 to present)

**With her experience as a former chief executive officer and as a board member of publicly traded companies, Mrs. Farrell provides important insight in the the areas of leadership, global business management and operations, shareholder relations, risk management and financial matters. Mrs. Farrell also has substantial experience in strategy, generation operations, large acquisitions, implementing environmental, health and safety programs, negotiating major regulatory deals and financing.**



**Erin N. Kane**

**Director Since:** 2019

**Committee Memberships:** Audit, Compensation and Leadership Development

**Term of Office Expires:** 2022

**Age:** 45

**Business Experience:**
- President and Chief Executive Officer, AdvanSix (2016 to present)
- Vice President and General Manager, Resins and Chemical, Honeywell (2014 to 2016); Business Director, Chemical Intermediates, (2011 to 2014); Global Marketing Manager, Resins and Chemicals (2008 to 2011); Global Marketing Manager, Authentication Technologies Business (2006 to 2008); Product Marketing Manager, Specialty Additives Business (2004 to 2006); Six Sigma Blackbelt Specialty materials (2002 to 2004)
- Six Sigma and Process Engineering, Elementis Specialties and Kvaerner Process prior to 2002

**Other Boards and Positions**
- American Chemistry Council (2017 to present)
- American Institute of Chemical Engineers (2019 to 2021)

**Ms. Kane led the spin-off of AdvanSix into an independent, NYSE-listed public company, including the appointment of an executive team, oversight of global business operations and strategy, creation of a best-practices corporate governance regime and Board of Directors function, structuring of compensation and succession planning, and the development of ERM and HSE programs.**

7



**Sean D. Keohane**

**Director Since:** 2018

**Committee Memberships:** Compensation and Leadership Development (Chair), Nominating and Corporate Governance

**Term of Office Expires:** 2022

**Age:** 54

**Business Experience:**
- President and CEO, Cabot Corporation (2016 to present)
- EVP, President, Reinforcement Materials, Cabot Corporation (2014 to 2016); SVP, President, Performance Chemicals (2012 to 2014); General Manager, Performance Chemicals (2008 to 2012); Vice President (2005 to 2008); joined Cabot Corporation (2002)
- General Management positions, Pratt & Whitney, a division of United Technologies, prior to 2002

**Other Boards and Positions**
- American Chemistry Council (2016 to Present)

**Mr. Keohane has a deep understanding of the chemicals industry and international business. From his role as CEO of Cabot Corporation, Mr. Keohane brings expertise in commercial and operational excellence, a commitment to safety, health and environmental leadership, and a strong track record business development in international markets, particularly China. Mr. Keohane also has a deep knowledge and experience in commercializing technology, risk management and broad financial matters, including investor relations.**



**Mark E. Newman**

**Director Since:** 2021

**Committee Memberships:** President & CEO

**Term of Office Expires:** 2022

**Age:** 58

**Business Experience:**
- President and Chief Executive Officer, The Chemours Company (2021 to present); SVP and Chief Operating Officer (2019 to 2021); SVP and Chief Financial Officer (2015 to 2019)
- SVP and Chief Financial Officer, Performance Chemicals, DuPont (2014 to 2015)
- SVP and Chief Financial Officer, SunCoke Energy Inc. (2011 to 2014)
- VP and Managing Director, SmartAuction, Ally Financial Inc. (2008 to 2011)
- VP and Chief Financial Officer, North America — Vice Chairman GMAC Bank, General Motors Corporation, GMAC Financial Services LLC (2007 to 2008); VP and Chief Financial Officer, GM North America (2006); Assistant Treasurer and General Director (2002 to 2005)
- VP and Chief Financial Officer, Shanghai General Motors (1999 to 2022)
- Treasurer's Office and Government Relations various positions, General Motors Corporation, prior to 1999

**Other Boards and Positions**
- American Chemistry Board (2022)
- Altria Group, Inc. (2018 to 2021)

**Mr. Newman was instrumental in Chemours' launch as a stand-alone, publicly-traded company and its continued transformation from a portfolio of businesses into a focused and profitable company. He has substantial leadership experience in strategy, business development, operations, corporate governance, and financial matters. Through his roles with Chemours and prior positions, he has a deep understanding of the chemical and industrial space.**

TABLE OF CONTENTS



**Guillaume Pepy**

**Director Since:** 2022

**Committee Memberships:** Audit, Compensation and Leadership Development

**Term of Office Expires:** 2022

**Age:** 63

**Business Experience:**
- Chairman and CEO, Societe Nationale SNCF SA (2008 to 2019), Chief Operating Officer (2003-2008), Deputy Chief Executive Officer (1998 to 2003), Head of Mainland Services (TGV) (1997 to 1998)
- Deputy Chief Executive Office, B2B Markets, SorresGroup (1996 to 1997)
- Chief Strategy Officer and Investment Director, SNCF (1993 to 1995)
- Chief of Staff to Minister of Labour, French Government (1991 to 1993), Chief of Staff to Minister of Labour (1990 to 1991)
- Chief of Staff, SNCF (1989 to 1990)
- Advisor to Minister of Budget, French Government (1988 to 1989)
- Deputy General Secretary, Council of State (1984 to 1988)

**Other Boards and Positions**
- Suez Morocco (LYDEC), Chairman (2021)

**Mr. Pepy brings a wealth of public and government sector experience in addition to expert perspective and insights into the regulatory and environmental landscapes in Europe. With his history of leading successful business transformations, Mr. Pepy's skills will contribute to Chemours' sustainable growth in this next chapter of our company.**



**Sandra Phillips Rogers**

**Director Since:** 2021

**Committee Memberships:** Audit, Nominating and Corporate Governance

**Term of Office Expires:** 2022

**Age:** 56

**Business Experience:**
- Group Vice President, Chief Legal Officer, General Counsel, Corporate Secretary and Chief Diversity Officer; oversight responsibility for Social Innovation, Sustainability and Regulatory Affairs and Compliance and Audit Office, Toyota Motor North America Inc. (January 2019 to present); Chief Diversity Officer (2015 to present); Vice President and Deputy General Counsel (2014 to 2015); Vice President and Assistant General Counsel (2012 to 2014)
- Partner, Complex Litigation Management and Strategy, Morgan, Lewis & Bockius LLP (2008 to 2012)
- Vice President, Assistant General Counsel and Chief Litigation Counsel, Pfizer (2008); Senior Vice President and Associate General Counsel (2006 to 2008); Vice President and Assistant General Counsel (2005 to 2006); Assistant General Counsel (2004 to 2005)

**Other Boards and Positions**
- MSA Safety Inc (2017 to Present)

**Ms. Rogers has substantial legal experience, along with her experience leading enterprise-level diversity and inclusion efforts. Ms. Rogers offers the board strong expertise in the legal, human capital, regulatory, and operational aspects of managing a large manufacturing company.**

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" THE ELECTION OF EACH OF ITS TEN DIRECTOR NOMINEES**

# CORPORATE GOVERNANCE

## Corporate Governance Highlights

➢ Declassified Board in 2016 — all directors elected annually
➢ 9 of 10 director nominees for 2022 are independent
➢ Independent Board Chair
➢ Highly qualified directors reflect broad and diverse mix of business backgrounds, skills and experiences — Skills Matrix added in 2019
➢ Board Refreshment — onboarded new directors in 2018, 2019, 2021, and 2022
➢ Diversity — increased to 60% Board member diversity based on gender and ethnicity in 2022
➢ Five of the six Audit Committee members are "audit committee financial experts"
➢ Majority voting for uncontested elections with a director resignation policy
➢ Executive sessions of independent directors at each regularly scheduled Board meeting

➢ Committee reassignments in February 2022
➢ Elimination of supermajority voting provision recommended and submitted for shareholder vote in 2021
➢ Nominating and Corporate Governance Committee responsible for ESG oversight
➢ Clawback (with express linkage to Code of Conduct and other corporate policies) and Anti-Hedging policies
➢ Directors and Officers must meet share ownership guidelines
➢ No director may stand for re-election after reaching age 75 with no provision for waivers or exemptions
➢ Annual Board and Committee self-evaluations
➢ Commitment to Corporate Responsibility — additional progress and publications. See highlights on page 11

## Corporate Governance Practices

The Board is committed to the highest standards of corporate governance, which is essential for sustained success and long-term shareholder value.

In light of this goal, the Board has adopted the Corporate Governance Guidelines, which provide the framework for the Board's corporate governance. The Nominating and Corporate Governance Committee of the Board reviews and assesses the Corporate Governance Guidelines annually and recommends changes to the Board as appropriate. Among other things, the Corporate Governance Guidelines provide that:

➢ Independent directors will meet regularly in executive session in conjunction with regularly scheduled Board meetings
➢ Directors have access to the Company's management and advisors, and are encouraged to visit the Company's facilities
➢ As necessary and appropriate, the Board and its Committees may retain outside legal, financial or other advisors
➢ The Board will make an annual self-evaluation of its performance with a particular focus on overall effectiveness

➢ Directors will avoid any actual or potential conflicts with the interests of the Company, and if any actual or potential conflict develops, will report all facts to the Board so that the conflict may be resolved, or the director may resign
➢ Shareholders and others interested in communicating directly with the Board, Chair or other outside director may do so by writing in care of the Corporate Secretary. The Board's independent directors have approved procedures for handling such correspondence received by the Company and addressed to the Board

The Corporate Governance Guidelines, along with the Charters of the Board Committees, the Company's Code of Conduct, Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Controller, and Code of Business Conduct and Ethics for the Board of Directors are available on the Company's website at www.chemours.com. under the heading "Investor Relations" and then "Corporate Governance."

10

## Corporate Responsibility Commitment (CRC) Highlights

➢ Expanded The Future of Chemistry Scholarship globally to provide scholarships and internships to underrepresented STEM students in our operating communities

➢ Awarded more than $4.7M in grants in support of our Vibrant Communities goal to improve lives by increasing access to STEM skills, safety initiatives, and sustainable environment programs within the communities where we operate, including investments to launch ChemFEST, a global school adoption program impacting access to early STEM education at schools around our Wilmington headquarters and our New Johnsonville and Chambers Works sites

➢ Employees in 13 countries dedicated more than 1,500 participation hours during our third global Corporate Responsibility Commitment (CRC) Day, reinforcing that our individual actions support collective progress

➢ In 2021, our teams in China achieved Great Places to Work certification, our team in Spain certified for a second time, and our Mexico teams certified for the fourth consecutive year in a row

➢ 15 Chemours teams were awarded our Catalyst for Better Award, a new company-wide award that celebrates technological innovations and solutions

➢ Received the 2021 American Chemistry Council (ACC) Responsible Care® Outstanding COVID-19 Response Efforts Award

➢ Recognized as a safe shipper of hazardous materials for the fifth year in a row with the Non-Accident Release Grand Slam Award from the Association of American Railroads

➢ Updated our Greenhouse Gas (GHG) reduction target from an intensity goal to an absolute goal of reducing Scope 1 and 2 emissions by 60% by 2030 from a 2018 baseline

➢ Announced aspiration to achieve net zero operations GHG emissions by 2050

➢ One of 32 companies to join the U.S. Department of Energy (DOE) Better Climate Challenge with a commitment to reduce energy intensity by 17% and reduce GHG emissions by 50% in 10 years

➢ Purchased renewable energy at our Mechelen, Belgium and Louisville, Kentucky sites

➢ Received 2021 American Chemistry Council (ACC) Sustainability Leadership Award for EVOLVE 2030 product sustainability methodology that we developed to assess the UN SDG contributions of our offerings

➢ Met and surpassed our Sustainable Supply Chain goal of assessing sustainability performance of 80% of suppliers by spend, with 82% of suppliers evaluated by end of 2021

➢ Included a new Taskforce for Climate-Related Financial Disclosures (TCFD) index in our most recent GRI compliant Corporate Responsibility Commitment Index Report and received a CDP climate rating of B

➢ Received Silver certification from EcoVadis for the third year in a row

➢ In 2021 100% of eligible employees met the annual corporate ethics and compliance training requirement by completing the Living Integrity Code of Conduct Training

11

OUR 2030 CORPORATE RESPONSIBILITY GOALS

| OUR PILLARS | OUR 2030 GOALS | OUR CONTRIBUTION TO THE UN SDGS |
| --- | --- | --- |
| **INSPIRED PEOPLE** | **EMPOWERED EMPLOYEES**<br>• Fill 50% of all positions globally with women<br>• Fill 20% of all US positions with ethnically diverse employees | 3 4 5 8 10 16 |
| | **SAFETY EXCELLENCE**<br>• Improve employee, contractor, process, and distribution safety performance by at least 75% | 8 |
| | **VIBRANT COMMUNITIES**<br>• Invest $50M in our communities to improve lives by increasing access to science, technology, engineering, and math (STEM) skills, safety initiatives, and sustainable environment programs | 4 6 8 11 15 |
| **SHARED PLANET** | **CLIMATE**<br>• Reduce absolute GHG emissions from operations by 60%<br>• Journey to net-zero operations by 2050 | 7 8 12 13 |
| | **WATER**<br>• Reduce air and water process emissions of fluorinated organic chemicals by 99% or more | 6 8 12 14 |
| | **WASTE**<br>• Reduce our landfill volume intensity by 70% | 8 12 15 |
| **EVOLVED PORTFOLIO** | **SUSTAINABLE OFFERINGS**<br>• Ensure that 50% or more of our revenue comes from offerings that make a specific contribution to the UN SDGs | 2 3 6 7 8 9 11 12 13 |
| | **SUSTAINABLE SUPPLY CHAIN**<br>• Establish a baseline for the sustainability performance of 80% of suppliers by spend and demonstrate 1.5% improvement | 5 6 8 10 12 13 15 |

To view our Corporate Responsibility Commitment Report and learn more about our goals, go to:
https://www.chemours.com/en/about-chemours/corporate-responsibility

12

## Board Oversight of Corporate Responsibility

Because environmental, social, and governance (ESG) matters are integral to the growth and long-term success of the Company, we believe that a two-tiered level of oversight provides the best avenue to integrate ESG risks and opportunities into our overall business strategy, and help us meet the changing demands of all our stakeholders — customers, partners, investors, employees and communities. The Nominating and Corporate Governance Committee is responsible for the oversight of the Company's policies, processes, performance metrics, and reporting in the areas of Corporate Responsibility, including environmental, social and governance. Our full Board is responsible for the oversight of our Corporate Responsibility strategy, standards, goals and performance. In addition, oversight of the enterprise risk management framework and cybersecurity risks is the responsibility of the Audit Committee. Oversight of a range of human capital management activities related to the effective recruitment, development and retention of the diverse talent necessary to support the long-term success of the Company is the responsibility of the Compensation and Leadership Development Committee.

Corporate Responsibility is embedded in our business processes, guides how we manage and operate our manufacturing sites, and inspires the new products and offerings we bring to market. Our growth strategy is directly linked to Corporate Responsibility so that we aim not only to grow, but to grow responsibly. Proposed corporate transactions and overall corporate strategy are reviewed by the full Board with input from management on ESG risks and opportunities. Our Board and its Committees receive regular updates from senior management on Corporate Responsibility matters, including environmental, health and safety (EHS), social issues, regulatory actions and product stewardship. Under the oversight of our Board, senior management continues to execute on our Corporate Responsibility commitments which focus on three key pillars — inspired people, a shared planet, and an evolved portfolio. With the Board's guidance, we have developed and are advancing progress on goals for climate change, water stewardship, waste management, diversity and inclusion, safety, product sustainability and sustainable sourcing.

## Board Leadership Structure

Mrs. Dawn L. Farrell began serving as Chair of the Board on January 1, 2022. During fiscal year 2021, Mr. Richard H. Brown served as the Chairman of the Board until July 1, 2021 and Mr. Mark P. Vergnano served as Chairman of the Board from July 1, 2021 to December 31, 2021. Mrs. Farrell served as Lead Independent Director from July 1, 2021 until December 31, 2021. The Company's governing documents allow the roles of Chair and Chief Executive Officer (CEO) to be filled by the same or different individuals. This approach allows the Board flexibility to determine whether the two roles should be separated or combined based upon the Company's needs and the Board's assessment of the Company's leadership from time to time. If the Board does not have an independent chairperson, the Board will appoint a Lead Independent Director

and determine the Lead Independent Director's duties and responsibilities. The Board will periodically consider the advantages of having an independent Chair or a combined Chair and CEO and is open to different structures as circumstances may warrant.

At this time, the Board has determined that separating the roles of Chair and CEO serves the best interests of Chemours and its shareholders. The Company's CEO and senior management, working with the Board, set the strategic direction for Chemours, and the CEO provides day-to-day leadership. The independent Chair leads the Board in the performance of its duties and serves as the principal liaison between the independent directors and the CEO.

13

TABLE OF CONTENTS

## Director Independence

The Nominating and Corporate Governance Committee of the Board is responsible for reviewing the qualifications and independence of members of the Board and its various Committees on a periodic basis, as well as the composition of the Board as a whole. This assessment includes members' qualifications as independent, as well as, consideration of skills and experience in relation to the needs of the Board. Director nominees are recommended to the Board by the Nominating and Corporate Governance Committee in accordance with the policies and principles in its Charter. The ultimate responsibility for selection of director nominees resides with the Board. The qualifications that the Board considers when nominating directors is discussed in more detail under "Director Nominees and Director Qualification Standards" in this Proxy Statement.

### Independent Directors

The Board assesses the independence of directors and examines the nature and extent of any relations between the Company and directors, their families and their affiliates. The Corporate Governance Guidelines provide that a director is "independent" if he or she satisfies the New York Stock Exchange (NYSE) Listing Standards on director independence and the Board affirmatively determines that the director has no material relationship with the Company (either directly, or as a partner, shareholder or officer of an organization that has a relationship with the Company). The Board has determined that, with the exception of Mark E. Newman and Mark P. Vergnano, each of the current directors — Curtis V. Anastasio, Bradley J. Bell, Mary B. Cranston, Curtis J. Crawford, Dawn L. Farrell, Erin N. Kane, Sean D. Keohane, Guillaume Pepy, and Sandra Phillips Rogers — is independent.

### Independent Committees

All members serving on the Audit Committee, the Compensation and Leadership Development Committee and the Nominating and Corporate Governance Committee must be independent as defined by the Corporate Governance Guidelines.

In addition, Audit Committee members must meet heightened independence criteria under NYSE Listing Standards and the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") relating to audit committees. Each Compensation and Leadership Development Committee member must meet heightened independence criteria under NYSE Listing Standards and the rules and regulations of the SEC relating to compensation committees and be a "non-employee director" pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act").

The Board has determined that each member of the Audit Committee, the Compensation and Leadership Development Committee, and the Nominating and Corporate Governance Committee meets the requisite independence and related requirements.

## Oversight of Risk Management

The Board of Directors is responsible for oversight of risk management and its leadership structure supports its effective oversight of the Company's risk management. In fulfilling its oversight responsibility, the Board receives various management and Board Committee reports and engages in periodic discussions with the Company's officers, as it may deem appropriate. In addition, each of the Board Committees considers the risks within its areas of responsibility. For example, the Audit Committee focuses on risks inherent in the Company's accounting, financial reporting and internal controls and reviews the Company's cybersecurity and information security programs; and the Compensation and Leadership Development Committee considers the risks that may be implicated by the Company's incentive compensation program. The Compensation and Leadership Development Committee's assessment of risk related to compensation practices is discussed in more detail in the "Compensation Discussion and Analysis" section of this Proxy Statement. The Nominating and Corporate Governance Committee provides oversight regarding the Company's policies on political

14

contributions and lobbying expenses. The Nominating and Corporate Governance Committee is also responsible for reviewing transactions between the Company and related persons, which is discussed in more detail under "Certain Relationships and Transactions" in this Proxy Statement.

Pursuant to its Charter, the Audit Committee assists the Board of Directors in oversight of the Company's compliance with legal and regulatory requirements. In fulfilling this role, the Audit Committee reviews with the Company's General Counsel or the attorney(s) designated by the General Counsel, any legal matters that may have a material impact on the Company's financial statements. The Audit Committee also meets at least annually with the

Chief Financial Officer (CFO) and other members of management, as the Audit Committee deems appropriate, to discuss in a general manner the policies and practices that govern the processes by which major risk exposures are identified, assessed, managed and controlled on an enterprise-wide basis. The Audit Committee reviews and discusses with management the Company's cybersecurity and information security programs. Additionally, on a general basis not less than annually, the Audit Committee reviews and approves the Company's decisions, if any, to enter into swaps, including security-based swaps, in reliance on the "end-user" exception from mandatory clearing and exchange trading requirements.

## Succession Planning

The Board plans for succession to the position of CEO. The Compensation and Leadership Development Committee, on behalf of the Board, oversees the succession planning process. To assist the Board, the CEO periodically provides the Board with an assessment of senior executives and their potential to succeed to the position of CEO, as well

as, perspective on potential candidates from outside the Company. The Board has available, on a continuing basis, the CEO's recommendation should he or she be unexpectedly unable to serve.

The CEO also provides the Board with an assessment of potential successors to key positions.

## Director Education

New directors participate in an orientation process to become familiar with the Company and its strategic plans and businesses, significant financial matters, core values including ethics, compliance programs, corporate governance practices and other key policies and practices through a review of

background materials, meetings with senior executives and visits to Company facilities. The Nominating and Corporate Governance Committee is responsible for providing guidance on directors' continuing education, and actively monitors and encourages director education opportunities.

## Code of Conduct

The Company is committed to high standards of ethical conduct and professionalism, and the Company's Code of Conduct confirms the commitment to ethical behavior in the conduct of all activities.

In furtherance of this commitment, the Company has adopted a Code of Conduct, a Code of Business Conduct and Ethics for the Board of Directors, and a Code of Ethics for the CEO, CFO and Controller.

➢ The Code of Conduct applies to all directors, officers (including the CEO, CFO and Controller) and employees of Chemours, and it sets forth the Company's policies and expectations on a

number of topics including avoiding conflicts of interest, confidentiality, insider trading, protection of Chemours and customer property, and providing a proper and professional work environment. The Code of Conduct sets forth a worldwide toll-free and Internet-based ethics hotline, which employees can use to communicate any ethics-related concerns, and the Company provides training on ethics and compliance topics for employees

➢ The Code of Business Conduct and Ethics for the Board of Directors applies to all directors, and is intended to (i) foster the highest ethical

15

standards and integrity; (ii) focus the Board and each director on areas of potential ethical risk and conflicts of interest; (iii) guide directors in recognizing and dealing with ethical issues; (iv) establish reporting mechanisms; and (v) promote a culture of honesty and accountability

➢ The Code of Ethics for the CEO, CFO and Controller applies to those three executive officers. This Code sets forth the standards of conduct that the CEO, CFO and Controller must uphold while performing his or her duties

➢ Each year, the Company trains 100% of its employees on the Code of Conduct

➢ In order to continuously improve and evolve its compliance program, the Company engages in regular risk assessments and conducts root cause analyses of any confirmed instances of ethical misconduct

In fiscal year 2021, there were no waivers of any provisions of (i) the Code of Conduct; (ii) the Code of Business Conduct and Ethics for the Board of Directors; or (iii) the Code of Ethics for the CEO, CFO and Controller. In the event the Company amends or waives any provision of any Code of Conduct or Code of Ethics that relates to any element of the definition of "code of ethics" enumerated in Item 406(b) of Regulation S-K promulgated under the Exchange Act, the Company intends to disclose these actions on the Company website at www.chemours.com.

## Shareholder Engagement

We maintain a very active and broad-based investor relations outreach program to solicit input and to communicate with shareholders on a variety of topics related to our business and strategy. We also speak to shareholders about governance matters, including our corporate governance profile and our corporate responsibility commitments. Throughout the year, our investor relations team and some of our executive officers and other key employees speak with shareholders at investor conferences, in-person meetings and phone conversations. We will continue to engage with shareholders on business, strategy, governance and other relevant topics.

## Policy on Hedging Transactions

We have adopted a policy that prohibits all officers and directors and all employees that receive or have access to material nonpublic information about the Company from engaging in transactions in publicly traded options, puts, calls or other derivative securities and from entering into hedges or swaps involving the Company's securities. Officers and Directors are also prohibited from pledging Chemours securities as collateral for a loan without special exception.

16

# BOARD STRUCTURE AND COMMITTEE COMPOSITION

The Board has eleven Directors now and three standing Committees: the Audit Committee, the Compensation and Leadership Development Committee, and the Nominating and Corporate Governance Committee.

The table below reflects the composition of each Committee at fiscal year end 2021, and the number of meetings held by each Committee during fiscal year 2021. Richard H. Brown during his tenure as Chairman of the Board and Mark P. Vergnano, as former Chief Executive Officer of the Company and then as Chairman of the Board, and Mark E Newman, as President and Chief Executive Officer, were not members of any Committee.

| | Audit Committee | Compensation and Leadership Development Committee | Nominating and Corporate Governance Committee |
|---|---|---|---|
| Curtis V. Anastasio | C | | X |
| Bradley J. Bell | | X | X |
| Mary B. Cranston | X | | C |
| Dr. Curtis J. Crawford | X | | |
| Dawn L. Farrell | X | X | |
| Erin N. Kane | X | X | |
| Sean D. Keohane | | C | X |
| Sandra Phillips Rogers | X | | X |
| 2021 Meetings | 4 | 8 | 7 |
| **X = Member** | | | **C = CHAIR** |

The Board met 9 times during fiscal year 2021. Each of the directors attended over 75% of the Board meetings and meetings of the Committees on which they served. The Company's Corporate Governance Guidelines provide that directors are expected to attend meetings of the Board, its Committees on which they serve, and the Annual Meeting of Shareholders.

Each Committee operates under a written charter. The Charters are available on the Company's corporate website, www.chemours.com, under the heading "Investor Relations" and subheading "Corporate Governance." The principal functions of each Committee are summarized below.

## Audit Committee

The responsibilities of the Audit Committee are more fully described in the Audit Committee Charter and include, among other duties, the fulfillment of its and the Board's oversight responsibilities relating to:

➢ The integrity of the financial statements of the Company
➢ The qualifications and independence of the Company's independent auditor, and in connection with the Committee's oversight in this regard, the Chair of the Audit Committee is engaged in the selection process for the audit engagement partner
➢ The performance of the Company's internal audit function and independent auditors
➢ Compliance by the Company with legal and regulatory requirements
➢ Conducting an annual Committee self-assessment and an assessment of the

independent audit firm, and reporting the results to the full Board
➢ Conducting a quarterly review of the Company's cyber security and information security programs

The Audit Committee consists entirely of independent directors, and each meets the heightened independence requirements under NYSE Listing Standards and the rules and regulations of the SEC relating to audit committees. Each member of the Audit Committee is financially literate and has accounting or related financial management expertise, as such terms are interpreted by the Board in its business judgment. Additionally, the Board of Directors has determined, in its business judgment, that each member of the Audit Committee is an "audit committee financial expert" for purposes of the rules of the SEC.

17

TABLE OF CONTENTS

## Compensation and Leadership Development Committee

The responsibilities of the Compensation and Leadership Development Committee are more fully described in the Compensation and Leadership Development Committee Charter and include, among other duties:

- ➢ Assess current and future senior leadership talent, including their development and the succession plans of key management positions (other than CEO)
- ➢ Assist the Board in CEO succession planning, including providing oversight of the CEO's succession planning process
- ➢ Review the Company's programs for executive development, performance and skills evaluations
- ➢ Conduct an annual review of the Company's diversity talent, as well as diversity representation on the slate for key positions
- ➢ Oversee the performance evaluation of the CEO based on input from other independent directors versus Board-approved goals and objectives
- ➢ Recommend to the independent members of the Board, compensation, including severance agreements as appropriate, for the CEO
- ➢ Review and approve compensation and employment arrangements, including equity compensation plans, bonus plans and severance agreements as appropriate, of the CEO and other senior executive officers

- ➢ Review the Company's incentive compensation arrangements to determine whether they encourage excessive risk-taking, review and discuss at least annually the relationship between risk management policies and practices and compensation, and evaluate compensation policies and practices that could mitigate any such risk. Review and approve the Compensation Discussion and Analysis and the Committee report, and other executive compensation disclosures, as required by the SEC to be included in the Company's Proxy Statement or applicable SEC filings
- ➢ Review the voting results of any say-on-pay or related shareholder proposals
- ➢ Conduct an annual Committee self-assessment and an assessment of the independent compensation consultant and report the results to the full Board

The Compensation and Leadership Development Committee consists entirely of independent directors, and each member meets the heightened independence requirements under NYSE Listing Standards and the rules and regulations of the SEC relating to compensation committees; and is a "non-employee director" for purposes of Rule 16b-3 promulgated under the Exchange Act.

## Compensation Committee Interlocks and Insider Participation

During fiscal year 2021, none of the members of the Compensation and Leadership Development Committee was an officer or employee of the Company. No executive officer of the Company served on the compensation committee (or other board committee performing equivalent functions) or on the board of directors of any company having an executive officer who served on the Compensation and Leadership Development Committee or the Board.

18

## Nominating and Corporate Governance Committee

The responsibilities of the Nominating and Corporate Governance Committee are more fully described in the Nominating and Corporate Governance Committee Charter and include, among other duties:

➢ Develop and recommend to the Board of Directors a set of corporate governance guidelines for the Company

➢ Identify individuals qualified to become Board members consistent with criteria approved by the Board and recommend to the Board nominees for election as directors of the Company, including nominees whom the Board proposes for election as directors at the Annual Meeting

➢ Review and approve any transaction between the Company and any related person in accordance with the Company's policies and procedures for transactions with related persons

➢ Oversee the Company's corporate governance practices, including reviewing and recommending to the Board of Directors for approval any changes to the Company's Code of Conduct, Certificate of Incorporation, Bylaws and Committee Charters

➢ Oversee the Company's policies, performance, and reporting in the areas of corporate responsibility, including environmental, social and governance

➢ Conduct an annual assessment of the Committee's performance, oversee the self-evaluation process of the entire Board of Directors and its other Committees, establish the evaluation criteria, implement the process and report its findings on the process to the Board of Directors

The Nominating and Corporate Governance Committee consists entirely of independent directors, and each meets the independence requirements set forth in the NYSE Listing Standards.

19

TABLE OF CONTENTS

# DIRECTOR COMPENSATION

## Overview

Non-employee directors receive compensation for Board service, which is designed to fairly compensate them for their Board responsibilities and align their interests with the long-term interests of shareholders. The Nominating and Corporate Governance Committee, which consists solely of independent directors, has the primary responsibility to review and consider any revisions to directors' compensation.

During fiscal year 2021, non-employee directors were entitled to the following annual retainers:

**Fiscal Year 2021 Director Retainers**

| | |
|---|---|
| Annual Retainer[1] | $100,000 |
| Annual Equity Award[2] | $145,000 |
| Non-Executive Chairman Retainer[1] | $110,000 |
| Lead Independent Director[3] | $ 35,000 |
| Audit Committee Chair Retainer[1] | $ 20,000 |
| Compensation and Leadership Development Committee Chair Retainer[1] | $ 15,000 |
| Nominating and Corporate Governance Committee Chair Retainer[1] | $ 15,000 |

(1)  Amounts payable in cash may be deferred pursuant to The Chemours Company Stock Accumulation and Deferred Compensation Plan for Directors (the "Directors Deferred Compensation Plan"), which is described further below.

(2)  Equity awards are valued as of the grant date and rounded down to the nearest whole share. Equity awards may be deferred pursuant to Directors Deferred Compensation Plan. For 2021, equity awards were in the form of shares of common stock or for directors who elected to defer their equity awards, deferred stock units (DSUs) that convert into shares of common stock when a director leaves the Board or on a grant date anniversary selected by the director. Before DSUs are converted into shares, directors are not entitled to dividends on the DSUs, but they receive dividend equivalents (credited in the form of additional DSUs) that likewise are converted into shares (with any fractional share paid in cash) upon termination of service or on a grant date anniversary selected by the director.

(3)  This was a new position for the period July 1, 2021 through December 31, 2021.

The fees reflected in the table above assume service for a full year. Directors who serve for less than the full year are entitled to receive a pro-rated portion of the applicable payment. Each "year," for purposes of non-employee director compensation, begins on the date of the Company's annual meeting of shareholders. The Company does not pay meeting fees, but does pay for or reimburse directors for reasonable expenses related to Board service, including for attending Board, Committee, educational and Company business meetings.

During 2021, the Nominating and Corporate Governance Committee reviewed, after consultation with the independent compensation consultant, Willis Towers Watson, the annual amount of the non-employee director equity and cash compensation and recommended no changes to equity, but recommended several changes to cash compensation, which the Board adopted. The Board approved the following changes for non-employee Directors effective January 1, 2022: Board Chairman annual cash retainer: $150,000; Audit Committee Chair annual cash retainer: $22,500; Compensation Committee Chair annual cash retainer: $17,500; and Nominating and Corporate Governance Chair annual cash retainer: $17,500. These changes were calibrated to align these cash retainers with the current market and remit of the Committees. The Board believes the compensation program is in the best interest of the Company and designed to fairly compensate directors for their Board responsibilities and align their interests with the long-term interests of shareholders.

The Board has adopted share ownership guidelines applicable to non-employee director equity awards. The share ownership guidelines, contained in the Corporate Governance Guidelines, require non-employee directors to hold at least six (6) times the cash portion of their annual retainer worth of Chemours common stock, restricted stock units (RSUs) and/or DSUs while serving as a director. Non-employee directors will have five (5) years to attain this ownership threshold from the time of their election to the Board.

## The Chemours Company Stock Accumulation and Deferred Compensation Plan for Directors

Under the Stock Accumulation and Deferred Compensation Plan for Directors, a director is eligible to defer all or part of his or her Board retainer and Committee Chair fees in an interest-bearing notional cash account or stock units until a future year or years, payable in a lump sum or equal annual installments. Interest will accrue on the notional cash account at a rate corresponding to the average 30-year Treasury securities rate applicable for the quarter (or at such other rate as may be specified by the Compensation Committee from time to time) with quarterly compounding. Dividend equivalents will accrue on deferred stock units. This deferred compensation is an unsecured obligation of the Company.

## 2021 Director Compensation Table

The following table shows information concerning the compensation paid in fiscal year 2021 to non-employee directors:

| Director | Fees Earned or Paid in Cash ($)[2] | Equity Awards ($)[3] | Total ($) |
|---|---|---|---|
| Curtis V. Anastasio | 120,000 | 144,987 | 264,987 |
| Bradley J. Bell | 105,000 | 144,987 | 249,987 |
| Richard H. Brown | 105,000 | 144,987 | 249,987 |
| Mary B. Cranston | 115,000 | 144,987 | 259,987 |
| Curtis J. Crawford | 100,000 | 144,987 | 244,987 |
| Dawn L. Farrell | 135,000 | 144,987 | 279,987 |
| Erin N. Kane | 100,000 | 144,987 | 244,987 |
| Sean D. Keohane | 115,000 | 144,987 | 259,987 |
| Mark P. Vergnano[1] | 160,000 | 144,996 | 304,996 |
| Sandra P. Rogers | 25,000 | 144,982 | 169,982 |

(1) From January 1, 2021 — July 1, 2021, Mr. Vergnano was an employee of the Company. The amounts noted in this table reflect compensation earned while serving as Chairman of the Board from July 1, 2021 — December 31, 2021. See "Executive Compensation — Summary Compensation Table" in this Proxy Statement for information relating to the total compensation paid to Mr. Vergnano during 2021, including the compensation earned for the first half of fiscal year 2021 when he was an employee.

(2) Column reflects all cash compensation earned during fiscal year 2021, whether or not payment was deferred pursuant to the Directors Deferred Compensation Plan.

(3) This column represents the dollar amount recognized for financial statement reporting purposes with respect to fiscal year 2021 in accordance with FASB ASC 718 as the grant date fair value of compensation earned by directors in the form of DSUs of Chemours common stock or shares of common stock. This value is determined by dividing the annual equity award amount by the closing share price on the date of grant and rounding down to the next whole share, then multiplying by the closing share price on the grant date.

TABLE OF CONTENTS

The aggregate number of RSUs and DSUs held by each non-employee director at fiscal year-end is as follows:

| Name | Aggregate Equity RSUs and DSUs Outstanding as of December 31, 2021 |
|---|---|
| Curtis V. Anastasio | 59,330 |
| Bradley J. Bell | 53,181 |
| Mary B. Cranston | 62,934 |
| Curtis J. Crawford | 81,494 |
| Dawn L. Farrell | 62,934 |
| Erin N. Kane | 29,121 |
| Sean D. Keohane | 28,485 |
| Mark P. Vergnano | 87,223 |
| Sandra P. Rogers | 5,085 |

22

# SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

## Security Ownership of Directors and Management

The following table sets forth information with respect to the beneficial ownership of Chemours' common stock as of March 2, 2022 by each of the Company's directors and nominees, named executive officers, and all directors and executive officers as a group.

Amount and nature of beneficial ownership:

| Name of beneficial owner | Direct[1] | Indirect[2] | Right to acquire[3] | Total | Percent of Class |
|---|---|---|---|---|---|
| Mark E. Newman | 149,576 | 2,480 | 593,472 | 745,528 | * |
| Mark P. Vergnano | 85,349 | 728,673 | 1,759,078 | 2,573,100 | 1.6% |
| Sameer Ralhan | 262,552 | — | 256,785 | 519,337 | * |
| Edwin Sparks | 19,854 | — | 64,391 | 84,245 | * |
| David C. Shelton | 30,290 | 91,992 | 226,545 | 348,827 | * |
| Bryan Snell | 18,203 | — | 173,402 | 191,605 | * |
| Susan Kelliher | 18,778 | — | 94,774 | 113,552 | * |
| Curtis V. Anastasio | 2,692 | 3,500 | 52,919 | 59,111 | * |
| Bradley J. Bell | 8,737 | 20,400 | 46,823 | 75,960 | * |
| Mary B. Cranston | 2,834 | — | 56,067 | 58,901 | * |
| Curtis J. Crawford | 27,703 | 47 | 66,279 | 94,029 | * |
| Dawn L. Farrell | — | — | 56,067 | 56,067 | * |
| Erin N. Kane | — | — | 27,099 | 27,099 | * |
| Sean D. Keohane | — | — | 26,403 | 26,403 | * |
| Sandra P. Rogers | — | 378 | 5,046 | 5,424 | * |
| Guillaume Pepy | — | — | 1,395 | 1,395 | * |
| Directors, nominees and executive officers as a group (19 persons) | 639,449 | 847,470 | 3,449,254 | 4,936,174 | 3.04% |

\* Indicates ownership of less than 1% of the outstanding shares of Chemours common stock. Each of the Company's executive officers and directors may be contacted at 1007 Market Street, Wilmington, DE 19801.

(1) Shares held individually or jointly with others, or in the name of a bank, broker or nominee for the individual's account.

(2) Shares over which directors, nominees and executive officers may be deemed to have or share voting or investment power, including shares owned by trusts and certain relatives.

(3) Shares which directors and executive officers had a right to acquire beneficial ownership of within 60 days from March 2, 2022, through the exercise of stock options or through the conversion of stock units held under the Company's equity-based compensation plans.

TABLE OF CONTENTS

## Security Ownership of 5% Beneficial Owners

Based solely on the information filed on Schedule 13G for the fiscal year ended December 31, 2021, the following table sets forth those shareholders who beneficially own more than five percent of Chemours common stock.

| Name and Address of Beneficial Owner | Number of Shares Beneficially Owned | Percent of Class[5] |
|---|---|---|
| The Vanguard Group[1]<br>100 Vanguard Blvd.<br>Malvern, PA 19355 | 16,327,974 | 10.14% |
| BlackRock, Inc[2],<br>55 East 52nd Street<br>New York, NY 10055 | 14,015,490 | 8.70% |
| FMR LLC[3]<br>245 Summer Street<br>Boston, MA 02210 | 13,964,251 | 8.67% |
| Sessa Capital[4],<br>888 Seventh Avenue, 30th Floor<br>New York, NY 10019 | 8,193,436 | 5.09% |

(1)  Based solely on a Schedule 13G/A regarding holdings in Chemours common stock filed with the SEC on February 11, 2022, The Vanguard Group reported that it had shared voting power with respect to 99,015 shares, sole dispositive power with respect to 16,097,978 shares, and shared dispositive power with respect to 229,996 shares as of December 31, 2021.

(2)  Based solely on a Schedule 13G/A regarding holdings in Chemours common stock filed with the SEC on February 3, 2022, BlackRock, Inc. reported that it had sole voting power with respect to 13,260,466 shares and sole dispositive power with respect to 14,015,490 shares as of December 31, 2021.

(3)  Based solely on a Schedule 13G/A regarding holdings in Chemours common stock filed with the SEC on February 9, 2022, FMR LLC reported that it had sole voting power with respect to 447,527 shares and sole dispositive power with respect to 13,964,251 shares as of December 31, 2021.

(4)  Based solely on a Schedule 13G/A regarding holdings in Chemours common stock filed with the SEC on February 14, 2022, Sessa Capital reported that it had sole voting power with respect to 8,193,436 shares, and sole dispositive power with respect to 8,193,436 shares as of December 31, 2021

(5)  Ownership percentages based on 161,046,732 shares outstanding as of December 31, 2021.

# EXECUTIVE COMPENSATION

## Compensation Discussion and Analysis

| Name | Position |
|---|---|
| Mark Newman | President and Chief Executive Officer (July — December) |
| Mark Vergnano | President and Chief Executive Officer (January — June) (retired July 2021) |
| Sameer Ralhan | Senior Vice President, Chief Financial Officer |
| Edwin Sparks | President, Titanium Technologies and Chemical Solutions (March — December) |
| David Shelton | Senior Vice President, General Counsel and Corporate Secretary |
| Susan Kelliher | Senior Vice President, People |
| Bryan Snell | President, Titanium Technologies (retired July 2021) |

This Compensation, Discussion and Analysis is organized into five sections:
- Executive Summary
- Executive Compensation Philosophy and Pay-for-Performance
- Executive Compensation Decision Making
- 2021 Executive Compensation
- Company Sponsored Employee Benefits

## Executive Summary

**2021 Business Highlights**

In 2021, our business performance rebounded from pandemic lows in 2020 to robust pre-pandemic levels. As part of our continued transformation since spin, we accelerated a number of strategic initiatives designed to improve growth, drive higher quality earnings and cash, reduce risk for our business, and improve the long-term sustainability and performance of Chemours. In addition, we continue to exercise a balanced approach to capital allocation to ensure that cash flow generation funds investments in the capital programs needed to grow and improve the returns of the business long-term. We returned the majority of our free cash flow to shareholders through our dividend and share repurchases while reducing gross debt.

Our 2021 Results include:
- Net Sales of $6.3 billion, up 28% on a year-over-year basis
- GAAP Net Income of $608 million with EPS of $3.60 up $2.28 year-over-year
- Adjusted Net Income of $674 million with Adjusted EPS of $4.00 up $2.02 year-over-year
- Adjusted EBITDA of $1,313 million, up 49% on a year-over-year basis
- Free Cash Flow of $543 million
- Repurchased $173 million in stock, paid $164 million in dividends and reduced debt by $204 million
- Reduced net leverage to 1.8 times on a trailing twelve-month Adjusted EBITDA basis
- Achieved a 35% stock price appreciation in 2021 and a 5-year TSR of 80%
- Improved employee and contractor safety performance with zero workplace COVID-19 recordable incidents

Connected to our strong financial results, we achieved a number of important strategic milestones in 2021 that helped drive results and improve our focus on sustainable growth, including:
- Demonstrating the value of our Ti-Pure™ Value Stabilization (TVS) strategy by regaining market share among multinational competitors, optimizing channel participation, and building a strong contractual book of business with key global strategic customers.

25

- Driving enhanced customer focus, accountability and transparency through the formation of our Thermal & Specialized Solutions (TSS) and Advanced Performance Materials (APM) segments, which were previously part of our Fluoroproducts Segment. These new segments are poised to capture secular growth trends in low global warming potential refrigerants, clean energy and advanced electronics.
- Significantly de-risking the company by signing a Memorandum of Understanding (MOU) with DuPont de Nemours, Inc. (DuPont), E. I. du Pont de Nemours and Company (EID), and Corteva, Inc. (Corteva), which provides a cost sharing mechanism and escrow account for use in resolving legacy PFAS liabilities. This resolved a long-standing dispute with our former parent that brought additional certainty to the organization and its shareholders and will benefit all our stakeholder communities. This agreement was a significant result for Chemours in 2021.
- The successful transition of our Chief Executive Officer from Mark P. Vergnano to our Chief Operating Officer, Mark E. Newman, with full support and guidance from our Board as part of a well-defined and executed long-term succession plan.
- The divestiture of our Mining Solutions business to Draslovka Holding a.s. for $521 million on December 1, 2021, which generated significant proceeds and which will support our increased focus in our key businesses going forward.

Despite the headwinds and supply chain challenges of 2021, many of which were COVID-19 related, Chemours' actions and the efforts of its leadership team delivered strong operating performance across our business segments.

In our Titanium Technologies (TT) segment, we achieved market momentum through strong customer preference for our Ti-Pure$^{TM}$ products and the supply and pricing assurances afforded through our TVS channels. We achieved 40% revenue growth in the year driven by volume and price increases in our contracted, Flex and distribution channels, which resulted in significant revenue share gains against our multinational competitors. We exited 2021 with what we believe is the strongest book of contracted business in our history, a recognition of the customer value proposition our TVS strategy delivers.

In our Thermal & Specialized Solutions (TSS) segment, volume and price increased as demand rebounded across our key markets, despite demand weakness in auto OEM sales driven by semiconductor shortages. Favorable product mix and execution helped to offset headwinds from raw material inflation and contractual price reductions. Adoption of Opteon™ low global warming potential refrigerants remained strong, driven by the economic recovery and a continued recognition of the importance of Chemours' climate friendly chemistries which are being supported by changing regulations and equipment OEM adoption around the world.

In our Advanced Performance Materials (APM) segment, we delivered record Net Sales and Adjusted EBITDA performance as the recovery bolstered demand for our fluoropolymers and our efficiency programs enabled significant margin expansion. Pricing actions across 2021 helped to offset raw material inflation throughout the year. Sales performance was strong across all end markets and geographies. We continue to invest behind key growth areas including clean energy (such as our Nafion™ membranes) and advanced electronics (such as our PFA melt products) and believe we are in the early stages of significant secular growth in these markets where our chemistry remains essential.

In our Chemical Solutions segment, demand recovered from 2020 lows resulting in higher price and volumes across the segment. Demand for our Mining Solutions and PC&I products improved across most geographies and end markets. In December 2021, we sold our Mining Solutions business for $521 million to Draslovka Holding a.s. as part of our strategy to focus on sustainable growth in our key businesses.

Adjusted EBITDA, Adjusted EPS, Adjusted Net Income, Free Cash Flow and Net Leverage Ratio are non-GAAP financial measures. Please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations — Non-GAAP Financial Measures" starting on page 67 of the Company's Annual Report on Form 10-K for the year ended December 31, 2021 for a reconciliation of Adjusted EBITDA, Adjusted EPS, Adjusted Net Income, Free Cash Flow and Net Leverage Ratio to the most directly comparable GAAP measure.

In 2021, we made significant progress on our Corporate Responsibility Commitment (CRC) goals — our 10 ambitious goals designed to demonstrate our commitment to an Evolved Portfolio, Shared Planet and Inspired People. Of note, we enhanced our Climate Goal to achieve a 60% reduction in Scope 1 & 2 GHG emissions by 2030 and to achieve Net Zero by 2050.

26

Finally, Chemours was recognized as a certified Great Place To Work™ in a number of geographies — including Mexico, China, and Spain. These recognitions are the steps in our journey to becoming the greatest place to work and to ensure that Chemours has the best talent pipeline to continue to thrive over the long term.

**2021 Executive Compensation Highlights**

Chemours' Executive pay programs are highly performance-based, with payouts under both the short-term and long-term incentive programs dependent on meeting financial and operational objectives over various performance periods. In recognition of exceptional performance in 2021, the Company as a whole and all business units achieved overall results that were well above target for our Annual Incentive Plan (AIP). However, the 2019-2021 Long-Term Incentive Plan delivered PSU equity awards at 50% of target value because Chemours' Relative TSR modifier was in the 4th quartile of TSR performance.

**Named Executive Officer (NEO) Compensation**

2021 was a year of significant change amongst the Chemours Executive team. Mark Newman assumed the President and CEO role following the retirement of Mark Vergnano on July 1, 2021. We were pleased to execute our succession plan for this position promoting Mr. Newman to this role. Additionally, Edwin Sparks assumed a new leadership role for our Titanium Technologies (TT) business on March 1, 2021, succeeding Bryan Snell who went on special assignment prior to his retirement on July 2, 2021. Once again, we were pleased to follow our succession plan for the role promoting this highly talented Executive.

While not currently NEOs, it is worth mentioning the promotion of Alisha Bellezza (Thermal & Specialized Solutions — TSS) and Denise Dignam (Advanced Performance Materials — APM) to Business Unit Presidents in March. We are proud to, once again, have followed our talent and succession plan to elevate these key executives to these roles. Their promotions further diversify our leadership team, which now includes four (4) women in key executive leadership positions.

Aligned to these new and expanded responsibilities, the following adjustments were made to executive compensation as a result of the above changes, market conditions, and our continued focus on retaining our top talent.

- Mark Newman's compensation was adjusted to reflect his promotion to President and CEO as of July 1st. His compensation was recommended by the Compensation and Leadership Development Committee (CLDC) and was approved by the Board of Directors with the support of the independent compensation consultant Willis Towers Watson (WTW). The Board considered Mr. Newman's experience as well as the compensation provided to chief executive officers of our peers. Effective July 1, 2021, Mr. Newman's base salary was increased to $975,000, his Annual Incentive Plan target increased to $1,170,000 (120% of base salary) and his long-term incentive target increased to $4,300,000. He received a grant upon promotion in the amount of $1,400,000 in recognition of his partial year as CEO in 2021. The grant amount was calculated using the annual grant target for the CEO role based on a partial year in position and factoring in the grant he received in March 2021 related to his prior role as chief operating officer. Accordingly, the Equity vehicles for this grant aligned with the annual grant process: 50% PSUs, 40% NQSOs and 10% RSUs. Mr. Newman's full year Total Direct Compensation (TDC = base salary plus short term and long term incentive targets) at target is now $6,445,000.
- In early 2021, Sameer Ralhan's base salary, short-term and long-term incentive target opportunities were adjusted. The CLDC believed these changes were appropriate after a careful review of 2020 performance, internal equity, his expanded job responsibilities to include IT and Procurement, and compensation paid by our peers for executives in comparable roles. As a result, Mr. Ralhan's 2021 base pay increased to $625,000 and his short-term incentive target to $500,000 (80% of base salary) and his long-term incentive target to $1,200,000. These changes increased his Total Direct Compensation at target to $2,325,000.
- In early 2021, Edwin Sparks' long-term incentive target was adjusted. This adjustment further aligned Mr. Sparks' compensation to what is paid by industry peers to executives in comparable roles, while also recognizing his leadership of the Titanium Technologies and Chemical Solutions Business Units. Mr. Sparks' long-term incentive target increased $100,000 to $900,000. This increased his Total Direct Compensation at target to $1,862,500.
- Mr. Vergnano, Mr. Shelton, Ms. Kelliher and Mr. Snell's Total Direct Compensation remained unchanged in 2021.

27

- Mr. Vergnano retired from the organization as of July 1, 2021. Consistent with the Board's rigorous talent and succession planning process, he was succeeded by Chief Operating Officer, Mr. Newman. At that time, Mr. Vergnano assumed the role of Chairman of the Board and served until year end 2021. Mr. Vergnano is not standing for reelection to the Board. For purposes of determining the Annual Incentive Plan award, full fiscal year Corporate performance was used to determine a prorated award. His stock options and restricted stock units continued to vest in accordance with the terms of our award agreements. Mr. Vergnano's Performance Stock Units were prorated as if he were employed through December 31, 2021. The CLDC determined this treatment was appropriate in light of Mr. Vergnano's continued role with the company, his support of the CEO transition process, and his performance during his tenure as CEO.
- The CLDC assessed the milestone of achieving a long-term agreement with DuPont, EID, and Corteva on PFAS liabilities and determined that the reward for this accomplishment did not fit within the parameters of the current compensation system, which is primarily focused on short and medium term financial metrics that impact the Company's performance. The CLDC determined that the agreement reduced uncertainty for shareholders and other stakeholders. After extensive analysis of practical ways to reward management for such an accomplishment, the Committee determined that one-time grants for the Mr. Vergnano and Mr. Shelton were in order. Given the long-term impact of this agreement, typical financial parameters could not be used practically to reflect the outcome of this agreement on the future success of Chemours. Mr. Vergnano received a one-time grant of RSUs with a grant date fair value of $1,000,000, which vests equally over three years, and Mr. Shelton received a one-time grant of RSUs with a grant date fair value of $500,000, which vests equally over three years.
- Bryan Snell retired from the organization as of July 2, 2021. He was afforded the standard plan provisions as reflected in our incentive plans and form of award agreements. Mr. Snell's Annual Incentive Plan was paid on a prorated basis at 100% of target. Mr. Snell received an additional $290,000 in stock options as part of the annual compensation process in recognition of the value created by the Ti Pure ™ Value Stabilization (TVS) strategy, the expected long-term future improvement in business results from the implementation of that strategy change starting in 2019, and the work he did to ensure a timely transition to his successor. His stock options and restricted stock units continued to vest in accordance with the terms of our award agreements. Mr. Snell's Performance Stock Units were treated in accordance with our plan provisions. The target shares have been prorated based on the number of calendar days he worked during the performance period.

Mr. Snell was offered and accepted a consulting arrangement with us from July 3, 2021 through December 31, 2021 for which he earned $18,333.33 per month. Mr. Snell consulted based on his expertise related to TVS, which was launched under his leadership. He also provided insights on key TT global accounts. Additionally, Mr. Snell agreed to a two-year non-compete agreement under which he may be paid a total of $600,000, payable in two equal installments between January 31, 2022 and January 31, 2023.

**Annual Incentive Plan (AIP)**

The Compensation and Leadership Development Committee (CLDC or the Committee) modified the short-term incentive plan for 2021 to ensure that management's incentives were aligned with emerging important business metrics. The plan maintained a strong focus on key Corporate and Business Unit measures, but the mix of Corporate and Business Unit metrics shifted slightly with the addition of Environmental, Social and Governance (ESG) metrics. For executives designated as corporate employees, the metrics were weighted 85% for the Corporate metrics and 15% for ESG metrics; executives assigned to business units have metrics weighted 20% for Corporate metrics, 65% for Business Unit metrics, and 15% for ESG metrics. The plans were also adjusted to recognize the organizational split of the Fluoroproducts segment into the Advanced Performance Materials (APM) and the Thermal & Specialized Solutions (TSS) segments.

For Chemours as a whole, the financial metrics remained focused on Free Cash Flow and Adjusted EBITDA as management and the CLDC believe these measures reinforce the importance of earnings and cash generation to the achievement of Chemours' objectives, as well as their importance to shareholders. Likewise, the focus for the business units remained on Adjusted EBITDA and Free Cash Flow. Additionally, the CLDC approved specific Business Unit metrics to reinforce their importance to each business unit. Specifically, TT continued to have a market share target, TSS had a special Opteon™ variable contribution target, and APM had a revenue target. Consistent with our bold Corporate Responsibility Commitments, the CLDC approved introducing Environmental,

28

Social and Governance (ESG) metrics representing 15% of the plan design. Specifically, we introduced both gender diversity and environmental project metrics. Gender diversity was assigned a 9% weight, while the environmental projects metric was assigned a 6% weight.

**2021 AIP Results**

As documented in the Business Highlights summary, Chemours achieved outstanding outcomes in 2021. The business success translated into a high-level achievement against our Adjusted EBITDA and Free Cash Flow metrics and the business advanced well ahead of results in 2020. Both at the Corporate and business unit level, financial metric performance was above 100% of target. For our ESG metrics, the Company achieved maximum performance on the environmental projects but failed to meet the threshold for increasing the percentage of women in the Company. The overall result was annual incentive achievement that exceeded 100% for the Company as a whole and for each of the business units. Specifically, the 2021 Chemours Corporate AIP payout was 179%, Titanium Technologies 178%, Thermal and Specialized Solutions 140%, Advanced Performance Materials 172%, and Chemical Solutions 127% of target.



**2021 Long — Term Incentive Plan (LTIP)**

The CLDC also approved minor plan design changes to the Long-Term Incentive Plan for 2021. The LTIP award mix is 90% performance-based, consisting of PSUs and stock options, which increase in value when our share price increases above the share price on the date of grant. In 2021, the mix of equity award types was updated to include Restricted Stock Units with vesting tied to continued service and representing 10% of the long-term incentive mix. With this change, the new mix is 50% PSUs, 40% stock options and 10% RSUs. The CLDC approved this change because it provides a strong performance orientation with a balance of long-term retention of talent to drive the company strategy. The CLDC believes that this balance is optimal to drive long-term shareholder value and is aligned with competitive market practice. The change was verified as reflecting market practice by Willis Towers Watson, the CLDC's independent compensation consultant.

The stock options and RSUs vest annually in three-equal installments from the date of grant.

Consistent with the 2020 PSUs, the PSUs are earned based on performance over a three-year performance period, reflecting the long-term nature of the awards. The performance metrics used in the 2021 PSU awards remained Adjusted Net Income and Free Cash Flow Conversion, which were equally weighed. Relative Total Shareholder Return (Relative TSR) remained a modifier, ranging from 50% to 150% based on relative stock performance to our selected peers.

**2019- 2021 PSU Award Results**

The overall performance result for the 2019 — 2021 PSU Award was 50% of target. The achievement for this award was based on pre-established three-year cumulative targets for Adjusted Net Income and Free Cash Flow Conversion. These metrics were equally weighted in the plan. Adjusted Net Income, which was unfavorably impacted by the market share loss from the Ti-Pure™ Value Stabilization (TVS) implementation in 2019 and significant demand contraction in all businesses from the COVID-19 pandemic in 2020, did not reach the

29

threshold for payment, which resulted in no award for this metric. Free Cash Flow Conversion exceeded the maximum of the target range, which resulted in a 200% award for this metric. The blended outcome for the performance achievement for these metrics was 100%.

Under the 2019 — 2021 PSU Award, performance results were subject to adjustment by a Relative TSR modifier over the three-year performance period. Over the three-year period ending December 31, 2021, Chemours delivered Relative TSR below the 25th percentile for the peer group described in the section titled, "2019 — 2021 PSU Award Results," resulting in the number of PSUs earned being reduced by 50%.

**Executive Compensation Governance and Best Practices**

Chemours' executive compensation policies and practices demonstrate a commitment to strong governance standards and include features designed to mitigate compensation-related risks. The table below highlights the key features of Chemours' executive compensation programs and those features that Chemours does not employ:

| What Chemours Does | | What Chemours Doesn't Do | |
|---|---|---|---|
| ☑ | Pay-for-performance | ☒ | Provide income tax gross-ups, other than for international assignment and / or relocation |
| ☑ | Deliver total direct compensation predominantly through variable pay | ☒ | Re-price underwater stock options |
| ☑ | Set challenging short- and long-term incentive award goals | ☒ | Allow hedging, pledging, short sales, derivative transactions, margin accounts or short-term trading |
| ☑ | Target pay and benefits to market competitive levels | ☒ | Have a liberal share recycling provision in our equity plan |
| ☑ | Maintain robust stock ownership requirements | ☒ | Provide single tigger change in control |
| ☑ | Maintain a clawback policy for incentive-based compensation | | |
| ☑ | Annually review the constituents of Compensation and Performance peer groups and adjust as appropriate | | |
| ☑ | Undertake an annual review of compensation risk | | |
| ☑ | Offer limited perquisites | | |
| ☑ | Regularly review compensation, especially incentive compensation to ensure continued alignment with Chemours' strategy | | |

**2021 "Say on Pay" Vote Result**

At Chemours' 2021 Annual Meeting, shareholders approved the Company's "Say-on-Pay" proposal with 94% of the votes cast in support of the executive compensation program. The Compensation and Leadership Development Committee is committed to regularly reviewing the program in the context of Chemours' compensation philosophy and will continue to consider shareholder input in evaluating executive compensation program design and decisions.

## Executive Compensation Philosophy and Pay-for-Performance

**Executive Compensation Philosophy**

The objectives of Chemours' executive compensation philosophy are rooted in:
  • Promoting a performance-based culture that strongly links executive rewards to shareholder interests and to the Company's strategic and financial goals
  • Providing a competitive total compensation opportunity designed to attract, retain, and motivate high-performing executive talent

These objectives are achieved through fixed and variable compensation elements. The Compensation and Leadership Development Committee determines the appropriate balance between these elements in setting the Total Direct Compensation (TDC = base salary, plus short term and long term incentive targets) opportunity for executives. The Compensation Philosophy was reviewed and approved with no modifications by the Committee mid-year.

| Element | Purpose and Key Features |
|---|---|
| Base Salary | ➢ Salary paid in cash<br>➢ Provides a stable source of income and is a standard element in executive compensation packages<br>➢ Compensates for expected day to day contribution<br>➢ Supports equitable pay practices |
| Annual Incentive Plan (AIP) | ➢ Cash incentive earned and awarded annually<br>➢ Creates a variable incentive opportunity as a portion of the executive compensation package<br>➢ Reinforces and rewards executives for delivering key business goals which are short term in nature<br>➢ Pays only when minimum performance criteria are met and pays above market when target performance criteria are exceeded<br>➢ Focuses on quantitative metrics but includes qualitative metrics when appropriate<br>➢ Includes a mix of corporate and business unit metrics. |
| Long-Term Incentive Plan (LTIP) | ➢ Long-term equity-based Incentives earned and awarded periodically in various forms of equity: RSUs, PSUs, and/or Stock Options<br>➢ Creates a compensation opportunity aligned with the interests of our shareholders<br>➢ Provides incentive to achieve sustained performance and growth<br>➢ Rewards executives for delivering total shareholder return |

31

**Pay Mix at Target**

The Committee believes that aligning executive incentive payouts with Chemours' performance outcomes is critical for shareholders. Accordingly, the targets under the annual and long-term incentive programs represent rigorous performance expectations that are aligned to short and long-term financial and strategic goals.

To reinforce Chemours' pay-for-performance philosophy, the Total Direct Compensation program for executives emphasizes at-risk incentive pay and, therefore, fluctuates with financial results and stock price. This approach aligns the pay outcomes of executives with Company performance and shareholder interests. The charts that follow illustrate the percentage of target pay at-risk for the CEO and other NEOs on average.



**CEO Pay for Performance**

The chart below demonstrates the relationship between Messrs Newman and Vergnano's pay and Chemours' TSR from 2016 through 2021.

Target and Realizable Pay for 2016 through 2020 reflect CEO pay during Mr. Vergnano's tenure. Target Pay refers to the target pay plan approved by the Board for base salary, annual incentive, and equity awards. Realizable Pay is defined as actual W-2 base salary, actual annual incentive payment for performance in that year (paid in following year), and the value of granted equity awards at the end of each year. Stock options are valued based on the in-the-money value of options granted during that year (the spread between end-of-year stock price and grant price). Performance Share Units (PSUs) are valued based on the number of PSUs awarded during that year (i.e. target number of PSUs), valued at the stock price at the end of the year.

Target and Realizable Pay for 2021 is a calculated representation of Mr. Newman's annual compensation as President and CEO for the full year. Target Pay includes target base salary, annual incentive target and equity award target as if Mr. Newman had been President and CEO the full year (see footnote 1 detailed calculation). In order to fairly represent CEO Realizable Pay in 2021, we made calculations with the assumption of what Mr. Newman would have received had he been in the President and CEO role for the full year and for equity used the value at grant for the awards granted in 2021(see footnote 2 detailed calculation). Based on that assumption, Mr. Newman's full year base salary reflects what was approved in July 2021. The annual incentive amount was determined using his target bonus as CEO and the funding based on actual company performance. The equity award amount reflects the awards he received in March 2021 in the regular compensation cycle and the grant awarded at the time of his promotion in July 2021, according to the equity program approved for 2021 (50% PSUs, 40% stock options, and 10% RSUs). All equity amounts reflect the value as granted.

CEO Pay vs. Performance



(1)  2021 Target Pay
- Mark Newman's Total Direct Compensation upon his promotion to President and CEO. Base Salary $975,000, Short-term Incentive target $1,170,000, and Long-term Incentive target $4,300,000

(2)  2021 Realizable Pay
- Mr. Newman's Base Salary reflects his base salary at target at the time of his promotion ($975,000).
- Mr. Newman's earned short-term incentive represents full year achievement at CEO base salary and bonus target multiplied by Corporate bonus achievement of 179%. ($975,000 x 120% x 179% = $2,094,000).
- Mr. Newman's realizable equity is represented by his actual grant value in 2021. This includes the March equity value of $1,500,000 plus the July equity value of $1,400,000 = $2,900,000.

33

TABLE OF CONTENTS

## Executive Compensation Decision Making

The Chemours Compensation and Leadership Development Committee applies the following factors to guide executive compensation decisions:

- Company performance and strategic objectives
- Independent external market data
- Economic environment for the chemicals industry

The table below summarizes oversight responsibilities and participation in executive compensation decisions:

| | |
|---|---|
| Compensation and Leadership Development Committee | ➤ Establish executive compensation philosophy<br>➤ Approve incentive compensation programs and determine performance expectations for short-term and long-term incentive programs<br>➤ Approve all compensation actions for the NEOs, other than the CEO, including base salary, target and actual short-term incentive plan payouts and long-term incentive targets, grants and earned awards<br>➤ Recommend to the independent directors of the Board compensation actions for the CEO, including base salary, target and actual short-term incentive plan payouts and long-term incentive targets, grants and earned awards |
| All Independent Board Members | ➤ Assess performance of the CEO<br>➤ Approve all compensation actions for the CEO, including base salary, target and actual short-term incentive plan payouts and long-term incentive targets, grants and earned awards |
| Chief Executive Officer | ➤ Provide compensation recommendations for the NEOs (other than the CEO) to the Compensation and Leadership Development Committee, which considers these recommendations as part of its evaluation. However, review, analysis, and final approval of compensation actions are made solely by the Compensation and Leadership Development Committee<br>➤ Recommendations are based on the CEO's personal review of each NEOs performance, job responsibilities, and importance to the Company's overall business strategy, as well as the Company's compensation philosophy<br>➤ In preparing compensation recommendations for the NEOs, the CEO and the SVP, People compare each key element of compensation provided to the NEOs to market data and consider the total compensation package<br>➤ In consultation with the Chief Financial Officer, recommends incentive measures and performance expectations |
| Independent Consultant to the Compensation and Leadership Development Committee | ➤ Provide independent advice, research, and analytical services on a variety of subjects, including compensation of executive officers and executive compensation trends<br>➤ Participate in meetings as requested and communicate with the Chair of the Compensation and Leadership Development Committee between meetings<br>➤ Evaluate executive compensation policies and guidelines and provide analysis of policies and guidelines compared to best practices in the industry<br>➤ Engaged by, and reports directly to the Compensation and Leadership Development Committee |

34

**Independent Compensation Consultant**

The Compensation and Leadership Development Committee has engaged Willis Towers Watson (WTW) as its independent compensation consultant since April 2017. WTW is engaged by and reports directly to the CLDC, which may replace the firm or hire additional consultants at any time. The CLDC and the other independent directors of Chemours' Board are the sole decision makers for compensation of executive officers. The Committee has assessed the independence of Willis Towers Watson based on NYSE Listing Standards and SEC rules and concluded that its work does not raise any conflict of interest.

WTW provides a variety of consulting services to the Committee. These services include but are not limited to, benchmarking market pay practices, sharing compensation best practices, providing competitive pay reviews, supporting the review of the Executive Compensation Philosophy, reviewing the disclosure of the Executive compensation programs in this proxy statement, sharing market trends, opining on incentive plan design and target setting, recommending peer group(s) and providing legislative and regulatory updates.

**Peer Group Selection and Competitive Positioning**

In making compensation decisions, the CLDC considers competitive market data from a compensation peer group of companies as one of several reference points. Compensation peer group data is supplemented with broader chemical industry and general industry data. The selection of the compensation peer group is composed of publicly-traded U.S. based companies with similar scale (generally 0.25x to 4x on market capitalization), revenue (generally 0.5x to 2x), industry, and business characteristics reflecting Chemours' current state as well as its business direction.

The CLDC reviews the composition of the compensation peer group annually to ensure that it remains suitable and appropriate. With the assistance of its independent compensation consultant, the Committee conducted a review of the peer group mid-year. The Committee determined that the peer group remained suitable and appropriate. It was approved with no changes from the previous year.

For compensation decisions made in 2021, the compensation peer group consisted of the following companies:

| | |
|---|---|
| Albemarle Corporation | Olin Corporation |
| Ashland Global Holdings Inc. | PPG Industries, Inc. |
| Avient Corporation | RPM International Inc. |
| Axalta Coating Systems Ltd. | The Sherwin-Williams Company |
| Cabot Corporation | Trinseo S.A. |
| Celanese Corporation | Tronox Limited |
| Eastman Chemical Company | Venator Materials PLC |
| Huntsman Corporation | Westlake Chemical Corporation |

Chemours generally targets the market median for total direct compensation including each element of compensation for senior officers and NEOs. Ultimately, the Committee has the flexibility to pay above or below the market median based on a variety of factors including an executive's scope of responsibility, experience level, the critical need for retention, sustained performance over time, potential for advancement as part of key succession planning processes, and other unique factors.

## 2021 Executive Compensation

The following section reflects the promotion of Mr. Newman to CEO in July and the retirement of Mr. Vergnano at that time. We were pleased to have executed our succession plan for this position. The information presented for Mr. Newman reflects his role as Senior Vice President and Chief Operating Officer and his accession to President and CEO. Mr. Vergnano's information reflects his compensation prior to his retirement in July, recognition for his role in the settlement with DuPont, EID, and Corteva, and his support for the CEO transition through the balance of 2021. His target compensation displays what would have been his full-year compensation opportunity.

## 2021 CEO Compensation Highlights

**Mark Newman — President and CEO**

Mr. Newman's compensation was adjusted to reflect his promotion to President and CEO as of July 1, 2021. With the support of the independent compensation consultant, the CLDC recommended and the Board of Directors

35

approved adjustments to Mr. Newman's compensation. Mr. Newman's base salary was increased to $975,000, his short-term incentive target increased to $1,170,000 (120% at target) and his long-term incentive target increased to $4,300,000. Mr. Newman's Total Direct Compensation (TDC = base salary, plus short term and long term incentive targets) was $6,445,000.

The Board considered the following factors when determining his compensation:

- Overall experience in the role
- Mr. Newman's individual performance
- Compensation provided to CEOs of peer organizations

|  | 2020[1] | 2021 |
| --- | --- | --- |
| Base Salary | $700,000 | $975,000 |
| Target AIP Opportunity | $630,000 *(90% of salary)* | $1,170,000 *(120% of salary)* |
| Target LTI Opportunity (Grant Value) | $1,500,000 | $4,300,000 |
| Target Total Direct Compensation | $2,830,000 | $6,445,000 |

(1)  2020 compensation reflects Mr. Newman's previous role as Senior Vice President and Chief Operating Officer.

Mr. Newman's actual 2021 short-term incentive award earned was $1,611,000. This amount reflects a blend of incentive targets from his time as the Senior Vice President and Chief Operating Officer and President and CEO. The company's performance was applied to the blended incentive target to determine his final AIP payment. In 2021, Mr. Newman's total long-term incentive opportunity was delivered in PSUs, stock options, and RSUs, as described above.

In conjunction with his promotion to President and CEO, Mr. Newman was awarded $1,400,000[1] in equity awards on July 1, 2021, representing a prorated portion of his increased Long Term Incentive Target for 2021. The grant amount was calculated using the annual grant target for the CEO role based on a partial year in position and factoring in the grant he received in March 2021 related to his prior role as Chief Operating Officer. The Equity vehicles aligned with the annual grant process were: 50% PSUs, 40% NQSOs and 10% RSUs. The Number of PSUs and RSUs were determined by dividing the target value by the closing price for the Chemours common stock on grant date and rounding down to the nearest whole share. The closing price of Chemours common stock was $35.46 on July 1, 2021. The number of stock options awarded was determined based on the Black-Scholes value. The Black-Scholes value of an option was $16.14 on July 1,2021. The exercise price of the options was equal to the closing price of Chemours common stock on the grant date at $35.46.

[1] Mr. Newman's prorated grant was determined based on the following: $1,500,000/2 (annual grant in March) = $750,000 (equity target for the first half of the year). $4,300,000/2 (LTI target for the second half of the year) = $2,150,000. Blended annual LTI target = $750,000 + $2,150,000 = $2,900,000. The prorated portion of the target remaining to grant to Mr. Newman based on the blended annual target therefore is $2,900,000 — $1,500,000 = $1,400,000.

**Mark Vergnano — Former President and CEO**

Prior to Mr. Newman's accession to President and CEO role, Mr. Vergnano held this role. In early 2021, the CLDC reviewed and recommended to the Board of Directors no adjustment to Mr. Vergnano's compensation. This recommendation was approved by the Board of Directors at that time.

|  | 2020 | 2021 |
| --- | --- | --- |
| Base Salary | $1,050,000 | $1,050,000 |
| Target AIP Opportunity | $1,365,000 *(130% of salary)* | $1,365,000 *(130% of salary)* |
| Target LTI Opportunity (Grant Value) | $5,600,000 | $5,600,000 |
| Target Total Direct Compensation | $8,015,000 | $8,015,000 |

Mr. Vergnano's actual 2021 short-term incentive award earned in 2021 was $1,221,675, which is reflective of his time in role and the company performance outcomes. In 2021, Mr. Vergnano's total long-term incentive opportunity was delivered in PSUs, stock options and RSUs, as described above. Additionally, Mr. Vergnano

36

received a one-time grant of $1,000,000 RSUs, which vests equally over three years, in recognition of his effort and success with the strategic legal settlement between Chemours, EID, DuPont, and Corteva. The largest portion of Mr. Vergnano's equity allocation remains performance based even when considering the aforementioned RSU grant.

**2021 Base Salaries of the Other NEOs**

Base salaries for the NEOs are intended to be competitive with the market to attract and retain the executive talent needed to successfully execute our strategy. The Committee reviews base salaries for NEOs annually. Our NEOs' base salaries reflect the scope of responsibilities, experience, achievement of individual strategic objectives, and external market competitiveness. Base salaries represent a small portion of overall compensation.

In early 2021, after considering external market pay data, internal equity and performance, the Committee approved a base salary increase for Mr. Ralhan to $625,000 (an increase of 8.7%). No other adjustments were approved for the NEOs, other than as noted above for Mr. Newman.

| NEO | Base Salary as of December 31, 2020 | Base Salary as of December 31, 2021 |
|---|---|---|
| Sameer Ralhan | $575,000 | $625,000 |
| David Shelton | $500,000 | $500,000 |
| Edwin Sparks | $550,000 | $550,000 |
| Susan Kelliher | $425,000 | $425,000 |
| Bryan Snell[1] | $550,000 | $550,000 |

(1)  Mr. Snell's 2021 base salary reflects his full year rate of base salary when he retired.

**Annual Incentive Plan (AIP)**

Chemours' annual incentive plan (AIP) is designed to reward executives for achieving and exceeding annual financial performance goals. Under the AIP, each NEO has a target annual incentive opportunity, expressed as a percentage of base salary. Incentive targets are determined based on the CLDC's review of peer group practices, chemical industry data from proprietary third-party surveys, and the position and scope of responsibilities of each NEO. Incentive targets are reviewed annually in the first half of the year. The NEOs' AIP target opportunity (as a percentage of salary) remained unchanged for 2021.

The following table summarizes 2021 AIP target percentages:

| NEO | Bonus Target as of December 31, 2020 | Bonus Target as of December 31, 2021 |
|---|---|---|
| Sameer Ralhan | 80% | 80% |
| David Shelton | 70% | 70% |
| Edwin Sparks | 75% | 75% |
| Susan Kelliher | 65% | 65% |
| Bryan Snell[1] | 75% | 75% |

(1)  Mr. Snell's 2021 bonus target reflects his full year opportunity at retirement.

**Incentive Formula**

Actual cash annual incentive awards for NEOs in 2021 were determined using the formulas shown below. The calculation of award payments for each NEO is determined based on Chemours' financial performance or a combination of Chemours, Business Unit and ESG performance. There is no individual performance component for NEOs. The CLDC may use discretion to reduce payout.

AIP awards for Messrs. Newman, Vergnano, Ralhan, Shelton, Snell[3] and Ms. Kelliher are determined as follows:

| Total Target Opportunity | x | CC[1] Financial Metrics (85% weight) / ESG Metrics (15% weight) | = | Final AIP Payment Capped at 192.5% |
|---|---|---|---|---|

The AIP award for Mr. Sparks is determined as follows (with the relevant Business Unit being Titanium Technologies)



(1)  Chemours companywide metrics

(2)  Mr. Sparks' Business Unit results are specific to the Titanium Technologies business.

(3)  In accordance with the plan terms and conditions, Mr. Snell received a prorated portion of his annual bonus opportunity at target at the time of his retirement.

**Performance Measures**

The Compensation and Leadership Development Committee (CLDC or the Committee) modified the short-term incentive plan for 2021 to ensure that management's incentives were aligned with emerging important business metrics. The plan maintained a strong focus on key Corporate and Business Unit measures, but the mix of Corporate and Business Unit metrics shifted slightly with the addition of Environmental, Social and Governance (ESG) metrics. For executives designated as corporate employees, the metrics were weighted 85% for the Corporate metrics and 15% for ESG metrics; executives assigned to Business Units have metrics weighted 20% for Corporate metrics, 65% for Business Unit metrics and 15% for ESG metrics. The plans were also adjusted to recognize the organizational split of the Fluoroproducts segment into the Advanced Performance Materials (APM) and Thermal & Specialized Solutions (TSS) segments.

For Chemours as a whole, the metrics remained primarily focused on Free Cash Flow and Adjusted EBITDA as management and the CLDC believe these measures reinforce the importance of earnings and cash generation to the achievement of Chemours' objectives, as well as their importance to shareholders. Likewise, the focus for the business units remained on Adjusted EBITDA and Free Cash Flow. Additionally, the CLDC approved specific Business Unit metrics to reinforce their importance to each business unit. Specifically, TT continued to have a market share target, TSS had a special Opteon™ variable contribution target, and APM had a revenue target.

| Chemours | Weight |
|---|---|
| Chemours ESG | 15.0% |
| Chemours Free Cash Flow | 42.5% |
| Chemours Adjusted EBITDA | 42.5% |

| Titanium Technologies | Weight |
|---|---|
| Chemours ESG | 15.0% |
| Chemours Free Cash Flow | 20.0% |
| Business Unit Free Cash Flow | 20.0% |
| Business Unit EBITDA | 20.0% |
| Business Unit Market Share | 25.0% |

| Advanced Performance Materials | Weight |
|---|---|
| Chemours ESG | 15.0% |
| Chemours Free Cash Flow | 20.0% |
| Business Unit Revenue | 25.0% |
| Business Unit Free Cash Flow | 20.0% |
| Business Unit Adjusted EBITDA | 20.0% |

| Thermal and Specialized Solutions | Weight |
|---|---|
| Chemours ESG | 15.0% |
| Chemours Free Cash Flow | 20.0% |
| Business Unit Free Cash Flow | 35.0% |
| Opteon™ Variable Contribution Increase | 30.0% |

TABLE OF CONTENTS

| Chemical Solutions | |
|---|---|
| Chemours ESG | 15.0% |
| Business Unit Free Cash Flow | 30.0% |
| Business Unit Adjusted EBITDA | 55.0% |

Adjusted EBITDA is defined as income (loss) before interest, income taxes, depreciation and amortization excluding the following items: non-operating pension and other postretirement employee benefit costs (income), exchange gains (losses), restructuring and asset-related charges (benefits), gains (losses) on sale of business or assets, significant legal settlements, impacts of changes to U.S. GAAP accounting or other items not considered indicative of ongoing operations during the Performance Period, which includes income, expenses and losses not budgeted resulting from acquisitions, dispositions, regulatory actions and legal settlements.

Free Cash Flow is defined as Cash Flows from Operations less purchases of property, plant and equipment as disclosed on the Company's Cash Flow statement. Business Unit Free Cash Flow is defined as Adjusted EBITDA plus the delta Working Capital minus CapEx. Working Capital equals Accounts Receivable plus Inventory minus Accounts Payable. Unknown impacts of changes to U.S. GAAP accounting and tax policy changes, or other items not considered indicative of ongoing operations during the performance period will be excluded from this calculation during the Performance Period, including cash impact of unbudgeted items resulting from acquisitions, dispositions, regulatory actions and legal settlements.

Business Revenue is defined as sales to external customers as defined by ASC 606, revenue from contracts with customers.

Titanium Technologies market share is determined based on the improvement of our total pigment revenue market share as a percentage of our three (3) major competitors.

The Opteon™ variable contribution target is defined as variable contribution from the sales of HFO (hydrofluoroolefin)-based products (equivalent to Revenue less variable costs).

ESG metrics include improving gender diversity in our global workforce and completing defined environmental projects to mechanical completion.

The chart below shows the 2021 AIP performance targets, ranges and results approved by the CLDC. Performance targets were set and approved in early 2021 and were consistent with the Company's budget for 2021, which incorporated considerations of potential opportunities and risks associated with external business and market conditions. Targets for each of the performance measures are set at levels considered challenging, motivational, and competitive. The performance range is determined using external guidance, historical performance, and expectations as guardrails. Threshold is considered the level of performance that warrants the minimum payout and the maximum defines what level of performance is exceptional.

Based on 2021 financial results, the 2021 Chemours Corporate AIP payout was 179%, Titanium Technologies 178%, Thermal and Specialized Solutions 140%, Advanced Performance Materials 172%, and Chemical Solutions 127% of target.

*Dollars are in millions*

**Corporate AIP[4]**

| Measure | Threshold[1] | Target | Maximum[2] | Actual | Weighted Funding Result |
|---|---|---|---|---|---|
| Corporate Adj. EBITDA | $832 | $1,067 | $1,312 | $1,333 | 85% |
| Corporate Free Cash Flow | $275 | $ 370 | $ 574 | $ 682 | 85% |
| ESG Diversity Metric | 1.1% | 1.5% | 2.3% | 0.6% | 0% |
| ESG Emissions Metric | 4 | 5 | 7 | 7 | 9% |
| | | | | | **179%** |

39

**Titanium Technologies AIP**

| Measure | Threshold[1] | Target | Maximum[2] | Actual | Weighted Funding Result |
|---|---|---|---|---|---|
| Corporate Free Cash Flow | $ 275 | $ 370 | $ 574 | $ 682 | 40% |
| ESG Diversity Metric | 1.1% | 1.5% | 2.3% | 0.6% | 0% |
| ESG Emissions Metric | 4 | 5 | 7 | 7 | 9% |
| Business Unit EBITDA | $ 465 | $ 596 | $ 733 | $ 809 | 40% |
| Business Unit Revenue Share | 31.2% | 32.6% | 34.0% | 33.9% | 49% |
| Business Unit Free Cash Flow | $ 383 | $ 451 | $ 555 | $ 608 | 40% |
| | | | | | **178%** |

**Thermal and Specialized Solutions AIP**[3]

| Measure | Threshold[1] | Target | Maximum[2] | Actual | Weighted Funding Result |
|---|---|---|---|---|---|
| Corporate Free Cash Flow | $275 | $370 | $574 | $682 | 40% |
| ESG Diversity Metric | 1.1% | 1.5% | 2.3% | 0.6% | 0% |
| ESG Emissions Metric | 4 | 5 | 7 | 7 | 9% |
| Opteon™ Variable Contribution | 390 | 501 | 615 | 490 | 30% |
| Business Unit Free Cash Flow | $283 | $347 | $427 | $408 | 61% |
| | | | | | **140%** |

**Advanced Performance Materials AIP**[3]

| Measure | Threshold[1] | Target | Maximum[2] | Actual | Weighted Funding Result |
|---|---|---|---|---|---|
| Corporate Free Cash Flow | $ 275 | $ 370 | $ 574 | $ 682 | 40% |
| ESG Diversity Metric | 1.1% | 1.5% | 2.3% | 0.6% | 0% |
| ESG Emissions Metric | 4 | 5 | 7 | 7 | 9% |
| Business Unit Revenue | $1,110 | $1,224 | $,342 | $1,397 | 50% |
| Business Unit Adjusted EBITDA | $ 176 | $ 226 | $ 278 | $ 261 | 33% |
| Business Unit Free Cash Flow | $ 66 | $ 82 | $ 100 | $ 153 | 40% |
| | | | | | **172%** |

**Chemical Solutions AIP**

| Measure | Threshold[1] | Target | Maximum[2] | Actual | Weighted Funding Result |
|---|---|---|---|---|---|
| Corporate Free Cash Flow | $275 | $370 | $574 | $682 | 40% |
| ESG Diversity Metric | 1.1% | 1.5% | 2.3% | 0.6% | 0% |
| ESG Emissions Metric | 4 | 5 | 7 | 7 | 9% |
| Business Unit Adjusted EBITDA | $ 10 | $ 12 | $ 15 | $ 13 | 54% |
| Business Unit Free Cash Flow | $ 7 | $ 9 | $ 11 | $ 9 | 23% |
| | | | | | **127%** |

(1)  Represents the minimum level of performance required to earn any incentive for this component of the 2021 AIP. Performance below this level would not result in a payout for the performance measure.

(2)  Represents the highest level of performance at which maximum payout under the 2021 AIP is earned. Achievement of performance above this level would not result in a greater payout for the performance measure.

(3)  Results do not total exactly due to rounding.

(4)  Achievement varies slightly from 10-K based on adjustments applied to AIP outcomes related to unbudgeted events primarily related to the Ohio Multi District Litigation settlement payment related to legacy legal matters, sale of Mining Solutions business (transaction costs, vendor settlement in Mexico, lost EBITDA due to the timing of the sale, partially offset by the capital expenditures not incurred), strategic investment actions to drive long-term value capture driven by newly enacted U.S. AIM act. All adjustments made by the Committee were consistent with past practice.

40

Based on the actual performance achieved, the following AIP awards for each NEO were approved:

| NEO | Bonus Target as of December 31, 2021 | Base Salary as of December 31, 2021 | Actual Annual Incentive |
|---|---|---|---|
| Mark Newman[1] | 120% | $ 975,000 | $1,611,000 |
| Mark Vergnano[2] | 130% | $1,050,000 | $1,221,675 |
| Sameer Ralhan | 80% | $ 625,000 | $ 895,000 |
| David Shelton | 70% | $ 500,000 | $ 626,500 |
| Edwin Sparks | 75% | $ 550,000 | $ 734,250 |
| Susan Kelliher | 65% | $ 425,000 | $ 494,488 |
| Bryan Snell[3] | 75% | $ 550,000 | $ 206,250 |

(1) Mr. Newman's Actual Annual Incentive reflects a blend of his H1 base salary and incentive target of $700,000 and 90% and H2 base salary and incentive target displayed above. ((((($700,000 * 90%)/2) + (($975,000 *120%)/2))) *179%) = $1,611,000

(2) Mr. Vergnano's Actual Annual Incentive reflects a prorated incentive opportunity prior to his retirement on July 1, 2021 including performance achievement for the full fiscal year ((($1,050,000 * 130%)/2)*179%) = $1,221,675

(3) Mr. Snell's Actual Annual Incentive reflects a prorated incentive opportunity prior to his retirement on July 2, 2021 at target (($550,000*75%)/2) = $206,250

**Long-Term Incentive Plan (LTIP)**

Chemours provides long-term incentive compensation to directly tie our NEOs' interests to the interests of shareholders. The Compensation and Leadership Development Committee views long-term incentives as a critical element of our executive compensation program. Long-term incentive targets are reviewed annually and determined based on the CLDC's review of the following:
- NEO position, scope of responsibilities and performance
- Internal pay equity considerations
- Peer group practices
- Current market compensation data for the chemical industry and general industry from proprietary third-party surveys

In early 2021, the Compensation and Leadership Development Committee reviewed the long-term incentive target opportunities for all NEOs and chose to adjust Mr. Ralhan's and Mr. Sparks' targets as reflected in the following table and as discussed above

| NEO | Long Term Incentive Target as of December 31, 2020 | Long Term Incentive Target as of December 31, 2021 |
|---|---|---|
| Sameer Ralhan | $1,000,000 | $1,200,000 |
| David Shelton | $ 950,000 | $ 950,000 |
| Edwin Sparks | $ 800,000 | $ 900,000 |
| Susan Kelliher | $ 700,000 | $ 700,000 |
| Bryan Snell[1] | $ 900,000 | $ 900,000 |

(1) Mr. Snell's 2021 long term incentive target reflects his full year opportunity upon his retirement.

The CLDC also approved minor plan design changes to the Long-Term Incentive Plan for 2021. The LTIP award mix is 90% performance-based, consisting of PSUs and stock options, which increase in value when our share price increases above the share price on the date of grant. In 2021, the mix of equity award types was updated to include Restricted Stock Units with vesting tied to continued service and representing 10% of the long-term incentive mix. With this change, the new mix is 50% PSUs, 40% stock options and 10% RSUs. The CLDC approved this change because it provides a strong performance orientation with a balance of long-term retention of talent to drive the company strategy. The CLDC believes that this balance is optimal to drive long-term shareholder value and is aligned with competitive market practice.

The stock options and RSUs vest annually in three-equal installments from the date of grant.

Consistent with the 2020 PSUs, the PSUs are earned based on performance over a three-year performance period, reflecting the long-term nature of the awards. The performance metrics used in the 2021 PSU awards remained Adjusted Net Income and Free Cash Flow Conversion, which were equally weighted. Relative Total Shareholder Return (Relative TSR) remained a modifier ranging from 50% to 150% based on relative stock performance to our selected peers. This is the third consecutive year we have used those plan metrics.



Consistent with the 2020 PSU Plan, the CLDC once again approved a three-year performance period reflecting the long-term nature of the plan.

### *PSU Awards (50% of LTI Target Award)*

Fifty percent of a NEO's LTI award is delivered through PSUs. The PSUs are earned and vest based on the achievement of Adjusted Net Income and Free Cash Flow Conversion objectives, which are determined at the time of grant. The 2021 — 2023 PSU plan is measured over a three-year cumulative period.

Performance goals are considered challenging to obtain and are aligned with delivering shareholder value. In setting these objectives, the CLDC considers how the achievement of goals may be affected by competitive and/or economic conditions over the three-year period. Final awards are subject to potential modification based on TSR results relative to Chemours' peer group over the cumulative three-year performance period.

The initial payout range of the PSUs is 0% to 200% depending on Chemours' achievement versus the Adjusted Net Income and Free Cash Flow Conversion performance goals. The payout is then subject to modification based on the Relative TSR performance compared to our peer group, which modifies the amount earned by applying a multiple from 0.5 to 1.5, resulting in a maximum payout capped at 250% of the target award.

As in prior years, the PSU portion of Chemours' LTI program consisted of overlapping cycles, with a new equity award each year. In general, each participant receives a grant at the beginning of each three-year cycle.



### *Stock Options (40% of LTI Target Award)*

The use of stock options provides clear and direct alignment with shareholder interests as they have value only if the price of Chemours' stock at the time of exercise exceeds the stock price on the date of grant. As a result, stock option grants encourage executives to focus on behaviors and initiatives that support sustained long-term stock price appreciation, which benefits all shareholders. The stock options are designed to vest in equal annual installments over three years from the grant date and have a ten-year term.

### *Restricted Stock Units (10% of LTI Target Award)*

In 2021, the mix of equity award types was updated to include Restricted Stock Units with vesting tied to continued service and representing 10% of the long-term incentive mix. With this change, the new LTIP equity mix is 50% PSUs, 40% stock options and 10% RSUs. The CLDC approved this change because it provides a strong performance orientation with a balance of long-term retention of talent to drive the company strategy. The CLDC believes that this balance is optimal to drive long-term shareholder value and is aligned with competitive market practice. The RSUs vest in a ratable manner over a three-year period.

Financial / Operating Measures

The use of Adjusted Net Income in the long-term program is an important indicator of success in delivering long-term shareholder value. Free Cash Flow Conversion is critical to Chemours' ability to invest and manage assets that deliver the greatest return. The Committee believes these performance measures are appropriate to motivate executives to achieve and sustain outstanding long-term results.

42

The 2021-2023 PSU Award performance period, January 1, 2021 through December 31, 2023, consists of one, cumulative three-year measurement period.

| Adjusted Net Income | | Free Cash Flow Conversion | |
|---|---|---|---|
| **Period** | **Weighting** | **Period** | **Weighting** |
| Cumulative FY2021 – FY2023 | 50% | Average FY2021 – FY2023 | 50% |

Adjusted Net Income is defined as Net Income, as reported externally, adjusted in a manner consistent with Adjusted EBITDA, where appropriate to exclude non-operating pension and other postretirement employee benefit costs (income), windfall tax benefit (expense) related to stock based compensation, exchange gains (losses), restructuring and asset-related charges (benefits), gains (losses) on sale of business or assets, significant legal settlements, impacts of changes to U.S. GAAP accounting, or other items not considered indicative of ongoing operations during the Performance Period, which includes income, expenses and losses not budgeted for as a result of acquisitions, dispositions, regulatory actions and legal settlements.

Free Cash Flow Conversion is defined as Free Cash Flow, defined as Cash Flows from Operations less purchases of property, plant and equipment as disclosed on the Company's Cash Flow statement divided by Adjusted EBITDA defined as income (loss) before interest, income taxes, depreciation and amortization excluding the following items: non-operating pension and other postretirement employee benefit costs (income), exchange gains (losses), restructuring and asset-related charges (benefits), gains (losses) on sale of business or assets, significant legal settlements, impacts of changes to U.S. GAAP accounting or other items not considered indicative of ongoing operations during the Performance Period, including cash impact of unbudgeted items resulting from acquisitions, dispositions, regulatory actions and legal settlements. Subject to Board approval this calculation will be adjusted to reflect the increase in actual amount spent on purchases of property, plant and equipment in excess of 5%, from the amount contemplated in the three-year business plan, used for compensation plan purposes.

Chemours believes disclosing specific targets while the applicable performance period is ongoing could cause competitive harm. However, such targets will be disclosed once the applicable performance periods have ended as part of our discussion and analysis on awards earned by the NEOs.

Relative TSR

Relative TSR is used as a modifier to promote alignment with shareholder interests. Relative TSR for the 2021-2023 PSU Award will be measured at the end of the three-year period against the 2021 peer group discussed previously. Chemours' TSR relative to these peers will be used as a modifier to increase or reduce the number of units earned.

Relative TSR is defined as the change in the Company's stock price plus dividends paid and assumed to be reinvested on the ex-dividend date during the period, divided by beginning stock price, compared on a percentile basis to the same change with respect to a peer group. For this purpose, a company's beginning stock price will be the closing stock price averaged over the 20 trading days ending on the trading day before the start of the Performance Period and the ending stock price will be the closing stock price, inclusive of reinvested dividends, averaged over the 20 trading days ending with the last trading day within the Performance Period.

For purposes of calculating the appropriate earned percentile, any companies that are in the peer group at the beginning of the Performance Period that are no longer separate publicly traded companies due to merger, acquisition, or buyout shall be disregarded. Companies that are no longer publicly traded due to insolvency or bankruptcy will be included at the lowest performance ranking. For purposes of calculating the earned percentile, the Company will be considered a member of the peer group.

| TSR Modifier | <P25 | >=P25 to <P40 | >=P40 to <P60 | >=P60 to <=P75 | >P75 |
|---|---|---|---|---|---|
| Relative TSR to Peer Group | 0.5 | 0.75 | 1 | 1.25 | 1.5 |

43

TABLE OF CONTENTS

*2021 LTI Awards*

Awards to the NEOs under the 2021 long-term incentive program were as follows:

| NEO | 2021 Target LTI Award Value | Share Equivalent Value of PSUs on grant date | Target Number of PSU Awards[1] | Grant Date Fair Value of RSUs | Number of RSUs granted | Grant Date Fair Value of Stock Options | Number of Stock Options Granted[2] |
|---|---|---|---|---|---|---|---|
| Mark Newman | $1,500,000 | $ 49,976 | 31,236 | $ 49,990 | 6,247 | $ 599,993 | 61,349 |
| July 1[3] | $1,400,000 | $ 699,980 | 19,740 | $ 139,996 | 3,948 | $ 559,993 | 34,696 |
| Mark Vergnano[4] | $6,600,000 | $2,799,998 | 116,618 | $1,559,978 | 64,972 | $2,239,992 | 229,038 |
| Sameer Ralhan | $1,200,000 | $ 599,986 | 24,989 | $ 119,978 | 4,997 | $ 479,993 | 49,079 |
| David Shelton[5] | $1,450,000 | $ 474,990 | 19,783 | $ 594,968 | 24,780 | $ 379,992 | 38,854 |
| Edwin Sparks | $ 900,000 | $ 449,995 | 18,742 | $ 89,989 | 3,748 | $ 359,992 | 36,809 |
| Susan Kelliher | $ 700,000 | $ 349,994 | 14,577 | $ 69,989 | 2,915 | $ 279,992 | 28,629 |
| Bryan Snell[6] | $1,190,000 | $ 449,995 | 18,742 | $ 89,989 | 3,748 | $ 649,989 | 66,461 |

Annual LTI awards are generally granted March 1st each year.

(1)   The number of PSUs awarded was determined by dividing the dollar target value for each NEO by the closing price for Chemours common stock on grant date and rounding down to the nearest whole share. The closing price of Chemours common stock was $24.01 on March 1, 2021.

(2)   The number of stock options awarded was determined based on the Black-Scholes value. The Black-Scholes value of an option was $9.78 on March 1,2021. The exercise price of the options was equal to the closing price of Chemours common stock on the grant date. The closing price of Chemours common stock was $24.01 on March 1, 2021.

(3)   In conjunction with his promotion to CEO, Mr. Newman was awarded $1,400,000 in equity awards on July 1, 2021 representing a prorated portion of his increased Long Term Incentive Target for 2021. The Equity vehicles aligned with the annual grant process: 50% PSUs, 40% NQSOs and 10% RSUs. The Number of PSUs and RSUs were determined by dividing the target value by the closing price for the Chemours common stock on grant date and rounding down to the nearest whole share. The closing price of Chemours common stock was $35.46 on July 1, 2021. The number of stock options awarded was determined based on the Black-Scholes value. The Black-Scholes value of an option was $16.14 on July 1,2021. The exercise price of the options was equal to the closing price of Chemours common stock on the grant date at $35.46.

(4)   In addition to Mr. Vergnano's annual grant, he received a one-time grant of $1,000,000 RSUs in recognition of his effort and success with the strategic legal settlement between Chemours, DuPont, EID, and Corteva. The largest portion of Mr. Vergnano's equity allocation remains performance based even when considering the aforementioned RSU grant.

(5)   In addition to his annual grant, Mr. Shelton received a one-time grant of $500,000 in RSUs, which will vest equally over three years. This award is in recognition of his effort and success with the strategic legal settlement between Chemours, DuPont, EID, and Corteva.

(6)   Mr. Snell received an added $290,000 in stock options as part of the annual compensation process in recognition of the value created by the TVS strategy and the expected long-term improvement in business results from the implementation of that strategy change starting in 2019.

**2019 — 2021 PSU Award Results**

The overall performance result for the 2019 — 2021 PSU Award was 50%. The payout for this award was based on pre-established three-year cumulative targets for Adjusted Net Income and Free Cash Flow Conversion. The outcome against these metrics, after applying the pay curves was 100%. Additionally, under the 2019 — 2021 PSU Award, performance results were subject to adjustment by Relative TSR over the three-year performance period. Over the three-year period ending December 31, 2021, Chemours performed below the 25th percentile of the peer group resulting in the number of PSUs being reduced by 50%.

44

The tables below detail performance against each measure:

| Metric | Metric Weight | 2019 Actual | 2020 Actual | 2021 Actual | Cumulative | % Attainment | Achievement with Pay Curve Applied |
|---|---|---|---|---|---|---|---|
| Adj. Net Income | 50% | 419 | 328 | 691 | 1,438 | 0% | 0% |
| FCF Conversion | 50% | 16.70% | 61.50% | 51.20% | 43.10% | 100% | 200% |
| | | | | | | Weighted Outcome | 100% |

*Total Shareholder Return (TSR)*

Relative TSR is a modifier that is applied to the outcome of Adjusted Net Income and Free Cash Flow Conversion.

| <P25 | >=P25 to <P40 | >=P40 to <P60 | >=P60 to <=P75 | >P75 | Achievement |
|---|---|---|---|---|---|
| 0.5 | 0.75 | 1 | 1.25 | 1.5 | 12% |

The performance peer group is comprised of the following companies:

| | | |
|---|---|---|
| Air Products & Chemicals Inc. | Eastman Chemical Co. | The Sherwin-Williams Company |
| Albemarle Corporation | Element Solutions Inc.[2] | Trinseo S.A. |
| Ashland Global Holdings Inc. | Huntsman Corporation | Tronox Holdings Plc |
| Avient Corporation[1] | Olin Corporation | Venator Materials Plc |
| Axalta Coating Systems Ltd | PPG Industries Inc. | Westlake Chemical Corp. |
| Celanese Corporation | RPM International | |

(1) Formally known as PolyOne Corporation

(2) Formally known as Platform Product Specialty Solutions Corporation

(3) W.R Grace & Co has been removed from the benchmark as it operates as a subsidiary of Standard Industry Inc.

The table below shows the target number of PSUs granted in 2019 and the actual number of PSUs earned, excluding dividend equivalent units.

| NEO | Shared Granted in 2019 | Achievement | Earned Share Award (excl. dividend shares) |
|---|---|---|---|
| Mark Newman | 34,176 | 50% | 17,088 |
| Mark Vergnano[1] | 88,374 | 50% | 44,187 |
| Sameer Ralhan | 20,820 | 50% | 10,410 |
| Edwin Sparks | 16,086 | 50% | 8,043 |
| David Shelton | 14,992 | 50% | 7,496 |
| Susan Kelliher | 9,468 | 50% | 4,734 |
| Bryan Snell[2] | 14,203 | 50% | 5,771 |

(1) Mr. Vergnano's Performance Stock Units vested as if he were employed through December 31, 2021 to reflect his continued role with the Company, his support of the CEO transition process, and his performance during his tenure as CEO.

(2) Award prorated based on days in role in accordance with PSU terms and conditions for retiring NEOs.
Mr. Snell retired as of July 2, 2021, and thus was credited with 913 days (365+366+182) days.

## Company Sponsored Employee Benefits

The Company offers the NEOs health and welfare and retirement plan benefits. Additional elements specific to the executive compensation program include nonqualified retirement benefit plans, reimbursement of financial planning and income tax preparation services, and change-in-control benefits.

45

**The Chemours Company Retirement Savings Restoration Plan**

The Chemours Company Retirement Savings Restoration Plan (RSRP) is a nonqualified defined contribution plan that restores benefits above the Internal Revenue Code limits for tax-qualified retirement plans to be consistent with those provided to other eligible employees at Chemours.

**The Chemours Company Management Deferred Compensation Plan**

Under the Chemours Company Management Deferred Compensation Plan (MDCP), a nonqualified elective deferred compensation plan, participants may defer base salary, bonus, and certain incentive plan awards until a later date. Generally, earnings on deferred amounts include returns on investments that mirror the investment alternatives available to all employees under the Company's retirement savings plan.

**Change-in-Control Severance Benefits**

To ensure that executives remain focused on Chemours' business during a period of uncertainty, Chemours maintains a change-in-control severance plan for its executives, including the NEOs. For any benefits to be earned, a change in control must occur and the executive's employment must be terminated within two years following the change in control, either by Chemours without cause or the executive for good reason (often called a "double trigger"). The plan does not provide tax gross-ups. For additional information, see "Executive Compensation — Potential Payments upon Termination or Change-in-Control."

Benefits provided under the change-in-control severance plan include:
- A lump sum cash payment of two times (three times for the CEO) the sum of the executive's base salary and target annual incentive;
- A lump sum cash payment equal to the pro-rated portion of the executive's target annual incentive for the year of termination; and
- Continued health and dental benefits, financial counseling and tax preparation, and outplacement services for up to two years (three years for the CEO) following the date of termination.

The change-in-control severance plan also includes 12-month (18-month for the CEO) non-competition and non-solicitation covenants, non-disparagement, and confidentiality provisions.

# Compensation and Risk

In 2021, Chemours management reviewed its executive and non-executive compensation programs and in concurrence with the Compensation and Leadership Development Committee's independent compensation consultant, determined that none of its compensation programs encourages or creates excessive risk-taking, and none are reasonably likely to have a material adverse effect on the Company.

In conducting this assessment, the components and design features of executive and non-executive plans and programs were analyzed. A summary of the findings of the assessment was provided to the Compensation and Leadership Development Committee. Overall, the Compensation and Leadership Development Committee concluded that (1) the Company's executive compensation programs provide a mix of awards with performance criteria and design features that mitigate potential excessive risk taking and (2) non-executive employee compensation programs are appropriately balanced between fixed and variable compensation and do not encourage excessive risk taking. The CLDC also considered its payout caps or limits, stock ownership guidelines, and claw back policy as risk mitigating features of its executive compensation program.

**Payout Limitations or Caps**

Earned awards from the short-term incentive plan are capped at 192.5% of target. This is a slight decrease from previous years resulting from the maximum payout of 150% of the ESG metric. PSU awards are capped at 250% of target to protect against excessive payouts.

**Stock Ownership Guidelines**

To further support our goal of achieving a strong link between shareholder and executive interests, Chemours maintains stock ownership guidelines to require executive share ownership of a value equal to a specified multiple

46

of base pay. Executives have five (5) years from the date they become subject to the guidelines to reach their respective ownership requirements. Until the ownership requirement is satisfied, 100% of the net shares realized from exercise or vesting of stock-based awards must be retained. Share ownership guidelines are as follows:

| Multiple of Base Salary | 2021 Target |
|---|---|
| CEO | 5.0x |
| Other NEOs | 3.0x |

All applicable NEOs have satisfied or are on track to satisfy these guidelines.

**Incentive Compensation Clawback Policy**

The Incentive Compensation Clawback Policy (the "Policy") covers each current and former employee of The Chemours Company ("Company") or an Affiliate (within the meaning of the Company's 2017 Equity and Incentive Plan (the 2017 Plan) who is or was, as the case may be, the recipient of incentive-based compensation (referred to in this policy as "Grantee"). The Policy is deemed part of the terms of any award made on or after the effective date of the Policy set forth above which by its terms provides for incentive-based compensation.

If a Grantee engages in misconduct (as defined in this Policy), the Grantee: (i) forfeits any right to receive any future awards or other equity-based incentive compensation; and (ii) the Company may demand repayment of any awards or cash payments already received by a Grantee (that were made subject to this Policy), including without limitation repayment due to making retroactive adjustments to any awards or cash payments already received by a Grantee, where such award or cash payment was predicated upon the achievement of certain financial results that were subsequently the subject of a restatement as a result of misconduct by the Grantee. The Grantee shall be required to provide repayment within ten (10) days following such demand.

"Misconduct" means (i) Grantee's employment or service is terminated for Cause (within the meaning of the Company's Equity and Incentive Plan), or (ii) the breach of a non-compete or confidentiality covenant set out in the employment agreement between the Grantee and the Company or an Affiliate, or (iii) management has determined, after review and consultation with the Audit Committee, that the Company is required to prepare an accounting restatement due to material noncompliance, as a result of fraud or misconduct, with any financial reporting requirement under the securities laws, and the Compensation Committee has determined, subsequent to such restatement and in its sole discretion, that the Grantee: (A) had knowledge of the material noncompliance or the circumstances that gave rise to such noncompliance and failed to take reasonable steps to bring it to the attention of appropriate individuals within the Company; or (B) personally and knowingly engaged in practices which materially contributed to the circumstances that enabled a material noncompliance to occur.

Furthermore, if management has determined, after review and consultation with the Audit Committee, that the Company is required to prepare an accounting restatement due to material noncompliance, for reason(s) not related to fraud or misconduct, with any financial reporting requirement under the securities laws, the Company may demand repayment of any awards or cash payments already received by a Grantee (that were made subject to this Policy), including without limitation repayment due to making retroactive adjustments to any awards or cash payments already received by a Grantee, where such award or cash payment was predicated upon the achievement of certain financial results that were subsequently the subject of a restatement. The Grantee shall be required to provide repayment within thirty (30) days following such demand.

This Policy is administered and enforced by the Compensation and Leadership Development Committee and its decision as to all questions of interpretation and application of the Plan shall be final, binding and conclusive on all persons.

This Policy is intended to comply with, shall be interpreted to comply with, and shall be deemed automatically amended to comply with, Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, as it may be amended from time to time, and any related rules or regulations promulgated by the Securities and Exchange Commission or the New York Stock Exchange, including any additional or new requirements that become effective after the effective date. Any such amendment shall be effective at such time as is necessary to comply with Section 10D of the Exchange Act of 1934, as amended.

The Company with support of the independent compensation consultants and external council continue to evaluate this policy in anticipation of final SEC guidance in this area. This Policy may be amended at any time by the Compensation and Leadership Development Committee, provided, however, that the Senior Vice President, People is hereby authorized to make any and all amendments required under applicable laws, rules or regulations.

47

## Restrictions on Hedging and Similar Transactions

The Company has a policy that prohibits executive officers and directors from engaging in the following types of transactions with respect to Chemours' stock: hedging transactions, pledging securities, short sales, derivative transactions, margin accounts, and short-term trading.

## Deductibility of Compensation

In setting the NEOs 2021 compensation packages, the Compensation and Leadership Development Committee considered Section 162(m) of the Internal Revenue Code, which provides that compensation in excess of $1 million paid to certain executive officers is generally not deductible. While the Compensation and Leadership Development Committee will continue to consider the tax deductibility of compensation.

## CEO Pay Ratio

There were no significant changes to the global employee population nor significant changes to employee compensation arrangements. per SEC rules, Chemours is using the same individual as last year for the CEO Pay Ratio. The second of the three-year period the individual can be used for this analysis. The CEO pay ratio figures below are a reasonable estimate calculated in a manner consistent with SEC rules.

The individual's compensation reflects January 1, 2021 to December 31, 2021. The total number of employees was approximately 6,400. When Chemours selected the employee, the Company determined the median of the employee's pay, Chemours chose total earnings including overtime pay as the consistently applied compensation measure. Chemours then calculated an annual gross cash compensation for each employee. Chemours used a valid statistical sampling methodology to identify a population of employees whose base pay was within a 5% range of the median. Using this methodology, Chemours identified the median employee from that group.

It was determined that the total compensation for the selected median employee in 2021 was $109,148. The ratio of CEO pay to the median worker pay is 51:1.

| Element | Median Employee | CEO[4] |
|---|---|---|
| Salary (includes Overtime)[1] | $ 96,471 | $ 837,500 |
| Stock Awards | $ 0 | $1,879,997 |
| Option Awards | $ 0 | $1,159,987 |
| Non-Equity Incentive Plan Compensation/Bonus[2] | $ 6,780 | $1,611,000 |
| Change in Pension Value | $ 0 | $ 0 |
| All Other Compensation[3] | $ 5,897 | $ 49,185 |
| Summary Compensation Table Totals | $109,148 | $5,537,669 |
| CEO Pay Ratio | **51:1** | |

(1)  Consists of 2021 base salary plus overtime pay.

(2)  Actual 2021 cash incentive paid during the first quarter of fiscal year 2022 under a performance-based compensation plan.

(3)  Consists of 2021 employer contributions to qualified and non-qualified defined contribution plans and perquisites/personal benefits as listed in footnote 5 of the Summary Compensation Table.

(4)  CEO Pay ratio reflects Mr. Newman's pay from 2021 which is a blend of pre and post promotion compensation.

48

# Summary Compensation Table

The following table sets forth information concerning the total compensation earned by the NEOs during fiscal years 2021, 2020, and 2019.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)[(1)(2)] | Option Awards ($)[(3)] | Non-Equity Incentive Plan Compensation ($)[(4)] | All Other Compensation ($)[(5)] | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Mark Newman President and Chief Executive Officer (July – December) | 2021 2020 2019 | 837,500 678,462 649,290 | | 1,879,997 1,069,022 1,296,199 | 1,159,987 599,997 719,982 | 1,611,000 557,298 | 49,185 90,691 85,347 | 5,537.669 2,995,470 2,750,819 |
| Mark Vergnano President and Chief Executive Officer (retired July 2021) | 2021 2020 2019 | 528,977 1,029,808 1,029,808 | | 4,816,342 3,991,015 4,273,767 | 2,239,992 2,239,998 2,239,992 | 1,221,675 1,207,479 | 205,900 138,276 152,077 | 9,012,886 8,606,576 7,695,644 |
| Sameer Ralhan Senior Vice President, Chief Financial Officer | 2021 2020 2019 | 616,667 575,000 474,588 | | 786,684 1,712,679 792,940 | 479,993 399,997 439,987 | 895,000 406,916 | 38,400 48,740 30,847 | 2,816,744 3,143,332 1,738,361 |
| David Shelton Senior Vice President, General Counsel and Corporate Secretary | 2021 2020 2019 | 500,000 498,077 493,910 | | 1,122,778 677,047 725,013 | 379,992 379,999 379,988 | 626,500 309,610 | 44,400 60,461 83,737 | 2,673,670 1,925,194 1,682,648 |
| Edwin Sparks President, Titanium Technologies and Chemical Solutions (March – December) | 2021 2020 2019 | 546,058 537,500 396,300 | | 590,026 2,070,143 564,003 | 359,992 319,998 319,992 | 734,250 327,938 241,511 | 41,521 56,980 57,173 | 2,271,847 3,312,559 1,578,979 |
| Susan Kelliher Senior Vice President, People | 2021 2020 2019 | 425,000 | | 458,904 | 279,992 | 494,488 | 36,233 | 1,694,617 |
| Bryan Snell President Titanium Technologies (retired July 2021) | 2021 2020 2019 | 279,167 539,423 539,423 | | 590,026 641,413 686,857 | 649,989 359,997 359,998 | 206,250 259,834 103,125 | 345,473 53,943 60,082 | 2,070,905 1,854,610 1,749,485 |

(1)  Represents the aggregate grant date fair value of PSUs and RSUs computed in accordance with FASB ASC Topic 718. The grant date fair value of each PSU granted to NEOs in 2021, taking into account the estimated probable outcome of the performance conditions, was determined to be $26.68 on March 1, 2021 and $38.33 on July 1, 2021. Assumptions used in determining the values can be found in Note 24 ("Stock-based Compensation") to the Consolidated Financial Statements in Chemours' Annual Report on Form 10-K for the year ended December 31, 2021. The grant date fair value of each RSU granted to NEOs in 2021 is equal to the closing share price of Chemours common stock on their respective grant dates — $24.01 on March 1, 2021 and $35.46 on July 1, 2021.

(2)  If the maximum level of performance were achieved, each NEO would earn 250% of the target number of PSUs awarded. Based on the closing price of Chemours common stock on the March 1 grant date ($24.01), the maximum value of PSUs awarded on March 1, 2021, to each NEO is as follows: Mr. Newman — $3,624,892; Mr. Vergnano — $6,999,995; Mr. Ralhan — $1,499,965; Mr. Shelton — $ 1,187,475; Mr. Sparks — $ 1,124,989; Ms. Kelliher — $874,984; Mr. Snell — $1,124,989.

49

(3)  Represents the aggregate grant date fair value of stock options computed in accordance with FASB ASC Topic 718. Assumptions used in determining the values can be found in Note 24 ("Stock-based Compensation") to the Consolidated Financial Statements in Chemours' Annual Report on Form 10-K for the year ended December 31, 2021.

(4)  Represents payouts under the Annual Incentive Plan. This column includes compensation which may have been deferred at the NEOs election. Any such amounts will be included in the "Executive Contributions" column of the 2021 Nonqualified Deferred Compensation table.

(5)  The amounts reflect perquisites and personal benefits (financial planning / income tax preparation) and Company contributions to qualified and nonqualified defined contribution plans. The following table details these amounts.

(6)  Compensation in the above table reflects Mr. Vergnano's time as President and CEO and as Chairman of the Board. For purposes of the above chart, his Fees Earned or Paid in Cash for his service as Chairman is reflected in All Other Compensation, and his Equity Awards are reflected as Stock Awards.

| Name | Company Contributions to Qualified Defined Contribution Plan ($) | Company Contribution to Nonqualified Defined Contribution Plan ($) | Financial Planning/ Income Tax Preparation ($) | Separation Agreements ($) |
|---|---|---|---|---|
| Mark Newman | 18,400 | 16,750 | 14,035 | |
| Mark Vergnano | 20,400 | 10,500 | 15,000 | |
| Sameer Ralhan | 18,400 | 12,500 | 7,500 | |
| David Shelton | 19,400 | 10,000 | 15,000 | |
| Edwin Sparks | 19,400 | 10,764 | 11,357 | |
| Susan Kelliher | 18,400 | 2,833 | 15,000 | |
| Bryan Snell | 20,400 | 3,690 | — | 321,383 |

## 2021 Grants of Plan Based Awards

The following table provides information on AIP awards, PSUs and stock options granted in 2021 to each NEO. For a complete understanding of the table, refer to the footnotes that follow.

| Name | Type of award | Grant Date | Approval Date | Estimated Possible Payouts Under Nonequity Incentive Plan Awards[1] Threshold ($) | Target ($) | Maximum ($) | Estimated Future Payouts Under Equity Incentive Plan Awards[2] Threshold (#) | Target (#) | Maximum (#) | All Other Stock Awards; Number of Shares of Stock or Units (#) | All other Option Awards; Number of Securities Underlying Options[3] (#) | Exercise of Base Price of Option Awards ($) | Grant Date Fair Value of Stock and Option Awards ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mark Newman | 2021 AIP | | | 450,000 | 900,000 | 1,732,500 | | | | | | | |
| | Stock Options | 3/1/21 | 2/10/21 | | | | | | | | 61,349 | 24.01 | 599,993 |
| | Stock Options | 7/1/21 | 6/2/21 | | | | | | | | 34,696 | 35.46 | 559,993 |
| | PSU | 3/1/21 | 2/10/21 | | | | 15,618 | 31,236 | 78,090 | | | | 833,376 |
| | PSU | 7/1/21 | 6/2/21 | | | | 9,870 | 19,740 | 49,350 | | | | 756,634 |
| | RSU | 3/1/21 | 2/10/21 | | | | | | | 6,247 | | | 149,990 |
| | RSU | 7/1/21 | 6/2/21 | | | | | | | 3,948 | | | 139,996 |
| Mark Vergnano | 2021 AIP | | | 341,250 | 682,500 | 1,313,813 | | | | | | | |
| | Stock Options | 3/1/21 | 2/10/21 | | | | | | | | 229,038 | 24.01 | 2,239,992 |
| | PSU | 3/1/21 | 2/10/21 | | | | 58,309 | 116,618 | 291,545 | | | | 3,111,368 |
| | RSU | 3/1/21 | 2/10/21 | | | | | | | 64,972 | | | 1,559,978 |
| Sameer Ralhan | 2021 AIP | | | 250,000 | 500,000 | 962,500 | | | | | | | |
| | Stock Options | 3/1/21 | 2/10/21 | | | | | | | | 49,079 | 24.01 | 479,993 |
| | PSU | 3/1/21 | 2/10/21 | | | | 12,495 | 24,989 | 62,473 | | | | 666,707 |
| | RSU | 3/1/21 | 2/10/21 | | | | | | | 4,997 | | | 119,978 |
| David Shelton | 2021 AIP | | | 175,000 | 350,000 | 673,750 | | | | | | | |
| | Stock Options | 3/1/21 | 2/10/21 | | | | | | | | 38,854 | 24.01 | 379,992 |
| | PSU | 3/1/21 | 2/10/21 | | | | 9,892 | 19,783 | 49,458 | | | | 527,810 |
| | RSU | 3/1/21 | 2/10/21 | | | | | | | 24,780 | | | 594,968 |
| Edwin Sparks | 2021 AIP | | | 206,250 | 412,500 | 794,063 | | | | | | | |
| | Stock Options | 3/1/21 | 2/10/21 | | | | | | | | 36,809 | 24.01 | 359,992 |
| | PSU | 3/1/21 | 2/10/21 | | | | 9,371 | 18,742 | 46,855 | | | | 500,037 |
| | RSU | 3/1/21 | 2/10/21 | | | | | | | 3,748 | | | 89,989 |

| Name | Type of award | Grant Date | Approval Date | Estimated Possible Payouts Under Nonequity Incentive Plan Awards(1) | | | Estimated Future Payouts Under Equity Incentive Plan Awards(2) | | | All Other Stock Awards; Number of Shares of Stock or Units (#) | All other Option Awards; Number of Securities Underlying Options(3) (#) | Exercise of Base Price of Option Awards ($) | Grant Date Fair Value of Stock and Option Awards ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | | | |
| Susan Kelliher | 2021 AIP | | | 138,125 | 276,250 | 531,781 | | | | | | | |
| | Stock Options | 3/1/21 | 2/10/21 | | | | | | | | 28,629 | 24.01 | 279,992 |
| | PSU | 3/1/21 | 2/10/21 | | | | 7,289 | 14,577 | 36,443 | | | | 388,914 |
| | RSU | 3/1/21 | 2/10/21 | | | | | | | 2,915 | | | 69,989 |
| Bryan Snell | 2021 AIP | | | 103,125 | 206,250 | 397,031 | | | | | | | |
| | Stock Options | 3/1/21 | 2/10/21 | | | | | | | | 66,461 | — | 649,989 |
| | PSU | 3/1/21 | 2/10/21 | | | | 9,371 | 18,742 | 46,855 | | | | 500,037 |
| | RSU | 3/1/21 | 2/10/21 | | | | | | | 3,748 | | | 89,989 |

(1) Nonequity incentive plan awards are short-term incentives that may be earned under the 2021 AIP.

(2) Equity incentive plan awards are PSUs corresponding to a three-year performance period, FY2021 – FY2023. The NEOs may earn 50% of the target award upon attainment of threshold performance and up to 250% of the target award upon attainment of maximum performance. Performance outcomes will be determined following the conclusion of the performance period. Dividend equivalent units will be applied to the actual number of shares earned.

(3) The exercise price is equal to the fair market value of a share of Chemours common stock on the grant date. Stock options are not credited with dividend equivalent units. Stock options feature three-year equal ratable vesting and a ten-year term.

## Outstanding Equity Awards at 2021 Fiscal Year-End

The following table shows the number of shares underlying exercisable and unexercisable options and unvested and, as applicable, unearned RSUs and PSUs (in each case denominated in shares of Chemours common stock) held by each of the NEOs as of December 31, 2021. Market or payout values in the table below are based on the closing price of Chemours common stock as of December 31, 2021: $33.56.

Upon completion of the separation from DuPont and in accordance with the Employee Matters Agreement, the NEOs received replacement Chemours stock option awards in respect of their DuPont stock option awards. The stock option awards reflected in the following table with a grant date prior to July 1, 2015, are these replacement stock option awards.

| | | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Number of Securities Underlying Unexercised Options(1) | | | | Shares or Units of Stock that Have Not Vested(2) | | Equity Incentive Plan Awards: Unearned Shares, Units or Other Rights that Have Not Vested(3) | |
| Name | Grant Date | Exercisable (#) | Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Number (#) | Market Value ($) | Number (#) | Market or Payout Value ($) |
| Mark Newman | 7/1/2021 | — | 34,696 | 35.46 | 7/1/2031 | 3,948 | 132,495 | 19,740 | 662,474 |
| | 3/1/2021 | — | 61,349 | 24.01 | 3/1/2031 | 6,247 | 209,649 | 31,236 | 1,048,280 |
| | 3/2/2020 | 53,476 | 106,951 | 14.43 | 3/2/2030 | | | 155,925 | 5,232,843 |
| | 6/3/2019 | — | 29,717 | 21.96 | 6/3/2029 | 6,830 | 229,215 | | |
| | 3/1/2019 | 24,157 | 12,079 | 38.02 | 3/1/2029 | 10,257 | 344,225 | | |
| | 3/1/2018 | 23,357 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 31,662 | — | 34.72 | 3/1/2027 | | | | |
| | 3/1/2016 | 166,089 | — | 5.40 | 3/1/2026 | | | | |
| | 7/6/2015 | 197,161 | — | 16.04 | 7/5/2025 | | | | |
| Mark Vergnano | 3/1/2021 | — | 229,038 | 24.01 | 7/1/2024 | 64,972 | 2,180,460 | 38,801 | 1,302,162 |
| | 3/2/2020 | 199,644 | 399,286 | 14.43 | 7/1/2024 | | | 388,080 | 13,023,965 |
| | 3/1/2019 | 104,065 | 52,032 | 38.02 | 7/1/2024 | | | | |
| | 3/1/2018 | 107,055 | — | 48.53 | 7/1/2024 | | | | |
| | 3/1/2017 | 145,118 | — | 34.72 | 7/1/2024 | | | | |
| | 3/1/2016 | 543,944 | — | 5.40 | 7/1/2024 | | | | |
| | 7/6/2015 | 331,231 | — | 16.04 | 7/5/2025 | | | | |

51

| Name | Grant Date | Option Awards — Number of Securities Underlying Unexercised Options(1) Exercisable (#) | Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Stock Awards — Shares or Units of Stock that Have Not Vested(2) Number (#) | Market Value ($) | Equity Incentive Plan Awards: Unearned Shares, Units or Other Rights that Have Not Vested(3) Number (#) | Market or Payout Value ($) |
|---|---|---|---|---|---|---|---|---|---|
| Sameer Ralhan | 3/1/2021 | — | 49,079 | 24.01 | 3/1/2031 | 4,997 | 167,699 | 24,989 | 838,631 |
| | 12/1/2020 | | | | | 39,510 | 1,325,956 | | |
| | 3/2/2020 | 35,651 | 71,300 | 14.43 | 3/2/2030 | | | 103,950 | 3,488,562 |
| | 6/3/2019 | — | 17,830 | 21.96 | 6/3/2029 | 4,098 | 137,529 | | |
| | 3/1/2019 | 14,866 | 7,433 | 38.02 | 3/1/2029 | 6,312 | 211,831 | | |
| | 3/1/2018 | 4,866 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 6,596 | — | 34.72 | 3/1/2027 | | | | |
| | 4/26/2016 | 80,000 | — | 9.43 | 4/26/2026 | | | | |
| | 3/1/2016 | 55,363 | — | 5.40 | 3/1/2026 | | | | |
| David Shelton | 3/1/2021 | — | 38,854 | 24.01 | 3/1/2031 | 24,780 | 831,617 | 19,783 | 663,917 |
| | 3/2/2020 | 33,868 | 67,736 | 14.43 | 3/2/2030 | | | 98,752 | 3,314,117 |
| | 3/1/2019 | 17,653 | 8,827 | 38.02 | 3/1/2029 | 7,496 | 251,566 | | |
| | 3/1/2018 | 16,545 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 19,788 | — | 34.72 | 3/1/2027 | | | | |
| | 3/1/2016 | 83,044 | — | 5.40 | 3/1/2026 | | | | |
| Edwin Sparks | 3/1/2021 | — | 36,809 | 24.01 | 3/1/2031 | 3,748 | 125,783 | 18,742 | 628,982 |
| | 12/1/2020 | | | | | 39,510 | 1,325,956 | | |
| | 3/2/2020 | — | 57,040 | 14.43 | 3/2/2030 | 34,650 | 1,162,854 | 83,160 | 2,790,850 |
| | 6/3/2019 | — | 17,830 | 21.96 | 6/3/2029 | 4,098 | 137,529 | | |
| | 3/1/2019 | 9,291 | 4,646 | 38.02 | 3/1/2029 | 3,945 | 132,394 | | |
| | 3/1/2018 | 5,352 | — | 48.53 | 3/1/2028 | | | | |
| | 3/1/2017 | 4,312 | — | 34.72 | 3/1/2027 | | | | |
| Susan Kelliher | 3/1/2021 | — | 28,629 | 24.01 | 3/1/2031 | 2,915 | 97,827 | 14,577 | 489,204 |
| | 12/1/2020 | | | | | 19,755 | 662,978 | | |
| | 3/2/2020 | 24,956 | 49,910 | 14.43 | 3/2/2030 | | | 72,765 | 2,441,993 |
| | 3/1/2019 | 11,149 | 5,575 | 38.02 | 3/1/2029 | 4,734 | 158,873 | | |
| | 3/1/2018 | 9,732 | — | 48.53 | 3/1/2028 | | | | |
| | 6/1/2017 | 8,864 | — | 41.51 | 6/1/2027 | | | | |
| Bryan Snell | 3/1/2021 | — | 66,461 | 24.01 | 7/2/2024 | 3,748 | 125,783 | 3,012 | 101,083 |
| | 3/2/2020 | 32,086 | 64,170 | 14.43 | 7/2/2024 | | | 44,272 | 1,485,768 |
| | 3/1/2019 | 16,725 | 8,362 | 38.02 | 7/2/2024 | | | | |
| | 3/1/2018 | 17,518 | — | 48.53 | 7/2/2024 | | | | |
| | 3/1/2017 | 23,746 | — | 34.72 | 7/2/2024 | | | | |
| | 3/1/2016 | 110,726 | — | 5.40 | 7/2/2024 | | | | |

(1)  The following table provides the vesting schedules of stock options outstanding as of December 31, 2021:

| Grant Date | Outstanding Vesting Dates |
|---|---|
| 7/1/2021 | Vests in equal installments on March 1, 2022, 2023 and 2024 |
| 3/1/2021 | Vests in equal installments on March 1, 2022, 2023 and 2024 |
| 3/2/2020 | Vests in equal installments on March 2, 2022 and 2023 |
| 6/3/2019 | Vests on June 3, 2022 |
| 3/1/2019 | Balance vests on March 1, 2022 |

(2)  The following table consists of RSUs outstanding as of December 31, 2021 and PSUs where the performance period is complete, but the units remain unvested. The following table provides details of the vesting schedules for such RSUs and PSUs, including dividend equivalent units:

| Grant Date | Outstanding Vesting Dates |
|---|---|
| 7/1/2021 | Vests in equal installments on March 1, 2022, 2023 and 2024 |
| 3/1/2021 | Vests in equal installments on March 1, 2022, 2023 and 2024 |
| 12/1/2020 | RSUs with vesting date of December 1, 2023 |
| 3/2/2020 | RSUs with vesting date of March 2, 2023 |
| 6/3/2019 | PSUs where the performance period ended on December 31, 2021. If the NEO was not retirement eligible, the award remained unvested through the Determination Date of February 8, 2022. |
| 3/1/2019 | PSUs where the performance period ended on December 31, 2021. If the NEO was not retirement eligible, the award remained unvested through the Determination Date of February 8, 2022. |

52

(3)  The following table provides the vesting schedules for unearned PSUs with outstanding vesting dates as of December 31, 2021:

| Grant Date | Outstanding Vesting Dates |
|---|---|
| 3/1/2021 and 7/1/2021 | Performance period ending December 31, 2023. The number of PSUs reported is based on achievement of target performance. |
| 3/2/2020 | Performance period ending December 31, 2022. The number of PSUs reported is based on achievement of maximum performance. |

The 2021 plan provides for a payout range of 0% to 250% and dividend equivalent units are applied subsequently to the final performance determination.

53

# Option Exercises and Stock Vested

The table below identifies the number of shares of Chemours common stock acquired upon the exercise of stock options and the vesting of RSUs and PSUs during 2021:

| Name | Option Awards[1] | | Stock Awards[2] | |
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
|---|---|---|---|---|
| Mark Newman | 67,675 | 946,754 | 2,868 | 74,970 |
| Mark Vergnano[3] | 198,121 | 2,771,207 | 50,564 | 1,696,928 |
| Sameer Ralhan | 34,457 | 480,191 | 597 | 15,606 |
| David Shelton | 19,640 | 273,056 | 2,031 | 53,090 |
| Edwin Sparks | 28,521 | 618,087 | 657 | 17,174 |
| Susan Kelliher | — | — | 1,195 | 31,237 |
| Bryan Snell[3] | 37,902 | 653,097 | 6,776 | 227,386 |

(1)  The value realized upon exercise is the difference between the market value of the stock on the exercise date and the option price, multiplied by the number of shares acquired on exercise.

(2)  Represents the number of RSUs, PSUs and related dividend equivalent units vesting in 2021. The value realized upon vesting is computed by multiplying the number of units by the closing price of the underlying shares on the vesting date.

(3)  The 2019 grant, with a performance period of January 1, 2019 to December 31, 2021 was considered as 'earned' on December 31, 2021.

➢  Mr. Vergnano and Mr. Snell were retirement eligible and considered fully vested on December 31, 2021. Their 2019 PSU awards are reported in the above table.

➢  If the NEO was not retirement eligible, the 2019 PSU award remained unvested through the Determination Date of February 9, 2022. Mr. Newman, Mr. Ralhan, Mr. Shelton, Mr. Sparks and Ms. Kelliher were not retirement eligible, therefore 2019 PSU awards are reported in the Outstanding Equity Awards at 2021 Fiscal Year-End table.

# 2021 Nonqualified Deferred Compensation

The following table provides information on the Company's defined contribution or other plans that during 2021 provided for deferrals of compensation on a basis that is not tax-qualified. Mr. Newman, Mr. Vergnano, Mr. Ralhan, Mr. Shelton, Mr. Sparks, Ms. Kelliher, and Mr. Snell each participated in such a Chemours plan during 2021.

| Name | Executive Contributions in Last Fiscal Year ($)[1] | Registrant Contribution in Last Fiscal Year ($)[2] | Aggregate Earning in Last Fiscal Year ($)[3] | Aggregate Withdrawals / Distributions In last Fiscal Year ($) | Aggregate Balance at Last Fiscal Year-End ($) |
|---|---|---|---|---|---|
| Mark Newman | | | | | |
| RSRP | 66,288 | 66,288 | 83,216 | | 734,866 |
| MDCP | 83,595 | | 85,343 | -45,175 | 928,573 |
| Mark Vergnano | | | | | |
| RSRP | 86,549 | 86,549 | 24,520 | | 1,593,558 |
| Sameer Ralhan | | | | | |
| RSRP | 44,015 | 44,015 | 96,908 | | 522,199 |
| David Shelton | | | | | |
| RSRP | 31,177 | 31,177 | 92,368 | | 667,421 |
| MDCP | 125,000 | | 49,814 | | 549,072 |
| Edwin Sparks | | | | | |
| RSRP | 35,040 | 35,040 | 30,483 | | 309,782 |
| MDCP | | | | | |
| Susan Kelliher | | | | | |
| RSRP | 7,587 | 7,587 | 20,229 | | 172,051 |
| MDCP | 146,623 | | 31,331 | | 333,020 |
| Bryan Snell | | | | | |
| RSRP | 3,690 | 3,690 | 56,421 | | 536,243 |
| MDCP | | | 5,145 | | 325,498 |

(1) The amount in this column represents deferrals from base salary and Non-Equity Incentive Plan Compensation under the RSRP and/or MDCP. The amounts are also included in the 2021 Summary Compensation Table.

(2) The amount in this column represents employer contributions made under the RSRP; the amounts are also included in the 2021 Summary Compensation Table.

(3) Earnings (loss) represent returns on investments in twenty (20) core investment alternatives and interest accruals on cash balances, Chemours common stock returns, and dividend reinvestments. The core investment alternatives are the same investment alternatives available to all employees under the qualified plan. Interest is accrued on cash balances based on a rate that is traditionally less than 120% of the applicable federal rate, and dividend equivalents are accrued at a non-preferential rate. Accordingly, these amounts are not considered above-market or preferential earnings for purposes of, and are not included in, the 2021 Summary Compensation Table.

This table reflects Salary and Non-Equity Incentive Plan Compensation amounts and Company contributions to qualified and nonqualified defined contribution plans reported in the aggregate balance at last fiscal year-end that were previously reported as compensation to the NEO in Chemours' Summary Compensation Table for previous year(s).

| | RSRP | MDCP | TOTAL |
|---|---|---|---|
| Mark Vergnano | 1,449,728 | — | 1,449,728 |
| Mark Newman | 493,221 | 773,105 | 1,266,326 |
| Sameer Ralhan | 116,252 | — | 116,252 |
| David Shelton | 328,870 | — | 328,870 |
| Edwin Sparks | 114,525 | — | 114,525 |

55

## Narrative Discussion of the Nonqualified Deferred Compensation Table

Chemours sponsors two nonqualified deferred compensation plans for the benefit of eligible employees. The Retirement Savings Restoration Plan (RSRP) supplements our qualified defined contribution plan, the Retirement Savings Plan (RSP), and is designed to provide benefits in excess of IRS qualified plan limits applicable to the RSP. The Management Deferred Compensation Plan (MDCP) is an elective deferral plan that provides eligible employees with the opportunity to defer receipt of a specified portion of their compensation, thereby postponing income taxation on amounts deferred until the time such deferrals are distributed from the MDCP. Eligible employees may elect to participate in either, neither, or both nonqualified deferred compensation plans annually. The following provides an overview of the various deferral options as of December 31, 2021.

### Retirement Savings Restoration Plan

Each year during the enrollment window, eligible employees can elect to defer 1 – 6% of compensation. The deferral elections spring into effect when the participant's year-to-date compensation exceeds the IRS annual compensation limit ($290,000 for 2021). Compensation for RSRP purposes consists of base salary and annual incentive payments. Chemours provides a Company matching contribution equal to 100% of the first 6% of the NEOs deferral amount. In addition, and entirely at its discretion, Chemours may make non-elective contributions to the RSRP.

Deferrals and contributions to the RSRP are notionally invested in the available investment alternatives which mirror those made available under the qualified RSP. The term "notional" means account balances are not actually invested in any of the deemed investment alternatives, rather, the rate of return derived from the notional investments is credited to individual account balances consistent with the participant's investment direction elections.

When enrolling in the RSRP, participants are also requested to make distribution elections. Distributions are triggered by termination of employment and will commence either upon separation from service or 1 – 5 years thereafter if the participant so elects. Distributions may be paid in a lump sum or substantially equal annual installments over 2 – 15 years, at the election of the participant.

Employee and Matching contributions are always 100% vested. Non-Elective Contributions are vested upon completion of three years of service. The NEOs are 100% vested in their deferrals and related investment experience.

### Management Deferred Compensation Plan

Under the terms of the MDCP, each year during the enrollment window eligible employees can elect to defer: 1 – 60% of "base salary" and/or 1 – 60% of the annual incentives. Additionally, corporate officers may elect to defer settlement of their equity awards (i.e., RSUs and/or PSUs).

Base salary and annual incentive award deferrals are notionally invested in the available investment alternatives. The term "notional" means account balances are not actually invested in any of the deemed investment alternatives, rather, the rate of return derived from the notional investments is credited to individual account balances consistent with the participant's investment direction elections. Equity award deferrals are notionally invested in Chemours common stock with dividend equivalents credited as additional stock units. Chemours does not match deferrals under the MDCP.

When enrolling in the MDCP, participants are also requested to make distribution elections. Participants may elect either in-service or termination distribution elections. In-service distributions are payable as of a specified date in the form of a lump sum. Termination distributions commence either upon separation from service or 1 – 5 years thereafter if the participant so elects and can be paid either in a lump sum or substantially equal annual installments over 2 – 15 years, at the election of the participant.

NEOs are 100% vested in their deferrals and related investment experience.

56

# Potential Payments upon Termination or Change in Control

The table below summarizes the potential payouts to the NEOs, upon a termination from the Company, or under specified situations in a change in control as further described below. The amounts shown in the following table are approximate and reflect certain assumptions that the Company has made in accordance with the SEC's rules. These assumptions include that the termination of employment or change in control occurred on December 31, 2021, and that the value of a share of the Company's stock on that day was $33.56, the closing price per share of the Company's common stock on December 31, 2021. The table also includes potential payments under The Chemours Company 2017 Equity and Incentive Plan (the "2017 Plan"). The treatment of benefits under each plan on termination or change in control is detailed in the footnotes to the table.

| Name | Form of Compensation[1] | Voluntary or For Cause ($)[2] | Involuntary Termination without Cause ($)[3] | Retirement ($)[4] | Death ($)[5] | Disability ($)[6] | Change in Control[7] |
|---|---|---|---|---|---|---|---|
| Mark Newman | Annual Salary | | 134,375 | | | | 2,925,000 |
| | Target Annual Bonus | | 1,170,000 | | | | 3,510,000 |
| | Target Annual Bonus (pro-rated) | | | | 1,170,000 | 1,170,000 | 1,170,000 |
| | Health and Dental Benefits | | 4,079 | | | | 48,943 |
| | Outplacement Services | | 2,150 | | | | 12,900 |
| | Stock Options | — | — | — | 2,976,573 | 2,976,573 | 2,976,573 |
| | RSUs | | 342,144 | — | 342,144 | 342,144 | 342,144 |
| | PSUs | — | — | — | 3,113,897 | 3,113,897 | 4,950,838 |
| **Total** | | **—** | **1,652,748** | **—** | **7,602,614** | **7,602,614** | **15,936,398** |
| Mark Vergnano | Annual Salary | | | | | | |
| | Target Annual Bonus | | | | | | |
| | Target Annual Bonus (pro-rated) | | | 682,500 | | | |
| | Health and Dental Benefits | | | | | | |
| | Outplacement Services | | | | | | |
| | Stock Options | | | 9,825,654 | | | |
| | RSUs | | | 2,180,460 | | | |
| | PSUs | | | 8,800,573 | | | |
| **Total** | | **—** | **—** | **21,489,187** | **—** | **—** | **—** |
| Sameer Ralhan | Annual Salary | | 93,149 | | | | 1,250,000 |
| | Target Annual Bonus | | 500,000 | | | | 1,000,000 |
| | Target Annual Bonus (pro-rated) | | | | 500,000 | 500,000 | 500,000 |
| | Health and Dental Benefits | | 6,011 | | | | 48,086 |
| | Outplacement Services | | 2,150 | | | | 8,600 |
| | Stock Options | — | — | — | 2,039,501 | 2,039,501 | 2,039,501 |
| | RSUs | — | — | — | 1,493,655 | 1,493,655 | 1,493,655 |
| | PSUs | — | — | — | 1,350,357 | 1,350,357 | 2,932,775 |
| **Total** | | **—** | **601,310** | **—** | **5,383,513** | **5,383,513** | **9,272,617** |
| David Shelton | Annual Salary | | 250,000 | | | | 1,000,000 |
| | Target Annual Bonus | | 350,000 | | | | 700,000 |
| | Target Annual Bonus (pro-rated) | | | | 350,000 | 350,000 | 350,000 |
| | Health and Dental Benefits | | 1,768 | | | | 14,141 |
| | Outplacement Services | | 2,150 | | | | 8,600 |
| | Stock Options | — | — | — | 1,822,261 | 1,822,261 | 1,822,261 |
| | RSUs | | 831,617 | — | 831,617 | 831,617 | 831,617 |
| | PSUs | — | — | — | 1,607,802 | 1,607,802 | 2,492,703 |
| **Total** | | **—** | **1,435,535** | **—** | **4,611,680** | **4,611,680** | **7,219,322** |
| Edwin Sparks | Annual Salary | | 275,000 | | | | 1,100,000 |
| | Target Annual Bonus | | 412,500 | | | | 825,000 |
| | Target Annual Bonus (pro-rated) | | | | 412,500 | 412,500 | 412,500 |
| | Health and Dental Benefits | | 1,639 | | | | 13,110 |
| | Outplacement Services | | 2,150 | | | | 8,600 |
| | Stock Options | — | — | — | 1,649,529 | 1,649,529 | 1,649,529 |
| | RSUs | — | — | — | 2,614,592 | 2,614,592 | 2,614,592 |
| | PSUs | — | — | — | 1,493,350 | 1,493,350 | 2,285,168 |
| **Total** | | **—** | **691,289** | **—** | **6,169,971** | **6,169,971** | **8,908,499** |

57

| Name | Form of Compensation[1] | Voluntary or For Cause ($)[2] | Involuntary Termination without Cause ($)[3] | Retirement ($)[4] | Death ($)[5] | Disability ($)[6] | Change in Control[7] |
|---|---|---|---|---|---|---|---|
| Susan Kelliher | Annual Salary | | 37,460 | | | | 850,000 |
| | Target Annual Bonus | | 276,250 | | | | 552,500 |
| | Target Annual Bonus (pro-rated) | | | | 276,250 | 276,250 | 276,250 |
| | Health and Dental Benefits | | 5,542 | | | | 44,335 |
| | Outplacement Services | | 2,150 | | | | 8,600 |
| | Stock Options | — | — | — | 1,228,185 | 1,228,185 | 1,228,185 |
| | RSUs | — | — | — | 760,805 | 760,805 | 760,805 |
| | PSUs | — | — | — | 1,131,714 | 1,131,714 | 1,783,748 |
| **Total** | | **—** | **321,402** | **—** | **3,396,954** | **3,396,954** | **5,504,423** |
| Bryan Snell | Annual Salary | | | | | | |
| | Target Annual Bonus | | | | | | |
| | Target Annual Bonus (pro-rated) | | | 206,250 | | | |
| | Health and Dental Benefits | | | | | | |
| | Outplacement Services | | | | | | |
| | Stock Options | | | 1,862,275 | | | |
| | RSUs | | | 125,783 | | | |
| | PSUs | | | 1,007,555 | | | |
| | Retained Employee as Consultant | | | 110,000 | | | |
| | Non-Compete Agreement | | | 600,000 | | | |
| **Total** | | **—** | **—** | **3,201,863** | **—** | **—** | **—** |

Effective January 1, 2017, Chemours revised the termination provisions associated with PSU, Stock Option, and RSU awards to be more consistent with market prevalence and simplify administration. A summary of the provisions by award type follows.

Stock Options
- Retirement eligibility results in continued vesting, and the time to exercise is three years post-employment or the original expiration date of the award, whichever occurs first.
- Death or Disability termination results in immediate vesting of unvested awards and the time to exercise is limited to two years post-employment, or the original expiration date of the award whichever occurs first.
- Change in Control with qualifying termination remains consistent with the description below.
- Any other termination results in the forfeiture of unvested options and 90 days post-employment to exercise any options vested as of the termination date.

RSUs
- Retirement eligibility results in continued vesting of unvested awards.
- Death or Disability termination results in immediate vesting of unvested awards.
- Change in Control with qualifying termination remains consistent with the description below.
- Any other termination results in forfeiture of unvested awards.

PSUs
- Retirement eligibility results in vesting of a pro-rated portion of the award, with performance based on actual performance over the full performance period and proration based on the number of days the NEO was employed during the performance period.
- Death or Disability results in vesting of a pro-rated portion of the award, with performance based on actual performance over the full performance period and proration based on the number of days the NEO was employed during the performance period.
- Change in Control with qualifying termination remains consistent with the description below.
- Any other termination results in forfeiture of unvested awards.
- The 2019 PSU grant, with a performance period of 1/1/2019 to 12/31/2021 was considered as 'earned' on 12/31/2021, but the PSUs remained unvested until performance was certified on 2/8/2022 if the executive was not retirement eligible on 12/31/2021.

58

➢ Mr. Vergnano and Mr. Snell were retirement eligible and considered fully vested on 12/31/2021.

➢ Mr. Newman, Mr. Ralhan, Mr. Shelton, Mr. Sparks and Ms. Kelliher were not retirement eligible, therefore the 2019 PSU award was unvested on 12/31/2021. The 2019 PSU awards are reported in the above table for termination reasons that would have resulted in payout of the unvested award on 12/31/2021.

(1) The award agreements for stock options, PSUs and RSUs contain restrictive covenants that may result in forfeiture of unvested stock options, PSUs and RSUs upon a breach of confidentiality, non-solicitation and non-competition obligations during employment and after termination of employment (for a period of one year for non-solicitation and non-competition).

(2) Amounts shown in this column indicate the NEO has achieved the requisite age and service milestones to be regarded as "retirement eligible" in accordance with award terms. To the extent that the NEO is retirement eligible, unvested stock options, RSUs, and PSUs are treated as if the NEO had retired. The amounts listed in the table for Mr. Vergnano and Mr. Snell represent values that will continue to vest in accordance with retirement eligible provisions. Mr. Vergnano and Mr. Snell meet the retirement eligible provisions for all plans. If an NEO is not retirement eligible, upon voluntary termination or termination for cause, the various Company plans and programs provide for forfeiture of all unvested stock options, RSUs, and PSUs. The PSUs listed relate to the 2020 and 2021 PSU grants and are based on the level of performance assumed and disclosed in the Outstanding Equity Awards at 2021 Fiscal Year-End table.

(3) Upon termination of employment for Lack of Work or Involuntary Termination:

a. Stock option awards granted on or after January 1, 2017, and vested as of the termination date may be exercised during the 90-day period following termination. Unvested stock option awards granted on or after January 1, 2018, to holders who are not retirement eligible are forfeited.

b. Stock option awards granted prior to January 1, 2017, may be exercised during the one-year period following termination.

c. PSUs granted on or after January 1, 2017, and unvested as of the termination date are forfeited.

d. To the extent that an NEO is retirement eligible, unvested stock options, RSUs and PSUs are treated as if the NEO has retired.

e. Severance benefits consist of: one week of salary for each complete year of service, with a minimum of four weeks and a maximum of twenty-six weeks; pro-rata annual bonus based on service during the performance period (i.e. calendar year); three months of company-paid health care continuation coverage; limited outplacement assistance.

(4) Upon Retirement:

a. Stock options granted on or after January 1, 2017 continue vesting, but the time to exercise is limited to three years post-employment or the original expiration date of the award, whichever occurs first.

b. For stock options granted prior to January 1, 2017 the award holder retains the full term of the award in which to exercise.

c. PSUs are pro-rated based on actual performance for service during the performance period. Amount shown represents the pro-rated number of units earned as of December 31, 2021 at the level of performance assumed and disclosed in the Outstanding Equity Awards at 2021 Fiscal Year-End table.

(5) Upon Death:

a. Stock option awards immediately vest and the time to exercise is limited to two years post-employment or the original expiration date of the award, whichever occurs first. Amount shown represents the in-the-money value of stock options for which vesting is accelerated, as of December 31, 2021.

b. RSUs are automatically vested and paid out. Amount shown represents the value of all RSUs as of December 31, 2021 that are automatically vested and paid out.

c. PSUs are pro-rated based on actual performance for service during the performance period. Amount shown represents the pro-rated number of units earned as of December 31, 2021 at the level of performance assumed and disclosed in the Outstanding Equity Awards at 2021 Fiscal Year-End table.

59

(6)  Upon termination of employment for Disability:

    a.  Stock option awards granted on or after January 1, 2017 are immediately vested and the time to exercise is limited to two years post-employment or the original expiration date of the award, whichever occurs first.

    b.  Stock option awards granted prior to January 1, 2017 may be exercised during the one-year period following termination.

    c.  PSUs are pro-rated based on actual performance for service during the performance period. Amount shown represents the pro-rated number of units earned as of December 31, 2021 at the level of performance assumed and disclosed in the Outstanding Equity Awards at 2021 Fiscal Year-End table.

    d.  RSUs are automatically vested and paid out. Amount shown represents the value of all RSUs as of December 31, 2021 that are automatically vested and paid out.

    e.  To the extent that the NEO is retirement eligible, unvested stock options, RSUs and PSUs are treated as if the NEO has retired.

(7)  Upon Change in Control:

    a.  Treatment varies depending on whether the Company is the surviving entity and, if not, whether the awards are assumed by an acquiring entity. Values shown in the table above assume that the Company is not the surviving entity and the acquiring entity does not assume or otherwise provide for continuation of the awards.

    b.  Stock options are immediately vested and cancelled in exchange for payment in an amount equal to (i) the excess of the fair market value per share of the stock subject to the award immediately prior to the change in control over the exercise or base price per share of stock subject to the award multiplied by (ii) the number of shares granted. Amount shown represents the in-the-money value of unvested stock options as of December 31, 2021.

    c.  RSUs are immediately vested and all restrictions lapse. Awards cancelled in exchange for a payment equal to the fair market value per share of the stock subject to the award immediately prior to the change in control multiplied by the number of shares granted. Amount shown represents the value of all RSUs as of December 31, 2021.

    d.  PSUs convert, at target amount, to time-based vesting RSUs, and subsequent vesting is governed by the applicable change-in-control terms. Amount shown represents the value of all PSUs, at target value, as of December 31, 2021.

    In the event that the Company is the surviving entity, or the acquiring entity assumes or otherwise provides for continuation of the awards, all stock options, RSUs and PSUs remain in place or substitute awards are issued. Upon termination without cause or termination for good reason within two years after change in control, awards vest in full. Stock options remain exercisable for two years, or the original expiration date, whichever occurs first.

    Under the Senior Executive Severance Plan, a change in control must occur and the executive's employment must be terminated within two years following the change in control, either by the Company without cause or the executive for good reason (often called a "double trigger"). Benefits provided under the plan include: (i) a lump sum cash payment equal to two times (three times for the CEO) the sum of the executive's base salary and target annual bonus; (ii) a lump sum cash payment equal to the pro-rated portion of the executive's target annual bonus for the year of termination; and (iii) continued health and dental benefits and outplacement services for two years (three years for the CEO) following the date of termination.

60

## Compensation and Leadership Development Committee Report

*Notwithstanding anything to the contrary set forth in any of the previous or future filings under the Securities Act of 1933 or the Securities Exchange Act of 1934 that might incorporate this proxy statement or future filings with the Securities and Exchange Commission, in whole or part, the following report shall not be deemed to be incorporated by reference into any such filing.*

The Compensation and Leadership Development Committee reviewed and discussed the Compensation Discussion and Analysis contained in this Proxy Statement with management of the Company. Based on the review and discussions noted above, the Compensation and Leadership Development Committee recommended to the Board that the Compensation Discussion and Analysis be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and in this Proxy Statement.

COMPENSATION AND LEADERSHIP DEVELOPMENT COMMITTEE
Sean D. Keohane, Chair
Bradley J. Bell
Dawn L. Farrell
Erin N. Kane

# PROPOSAL 2 —  ADVISORY VOTE TO APPROVE NAMED EXECUTIVE OFFICER COMPENSATION

Pursuant to Section 14A of the Exchange Act and the related rules of the SEC, the Company seeks your vote to approve, on an advisory basis, the compensation of the Company's named executive officers as disclosed in this Proxy Statement pursuant to the SEC's compensation disclosure rules, including the Compensation Discussion and Analysis, the compensation tables, and the narrative disclosures that accompany the compensation tables (a "say-on-pay" vote).

As described in detail under the heading "Executive Compensation — Compensation Discussion and Analysis" in this Proxy Statement, the Board of Directors seeks to link a significant portion of executive officer compensation with the Company's performance. The Company's compensation programs are designed to reward the Company's executive officers for the achievement of short-term and long-term financial goals, while minimizing excessive risk taking. The Company's executive compensation program is strongly aligned with the long-term interests of shareholders. The Company urges you to read the Compensation Discussion and Analysis section of this Proxy Statement for additional details on executive compensation programs, including compensation philosophy and objectives and the compensation of named executive officers during fiscal year 2021.

The vote on this proposal is not intended to address any specific element of compensation; rather, the vote relates to all compensation relating to the Company's named executive officers, as described in this Proxy Statement.

The vote is advisory and is not binding on the Company, the Board, or the Compensation and Leadership Development Committee, and will not be construed as overruling a decision by, or creating or implying any additional fiduciary duty for, the Company, the Board, or the Compensation and Leadership Development Committee. However, the Board and the Compensation and Leadership Development Committee value the opinions expressed by shareholders in their votes on this proposal and will consider the outcome of the vote when making future compensation decisions and policies regarding the Company's executive officers.

Accordingly, the Board of Directors and management ask shareholders to approve the following resolution at the virtual Annual Meeting:

"**RESOLVED**, that the Company's shareholders approve, on an advisory basis, the compensation of the named executive officers, as disclosed in the Company's Proxy Statement for the 2022 Virtual Annual Meeting of Shareholders pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the Compensation Discussion and Analysis, the compensation tables and any related material disclosed in this Proxy Statement."

---

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" THE APPROVAL, ON AN ADVISORY BASIS, OF THE COMPENSATION OF THE NAMED EXECUTIVE OFFICERS AS DESCRIBED IN THIS PROXY STATEMENT.**

---

# PROPOSAL 3 — ADVISORY VOTE ON FREQUENCY OF ADVISORY VOTE ON NAMED EXECUTIVE OFFICER COMPENSATION

Pursuant to Section 14A of the Exchange Act and the related rules of the SEC, we seek your vote, on an advisory basis, on whether the say-on-pay vote should occur every one, two or three years. Stockholders may instead abstain from casting a vote on this proposal.

The Board asks that you support a frequency period of one year (an annual vote) for future advisory stockholder votes on the compensation of the Company's named executive officers. The Board has determined that an annual advisory vote on executive compensation will allow stockholders to provide timely, direct input on the Company's executive compensation philosophy, policies, and practices as disclosed in the proxy statement for each Annual Meeting. An annual vote is therefore consistent with the Company's efforts to engage in a dialogue with stockholders on executive compensation and corporate governance matters.

Stockholders may vote on their preferred voting frequency by choosing the option of one year, two years or three years, or may abstain from voting. Stockholders are not voting to approve or disapprove the

recommendation of the Board. Although the Board intends to carefully consider the voting results of this proposal, the vote is advisory and is not binding on the Company, the Board or the Compensation Committee. The Board may decide that it is in the best interests of stockholders and the Company to hold an advisory vote to approve executive compensation more or less frequently than the frequency preferred by stockholders.

---

**THE BOARD RECOMMENDS THAT YOU VOTE FOR THE OPTION OF "ONE YEAR" AS THE PREFERRED FREQUENCY FOR AN ADVISORY VOTE ON EXECUTIVE COMPENSATION.**

---

# PROPOSAL 4 — RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Audit Committee has selected PricewaterhouseCoopers LLP (PwC) as the Company's independent registered public accounting firm to audit the Company's consolidated financial statements and internal control over financial reporting for the fiscal year ending December 31, 2022. In Proposal 4, the Company is asking shareholders to ratify this selection.

Although ratification is not required by the Company's Bylaws or otherwise, the Board is submitting the selection of PwC to the Company's shareholders for ratification. If the selection is not ratified, the Audit Committee will consider whether it is appropriate to select another independent registered public accounting firm. Even if the selection is ratified, the Audit Committee in its discretion may select a different independent registered public accounting firm at any time during the year, if it determines that such a change would be in the best interests of the Company and its shareholders.

Representatives of PwC are expected to be present at the virtual Annual Meeting and will be available to respond to appropriate questions and will have the opportunity to make a statement if they desire to do so.

---

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" THE PROPOSAL TO RATIFY THE SELECTION OF PRICEWATERHOUSECOOPERS LLP AS INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR FISCAL YEAR 2022.**

---

## Fees Paid to Independent Registered Public Accounting Firm

PwC has served as the Company's independent registered public accounting firm since 2014. Aggregate fees for professional services rendered by PwC for 2021 and 2020 are set forth in the table below.

| | 2021 (in thousands) | 2020 (in thousands) |
|---|---|---|
| Audit fees[1] | $ 7,012 | $7,133 |
| Audit-related fees[2] | 2,207 | 534 |
| Tax fees[3] | 1,549 | 938 |
| All other fees[4] | 37 | 9 |
| Total | $10,805 | $8,614 |

(1)  Audit fees related to audits of financial statements and internal controls over financial reporting, statutory audits, reviews of quarterly financial statements, comfort letters, reviews of registration statements and certain periodic reports filed with the SEC.

(2)  Audit-related fees related primarily to carve out audits, accounting consultations, systems implementation and other assurance related services not required by statute.

(3)  Tax fees related primarily to tax compliance and advice.

(4)  Other fees in 2021 primarily related to a cyber breach simulation digital tool and technical accounting and reporting software tools.

63

## Audit Committee's Pre-Approval Policies and Procedures

To assure that the audit and non-audit services performed by the independent registered public accounting firm do not impair its independence in appearance and/or fact, the Audit Committee has established the Audit and Non-Audit Services Pre-Approval Policy of the Audit Committee (the "Policy"). The Policy outlines the scope of services that PwC may provide to the Company. The Policy sets forth guidelines and procedures the Company must follow when retaining PwC to perform audit, audit-related, tax and other services. The Policy also specifies certain non-audit services that may not be performed by PwC under any circumstances. Pursuant to the Policy, the Audit Committee has approved services to be provided by PwC and fee thresholds within each of the service categories, and services within these thresholds are deemed pre-approved. Additional services and fees exceeding those thresholds require further pre-approval. Requests for specific pre-approvals may be considered by the full Audit Committee. In addition, the Audit Committee has delegated to the Chair the authority to grant specific pre-approvals. Any such pre-approvals are reported to the full Audit Committee at its next meeting. The Policy is evaluated and updated annually by the Audit Committee. For fiscal year 2021, all services provided by PwC were approved by the Audit Committee.

## Report of the Audit Committee

*Notwithstanding anything to the contrary set forth in any of the Company's previous or future filings under the Securities Act of 1933 or the Securities Exchange Act of 1934 that might incorporate this proxy statement or future filings with the Securities and Exchange Commission, in whole or part, the following report shall not be deemed to be incorporated by reference into any such filing.*

The Audit Committee is appointed by the Board of Directors to assist the Board in the oversight of (i) the integrity of the financial statements of the Company, (ii) the qualifications and independence of the Company's independent auditor, (iii) the performance of the Company's internal audit function and independent auditors, and (iv) the compliance by the Company with legal and regulatory requirements. All members of the Audit Committee meet the criteria for independence applicable to audit committee members under NYSE Listing Standards and the rules and regulations of the SEC relating to audit committees. The Audit Committee Charter complies with NYSE Listing Standards.

Management is responsible for the financial reporting process, including its internal control over financial reporting, and for the preparation of its consolidated financial statements in accordance with accounting principles generally accepted in the United States ("GAAP"). The Company's independent registered public accounting firm is responsible for performing an independent audit of the consolidated financial statements, and expressing opinions on the consolidated financial statements and internal control over financial reporting. The Audit Committee's responsibility is to monitor and review these processes and act in an oversight capacity. The Audit Committee does not certify the financial statements or guarantee the independent registered public accounting firm's report. The Audit Committee relies, without independent verification, on the information provided to it, including representations made by management and the independent registered public accounting firm, including its audit report.

The Audit Committee discussed with PwC, the Company's independent registered public accounting firm, the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC. The Audit Committee has received the written disclosures and the letter from PwC required by applicable requirements of the Public Company Accounting Oversight Board regarding PwC's communications with the Audit Committee concerning independence, and has discussed with PwC its independence. The Audit Committee reviewed and discussed the audited financial statements of the Company for the fiscal year ended December 31, 2021 with management and PwC. Based on the review and discussions noted above, the Audit Committee recommended to the Board that the audited financial statements of the Company be included in the Company's Annual Report on Form 10-K filed with the SEC for the fiscal year ended December 31, 2021.

AUDIT COMMITTEE
Curtis V. Anastasio, Chair
Mary B. Cranston
Curtis J. Crawford
Dawn L. Farrell
Erin N. Kane
Sandra Phillips Rogers

64

# CERTAIN RELATIONSHIPS AND TRANSACTIONS

The Board has adopted "Policies and Procedures for Transactions with Related Persons" to assist it in reviewing, approving and ratifying related person transactions and to assist the Company in preparing the disclosures that the rules and regulations of the SEC require to be included in the Company's applicable SEC filings. Pursuant to the policies and procedures, any reported transaction between the Company and a "Related Person" that may qualify as a "Related Person Transaction" will be referred to the Nominating and Corporate Governance Committee or any other committee comprised of independent directors designated by the Board.

The Nominating and Corporate Governance Committee (or its Chair, under some circumstances) will determine whether to approve, ratify, disapprove or reject any Related Person Transaction following consideration of all relevant factors, including, without limitation, the following: (i) the commercial reasonableness of the transaction; (ii) the materiality of the Related Person's direct or indirect interest in the transaction; (iii) whether the transaction may involve a conflict of interest, or the appearance of one; (iv) whether the transaction was in the ordinary course of business; (v) the benefits to the Company; (vi) the availability of other sources for comparable products or services; and (vii) the impact of the transaction on the Related Person's independence under the Company's Corporate Governance Guidelines and applicable regulatory and listing standards. Related Person Transactions will be approved or ratified only if they are determined to be in the best interests of the Company and its shareholders.

If a Related Person Transaction that has not been previously approved or ratified is discovered, the Related Person Transaction will be presented to the Nominating and Corporate Governance Committee for ratification. If the Nominating and Corporate Governance Committee does not ratify the Related Person Transaction, then the Company will ensure all appropriate disclosures regarding the transaction are made and, if appropriate, take all reasonable actions to attempt to terminate the Company's participation in the transaction.

It is expected that the Company and its subsidiaries may purchase products and services from and/or sell products and services to companies of which certain of the Company's directors or executive officers, or their immediate family members, are directors or employees. Chemours carries out transactions with these entities on customary terms, and, in many instances, the Company's directors and executive officers may not be aware of them. To the Company's knowledge, since the beginning of fiscal year 2021, no related person has had a material interest in any of the Company's business transactions or relationships.

# GENERAL INFORMATION ABOUT THE MEETING

**Q.  Why am I being asked to review these materials?**

**A.**  The Board is soliciting proxies for use at the virtual Annual Meeting to be held on April 27, 2022, beginning at 10:00 a.m. Eastern time via live webcast at www.viewproxy.com/chemours/2022/vm. In order to solicit your proxy, the Company must furnish you with this Notice and Proxy Statement, which contains information about the proposals to be voted upon at the virtual Annual Meeting. As a Company shareholder, you are invited to attend the virtual Annual Meeting and are entitled and encouraged to vote on the proposals described in this Proxy Statement. This Proxy Statement and the Company's Annual Report to Shareholders are first being mailed to the Company's shareholders and made available on the Internet on or about March 11, 2022.

**Q.  Why am I being asked to review materials online?**

**A.**  In accordance with rules and regulations adopted by the SEC, instead of mailing a printed copy of the Company's proxy materials to each shareholder, the Company is furnishing proxy materials, including this Proxy Statement and Annual Report to Shareholders, by providing access on the Internet rather than mailing printed copies of the materials. Most

65

shareholders will not receive printed copies of the proxy materials unless they request them. Instead, a Notice of Internet Availability of Proxy Materials (the "Notice") has been sent to most of the Company's shareholders with instructions on how to access and review the proxy materials on the Internet. The Notice also provides instructions on how you may submit your proxy on the Internet. If you would like to receive a paper or email copy of the Company's proxy materials, please follow the instructions for requesting such materials in the Notice.

**Q.** **How does the Board recommend I vote on the proposals described in this Proxy Statement?**

**A.** The Board recommends that you vote **"FOR"** each of the director nominees to the Board (Proposal 1), "**FOR**" approval of the compensation of the named executive officers (Proposal 2), **"FOR"** approval of the option of **"ONE YEAR"** as the preferred frequency for an advisory vote on executive compensation (Proposal 3), and "**FOR**" ratification of the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm (Proposal 4).

**Q.** **Who may vote at the meeting?**

**A.** Only holders of record of Chemours common stock at the close of business on March 1, 2022 (the "Record Date") are entitled to vote at the Annual Meeting. Each outstanding share of common stock is entitled to one vote. On the Record Date, there were 159,305,931 shares of Chemours common stock outstanding and entitled to vote.

**Q.** **How do I vote?**

**A.** If your shares are registered directly in your own name with the Company's transfer agent, Computershare Trust Company, N.A., you are considered a "shareholder of record" with respect to those shares, and the Notice has been sent directly to you.

As a shareholder of record, you may submit your proxy in advance of the virtual Annual Meeting using any of the following alternatives:

VIA INTERNET at www.AALVote.com/CC

BY TELEPHONE by dialing: 866-804-9616

BY MAIL by completing and mailing in a paper proxy card.

Or you may vote ON-LINE at the virtual Annual Meeting.

If, like most shareholders of the Company, you hold your shares through a broker, bank or other nominee, you are considered a "beneficial owner" of those shares, holding the shares in "street name." If you are a beneficial owner of shares, you will receive instructions from your broker or other nominee describing how to vote your shares. To vote on-line at the virtual Annual Meeting, beneficial owners will need to contact the broker, trustee or nominee that holds their shares to obtain a "legal proxy" to bring to the meeting.

**Q.** **What is the deadline for voting if I do not plan to attend the virtual Annual Meeting?**

**A.** You may submit your proxy via the Internet or by telephone until 11:59 p.m., Eastern Time, on April 26, 2022, or the Company's agent must receive your paper proxy card by mail on or before April 26, 2022.

If your shares are held in "street name," please refer to the voting instructions from your broker, trustee or other nominee.

**Q.** **If I provide voting instructions and/or grant my proxy, who will vote my shares at the virtual Annual Meeting and how will they vote my shares?**

**A.** Sameer Ralhan and David C. Shelton are Officers of the Company and were named by the Board as proxy holders. They will vote all proxies, or record an abstention, in accordance with the directions on the proxy. If no contrary direction is given, the shares will be voted as recommended by the Board.

**Q.** **Who will count the votes?**

**A.** A representative of Alliance Advisors, LLC, an independent tabulator, will count the vote and act as the inspector of election.

66

TABLE OF CONTENTS

**Q. Can I change my vote after I have delivered my proxy?**

**A.** Yes. Submission of a later proxy by any means by the deadlines described herein or voting online at the virtual Annual Meeting will change your prior vote. Beneficial owners who wish to change their vote must follow the procedures provided by their broker, bank or other nominee.

**Q. Can I revoke a proxy?**

**A.** Yes. A shareholder of record may revoke a properly executed proxy at any time before its exercise by submitting a letter addressed to, and received by, the Corporate Secretary of the Company, by delivering later dated proxy instructions or by voting at the virtual meeting. Beneficial owners who wish to revoke their proxy should contact their broker, bank or other nominee. Attendance at the meeting alone will not revoke a proxy. Without a legal proxy from the record owner, beneficial owners cannot revoke their proxies at the virtual Annual Meeting because the actual registered shareholders — the broker, bank or other nominees — will not be present. Beneficial owners who wish to vote at the virtual Annual Meeting must obtain a legal proxy from their broker, bank or other nominee.

**Q. What does it mean if I receive more than one Notice, proxy or voting instruction card?**

**A.** It means your shares are registered differently or are in more than one account. For all Notices you receive, please submit your proxy by Internet for each control number you have been assigned. If you received paper copies of proxy materials, please provide voting instructions for all proxy and voting instruction cards you receive. The Company encourages you to register all your accounts in the same name and address. Registered shareholders may contact the Company's transfer agent, Computershare Investor Services, P.O. Box 505000, Louisville, KY 40233-5000; (866) 478-8569. Beneficial owners holding Chemours common stock through a broker, bank or other nominee should contact their broker, bank or nominee and request consolidation of their accounts.

**Q. What is a quorum? Why is a quorum required?**

**A.** Return of your proxy is important because a quorum is required for the Company shareholders to conduct business at the meeting. The presence at the meeting, on-line or by proxy, of the holders of shares having a majority of the voting power represented by all issued and outstanding shares entitled to vote on the record date will constitute a quorum, permitting the Company to conduct the business of the meeting. Proxies received but marked as abstentions, if any, will be included in the calculation of the number of shares considered to be present at the meeting for quorum purposes. Because this proxy includes a "routine" management proposal, shares represented by "broker non-votes" will be counted in determining whether there is a quorum present. If there is not a quorum present at the virtual Annual Meeting, the chairman of the meeting may adjourn the virtual Annual Meeting to a later time.

**Q. How will votes be counted on shares held through brokers?**

**A.** If you are a beneficial owner and do not provide your broker with voting instructions, your shares may constitute "broker non-votes." Generally, broker non-votes occur on a matter when a broker is not permitted to vote on that matter without instructions from the beneficial owner and instructions are not given. The shares of a shareholder whose shares are not voted because of a broker non-vote on a particular matter will be counted for purposes of determining whether a quorum is present at the virtual Annual Meeting so long as the shares are represented at the meeting. In tabulating the voting result for any particular proposal, shares that constitute broker non-votes are not considered present and entitled to vote on that proposal. Thus, broker non-votes will not affect the outcome of any matter being voted on at the virtual Annual Meeting, assuming that a quorum is obtained. Brokers will be permitted to vote without voting instructions on the ratification of

67

the selection of PricewaterhouseCoopers LLP, assuming that a quorum is obtained and therefore no broker non-votes are expected with respect to that proposal.

**Q. How many votes are needed to elect the director nominees and approve each of the proposals?**

**A.**

| Proposal | Vote Required | Broker Discretionary Voting Allowed? |
|---|---|---|
| Election of Directors | Majority of Votes Cast | No |
| Advisory Approval of Executive Compensation | Majority of Votes Represented and Entitled to Vote | No |
| Frequency of Advisory Votes on Executive Compensation | Plurality of Votes Cast | No |
| Ratification of PwC | Majority of Votes Represented and Entitled to Vote | Yes |

For the election of directors (Proposal 1), under the Bylaws, the number of votes cast "for" a nominee must exceed the number of votes cast "against" the nominee for the nominee to be elected as a director. With respect to the non-binding advisory vote on the frequency of stockholder votes on the approval, on an advisory basis, of the compensation of the Company's named executive officers (Proposal 3), the frequency option — one year, two years, or three years — that receives the most votes "for" of all votes cast on the proposal will be the frequency option approved by the stockholders. For all other matters, except as set forth in the Certificate of Incorporation, the Bylaws or applicable law, the approval of the holders of a majority of votes represented at the meeting and entitled to vote on the proposal is required for approval of a proposal under the Bylaws.

In accordance with the voting standards set forth above, abstentions from voting on a matter by a stockholder present in person or represented by proxy at the meeting have no effect on the election of directors or on the outcome of the votes for the frequency of stockholder votes on the compensation of the Company's named executive officers but have the same effect as votes "against" the other proposals.

**Q. What happens if an incumbent director nominee does not receive a majority of the votes cast for his or her re-election at the virtual Annual Meeting?**

**A.** The Company's Corporate Governance Guidelines provide that the Board shall nominate for election or re-election only those candidates who agree to tender, promptly following the virtual annual meeting at which they are elected or re-elected as a director, their irrevocable resignations contingent upon their failure to receive a majority of the votes cast for their election in an election that is not a contested election and the Board's acceptance of such resignations. In the event an incumbent director fails to receive the required vote for re-election, the Nominating and Corporate Governance Committee will make a recommendation to the Board as to whether to accept or reject the resignation of the incumbent director. The Board will act on the resignation, taking into account the recommendation of the Nominating and Corporate Governance Committee, and publicly disclose its decision within ninety (90) days following certification of the election results. The Nominating and Corporate Governance Committee in making its recommendation and the Board in making its decision may consider all facts and circumstances they consider relevant or appropriate in reaching their determinations.

**Q. Where can I find voting results of the virtual Annual Meeting?**

**A.** Chemours will announce preliminary general voting results at the meeting and publish final detailed voting results on a Current Report on Form 8-K that Chemours will file with the SEC within four business days after the meeting.

**Q. Who will bear the cost for soliciting votes for the virtual Annual Meeting?**

**A.** Chemours will bear all expenses in conjunction with the solicitation of the enclosed proxy, including the charges of brokerage houses and other custodians, nominees or fiduciaries for forwarding documents to security owners and the fee to Innisfree M&A Incorporated ("Innisfree"), who will help the Company solicit proxies. Chemours anticipates that the fee to Innisfree will be approximately $15,000, plus

68

expenses. In addition, proxies may be solicited by mail, email, in person, or by telephone or fax by certain of the Company's directors, officers and other employees.

**Q.   What do I need to do to attend the Annual Meeting virtually?**

**A.   **Both stockholders of record and street name stockholders will need to register to be able to attend the Annual Meeting via live audio webcast, submit their questions during the meeting and vote their shares electronically at the Annual Meeting by following the instructions below.

If you are a stockholder of record, you must:

- Follow the instructions provided on your Notice or proxy card to first register at www.viewproxy.com/chemours/2022/VM by 11:59 p.m. Eastern Time on April 25, 2022. You will need to enter your name, phone number, virtual control number (included on your Notice or proxy card) and email address as part of the registration, following which, you will receive an email confirming your registration, as well as the password to attend the virtual Annual Meeting.

- On the day of the virtual Annual Meeting, if you have properly registered, you may enter the virtual Annual Meeting by logging in using the password you received via email by clicking on the link in your registration confirmation. (If you wish to vote you will need the virtual control number included on your Notice or proxy card).

- If you wish to vote your shares electronically at the virtual Annual Meeting, you will need to click on http://www.AALvote.com/CC during the Annual Meeting while the polls are open (you will need the virtual control number included on your Notice or proxy card).

If you are a street name stockholder, you must:

Obtain a legal proxy from your broker, bank or other nominee.

- Register at www.viewproxy.com/Chemours/2022/VM by 11:59 p.m. Eastern Time on April 25, 2022. You will need to enter your name, phone number and email address, and provide a copy of the legal proxy (which may be uploaded to the registration website or sent via email to VirtualMeeting@viewproxy.com as part of

the registration, following which, you will receive an email confirming your registration, your virtual control number, as well as the password to attend the virtual Annual Meeting. Please note, if you do not provide a copy of the legal proxy, you may still attend the virtual Annual Meeting, but you will be unable to vote your shares electronically at the virtual Annual Meeting.

- On the day of the virtual Annual Meeting, if you have properly registered, you may enter the virtual Annual Meeting by logging in using the password you received via email by clicking on the link in your registration confirmation. (If you wish to vote you will need the virtual control number assigned to you in your registration confirmation email).

- If you wish to vote your shares electronically at the virtual Annual Meeting, you will need to click http://www.AALvote.com/CC during the virtual Annual Meeting while the polls are open (you will need the virtual control number assigned to you in your registration confirmation email). Further instructions on how to attend the Annual Meeting via [live audio webcast], including how to vote your shares electronically at the virtual Annual Meeting are posted on www.viewproxy.com/chemours/2022/VM under Frequently Asked Questions (FAQ). The Annual Meeting [live audio webcast] will begin promptly at 10:00 a.m. Eastern Daylight Time on April 27, 2022. We encourage you to access the meeting prior to the start time. [Online] check-in will begin at 9:30 a.m. Eastern Daylight Time, and you should allow ample time for the check-in procedures.

Chemours has created and implemented the virtual format in order to facilitate stockholder attendance and participation by enabling stockholders to participate fully, and equally, from any location around the world, at no cost. However, you will bear any costs associated with your Internet access, such as usage charges from Internet access providers and telephone companies. A virtual Annual Meeting makes it possible for more stockholders (regardless of size, resources or physical location) to have direct access to information more quickly, while saving the company and our stockholders time and money, especially as physical attendance at meetings has dwindled. We also believe that the online tools we have selected will increase stockholder communication. For example, the

69

virtual format allows stockholders to communicate during the Annual Meeting so they can ask questions of our board of directors or management. During the live Q&A session of the virtual Annual Meeting, we may answer questions as they come in, to the extent they are relevant to the business of the Annual Meeting, as time permits.

**Q. Can I access future annual meeting materials through the Internet rather than receiving them by mail?**

**A.** Yes. Shareholders of record can sign up for electronic delivery at www.allianceproxy.com/chemours/2022. If you submit your proxy through the Internet, you can also sign up for electronic delivery by following the instructions that appear after you finish voting. You will receive an e-mail next year containing links to the Company's Annual Report to Shareholders and the Proxy Statement for the Company's 2023 Annual Meeting.

Beneficial owners may also have the opportunity to receive copies of these documents electronically. Please check the information provided in the proxy materials mailed to you by your broker or other nominee regarding the availability of this service. This procedure reduces the printing costs and fees the Company incurs in connection with the solicitation of proxies.

**Q. What is "householding"?**

**A.** As permitted by SEC rules, the Company has adopted a procedure called "householding," under which multiple shareholders who have the same address will receive a single Notice and, if applicable, a single set of annual report and other proxy materials, unless one or more of these shareholders notifies the Company that they wish to continue receiving individual copies.

Shareholders who participate in householding will continue to receive separate proxy cards. This procedure can result in significant savings to the Company by reducing printing and postage costs.

If you are a registered holder and would like to participate in householding, or if you participate in householding and would like to receive a separate set of proxy materials, please contact Alliance Advisors, LLC by calling 1-877-777-2857 or by e-mailing requests@viewproxy.com. Beneficial owners should contact their broker or other nominee for information about householding.

**Q. How can I communicate with the Company's Board?**

**A.** Shareholders and other interested parties may send communications to the Board in care of the Corporate Secretary, The Chemours Company, 1007 Market Street, Wilmington, Delaware 19801. Please indicate whether your message is for the Board as a whole, a particular group or committee of directors, or an individual director.

**Q. What if I have additional questions?**

**A.** If you have additional questions about the virtual Annual Meeting or any of the information presented in this Proxy Statement, you may direct your questions to Chemours Investor Relations at annualmeeting@chemours.com, or call (302) 773-3291. Web links throughout this document are provided for convenience only, and the content on the referenced websites does not constitute a part of this Proxy Statement.

70

# OTHER INFORMATION

## Other Business that May Come Before the Meeting

The Company does not intend to bring any other business before the Annual Meeting for action and has not been notified of any other business proposed to be brought before the Annual Meeting. However, if any other business should be properly presented for action, it is the intention of the persons named on the proxy card to vote in accordance with their judgment on such business.

## 2023 Annual Meeting of Shareholders

### Procedures for Submitting Shareholder Proposals and Nominations

If you want to include a shareholder proposal in the Proxy Statement for the Company's 2023 Annual Meeting of Shareholders, your shareholder proposal must be delivered to the Company not later than November 11, 2022 and it must satisfy the rules and regulations of the SEC to be eligible for inclusion in the Proxy Statement for that meeting. If the date of the Company's 2023 Annual Meeting of Shareholders changes by more than 30 days from the date that is the first anniversary of the 2022 virtual Annual Meeting, then the deadline is a reasonable time before the Company begins to print and mail proxy materials for the 2023 Annual Meeting.

If you want to submit a shareholder proposal for the Company's 2023 Annual Meeting of Shareholders and you do not require that the proposal be included in the Company's proxy materials or want to submit a director nomination, your shareholder proposal or director nomination must be delivered to the Company not earlier than January 1, 2023 and not later than January 31, 2023. However, if the date of the 2023 Annual Meeting changes by more than

30 days from the date that is the first anniversary of the 2022 virtual Annual Meeting, then any shareholder proposal must be received no later than the close of business on the tenth day following the date of public disclosure of the date of such meeting. Your notice must also include the information required by the Company's Bylaws.

All shareholder proposals and director nominations must be delivered to the Company at the following address: The Chemours Company, 1007 Market Street, Wilmington, DE 19801, Attention: Corporate Secretary.

The chairman of the Annual Meeting or any other annual meeting or special meeting of shareholders may refuse to acknowledge the nomination or shareholder proposal of any person not made in compliance with the foregoing procedures and the Bylaws. A shareholder's compliance with these procedures will not require the Company to include information regarding a proposed nominee in the Company's proxy solicitation materials.

## Annual Report on Form 10-K Shareholders

A copy of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021, including the financial statements and schedules and a list of all exhibits, will be supplied without charge to any shareholder upon written request sent to The Chemours Company, 1007 Market Street,

Wilmington, DE 19801, Attention: Investor Relations. Exhibits to the Form 10-K are available for a reasonable fee. You may also view the Annual Report on Form 10-K and its exhibits on-line at the SEC website at www.sec.gov or on the Company's website at https://investors.chemours.com.

**IMPORTANT**

**We value the input and support of all shareholders. Whether your share holdings are large or small, and even if you expect to attend the virtual Annual Meeting, please promptly submit your proxy by telephone, through the Internet or by mail.**

71

**PROXY**

## The Chemours Company

**PROXY FOR VIRTUAL ANNUAL MEETING OF SHAREHOLDERS TO BE HELD APRIL 27, 2022**
**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**
**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED**

The undersigned hereby appoints Sameer Ralhan and David C. Shelton, or either of them, each with power of substitution, as proxies for the undersigned to vote all shares of Common Stock of said Company which the undersigned is entitled to vote at the Virtual Annual Meeting of Shareholders (the "Annual Meeting") of The Chemours Company (the "Company") to be held on April 27, 2022, and any adjournment or postponement thereof, as hereinafter specified and, in their judgment, upon such other matters as may properly come before the meeting. The undersigned hereby revokes all proxies previously given.

THIS PROXY WILL BE VOTED AS DIRECTED OR, IF NO DIRECTION IS GIVEN, WILL BE VOTED "FOR" EACH OF THE NOMINEES NAMED IN PROPOSAL 1, AND "FOR" PROPOSALS 2 AND 4 AND "ONE YEAR" FOR PROPOSAL 3. THE PROXIES ARE AUTHORIZED TO VOTE IN THEIR JUDGMENT UPON SUCH OTHER BUSINESS NOT KNOWN AS MAY PROPERLY COME BEFORE THE ANNUAL MEETING OR ANY ADJOURNMENTS THEREOF.

(Continued and to be marked, dated and signed on other side)

▲ PLEASE DETACH ALONG PERFORATED LINE AND MAIL IN THE ENVELOPE PROVIDED. ▲

If you plan to attend the Virtual Annual Meeting, you must be a holder of Company shares as of the Record Date of March 1, 2022, you must register at www.viewproxy.com/chemours/2022/VM by 11:59 p.m. Eastern Time on April 25, 2022. You will need to enter your name, phone number and email address, and provide a copy of the legal proxy (which may be uploaded to the registration website or sent via email to VirtualMeeting@viewproxy.com as part of the registration, following which, you will receive an email confirming your registration, your virtual control number, as well as the password to attend the virtual Annual Meeting. Please note, if you do not provide a copy of the legal proxy, you may still attend the virtual Annual Meeting, but you will be unable to vote your shares electronically at the virtual Annual Meeting.

**Important Notice Regarding the Availability of Proxy Materials for the Virtual Annual Meeting of Shareholders to be held April 27, 2022**

**The Proxy Statement and our 2021 Annual Report to Shareholders are available at: http://www.allianceproxy.com/chemours/2022**

TABLE OF CONTENTS

Please mark your votes like this in blue or black ink ☒

The Board of Directors recommends you vote FOR each of the nominees named in Proposal 1, FOR Proposals 2 and 4, and ONE YEAR for Proposal 3.

**Proposal 1** – Election of Directors to Serve One-Year Terms expiring at the Annual Meeting of Shareholders in 2023.

Nominees:

| | | FOR | AGAINST | ABSTAIN |
|---|---|---|---|---|
| 1a. | Curtis V. Anastasio | ☐ | ☐ | ☐ |
| 1b. | Bradley J. Bell | ☐ | ☐ | ☐ |
| 1c. | Mary B. Cranston | ☐ | ☐ | ☐ |
| 1d. | Curtis J. Crawford | ☐ | ☐ | ☐ |
| 1e. | Dawn L. Farrell | ☐ | ☐ | ☐ |
| 1f. | Erin N. Kane | ☐ | ☐ | ☐ |
| 1g. | Sean D. Keohane | ☐ | ☐ | ☐ |
| 1h. | Mark E. Newman | ☐ | ☐ | ☐ |
| 1i. | Guillaume Pepy | ☐ | ☐ | ☐ |
| 1j. | Sandra Phillips Rogers | ☐ | ☐ | ☐ |

**Proposal 2** – Advisory Vote to Approve Named Executive Officer Compensation

☐ FOR ☐ AGAINST ☐ ABSTAIN

**Proposal 3** – Advisory Vote on Frequency of Advisory Vote on Named Executive Officer Compensation (the Board Recommends a vote of "ONE YEAR").

☐ ONE YEAR ☐ TWO YEARS ☐ THREE YEARS ☐ ABSTAIN

**Proposal 4** – Ratification of Selection of PricewaterhouseCoopers LLP for fiscal year 2022

☐ FOR ☐ AGAINST ☐ ABSTAIN

To transact other business as may properly come before the meeting or any adjournment or postponement thereof.

Date _____

Signature _____

Signature _____
(Joint Owners)

Note: Please sign exactly as your name or names appear on this card. Joint owners should each sign personally. If signing as a fiduciary or attorney, please give your exact title.

Address Change/Comments: (If you noted any Address Changes and/or Comments above, please mark box.) ☐

Please indicate if you plan to attend this meeting ☐

**CONTROL NUMBER**

▲ PLEASE DETACH ALONG PERFORATED LINE AND MAIL IN THE ENVELOPE PROVIDED. ▲

As a shareholder of The Chemours Company, you have the option of voting your shares electronically through the Internet or by telephone, eliminating the need to return the proxy card. Your electronic vote authorizes the named proxies to vote your shares in the same manner as if you marked, signed, dated and returned the proxy card. Votes submitted electronically over the Internet or by telephone must be received by 11:59 p.m., Eastern Standard Time, on April 26, 2022.

**CONTROL NUMBER**

## PROXY VOTING INSTRUCTIONS

Please have your 11-digit control number ready when voting by Internet or Telephone



**INTERNET**
Vote Your Proxy on the Internet:
Go to www.AALVote.com/CC
Have your proxy card available when you access the above website. Follow the prompts to vote your shares.



**TELEPHONE**
Vote Your Proxy by Phone:
Call 1 866-804-9616
Use any touch-tone telephone to vote your proxy. Have your proxy card available when you call. Follow the voting instructions to vote your shares.



**MAIL**
Vote Your Proxy by Mail:
Mark, sign, and date your proxy card, then detach it, and return it in the postage-paid envelope provided.

# Exhibit 11

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

**July 26, 2023**
Date of Report (Date of Earliest Event Reported)



# The Chemours Company
(Exact Name of Registrant as Specified in Its Charter)

| Delaware | 001-36794 | 46-4845564 |
|---|---|---|
| (State or Other Jurisdiction | (Commission | (I.R.S. Employer |
| Of Incorporation) | File Number) | Identification No.) |

**1007 Market Street**
**Wilmington, Delaware 19801**
(Address of principal executive offices)

Registrant's telephone number, including area code: (302) 773-1000

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐     Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Exchange on Which Registered |
|---|---|---|
| Common Stock ($0.01 par value) | CC | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company     ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.     ☐

**Item 2.02**         **Results of Operations and Financial Condition.**

On July 27, 2023, The Chemours Company (the "Company") issued a press release regarding its second quarter 2023 financial results. A copy of the press release is furnished hereto as Exhibit 99.1.

The information furnished with this report on Form 8-K, including Exhibit 99.1, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, and it will not be deemed incorporated by reference into any registration statement or other document filed under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such a filing.

**Item 2.05**         **Costs Associated with Exit or Disposal Activities.**

On July 27, 2023, the Company announced its plan to close its Titanium Technologies segment manufacturing site in Kuan Yin, Taiwan effective August 1, 2023, which the Company's Board of Directors approved on July 26, 2023. The operations at Kuan Yin produce dry and slurry titanium dioxide ("TiO$_2$"). The Company expects to immediately begin decommissioning the plant and dismantling and removal thereafter.

As a result, in the third quarter 2023, the Company expects to record pre-tax asset-related impairment, restructuring, and other charges in the range of approximately $150 million to $160 million, comprised primarily of non-cash charges of approximately $130 million related to property, plant and equipment, inventory and other assets, and cash charges related to severance, contract termination and other charges in the range of approximately $20 million to $30 million. The Company also expects to incur additional charges in the range of approximately $25 million to $45 million for decommissioning, dismantling and removal costs from third quarter 2023 and thereafter, which will be expensed as incurred.

A copy of the press release containing the announcement of the Company's plan to close the Kuan Yin manufacturing site is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

**Item 2.06**         **Material Impairments.**

The information set forth in Item 2.05 above is incorporated into this Item 2.06 by reference.

This current report on Form 8-K contains forward-looking statements, within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, which involve risks and uncertainties. Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to a historical or current fact. The words "believe," "expect," "will," "anticipate," "plan," "estimate," "target," "project" and similar expressions, among others, generally identify "forward-looking statements," which speak only as of the date such statements were made. These forward-looking statements may address, among other things, the outcome or resolution of any pending or future environmental liabilities, the commencement, outcome or resolution of any regulatory inquiry, investigation or proceeding, the initiation, outcome or settlement of any litigation, changes in environmental regulations in the U.S. or other jurisdictions that affect demand for or adoption of our products, anticipated future operating and financial performance for our segments individually and our company as a whole, business plans, prospects, targets, goals and commitments, capital investments and projects and target capital expenditures, plans for dividends or share repurchases, sufficiency or longevity of intellectual property protection, cost reductions or savings targets, including those related to the closing of Chemours' Kuan Yin manufacturing site located in Taiwan, plans to increase profitability and growth, our ability to make acquisitions, integrate acquired businesses or assets into our operations, and achieve anticipated synergies or cost savings, all of which are subject to substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Forward-looking statements are based on certain assumptions and expectations of future events that may not be accurate or realized, such as full year guidance relying on models based upon management assumptions regarding future events that are inherently uncertain. These statements are not guarantees of future performance. Forward-looking statements also involve risks and uncertainties that are beyond Chemours' control. Matters outside our control, including general economic conditions and the COVID-19 pandemic, have affected or may affect our business and operations and may or may continue to hinder our ability to provide goods and services to customers, cause disruptions in our supply chains such as through strikes, labor disruptions or other events, adversely affect our business partners, significantly reduce the demand for our products, adversely affect the health and welfare of our personnel or cause other unpredictable events. Additionally, there may be other risks and uncertainties that Chemours is unable to identify at this time or that Chemours does not currently expect to have a material impact on its business. Factors that could cause or contribute to these differences include the risks, uncertainties and other factors discussed in our filings with the U.S. Securities and Exchange Commission, including in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2023 and in our Annual Report on Form 10-K for the year ended December 31, 2022. Chemours assumes no obligation to revise or update any forward-looking statement for any reason, except as required by law.

**Item 9.01**         **Financial Statements and Exhibits.**

(d) Exhibits

    99.1 <u>Press release dated July 27, 2023.</u>

    104  The cover page from this Current Report on Form 8-K, formatted in Inline XBRL.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

THE CHEMOURS COMPANY

| By: | /s/ Jonathan Lock |
| --- | --- |
| | Jonathan Lock |
| | Senior Vice President, Chief Financial Officer |
| Date: | July 27, 2023 |

EX-99.1 2 cc-ex99_1.htm EX-99.1

**EXHIBIT 99.1**



**The Chemours Company Reports Second Quarter 2023 Results and Announces Closure of Titanium Dioxide Plant in Taiwan**

*Solid second quarter despite signs of demand weakness, FY 2023 Adjusted EBITDA guidance lowered 9% at the midpoint*

**Wilmington, Del**., July 27, 2023 -- The Chemours Company ("Chemours" or "the Company") (NYSE: CC), a global chemistry company with leading market positions in Titanium Technologies ("TT"), Thermal & Specialized Solutions ("TSS"), and Advanced Performance Materials ("APM"), today announced its financial results for the second quarter 2023 paired with the announcement of the closing of the Kuan Yin, Taiwan titanium dioxide manufacturing facility.

**Second Quarter 2023 Results & Highlights**

- Net Sales of $1.6 billion

- Net Loss of $(376) million with EPS[1] of $(2.52)

- Adjusted Net Income[2] of $167 million with Adjusted EPS[2] of $1.10

- Adjusted EBITDA[2] of $324 million and Free Cash Flow of $3 million

- Announced shutdown of TT's Kuan Yin, Taiwan manufacturing facility as part of overall cost optimization efforts

- Reached comprehensive settlement of PFAS-related drinking water claims of a defined class of U.S. public water systems; Chemours' share totaling $592 million

- Agreed to sell Chemours' Glycolic Acid business to PureTech Scientific Inc. for $137 million

- Launched operations at THE Mobility F.C. Membranes Company as a part of Chemours' joint venture

- Issued Chemours' sixth Sustainability Report highlighting significant progress towards 2030 CRC goals

- On July 26, 2023, the Company's Board of Directors approved a third quarter dividend of $0.25 per share

- Given weaker 2H demand visibility, we now anticipate full year Adjusted EBITDA to be between $1.100 billion and $1.175 billion; with Free Cash Flow guidance greater than $325 million[3]

"Our second quarter performance underscores the strength of our industry-leading businesses despite increasing economic uncertainty.  In Thermal & Specialized Solutions, we delivered record Net Sales and Adjusted EBITDA, and in Advanced Performance Materials demonstrated the strength of our Performance Solutions portfolio achieving double-digit growth," said Mark Newman, Chemours President and CEO.  "As part of our plan to improve the earnings power of our Titanium Technologies segment, we have decided to close our Kuan Yin facility.  This action will enable us to optimize our manufacturing circuit without compromising our ability to meet customer demand and deliver significant recurring cost savings starting in the second half of 2023."

Second quarter 2023 Net Sales of $1.6 billion, were (14)% lower than the prior-year quarter, driven by lower Net Sales in TT and APM's Advanced Materials portfolio.  Price was a positive contributor, up 2%, offset by lower volumes of (16)%, while currency was relatively flat, on a year-over-year basis.

1 Earnings per share ('EPS") on diluted basis.
2 Adjusted Net Income, Adjusted EPS and Adjusted EBITDA, referred to throughout, principally exclude the impact of recent legal settlements for legacy environmental matters and associated fees in addition to other items of a non-recurring nature – please refer to the attached "Reconciliation of GAAP Financial Measures to non-GAAP Financial Measures  (Unaudited)".
3 Assumes future cash payments of approximately $592 million related to the recent PFAS settlement with U.S. public water systems, which is currently pending preliminary court approval, will occur after  December 31, 2023.

EXHIBIT 99.1



Second quarter Net Loss was $(376) million, inclusive of $644 million[4] of charges related to legal settlements for legacy PFAS environmental matters and associated fees, resulting in EPS of $(2.52), down $(3.78) vs. the prior-year quarter.  Adjusted Net Income was $167 million resulting in Adjusted EPS of $1.10, down $(0.79), or approximately (42)% vs. the prior-year quarter.  Adjusted EBITDA for the second quarter of 2023 declined (32)% to $324 million in comparison to $475 million in the prior-year second quarter, driven primarily by weaker results in TT.  Price outpaced cost in the second quarter, offset by the impact of lower volumes of (30)% primarily driven by TT.  Currency was a (3)%, or $(12) million, headwind vs. the prior-year quarter due to a stronger USD.

**Announcement of Closure of Taiwan Titanium Technologies Plant**
The Company today announced the decision to close its Kuan Yin manufacturing facility.  The decision comes as part of a comprehensive strategy to improve the earnings quality of TT – producers of the popular Ti-Pure™ brand – by optimizing its manufacturing circuit.

"Plant closures are incredibly difficult because of the impact on talented and hard-working people like our Kuan Yin colleagues who have been valued members of our company, as well as their families and the community.  We are working closely with local leaders to help with this transition," said Denise Dignam, President of Chemours Titanium Technologies. "Moving forward, Chemours remains committed to delivering excellent service to our customers and continuing to lead the industry in innovation and sustainability."

The Kuan Yin site will stop producing dry titanium dioxide pigment on August 1, 2023, and decommissioning will begin immediately.  Chemours sales and technical service teams will work closely with affected customers to maintain uninterrupted supply. The Company expects there will be no impact on product or service quality and no supply interruption during this transition.

**Segment Results**
**Titanium Technologies**
*Delivering high-quality Ti-Pure™ pigment through customer-centered innovation and sustainability leadership*

|  | Q2 2023 | Q2 2022 | Change |
|---|---|---|---|
| **Titanium Technologies** |  |  |  |
| Net sales *($ millions)* | $707 | $968 | (27)% |
| Adjusted EBITDA *($ millions)* | $87 | $216 | (60)% |
| Adjusted EBITDA Margin | 12% | 22% | (10) ppts |

In the second quarter, TT reported Net Sales of $707 million, down $(261) million, or (27)%, from $968 million in the prior-year quarter.  Compared with the prior-year quarter, price and currency were relatively flat, with the total change driven by a (27)% decline in volume.  Flat price, in comparison to the prior period, reflected aggregate contractual price increases offset by the decline in pricing in global flex and distribution channels.  Overall volumes decreased due to softer market demand in all regions.  Segment Adjusted EBITDA was $87 million, down (60)% compared to the prior-year quarter, resulting in Adjusted EBITDA Margin of 12%.  The decreases in TT Adjusted EBITDA and Adjusted EBITDA Margin over the prior-year quarter were primarily attributable to the aforementioned decrease in sales volumes, the effects of inflation on costs, and lower fixed cost absorption.

On a sequential basis, Net Sales increased by 12%.  Price was down (1)%, and volume was up 13% driven by seasonal demand, while currency was relatively flat over the prior-quarter.

---

4 Includes $592 million related to the above-referenced PFAS settlement with U.S. public water systems.

EXHIBIT 99.1



We anticipate the closure of our Kuan Yin facility to provide an annual run-rate cost savings of approximately $50 million starting in 2024, with approximately $15 million for the remainder of 2023.  Estimated pre-tax asset-related impairment, restructuring, and other charges are estimated to range between approximately $150 to $160 million, comprised primarily of non-cash charges of approximately $130 million for property, plant and equipment, inventory and other assets, and cash charges related to severance, contract termination and other charges in the range of approximately $20 to $30 million.  The Company also expects to incur additional charges in the range of approximately $25 to $45 million for decommissioning, dismantling and removal costs from the third quarter of 2023 over the next two to three years.  The cash impacts associated with these charges are expected to approximate $25 million per year in 2023 and 2024.

Our overall outlook anticipates a delayed recovery, with second half demand expected to be flat to slightly improved compared to the first half, given uneven and uncertain macroeconomic conditions globally.

**Thermal & Specialized Solutions**
*Driving innovation in low GWP thermal management solutions to support customer transitions to more sustainable products*

| | Q2 2023 | Q2 2022 | Change |
|---|---|---|---|
| **Thermal & Specialized Solutions** | | | |
| Net sales *($ millions)* | $523 | $518 | 1% |
| Adjusted EBITDA *($ millions)* | $214 | $213 | 0% |
| Adjusted EBITDA Margin | 41% | 41% | (0) ppts |

In the second quarter, TSS reported record Net Sales of $523 million, up $5 million, from $518 million in the prior-year quarter.  Compared with the prior-year quarter, price increased 2%, partially offset by a (1)% decline in volume with currency relatively flat.  Prices increased across the portfolio, excluding automotive end markets, due to changing market and regulatory dynamics and steady value-based pricing growth within our Refrigerants and Foam, Propellants and Other Products portfolio.  Volumes decreased slightly due to lower demand for legacy refrigerants partially offset by increased demand for Opteon$^{TM}$ products.  Versus the prior-year quarter, segment Adjusted EBITDA increased $1 million, to a record $214 million driven by the aforementioned increase in price offset by higher raw material costs and lower earnings from our equity affiliates and other income, resulting in Adjusted EBITDA Margin of 41%.

On a sequential basis, Net Sales increased by 8%.  Price decreased (1)%, and volume increased 9%, reflecting seasonal refrigerant demand trends, while currency was relatively flat over the prior-quarter.

Our outlook anticipates continued Opteon$^{TM}$ adoption in mobile and stationary applications ahead of the next EU and USA HFC step-downs in 2024, paired with uncertainty in the rate of automotive and construction end-market demand recovery. We expect typical seasonality in customer demand trends in the second half of the year.

EXHIBIT 99.1



**Advanced Performance Materials**
*Creating a clean energy and advanced electronics powerhouse*

| | Q2 2023 | Q2 2022 | Change |
|---|---|---|---|
| **Advanced Performance Materials** | | | |
| Net sales *($ millions)* | $387 | $401 | (3)% |
| Adjusted EBITDA *($ millions)* | $81 | $107 | (24)% |
| Adjusted EBITDA Margin | 21% | 27% | (6) ppt |

In the second quarter, APM reported Net Sales of $387 million, down $(14) million, or (3)%, from $401 million in the prior-year quarter.  Within the underlying APM business, the Performance Solutions portfolio reported an increase in Net Sales of $20 million, or 17%, whereas Advanced Materials portfolio reported Net Sales decrease of $(34) million, or (12)% from the prior year quarter.  In total, compared with the prior-year quarter, APM's price increased 7%, while volume declined (9)%, and currency was a headwind of (1)%.  Prices increased due to increasing sales in high-value end-markets, including advanced electronics and clean energy, in the Performance Solutions portfolio, as well as pricing actions to offset higher raw material costs in our Advanced Materials portfolio.  Volumes decreased due to demand softening in the Advanced Materials portfolio which serves more economically sensitive end-markets and lower demand in non-strategic end-markets where some volume fade has been accelerated given our strategy to drive higher value Performance Solutions product offerings.  Versus the prior-year quarter, Adjusted EBITDA was down $(26) million, or (24)%, to $81 million resulting in Adjusted EBITDA Margin of 21%.  The decreases in segment Adjusted EBITDA and Adjusted EBITDA Margin for the quarter were primarily attributable to the aforementioned decrease in sales volume driving lower fixed cost absorption, impact of higher raw material costs, and the continued effects of inflation on other costs.

On a sequential basis, Net Sales were relatively flat.  Price decreased by (1)%, and volume increased 1% while currency remained flat.  On the same basis, the Performance Solutions portfolio Net Sales decreased by (3)% due to the timing of several key contractual arrangements, while Advanced Materials portfolio Net Sales increased by 1%.

Our outlook anticipates weaker second half demand for products in the Advanced Materials portfolio which serves economically sensitive end-markets, paired with continued elevated input costs, partially offset by improved customer demand for high-value, differentiated products in the Performance Solutions portfolio.

**Other Segment**

The Performance Chemicals and Intermediates business in Other Segment had Net Sales and Adjusted EBITDA in the second quarter 2023 of $26 million and $5 million, respectively.

**Corporate and Other Activities**

Corporate and Other was an offset to second quarter Adjusted EBITDA of $(63) million vs. $(59) million in the prior-year second quarter.  The slight increase over the prior-year quarter was primarily attributable to higher legacy environmental and legal costs.

EXHIBIT 99.1



**Liquidity**

As of June 30, 2023, consolidated gross debt was $3.7 billion.  Total debt principal, net of $0.7 billion cash, was $2.9 billion, resulting in a net leverage ratio of approximately 2.6 times on a trailing twelve-month Adjusted EBITDA basis.  Total liquidity was $1.5 billion, comprised of $0.7 billion cash, and $0.8 billion of revolving credit facility capacity, net of outstanding letters of credit.

Cash provided by operating activities for the second quarter of 2023 was $61 million vs. $291 million in the prior-year quarter.  Capital expenditures for the second quarter of 2023 were $58 million vs. $62 million in the prior-year second quarter.  Free Cash Flow for the second quarter of 2023 was $3 million vs. $229 million in the prior-year quarter.  In the quarter, we repurchased approximately $37 million of common stock.

**Guidance**

The Company is updating its full year 2023 Adjusted EBITDA guidance. The Company now expects full year 2023 Adjusted EBITDA to be within the range of $1.100 to $1.175 billion and Free Cash Flow of greater than $325 million[5], inclusive of approximately $400 million of capital expenditures which remains unchanged.

Mr. Newman concluded, "We take pride in the results achieved this quarter in a challenging macroeconomic environment and I would like to thank the entire Chemours team for remaining focused on delivering this strong performance.  However, given the low visibility in certain order books and increasing uncertainties in the second half of the year, we are lowering our guidance accordingly.  In light of our revised guidance, we are actively working to optimize our cost structure and enhance the earnings quality of the TT segment, as demonstrated by our actions at Kuan Yin.  We remain focused on executing against our five strategic priorities and unlocking greater shareholder value over time."

**Conference Call**

As previously announced, Chemours will hold a conference call and webcast exclusively for Q&A on July 28, 2023, at 8:00 AM Eastern Daylight Time. A transcript of the prepared remarks and additional presentation materials can be accessed by visiting the *Events & Presentations* page of Chemours' investor website, investors.chemours.com. A webcast replay of the conference call will be available on Chemours' investor website.

###

**About The Chemours Company**

The Chemours Company (NYSE: CC) is a global leader in Titanium Technologies, Thermal & Specialized Solutions, and Advanced Performance Materials providing its customers with solutions in a wide range of industries with market-defining products, application expertise and chemistry-based innovations. We deliver customized solutions with a wide range of industrial and specialty chemicals products for markets, including coatings, plastics, refrigeration and air conditioning, transportation, semiconductor and consumer electronics, general industrial, and oil and gas. Our flagship products include prominent brands such as Ti-Pure™, Opteon™, Freon™, Teflon™, Viton™, Nafion™, and Krytox™. The Company has approximately 6,600 employees and 29 manufacturing sites serving approximately 2,900 customers in approximately 120 countries. Chemours is headquartered in Wilmington, Delaware and is listed on the NYSE under the symbol CC.

For more information, we invite you to visit chemours.com or follow us on Twitter @Chemours or LinkedIn.

---

5 Assumes future cash payments of approximately $592 million related to the recent PFAS settlement with U.S. public water systems, which is currently pending preliminary court approval, will occur after December 31, 2023.

EXHIBIT 99.1



**Non-GAAP Financial Measures**

We prepare our financial statements in accordance with Generally Accepted Accounting Principles (GAAP). Within this press release, we may make reference to Adjusted Net Income, Adjusted EPS, Adjusted EBITDA, Adjusted EBITDA Margin, Free Cash Flow, Adjusted Effective Tax Rate, Return on Invested Capital and Net Leverage Ratio which are non-GAAP financial measures. The Company includes these non-GAAP financial measures because management believes they are useful to investors in that they provide for greater transparency with respect to supplemental information used by management in its financial and operational decision making.

Management uses Adjusted Net Income, Adjusted EPS, Adjusted EBITDA, Adjusted EBITDA Margin, Free Cash Flow, Adjusted Effective Tax Rate, Return on Invested Capital and Net Leverage Ratio to evaluate the Company's performance excluding the impact of certain noncash charges and other special items which we expect to be infrequent in occurrence in order to have comparable financial results to analyze changes in our underlying business from quarter to quarter.

Accordingly, the Company believes the presentation of these non-GAAP financial measures, when used in conjunction with GAAP financial measures, is a useful financial analysis tool that can assist investors in assessing the Company's operating performance and underlying prospects. This analysis should not be considered in isolation or as a substitute for analysis of our results as reported under GAAP. This analysis, as well as the other information in this press release, should be read in conjunction with the Company's financial statements and footnotes contained in the documents that the Company files with the U.S. Securities and Exchange Commission. The non-GAAP financial measures used by the Company in this press release may be different from the methods used by other companies. For more information on the non-GAAP financial measures, please refer to the attached schedules or the table, "Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures" and materials posted to the Company's website at investors.chemours.com.

EXHIBIT 99.1



**Forward-Looking Statements**

This press release contains forward-looking statements, within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, which involve risks and uncertainties. Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to a historical or current fact. The words "believe," "expect," "will," "anticipate," "plan," "estimate," "target," "project" and similar expressions, among others, generally identify "forward-looking statements," which speak only as of the date such statements were made. These forward-looking statements may address, among other things, the outcome or resolution of any pending or future environmental liabilities, the commencement, outcome or resolution of any regulatory inquiry, investigation or proceeding, the initiation, outcome or settlement of any litigation, changes in environmental regulations in the U.S. or other jurisdictions that affect demand for or adoption of our products, anticipated future operating and financial performance for our segments individually and our company as a whole, business plans, prospects, targets, goals and commitments, capital investments and projects and target capital expenditures, plans for dividends or share repurchases, sufficiency or longevity of intellectual property protection, cost reductions or savings targets, including those related to the closing of Chemours' Kuan Yin manufacturing site located in Taiwan, plans to increase profitability and growth, our ability to make acquisitions, integrate acquired businesses or assets into our operations, and achieve anticipated synergies or cost savings, all of which are subject to substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Forward-looking statements are based on certain assumptions and expectations of future events that may not be accurate or realized, such as full year guidance relying on models based upon management assumptions regarding future events that are inherently uncertain.  These statements are not guarantees of future performance. Forward-looking statements also involve risks and uncertainties that are beyond Chemours' control. Matters outside our control, including general economic conditions and the COVID-19 pandemic, have affected or may affect our business and operations and may or may continue to hinder our ability to provide goods and services to customers, cause disruptions in our supply chains such as through strikes, labor disruptions or other events, adversely affect our business partners, significantly reduce the demand for our products, adversely affect the health and welfare of our personnel or cause other unpredictable events. Additionally, there may be other risks and uncertainties that Chemours is unable to identify at this time or that Chemours does not currently expect to have a material impact on its business. Factors that could cause or contribute to these differences include the risks, uncertainties and other factors discussed in our filings with the U.S. Securities and Exchange Commission, including in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2023 and in our Annual Report on Form 10-K for the year ended December 31, 2022. Chemours assumes no obligation to revise or update any forward-looking statement for any reason, except as required by law.

EXHIBIT 99.1





**CONTACTS:**

**INVESTORS**
*Brandon Ontjes*
*VP, FP&A and Investor Relations*
*+1.302.773.3309*
*investor@chemours.com*

*Kurt Bonner*
*Manager, Investor Relations*
*+1.302.773.0026*
*investor@chemours.com*

**NEWS MEDIA**
*Thom Sueta*
*Director, Corporate Communications*
*+1.302.773.3903*
media*@chemours.com*

EXHIBIT 99.1

**The Chemours Company**
**Consolidated Statements of Operations (Unaudited)**
*(Dollars in millions, except per share amounts)*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Net sales | $ 1,643 | $ 1,915 | $ 3,179 | $ 3,679 |
| Cost of goods sold | 1,233 | 1,418 | 2,401 | 2,697 |
| Gross profit | 410 | 497 | 778 | 982 |
| Selling, general, and administrative expense | 779 | 254 | 903 | 395 |
| Research and development expense | 28 | 25 | 54 | 55 |
| Restructuring, asset-related, and other charges | (1) | 1 | 15 | 12 |
| Total other operating expenses | 806 | 280 | 972 | 462 |
| Equity in earnings of affiliates | 13 | 16 | 25 | 28 |
| Interest expense, net | (48) | (40) | (90) | (82) |
| Other (expense) income, net | (2) | 38 | (1) | 44 |
| **(Loss) income before income taxes** | (433) | 231 | (260) | 510 |
| (Benefit from) provision for income taxes | (57) | 30 | (30) | 76 |
| **Net (loss) income** | (376) | 201 | (230) | 434 |
| Less: Net income attributable to non-controlling interests | — | — | 1 | — |
| **Net (loss) income attributable to Chemours** | $ (376) | $ 201 | $ (231) | $ 434 |
| **Per share data** | | | | |
| Basic (loss) earnings per share of common stock | $ (2.52) | $ 1.29 | $ (1.55) | $ 2.75 |
| Diluted (loss) earnings per share of common stock | (2.52) | 1.26 | (1.55) | 2.69 |

EXHIBIT 99.1

**The Chemours Company**
**Consolidated Balance Sheets (Unaudited)**
*(Dollars in millions, except per share amounts)*

| | June 30, 2023 | December 31, 2022 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 738 | $ 1,102 |
| Restricted cash and restricted cash equivalents | 207 | — |
| Accounts and notes receivable, net | 890 | 626 |
| Inventories | 1,446 | 1,404 |
| Prepaid expenses and other | 64 | 82 |
| Assets held for sale | 29 | — |
| Total current assets | 3,374 | 3,214 |
| Property, plant, and equipment | 9,548 | 9,387 |
| Less: Accumulated depreciation | (6,358) | (6,216) |
| Property, plant, and equipment, net | 3,190 | 3,171 |
| Operating lease right-of-use assets | 244 | 240 |
| Goodwill | 102 | 102 |
| Other intangible assets, net | 8 | 13 |
| Investments in affiliates | 189 | 175 |
| Restricted cash and restricted cash equivalents | — | 202 |
| Other assets | 553 | 523 |
| **Total assets** | $ 7,660 | $ 7,640 |
| **Liabilities** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,009 | $ 1,251 |
| Compensation and other employee-related cost | 78 | 121 |
| Short-term and current maturities of long-term debt | 25 | 25 |
| Current environmental remediation | 148 | 194 |
| Other accrued liabilities | 930 | 300 |
| Total current liabilities | 2,190 | 1,891 |
| Long-term debt, net | 3,604 | 3,590 |
| Operating lease liabilities | 196 | 198 |
| Long-term environmental remediation | 473 | 474 |
| Deferred income taxes | 58 | 61 |
| Other liabilities | 329 | 319 |
| Total liabilities | 6,850 | 6,533 |
| Commitments and contingent liabilities | | |
| **Equity** | | |
| Common stock (par value $0.01 per share; 810,000,000 shares authorized; 196,759,211 shares issued and 148,229,690 shares outstanding at June 30, 2023; 195,375,810 shares issued and 148,504,030 shares outstanding at December 31, 2022) | 2 | 2 |
| Treasury stock, at cost (48,529,521 shares at June 30, 2023; 46,871,780 shares at December 31, 2022) | (1,790) | (1,738) |
| Additional paid-in capital | 1,014 | 1,016 |
| Retained earnings | 1,864 | 2,170 |
| Accumulated other comprehensive loss | (282) | (343) |
| Total Chemours stockholders' equity | 808 | 1,107 |
| Non-controlling interests | 2 | — |
| Total equity | 810 | 1,107 |
| **Total liabilities and equity** | $ 7,660 | $ 7,640 |

EXHIBIT 99.1

**The Chemours Company**
**Consolidated Statements of Cash Flows (Unaudited)**
*(Dollars in millions)*

| | Six Months Ended June 30, | |
|---|---|---|
| | 2023 | 2022 |
| **Cash flows from operating activities** | | |
| Net (loss) income | $ (231) | $ 434 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization | 157 | 146 |
| Gain on sales of assets and businesses, net | — | (27) |
| Equity in earnings of affiliates, net | (21) | (23) |
| Amortization of debt issuance costs and issue discounts | 4 | 4 |
| Deferred tax benefit | (71) | (9) |
| Asset-related charges | 11 | 5 |
| Stock-based compensation expense | 7 | 17 |
| Net periodic pension cost | 4 | 4 |
| Defined benefit plan contributions | (7) | (7) |
| Other operating charges and credits, net | (5) | (8) |
| Decrease (increase) in operating assets: | | |
| Accounts and notes receivable | (261) | (339) |
| Inventories and other operating assets | 26 | (86) |
| (Decrease) increase in operating liabilities: | | |
| Accounts payable and other operating liabilities | 329 | 182 |
| Cash (used for) provided by operating activities | (58) | 293 |
| **Cash flows from investing activities** | | |
| Purchases of property, plant, and equipment | (149) | (168) |
| Proceeds from sales of assets and businesses | — | 33 |
| Foreign exchange contract settlements, net | (8) | (1) |
| Other investing activities | — | (9) |
| Cash used for investing activities | (157) | (145) |
| **Cash flows from financing activities** | | |
| Debt repayments | (6) | (7) |
| Payments on finance leases | (6) | (6) |
| Payments of debt issuance cost | — | (1) |
| Purchases of treasury stock, at cost | (51) | (272) |
| Proceeds from exercised stock options, net | 9 | 48 |
| Payments related to tax withholdings on vested stock awards | (18) | (4) |
| Payments of dividends to the Company's common shareholders | (75) | (78) |
| Cash received from non-controlling interest shareholder | 1 | — |
| Cash used for financing activities | (146) | (320) |
| Effect of exchange rate changes on cash, cash equivalents, restricted cash and restricted cash equivalents | 2 | (31) |
| **Decrease in cash, cash equivalents, restricted cash and restricted cash equivalents** | (359) | (203) |
| **Cash, cash equivalents, restricted cash and restricted cash equivalents at January 1,** | 1,304 | 1,551 |
| **Cash, cash equivalents, restricted cash and restricted cash equivalents at June 30,** | $ 945 | $ 1,348 |
| | | |
| **Supplemental cash flows information** | | |
| Non-cash investing and financing activities: | | |
| Purchases of property, plant, and equipment included in accounts payable | $ 53 | $ 41 |
| Treasury Stock repurchased, not settled | 1 | 2 |

**EXHIBIT 99.1**

**The Chemours Company**
**Segment Financial and Operating Data (Unaudited)**
*(Dollars in millions)*

**Segment Net Sales**

| | Three Months Ended June 30, | | | | Increase / (Decrease) | | Three Months Ended March 31, 2023 | | Sequential Increase / (Decrease) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2023 | | 2022 | | | | | | |
| Titanium Technologies | $ | 707 | $ | 968 | $ | (261) | $ | 632 | $ | 75 |
| Thermal & Specialized Solutions | | 523 | | 518 | | 5 | | 486 | | 37 |
| Advanced Performance Materials | | 387 | | 401 | | (14) | | 388 | | (1) |
| Other Segment | | 26 | | 28 | | (2) | | 30 | | (4) |
| **Total Net Sales** | $ | 1,643 | $ | 1,915 | $ | (272) | $ | 1,536 | $ | 107 |

**Segment Adjusted EBITDA**

| | Three Months Ended June 30, | | | | Increase / (Decrease) | | Three Months Ended March 31, 2023 | | Sequential Increase / (Decrease) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2023 | | 2022 | | | | | | |
| Titanium Technologies | $ | 87 | $ | 216 | $ | (129) | $ | 70 | $ | 17 |
| Thermal & Specialized Solutions | | 214 | | 213 | | 1 | | 185 | | 29 |
| Advanced Performance Materials | | 81 | | 107 | | (26) | | 84 | | (3) |
| Other Segment | | 5 | | (2) | | 7 | | 10 | | (5) |
| Corporate and Other | | (63) | | (59) | | (4) | | (45) | | (18) |
| **Total Adjusted EBITDA** | $ | 324 | $ | 475 | $ | (151) | $ | 304 | $ | 20 |
| **Adjusted EBITDA Margin** | | 20 % | | 25 % | | | | 20 % | | |

**Quarterly Change in Net Sales from the three months ended June 30, 2022**

| | June 30, 2023 Net Sales | | Percentage Change vs. June 30, 2022 | Percentage Change Due To | | | |
|---|---|---|---|---|---|---|---|
| | | | | Price | Volume | Currency | Portfolio |
| Total Company | $ | 1,643 | (14)% | 2 % | (16)% | — % | — % |
| Titanium Technologies | $ | 707 | (27)% | — % | (27)% | — % | — % |
| Thermal & Specialized Solutions | | 523 | 1 % | 2 % | (1)% | — % | — % |
| Advanced Performance Materials | | 387 | (3)% | 7 % | (9)% | (1)% | — % |
| Other Segment | | 26 | (7)% | 19 % | (26)% | — % | — % |

**Quarterly Change in Net Sales from the three months ended March 31, 2023**

| | June 30, 2023 Net Sales | | Percentage Change vs. March 31, 2023 | Percentage Change Due To | | | |
|---|---|---|---|---|---|---|---|
| | | | | Price | Volume | Currency | Portfolio |
| Total Company | $ | 1,643 | 7 % | (1)% | 8 % | — % | — % |
| Titanium Technologies | $ | 707 | 12 % | (1)% | 13 % | — % | — % |
| Thermal & Specialized Solutions | | 523 | 8 % | (1)% | 9 % | — % | — % |
| Advanced Performance Materials | | 387 | — % | (1)% | 1 % | — % | — % |
| Other Segment | | 26 | (13)% | — % | (13)% | — % | — % |

EXHIBIT 99.1

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions)*

**GAAP Net (Loss) Income Attributable to Chemours to Adjusted Net Income and Adjusted EBITDA Reconciliation**

Adjusted earnings before interest, taxes, depreciation, and amortization ("Adjusted EBITDA") is defined as income (loss) before income taxes, excluding the following items: interest expense, depreciation, and amortization; non-operating pension and other post-retirement employee benefit costs, which represents the components of net periodic pension costs excluding the service cost component; exchange (gains) losses included in other income (expense), net; restructuring, asset-related, and other charges; (gains) losses on sales of businesses or assets; and, other items not considered indicative of the Company's ongoing operational performance and expected to occur infrequently, including Qualified Spend reimbursable by DuPont and/or Corteva as part of the Company's cost-sharing agreement under the terms of the MOU that were previously excluded from Adjusted EBITDA. Adjusted Net Income is defined as net income (loss) attributable to Chemours, adjusted for items excluded from Adjusted EBITDA, except interest expense, depreciation, amortization, and certain provision for (benefit from) income tax amounts.

| | Three Months Ended | | | | | | Six Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | June 30, | | | | March 31, | | June 30, | | | |
| | 2023 | | 2022 | | 2023 | | 2023 | | 2022 | |
| Net (loss) income attributable to Chemours | $ | (376) | $ | 201 | $ | 145 | $ | (231) | $ | 434 |
| Non-operating pension and other post-retirement employee benefit income | | — | | (2) | | — | | — | | (3) |
| Exchange losses, net | | 5 | | 3 | | 7 | | 12 | | 3 |
| Restructuring, asset-related, and other charges (1) | | (1) | | — | | 16 | | 15 | | 16 |
| Gain on sales of assets and businesses | | — | | (26) | | — | | — | | (27) |
| Qualified spend recovery (2) | | (18) | | (13) | | (14) | | (32) | | (27) |
| Legal charges (3) | | 644 | | 5 | | 1 | | 645 | | 7 |
| Environmental charges (4) | | 1 | | 165 | | — | | 1 | | 171 |
| Adjustments made to income taxes (5) | | — | | (2) | | (4) | | (4) | | (6) |
| Benefit from income taxes relating to reconciling items (6) | | (88) | | (29) | | (3) | | (91) | | (28) |
| Adjusted Net Income (7) | | 167 | | 302 | | 148 | | 315 | | 540 |
| Net income attributable to non-controlling interests | | — | | — | | — | | 1 | | — |
| Interest expense, net | | 48 | | 40 | | 42 | | 90 | | 82 |
| Depreciation and amortization | | 78 | | 72 | | 79 | | 157 | | 146 |
| All remaining provision for income taxes (7) | | 31 | | 61 | | 35 | | 65 | | 110 |
| Adjusted EBITDA | $ | 324 | $ | 475 | $ | 304 | $ | 628 | $ | 878 |
| | | | | | | | | | | |
| Adjusted effective tax rate (7) | | 16 % | | 17 % | | 19 % | | 17 % | | 17 % |

(1) In 2023, restructuring, asset-related, and other charges primarily includes charges related to our decision to abandon implementation of our new ERP software platform. In 2022, includes asset charges and write-offs resulting from the conflict between Russia and Ukraine and our decision to suspend our business with Russian entities.

(2) Qualified spend recovery represents costs and expenses that were previously excluded from Adjusted EBITDA, reimbursable by DuPont and/or Corteva as part of our cost-sharing agreement under the terms of the MOU which is discussed in further detail in "Note 17 – Commitments and Contingent Liabilities" to the *Interim Consolidated Financial Statements* in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2023.

(3) Legal charges pertains to litigation settlements, PFOA drinking water treatment accruals, and related legal fees. See "Note 17 – Commitments and Contingent Liabilities" to the *Interim Consolidated Financial Statements* in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2023 for further details.

(4) Environmental charges pertains to management's assessment of estimated liabilities associated with certain non-recurring environmental remediation expenses at various sites. See "Note 17 – Commitments and Contingent Liabilities" to the *Interim Consolidated Financial Statements* in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2023 for further details.

(5) Includes the removal of certain discrete income tax impacts within our provision for income taxes, such as shortfalls and windfalls on our share-based payments, certain return-to-accrual adjustments, valuation allowance adjustments, unrealized gains and losses on foreign exchange rate changes, and other discrete income tax items.

(6) The income tax impacts included in this caption are determined using the applicable rates in the taxing jurisdictions in which income or expense occurred for each of the reconciling items and represent both current and deferred income tax expense or benefit based on the nature of the non-GAAP financial measure.

(7) Adjusted effective tax rate is defined as all remaining provision for income taxes divided by pre-tax Adjusted Net Income.

EXHIBIT 99.1

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions, except per share amounts)*

### GAAP Earnings per Share to Adjusted Earnings per Share Reconciliation

Adjusted earnings per share ("Adjusted EPS") is calculated by dividing Adjusted Net Income by the weighted-average number of common shares outstanding. Diluted Adjusted EPS accounts for the dilutive impact of stock-based compensation awards, which includes unvested restricted shares. Diluted Adjusted EPS considers the impact of potentially-dilutive securities, except in periods in which there is a loss because the inclusion of the potentially-dilutive securities would have an anti-dilutive effect.

| | Three Months Ended | | | Six Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | June 30, | | March 31, | June 30, | |
| | 2023 | 2022 | 2023 | 2023 | 2022 |
| Numerator: | | | | | |
| Net (loss) income attributable to Chemours (1) | $ (376) | $ 201 | $ 145 | $ (231) | $ 434 |
| Adjusted Net Income | 167 | 302 | 148 | 315 | 540 |
| Denominator: | | | | | |
| Weighted-average number of common shares outstanding - basic | 149,095,543 | 156,224,802 | 148,997,084 | 149,046,585 | 158,051,092 |
| Dilutive effect of the Company's employee compensation plans | 1,517,177 | 3,442,411 | 2,182,181 | 1,849,679 | 3,562,159 |
| Weighted-average number of common shares outstanding - diluted | 150,612,720 | 159,667,213 | 151,179,265 | 150,896,264 | 161,613,251 |
| | | | | | |
| Basic (loss) earnings per share of common stock (2) | $ (2.52) | $ 1.29 | $ 0.97 | $ (1.55) | $ 2.75 |
| Diluted (loss) earnings per share of common stock (1) (2) | (2.52) | 1.26 | 0.96 | (1.55) | 2.69 |
| Adjusted basic earnings per share of common stock (2) | 1.11 | 1.93 | 0.99 | 2.11 | 3.42 |
| Adjusted diluted earnings per share of common stock (1) (2) | 1.10 | 1.89 | 0.98 | 2.08 | 3.34 |

(1) In periods where the Company incurs a net loss, the impact of potentially dilutive securities is excluded from the calculation of EPS under U.S. GAAP, as their inclusion would have an anti-dilutive effect. As such, with respect to the U.S. GAAP measure of diluted EPS, the impact of potentially dilutive securities is excluded from our calculation for the three and six months ended June 30, 2023. With respect to the non-GAAP measure of adjusted diluted EPS, the impact of potentially dilutive securities is included in our calculation for the three and six months ended June 30, 2023, as Adjusted Net Income was in a net income position.

(2) Figures may not recalculate exactly due to rounding. Basic and diluted earnings per share are calculated based on unrounded numbers.

EXHIBIT 99.1

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(In millions, except per share amounts)*

**2023 Estimated GAAP Net Loss Attributable to Chemours to Estimated Adjusted Net Income, Estimated Adjusted EBITDA and Estimated Adjusted EPS Reconciliation (*)**

| | | (Estimated) Year Ending December 31, 2023 | | |
| --- | --- | --- | --- | --- |
| | | Low | | High |
| **Net loss attributable to Chemours** | $ | (97) | $ | (47) |
| Restructuring, transaction, and other costs, net (1) | | 592 | | 592 |
| **Adjusted Net Income** | | 495 | | 545 |
| Interest expense, net | | 200 | | 200 |
| Depreciation and amortization | | 300 | | 300 |
| All remaining provision for income taxes | | 105 | | 130 |
| **Adjusted EBITDA** | $ | 1,100 | $ | 1,175 |
| | | | | |
| Weighted-average number of common shares outstanding - basic (2) | | 148.6 | | 148.6 |
| Dilutive effect of the Company's employee compensation plans (3) | | 2.9 | | 2.9 |
| Weighted-average number of common shares outstanding - diluted | | 151.5 | | 151.5 |
| | | | | |
| Basic loss per share of common stock | $ | (0.65) | $ | (0.32) |
| Diluted loss per share of common stock (4) | | (0.65) | | (0.32) |
| Adjusted basic earnings per share of common stock | | 3.33 | | 3.67 |
| Adjusted diluted earnings per share of common stock (4) | | 3.27 | | 3.60 |

(1) Restructuring, transaction, and other costs, net includes the net provision for (benefit from) income taxes relating to reconciling items and adjustments made to income taxes for the removal of certain discrete income tax impacts; qualified spend recovery; gain associated with the sale of our Glycolic Acid business; and costs related to legal settlements for legacy environmental matters and associated fees (including the recent PFAS settlement with U.S. public water systems, pending court approval), shutdown of our Kuan Yin, Taiwan manufacturing site and abandonment of ERP software implementation. Qualified spend recovery represents costs and expenses that were previously excluded from Adjusted EBITDA, reimbursable by DuPont and/or Corteva as part of our cost-sharing agreement under the terms of the MOU which is discussed in further detail in "Note 17 – Commitments and Contingent Liabilities" to the Interim Consolidated Financial Statements.

(2) The Company's estimates for the weighted-average number of common shares outstanding - basic reflect results for the six months ended June 30, 2023, which are carried forward for the projection period.

(3) The Company's estimates for the dilutive effect of the Company's employee compensation plans reflect the dilutive effect for the six months ended June 30, 2023, which is carried forward for the projection period.

(4) Diluted earnings per share is calculated using net income available to common shareholders divided by diluted weighted-average common shares outstanding during each period, which includes unvested restricted shares. Diluted earnings per share considers the impact of potentially dilutive securities except in periods in which there is a loss because the inclusion of the potential common shares would have an anti-dilutive effect.

(*) The Company's estimates reflect its current visibility and expectations based on market factors, such as currency movements, macro-economic factors, and end-market demand. Actual results could differ materially from these current estimates.

EXHIBIT 99.1

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions)*

**GAAP Cash Flow Provided by (Used for) Operating Activities to Free Cash Flows Reconciliation**

Free Cash Flows is defined as cash flows provided by (used for) operating activities, less purchases of property, plant, and equipment as shown in the consolidated statements of cash flows.

| | Three Months Ended | | | | | March 31, | | Six Months Ended | | | |
| | June 30, | | | | | | | June 30, | | | |
| | 2023 | | 2022 | | 2023 | | | 2023 | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash provided by (used for) operating activities | $ | 61 | $ | 291 | $ | (119) | $ | (58) | $ | 293 | |
| Less: Purchases of property, plant, and equipment | | (58) | | (62) | | (91) | | (149) | | (168) | |
| **Free Cash Flows** | $ | 3 | $ | 229 | $ | (210) | $ | (207) | $ | 125 | |

**2023 Estimated GAAP Cash Flow Provided by Operating Activities to Estimated Free Cash Flow Reconciliation (\*)**

| | | (Estimated) Year Ending December 31, 2023 |
|---|---|---|
| Cash flow provided by operating activities | $ | >725 |
| Less: Purchases of property, plant, and equipment | | ~(400) |
| **Free Cash Flows** | $ | >325 |

(\*)  Assumes future cash payments of approximately $592 million related to the recent PFAS settlement with U.S. public water systems, which is currently pending preliminary court approval, will occur after December 31, 2023.

(The Company's estimates reflect its current visibility and expectations based on market factors, such as currency movements, macro-economic factors, and end-market demand. Actual results could differ materially from these current estimates.

**Return on Invested Capital Reconciliation**

Return on Invested Capital ("ROIC") is defined as Adjusted EBITDA, less depreciation and amortization ("Adjusted EBIT"), divided by the average of invested capital, which amounts to net debt, or debt less cash and cash equivalents, plus equity.

| | Twelve Months Ended June 30, | | | |
| | 2023 | | 2022 | |
|---|---|---|---|---|
| Adjusted EBITDA (1) | $ | 1,111 | $ | 1,557 |
| Less: Depreciation and amortization | | (303) | | (300) |
| **Adjusted EBIT** | $ | 808 | $ | 1,257 |

| | As of June 30, | | | |
| | 2023 | | 2022 | |
|---|---|---|---|---|
| Total debt, net (2) | $ | 3,629 | $ | 3,680 |
| Total equity | | 810 | | 1,215 |
| Less: Cash and cash equivalents | | (738) | | (1,248) |
| **Invested capital, net** | $ | 3,701 | $ | 3,647 |
| Average invested capital (3) | $ | 3,731 | $ | 3,667 |
| | | | | |
| **Return on Invested Capital** | | 22 % | | 34 % |

(1)  Reconciliations of net (loss) income attributable to Chemours to Adjusted EBITDA are provided on a quarterly basis. See the preceding table for the reconciliation of net (loss) income attributable to Chemours to Adjusted EBITDA.

(2)  Total debt principal minus unamortized issue discounts of $4 and $5 million and debt issuance costs of $20 and $25 million at June 30, 2023 and 2022, respectively.

(3)  Average invested capital is based on a five-quarter trailing average of invested capital, net.

**EXHIBIT 99.1**

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions)*

**Net Leverage Ratio Reconciliation**

Net Leverage Ratio is defined as our total debt principal, net, or our total debt principal outstanding less cash and cash equivalents, divided by Adjusted EBITDA.

| | As of June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2023 | | 2022 | |
| Total debt principal | $ | 3,653 | $ | 3,710 |
| Less: Cash and cash equivalents | | (738 ) | | (1,248 ) |
| **Total debt principal, net** | $ | 2,915 | $ | 2,462 |

| | Twelve Months Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2023 | | 2022 | |
| Adjusted EBITDA (1) | $ | 1,111 | $ | 1,557 |
| | | | | |
| **Net Leverage Ratio** | | 2.6x | | 1.6x |

(1)   Reconciliations of net (loss) income attributable to Chemours to Adjusted EBITDA are provided on a quarterly basis. See the preceding table for the reconciliation of net (loss) income attributable to Chemours to Adjusted EBITDA.

# Exhibit 12

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

**October 26, 2023**
Date of Report (Date of Earliest Event Reported)



# The Chemours Company
(Exact Name of Registrant as Specified in Its Charter)

| Delaware | 001-36794 | 46-4845564 |
|---|---|---|
| (State or Other Jurisdiction | (Commission | (I.R.S. Employer |
| Of Incorporation) | File Number) | Identification No.) |

**1007 Market Street**
**Wilmington, Delaware 19801**
(Address of principal executive offices)

Registrant's telephone number, including area code: (302) 773-1000

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Exchange on Which Registered |
|---|---|---|
| Common Stock ($0.01 par value) | CC | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02**        **Results of Operations and Financial Condition.**

On October 26, 2023, The Chemours Company (the "Company") issued a press release regarding its third quarter 2023 financial results. A copy of the press release is furnished hereto as Exhibit 99.1.

The information furnished with this report on Form 8-K, including Exhibit 99.1, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, and it will not be deemed incorporated by reference into any registration statement or other document filed under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such a filing.

**Item 9.01**        **Financial Statements and Exhibits.**

(d) Exhibits

99.1  Press release dated October 26, 2023.

104  The cover page from this Current Report on Form 8-K, formatted in Inline XBRL.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

THE CHEMOURS COMPANY

By:    /s/ Jonathan Lock

Jonathan Lock

Senior Vice President, Chief Financial Officer

Date:    October 26, 2023

EX-99.1 2 cc-ex99_1.htm EX-99.1

**EXHIBIT 99.1**



### The Chemours Company Announces Third Quarter 2023 Results

*Continued actions through the Titanium Technologies Transformation Plan to drive improved margins*
*FY 2023 Adjusted EBITDA guidance lowered 8% at the midpoint*

**Wilmington, Del**., October 26, 2023 – The Chemours Company ("Chemours" or "the Company") (NYSE: CC), a global chemistry company with leading market positions in Titanium Technologies ("TT"), Thermal & Specialized Solutions ("TSS"), and Advanced Performance Materials ("APM"), today announced its financial results for the third quarter 2023, and Titanium Technologies Transformation Plan.

### Third Quarter 2023 Results & Highlights

- Net Sales of $1.5 billion

- Net Income of $20 million with EPS[1] of $0.13

- Adjusted Net Income[2] of $96 million with Adjusted EPS[2] of $0.63

- Adjusted EBITDA[2] of $247 million and Adjusted Free Cash Flow[3] of $81 million

- Launched TT Transformation Plan, to drive approximately $100 million in run-rate cost savings starting in 2024

- Announced development of Opteon™ 2P50, a new specialty fluid for two-phase immersion cooling, including applications in data centers

- Completed sale of the Glycolic Acid business to PureTech Scientific Inc., generating net cash proceeds of $138 million

- ARCH2 hydrogen hub, in which Chemours is a project development partner, selected by the U.S. Department of Energy for grant award

- On October 26, 2023, the Company's Board of Directors approved a third quarter dividend of $0.25 per share

- Given weaker demand outlook, we now anticipate full year Adjusted EBITDA to be between $1.025 billion and $1.075 billion; with Adjusted Free Cash Flow guidance greater than $225 million[3,4]

"Our third quarter results reflect the weaker global macroeconomic environment primarily impacting our TT segment and the Advanced Materials portfolio in APM," said Mark Newman, Chemours President and CEO. "We have stepped up our efforts to improve the TT segment's earnings with the launch of our TT Transformation Plan, which commenced with the recent Kuan Yin facility closure, and has been augmented by incremental efforts to streamline our workforce and other measures to drive cost savings and long-term margin improvement. While experiencing macro-driven weakness in our Advanced Materials APM portfolio, we remain committed to sustainability-led growth in our Performance Solutions APM portfolio, achieving double-digit year-to-date top-line growth over the previous year. Our TSS business continues to deliver top line growth and strong Adjusted EBITDA Margins, and remains well positioned for continued growth in low GWP Opteon™ refrigerants, with the planned US AIM Act quota stepdown in 2024."

Third quarter 2023 Net Sales of $1.5 billion, were (16)% lower than the prior-year quarter, driven by lower Net Sales in TT and APM's Advanced Materials portfolio. Price was down slightly (1)%, while volumes were down (15)%, and currency was flat, on a year-over-year basis.

1 Earnings per share ('EPS") on diluted basis.
2 Adjusted Net Income, Adjusted EPS and Adjusted EBITDA, referred to throughout, principally exclude the impact of recent legal settlements for legacy environmental matters and   associated fees in addition to other items of a non-recurring nature – please refer to the attached "Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures   (Unaudited)".
3 Adjusted Free Cash Flow, referred to throughout, principally excludes the impact of certain PFAS-related litigation settlements & legal fees – please refer to the/attached "Reconciliation of  GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)".
4 Assumes the release of restricted cash related to the recent PFAS settlement with U.S. public water systems, which is subject to court approval, will occur after December 31, 2023.

EXHIBIT 99.1



Third quarter Net Income was $20 million, resulting in EPS of $0.13, down $(1.39) vs. the prior-year quarter. Adjusted Net Income was $96 million resulting in Adjusted EPS of $0.63, down $(0.61), or approximately (49)% vs. the prior-year quarter. Adjusted EBITDA for the third quarter of 2023 declined (32)% to $247 million in comparison to $363 million in the prior-year third quarter, driven primarily by lower volumes in TT and the Advanced Materials portfolio in APM. In the third quarter, price declines were more than offset by lower cost. Reduced sales volume primarily drove lower Adjusted EBITDA vs. the prior-year quarter, while currency, portfolio adjustments, and other income were slightly unfavorable.

**Segment Results**
**Titanium Technologies**
*Delivering high-quality Ti-Pure™ pigment through customer-centered innovation and sustainability leadership*

|  | Q3 2023 | Q3 2022 | Change |
|---|---|---|---|
| **Titanium Technologies** |  |  |  |
| Net sales *($ millions)* | $690 | $877 | (21)% |
| Adjusted EBITDA *($ millions)* | $69 | $137 | (50)% |
| Adjusted EBITDA Margin | 10% | 16% | (6) ppts |

In the third quarter, TT reported Net Sales of $690 million, down $(187) million, or (21)%, from $877 million in the prior-year quarter. Compared with the prior-year quarter, prices decreased by (3)%, and volume declined (18)%, with currency flat. Price declines compared to the prior period, primarily reflect declines in market exposed channels partially offset by contractual price increases. Overall volumes decreased due to softer demand in all regions. Segment Adjusted EBITDA was $69 million, down (50)% compared to the prior-year quarter, resulting in Adjusted EBITDA Margin of 10%. The decreases in TT Adjusted EBITDA and Adjusted EBITDA Margin over the prior-year quarter were primarily due to the decrease in sales volume and price.

On a sequential basis, Net Sales saw a (2)% decrease, driven by a (3)% decline in price, primarily in market-exposed channels. In contrast, volume increased by 1%, while currency remained relatively flat compared to the prior quarter.

Fourth quarter demand is expected to be down sequentially, consistent with normal seasonal patterns. Costs are expected to improve inclusive of the benefits of the Kuan Yin plant closure.

*TT Transformation Plan*

The TT Transformation Plan was launched with the recent Kuan Yin facility closure and has been expanded to include further measures to streamline our workforce, drive cost improvements and long-term margin improvement.

We expect the TT Transformation Plan to provide approximately $100 million of run-rate savings in 2024, with additional cost-saving opportunities as we progress with the plan in the years ahead. Of these total projected savings, the closure of the Kuan Yin site is projected to provide for run-rate savings of $50 million in 2024, with $15 million in 2023.

Under the TT Transformation Plan, for the period ended September 30, 2023, we recorded charges of $147 million, comprised primarily of non-cash charges of $78 million related to asset-related impairments, $28 million related to the write-off of certain raw materials inventory, with $10 million in other charges and cash charges of $31 million related to severance, contract termination and decommissioning charges. In addition, the Company anticipates additional cash charges in the range of $20 million to $30 million for decommissioning, dismantling and removal costs in the next couple years.

EXHIBIT 99.1



**Thermal & Specialized Solutions**
*Driving innovation in low GWP thermal management solutions to support customer transitions to more sustainable products*

| | Q3 2023 | Q3 2022 | Change |
|---|---|---|---|
| **Thermal & Specialized Solutions** | | | |
| Net sales *($ millions)* | $436 | $417 | 5% |
| Adjusted EBITDA *($ millions)* | $162 | $162 | 0% |
| Adjusted EBITDA Margin | 37% | 39% | (2) ppts |

TSS reported record third quarter Net Sales of $436 million, up $19 million, from $417 million in the prior-year quarter.  Compared with the prior-year quarter, price declined (1)%, volume increased by 5%, with currency a 1% tailwind. Price declines in automotive end-markets were partially offset by value-based pricing growth within our Refrigerants and Foam, Propellants, and Other Products portfolios when compared to the prior period. Volumes increased due to continued adoption of Opteon™ products in stationary and automotive original equipment manufacturers. Versus the prior-year quarter, segment Adjusted EBITDA remained unchanged at $162 million, primarily driven by the increase in sales volume and lower raw material costs, offset by lower earnings from our equity affiliates and other income, higher production-related fixed costs, and continued investment in R&D growth initiatives, resulting in Adjusted EBITDA Margin of 37%.

On a sequential basis, Net Sales decreased by (17)%.  Price and volume decreased (5)% and (12)%, respectively, reflecting seasonal refrigerant demand trends.

Our outlook anticipates continued Opteon™ adoption in mobile and stationary applications ahead of the next EU and US HFC step-downs in 2024, paired with uncertainty in the rate of automotive and construction end-market demand recovery. We expect typical seasonality in customer demand trends throughout the remainder of the year.

**Advanced Performance Materials**
*Creating a clean energy and advanced electronics powerhouse*

| | Q3 2023 | Q3 2022 | Change |
|---|---|---|---|
| **Advanced Performance Materials** | | | |
| Net sales *($ millions)* | $343 | $450 | (24)% |
| Adjusted EBITDA *($ millions)* | $68 | $112 | (39)% |
| Adjusted EBITDA Margin | 20% | 25% | (5) ppts |

In the third quarter, APM reported Net Sales of $343 million, down $(107) million, or (24)%, from $450 million in the prior-year quarter. Within the underlying APM business, the Performance Solutions portfolio reported a decrease in Net Sales of $(4) million, or (3)%, whereas Advanced Materials portfolio reported Net Sales decrease of $(103) million, or (32)% from the prior-year quarter. Compared with the prior-year quarter, APM's price increased 2%, volume declined (26)%, and currency remained relatively flat. Prices increased due to increasing sales in high-value end-markets, including advanced electronics and clean energy, in the Performance Solutions portfolio, as well as pricing actions to offset higher raw material costs in our Advanced Materials portfolio. Volumes decreased primarily due to demand softening in the Advanced Materials portfolio which serves more economically sensitive end-markets. Versus the prior-year quarter, Adjusted EBITDA was down $(44) million, or (39)%, to $68 million resulting in Adjusted EBITDA Margin of 20%. The decreases in segment Adjusted EBITDA and Adjusted EBITDA Margin for the quarter were primarily attributable to the aforementioned decrease in sales volume driving lower fixed cost absorption, impact of higher raw material costs, and the continued effects of inflation on other costs.



On a sequential basis, Net Sales decreased by (11)%. Price decreased by (1)% and volume declined (10)%, with currency flat. On the same basis, Performance Solutions portfolio Net Sales declined (8)%, while the Advanced Materials portfolio declined (13)%.  These declines were primarily driven by ongoing demand softness in more economically sensitive end-markets in the Advanced Materials portfolio and, to a lesser extent, specific product lines within the Performance Solutions portfolio.

Our outlook anticipates continued demand weakness throughout the year for products in the Advanced Materials portfolio serving economically sensitive end-markets, paired with continued elevated input costs, partially offset by improved customer demand for high-value, differentiated products in the Performance Solutions portfolio.

**Other Segment**

The Performance Chemicals and Intermediates business in Other Segment had Net Sales and Adjusted EBITDA in the third quarter 2023 of $18 million and $2 million, respectively. The sale of the Glycolic Acid Business, which was within the Other Segment, was successfully completed on August 1, 2023.

**Corporate and Other Activities**

Corporate and Other was an offset to third quarter Adjusted EBITDA of $(54) million vs. $(51) million in the prior-year third quarter. The increase was primarily related to legacy related legal spend.

**Liquidity**

As of September 30, 2023, consolidated gross debt was $4.0 billion. Total debt principal, net of $0.9 billion cash, was $3.2 billion, resulting in a net leverage ratio of approximately 3.2 times on a trailing twelve-month Adjusted EBITDA basis. Total liquidity was $1.7 billion, comprised of $0.9 billion cash, and $0.8 billion of revolving credit facility capacity, net of outstanding letters of credit.

Cash provided by operating activities for the third quarter of 2023 was $130 million vs. $301 million in the prior-year quarter.  Capital expenditures for the third quarter of 2023 were $86 million vs. $72 million in the prior-year third quarter. In our Q3 results, we have now added Adjusted Free Cash Flow as a financial metric, which excludes the impact of recent PFAS-related litigation settlements. Adjusted Free Cash Flow for the third quarter of 2023 was $81 million vs. $229 million in the prior-year quarter which excludes certain PFAS-related litigation settlements of $37 million with no adjustments in the comparative period. In the quarter, we returned $55 million in cash to shareholders inclusive of $18 million of common stock repurchases and $37 million of dividends.

In August 2023, we completed the amendment and extension of both EUR and USD term loans, increasing aggregate borrowing by $400 million with an updated maturity in 2028, enhancing our overall liquidity profile.

Preliminary approval of a comprehensive PFAS settlement with a defined class of U.S. water systems was granted by the Court on August 22, 2023. Subsequently, on September 6, 2023, Chemours deposited its 50% share totaling $592 million into the water district settlement fund. This deposit was funded through a combination of sources, including net proceeds from the issuance of new term loans, available cash and funds available under the MOU escrow account. DuPont and Corteva jointly contributed the remaining 50%.

EXHIBIT 99.1



**Guidance**

The Company is updating its full year 2023 Adjusted EBITDA and Adjusted Free Cash Flow guidance. The Company now expects full year 2023 Adjusted EBITDA to be within the range of $1.025 to $1.075 billion and Adjusted Free Cash Flow of greater than $225 million, inclusive of approximately $400 million of capital expenditures which remains unchanged.

Mr. Newman continued, "We remain committed to our five strategic priorities with increased focus on cost reduction activities through the TT Transformation Plan. We've taken decisive steps to improve earnings in our TT segment,  continue to invest in sustainability-driven growth for TSS and APM's Performance Solutions portfolio, and to ensure prudent capital allocation and liquidity management. Our entire leadership team is responding to the near-term demand challenges, while staying focused on our strategy to unlock shareholder value."

**Conference Call**

As previously announced, Chemours will hold a conference call and webcast exclusively for Q&A on October 27, 2023, at 8:00 AM Eastern Daylight Time. A transcript of the prepared remarks and additional presentation materials can be accessed by visiting the *Events & Presentations* page of Chemours' investor website, investors.chemours.com. A webcast replay of the conference call will be available on Chemours' investor website.

###

**About The Chemours Company**
The Chemours Company (NYSE: CC) is a global leader in Titanium Technologies, Thermal & Specialized Solutions, and Advanced Performance Materials providing its customers with solutions in a wide range of industries with market-defining products, application expertise and chemistry-based innovations. We deliver customized solutions with a wide range of industrial and specialty chemicals products for markets, including coatings, plastics, refrigeration and air conditioning, transportation, semiconductor and consumer electronics, general industrial, and oil and gas. Our flagship products include prominent brands such as Ti-Pure™, Opteon™, Freon™, Teflon™, Viton™, Nafion™, and Krytox™. The Company has approximately 6,600 employees and 29 manufacturing sites serving approximately 2,900 customers in approximately 120 countries. Chemours is headquartered in Wilmington, Delaware and is listed on the NYSE under the symbol CC.

For more information, we invite you to visit chemours.com or follow us on Twitter @Chemours or LinkedIn.

EXHIBIT 99.1



**Non-GAAP Financial Measures**
We prepare our financial statements in accordance with Generally Accepted Accounting Principles (GAAP). Within this press release, we may make reference to Adjusted Net Income, Adjusted EPS, Adjusted EBITDA, Adjusted EBITDA Margin, Free Cash Flow, Adjusted Free Cash Flow, Adjusted Effective Tax Rate, Return on Invested Capital and Net Leverage Ratio which are non-GAAP financial measures. The Company includes these non-GAAP financial measures because management believes they are useful to investors in that they provide for greater transparency with respect to supplemental information used by management in its financial and operational decision making.

Management uses Adjusted Net Income, Adjusted EPS, Adjusted EBITDA, Adjusted EBITDA Margin, Free Cash Flow, Adjusted Free Cash Flow, Adjusted Effective Tax Rate, Return on Invested Capital and Net Leverage Ratio to evaluate the Company's performance excluding the impact of certain noncash charges and other special items which we expect to be infrequent in occurrence in order to have comparable financial results to analyze changes in our underlying business from quarter to quarter.

Accordingly, the Company believes the presentation of these non-GAAP financial measures, when used in conjunction with GAAP financial measures, is a useful financial analysis tool that can assist investors in assessing the Company's operating performance and underlying prospects. This analysis should not be considered in isolation or as a substitute for analysis of our results as reported under GAAP. This analysis, as well as the other information in this press release, should be read in conjunction with the Company's financial statements and footnotes contained in the documents that the Company files with the U.S. Securities and Exchange Commission. The non-GAAP financial measures used by the Company in this press release may be different from the methods used by other companies. For more information on the non-GAAP financial measures, please refer to the attached schedules or the table, "Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)" and materials posted to the Company's website at investors.chemours.com.

EXHIBIT 99.1



**Forward-Looking Statements**

This press release contains forward-looking statements, within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, which involve risks and uncertainties. Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to a historical or current fact. The words "believe," "expect," "will," "anticipate," "plan," "estimate," "target," "project" and similar expressions, among others, generally identify "forward-looking statements," which speak only as of the date such statements were made. These forward-looking statements may address, among other things, the outcome or resolution of any pending or future environmental liabilities, the commencement, outcome or resolution of any regulatory inquiry, investigation or proceeding, the initiation, outcome or settlement of any litigation, changes in environmental regulations in the U.S. or other jurisdictions that affect demand for or adoption of our products, anticipated future operating and financial performance for our segments individually and our company as a whole, business plans, prospects, targets, goals and commitments, capital investments and projects and target capital expenditures, plans for dividends or share repurchases, sufficiency or longevity of intellectual property protection, cost reductions or savings targets, including those related to the closing of Chemours' Kuan Yin manufacturing site located in Taiwan, plans to increase profitability and growth, our ability to make acquisitions, integrate acquired businesses or assets into our operations, and achieve anticipated synergies or cost savings, all of which are subject to substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Forward-looking statements are based on certain assumptions and expectations of future events that may not be accurate or realized, such as full year guidance relying on models based upon management assumptions regarding future events that are inherently uncertain.  These statements are not guarantees of future performance. Forward-looking statements also involve risks and uncertainties that are beyond Chemours' control. Matters outside our control, including general economic conditions and the COVID-19 pandemic, have affected or may affect our business and operations and may or may continue to hinder our ability to provide goods and services to customers, cause disruptions in our supply chains such as through strikes, labor disruptions or other events, adversely affect our business partners, significantly reduce the demand for our products, adversely affect the health and welfare of our personnel or cause other unpredictable events. Additionally, there may be other risks and uncertainties that Chemours is unable to identify at this time or that Chemours does not currently expect to have a material impact on its business. Factors that could cause or contribute to these differences include the risks, uncertainties and other factors discussed in our filings with the U.S. Securities and Exchange Commission, including in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2023 and in our Annual Report on Form 10-K for the year ended December 31, 2022. Chemours assumes no obligation to revise or update any forward-looking statement for any reason, except as required by law.

EXHIBIT 99.1





**CONTACTS:**

**INVESTORS**
*Brandon Ontjes*
*VP, FP&A and Investor Relations*
*+1.302.773.3309*
*investor@chemours.com*

*Kurt Bonner*
*Manager, Investor Relations*
*+1.302.773.0026*
*investor@chemours.com*

**NEWS MEDIA**
*Cassie Olszewski*
*Manager, Media Relations & Financial Communications*
*+1.302.219.7140*
*media@chemours.com*

EXHIBIT 99.1

**The Chemours Company**
**Consolidated Statements of Operations (Unaudited)**
*(Dollars in millions, except per share amounts)*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Net sales | $ 1,487 | $ 1,777 | $ 4,666 | $ 5,456 |
| Cost of goods sold | 1,206 | 1,345 | 3,607 | 4,042 |
| Gross profit | 281 | 432 | 1,059 | 1,414 |
| Selling, general, and administrative expense | 165 | 140 | 1,067 | 535 |
| Research and development expense | 28 | 32 | 82 | 88 |
| Restructuring, asset-related, and other charges | 124 | (1) | 139 | 10 |
| Total other operating expenses | 317 | 171 | 1,288 | 633 |
| Equity in earnings of affiliates | 13 | 16 | 38 | 44 |
| Interest expense, net | (55) | (41) | (145) | (123) |
| (Loss) gain on extinguishment of debt | (1) | 7 | (1) | 7 |
| Other income, net | 102 | 56 | 100 | 101 |
| **Income (loss) before income taxes** | 23 | 299 | (237) | 810 |
| Provision for (benefit from) income taxes | 3 | 59 | (26) | 135 |
| Net income (loss) | 20 | 240 | (211) | 675 |
| Less: Net income attributable to non-controlling interests | — | — | 1 | — |
| Net income (loss) attributable to Chemours | $ 20 | $ 240 | $ (212) | $ 675 |
| **Per share data** | | | | |
| Basic earnings (loss) per share of common stock | $ 0.13 | $ 1.54 | $ (1.42) | $ 4.30 |
| Diluted earnings (loss) per share of common stock | 0.13 | 1.52 | (1.42) | 4.21 |

EXHIBIT 99.1

**The Chemours Company**
**Consolidated Balance Sheets (Unaudited)**
*(Dollars in millions, except per share amounts)*

|  | | September 30, 2023 | | December 31, 2022 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 852 | $ | 1,102 |
| Restricted cash and restricted cash equivalents | | 595 | | — |
| Accounts and notes receivable, net | | 846 | | 626 |
| Inventories | | 1,314 | | 1,404 |
| Prepaid expenses and other | | 76 | | 82 |
| Total current assets | | 3,683 | | 3,214 |
| Property, plant, and equipment | | 9,243 | | 9,387 |
| Less: Accumulated depreciation | | (6,124) | | (6,216) |
| Property, plant, and equipment, net | | 3,119 | | 3,171 |
| Operating lease right-of-use assets | | 258 | | 240 |
| Goodwill | | 102 | | 102 |
| Other intangible assets, net | | 5 | | 13 |
| Investments in affiliates | | 192 | | 175 |
| Restricted cash and restricted cash equivalents | | — | | 202 |
| Other assets | | 589 | | 523 |
| **Total assets** | $ | 7,948 | $ | 7,640 |
| **Liabilities** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 901 | $ | 1,251 |
| Compensation and other employee-related cost | | 94 | | 121 |
| Short-term and current maturities of long-term debt | | 23 | | 25 |
| Current environmental remediation | | 138 | | 194 |
| Other accrued liabilities | | 1,039 | | 300 |
| Total current liabilities | | 2,195 | | 1,891 |
| Long-term debt, net | | 3,944 | | 3,590 |
| Operating lease liabilities | | 207 | | 198 |
| Long-term environmental remediation | | 467 | | 474 |
| Deferred income taxes | | 54 | | 61 |
| Other liabilities | | 324 | | 319 |
| Total liabilities | | 7,191 | | 6,533 |
| Commitments and contingent liabilities | | | | |
| **Equity** | | | | |
| Common stock (par value $0.01 per share; 810,000,000 shares authorized; 197,344,369 shares issued and 148,364,181 shares outstanding at September 30, 2023; 195,375,810 shares issued and 148,504,030 shares outstanding at December 31, 2022) | | 2 | | 2 |
| Treasury stock, at cost (48,980,188 shares at September 30, 2023; 46,871,780 shares at December 31, 2022) | | (1,807) | | (1,738) |
| Additional paid-in capital | | 1,030 | | 1,016 |
| Retained earnings | | 1,845 | | 2,170 |
| Accumulated other comprehensive loss | | (315) | | (343) |
| Total Chemours stockholders' equity | | 755 | | 1,107 |
| Non-controlling interests | | 2 | | — |
| Total equity | | 757 | | 1,107 |
| **Total liabilities and equity** | $ | 7,948 | $ | 7,640 |

EXHIBIT 99.1

**The Chemours Company**
**Consolidated Statements of Cash Flows (Unaudited)**
*(Dollars in millions)*

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2023 | 2022 |
| **Cash flows from operating activities** | | |
| Net (loss) income | $ (212) | $ 675 |
| Adjustments to reconcile net (loss) income to cash provided by operating activities: | | |
| Depreciation and amortization | 233 | 217 |
| Gain on sales of assets and businesses, net | (106) | (27) |
| Equity in earnings of affiliates, net | (32) | (36) |
| Loss (gain) on extinguishment of debt | 1 | (7) |
| Amortization of debt issuance costs and issue discounts | 6 | 7 |
| Deferred tax (benefit) provision | (135) | 6 |
| Asset-related charges | 123 | 5 |
| Stock-based compensation expense | 13 | 24 |
| Net periodic pension cost | 8 | 6 |
| Defined benefit plan contributions | (9) | (9) |
| Other operating charges and credits, net | (14) | (24) |
| Decrease (increase) in operating assets: | | |
| Accounts and notes receivable | (212) | (256) |
| Inventories and other operating assets | 95 | (259) |
| (Decrease) increase in operating liabilities: | | |
| Accounts payable and other operating liabilities | 313 | 272 |
| Cash provided by operating activities | 72 | 594 |
| **Cash flows from investing activities** | | |
| Purchases of property, plant, and equipment | (235) | (240) |
| Proceeds from sales of assets and businesses | 138 | 33 |
| Foreign exchange contract settlements, net | (8) | 1 |
| Other investing activities | 6 | (13) |
| Cash used for investing activities | (99) | (219) |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of debt | 648 | — |
| Debt repayments | (277) | (64) |
| Payments of debt issuance cost | (4) | (1) |
| Payments on finance leases | (8) | (9) |
| Purchases of treasury stock, at cost | (69) | (351) |
| Proceeds from exercised stock options, net | 18 | 51 |
| Payments related to tax withholdings on vested stock awards | (18) | (4) |
| Payments of dividends to the Company's common shareholders | (112) | (117) |
| Cash received from non-controlling interest shareholder | 1 | — |
| Cash provided by (used for) financing activities | 179 | (495) |
| Effect of exchange rate changes on cash, cash equivalents, restricted cash and restricted cash equivalents | (9) | (63) |
| **Increase (decrease) in cash, cash equivalents, restricted cash and restricted cash equivalents** | 143 | (183) |
| **Cash, cash equivalents, restricted cash and restricted cash equivalents at January 1,** | 1,304 | 1,551 |
| **Cash, cash equivalents, restricted cash and restricted cash equivalents at September 30,** | $ 1,447 | $ 1,368 |
| | | |
| **Supplemental cash flows information** | | |
| Non-cash investing and financing activities: | | |
| Purchases of property, plant, and equipment included in accounts payable | $ 76 | $ 42 |
| Treasury Stock repurchased, not settled | — | 10 |

EXHIBIT 99.1

**The Chemours Company**
**Segment Financial and Operating Data (Unaudited)**
*(Dollars in millions)*

**Segment Net Sales**

| | Three Months Ended September 30, | | | | Increase / (Decrease) | | Three Months Ended June 30, 2023 | | Sequential Increase / (Decrease) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2023** | | **2022** | | | | | | | |
| Titanium Technologies | $ | 690 | $ | 877 | $ | (187) | $ | 707 | $ | (17) |
| Thermal & Specialized Solutions | | 436 | | 417 | | 19 | | 523 | | (87) |
| Advanced Performance Materials | | 343 | | 450 | | (107) | | 387 | | (44) |
| Other Segment | | 18 | | 33 | | (15) | | 26 | | (8) |
| **Total Net Sales** | $ | 1,487 | $ | 1,777 | $ | (290) | $ | 1,643 | $ | (156) |

**Segment Adjusted EBITDA**

| | Three Months Ended September 30, | | | | Increase / (Decrease) | | Three Months Ended June 30, 2023 | | Sequential Increase / (Decrease) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2023** | | **2022** | | | | | | | |
| Titanium Technologies | $ | 69 | $ | 137 | $ | (68) | $ | 87 | $ | (18) |
| Thermal & Specialized Solutions | | 162 | | 162 | | — | | 214 | | (52) |
| Advanced Performance Materials | | 68 | | 112 | | (44) | | 81 | | (13) |
| Other Segment | | 2 | | 3 | | (1) | | 5 | | (3) |
| Corporate and Other | | (54) | | (51) | | (3) | | (63) | | 9 |
| **Total Adjusted EBITDA** | $ | 247 | $ | 363 | $ | (116) | $ | 324 | $ | (77) |
| | | | | | | | | | | |
| **Adjusted EBITDA Margin** | | 17 % | | 20 % | | | | 20 % | | |

**Quarterly Change in Net Sales from the three months ended September 30, 2022**

| | September 30, 2023 Net Sales | | Percentage Change vs. September 30, 2022 | Percentage Change Due To | | | |
|---|---|---|---|---|---|---|---|
| | | | | **Price** | **Volume** | **Currency** | **Portfolio** |
| Total Company | $ | 1,487 | (16)% | (1)% | (15)% | — % | — % |
| | | | | | | | |
| Titanium Technologies | $ | 690 | (21)% | (3)% | (18)% | — % | — % |
| Thermal & Specialized Solutions | | 436 | 5 % | (1)% | 5 % | 1 % | — % |
| Advanced Performance Materials | | 343 | (24)% | 2 % | (26)% | — % | — % |
| Other Segment | | 18 | (45)% | 11 % | (25)% | — % | (31)% |

**Quarterly Change in Net Sales from the three months ended June 30, 2023**

| | September 30, 2023 Net Sales | | Percentage Change vs. June 30, 2023 | Percentage Change Due To | | | |
|---|---|---|---|---|---|---|---|
| | | | | **Price** | **Volume** | **Currency** | **Portfolio** |
| Total Company | $ | 1,487 | (9)% | (3)% | (6)% | — % | — % |
| | | | | | | | |
| Titanium Technologies | $ | 690 | (2)% | (3)% | 1 % | — % | — % |
| Thermal & Specialized Solutions | | 436 | (17)% | (5)% | (12)% | — % | — % |
| Advanced Performance Materials | | 343 | (11)% | (1)% | (10)% | — % | — % |
| Other Segment | | 18 | (31)% | 4 % | (14)% | — % | (21)% |

EXHIBIT 99.1

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions)*

### GAAP Net Income (Loss) Attributable to Chemours to Adjusted Net Income and Adjusted EBITDA Reconciliation

Adjusted earnings before interest, taxes, depreciation, and amortization ("Adjusted EBITDA") is defined as income (loss) before income taxes, excluding the following items: interest expense, depreciation, and amortization; non-operating pension and other post-retirement employee benefit costs, which represents the components of net periodic pension costs excluding the service cost component; exchange (gains) losses included in other income (expense), net; restructuring, asset-related, and other charges; (gains) losses on sales of businesses or assets; and, other items not considered indicative of the Company's ongoing operational performance and expected to occur infrequently, including Qualified Spend reimbursable by DuPont and/or Corteva as part of the Company's cost-sharing agreement under the terms of the MOU that were previously excluded from Adjusted EBITDA. Adjusted Net Income is defined as net income (loss) attributable to Chemours, adjusted for items excluded from Adjusted EBITDA, except interest expense, depreciation, amortization, and certain provision for (benefit from) income tax amounts.

| | Three Months Ended | | | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | September 30, | | | | June 30, | | September 30, | | | |
| | 2023 | | 2022 | | 2023 | | 2023 | | 2022 | |
| Net income (loss) attributable to Chemours | $ | 20 | $ | 240 | $ | (376) | $ | (212) | $ | 675 |
| Non-operating pension and other post-retirement employee benefit cost (income) | | 1 | | (1) | | — | | 1 | | (4) |
| Exchange losses (gains), net | | 9 | | (13) | | 5 | | 21 | | (11) |
| Restructuring, asset-related, and other charges (1) | | 153 | | (2) | | (1) | | 168 | | 14 |
| Loss (gain) on extinguishment of debt | | 1 | | (7) | | — | | 1 | | (7) |
| Gain on sales of assets and businesses (2) | | (106) | | — | | — | | (106) | | (27) |
| Transaction costs (3) | | 7 | | — | | — | | 7 | | — |
| Qualified spend recovery (4) | | (11) | | (14) | | (18) | | (43) | | (41) |
| Litigation-related charges (5) | | 31 | | (23) | | 644 | | 675 | | (15) |
| Environmental charges (6) | | 8 | | 11 | | 1 | | 9 | | 182 |
| Adjustments made to income taxes (7) | | (1) | | (3) | | — | | (5) | | (9) |
| (Benefit from) provision for income taxes relating to reconciling items (8) | | (16) | | 8 | | (88) | | (107) | | (20) |
| Adjusted Net Income (9) | | 96 | | 196 | | 167 | | 409 | | 737 |
| Net income attributable to non-controlling interests | | — | | — | | — | | 1 | | — |
| Interest expense, net | | 55 | | 41 | | 48 | | 145 | | 123 |
| Depreciation and amortization | | 76 | | 72 | | 78 | | 233 | | 217 |
| All remaining provision for income taxes (9) | | 20 | | 54 | | 31 | | 86 | | 164 |
| Adjusted EBITDA | $ | 247 | $ | 363 | $ | 324 | $ | 874 | $ | 1,241 |
| | | | | | | | | | | |
| Adjusted effective tax rate (9) | | 17 % | | 22 % | | 16 % | | 17 % | | 18 % |

(1) Refer to "Note 5 – Restructuring, Asset-related, and Other Charges" to the *Interim Consolidated Financial Statements* in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2023 for further details. In addition, the periods ended in September 30, 2023 include $28 million related to the write-off of certain raw materials inventory from the Kuan Yin, Taiwan plant closure. In 2022, includes asset charges and write-offs resulting from the conflict between Russia and Ukraine and our decision to suspend our business with Russian entities.

(2) Refer to "Note 6 – Other Income" to the *Interim Consolidated Financial Statements* in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2023 for further details.

(3) Includes costs associated with the New Senior Secured Credit Facilities entered into during the third quarter of 2023, which is discussed in further detail in "Note 15 – Debt" to the *Interim Consolidated Financial Statements* in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2023.

(4) Qualified spend recovery represents costs and expenses that were previously excluded from Adjusted EBITDA, reimbursable by DuPont and/or Corteva as part of our cost-sharing agreement under the terms of the MOU which is discussed in further detail in "Note 17 – Commitments and Contingent Liabilities" to the *Interim Consolidated Financial Statements* in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2023.

(5) Litigation-related charges pertains to litigation settlements, PFOA drinking water treatment accruals, and related legal fees. In the periods ended in September 30, 2022, litigation-related charges include proceeds from a settlement in a patent infringement matter. See "Note 17 – Commitments and Contingent Liabilities" to the *Interim Consolidated Financial Statements* in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2023 for further details.

(6) Environmental charges pertains to management's assessment of estimated liabilities associated with certain non-recurring environmental remediation expenses at various sites. In 2022, environmental charges include $175 million primarily related to an update to the off-site drinking water programs at Fayetteville and changes in estimates related to the barrier wall constructions. See "Note 17 – Commitments and Contingent Liabilities" to the *Interim Consolidated Financial Statements* in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2023 for further details.

(7) Includes the removal of certain discrete income tax impacts within our provision for income taxes, such as shortfalls and windfalls on our share-based payments, certain return-to-accrual adjustments, valuation allowance adjustments, unrealized gains and losses on foreign exchange rate changes, and other discrete income tax items.

(8) The income tax impacts included in this caption are determined using the applicable rates in the taxing jurisdictions in which income or expense occurred for each of the reconciling items and represent both current and deferred income tax expense or benefit based on the nature of the non-GAAP financial measure.

(9) Adjusted effective tax rate is defined as all remaining provision for income taxes divided by pre-tax Adjusted Net Income.

EXHIBIT 99.1

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions, except per share amounts)*

<u>**GAAP Earnings per Share to Adjusted Earnings per Share Reconciliation**</u>

Adjusted earnings per share ("Adjusted EPS") is calculated by dividing Adjusted Net Income by the weighted-average number of common shares outstanding. Diluted Adjusted EPS accounts for the dilutive impact of stock-based compensation awards, which includes unvested restricted shares. Diluted Adjusted EPS considers the impact of potentially-dilutive securities, except in periods in which there is a loss because the inclusion of the potentially-dilutive securities would have an anti-dilutive effect.

| | Three Months Ended | | | Nine Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | September 30, | | June 30, | September 30, | |
| | 2023 | 2022 | 2023 | 2023 | 2022 |
| Numerator: | | | | | |
| Net income (loss) attributable to Chemours | $ 20 | $ 240 | $ (376) | $ (212) | $ 675 |
| Adjusted Net Income | 96 | 196 | 167 | 409 | 737 |
| Denominator: | | | | | |
| Weighted-average number of common shares outstanding - basic | 148,623,633 | 155,376,422 | 149,095,543 | 148,929,580 | 157,149,738 |
| Dilutive effect of the Company's employee compensation plans | 1,562,005 | 2,473,700 | 1,517,177 | 1,753,788 | 3,199,339 |
| Weighted-average number of common shares outstanding - diluted | 150,185,638 | 157,850,122 | 150,612,720 | 150,683,368 | 160,349,077 |
| | | | | | |
| Basic earnings (loss) per share of common stock (2) | $ 0.13 | $ 1.54 | $ (2.52) | $ (1.42) | $ 4.30 |
| Diluted earnings (loss) per share of common stock (1) (2) | 0.13 | 1.52 | (2.52) | (1.42) | 4.21 |
| Adjusted basic earnings per share of common stock (2) | 0.64 | 1.26 | 1.11 | 2.75 | 4.69 |
| Adjusted diluted earnings per share of common stock (1) (2) | 0.63 | 1.24 | 1.10 | 2.71 | 4.60 |

(1) In periods where the Company incurs a net loss, the impact of potentially dilutive securities is excluded from the calculation of EPS under U.S. GAAP, as their inclusion would have an anti-dilutive effect. As such, with respect to the U.S. GAAP measure of diluted EPS, the impact of potentially dilutive securities is excluded from our calculation for the three months ended June 30, 2023 and nine months ended September 30, 2023. With respect to the non-GAAP measure of adjusted diluted EPS, the impact of potentially dilutive securities is included in our calculation for the three months ended June 30, 2023 and the nine months ended September 30, 2023, as Adjusted Net Income was in a net income position.

(2) Figures may not recalculate exactly due to rounding. Basic and diluted earnings per share are calculated based on unrounded numbers.

EXHIBIT 99.1

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(In millions, except per share amounts)*

### 2023 Estimated GAAP Net Loss Attributable to Chemours to Estimated Adjusted Net Income, Estimated Adjusted EBITDA and Estimated Adjusted EPS Reconciliation (*)

|  | (Estimated) Year Ending December 31, 2023 | |
| --- | --- | --- |
|  | Low | High |
| **Net loss attributable to Chemours** | $ (201) | $ (166) |
| Litigation-related charges | 675 | 675 |
| Gain on sales of assets and businesses | (106) | (106) |
| Restructuring, transaction, and other costs, net (1) | 52 | 52 |
| **Adjusted Net Income** | 420 | 455 |
| Interest expense, net | 215 | 215 |
| Depreciation and amortization | 300 | 300 |
| All remaining provision for income taxes | 90 | 105 |
| **Adjusted EBITDA** | $ 1,025 | $ 1,075 |
|  |  |  |
| Weighted-average number of common shares outstanding - basic (2) | 148.8 | 148.8 |
| Dilutive effect of the Company's employee compensation plans (3) | 2.9 | 2.9 |
| Weighted-average number of common shares outstanding - diluted | 151.7 | 151.7 |
|  |  |  |
| Basic loss per share of common stock | $ (1.35) | $ (1.12) |
| Diluted loss per share of common stock (4) | (1.35) | (1.12) |
| Adjusted basic earnings per share of common stock | 2.82 | 3.06 |
| Adjusted diluted earnings per share of common stock (4) | 2.77 | 3.00 |

(1)   Restructuring, transaction, and other costs, net includes the net provision for (benefit from) income taxes relating to reconciling items and adjustments made to income taxes for the removal of certain discrete income tax impacts; qualified spend recovery; shutdown of our Kuan Yin, Taiwan manufacturing site and abandonment of ERP software implementation. Qualified spend recovery represents costs and expenses that were previously excluded from Adjusted EBITDA, reimbursable by DuPont and/or Corteva as part of our cost-sharing agreement under the terms of the MOU which is discussed in further detail in "Note 17 – Commitments and Contingent Liabilities" to the Interim Consolidated Financial Statements.

(2)   The Company's estimates for the weighted-average number of common shares outstanding - basic reflect results for the nine months ended September 30, 2023, which are carried forward for the projection period.

(3)   The Company's estimates for the dilutive effect of the Company's employee compensation plans reflect the dilutive effect for the nine months ended September 30, 2023, which is carried forward for the projection period.

(4)   Diluted earnings per share is calculated using net income available to common shareholders divided by diluted weighted-average common shares outstanding during each period, which includes unvested restricted shares. Diluted earnings per share considers the impact of potentially dilutive securities except in periods in which there is a loss because the inclusion of the potential common shares would have an anti-dilutive effect.

(*)   The Company's estimates reflect its current visibility and expectations based on market factors, such as currency movements, macro-economic factors, and end-market demand. Actual results could differ materially from these current estimates.

**EXHIBIT 99.1**

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions)*

#### GAAP Cash Flow Provided by Operating Activities to Free Cash Flows and Adjusted Free Cash Flows Reconciliation

Free Cash Flows is defined as cash flows provided by (used for) operating activities, less purchases of property, plant, and equipment as shown in the consolidated statements of cash flows.

Beginning in the third quarter of 2023, we added a new non-GAAP liquidity measure of Adjusted Free Cash Flows to exclude the impact of cash inflows/outflows that are significant, unusual in nature and/or infrequent in occurrence that neither relate to the ordinary course of our business nor reflect the ongoing operational performance and underlying cash generation of our businesses. The change was driven by certain PFAS litigation settlements and legal fees that we believe were unusual in nature or infrequent in occurrence that neither related to the Company's ordinary course of business or ongoing operational performance and underlying cash generation of our businesses. We believe that excluding items of this nature provides the Company's investors with better understanding of and enables them to compare our underlying cash generation of our businesses from period to period. Prior year measures have been presented to conform with the current measure of Adjusted Free Cash Flow.

| | Three Months Ended | | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | September 30, | | | | June 30, | September 30, | | | |
| | 2023 | | 2022 | | 2023 | 2023 | | 2022 | |
| Cash provided by operating activities | $ | 130 | $ | 301 | $ | 61 | $ | 72 | $ | 594 |
| Less: Purchases of property, plant, and equipment | | (86 ) | | (72 ) | | (58 ) | | (235 ) | | (240 ) |
| **Free Cash Flows** | | 44 | | 229 | | 3 | | (163 ) | | 354 |
| PFAS Litigation Settlements (1) | | 37 | | — | | — | | 37 | | 25 |
| **Adjusted Free Cash Flows** | $ | 81 | $ | 229 | $ | 3 | $ | (126 ) | $ | 379 |

(1)    Represents litigation settlements and fees related to PFAS and PFOA matters.

#### 2023 Estimated GAAP Cash Flow Provided by Operating Activities to Estimated Free Cash Flows and Adjusted Free Cash Flows Reconciliation (*)

| | (Estimated) Year Ending December 31, 2023 |
| --- | --- |
| Cash flow provided by operating activities | $ >588 |
| Less: Purchases of property, plant, and equipment | ~(400) |
| **Free Cash Flows (1)** | >188 |
| PFAS Litigation Settlements (2) | 37 |
| **Adjusted Free Cash Flows (1)** | $ >225 |

(1) Assumes the release of restricted cash related to the recent PFAS settlement with U.S. public water systems, which is subject to court approval, will occur after December 31, 2023.

(2) Represents litigation settlements and fees related to PFAS and PFOA matters.

(*) The Company's estimates reflect its current visibility and expectations based on market factors, such as currency movements, macro-economic factors, and end-market demand. Actual results could differ materially from these current estimates.

EXHIBIT 99.1

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions)*

**Return on Invested Capital Reconciliation**

Return on Invested Capital ("ROIC") is defined as Adjusted EBITDA, less depreciation and amortization ("Adjusted EBIT"), divided by the average of invested capital, which amounts to net debt, or debt less cash and cash equivalents, plus equity.

| | Twelve Months Ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Adjusted EBITDA (1) | $ 995 | $ 1,548 |
| Less: Depreciation and amortization | (307) | (294) |
| **Adjusted EBIT** | $ 688 | $ 1,254 |

| | As of September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Total debt, net (2) | $ 3,967 | $ 3,534 |
| Total equity | 757 | 1,285 |
| Less: Cash and cash equivalents | (852) | (1,167) |
| **Invested capital, net** | $ 3,872 | $ 3,652 |
| Average invested capital (3) | $ 3,776 | $ 3,648 |
| | | |
| **Return on Invested Capital** | 18 % | 34 % |

(1) Reconciliations of net income (loss) attributable to Chemours to Adjusted EBITDA are provided on a quarterly basis. See the preceding table for the reconciliation of net income (loss) attributable to Chemours to Adjusted EBITDA.

(2) Total debt principal minus unamortized issue discounts of $26 and $4 million and debt issuance costs of $22 and $24 million at September 30, 2023 and 2022, respectively.

(3) Average invested capital is based on a five-quarter trailing average of invested capital, net.

EXHIBIT 99.1

**The Chemours Company**
**Reconciliation of GAAP Financial Measures to Non-GAAP Financial Measures (Unaudited)**
*(Dollars in millions)*

**Net Leverage Ratio Reconciliation**

Net Leverage Ratio is defined as our total debt principal, net, or our total debt principal outstanding less cash and cash equivalents, divided by Adjusted EBITDA.

| | As of September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Total debt principal | $ 4,015 | $ 3,562 |
| Less: Cash and cash equivalents | (852) | (1,167) |
| **Total debt principal, net** | $ 3,163 | $ 2,395 |

| | Twelve Months Ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Adjusted EBITDA (1) | $ 995 | $ 1,548 |
| | | |
| **Net Leverage Ratio** | 3.2x | 1.5x |

(1)  Reconciliations of net  income (loss) attributable to Chemours to Adjusted EBITDA are provided on a quarterly basis. See the preceding table for the reconciliation of net income (loss) attributable to Chemours to Adjusted EBITDA.