**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| The Chemours Company Securities Litigation, | Case No. 24-cv-361-RGA |
| | CLASS ACTION |

**ANSWERING BRIEF IN OPPOSITION TO THE CHEMOURS COMPANY'S
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Dated: December 20, 2024

Of Counsel:

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Brian B. Alexander, Esq.
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: balexander@rosenlegal.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs and the Class*

**Table of Contents**

PRELIMINARY STATEMENT ............................................................................................ 1

NATURE AND STAGE OF PROCEEDINGS ..................................................................... 3

SUMMARY OF ARGUMENT ............................................................................................ 3

STATEMENT OF FACTS ................................................................................................... 3

    A.    Background of Chemours and Other Defendants. ......................................... 3

    B.    Free Cash Flow Was One of Chemours' Most Important Metrics. ............................. 3

    C.    Defendants Began the Class Period by Announcing $447 Million in Free Cash Flow for the Year 2022 and $1.5 Billion in Free Cash Flow Over the Last Three Years. ........................................................................................... 4

    D.    Defendants Announce Negative $210 Million in Free Cash Flow for the First Quarter of 2023, But Affirm Free Cash Flow Guidance of Over $350 Million for 2023. ........................................................................................... 5

    E.    Defendants Continue to Make Free Cash Flow Projections and Provide Misleading Explanations for Chemours' Poor Year-to-Date Cash Flow Results. ........................................................................................... 6

    F.    Defendants Repeatedly State that Chemours Had Effective Internal Controls. ........... 6

    G.    In a Series of Disclosures, Chemours Admits That its Ineffective Internal Controls Allowed the Individual Defendants to Manipulate Free Cash Flow. ............. 7

        1.    Chemours' Stock Drops When it Delays its 2023 Financial Results to Evaluate its Internal Controls and Complete a Related Internal Review. .................................. 7

        2.    Chemours' Stock Plunges When it Announces that it is Placing Newman, Lock, and Wisel on Leave Pending Review of the Company's Managing of Working Capital, Including its Impact on Non-GAAP Metrics Within the Company's Incentive Plans. ........................................................................ 7

        3.    Chemours Admits the Individual Defendants Violated its Code of Ethics by Manipulating Free Cash Flow to Meet Targets and Increase Incentive Compensation ........................................................................... 8

        4.    Chemours Admits that Defendants Manipulated $360 Million and $215 Million in Operating Cash Flow at the End of 2023 and 2022, Respectively. ............. 9

i

ARGUMENT ................................................................................................................. 10

    I.      PLAINTIFFS PLEAD MISREPRESENTATIONS AND OMISSIONS. ...................... 10

      A.   Defendants' Cash Flow Statements Were Misleading ................................................ 11

        1.  The 2022 Free and Operating Cash Flow Statements Were Misleading. .................. 11

        2.  The Statements Explaining Cash Flow Generation and Results Were Misleading ................................................................................................................. 17

        3.  The 2023 Free and Operating Cash Flow Guidance Statements Were Misleading ................................................................................................................. 19

      B.   Defendants' SOX Certifications and Internal Controls Statements Were Misleading ................................................................................................................. 20

      C.   Defendants' Code of Ethics for the CEO, CFO, and Controller was Misleading ................................................................................................................. 21

    II.     PLAINTIFFS PLEAD SCIENTER. ............................................................................. 22

      A.   The Inference of Scienter is at least as Compelling as any Competing Inference. ................................................................................................................... 22

        1.  The Individual Defendants Intentionally Manipulated Free Cash Flow in an Effort to Meet Publicly Communicated Targets in Violation of Chemours' Code of Ethics. ............................................................................................................ 23

        2.  The Close Tie Between Yearly Free Cash Flow and the Individual Defendants' Incentive Compensation Supports Scienter. ........................................... 25

        3.  "Lack of Transparency" with the Board Supports Scienter. ...................................... 26

        4.  Putting Newman, Lock, and Wisel on Leave and Their Resignations Support Scienter. ................................................................................................................... 27

        5.  Defendants' Exploitation of Weak Internal Controls Supports Scienter. ................... 27

      B.   Each Individual Defendant's Scienter Should be Imputed to Chemours For Each Statement Regardless of Whether He or She was the Speaker. ......................... 28

    III.    PLAINTIFFS PLEAD LOSS CAUSATION ................................................................ 28

    IV.   PLAINTIFFS PLEAD SCHEME LIABILITY. ........................................................... 30

CONCLUSION..................................................................................................................... 30

## Table of Authorities

**Page(s)**

**Cases**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ........................................................................................ 13, 25

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ......................................................................... 21, 28

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013) ................................................................................. 16

*Behrmann v. Brandt*,
2020 WL 4432536 (D. Del. July 31, 2020) ..................................................................... 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................................... 10

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................................... 11

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021) .............................................................................. 28

*Cheng v. Activision Blizzard, Inc.*,
2022 WL 2101919 (C.D. Cal. Apr. 18, 2022) ................................................................. 15

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ............................................................................................. 16

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
713 F. Supp. 2d 378 (D. Del. 2010) ................................................................................. 26

*Craftmatic Sec. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989) ............................................................................................. 16

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) .......................................................................................................... 29

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000) ............................................................................................. 29

iv

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)..................................................................... 20, 23

*Friedman v. Rayovac Corp.*,
   295 F. Supp. 2d 957 (W.D. Wis. 2003) ....................................................................... 14

*Glover v. DeLuca*,
   2006 WL 2850448 (W.D. Pa. Sept. 29, 2006)........................................................... 15

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
   594 U.S. 113, (2021).................................................................................................. 30

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999)...................................................................................... 21

*Hull v. Glob. Digital Sols., Inc.*,
   2017 WL 6493148 (D.N.J. Dec. 19, 2017) ............................................................... 30

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004)....................................................................................... 16

*In re Advance Auto Parts, Inc., Sec. Litig.*,
   2020 WL 599543 (D. Del. Feb. 7, 2020) .................................................................. 19

*In re Aurora Cannabis Inc. Sec. Litig.*,
   2023 WL 5508831 (D.N.J. Aug. 24, 2023) ............................................................... 30

*In re Bristol-Myers Squibb Sec. Litig.*,
   2005 WL 2007004 (D.N.J. Aug. 17, 2005) ............................................................... 29

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)............................................................................... 19, 22

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ........................................................................... 17

*In re Chemours Co. Sec. Litig.*,
   587 F. Supp. 3d 143 (D. Del. 2022)........................................................................... 12

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2018 WL 3772675 (D.N.J. Aug. 8, 2018) ..................................................... 21, 27, 28

*In re Global Crossing, Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004)........................................................................ 13

*In re Hertz Glob. Holdings Inc*,
    905 F.3d 106 (3d Cir. 2018)............................................................................ 15, 24, 28

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ................................................................. 26

*In re LendingClub Sec. Litig.*,
    254 F. Supp. 3d 1107 (N.D. Cal. 2017) ........................................................ 21, 27

*In re Michaels Stores, Inc. Sec. Litig.*,
    2004 WL 7344746 (N.D. Tex. Dec. 13, 2004) .............................................. 13

*In re Mylan N.V. Sec. Litig.*,
    2023 WL 3539371 (W.D. Pa. May 18, 2023) ................................................ 16

*In re Nature's Sunshine Prod. Sec. Litig.*,
    486 F. Supp. 2d 1301 (D. Utah 2007) ............................................................ 26

*In re Ocugen, Inc. Sec. Litig.*,
    2024 WL 1209513 (3d Cir. Mar. 21, 2024) ................................................... 16

*In re Par Pharm. Sec. Litig.*,
    2009 WL 3234273 (D.N.J. Sept. 30, 2009) ................................................... 27

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016) ............................................................ 15, 21

*In re Under Armour Sec. Litig.*,
    540 F. Supp. 3d 513 (D. Md. 2021) ................................................................ 14, 23

*In re Under Armour Sec. Litig.*,
    719 F. Supp. 3d 438 (D. Md. 2024) ................................................................ 13

*In re Urb. Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................................................. 26, 29

*In re WageWorks, Inc., Sec. Litig.*,
    2020 WL 2896547 (N.D. Cal. June 1, 2020) ................................................. 28

*In re: Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. Dec. 15, 2015) .................................................... 13, 16, 20

*In the Matter of Marvell Technology Group, Ltd*,
    Administrative Proceeding File No. 3-19454, 2019 WL 4447393, (Sept*ember 16, 2019)* ...... 13

*In the Matter of Under Armour, Inc.*,
   Administrative Proceeding File No. 3-20278, 2021 WL 1737508, (May 3, 2021) ............ 13, 14

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
   620 F. Supp. 3d 167 (D.N.J. 2022) ....................................................................... 19

*Institutional Investors Grp. v. Avaya*,
   564 F.3d 242 (3d Cir. 2009) ........................................................................... 11, 22

*Kanefsky v. Honeywell Int'l Inc.*,
   2020 WL 2520669 (D.N.J. May 18, 2020) ............................................................. 30

*Kumar v. Kulicke & Soffa Indus., Inc.*,
   2019 WL 5081896 (E.D. Pa. Oct. 9, 2019) ............................................................. 27

*Lowry v. RTI Surgical Holdings, Inc.*,
   532 F. Supp. 3d 652 (N.D. Ill. 2021) .................................................................... 27

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ....................................................................................... 10

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007) .............................................................................. 30

*McMahan & Co. v. Wherehouse Ent., Inc.*,
   900 F.2d 576 (2d Cir. 1990) .............................................................................. 11

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................... 26

*Nykredit Portefolje Admin. A/S v. Propetro Holding Corp.*,
   2021 WL 9037758 (W.D. Tex. Sept. 13, 2021) ........................................................ 21

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*,
   2023 WL 1800963 (D. Ariz. Feb. 7, 2023) ......................................................... 21, 29

*Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*,
   346 F. Supp. 3d 389 (S.D.N.Y. 2018) ................................................................... 14

*Roth v. AON Corp.*,
   2008 WL 656069 (N.D. Ill. Mar. 7, 2008) .............................................................. 24

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   2024 WL 1898512 (S.D.N.Y. May 1, 2024) ............................................................. 25

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs.*, Inc.,
2016 WL 466958 (M.D. Pa. Feb. 8, 2016) ................................................................. 27

*S.E.C. v. Desai*,
145 F. Supp. 3d 329 (D.N.J. 2015) ........................................................................... 26

*SEC v. Mintz*,
723 F. Supp. 3d 386 (D.N.J. 2024) ........................................................................... 30

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000) ..................................................................................... 20

*Sills v. United Nat. Foods, Inc.*,
2024 WL 4188324 (S.D.N.Y. Sept. 13, 2024) .......................................................... 24

*Staff Acct. Bull. No. 99*,
Release No. 99 (Aug. 12, 1999) ................................................................................ 14

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
2022 WL 17740482 (D.N.J. Dec. 16, 2022) ............................................................. 17

*Tellabs, Inc. v. Makor Issues & Rights*, Ltd.,
551 U.S. 308 (2007) ............................................................................................ 10, 22

*Vanderhoef v. China Auto Logistics Inc.*,
2020 WL 5105243 (D.N.J. Aug. 31, 2020) ............................................................... 26

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017) ..................................................................................... 11

## **Statutes**

15 U.S.C. §78u-4 (b)(1)(B) ............................................................................................ 11

**PRELIMINARY STATEMENT**

During the Chemours Company's ("Chemours" or the "Company") end of 2023 audit, its Board of Directors (the "Board") caught top management engaging in serious misconduct. An investigation by the Board's Audit Committee found that Defendants Newman (the CEO), Lock (the CFO), and Wisel (the Controller) had engaged in an ongoing and escalating scheme to delay payments that were due and to accelerate collections that were not yet due to be received in an effort to meet yearly Free Cash Flow (defined below) targets that had been publicly communicated and to increase their incentive compensation. During its internal investigation, the Board put Newman, Lock, and Wisel on administrative leave and they later resigned without ever returning to their positions. The Audit Committee determined that Newman, Lock, and Wisel had demonstrated a "lack of transparency" with the Board about their Free Cash Flow manipulation and had violated the portion of Chemours' Code of Ethics for the CEO, CFO, and Controller (the "Code of Ethics") that ***required them to "promote full, fair, accurate, timely and understandable disclosure…in documents…the Company files with the Securities and Exchange Commission and in other public communications***." Pls. Ex. 1.[1] Chemours also admitted four internal control deficiencies that had allowed Defendants to manipulate Free Cash Flow undetected.

Chemours attempts to rewrite history by claiming that its management did nothing wrong. For the purposes of this case, it is implicitly taking the position that its Board unjustly removed and smeared Newman, Lock, and Wisel. The Court should reject this self-serving narrative.

*Falsity.* Defendants made numerous misstatements about Chemours' cash flows. *First*, Chemours claims that its reporting of its 2022 Free Cash Flow and its key component Operating

---

[1] The Alexander Declaration filed alongside this brief attaches the Code of Ethics, which is incorporated into the Complaint, and referenced as "Pls. Ex. 1". Unless otherwise noted, emphases are added and internal citations and quotations are omitted in this and the other answering briefs.

1

Cash Flow was not misleading, but its own Board found that its SEC filings and other statements failed to "promote full, fair, accurate, timely and understandable disclosure." Additionally, intentionally shifting Free Cash Flow to meet targets is misleading to investors under SEC policies. *Second*, Defendants made statements throughout the Class Period purporting to explain what Chemours' Operating Cash Flow was "driven by" and why the Company had such poor results for the beginning of 2023 that self-servingly and misleadingly failed to disclose the significant impact of the intentional shifting of Operating Cash Flow into the end of 2022 from the beginning of 2023. *Third*, Defendants made numerous statements concerning Chemours' 2023 Free and Operating Cash Flow guidance that were misleading because of Defendants' undisclosed intention to artificially shift Operating Cash Flow from first quarter 2024 to fourth quarter 2023. Defendants also made misstatements when they certified that Chemours had effective internal controls while they were exploiting them for personal gain and by disseminating the Code of Ethics they violated.

*Scienter.* Plaintiffs also plead scienter. The Audit Committee found Defendants ***intentionally*** manipulated Free Cash Flow both to mislead investors about the Company's yearly results and to fraudulently increase their incentive compensation. When the Board started investigating them ***they tried to cover it up.*** The Board then put them on leave for the specific misstatements alleged in the Complaint. Defendants' scienter is also supported by the fact they exploited Chemours' ineffective internal controls to enrich themselves.

*Loss Causation.* Shareholders were badly damaged when Chemours' stock fell 12% and then 31%. The heightened standards of Rule 9(b) and the PSLRA do not apply to loss causation, and Plaintiffs are only required to plead a causal connection between the misrepresentation and the loss — the misrepresentation and disclosure do not need to be mirror images.

The Court should deny Chemours' motion.

2

## NATURE AND STAGE OF PROCEEDINGS

This is a putative securities fraud class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 for purchasers of Chemours' common stock, call options, and/or put options, between February 10, 2023 and February 28, 2024, both dates inclusive (the "Class Period"), and suffered compensable damages thereby. After consolidation, the Court appointed Cindy Nguyen as Lead Plaintiff and Nguyen and Named Plaintiffs Todd Masel and Jim Hayes filed the Amended Complaint ("Complaint", "¶_") on September 11, 2024 (D.I. 17). Defendants moved to dismiss on October 11, 2024 (D.I. 36-51). Plaintiffs oppose Chemours' Motion (D.I. 37).

## SUMMARY OF ARGUMENT

1.  Plaintiffs plead false and misleading statements and omissions. Point I.

2.  Plaintiffs plead scienter. Point II.

3.  Plaintiffs plead loss causation. Point III.

4.  Plaintiffs plead scheme liability. Point IV.

## STATEMENT OF FACTS

### A. Background of Chemours and Other Defendants.

Chemours is a chemical company with three reportable segments: Titanium Technologies ("TT"), Thermal & Specialized Solutions ("TSS"), and Advanced Performance Materials ("APM"). ¶36. Newman was CEO starting in July 2021 and was COO from June 2019 to June 2021 and CFO from July 2015 to July 2019. ¶28. Ralhan replaced Newman as CFO in June 2019 and served until June 19, 2023. ¶29. Lock replaced Ralhan as CFO in June 2023 and was VP of Corporate Development starting in 2018. ¶30. Wisel was Chief Accounting Officer, Controller, and principal accounting officer for Chemours' SEC filings starting in September 29, 2021. ¶31.

### B. Free Cash Flow Was One of Chemours' Most Important Metrics.

Chemours defines Free Cash Flow as "cash flows provided by (used for) operating

3

activities" ("Operating Cash flow") less "purchases of property, plant, and equipment" (also known as, "CAPEX"). ¶54. Manipulations of accounts receivable and payable directly impact Operating Cash Flow. *Id.* Chemours said it used non-GAAP metrics, including Free Cash Flow, "in order to…***provide investors with a better understanding of our performance…and provide for greater transparency*** [in]…its financial and operational decision-making" and that they were a "useful financial analysis tool that can assist investors in assessing our operating performance and…prospects." ¶55. Not meeting Free Cash Flow targets "could negatively impact the value of our business and adversely affect our stock price." ¶56. Chemours explained that Free Cash Flow was ***one of only two metrics*** that Chemours used to determine Defendants' annual ("AIP") and long term incentive pay ("LTIP") because they "focused…on ***the key areas that produce long-term sustained growth specifically***, Adjusted EBITDA and ***Free Cash Flow***" and that "***these measures reinforced the importance of earnings and cash generation to the achievement of Chemours' objectives, as well as their importance to shareholders***." ¶¶57, 229-235.

### C. Defendants Began the Class Period by Announcing $447 Million in Free Cash Flow for the Year 2022 and $1.5 Billion in Free Cash Flow Over the Last Three Years.

On February 9, 2023, Chemours released a Form 8-K touting its 2022 Free Cash Flow results to investors, stating that it "was $447 million [in 2022], demonstrating our continuing ability to generate strong Free Cash Flow" and that it had "delivered over $1.5 billion in Free Cash Flow over the last three years." ¶¶59, 119, 121. In the Q4 and Full Year 2022 Earnings Prepared Comments, Newman reiterated the Free Cash Flow results and said they showed the "ability to turn earnings into cash consistently." ¶135. Ralhan said: "Free Cash Flow continues to be a strength for the company," while referencing a slide of the 2022 results. ¶¶138-139.

Defendants also announced Free Cash Flow guidance of $350 million for 2023. ¶¶60-61, 123, 127, 146-147, 151. It was based on a projection of more than $750 million in Operating Cash

4

Flow — almost identical to Chemours' 2022 Operating Cash Flow, which was $754 million. *Id.*

Chemours' 2022 10-K stated what the Company's Operating Cash flow was "driven by": "the general global economic conditions *at any point in time*…, raw materials and energy prices, and industry-specific issues, such as production capacity and utilization." ¶132. Additionally, when an analyst asked about "headwinds to cash flow" at the beginning of 2023, Ralhan attributed them only to "the seasonality both for the TT business and the TSS business." ¶153.

**D. Defendants Announce Negative $210 Million in Free Cash Flow for the First Quarter of 2023, But Affirm Free Cash Flow Guidance of Over $350 Million for 2023.**

On April 27, 2023, Defendants announced *negative* $210 million in Free Cash Flow for the first quarter of 2023. ¶63. It was driven by *negative* $119 million in Operating Cash Flow, a decline of $121 million from the first quarter of 2022. *Id.*[2] Despite this, Chemours reaffirmed its 2023 Free Cash Flow guidance. ¶¶64, 159, 160, 168, 169, 177. According to FE-1, a former Senior Finance Manager, the guidance was achievable only if Defendants intended to manipulate Free Cash Flow since Chemours' business was not sufficiently seasonal or cyclical to generate such disproportionate Free Cash Flow later in the year. ¶¶107, 110.

Chemours' first quarter 2023 10-Q ("1Q23 10-Q") attributed its significant year-over-year decrease in Operating Cash Flow to "a decrease in our net income, changes in net working capital, and higher spend at our Fayetteville site" (¶163) and made a statement similar to the 2022 10-K about the generation of Operating Cash Flow (¶165). In Chemours' Q1 Earnings Prepared Remarks and 1Q 2023 Presentation, Defendants provided additional explanations for the poor first quarter, stating that it was due to "higher inventory primarily driven primarily by seasonal inventory builds across the business and lower sales volume in TT." ¶172; *see also* ¶¶173, 175. There was no

---

[2] It was only the second time since Chemours became a public company that it had negative first quarter Operating Cash Flow. In 2019, it had the much smaller loss of negative $44 million.

mention of intentionally shifting cash flow into the end of the previous year.

**E. Defendants Continue to Make Free Cash Flow Projections and Provide Misleading Explanations for Chemours' Poor Year-to-Date Cash Flow Results.**

On July 27, 2023, Chemours announced *negative* $207 million Free Cash Flow and *negative* $58 million Operating Cash Flow for the first six months of 2023. ¶183; Chemours Ex. ("Chem. Ex.") 12, D.I. 41 at 478. But it only cut its Operating and Free Cash Flow projections by $25 million to $725 and $325 million. ¶¶179-180, 188-192. Chemours' second quarter 2023 10-Q ("2Q23 10-Q") attributed the year-over-year decrease of year-to-date Operating Cash Flow to "lower earnings, changes in net working capital, primarily due to higher payment of payables due to timing of inventory build and higher cost of raw materials, and higher spend at our Fayetteville site." ¶183. It also made an Operating Cash Flow generation statement similar to earlier filings, but added: "We have a historical pattern of seasonality, with working capital use of cash in the first half of the year, and a working capital source of cash in the second half of the year." ¶185.

On October 27, 2023, Chemours announced that for the first nine months of 2023, it had Free Cash Flow of *negative* $163 million and Operating Cash Flow of $72 million. ¶199; Chem. Ex. 14, D.I. 42 at 113. It still projected $588 million in Operating Cash Flow and $188 million in Free Cash Flow. ¶¶195-196, 204-208. Chemours' third quarter 2023 10-Q ("3Q23 10-Q") made statements explaining the large year-over-year decrease in year-to-date Operating Cash Flow and how Chemours generated Operating Cash Flow similar to the ones in the 2Q23 10-Q. ¶¶199, 201.

**F. Defendants Repeatedly State that Chemours Had Effective Internal Controls.**

Chemours' 2022 10-K and 10-Qs each attached Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Newman and Ralhan (2022 10-K and 1Q23 10-Q) or Lock (2Q23 10-Q and 3Q23 10-Q), stating that they disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," and "[a]ny fraud, whether

or not material, that involves management…." ¶¶69, 210, 214, 217, 220. The filings further stated the CEO and CFO conducted an evaluation of the effectiveness of Chemours' disclosure controls and procedures and "have concluded [they] are effective." ¶¶70, 211-212, 215, 218, 221.

**G. In a Series of Disclosures, Chemours Admits That its Ineffective Internal Controls Allowed the Individual Defendants to Manipulate Free Cash Flow.**

1. <u>Chemours' Stock Drops When it Delays its 2023 Financial Results to Evaluate its Internal Controls and Complete a Related Internal Review.</u>

On February 13, 2024, after market hours, Chemours filed an 8-K stating that it was postponing the release of its financial results because it was *"evaluating its internal control over financial reporting...with respect to maintaining effective controls related to information and communications"*, and needed additional time for its Audit Committee "to complete a related internal review." ¶71. Chemours' common stock fell $3.85 per share from its closing price on February 13, 2024, or more than 12%, to close at $26.64 per share on February 14, 2024. ¶72.

2. <u>Chemours' Stock Plunges When it Announces that it is Placing Newman, Lock, and Wisel on Leave Pending Review of the Company's Managing of Working Capital, Including its Impact on Non-GAAP Metrics Within the Company's Incentive Plans.</u>

On February 29, 2024, before the market opened, Chemours stunned investors when it announced in a Form 8-K and a NT 10-K that it had again delayed filing its 2023 10-K and the Board had placed Defendants Newman, Lock, and Wisel on administrative leave pending the previously disclosed internal review by the Board's Audit Committee. ¶73. The scope of the investigation "include[d]…***the Company's practices for managing working capital, including the related impact on metrics within the Company's incentive plans, certain non-GAAP metrics included in filings made with the [SEC] or otherwise publicly released***…." *Id.* The Company further disclosed that it was evaluating "one or more…material weaknesses in its internal control over financial reporting…including the effectiveness of the 'tone at the top' set by certain members of senior management." ¶74. Chemours' stock plunged $9.05 per share from its closing price on

February 28, 2024, or more than 31%, to close at $19.67 on February 29, 2024. ¶77.

> 3. Chemours Admits the Individual Defendants Violated its Code of Ethics by Manipulating Free Cash Flow to Meet Targets and Increase Incentive Compensation

Chemours' March 7, 2024 Form 8-K, stated that the Audit Committee's review determined that Newman, Lock, and Wisel "engaged in efforts in the fourth quarter of 2023 *to delay payments to certain vendors that were originally due to be paid* in the fourth quarter of 2023 until the first quarter of 2024, and *to accelerate the collection of receivables* into the fourth quarter of 2023 *that were originally not due to be received* until the first quarter of 2024" and that this had the "*effect of significantly increasing the cash flow measures, including free cash flow, for the quarter ended December 31, 2023, with a corresponding anticipated decrease in these measures in the first quarter of 2024*." ¶¶80-81. "*[S]imilar actions…were taken in the fourth quarter of 2022*, resulting in a significant increase in these cash flow measures for the quarter ended December 31, 2022, and a decrease in these measures in the first quarter of 2023." ¶81. Newman, Lock, and Wisel "*engaged in these efforts in part to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers*." ¶80. It also "determined that *there was a lack of transparency with the [Board] by [Newman, Lock and Wisel*]" and they "*violated the Company's Code of Ethics applicable to the [CEO, CFO], and the Controller relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure*.'" ¶¶79-80, 224; Pls. Ex. 1.

The review was spurred by a report to the Chemours Ethics Hotline that was "not elevated to the General Counsel or the Audit Committee, until…the Company's year-end 2023 external audit" and that "failure resulted from inadequate controls and procedures …." ¶82. Chemours further stated it was evaluating one or more material weaknesses in its internal controls "including the effectiveness of the 'tone at the top' set by certain members of senior management" and that it

expected to report material weaknesses in its 2023 10-K. ¶83.

On March 22, 2024, Newman resigned and was "not entitled to any severance." ¶85.

4.  Chemours Admits that Defendants Manipulated $360 Million and $215 Million in Operating Cash Flow at the End of 2023 and 2022, Respectively.

On March 28, 2024, Chemours finally filed its 2023 10-K, which reaffirmed that the Audit Committee found that Newman, Lock, and Wisel had shown a "*lack of transparency with the [Board] with respect to working capital timing actions*…, *their effect on publicly communicated free cash flow targets*", and which also would be part of a key metric for determining incentive compensation…." ¶¶86, 89. The 2023 10-K disclosed that Chemours' management delayed payment of $100 million from fourth quarter 2023 until first quarter 2024 and accelerated $260 million in receivables into fourth quarter 2023 from first quarter 2024. ¶87. *The $360 million total accounted for almost 65% of Chemours' $556 million in 2023 Operating Cash Flow*. *Id.* Chemours further admitted that based on "seasonal trends and the impact of the approximate $360 million of fourth quarter 2023 working capital actions, *we currently expect our unrestricted cash and cash equivalents balance to decrease by approximately $600 million in the first half of 2024*, with a majority of the decrease occurring in the first quarter…" Chem. Ex. 20, D.I 42 at 303. According to FE-2, the manipulation required significant coordination — meetings started in October 2023 to delay payments until 2024, based on a "top-down" directive. ¶¶111-118.

Chemours further disclosed that senior management delayed $40 million in payments from fourth quarter 2022 until first quarter 2023 and accelerated $175 million of receivables into fourth quarter 2022 from first quarter 2023. ¶88. *The $215 million total was more than 28% of Chemours' $754 million in 2022 Operating Cash Flow and was greater than the $161 million it reported in fourth quarter 2022. Id.* They also manipulated $90 million at the end of 2021. ¶90.

The 2023 10-K identified "four control deficiencies relating to failure to set an appropriate

9

tone at the top, design and maintenance of effective controls related to information and communication, design and maintenance of effective controls related to evaluation and escalation of reports made to the Chemours Ethics Hotline, and design and maintenance of effective controls related to vendor master data in order to prevent unauthorized cash disbursements." ¶¶92-96. This led to a lack of transparency by former senior management regarding their delay of payments and acceleration of receivables. ¶94. The 2023 10-K detailed an extensive remediation plan. ¶¶97-98.

Further indicating the seriousness of Defendants' misconduct, the 2023 10-K added four new risk factors: (1) investigations by the SEC and US Attorney's Office for the Southern District of New York could "affect [Chemours'] reputation, results of operations, financial condition, and cash flows", (2) weak internal controls "could result in material misstatements in our financial statements that could go undetected", (3) "significant expenses" from the Audit Committee review and remediation, and (4) disruption to business due to senior management transitions. ¶¶99-103.

On April 25, 2024, Defendant Lock resigned and was "not entitled to severance." ¶104.

## ARGUMENT

To survive a motion to dismiss, a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine if the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 322-324 (2007). A complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims. *Twombly*, 550 U.S. at 545.

## I. PLAINTIFFS PLEAD MISREPRESENTATIONS AND OMISSIONS.

A securities fraud complaint adequately pleads a false or misleading statement by alleging

the "who, what, when, where, and how" of the fraud and specifying each statement and the reason or reasons why the statement is misleading. *Institutional Investors Grp. v. Avaya*, 564 F.3d 242, 253 (3d Cir. 2009); 15 U.S.C. §78u-4 (b)(1)(B). Plaintiffs allege that statements in three areas were materially misleading: (1) cash flow, (2) internal controls, and (3) Chemours' Code of Ethics.

**A. Defendants' Cash Flow Statements Were Misleading.**

Plaintiffs allege three types of misstatements concerning Chemours' cash flow were materially misleading: Those (1) concerning full-year and fourth quarter 2022 Free Cash Flow and Operating Cash Flow, ¶¶119, 121, 125, 130, 135, 136, 138-139, 141-144, 149, 156,  (2) explaining Operating Cash Flow generation and results, ¶¶132, 153, 163, 165, 172-173, 175, 183, 185, 199, 201 and (3) discussing 2023 Free Cash Flow and Operating Cash Flow guidance, ¶¶123, 127, 146-147, 151, 159-160, 168-170, 177, 179, 180, 188-192, 195-196, 204-208.

1.  The 2022 Free and Operating Cash Flow Statements Were Misleading.

 "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what [it] consisted of"); *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("disclosure required…is measured" by ability to "accurately inform", not "literal truth").

Defendants put Chemours' 2022 Free Cash Flow (and its component Operating Cash Flow), at issue. They repeatedly touted 2022 Free Cash Flow results to investors, emphasized the importance of measuring it by year, and stated it showed the strength of Chemours' business. The press release announcing its 2022 results stated that Chemours had "[2022] Free Cash Flow of $447 million [and]  delivered over $1.5 billion…over the last three years," ¶119, and that the 2022

11

results "demonstrate[ed] [Chemours] continuing ability to generate strong Free Cash Flow." ¶121. Furthermore, during the Q4 and Full Year 2022 Earnings Prepared Comments, Newman said Chemours' Free Cash Flow results reflected its "ability to turn earnings into cash consistently", ¶135, while referencing a slide of "Full Year 2022 Highlights" that included "Generated $447 million in Free Cash Flow." ¶136. Ralhan stated that "Free Cash Flow continues to be a strength for the company", while referencing a slide showing the Free Cash Flow numbers.  ¶¶138-139. [3] Chemours' 2022 10-K also included a table specifically devoted to Free Cash Flow. ¶130.

While it is true that Free Cash Flow is not the only non-GAAP metric that Chemours provides (Chem. Mot. at 14), it is **one of only two performance metrics it used for incentive pay** because it wanted to focus on "the key areas that produce long-term sustained growth specifically" and its selection "reinforced the importance of…cash generation to the achievement of Chemours' objectives, **as well as their importance to shareholders**." ¶¶57, 229-236.

Chemours argues that Defendants' statements cannot be misleading because its auditor did not find a GAAP violation and Plaintiffs do not allege one (Chem Mot. at 11), but that is wrong — Chemours made the same argument in another recent securities case and the court rejected it. There, Chemours argued that its disclosures about maximum possible environmental remediation liability were not actionable because it is "not a GAAP concept." *In re Chemours Co. Sec. Litig.*, 587 F. Supp. 3d 143, 155 (D. Del. 2022). Chief Judge Connolly held that "Defendants' argument misses the point" because "once Chemours chose to make that disclosure—even if not required by GAAP or otherwise—it had to speak truthfully." *Id.* Furthermore, a defendant can "'employ a GAAP-approved accounting standard…, but nonetheless violate the securities laws by failing to

---

[3] Defendants' characterization of Free Cash Flow as "strong" and use of similar terms were misleading (Chem. Mot. at 18) when used in conjunction with discussing the 2022 results because they show the importance of the *yearly* reporting of Free Cash Flow to Chemours and investors.

12

disclose additional information necessary to render its financial reports fair and accurate.'" *In re Under Armour Sec. Litig.*, 719 F. Supp. 3d 438, 456 (D. Md. 2024) (quoting *In re Michaels Stores, Inc. Sec. Litig.*, 2004 WL 7344746, at *4 (N.D. Tex. Dec. 13, 2004)); *see also In re Global Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d 319, 339-41 (S.D.N.Y. 2004) (same). Furthermore, the findings of a company's auditor do not immunize it from the securities laws. *See In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).

As alleged in the Complaint, it is the SEC's view that it is misleading to shift revenue to earlier quarters to meet publicly-issued guidance even if the sales and revenue in question were real and the way the company recorded the sales did not violate GAAP. ¶¶44-49. In the cease-and-desist order settling *In the Matter of Marvell Technology Group, Ltd*, Administrative Proceeding File No. 3-19454, 2019 WL 4447393, (September 16, 2019), the SEC found that Marvell made materially misleading statements when it announced its financial results without disclosing the impact of "pull-in" sales, i.e., sales where Marvell obtained an agreement from a customer to modify an existing sales order's scheduled shipment date from a subsequent quarter into a current quarter. *Id.* at *1-*3 n.2. Marvell failed to disclose that a "a significant portion of its revenue [9% and 11% in two different quarters] had resulted from the use of pull-ins intended to meet the company's public revenue guidance," "investors were left with the misleading impression that Marvell was able to meet its public guidance organically, through normal customer demand for its products," and "were unaware of the adverse impact that pull-ins were having on revenue and sales in future quarters." *Id.* at *5-6, *8. The cease-and-desist order did not mention GAAP.

Similarly, *In the Matter of Under Armour, Inc.*, Administrative Proceeding File No. 3-20278, 2021 WL 1737508, (May 3, 2021), the SEC found that Under Armour misled investors by failing to disclose that "a significant portion of its revenue [the SEC cites quarters where it was

13

4%, 8.5%, and 4.5%] and revenue growth had resulted from the use of pull forwards" because it left investors with a misleading impression about how Under Armour was beating revenue estimates and investors were unaware that this was compromising revenue from other quarters. *Id.* at \*9. The cease-and-desist order stated it did "not make any findings that revenue from these sales was not recorded in accordance with [GAAP]." *Id.* at \*2 n.2.

In the parallel securities class action, the court held that the SEC's findings concerning Under Armour were sufficient to plead Rule 10(b) falsity. *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 521–22 (D. Md. 2021). *See also Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 396, 402-403 (S.D.N.Y. 2018) (Free Cash Flow statements materially misleading when defendant "froze or delayed…payments to suppliers" to make annual benchmarks); *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 988 (W.D. Wis. 2003) ("If in fact Rayovac was threatening future sales by overloading its customers with product, a potential investor would likely want to be aware of this fact before deciding whether to purchase stock.").

This case is akin to *Marvell* and *Under Amour*. The SEC did not accuse them of "manufactur[ing]" sales (Chem. Mot. at 11 n.9) — it alleged they modified the schedule for existing sales by pulling them into earlier quarters, similar to how Chemours delayed payments "that were originally due to be paid in the fourth quarter of 2022 until the first quarter of 2023" and accelerated "the collection of receivables…into the fourth quarter of 2022 that were originally not due to be received until the first quarter of 2023." ¶88. What made Marvel and Under Armour's statements misleading, even though the sales occurred when the companies said they did, is they pulled sales forward to meet public targets and investors were unaware they were compromising future quarters. According to the SEC, the "intent of management….may provide significant evidence of materiality" and it is "particularly compelling" when it attempts to "'manage' reported earnings." *Staff Acct. Bull. No. 99,* Release No. 99 (Aug. 12, 1999).

14

This case is even stronger. *First*, Chemours' Board **admitted** that Defendants undertook the manipulation to "meet free cash flow targets that the Company had communicated publicly" and that they violated the portion of the Code of Ethics that states they shall "promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the [SEC] and in other public communications." ¶¶43, 79-80; Pls. Ex. 1. *Second*, Chemours' undisclosed manipulation of $215 million in fourth quarter 2022 resulted in **negative** $210 million in Free Cash Flow and **negative** $119 million in Operating Cash Flow for first quarter 2023 and led Defendants to make additional misleading statements about what caused such poor results. ¶¶63, 163, 172-173, 175. *Third*, the magnitude of the manipulation — more than the entire $161 million in Operating Cash Flow for fourth quarter 2022 and 28% of the entire 2022 Operating Cash Flow was significantly larger than the percentages in *Marvell* and *Under Armour*. *See* ¶88. The Complaint "plausibly" alleges that Defendants' statements were misleading.

The cases Chemours cites are distinguishable because they stand for the uncontroversial proposition that the omitted facts must be closely related enough to the alleged misstatements to make them misleading.[4] Here, **Chemours' own Board thought Defendants' statements** were misleading. Plaintiffs' claims are also nothing like *In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 116 (3d Cir. 2018), where errors across "myriad accounting categories" indicated mismanagement. Defendants' actions were the opposite of careless mismanagement — they ran a well-organized

---

[4] *Behrmann v. Brandt*, 2020 WL 4432536, at *9-*10 (D. Del. July 31, 2020) (company's financial results did not put at issue a scheme defendants did not participate in or the possibility that agreement would not be renewed); *Glover v. DeLuca*, 2006 WL 2850448, at *22 (W.D. Pa. Sept. 29, 2006) (no indication how company put its practice of paying down revolving credit line at the end of the quarter at issue, how the practice violated SEC policies, and it was possible to tell what the company was doing from its financial statements, which is not the case here); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403-404 (S.D.N.Y. 2016) (generic growth statements did not put illegal marketing scheme at issue); *Cheng v. Activision Blizzard, Inc.*, 2022 WL 2101919, at *9 (C.D. Cal. Apr. 18, 2022) (general mention of investigations not enough to put all investigations at issue).

and escalating scheme to manipulate cash flow.  ¶¶79-80.[5]

Additionally, contrary to Chemours' contention, Plaintiffs are not arguing that Defendants should have characterized their shifting of cash flow as improper — what made Defendants' statements misleading is that they did not disclose their actions at all.[6] Chemours argues that it disclosed the intentional Operating Cash Flow shifting in its 2022 10-K (Chem. Mot. at 12), but that is false. *First*, the statements Chemours points to purport to explain why Chemours had a **decrease** in Operating Cash Flow between 2021 and 2022, so a reader would think that the Company was saying that timing of payment and collection **decreased** Operating Cash Flow for 2022, when, instead, it dramatically increased it. Chem Ex. 10 at 48-50; D.I. 41 at 245-247. *Second*, these statements in no way indicate that the changes to the timing of payments were made intentionally. *Id.* No one reading these disclosures would understand that Defendants had intentionally moved $215 in Operating Cash flow in an effort to meet the Company's guidance.

Even if the disclosures had been more informative, dismissal would still be inappropriate since "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Enzymotec*, 2015 WL 8784065, at *16; *see also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004) ("Materiality…is…not typically a matter for Rule 12(b)(6) dismissal").[7]

---

[5] *In re Ocugen, Inc. Sec. Litig.*, 2024 WL 1209513, at *5 (3d Cir. Mar. 21, 2024), is easily distinguishable since it concerned whether defendants actually believed an opinion statement.

[6] In the cases Chemours cites, the plaintiffs' argument hinged on how the defendants characterized their conduct instead of the failure to disclose the conduct. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("plaintiffs argue that defendants' failure to disclose the tax scheme violated Regulation S–K, Item 503(c)"); *Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013) ("Plaintiffs argue that defendants should have described their development strategy as a 'failure'"); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 640 (3d Cir. 1989) (did not, *inter alia*, characterize studies as "meaningless" and costs as "out of control").
[7] In *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *11 (W.D. Pa. May 18, 2023), which Chemours cites, defendants disclosed FDA notices, the exact fact they allegedly omitted.

2. The Statements Explaining Cash Flow Generation and Results Were Misleading.

When defendants decide to explain the factors impacting results or causing a trend, they must not omit facts that make the explanation materially misleading to investors. *See, e.g., Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *10 (D.N.J. Dec. 16, 2022) (statement that increase in net sales was "driven by [favorable pricing] and lower rebate expenses" was misleading where it omitted that the company used wrong manufacturer price in Medicaid submissions); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 587, 588 (D.N.J. 2001) (statements about "volume-driven growth" were misleading due to omission of "questionable sales practices").

*"Operating Cash Flow Generation" Statements*. The 2022 10-K and three Class Period 10-Qs all contain statements explaining that Chemours' "operating cash flow generation is driven by, among other things, the general global economic conditions *at any point in time* and their resulting impacts on demand for our products, raw materials and energy prices, and industry-specific issues, such as production capacity and utilization." ¶¶132, 165, 185, 201. These statements are misleading since they put the time when Chemours generated Operating Cash Flow at issue, and a significant factor in the timing was the undisclosed intentional shifting.

The statements from the 2Q23 10-Q and 3Q23 10-Q added: "We have a historical pattern of seasonality, with working capital use of cash in the first half of the year, and a working capital source of cash in the second half of the year." ¶¶185, 201. This made those two statements even more misleading since it gave the impression that the seasonality was entirely based on a natural pattern. Even if it is true that Chemours' business was naturally seasonal, this was misleading since it self-servingly omitted that intentional shifting was a large factor in the appearance of seasonality.

Furthermore, the disclosure about Operating Cash Flow that Chemours made in its 2023 10-K, after the cash flow manipulation was already public, shows that disclosure of the intentional shifting of Operating Cash flow was necessary to accurately inform investors. To explain an

17

expected balance decrease of "unrestricted cash and cash equivalents", the 2023 10-K cited both "a historical pattern of seasonality" and "the impact of the approximate $360 million of fourth quarter 2023 working capital actions." Chem. Ex. 20, D.I 42 at 303.

*Additional Seasonality Statements.* Ralhan and the 1Q 2023 Presentation made statements explaining that the poor results for first quarter 2023 were due to the natural seasonality of Chemours' business. *See* ¶¶153, 172-173, 175. They were misleading since, as discussed, Defendants' intentional Operating Cash Flow shifting was a large contributor to those results and greatly increased the appearance of seasonality. The intentional shifting caused Free Cash Flow for first quarter 2023 to be *negative* $210 million instead of *positive* $5 million and Operating Cash Flow to be *negative* $119 million instead of *positive* $96 million. *See* ¶¶63, 163-164

*Statements Explaining Decrease in Year-to-Date Operating Cash Flow.* Each of the 10-Qs from 2023 made statements explaining why the year-to-date Operating Cash Flow was significantly lower than the comparative figure in 2022. ¶¶163, 183, 199. Omitting Defendants' intentional shifting of $215 million in Operating Cash Flow from first quarter 2023 to the fourth quarter of 2022 clearly rendered these misleading since it was a significant contributor to the year-over-year shortfall at the time each statement was made. In fact, the intentional shifting *made up the entire shortfall in the first quarter 2023 10-Q*. ¶¶163-164.

Defendants claim the statements are not misleading because one of the factors they listed is "changes in net working capital", but, as discussed above (*see* p. 16), there is no way that investors would have recognized such a vague statement as disclosing that Defendants intentionally shifted a significant amount of Operating Cash Flow in an effort to meet public guidance. Notably, the 2Q23  10-Q states that the decrease in Operating Cash Flow was, in part, "due to changes in net working capital, *primarily due to higher payment of payables due to timing of inventory build and higher cost of raw materials*…." ¶183. This is clearly saying that the

18

"changes in net working capital" were due to factors other than Defendants' intentional shifting.

      3.   <u>The 2023 Free and Operating Cash Flow Guidance Statements Were Misleading.</u>

While "'[t]he federal securities laws do not obligate companies to disclose their internal forecasts ... if a company voluntarily chooses to disclose a forecast or projection, that disclosure is susceptible to attack on the ground that it was issued without a reasonable basis.'" *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 191 (D.N.J. 2022) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997)); *see also In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *2 (D. Del. Feb. 7, 2020).

Defendants' statements about 2023 Free and Operating Cash Flow Guidance were misleading because they were made based on Defendants' undisclosed intention to artificially shift Operating Cash Flow from first quarter 2024 to fourth quarter 2023. Chemours admits that Defendants artificially shifted $90 million in Operating Cash Flow from 2022 to 2021 and $215 million from 2023 to 2022. ¶¶89-90. The pattern was clear — Defendants always intended to continue manipulating Operating Cash Flow in 2023, which they did by shifting ***$360 million***. *Id.*

Another indication that Defendants intended to manipulate Operating Cash Flow is, when they announced Free Cash Flow guidance of $350 million for 2023 at the same time they announced 2022 results, it was based on a projection of more than $750 million in Operating Cash Flow. ¶¶123, 127, 146-147, 151. This was almost identical to the $754 million that Chemours reported for 2022, ***which included $215 million in Operating Cash Flow shifted from 2023 to 2022***. *Id.* Even after Defendants announced that Free Cash Flow for the first quarter of 2023 was ***negative*** $210 million on ***negative*** $119 million in Operating Cash Flow, Defendants reaffirmed the same guidance. ¶¶159-160, 168-170, 177. Then, after Chemours reported it had Free Cash Flow of ***negative*** $207 million and Operating Cash Flow of ***negative*** $58 million for the first six months of 2023 (¶183), it only cut its Free and Operating Cash Flow guidance by $25 million each.

19

¶¶179-180, 188-192. The contrast between Chemours' Free and Operating Cash Flow results and Chemours' publicly stated guidance during 2023 show a clear intention to manipulate Operating Cash Flow to try to make up the difference at the end of the year. Indeed, according to FE-1, it was clear early in the year that it was the only way Defendants could make up the difference ¶¶107, 110. Also, the guidance statements that Defendants made when they announced their third quarter 2023 results on October 26-27, 2023, were made after Defendants had already started the process of shifting Operating Cash Flow from 2024 to 2023, according to FE-2. ¶¶ 114, 195-196, 204-208.

Defendants' public filings are not close to providing "meaningful cautionary" language for the PSLRA safe-harbor to apply, which must be "extensive yet specific to prevent a reasonable investor from relying on specific projections" and "must be substantive and tailored" to those projections. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000). As discussed above (p. 16), the disclosures that Chemours cites did not give any indication that Defendants were intentionally shifting Operating Cash Flow between years. Thus, investors were not warned about the risk at issue. *See Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017) (warning about changes to accounting interpretations or methods not sufficient to warn about misconduct). Also, Defendants had actual knowledge the guidance statements were misleading since it was their intention to meet them by intentionally shifting Operating Cash Flow.

**B. Defendants' SOX Certifications and Internal Controls Statements were Misleading.**

Defendants do not dispute that, contrary to their statements (¶¶210-222), Chemours' internal controls had material weaknesses throughout the Class Period. Instead, they argue that Defendants were not aware their conduct was inconsistent with effective internal controls. Chem Br. at 16. All Plaintiffs must do, however, is "specifically allege that the internal controls were deficient, such that Defendants were allowed to engage in the allegedly fraudulent behavior during the Class Period." *Enzymotec*, 2015 WL 8784065, at *16.

20

This case easily meets this standard because Chemours admitted that inadequate internal controls allowed Defendants to manipulate the timing of Free Cash Flow. ¶¶80, 82, 91-96. Furthermore, Courts have consistently held that defendants' statements that a company has effective internal controls are misleading when, as is true here, those defendants are taking advantage of the company's ineffective internal controls for their personal benefit. *See, e.g. Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, 2023 WL 1800963, at *1, 19 (D. Ariz. Feb. 7, 2023) (defendants were "motivated by lucrative compensation under a scheme pegged to certain financial performance metrics" to engage in accounting manipulations); *In re LendingClub Sec. Litig.,* 254 F. Supp. 3d 1107, 1116-1117 (N.D. Cal. 2017) (deficiencies related to tone at the top allowed CEO to take out loans for himself and family members); *Nykredit Portefolje Admin. A/S v. Propetro Holding Corp.*, 2021 WL 9037758, at *17 (W.D. Tex. Sept. 13, 2021) (related party transactions).[8]

### C. Defendants' Code of Ethics for the CEO, CFO, and Controller was Misleading.

Chemours' Code of Ethics for its CEO, CFO, and Controller is one page long with only four "Standards of Conduct". Pls. Ex. 1. One states that those officers "shall… ***promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the [SEC] and in other public communications***…" *Id*. Chemours' Board found that Defendants' Free Cash Flow manipulation violated this standard. ¶79.

Chemours claims that Code of Ethics statements cannot be misleading, but courts have rejected a brightline rule — they can be actionable when they contain "affirmative statements [that] would be misleading if [they] omitted material facts." *Allegheny Cnty. Employees' Ret. Sys. v.*

---

[8] *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *10, *26-*27 (D.N.J. Aug. 8, 2018), is easily distinguishable because defendants who signed SOX certifications and other internal control statements were not involved in the bribery scheme. In *In re Sanofi*, 155 F. Supp. 3d 402, plaintiffs did not allege that the company had inadequate internal controls. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999), does not involve internal controls.

*Energy Transfer LP*, 532 F. Supp. 3d 189, 222 (E.D. Pa. 2021) (unwritten policy of hiring uniformed officers contradicted Code even though it did not violate bribery laws). Here the statement is clearly affirmative, stating what the CEO, CFO, and Controller "shall" do. Chemours' proxy statements say that the Code of Ethics sets forth conduct the "CEO, CFO and Controller ***must uphold***." ¶41. The omitted fact is also material — people in the positions covered by the Code engaged a scheme to make misleading disclosures to investors and enrich themselves. ¶80.[9]

## II.  PLAINTIFFS PLEAD SCIENTER.

To plead scienter, plaintiffs must allege facts giving rise to a strong inference of "either reckless or conscious behavior." *Avaya,* 564 F.3d at 267. Allegations of "motive and opportunity" to commit fraud contribute to the inference. *Id.* The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 268-269 (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs,* 551 U.S. at 324. Thus, it can be inferred from "circumstantial evidence." *Burlington Coat Factory*, 114 F.3d at 1418.

### A.  The Inference of Scienter is at least as Compelling as any Competing Inference.

Chemours argues that the Complaint does not plead scienter by citing cases where the plaintiffs attempted to use the existence of accounting violations to show that the defendants made the misstatements with scienter. Chem Br. 21-23. But that argument is misdirection. Here, Plaintiffs do not rely on the mere fact that Defendants manipulated Free Cash Flow to show scienter. Instead, there are numerous other allegations not present in those cases showing that Defendants engaged in reckless or conscious misbehavior. *First*, the Board determined that the

---

[9] Chemours' cases do not concern a code that only applies to top officers or a finding by a board that the defendants violated the code by engaging in the misconduct. Chem. Mot. at 17.

22

Individual Defendants intentionally manipulated Free Cash Flow "to meet…targets that the Company had communicated publicly" in violation of Chemours' Code of Ethics. *Second*, the Individual Defendants' incentive compensation was tied to yearly Free Cash Flow. *Third*, Newman, Lock, and Wisel tried to hide the manipulation from the Board. *Fourth,* the Board put Newman, Lock, and Wisel on leave due to the manipulation and they later resigned. *Fifth*, the Individual Defendants exploited Chemours' weak internal controls.[10]

Chemours' argument that a nonculpable inference is more plausible is nonsensical. It relies on the contention that Chemours' own Board's decision to remove the Company's leadership team and accuse it of ethics violations was an unjust overreaction to unobjectionable behavior. The inference that the Board's reaction was due to intentional or reckless misconduct by the Individual Defendants is more plausible.

1.  <u>The Individual Defendants Intentionally Manipulated Free Cash Flow in an Effort to Meet Publicly Communicated Targets in Violation of Chemours' Code of Ethics.</u>

Chemours' Audit Committee did not just find that the Individual Defendants improperly shifted Operating Cash between years. It found that they ***took those actions intentionally*** "to meet free cash flow targets that the Company had communicated publicly" and that they "violated the Company's Code of Ethics…relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'" ¶¶79-80. *See comScore,* 268 F. Supp. 3d at 551 (company's admission of misconduct supported scienter); *Under Armour*, 540 F. Supp. 3d at 522 (SEC cease-and-desist order that, as discussed above, described pulling sales forward to meet guidance supported scienter).

Chemours claims that its Audit Committee only found that the Individual Defendants

---

[10] Plaintiffs' responses to scienter arguments specific to each Individual Defendant, including the FE statements about Newman and Ralhan are in the responses to their individual briefs.

violated the Code of Ethics due to their lack of transparency with the Board (Chem. Mot. at 25), but that is a misleading, self-serving interpretation of its disclosures. The provision of the Code of Ethics that Chemours' March 7, 2024 Form 8-K says Defendants violated states that the CEO, CFO, and Controller shall promote "full, fair, accurate, timely and understandable disclosure" in "documents that the Company *files with…the [SEC] and in other public communications*." ¶¶79, 224; Pls. Ex. 1. It makes no mention of communications with the Board. Thus, the best reading of Chemours' disclosures is that the Audit Committee found the manipulation of Free Cash Flow violated Chemours' Code of Ethics because it rendered Chemours' SEC filings and other public statements misleading.[11] *See Roth v. AON Corp.*, 2008 WL 656069, at *9 (N.D. Ill. Mar. 7, 2008) (post class period admission that defendants violated Code of Ethics supports scienter).

Chemours' admission of intentional misconduct concerning one key metric stands in contrast to *Hertz*, 905 F.3d at 116, where unfocused errors spread across accounting categories suggested mismanagement. Furthermore, the manipulation was significant (28% of Operating Cash Flow for 2022, more than all of the Operating Cash Flow reported for fourth quarter 2022, and almost 65% of the Operating Cash Flow reported in 2023, *see* ¶¶87-88) and involved the coordination of a large number of employees (¶¶111-118).[12] Accordingly, "[t]he more compelling inference is that these sophisticated Defendants" acted with scienter. *Sills v. United Nat. Foods, Inc.*, 2024 WL 4188324, at *12 (S.D.N.Y. Sept. 13, 2024). The findings of Chemours' independent auditor (Chem Mot. at 23) does not negate this. All the auditor found is that Chemours did not

---

[11] Additionally, while the March 7, 2024 8-K mentions the lack of transparency with the Board and violation of the Code of Ethics in the same paragraph, it says that Defendants violated the Code of Ethics "in connection with the actions described below" and then goes on to describe the Free Cash Flow manipulation. Chem. Ex. 18, D. I. 42 at 227.

[12] The cases that Chemours cites concerning the magnitude of the manipulation stand for the proposition that the size of the manipulation is not, by itself sufficient for scienter. Chem. Mot. at 28. There is additional compelling evidence of scienter here, however.

violate GAAP, which is not at issue in this case. Furthermore, even if Plaintiffs were trying to plead a GAAP violation, an independent auditor cannot be used to refute scienter so that Defendants are broadly immunized from the securities laws. *See Aldridge,* 284 F.3d at 83.

2. <u>The Close Tie Between Yearly Free Cash Flow and the Individual Defendants' Incentive Compensation Supports Scienter.</u>

When Chemours disclosed that the Individual Defendants intentionally manipulated Free Cash Flow to meet publicly communicated targets, it also stated Free Cash Flow was "part of a key metric for determining incentive compensation applicable to executive officers," clearly indicating that the Individual Defendants were motivated to manipulate it because it increased their incentive compensation. ¶80. Indeed, Free Cash Flow was only one of two performance metrics that Chemours used to determine how much each Individual Defendant earned under Chemours' AIP and LTIP incentive pay plans. ¶¶229-236. This supports the inference of scienter in two ways.

*First*, that incentive compensation was based on Free Cash Flow measured on a ***yearly basis*** undermines Chemours' argument that Defendants did not know what they were doing was wrong. Under the AIP plan, Chemours set a Free Cash Flow threshold each year that the Company had to exceed for the Individual Defendants to receive any AIP compensation at all based on that metric. ¶232. In 2022, Chemours only exceeded the threshold because of Defendants' manipulation and in 2023, Defendants' manipulation would have put it over the threshold if the Board had not caught it. ¶¶232-233. Likewise, LTIP was assessed on rolling three-year periods with a cut off at the end of the year. Given this, the argument that Defendants did not understand that internationally shifting Free Cash Flow between years was misleading strains credulity.

*Second*, Plaintiffs have alleged a motive that supports scienter because, as Chemours' disclosures admit, there was a direct link between the fraudulent statements and increased compensation for the Individual Defendants. *See San Antonio Fire & Police Pension Fund v.*

25

*Dentsply Sirona Inc.,* 2024 WL 1898512, at *7 (S.D.N.Y. May 1, 2024) (motive weighted in favor of scienter where channel stuffing allowed defendants to make bonus thresholds); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1029 (N.D. Cal. 2020) (bonus structure that incentivized defendants to report inflated revenue was "strong correlation" that supported scienter). As discussed further in the oppositions to the Individual Defendants' briefs, a large portion of compensation for each was based on the AIP and LTIP incentive plans, which were directly connected to yearly Free Cash Flow numbers that Defendants manipulated. *See also* ¶¶226-236.[13]

3.    "Lack of Transparency" with the Board Supports Scienter.

Another fatal flaw in Chemours' theory is: If Defendants believed their conduct was proper, why did they try to hide it from the Board? Chemours admitted in its 2023 10-K that there was a "lack of transparency with the [Board] by [Newman, Lock, and Wisel] with respect to working capital timing actions described above [and] their effect on publicly communicated free cash flow targets…." ¶89. Attempts to "cover up" fraud are evidence of scienter. *See Vanderhoef v. China Auto Logistics Inc.,* 2020 WL 5105243, at *3 (D.N.J. Aug. 31, 2020) (holding "[a]ttempts to cover up fraud demonstrate a high degree of scienter" where defendants "took steps to impede the internal investigation"); *S.E.C. v. Desai*, 145 F. Supp. 3d 329, 337 (D.N.J. 2015) (effort to mask misappropriation when confronted showed a high degree of scienter); *In re Nature's Sunshine Prod. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310-1311 (D. Utah 2007) (same).

---

[13] The cases Chemours cites did not show a direct link between the misrepresentation of a financial metric and increased compensation. *See City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 385 (D. Del. 2010) (defendants allegedly concealed a price fixing scheme); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 342 (D.N.J. 2007) (Defendants did not obtain any personal benefits). The argument that the lack of stock sales for three of the Defendants detracts from the inference of scienter (Chem. Mot. at 28) is irrelevant since they were financially motived by increased incentive compensation. Also, stock sales are not necessary to plead scienter. *See In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015).

4.  Putting Newman, Lock, and Wisel on Leave and Their Resignations Support Scienter.

*Cognizant*, 2018 WL 3772675, at *30-31, held a defendant's resignation was indicative of his scienter where Cognizant announced his resignation in the same 8-K filing as an internal investigation and FCPA violations, distinguishing *Hertz*, where the connection between resignation and misconduct was not clear. (citing *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs.*, Inc., 2016 WL 466958, at *5 (M.D. Pa. Feb. 8, 2016) and *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009)).

The facts of this case are even stronger than *Cognizant*. Newman, Lock, and Wisel did not just resign — the February 29, 2024 8-K stated that the Board had placed them on leave because of the internal review concerning "practices for managing working capital, including the related impact on metrics within the Company's incentive plans, certain non-GAAP metrics included in filings made with the [SEC]" and the March 7, 2024 8-K quickly followed up by stating that Defendants have not been transparent with the Board and had violated the Code of Ethics. ¶¶73, 79; *see also LendingClub,* 254 F. Supp. 3d at 1122 (resignation of CEO amid allegations that he exploited flaws in the company's internal procedures supported scienter).[14]

5.  Defendants' Exploitation of Weak Internal Controls Supports Scienter.

Chemours' disclosures indicate that Newman, Ralhan, and Lock falsely certified that Chemours had effective internal controls while they took advantage of its ineffective internal controls to execute their scheme to manipulate Free Cash Flow. ¶¶78-83, 210-222. This strongly supports scienter. *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 661 (N.D. Ill. 2021) (attesting to effective internal controls while directing account managers to improperly ship products early supported scienter); *LendingClub*, 254 F. Supp. 3d at 1121 (N.D. Cal. 2017) (strong

---

[14] *Kumar v. Kulicke & Soffa Indus., Inc.*, 2019 WL 5081896, at *9-*10 (E.D. Pa. Oct. 9, 2019), concerns corporate scienter in the absence of the scienter of any individual defendant.

27

inference of scienter for CEO where he must have known about weaknesses in internal controls because he engaged in self-dealing to inflate loan origination numbers).

*Hertz*, 905 F.3d at 117, does not help Defendants since it concerned mismanagement. Where, as here, the tone at the top deficiency concerns intentional conduct, it supports scienter. *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 135 (D. Conn. 2021) (distinguishing *Hertz*); *see also In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020) (tone at the top deficiency supported scienter where defendants withheld information). Chemours also claims that the internal controls deficiencies were not severe enough to support scienter, but they led to the removal of Chemours' top management and the 2023 10-K admitted they created an ongoing risk of "material misstatements…that could go undetected." ¶101.

### B. Each Individual Defendant's Scienter Should be Imputed to Chemours For Each Statement Regardless of Whether He or She was the Speaker.

Scienter of "a high managerial agent...who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance" is imputed to the corporation even if that agent did not make the statement at issue. *Cognizant*, 2018 WL 3772675, at *33 (imputing scienter of non-speaking defendant for SEC filings and sustainability reports); *Energy Transfer*, 532 F. Supp. 3d at 236-238 (individual defendants' scienter imputed where investor presentation speaker unidentified). Since each Individual Defendant was a "high managerial agent," the Court should impute scienter from each Individual to Chemours for all the statements in the Complaint, including the ones that were not attributed to that person  because the statements were all contained in SEC filings, posted on Chemours' website, or made on official earnings calls.[15]

### III. PLAINTIFFS PLEAD LOSS CAUSATION.

Loss causation is not subject to Rule 9(b) and the PSLRA; it just requires "some indication

---

[15] The only exception is that Ralhan cannot provide scienter for the statements after his departure.

of the loss and the causal connection," consistent with Rule 8(a). *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 348 (2005). "[Loss] causation is usually reserved for the trier of fact." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000). Chemours argues the cash flow misstatements lack loss causation, but confuses the standard — "[a]lthough a corrective disclosure must be related to the same subject as the misrepresentation… ***there is no requirement that the disclosure mirror the earlier misrepresentation***." *Urb. Outfitters,* 103 F. Supp. 3d at 655.

*First*, the February 29, 2024 disclosure easily meets this standard since it stated that Newman, Lock, and Wisel were put on leave pending an internal review that "included the Company's practices for managing working capital, including the related impact on metrics within the Company's incentive plans, certain non-GAAP metrics included in filings made with the [SEC] or otherwise publicly released, and related disclosures." ¶273. Free Cash Flow is only one of two non-GAAP metrics considered in Chemours' incentive plans and the only one directly concerning working capital. ¶¶57, 237. The Company also referred to the Free Cash Flow manipulation after the fact as "working capital timing actions." *See* ¶89. Chemours discusses how "working capital" and Free and Operating Cash Flow are connected in its brief and claims mentioning "changes in working capital" disclosed Free Cash Flow manipulation. Chem Br. at 4-6, 19. *See NortonLifelock*, 2023 WL 1800963, at *17 (disclosure of review by of non-GAAP metrics sufficient to plead loss causation). The huge 31% stock drop on February 29, 2024 and the partial rebound that Chemours mentions (Chem. Mot. at 29) is more evidence that the February 29 disclosure was enough to alert investors of the negative news. "[T]hat the stock price fell without a more complete and detailed disclosure…only goes to show that the tip of the iceberg was enough to cause the loss." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *21 (D.N.J. Aug. 17, 2005).

*Second*, both the February 13 and 29, 2024, disclosures pled loss causation for the cash flow statements because the internal investigation, delay of Chemours' 10-K, and reporting of

29

internal controls weaknesses was the foreseeable consequence of Defendants' Free Cash Flow manipulation. *See Kanefsky v. Honeywell Int'l Inc.*, 2020 WL 2520669, at *7 (D.N.J. May 18, 2020) (loss causation pled because SEC investigation and the corresponding stock drop was a foreseeable consequence of alleged fraud (citing *Ernst & Young,* 494 F.3d at 436)).[16]

## IV. PLAINTIFFS PLEAD SCHEME LIABILITY.

Chemours attempts to brush away scheme liability with a cursory argument that the deceptive conduct alleged here is simply the Defendants' misstatements, but ignores the allegations that Defendants "***engaged in efforts***" "to ***delay payments*** to certain vendors," and "to ***accelerate the collection of receivables***" into different accounting periods in order to meet Free Cash Flow Targets. *See, e.g.*, ¶¶80-81. These are deceptive actions taken by Defendants beyond the misstatements themselves, and suffice to state a claim for scheme liability for similar reasons that the allegations sufficed in *SEC v. Mintz*, 723 F. Supp. 3d 386, 407 (D.N.J. 2024), a case on which Chemours mistakenly relies. *Mintz* found a scheme claim because defendants' naked short selling scheme extended to trading counterparties and they tried to conceal the scheme. *Id.* Here, each manipulation of payables and receivables entailed a counterparty and Defendants obstructed the Audit Committee (*see,* ¶79). Additionally, as discussed above, the Complaint pleads scienter.

### CONCLUSION

Chemours' Motion should be denied in its entirety. If the Court dismisses any part of the Complaint, Plaintiffs respectfully request leave to file an amended complaint.

---

[16] *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123, (2021) concerns when the misrepresentation is generic and the corrective disclosure is more specific, which has no applicability here. *In re Aurora Cannabis Inc. Sec. Litig.*, 2023 WL 5508831, at *5 (D.N.J. Aug. 24, 2023) and *Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148, at *13 (D.N.J. Dec. 19, 2017) are inapposite because they both concern negative financial disclosures with no indication they were caused by fraud. *McCabe v. Ernst & Young, LL*P, 494 F.3d 418, 426 (3d Cir. 2007) just stands for the basic proposition that the misrepresentation or omission must proximately cause the loss, not that the corrective disclosure must be a mirror image of the misrepresentation.

Dated: December 20, 2024

Of Counsel:

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Brian B. Alexander, Esq.
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: balexander@rosenlegal.com

Respectfully submitted,

FARNAN LLP

/s/ *Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs and the Class*