**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| The Chemours Company Securities Litigation, | Case No. 24-cv-361-RGA |
| | <u>CLASS ACTION</u> |

**ANSWERING BRIEF IN OPPOSITION TO JONATHAN LOCK'S
<u>MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT</u>**

Dated: December 20, 2024

Of Counsel:

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Brian B. Alexander, Esq.
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: balexander@rosenlegal.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs and the Class*

**Table of Contents**

PRELIMINARY STATEMENT ............................................................................................... 1

NATURE AND STAGE OF PROCEEDINGS ........................................................................ 1

SUMMARY OF ARGUMENT .............................................................................................. 2

STATEMENT OF FACTS ..................................................................................................... 2

ARGUMENT .......................................................................................................................... 3

    I.     PLAINTIFFS PLEAD MISREPRESENTATIONS AND OMISSIONS FOR LOCK. ........................................................................................................................ 4

        A.    When Lock Directed Investors to Statements During the 4Q2022 and 1Q2023 Earnings Calls, He Adopted Them. ................................................ 4

        B.    The Operating Cash Flow Statements in the 2Q23 and 3Q23 10-Qs Were Misleading. ................................................................................................... 4

        C.    Lock Made the Statements Attached to the Form 8-Ks He Signed. ............. 5

        D.    Lock's SOX Certifications and Internal Controls Statements in his 2Q23 and 3Q23 10-Qs Were Misleading. ................................................................. 6

    II.    PLAINTIFFS PLEAD SCIENTER FOR LOCK. ............................................... 7

    III.    PLAINTIFFS PLEAD CONTROL PERSON LIABILITY FOR LOCK. ...................... 10

CONCLUSION .................................................................................................................... 10

## Table of Authorities

**Page(s)**

**Cases**

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
  2024 WL 3716137 (E.D. Pa. Aug. 8, 2024) ................................................................ 4, 5

*Dudley v. Haub*,
  2013 WL 1845519 n.5 (D.N.J. Apr. 30, 2013) ........................................................ 10

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004)............................................................................................ 8

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)......................................................................... 6

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ............................................................................. 7

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2018 WL 3772675 (D.N.J. Aug. 8, 2018) ................................................................. 9

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2020 WL 3026564 (D.N.J. June 5, 2020) ................................................................. 6

*In re DVI, Inc. Sec. Litig.*,
  2010 WL 3522086 (E.D. Pa. Sept. 3, 2010) ........................................................... 10

*In re eHealth, Inc. Sec. Litig.*,
  2023 WL 6390593 (N.D. Cal. Sept. 28, 2023) ........................................................ 4

*In re Great Atl. & Pac. Tea Co., Inc. Sec. Litig.*,
  103 F. App'x 465 (3d Cir. 2004) ................................................................................. 8

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
  2011 WL 3444199 (D.N.J. Aug. 8, 2011) ................................................................. 5

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010).......................................................................... 8

*In re Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................................................................... 10

i

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
　564 U.S. 135 (2011).................................................................................................................. 4

*Messner v. USA Techs., Inc.*,
　2016 WL 1466543 (E.D. Pa. Apr. 13, 2016) ............................................................................. 9

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
　142 F. Supp. 2d 589 (D.N.J. 2001) ........................................................................................ 10

*SEC v. Carter*,
　2011 WL 5980966 (N.D. Ill. Nov. 28, 2011) ........................................................................... 5

*SEC v. Desai*,
　145 F. Supp. 3d 329 (D.N.J. 2015) .......................................................................................... 8

*Tomaszewski v. Trevena, Inc.*,
　482 F. Supp. 3d 317 (E.D. Pa. 2020) ..................................................................................... 10

Plaintiffs submit this answering brief in opposition to Defendant Lock's Motion to Dismiss the Amended Class Action Complaint (the "Lock Motion") (D.I. 45). Plaintiffs incorporate their Answering Brief in Opposition to Chemours' Motion to Dismiss ("Answering Brief to Chemours" or "Ans. Br. to Chem."), in its entirety, including the defined terms therein.

## PRELIMINARY STATEMENT

Lock claims that he is "uniquely situated" in this case, but he was Chemours' CFO for the majority of the Class Period and one of three employees whom the Chemours Board put on leave because of Defendants' Free Cash Flow manipulation. The Board's Audit Committee specifically found that he: (1) intentionally manipulated payables and receivables in an effort to meet publicly communicated Free Cash Flow targets and increase his incentive pay, (2) violated the portion of Chemours' Code of Ethics that required him, as CFO, to promote "full, fair, accurate, timely and understandable disclosure…in…documents…the Company files with…the [SEC] and in other public communications," and (3) showed a lack of transparency with the Board about the Free Cash Flow manipulation. Furthermore, before he was promoted to CFO, he was Chemours' VP of Corporate Development and conducted Chemours' fourth quarter 2022 and first quarter 2023 earnings calls with the Company's CEO, Defendant Newman, and CFO, Defendant Ralhan, during which he directed investors to misleading prepared remarks and presentations about Chemours' 2022 Free Cash Flow. Accordingly, Lock cannot claim only a minor role in the fraud and evade liability. The Court should deny his motion.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs incorporate by reference the Nature and Stage of the Proceedings as described in their Answering Brief to Chemours. Plaintiffs oppose Defendant Lock's Motion (D.I. 45) here.

1

**SUMMARY OF ARGUMENT**

1. Plaintiffs plead that Lock made false and misleading statements. Point I.

2. Plaintiffs plead scienter for Defendant Lock. Point II.

3. Plaintiffs plead control liability under §20(a). Point III.

**STATEMENT OF FACTS**

Plaintiffs incorporate by reference the complete Statement of Facts as set out in the Answering Brief to Chemours, and here provide additional factual allegations pertinent to Lock.

Defendant Lock was appointed CFO in June 2023 and, prior to that, served as Chemours' VP of Corporate Development and Investor Relations starting in 2018. ¶30. As CFO, Lock's compensation was heavily dependent upon Chemours' Free Cash Flow. Only 29% of Lock's salary was base salary, while 22% was Annual Incentive Pay ("AIP"), and 49% was Long Term Incentive Pay ("LTIP"). ¶227.

As VP of Corporate Development, Lock conducted Chemours' 4Q2022 and 1Q2023 Earnings Calls with Defendants Newman and Ralhan. ¶¶134, 167. During the 4Q2022 Earnings Call, Lock directed investors to the February 9, 2023 Press Release (¶¶119-128) and the Q4 and Full Year 2022 Earnings Prepared Comments and related Earnings Presentation (¶¶135-154), which boasted about the 2022 Free Cash Flow results, stating "[a]s a reminder, our prepared remarks, a full transcript and an audio recording, plus our earnings deck has been posted to our website alongside our earnings release." (¶134). During the 1Q2023 Earnings Call, Lock, using the same language (¶167), directed investors to the April 27, 2023 Press Release (¶¶159-161) and the Q1 2023 Earnings Prepared Remarks and Presentation (¶¶168-178), which provided the 2023 Free Cash Flow Guidance and explained Chemours' poor first quarter while omitting Defendants' shifting of Free Cash Flow from the first quarter of 2023 to the fourth quarter of 2022.

2

After Lock became CFO, he signed and executed SOX certifications for the 2Q23 10-Q and 3Q23 10-Q, which contained misstatements concerning what was driving Chemours' Operating Cash Flow and the decrease in year-to-date Operating Cash Flow. ¶¶182-186; 198-202. Lock also certified that Chemours had effective internal controls and had disclosed "[a]ny fraud, whether or not material, that involves management." (¶¶217-222). Lock also signed the July 28, 2023 and October 26, 2023 8-Ks, which explicitly incorporated and attached, respectively, press releases stating Chemours' 2023 Free Cash Flow Guidance. (¶¶179-181; 194-197).

Chemours' Board placed Lock, along with Defendants Newman and Wisel, on leave pending the completion of the Audit Committee's internal review. ¶73. The Audit Committee then specifically found that Lock had manipulated payables and receivables and "engaged in these efforts in part to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers," "violated the Company's Code of Ethics applicable to the [CFO] relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure,'" and showed "a lack of transparency with the [Board]" concerning Defendants' Free Cash Flow manipulation. ¶79. On April 25, 2024, Lock resigned and "was not entitled to any severance." ¶104.

## ARGUMENT

Plaintiffs incorporate their Answering Brief to Chemours in its entirety. Plaintiffs address here only the arguments in Lock's Motion, which challenge Plaintiffs' pleading as to Lock's (1) false statements, (2) scienter, and (3) control person liability. Because Plaintiffs have sufficiently pled all three, Lock's Motion should be denied.

3

## I.   PLAINTIFFS PLEAD MISREPRESENTATIONS AND OMISSIONS FOR LOCK.

### A.   When Lock Directed Investors to Statements During the 4Q2022 and 1Q2023 Earnings Calls, He Adopted Them.

When Lock directed investors "to our prepared remarks" and stated that "a full transcript and an audio recording, plus our earnings deck has been posted to our website alongside our earnings release" during the Company's 4Q2022 (*see* ¶¶134, 119-128, 135-154) and 1Q2023 Earnings Calls (*see* ¶¶167, 159-161, 168-178), Lock incorporated the statements in those documents, making his statements misleading. Plaintiffs are not, as Lock contends, alleging he is liable for the statements of Ralhan and Newman. Rather, Plaintiffs allege that by incorporating the materially false statements, Lock's statements at the start of the presentations were misleading in and of themselves. *See Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 2024 WL 3716137, at *16, *26 (E.D. Pa. Aug. 8, 2024) (stating "[p]rior to the meetings, interested parties will be able to view the prepared materials by visiting our website [] under 'Presentations'" is sufficient to attribute the statements found at the link to the signer of the statement).

Lock further argues that under *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), he is not the maker of any "earnings release statements." *Janus*, however, does not extend so far as to absolve defendants who make statements that expressly incorporate false statements. As the court found in *Energy Transfer*, parties are considered to have adopted the false statements to which they direct investors. 2024 WL 3716137, at *26.[1]

### B.   The Operating Cash Flow Statements in the 2Q23 and 3Q23 10-Qs Were Misleading.

Lock signed the 2Q23 and 3Q23 10-Qs, which contained misstatements concerning

---

[1] *In re eHealth, Inc. Sec. Litig.,* is unavailing. There, the defendant was not the maker of the statements because the court found he could not be held accountable for the "extemporaneous oral statements of other corporate officers." 2023 WL 6390593, at *9 (N.D. Cal. Sept. 28, 2023). Here, Lock is directing the investors to pre-approved prepared comments and presentations.

Chemours' generation of its Operating Cash Flow and the decrease in the year-to-date Operating Cash Flow. ¶¶183-86; 199-202. The Answering Brief to Chemours explains why these statements were misleading. *See* Point I.A.2. Lock argues these statements were not misleading because the improper timing actions did not take place in the second or third quarter of 2023, but then refutes his own argument by acknowledging that the statements address *the fiscal year-to-date*. Lock Mot. at 5-6. Chemours admitted the Defendants shifted $215 million in Operating Cash Flow from first quarter 2023 to the fourth quarter of 2022, ¶88, greatly affecting the year-to-date Operating Cash Flow reported in the 2Q23 and 3Q23 10-Qs. For example, the $215 million was more than half of the $351 million decline in year-over-year Operating Cash Flow for the first half of the year. ¶183. Omitting the intentional shifting of Operating Cash Flow made these statements misleading.

Also, nothing in the "Operating Cash Flow Generation" statements (¶185, 201) tie them to a particular period, and they were clearly misleading given Defendants' ongoing scheme to manipulate Free Cash Flow at each year end. *See* Ans. Br. to Chem. at Point I.A.2. Also, according to FE-2, the Free Cash Flow manipulation for 2023 began in October. ¶114. Therefore, Lock signed the 3Q23 10-Q after he had begun to manipulate Free Cash Flow at the end of 2023. ¶198.

**C. Lock Made the Statements Attached to the Form 8-Ks He Signed.**

Lock signed the July 28, 2023, and October 26, 2023 8-Ks, which attached press releases containing false statements on Chemours' Free Cash Flow guidance. ¶¶179, 194. Lock claims he was not the "maker" of the false statements contained in the press releases since he "only" signed the 8-Ks attaching the press releases, not the press releases themselves. Lock's Mot. at 7. This argument fails because Lock "signed an SEC form (a form 8–K) as high ranking corporate officer" and the "electronic signature indicates that he 'made' the statements [in the press release]." *SEC v. Carter*, 2011 WL 5980966, at *3 (N.D. Ill. Nov. 28, 2011) (citing *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011)). Similarly, in *Energy*

5

*Transfer LP*, 2024 WL 3716137, at \*26, the court found, over the Defendants' *Janus* objections, that signing the 8-K directing the investors to slides incorporated the slides and made the defendant the "maker" of the slides' statements. Here, Lock did not just direct investors to the statements, but attached them to the 8-Ks as an exhibit, incorporating the press releases into the 8-Ks.[2]

Finally, at minimum this argument fails as to the July 28, 2023 8-K which explicitly incorporates the press release, stating without reservation it is "attached hereto as Exhibit 99.1 and is incorporated herein by reference." D.I. 45-1 at 307 (Lock Ex. 11). By incorporating the press release, Lock ratified and affirmed its contents. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 663 (S.D.N.Y. 2017) (by signing the statement "we would like to take this opportunity to reiterate the clarifications," defendant had "ratified and approved" the statements).

Lock also argues these statements were forward looking under the PSLRA's Safe Harbor. This argument fails for the reasons discussed in the Answering Brief to Chemours, at Point I.A.3.

### D. Lock's SOX Certifications and Internal Controls Statements in his 2Q23 and 3Q23 10-Qs Were Misleading.

Lock certified that Chemours had effective internal controls in the 2Q23 10-Q and 3Q 2023 10-Q. ¶¶217-222. As explained in the Answering Brief to Chemours, at Point I.B, these statements were misleading. Lock claims that those arguments do not apply to him because was not the CFO until June 2023. Lock's argument would apply if he had joined the Company in June 2023, but that was not the case. Before he was CFO, he served as the VP of Corporate Development and his duties included conducting Chemours' earnings calls with Defendants Newman and Ralhan. ¶¶134, 167. Accordingly, it is a reasonable inference that when the Board put Lock on leave for

---

[2] This is unlike *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at \*8, \*15 (D.N.J. June 5, 2020), since the question facing the court there was whether the **Chief Legal Counsel** could be held liable for the financial statements attached to the 8-Ks he signed. In contrast, the question here is whether Lock, **the CFO**, is the maker of **financial statements** attached to his 8-K.

his role in the Free Cash Flow manipulations, they did so because he had a role in both the 2022 and 2023 manipulations. *See* ¶81. Furthermore, as the Audit Committee found, Lock was heavily involved in the 2023 year-end manipulations, which, as FE-2 explained, required Free Cash Flow manipulation to begin before Lock certified Chemours' internal controls in the Q 2023 10-Q. ¶115.

## II.  PLAINTIFFS PLEAD SCIENTER FOR LOCK.

The scienter argument in the Answering Brief to Chemours, at Point II, applies with full force to Lock since the Board specifically found that he, along with Defendants Newman and Wisel, undertook the Free Cash Flow manipulation intentionally to "to meet free cash flow targets that the Company had communicated publicly and which also would be part of a key metric for determining incentive compensation applicable to executive officers," "violated the Company's Code of Ethics…relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure,'" showed a "lack of transparency with the [Board]…with respect to working capital timing actions," and was placed on leave due to the cash flow manipulation. ¶¶73, 79, 80, 89. He "knew or, more importantly, should have known they were misrepresenting material facts related to the corporation." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001). The specific arguments Lock makes in his Motion also fail.

*Incentive Compensation.* Lock claims that only a small fraction of his total compensation was affected by Free Cash Flow. Lock's Mot. at 8. This is wrong — Chemours' 2023 Proxy statement says that as CFO, only 29% of Lock's salary was base salary, while 22% was AIP and 49% was LTIP. ¶227, D.I. 45-1 at 80. The 2023 Proxy Statement also makes clear that Free Cash Flow comprised 42.5% of the AIP and 40% of the LTIP. *See also* Chemours' 2024 Proxy Statement at 37, 45, D.I. 45-1 at 80, 88, 89. This means that a significant portion of Lock's income depended on the Free Cash Flow, far from the "small fraction" he claims. As discussed further in the Answering Brief to Chemours, at Point II.A.2, this strongly supports Lock's scienter because

Chemours admitted there was a direct link between Lock's manipulation of Free Cash Flow and increased incentive compensation. *See also In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010) (finding that where the defendant stood to gain cash and would be able to exercise a stock option, this was no longer a generic corporate interest, but personal gain).[3]

*Audit Committee Findings.* Lock's argument that "the Company's statement expressly was cabined to Mr. Lock's dealings *with the Board* at the end of 2023, not to any public statement" is wrong. *See* Lock's Mot. at 8. The Committee found he "violated the Company's Code of Ethics applicable to the . . . [CFO] . . . relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'" ¶97. This provision of the Code of Ethics does not concern disclosure to the Board, but concerns "promot[ion of] full, fair, accurate, timely and understandable disclosure ***in reports and documents that the Company files with or submits to the [SEC] and in other public communications made by the Company***." ¶224; Pls. Ex. 1. Contrary to Lock's claim, then, the Audit Committee found that Lock made misleading public statements.

Furthermore, Lock completely avoids the question why he showed a "lack of transparency with the [Board]… with respect to working capital timing actions described above [and] their effect on publicly communicated free cash flow targets…." ¶89. His effort to cover up his actions strongly supports scienter. *See* Ans. Br. to Chem. at Point II.A.3; *SEC v. Desai*, 145 F. Supp. 3d 329, 337 (D.N.J. 2015), *aff'd*, 672 F. App'x 201 (3d Cir. 2016) (effort to mask conduct strongly supports scienter).

---

[3] The direct link between Lock's manipulation and his increased incentive compensation defeats his claim that "vague allegations concerning ordinary corporate motives do not support a strong inference of scienter." *See* Lock's Mot. at 8. It also makes the cases he cites easily distinguishable. *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (motive allegation simply the desire for successful acquisition and the potential for fees, present in every corporate transaction); *In re Great Atl. & Pac. Tea Co., Inc. Sec. Litig.*, 103 F. App'x 465, 469 (3d Cir. 2004) (general corporate success does not provide support under motive prong of scienter analysis).

*SOX Certifications.* As discussed above, the 2023 end of year Free Cash Flow manipulation took place before Lock certified Chemours' internal controls in the Q 2023 10-Q. ¶¶115, 217-218. Accordingly, Lock certified the effectiveness of Chemours' internal controls while exploiting them for personal gain. Additionally, based on the Audit Committee's findings there is every reason to believe that Lock knew about the Free Cash Flow manipulation long before doing so.

*Lock was Placed on Leave and Then Resigned.* As discussed at greater length in the Answering Brief to Chemours, at Point II.A.4, the February 29, 2024 8-K announced that Lock was being placed on leave because of the Audit Committee's internal review. That provides strong evidence of scienter. In an apparent attempt to argue that he instead left on good terms, Lock claims he did not leave the Company "empty handed," yet he cannot get around two facts. First, he was put on leave pending an investigation, and resigned following the investigation's findings accusing him of misbehavior. ¶73. Plaintiffs have, therefore, properly alleged "specific facts to refute the nonculpable explanation" for his departure. *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *31 (D.N.J. Aug. 8, 2018). Second, following the investigation, Lock resigned without any significant severance. ¶247. Upon leaving Chemours, Lock received the salary he was owed prior to his termination, stock which had already vested, and health insurance he was legally entitled to under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). *Id,* D.I. 45-1 at 20. Lock, therefore, did not receive anything he was not already owed.[4]

*Lock's Other Assertions Are Meritless.* Contrary to Lock's assertion, Plaintiffs' allegations are not based only on Lock's position at the Company — as discussed above and in the Answering Brief to Chemours, the Audit Committee made multiple findings about his culpability.

---

[4] This is fundamentally unlike *Messner v. USA Techs., Inc.*, 2016 WL 1466543, at *10 (E.D. Pa. Apr. 13, 2016), where one defendant received unearned payments and was retained as consultant and the other resigned four months after the restatement.

9

Lock also contends the strong inference of scienter alleged is negated because Plaintiffs did not allege that Lock engaged in insider trading. But "[w]hile insider sales can support an inference of scienter, they are not required." *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015). This is especially true where Defendants have strong non-insider trader motive allegation, such as the cash flow-dependent incentive compensation identified here. *See In re DVI, Inc. Sec. Litig.,* 2010 WL 3522086, at *9 (E.D. Pa. Sept. 3, 2010). Lock's cases do not hold otherwise. Finally, "there is no requirement that plaintiffs in a securities fraud action support their allegations with information attributed to confidential witnesses." *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 334 (E.D. Pa. 2020).

### III. PLAINTIFFS PLEAD CONTROL PERSON LIABILITY FOR LOCK.

Because Plaintiffs have pleaded a primary Section 10(b) violation, they have also pleaded a control person claim against Lock under Section 20(a), which imposes "liability upon anyone who 'controls a person liable under any provision of' the Exchange Act.'" *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 623 (D.N.J. 2001). As set forth above, Plaintiffs allege a predicate §10(b) violation. That Defendant Lock controlled the violation is manifest from the fact he made and adopted numerous false and misleading statements and SOX certifications. Accordingly, Plaintiffs' allegation of control is not based solely on position, but on the Audit Committee's findings about Lock's culpability in this scheme.[5]

**CONCLUSION**

Lock's Motion should be denied in its entirety. If the Court dismisses any part of the Complaint, Plaintiffs respectfully request leave to file an amended complaint.

---

[5] While Lock's culpable participation is clear, "the overwhelming trend in this circuit" is that "culpable participation does not have to be pled in order to survive a motion to dismiss." *Dudley v. Haub*, 2013 WL 1845519, at *20 n.5 (D.N.J. Apr. 30, 2013) (collecting cases).

Dated: December 20, 2024

Of Counsel:

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Brian B. Alexander, Esq.
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: balexander@rosenlegal.com

Respectfully submitted,

FARNAN LLP

/s/ *Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs and the Class*