# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| The Chemours Company Securities Litigation, | Case No. 24-cv-361-RGA<br><br>CLASS ACTION |

## ANSWERING BRIEF IN OPPOSITION TO DEFENDANT SAMEER RALHAN'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

Dated: December 20, 2024

Of Counsel:

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Brian B. Alexander, Esq.
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: balexander@rosenlegal.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs and the Class*

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................ 1

NATURE AND STAGE OF PROCEEDINGS .................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

    A.    Defendant Ralhan's Role in the Company, and Conduct During the Class Period ................................................................................................................. 2

    B.    A Former Employee Has Alleged that Ralhan Was Personally Involved in Manipulating Chemours' Free Cash Flows ................................................... 4

ARGUMENT ..................................................................................................................... 4

    I.    PLAINTIFFS PLEAD RALHAN'S SCIENTER ........................................... 5

    A.    The Misconduct Detailed by the Audit Committee and Ralhan's Statements During the Class Period Strongly Support Scienter ........................................ 5

    B.    That a Former Chemours Employee Personally Observed Defendant Ralhan Commit the Same Type of Misconduct Detailed by the Audit Committee Supports Scienter ................................................................................................ 8

    C.    Ralhan's Compensation Incentives and Stock Sales Shows Motive ........................... 9

    II.    PLAINTIFFS PLEAD CONTROL PERSON LIABILITY ......................................... 10

CONCLUSION.................................................................................................................. 10

i

## Table of Authorities

**Page(s)**

**Cases**

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ...................................................................................... 8

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009) ........................................................................................ 7

*Dudley v. Haub*,
2013 WL 1845519 n.5 (D.N.J. Apr. 30, 2013) ..................................................................... 10

*Dutton v. Harris Stratex Networks, Inc.*,
270 F.R.D. 171 (D. Del. 2010) .............................................................................................. 10

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .................................................................................................... 8

*In re Advance Auto Parts, Inc., Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020) .............................................................................. 10

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) .................................................................................................. 5

*In re Novo Nordisk Sec. Litig.*,
2018 WL 3913912 (D.N.J. Aug. 16, 2018) ............................................................................ 9

*In re Urb. Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ..................................................................................... 7

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ................................................................................................ 5, 6

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
720 F. Supp. 2d 517 (D.N.J. 2010) ......................................................................................... 9

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
834 F.3d 481 (3d Cir. 2016) .................................................................................................... 8

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
142 F. Supp. 2d 589 (D.N.J. 2001) ....................................................................................... 10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
   551 U.S. 308 (2007)................................................................................................... 5

*Waterford Twp. Police v. Mattel, Inc.*,
   321 F. Supp. 3d 1133 (C.D. Cal. 2018) .................................................................... 8

*Wu v. GSX Techedu Inc.*,
   2024 WL 3163219 (D.N.J. June 25, 2024).......................................................... 7, 8

Plaintiffs submit this answering brief in opposition to Defendant Ralhan's Motion to Dismiss the Amended Class Action Complaint (the "Ralhan Motion") (D.I. 48). Plaintiffs incorporate their Answering Brief in Opposition to Chemours' Motion to Dismiss ("Answering Brief to Chemours" or "Ans. Br. to Chem."), in its entirety, including the defined terms therein.

## PRELIMINARY STATEMENT

Defendant Ralhan served as Chemours' CFO during the majority of the years-long scheme that Chemours' management undertook to manipulate Free Cash Flow at year-end in an effort to meet the Company's publicly-communicated targets and increase their incentive compensation. Chemours' Board found that this manipulation violated the portion of Chemours' Code of Ethics for the CEO, CFO, and Controller that required them to "promote full, fair, accurate, timely and understandable disclosure" in SEC filings and other public communications. During that time, Ralhan certified the Company's manipulated cash flow figures and repeatedly touted and explained those figures on earnings calls with investors. Ralhan's argument is essentially that because he left Chemours part way through the Class Period and, therefore, escaped punishment from the Board when it exposed the scheme and disciplined the other Defendants who remained at the Company, he should evade liability. But the Court need not close its eyes to the misconduct detailed in the Board's findings, and can and should readily draw an inference of scienter from the well-pleaded allegations in the Complaint. Ralhan's Motion to Dismiss should be denied.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs incorporate by reference the Nature and Stage of the Proceedings as described in the Answering Brief to Chemours. Plaintiffs oppose Defendant Ralhan's Motion here.

## SUMMARY OF ARGUMENT

1. Plaintiffs plead scienter for Defendant Ralhan. Point I.

1

2. Plaintiffs plead control liability under Section 20(a). Point II.

## STATEMENT OF FACTS

Plaintiffs incorporate by reference the complete Statement of Facts as set out in their Answering Brief to Chemours, and here provide additional facts pertinent to Defendant Ralhan.

### A. Defendant Ralhan's Role in the Company, and Conduct During the Class Period

Defendant Ralhan started working for Chemours in November 2014. ¶29. He served as a VP of Finance from May 2016 to June 2019, and as the Company's CFO and Senior VP from June 2019 until he left the Company on June 19, 2023. *Id*. Before Defendant Ralhan ascended to the role of CFO and Senior VP, that role was held by Defendant Newman. ¶28. After Ralhan left the company, the role was held by Defendant Lock. ¶30. As Chemours' CFO, Ralhan was responsible for reviewing and certifying the Company's financial statements. ¶254.

Ralhan signed the February 9, 2023 Form 8-K press release that began the Class Period by announcing Chemours' Free Cash Flow results of $447 million for the full year 2022 and offering guidance for 2023. ¶¶119-33. On the Company's fourth quarter 2022 earnings conference call the next morning, Ralhan touted Chemours' Free Cash Flow repeatedly, including stating that "Free Cash Flow continues to be a strength for the company" when referencing the results. ¶¶138, 141, 143. Moreover, Ralhan stepped forward – even ahead of the CEO – to address an analyst's question about "headwinds to cash flow" at the beginning of 2023. ¶153. He attributed the headwinds to the purported seasonality of Chemours' business and reaffirmed the Company's strong guidance for future cash flows. ¶153. Ralhan also signed the 2022 10-K, which contained both the Free and Operating Cash Flow results and one of the statements about the drivers of Chemours' Operating Cash Flow generation. ¶¶129-33.

Ralhan was also serving as CFO when Chemours released its first quarter 2023 results. He signed the April 27, 2023 8-K, which attached a press release stating that despite reporting ***negative***

2

$210 million in Free Cash Flow and **negative** $119 million in Operating Cash Flow for the first quarter of 2023, Chemours still reaffirmed Free Cash Flow guidance of $350 million on $750 million in Operating Cash Flow. ¶¶158-160. During the Q1 2023 Earnings Prepared Remarks, Ralhan made two statements attributing Chemours' poor first quarter results to seasonal inventory build-up and decreased sales in the TT division. ¶¶172, 175. Defendant Ralhan also signed the 1Q23 10-Q, which contained the statement explaining the $121 million year-over-year decrease in Operating Cash Flow for the first quarter of 2023, and another statement about what was driving the generation of Chemours' Operating Cash Flow. ¶¶162-166.

Ralhan also signed the Company's 2022 10-K and 1Q23 10-Q SOX certifications, stating that he had evaluated the effectiveness of the Company's internal controls and procedures, and that those controls were effective. ¶¶210-16. Free Cash Flow was also a major factor in both Defendant Ralhan's AIP (annual incentive plan) and LTIP (long-term incentive plan) compensation, ¶229, with Ralhan receiving an additional $123,322 in AIP compensation in 2022 because of the manipulation, nearly 20% of his $625,000 base salary. ¶232. Even more significantly, according to the 2023 Proxy Statement, LTIP compensation was 49% of Ralhan's target yearly pay. ¶227. Because Free Cash Flow Conversion exceeded expectations, Ralhan earned 200% of his target of Performance Stock Unit ("PSU") equity awards for the 2020-2022 LTIP. ¶235. Finally, public filings disclosed Defendant Ralhan's intent to exercise stock options and make stock sales worth about $8.5 million during the Class Period. ¶¶239-41.

While Defendant Ralhan had left the Company by the time Chemours' Board announced the Audit Committee's findings on March 6, 2024, the Audit Committee detailed misconduct at the heart of Ralhan's role. It found that the manipulation of payables and receivables "violated the Company's Code of Ethics applicable to … the [CFO] …relating to the 'promot[ion of] full, fair,

accurate, timely and understandable disclosure" in submissions to the SEC and other public communications. ¶¶43, 79; Pls. Ex. 1. The Audit Committee further found that Chemours' ineffective internal control over financial reporting had allowed the manipulation to occur, and that significant manipulation of Operating Cash Flow had occurred at the end of both 2021 ($90 million) and 2022 ($215 million) when Ralhan was CFO. ¶¶81, 84-96.

### B. A Former Employee Has Alleged that Ralhan Was Personally Involved in Manipulating Chemours' Free Cash Flows

A Former Chemours Employee (FE-1), a Senior Finance Manager from 2016 to 2024 stated, based on personal knowledge, that Ralhan had long-running and direct involvement in manipulating free cash flow at Chemours going back to when Ralhan was a VP of Finance in 2018. ¶108. FE-1 stated that Ralhan attended daily meetings about delaying payables and accelerating receivables at that time, and that Ralhan was the one who directed which accounts would not be paid despite being due, in order to hit the Company's Free Cash Flow targets. ¶¶108, 255. Moreover, the statements of FE-1 and FE-2 show that the end of year free cash flow manipulations required extensive planning, including many team meetings involving large numbers of people. ¶261. FE-2 indicated that delaying payments at the end of the year to manipulate cash flow was a routine practice at Chemours, even though she viewed the practice as wrong. ¶¶115-18.

### ARGUMENT

Plaintiffs incorporate by reference their Answering Brief to Chemours in its entirety, including as to the falsity of the challenged statements. *See* Ans. Br. to Chem. at Point I. Plaintiffs address only the arguments that Defendant Ralhan puts forth in his Motion, which concern Plaintiffs' pleading as to Ralhan's (1) scienter, and (2) control person liability. *See* Ralhan Mot. at 2-3, 10. Because Plaintiffs have pleaded both, Ralhan's Motion should be denied.

## I.   PLAINTIFFS PLEAD RALHAN'S SCIENTER

To plead scienter, the Third Circuit requires plaintiffs to allege facts giving rise to a strong inference of "either reckless or conscious behavior." *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009). The inference need not be "of the smoking-gun genre," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 324 (2007), and can be drawn from "circumstantial evidence." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). Accordingly, Plaintiffs need not "point to any particular document or conversation" as providing the requisite state of mind, because the analysis "will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *See Avaya, Inc.*, 564 F.3d at 268-69.

### A.   The Misconduct Detailed by the Audit Committee and Ralhan's Statements During the Class Period Strongly Support Scienter

Ralhan argues that the Complaint does not plead scienter against him because "Plaintiffs' Complaint leans heavily on statements by the Company's Audit Committee that three other individuals—not Mr. Ralhan—violated the Company's Code of Ethics due to a lack of transparency with its Board." Ralhan Mot. at 1. Indeed, much of Ralhan's Motion boils down to the contention that, since the Audit Committee did not mention Ralhan by name, its findings cannot supply a strong inference that Ralhan knew about the manipulation. This is wrong.

*First*, Ralhan misconstrues the Audit Committee's Code of Ethics finding. The Code of Ethics provision that the Audit Committee determined that Chemours' management violated does not concern disclosure to the Board. Instead it states that the CEO, CFO, and Controller shall "promote full, fair, accurate, timely and understandable disclosure *in reports and documents that the Company files with or submits to the [SEC] and in other public communications made by*

5

*the Company*." ¶224; Pls. Ex. 1. The provision therefore relates to the filings and SOX certifications that Defendant Ralhan signed and the other statements he made as CFO.

*Second*, the Audit Committee found a years-long scheme to manipulate the payables and receivables at year-end to meet the Company's publicly-communicated cash flow targets that spanned at least the fourth quarters of 2021 ($90 million), 2022 ($215 million) and 2023 ($360 million). *See* ¶¶78-96. Accordingly, the Audit Committee admitted that Chemours' management was issuing misleading SEC filings and other public statements for years. Ralhan, who started serving as CFO in 2019, was CFO, and, therefore, responsible for reviewing and certifying the Company's financial statements, for the majority of that period.

*Third*, the Audit Committee determined that the CFO before Ralhan – Defendant Newman – and the CFO after Ralhan – Defendant Lock – were both aware of the manipulation. ¶254. It is unavailing to suggest that scienter somehow jumped over Ralhan, especially given he certified the cash flow numbers at issue and repeatedly addressed cash flows on earnings calls with investors during the Class Period, showing that he was aware of and responsible for the precise area in which the misconduct occurred. *See* ¶¶138, 141, 143, 153, 172, 175. Notably, he made multiple statements where he covered up the manipulation of Operating Cash Flow by blaming poor results at the beginning of 2023 on the seasonality of Chemours' payables and receivables. ¶¶153, 172, 175. *See Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("[T]he most powerful evidence of scienter is the content and context of [defendant's] statements themselves."). Similarly, Ralhan reaffirmed Chemours' robust full-year 2023 Free and Operating Cash Flow guidance despite poor results, showing his understanding that payables and receivables would be manipulated at the end of the year to make up the difference. ¶¶158-160. Furthermore, as discussed below, FE-1 said Ralhan was directly involved in manipulating Free Cash Flow starting in 2018. ¶108. To state the obvious,

the fact that Ralhan left the Company before the Audit Committee's investigation explains why he was not among the group of executives placed on administrative leave (subsequently adjudged to have shown a lack of transparency toward the Audit Committee's investigation). *See* ¶¶73, 79.

Ralhan cites *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 425 (D. Del. 2009), to support his argument that the Company's decision to place other individuals on leave does not support a finding of scienter against him. But Plaintiffs are not asking the Court to infer scienter based on the Company's decision to punish other individuals who remained at the Company, or merely based on Ralhan's job title. Rather, Plaintiffs are asking the court to infer scienter because Ralhan was both responsible for, and clearly knowledgeable about, Chemours' cash flows and the treatment of payables and receivables during the period that the Audit Committee found the scheme to be in effect. *See* ¶81.[1]

Courts have found scienter in similar situations to this one, where plaintiffs have pleaded that the substance of the misconduct fell within a particular defendant's purview. *See, e.g., Wu v. GSX Techedu Inc.*, 2024 WL 3163219, at \*27-28 (D.N.J. June 25, 2024) (inferring scienter where a particular subject matter fell within certain defendants' "workplace bailiwick," and commenting "[a]s for publicly-reported revenue numbers, that was plainly within the CFO's job description. And there are ample allegations in the Complaint that the CEO and the CFO were both focused on revenue numbers"); *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 652-53 (E.D. Pa. 2015) (finding scienter where plaintiffs alleged that defendants were directly involved with the

---

[1] *Roseville's* facts are also easily distinguishable — it declined to infer scienter of CEO and CFO defendants where the complaint contained no facts showing they were "part of or knew about the conspiracy" perpetrated by a group of lower level employees, explaining that it could not infer scienter against "corporate executives merely for failing to catch the purposefully fraudulent conduct of their subordinates." *Roseville*, 686 F. Supp. 2d at 425. Here there is no dispute that the scheme was undertaken by Chemours' top management.

relevant business activities, knew or reasonably should have known the truth, and omitted it when answering analysts' questions on the matter); *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228–230 (E.D. Pa. 2021) (finding scienter for individuals with detailed knowledge of a process and/or who personally oversaw the project).

**B. That a Former Chemours Employee Personally Observed Defendant Ralhan Commit the Same Type of Misconduct Detailed by the Audit Committee Supports Scienter**

FE-1's statement that she personally observed Ralhan playing a leading role in the manipulation of Free Cash Flows – in particular, that Ralhan attended daily meetings about delaying payables and accelerating receivables, and that it was Ralhan who directed which accounts would not be paid in order to hit Free Cash Flow targets, ¶¶108, 255 – further supports the inference of scienter. Ralhan argues that because FE-1's account predates the Class Period by several years it is therefore "untethered to any alleged misrepresentation or omission during the class period." *See* Ralhan Mot. at 5-6. To the contrary, that FE-1 personally observed Ralhan manipulating Chemours' cash flows before Ralhan was CFO makes it less likely that Ralhan was somehow unaware of the cash flow manipulation that, as the Audit Committee found, was going on when he was CFO. ¶108. *See GSX Techedu*, 2024 WL 3163219, at *28 n.40 (allegations from employees who worked for company outside of Class Period "[did] not require much" discounting); *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (FE "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period").[2] Finally, the statements of both Former Employees

---

[2] The cases Ralhan cites are inapposite. *See Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1154 (C.D. Cal. 2018)  (discounting of former employee allegations from before the class period because there was a dispute about inventory level during class period is irrelevant here, since there is no dispute that Free Cash Flow manipulation occurred); *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 495 (3d Cir. 2016) (finding that testimony of former employees not sufficiently detailed to address technical question of whether defendant was in exclusive possession of real property has no applicability here). In addition, FE-1's knowledge was firsthand

8

indicating that the end of year free cash flow manipulations required extensive planning, including many team meetings involving large numbers of people, make it less likely that these cash flow manipulations could have happened without the knowledge of the CFO, Ralhan. ¶¶107-118.[3]

### C. Ralhan's Compensation Incentives and Stock Sales Shows Motive

The fact that significant components of Ralhan's take-home pay were keyed off of Chemours' Free Cash Flow – which he was manipulating – and that Ralhan exercised stock options worth over $8.5 million before the stock dropped at the end of the Class Period, contribute to the already strong inference of scienter. While Ralhan claims that his stock sales were made pursuant to an option plan and tied to his departure from the Company, and that he continues to own extensive holdings of Chemours stock today, the fact remains that Ralhan not only profited during the course of the scheme, but he profited because of the scheme that was carried out on his watch. Courts have found this type of evidence of motive to contribute to a finding of scienter at the pleading stage. *See, e.g., In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *8 (D.N.J. Aug. 16, 2018) (share-based compensation structure contributed to inference of scienter).

Moreover, while Ralhan spends several pages discussing the minutiae of his stock option plan, he ignores the argument that his pay was tied to Chemours' Free Cash Flow during the Class Period; namely that LTIP made up a whopping 49% of his target pay in 2023 and that he received an additional nearly 20% of his base salary due to the manipulation in 2022 due to AIP. *See* ¶¶227,

---

unlike that provided by former employees in *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 540 (D.N.J. 2010), which Chemours cited in its brief.

[3] Along similar lines, the sheer magnitude of the manipulations – approximately 28% of the Operating Cash Flow in 2022 and more than the $161 million the Company reported for the entire fourth quarter of 2022, ¶259 – further undercuts the notion that Defendant Ralhan somehow did not know about them and therefore did not know the SOX certifications he was signing were erroneous. *See* Ralhan Mot. at 6-7. Additionally, as discussed further in the Answering Brief to Chemours at Part II.A.5, that Ralhan, like the other Individual Defendants, exploited Chemours' ineffective internal controls to improperly increase incentive pay supports his scienter.

232. This is the motive the Company ascribed to the Individual Defendants who were still at the Company at the time of the Report: "[T]he Audit Committee found that these individuals *engaged in these efforts in part to meet free cash flow targets that the Company had communicated publicly, and which also would be part of a key metric for determining incentive compensation applicable to executive officers*." ¶¶16, 80. This motive applies to Ralhan in the exact same way. *See* Ans. Br. to Chem. at Part II.A.2.

## II.  PLAINTIFFS PLEAD CONTROL PERSON LIABILITY

Because Plaintiffs have pleaded a primary Section 10(b) violation, they have also pleaded a control person claim against Ralhan under Section 20(a), which imposes "liability upon anyone who 'controls a person liable under any provision of' the Exchange Act.'" *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 623 (D.N.J. 2001). The sole case that Ralhan cites for the proposition that Plaintiffs have not alleged that he controlled the Company or that he was a "culpable participant" in the primary violation is a discussion, in a false statement case, about certain defendants who were not alleged to have seen, drafted or signed the statements at issue. *See In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *10 (D. Del. Feb. 7, 2020). Here, Ralhan made several of the misstatements at issue during his time as CFO, easily demonstrating culpable participation in the 10(b) violation. *See, e.g., Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 178-79, 181-82 (D. Del. 2010). In any event, "the overwhelming trend in this circuit" is that "culpable participation does not have to be pled in order to survive a motion to dismiss." *Dudley v. Haub*, 2013 WL 1845519, at *20 n.5 (D.N.J. Apr. 30, 2013) (collecting cases).

## CONCLUSION

Defendant Ralhan's Motion should be denied in its entirety. If the Court dismisses any part of the Complaint, Plaintiffs respectfully request leave to file an amended complaint.

10

Dated: December 20, 2024

Of Counsel:

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Brian B. Alexander, Esq.
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: balexander@rosenlegal.com

Respectfully submitted,

FARNAN LLP

/s/ *Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs and the Class*

11