**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| The Chemours Company Securities Litigation | Civil Action No. 24-361-RGA |

<u>MEMORANDUM OPINION</u>

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE; Phillip Kim, Laurence M. Rosen, Brian B. Alexander, THE ROSEN LAW FIRM, P.A., New York, NY,

     Attorneys for Plaintiffs.

Peter J. Walsh, Jr., Tyler E. Cragg, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Jonathan M. Moses, Canem Ozyildirim, WACHTELL, LIPTON, ROSEN & KATZ, New York, NY,

     Attorneys for Defendant The Chemours Company.

Raymond J. DiCamillo, Christine D. Haynes, Gabriela Z. Monasterio, RICHARDS, LAYTON & FINGER, P.A., Wilmington DE; David A. Gordon, Geeta Malhotra, Jacqueline Pruitt, SIDLEY AUSTIN LLP, Chicago, IL,

     Attorneys for Defendant Jonathan Lock.

Kelly A. Green, SMITH KATZENSTEIN JENKINS LLP, Wilmington DE; James J. Benjamin, Jr., Parvin D. Moyne, AKIN GUMP STRAUSS HAUER & FELD LLP, New York, NY,

     Attorneys for Defendant Camela Wisel.

D. McKinley Measley, Alec F. Hoeschel, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Michael S. Schachter, Todd G. Cosenza, Samantha G. Prince, WILLKIE FARR & GALLAGHER LLP, New York, NY,

     Attorneys for Defendant Sameer Ralhan.

Michael Busenkell, GELLERT SEITZ BUSENKELL & BROWN, LLC, Wilmington, DE; Guy Petrillo, Joshua Klein, Caelyn Stephens, PETRILLO KLEIN + BOXER, New York, NY,

     Attorneys for Defendant Mark Newman.

May 5, 2026

1

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before me are motions to dismiss filed by The Chemours Company (D.I. 36), and four individuals, Jonathan Lock (D.I. 43), Camela Wisel (D.I. 44), Sameer Ralhan (D.I. 47), and Mark Newman (D.I. 49) (collectively, "Individual Defendants"). I have considered the parties' briefing. (D.I. 37, 45, 46, 48, 50, 54, 55, 56, 57, 58, 60, 61, 62, 63, 64). For the reasons that follow, I GRANT Defendants' Motions to Dismiss and DISMISS the Amended Complaint (D.I. 17) without prejudice.

## I.    BACKGROUND

Plaintiffs bring an action against Chemours and the Individual Defendants for violations of Section 10(b) of the Securities and Exchange Act and Rules 10b-5(a), (b), and (c) promulgated thereunder. (D.I. 17 at ¶¶ 285-304). Plaintiffs also bring an action against the Individual Defendants for violations of Section 20(a) of the Securities and Exchange Act. (*Id*. at ¶¶ 305-309). The thrust of this action concerns allegedly misleading statements issued by Defendants which, upon revelation of their supposedly deceptive nature, resulted in significant decreases in the value of Chemours's[1] common stock price. (*Id*. at ¶¶ 1-20). The misleading statements in question are alleged to have been made between February 9, 2023 and February 29, 2024, and Plaintiffs seek to certify a class for individuals who purchased publicly traded Chemours stock, or put/call options relating to Chemours stock, from February 10, 2023 to February 28, 2024, inclusive.[2] (*Id*. at ¶¶ 1, 3, 13).

---

[1] The parties use "Chemours'" as the possessive." I prefer "Chemours's." Where I quote the parties, I defer to their orthography. Otherwise, I follow my preference.
[2] The reason why Plaintiffs do not seek to certify a class for individuals who traded Chemours stock or options on February 9, 2023 or February 29, 2024 is presumably because any alleged misrepresentations occurring on those days either occurred after market close on February 9, 2023 or before market open on February 29, 2024. (D.I. 17 at ¶¶ 3, 13).

Chemours is an industrial and specialty chemical company, whose common stock trades on the New York Stock Exchange. (*Id.* at ¶¶ 1, 27). The Individual Defendants served as Chemours's executive officers throughout the class period. (*Id.* at ¶ 28-31). The Individual Defendants were compensated in large part based on their ability to generate Free Cash Flow for Chemours. (*Id.* at ¶ 5). Free Cash Flow is a non-GAAP metric, "defined as Cash Flow Provided by Operations, less purchase of property, plant, and equipment." (*Id.* at ¶ 3).

Free Cash Flow was manipulable to some extent, as the following timeline of events will demonstrate. On February 13, 2024, Chemours postponed the release of its 2023 financial results, because "it needed additional time to complete its year-end reporting process and was evaluating its internal control over financial reporting with respect to maintaining effective controls related to information and communications." (*Id.* at ¶ 11) (cleaned up). In response to this news, the value of Chemours common stock dropped by approximately 12%. (*Id.* at ¶ 12). On February 29, 2024, Chemours announced that it had placed Defendants Newman, Lock, and Wisel[3] "on administrative leave pending the completion of an internal review being overseen by the Audit Committee of the Board of Directors [of] the processes for reviewing reports made to the Chemours Ethics Hotline and Chemours' practices for managing working capital, including the related impact on metrics within [Chemours's] incentive plans [and] certain non-GAAP metrics." (*Id.* at ¶ 13) (cleaned up). Chemours expressed its desire to "evaluat[e] one or more potential material weaknesses in its internal control over financial reporting . . . including the effectiveness of the 'tone of the top' set by certain members of senior management." (*Id.*). In

---

[3] Defendant Ralhan was not referenced in this disclosure, presumably because he ceased to serve as Chemours's CFO on June 19, 2023. (D.I. 17 at ¶ 29).

3

response to this news, the value of Chemours common stock fell by approximately 31%. (*Id.* at ¶ 14).

On March 6, 2024, Chemours disclosed that Defendants Newman, Lock, and Wisel were found to have "engaged in efforts in the fourth quarter of 2023 [and 2022] to delay payments . . . until the first quarter of 2024 [and 2023], and to accelerate the collection of receivables into the fourth quarter of 2023 [and 2022] that were originally not due to be received until the first quarter of 2024 [and 2023]." (*Id.* at ¶ 15). Chemours noted that Defendants Newman, Lock, and Wisel "engaged in these efforts in part to meet free cash flow targets that [Chemours] had communicated publicly, and which would also be a part of a key metric for determining incentive compensation applicable to executive officers." (*Id.* at ¶ 16). Chemours noted that Defendants Newman, Locke, and Wisel had "violated [Chemours's] Code of Ethics . . . relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'" (*Id.* at ¶ 17). Chemours admitted:

> [T]he combined accelerated collections and delayed payable[s] totaled $215 million in 2022 – more than 28% of the $754 million of the Cash Provided by Operating Activities that Chemours reported for the year and greater than the $161 million [Chemours] reported for the entire fourth quarter of 2022. In 2023, the manipulation was even greater – the $360 million in combined accelerated collections and delayed payables accounted for almost 65% of the $556 million of Cash Provided by Operating Activities that Chemours reported for 2023.

(*Id.* at ¶ 18).

In light of the foregoing, Plaintiffs plead that Defendants made three main categories of actionable misstatements: (1) Free Cash Flow Misstatements, (2) Internal Controls Misstatements, and (3) Code of Ethics Misstatements.

4

The Free Cash Flow Misstatements comprise various statements made by Defendants in a series of disclosures or communications regarding Chemours's financial metrics.[4] Plaintiffs allege that these statements were false or misleading, because, broadly speaking, they "failed to disclose that Chemours improperly delayed payables and accelerated receivables . . . [and] violated [Chemours's] Code of Ethics . . . relating to the 'promot[ion of] full, fair, accurate, timely and understandable disclosure.'"[5] (*See id.* at ¶¶ 120, 122, 124, 126, 128, 131, 133, 140, 145, 148, 150, 152, 154, 157, 161, 164, 166, 171, 174, 176, 178, 181, 184, 186, 193, 197, 200, 202, 209).

The Internal Controls Misstatements relate to various statements made by Defendants Lock, Newman, and Ralhan in connection with Sarbanes-Oxley ("SOX") required certifications attesting to the accuracy of Chemours's various financial disclosures. Plaintiffs allege that these statements were false or misleading, because, contrary to what the SOX certifications statements would suggest, "Defendants exploited weaknesses in Chemours' internal controls in financial reporting . . . to improperly delay payables and accelerate receivables . . . [and] because Defendants engaged in an intentional scheme to override internal controls and misrepresent Operating Cash Flow and Free Cash Flow in an effort to mislead investors and obtain larger incentive compensation." (*See id.* at ¶¶ 213, 216, 219, 222).

---

[4] Specifically, the statements at issue are found in (1) The February 9, 2023 Press Release and 8-K, (2) The 2022 10-K, (3) The 4Q 2022 Earnings Call and Presentation, (4) The Proxy Statement, (5) The April 27, 2023 Press Release and 8-K, (6) The 1Q23 10-Q, (7) The 1Q 2023 Earnings Call and Presentation, (8) The July 27, 2023 Press Release and July 28, 2023 8-K, (9) The 2Q23 10-Q, (10) The 2Q 2023 Earnings Call and Presentation, (11) The October 26, 2023 Press Release and 8-K, (12) The 3Q23 10-Q, and (13) The 3Q 2023 Earnings Call and Presentation.

[5] For the sake of concision, the quoted language is taken from Paragraph 120 of the Complaint (D.I. 17 at ¶ 120), because substantially similar language is used to describe the misstatements detailed in each of the other paragraphs.

The Code of Ethics Misstatements relate to the failure of Defendants Newman, Lock, and Wisel to "promote full, fair, accurate, timely and understandable disclosure in reports and documents . . . file[d] with or submit[ted] to the [SEC] and in other public communications made by [Chemours]." (*Id*. at ¶ 224). Plaintiffs plead that Defendants violated these provisions of the Code of Ethics, thus rendering the Code of Ethics false and misleading, because Defendants "improperly delayed payables and accelerated receivables in violation of Chemours' internal policies and SEC policies. (*Id*. at ¶ 225).

The Defendants subsequently filed Motions to Dismiss under Rule 12(b)(6) for failure to state a claim. (D.I. 36, 43, 44, 47, 49).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Federal Rule of Civil Procedure 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). I am "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d

Cir. 2002). A complaint may not be dismissed "for imperfect statement of the legal theory supporting the claim asserted." *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014).

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 12. That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the [complainant] pleads factual content that allows the court to draw the reasonable inference that the [accused] is liable for the misconduct alleged." *Id.* Deciding whether a claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

All securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Put another way, Rule 9(b) requires that a plaintiff set forth "the who, what, when, where, and how" of the alleged fraud. *Avaya*, 564 F.3d at 253. Under the PSLRA, plaintiffs must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"; and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u–4(b)(1) and 15 U.S.C. § 78u–4(b)(2)).

"To recover damages for violations of section 10(b) [of the Securities and Exchange Act] . . ., a plaintiff must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

7

causation.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460-61 (2013)). Under the PSLRA, the "materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (cleaned up). Although there is no affirmative duty to disclose all material information, disclosure is required if it is necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Id*. at 44 (quoting 17 C.F.R. § 240.10b–5(b)). Misrepresentations and omissions are immaterial as a matter of law only if they "are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 n.13 (3d Cir. 1993).

## III.   DISCUSSION

### A.  Material Misrepresentation

I begin by analyzing whether the statements at issue in this suit constitute actionable material misrepresentations or omissions by Defendants.

#### 1.  Free Cash Flow Misstatements

Defendants argue that the Free Cash Flow Misstatements do not constitute actionable omissions or misrepresentations, because

> Chemours actually received every dollar that it reported during the Class Period, in the quarter for which it was reported, based on legitimate sales that were properly recorded under recognized accounting principles. . . . For this reason, Chemours has not restated any of its financial statements . . . and [Plaintiffs] cannot [] dispute that Chemours fairly represents its cash flows during the Class Period. This, alone, is dispositive as to those statements.

(D.I. 37 at 11).

In support of this argument, Defendants cite *Berhmann v. Brandt*, 2020 WL 4432536, at *10 (D. Del. July 31, 2020), *report and recommendation adopted*, 2020 WL 5752389 (D. Del. Sept. 25, 2020) for the proposition, "Absent inaccuracies in a company's reported financial results, statements or omissions regarding those financial statements are generally not actionable."

Second, Defendants note, "Unable to dispute the accuracy of Chemours' accounting, Plaintiffs instead claim that Defendants' presentation of the company's cash flows was 'misleading' because Defendants 'failed to disclose that Chemours improperly delayed payables and accelerated receivables . . . in violation of Chemours' internal policies and SEC policies.'" (D.I. 37 at 12). Defendants argue, however, that "Chemours <u>did</u> disclose to investors that its cash flows were significantly impacted by discretionary 'timing' of payables and receivables" and that disclosures "specifically call[ing] out the major impact of the 'timing of payment on accounts payable and collection of [Chemours's] accounts receivable'" can be "found in all of the financial statements cited by the Complaint." (*Id.*). Specifically, "Chemours itemized the significant year-over-year change in receivables and payables — shifts that were 'primarily attributable' to, among other factors, 'the timing of collections from our customers' and 'the timing of payments to our vendors,' respectively." (D.I. 37 at 12 (quoting D.I. 41, Ex. 10 at 49-50)).[6] Defendants thus argue, "Plaintiffs cannot plead fraud by omission in the face of these express disclosures." (D.I. 37 at 12).

---

[6] D.I. 41 is Chemours's 2022 10-K. "Filings with the Securities and Exchange Commission are matters of public record of which [I] can take notice at the motion to dismiss stage." *Taylor v. Dover Downs, Inc.*, 543 F. Supp. 3d 39, 41 n. 7 (D. Del. 2021) (citing *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014)).

Plaintiffs do not dispute that Defendants made these disclosures, or substantially similar disclosures, in Chemours's various public filings with the SEC. Instead, Plaintiffs argue that Chemours's disclosures were misleading, because "these [disclosures] in no way indicate that the changes to the timing of payments were made intentionally. No one reading these disclosures would understand that Defendants had intentionally moved $215 [million] in Operating Cash flow." (D.I. 54 at 16). Plaintiffs further argue that when "defendants decide to explain the factors impacting results or causing a trend, they must not omit facts that make the explanation materially misleading to investors." (*Id*. at 17). After all, as the Supreme Court has noted, although there is no affirmative duty to disclose all material information, disclosure is required if it is necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives*, 563 U.S. at 44. The question, then, is whether Chemours's express disclosure regarding the timing of collections from its customers and the timing of the payment of its vendors would be materially misleading, without a concomitant disclosure that "a significant factor in the timing was the undisclosed intentional shifting." (*See* D.I. 54 at 17-19).

I think Plaintiffs have failed to make a good argument as to why Defendants' disclosure regarding the effects of the variable timing of payments and collections would have required a concomitant disclosure that the variable timing was caused by "intentional shifting." Plaintiffs cite no case law for this proposition, and it is rather opaque as to why, from the face of Plaintiffs' Complaint, or from their answering briefs, I should find that Defendants ought to have disclosed that the variable timing was specifically *intentional* in nature, given that Defendants had already disclosed that that timing constituted a "substantial factor" in influencing the amounts of accounts payable and accounts receivable at various points in time. The Third Circuit has held,

10

"Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts." *Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 639-40 (3d Cir. 1990). "Indeed, absent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or violations of a company's internal codes of conduct and legal policies." *Cheng v. Activision Blizzard, Inc.*, 2022 WL 2101919 at *9 (C.D. Cal. April 18, 2022) (quoting *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014)).

Plaintiffs point to two settlements between the SEC and private parties, *In the Matter of Marvell Tech. Grp.*, 2019 WL 4447393 (S.E.C. Sept. 16, 2019), and *In the Matter of Under Armour, Inc.*, 2021 WL 1737508 (S.E.C. May 3, 2021), in support of their argument that "it is the SEC's view that it is misleading to shift revenue to earlier quarters to meet publicly-issued guidance even if the sales and revenue in question were real and the way the company recorded the sale did not violate GAAP." (D.I. 54 at 13). Even assuming *arguendo* that this accurately characterizes the SEC's view as laid out in those consent orders, however, Plaintiffs fail to explain why those views should guide the decision I come to here.

First, as Defendants correctly note, "each [order] cautioned it was 'not binding on any other person or entity in . . . any other proceeding.'" (D.I. 61 at 3 (citing *Marvell,* 2019 WL 4447393 at *1 n.1; *Under Armour*, 2021 WL 1737508, at *1 n. 1)).

Second, I am hesitant to imbue these "un-adjudicated consent orders" (D.I. 61 at 3) with the degree of persuasive effect that Plaintiffs appear to impute to them. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S.

11

137, 177 (1803). To permit the SEC, as an executive agency, to mold the contours of the law, by means of unadjudicated consent orders, would strike me as permitting an unwelcome encroachment on that core province and duty of the judicial department.

Moreover, my disinclination to be persuaded by Plaintiffs' cited consent orders stems not merely from some desire to observe the formal separation of powers between the executive and judicial branches. As one legal scholar notes, the SEC is subject to political pressures or directives that can, and often do, change its enforcement priorities: "Enforcement practices changes in the face of changed capital markets, changed securities violations, and changed pressures on the SEC," whereas "Courts face no such constraints." Urska Velikonja, *Securities Settlements in the Shadows*, 126 Yale L.J.F. 124, 133 (2016). In addition, "Most consent agreements do not require the defendant to admit wrongdoing, and . . . a central characteristic of [] consent judgment[s]," as was the case in *Marvell* and *Under Armour*,[7] is thus "that [a] court [will] not [have] actually resolved the substance of the issues presented." Dorothy S. Lund, *Lessons from SEC v. Citigroup: The Optimal Scope for Judicial Review of Agency Consent Decrees*, 15 J. Bus. & Sec. L. 63, 72 (2014) (citation omitted). In light of the foregoing considerations, I don't think that a consent decree between the SEC and a non-party to the present lawsuit should enjoy much, if any, persuasive force as to the disposition of the present case.

In sum, Defendants disclosed that their cash flows were significantly impacted by the discretionary timing of their accounts payable and accounts receivable. But Plaintiffs have not

---

[7] "[W]ithout admitting or denying the findings herein, except as to the [SEC's] jurisdiction over it and the subject matter of these proceedings, which is admitted, Respondent consents to the entry of this order." *Marvell,* 2019 WL 4447393 at *1 n.1; *Under Armour*, 2021 WL 1737508, at *1 n. 1.

pointed to any case law suggesting that Defendants were under an obligation to disclose that this discretionary timing was affected or influenced by some intentional action on Defendants' part.[8] I am accordingly unpersuaded by Plaintiffs' argument that Defendants' failure to disclose the intentional nature of timing vis-à-vis the accounts payable and accounts receivable constitutes a material misrepresentation or omission under the Securities and Exchange Act.[9]

Plaintiffs raise one more argument in their answering brief. Chemours's 2022 10-K shows that Chemours had $820 million in "Cash provided by operating activities" in 2021 and $754 million in "Cash provided by operating activities" in 2022. (D.I. 41, Ex. 10 at 48). Chemours explained the difference between 2022 and 2021 by noting, "The *decrease* in our operating cash inflows for the year ended December 31, 2022 was primarily attributable to changes in [a variety of factors, including the] impact of timing of payment on accounts payable and collection of our accounts receivable." (*Id.*) (emphasis added). One page later, the 2022 10-K

---

[8] Other than the SEC consent orders, it appears to me that Plaintiffs' best cited source supporting the proposition that Defendants had to have disclosed that they intentionally influenced the timing of accounts receivable and accounts payable would be an SEC Bulletin from 1999. (D.I. 54 at 14); *Staff Acct. Bull. No. 99*, Release No. 99 (Aug. 12, 1999). Plaintiffs argue, "According to the SEC, the 'intent of management . . . may provide significant evidence of materiality' and it is 'particularly compelling' when it attempts to '"manage" reported earnings.'" Plaintiffs' selective excerpting is somewhat misleading, as the whole quotation in context runs, "*While the intent of management does not render a misstatement material*, it *may* provide significant evidence of materiality. The evidence may be particularly compelling where management has *intentionally misstated items* in the financial statements to 'manage' reported earnings." *Staff Acct. Bull. No. 99,* Release No. 99 (Aug. 12, 1999) (emphasis added). As I previously noted, there is no indication, from Plaintiffs' Complaint, that Defendants misstated, much less *intentionally* misstated, items in Chemours's financial statements, rendering this source marginal in utility for Plaintiffs, at best. At any rate, even if this Bulletin were more on point, I would still be hesitant to consider it for the same reason that I was hesitant to consider the SEC consent orders.

[9] I note that Defendants argue that some of the allegedly misleading statements would be inactionable as falling under the PSLRA's statutory safe harbor for forward-looking statements. (D.I. 37 at 15). Since I am finding them inactionable without consideration of the statutory safe harbor, I do not need to consider the safe-harbor argument.

13

shows that Chemours had $720 million at the end of 2021 in "Accounts and note receivable, net" and $626 million at the end of 2022 in "Accounts and notes receivable, net." (*Id*. at 49). Chemours explained this difference by noting, "The *decrease* in our accounts and notes receivable, net at December 31, 2022 was primarily attributable to lower net sales in the fourth quarter of 2022 when compared to the same period in 2021, as well as the timing of collections from our customers." (*Id*.) (emphasis added). Plaintiffs argue, "[T]he statements Chemours points to purport to explain why Chemours had a ***decrease*** in Operating Cash Flow between 2021 and 2022, so a reader would think that [Chemours] was saying that [the] timing of payment and collection ***decreased*** Operating Cash Flow for 2022, when, instead, it dramatically increased it." (D.I. 54 at 16).

Defendants do not appear to address this argument in their reply brief.[10] (D.I. 61). Perhaps that is because Plaintiffs do not allege in their Complaint that Defendants made any statements implying that the timing of collections would have negatively affected cash flows and that this was the reason why the 2022 10-K contained material misrepresentations. Under the PSLRA, plaintiffs must: "specify each statement alleged to have been misleading [and] *the reason or reasons why* the statement is misleading." *Tellabs*, 551 U.S. at 321 (citation omitted) (emphasis added). Instead, all Plaintiffs have pleaded as to the 2022 10-K was that the disclosures contained therein were "false and misleading when made because they failed to disclose that Chemours *improperly delayed payables and accelerated receivables . . .* in violation

---

[10] The closest Defendants get to addressing this argument is probably as follows: "When management accelerated collection on receivables, that decreased the (disclosed) year-end receivables. When management delayed payments to vendors, that increased the (disclosed) year-end payables." (D.I. 61 at 4). But this argument misses the mark, because the overall impact of the discretionary timing of the collection of receivables and payment of payables was that of increasing, and not decreasing, Chemours's 2022 Operating Cash Flow.

14

of Chemours's internal policies and SEC policies . . . and violated the Company's Code of Ethics . . . relating to the promot[ion of] full, fair, accurate, timely and understandable disclosure." (D.I. 17 at ¶ 131) (emphasis added). Plaintiffs' allegations of "improper delay" or "improper acceleration" of payables and receivables does not sweep in an argument about the effects of that delay and acceleration.

Therefore, the Complaint fails to plead that any of the "Free Cash Flow Misstatements" constituted a material misrepresentation or omission.

### 2. Internal Controls Misstatements

At issue are various SOX certifications signed by certain Individual Defendants attesting to the existence of effective internal controls at Chemours relating to financial reporting. (*See generally* D.I. 17 at ¶¶ 210-222).

Defendants argue that these "SOX certifications . . . concerning Chemours' internal controls . . . are 'statements of opinion or belief,' reflecting only 'defendants' perception of . . . internal controls.'" (D.I. 54 at 15 (quoting *S.E. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, at *48 (M.D. Pa. Aug. 18, 2022))). As such, Defendants continue, "[t]o plead the falsity of these opinion statements, Plaintiffs must present particularized facts showing that they (i) were not sincerely believed when made; (ii) contained an expressly embedded, untrue factual assertion; or (iii) reasonably implied untrue facts and omitted appropriate qualifying language." (D.I. 37 at 16 (quoting *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023) (cleaned up)).

Plaintiffs do not respond to Defendants' argument. Instead, Plaintiffs argue, "All Plaintiffs must do . . . is 'specifically allege that the internal controls were deficient, such that Defendants were allowed to engage in the allegedly fraudulent behavior during the Class

15

Period.'" (D.I. 54 at 20 (quoting *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015))).

I think Defendants have the better of this argument, since Plaintiffs' own case law does not support their position. The *Enzymotec* court noted, "[I]n contrast to the [SOX] certifications, [the plaintiffs] specifically allege that the internal controls were deficient, such that [the defendants] were allowed to engage in the allegedly fraudulent behavior during the Class Period." *Enzymotec*, 2015 WL 8784065, at *16. That is, the *Enzymotec* court found that the plaintiffs had adequately pleaded the existence of an underlying fraud, such that the SOX certifications attesting to adequate internal controls could in fact be construed as misleading. This makes sense: if there is no adequately pleaded fraud found in Chemours's financial statements, it is difficult for me to see how attestations that Chemours had in place adequate internal controls could be fraudulent.

As I noted earlier, Plaintiffs have failed to sufficiently plead the existence of an underlying fraud or misleading disclosure at Chemours. Therefore, I find that the Complaint has failed to adequately plead that any of the "Internal Controls Misstatements" constituted a material misrepresentation or omission.

### 3. Code of Ethics Misstatements

Finally, Plaintiffs note that Chemours's Code of Ethics states that its officers "shall . . . promote full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with or submits to the [SEC] and in other public communications[.]" (D.I. 54 at 21). Plaintiffs argue that pursuant to the Code of Ethics, Defendants should have disclosed that they "engaged [in] a scheme to make misleading disclosures to investors[.]" (*Id*. at 22 (citing D.I. 17 ¶ 80)). As noted above, I have already found that the Complaint fails to plead the existence of

16

an underlying materially misleading disclosure. As such, I find that the Complaint has also failed to adequately plead that any of the "Code of Ethics Misstatements" constituted a material misrepresentation or omission.

## B. The Individual Defendants

In order to plead a claim under Section 20(a), the Third Circuit has held that "the defendant must have been a culpable participant in the act or acts constituting the violation or cause of action." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013). Put another way, a Section 20(a) violation requires "that one person controlled another person or entity and that controlled person or entity committed a primary violation of the securities laws." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006).

Plaintiffs have not adequately pleaded the existence of a primary violation. It follows that Plaintiffs have not adequately pleaded Section 20(a) claims against the Individual Defendants.

## IV.   CONCLUSION

In sum, Plaintiffs fail to successfully plead any of their claims, and I will therefore dismiss the Complaint.[11] Plaintiffs request leave to file a second amended complaint. (D.I. 54 at 30). "The court should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). The deficiencies that I have identified in Plaintiffs' Complaint may be curable

---

[11] Because I dismiss due to Plaintiffs' failure to plead the existence of a material misrepresentation, I make no determination as to the other four issues raised by Defendants in the opening brief, namely, (1) whether certain statements at issue fall within the PSLRA's statutory safe harbor (D.I. 37 at 14-15), (2) whether Plaintiffs plead scienter (*id*. at 20-28), (3) whether Plaintiffs plead loss causation (*id*. at 29-30), or (4) whether Plaintiffs plead "scheme liability" under Rules 10b-5(a) and (c) (*id*.). If Plaintiffs move for leave to amend their Complaint, they should make whatever amendments, if any, they believe are necessary to meet Defendants' arguments on these subjects. They will not be given another opportunity.

by amendment. I will permit Plaintiffs to file a motion to amend their complaint so long as the

motion is filed by June 5, 2026.

An appropriate order will issue.